RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

ROBERT C. WALTERS, *pro hac vice forthcoming*
  rwalters@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201-2911
Telephone: 214.698.3100

JOHN B. QUINN, SBN 90378
  johnquinn@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN
LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
  bobfeldman@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone:  650.801.5000
Telephone:  650.801.5100

*Attorneys for Plaintiffs Talor Gooch, Hudson Swaf-*
  *ford, Matt Jones, Bryson DeChambeau, Abraham*
  *Ancer, Carlos Ortiz, Ian Poulter, Pat Perez, Jason*
  *Kokrak and Peter Uihlein*

WILLIAM V. ROPPOLO, *pro hac vice forthcoming*
  william.roppolo@bakermckenzie.com
BAKER McKENZIE LLP
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131 USA
Telephone:  305.789.8900

*Attorneys for Phil Mickelson*

*(additional counsel listed on signature page)*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PHIL MICKELSON, TALOR GOOCH, HUDSON SWAFFORD, MATT JONES, BRYSON DECHAMBEAU, ABRAHAM ANCER, CARLOS ORTIZ, IAN POULTER, PAT PEREZ, JASON KOKRAK and PETER UIHLEIN,<br><br>              Plaintiffs,<br><br>        v.<br><br>PGA TOUR, INC.,<br><br>              Defendant. | CASE  NO. 3:22-cv-04486<br><br>**NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER** |

Gibson, Dunn &
Crutcher LLP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on a date and time to be determined, or as soon as the matter may be heard, before the judge to be assigned of the United States District Court for the Northern District of California in the 450 Golden Gate Avenue, in the courtroom of the assigned judge, Plaintiffs Talor Gooch, Hudson Swafford, and Matt Jones ("TRO Plaintiffs") will and do move this Court for a temporary restraining order prohibiting Defendant from preventing Talor Gooch, Hudson Swafford, and Matt Jones from playing in the FedEx Cup Playoffs during the term of the Temporary Restraining Order. Defendant is prohibited from enforcing its Media Rights and Conflicting Events Regulations to punish Talor Gooch, Hudson Swafford, and Matt Jones for playing with a competing promoter or other activities related to LIV Golf during the term of the Temporary Restraining Order. Defendant is prohibited from enforcing its disciplinary procedures in connection with their play with a competing promoter or other activities related to LIV Golf on Talor Gooch, Hudson Swafford, and Matt Jones during the term of the Temporary Restraining Order. This motion is brought on the grounds that Defendant's restrictions are illegal under the antitrust laws, Defendant has breached its Regulations by refusing to abate TRO Plaintiffs' suspensions as it is required to under its Regulations, and Defendant's disciplinary procedures are unfair under state law. Plaintiff is likely to succeed on the merits, it will imminently suffer irreparable harm absent injunctive relief, and the balance of equities favors immediate injunctive relief.

DATED: August 3, 2022                    GIBSON, DUNN & CRUTCHER LLP

By:      */s/ Rachel S. Brass*
         Rachel S. Brass

RACHEL S. BRASS, SBN 219301
   rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone:    415.393.8200
Facsimile:    415.393.8306

Gibson, Dunn &
Crutcher LLP

ROBERT C. WALTERS, *pro hac vice forthcoming*
  rwalters@gibsondunn.com
SCOTT K. HVIDT, *pro hac vice forthcoming*
  shvidt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Telephone: 214.698.3100

JOSHUA LIPTON, *pro hac vice forthcoming*
  jlipton@gibsondunn.com
KRISTEN C. LIMARZI, *pro hac vice forthcoming*
  klimarzi@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500

JOHN B. QUINN, SBN 90378
  johnquinn@quinnemanuel.com
DOMINIC SURPRENANT, SBN 165861
  dominicsurprenant@quinnemmanuel.com
KEVIN TERUYA, SBN 235916
  kevinteruya@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
  bobfeldman@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone: 650.801.5000

*Attorneys for Plaintiffs Talor Gooch, Hudson Swafford,
Matt Jones, Bryson DeChambeau, Abraham Ancer,
Carlos Ortiz, Ian Poulter, Pat Perez, Jason Kokrak and
Peter Uihlein*

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
CASE NO. 3:22-cv-04486

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

**Pages**

I.  SUMMARY OF THE ARGUMENT ............................................................. 1

II. FACTUAL BACKGROUND .................................................................. 3

    A.  PGA Tour ....................................................................... 3

    B.  LIV Golf ........................................................................ 4

    C.  Anticompetitive Actions ......................................................... 5

    D.  Regulations ...................................................................... 6

    E.  The Tour's Star Chamber Disciplinary Process ................................... 7

    F.  Application of the Tour's Unfair Disciplinary Process to Harm Plaintiffs ........... 8

    G.  FedEx Cup Playoffs and TRO Plaintiffs ......................................... 10

III. LEGAL STANDARD ..................................................................... 11

IV. ARGUMENT ............................................................................ 11

    A.  TRO PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON THE MERITS ..... 11

        1.  The Tour Breached Its Regulations by Refusing to Abate TRO Plaintiffs' Suspensions Pending Appeal .............................. 11

        2.  The Tour Unlawfully Maintains a Monopoly Under Section 2 of the Sherman Act ........................................................ 12

        3.  The Tour Has Unlawfully Agreed With Others To Boycott Players Under Section 1 of the Sherman Act ............................. 19

        4.  The Tour's Appeal Process Does Not Justify The Suspensions, Both Because The Suspensions Were An Illegal Exercise of Monopoly Power, And Because They Were Unfair ............. 20

    B.  TRO PLAINTIFFS WILL SUFFER IRREPARABLE HARM ...................... 22

    C.  THE BALANCE OF THE EQUITIES WEIGHS IN TRO PLAINTIFFS' FAVOR .. 23

    D.  THE PUBLIC INTEREST SUPPORTS A TEMPORARY RESTRAINING ORDER ................................................................................ 25

V.  CONCLUSION .......................................................................... 26

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
CASE  NO. 3:22-cv-04486

Gibson, Dunn &
Crutcher LLP

**CASES**

AECOM Energy & Constr., Inc. v. Morrison Knudsen Corp.,
   748 Fed. App'x 115 (9th Cir. 2018)................................................................25

Alliance for the Wild Rockies v. Cottrell,
   632 F.3d 1127 (9th Cir. 2011)................................................................11

Axis Reinsurance Co. v. Telekenex, Inc.,
   913 F. Supp. 2d 793 (N.D. Cal. 2012) ................................................12, 21

Blalock v. LPGA,
   359 F. Supp. 1260 (N.D. Ga. 1973) ................................................................20

Boardman v. Pac. Seafood Grp.,
   2015 WL 13358335 (D. Or. June 8, 2015) ................................................14

Boardman v. Pac. Seafood Grp.,
   822 F.3d 1011 (9th Cir. 2016)................................................22, 24, 25, 26

Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.,
   No. CV 14-2307, 2014 WL 4679001 (C.D. Cal. Sept. 18, 2014)................25

Denver Rockets v. All-Pro Mgmt., Inc.,
   325 F.Supp.1049 (C.D. Cal. 1971), reinstated by Haywood, 401 U.S. 1204 (1971)................23

Disney Enter., Inc. v. VidAngel, Inc.,
   869 F.3d 848 (9th Cir. 2017)................................................................22

DNA Genotek Inc. v. Spectrum Sols. L.L.C.,
   2016 WL 8738225 (S.D. Cal. Oct. 6, 2016) ................................................26

Eastman Kodak Co. v. Image Tech. Servs., Inc.,
   504 U.S. 451 (1992) ................................................................................14

Ernst v. Cincinnati Bengals, Inc.,
   1976 WL 189949 (Ohio Ct. App. Aug. 30, 1976) ................................21

Fashion Originators' Guild of Am. v. FTC,
   312 U.S. 457 (1941)................................................................................20

FTC v. Ind. Fed. of Dentists,
   476 U.S. 447 (1986)................................................................14, 19

Gardella v. Chandler,
   172 F.2d 402 (2d Cir. 1949) ................................................................14

Gilder v. PGA Tour, Inc.,
   936 F.2d 417 (9th Cir. 1991)................................................................23, 25

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
CASE NO. 3:22-cv-04486

Gibson, Dunn &
Crutcher LLP

*Haywood v. NBA,*
    401 U.S. 1204 (1971) ....................................................................................................18

*Idaho v. Coeur D'Alene Tribe,*
    794 F.3d 1039 (9th Cir. 2015) .....................................................................................11

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
    125 F.3d 1195 (9th Cir. 1997) .....................................................................................18

*Int'l Boxing Club of N.Y. v. U.S.,*
    358 U.S. 242 (1959) ...........................................................................................2, 13, 15

*Jackson v. NFL,*
    802 F. Supp. 226 (D. Minn. 1992) ..............................................................................23

*Kapp v. NFL,*
    390 F. Supp. 73, 81 (N.D. Cal. 1974), *vacated in not relevant part,* No. C 72 537 WTS, 1975 WL 959 (N.D. Cal. Apr. 11, 1975), *aff'd,* 586 F.2d 644 (9th Cir. 1978), *and aff'd,* 586 F.2d 644 (9th Cir. 1978) ...............................................................................................................18

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
    232 F.3d 979 (9th Cir. 2000) .......................................................................................26

*Le v. Zuffa, LLC,*
    216 F. Supp. 3d 1154 (D. Nev. 2016) .........................................................................15

*Linseman v. World Hockey Ass'n,*
    439 F. Supp. 1315 (D. Conn. 1977) ............................................................................23

*Lorain Journal Co. v. U.S.,*
    342 U.S. 143 (1951) .....................................................................................................17

*Mackey v. NFL,*
    543 F.2d 606 (8th Cir. 1976), *overruled on other grounds by Brown v. Pro Football, Inc.,* 518 U.S. 231 (1996) ...............................................................................................................16

*McCune v. Wilson,*
    237 So. 2d 169 (Fla. 1970) ....................................................................................21, 22

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,*
    473 U.S. 614 (1985) .....................................................................................................22

*Nat'l Soc. of Pro. Eng'rs v. U.S.,*
    435 U.S. 679 (1978) .....................................................................................................18

*NCAA v. Alston,*
    141 S. Ct. 2141 (2021) ...........................................................................................13, 19

*NCAA v. Bd. of Regents of Univ. of Okla.,*
    468 U.S. 85 (1984) .................................................................................................16, 18

Gibson, Dunn &
Crutcher LLP

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
 472 U.S. 284 (1985)...................................................................................................19

*NYNEX Corp. v. Discon, Inc.*,
 525 U.S. 128 (1998)...................................................................................................20

*O'Bannon v. NCAA*,
 802 F.3d 1049 (9th Cir. 2015)...................................................................................13

*O.M. by & through Moultrie v. Nat'l Women's Soccer League, LLC*,
 544 F. Supp. 3d 1063, 1077 (D. Or. 2021), *appeal dismissed*, No. 21-35469, 2021 WL 4268938
 (9th Cir. Aug. 20, 2021).......................................................................................18, 23

*Ohio v. Am. Express Co.*,
 138 S. Ct. 2274 (2018)...............................................................................................16

*Paladin Assocs., Inc. v. Mont. Power Co.*,
 328 F.3d 1145 (9th Cir. 2003)...................................................................................13

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
 96 F.3d 1151 (9th Cir. 1996).....................................................................................12

*Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*,
 351 F. Supp. 462 (E.D. Pa. 1972)..............................................................................13

*Pinsker v. Pac. Coast Soc. of Orthodontists*,
 460 P.2d 495 (Cal. 1969)...........................................................................................21

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
 32 F.4th 824 (9th Cir. 2022).....................................................................................15

*Prop Sols., LLC v. GOPD, LLC*,
 2016 WL 8902589 (N.D. Ga. Dec. 8, 2016)...............................................................24

*Radovich v. NFL*,
 352 U.S. 445 (1957)...................................................................................................15

*Rebel Oil Co. v. Atl. Richfield Co.*,
 51 F.3d 1421 (9th Cir. 1995).....................................................................................14

*Rewolinski v. Fisher*,
 444 So. 2d 54 (Fla. Dist. Ct. App. 1984)...................................................................21

*Smith v. Pro-Football, Inc.*,
 593 F.2d 1173 (D.C. Cir. 1978).................................................................................19

*U. S. v. Dentsply Int'l, Inc.*,
 399 F.3d 181 (3d Cir. 2005).......................................................................................19

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
CASE  NO. 3:22-cv-04486

Gibson, Dunn &
Crutcher LLP

*U. S. v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003).....................................................................................19

*U.S. Football League v. NFL*,
    842 F.2d 1335 (2d Cir. 1988)................................................................................16

*U.S. v. E.I. duPont de Nemours & Co.*,
    351 U.S. 377 (1956)........................................................................................12, 14

*U.S. v. Grinnell Corp.*,
    384 U.S. 563 (1966)........................................................................................12, 13

*U.S. v. Richfield Oil Corp.*,
    99 F. Supp. 280 (S.D. Cal. 1951).........................................................................15

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
    857 F.2d 55 (2d Cir. 1988)..............................................................................2, 20

*Wash. State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.*,
    356 F.2d 371 (9th Cir. 1966).................................................................................15

*Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*,
    549 U.S. 312 (2007)........................................................................................13, 14

**STATUTES**

15 U.S.C. § 2 ....................................................................................................................12

15 U.S.C. § 26 ..................................................................................................................22

Defendant PGA Tour, Inc. (sometimes the "Tour") is a monopsonist. It controls the market for the services of professional golfers for elite golf events in the United States. The purpose of this action is to strike down the PGA Tour's anticompetitive rules and practices that prevent these independent-contractor golfers from playing when and where they choose.

Three of the Plaintiffs in this case, Talor Gooch, Hudson Swafford, and Matt Jones ("TRO Plaintiffs"), seek a temporary restraining order. Each of the three TRO Plaintiffs has qualified to play in the highly prestigious and lucrative FedEx Cup Playoffs, which begin in eight days. The Tour has unlawfully suspended the TRO plaintiffs from the Tour *for almost two years* and, as of yesterday, refused to stay these suspensions, as the Tour's own rules require. As we describe below, the Tour has imposed these suspensions solely because the TRO Plaintiffs chose to play in events sponsored by LIV Golf, a newly created golf promoter, as the Tour views LIV Golf as a threat to its long-standing domination of elite professional golf. Unless restrained, the Tour's impermissible suspensions will prevent the TRO Plaintiffs from playing in the FedEx Cup Playoffs, which will deny them a crucial opportunity to qualify for next year's premier professional golf events. The Tour thinks it is above the law. Yesterday, a Tour representative said, "**We hold all the cards** . . . . **We don't want those guys playing. We don't care what the courts say.**" Declaration of Rachel Brass ("Brass Decl.") Ex. 62 (emphasis added). Accordingly, the TRO Plaintiffs request that the Court prevent irreparable injury by restraining the Tour from enforcing its impermissible suspension of these players.

## I. SUMMARY OF THE ARGUMENT

The Tour has suspended Mr. Gooch, Mr. Swafford, and Mr. Jones for violating Tour restrictions that are illegal and unenforceable under the antitrust laws. TRO Plaintiffs appealed their suspensions to the Tour's Appeals Committee, and should, under the Tour's own regulations, be permitted to play in Tour events while their appeals are pending. But, only yesterday, the Tour informed Mr. Gooch that it would bar TRO Plaintiffs from the FedEx Cup Playoffs. The Tour's actions are aimed at harming these players' careers as part of its larger ambition to protect its monopsony against the nascent entry of LIV Golf. The Tour's violation of its own regulations underscores that it is employing its so-called disciplinary process to boycott players, LIV Golf, and all who would support them in introducing competition to elite professional golf. The TRO Plaintiffs respectfully request that the Court enjoin the

Gibson, Dunn & Crutcher LLP

Tour's suspensions and allow them to play in the FedEx Cup Playoffs, a high honor each earned through his superior play on the PGA Tour this year.

The Tour's abdication of its own disciplinary rules is but its latest act in its unceasing efforts to protect its unlawful monopsony. The Tour's ostensible 501(c)(6) tax-exempt purpose is to "promote the common interests of professional tournament golfers," yet it denies TRO Plaintiffs the opportunity to play in the potentially career-altering FedEx Cup merely because they play during their off-weeks for a competing golf promoter.

TRO Plaintiffs have dedicated years of their lives to the Tour, playing in over one hundred Tour events each, and well over this season's minimum number of Tour-required events. Through superb play, each qualified for the FedEx Cup Playoffs, an event critical to the TRO Plaintiffs' careers. Indeed, the Tour itself describes the FedEx Cup Playoffs as the "pinnacle"—"if not the No. 1 goal, it's certainly a top goal for every single player" each golf season. Brass Decl. Ex. 1. Entry into next year's Majors (Masters, PGA Championship, U.S. Open, and The Open), as well as into the Tour's premier invitationals, is earned in the FedEx Cup. Large bonuses, big purses, substantial retirement plan payments, sponsorship, branding, and important business opportunities are at stake.

The Tour is denying TRO Plaintiffs entry into the Playoffs by imposing career-threatening suspensions until March 31, 2024, as punishment for playing in two events sponsored by LIV Golf with a threat of increased exclusion if they ever again play for LIV Golf. The Tour's suspensions are unlawful acts in furtherance of the its efforts to prevent competition for professional golfers' services for elite events. *See, e.g.*, *Int'l Boxing Club of N.Y. v. U.S.*, 358 U.S. 242, 254 (1959) (boxing club violated antitrust law through its "control of contending [championship] boxers through exclusive agreements"); *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 69 (2d Cir. 1988) (tennis council's agreements that "discourage players from participating" in any non-council events were unlawful group boycott).

The Tour has enforced its Regulations to ensure that golfers—whom the Tour freely acknowledges are independent contractors—are not permitted to play for any other promoter that the Tour deems a threat to its monopoly. Through a two-year campaign to intimidate golfers, the Tour has threatened unlawful lifetime suspensions for any golfer who plays for a new entrant. The Tour has also

Gibson, Dunn &
Crutcher LLP

1 unlawfully agreed with the European Tour to ensure that any player who plays for LIV Golf would be
2 cut off from access to the golf "ecosystem." The Tour has even leaned on those who operate the Majors
3 to call into question whether golfers who play in LIV Golf will qualify for future Majors. And the Tour
4 has threatened agents, vendors, and sponsors with dire consequences if they do business with LIV Golf.

5        The Tour has historically embraced its members' playing on other tours—so long as those tours
6 respect the Tour's monopsony by staying out of the United States. But because the Tour views LIV
7 Golf as threatening its monopsony, the Tour responded by imposing career-threatening suspensions
8 when the TRO Plaintiffs sold their services to this competing buyer. The Tour's actions are obviously
9 anticompetitive, as they serve no purpose but to thwart competition and maintain its monopsony. Even
10 setting aside antitrust issues, the proceedings by which the Tour imposed the suspensions have proven
11 biased, predetermined, and contrary to the Tour's own requirements. TRO Plaintiffs therefore request
12 that the Court enjoin their suspensions so they can avoid irreparable harm they would otherwise suffer.

## II.   FACTUAL BACKGROUND

### A.   PGA Tour

15        The PGA Tour is a 501(c)(6) tax-exempt member association that describes itself as "the
16 world's leading professional golf tour" and "second to none due to the strength of its members." Brass
17 Decl. Ex. 2. Until LIV Golf's recent entry, top golfers had no alternative to pursue their careers except
18 through the Tour. Declaration of Talor Gooch ("Gooch Decl.") ¶ 3; Declaration of Hudson Swafford
19 ("Swafford Decl.") ¶ 3; Declaration of Matt Jones ("Jones Decl.") ¶ 3; Expert Declaration of Dr. Jeffrey
20 Leitzinger, Ph.D. ("Leitzinger Decl.") ¶¶ 18, 50.[1] Professional golfers who qualify for Tour member-
21 ship invariably compete on the Tour, as it offers by far the largest tournament purses, the greatest
22 opportunities to qualify for the Majors, the greatest exposure in the golf world and beyond, and the
23 most expansive opportunities to secure endorsements and sponsors. Leitzinger Decl. ¶ 18. *All* of the
24 top golfers in the world are Tour members—except those the Tour recently suspended or effectively
25 forced to resign for playing with LIV Golf. *Id.* ¶ 17. The Tour's dominance in the United States and
26 globally is absolute. *Id.* ¶ 31. Before LIV Golf's entry, all global tours fed directly or indirectly into
27 the Tour. *Id.* ¶¶ 43–46. The Tour concedes that it is "irrational" to try to compete with it, Brass Decl.

28

[1] Dr. Leitzinger is an experienced economist who testifies frequently in antitrust cases.

Ex. 1a (Jay Monahan in June 2022: "LIV Golf . . . is an irrational threat"), and has used its monopso-

nistic control over elite professional golf to exclude competition. *Id.* Exs. 4–10.

Most of the Tour's members are professional golfers, whom the Tour acknowledges are inde-

pendent contractors. Brass Decl. Exs. 11, 61. These independent contractors receive no salary from

the Tour. Gooch Decl. ¶ 40; Swafford Decl. ¶ 38; Jones Decl. ¶ 38. They pay for their own coaches,

caddies, trainers, travel, and lodging—even though about half the players in each Tour event do not

make the cut and earn nothing. Gooch Decl. ¶ 40; Swafford Decl. ¶ 38; Jones Decl. ¶ 38. When mem-

ber golfers are injured, they earn nothing. Gooch Decl. ¶ 40; Swafford Decl. ¶ 38; Jones Decl. ¶ 38.

For example, Mr. Swafford was injured for two years, and the Tour gave him no support. Swafford

Decl. ¶ 38. The people who control the Tour and its Policy Board are not professional golfers, but are

full-time administrators. Brass Decl. Exs. 11–13. The Tour has taken in billions in revenue on the

backs of golfers who have had no choice but to play for it, and it has used this revenue to fund a bloated

bureaucracy and pay its executives multimillion-dollar salaries. *Id.* Ex. 3; Leitzinger Decl. ¶ 61. The

Tour's members, by contrast, earn far less than their peers in other professional sports and a far lower

share of league revenues than other athletes. *Id.* ¶ 54. And because they pay their own way and have

no guaranteed earnings, Tour members can—and often do—play an entire season and have net negative

earnings. Gooch Decl. ¶ 40; Swafford Decl. ¶ 38; Jones Decl. ¶ 38; Brass Decl. Exs. 14, 59.

**B.     LIV Golf**

LIV Golf is a start-up golf tournament promoter. Declaration of Atul Khosla ("Khosla Decl.")

¶ 5.[2] LIV Golf aspires to host an elite League of 48-player golf tournaments where players compete

both as individuals and as franchised teams. *Id.* ¶ 8. Because the Tour thwarted LIV Golf's plans to

launch its full League in 2022, Brass Decl. Exs. 6, 7, 8, 15, 16, LIV Golf launched a back-up plan: an

eight-event series known as the LIV Golf Invitational Series with an innovative new golf format (54

holes, shotgun start, team and individual components, limited field, and more attractive purses) and

featuring individuals and teams playing for more than $250 million in prize purses. Khosla Decl. ¶¶ 8,

14–17. In June and July 2022, the LIV Golf Invitational Series has visited London, England, Portland,

Oregon, and Bedminster, New Jersey. *Id.* ¶ 17.

[2]  Mr. Khosla is the President and Chief Commercial Officer of LIV Golf. Khosla Decl. ¶ 2.

1    LIV Golf's entry introduced new competition for the services of professional golfers for elite

2    golf events. Khosla Decl. ¶¶ 19, 31; *e.g.*, Jones Decl. ¶ 8, Ex. J; Leitzinger Decl. ¶¶ 62–64; Brass Decl.

3    Ex. 17. For the first time in decades, professional golfers have a viable alternative to the Tour; golf

4    fans, broadcasters, and advertisers alike will benefit from this newly introduced competition and inno-

5    vation. Leitzinger Decl. ¶ 64. Already, competition from LIV Golf compelled the Tour to increase

6    player compensation by millions of dollars and introduce new elite-player-only events mirroring LIV

7    Golf's offerings. *Id.* ¶¶ 54–61. The Tour, however, is intent on destroying LIV Golf and on enforcing

8    unlawful restraints preventing players from exercising their rights as independent contractors to pursue

9    their profession. Brass Decl. Exs. 4, 12, 18–21.

10    LIV Golf tried to partner with existing golf entities in 2021 to facilitate its entry, but the Tour

11    pressured those entities not to work with LIV Golf. Brass Decl. Ex. 5. For example, in July 2021,

12    when LIV Golf representatives offered the European Tour a partnership worth up to $1 billion dollars,

13    the European Tour, in its own words, confirmed that LIV Golf had "fit and appeal" for the European

14    Tour, but it rejected the partnership offer, stating the "main issue is ***US PGA mighty power*** and the

15    need to avoid a collision course between ET and PGA." *Id.* (emphasis added).

16    **C.    Anticompetitive Actions**

17    With the intent and effect of foreclosing competition, Brass Decl. Ex. 4, the Tour has engaged

18    in a campaign to destroy the careers of anyone who plays with LIV Golf, *e.g.*, Gooch Decl. Ex. G. The

19    Tour has threatened ***lifetime bans*** for players who participate in LIV Golf events, Brass Decl. Exs. 6–

20    8, 21, and it has recruited the European Tour to join it in punishing players for participating in LIV

21    Golf events. *Id.* Ex. 22. As part of its intimidation campaign, the Tour has (1) told golfers they will

22    be banned from the Tour for life if they play with LIV Golf, Gooch Decl. Ex. C; (2) amended its Reg-

23    ulations to make it harder for members to play with LIV Golf, Brass Decl. Exs. 4, 12, 23; (3) pressured

24    sponsors to drop players for playing with LIV Golf, *Id.* Exs. 4, 18, 30; (4) threatened to blacklist player

25    agencies whose golfers played with LIV Golf, Khosla Decl. ¶ 29, Compl. ¶ 195; (5) amended rules to

26    discourage college athletes from playing with LIV Golf, Brass Decl. Ex. 24; (6) enlisted famous players

27    to publicly intimidate young golfers against playing with LIV Golf, Brass Decl. Exs. 25, 26, 33, 62;

28    (7) threatened small business vendors and others with blacklisting if they work with LIV Golf, Khosla

Gibson, Dunn &
Crutcher LLP

Decl. ¶¶ 8, 28, 29; Brass Decl. Exs. 27, 60; Compl. ¶¶ 243–63; (8) leaned on the PGA of America, Royal & Ancient, and others to intimidate players from playing with LIV Golf, Brass Decl. Ex. 28; and (9) coordinated with the European Tour to oppose LIV Golf and any players who play on its Tour, *Id.* Ex. 22. And, just days ago, the Tour sanctioned players for speaking positively about LIV Golf, Brass Decl. Ex. 58, and had the Presidents Cup Captain (a Tour position), Davis Love III, propose that 150 Tour members boycott the Majors if those events don't bar those who play with LIV Golf. *Id.* Ex. 33.

The Tour also is acting in concert with the European Tour as part of its effort to thwart competitor tours from emerging. In Commissioner Monahan's Monopoly Manifesto, defined below, describing the Tour's plan to foreclose entry, he explained: "We have continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of" a new entrant. Brass Decl. Ex. 4. The Tour and the European Tour formalized their alliance in November 2020. *Id.* Ex. 10. As the alliance evolved, they coordinated to prevent their respective members from participating in LIV Golf events, including by amending European Tour rules to restrict LIV Golf's access to European Tour members, and by jointly punishing golfers for playing with LIV Golf to maximize the exclusionary effect of their bans. *Id.* Ex. 22. Earlier this year, the Tour compelled the European Tour to suspend its members from co-sanctioned events for playing in LIV Golf events. *Id.* Three golfers challenged those suspensions from the European Tour on similar procedural grounds and under European competition laws. *Id.* On July 4, 2022, a Sports Resolution (UK) judge stayed the suspensions, concluding the suspended players were denied fair proceedings because the European Tour CEO was "necessarily partial" and could not render impartial judgment. *Id.*

**D. Regulations**

The Tour's exclusionary Regulations purport to provide the Tour Commissioner with unfettered discretion to impose punishments—including lifetime bans—on any member who participates in a competing event. Brass. Decl. Ex. 4. First, the "Conflicting Events Regulation" prohibits Tour members, without exception, from playing in any tournament in the United States that takes place in the same week as a Tour event. *Id.* Ex. 12 (V.A.2.a.). And it prohibits Tour members from playing in international events unless the Tour Commissioner grants a release, and only then three times a season. *Id.* (V.A.2–3). Because the Tour holds events 47 to 49 weeks of the year, this Regulation ensures that

Gibson, Dunn &
Crutcher LLP

Tour members cannot sell their services to a competing tour. *Id.* Second, the Media Rights Regulation prohibits Tour members from participating in any live or recorded golf program anywhere in the world at any time without prior approval of the Tour Commissioner—***even when they are not playing in a PGA Tour event***. *Id.* (V.B.1.b). Notably, the Tour beefed up this Regulation in 2020 to make it an even more powerful tool for excluding entry. *Id.* Ex. 4. The Tour Commissioner has the power to permanently ban a player who violates either Regulation. *Id.* Ex. 12 (at 87, VII). These rules make the Tour the gatekeeper to any potential competitor, as no golf event anywhere in the world has access to the top players "without the prior written approval of the [Tour] Commissioner." *Id.* (V.B.1.b). The Tour has used these Regulations to exclude competitors. *Id.* Exs. 4–10. The Tour admits these Regulations give it the power to prevent its members from playing for competitors. *Id.* Exs. 4, 19.

**E.     The Tour's Star Chamber Disciplinary Process**

The Tour requires its members to agree to its Regulations, Brass Decl. Exs. 31, 32, which expressly give the Commissioner the power to interpret and apply the Regulations as he sees fit. *Id.* Ex. 12 (at 87, VII). The Regulations also give the Commissioner discretionary authority over player discipline. *Id.* (VII). As he did here, the Commissioner has the discretion to place a Tour member "on probation for an infraction of any rule of the" Tour, and if the member violates any other rule then the Commissioner "may immediately suspend the member's playing privileges" indefinitely. *Id.* (VII.C). As he did here, the Commissioner has the discretion to interpret playing in even a single competing event as constituting multiple violations and thus impose an indefinite or lifetime ban. *Id.* And players lack any ability to negotiate the terms or amend the Regulations. *Id.*; *see also id.* Ex. 11.

The Tour's disciplinary process for "major" penalties (at issue here) takes the following steps: (1) notice of disciplinary inquiry; (2) member's response; (3) notice of disciplinary action; and (4) member's appeal of the disciplinary action. Brass Decl. Ex. 12 (VII). Importantly, the member's appeal automatically stays any suspension during the pendency of the appeal. *Id.* (VII.E.2). On receipt of the appeal, the Commissioner may choose in his discretion: (1) an expedited appeal where he transfers the appeal to the Appeals Committee, or (2) a long-appeal. *Id.* According to the Tour's Regulations, failure to appeal purportedly constitutes admission of the violation, and the Tour requires an

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
CASE  NO. 3:22-cv-04486

Gibson, Dunn &
Crutcher LLP

advance release of decisionmakers from liability. *Id.* The Appeals Committee, "three non-Player Directors designated by the Board," "shall prescribe its own rules of procedure." *Id.* This Disciplinary Process does not provide members rights to a hearing or an impartial tribunal. *Id.* Rather, the Regulations give the Commissioner the discretion to proceed as he sees fit, other than providing that any suspension is stayed pending player appeals. *Id.*

## F. Application of the Tour's Unfair Disciplinary Process to Harm Plaintiffs

Almost three years ago, Tour Commissioner Monahan wrote a memorandum (his "Monopoly Manifesto") to the PGA Tour Policy Board detailing his plan to thwart competitive entry by applying the Tour's Regulations to prevent a new entrant from accessing Tour members such as TRO Plaintiffs. Brass Decl. Ex. 4. The Monopoly Manifesto explains: "The impact that [the new league] could have on the PGA TOUR is dependent on the level of support it may receive from these players. Without this support, [the new league's] ability to attract media and corporate partners will be significantly marginalized and its impact on the TOUR diminished." *Id.* Consistent with the Monopoly Manifesto, the Commissioner has vocally and consistently punished golfers who play with LIV Golf. *Id.* Ex. 19.

In 2020, Monahan promised to "vigilantly protect [the Tour's] business model"—not its players. Brass Decl. Ex. 19b. The Tour has in the past routinely permitted golfers to play with other promoters; however, in 2021, Monahan threatened to impose career bans simply for playing professional golf with LIV Golf, because LIV Golf would offer players more compensation and rights than would the Tour. *Id.* Then, in 2022, Monahan publicly maligned TRO Plaintiffs for choosing to play professional golf with another promoter and took every step in his power to punish them because they played with a promoter that the Tour views as a threat to its monopsony. *Id.*

Despite these threats, a number of players saw the benefits that new competition from LIV Golf would bring to players, fans, and the sport as a whole. After much consideration, the TRO Plaintiffs ultimately decided to participate in LIV Golf events. Gooch Decl. ¶ 17; Swafford Decl. ¶ 17; Jones Decl. ¶ 17. On May 10, 2022, Commissioner Monahan denied all requests for permission to participate in LIV Golf's June 9–11 London Invitational. *E.g.*, Jones Decl. Ex. A. The Tour's stated rationale was: (1) the London Invitational would compete with the Tour-sponsored RBC Canadian Open; and

(2) LIV Golf intends to compete with the Tour in the United States. *Id.* The same day, the Tour pressured other golfers not to ask for permission to participate in LIV Golf events. Brass Decl. Ex. 24.

On May 31, 2022, LIV Golf announced the player field for its London Invitational. Brass Decl. Ex. 35. The field included the TRO Plaintiffs. *Id.* TRO Plaintiffs elected to play in LIV Golf's London Invitational because they believed the Tour could not lawfully punish them for exercising their independent contractor rights to play where they choose when not playing on the Tour. Gooch Decl. ¶ 21; Swafford Decl. ¶ 21; Jones Decl. ¶ 21. In response, on June 1, 2022, the Tour sent disciplinary notices for violating the Conflicting Events Regulation. *E.g.*, Jones Decl. Ex. B. The Tour did not send a notice to Mr. Swafford. Swafford Decl. ¶ 25. The Tour also enforced that same Regulation on developmental tour players who had not even qualified for events that week, and thus had no possible "conflict." Brass Decl. Ex. 36. As one such player, Andy Ogletree, responded to the Tour, "Should I just sit at home on my couch next week and not make any money? It seems like this is your stance." *Id.*

On June 2, 2022, Tour Chief Tournament & Competitions Officer Andy Pazder texted Mr. Gooch: "Just want to make sure you understand the implications of playing without an approved conflicting event release." Gooch Decl. Ex. C. Mr. Gooch responded, "Davis [Love III] called yesterday and said jay [Tour Commissioner] is going to suspend, is this true?" *Id.* Mr. Pazder then told Mr. Gooch that he would be banned from the Tour *for life* if he played in one LIV Golf event: "Our position has been that a player may choose to be a member of the Tour or to play in the Saudi/LIV events, but he can't do both. If the player chooses the latter, he should not expect to be welcomed back." *Id.*

On June 3 and 5, 2022, the PGA Tour sent TRO Plaintiffs a letter placing them on probation "pursuant to Article VII, Section C." *E.g.*, Swafford Decl. Ex. A. This Regulation relates to "conduct unbecoming a professional." *Id.* In other words, the Tour's position is that playing professional golf is "conduct unbecoming a professional" golfer—when it is played with a competing promoter. *Id.* In response, approximately ten Tour members who had played with LIV Golf decided to resign from the Tour. *E.g.*, Brass Decl. Ex. 37. The Tour responded by informing resigning members not to "expect that [they] will be able to rejoin membership or play in any events without membership." *Id.* Ex. 38.

The Tour has plainly targeted the TRO Plaintiffs as part of its effort to exclude competition from LIV Golf. For example, on June 9, 2022, Commissioner Monahan sent a public letter to all Tour

Gibson, Dunn &
Crutcher LLP

members identifying the suspended golfers and stating that "the same fate [would] hold" for any member playing in any LIV Golf event. Brass Decl. Ex. 18. Then, shortly after TRO Plaintiffs teed off in the London Invitational, the Tour notified them that (i) it considered them in violation of the Media Rights Regulation (V.B.1.b); (ii) it considered Messrs. Swafford and Jones in violation of the Regulation against Public Attacks (VI.E)—a rule that prohibits "hateful, abusive, obscene and/or divisive speech" but permits "reasonable expressions" of opinion—for favorably describing LIV Golf; and (iii) they were all suspended from Tour events "until further notice." *E.g.*, Swafford Decl. Ex. B. TRO Plaintiffs submitted their responses challenging the suspensions. *E.g.*, *id.*; Jones Decl. Ex. E.

Thereafter, the Tour suspended TRO Plaintiffs until March 31, 2023 from participation "in any PGA Tour-affiliated tournaments including PGA Tour [and other affiliated tours]," with threats to extend the suspensions based on further violations of Tour Regulations (*i.e.*, playing in LIV Golf events). *E.g.*, Swafford Decl. Ex. D. Commissioner Monahan also banned Messrs. Swafford and Jones from entering any Tour-owned or managed courses, including TPC Harding Park in San Francisco. *Id.*

On July 13, 2022, TRO Plaintiffs appealed their suspensions. *E.g.*, Swafford Decl. Ex. H. In their appeals, TRO Plaintiffs asked the Commissioner to transfer the appeal to an independent tribunal. *Id.* On July 27, 2022, the Commissioner rejected that request, referred their appeals to the Tour Board, and requested that any materials in support of their appeals be submitted by August 10, 2022. *E.g.*, *id.* Ex. I. In response, Mr. Gooch requested confirmation that the Tour would abate suspensions pending appeal. Gooch Decl. Ex. L. Yesterday, the Commissioner refused to do so. *Id.* Exs. M–N.

While TRO Plaintiffs' appeals of the suspensions through March 31, 2023 were pending, the Tour extended the suspensions through March 31, 2024 for TRO Plaintiffs' participation in a second LIV Golf event, even though at that time they already were suspended from the Tour. *E.g.*, *id.* Ex. B. The Tour's rolling suspension scheme thus operates as an effective career ban from the Tour.

## G.   FedEx Cup Playoffs and TRO Plaintiffs

The FedEx Cup is a season-long competition in which players accumulate points for placing in Tour tournaments and in the Majors. Brass Decl. Ex. 39. At the conclusion of the season, the top 125 players in points are eligible to play in a three-tournament event known as the FedEx Cup Playoffs. *Id.* The FedEx Cup Playoffs feature a progressive cut through the first two events to determine the final

30 players who qualify for the Tour Championship and all four Major Championships the following year (2023). *Id.* The Top 70 players qualify for the marquee PGA Tour Invitationals. *Id.* Players such as the TRO Plaintiffs receive higher bonuses and deferred compensation retirement plan payments the higher they place in the FedEx Cup Playoffs. *Id.* In addition, placing high in the FedEx Cup Playoffs can dramatically boost a golfer's world ranking. *Id.*

TRO Plaintiffs are currently ranked 20th (Gooch), 62nd (Jones), and 63rd (Swafford) in the FedEx Cup. Brass Decl. Ex. 40. Each earned the right to play in the FedEx Cup Playoffs under the Tour's rules. *Id.* None has qualified for the Majors or premier Tour Invitationals in 2023. Gooch Decl. ¶ 42; Swafford Decl. ¶ 41; Jones Decl. ¶ 41. But they will hit those critical milestones, and the associated increased career benefits, if they place in the Top 30 or Top 70 of the Playoffs. Swafford Decl. ¶ 42; Jones Decl. ¶ 42. Qualifying for the Top 30 would bring qualification into the 2023 Majors, even greater benefits in revenue, event eligibility, and a major career accomplishment. Gooch Decl. ¶ 42. The importance of playing in the FedEx Cup Playoffs is undisputed. Brass Decl. Ex. 1. Not playing in the FedEx Cup will all-but guarantee they will not qualify.

### III. LEGAL STANDARD

A party moving for a temporary restraining order "must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest." *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). The Court may apply a "sliding scale" approach that considers how "serious questions going to the merits" compare to the balance of hardships. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).

### IV. ARGUMENT

### A. TRO PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON THE MERITS

#### 1. The Tour Breached Its Regulations by Refusing to Abate TRO Plaintiffs' Suspensions Pending Appeal

TRO Plaintiffs entered into individual agreements with the Tour to mutually abide by the terms of the Regulations. Brass Decl. Ex. 32. Commissioner Monahan suspended TRO Plaintiffs under the Regulations, and TRO Plaintiffs appealed those suspensions. The Regulations provide that TRO Plaintiffs' appeals "***shall operate to stay*** the effective date of any penalty . . . until after the final decision

Gibson, Dunn & Crutcher LLP

on the appeal." *Id.* Ex. 12 (VII.E.2) (emphasis added). This Regulation operates to stay "suspen-sion[s]" unless the tournament is "then in progress or scheduled for the calendar week in which the alleged violation occurred." *Id.* On August 2, 2022, the Tour indicated it would not honor Section VII.E.2 and TRO Plaintiffs could not play in Tour events, including the Playoffs, pending their appeals. Gooch Decl. Ex. L. If not enjoined, the Tour's breach of this unambiguous provision will irreparably harm TRO Plaintiffs by denying them their earned right to play in the Playoffs. *E.g.*, Gooch Decl. 42–46. TRO Plaintiffs are highly likely to succeed on the merits of their breach of contract claim.[3]

### 2. The Tour Unlawfully Maintains a Monopoly Under Section 2 of the Sherman Act

Section 2 of the Sherman Act makes it illegal to acquire or maintain a monopoly through anti-competitive conduct. 15 U.S.C. § 2. To establish a Section 2 violation, a plaintiff must show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, busi-ness acumen, or historic accident." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

### a) The Tour Possesses Monopoly Power in the Relevant Market

Monopoly power "is the power to control market prices or exclude competition." *U.S. v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *see also Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320–22 (2007) ("a monopsony is to the buy side of the market what a monopoly is to the sell side" and "similar legal standards should apply"). A defendant's "pre-dominant share of the market" ordinarily demonstrates market power. *Grinnell*, 384 U.S. at 571. An antitrust market "is composed of products that have reasonable interchangeability for the purposes for which they are produced." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003) (citation omitted). The Tour unquestionably dominates the national (and indeed, world) market for the services of professional golfers for elite golf events.

---

[3] The Regulations include no choice of law provision. The Tour's clear breach of its unambiguous Regulations requires no choice of law analysis, though California law would apply here. *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996) (federal court applies the choice-of-law rules of the forum state where court is exercising supplemental jurisdiction); *Axis Rein-surance Co. v. Telekenex, Inc.*, 913 F. Supp. 2d 793, 800 (N.D. Cal. 2012) ("[C]ourts need not engage in a . . . choice-of-law analysis where there is no material conflict between the laws of the states.").

For golfers who qualify for elite events, the Tour has no substitutes (absent successful entry by LIV Golf). All other tours merely feed into the PGA Tour, *see* Leitzinger Decl. ¶¶ 34–52. The CEO of the European Tour conceded that his organization no longer competes with the PGA Tour for players' services. Brass Decl. Ex. 22. There are no reasonably interchangeable alternatives to the Tour because no other golf promoter offers the Tour's combination of large tournament purses, opportunities to earn Official World Golf Ranking ("OWGR") points, public exposure, and endorsement deal prospects. Leitzinger Decl. ¶¶ 17–18. The Tour provides the principal avenue for professional golfers to qualify for the Majors. *Id*. ¶ 51. Courts routinely find that similar facts establish a market for elite sports. *See O'Bannon v. NCAA*, 802 F.3d 1049, 1056 (9th Cir. 2015) (a market "for FBS football and Division I basketball scholarships is cognizable under the antitrust laws because there are no professional or college football or basketball leagues capable of supplying a substitute for the bundle of goods and services [they] provide") (cleaned up); *Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*, 351 F. Supp. 462, 501 (E.D. Pa. 1972) (recognizing separate markets for major / minor league hockey due to the former's "higher ticket prices, increased television revenues, and greater players' *skill* and *salaries*"); *Int'l Boxing Club*, 358 U.S. at 250–51 (championship boxing contests are a separate market from non-championship ones); *NCAA v. Alston*, 141 S. Ct. 2141, 2151, 2154 (2021) ("NCAA's Division I essentially *is* the relevant market for elite college football and basketball") (citation omitted).

By restricting the output of player services through its Regulations, the Tour artificially depresses player wages—*i.e.*, it controls market prices. Leitzinger Decl. ¶¶ 8, 10, 65, 79, 82. Notably, in response to entry by LIV Golf, the Tour announced increases in player pay totaling over $235 million. *Id.* ¶¶ 54–61. These increases are direct proof of monopsony power, as they show that the Tour's compensation to players before LIV Golf's prospective entry was sub-competitive and substantially lower than the levels of compensation that would prevail in a competitive market. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (reduced output and sub-competitive pricing can be "direct proof" of "the actual exercise of market power").

The first three LIV Golf Invitationals provide further direct evidence of the Tour's exercise of monopsony power over the services of professional golfers for elite golf events causing "genuine adverse effects on competition." *FTC v. Ind. Fed. of Dentists*, 476 U.S. 447, 460–61 (1986). The question

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
CASE NO. 3:22-cv-04486

Gibson, Dunn & Crutcher LLP

in a monopsony case is whether the monopsony buyer "has enough market power to pay suppliers less than it would pay in a truly competitive market." *Boardman v. Pac. Seafood Grp.*, 2015 WL 13358335, at *1 n.1 (D. Or. June 8, 2015) (citing *Weyerhaeuser*, 549 U.S. at 320). During the same time period as the first three LIV Golf events, the Tour paid half of the golfers in its tournaments (those who made the cut) essentially one-third of LIV Golf's purses, and paid nothing to those who didn't make the cut— while LIV Golf paid every player (and paid them significantly more in purses, bonuses, and appearance fees). Brass Decl. Exs. 41–44. Nonetheless, despite these differences, a very small percentage of Tour members played in even one LIV Golf event. Leitzinger Decl. ¶ 86. This is direct evidence of monopsony power. Leitzinger Decl. ¶¶ 54–61. The Tour's dominance is also shown through its exclusion of potential competitors, Brass Decl. Exs. 4–10. *E.I. duPont*, 351 U.S. at 391.

### b) The Tour Is Unlawfully Maintaining Its Monopoly By Willfully Excluding Competition

The Tour has violated Section 2 of the Sherman Act because it uses its monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a [prospective] competitor" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992) (citation omitted).

The antitrust laws "certainly forbid all restraints of trade which were unlawful at common-law, and one of the oldest and best established of these is a contract which unreasonably forbids any one to practice his calling." *Gardella v. Chandler*, 172 F.2d 402, 408 (2d Cir. 1949) (Hand, J., dissenting where restrictions upheld due to baseball's unique antitrust exemption). These principles have been confirmed when dominant sports leagues have blacklisted players in an attempt to force players to boycott an upstart competitor. *See, e.g.*, *Radovich v. NFL*, 352 U.S. 445, 448, 453-54 (1957).

Here, the PGA Tour's Media Rights and its Conflicting Events Regulations are nakedly anti-competitive, as they invest the Tour with control to prevent PGA Tour members from selling their services to any buyer without Tour permission. The Tour expressly designed its rules to deny would-be competitors access to independent contractors to "mitigate" the impact of competitive entry and to deny those independent contractors their right to sell their services to other promoters it might deem a threat. Brass Decl. Exs. 4, 12, 45–50. Such rules in furtherance of a monopoly are unlawful. *See, e.g.*, *Int'l Boxing*, 358 U.S. at 254; *Wash. State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.*, 356 F.2d

Gibson, Dunn &
Crutcher LLP

371, 374-77 (9th Cir. 1966) (affirming antitrust judgment against bowling alley proprietors that black-

listed bowlers who bowled in competitors' establishments).[4]

The Tour prohibits releases for events in North America, caps international releases for any

player at three per season, and gives the Tour Commissioner unfettered discretion to reject a player's

release request. Brass Decl. Ex. 12 (V.A). Thus, the Tour's Regulations create for golfers "precisely

the dilemma the Sherman Act is designed to prevent," wherein "the dominant firm[] force[s] [its] sup-

pliers or customers to choose between assisting the dominant firm[] in injuring [its] competitors or

working exclusively with those competitors, knowing that because of the dominant firm['s] market

power very few suppliers or customers will be able to rely exclusively on the competitors." *PLS.com,*

*LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022). The effect is to suppress player

compensation, deny competition for their services, and reduce the number of elite professional golf

events. Leitzinger Decl. ¶¶ 8, 10, 65, 79, 82.; *e.g.* Gooch Decl. ¶¶ 11, 14.

The purely anticompetitive, unlawful nature of these Regulations is further evidenced by the

Tour's selective enforcement of the Regulations to respond to LIV Golf's competitive threat. Never

before has the Tour imposed lengthy or lifetime bans for playing in competing events. To the contrary,

the Tour routinely permitted its members to play with the tours that feed into it (*e.g.*, European Tour)

and it has routinely granted releases for golfers to play with promoters that the Tour does not view as

a competitive threat. *E.g.*, Jones Decl. ¶ 20. For example, just last month, the Tour did not require its

members to seek a media release to participate in the JP McManus event in Ireland. Brass Decl. Ex.

52. But when LIV Golf entered the market, presenting a threat to the Tour's dominance, the Tour

denied all release requests and imposed potentially career-ending suspensions on any member that

dared to play in even one LIV Golf event. *E.g.*, Jones Decl. Exs. A, F; Brass Decl. Exs. 18, 34. The

Tour has made clear that it enforces these Regulations to destroy LIV Golf, regardless of how much it

may harm itself and its own members in the process. *Id.* Exs. 17, 19. The Tour's actions directly harm

the TRO Plaintiffs because they are the targets of the Tour's anticompetitive campaign and the Tour is

---

[4] *See also, e.g.*, *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1169 (D. Nev. 2016) (independent contractor fighters sufficiently alleged that UFC's exclusivity agreements constituted exclusionary conduct under § 2); *U.S. v. Richfield Oil Corp.*, 99 F. Supp. 280, 294 (S.D. Cal. 1951) (policy requiring independent contractors to work with only one company violated antitrust laws where it could create a monopoly).

eliminating their ability to offer their services in a competitive market, *e.g.*, Gooch Decl. ¶¶ 11, 14, Ex. J. Courts regularly find such bans violate the antitrust laws by excluding athletes from their profession.[5]

The Tour's Regulations also severely limit the overall output of professional golf services for elite events, by foreclosing professional golfers from playing elsewhere even when they are not playing in a Tour event and threatening the viability of LIV Golf. Leitzinger Decl. ¶¶ 8, 10, 65; *e.g.*, Gooch Decl. ¶¶ 11, 14, Ex. J; Brass Decl. Ex. 36; Khosla Decl. ¶¶ 26, 31, 33. Output restrictions are a "paradigmatic example" of the adverse effects a monopolist can have on competition. *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104-08 (1984) ("Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit."); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). That rule is no different in the sports context than any other. *See, e.g., NCAA*, 468 U.S. at 104–08; *U.S. Football League v. NFL*, 842 F.2d 1335, 1341-42 (2d Cir. 1988) (affirming that the NFL unlawfully maintained its monopoly over professional football through predatory tactics intended to destroy a nascent competitor league).

Aside from the direct harm caused to the TRO Plaintiffs, the Tour's suspensions have harmed competition in the market as a whole. Leitzinger Decl. ¶¶ 83–88; Khosla Decl. ¶¶ 14, 18–33. The suspensions serve as a warning shot to other professional golfers, distorting the market and compelling other golfers to act contrary to their best interests, thereby foreclosing LIV Golf's access to a substantial portion of the market. *E.g.*, Gooch Decl. ¶¶ 11, 14, Ex. J. In so doing, the Tour's suspension of TRO Plaintiffs has the effect—and the intent—of threatening LIV Golf's nascent entry and depriving golf fans of the opportunity to enjoy the new and innovative product that LIV Golf is attempting to offer. Brass Decl. Ex. 19; Leitzinger Decl. ¶¶ 83–88; Khosla Decl. ¶¶ 14, 18–33; *e.g.*, Gooch Decl. Ex. J.

Moreover, in addition to its unlawful Regulations and its associated unlawful punishments, the Tour has acted to foreclose competition for the services of professional golfers for elite golf events in a variety of equally illegal ways, including: (a) threatening to revoke player agents' credentials for representing clients who played with LIV Golf; (b) threatening to blacklist small businesses if they

---

[5] *See, e.g., Mackey v. NFL*, 543 F.2d 606, 617–18, 622 (8th Cir. 1976), *overruled on other grounds by Brown v. Pro Football, Inc.,* 518 U.S. 231 (1996) ("courts have not hesitated to apply the Sherman Act to club owner imposed restraints on competition for players' services") (compiling cases).

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
CASE NO. 3:22-cv-04486

Gibson, Dunn &
Crutcher LLP

work with LIV Golf; (c) leaning on the Majors to do its bidding by calling into question whether players who participate in LIV Golf will be eligible for their respective future tournaments; (d) threatening LIV Golf's partners with exclusion from the professional golf "ecosystem" if they continue to support LIV Golf; (e) threatening sponsors and advertisers with loss of future opportunities with the Tour if they associate with LIV Golf or players who've played with LIV Golf; and (g) pressuring the European Tour to enter into an alliance to foreclose LIV Golf. *See supra* at 5–6. All of these actions were aimed at thwarting LIV Golf's entry, foreclosing competition for the services of professional golfers for elite golf events, and harming TRO Plaintiffs and competition in the market. *See Lorain Journal Co. v. U.S.*, 342 U.S. 143, 149–50, 186 (1951) (monopolist's "attempt to regain its monopoly . . . by forcing [customers] to boycott a competit[or] violated [Section] 2").

### c) No Procompetitive Justification Redeems the PGA Tour's Conduct

Finally, the Tour's actions serve no legitimate business purpose. Leitzinger Decl. ¶¶ 109–22. Forcing Plaintiffs to sit on the sidelines when they are not playing in PGA Tour events does not improve any product or expand output. Threatening star players with destruction of their careers by imposing lifetime bans for playing with a competitor serves no purpose other than thwarting competition. Indeed, it only serves to degrade—not improve—the product of the Tour. *Id.* __; *e.g.*, Gooch Decl. Ex. J.

In an August 2, 2022 letter to Mr. Gooch, the Tour asserted that its Regulations benefit the Tour by "enabling members to pool media rights," which drives revenue for the Tour. Gooch Decl. Ex. M. But that misses the point. Plaintiffs are not challenging the Tour's rules that assign media rights to the Tour *when golfers are playing in Tour events*. They are challenging the Tour's rules that prevent players from having and assigning their media rights *during weeks they are not playing in Tour events*. Those rules serve no beneficial purpose, and serve only to reduce output and foreclose competition.

Similarly, to the extent the Tour argues its restrictions benefit the Tour by guaranteeing fields comprised of the best players in the sport, that would only serve to underscore the anticompetitive purpose and effect of those Regulations. As with any business that relies on the input of talented professionals, if the Tour wants to secure the services of top-tier golfers it must **compete** for those services—not bind the players to rules that foreclose competition. The antitrust laws do not permit

Gibson, Dunn & Crutcher LLP

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
CASE NO. 3:22-cv-04486

arguments that competition would somehow be harmful—and certainly not where an incumbent mo-

nopolist is seeking shelter from competition. *Nat'l Soc. of Pro. Eng'rs v. U.S.*, 435 U.S. 679, 695

(1978). The Supreme Court rejected the NCAA's attempted justifications for similar output restriction

on televised football games. *NCAA*, 468 U.S. at 113-17 (rejecting argument that televised games must

be limited to preserve live ticket sales, because it would be antithetical to the antitrust laws to "insulate

live ticket sales from the full spectrum of competition"). Proffered justifications that "do[] not legiti-

mately promote competition" are irrelevant. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d

1195, 1212 (9th Cir. 1997). The Tour has other regulations (such as a minimum participation require-

ment) that are sufficient to ensure that golfers play in enough events to support the Tour. Brass Decl.

Ex. 12 (IX.B.1–2). In fact, TRO Plaintiffs have all played in over 20 Tour events this season—five

more than the minimum. *Id.* Ex. 40. The Conflicting Events and Media Rights Regulations serve only

to construct a competitive moat around the PGA Tour. Khosla Decl. ¶¶ 17–19, 24, 27–28, 33; Brass

Decl. Ex. 4. Restrictive professional sports rules that exceed what is necessary to create a product are

unlawful, and as applied here, require immediate injunctive relief.[6]

Moreover, the Tour's stated reasons for prohibiting players from associating with LIV Golf

undermine any claim that the rules are necessary to support its business model. Brass Decl. Exs. 19,

51; Gooch Decl. Ex. A. The Tour regularly grants exceptions for players to participate in international

events hosted by other promoters, e.g., Jones Decl. ¶ 20, but it rejected requests to participate in LIV

Golf's London Invitational for the stated reason that it is "the first in an eight-event '2022 LIV Golf

Invitational Series' season, and more than half of them will be held in the United States." Ex. Gooch

Decl. Ex. A. In other words, the Tour prevented players from participating *because* LIV Golf posed a

potential competitive threat, making any other claims of a valid business justification plainly pretextual.

*See, e.g.*, *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196–97 (3d Cir. 2005) (conduct inconsistent with

---

[6] *See, e.g.*, *O.M. by & through Moultrie v. Nat'l Women's Soccer League, LLC*, 544 F. Supp. 3d 1063, 1077 (D. Or. 2021), *appeal dismissed*, No. 21-35469, 2021 WL 4268938 (9th Cir. Aug. 20, 2021) (enjoining eligibility rule as an unreasonable restraint of trade); *Haywood v. NBA*, 401 U.S. 1204, 1205–07 (1971) (reinstating injunction restraining four-year eligibility rule); *Kapp v. NFL*, 390 F. Supp. 73, 81 (N.D. Cal. 1974) (enjoining enforcement of rule capping players' earning potential), *vacated in not relevant part*, No. C 72 537 WTS, 1975 WL 959 (N.D. Cal. Apr. 11, 1975), *aff'd*, 586 F.2d 644 (9th Cir. 1978), and *aff'd*, 586 F.2d 644 (9th Cir. 1978).

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
CASE NO. 3:22-cv-04486

Gibson, Dunn &
Crutcher LLP

purported justifications for exclusionary policies is pretextual); *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 243 (2d Cir. 2003) (defendants' purported justification for exclusionary rules was pretextual where they did not enforce such rules overseas).

### 3. The Tour Has Unlawfully Agreed With Others To Boycott Players Under Section 1 of the Sherman Act.

Courts have "long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of § 1 of the Sherman Act." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (1985). Here, the Tour coerced and coordinated with the European Tour (an inferior buyer of professional golfers' services and potential competitor) to boycott any players that work with LIV Golf. Brass Decl. Ex. 22. And agreements "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle" are per se unlawful. *Nw. Wholesale*, 472 U.S. at 294 (citation omitted).[7] A group boycott claim requires (1) an agreement (2) to deprive a would-be competitor of a trade relationship they need to enter or participate in the market. *Smith v. Pro-Football, Inc.*, 593 F.2d 1173, 1178 (D.C. Cir. 1978).

Here, the Tour has openly acted in concert with the European Tour (and potentially others) to thwart competition. Commissioner Monahan detailed his unlawful agreement in his Monopoly Manifesto, describing how the Tour would "remov[e] the European Tour as a potential partner" of a new entrant like LIV Golf. Brass Decl. Ex. 4. The timeline in Brass Declaration, Ex. 22 illustrates just how the Tour's strategic alliance with the European Tour evolved to thwart competitive entry. That agreement effectuated the removal of an important potential LIV Golf partner, and bolstered the exclusionary

---

[7] The actions of the Tour and the European Tour are also unlawful under the rule of reason. *FTC*, 476 U.S. at 460-61. Here, where there is an agreement to punish players to foreclose competitive entry, it is inconceivable that there is a colorable procompetitive justification that could outweigh the obvious competitive harm from excluding a once-in-a-generation potential entrant. As described *infra*, at 12–14, the Tour has monopoly power in the relevant market, and the anticompetitive effects of starving potential entrants of skilled players are clear. Leitzinger Decl. ¶¶ 17–61, 83–88. Just because "*some* restraints are necessary to create or maintain a league sport does not mean *all* aspects of elaborate interleague cooperation are." *Alston*, 141 S.Ct. at 2156 (cleaned up). Any purported "procompetitive benefits" of the challenged Regulations can be achieved through "substantially less restrictive restraints;" and there can be no doubt that absent anticompetitive rules like the Media Rights and Conflicting Events Prohibitions, the Tour's golf tournaments would still "go on." *Id.* at 2157, 2162.

consequences of its punishments and threats. Such an agreement to boycott a would-be entrant is a clear antitrust violation, under either the per se rule or the rule of reason. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *Volvo N. Am. Corp.*, 857 F.2d at 73; *see also Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 467–68 (1941) (scheme to boycott any customer that used textile of a competitor to achieve the "intentional destruction" of that competitor violated Section 1).

In addition, the Tour's suspensions of TRO Plaintiffs necessarily constitute an unlawful group boycott because they effectively foreclose the suspended players from the market. *See Blalock v. LPGA*, 359 F. Supp. 1260, 1265-66 (N.D. Ga. 1973) (one-year suspension of golfer constituted an illegal group boycott as it is "tantamount to total exclusion from the market of professional golf"). Because this conduct is per se unlawful, and serves no procompetitive purpose even if the rule of reason applies, TRO Plaintiffs are highly likely to succeed in a Section 1 violation.

4.    **The Tour's Appeal Process Does Not Justify The Suspensions, Both Because The Suspensions Were An Illegal Exercise of Monopoly Power, And Because They Were Unfair.**

The Tour is wrong if it attempts to rely on its procedures or its internal appeals process to argue that the suspensions should be upheld. The arguments would fail at the outset because fair process (even assuming it was provided) does not justify an illegal exercise of monopoly power. But the Tour's processes were not fair. And because TRO Plaintiffs were unlawfully denied fair proceedings and an impartial arbiter during the Tour's imposition of their career-threatening suspensions, that provides a separate and independent basis for them to succeed on the merits.

The Tour must provide its members with fair process in disciplining them. Since the Tour is a private membership organization "tinged with public . . . purpose" it must provide fair process in disciplining members. *McCune v. Wilson*, 237 So. 2d 169, 173 (Fla. 1970). Further, where, as here, the organization "exercis[es] virtually monopolistic control" over a profession, expulsion would harm the professional's career, and thus "the power (of exclusion) should not be unbridled" and should be "exercised in a reasonable and lawful manner." *Pinsker v. Pac. Coast Soc. of Orthodontists*, 460 P.2d 495, 498 (Cal. 1969); *see also Rewolinski v. Fisher*, 444 So. 2d 54, 58 (Fla. Dist. Ct. App. 1984) (requiring

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
CASE  NO. 3:22-cv-04486

Gibson, Dunn &
Crutcher LLP

fair process where "the association's action adversely affects substantial . . . economic rights").[8]

Fair process must include impartial review. *McCune*, 237 So. 2d at 173; *see also Ernst v. Cincinnati Bengals, Inc.*, 1976 WL 189949, at *2 (Ohio Ct. App. Aug. 30, 1976) (concluding NFL Commissioner had to be "impartial and unbiased" in disciplinary process). However, Commissioner Monahan demonstrated his bias and tainted the Appeals Committee in multiple ways. As early as 2020, he wrote his Monopoly Manifesto to the Appeals Committee, notifying them of his plan to punish golfers to thwart competition. Brass Decl. Ex. 19. Over the two years since receiving the Monopoly Manifesto, not one member of the Appeals Committee has disavowed it. Commissioner Monahan has since then engaged in a long-running and public vendetta against everything LIV Golf-related. *Id.* Consequently, once the Tour's internal disciplinary process started (a process Monahan initiates and oversees), its outcome was foretold. *Id.* Exs. 4, 18, and it doesn't care what the court says. *Id.* Ex. 62.

Further, the Tour's disciplinary process provided TRO Plaintiffs was entirely unfair considering the magnitude of the penalties imposed. The players had no ability to negotiate the Regulations, and no alternative but to accept them. *E.g.*, Gooch Decl. ¶ 3. The Regulations purport to provide the Commissioner with unlimited discretion to interpret the Regulations and punish players, and, as in this case, impose what effectively amounts to career bans from the Tour. Brass Decl. Ex. 12 at 87. Furthermore, while the players' appeals of Commissioner Monahan's suspensions—challenging them as unlawful anticompetitive conduct—were pending, Commissioner Monahan more than doubled their suspensions—demonstrating that he is not giving players and their appeals any serious consideration. *E.g.*, Gooch Decl. Ex. M. Meanwhile, the Commissioner has also (1) failed to timely notify Plaintiff Gooch of his appeal decision, *id.* ¶ 35; (2) failed to send disciplinary inquiry letters to TRO Plaintiffs despite sending those letters to other similarly situated golfers, e.g., Swafford Decl. ¶¶ 25–26; (3) claimed TRO Plaintiffs failed to respond when they had in fact responded, *id.* Ex. J; and (4) failed to honor the provision of the Regulations that abates suspensions pending appeal, Gooch Decl. Exs. M–N—leaving TRO Plaintiffs with no choice but to come to the Court to seek immediate interim relief.[9]

---

[8] There is no conflict between California and Florida law regarding Plaintiffs' right of fair procedure, and thus California law applies and does not change the result. *See Telekenex*, 913 F. Supp. 2d at 800.
[9] The Regulations also include an unenforceable release of claims against the Tour and others in the disciplinary process, and unfairly deem failure to participate in the process as an admission of the charges. Courts have recognized that parties cannot contractually evade antitrust liability. *See, e.g.*,

NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER
CASE  NO. 3:22-cv-04486

Gibson, Dunn &
Crutcher LLP

The Tour's one-sided and harsh disciplinary proceedings only further compel a finding of unfairness and an abatement of the Tour's suspensions. *See McCune*, 237 So.2d at 173.

## B. TRO PLAINTIFFS WILL SUFFER IRREPARABLE HARM

A party seeking a temporary restraining order must demonstrate that "irreparable injury is likely in the absence of an injunction." *Disney Enter., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 865 (9th Cir. 2017) (emphasis omitted). To establish irreparable harm, a movant must generally show that the injury cannot be adequately compensated by monetary damages. 15 U.S.C. § 26. A threat of irreparable harm is "sufficiently immediate to warrant preliminary injunctive relief if the plaintiff is likely to suffer irreparable harm before a decision on the merits can be rendered." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (citation and quotation marks omitted).

TRO Plaintiffs have experienced—and continue to experience—irreparable harm, because the Tour's unlawful suspensions deny them the ability to participate in the FedEx Cup Playoffs, which each has earned the right to play. Gooch Decl. ¶¶ 42–46; Swafford Decl. ¶¶ 41–46; Jones Decl. ¶¶ 41–46. The Tour concedes the Playoffs are special and that playing in them is meaningful to the TRO Plaintiffs. Brass Decl. Ex. 1. If the Tour's suspensions of the TRO Plaintiffs are not immediately enjoined, TRO Plaintiffs will (1) lose the opportunity to qualify for the 2023 Majors, (2) lose opportunities to accumulate points, (3) lose chances to qualify for other premier tournaments, (4) lose income earning opportunities, and (5) suffer irreparable losses to goodwill, reputation, and brand. Gooch Decl. ¶¶ 42–46; Swafford Decl. ¶¶ 41–46; Jones Decl. ¶¶ 41–46. These injuries will be complete upon the inception of the FedEx Cup Playoffs; and no monetary relief could compensate TRO Plaintiffs for these injuries. The only reason TRO Plaintiffs are being denied this opportunity is because they are the targets of the Tour's unlawful scheme to defeat its new competitor—LIV Golf.

Because of the "undisputed brevity and precariousness of the players' careers in professional sports," courts recognize that even a short-term player suspension causes irreparable injury. *Jackson v. NFL*, 802 F. Supp. 226, 231–35 (D. Minn. 1992) (enjoining NFL from preventing football players' participation in league); *see also O.M.*, 544 F. Supp. 3d at 1077 (soccer player irreparably harmed if

---

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (if contractual term operated "as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy").

prevented from competing because "the career of a professional soccer player is short, and . . . there are no substitutes to actual professional competition to help her realize her full potential"). Professional golf is no exception. The Ninth Circuit has recognized that restricting professional golfers' ability to play golf causes "immeasurable injuries" and irreparable harm. *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991) (forcing golfers not to use the club of their choice would cause irreparable harm because it would "have an immediately discernible but unquantifiable adverse impact on their earnings, their ability to maintain their eligibility for the tour, and for endorsement contracts"). Here, the harm is more acute, as the Tour's ban prevents Plaintiffs from *all play*.[10]

If the Tour is allowed to proceed with its anticompetitive behavior, it risks severely harming TRO Plaintiffs' careers. The Tour has already indefinitely suspended any player who participates in LIV Golf events. Gooch Decl. ¶ 36; Swafford Decl. ¶ 34; Jones Decl. ¶ 34. The Tour is trying to prevent TRO Plaintiffs, whom it views as defecting from its monopoly, from performing at an elite level *anywhere*. *E.g.* Gooch Decl. Ex. A. The only elite golf leagues in existence today are the Tour and LIV Golf, and the Tour wants to exclude the players from participating in *both* at a pivotal juncture—the FedEx Cup Playoffs. The Tour itself describes the FedEx Cup as the "pinnacle." Brass Decl. Ex. 1. The Playoffs are critical to the TRO Plaintiffs' careers, and their attempts try to qualify for the Majors and other key 2023 events. Gooch Decl. ¶ 42; Swafford Decl. ¶ 41; Jones Decl. ¶¶ 41–42. Moreover, the irreparable harm to the TRO Plaintiffs is imminent, as the FedEx Cup begins in 8 days.[11]

## C.    THE BALANCE OF THE EQUITIES WEIGHS IN TRO PLAINTIFFS' FAVOR

The balance of harms here clearly weighs in TRO Plaintiffs' favor. *See Boardman*, 822 F.3d

---

[10]  *See, e.g.*, *Denver Rockets v. All-Pro Mgmt., Inc.*, 325 F. Supp. 1049, 1057 (C.D. Cal. 1971) (player would "suffer irreparable injury in that a substantial part of his playing career will have been dissipated, his physical condition, skills and coordination will deteriorate from lack of high-level competition, [and] his public acceptance as a super star will diminish to the detriment of his career"), *reinstated by Haywood*, 401 U.S. 1204, 1207 (1971); *Linseman v. World Hockey Ass'n*, 439 F. Supp. 1315, 1319–20 (D. Conn. 1977) (similar).

[11]  The Tour's suspensions further deprive TRO Plaintiffs and other players access to the LIV Golf Invitational matches, and if not enjoined, those efforts will negatively impact LIV Golf's business and deprive the players of sustained competition for their services. Plaintiffs plan to seek a preliminary injunction to ensure they are not unlawfully punished for further participation in LIV Golf and their suspensions for doing the same are stayed pending the outcome of this litigation.

at 1020 (the balance of equities weighs heavily in plaintiffs' favor where there is a reasonable probability of "substantially lessen[ed] competition" injuring plaintiffs and no evidence that "maintaining the status quo . . . will injure [defendants]"). As TRO Plaintiffs have demonstrated, the Tour's suspensions deprive them of their ability to play in the FedEx Cup, or perhaps even play on the Tour ever again, and denying them the professional and financial benefits of participating in these events. *Prop Sols., LLC v. GOPD, LLC*, 2016 WL 8902589, *5 (N.D. Ga. Dec. 8, 2016) (recognizing as decisive, in weighing the relative harms, the inability of "at least some" of 300 businesses to continue operating).

Against these injuries, the Tour cannot demonstrate any discernible injury that would result from a temporary restraining order. The TRO Plaintiffs have qualified for the FedEx Cup Playoffs under the Tour's own point system. To exclude them from these tournaments would actually *weaken* the fields for those events by removing players who earned their right to play and replacing them with lower-ranked players. Gooch Decl. Ex. J. And, the Tour violates its own Regulations which require the result TRO Plaintiffs seek—abatement of their suspensions. Brass Decl. Ex. 12 (VII.E.2). In any event, because the Tour's conduct is without any legitimate justification, its cessation will do the Tour no harm. The Tour cannot possibly claim any harm as a result.

The Tour might contend that staying the three TRO Plaintiffs' suspensions risks upending the Tour's business model as the enforceability of its Regulations are called into question. But the Ninth Circuit has already rejected that same argument from the Tour. *See Gilder*, 936 F.2d at 424. Moreover, it would obviously be hyperbolic to assert that the participation by these three golfers in a three-tournament event risks any serious consequences to the Tour (in contrast to the severe harm the ban would do to the TRO Plaintiffs). Indeed, the Tour's own Regulations provide precisely what the TRO Plaintiffs are seeking here—a stay of punishments pending appeal. Brass Decl. Ex. 12 (VII.E.2). The Tour breached the plain terms of its Regulations by expressly refusing to abate the TRO Plaintiffs' suspensions pending appeal, Gooch Decl. Ex. L, meaning any harm to the Tour from a suspended player playing in a Tour tournament is self-inflicted. Brass Decl. Ex. 51. In addition, as a matter of law, the Tour does not suffer any cognizable harm if it is prevented from enforcing unlawful Regulations. *See AECOM Energy & Constr., Inc. v. Morrison Knudsen Corp.*, 748 F. App'x 115, 120 (9th Cir. 2018)

1    (affirming preliminary injunction where defendant "will merely be required to cease [its] illegal activ-

2    ities"); *see also Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.*, 2014 WL 4679001, *13 (C.D.

3    Cal. Sept. 18, 2014) ("There is no hardship to a defendant when a [temporary restraining order] would

4    merely require the defendant to comply with law.").

5            Finally, the relief requested here would impart no harm to other golfers or affiliates; they will

6    be able to carry on with their normal course of business. Golfers can continue to participate in the

7    Tour's tournaments. That the Tour promised to add lower-ranking golfers to replace TRO Plaintiffs is

8    of no import. Brass Decl. Ex. 51. The Tour could easily add a tee time to accommodate the three

9    golfers, as was done during the Scottish Open. *Id.* Ex. 22. The equities therefore favor entry of the

10   proposed order. A Sports Resolution (UK) judge has already concluded the same: the equitable result

11   is to avoid irreparably harming the professional golfers' careers by letting them play in critical tourna-

12   ments by staying their sanction until an impartial court can rule on the legality of the suspension. *Id.*

13   **D.      THE PUBLIC INTEREST SUPPORTS A TEMPORARY RESTRAINING ORDER**

14           The public interest factor is concerned with the rights of non-parties. *See Boardman*, 822 F.3d

15   at 1023–24. There is a strong public interest in enforcing the antitrust laws and preserving free and fair

16   competition. *See id.* at 1024 ("state and federal" antitrust laws "preserve competition" which is "vital

17   to the public interest" (quoting *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir.

18   2000)). Enjoining an antitrust violation that harms consumers (golf fans) is in the public interest.

19           A temporary restraining order would also serve the public interest by promoting competition

20   for the services of professional golfers for elite golf events. Leitzinger Decl. ¶¶ 83–88. By allowing

21   TRO Plaintiffs to participate in the FedEx Cup, the competition would improve. Moreover, LIV Golf

22   offers the first meaningful competition in elite professional golf in decades. *Id.* ¶ 64. Denying the

23   Motion would only serve to further entrench the Tour's monopoly by imposing career threatening pun-

24   ishment on independent contractors for simply playing with a competitor. This would have a chilling

25   effect on competition for players' services and deny the public fans more, better elite professional golf.

26   *See DNA Genotek Inc. v. Spectrum Sols. L.L.C.*, 2016 WL 8738225, at *5 (S.D. Cal. Oct. 6, 2016) ("the

27   public interest would be better served by increased competition between two competitors").

28

Gibson, Dunn &
Crutcher LLP

# V. CONCLUSION

For all of these reasons, TRO Plaintiffs respectfully request that the Court grant their motion for temporary restraining order, and enter the accompanying proposed order.

DATED: August 3, 2022                      GIBSON, DUNN & CRUTCHER LLP

By:  ___/s/ Rachel S. Brass___
                 Rachel S. Brass

RACHEL S. BRASS, SBN 219301
    rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

ROBERT C. WALTERS, *pro hac vice forthcoming*
    rwalters@gibsondunn.com
SCOTT K. HVIDT, *pro hac vice forthcoming*
    shvidt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201-2911
Telephone: 214.698.3100

JOSHUA LIPTON, *pro hac vice forthcoming*
    jlipton@gibsondunn.com
KRISTEN C. LIMARZI, *pro hac vice forthcoming*
    klimarzi@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone: 202.955.8500

JOHN B. QUINN, SBN 90378
  johnquinn@quinnemanuel.com
DOMINIC SURPRENANT, SBN 165861
  dominicsurprenant@quinnemmanuel.com
KEVIN TERUYA, SBN 235916
  kevinteruya@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
  bobfeldman@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone: 650.801.5000

*Attorneys for Plaintiffs Talor Gooch, Hudson Swafford,
Matt Jones, Bryson DeChambeau, Abraham Ancer,
Carlos Ortiz, Ian Poulter, Pat Perez, Jason Kokrak and
Peter Uihlein*

\* \* \* \* \* \* \*

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1

Pursuant to Civil Local Rule 5-1(h)(3) of the Northern District of California, I attest that con-currence in the filing of the document has been obtained from each of the other signatories to this document.

DATED: August 3, 2022          GIBSON, DUNN & CRUTCHER LLP


                              By:    /s/ Rachel S. Brass
                                      Rachel S. Brass