**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **PHIL MICKELSON, TALOR GOOCH, HUDSON SWAFFORD, MATT JONES, BRYSON DECHAMBEAU, ABRAHAM ANCER, CARLOS ORTIZ, IAN POULTER, PAT PEREZ, JASON KOKRAK, AND PETER UIHLEIN** | **No.  3:22-cv-04486** |
| **Plaintiffs,** | |
| **v.** | |
| **PGA TOUR, INC.,** | |
| **Defendant.** | |

**EXPERT DECLARATION OF JEFFREY LEITZINGER, PH.D.**

**Econ ONE Research, Inc.**

**August 2, 2022**

**Mickelson et al. v. PGA TOUR**

Suite 800
550 South Hope Street
Los Angeles, California 90071

# TABLE OF CONTENTS

**I.    Introduction** ...............................................................3

**II.   Summary of Conclusions** ........................................5

**III.  Background** ...........................................................7

    A.  Governing Organizations ................................................ 7

    B.  Tour Organizations ........................................................ 8

    C.  The PGA Tour ............................................................. 10

    D.  The Key Role of Leading Golfers ..................................... 14

**IV.   The Event Participation Market** ...............................19

**V.    The Relevant Geographic Market**............................22

**VI.   Monopsony Power in the Event Participation Market**...............25

    A.  The PGA TOUR's Dominant Market Position ........................ 25

    B.  Entry Barriers ............................................................. 27

    C.  Direct Evidence of Market Power...................................... 27

**VII.  Anti-Competitive Conduct** .....................................33

    A.  The LIV Golf Threat ....................................................... 33

    B.  The Challenged Conduct................................................. 34

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

C. Economic Perspective ..................................................................... 37

D. Harm to Competition ..................................................................... 43

**VIII. Mobility Restraints in Other Sports ........................................46**

A. Efforts to Restrain Mobility in Other Sports........................................ 46

B. The Competitive Impact of New Organizers........................................ 51

C. The Monopsony Power Flowing from Mobility Restrictions Has Been
Significant............................................................................... 53

D. Lifting Competitive Restrictions Did Not Destroy Sports .................... 54

**IX. The PGA TOUR's Justifications.................................................57**

A. Protecting the Best Interests of the Tour and Its Golfers .................... 58

B. Freeriding on Investments to Establish and Promote PGA Tour
Members................................................................................. 60

**Appendix A — List of Elite Golfer Names, Event Participation, and
Earnings, 2021 ......................................................................63**

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

# I.    Introduction

1.    My name is Jeffrey J. Leitzinger. I am an economist and Managing Director at Econ One Research Inc., an economic research and consulting firm headquartered in Los Angeles, California with offices in a number of other cities. I have both master's and doctoral degrees in economics from the University of California at Los Angeles and a bachelor's degree in economics from Santa Clara University. During the four decades of my professional career, I have worked on numerous projects relating to antitrust economics, including analyzing issues involving market power, market definition, and anti-competitive conduct. I also have testified on numerous occasions as an expert economist in state and federal courts. A more detailed summary of my training, past experience, and prior testimony is shown in **Exhibit 1**.

2.    Plaintiffs Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Abraham Ancer, Carlos Ortiz, Ian Poulter, Pat Perez, Jason Kokrak, and Peter Uihlein ("Plaintiffs") have brought this action in response to certain rules, policies, and conduct regarding participation of PGA Tour members in events outside the PGA Tour,[1] including specifically the proposed LIV Golf League and LIV Golf Invitational Series (the "Challenged Conduct"). Among other things, Plaintiffs challenge:

   a.  the PGA TOUR's announced intention to impose a lifetime ban on any golfer that joins or participates in LIV Golf;

   b.  the PGA TOUR's imposition of indefinite, long-term, and effective lifetime bans on Plaintiffs for playing in LIV Golf events;

   c.  the PGA TOUR's imposition of indefinite, long-term, and effective lifetime bans on Tour members who resigned membership when they joined LIV Golf;

---

[1] For clarity of discussion in this declaration, I use the term "PGA TOUR" (all caps) to refer to the organization, PGA Tour, Inc., and use terms "PGA Tour" or "Tour" to refer to the namesake tour of professional golf events. *See infra* paragraph 15.

Page 3

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

d.  the PGA TOUR's amendments to and expansion of its Media Rights and Conflicting Events Regulations in response to competitive pressure from LIV Golf;

e.  the PGA TOUR's use of those regulations to preclude Tour members from playing in LIV Golf events;

f.  an agreement between the PGA TOUR and the European Tour, to similarly exclude golfers that participate in LIV Golf events from participation in their events and cease competition for golfers' services;

g.  threats by the PGA TOUR that Tour agents representing Tour members who elected to join LIV Golf would lose their Tour credentials;

h.  PGA TOUR efforts involving organizers of the Majors to create doubt about the eligibility of LIV Golf participants.[2]

3.  Plaintiffs maintain that the purchase of services from top-level touring professionals for elite-level tournaments (of the sort which comprise the PGA Tour) in the US, referred to below as the Event Participation Market, is a relevant market for purposes of analyzing their antitrust claims.[3] In this market, the PGA TOUR is a buyer of event participation services from professional golfers. Plaintiffs maintain that the PGA TOUR possesses monopsony power in this market and that the Challenged Conduct has enhanced and maintained that power.[4] Finally, Plaintiffs maintain that the Challenged Conduct cannot be justified as reasonably necessary to achieve pro-competitive or efficiency-enhancing benefits.[5]

4.  I have been asked to determine whether the economic evidence available at this preliminary (i.e., pre-discovery) stage of the litigation supports these claims. In the course of our work on this assignment, my staff and I have reviewed Plaintiffs' complaint; declarations and other materials submitted with Plaintiffs' motion for a

---

[2] Mickelson et al. Complaint Against PGA TOUR, Inc., 8/2/2022 ("Complaint") at 5-7.

[3] Complaint at 84.

[4] Complaint at 8.

[5] Complaint at 92.

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

temporary restraining order; various scholarly publications in the economic and sports literature; golf and other sports news publications; golf tour organization websites; publicly available US and non-US data on golfer compensation, golfer world rankings, and golf event participation; marketing research documents prepared for LIV Golf; PGA TOUR emails and memoranda, and PGA TOUR tax filings (all of which are listed in **Exhibit 2**). My work on this case is ongoing and I may update or supplement my opinions as additional information becomes available in this case.

5.  Econ One is being compensated for the time I spend on this matter at my normal and customary rate of $895 per hour. Econ One also is being compensated for time spent by research staff on this project at their normal and customary hourly rates. None of this compensation is in any way contingent on the outcome of the case.

## II.   Summary of Conclusions

6.  The economic evidence I have reviewed at this stage supports Plaintiffs' claims regarding the relevant market. That evidence also supports Plaintiffs' claim that the PGA TOUR has monopsony power in that market.

7.  That power has been threatened by a new and significant source of competition to the PGA TOUR as a buyer of elite golfer services, namely LIV Golf. This new event series brings innovation to professional golf, including a new format which presents competition in a more manageable viewing window, no cuts, and team competitions, all of which are designed to increase fan interest in the sport and attract significant interest from professional golfers.

8.  Competition from LIV Golf has created competitive pressure on payments to golfers, undoing (at least for now) some of the PGA TOUR's monopsony power. The market has already seen higher compensation for golfers, both in LIV Golf events and from the PGA TOUR in its events. LIV Golf will also increase output in the relevant market, organizing additional events for golfers and fans showcasing competition at the elite level.

9.  As an economic matter, it is also clear that the Challenged Conduct likely imposes a significant barrier to the competition (and competitive benefits for golfers) that LIV Golf would otherwise create. The Challenged Conduct reduces Plaintiffs' ability to sell their services to other buyers. That conduct creates the expectation (or in the case

Page 5

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

of Tour members that have already elected to participate in LIV Golf events, the reality) of substantial costs should golfers make a competitive choice. These costs would include the loss of expected lifetime playing revenues on the Tour and (by virtue of the threatened use of media rights regulations) the loss of national exposure, along with the fan interest and endorsement opportunities that go with it. The costs would also include a loss of opportunities to earn ranking points, to earn entry into the Majors, and to earn retirement benefits. Given these added costs, many Tour members understandably would be very reluctant or altogether unwilling to participate in LIV Golf events.[6] It is no surprise then that many elite golfers that agreed to participate in LIV Golf events required large upfront payments.

10. Limited elite golfer participation in LIV Golf events also means limited fan interest. That, combined with the PGA TOUR's control of its members' media rights (one of the elements in the Challenged Conduct) will likely reduce LIV Golf's prospects for TV coverage and event sponsorship—key sources for revenue needed to support elite-level events. The impact on LIV Golf directly harms the Plaintiffs and harms competition for their services, reduces output of playing opportunities, and suppresses golfers' compensation. In effect then, the Challenged Conduct is squeezing LIV Golf both from a cost and a revenue perspective—an ideal recipe as an economic matter for blocking competition.

11. Finally, while the PGA TOUR publicly has offered various justifications for the Challenged Conduct, much of it mirrors oft-repeated rationales from disputes over player mobility in other sports. Those rationales have found little economic support generally and have even less applicability here given the facts and circumstances of elite-level competitive golf. Moreover, as is widely recognized in antitrust economics, mere conjecture about efficiencies or pro-competitive justifications does not outweigh the real, tangible costs of continuing monopsony power. Hence, an economically meaningful justification requires cognizable pro-competitive or efficiency benefits that both outweigh the costs of monopoly power and cannot be achieved through less restrictive means. In the evidence available at this stage, I see no justification likely to meet this test.

---

[6] In that regard, less than 10 percent of PGA Tour members chose to do so.

econ **ONE**

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

## III.  Background

### A. Governing Organizations

12.  The sport of golf is jointly governed by two separate organizations: The United States Golf Association (USGA), which governs the sport in the US and Mexico, and the Scotland-based R&A, which governs the sport in the rest of the world. These two organizations jointly determine the rules of golf and thereby share a single code of rules. In addition to rule-setting, both entities respectively organize certain professional and amateur competitive golf events, the most notable of which include two Major tournaments, namely the US Open (USGA) and the British Open (R&A).[7]

13.  The Professional Golf Association of America (PGA of America) is a US organization that certifies and sets standards for golf professionals who do not make their livings by playing in tournaments but rather by working at venues such as golf courses, golf clubs, pro shops, and driving ranges. The PGA of America also organizes certain national and local professional tournaments, including the PGA Championship (one of the four Major tournaments)[8] and the Ryder Cup, a prestigious biennial event involving team competition between the US and Europe.

14.  Representatives of the PGA of America and the USGA also serve—along with representatives from the PGA TOUR and the European Tour—on the Governing Board of the Official World Golf Rankings ("OWGR"), a system which comparatively ranks tour professional golfers throughout the world.[9] OWGR's rankings are often used as qualifying criteria for entry into the Majors and other premiere golf events.

---

[7] *See infra* paragraph 16.

[8] *See infra* paragraph 16.

[9] Those representatives include CEO of the European Tour (Keith Pelley), General Counsel of the European Tour (Ben Bye), COO of the European Tour (Keith Waters), CEO of the PGA of America (Seth Waugh), Executive Director of the United States Golf Association (Mike Whan), Senior Director of the Masters Tournament at the Augusta National Golf Club (Buzzy Johnson), CEO of the R&A (Martin Slumbers), the former CEO of the R&A (Peter Dawson), as well as the Commissioner of the PGA TOUR (Jay Monahan). Complaint at 19.



## B. Tour Organizations

15.     There are organizations within the sport of golf that are in the business of organizing and promoting tours of competitive events involving professional golfers. Typically, those organizations offer a series of events over the course of the year (or season) tailored to golfers of certain skill levels, ages, or worldwide regions. These event series are known as golf tours. The tour organizations active in the sport of golf today include:

- *The PGA TOUR.* It organizes the principal men's golf tour in the US—also named the PGA Tour. In addition, the PGA TOUR organizes a senior tour known as the PGA Tour Champions (for golfers aged 50 or over), the Korn Ferry Tour (a US-based developmental tour), the PGA Tour Latinoamérica (a regional tour based in Latin America), and the Mackenzie Tour-PGA Tour Canada (a regional tour based in Canada).[10]

- *The PGA European Tour.* It organizes the European Tour[11] (Europe's principal men's tour), the European Senior Tour, and the developmental Challenge Tour.

- *The PGA of Australia.* It organizes a professional men's tour currently known as the ISPS Handa PGA Tour of Australasia, which holds events in Australia, New Zealand, and Papua New Guinea. It also organizes a senior tour known as the PGA Legends Tour.[12]

---

[10] PGA TOUR website (https://www.pgatour.com/), accessed 6/9/2022. The PGA TOUR also organizes and manages a series of events in China known as the PGA Tour Series-China. This series has been on hiatus since 2020 due to the Covid-19 pandemic.

[11] The official name of the European Tour was changed to the "DP World Tour" in 2021 following a change in sponsorship. For clarity of discussion, I refer to this golf tour by its former name, the "European Tour." European Tour website (https://www.europeantour.com/dpworld-tour/), accessed 6/9/2022; and European Tour website, *European Tour to become the DP World Tour from 2022* (https://www.europeantour.com/dpworld-tour/news/articles/detail/european-tour-to-become-the-dp-world-tour-from-2022/), accessed 6/9/2022.

[12] PGA of Australia website (https://pga.org.au/), accessed 6/9/2022.

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

- *The Japan Golf Tour Organization*. It organizes the principal men's golf tour in Japan known as the Japan Golf Tour as well as a developmental tour known as the ABEMA Tour.[13]

- *The Asian Tour*. It organizes the principal men's golf tour in Asia (except for Japan) as well as a developmental tour known as the Asian Development Tour.[14]

- *The Sunshine Tour*. It organizes the principal men's golf tour in South Africa—also named the Sunshine Tour—as well as a senior tour known as the Sunshine Senior Tour, and a developmental tour known as the Big Easy Tour.[15]

- *The KPGA Korean Tour*. A men's tour with events in South Korea.[16]

16. In addition to participation in one or more of the tours listed above, top-level touring professionals may also play in one or more of the four Majors (the Masters, the US Open, the British Open, and the PGA Championship), which are typically regarded as the premiere events for professional golfers.[17] Other prestigious events that typically attract the sport's leading golfers include the World Golf Championships ("WGC"),[18] the Players Championship, and the FedEx Cup Playoffs.[19]

---

[13] Japan Golf Tour Organization website (https://www.jgto.org/en/), accessed 6/9/2022.

[14] Asian Tour website (https://asiantour.com), accessed 6/9/2022.

[15] Sunshine Tour website (https://sunshinetour.com), accessed 6/9/2022.

[16] KPGA Korean Tour website (https://www.kpga.co.kr/), accessed 6/9/2022.

[17] These events are attractive to top golfers because they offer high purses, provide top finishers with exemptions from future qualifying events and create high visibility along with endorsement opportunities. S. Shmanske, *Golfonomics*, World Scientific Publishing Co., 2004 ("Shmanske") at 196-197.

[18] The WGC are events co-sanctioned by the founding members of the International Federation of PGA Tours. Those members include the PGA TOUR, the PGA European Tour, the Asian Tour, the Japan Golf Tour Organization, the PGA Tour of Australasia, and the Sunshine Tour. WGC website, *History: World Golf Championships* (https://www.worldgolfchampionships.com/overview.html), accessed 6/9/2022.

[19] PGA TOUR website, *HOW IT WORKS: FEDEXCUP PLAYOFFS* (https://www.pgatour.com/tournaments/fedex-st-jude-championship/news/2022/01/25/how-it-works-



### C.  The PGA Tour

17.     Prior to LIV Golf's entry, the PGA TOUR was the sole provider of golf tours for leading professional golfers in the US (of course, LIV Golf is seeking to change that). Its showcase tour is the PGA Tour, which stages events on most weekends year-round at different courses around the country,[20] presenting competition among the best professional golfers in the world.[21] The PGA TOUR is far and away the country's leading employer of event participation services from the top (male) professional golfers.[22] For example, in 2021, 82 percent of the top 100 golfers (based upon the OWGR) were members of the PGA Tour.[23]

18.     Prior to LIV Golf's entry, the PGA Tour was the only tour for leading golfers in the US. It is also the largest professional golf tour in the world in terms of the number of events and the size of purses offered. In Table 1 below, I provide some comparative data for the PGA Tour and other men's tours for 2019.[24] As shown in the table, the PGA Tour had more events than any of the other tours. On average, PGA Tour events had much larger purses, offered more OWGR points, and included better performing golfers (as indicated by the strength of field—a measure commonly used

---

fedexcup-playoffs.html), accessed 7/22/2022 ("The FedExCup is a season-long points competition that culminates with the FedExCup Playoffs, a series of three tournaments to determine the FedExCup champion.").

[20] The PGA Tour also organizes a few events on courses outside of the US, such as Canada and Mexico.

[21] As noted above, the PGA TOUR also organizes a tour (the Korn-Ferry tour) for golfers below the top tier—who might seek to improve their skills and qualify for the PGA Tour or simply continue as a professional golfer at a less competitive level with lower purses. The PGA TOUR also organizes the PGA Tour Champions tour for professional golfers over 50 years of age.

[22] As of May 2022, before any golfers resigned or were suspended from the PGA Tour for participating in LIV Golf events, there were 283 golfers listed as "active players" on the PGA Tour's player directory. PGA TOUR website, *PGA TOUR Players* (https://www.pgatour.com/players.html), accessed 5/4/2022 ("PGA Tour Player Directory").

[23] Because the OWGR is updated weekly based on tournament outcomes, this figure reflects the average weekly percentage of the top 100 golfers in 2021.

[24] I use 2019 data here because the Covid-19 pandemic led to a number of event cancellations as well as other changes to these tours' regular season schedules occurring in 2020 and 2021. For example, the PGA Tour cancelled several events in 2020 and the Asian tour combined 2020, 2021, and 2022 into a single season.

**econ ONE** *Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

in golf to reflect the typical play caliber of the event participants) than events on other tours.

### Table 1 – Comparative Statistics of Professional Golf Events, 2019

| Tour | Total Events | Average Purse Amount ($) | Average Total OWGR Points | Average Strength of Field |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| PGA Tour | 41 | 6,931,921 | 253 | 305 |
| European Tour | 28 | 3,535,214 | 174 | 154 |
| Japan Golf Tour | 20 | 1,243,672 | 80 | 39 |
| Sunshine Tour | 20 | 95,213 | 38 | 3 |
| Asian Tour | 9 | 480,703 | 63 | 9 |
| PGA Tour of Australasia | 9 | 236,571 | 45 | 66 |

Note: The figures in this table exclude co-sanctioned events.

Sources: Golf events, points, and strength of field were obtained from the Official World Golf Rankings website. Purse information was obtained from respective tour websites.

19.   In the US, the PGA Tour has more live broadcast network TV coverage and viewership than any other tour or individual marquee event, as shown in Table 2 below. PGA Tour events also receive substantial coverage (both live and delayed) on US cable TV networks. Events on other men's tours—particularly the European Tour—also receive some live coverage, mostly on cable networks and (obviously) with less popular airtimes late at night or early in the morning.[25]

---

[25] *See e.g., Golf News Net website, 2021 DP World Tour Championship Dubai TV schedule: How to watch on Golf Channel* (https://thegolfnewsnet.com/golfnewsnetteam/2021/11/18/how-to-watch-2021-dp-world-tour-championship-dubai-european-tour-tv-schedule-times-golf-channel-124550/), accessed 6/9/2022.

econ **ONE**

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

**Table 2 – US Television Viewership of Live Golf Events, 2021**

| Event | Broadcast Television | | Cable Television | |
| | Viewers (thousands) | Share (%) | Viewers (thousands) | Share (%) |
| (1) | (2) | (3) | (4) | (5) |
| ***Tour Events*** | | | | |
| PGA Tour | 125,765 | 66.0% | 110,251 | 62.7% |
| European Tour | 0 | 0.0% | 13,461 | 7.6% |
| Asian Tour | 0 | 0.0% | 188 | 0.1% |
| Japan Golf Tour | 0 | 0.0% | 0 | 0.0% |
| Sunshine Tour | 0 | 0.0% | 500 | 0.3% |
| PGA Tour of Australasia | 0 | 0.0% | 0 | 0.0% |
| PGA Tour Champions | 2,012 | 1.1% | 16,885 | 9.6% |
| Korn Ferry Tour | 0 | 0.0% | 2,211 | 1.3% |
| | | | | |
| ***Other Events*** | | | | |
| The Masters | 14,866 | 7.8% | 5,093 | 2.9% |
| The US Open | 14,203 | 7.5% | 4,722 | 2.7% |
| The PGA Championship | 10,561 | 5.5% | 5,369 | 3.1% |
| The Open | 10,039 | 5.3% | 4,913 | 2.8% |
| World Golf Championships | 13,167 | 6.9% | 7,030 | 4.0% |
| Ryder Cup | 0 | 0.0% | 5,344 | 3.0% |
| Total Viewers | 190,613 | | 175,967 | |

Source: Nielsen TV viewership data (Persons aged 2-99) as reported in a marketing presentation prepared by Performance 54 (Highly Confidential).

20.     The PGA TOUR is paid for putting on these events through a combination of attendance fees from fans, payments from TV networks, and sponsorship dollars from companies who advertise at the events. According to the PGA TOUR's most recent publicly available consolidated tax filing, its production and TV contracts have represented 48 percent of the payment for these events, tournament and other program service revenue another 36 percent, and program sponsorship the remaining

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

16 percent.[26] The PGA TOUR provides the purses for each event that are used to compensate the participating golfers, pays the golf facilities that host its events, pays the staff needed to run those events and, typically, makes donations to local charities.

21.     PGA Tour open events typically have an initial competitive field ranging between 132 and 156 golfers who play four 18-hole rounds over the course of four days.[27] Following the first two days of play, the 65 golfers with the lowest score totals in these events advance to the final two weekend rounds. The other participants are "cut" from the field.[28] These weekend rounds are typically aired live on TV (via cable stations in the morning and early afternoon, depending on time zones, and via network broadcasts in the afternoon until the event is completed).

22.     Tour golfers are not full-time employees of the PGA TOUR and do not receive salaries. Rather, as I understand it, they are independent contractors who are compensated through prize money (out of the event "purse") and have the opportunity to win based upon their finishing positions in each event.[29] Tour golfers pay for their own transportation and lodging, their own coaches, trainers, caddies, physical therapists, and other costs associated with participation in Tour events.

23.     A top Tour performer can earn substantial prize money.[30] Top Tour performers also can earn substantial sponsorship money (from golf equipment companies, banks,

---

[26] PGA TOUR Form 990 (2019).

[27] Non-open events on the PGA Tour such as invitational or other special events typically have lower initial fields. PGA TOUR, *Player Handbook & Tournament Regulations 2021-2022* ("PGA Tour Player Regulations"); and Golf News Net website, *What is the Field Size for Every PGA Tour Event?* (https://thegolfnewsnet.com/golfnewsnetteam/2020/03/01/what-is-the-field-size-for-every-pga-tour-event-118489/), accessed 6/9/2022.

[28] PGA Tour Player Regulations at 115-116. If golfers tie for 65th place, those golfers make the cut and move forward to the final rounds.

[29] There is typically no prize money for golfers failing to make the cut at the end of the second round of open tournament play.

[30] For example, total earnings for the top 20 PGA Tour career money leaders range from $42 million (David Toms) to $121 million (Tiger Woods). PGA TOUR website, *Career Money Leaders* (https://www.pgatour.com/stats/stat.110.html), accessed 8/1/2022.



business consulting firms, and other golf-oriented marketers).[31] However, other Tour participants who often finish low in their event rankings or do not make the weekend cuts, receive little or no payment from the PGA TOUR and—after expenses—may well lose money from their Tour participation.

### D. The Key Role of Leading Golfers

24.    There is a high level of demand among fans of the sport of golf in the US to watch the game's elite golfers compete with one another and other top-level golfers. As a result of their prior success, personal charisma, or fan familiarity, these elite golfers become celebrities who deliver unique value to fans. As explained in a 2004 textbook on the economics of professional golf:

> [S]ome superstar golfers (Arnold Palmer, Jack Nicklaus, Lee Trevino, Tom Watson, and Greg Norman, in the past; Tiger Woods, Ernie Els, Sergio Garcia, and Phil Mickelson, currently) create more value for the fans because of their exceptional play and personal charisma.[32]

25.    Such "star-value" is recognized in the economic literature as a source of significant benefits to a professional sports team or league in the form of higher attendance rates, increased television viewership, and sponsorship revenue.[33] Fan interest is

---

[31] For example, Tiger Woods is estimated to have earned $42 million in sponsorship money in the 2018-2019 season. Other top performers also earned substantial sponsorship money in 2019, namely Phil Mickelson ($37 million), Jordan Spieth ($30 million), and Justin Thomas ($23 million). Golf News Net website, *Golf's biggest-ever sponsorship deals: Prepare to be amazed!* (https://thegolfnewsnet.com/golfnewsnetteam/2020/01/09/golfs-biggest-ever-sponsorship-deals-prepare-to-be-amazed-117877/), accessed 6/9/2022.

[32] Shmanske at 203. Today's star golfers would include Rory McIlroy, Jordan Spieth, Phil Mickelson, Justin Thomas, Dustin Johnson, Bryson DeChambeau, Jon Rahm, Scottie Scheffler, Collin Morikawa, and Brooks Koepka.

[33] J. Hausman and G. Leonard, "Superstars in the National Basketball Association: Economic Value and Policy," *Journal of Labor Economics*, 15(4), 1997 at 587 and 591 ("[T]he presence of a 'superstar' can have a substantial positive effect on the television rating of an NBA game, even when the game might otherwise be expected to receive a high rating (e.g., because the two teams involved are of high quality).... A superstar can have an effect on the revenues of his own team beyond simply improving team quality. The superstar may have a "personal appeal" that attracts fans even after controlling for his team's (increased) quality."); C. Mullin and L. Dunn, "Using Baseball Card Prices to Measure Star Quality and Monopsony," *Economic Inquiry*, 40(4),



especially high when players and teams at the highest skill levels compete together. As a paper on the subject explained it:

> Certainly, some component of fan demand is absolute—the desire to see long-standing records broken, visits to shrines (halls of fame) that honor the best players of all time, and the preference for watching premier league competition instead of lower quality alternatives.[34]

26.  But, as the literature also recognizes, the fan value derived from elite athletes rests with both the *absolute* and *relative* quality of their play.[35] Close games are simply more fun to watch than lopsided games. When the outcome is uncertain, the game has an element of suspense that adds value to the viewing experience.[36]

27.  These observations clearly fit the sport of golf. As one economist observed, "Elite players on the PGA TOUR likely provide a large portion of the revenue generation that makes tournament purses relatively high largely by helping create much of the fan interest[.]"[37] Elite-level events that feature the sport's premier golfers generate higher attendance, TV viewership, and event sponsorship dollars.

2002 at 631. ("Although high star quality…is a phenomenon of an elite group of players, we nevertheless feel that it is significant because in most sports the mystique of the 'best' and/or most colorful athletes is in part what drives fan attention and revenues."); and B. Smart, *The Sport Star: Modern Sport and the Cultural Economy of Sporting Celebrity*, SAGE Publications Ltd, 2005 at 16 ("Increasingly corporations have sought to associate themselves with the imagery of sport through endorsement and sponsorship deals. Images of high profile sportsmen and sportswomen are employed to promote the corporation as a brand as well as particular product lines.").

[34] A. Sanderson, "The Many Dimensions of Competitive Balance," *Journal of Sports Economics*, 3(2), May 2002 at 206.

[35] S. Rosen and A. Sanderson, "Labor Markets in Professional Sports," *National Bureau of Economic Research Working Paper 7573*, February 2000 at 5.

[36] See L. Hadley, J. Ciecka, & A. Krautmann, "Competitive Balance in the Aftermath of the 1994 Players' Strike," *Journal of Sports Economics*, 6(4), 2005 at 379-380 ("Competitive balance is important to a sports league because game outcomes must be sufficiently uncertain to maintain fan interest in the league as a whole.…Moreover, close matchups are important to the league as a whole as this spiked interest spills over to other matchups within the league, increasing overall league demand.").

[37] T. Rhoads, "Labor Supply on the PGA TOUR: The Effect of Higher Expected Earnings and Stricter Exemption Status on Annual Entry Decisions," *Journal of Sports Economics*, 8(1), February 2007 at 87.



28.    In this way, there is a symbiotic relationship between elite golfers and elite-level events. Higher attendance and TV viewership translate into higher event revenues. Higher attendance and viewership also mean greater public visibility for golfers. Higher event revenue and visibility mean higher purses and greater opportunity for golfer sponsorship and product endorsement deals. That makes leading golfers want to participate, which completes the circle, making those events more valuable.

29.    Although the concept that elite golfers play a key role in the fan value of competitive golf events seems uncontroversial on its face, there is no precise demarcation for elite versus non-elite golfers. Nonetheless, data regarding golfers' performance over time can be used to lend some real-world content to the elite golfer concept. Elite golfers stand out from the rest of touring professionals in their proficiency as players— which translates into higher event finishes—and, relatedly, their fan familiarity. Tour professional golfers are ranked each week based upon their tournament success.[38] These rankings can be used to provide part of the elite golfer picture. Fan familiarity (and therefore fan allegiance) comes from repeated exposure. Given that fans turn out (and especially tune in) to see the final weekend rounds of each tournament, repeated fan exposure goes hand in hand with consistent high tournament finishes, which ties back to top rankings. So, elite golfers (both in terms of skill and fan familiarity) will generally be those who maintain top rankings over multiple seasons. In addition, the Majors provide a very important stage for fan familiarity and appreciation. Major wins likely create memorable fan connections.

30.    With these considerations in mind, I have identified the golfers in 2021 that were ranked among the Top 100 golfers for a full year in at least two of the three preceding years or won at least one Major within the past 5 years. There were 59 such golfers in 2021. They are listed by name along with the number of their 2021 PGA Tour appearances and total purse winnings in **Appendix A**. These golfers took home 48 percent of the prize money awarded at PGA Tour events last year.[39] They also

---

[38] Based upon his finishing position in weekly tournaments, a golfer earns points towards his Official World Golf Ranking. As noted above, the OWGR is a system which comparatively ranks tour professional golfers throughout the world and is used as one of the qualifying criteria for entry into the Majors.

[39] PGA TOUR website (www.pgatour.com), accessed 6/9/2022; and OWGR website (www.owgr.com), accessed 6/9/2022.

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

represented, on average, 34 percent of the field on Saturday and Sunday (the biggest days of each event for fan attendance and viewership).[40] They accounted for 9 of the top 10 finishing positions in last year's FedEx Cup and won all four Majors.[41]

31.   Prior to LIV Golf's entry, the PGA Tour was the only US tour that showcased these elite golfers. As shown in Table 3 below, Tour events accounted for approximately 97 percent of the 2021 event appearances in US golf tours by the 59 elite golfers identified in Appendix A. Notwithstanding the existence of other events aimed at elite golfers (for example, the Majors noted above) all but one of those golfers spent most of their US event appearances on the Tour.[42]

### Table 3 – Elite Golfer Participation in US Golf Tours, 2021

| Tour | Share of Total Elite Golfer Event Appearances | Average Elite Golfer Share of Field | Average Purse Amount ($) | Average Strength of Field |
|------|------|------|------|------|
| (1) | (2) | (3) | (4) | (5) |
| PGA Tour | 97.4% | 17.7% | 7,420,232 | 346 |
| PGA Tour Champions | 1.4% | 0.7% | 2,203,400 | N/A |
| Korn Ferry Tour | 1.1% | 0.3% | 662,603 | 12 |

Note: PGA Tour figures include internationally co-sanctioned events (e.g., WGC).
Sources: Official World Golf Rankings and PGA TOUR website.

---

[40] The State Journal-Register, *Turning Stone betting on a 'full house' this weekend* (https://www.sj-r.com/story/news/2007/09/22/turning-stone-betting-on-full/47249286007/), accessed 6/9/2022 ("Most people have either work or school Thursday and Friday, so Saturday and Sunday are typically the most popular spectator days for golf tournaments.")

[41] In 2020, the Open Championship was cancelled by the R&A due to the Covid-19 pandemic.

[42] The only exception is Tiger Woods, who did not play any events in 2021.

32.    As is also shown in Table 3, elite golfers comprised approximately 18 percent of the player field, on average, in PGA Tour events. In contrast, these elite golfers represented less than one percent of the player field on both the Korn Ferry and Champions tours. The average strength of field and purse size were much higher on the PGA Tour than on the other two tours in 2021.[43] And (as reflected by the viewership amounts shown in Table 2 above), while the weekend rounds for most PGA Tour events were televised live on broadcast network channels in 2021, Korn Ferry events had no live viewership on broadcast TV and viewership of PGA Tour Champions events was very limited. Of course, these results are not surprising given the differing focus among these tours. However, they do show that (absent competition from LIV Golf) if you are an elite golfer able to compete at that level, the PGA Tour is where you want to play. Similarly, if you are a top-level golfer with aspirations of joining the elite ranks of the sport—presumably the golfers that make up the remaining 82 percent of PGA Tour participation—those are the events one would want to join as well. The purses are much higher and there is much more public exposure (with all the added benefit that generates both for golfers, sponsors, and advertisers).

33.    Viewed in terms of these event metrics, PGA Tour events had demonstrably more of an elite character than the principal men's tours elsewhere in the world. Table 4 (below) shows the participation rate by elite golfers on the various tours around the world in 2021. It was much higher for the PGA Tour than for other tours. Moreover, as was shown in Table 1 above, the PGA Tour events also had higher strength of field figures and higher purses than the other tours. Putting aside for the moment matters of geographic market definition, one takeaway from these data is that even if geography did not matter, these other tours would not be ready replacements for PGA Tour events from a golfer or a fan standpoint.

---

[43] The OWGR does not report strength of field figures for PGA Tour Champions events. However, an article published in 2017 by the PGA TOUR provides an alternative comparison, which shows the average player strength for the PGA Tour Champions to be much lower than that of the PGA Tour. PGA TOUR website, *How to measure the strongest fields in golf* (https://www.pgatour.com/statsreport/2017/09/27/stats-formulas-numbers-golf-strongest-fields.html), accessed 6/9/2022.

econ **ONE**

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

**Table 4 – Elite Golfer Participation in Golf Tours Worldwide, 2021**

| Tour | Share of Total Elite Golfer Event Appearances | Average Elite Golfer Share of Field |
|------|:---:|:---:|
| (1) | (2) | (3) |
| PGA Tour | 80.7% | 16.0% |
| European Tour | 16.9% | 3.8% |
| Japan Golf Tour | 2.2% | 0.8% |
| Sunshine Tour | 0.1% | 0.1% |
| Asian Tour | 0.0% | 0.0% |
| PGA Tour of Australasia | 0.0% | 0.0% |

Note: Figures exclude co-sanctioned events.
Source: Official World Golf Rankings.

## IV.   The Event Participation Market

34.   In their Complaint, Plaintiffs identify "the services of professional golfers for elite golf events" as the relevant product market for evaluation of potential monopsony power held by the PGA TOUR in its employment of golfers on the Tour.[44] The economic purpose of market definition in this context is to identify the event participation options for golfers that a buyer of their services would need to control in order to have monopsony power. A standard framework employed for this purpose is set forth in the Merger Guidelines published by the two US antitrust enforcement agencies ("Guidelines Framework").[45] The evidence available here indicates that Plaintiffs have identified a proper relevant product market for this aspect of their claims.

---

[44] Complaint at 84.

[45] US Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, 2010 ("Merger Guidelines").

35.     Following the Guidelines Framework, one begins the market definition process with the alleged economic purpose underlying the conduct at issue.[46] Here, Plaintiffs allege that the PGA TOUR is acting to preserve its monopsony power over the amounts paid to golfers for their participation on the Tour by blocking LIV Golf from emerging as a competing organizer of events for the game's best golfers. From that perspective, an appropriate starting point—under the Guidelines Framework, a "candidate market"—would be to consider a market consisting of golfer participation opportunities limited just to the kind of elite events offered on the Tour. In that regard, the appropriate question under the Guidelines Framework is then whether a hypothetical sole-organizer of those top-level events would have the ability to profitably depress the payments to golfers by a significant amount for a non-transitory period of time.[47]

36.     In other words, would the potential loss (if any) of golfers who would respond to depressed payments by shifting their participation to other lower-level golf events outweigh the benefit to the monopsonist top-level event organizer of reduced payments to golfers? If not, a hypothetical monopsonist could profitably maintain uncompetitive golfer payments and therefore, following the Guidelines Framework, the candidate product market would be adopted as the relevant product market. If so, the candidate product market would then be expanded to include the other lower-level golf events that a monopsonist also would need to control to profitably depress golfer payments.

37.     As noted above, the top-level events of the sort presented on the PGA Tour are where the game's best golfers want to play. They attract more fan interest, TV

---

[46] A. Edlin and D. Rubinfeld, "Exclusion or Efficient Pricing: The 'Big Deal' Bundling of Academic Journals," *Antitrust Law Journal*, 72(1), 2004 at 126; and J. Baker, "Market Definition: An Analytical Overview," *Antitrust Law Journal*, 74(1), 2007 at 173 ("Moreover, market definition does not take place in a vacuum: in any particular case, demand substitution must be evaluated with reference to the specific allegations of anticompetitive effect in the matter under review").

[47] Merger Guidelines at § 4.1.2. The Guidelines use the term "SSNIP" to refer to a small but significant and non-transitory increase in prices under a monopoly setting. In their implementation of this framework, the antitrust agencies have generally treated a five percent departure from otherwise competitive price levels for at least a year as indicative of significant market power. In my experience, economists practicing in the antitrust field generally have adopted that same standard. I do so here in evaluating Plaintiffs' market definition claims.

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

coverage, and sponsorship money than events with lower levels of competition. As a result, those top-level events generate the fan-related revenue needed to support the large purses and other payments that attract the best golfers in the first place (see Tables 2 and 3 above). Hence, one would not expect top-level golfers to shift their participation to lower-level events (certainly not to any significant degree) in response to a small but significant (e.g., five percent) reduction in purse sizes from otherwise competitive levels. Or, to put it in economic terms, there likely would be very limited cross-price elasticity between golfer participation in the events offered on the PGA Tour and those generally offered on other existing tours (prior, that is, to the entry of LIV Golf). Accordingly, a monopsonist buyer of golfer services for such events likely would be able to profitably maintain a significant reduction in golfer payments relative to the competitive level. In which case, Plaintiffs would be correct in their claim that the purchase of services from top-level professional golfers for competitive events is a relevant product market.

38.   There also is direct evidence from the behavior of event purses over time that supports this market definition. When the Premier Golf League ("PGL") emerged as a potential competitor for the services of golfers in 2020, the PGA TOUR raised the payments it offered to its golfers.[48] As noted above, LIV Golf has offered higher purses than those generally available on the Tour. And, here again in response to LIV Golf, the PGA TOUR has announced on multiple occasions new programs to increase golfer payments and a new global golf series that copies features of LIV Golf's innovative tournament design.[49] In short, when it provided what essentially represented the sole event series for top-level touring professionals in the US, the PGA Tour was able to profitably maintain lower purses than it did when faced with the potential launch of a competing top-level event series. In other words, sole control of those top-level events carried with it pricing power—precisely what one looks for in defining relevant markets under the Guidelines Framework.

---

[48] CBS Sports website, *PGA Tour to increase tournament purses, bonuses for players amid threats from rival start-up leagues* (https://www.cbssports.com/golf/news/pga-tour-to-increase-tournament-purses-bonuses-for-players-amid-threats-from-rival-start-up-leagues/), accessed 6/9/2022.

[49] Memo from J. Monahan to PGA TOUR golfers, 11/22/2021; and Memo from J. Monahan to PGA TOUR golfers, 6/22/2022.

**econ ONE**

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

## V.   The Relevant Geographic Market

39.    A relevant antitrust market also has a geographic dimension. The Guidelines
       Framework for defining the relevant geographic market proceeds along the same
       conceptual lines outlined above for the relevant product market. Here, one seeks to
       identify the smallest geographic region that a hypothetical monopsonist buyer of
       golfer services for elite-level events would need to control in order to profitably
       impose a small but significant reduction in payments below the competitive level.[50]

40.    The available economic evidence indicates that the US would be an appropriately
       defined geographic market with regard to the purchase of top-level golfer services.
       Most top-level golfers reside in the US.[51] Not surprisingly, there also is a
       concentration of resources (e.g., golf courses and training facilities, caddies, golf
       coaches, and equipment suppliers) that support golfers, especially the elite-level ones,
       in the US.[52] PGA Tour events mostly occur in the US and the fans who attend those
       events mostly live in the US. Accordingly, the US would be an initial candidate
       geographic market.

41.    As noted above, the market definition question would then be whether the golfers in
       these events would respond to a small but significant decrease (below the competitive
       level) in payments by shifting their event participation to other tours around the
       world in sufficient numbers to make that reduction in payments unprofitable. If not,
       the US would be the relevant geographic market.

42.    With the market definition question framed in that fashion, it seems clear that the US
       would be the relevant geographic market. One would not expect golfers participating
       on the Tour to shift their tournament activity overseas (along with the necessary
       support resources) in response to a small but significant decrease in purse sizes. Even
       if a golfer could find a Tour-equivalent event organizer with competitive payments
       overseas, the costs of travel and overseas support likely would exceed a small but

---

[50] Merger Guidelines at §§ 4.1-2 and 12.

[51] PGA Tour Player Directory.

[52] National Golf Foundation, *Golf Industry Report*, 2019 Edition at 10 ("The United States remains the world's
best-supplied market, by far, boasting 43% of courses globally.").



*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

significant monopsony effect. Moreover, a competitive Tour-equivalent event organizer does not exist overseas. Average purses in Europe, for instance, are still well below those on the Tour even with the monopsony effects alleged in this case (see Table 1).

43. More fundamentally, the level of play and all that goes with it (fan interest, TV exposure, endorsements, etc.) outside the US is well below that on the PGA Tour. The strongest of the overseas tours is the European Tour but, as Rory McIlroy described it:[53]

> The ultimate goal is here [the US]. The European Tour is a stepping stone. That's the truth. The European Tour is a stepping stone. That's the way it is[.]…It's so one-sided. You can talk all you want about these bigger events in Europe, but you can go to America and play for more money and more ranking points. I think as well with the world ranking points, everyone out here, all of their contracts with sponsors, it's all about world ranking points. If players are getting paid more and earning more world ranking points, why would you play over there [European Tour]?[54]

44. European Tour Board Member Paul McGinley stated in March 2022:

> We [the European Tour] are there to enhance that and enable the PGA Tour to become the premier golf tour in the world. We realize that the [European] Tour will not be that, but we want to be very much there is [sic] a kind of international arm and create pathways for players to come into the ecosystem via the European Tour and perhaps the Korn Ferry Tour and then

---

[53] Rory McIlRoy is beyond question one of the game's elite golfers. He was born in Ireland, started his professional career in Europe, and has now been a PGA Tour member for many years.

[54] Golf Monthly website, *Rory McIlroy Calls European Tour A Stepping Stone* (https://www.golfmonthly.com/news/rory-mcilroy-european-tour-stepping-stone-171150), accessed 6/9/2022.



graduate onto the premier tour in the world which is the PGA Tour.[55]

45.     Either viewed as a "stepping stone" to the PGA Tour or simply operating at a lower level of competitive play and reward, the European Tour would not be expected as an economic matter to prevent the PGA TOUR from attaining or exercising monopsony power over payments to golfers (which, of course, is why one would limit the geographic market to the US, from a traditional market definition perspective).

46.     Moreover, there apparently is not much competitive rivalry between the PGA TOUR and the European Tour in any event. European Tour CEO Keith Pelley told *The New York Times* that "with [the European Tour] co-sanctioning three events this year [with the PGA Tour], we are no longer competing for top players[.] … It was a mind-set shift for both of our organizations to work as closely together as we could and share all facets of our businesses. We went from competitors to partners."[56]

47.     One last observation here: I understand that PGA Tour Player Regulations allow for player exemptions to participate in up to three events each year that are not part of the Tour. However, as alleged in the Complaint, the PGA TOUR has apparently made it clear as a policy matter that none of these exemptions would be granted to play in US events outside the Tour. Similarly, in a letter to one golfer on May 10, 2022 denying a request for an event release to play in LIV Golf's London tournament, the PGA TOUR explained that it was deviating from its policy of granting releases for tournaments played outside the US because LIV Golf is also

---

[55] Independent website, *Paul McGinley insists Phil Mickelson has 'got to backtrack' on Saudi comments to get back into PGA Tour fold* (https://www.independent.ie/sport/golf/paul-mcginley-insists-phil-mickelson-has-got-to-backtrack-on-saudi-comments-to-get-back-into-pga-tour-fold-41429178.html), accessed 6/9/2022. See also Sky Sports website, *Paul McGinley: PGA Tour's alliance with European Tour is good for golf* (skysports.com/golf/news/29745/12144775/paul-mcginley-pga-tours-alliance-with-european-tour-is-good-for-golf), accessed 6/9/2022 ("In professional golf you have the PGA Tour at the top of the tree, the European Tour just beneath that, then there's the Sunshine Tour, Asian Tour, PGA Tour of Australasia and other Tours around the world.").

[56] The New York Times, *The PGA and DP World Tours Allied. Then LIV Golf Happened* (https://www.nytimes.com/2022/07/06/sports/golf/pga-dp-world-tour-liv-golf.html), accessed 7/7/2022.

planning tournaments within the US.[57] These facts would suggest that the PGA TOUR's concerns regarding competing events are much greater for other events in the US than they are for non-US events, underscoring the conclusion that the US represents a separate geographic market.

## VI.   Monopsony Power in the Event Participation Market

48.   Economists often draw inferences about market power from market structure evidence including the firm's market share, market concentration, the nature of entry barriers, and other factual circumstances that bear on the likely effectiveness of competitors (e.g., available capacity to divert customers). Economists also draw conclusions about market power from direct evidence showing prices that depart from competitive levels, output reductions, or control over the ability of other firms to compete.

### A.  The PGA TOUR's Dominant Market Position

49.   The PGA TOUR organizes the only season-long series of golf events showcasing competition among the sport's elite golfers in the US (of course, LIV Golf is seeking to change that). There were three WGC events in the US in 2021 and one in 2022, all of which could fairly be characterized as elite events. But, as mentioned above, the PGA TOUR is one of the multiple partner organizations that make up the WGC; it sanctions these events and includes them on the PGA Tour schedule. Moreover, the PGA TOUR does not organize and schedule elite-level events of its own on WGC weekends. Clearly then, the WGC is not competing with the PGA TOUR.

50.   Prior to LIV Golf's entry, the only elite events which take place each year in the US that are not organized by the PGA TOUR (or part of the Tour itself) are the Masters, the PGA Championship, and the US Open. That leaves the PGA TOUR in control of over 85 percent of the elite events held in the US in 2021—well above the thresholds normally associated with significant market power. It should also be noted here that Tour membership is a season-long activity. Tour members are required

---

[57] PGA TOUR letter from K. Burgess to G. McDowell, 5/10/2022.

Page 25

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

under the Tour rules to play in at least 15 events each year.[58] Moreover, golfers depend on ongoing play and competition to keep their competitive skills honed to the elite level (or, for newer Tour members, sharpen them to the point at which they can reach that level). On average, Tour members played in 23 events in 2021. And, I understand that for most Tour members, their weekly tournament play (and the purses and the sponsorship monies that come with it) is their primary source of employment. Hence, the three Majors offered in the US each year outside of the Tour are not a competitive alternative to Tour participation for golfers.

51.   In addition, there is good reason to see the Majors not as competitive substitutes for the PGA Tour, but as economic complements—in effect, partners or collaborators with it. There are, by design, no Tour events scheduled on weekends with a US Major event. Hence, participation in US Majors does not displace Tour participation, even to a limited extent. Indeed, rather than being alternatives to one another, Tour events and the Majors have a complementary relationship. Competition each week against other top-level golfers on the Tour is how professional golfers develop and hone their game to top-level caliber. Moreover, success on the Tour is then the way that most aspiring elite-level golfers qualify for the Majors, which is the surest and fastest way to build their elite brand. Nor, of course, does the PGA TOUR make any effort to keep its Tour members from playing in the Majors.

52.   In addition to its control over the supply of top-level events, the PGA TOUR also controls event participation by most of the sport's elite golfers (defined using the criteria described above)—an essential input for success on the part of any would-be organizer of a competing event series. In 2021, 90 percent of the elite golfers were Tour members subject to its rules and policies limiting participation in competing events. Over 80 percent of the event appearances by those elite golfers were in Tour events.[59] And, their non-PGA Tour appearances were almost entirely outside the US (mostly in the European Tour). Hence, the PGA TOUR potentially has the power (through the Challenged Conduct) to prevent elite golfers from playing in events organized by a would-be competitor, thereby assuring that it will maintain its

[58] PGA Tour Player Regulations at Sections V.A.3.a and IX.B.1.

[59] This amount excludes appearances in the Majors for the reasons described above.

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

position, with few exceptions, as the sole supplier of those events. This clearly supports an economic inference that the PGA TOUR possesses monopsony power in the Event Participation Market.[60]

## B. Entry Barriers

53.   As explained in more detail below, the Challenged Conduct likely creates a significant barrier to competitive entry which—if maintained over time—will protect the monopsony power associated with the PGA TOUR's dominant position from would-be competitors, most notably LIV Golf. The Challenged Conduct creates substantial penalties for golfers who would play in a competing event series (in this case LIV Golf) thereby limiting player mobility, and therefore making it difficult and expensive for a would-be competitor to attract the elite golfers it needs to be a viable organizer of elite events. Without participation by elite golfers, a competing tour cannot generate fan interest, event sponsorship, or TV coverage that is at all comparable to the PGA Tour. And, without fan interest, sponsorship, and TV coverage, a would-be competing tour cannot generate the revenue needed for purses sufficient to attract elite golfers. Hence, as Plaintiffs claim, the Challenged Conduct could certainly foreclose competition from new event organizers, protecting its monopsony power for years to come.

## C. Direct Evidence of Market Power

54.   There is also direct evidence indicative of the exercise of monopsony power by the PGA TOUR. While maintaining its dominant position as the buyer of services in the Event Participation Market, the PGA TOUR has consistently reduced the share of Tour revenue (generated through the golfers' participation) that it pays them. As shown in Figure 1 below, the golfers' share of Tour revenue declined from about 49 percent in 2011 to 41 percent in 2019.[61] Moreover, as is also shown in Figure 1,

---

[60] This conclusion does not change if one were to hypothesize a worldwide relevant market. As described above, other tours around the world are not in a position (in terms of playing level, purses, fan visibility, or their competitive posture) to preclude the exercise of monopsony power by the PGA TOUR.

[61] To calculate the PGA Tour players' share of total revenue I rely on annual PGA TOUR IRS Forms 990. I include in the players' share calculation the following reported expense items: total reported player prize and other earnings, player retirement contributions, and player retirement earnings. Notably, these forms contain

Page 27

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

golfers on the PGA Tour receive a lower share of league revenue than athletes in other major sports.

**Figure 1 – Comparison of Players' Share of Revenue by Sports League**

Sources: PGA TOUR Forms 990; PGA TOUR website; and Rodney Fort's Sports Business Data website (https://sites.google.com/site/rodswebpages/codes), accessed 6/9/2022.

---

consolidated revenues and expense amounts for all golf tours organized under the PGA TOUR umbrella. To isolate the portion of consolidated revenues and player expenses attributable to the Tour, I apportion these amounts using as a proxy the Tour's share of the total purses offered across each of the tours under the umbrella (including the FedExCup bonus pool). The Tour's share of total purses generally amounts to 83 percent each year. Furthermore, The PGA TOUR Forms 990 appear only to include its own portion of gross receipts earned as a co-organizer of its golf events. These amounts likely do not include the portion of gross receipts that go to the other co-organizers of these events. Therefore, the revenue amounts underlying the yearly PGA Tour players' shares shown in Figure 1 would likely be even lower if these additional revenues were included.

55.     One also can see direct evidence of the monopsony power the PGA TOUR has exercised with respect to golfer payments in the manner in which competition from the PGL and now LIV Golf has positively affected those payments. In April 2021, the PGA TOUR announced a new $40 million dollar Player Impact Program ("PIP") with bonuses to the top ten golfers (gauged by social media appeal, brand exposure, and fan/sponsor engagement).[62] The PIP was widely seen as a direct response to the PGL.[63]

56.     In November of 2021, PGA TOUR Commissioner Jay Monahan announced increases to official prize money, bonus programs, and other golfer benefits for 2022 totaling $105 million.[64] These increases included a $15 million uplift in the FedExCup bonus pool, a $10 million increase in the PIP, and $60 million for higher event purses. Golf news outlets described these changes as "a response by the [PGA TOUR] to external threats like the Premier Golf League…and the Super Golf League [LIV Golf]."[65] According to a recent article in GolfDigest, "LIV Golf's challenge to the PGA Tour has gifted the top players leverage, and the PGA Tour has had no choice but to respond with additional dollars—some that's being distributed across the spectrum of players, but the bigger increases going to the stars."[66] In June 2022,

---

[62] Golfweek website, *Exclusive: PGA Tour to create a $40 million bonus pool for stars like Tiger Woods, Bryson DeChambeau* (https://golfweek.usatoday.com/2021/04/20/pga-tour-bonus-pool-top-players-tiger-woods-bryson-dechambeau/), accessed 6/9/2022; and PGA TOUR website, *Tiger Woods finishes atop inaugural Player Impact Program* (https://www.pgatour.com/news/2022/03/02/tiger-woods-tops-player-impact-program-pip-phil-mickelson-finsihes-second.html), accessed 6/9/2022.

[63] GolfDigest website, *PGA Tour golfers react to big bonuses for the most popular players: 'There's a little bit of envy'* (https://www.golfdigest.com/story/pga-tour-player-reaction-to-player-impact-program), accessed 6/9/2022; and Golfweek website, *Exclusive: PGA Tour to create a $40 million bonus pool for stars like Tiger Woods, Bryson DeChambeau* (https://golfweek.usatoday.com/2021/04/20/pga-tour-bonus-pool-top-players-tiger-woods-bryson-dechambeau/), accessed 6/9/2022.

[64] Memo from J. Monahan to PGA TOUR golfers, 11/22/2021.

[65] CBS Sports website, *PGA Tour to increase tournament purses, bonuses for players amid threats from rival start-up leagues* (https://www.cbssports.com/golf/news/pga-tour-to-increase-tournament-purses-bonuses-for-players-amid-threats-from-rival-start-up-leagues/), accessed 6/9/2022; and Golf Magazine website, *Tour Confidential: Bryson and Brooks, PGA Tour money, Tiger Woods* (https://golf.com/news/tour-confidential-bryson-brooks-pga-tour-money-tiger-woods/), accessed 6/9/2022.

[66] GolfDigest website, *Why reimagining the PGA Tour's fall schedule is more complicated than you think* (https://www.golfdigest.com/story/pga-tour-fall-schedule-revamping-rory-mcilroy), accessed 6/9/2022.

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

Commissioner Monahan announced further increases in prize money and the creation of a new global golf series incorporating some of the innovative features of LIV Golf events.[67] Based upon his descriptions, the increases in golfer compensation will total over $100 million. In response to a question asking whether that the PGA TOUR's announcement of its new global golf series and increased golfer compensation is a "direct reaction to LIV [Golf]", Commissioner Monahan stated: "[Y]es…this is something that we're doing to respond on behalf of our members to the current environment that we're in[,]" and that this represents "an acceleration" of the Tour's plans.[68]

57.     These increases, however, do not mean that the PGA TOUR is now paying its members competitive compensation. Indeed, the eight events in the recently announced LIV Golf Invitational Series have purses of at least $25 million per event, with $50 million in the final championship event. These amounts may be more suggestive of competitive levels and they greatly exceed the average purse size offered on Tour events last year.

58.     A number of PGA Tour golfers have spoken to the benefits that competition could create for them, which is, in effect, their acknowledgement that current levels of compensation on the Tour are not competitive. Jason Kokrak stated in a January 2022 golf podcast:

> Competition is good. The Saudi Golf League or the Premier Golf League or whatever you want to call it has gained traction and created competition for the PGA [TOUR], which has in-turn increased the purses….I'm curious to see if the PGA [TOUR] would've ever increased any of that without this competition. It's scary to see how much money is out there, how much money was held back from the players, from the people who are making the money for the tour.…I'm enjoying the PGA Tour, but if somebody's going to pay me enough to retire in the next four

---

[67] Memo from J. Monahan to PGA TOUR golfers, 6/22/2022. The newly announced golf series includes limited fields and no weekend cuts.

[68] Press Conference with J. Monahan, "TRAVELERS CHAMPIONSHIP," Cromwell, CT, 6/22/2022.

econ **ONE**

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

years…it's more money than I could possibly make winning multiple times a year on the PGA Tour and being told what to do.[69]

59.   Lee Westwood described matters this way:

It's being portrayed as an 'us and them,' [situation] … But in all the reports I've read, the people from LIV Golf have said that they want to stand side-by-side [with the current tours]. They are not going up against any of the really massive tournaments. They want everybody to be able to play, to have options. They are not forcing anybody's hand.…This is my job. I do this for money. It's not the only reason for doing it. But if anybody comes along and gives any of us a chance at a pay rise, then you have to seriously consider it.[70]

60.   As Jordan Spieth put it, "I think as a player, overall, it [LIV Golf's entry] will benefit in that I think that the changes that have come from the PGA Tour have been modernized in a way that may or may not have come about if [the reports on the Saudi League] weren't there."[71] Rory McIlroy said:

I've always thought that rival golf tours are just going to make the PGA Tour and the [European] Tour better…Competition is a good thing. Any business needs competition for things to progress and move on.[72]

---

[69] Golf Monthly website, *'I Want to Make as Much Money In As Little Time' – Kokrak Brutally Honest on Saudi League* (https://www.golfmonthly.com/news/i-want-to-make-as-much-money-in-as-little-time-kokrak-brutally-honest-on-saudi-league), accessed 6/9/2022.

[70] GolfDigest website, *Lee Westwood makes official his long-assumed interest in playing in LIV Golf events* (https://www.golfdigest.com/story/lee-westwood-applies-for-release-liv-golf-invitational-series), accessed 6/9/2022.

[71] Golf Channel website, *Why Jordan Spieth thinks Saudi League threat has been good for PGA Tour* (https://www.golfchannel.com/news/why-jordan-spieth-thinks-saudi-league-threat-has-been-good-pga-tour), accessed 6/9/2022.

[72] GolfDigest website, *Rory McIlroy sees upside in talk about rival tours: Players becoming more invested in pro golf's future*

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

61.    One last indicator, which is at minimum consistent with the existence of market power, is the PGA TOUR's financial results. The PGA TOUR has had the ability over time to generate significant profits. As shown below, the PGA TOUR's retained earnings exceeded $1.2 billion dollars as of 2019.

**Figure 2 – PGA TOUR Retained Earnings, 2011-2019**



Source: PGA TOUR Forms 990.

(https://www.golfdigest.com/story/saudi-super-league-discussion-players-interested-in-future-rory-mcIlroy), accessed 6/9/2022.

## VII. Anti-Competitive Conduct

### A. The LIV Golf Threat

62.   LIV Golf developed a new event model which positions it to compete effectively with the PGA TOUR for the services of top-level professional golfers. LIV Golf's model involves 12 four-golfer teams that compete with each other in a series of events each year. The shorter event durations, shorter time to complete each round, and smaller field of elite golfers are all designed to focus more on elite-level competition, increasing entertainment value for fans. As noted above, this year's LIV Golf events provide purse sizes well above the average Tour event. They have been scheduled not to conflict directly with the Majors or the leading elite events on the Tour. I understand that there has been a high level of interest in the new league by leading professional golfers, potential sponsors, and broadcast companies.[73] Twelve of the 59 elite golfers listed in Appendix A participated in the first two LIV Golf events, and 15 elite golfers in the third event (notwithstanding the penalties imposed by the PGA TOUR and the DP World Tour).

63.   There has been widespread interest and media coverage of LIV Golf's these first three events, held in London, Portland, OR, and Bedminster, NJ, respectively—a bellwether, it would appear, of significant fan interest and potential opportunities for TV coverage and event sponsorships (assuming, of course, that the Challenged Conduct does not upend LIV Golf's future event plans).

64.   As described above, it already appears that LIV Golf has created competitive pressure on the market power possessed by the PGA TOUR. LIV Golf's series of elite events this year will represent approximately 9 percent of the US elite event offerings and approximately 20 percent next year, based on LIV Golf's current plans and the PGA Tour's recently-announced 2022-2023 schedule.[74] With LIV Golf's much higher

---

[73] Complaint at 35-36.

[74] GolfDigest website, *LIV Golf to transition to 'league' schedule in 2023, with 14 events and 48 contracted players* (https://www.golfdigest.com/story/liv-golf-league-schedule-2023), accessed 7/25/2022. The PGA Tour's 2022-2023 schedule runs through August 27, 2023; and PGA TOUR website, *PGA TOUR's 2022-2023 FedExCup Season schedule raises the stakes on drama, consequences* (https://www.pgatour.com/news/2022/08/01/pga-tour-full-schedule-2022-23-season-fedexcup-

average purse sizes, the PGA TOUR will have to increase golfer compensation, compete harder to offer a better product for professional golfers, or accept reduced participation by elite golfers at its events. Certainly, the vigorous response by the PGA TOUR including warnings to golfers, suspensions, refused requests for exceptions, and statements and interviews at events and to the press are all consistent with LIV Golf emerging as a serious nascent competitive threat that could challenge the PGA TOUR absent its Challenged Conduct.

### B. The Challenged Conduct

65.   As alleged by Plaintiffs, the PGA TOUR has responded to this threat by engaging in a series of restrictions that have the purpose and effect of foreclosing competition and restricting output. Not only has the PGA TOUR denied permission for its members to participate in LIV Golf events,[75] it has publicly threatened lifetime bans on Tour members that participate in those events[76] and followed through with indefinite, long-term, and effective career suspensions of members who did.[77] Also, according to Plaintiffs, the PGA TOUR claims exclusive control over the media rights to its members' participation in golf events anywhere in the world and will not allow their participation in a LIV Golf event to be shown in any media by LIV Golf or its licensees.[78] Plaintiffs also allege that the PGA TOUR has threatened adverse

---

playoffs.html), accessed 8/2/2022. For this calculation I assume that the number of PGA Tour events scheduled between August 28, 2023 and December 31, 2023 is the same as the previous year.

[75] *See e.g.*, PGA TOUR letter from K. Burgess to G. McDowell, 5/10/2022.

[76] In addition to its threats of lifetime bans to current professional golfers, the PGA TOUR also has taken steps to thwart potential participation by college-level golfers in LIV Golf events. In May 2022, the PGA TOUR announced changes to its eligibility rules for the PGA Tour University, a program started in 2020 that is designed to give the top Division I college senior golfers playing privileges on the PGA TOUR's various developmental tours. I understand that these rule changes make any golfer who competes in a professional golf tournament that is not ranked by the OWGR (which includes LIV Golf events) ineligible to receive benefits from the PGA Tour University program. GolfDigest website, *In response to LIV Golf threat PGA Tour U changes eligibility for college stars* (https://www.golfdigest.com/story/pga-tour-u-liv-golf), accessed 6/9/2022; and Golf Channel website, *PGA Tour U changes eligibility rules regarding nonapproved, unranked pro events* (https://www.golfchannel.com/news/pga-tour-u-changes-eligibility-rules-regarding-nonapproved-unranked-pro-events), accessed 6/9/2022.

[77] PGA TOUR letter from Commissioner J. Monahan notifying players of its decision to suspend, 6/9/2022.

[78] Complaint at 23-25.



actions directed at agents or other business partners of golfers that join LIV Golf, and pressured sponsors not to work with those golfers or LIV Golf.[79]

66. Plaintiffs also claim that the PGA TOUR has encouraged others (using the words of the CEO of the PGA of America) in "the current ecosystem of the professional game"[80] to discourage golfers from participating in LIV Golf events, and agreed with the European Tour to boycott LIV Golf and golfers who play in LIV Golf events.[81] European Tour CEO Keith Pelley announced that, "We are aligned with the PGA [TOUR] in opposing, in the strongest possible terms, any proposal for an alternative golf league."[82] Following the London LIV Golf event, the European Tour announced that its members that played in the event would be suspended from upcoming events that the European Tour was co-sanctioning with the PGA Tour.[83]

67. And, PGA of America CEO Seth Waugh stated, "We are in full support of the PGA [TOUR] and the European Tour regarding the current ecosystem of the professional game."[84] And, he also said that "If someone wants to play on a Ryder Cup for the U.S., they're going to need to be… a member of the PGA of America, and they get that membership through being a member of the TOUR."[85] According to Plaintiffs, the PGA of America has suggested that if golfers play in LIV Golf they will not be able to play in the PGA Championship, one of the four Majors.[86]

---

[79] *Id.* at 2 and 7.

[80] Golf Channel website, *Phil Mickelson still intrigued by Super Golf League, while Rory McIlroy, Justin Thomas adamantly oppose it* (https://www.golfchannel.com/news/phil-mickelson-still-intrigued-super-golf-league-while-rory-mcilroy-justin-thomas-adamantly), accessed 2/22/2022.

[81] Complaint at 6 and 31.

[82] Declaration of Rachel Brass 8/2/2022 ("Brass Declaration") Exhibit 22b.

[83] I understand that those suspensions were subsequently stayed by an arbitration panel in the UK.

[84] Golf Channel website, *Phil Mickelson still intrigued by Super Golf League, while Rory McIlroy, Justin Thomas adamantly oppose it* (https://www.golfchannel.com/news/phil-mickelson-still-intrigued-super-golf-league-while-rory-mcilroy-justin-thomas-adamantly), accessed 2/22/2022.

[85] Press Conference with J. Richerson, S. Waugh, and K. Haigh, "PGA CHAMPIONSHIP," Kiawah Island, SC, 5/18/2021.

[86] Complaint at 49-50; Press Conference with S. Waugh, K. Haigh, and J. Richerson, "PGA

econ ONE ———————————————

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

68.   Augusta National Golf Club (the organizer of the Masters) also announced its support for the PGA TOUR: "The PGA [TOUR] and European Tour have each served the global game of golf with honor and distinction…As it has for many decades, the Masters Tournament proudly supports both organizations in their pursuit to promote the game and world's best players."[87] Indeed, Plaintiffs allege that Augusta National Golf Club Chairman Fred Ridley has personally discouraged golfers from joining the LIV Golf Invitational Series and seeded doubt among top professional golfers whether they would be banned from future Masters Tournaments if they do so.[88]

69.   When asked if the USGA might change the qualification criteria for future US Open events to limit opportunities for golfers who play in LIV Golf to qualify for the US Open, USGA CEO Mike Whan simply said "Yes.[89] Finally, R&A CEO Martin Slumbers (the organizing body behind the British Open) announced that "[W]e have longstanding and deep relationships with the European Tour and the PGA [TOUR]. We are fully supportive of them[.]"[90] In July 2022, at the British Open, R&A CEO Martin Slumbers said LIV Golf was not in golf's best interest and that "we will review our exemptions and qualifications criteria for The Open. And whilst we do that every year, we absolutely reserve the right to make changes as our Open Championships Committee deems appropriate."[91] Finally, I understand here that continued ability to earn OWGR points was an important consideration for golfers joining LIV Golf. However, it remains unclear at this point whether there will be

---

CHAMPIONSHIP," Tulsa, OK, 5/17/2022.

[87] Golf Channel website, *Phil Mickelson still intrigued by Super Golf League, while Rory McIlroy, Justin Thomas adamantly oppose it* (https://www.golfchannel.com/news/phil-mickelson-still-intrigued-super-golf-league-while-rory-mcilroy-justin-thomas-adamantly), accessed 2/22/2022.

[88] Complaint at 51.

[89] Press Conference with S. Francis, M. Whan, and J. Bodenhamer, "U.S. OPEN CHAMPIONSHIP 2022," Brookline, MA, 6/15/2022.

[90] Golf Channel website, *Phil Mickelson still intrigued by Super Golf League, while Rory McIlroy, Justin Thomas adamantly oppose it* (https://www.golfchannel.com/news/phil-mickelson-still-intrigued-super-golf-league-while-rory-mcilroy-justin-thomas-adamantly), accessed 2/22/2022.

[91] Press Conference with M. Slumbers, "THE 150TH OPEN," St. Andrews, Fife, Scotland, UK, 7/13/2022.



*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

OWGR ranking points for LIV Golf events. Clearly, given the role of the PGA TOUR and the European Tour on the governing body of the OWGR, LIV Golf participants have good reason to be concerned that OWGR ranking points will not be forthcoming.

### C.  Economic Perspective

70.  With competition among elite golfers providing the essential character of the product offered on the PGA Tour, access to those golfers becomes what economists would describe as an essential input for a competing tour or series of golf events. A dominant share of the world's elite golfers are PGA Tour members subject to the rules and policies associated with Tour membership.[92] If those rules and policies can be used to preclude participation by Tour members in competing events, or even just make it very expensive for competing event organizers to enlist their participation, the PGA TOUR then has the ability to greatly limit or altogether foreclose competition from other tours and event organizers and thereby maintain its position and market power as the dominant buyer of top-level golfer services.

71.  Some of the statements by the PGA TOUR suggest that there is no real competitive restriction arising from its rules and policies. The PGA TOUR notes that its Tour members are free to play in LIV Golf events, asserting that the effect of its rules and policies is to make it clear that golfers simply must make a "competitive choice" to either play on the Tour or play in the LIV Golf event series. As Commissioner Monahan put it in a January 2020 PGA Tour golfer's meeting, "[i]f the Team Golf Concept [PGL] or another iteration of this structure becomes a reality in 2022 or at any time before or after, our members will have to decide whether they want to continue to be a member of the PGA Tour or play on a new series."[93]

72.  What the Challenged Conduct does preclude (or at least threatens to preclude) however is playing both on the Tour and in the LIV Golf series. Or, playing a few LIV Golf events to test the experience and assess their viability, but then returning to

---

[92] Of the 59 elite golfers identified above, 53 (90 percent) were listed as "Active Players" in the PGA Tour Player Directory as of May 2022, before any golfers resigned or were suspended from the PGA Tour as a result of their choice to participate in LIV Golf.

[93] Brass Declaration Exhibit 22k.

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

the PGA Tour should that experience prove unsatisfactory. The alleged cooperation with, and support of, the other parts of the "golf ecosystem" adds further risk that a decision to participate in LIV Golf events might also mean an end to Majors participation. This could happen either through a change in qualification criteria adverse to LIV Golf participants or simply inability on their part to earn OWGR points. The loss of these options directly harms LIV Golf participants, creates a large downside for those who might consider doing so, and could be expected to greatly limit the competition that LIV Golf might otherwise create.

73.   To appreciate why this is so, it is important first to understand that as a matter of competitive economics there is no reason one could not have golfers playing both event series (the Tour and LIV Golf) during the same season. Indeed, for many years the PGA TOUR has permitted golfers to participate on tours outside the US while maintaining their Tour membership. As noted above, the average Tour member played about 23 events last year. The initial LIV Golf series is scheduled for 8 events with planned expansion to 14 events. Recognizing that none of the events on the Tour (or the events planned by LIV Golf) include all elite golfers, there is ample player capacity over the course of a year to accommodate both the Tour and the LIV Golf event series. Accordingly, the PGA TOUR and LIV Golf could co-exist, competing through the year for participation by the sport's elite golfers in their respective events. Fan appeal and event economics would determine the outcome.

74.   This is what the Challenged Conduct prevents. In effect then, it forces the two organizers to compete for the exclusive season commitments by the elite golfers—in economic terms, to compete *for* the market, not *within* it. This is an important distinction. There is a consensus among antitrust economists that competition for the market often does not work as effectively as competition within the market. In particular, when an incumbent monopolist (or monopsonist) succeeds in limiting competition just to competition for the market, would-be competitors must then persuade buyers (or input suppliers) to shift all their business from the incumbent to them. But often, product quality/performance is hard to gauge. Hence, competition for the market creates significant risks for buyers (and input suppliers) who can only make that competition work by credibly threatening to convert all their business to a

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

new entrant.[94] They also face the risk that, if they do, the new entrant may prove unable to operate efficiently over time and therefore be forced to raise (or, in the monopsony case, lower) prices, reduce product quality, or exit the business. Accepting some level of uncompetitive pricing from the incumbent can be more attractive than assuming those risks.[95]

75.  With the ability instead to compete within the market, new entrants in a market dominated by an incumbent seller (or buyer) can enter initially by inducing some portion of the existing customers to try their products (or inducing input suppliers to divert some portion of their output to the new entrant) while still doing significant business with the incumbent.[96] By doing so, the customer (or input supplier) limits the risk it faces in trying the new entrant.[97] Assuming the new entrant is discovered to

---

[94] K. Bagwell, "Informational Product Differentiation as a Barrier to Entry," *International Journal of Industrial Organization*, 8(2), 1990 ("Bagwell") at 207. ("Of particular interest is Schmalensee (1982). In his model, an incumbent with a known high quality product competes with an entrant whose product quality is unknown (perhaps high, perhaps low). Schmalensee concludes that the incumbent may make profits without encouraging entry of an equally efficient, high quality entrant. In effect, consumers seek insurance and will pay a risk premium for a known product."); R. Schmalensee, "Product Differentiation Advantages of Pioneering Brands," *American Economic Review*, 72(3), 1982, 349-365.

[95] P. Carstensen, "Buyer Power, Competition Policy, and Antitrust: The Competitive Effects of Discriminations Among Suppliers," *The Antitrust Bulletin*, 53(2), 2008 at 279-280 ("For any producer that is selling directly to another buyer on a repeat basis, there are costs associated with switching to another customer….Where there are few buyers overall, the risks under those circumstances will be a substantial deterrent to looking for an alternative outlet even if the current buyer imposes substantial burdens on the producer. Thus, the costs and risks of switching increase as the number of potential buyers declines…These costs and risks also vary with the quantity and proportion of sales that any one buyer takes from the seller. Where the buyer takes all or a substantial part of the producer's output, the difficulties associated with finding an alternative buyer will increase. One classic example is human labor. The employee usually sells all or most of her labor to a single buyer. Economic models of labor markets show that in such contexts as a matter of theory, there is buyer power even if there are many buyers, and this is confirmed by various empirical studies. Logically, the same conclusions would apply to any other input market with similar characteristics").

[96] Bagwell at 208 ("As the entrant's quality is commonly known to be at least as good as the incumbent's, it may seem surprising that the entrant has difficulty gaining market share. The intuition is roughly as follows. Consumers initially do not know entrant quality, and they therefore will try the entrant's product only if a 'reasonably' low price is charged. Assuming that high-quality products are more costly to produce, the introductory prices which attract consumers to the entrant may be below the cost of high-quality production. Thus, to win consumers, it may be necessary to initially experience losses. High quality entry will occur only if these losses are no larger than the future profits coming to the entrant once consumers are induced to experience the quality of its product.").

[97] *See* P. Klemperer, "Competition when Consumers have Switching Costs: An Overview with Applications to

---



offer a better combination of price and quality, then more and more business can be shifted over time to the new entrant, eventually forcing prices in the market generally to competitive levels.[98]

76. By removing the option to test the LIV Golf experience without having to abandon the Tour altogether, the Challenged Conduct greatly stacks the competitive deck against LIV Golf. The "competitive choice" it leaves for Tour members is either to continue their professional livelihood in the successful setting they have worked for years to join or start over in a new event setting with an uncertain future. One would expect that for many Tour members the prospect of leaving the Tour to join a new, and as yet unproven, professional golf series might well be a non-starter.

77. Forcing Tour members to make this kind of all-or-nothing decision regarding participation in LIV Golf events has another predictable economic consequence. If it is to succeed in attracting golfers, one would expect that LIV Golf would have to pay them to take on the added risk created by the all-or-nothing choice the Challenged Conduct forces them to make—the risk that they will permanently lose the option to play in Tour events; the risk that they will not be able to play in (some or all of) the Majors; the risk that they will not be welcome in European Tour events; and the risk that they will lose fan exposure and endorsement opportunities. And, as described above, this is what has happened here. The elite golfers that moved to LIV Golf reportedly were paid large up-front bonuses to do so.[99]

---

Industrial Organization, Macroeconomics, and International Trade," *The Review of Economic Studies*, 62(4), 1995 at 517 ("Uncertainty about the quality of untested brands[:] Consumers re-use medicines that have worked for them, in preference to taking the gamble of trying drugs that they have not tested and that may not suit them. In markets like this one, a consumer behaves as if he faced a cost of switching to a new brand that is equal to the maximum insurance premium that he would be willing to pay to be guaranteed a product of the same value to him as a product he has previously purchased.").

[98] *Id.* at 532 ("…if firms differentiate their products, some consumers may, in spite of their switching costs, buy from more than one firm in order to increase product variety. These consumers may then be relatively sensitive to price competition; that is a small price cut may persuade these consumers, who are anyway patronizing more than one supplier, to move a large part of their business.").

[99] *See* GolfDigest website, *Dustin Johnson is getting big money ($100 million?!) to jump ship. But it might cost him big as well* (https://www.golfdigest.com/story/dustin-johnson-liv-golf-opener-big-money-jump-ship), accessed 7/25/2022.



78.     This makes success for LIV Golf a much more expensive and riskier proposition. In the economic literature, the anticompetitive consequences of conduct that raises the cost of entry and expansion for would-be competitors—referred to as "raising rivals' costs"—is widely recognized and discussed. As described in one of the seminal academic articles on the subject:

> The RRC [raising rivals' costs] foreclosure paradigm generally describes exclusionary conduct that totally or partially "forecloses" competitors from access either to critical inputs or customers, with the effect of causing them to raise their prices or reduce their output, thereby allowing the excluding firm to profit by setting a supracompetitive output price, with the effect of harming consumers.…
>
> When a monopolist engages in foreclosure against entrants, consumer harm can occur through several mechanisms. First, the foreclosure can so raise the costs of the potential entrants or constrain their potential sales that it creates prohibitive barriers to entry, in which case the monopolist can maintain its full monopoly price. Second, the foreclosure can raise an entrant's costs to a lesser degree, in which case the monopolist may need to reduce its prices somewhat, but by less than if the rivals' costs had not been raised. Third, the foreclosure could limit the capacity of entrants, cause them to shrink, or restrict their ability to expand and gain market share, whether or not it raises their costs of producing at low output levels. Here too, the limitation may reduce or eliminate the monopolist's incentive to cut prices in response to the entry.[100]

79.     One might ask why golfers—as victims of monopsony power that is protected by the terms of the PGA TOUR's rules and regulations—would sign up to play with the PGA Tour in the first place? First, for some time now, the Tour has been essentially

---

[100] S. Salop, "The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test," *Antitrust Law Journal*, 81, 2017 at 376 and 391-392.

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

8/2/2022

the only source of elite-level events in the US. Hence, there were no viable options for elite competition and rewards that did not involve the PGA TOUR's limiting restrictions. Nor were there viable options in Europe, especially now with the European Tour following suit in its rules.[101] Hence, refusing to accept the PGA TOUR rules and policies meant forgoing elite-level golf competition. Even with compensation depressed as a result of the PGA TOUR's monopsony power, Tour members have had no choice but to accept the rules presented by the PGA TOUR if they wish to pursue their profession at the elite level.

80.     Second, while Tour members might understand that if they collectively opted for a competing event series in sufficient numbers, they could collectively create a viable elite event option. But individually, elite golfers cannot assume that others would make the same choice. Situations such as this give rise to what economists refer to as a collective action problem. As one author described the collective action problem:

> Indeed, unless the number of individuals in a group is quite small, or unless there is coercion or some other special device to make individuals act in their common interest, *rational, self-interested individuals will not act to achieve their common or group interests.* In other words, even if all of the individuals in a large group are rational and self-interested, and would gain if, as a group, they acted to achieve their common interest or objective, they will still not voluntarily act to achieve that common or group interest.[102]

81.     To take another example of this same theme from the literature:

> Ordinarily, a monopoly cannot increase its profits by asking customers to sign agreements not to deal with potential competitors. If, however, there are 100 customers and the minimum efficient scale requires serving 15, the monopoly need

---

[101] Golf Monthly website, *Report: DP World Tour Blocks Releases to LIV Golf Event* (https://www.golfmonthly.com/news/report-dp-world-tour-blocks-releases-to-liv-golf-event), accessed 6/9/2022.

[102] M. Olson. *The Logic of Collective Action: Public Goods and the Theory of Groups*, Harvard University Press, 1971 at 2 [emphasis in original].

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

only lock up 86 customers to forestall entry. If each customer believes that the others will sign, each also believes that no rival seller will enter. Hence, an individual customer loses nothing by signing the exclusionary agreement and will indeed sign. Thus, naked exclusion can be profitable.[103]

82.    Here, Tour members do not know, and cannot assume, what choices their colleagues will make. That makes a decision to join a competing event series (and be banned from the Tour) very risky. If others do not follow in sufficient numbers, the new event series fails and the former Tour member still faces a lifetime ban. Consequently, individual golfers could rationally decide to stay with the Tour and its depressed payments because they cannot count on collective action by other members[104]—a perception reinforced by statements of loyalty from a few well-known elite golfers.[105] For all these reasons then, the PGA TOUR's threats regarding career consequences can create loyalty on the part of its members even though their compensation is sub-competitive.

### D. Harm to Competition

83.    Successful entry by LIV Golf would provide a new and significant competitor to the PGA TOUR both for purposes of golfer participation. The prospective benefits of that competition for golfers are (as discussed above) already evidenced by the increased compensation that LIV Golf has offered, and that the PGA TOUR has offered in response. If successful, LIV Golf would also raise the number of elite-level events in the US by five (a 10 percent increase) this year and by ten (a 25 percent

---

[103] E. Rasmusen, J. Ramseyer, and J. Wiley, "Naked Exclusion," *The American Economic Review*, 81(5), 1991 at 1137 (abstract).

[104] As discussed below, player unionization has been a successful strategy for overcoming league efforts to limit player mobility in other professional sports. This is unsurprising as an economic matter. Unionization is a means for ensuring collective action and thereby overcoming the chilling effect of mobility limits on the development of competing leagues.

[105] For example, in and around the public commentary that has accompanied some of the recent news about LIV Golf's plans, some elite golfers (Rory McIlroy, for instance, who is a member of the PGA TOUR Policy Board and presumably compensated by the Tour in that role) announced their intention to support the Tour and its rules. Golf Magazine website, '*I'm all for the PGA Tour': Top pros rebuke Saudi golf league* (https://golf.com/news/top-pros-rebuke-saudi-league-genesis/), accessed 6/9/2022.



increase) next year.[106] That benefits golfers, broadcasters, advertisers, and golf fans generally.

84.     There is another competitive benefit that LIV Golf would bring—innovation. Fan research undertaken by LIV Golf shows that golf fans are dissatisfied with the length of PGA Tour events and, relatedly, the slow pace of play.[107] 45 percent of the golf fans that watched or attended Tour events expressed overall dissatisfaction with the Tour.[108] And, there has been a "slowdown in number of viewers" for golf events in recent years.[109] That same research revealed strong demand for changes LIV Golf would bring, namely faster pace of play, shorter match times, and more concentration on top golfers.[110] LIV Golf also planned to provide online statistics and live betting, which is expected to attract younger fans and more women.[111]

85.     In addition, LIV Golf is well positioned to deliver those competitive benefits, and in some ways uniquely so, which means that if it fails, the competitive opportunity may not soon be replicated. LIV Golf has a well-qualified management team headed up by Greg Norman, one of the sport's iconic players who also has been a very successful entrepreneur. It offers (as discussed above) a series of innovative ideas about the presentation of elite competition. It has been able, even in the face of the Challenged Conduct, to enlist the participation of some of today's best-known golfers. And, it is backed by investors with substantial capital.

86.     The harm to competition posed by the Challenged Conduct is the diminution or elimination of this promising competitor—along with the many competitive benefits it appears poised to provide—in a market that has for some time been dominated by

---

[106] GolfDigest website, *LIV Golf to transition to 'league' schedule in 2023, with 14 events and 48 contracted players* (https://www.golfdigest.com/story/liv-golf-league-schedule-2023), accessed 7/25/2022. This calculation assumes the number of US PGA Tour events in 2023 remains constant at 37.

[107] McKinsey Fan Research (Highly Confidential) at 8.

[108] *Id.* at 11. Among US fans, 40 percent expressed overall dissatisfaction with the PGA TOUR.

[109] McKinsey Final Report (Highly Confidential) at 8.

[110] *Id.* at 9-10; McKinsey Fan Research (Highly Confidential) at 8.

[111] McKinsey Fan Research (Highly Confidential) at 8 and 13.



*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

a single buyer. As described above, the Challenged Conduct likely has limited (and will continue to limit if maintained over time) golfer participation in LIV Golf, which limits the competitive strength of its events. And as Commissioner Jay Monahan observed back in January 2020 in response to the competitive threat from the PGL:

> The impact that Private Equity Golf could have on the PGA TOUR is dependent on the level of support it may receive from [high-profile] players. Without this support, Private Equity Golf's ability to attract media and corporate partners will be significantly marginalized and its impact on the [PGA] TOUR diminished.[112]

87.  I understand that a television broadcast contract is essential for LIV Golf's long-term viability. The great bulk of the revenue planned in LIV Golf's business model results from broadcast contracts, as it does for the PGA TOUR. Moreover, LIV Golf's sponsorship, advertising, and marketing relationships depend on securing broadcast agreements. I understand that the PGA TOUR's efforts to control its members' media rights has deterred potential broadcast partners from engaging with LIV Golf.

88.  Also as noted above, LIV Golf has incurred hundreds of millions of dollars in commitments to golfers who have been willing to play in LIV Golf events. While LIV Golf has the financial resources to make these cash outlays at the present time, these outlays are not sustainable. Like many start-up enterprises, it has been forced to absorb upfront costs as it strives to enter the market. But it cannot continue to do so indefinitely while the punishments from the PGA TOUR and the European Tour escalate. And, absent the prospect for TV coverage of LIV Golf events, continued investment in golfer recruiting may not make economic sense. In that case, LIV Golf likely will not be economically viable. Also in that case, the PGA TOUR will have successfully foreclosed an important new source of competition and the full extent of the monopsony power held by the PGA TOUR over time will be restored. Top-level golfers will pay the price in the form of reduced compensation, fewer participation opportunities, less innovation in event formats, and reduced levels of fan interest.[113]

---

[112] Brass Declaration Exhibit 4.

[113] B. Bernheim and R. Heeb, "A Framework for the Economic Analysis of Exclusionary Conduct," in *The*

econ ONE ─────────────────────────

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

# VIII. Mobility Restraints in Other Sports

89.     Other professional sports provide numerous examples of organizers taking steps to limit competition for players and competition from other organizers. The history surrounding these efforts underscores the likely anticompetitive effects of the conduct challenged in this case. First, the frequent efforts to limit player mobility in other sports validates the economic notion that such limits can create monopsony power for the organizer, depressing player payments, and increasing profitability. Second, the entry of new organizers (or new leagues) such as LIV Golf has been a powerful competitive force over the years for creating competition over services offered by professional athletes and undoing monopsony power. Third, history also shows concrete evidence of the high level of monopsony power that mobility restrictions create. In several sports, pressure from players and/or competing organizers have led to the lifting of mobility restrictions which resulted in much higher and more competitive player payments. Finally, notwithstanding frequent claims by the organizers to the contrary, the end of those restrictions did not spell economic disaster for professional sports. Indeed, the sports for which these competitive restrictions have been lifted have seen years of continuing and growing prosperity. I discuss these patterns below.

## A. Efforts to Restrain Mobility in Other Sports

90.     There is a long history in the US for organizers of professional sports matches to severely limit, if not prohibit entirely, players' ability to freely offer their athletic services to willing buyers. As noted above, successful attempts by incumbent organizers have been rewarded with monopsony power over the allocation of player services, the ability to offer lower payments to players, and increased profits to sports clubs and leagues.

91.     As the first organized professional sport in the US, Major League Baseball offers the earliest examples of player restraints. In 1879, contracts used by baseball owners first

---

*Oxford Handbook of International Antitrust Economics Vol. 2* (R. Blair and D. Sokol eds.), Oxford University Press, 2015 at 30. ("When the conduct enhances the excluding firm's market power . . . harm to consumers is usually ensured: consumers will pay higher prices and potentially forgo other benefits of competition, such as improved variety and innovation.").

econ **ONE**

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

included what came to be known as the "reserve clause."[114] It permitted a team to "reserve" a player for the following season at a rate at least as high as the player's current-year compensation. As some authors have noted, this clause effectively granted an owner a perpetual option to retain a player's services over his entire career.[115] As a result, competition across teams for player services was greatly limited. Following the Supreme Court decision in *Federal Baseball Club v. National League* which granted baseball an antitrust exemption, reserve clauses were incorporated in players' contracts from the 1920s into the 1970s.[116] Nearly 100 years after its inception, the reserve system was finally abolished in 1976 through a collective bargaining agreement that provided players with free agency after six years of service in the major leagues.[117]

92. The history of professional football also reveals restraints over player services. By the early 1920's, the NFL employed standard player contracts including its own version of the reserve clause, giving teams the right to re-sign its players each season in perpetuity.[118] Faced with emerging competition from rival organizers in the 1940s and 1950s, including the All-America Football Conference (AAFC) and the American Football League (AFL), the NFL adopted additional restrictions in order to prevent players from moving to rival leagues. These included an "agreement of the clubs to black-list any player violating them and to visit severe penalties on recalcitrant member clubs."[119] The NFL ceased its blacklisting practice in the face of antitrust lawsuits, including *Radovich v. NFL*, in which the Supreme Court held that the NFL was not entitled to baseball's antitrust exemption. Roughly two years after the Supreme Court's decision in *Radovich*, the American Football League (AFL) entered

---

[114] J. Quirk and R. Fort, *Pay Dirt: The Business of Professional Team Sports*, Princeton Univ. Press, 1992 ("Quirk & Fort") at 181.

[115] Quirk & Fort at 186.

[116] Quirk & Fort at 185; L. Kahn, The Sports Business as a Labor Market, *Journal of Economic Perspectives*, 14(3), Summer 2000 ("Kahn") at 80.

[117] Quirk & Fort at 195.

[118] Quirk & Fort at 186.

[119] *Radovich v. National Football League*, 352 U.S. 445 (1957).

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

the scene in 1960 and ushered in an era of competition for players, at least until the NFL and AFL merged in 1967.

93.    Throughout the 1960s and early 1970s, the NFL employed a series of rules designed to limit player mobility among franchises, including the "Rozelle Rule."[120] The Rozelle Rule required a team wanting to sign a player from another team to compensate that team.[121] The NFL Commissioner was given unilateral authority to set that compensation, which, according to the court that struck down the Rozelle Rule as an antitrust violation, "significantly deters clubs from negotiating with and signing [the] free agents" and "acts as a substantial deterrent to players playing out their options and becoming free agents."[122] The court further found that "players are thus denied the right to sell their services in a free and open market [and] as a result, the salaries paid by each club are lower than if competitive bidding were allowed to prevail."[123] In 1989, some years after the Rozelle Rule was successfully challenged as anticompetitive, NFL owners imposed a modified reserve system known as "Plan B Free Agency." This gave teams the right to protect 37 players on its then 47-man active rosters from becoming free agents.[124]

94.    From 1949 to 1959, the National Basketball Association (NBA) was the only professional basketball league in the US.[125] As in baseball and football, the NBA also used reserve clauses through the mid-1970s to limit player mobility. As one set of

---

[120] *See Mackey v. National Football League*, 543 F.2d 606 (8th Cir. 1976) ("*Mackey v. NFL*") at 610-611, describing the history of the NFL's restrictions on player movement between teams.

[121] New England Patriots website, *The history of NFL Free Agency* (https://www.patriots.com/news/the-history-of-nfl-free-agency), accessed 6/9/2022.

[122] *Mackey v. NFL* at 620.

[123] *Ibid.*

[124] New England Patriots website, *The history of NFL Free Agency* (https://www.patriots.com/news/the-history-of-nfl-free-agency), accessed 6/9/2022.

[125] T. Rosenbaum, "The Antitrust Implications of Professional Sports Leagues Revisited: Emerging Trends in the Modern Era," *U. Miami L. Rev.* 41(4), 1987 at note 180.

econ ONE

authors note, basketball's reserve clause involved a one-year option clause and compensation for free agents similar in form to football's Rozelle Rule.[126]

95.     Since at least 1952, a reserve clause had been in effect in the NHL.[127] In addition to the use of a reserve clause in player contracts, the NHL By-Laws also "established 'lists' relating to the right of NHL teams to control the services of professional players and provide the number of players which each team may maintain on such lists[.]"[128] The NHL By-Laws also forbade "tampering" with any player controlled by another club, and was defined to include "negotiating with, offering employment or discussing employment."[129]

96.     In a 1975 collective bargaining agreement between the NHL and the National Hockey League Players Association (NHLPA), the NHLPA approved the NHL's use of a modified version of the NFL's Rozelle Rule in player contracts. Under the NHL's rule, if the two sides could not agree on compensation for a player who wanted to switch teams after his option year, an independent arbitrator would decide the matter.[130]

97.     Promoters of individual sports also have some experience with efforts to limit competition for athletes' services. For example, in *United States v. International Boxing Club of New York*, the Supreme Court described a scheme by boxing promoters to use a series of exclusive contracts to foreclose competition and prevent boxers from signing with other promoters. According to the Supreme Court:

> The effect of the conspiracy is obvious. Using the facilities of I.B.C., Illinois and I.B.C., New York, appellants entered into exclusive promotion contracts with title aspirants, requiring exclusive handling agreements in the event the contender became

---

[126] Quirk & Fort at 202.

[127] *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F. Supp. 462 (E.D. Pa. 1972) at 475.

[128] *Id.* at 476.

[129] *Id.* at 477.

[130] M. Schiavone, *Sports and Labor in the United States*, SUNY Press, 2015 at 132.

econ ONE

champion. In amassing their empire, appellants obtained control of champions in three divisions. The choice given a contender thereafter was clear, *i.e.*, to sign with appellants or not to fight. With appellants in control of the key arenas and stadia of the country through Madison Square Garden, Chicago Stadium Corporation, and others, an event could not be successfully staged in any of these areas, the most fruitful in the Nation, without their consent. The exercise of this power brought immediate results. From June 1949, when appellants staged their first championship fight, until May 15, 1953, the date of the amended complaint, they staged or controlled the promotion of 36 of the 44 championship battles held in this country, giving them approximately 81% of that field. In two of the classifications, heavyweight and middleweight, the combine staged all of the contests. The power of the combine to exclude competitors in the championship field is graphically shown by their promotion of 25 out of 27 fights in all divisions, a total of 93%, during the two-and-a-half-year period ending with the filing of the amended complaint.[131]

98.    Recently, a group of approximately 1,200 fighters sued the Ultimate Fighting Championship (UFC) mixed martial arts (MMA) promotion company.[132] The Plaintiffs alleged that the UFC sought to exclude competition from other promoters in an attempt to maintain monopsony power over payments to fighters.[133] Plaintiffs claimed that the UFC: (1) used long-term exclusive contracts which prevented fighters from competing elsewhere, (2) used the market power created by their contractual control over fighters to force fighters to resign when those contracts

---

[131] *United States v. International Boxing Club of New York,* 348 U.S. 236 (1955) at 248-249.

[132] Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship and UFC, No. 2:15-cv-01045-RFB-BNW (D. Nev.).

[133] ESPN website, *Antitrust Suit vs. UFC Wins Legal Decision* (https://www.espn.com/mma/story/_/id/30492170/antitrust-suit-vs-ufc-wins-legal-decision), accessed 6/9/2022.

econ**ONE**

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

expired, effectively locking them in for perpetuity, and (3) acquired and terminated rival MMA organizations.[134]

### B. The Competitive Impact of New Organizers

99.     The emergence of a rival organizers in professional sports has played a powerful role in limiting the monopsony power enjoyed by incumbent leagues, even in the face of restrictions on player mobility. For instance, immediately following the introduction of the reserve system in 1879, baseball player salaries dropped.[135] However, three years later in 1882, a new rival league known as the American Association (AA) emerged and began competing with the National League for player services. As a result, player salaries rapidly increased over the next 10 years.

100.    Between 1891 and 1920, the National League faced two more brief periods of competition from rival leagues—the American League (1901-1903) and the Federal League (1913-1915). As shown in Figure 3 below, players experienced substantial salary increases during these periods of competition, and sharp decreases in the periods between.[136]

---

[134] PR Newswire website, *Fighters File Class Action Antitrust Lawsuit Against The Ultimate Fighting Championship ("UFC") And Endeavor Group Holdings, Inc.* (https://www.prnewswire.com/news-releases/fighters-file-class-action-antitrust-lawsuit-against-the-ultimate-fighting-championship-ufc-and-endeavor-group-holdings-inc-301319030.html), accessed 6/9/2022.

[135] Kahn at 76.

[136] *Id.* at 77-78.



**Figure 3 - Average Nominal and Real Salaries, Major League Baseball, 1876-1920**



† The author notes that the increase in average player salaries around the time the American League was formed appears to begin in 1900, which may reflect anticipation of the new league.

Source: Kahn at 77.

101.   As a result of competition from the AFL during the 1960s, NFL salaries more than doubled from an average of $10,000 in 1960 to $25,000 in 1967.[137] This competition ended in 1970 when the two leagues merged. Between 1982 and 1985, the NFL once again faced competition from another emerging rival, the United States Football League (USFL). Many NFL players switched leagues and the USFL was able to sign some high-profile college players.[138] The inter-league competition helped increase NFL players' salaries from $90,000 in 1982 to $205,000 in 1987.[139]

---

[137] P. Weiler, *Leveling the Playing Field: How the Law Can Make Sports Better for Fans*, Harvard University Press, 2000 ("Weiler") at 151.

[138] Kahn at 79.

[139] Weiler at 108.

102.    A similar pattern played out in professional basketball with the rise of the American Basketball Association (ABA) in 1967. The ABA's emergence positively affected player payments. As one author noted, "By 1972–1973, the NBA had to increase salaries to prevent players from joining a league that clearly was a legitimate competitor."[140] According to one study, NBA salaries as a percentage of gross basketball revenues rose from 30 percent in 1967 to 66 percent in 1972.[141]

### C.  The Monopsony Power Flowing from Mobility Restrictions Has Been Significant

103.    In Major League Baseball, according to a recent paper, the wage-restraining effects of the reserve clause allowed baseball teams to limit player payments to 25 percent of their revenue.[142] The extent of that monopsony power can also be seen in the aftermath of the reserve clause. As one author describes its effects:

> The rise of free agency in the 1976-77 period had a powerful impact on the salaries of baseball players. The average real increase in baseball salaries was from 0-2 percent per year from 1973-75. In 1976 the average real salary increase was almost 10 percent; in 1977, the first year under the new collective bargaining agreement, 38 percent (!); in 1978, 22 percent, before falling back into single digits growth in 1979. Moreover, baseball salaries as a percentage of team revenues rose from 17.6 percent in 1974 to 20.5 percent in 1977 to 41.1 percent in 1982, further suggesting that free agency has had a structural effect on baseball salary determination.[143]

---

[140] D. Berri, "Oscar Robertson, Antitrust, and the Fight Against Monopsony Power in the NBA," *The Antitrust Bulletin*, 66(3), 2021 ("Berri") at 356.

[141] Kahn at 79. *See also* Berri at 355-356 ("Given what we know of 1970–1971, we know that percentage had declined to only 27%. … Hence, it seems clear the percentage paid to the players increased dramatically. In fact, the estimate presented here suggests players in 1972–1973 were capturing about 50% of league revenue.")

[142] Berri at 330-331.

[143] Kahn at 81 (citations omitted). See also Berri at 331 ("After 1976, players with six years of Major League

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

104.    The lifting of player mobility restrictions and the advent of free agency led to substantial increases in player salaries in football, basketball, and hockey as well. As a result of unrestricted free agency in football for veteran players which took root in 1993, average salaries increased over 30 percent from approximately $490,000 in 1992 to $650,000 in 1993, and further increased to $1.1 million by 1999.[144] Since the creation of the Oscar Robertson Rule for basketball in 1976 (which eliminated the reserve clause in the NBA's standard player contracts) there has been consistent and strong growth in player benefits and salaries. The average NBA salary in 1977 was $143,000, that average increased to $215,000 by 1982, to $1,416,000 by 1994-1995, and to $2,500,000 by 1999-2000.[145] In the early 1990s, nominal player salaries in hockey averaged just over $200,000. In combination with salary arbitration and reduced restrictions on player free agency, NHL average salaries increased to $570,000 by 1993-1994 and to $1.4 million by 1999-2000.[146]

### D. Lifting Competitive Restrictions Did Not Destroy Sports

105.    In defense of player mobility restrictions, league organizers and team owners have argued that player mobility would destroy the sport, allowing a few favored teams to accumulate the best players, thus destroying competitive balance, and driving up player salaries to the point that most teams would be unable to stay in business.[147] For example, in its defense of the Rozelle Rule, the NFL argued that if the restraints on player movement were lifted, "star players would flock to cities having natural advantages . . . [,] that competitive balance throughout the League would thus be destroyed[,] and that the destruction of competitive balance would ultimately lead to

---

experience could sell their services to different teams on the free agent market. This dramatically changed the bargaining power of players and hence allowed players to capture a greater share of league revenue.").

[144] Weiler at 110.

[145] Kahn at 80 and Rodney Fort's Sports Business Data website (https://sites.google.com/site/rodswebpages/codes), accessed 6/9/2022.

[146] Weiler at 111-112.

[147] *See e.g.*, The New York Times, *The Reserve Clause: Key in All Sports Is Control of Players Not Under Contract*, 9/28/1975 (https://timesmachine.nytimes.com/timesmachine/1975/09/28/issue.html), accessed 6/9/2022; and P. Fishman, "Competitive Balance and Free Agency in Major League Baseball," *The American Economist*, 47(2), 2003 at 86.



diminished spectator interest, franchise failures, and perhaps the demise of the NFL, at least as it operates today."[148]

106.   While player mobility has led to higher player payments (as noted above)—a normal and predictable result of competitive player markets—the doomsday predictions regarding the effects of mobility on sport itself have not born out. To this day, Major League Baseball continues to be one of the most popular spectator sports in the US, boasting growth in total revenue from $3.58 billion in 2001 to $10.37 billion in 2019.[149] Average player salaries also have continued to grow over this period, leveling off at just over $4 million starting in 2016.[150] And, as one sports economics textbook notes on the impact of free agency on competitive balance:

> It would be difficult indeed to argue with the conclusion that the experience of baseball since 1976 looks almost exactly like the prediction of microeconomic theory, that is, no change in competitive balance due to free agency, and bears no resemblance at all to the forecasts of owners that free agency would have a devastating deleterious effect on competitive balance.[151]

107.   The picture in football, basketball, and hockey is no different. Along with baseball, these three sports continue to top the list of the US' most popular spectator sports,[152] each generating significant revenue growth over the last two decades.[153] Player

---

[148] *Mackey v. NFL* at 621.

[149] Statista, *Major League Baseball total league revenue from 2001 to 2020*, (www.statista.com), accessed 2/6/2022.

[150] Statista, *Average player salary in Major League Baseball from 2003 to 2021*, (www.statista.com), accessed 5/23/2022.

[151] Quirk & Fort at 284-285.

[152] *See e.g.*, FiveThirtyEight website, *The 'Big Five' in North American Pro Sports* (https://fivethirtyeight.com/features/theres-a-big-five-in-north-american-pro-sports/), accessed 6/9/2022; Sports Browser website, *Top 10 Most Popular Sports In America In 2022* (https://sportsbrowser.net/most-popular-sports-in-america/), accessed 6/9/2022.

[153] NFL revenues increased from $4.28 billion in 2001 to $15.26 billion in 2019. NBA revenues have increased from $2.66 billion in 2001/2002 to $8.76 billion in 2018/2019. NHL revenues have increased from $2.27 billion in 2005/2006 to $5.09 billion in 2018/2019. Statista, *Total revenue of all National Football League teams from 2001 to 2020*, (www.statista.com), accessed 2/6/2022; Statista, *National Basketball Association total*



salaries in the NFL, NBA, and NHL have all continued to rise since free agency was established with no mass exodus of teams that failed to stay in business due to increased payments to players. As of 2021, average player salaries in the NFL, NBA, and NHL have reached $6 million, $7.3 million, and $3.4 million, respectively.[154]

108.    None of this is surprising as an economic matter. It is widely recognized by economists that competition produces the best allocation of resources, lower prices for consumers, higher quality goods and services, and more innovation.[155] As one Court noted, the Sherman Act "rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress."[156]

---

*league revenue from 2001/02 to 2019/20*, (www.statista.com), accessed 2/6/2022; and Statista, *National Hockey League – total league revenue from 2005/06 to 2019/20*, (www.statista.com), accessed 2/6/2022.

[154] Spotrac website (https://www.spotrac.com/nfl/rankings/2021/average/), accessed 6/9/2022; Basketball Reference website (https://www.basketball-reference.com/contracts/players.html), accessed 6/9/2022; Hockey Reference website (https://www.hockey-reference.com/friv/current_nhl_salaries.cgi), accessed 6/9/2022.

[155] S. Hunt and D. Duhan, "Competition in the third millennium Efficiency or Effectiveness?," *Journal of Business Research*, 55, 2002 at 97 ("With innovation exogenous, competition efficiently allocates resources and promotes social welfare when each firm in an industry restricts itself to adjusting its quantity of product produced and the quantities of its resources purchased in reaction to changes in the market prices for products and resources."); D. Schwartzman, "The Effect of Monopoly on Price," *Journal of Political Economy*, 67(4), 1959 at 352 ("Few topics in economics are treated with the unanimity characteristic of the discussion of price under monopoly and oligopoly. Nearly all writings agree that price under monopoly is higher than under competition, and the usual condemnation of monopoly rests on this conclusion."); M. Mussa and S. Rosen, "Monopoly and Product Quality," *Journal of Economic Theory*, 18, 1978 at 301 ("Assuming that buyers purchase one unit of the good and that there are constant costs of producing a given variety and increasing marginal costs of higher quality items, it is established that the monopolist almost always reduces the quality sold to any customer compared with what would be purchased under competition."); and K. Arrow, "Economic Welfare and the Allocation of Resources for Invention," in *The Rate and Direction of Inventive Activity: Economic and Social Factors*, Universities-National Bureau Committee for Economic Research, Committee on Economic Growth of the Social Science Research Council, Princeton University Press, 1962 at 620 ("[T]he monopolist's incentive [to innovate] is obviously less than the inventor's incentive under competition[.] … The preinvention monopoly power acts as a strong disincentive to further innovation.").

[156] *See, N. Pac. Rwy. v. United States*, 356 U.S. 1 (1958).

econ**ONE**

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

## IX.   The PGA TOUR's Justifications

109.   As an economic matter, contractual restrictions on competitive behavior can be justified by economic efficiencies or other consumer benefits that outweigh the costs associated with reduced competition and are unattainable through less restrictive means. For example, certain restrictions on intra-brand competition among retailers are sometimes justified by the manufacturers' legitimate interest in incentivizing retailers to provide nice showrooms, expensive product displays, customer education and/or post-sale service. The idea is that without limits on the ability of retailers who do not offer these attributes to undercut those who do, they would not be offered, manufacturers would be hindered in their ability to compete in the inter-brand marketplace, and the overall product experience available to consumers—that is, physical product plus education, service, and shopping experience—would be diminished.

110.   On the other hand, erecting barriers to protect a successful, highly profitable business from competition—thereby supporting uncompetitively high prices (or uncompetitively low prices in the case of a buyer)—is not an economic justification for contractual restrictions that limit competition. Increased profits are not a consumer benefit and do not counterbalance the costs to consumers of uncompetitive prices, reduced output and/or limited innovation that stem from competitive restrictions. In other words, the desire on the part of a monopolist (or monopsonist) simply to maintain its monopoly position is not an economic justification for conduct that forecloses entry by competitors. In that situation, the motive for the conduct and the cost to consumers are one in the same thing. There is no counterbalancing benefit.

111.   In its communication with golfers regarding their requests for exemptions to play in LIV Golf's June 2022 London event, the PGA TOUR offered two explanations for its refusal to grant the requested exemptions. First, the PGA TOUR stated that "granting such a Release would 'significantly and unreasonably harm the PGA TOUR and [TOUR] sponsors'"[157] and that it was denying the releases because "we believe

---

[157] PGA TOUR letter from K. Burgess to G. McDowell, 5/10/2022.

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

this is in the best interest of the PGA TOUR and its players."[158] Second, the PGA TOUR also stated that, "we simply cannot permit free riding on the investments made by the TOUR in establishing and promoting its members."[159] On their face, neither of these explanations appears to provide even a colorable economic justification for blocking competitive playing choices on the part of Tour members.

### A. Protecting the Best Interests of the Tour and Its Golfers

112.   The companion notions that its restrictions protect the "interest of the PGA Tour and its players" from "significant[] and unreasonabl[e] harm [to] the PGA TOUR and [TOUR] sponsors" does not articulate an economic efficiency or product benefit that arises solely by virtue of those restrictions. Rather, this explanation would seem to say nothing more than the PGA TOUR and its event sponsors will make less money if golfers participate in LIV Golf.

113.   To be more specific, perhaps the PGA TOUR is suggesting that it benefits from having the best golfers in the world play in its tournaments, which in turn makes those events more attractive to broadcasters and sponsors. The same could be said, however, for virtually any business in any industry that relies on talented individuals as a critical input. For example, any movie studio would benefit from having all the brightest stars in its lineup; any law firm would benefit from having all the best lawyers among its partners; and a boxing promoter (such as the promoters who were held in violation of the antitrust laws in *International Boxing*) would benefit by having control over all the top contenders. Critically, however, the benefits to a business (particularly a dominant incumbent) from having all the top talent in its lineup do not provide reasonable economic justification for foreclosing competition to acquire that talent. Actions by a dominant incumbent that undermine competition to attract talent and/or hinder a would-be entrant in its efforts to compete to hire talent do not

---

[158] PGA TOUR letter sent via email to PGA TOUR membership, 5/10/2022. Notably, European Tour CEO Keith Pelley offered a similar reason in a letter denying a European Tour golfer from participating in the LIV Golf Invitational London event, dated 5/17/2022 ("While trying to balance the challenge of allowing our members the opportunity to play in a conflicting tournament, we have, at the same time, to ensure protection for our Tour, all its members and our relationship with our stakeholders that provide the revenue which will enable all of you to continue to play for the levels of prize fund currently established.").

[159] PGA TOUR letter from K. Burgess to G. McDowell, 5/10/2022.

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

enhance competition. Quite the contrary—as described above, those actions create (or protect) monopsony power and foreclose competition in the output market.

114.   While the PGA TOUR has not identified some efficiency here, one might ask whether its restrictions nonetheless reflect some form of economic efficiency generally associated with player exclusivity. The manner in which the PGA TOUR has applied its rules would suggest not. While the PGA TOUR seeks to enforce these restrictions against LIV Golf, it does not enforce those same restrictions against participation by its members in European Tour events. Indeed, in denying the requested releases, the PGA TOUR acknowledged that it ordinarily granted releases for tournaments outside the US. The obvious difference here is that LIV Golf is a new source of competitive disruption, while the PGA TOUR and the European Tour are clearly aligned in maintaining the status quo. So, it would appear, the restrictions are directed at competition, not efficiencies.

115.   The PGA TOUR also has highlighted certain geographic distinctions underlying its refusal to grant exemptions for LIV Golf participation. In particular, the PGA TOUR attributed its refusal to allow Tour members from Europe (Ian Poulter and Sergio Garcia, for instance) to play in the LIV Golf London event—even though it routinely allows them to play in European Tour events—to the fact that LIV Golf has scheduled other competitive events in North America.[160] Here again, this would appear to be more about competition from LIV Golf than it is about the consequences of European golfers participating in European tournaments.

116.   Nor would it appear that the refused exemptions can be traced to concerns regarding golfer participation in coincident PGA Tour events. The PGA TOUR refused exemptions for the LIV Golf event in London to members who did not even qualify for the PGA Tour event or the Korn Ferry Tour event also held in that week. In the words of one golfer who was suspended by the PGA Tour for playing in the LIV

---

[160] See PGA TOUR letter from K. Burgess to G. McDowell, 5/10/2022 ("While releases have been granted in limited circumstances for one off-events [sic] outside North America or for events outside of North America on tours based exclusively outside of North America, the event for which you have requested a release is the first in an eight-event '2022 LIV Golf Invitational Series' season, and more than half of them will be held in the United States.").

Golf event, if he had not played in that event his only option would be to "just sit at home on [his] couch."[161]

### B. Freeriding on Investments to Establish and Promote PGA Tour Members

117.   With regard to the PGA TOUR's assertion that it "cannot permit free riding on the investments made by the TOUR in establishing and promoting its members," it is hard to understand what investments the PGA TOUR refers to as it relates to "freeriding" by would-be competitors. Golfers become established, known, and popular to fans by competing successfully in elite-level events. Golfers build the skills and experience needed to do so through coaches and trainers, and by traveling week after week to play in competitive events to first earn their Tour card and then, as Tour members, learn to successfully compete with other top-level golfers. The golfers pay for all of this, not the Tour. For example, in his correspondence with the PGA TOUR regarding a release to play in the LIV Golf London event, golfer Andy Ogletree explained:

> I am 40 spots out of the event next week on the Korn Ferry Tour. … I have not gotten into a single event all year. I have spent thousands and thousands of dollars at qualifying school and Monday qualifiers. I have spent countless hours contacting tournament directors, writing letters, emails, phone calls, etc. I have written a Korn Ferry Tour representative who decides who gets the one spot per week selected by the tour. I have exhausted all options in order to be able to play the Korn Ferry Tour.[162]

The PGA TOUR denied Mr. Ogletree's request with the letter cited above referring to freeriding. But, as to his own player development costs, Mr. Ogletree is clearly not freeriding on PGA TOUR investments.

---

[161] Email correspondence between A. Ogletree and PGA TOUR Vice President K. Burgess, 5/31/2022 and 6/4/2022.

[162] *Ibid.*

econ ONE

118. Perhaps what the PGA TOUR is referring to as "establish[ing] and promot[ing] its members" are the weekly Tour events, along with their broad TV viewership. But, as shown above, the PGA TOUR has over a billion dollars in retained earnings which it has been building consistently for at least the last decade. For all of that period, it has not been a net investor, it has been a beneficiary. It is the TV networks, their advertisers, event sponsors, and ultimately fans who are responsible for their ongoing financial success.

119. And here again, the underlying source of value that makes all of it work comes back to the golfers. When a golfer does finally build a valuable brand as a successful elite golfer (again, paying for all that is needed to achieve that himself), he brings that value and goodwill to the Tour each week. As Tiger Woods observed, the golfers "are marketed and used in events [by the PGA TOUR] that we are not even playing in."[163] As he also observed, "…the top players have carried the Tour for a number of years[.]"[164] Sergio Garcia developed his elite-level playing skills and reputation playing on the European Tour. He has since contributed his brand to the PGA TOUR for 23 years. He was another Tour member for whom an exemption to play in the LIV Golf London event was denied with reference to freeriding.[165] However, as with other European golfers (including Rory McIlroy), the PGA TOUR never objected to Mr. Garcia's participation on the European Tour based upon freeriding concerns.

120. Furthermore, even if it could be shown that a decision to play outside of the PGA TOUR would amount to freeriding on some net investment that it made in golfer development, the Challenged Conduct does not appear to address that. The Challenged Conduct does not prevent an elite golfer with a well-established fan base built through his Tour participation from taking his skills elsewhere. Indeed, as noted above, the PGA TOUR has been very vocal about the freedom of Tour members to choose to play elsewhere. Hence, even assuming the value that Tour members could

---

[163] Golf Channel website, *Tiger Woods has a thought – on what the PGA Tour needs to do better* (https://golf.com/news/tiger-woods-thought-pga-tour-do-better/), accessed 6/9/2022.

[164] *Ibid.*

[165] WSLS website, *PGA chief slams Saudi-funded league as series of exhibitions*, (https://www.wsls.com/sports/2022/06/12/monahan-blasts-saudi-funded-league-as-series-of-exhibitions/), accessed 7/27/2022.

**econ ONE**

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

bring to another event organizer was attributable somehow to PGA TOUR investment, the Challenged Conduct does not stop a golfer from doing so. Hence the prevention of freeriding as a justification does not fit the conduct.

121.  What the Challenged Conduct does with respect to a golfer is force a binary and permanent choice regarding where the golfer will apply his skills and fan value. Perversely, given the PGA TOUR's efforts to justify its conduct based upon an effort to prevent freeriding, what it is telling golfers through its conduct is that if they desire to utilize some of their personal player assets (the product of their investment according to the PGA TOUR) in another event series, they must "free-ride" completely. In other words, offer no sharing of that asset with the PGA TOUR while they employ it elsewhere. If anything, that would seem to worsen rather than solve a freeriding problem.

122.  One gets a clear understanding of the purpose behind this conduct if one looks past the PGA TOUR's claims about the source of the investment needed to build golfer skills and fan value, and considers simply why the PGA TOUR is focused just on stopping golfers from sharing their assets both with the Tour and with LIV Golf (the all-or-nothing choice described above). The answer is that the ability for Tour members to maintain Tour membership while also playing LIV Golf events would make LIV Golf a more attractive proposition to golfers and, as a result, make LIV Golf's competitive success much more likely. Blocking LIV Golf's competitive success is not a procompetitive justification.

_____

Jeffrey Leitzinger, Ph.D.
August 2, 2022

Page 62

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

8/2/2022

## Appendix A – List of Elite Golfer Names, Event Participation, and Earnings, 2021

| Player Name | 2021 | |
| --- | --- | --- |
| | Events | Earnings ($) |
| ABRAHAM ANCER | 21 | $  5,377,217 |
| ADAM HADWIN | 25 | 1,493,144 |
| ADAM SCOTT | 16 | 1,793,205 |
| BERND WIESBERGER | 5 | 139,435 |
| BILLY HORSCHEL | 16 | 3,628,051 |
| BRANDT SNEDEKER | 25 | 1,222,636 |
| BROOKS KOEPKA | 17 | 4,570,404 |
| BRYSON DECHAMBEAU | 16 | 4,923,564 |
| BUBBA WATSON | 14 | 1,141,845 |
| BYEONG HUN AN | 20 | 470,334 |
| CAMERON SMITH | 17 | 4,824,469 |
| CHEZ REAVIE | 25 | 868,676 |
| CHRISTIAAN BEZUIDENHOUT | 9 | 124,685 |
| COLLIN MORIKAWA | 16 | 8,122,950 |
| COREY CONNERS | 19 | 3,217,292 |
| DANNY WILLETT | 12 | 646,948 |
| DUSTIN JOHNSON | 15 | 1,911,104 |
| FRANCESCO MOLINARI | 12 | 897,787 |
| GARY WOODLAND | 20 | 1,521,042 |
| HENRIK STENSON | 9 | 150,947 |
| HIDEKI MATSUYAMA | 22 | 5,870,366 |
| IAN POULTER | 17 | 1,459,357 |
| JASON DAY | 15 | 906,203 |
| JASON KOKRAK | 19 | 4,479,925 |
| JOAQUIN NIEMANN | 23 | 3,573,366 |
| JON RAHM | 14 | 6,402,684 |
| JORDAN SPIETH | 17 | 6,485,701 |
| JUSTIN ROSE | 11 | 1,268,792 |
| JUSTIN THOMAS | 17 | 5,254,128 |
| KEVIN KISNER | 19 | 2,082,044 |
| KEVIN NA | 20 | 3,332,392 |
| LEE WESTWOOD | 12 | 3,174,011 |
| LOUIS OOSTHUIZEN | 14 | 5,372,372 |
| MARC LEISHMAN | 18 | 3,666,549 |

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

8/2/2022

| Player Name | 2021 | |
| | Events | Earnings ($) |
| --- | --- | --- |
| MATT KUCHAR | 19 | 1,421,223 |
| MATT WALLACE | 14 | 1,808,147 |
| MATTHEW FITZPATRICK | 14 | 2,024,416 |
| PATRICK CANTLAY | 14 | 5,749,969 |
| PATRICK REED | 22 | 4,006,458 |
| PAUL CASEY | 13 | 2,937,704 |
| PHIL MICKELSON | 15 | 2,677,237 |
| RICKIE FOWLER | 20 | 1,537,089 |
| ROBERT MACINTYRE | 8 | 451,360 |
| RORY MCILROY | 15 | 5,219,759 |
| RYAN PALMER | 18 | 1,928,491 |
| SCOTTIE SCHEFFLER | 24 | 5,251,795 |
| SERGIO GARCIA | 17 | 1,986,140 |
| SHANE LOWRY | 14 | 2,296,408 |
| SHUGO IMAHIRA | 1 | 118,718 |
| SIWOO KIM | 26 | 3,292,171 |
| SUNGJAE IM | 27 | 4,404,704 |
| TIGER WOODS | 0 | - |
| TOM LEWIS | 21 | 559,580 |
| TOMMY FLEETWOOD | 11 | 1,238,346 |
| TONY FINAU | 21 | 4,987,762 |
| TYRRELL HATTON | 12 | 1,270,829 |
| VICTOR PEREZ | 6 | 1,037,719 |
| WEBB SIMPSON | 17 | 2,373,033 |
| XANDER SCHAUFFELE | 16 | 3,590,663 |

Note: Figures include PGA Tour and WGC events.

Sources: Official World Golf Rankings and PGA TOUR website.

econ ONE

*Mickelson et al. v. PGA TOUR* • Expert Declaration of Jeffrey Leitzinger, Ph.D.

Exhibit 1

Exhibit 1
Page 1 of 9



**Dr. JEFFREY J. LEITZINGER**
*Managing Director*
**Los Angeles, California**
**Tel: 213 624 9600**

## EDUCATION

Ph.D., Economics, University of California, Los Angeles
M.A., Economics, University of California, Los Angeles
B.S., Economics, Santa Clara University

## WORK EXPERIENCE

*Econ One Research, Inc.*, 1997 to date
Board Chairman and Managing Director, 2018 to date
Management Committee Chair, 2012-2018
President and CEO, 1997-2011
Founder, 1997

*Micronomics, Inc.,* 1988-1997
President and CEO, 1994-1997
Executive Vice President, 1988-1994
Cofounder, 1988

*National Economic Research Associates, Inc. 1980-1988*
(Last position was Senior Vice President and member of the Board
of Directors)

*California State University, Northridge*, Lecturer, 1979-1980

## BOARD EXPERIENCE

Board of Visitors, UCLA Department of Economics, 2018-present
California United Bank, 2015-2017
Advisory Board Member, American Antitrust Institute, 2013-present
Bolton & Company, 2006-present
First Enterprise Bank, 2006-2015
Blind Children's Center, 2005-present

## AREAS OF EXPERTISE

Has offered expert testimony regarding:

- Competition economics

- Commercial damages

- Econometrics and statistics

- Intellectual property

- Valuation

## INVITED PRESENTATIONS

Some Implications of Tyson for Econometric Models in Class Action Antitrust Cases, *American Bar Association,* 65th Antitrust Law Spring Meeting, March 2017.

Where Are We on Class Certification? Examples from Health Care and Pharmaceutical Cases, *ABA Section of Antitrust Law, Health Care and Pharmaceuticals and Civil Practice and Procedure and Trial Practice Committees*, March 2016.

Corporations & Cartels: Should You Be a Plaintiff?, *American Bar Association,* 62nd Antitrust Law Spring Meeting, March 2014.

Developments in Antitrust Cases Alleging Delayed Generic Competition in the Pharmaceutical Industry, *American Antitrust Institute,* 5th Annual Future of Private Antitrust Enforcement Conference, December 2011.

Class Certification and Calculation of Damages, *American Bar Association*, Section of Antitrust Law and *International Bar Association*, 8th International Cartel Workshop, February 2010.

Class Certification Discussion and Demonstration, *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2007.

Antitrust Injury and the Predominance Requirement in Antitrust Class Actions, *American Bar Association*, Houston Chapter, April 2007.

Class Certification Discussion and Demonstration, *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2005.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                      **Page 3 of 9**

**INVITED PRESENTATIONS** (cont'd.)

What Can an Economist Say About the Presence of Conspiracy?, *American Bar Association,* Antitrust Law, The Antitrust Litigation Course, October 2003.

Lessons from Gas Deregulation, *International Association for Energy Economics,* Houston Chapter*,* December 2002.

A Retrospective Look at Wholesale Gas Industry Restructuring, *Center for Research in Regulated Industries*, 20th Annual Conference of the Advanced Workshop in Regulation and Competition, May 2001.

The Economic Analysis of Intellectual Property Damages, *American Conference Institute,* 6th National Advanced Forum, January 2001.

Law and Economics of Predatory Pricing Under Federal and State Law, *Golden State Antitrust and Unfair Competition Law Institute*, 8th Annual Meeting, October 2000.

Non-Price Predation--Some New Thinking About Exclusionary Behavior, *Houston Bar Association*, Antitrust and Trade Regulation Section, October 2000.

After the Guilty Plea:  Does the Defendant Pay the Price in the Civil Damage Action, *American Bar Association*, Section of Antitrust Law, 48th Annual Spring Meeting, April 2000.

Economics of Restructuring in Gas Distribution, *Center for Research in Regulated Industries*, 12th Annual Western Conference, July 1999.

A Basic Speed Law for the Information Superhighway, *California State Bar Association*, December 1998.

Innovation in Regulation, *Center for Research in Regulated Industries*, 11th Annual Western Conference, July/September 1998.

Electric Industry Deregulation: What Does the Future Hold?, *Los Angeles Headquarters Association,* November 1996.

Why Deregulate Electric Utilities?, *National Association of Regulatory Utility Commissioners*, November 1995.

Restructuring U.S. Power Markets: What Can the Gas Industry's Experience Tell Us?,  *National Association of Regulatory Utility Commissioners*, July 1995.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                    **Page 4 of 9**

## INVITED PRESENTATIONS (cont'd.)

Natural Gas Restructuring: Lessons for Electric Utilities and Regulators, *International Association for Energy Economics*, May 1995.

Techniques in the Direct and Cross-Examination of Economic, Financial, and Damage Experts*, The Antitrust and Trade Regulation Law Section of the State Bar of California and The Los Angeles County Bar Association*, 2nd Annual Golden State Antitrust and Trade Regulation Institute, October 1994.

Demonstration: Deposition of Expert Witnesses and Using Legal Technology, *National Association of Attorneys General*, 1994 Antitrust Training Seminar, September 1994.

Direct and Cross Examination of Financial, Economic, and Damage Experts, *The State Bar of California, Antitrust and Trade Regulation Law Section,* May 1994.

Price Premiums in Gas Purchase Contracts, *International Association for Energy Economics,* October 1992.

Valuing Water Supply Reliability, *Western Economic Association,* Natural Resources Section, July 1992.

Transportation Services After Order 636: "Back to the Future" for Natural Gas, Seminar sponsored by Jones, Day, Reavis & Pogue, May 1992.

The Cost of an Unreliable Water Supply for Southern California, Forum presented by Micronomics, Inc., May 1991.

Market Definition: It's Time for Some "New Learning", *Los Angeles County Bar Association,* Antitrust and Corporate Law Section, December 1989.

Market Definition in Antitrust Cases: Some New Thinking, *Oregon State Bar,* Antitrust Law Section, March 1987.

Future Directions for Antitrust Activity in the Natural Gas Industry, *International Association of Energy Economists*, February 1987.

Information Externalities in Oil and Gas Leasing, *Western Economic Association Meetings*, Natural Resources Section, July 1983.

Economic Analysis of Offshore Oil and Gas Leasing, *Western States Land Commissioners Association*, December 1982.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                              **Page 5 of 9**

## PUBLISHED ARTICLES

"Statistical Significance and Statistical Error in Antitrust Analysis," *Antitrust Law Journal*, Volume 81, Issue 2, July 2017.

"The Predominance Requirement for Antitrust Class Actions--Can Relevant Market Analysis Help?," American Bar Association, Section of Antitrust Law, *Economics Committee Newsletter*, Volume 7, No. 1, Spring 2007.

"A Retrospective Look at Wholesale Gas: Industry Restructuring," *Journal of Regulatory Economics,* January 2002.

"Balance Needed in Operating Agreements as Industry's Center of Gravity Shifts to State Oil Firms," *Oil & Gas Journal*, October 2000.

"What Can We Expect From Restructuring In Natural Gas Distribution?" *Energy Law Journal*, January 2000.

"Gas Experience Can Steer Power Away from Deregulation Snags," *Oil & Gas Journal,* August 1996.

"Anatomy of FERC Order 636: What's out, What's in," *Oil & Gas Journal*, June 1992.

"Antitrust II – Future Direction for Antitrust in the Natural Gas Industry," *Natural Gas*, November 1987.

"Information Externalities in Oil and Gas Leasing," *Contemporary Policy Issues*, March 1984.

"Regression Analysis in Antitrust Cases:  Opening the Black Box," *Philadelphia Lawyer*, July 1983.

"Foreign Competition in Antitrust Law," *The Journal of Law & Economics*, April 1983.

## REGULATORY SUBMISSIONS

<u>In the Matter of the Application of Southern California Gas Company Regarding Year Six (1999-2000) Under its Experimental Gas Cost Incentive Mechanism and Related Gas Supply Matters; A.00-06-023</u>, Public Utilities Commission of the State of California, November 2001.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                    **Page 6 of 9**


**REGULATORY SUBMISSIONS** (cont'd.)

Sempra Energy and KN Energy, Incorporation; Docket No. EC99-48-000 (Affidavit and Verified Statement), Federal Energy Regulatory Commission, March/May 1999.

Rulemaking on the Commission's Own Motion to Assess and Revise the Regulatory Structure Governing California's Natural Gas Industry (Market Conditions Report), Public Utilities Commission of the State of California, July 1998.

In the Matter of the Application of Pacific Enterprises, Enova Corporation, et al. for Approval of a Plan of Merger Application No. A. 96-10-038, Public Utilities Commission of the State of California, August/October 1997.

In re:  Koch Gateway Pipeline Company; Docket No. RP 97-373-000, Federal Energy Regulatory Commission, May/October 1997 and February 1998.

In the Matter of the Application of Sadlerochit Pipeline Company for a Certificate of Public Convenience and Necessity; Docket No. P-96-4, Alaska Public Utilities Commission, May 1996.

Public Funding of Electric Industry Research, Development, and Demonstration (RD&D) Under Partial Deregulation, California Energy Commission, January 1995.

NorAm Gas Transmission Company; Docket No. RP94-343-000, Federal Energy Regulatory Commission, August 1994/June 1995.

Natural Gas Vehicle Program; Investigation No. 919-10-029, California Public Utilities Commission, July 1994.

Transcontinental Gas Pipe Line Corporation; Docket No. RP93-136-000 (Proposed Firm-to-the-Wellhead Rate Design), Federal Energy Regulatory Commission, January 1994.

In re: Sierra Pacific's Proposed Nomination for Service on Tuscarora Gas Pipeline; Docket No. 93-2035, The Public Service Commission of Nevada, July 1993.

Employment Gains in Louisiana from Entergy-Gulf States Utilities Merger, Louisiana Public Utilities Commission, December 1992.

Employment Gains to the Beaumont Area from Entergy-Gulf States Utilities Merger, Texas Public Utilities Commission, August 1992.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                           **Page 7 of 9**

## REGULATORY SUBMISSIONS (cont'd.)

<u>Transcontinental Gas Pipe Line Corporation; Docket No. RS 92-86-000</u> (Affidavit regarding Transco's Proposed IPS Service), Federal Energy Regulatory Commission, June 1992.

<u>In Re: Pipeline Service Obligations; Docket No. RM91-11-000; Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations; Docket No. RM91-3-000; Revisions to the Purchased Gas Adjustment Regulations; Docket No. RM90-15-000</u>, Federal Energy Regulatory Commission, May 1991.

<u>In the Matter of Natural Gas Pipeline Company of America; Docket No. CP89-1281</u> (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, January 1990.

<u>In the Matter of United Gas Pipeline Company, UniSouth, Cypress Pipeline Company; Docket No. CP89-2114-000</u> (Proposed Certificate of Storage Abandonment by United Gas Pipeline Company), Federal Energy Regulatory Commission, December 1989.

<u>In the Matter of Tennessee Gas Pipeline Company; Docket No. CP89-470 </u>(Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, July 1989.

<u>In the Matter of Take-Or-Pay Allocation Proposed by Mississippi River Transmission Corporation</u>, Federal Energy Regulatory Commission, March 1988.

<u>In the Matter of Natural Gas Pipeline Company of America: Docket No.RP87-141-000</u> (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, December 1987.

<u>In the Matter of Application of Wisconsin Gas Company for Authority to Construct New Pipeline Facilities; 6650-CG-104</u>, Public Service Commission, State of Wisconsin, August 1987.

<u>Trans-Alaska Pipeline System: Docket Nos. OR 78-1-014 and OR 78-1-016</u> (Phase 1 Remand), Federal Energy Regulatory Commission, October 1983.

**Dr. Jeffrey Leitzinger**
**July 2018 – June 2022**

| | Proceeding | Court/Commission/ Agency | Docket or File |
|---|---|---|---|
| 1. | In Re: AndroGel Antitrust Litigation | U.S. District Court, Northern District of Georgia | Case No. 1:09-MD-2084-TWT |
| 2. | In Re: Rail Freight Surcharge Antitrust Litigation | U.S. District Court, District of Columbia | Case No. 1:07-MC-00489 |
| 3. | UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al. | Superior Court of California, County of San Francisco | No. CGC 14-538451 No. CGC-18-565398 |
| 4. | Sourceone Dental Inc. v. Patterson Companies, et al. | U.S. District Court, Eastern District of New York | Case No. 15-cv-05440 |
| 5. | In re: Thalomid and Revlimid Antitrust Litigation | U.S. District Court, District of Connecticut | C.A. No. 3:14-MD-2516 (SRU) |
| 6. | In re Loestrin 24 FE Antitrust Litigation | U.S. District Court, District of Rhode Island | MDL No. 2472, Master File No. 1:13-md-2472-S-PAS |
| 7. | CVS Health Corporation, Caremark, LLC, and Caremark, PCS, LLC v. Vividus LLC f/k/a HM Compounding Services, LLC, and HMX Services, LLC d/b/a HM Compounding | American Arbitration Association | Case No. 01-14-0002-0801 |
| 8. | In Re: Qualcomm Litigation | U.S. District Court, Southern District of California | Case No. 3:17-cv-00108-GPC-MDD |
| 9. | In re: Niaspan Antitrust Litigation | U.S. District Court, Eastern District of Pennsylvania | MDL 2460, Master Case No. 2:13-md-2460 |
| 10. | Littop Enterprises Limited, et al. v. Ukraine | The Stockholm Chamber of Commerce | SCC Case No 2015/092 |
| 11. | In re: Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation | U.S. District Court, Eastern District of New York | Case No. 18-MD-2819 (NG) (LB) |

Econ One Research, Inc.
Los Angeles, California
Page 9 of 9

**Dr. Jeffrey Leitzinger**
**July 2018 – June 2022**

| | Proceeding | Court/Commission/ Agency | Docket or File |
|---|---|---|---|
| 12. | In re: Opana ER Antitrust Litigation | U.S. District Court, Northern District of Illinois | Civil Action No. 14-cv-10150 |
| 13. | In re: Intuniv Antitrust Litigation | U.S. District Court, District of Massachusetts | Civil Action No. 16-cv-12653-ADB (Direct) |
| 14. | SS&C Technologies, Inc. v. Clearwater Analytics, LLC | Superior Court for the State of Connecticut, Judicial District of Hartford | No. X07-HHD-CV-16-6070719-S |
| 15. | In re: Zetia (Ezetimibe) Antitrust Litigation | U.S. District Court, Eastern District of Virginia Norfolk Division | MDL No. 2836 Civil Action No. 18-md-2836-RBS-DEM |
| 16. | In re: Glumetza Antitrust Litigation | U.S. District Court, Northern District of California | Case No. 3:19-cv-05822-WHA |
| 17. | In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation | U.S. District Court, Southern District of New York | No. 1:14-md-02542 (VSB) (SLC) No. 1:19-cv-00325 (VSB) |
| 18. | In Re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation | U.S. District Court, Eastern District of New York | No. 05-md-1720 |
| 19. | International Construction Products, LLC v. Caterpillar Inc., Komatsu America Corp., Associated Auction Services, LLC doing business as Cat Auction Services. | U.S. District Court, District of Delaware | C.A. No. 15-108-RGA |
| 20. | In re: Novartis and Par Antitrust Litigation | U.S. District Court, Southern District of New York | Case No. 1:18-cv-04361-AKH |

# Exhibit 2

Expert Declaration of Jeffrey Leitzinger, Ph.D.

**Exhibit 2**
**List of Materials Reviewed**

**Case documents including exhibits**
Declaration of Atul Khosla, 8/2/2022.
Declaration of Matt Jones, 8/2/2022.
Declaration of Rachel Brass, 8/2/2022.
Declaration of Rachel Brass Exhibit 4.
Declaration of Rachel Brass Exhibit 22b.
Declaration of Rachel Brass Exhibit 22k.
Mickelson et al. Complaint Against PGA TOUR, Inc., 8/2/2022.

**Court opinions from other cases**
*Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship and UFC*, No. 2:15-cv-01045-RFB-BNW (D. Nev.).
*Mackey v. National Football League*, 543 F.2d 606 (8th Cir. 1976).
*N. Pac. Rwy. v. United States*, 356 U.S. 1 (1958).
*Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F. Supp. 462 (E.D. Pa. 1972).
*Radovich v. National Football League*, 352 U.S. 445 (1957).
*United States v. International Boxing Club of New York,* 348 U.S. 236 (1955).

**PGA TOUR and other golf tour correspondence**
Email correspondence between A. Ogletree and PGA TOUR Vice President K. Burgess, 5/31/2022 and 6/4/2022.
European Tour CEO K. Pelley letter denying a European Tour golfer from participating in the LIV GOLF Invitational London event, 5/17/2022.
Memo from J. Monahan to PGA TOUR golfers, 6/22/2022.
Memo from J. Monahan to PGA TOUR golfers, 11/22/2021.
PGA TOUR letter from Commissioner J. Monahan notifying players of its decision to suspend, 6/9/2022.
PGA TOUR letter from K. Burgess to G. McDowell, 5/10/2022.
PGA TOUR letter sent via email to PGA TOUR membership, 5/10/2022.

**Books, journal articles, and other scholarly publications**
A. Edlin and D. Rubinfeld, "Exclusion or Efficient Pricing: The 'Big Deal' Bundling of Academic Journals," *Antitrust Law Journal*, 72(1), 2004.
A. Sanderson, "The Many Dimensions of Competitive Balance," *Journal of Sports Economics*, 3(2), May 2002.
B. Bernheim and R. Heeb, "A Framework for the Economic Analysis of Exclusionary Conduct," in *The Oxford Handbook of International Antitrust Economics Vol. 2* (R. Blair and D. Sokol eds.), Oxford University Press, 2015.
B. Smart, *The Sport Star: Modern Sport and the Cultural Economy of Sporting Celebrity,* SAGE Publications Ltd, 2005.
C. Mullin and L. Dunn, "Using Baseball Card Prices to Measure Star Quality and Monopsony," *Economic Inquiry*, 40(4), 2002.
D. Berri, "Oscar Robertson, Antitrust, and the Fight Against Monopsony Power in the NBA," *The Antitrust Bulletin*, 66(3), 2021.
D. Schwartzman, "The Effect of Monopoly on Price," *Journal of Political Economy*, 67(4), 1959.
E. Rasmusen, J. Ramseyer, and J. Wiley, "Naked Exclusion," *The American Economic Review*, 81(5), 1991.
J. Baker, "Market Definition: An Analytical Overview," *Antitrust Law Journal*, 74(1), 2007.
J. Hausman and G. Leonard, Superstars in the National Basketball Association: Economic Value and Policy, *Journal of Labor Economics*, 15(4), 1997.
J. Quirk and R. Fort, *Pay Dirt: The Business of Professional Team Sports*, Princeton Univ. Press, 1992.
K. Arrow, "Economic Welfare and the Allocation of Resources for Invention," in *The Rate and Direction of Inventive Activity: Economic and Social F* Universities-National Bureau Committee for Economic Research, Committee on Economic Growth of the Social Science Research Council, Princ University Press, 1962.
K. Bagwell, "Informational Product Differentiation as a Barrier to Entry," *International Journal of Industrial Organization*, 8(2), 1990.
L. Hadley, J. Ciecka, & A. Krautmann, "Competitive Balance in the Aftermath of the 1994 Players' Strike," *Journal of Sports Economics*, 6(4), 2005.
L. Kahn, The Sports Business as a Labor Market, *Journal of Economic Perspectives*, 14(3), Summer 2000.
M. Mussa and S. Rosen, "Monopoly and Product Quality," *Journal of Economic Theory*, 18, 1978.
M. Olson, *The Logic of Collective Action: Public Goods and the Theory of Groups,* Harvard University Press, 1971.
M. Schiavone, *Sports and Labor in the United States*, SUNY Press, 2015.
P. Carstensen, "Buyer Power, Competition Policy, and Antitrust: The Competitive Effects of Discriminations Among Suppliers," *The Antitrust Bullet* 53(2), 2008.
P. Fishman, "Competitive Balance and Free Agency in Major League Baseball," *The American Economist*, 47(2), 2003.
P. Klemperer, "Competition when Consumers have Switching Costs: An Overview with Applications to Industrial Organization, Macroeconomics, a International Trade," *The Review of Economic Studies*, 62(4), 1995.
P. Weiler, *Leveling the Playing Field: How the Law Can Make Sports Better for Fans*, Harvard University Press, 2000.
R. Schmalensee, "Product Differentiation Advantages of Pioneering Brands," *American Economic Review*, 72(3), 1982.
S. Hunt and D. Duhan, "Competition in the third millennium Efficiency or Effectiveness?," *Journal of Business Research*, 55, 2002.
S. Rosen and A. Sanderson, "Labor Markets in Professional Sports," *National Bureau of Economic Research Working Paper 7573*, February 2000.
S. Salop, "The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test," *Antitrust Law* 81, 2017.
S. Shmanske, *Golfonomics,* World Scientific Publishing Co., 2004.
T. Rhoads, "Labor Supply on the PGA TOUR: The Effect of Higher Expected Earnings and Stricter Exemption Status on Annual Entry Decisions," *Jour Sports Economics*, 8(1), February 2007.

Econ One
8/2/2022

Expert Declaration of Jeffrey Leitzinger, Ph.D.

**Exhibit 2**
**List of Materials Reviewed**

T. Rosenbaum, "The Antitrust Implications of Professional Sports Leagues Revisited: Emerging Trends in the Modern Era," *U. Miami L. Rev.*, 41(4), US Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, 2010.

**Sports news, publications, and other sports websites**

CBS Sports, *PGA Tour to increase tournament purses, bonuses for players amid threats from rival start-up leagues* (https://www.cbssports.com/golf/news/pga-tour-to-increase-tournament-purses-bonuses-for-players-amid-threats-from-rival-start-up-league accessed 6/9/2022.

ESPN, *Antitrust Suit vs. UFC Wins Legal Decision* (https://www.espn.com/mma/story/_/id/30492170/antitrust-suit-vs-ufc-wins-legal-decision), accessed 6/9/2022.

FiveThirtyEight, *The 'Big Five' in North American Pro Sports* (https://fivethirtyeight.com/features/theres-a-big-five-in-north-american-pro-sports/), accessed 6/9/2022.

Golf Channel, *PGA Tour U changes eligibility rules regarding nonapproved, unranked pro events* (https://www.golfchannel.com/news/pga-tour-u-changes-eligibility-rules-regarding-nonapproved-unranked-pro-events), accessed 6/9/2022.

Golf Channel, *Phil Mickelson still intrigued by Super Golf League, while Rory McIlroy, Justin Thomas adamantly oppose it* (https://www.golfchannel.com/news/phil-mickelson-still-intrigued-super-golf-league-while-rory-mcilroy-justin-thomas-adamantly), accessed 2/22/2022.

Golf Channel, *Tiger Woods has a thought – on what the PGA Tour needs to do better* (https://golf.com/news/tiger-woods-thought-pga-tour-do-better/), accessed 6/9/2022.

Golf Channel, *Why Jordan Spieth thinks Saudi League threat has been good for PGA Tour* (https://www.golfchannel.com/news/why-jordan-spieth-thinks-saudi-league-threat-has-been-good-pga-tour), accessed 6/9/2022.

Golf Magazine, *'I'm all for the PGA Tour': Top pros rebuke Saudi golf league* (https://golf.com/news/top-pros-rebuke-saudi-league-genesis/), accessed 6/9/2022.

Golf Magazine, *Tour Confidential: Bryson and Brooks, PGA Tour money, Tiger Woods* (https://golf.com/news/tour-confidential-bryson-brooks-pga-tour-money-tiger-woods/), accessed 6/9/2022.

Golf Monthly, *'I Want to Make as Much Money In As Little Time' – Kokrak Brutally Honest on Saudi League* (https://www.golfmonthly.com/news/i-want-to-make-as-much-money-in-as-little-time-kokrak-brutally-honest-on-saudi-league), accessed 6/9/

Golf Monthly, *Report: DP World Tour Blocks Releases to LIV Golf Event* (https://www.golfmonthly.com/news/report-dp-world-tour-blocks-releases-to-liv-golf-event), accessed 6/9/2022.

Golf Monthly, *Rory McIlroy Calls European Tour A Stepping Stone* (https://www.golfmonthly.com/news/rory-mcilroy-european-tour-stepping-stone-171150), accessed 6/9/2022.

Golf News Net, *2021 DP World Tour Championship Dubai TV schedule: How to watch on Golf Channel* (https://thegolfnewsnet.com/golfnewsnetteam/2021/11/18/how-to-watch-2021-dp-world-tour-championship-dubai-european-tour-tv-schedu times-golf-channel-124550/), accessed 6/9/2022.

Golf News Net, *Golf's biggest-ever sponsorship deals: Prepare to be amazed!* (https://thegolfnewsnet.com/golfnewsnetteam/2020/01/09/golfs-biggest-ever-sponsorship-deals-prepare-to-be-amazed-117877/), accessed 6/9/2022.

Golf News Net, *What is the Field Size for Every PGA Tour Event?* (https://thegolfnewsnet.com/golfnewsnetteam/2020/03/01/what-is-the-field-size-for-every-pga-tour-event-118489/), accessed 6/9/2022.

GolfDigest, *Dustin Johnson is getting big money ($100 million?!) to jump ship. But it might cost him big as well* (https://www.golfdigest.com/story/dustin-johnson-liv-golf-opener-big-money-jump-ship), accessed 7/25/2022.

GolfDigest, *In response to LIV Golf threat PGA Tour U changes eligibility for college stars* (https://www.golfdigest.com/story/pga-tour-u-liv-golf), accessed 6/9/2022.

GolfDigest, *Lee Westwood makes official his long-assumed interest in playing in LIV Golf events* (https://www.golfdigest.com/story/lee-westwood-applies-for-release-liv-golf-invitational-series), accessed 6/9/2022.

GolfDigest, *LIV Golf to transition to 'league' schedule in 2023, with 14 events and 48 contracted players* (https://www.golfdigest.com/story/liv-golf-league-schedule-2023), accessed 7/25/2022.

GolfDigest, *PGA Tour golfers react to big bonuses for the most popular players: 'There's a little bit of envy'* (https://www.golfdigest.com/story/pga-tour-player-reaction-to-player-impact-program), accessed 6/9/2022.

GolfDigest, *Rory McIlroy sees upside in talk about rival tours: Players becoming more invested in pro golf's future* (https://www.golfdigest.com/story/saudi-super-league-discussion-players-interested-in-future-rory-mcilroy), accessed 6/9/2022.

GolfDigest, *Why reimagining the PGA Tour's fall schedule is more complicated than you think* (https://www.golfdigest.com/story/pga-tour-fall-schedule-revamping-rory-mcilroy), accessed 6/9/2022.

Golfweek, Exclusive: *PGA Tour to create a $40 million bonus pool for stars like Tiger Woods, Bryson DeChambeau* (https://golfweek.usatoday.com/2021/04/20/pga-tour-bonus-pool-top-players-tiger-woods-bryson-dechambeau/), accessed 6/9/2022.

Independent, *Paul McGinley insists Phil Mickelson has 'got to backtrack' on Saudi comments to get back into PGA Tour fold* (https://www.independent.ie/sport/golf/paul-mcginley-insists-phil-mickelson-has-got-to-backtrack-on-saudi-comments-to-get-back-into-pga-t fold-41429178.html), accessed 6/9/2022.

National Golf Foundation, *Golf Industry Report*, 2019 Edition.

New England Patriots, *The history of NFL Free Agency* (https://www.patriots.com/news/the-history-of-nfl-free-agency), accessed 6/9/2022.

PGA TOUR, *Player Handbook & Tournament Regulations 2021-2022*.

PR Newswire, *Fighters File Class Action Antitrust Lawsuit Against The Ultimate Fighting Championship ("UFC") And Endeavor Group Holdings, Inc.* (https://www.prnewswire.com/news-releases/fighters-file-class-action-antitrust-lawsuit-against-the-ultimate-fighting-championship-ufc-and-endeavor-group-holdings-inc-301319030.html), accessed 6/9/2022.

Econ One
8/2/2022

Expert Declaration of Jeffrey Leitzinger, Ph.D.

## Exhibit 2
## List of Materials Reviewed

Press Conference with J. Monahan, "TRAVELERS CHAMPIONSHIP," Cromwell, CT, 6/22/2022.
Press Conference with J. Richerson, S. Waugh, and K. Haigh, "PGA CHAMPIONSHIP," Kiawah Island, SC, 5/18/2021.
Press Conference with M. Slumbers, "THE 150TH OPEN," St. Andrews, Fife, Scotland, UK, 7/13/2022.
Press Conference with S. Francis, M. Whan, and J. Bodenhamer, "U.S. OPEN CHAMPIONSHIP 2022," Brookline, MA, 6/15/2022.
Press Conference with S. Waugh, K. Haigh, and J. Richerson, "PGA CHAMPIONSHIP," Tulsa, OK, 5/17/2022.
Sky Sports, *Paul McGinley: PGA Tour's alliance with European Tour is good for golf*
    (skysports.com/golf/news/29745/12144775/paul-mcginley-pga-tours-alliance-with-european-tour-is-good-for-golf), accessed 6/9/2022.
Sports Browser, *Top 10 Most Popular Sports In America In 2022*  (https://sportsbrowser.net/most-popular-sports-in-america/), accessed 6/9/2022
The New York Times, *The PGA and DP World Tours Allied. Then LIV Golf Happened* , 7/6/2022
    (https://www.nytimes.com/2022/07/06/sports/golf/pga-dp-world-tour-liv-golf.html), accessed 7/7/2022.
The New York Times, *The Reserve Clause: Key in All Sports Is Control of Players Not Under Contract,*  9/28/1975
    (https://timesmachine.nytimes.com/timesmachine/1975/09/28/issue.html), accessed 6/9/2022.
The State Journal-Register, *Turning Stone betting on a 'full-house' this weekend*
    (https://www.sj-r.com/story/news/2007/09/22/turning-stone-betting-on-full/47249286007/), accessed 6/9/2022.
WSLS, PGA chief slams Saudi-funded league as series of exhibitions
    (https://www.wsls.com/sports/2022/06/12/monahan-blasts-saudi-funded-league-as-series-of-exhibitions/), accessed 7/27/2022.

**Golf organizations websites**
Asian Tour (https://asiantour.com), accessed 6/9/2022.
European Tour (https://www.europeantour.com/dpworld-tour/), accessed 6/9/2022.
European Tour, *European Tour to become the DP World Tour from 2022*
    (https://www.europeantour.com/dpworld-tour/news/articles/detail/european-tour-to-become-the-dp-world-tour-from-2022/), accessed 6/9/2022.
Japan Golf Tour Organization (https://www.jgto.org/en/), accessed 6/9/2022.
KPGA Korean Tour (https://www.kpga.co.kr/), accessed 6/9/2022.
PGA of Australia (https://pga.org.au/), accessed 6/9/2022.
PGA TOUR (https://www.pgatour.com/), accessed 6/9/2022.
PGA TOUR, *Career Money Leaders*  (https://www.pgatour.com/stats/stat.110.html), accessed 6/9/2022.
PGA TOUR, *HOW IT WORKS: FEDEXCUP PLAYOFFS*
    (https://www.pgatour.com/tournaments/fedex-st-jude-championship/news/2022/01/25/how-it-works-fedexcup-playoffs.html), accessed 7/22/2022.
PGA TOUR, *How to measure the strongest fields in golf*
    (https://www.pgatour.com/statsreport/2017/09/27/stats-formulas-numbers-golf-strongest-fields.html), accessed 6/9/2022.
PGA TOUR, *PGA TOUR Players*  (https://www.pgatour.com/players.html), accessed 5/4/2022.
PGA TOUR, *PGA TOUR's 2022-23 FedExCup Season schedule raises the stakes on drama, consequences*
    (https://www.pgatour.com/news/2022/08/01/pga-tour-full-schedule-2022-23-season-fedexcup-playoffs.html), accessed 8/2/2022.
PGA TOUR, *Tiger Woods finishes atop inaugural Player Impact Program*
    (https://www.pgatour.com/news/2022/03/02/tiger-woods-tops-player-impact-program-pip-phil-mickelson-finsihes-second.html), accessed 6/9/2022.
Sunshine Tour (https://sunshinetour.com), accessed 6/9/2022.
WGC, *History: World Golf Championships*  (https://www.worldgolfchampionships.com/overview.html), accessed 6/9/2022.

**Publicly available data**
Basketball Reference (https://www.basketball-reference.com/contracts/players.html), accessed 6/9/2022.
Hockey Reference (https://www.hockey-reference.com/friv/current_nhl_salaries.cgi), accessed 6/9/2022.
OWGR (www.owgr.com), accessed 6/9/2022.
PGA TOUR Forms 990 (2011-2019).
Rodney Fort's Sports Business Data (https://sites.google.com/site/rodswebpages/codes), accessed 6/9/2022.
Spotrac (https://www.spotrac.com/nfl/rankings/2021/average/), accessed 6/9/2022.
Statista, *Average player salary in Major League Baseball from 2003 to 202* 1 *(www.statista.com), accessed 5/23/2022.*
Statista, *Major League Baseball total league revenue from 2001 to 2020*  (www.statista.com), accessed 2/6/2022.
Statista, *National Basketball Association total league revenue from 2001/02 to 2019/20*  (www.statista.com), accessed 2/6/2022.
Statista, *National Hockey League – total league revenue from 2005/06 to 2019/20*  (www.statista.com), accessed 2/6/2022.
Statista, *Total revenue of all National Football League teams from 2001 to 2020*  (www.statista.com), accessed 2/6/2022.

**Marketing  Research Documents**
McKinsey Fan Research (HIGHLY CONFIDENTIAL).
McKinsey Final Report (HIGHLY CONFIDENTIAL).
Nielsen data reported by P54 marketing research presentation (HIGHLY CONFIDENTIAL).

*All other materials cited in my report, exhibits, and workpapers.*

Econ One
8/2/2022