KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS - # 158708
epeters@keker.com
DAVID SILBERT - # 173128
dsilbert@keker.com
R. ADAM LAURIDSEN - # 243780
alauridsen@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
SOPHIE HOOD - # 295881
shood@keker.com
633 Battery Street
San Francisco, CA  94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
ANTHONY J. DREYER - (*Pro Hac Vice*)
anthony.dreyer@skadden.com
KAREN M. LENT - (*Pro Hac Vice*)
karen.lent@skadden.com
One Manhattan West
New York, NY  10001
Telephone:     212 735 3000
Facsimile:     212 735 2000/1

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
PATRICK FITZGERALD - (*Pro Hac Vice
forthcoming*)
patrick.fitzgerald@skadden.com
155 North Wacker Drive
Chicago, IL  60606
Telephone:     312 407 0700
Facsimile:     312 407 0411

Attorneys for Defendant PGA TOUR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PHIL MICKELSON; TALOR GOOCH; HUDSON SWAFFORD; MATT JONES; BRYSON DECHAMBEAU; ABRAHAM ANCER; CARLOS ORTIZ; IAN POULTER; PAT PEREZ; JASON KOKRAK; PETER UIHLEIN,<br><br>Plaintiffs,<br><br>v.<br><br>PGA TOUR, INC.,<br><br>Defendant. | Case No. 3:22-cv-04486-BLF<br><br>**DECLARATION OF ANDREW LEVINSON IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' REQUEST FOR TEMPORARY RESTRAINING ORDER**<br><br>Judge:     Hon. Beth Labson Freeman<br>Date:      August 9, 2022<br>Time:      1:00 p.m.<br>Dept:      Courtroom 1, 5th Floor<br><br>Date Filed:  August 3, 2022<br><br>Trial Date:  None Set |

I, Andrew Levinson, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am the Senior Vice President, Tournament Administration, for PGA TOUR, Inc. (also known and referred to as the "PGA TOUR" or the "TOUR").  I make this declaration based on my personal knowledge of the facts set forth herein, unless otherwise noted.

### HISTORY OF THE PGA TOUR

2.     The TOUR is a membership organization.  It is organized as a non-profit under Internal Revenue Code Section 501(c)(6), which governs membership-based organizations established to promote their members' business interests.

3.     The TOUR began in 1968, when the Tournament Players Division split from the PGA of America and formed the Association of Professional Golfers ("APG"), which eventually became the modern-day PGA TOUR.  The creation of the PGA TOUR was led by the players, including some of the greatest professional golfers in history, like Arnold Palmer and Jack Nicklaus.

4.     The founding members of the APG elected to pool their media rights in a membership organization and negotiate jointly for television exposure and corporate sponsorship. They wanted, among other things, to increase prize money and improve playing conditions by aggregating their rights—thereby increasing their collective value—while preserving the freedom to plan their own travel and playing schedules, practice as and when they saw fit, and otherwise operate their respective "golf businesses" independently.

5.     Since its founding, the TOUR has operated as a membership organization.  Its revenues come principally from the sale of its members' bundled media rights and from sponsorships, and are used to fund its operations, tournament purses, membership benefits (e.g., healthcare and retirement plans), investments in growing the game of golf, and significant charitable initiatives.  These revenue streams depend on assurances to sponsors and media outlets that the TOUR has been assigned and is authorized to sell its members' media rights. For this reason, the Regulations prohibit members from participating in any live or recorded golf

tournament or other golf program without the express prior written approval of the Commissioner.

6.      The sponsorship, broadcast, and other revenues which the TOUR generates—which are much higher because of the exclusive nature of the agreements—are distributed to members in the form of golf tournament purses, bonuses, retirement plan contributions, and other ancillary benefits.  In 2021, $916 million—approximately 98% of the TOUR's net revenue (defined as consolidated gross revenues less all operating expenses, which support revenue generation and business operations, presented in accordance with U.S. Generally Accepted Accounting Principles)—was allocated to players, tournaments (i.e., a portion of the sponsorship revenue related to a specific tournament is paid to the tournament), and charities.  Of that amount, $770 million—approximately 82% of net revenue—was allocated to players: $443 million to player prize money and benefits, $110 million to player bonus programs, $17 million to Player Retirement Plan contributions, and $200 million to Player Retirement Plan earnings.

7.      The TOUR is governed by its Policy Board, which includes four player directors, and a fifth player director is slated to join in January 2023.  The TOUR also includes a sixteen-member Player Advisory Council ("PAC"), which advises and consults with the Policy Board, including the membership-elected player directors, and the Commissioner on major TOUR decisions.  TOUR members may vote to elect representatives to serve on the PAC and Policy Board.

8.      There are no non-player "owners" of the TOUR.  The TOUR is a 501(c)(6) non-profit membership organization comprised of players.  Since its inception, the player members have owned it.

## PGA TOUR SEASON

9.      Each year, the TOUR schedules more than forty golf tournaments on the PGA TOUR.  These tournaments are primarily played in North America and principally the United States.

10.      Tournaments on the PGA TOUR schedule include the four "Majors"—the Masters, the PGA Championship, the US Open, and the Open Championship.  The Majors are

operated by independent organizations and not the TOUR, but they are part of the TOUR's official schedule.  A player's TOUR membership status does not automatically qualify him to participate in any of the four Major tournaments.

11.     Players qualify for entry into the four Majors based upon the qualification criteria that organizations wholly separate from TOUR determine independently.  One of the ways players may qualify is based upon Official World Golf Ranking ("OWGR") points.  Players can earn OWGR points by playing in events on tours other than the PGA TOUR that have qualified for OWGR points, including the LIV-backed Asian Tour, among several others.

12.     TOUR Members choose which TOUR tournaments they wish to play and may make their own schedules.  However, a member must compete in at least fifteen events (including the Majors) to maintain his membership voting rights.

13.     Since 2007, FedEx has been the sponsor of the FedExCup—the TOUR's season-long points competition that culminates with the FedExCup Playoffs, a series of three events in which the members who performed the best over the course of the TOUR schedule that season participate to determine the FedExCup Champion.

## PGA TOUR REGULATIONS REGARDING CONFLICTING EVENTS AND MEDIA AND MARKETING RIGHTS

14.     At the start of each season on an annual basis, each member of the TOUR agrees to, and is subject to, the provisions of the Player Handbook and Tournament Regulations ("Regulations").  The Regulations and any amendment to them are approved not only by a majority of the Policy Board, but generally by at least three of the player directors who sit on the Policy Board.  The Regulations provide certain obligations flowing both from the TOUR to its members and from the members to the TOUR.  The Regulations for a given year constitute the final authority on the operations and policies of the TOUR.  This year's Regulations are set forth in the 2021–22 PGA TOUR Player Handbook and Tournament Regulations, attached hereto as **Exhibit 6**.

15.     The TOUR acts on its members' behalf to generate revenue through the sale of sponsorships and broadcast rights to TOUR events.  In exchange, members assign their media

rights to the TOUR, which allows the TOUR to negotiate media and sponsorship agreements that generate more money for the players in the form of bigger prize pools and other benefits.

16.     In part to help the TOUR secure and build its sponsorship and broadcast agreements, the TOUR maintains rules applicable to all players regarding conflicting events and media and marketing rights.  These rules are set forth in Article V of the Regulations.

17.     TOUR members generally may not participate in any other golf tournament on a date when a TOUR tournament is scheduled.  (**Exhibit 6** at Article V, Section A.2.).  These Regulations contribute to the success of scheduled TOUR events, help the TOUR fulfill its contractual obligations (including its obligation to sponsors and media partners to ensure representative fields), and provide substantial benefits to tournament sponsors, title sponsors, broadcasters, local host organizers, and ultimately, the players.  The Regulations make the TOUR's media rights more valuable to sponsors and content distributors, leading to higher sponsorship and broadcast revenues, which in turn are distributed to members.

18.     In certain circumstances, players may seek and receive releases to play in non-TOUR tournaments (and participate in non-TOUR media programs) that are held on the same dates as TOUR events.  Each player is eligible for up to three releases per season, assuming he participates in fifteen TOUR tournaments that season, and one additional release for each additional five TOUR tournaments in which he participates.

19.     The players have agreed that these releases are discretionary.  A release can be denied if the Commissioner determines that it would cause the TOUR to be in violation of a contractual commitment to a tournament sponsor, or would otherwise significantly and unreasonably harm the TOUR and its sponsors.  (**Exhibit 6** at Article V, Section A.2.a.; A3.). These Regulations allow players certain flexibility to play in tournaments outside North America (for example, in their home countries) while also protecting sponsor and broadcaster investments in the TOUR, which directly benefit all players.  The TOUR regularly grants releases for players provided that the releases do not violate one of these provisions or the TOUR's obligations to its members.

20.     Under the TOUR's Regulations, conflicting event releases cannot be granted for tournaments held in North America because those tournaments directly conflict with TOUR events for which the TOUR's domestic television partners have paid substantial rights fees. (**Exhibit 6** at Article V, Section A.2.a.).  Non-TOUR tournaments held in North America are more likely to capitalize on the TOUR's own investments to the non-TOUR tournament's benefit (and at the expense of the TOUR).  This has the potential to create issues for sponsors, courses, local host organizers, and broadcasters that have partnered with the TOUR to stage tournaments in which TOUR members will participate.

21.     The TOUR's Regulations do not prevent members from resigning their TOUR membership at any time to play professional golf on a competing tour.  Nothing in the Regulations precludes another tour from competing to entice TOUR members to leave the TOUR.

22.     The Regulations also contain rules regarding media rights.  For instance, on a season-to-season basis, players grant the TOUR their media rights, agreeing that "television, digital, radio, motion picture and all other media rights of all players participating in TOUR cosponsored and coordinated tournaments, pro-ams or any other golf event conducted in conjunction with TOUR cosponsored and coordinated tournaments (e.g., clinics, long-drive contests), or any portion thereof, are hereby granted and assigned to TOUR."  (**Exhibit 6** at Article V, Section B.1.a).

23.     The players grant and assign their media rights to the TOUR because doing so benefits all TOUR members.  For example, the TOUR is able to negotiate agreements for broadcast rights to and sponsorship deals for TOUR tournaments.  The players' grant of these exclusive media rights allows the TOUR to negotiate these agreements, and the TOUR's efforts generate more money for the players in the form of bigger prize pools for TOUR tournaments and lucrative individual sponsorship deals.

24.     Players grant and assign their media rights to the TOUR for one season at a time and may renew (or decline to renew) the grant of their media rights to the TOUR with each new season.

25.     Because players are free to resign their TOUR membership at any time, a player wishing to join a competing tour and assign his media rights to that tour may do so simply by resigning his PGA TOUR membership prior to participating in or committing to participate in the competing tour.

### PGA TOUR REGULATIONS REGARDING PLAYER CONDUCT

**26.**     Article VI of the Regulations regulates conduct of players and prohibits certain forms of conduct unbecoming professional golfers who are members of the TOUR.  Players agree to the following rules, among others, regarding conduct:

- "Players participating in PGA TOUR cosponsored, approved or coordinated tournaments . . . at all times shall conduct themselves in a manner becoming professional golfers that will not reflect unfavorably on PGA TOUR, its members, officers or representatives, tournaments or sponsors."  (**Exhibit 6** at Article VI)

- "The favorable public reputation of PGA TOUR, its players and its tournaments are valuable assets and create tangible benefits for all PGA TOUR members. Accordingly, it is an obligation of membership to refrain from making comments that unreasonably attack or disparage others, including, but not limited to tournaments, sponsors, fellow members/players and/or PGA TOUR.  . . .  [P]ublic comments that a member knows, or should reasonably know, will harm the reputation or financial best interest of PGA TOUR, a fellow member/player, a tournament sponsor or a charity are expressly covered by this section.  Any violation of this section shall be considered conduct unbecoming a professional."
  (**Exhibit 6** at Article VI, Section E)

27.     TOUR Regulations also prohibit players from holding any form of financial interest in another player.  The financial interest policy states: "A player shall not have any financial interest, either direct or indirect, in the performance or the winnings of another player in any event cosponsored, coordinated, approved or otherwise sanctioned by the PGA TOUR, whether through purse-splitting, prize money 'insurance,' financial assistance, bets or otherwise.

Any player who violates the provisions of this paragraph shall be subject to a suspension from tournament play for a minimum period of two seasons."  (**Exhibit 6** at Article VI, Section D).

28.     The Regulations that prohibit players from holding any form of financial interest in another player are intended to preserve the integrity of play among TOUR members.

### PGA TOUR REGULATIONS REGARDING DISCIPLINE, PENALTIES, AND APPEALS

29.     Article VII of the Regulations governs discipline, penalties, and appeals related to violations of the Regulations.

30.     Article VII defines three classes of penalties that may be imposed upon TOUR members: (1) *Minor Penalties*: Fines of not more than $10,000, which may be imposed by the PGA TOUR Chief of Operations or his designee (**Exhibit 6** at Article VII, Section D.1); (2) *Intermediate Penalties*: Fines of between $10,001 and $20,000 and/or suspension from play for no more than three tournaments, which may be imposed by the Commissioner, or if he is unavailable, the PGA Tour Chief of Operations or his designee (**Exhibit 6** at Article VII, Section D.2); and (3) *Major Penalties*: Fines of more than $20,000, suspension from tournament play for more than three tournaments and/or permanent disbarment from playing in PGA TOUR cosponsored or coordinated events, which may be imposed only by the Commissioner except as otherwise specified in the Regulations (**Exhibit 6** at Article VII, Section D.3).

31.     Article VII, Sections A and E provide a notice and appeal process for members subject to disciplinary action.

      1.     Section A governs disciplinary notice and provides that "any members subject to disciplinary action or penalties defined as intermediate or major penalties shall first be notified of such proposed action in writing" either by PGA Tour's Chief of Operations or, in the case of major penalties, by the PGA Tour Commissioner.  (**Exhibit 6** at Article VII, Section A).  Within 14 days of such notice, the member can submit to the Commissioner "such facts or evidence of mitigating circumstances as may apply."  *Id.*  Within 14 days of receiving the member's submission, "the Commissioner shall

notify the member in writing" whether the proposed disciplinary action or penalty will be imposed or dismissed, after which the member may seek an appeal of that decision.

2.      Section E sets forth appeal procedures for different classes of penalties. For instance, members subject to intermediate and major penalties may submit a written appeal to the Commissioner within 14 days of the date of notification of the penalty.  Then, within 14 days of receiving the appeal, the Commissioner shall reach a decision and notify the member in writing of his response.  Under Section E, "[a]n appeal shall operate to stay the effective date of any penalty, except suspension from a tournament then in progress or scheduled for the calendar week in which the alleged violation occurred, until after the final decision on appeal."  (**Exhibit 6** at Article VII, Section E).

32.     Players are entitled to a stay of penalties pending appeal in some—but not all—circumstances.  Specifically, Section E provides that the effective date of minor, intermediate, and major penalties is stayed if an appeal is taken, except with respect to violations for tournaments in progress or the week of the violation.

33.     In addition to the power to impose penalties for violations, the Commissioner is granted powers under Article VII, Section C to impose interim suspensions for violations made by players who have been placed on probation.  Section C states:

In any instance where a member of PGA TOUR has for any reason been placed on probation for an infraction of any rule of PGA TOUR, then and in that event, if at any time during the probation period that member shall violate any rule of PGA TOUR, irrespective of whether that violation carries with it a penalty designated minor, intermediate or major as described under Sections D-1, D-2 and D-3 of this Article VII, the Commissioner may immediately suspend the member's

playing privileges. The Commissioner shall inform the member of

the decision to revoke the probation within 14 days.

34.     Section C does not provide for an appeal or stay of the immediate suspension of players who are already on probation.  Suspensions imposed under Section C are separate and apart from the "penalties" outlined in Section D and not subject to the stay provision applicable to penalties.

35.     Section C establishes a probation and immediate suspension procedure to deal with players who serially violate the rules in a manner the Commissioner determines requires that they be suspended from play, while the disciplinary process against them runs its course.  This ensures that serial offenders do not disrupt TOUR events while their disciplinary process unfolds and is a central part of the Commissioner's duty to protect the TOUR, its members, and its partners and sponsors.

## DISCIPLINARY ACTION AGAINST TRO PLAINTIFFS

36.     Plaintiffs Talor Gooch, Hudson Swafford, and Matt Jones have collectively earned approximately $37 million in official prize money on the PGA TOUR.  These sums include over $7 million to date in the 2021- 2022 season.  These figures are simply their tournament winnings on the TOUR; they do not include or account for other benefits that these three players have received as TOUR members (such as pensions and bonuses), nor do they account for the revenues that they have received through their own sponsorship and endorsement deals that their status as TOUR members made possible, for example, by allowing them to display and promote their sponsors on TOUR telecasts.

### *Talor Gooch*

37.     Mr. Gooch requested a release to participate in the first LIV Golf event, the "LIV Golf Invitational London," which was scheduled for June 9–11[1]—the same week as a TOUR event, the RBC Canadian Open.  Mr. Gooch's request for a release was denied.  Mr. Gooch nevertheless decided to play the LIV Golf Event, and, on May 31, he was announced as part of the LIV Golf Invitational London field.

---

[1] Unless otherwise noted, all dates in this Section are in 2022.

DECLARATION OF ANDREW LEVINSON
Case No. 3:22-cv-04486-BLF

38.     On June 3, the TOUR issued a Notice of Disciplinary Inquiry (attached hereto as **Exhibit 7**) to Mr. Gooch in accordance with Article VII, Section A of the Regulations, notifying him that the announcement of his participation in the LIV Golf Invitational, for which he did not have a conflicting event release, violated Article V, Section A.2 of the Regulations.  The Notice explained that Mr. Gooch could submit written statements or evidence for the Commissioner's consideration within 14 days.  The TOUR also explained that, if Mr. Gooch withdrew from the LIV event or confirmed he would not be participating, the Notice would be withdrawn.

39.     On June 5, the TOUR sent a letter to Mr. Gooch (attached hereto as **Exhibit 8**) pursuant to Article VII, Section C of the Regulations, informing him of a separate disciplinary action stemming from his violation of Article V, Section A.2.  The letter informed Mr. Gooch that pursuant to Section C, he would be placed on an indefinite discretionary probation.  And the letter made clear that a subsequent violation, while Mr. Gooch was on probation, would lead to *immediate suspension*:

> "[I]f you violate any other rule of the PGA TOUR while on probation including, but not limited to, violating Article V, Section B.1, which prohibits your participation in a live or recorded golf program, such as LIV Golf Invitational London, for which a media release has been denied, the Commissioner may immediately suspend your playing privileges."

40.     Per the Regulations, the June 5 discretionary probation notice under Section C operated separately from the Section A disciplinary proceedings that the TOUR instituted against Mr. Gooch on June 3.  Accordingly, the June 5 letter did not ask Mr. Gooch to submit additional materials within 14 days, nor did it provide any instructions or process for appeal.  Rather, the letter made clear that Mr. Gooch was being placed on probation, and that, "[i]f the Commissioner chooses to revoke this probation, [he would] be notified within fourteen (14) days of such decision."

41.     Despite knowing the TOUR's position, Mr. Gooch chose to participate in the LIV Golf Invitational London event that began on June 9.

42.     On June 9, the TOUR issued a second Notice of Disciplinary Inquiry under Article VII, Section A of the Regulations (attached hereto as **Exhibit 9**).  The Notice informed Mr. Gooch of his violation of Article V, Section B.1.b of the Regulations, which prohibits participation in any live or recorded golf program without the prior written approval of the Commissioner.

43.     The June 9 notice also separately followed up on Mr. Gooch's pending discretionary probation under Article VII, Section C.  The letter informed Mr. Gooch that, pursuant to Section C, and per the TOUR's previous June 5 probation letter, because Mr. Gooch had violated a TOUR rule (Article V, Section B.1.b.) while on probation, his playing privileges would be "immediately suspended until further notice."  The letter made clear that the interim suspension was separate from the penalty to be imposed for Mr. Gooch's violation of the Regulations.

44.     On June 22, Mr. Gooch was announced as part of the field in the LIV Golf event scheduled for (and that began on) June 30 in Portland, Oregon.

45.     On June 25, the TOUR issued a third Notice of Disciplinary Inquiry (attached hereto as **Exhibit 10**) under Article VII, Section A, informing Mr. Gooch that there was no exception or waiver for his participation in this event, and that the announcement constituted another violation of Article V, Section A.2.  It again invited Mr. Gooch to submit any mitigating facts or circumstances for the Commissioner's consideration within 14 days.

46.     On June 27, Mr. Gooch sent an email to TOUR Commissioner Jay Monahan (attached hereto as **Exhibit 11**) in "response to [the TOUR's] letters of June 1, 3, and 9, 2022, which in summary have suspended me from the PGA tour."  Mr. Gooch expressed his disagreement with his suspension, but recognized and acknowledged that his suspension was immediate and indefinite: "Put simply, I believe the PGA Tour's indefinite suspension while I await further word from the Tour is unjust and unfair."  He also expressed his desire to play in "other PGA Tour events, including the upcoming FedEx Cup playoffs."  But, he stated, "the Tour has led me to believe that I will be suspended from the playoffs as well."

47.     On June 30, the TOUR issued a fourth Notice of Disciplinary Inquiry to Mr. Gooch (attached hereto as **Exhibit 12**) under Article VII, Section A, for participating in the LIV Golf event in Portland from June 30 to July 2.  The Notice informed Mr. Gooch that his participation in the Portland LIV event constituted yet another violation of Article V, Section B.1.b and again invited him to submit any mitigating circumstances or facts for the Commissioner's consideration within 14 days.

48.     On June 30, the TOUR issued its first Disciplinary Action Notice to Mr. Gooch (attached hereto as **Exhibit 13**) based on its June 1 and June 9 Notices of Disciplinary Inquiry. The Disciplinary Action Notice made clear that the TOUR "did not prohibit [him] from playing in the [LIV Golf event], as demonstrated by the fact that [he] played in it."  But, because he participated without the necessary waivers and violated the Regulations, the Notice explained, "the PGA TOUR is obligated and wholly within its rights to enforce the Regulations through its disciplinary procedures."  Accordingly, the Commissioner imposed the "Major Penalty" of suspending Mr. Gooch from participating in any PGA TOUR-affiliated tournaments and suspending his privileges at Tournament Players Clubs through March 31, 2023.  The Notice stated that Mr. Gooch could appeal this "Major Penalty" within 14 days pursuant to Article VII, Section E.2.

49.     The June 30 letter did not reference or revoke Mr. Gooch's separate discretionary suspension under Article VII, Section C—for violating TOUR Regulations while on probation— which had been in place since June 9 and remained (and remains) in effect.

50.     On July 13, Mr. Gooch submitted an appeal of the TOUR's June 30 Notice of Disciplinary Action (attached hereto as **Exhibit 14**).  Although Mr. Gooch did not argue that he had in fact complied with the Regulations, he nevertheless appealed the TOUR's disciplinary action against on various other grounds, including his belief that the TOUR's actions violated the Sherman Act, contravened the TOUR's non-profit purpose, and lacked fair process.  Mr. Gooch requested that the TOUR inform him of "any action or remedy of any sort that the Tour seeks to take against me before the appeal process is concluded."

51.     Mr. Gooch's July 13 appeal did not stay or otherwise affect the Commissioner's discretionary suspension for Mr. Gooch's violation of the Regulations while on probation, issued on June 9 under Article VII, Section C, because Section C suspensions may only be revoked at the Commissioner's discretion.  In addition, because Mr. Gooch continues to violate the TOUR's Regulations, his appeal does not stay the effective date of the suspension from tournaments imposed June 30 as part of his Major Penalty due to his ongoing violations of the Regulations.

52.     On July 23, the TOUR issued its second Notice of Disciplinary Action to Mr. Gooch (attached hereto as **Exhibit 15**) based on the Disciplinary Inquiry Notices from June 25 and June 30.  The Notice of Disciplinary Action noted that Mr. Gooch had failed to respond to either the June 25 or June 30 Disciplinary Inquiry Notices.  The Notice of Disciplinary Action stated that Mr. Gooch had been warned about and punished for his unauthorized participation in events in violation of the TOUR's Regulations, but nonetheless "continued to flagrantly violate the Regulations."  Therefore, the Commissioner imposed a Major Penalty of extending Mr. Gooch's suspension through March 31, 2024.  The Notice informed Mr. Gooch he could appeal these sanctions within 14 days pursuant to Article VII, Section E.2.

53.     On July 29, the TOUR sent another letter to Mr. Gooch (attached hereto as **Exhibit 16**), explaining that his continued flagrant violation of TOUR Regulations constituted "Ongoing Violations."  Therefore, rather than continue to issue individual Notices of Disciplinary Inquiry for the Ongoing Violations, the TOUR informed Mr. Gooch that it would "initiate the disciplinary process for the Ongoing Violations at such time PGA TOUR determines the Ongoing Violations have ceased or otherwise determines that the disciplinary process should proceed with respect to any or all of the Ongoing Violations."

54.     On July 30, Mr. Gooch re-forwarded his previous July 13 appeal letter to me.

55.     On July 30, the TOUR issued a letter (attached hereto as **Exhibit 17**) notifying Mr. Gooch that his July 13 appeal had been transferred to the TOUR Appeals Committee and directing him to submit any additional written evidence within 14 days.

56.     On August 1, Mr. Gooch submitted an email response to the TOUR's July 30 letter (attached hereto as **Exhibit 18**).  He indicated his intent to file additional written evidence for the

Appeal Committee's consideration in the next 14 days.  He also argued, for the first time, that "[U]nder Section VII.E.2 of the Regulations, my appeal 'shall operate to stay the effective date of *any* penalty . . . until after the final decision on the appeal.'"  He stated his intent to play in the FedEx St. Jude Championship and other FedExCup Playoff tournaments during the pendency of his appeal.

57.     On August 2, the TOUR responded to Mr. Gooch's August 1 letter (response attached hereto as **Exhibit 19**).  In its response, the TOUR stated that the stay provision Mr. Gooch referenced in Article VII, Section E of the Regulations "by its terms, could only apply to 'the effective date of any *penalty*' imposed by the Commissioner.  It does not apply to—let alone stay—the imposition of any suspension imposed by the Commissioner under Article VII, Section C . . . for a violation of TOUR rules while on probation."  The TOUR noted that Mr. Gooch was notified of his probation on June 5, and then, on June 9—in light of Mr. Gooch's continued and intentional violations of the Regulations—the Commissioner exercised his authority under Article VII, Section C to immediately suspend Mr. Gooch's playing privileges because of his subsequent Regulations violations while on probation.  "As the Regulations and our June 9, 2022 letter to you make clear, such interim suspension under Section C is separate and distinct from any 'penalty' that may be imposed by the Commissioner for a minor, intermediate, or major penalty."  As the TOUR explained to Mr. Gooch: "[I]t is clear that you have no intention of complying with the Regulations in the future and as such are not entitled to avail yourself of any stay of your [June 9] suspension. The June 9 suspension thus remains in effect during the pendency of your appeal."

58.     Mr. Gooch committed to the FedEx St. Jude Championship Tournament on April 12.  The TOUR withdrew him from that tournament on July 12.

### *Hudson Swafford*

59.     On May 31, Plaintiff Hudson Swafford was announced as part of the field of participants in the LIV Golf Invitational in London.

60.     On June 1, the TOUR issued a Notice of Disciplinary Inquiry (attached hereto as **Exhibit 20**) to Mr. Swafford in accordance with Article VII, Section A of the Regulations,

notifying him that the announcement of his participation in the LIV Golf Invitational, for which he did not have a conflicting event release, violated Article V, Section A.2 of the Regulations. The Notice explained that Mr. Swafford could submit written statements or evidence for the Commissioner's consideration within 14 days.  The TOUR also stated that if Mr. Swafford withdrew from the LIV event or confirmed he would not be participating, the Notice would be withdrawn.

61.     On June 3, the TOUR sent a letter to Mr. Swafford (attached hereto as **Exhibit 21**) pursuant to Article VII, Section C of the Regulations, informing him of a separate disciplinary action stemming from his violation of Article V, Section A.2.  The letter informed Mr. Swafford that pursuant to Section C, he would be placed on an indefinite discretionary probation.  And the letter made clear that a subsequent violation, while Mr. Swafford was on probation, would lead to *immediate suspension*:

> "[I]f you violate any other rule of the PGA TOUR while on probation including, but not limited to, violating Article V, Section B.1, which prohibits your participation in a live or recorded golf program, such as LIV Golf Invitational London, for which a media release has been denied, the Commissioner may immediately suspend your playing privileges."

62.     Per the Regulations, the June 3 discretionary probation notice under Section C operated separately from the Section A disciplinary proceedings that the TOUR instituted against Mr. Swafford on June 1.  Accordingly, the June 3 letter did not ask Mr. Swafford to submit additional materials within 14 days, nor did it provide any instructions or process for appeal. Rather, the letter made clear that Mr. Swafford was being placed on probation, and that, "[i]f the Commissioner chooses to revoke this probation, [he would] be notified within fourteen (14) days of such decision."

63.     Despite knowing the TOUR's position, Mr. Swafford chose to participate in the LIV Golf Invitational London event that began on June 9.

64.     On June 9, the TOUR issued a second Notice of Disciplinary Inquiry under Article VII, Section A of the Regulations (attached hereto as **Exhibit 22**).  The Notice informed Mr. Swafford of his violation of Article V, Section B.1.b of the Regulations, which prohibits participation in any live or recorded golf program without the prior written approval of the Commissioner.

65.     The June 9 Notice also separately followed up on Mr. Swafford's pending discretionary probation under Article VII, Section C.  The letter informed Mr. Swafford that, pursuant to Section C, and per the TOUR's previous June 3 probation letter, because Mr. Swafford had violated a TOUR rule (Article V, Section B.1.b.) while on probation, his playing privileges would be "immediately suspended until further notice."

66.     On June 17, Mr. Swafford responded to the June 1, June 3, and June 9 correspondence from the TOUR setting forth additional facts and circumstances for the Commissioner's consideration (attached hereto as **Exhibit 23**).

67.     On June 22, Mr. Swafford was announced as part of the field in the LIV Golf event scheduled for (and that began on) June 30 in Portland, Oregon.

68.     On June 25, the TOUR issued a third Notice of Disciplinary Inquiry (attached hereto as **Exhibit 24**) under Article VII, Section A, informing Mr. Swafford that there was no exception for his participation in this event, and that the announcement constituted another violation of Article V, Section A.2.  It again requested that Mr. Swafford submit any mitigating facts or circumstances for the Commissioner's consideration within 14 days.

69.     On June 29, the TOUR issued its first Disciplinary Action Notice to Mr. Swafford (attached hereto as **Exhibit 25**) based on its June 1 and June 9 Notices of Disciplinary Inquiry. The Disciplinary Action Notice made clear that the TOUR "did not prohibit [him] from playing in the [LIV Golf event], as demonstrated by the fact that [he] played in it."  But, because he participated without the necessary waivers and violated the Regulations, the Notice explained, "the PGA TOUR is obligated and wholly within its rights to enforce the Regulations through its disciplinary procedures."  Accordingly, the Commissioner imposed the "Major Penalty" of suspending Mr. Swafford from participating in any PGA TOUR-affiliated tournaments through

March 31, 2023.  The Notice stated that Mr. Swafford could appeal this "Major Penalty" within 14 days pursuant to Article VII, Section E.2.

70.    The June 29 letter did not reference or revoke Mr. Swafford's separate discretionary suspension under Article VII, Section C—for violating TOUR Regulations while on probation—which had been in place since June 9 and remained (and remains) in effect.

71.    On June 30, the TOUR issued a fourth Notice of Disciplinary Inquiry to Mr. Swafford (attached hereto as **Exhibit 26**) under Article VII, Section A, for participating in the LIV Golf event in Portland from June 30 to July 2.  The Notice informed Mr. Swafford that his participation in the Portland LIV event constituted yet another violation of Article V, Section B.1.b and again invited him to submit any mitigating circumstances or facts for the Commissioner's consideration within 14 days.

72.    On July 13, Mr. Swafford submitted an appeal of the TOUR's June 30 Notice of Disciplinary Action (attached hereto as **Exhibit 27**).  Although Mr. Swafford did not argue that he had in fact complied with the Regulations, he nevertheless appealed the TOUR's disciplinary action against on various other grounds, including his belief that the TOUR's actions violated the Sherman Act, contravened the TOUR's non-profit purpose, and lacked fair process.  Mr. Swafford requested that the TOUR inform him of "any action or remedy of any sort that the Tour seeks to take against me before the appeal process is concluded."

73.    Mr. Swafford's July 13 appeal did not stay or otherwise affect the Commissioner's discretionary suspension for Mr. Swafford's violation of the Regulations while on probation, issued on June 9 under Article VII, Section C, because Section C suspensions may only be revoked at the Commissioner's discretion.  In addition, because Mr. Swafford continues to violate the TOUR's Regulations, his appeal does not stay the effective date of the suspension from tournaments imposed June 29 as part of his Major Penalty due to his ongoing violations of the Regulations.

74.    On July 23, the TOUR issued its second Notice of Disciplinary Action to Mr. Swafford (attached hereto as **Exhibit 28**) based on the Disciplinary Inquiry Notices from June 25 and June 30.  The Notice of Disciplinary Action noted that Mr. Swafford had failed to respond to

either the June 25 or June 30 Disciplinary Inquiry Notices.  The Notice of Disciplinary Action stated that Mr. Swafford had been warned about and punished for his unauthorized participation in events in violation of the TOUR's Regulations, but nonetheless "continued to flagrantly violate the Regulations."  Therefore, the Commissioner imposed a Major Penalty of extending Mr. Swafford's suspension through March 31, 2024.  The Notice informed Mr. Swafford he could appeal these sanctions within 14 days pursuant to Article VII, Section E.2.

75.     On July 27, the TOUR issued a letter (attached hereto as **Exhibit 29**) notifying Mr. Swafford that his July 13 appeal had been transferred to the TOUR Appeals Committee and directing him to submit any additional written evidence within 14 days.

76.     On July 29, the TOUR sent another letter to Mr. Swafford (attached hereto as **Exhibit 30**), explaining that his continued flagrant violation of TOUR Regulations constituted "Ongoing Violations."  Therefore, rather than continue to issue individual Notices of Disciplinary Inquiry for the Ongoing Violations, the TOUR informed Mr. Swafford that it would "initiate the disciplinary process for the Ongoing Violations at such time PGA TOUR determines the Ongoing Violations have ceased or otherwise determines that the disciplinary process should proceed with respect to any or all of the Ongoing Violations."

77.     Mr. Swafford committed to the FedEx St. Jude Championship Tournament on June 21.  The TOUR withdrew him from that tournament on July 12.  He tried to recommit on July 20 and was withdrawn again on August 1.  He tried to recommit again on August 2 and was withdrawn on August 3.  Similarly, he attempted to recommit once again on August 4.  After he was withdrawn on August 5, he attempted to recommit a last time and was again withdrawn.

### *Matt Jones*

78.     On May 31, Plaintiff Matt Jones was announced as part of the field of participants in the LIV Golf Invitational in London.

79.     On June 1, the TOUR issued a Notice of Disciplinary Inquiry (attached hereto as **Exhibit 31**) to Mr. Jones in accordance with Article VII, Section A of the Regulations, notifying him that the announcement of his participation in the LIV Golf Invitational, for which he did not have a conflicting event release, violated Article V, Section A.2 of the Regulations. The Notice

1   explained that Mr. Jones could submit written statements or evidence for the Commissioner's

2   consideration within 14 days.  The TOUR also stated that if Mr. Jones withdrew from the LIV

3   event or confirmed he would not be participating, the Notice would be withdrawn.

4       80.     On June 3, the TOUR sent a letter to Mr. Jones (attached hereto as **Exhibit 32**)

5   pursuant to Article VII, Section C of the Regulations, informing him of a separate disciplinary

6   action stemming from his violation of Article V, Section A.2.  The letter informed Mr. Jones that

7   pursuant to Section C, he would be placed on an indefinite discretionary probation.  And the letter

8   made clear that a subsequent violation, while Mr. Jones was on probation, would lead to

9   ***immediate suspension***:

10      "[I]f you violate any other rule of the PGA TOUR while on probation

11      including, but not limited to, violating Article V, Section B.1, which

12      prohibits your participation in a live or recorded golf program, such

13      as LIV Golf Invitational London, for which a media release has been

14      denied, the Commissioner may immediately suspend your playing

15      privileges."

16      81.     Per the Regulations, the June 3 discretionary probation notice under Section C

17  operated separately from the Section A disciplinary proceedings that the TOUR instituted against

18  Mr. Jones on June 1.  Accordingly, the June 3 letter did not ask Mr. Jones to submit additional

19  materials within 14 days, nor did it provide any instructions or process for appeal.  Rather, the

20  letter made clear that Mr. Jones was being placed on probation, and that, "[i]f the Commissioner

21  chooses to revoke this probation, [he would] be notified within fourteen (14) days of such

22  decision."

23      82.     Despite knowing the TOUR's position, Mr. Jones chose to participate in the LIV

24  Golf Invitational London event that began on June 9.

25      83.     On June 9, the TOUR issued a second Notice of Disciplinary Inquiry under Article

26  VII Section A of the Regulations (attached hereto as **Exhibit 33**).  The Notice informed Mr. Jones

27  of his violation of Article V, Section B.1.b of the Regulations, which prohibits participation in

28  any live or recorded golf program without the prior written approval of the Commissioner.

84.     The June 9 Notice also separately followed up on Mr. Jones's pending discretionary probation under Article VII, Section C.  The letter informed Mr. Jones that pursuant to Section C, and per the TOUR's previous June 3 probation letter, because Mr. Jones had violated a TOUR rule (Article V, Section B.1.b.) while on probation, his playing privileges would be "immediately suspended until further notice."

85.     On June 17, Mr. Jones responded to the June 1, June 3, and June 9 correspondence from the TOUR setting forth additional facts and circumstances for the Commissioner's consideration (attached hereto as **Exhibit 34**).

86.     On June 22, Mr. Jones was announced as part of the field in the LIV Golf event scheduled for (and that began on) June 30 in Portland Oregon.

87.     On June 25, the TOUR issued a third Notice of Disciplinary Inquiry (attached hereto as **Exhibit 35**) under Article VII, Section A, informing Mr. Jones that there was no exception for his participation in this event, and that the announcement constituted another violation of Article V, Section A.2.  It again requested that Mr. Jones submit any mitigating facts or circumstances for the Commissioner's consideration within 14 days.

88.     On June 29, the TOUR issued its first Disciplinary Action Notice to Mr. Jones (attached hereto as **Exhibit 36**) based on its June 1 and June 9 Notices of Disciplinary Inquiry. The Disciplinary Action Notice made clear that the TOUR "did not prohibit [him] from playing in the [LIV Golf event], as demonstrated by the fact that [he] played in it."  But, because he participated without the necessary waivers and violated the Regulations, the Notice explained, "the PGA TOUR is obligated and wholly within its rights to enforce the Regulations through its disciplinary procedures."  Accordingly, the Commissioner imposed the "Major Penalty" of suspending Mr. Jones from participating in any PGA TOUR-affiliated tournaments and suspending his privileges at Tournaments Players Clubs through March 31, 2023.  The Notice stated that Mr. Jones could appeal this "Major Penalty" within 14 days pursuant to Article VII, Section E.2.

89.     The June 29 letter did not reference or revoke Mr. Jones's separately pending discretionary suspension under Article VII, Section C—for violating TOUR Regulations while on probation—which had been in place since June 9 and remained (and remains) in effect.

90.     On June 30, the TOUR issued a fourth Notice of Disciplinary Inquiry to Mr. Jones (attached hereto as **Exhibit 37**) under Article VII, Section A, for participating in the LIV Golf event in Portland from June 30 to July 2.  The Notice informed Mr. Jones that his participation in the Portland LIV event constituted yet another violation of Article V, Section B.1.b and again invited him to submit any mitigating circumstances or facts for the Commissioner's consideration within 14 days.

91.     On July 13 Mr. Jones submitted an appeal of the TOUR's June 30 Notice of Disciplinary Action (attached hereto as **Exhibit 38**).  Although Mr. Jones did not argue that he had in fact complied with the Regulations, he nevertheless appealed the TOUR's disciplinary action against on various other grounds, including his belief that the TOUR's actions violated the Sherman Act, contravened the TOUR's non-profit purpose, and lacked fair process.  Mr. Jones requested that the TOUR inform him of "any action or remedy of any sort that the Tour seeks to take against me before the appeal process is concluded."

92.     Mr. Jones's July 13 appeal did not stay or otherwise affect the Commissioner's discretionary suspension for Mr. Jones's violation of the Regulations while on probation, issued on June 9 under Article VII, Section C, because Section C suspensions may only be revoked at the Commissioner's discretion. In addition, because Mr. Jones continues to violate the TOUR's Regulations, his appeal does not stay the effective date of the suspension from tournaments imposed June 30 as part of his Major Penalty due to his ongoing violations of the Regulations.

93.     On July 23, the TOUR issued its second Notice of Disciplinary Action to Mr. Jones (attached hereto as **Exhibit 39**) based on the Disciplinary Inquiry Notices from June 25 and June 30.  The Notice of Disciplinary Action noted that Mr. Jones had failed to respond to either the June 25 or June 30 Disciplinary Inquiry Notices.  The Notice of Disciplinary Action stated that Mr. Jones had been warned about and punished for his unauthorized participation in events in violation of the TOUR's Regulations, but nonetheless "continued to flagrantly violate the

Regulations."  Therefore, the Commissioner imposed a Major Penalty of extending Mr. Jones's suspension through March 31, 2024.  The Notice informed Mr. Jones he could appeal these sanctions within 14 days pursuant to Article VII, Section E.2

94.    On July 27, the TOUR issued a letter (attached hereto as **Exhibit 40**) notifying Mr. Jones that his July 13 appeal had been transferred to the TOUR Appeals Committee and directing him to submit any additional written evidence within 14 days.

95.    On July 29, the TOUR sent another letter to Mr. Jones (attached hereto as **Exhibit 41**), explaining that his continued flagrant violation of TOUR Regulations constituted "Ongoing Violations."  Therefore, rather than continue to issue individual Notices of Disciplinary Inquiry for the Ongoing Violations, the TOUR informed Mr. Jones that it would "initiate the disciplinary process for the Ongoing Violations at such time PGA TOUR determines the Ongoing Violations have ceased or otherwise determines that the disciplinary process should proceed with respect to any or all of the Ongoing Violations."

96.    Mr. Jones committed to the FedEx St. Jude Championship Tournament on June 21.  The TOUR withdrew him from that tournament on July 12 and has not attempted to recommit to participate in the tournament.

97.    Although Mr. Gooch, Mr. Swafford, and Mr. Jones have sought a temporary restraining order seeking to play in the FedExCup Playoffs even though they remain suspended from the TOUR, there are four other named Plaintiffs in this lawsuit who have earned enough TOUR points to qualify for the first tournament of the Playoffs, the FedEx St. Jude Championship, but have *not* requested a temporary restraining order due to their suspensions. Those four non-moving Plaintiffs are Jason Kokrak, Abraham Ancer, Carlos Ortiz, and Pat Perez.

98.    Mr. Gooch received notice of his discretionary suspension on June 5.  Messrs. Swafford and Jones received notice of their discretionary suspensions on June 3.  Since that time, the TOUR has held ***seven*** events, each of which afforded players the opportunity to earn OWGR points. Messrs. Gooch, Swafford, and Jones did not play or attempt to play in any of those events.

99.     It is my understanding that as LIV players, Messrs. Gooch, Swafford and Jones could also play Asian Tour events to obtain OWGR points, as Patrick Reed, a resigned PGA TOUR member who has joined LIV, is reportedly doing this week and next.

## PGA TOUR RULES DO NOT PREVENT COMPETITION

100.     The TOUR's rules—the Regulations—are agreed to annually by the players.  The Regulations are designed to protect and advance the players' interests.

101.     The Regulations do not contain any prohibition that prevents a player from resigning their TOUR membership at any time.

102.     The Regulations do not prevent players from joining any other professional golf tour, including the LIV Golf International Series, even if those tours compete directly with the TOUR.

103.     The Regulations do not prevent players from participating in other non-PGA TOUR tournaments, subject to certain requirements and waivers that I have described above.

104.     However, the Regulations do not allow players to *simultaneously* participate on the TOUR *and* participate in a tour with conflicting events in North America, like the LIV Golf International Series, because doing so would harm TOUR players in various ways, including free-riding.

105.     In recent years, the TOUR has granted waivers for members to participate in conflicting events on the DP World Tour (formerly known as the European Tour).  However, DP World Tour tournaments are played almost exclusively outside of North America, which reduces the potential of broadcasts at the same time as TOUR events and limits the likelihood that courses, local organizers, sponsors and other partners of the TOUR will have direct conflicts with DP World Tour events.  LIV Golf International Series, on the other hand, has made it clear that the league's founders hope to pull players and sponsors away from the PGA TOUR and compete head-to-head with the TOUR over the course of its full season, interfering with the TOUR season and the FedExCup.  Indeed, while LIV suggests the TOUR must grant conflicting event releases for LIV Golf International Series events, LIV itself has announced plans to require members to play in all fourteen planned LIV Golf events by 2024.

### TOUR RULES PREVENT FREE RIDING AND
### <u>PROMOTE MEMBER LOYALTY AND BEST EFFORTS</u>

106.     PGA TOUR rules work to prevent free riding and ensure members use their best efforts to benefit the TOUR.

107.     TOUR rules regarding conflicting events and media rights serve legitimate goals of the TOUR.  All players benefit immeasurably from the extensive efforts the TOUR takes on behalf of membership in securing broadcast and sponsorship deals and furthering the game of golf.  These efforts have created an incredible media platform, one that gives TOUR members access to fans and potential sponsors across the world.  If players are allowed to benefit from the TOUR's reputation and services *while* participating in a rival golf tour like LIV Golf, LIV Golf and its member players would be unfairly using the TOUR's expensive, decades-long efforts to develop and promote professional golf tournaments in the United States for their own financial benefit.

108.     The TOUR's position is not that its past efforts to develop players, or the popularity and sponsorships that players have earned by playing on the TOUR, obligates those players to continue to play on the TOUR going forward.  But once a player decides to promote and develop another tour, he cannot also demand that the TOUR continue to let him use the TOUR's platform or lend its reputation to assist that player's efforts on behalf of the rival tour.

109.     It is reasonable for the TOUR to expect and require its members to use their best efforts to promote the TOUR and its tournaments, broadcasts, and media events.  Players with conflicting loyalties already have attempted to recruit players while participating in TOUR events, and would likely promote the LIV Golf International Series at future TOUR events.  The participation of members with such conflicting loyalties harms the quality of the TOUR's product for other members, as well as for fans, sponsors and broadcasters.

110.     If players are permitted to play for both the TOUR and LIV, the TOUR will be forced to provide a platform for golfers who have denigrated the TOUR and devalued its product for remaining TOUR members.

111.    If players are permitted to play for both the TOUR and LIV, it would also likely engender consumer confusion, as players with dual, conflicting loyalties would be allowed to promote one tour over the other while participating in the tournament events of both.

## TOUR REGULATIONS PROTECT THE TOUR'S REPUTATION

112.    The TOUR is also entitled to preserve its reputation by deciding that it does not want to be associated, through dual membership players, with LIV Golf.

113.    The concerns that many TOUR members, sponsors, associates and fans have with the activities of the Saudi government (and, by extension, with LIV Golf) will likely inflict significant harm on the TOUR's reputation if players who participate in the Saudi-backed tour continue their association with the PGA TOUR.

114.    Take, for example, the recent comments of Phil Mickelson, who justified his association with the Saudi government's new venture while describing that Saudi government as "scary motherf****rs" who "killed [*Washington Post* reporter and United States resident Jamal] Khashoggi and have a horrible record on human rights."  My understanding is that Mr. Mickelson's statement led numerous sponsors to disassociate themselves with him and news outlets and fans to condemn his comments.  Several prominent players have spoken out against LIV Golf and its funding through the Saudi PIF.

115.    Similarly, members of the Pumpkin Ridge Golf Club, located in Portland, Oregon, were unhappy about their club's decision to host a LIV Golf International Series event last month. This public condemnation could easily be directed at the TOUR if it was forced to allow LIV players to participate in TOUR events—and the TOUR could even be seen as endorsing or accepting those players' affiliation with the Saudi-backed tour.

116.    At the LIV Golf tournament in Bedminster, New Jersey, families of victims of the Sept. 11, 2001, terror attack protested outside the LIV event at Trump National Golf Club in Bedminster, New York angered that the golfers were participating in "blood-money soaked tournaments." In sum, if TOUR members simultaneously participated in LIV Golf events *and* on the TOUR, it would likely embroil the TOUR in unwanted controversy and risk alienating players, sponsors, associates and fans.

* * *

I declare under penalty of perjury of the laws that the foregoing is true and correct and that this declaration was executed this 7th day of August, 2022, at Ponte Vedra Beach, Florida.


*/s/ Andrew Levinson* _____

DECLARATION OF ANDREW LEVINSON
Case No. 3:22-cv-04486-BLF

1

## **LOCAL RULE 5-1 ATTESTATION**

2         I am the attorney whose ECF credentials are utilized in the electronic filing of this

3  document.  Pursuant to Civil L.R. 5-1(h)(3), I attest that the other signatories have concurred in

4  the filing of this document.

5  Dated:  August 8, 2022                                   */s/ Elliot R. Peters*_____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28