**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| Phil Mickelson, Taylor Gooch, Hudson Swafford, Matt Jones Bryson DeChambeau, Abraham Ancer, Carlos Ortiz, Ian Poulter, Pat Perez, Jason Kokrak and Peter Uihlein<br><br>v.<br><br>PGA TOUR, Inc. | **Civil Action No. 5:22-cv-04486-BLF** |

# Expert Declaration of Mark Israel

# August 7, 2022

I.     INTRODUCTION ........................................................................................ 1

       A.    QUALIFICATIONS .......................................................................... 1

       B.    ASSIGNMENT ................................................................................ 2

II.    SUMMARY OF CONCLUSIONS ........................................................... 3

III.   BACKGROUND ........................................................................................ 7

       A.    OVERVIEW OF THE PGA TOUR .................................................. 7

       B.    RULES AND REGULATIONS FOR PGA TOUR MEMBERS ........ 9

       C.    LIV GOLF ..................................................................................... 12

       D.    THE PGA TOUR'S DENIAL OF CONFLICTING EVENTS RELEASES FOR LIV
             GOLF EVENTS ............................................................................. 15

       E.    OTHER SIGNIFICANT PROFESSIONAL GOLF TOURS AND EVENTS ........................... 16

IV.    THE ELIGIBILITY RULES HAVE NOT PREVENTED COMPETITION
       FROM THRIVING ................................................................................. 17

       A.    COMPETITION FOR PROFESSIONAL GOLFERS AND FANS IS THRIVING .................... 17

       B.    RULES LIKE THE ELIGIBILITY RULES ARE COMMONPLACE AND GENERALLY
             RAISE NO COMPETITIVE CONCERNS .................................... 22

       C.    THE ELIGIBILITY RULES DO NOT STIFLE COMPETITION; THEY MERELY
             SHIFT THE FORM OF COMPETITION ..................................... 23

       D.    DR. LEITZINGER'S EXAMPLES OF HISTORICAL RESTRICTIONS ON PLAYERS'
             MOBILITY IN OTHER SPORTS ARE INAPT ............................. 28

V.     LIV GOLF'S SUCCESSFUL ENTRY DEMONSTRATES THAT THE PGA
       TOUR DOES NOT HAVE MONOPSONY POWER ............................. 32

VI.    THERE ARE STRONG PRO-COMPETITIVE RATIONALES FOR THE
       ELIGIBILITY RULES ............................................................................ 40

       A.    THE PGA TOUR'S INVESTMENTS  GREATLY BENEFIT ITS MEMBERS ................... 40

       B.    PRO-COMPETITIVE BENEFITS OF LIMITING FREE-RIDING ........................ 42

             1.    Limiting free-riding and thus preserving investment incentives is
                   an important benefit of the Eligibility Rules ............................. 42

             2.    Plaintiffs' arguments against the free-riding rationale for the
                   Eligibility Rules do not survive scrutiny ................................. 46

       C.    PRO-COMPETITIVE BENEFITS OF RETAINING CONTROL OVER REPUTATION .......... 49

       D.    PRO-COMPETITIVE BENEFITS OF ALLOWING THE PGA TOUR TO PROTECT
             THE COMPETITIVE INTEGRITY OF ITS TOURNAMENTS ............................. 51

i

**VII.    DR. LEITZINGER PRESENTS NO ECONOMIC ANALYSIS OF THE ALLEGED BOYCOTT** ...................................................................................................**52**

## I.  INTRODUCTION

### A.  QUALIFICATIONS

1.      I am a Senior Managing Director at Compass Lexecon, an economic consulting firm where I have worked since 2006.  I oversee Compass Lexecon's North American antitrust business.  From August 2000 to June 2006, I served as a full-time member of the faculty at Kellogg School of Management, Northwestern University.  I received my Ph.D. in economics in 2001 from Stanford University, where I also taught courses on economics and the application of mathematics to economics.

2.      I specialize in the economics of industrial organization—which is the study of competition in imperfectly competitive markets, including the study of antitrust and regulatory issues—as well as applied econometrics.  At Kellogg and Stanford, I taught graduate-level courses covering topics including business strategy, industrial organization economics, and econometrics.  My research on these topics has been published in leading economics journals including *American Economic Review*, *Rand Journal of Economics*, *Review of Industrial Organization*, *International Journal of Industrial Organization*, and *Journal of Competition Law and Economics*.

3.      My work at Compass Lexecon has focused on the application of economic theory and econometric methods to competitive analysis of the impact of mergers, antitrust issues including a wide variety of single-firm and multi-firm conduct, class certification, and damages estimation. My work has involved a range of industries including professional sports, various commodity products, food and beverage distribution, railroad shipping, airlines, automotive parts and transportation, wireless telecommunications, broadband Internet access, cable television, other high technology industries, retail, financial markets, pharmaceuticals, publishing, and many more.  Two of my colleagues and I authored the chapter on econometrics and regression analysis in the American Bar Association treatise, *Proving Antitrust Damages*.

4.      I have submitted expert reports in proceedings in U.S. federal courts, multiple state courts, Canadian courts, and in many regulatory and arbitration proceedings in the U.S. and around the world.  I have also submitted expert reports, declarations, and affidavits to government agencies on behalf of a wide range of clients.  My curriculum vitae, which details

my professional experience, including a list of all publications I authored within the last ten years and a list of matters in which I have given oral testimony at deposition or trial in the past four years, is attached as Exhibit A.

5.  In preparing this Declaration, I have relied on my training and experience in antitrust economics, described above, as well as my expertise as an industrial organization economist and applied econometrics more generally.  I, and my staff at my direction, have reviewed the legal filings in this matter, the PGA TOUR's rules and regulations, industry reports and other relevant materials.  A list of the materials on which I have relied in preparing this Report is attached as Exhibit B.  I continue to review evidence and reserve the right to supplement this declaration if new information becomes available that affects my opinion.

6.  Compass Lexecon currently bills my time on this matter at my standard rate of $1,600 per hour and neither Compass Lexecon's nor my compensation depend on the outcome of this case.

B.  **ASSIGNMENT**

7.  Plaintiffs are a group of eleven men's professional golfers who have been suspended by the Defendant, PGA TOUR, Inc. ("PGA TOUR") in response to their participation in LIV Golf, Inc. ("LIV Golf") events.[1]  Plaintiffs claim the PGA TOUR has maintained and abused its alleged monopsony power in the alleged relevant market for the services of professional golfers for elite golf events in the United States (or, alternatively, in the world) to prevent competition for such players' services and to prevent LIV Golf from launching a competitive elite professional golf tour.[2]  Plaintiffs also claim that the PGA TOUR and the DP World Tour (formerly called the European Tour), and "possibly others," have engaged in a group boycott of LIV Golf and players that agree to play for LIV Golf.[3]  Plaintiffs have proffered an expert declaration by Dr. Jeffrey Leitzinger in support of their claims.[4]

---

[1]    Complaint, Jury Trial Demanded ("Complaint"), *Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Abraham Ancer, Carlos Ortiz, Ian Poulter, Pat Perez, Jason Kokrak and Peter Uihlein v. PGA TOUR, Inc.*, Civil Action No. 3:22-cv-04486, August 3, 2022 ("Complaint"), ¶ 14.

[2]    Complaint, ¶¶ 299-300.

[3]    Complaint, ¶ 308.

[4]    Expert Declaration of Jeffrey Leitzinger, Ph.D., August 2, 2022 ("Leitzinger Declaration").

8.      I have been asked by counsel for the PGA TOUR to assess, from an economic standpoint, the Plaintiffs' claims and the opinions offered in Dr. Leitzinger's declaration.

## II.  SUMMARY OF CONCLUSIONS

9.      I reach the following main conclusions in this matter.

10.     First, what is currently playing out in men's professional golf is not a restraint on competition by the PGA TOUR, but instead intense competition in action.  (See Section IV.)

- LIV Golf has entered the marketplace; it is competing for players, viewers' attention, and fans, and it has achieved significant success in a short period of time, including signing many of the top players in the world.  In particular, it has already signed five of the top ten most popular players in the world in 2021 (according to the PGA TOUR's favored metric), and 31% of its roster is comprised of players that Dr. Leitzinger calls "elite," as compared to 16% of the field at an average PGA TOUR event.

- Plaintiffs and other professional golfers are already benefitting from that competition in the form of massive signing bonuses—with at least four players each reportedly receiving between $100 million and $200 million in signing bonuses for joining LIV Golf—and higher purse sizes at LIV Golf and PGA TOUR events than what was available before.  That is competition in action, and a direct demonstration that the PGA TOUR could not exclude that competition.

- Plaintiffs claim that the PGA TOUR's rules that prevent its members from joining LIV Golf while remaining in good standing with the PGA TOUR (the PGA TOUR's "Eligibility Rules") have prevented LIV Golf from being even more successful, but the need to compete to achieve success—and the potential limits on success that competition imposes—is an inherent part of the competitive process.  In this case, for example, the rules require players to choose between playing on the PGA TOUR and playing for LIV Golf (as does the way LIV Golf has chosen to structure itself, as explained below), which leads to competition between the leagues to attract players. New entrants in any business could always argue that if incumbents would simply share their assets (or raise their prices or generally compete less aggressively), the

3

entrant would be more successful, but that does not mean that enforcing rules and creating competition for assets is anti-competitive.  It is competition, not anti-competition.

11.     Second, the PGA TOUR's Eligibility Rules are not a prohibition or unreasonable restraint on competition.  These rules do not prevent PGA TOUR members from leaving the PGA TOUR, at any time, to play for competing tours—there is no ongoing guarantee of exclusivity for the PGA TOUR, as has been the case in other sports, as Dr. Leitzinger notes.  Nor do they prevent other men's professional golf leagues from structuring themselves in a compelling way, offering a compelling, differentiated product, and attracting players and fans.  The very fact that LIV Golf has been able to sign so many top players away from the PGA TOUR in such a short time period demonstrates that the PGA TOUR's eligibility rules do not prohibit or exclude competition.

- Rather than stifling competition, the PGA TOUR's Eligibility Rules merely shift the form of competition to a league vs. league level rather than an event vs. event level. That is, given the PGA TOUR's rules—and the way LIV Golf is structured—the PGA TOUR and LIV Golf must compete to attract players overall, rather than event by event.  But that simply changes the form of the competition, not the fact that there is competition.

- In this way, the PGA TOUR's Eligibility Rules are analogous to any setting in which firms choose to have exclusive contracts with particular suppliers or contractors for at least some period of time, and economics teaches that the competition to attract those exclusives can be particularly intense due to the all-or-nothing nature of competition. In the present context, competition at the league level between LIV Golf and the PGA TOUR is likely to be beneficial to players—including Plaintiffs—and fans.  With competition at the league level, each league has to offer something compelling such that it can survive and profit and attract players.  In essence, the leagues have to compete for players rather than share players, and this has led to fierce competition over those players, to their benefit in the form of the large signing bonuses they have received, for example.

- The examples Dr. Leitzinger presents of historical restrictions on player mobility in other sports are inapt comparisons for the Eligibility Rules because the Eligibility

Rules do not impose any of those restrictions.  In particular, none of the restrictions Dr. Leitzinger presents allowed a player to leave his team or league and join a competitor at will, as the Eligibility Rules allow.

12.    Third, LIV Golf's successful entry establishes that the PGA TOUR does not have the ability to exclude competition in the alleged relevant market, and thus it does not meet the economic standards for monopsony power.  (See Section V.)

- The fact that the PGA TOUR has recently increased its payments to its players—and is still losing many of its top players to LIV Golf—further underscores that the PGA TOUR is unable to exclude rivals and therefore does not have monopsony power.

- To the extent that, as Dr. Leitzinger claims, recent increases in purse sizes and other changes by the PGA TOUR are in part a response to LIV Golf—an open economic question that I do not analyze here—this certainly *does not* imply that the PGA TOUR has monopsony power now or had it previously.  The fact that entry by a new competitor leads to competitive reactions is fundamental to antitrust economics—including the standard conclusion in merger analysis that having more firms in a market leads to more competitive outcomes than having fewer—and does not require that a firm had monopoly or monopsony power pre-entry.  Instead, any reaction by the PGA TOUR to LIV Golf demonstrates that LIV Golf *is* able to compete effectively and induce a reaction by the PGA TOUR, despite Dr. Leitzinger's claims to the contrary.

13.    Fourth, the presence of what are de facto terminable exclusive arrangements with players by the PGA TOUR generates significant pro-competitive benefits, consistent with long-standing economic literature.  (See Section VI.)

- The PGA TOUR's Eligibility Rules reduce inefficiencies that would arise by limiting competitors' ability to free-ride on the PGA TOUR's investments.  As a result of the substantial investments made by the PGA TOUR in developing and promoting its players and tour, success on the PGA TOUR helps establish a player's reputation as a top-tier golfer and increases the player's visibility.  If an active PGA TOUR member were to play in a LIV Golf tournament, LIV Golf would capitalize on that player's reputation and would free-ride on ongoing investments made by the PGA TOUR to support its players and enhance their reputations.  This reduces the return on the PGA

5

TOUR's investment—and thereby reduces its incentives to invest—in two ways: by depriving the PGA TOUR of the full benefit of its investment and by enhancing the reputation of its competitor.[5]  In addition, by limiting the ability of LIV Golf to free-ride on PGA TOUR investments, the rules require LIV Golf to invest in its own independently attractive product, something that is good for competition (even if it would be easier for LIV if it did not have to compete) and for the players.

- Similarly, the Eligibility Rules also enhance the incentives for the PGA TOUR's media partners to invest in promoting the tour's events and players (thereby increasing the value of the PGA TOUR's media rights and thus the revenue it uses to compensate players).  They do so by limiting the free-riding that LIV Golf and *its media partners* could otherwise do.  In particular, if promotions of the PGA TOUR or its players would spill over and benefit those broadcasting or promoting LIV Golf— in the case where LIV Golf events would feature those same players—then there would be less incentive to promote the PGA TOUR and its players, as broadcasters could end up supporting their competition via their support for the PGA TOUR. Absent the Eligibility Rules, the PGA TOUR cannot assure its media partners that by promoting its players and events they are not also supporting their competitors that carry LIV Golf events.  This is similar to the benefits that a manufacturer gets in those cases when it chooses an exclusive retailer or distribution partner in a given region, as this assures that retailer or partner that—when promoting the manufacturer's products (similar to promoting particular players)—it is not also promoting competing retailers or distributors who also carry those products.  In both cases, the effect is to encourage *more* competition between retailers—or here between media partners—to promote the specific products or players with which they are affiliated.

---

[5]     To some extent, both of these forces are at work whenever a PGA TOUR member participates in a competing event.  However, the two forces are much stronger with LIV Golf than with other competitors because LIV Golf has opted to hold the majority of its events in North America and almost all at the same time as a PGA TOUR event.

- The Eligibility Rules also enhance the PGA TOUR's incentives to invest in—and preserve—its reputation.  Due to concerns about Saudi Arabia's human rights record, LIV Golf's majority ownership by that country's sovereign wealth fund has led to substantial negative press for players that have joined that league.  If those players were also allowed to play on the PGA TOUR, the negative repercussions of their association with Saudi Arabia could spill over and harm the PGA TOUR.  Additionally, LIV Golf's focus on competition at the team level—and its stated intention to give the principal player(s) on each team equity in that team—could create incentives (or the appearance of incentives) for members of the same LIV Golf team to help each other at PGA TOUR events, which could undermine the competitive integrity of those events.  The PGA TOUR takes the competitive integrity of its events seriously and has long had rules in place to preserve it.  By preventing LIV golfers from participating in PGA TOUR events, the Eligibility Rules help to preserve that competitive integrity.  It is not unusual for firms to invest in protecting and enhancing their reputation—as the PGA TOUR seeks to do here by limiting its association with Saudi Arabia and preserving the competitive integrity of its events— in order to compete more effectively, and thus doing so is a legitimate business decision.

14.    Finally, Dr. Leitzinger presents no economic analysis of the alleged group boycott of LIV Golf's players by the PGA TOUR and DP World Tour.  Notably, he claims that the DP World Tour does not compete with the PGA TOUR, and hence the alleged boycott—if it occurred— would not constitute a horizontal agreement among competitors to compete less aggressively with one another. (See Section VII.)

15.    The remainder of this declaration presents more background on the relevant competitors and rules in this case, and then develops the support for these conclusions in more detail.

## III. BACKGROUND

### A.    OVERVIEW OF THE PGA TOUR

16.    The PGA TOUR is a membership organization for touring professional golfers and is the organizer of the leading men's professional golf tour in North America.

17.     The PGA TOUR season starts each year in September and runs through the following August, consisting of approximately 45 events.[6]  Each season culminates in the FedEx Cup Playoffs, a series of three tournaments in the last three weeks of the season that determine the season's FedEx Cup Champion.[7]  The vast majority of PGA TOUR events are "co-sponsored," meaning that the PGA TOUR contracts with a co-sponsor to put on the tournament.  The PGA TOUR season also consists of a smaller number of "approved" events that are sanctioned by the PGA TOUR but for which the PGA TOUR has no contract with the tournament's organizer (i.e., The Masters, U.S. Open, The Open Championship, PGA Championship, and the biennial Ryder Cup).

18.     On-tour earnings are primarily based on a player's performance in specific events, with the overall pool of money awarded for a given PGA TOUR event during the 2021-2022 season generally ranging from $3.7 million to $20 million.[8]  There is one notable exception to this range:  The pool for the 2022 FedEx Cup will be $75 million, with the winner receiving $18 million (more than the amount awarded to all players combined for any other event except The Players Championship).[9]  The only on-tour earnings that are not performance-based come from the Player Impact Payment.  This payment, created in 2021, rewards the players who generated

---

[6]     This count excludes two unofficial events and the Ryder Cup. ("2021-2022 Tournament Schedule," *PGA TOUR*, available at https://www.pgatour.com/tournaments/schedule.html.)

[7]     "FedEx Cup – Overview," *PGA TOUR*, available at https://www.pgatour.com/fedexcup/fedexcup-overview.html.

[8]     "2021-2022 Tournament Schedule," *PGA TOUR*, available at https://www.pgatour.com/tournaments/schedule.html.

[9]     "FedEx Cup – Overview," *PGA TOUR*, available at https://www.pgatour.com/fedexcup/fedexcup-overview.html; "2021-2022 Tournament Schedule," *PGA TOUR*, available at https://www.pgatour.com/tournaments/schedule.html.

the most positive interest in the PGA TOUR during the previous year.[10]  The total pool for Player Impact Payments for 2022 is $50 million.[11]

19.     The PGA TOUR's conflicting events rules prohibit it from co-sponsoring or approving other golf tournaments on a date on which any golf tournament or event co-sponsored by the PGA TOUR is being played without the advance written consent of the first scheduled PGA TOUR tournament or event.[12]  In this way, the co-sponsor of the tournament gets the full benefit of sponsoring a PGA TOUR event on those particular dates, including an assurance that there is not another event occurring at the same time with a large number of PGA TOUR players, thus increasing its benefit from and incentive to invest the money required to sponsor PGA TOUR events.  Note that this assurance to co-sponsors would be substantially undermined or lost if a substantial number of PGA TOUR players could choose to play a non-PGA TOUR event on the same date (and potentially also in North America) as a PGA TOUR event, something that is prevented (or at least limited) by the rules on PGA TOUR members described next.

### B.    RULES AND REGULATIONS FOR PGA TOUR MEMBERS

20.    PGA TOUR members are required to follow certain regulations described in the player handbook.  For example, players are required to adhere to certain rules regarding their conduct during and outside of PGA TOUR events.[13]  Of particular relevance to the extant matter are the rules governing the media rights for events in which PGA TOUR members participate and those

---

[10]     The measure is a combination of the internet searches for the player's name, the number of unique news articles that include the player's name, a social media score that considers the players, reach, conversation, and engagement metrics, the duration that the player's sponsor logos appear on screen during weekend PGA TOUR telecasts, and the player's general awareness among the U.S. population. (Morfit, Cameron, "Tiger Woods finishes atop inaugural Player Impact Program," *PGA TOUR*, March 2, 2022, available at https://www.pgatour.com/news/2022/03/02/tiger-woods-tops-player-impact-program-pip-phil-mickelson-finsihes-second.html.)

[11]     Morfit, Cameron, "Tiger Woods finishes atop inaugural Player Impact Program," *PGA TOUR*, March 2, 2022, available at https://www.pgatour.com/news/2022/03/02/tiger-woods-tops-player-impact-program-pip-phil-mickelson-finsihes-second.html.

[12]     PGA TOUR Handbook, § V.A.

[13]     PGA TOUR Handbook, § VI.

governing members' ability to participate in non-PGA TOUR golf-related events held on the same day as a PGA TOUR event.

21.   <u>Media Rights</u>:  Under the PGA TOUR rules, all media rights for all participants in PGA TOUR tournaments and related events are assigned to the PGA TOUR.[14]  Additionally, PGA TOUR members are prohibited from participating in a live or recorded golf event anywhere in the world without the prior written approval of the PGA TOUR Commissioner.  Such approval may depend on the PGA TOUR entering into an agreement with the sponsor, promoter, television producer and/or other parties involved in the golf event whereby they acknowledge the PGA TOUR's media rights and pay rights fees to the PGA TOUR.[15]  Each year, when a golfer enters into a membership agreement with the PGA TOUR, he assigns these media rights to the PGA TOUR and agrees to abide by these media rules.[16]  The acquisition of these exclusive rights and the licensing of these rights to media entities and others are the fundamental way in which the PGA TOUR earns revenue—including the assurances it can offer its sponsors, as described above—which in turn enables it to pay its players and fund its other missions, such as efforts to grow the overall participation and popularity of golf.

22.   <u>Conflicting Events Rules</u>:  Except in a limited set of circumstances, the PGA TOUR prohibits its members from playing in "conflicting events," which it defines as golf tournaments or events held on the same date as a PGA TOUR co-sponsored tournament or other event.[17]  Specifically:

- PGA TOUR members are eligible to apply for up to three advance written releases per season to participate in conflicting, non-North American tournaments, provided they participate in at least fifteen co-sponsored or approved PGA TOUR events, and one additional release for every five additional co-sponsored or approved PGA

---

[14]       PGA TOUR Handbook, § V.B.1.a.

[15]       PGA TOUR Handbook, § V.B.1.b.

[16]       See, e.g., "2021-2022, PGA TOUR – Application for Membership."

[17]       PGA TOUR Handbook, § V.A.

TOUR events in which they participate, subject to approval by the PGA TOUR Commissioner.[18]

- A player can play in a conflicting event in his "home circuit" without needing a release as long as he plays at least fifteen PGA TOUR co-sponsored or approved events in that season.  The home-circuit exemption currently applies to five non-North American leagues (PGA European Tour (now called the DP World Tour), PGA Tour of Southern Africa, Japan Golf Tour, PGA Tour of Australasia, and Asian Tour).[19]

- The PGA TOUR will not grant releases for conflicting events held in North America, in part due to the harm this would impose on those sponsoring PGA TOUR events at the same time, as described above.[20]

23.    Per the media rights rules described above, even when the PGA TOUR grants a member a release to participate in a conflicting event, it reserves the right not to release the media rights associated with the member's participation in that event.[21]  However, it is my understanding that the conflicting events releases and media right releases have generally gone together, in the sense that the PGA TOUR has typically granted a media rights release when it has granted a conflicting event release.

24.    For convenience sake, I will refer to the PGA TOUR's membership-eligibility rules that pertain to players who join LIV Golf, and the PGA TOUR's enforcement of those rules, as the PGA TOUR's "Eligibility Rules."

25.    <u>Financial Interest Rule</u>:  The PGA TOUR expressly prohibits members from having "any financial interest, either direct or indirect, in the performance or the winnings of another player

---

[18]    PGA TOUR Handbook, § V.A.3.

[19]    PGA TOUR Handbook, § V.A.2.d.

[20]    PGA TOUR Handbook, § V.A.2.a.

[21]    I understand that, if a PGA TOUR member participated in a conflicting event, but the PGA TOUR did not grant a corresponding media rights release, this would, e.g., prevent broadcasters from showing the player's performance in that event in a live or recorded broadcast.

in any event co-sponsored, coordinated, approved or otherwise sanctioned by the PGA TOUR."[22]
A player who violates this rule is subject to a suspension from tournament play for a minimum of
two seasons.[23]  As discussed below, LIV Golf has indicated that it plans to give the principal
player(s) on each of its teams equity in that team.  If such a player participated in a PGA TOUR
event along with a teammate from LIV Golf, I understand that it would potentially violate the
PGA TOUR's Financial Interest Rule.

C.    **LIV GOLF**

26.    The LIV Golf Invitational Series ("LIV Golf") is a new men's professional golf league
that launched in June 2022.[24]

27.    The 2022 LIV Golf season will consist of a series of eight tournaments held from June to
October, with five of the events held in the United States, one held in Europe, and two held in
Asia.[25]  Each of the first seven tournaments will consist of three rounds of eighteen holes (54
holes total), no cuts, and "shotgun starts."[26] These seven tournaments will feature twelve teams
of four players (48 players total) competing as part of a team and as individuals.  The purses for
each tournament will consist of $20 million for individuals and $5 million for teams.[27]

28.    Individual winners will be determined for each tournament, and a season-long individual
champion will be awarded based on the players' performance in the first seven tournaments.  The

---

[22]    PGA TOUR Handbook, § VI.D.

[23]    PGA TOUR Handbook, § VI.D.

[24]    "LIV Golf Unveils Iconic Team Brands, London Team Captains and Draft Results for Inaugural
London Invitational," *LIV Golf Press Release*, June 7, 2022, available at
https://www.livgolf.com/news/liv-golf-unveils-iconic-team-brands-london-team-captains-and-
draft-results.

[25]    "Events," *LIV Golf*, available at https://www.livgolf.com/events.

[26]    "How It Works," *LIV Golf*, available at https://www.livgolf.com/format.  A shotgun start is a
format whereby each grouping of golfers starts on a different hole at the same time, so that all
golfers start and complete a round at roughly the same time.  LIV Golf expects this format to
enable it to complete a round of golf for the entire field in 4 to 4.5 hours.  ("Sean Bratches on the
Golf Super League," *Unofficial Partner Podcast*, Episode 243, May 2, 2022, 9:57 – 10:22.)

[27]    "How It Works," *LIV Golf*, available at https://www.livgolf.com/format.

top three individuals at the end of the season will split a $30 million purse.  These awards will only be available to players who compete in at least four of the seven tournaments.[28]

29.     Teams "will follow a franchise model akin to other sports" with logos, colors, and names, and will each have an appointed team captain.[29]  During the 2022 season, since the fields could differ across tournaments, each captain will draft the three other players for his team from the field for each tournament.[30]  The eighth tournament will consist of four rounds of seeded match play to determine the season-long team champion.  The twelve teams will split a $50 million purse.[31]  Thus, the combined individual and team purse for the 2022 LIV Golf season is $255 million.[32]

30.     Following a $2 billion dollar investment by LIV Golf's majority owner, the Public Investment Fund ("PIF")—the sovereign wealth fund of Saudi Arabia—LIV Golf announced that it would expand its schedule starting in 2023.[33]  Specifically, LIV Golf recently announced that it will expand to fourteen events starting in 2023, with the total purse increasing to $405 million.[34]  This increase will benefit players to an even greater extent than LIV Golf's entry already has.

---

[28]     "How It Works," *LIV Golf*, available at https://www.livgolf.com/format.

[29]     "LIV Golf Announces 2023 League Launch with 48 Players, 12 Established Team Franchises, 14-Event Schedule," *LIV Golf Press Release*, July 27, 2022, available at https://www.livgolf.com/news/liv-golf-announces-2023-league-launch-48-players-12-established-teams-14-events; "Teams and Players," *LIV Golf*, available at https://www.livgolf.com/teams-players; "How It Works," *LIV Golf*, available at https://www.livgolf.com/format.

[30]     "How It Works," *LIV Golf*, available at https://www.livgolf.com/format.

[31]     "How It Works," *LIV Golf*, available at https://www.livgolf.com/format.

[32]     7 regular season events ($25 million each) + top 3 individuals ($30 million combined) + 1 team championship ($50 million) = $255 million.

[33]     Poindexter, Owen, "LIV Golf Announces $2B Investment, Expanded Schedule for 2023-2025," *Front Office Sports*, May 10, 2022, available at https://frontofficesports.com/liv-golf-announces-2b-investment-expanded-schedule-for-2023-2025/.

[34]     "LIV Golf Announces 2023 League Launch with 48 Players, 12 Established Team Franchises, 14-Event Schedule," *LIV Golf Press Release*, July 27, 2022 available at https://www.livgolf.com/news/liv-golf-announces-2023-league-launch-48-players-12-established-teams-14-events.

31.     LIV Golf has also given players large signing bonuses to entice them to join.[35]  For example, Forbes estimated that the signing bonuses given to Phil Mickelson, Bryson DeChambeau, Dustin Johnson, and Brooks Koepka are worth $200 million, more than $125 million, $125 million, and $100 million, respectively, with likely half of those sums being paid upfront.[36]  LIV golfers subsequently clarified that prize money earned in LIV Golf events would *not* be drawn against the players' signing bonuses.[37]  These bonuses are a benefit to the players, and, as Plaintiffs acknowledge, LIV Golf would not have offered such large bonuses to its players if it did not need to compete for (rather than share) players with the PGA TOUR.[38]

32.     In addition to the signing bonuses, LIV Golf also plans to give the "principal" player(s) on each of its teams equity in that team.[39]  As noted above, this could result in a violation of the PGA TOUR's Financial Interest Rule if LIV Golf teammates participated in the same PGA TOUR event.

33.     LIV Golf's contracts reportedly require players to compete in every event,[40] and it has publicly indicated that, starting in 2024 (if not by 2023), it intends to have the same 48 players

---

[35]     Complaint, ¶ 276; Cradock, Matt, "How Much Are LIV Players Being Paid?," *Golf Monthly*, June 10, 2022, available at https://www.golfmonthly.com/news/how-much-are-liv-players-being-paid.

[36]     Birnbaum, Justin, "The World's Highest-Paid Golfers 2022: LIV Golf Reshuffles Top Earners and Sends Pay Soaring," *Forbes*, July 29, 2022, available at https://www.forbes.com/sites/justinbirnbaum/2022/07/28/the-worlds-highest-paid-golfers-2022-liv-golf-reshuffles-top-earners-and-sends-pay-soaring/?sh=6d162475724a.

[37]     Porter, Kyle, "LIV Golf prize money will not be drawn against player contracts, to be paid in addition to signing bonuses," *CBS Sports*, June 29, 2022, available at https://www.cbssports.com/golf/news/liv-golf-prize-money-will-not-be-drawn-against-player-contracts-to-be-paid-in-addition-to-signing-bonuses/.

[38]     Complaint, ¶ 276 ("LIV Golf … had to pay excessively higher guaranteed payments to recruit a number of marquee players than would be required in a competitive market.").

[39]     Declaration of Atul Khosla, August 3, 2022 (Khosla Declaration"), ¶ 8.

[40]     Colgan, James, "Phil Mickelson has 2 reasons why LIV Golf works. Neither is about money," *Golf*, July 31, 2022, available at https://golf.com/news/2-reasons-why-phil-mickelson-loves-liv/#:~:text=Unlike%20the%20PGA%20Tour%20%E2%80%94%20in,of%20field%20strength%20each%20week.

14

participating in each of its events, and that it will be a requirement for those players to do so.[41]
Such requirements—especially when coupled with the announced increase of the LIV Golf
season to fourteen events in 2023—would make it extremely unlikely that LIV Golf's players
could participate in a committed or substantial way on the PGA TOUR.  LIV Golf did not need
to impose such a restriction if its goal were to share players with the PGA TOUR.

34.     LIV Golf's approaches to structuring player compensation—large signing bonuses, team
equity, and required participation—and its differentiation from the PGA TOUR's approach—is
an example of a method open to LIV Golf or other leagues to compete with the PGA TOUR.

      D.     **THE PGA TOUR'S DENIAL OF CONFLICTING EVENTS RELEASES FOR LIV
          GOLF EVENTS**

35.     The PGA TOUR has to date denied all member requests for conflicting event releases to
play in LIV Golf tournaments.[42]  Some PGA TOUR members resigned from the TOUR in order
to compete in LIV Golf events.[43]  As to those PGA TOUR members who did not resign but
played in LIV Golf events, the PGA TOUR suspended them for violating the conflicting events
and media rights provisions in their agreements with the PGA TOUR.[44]  I understand that, in the
event that a player that resigned from or was suspended by the PGA TOUR subsequently leaves
LIV Golf and seeks to rejoin the PGA TOUR, the player would need to apply for reinstatement,

---

[41]     "Sean Bratches on the Golf Super League," *Unofficial Partner Podcast*, Episode 243, May 2,
2022, 11:36 – 11:48, 22:37 – 22:44 ("The second difference is that our players are going to *have*
to play in all 14 events, ultimately, in 2024." [Emphasis added]).  Sean Bratches is a member of
LIV Golf's leadership team. ("LIV Leadership," *LIV Golf*, available at
https://www.livgolf.com/leadership.)

[42]     See, e.g., Rapaport, Dan, "PGA Tour draws hard line with rival tour, won't grant players releases
to compete elsewhere," *Golf Digest*, May 10, 2022, available at
https://www.golfdigest.com/story/pga-tour-releases-first-liv-golf-invitational-event.

[43]     Schwarb, John "PGA Tour Suspends Current and Former Players Now Competing in LIV Golf,"
*Sports Illustrated*, June 9, 2022, available at https://www.si.com/golf/news/pga-tour-suspends-
current-and-former-players-now-competing-in-liv-golf.

[44]     Lavner, Ryan, "PGA Tour suspends players competing in LIV Golf Invitational Series," *Golf
Channel*, June 9, 2022, available at https://www.golfchannel.com/news/pga-tour-suspends-
players-competing-liv-golf-invitational-series; Hoggard, Rex, "Seven more players suspended by
PGA Tour; Patrick Reed resigns card," *Golf Channel*, July 1, 2022, available at
https://www.golfchannel.com/news/seven-more-players-suspended-pga-tour-patrick-reed-resigns-
card#:~:text=This%20wave%20of%20suspended%20players,has%20resigned%20his%20Tour%
20membership.

and that the player might be required to wait a certain amount of time before being eligible to do so.  It is my understanding that the PGA TOUR's actions simply amount to its enforcement of its conflicting event rules, consistent with the enforcements set out in those rules.

### E.   OTHER SIGNIFICANT PROFESSIONAL GOLF TOURS AND EVENTS

36.    There are numerous other significant men's professional golf events and tours that compete to attract players and fans. Three that are particular noteworthy are the four "Majors," the DP World Tour, and the Asian Tour.

37.    The four Majors (The Masters, U.S. Open, The Open Championship, and PGA Championship) are generally considered to be the most prestigious events in men's professional golf.  Each of these events is run by a different organization that determines the eligibility for that event, none of which is the PGA TOUR.  To date, players that joined LIV Golf have been allowed to participate in the Majors, and none of the Majors has indicated that it will prohibit LIV Golf's players from participating in the future.

38.    The DP World Tour (formerly called the "European Tour") is the premier men's professional golf tour in Europe, although the tour consists of tournaments throughout the world (some of which are co-sanctioned with another tour).[45]

39.    The Asian Tour is the premier men's professional golf tour in Asia.  Earlier this year, following a $300 million investment by LIV Golf in the Asian Tour, the two leagues introduced the co-sanctioned International Series, which in 2022 will consist of ten events.[46]  LIV Golf has announced that the number of International Series events will increase to eleven in 2023, and that

---

[45]    "DP World Tour Schedule – 2022," *European Tour*, available at https://www.europeantour.com/dpworld-tour/schedule/2022/; "PGA Tour and European Tour to co-sanction three tournaments in 2022," *SportsPro Media*, August 3, 2021, available at https://www.sportspromedia.com/news/european-tour-pga-co-sanctioned-tournaments-2022-scottish-open-genesis/.

[46]    Byers, Justin, "Asian Tour Gets $300M Investment from LIV Golf," *Front Office Sports*, February 1, 2022, available at https://frontofficesports.com/asian-tour-gets-300m-investment-from-liv-golf/.  This demonstrates another way in which a new league can compete, via investments in or partnerships with existing leagues if that is mutually beneficial.

its players "are expected to compete in numerous International Series tournaments."[47]  As a result, LIV Golf's players have an outlet in which to play in many more tournaments outside of the LIV Golf season.  Thus, although LIV Golf is a new entrant, it has partnered with an incumbent to assist with its entry.

## IV. THE ELIGIBILITY RULES HAVE NOT PREVENTED COMPETITION FROM THRIVING

### A.    COMPETITION FOR PROFESSIONAL GOLFERS AND FANS IS THRIVING

40.    The current situation in men's professional golf could only be described as one of intense competition for players, attention, and fans.  LIV Golf launched only five months ago and held its first tournament only two months ago, but already it has experienced a tremendous amount of success, and it is already competing with the PGA TOUR.  This is not a case of exclusion of competition by the PGA TOUR or the erection of effective barriers to entry; to the contrary, it is a case of rapid entry and head-to-head competition.

41.    In particular, LIV Golf has demonstrated the ability to recruit top players—often at the PGA TOUR's expense.  Already, LIV Golf has signed nine of the top 45-ranked golfers in the world, all of whom were PGA TOUR members at the time.[48]  It has also signed an additional fourteen players ranked among the top 100 players in the world, five of whom were PGA TOUR

---

[47]    "LIV Golf Announces 2023 League Launch with 48 Players, 12 Established Team Franchises, 14-Event Schedule," *LIV Golf Press Release*, July 27, 2022, available at https://www.livgolf.com/news/liv-golf-announces-2023-league-launch-48-players-12-established-teams-14-events.

[48]    The nine players are: Dustin Johnson, Abraham Ancer, Brooks Koepka, Louis Oosthuizen, Bryson DeChambeau, Kevin Na, Jason Kokrak, Talor Gooch, and Patrick Reed. (Rivera, Joe, "Who is playing LIV Golf? Updated list of PGA Tour defectors includes Phil Mickelson, Dustin Johnson, Bryson DeChambeau, others," *The Sporting News*, July 29, 2022, available at https://www.sportingnews.com/us/golf/news/liv-golf-tour-list-mickelson-johnson-dechambeau-pga/rlwprhtsx6uwgq73zq0e7ryc.)

members at the time.[49]  Alternatively, by Dr. Leitzinger's definition of an "elite" golfer,[50] which is based on a combination of recent golf rankings and wins at Majors, 15 of the 59 such golfers in the world (i.e., roughly 25%) have signed with LIV Golf.[51]  As a consequence, 31% of its roster is comprised of players he considers to be "elite,"[52] as compared to just 16% of the field at an average PGA TOUR event.[53]

42.     In addition to signing many of the top-performing golfers, LIV Golf has had even more success at signing the most popular golfers.  In particular, LIV Golf has signed five of the ten players who generated the most positive interest in the PGA TOUR in 2021, as measured by the PGA TOUR Player Impact Program.[54]  Such popular players can have an outsized effect on the audience size for an event.[55]  Thus, by any measure, LIV Golf's signings to date represent a

---

[49]     The five players are: Sergio Garcia, Matthew Wolff, Matt Jones, Bubba Watson, and Phil Mickelson. (Rivera, Joe, "Who is playing LIV Golf? Updated list of PGA Tour defectors includes Phil Mickelson, Dustin Johnson, Bryson DeChambeau, others," *The Sporting News*, July 29, 2022, available at https://www.sportingnews.com/us/golf/news/liv-golf-tour-list-mickelson-johnson-dechambeau-pga/rlwprhtsx6uwgq73zq0e7ryc.)

[50]     Leitzinger Declaration, ¶ 30.

[51]     Leitzinger Declaration, ¶ 62.

[52]     Leitzinger Declaration, ¶ 62.

[53]     Leitzinger Declaration, Table 4.

[54]     The five players are: Phil Mickelson, Dustin Johnson, Brooks Koepka, Bryson DeChambeau, and Bubba Watson.  (Morfit, Cameron, "Tiger Woods finishes atop inaugural Player Impact Program," *PGA TOUR*, March 2, 2022, available at https://www.pgatour.com/news/2022/03/02/tiger-woods-tops-player-impact-program-pip-phil-mickelson-finsihes-second.html.)

[55]     See, e.g., Silverman, Alex, "Which Golfers Are In Line for Huge Pay Days Under the PGA Tour's New Popularity Program?," *Morning Consult*, September 23, 2021, available at https://morningconsult.com/2021/09/23/pga-tour-golfers-popularity-poll/ ("The survey also found that the most popular players among golf fans are also the ones most likely to attract the interest of the broader population of sports fans."); and Fitzpatrick, Michael, "Tiger Woods' Masters Absence Sends Television Ratings and Ticket Prices Plunging," *Bleacher Report*, April 15, 2014, available at https://bleacherreport.com/articles/2030309-tiger-woods-masters-absence-sends-television-ratings-and-ticket-prices-plunging ("It is no secret that Tiger Woods has been the main driver in the PGA Tour's transformation from a low-budget traveling circus into a billion-dollar organization.")  Dr. Leitzinger apparently agrees, stating that "'star-value' is recognized in the economic literature as a source of significant benefits to a professional sports team or league in the form of higher attendance rates, increased television viewership, and sponsorship revenue." (Leitzinger Declaration, ¶ 25.)

18

substantial scale of entry for a league that, as of today, has held only three events in its inaugural season.

43.     Moreover, there is no indication that LIV Golf is done signing top players, having signed two world top-100 players (Jason Kokrak and Bubba Watson) just in the past few weeks; both of these players were PGA TOUR members at the time.[56]  LIV Golf apparently has substantial financial resources to spend on players, as evidenced by its recent acknowledgement that it offered Tiger Woods $700 - $800 million to join (which he declined).[57]

44.     As noted above, LIV Golf has also announced that it will be expanding the number of events its hosts, from eight this year to fourteen next year, with the number of U.S. events rising from five to ten.[58]  According to Dr. Leitzinger, by next year, LIV Golf will account for 20% of the "elite event offerings" in the U.S.[59]

45.     LIV Golf's success, by itself, shows that the PGA TOUR's Eligibility Rules have not prevented entry by competitors at scale.[60]

46.     LIV Golf's entry and the ensuing competition has been a boon to the players.  In order to compete for players, LIV Golf has reportedly given out massive signing bonuses that at least in some cases have greatly exceeded established players' *career* earnings from prize money on the PGA TOUR.  For example, the combined signing bonuses LIV Golf gave Phil Mickelson, Dustin Johnson, Bryson DeChambeau, and Brooks Koepka reportedly exceeded $550 million; in comparison, these players have collectively earned less than $235 million in prize money on the

---

[56]     Schlabach, Mark, "Jason Kokrak, Charles Howell III join LIV Golf Invitational Series," *ESPN*, July 20, 2022, available at https://www.espn.com/golf/story/_/id/34272706/jason-kokrak-charles-howell-iii-join-liv-golf-invitational-series; Saul, Derek, "LIV Golf Signs Yet Another Masters Champ in Bubba Watson," *Forbes*, July 29, 2022, available at https://www.forbes.com/sites/dereksaul/2022/07/29/liv-golf-signs-yet-another-masters-champ-in-bubba-watson/?sh=20f49d8678cb.

[57]     Heath, Elliott, "Tiger Woods Turned Down $700m-$800m To Join LIV - Greg Norman," *Golf Monthly*, August 2, 2022, available at https://www.golfmonthly.com/news/tiger-woods-turned-down-dollar700m-dollar800m-to-join-liv-greg-norman.

[58]     Leitzinger Declaration, ¶ 83.

[59]     Leitzinger Declaration, ¶ 64.

[60]     The PGA TOUR also competes for players with other professional tours, in particular the DP World Tour (formerly the European Tour), in which many of the world's top golfers play.

PGA TOUR over the course of their entire careers.[61]  In addition to handing out large signing bonuses, the purses for LIV Golf's tournaments are substantially larger on average than for the PGA TOUR's tournaments despite having smaller fields.  These large payouts to players provide direct evidence of competition for players in action.

47.     If, as Dr. Leitzinger claims, the recent increases in the PGA TOUR's purse sizes and other changes by the PGA TOUR[62] are in part a response to LIV Golf, then PGA TOUR members have benefited from this competition as well.  Collectively, the total value of performance-based pay and signing bonuses going to men's professional golfers has increased dramatically since just last year.  Again, while the PGA TOUR and LIV Golf would keep more money if the payouts to players did not rise in this way, this is competition in action.  And to the extent the PGA TOUR has responded competitively to LIV Golf, this provides a clear economic demonstration that LIV Golf *is* competing effectively, despite Dr. Leitzinger's claims that the PGA TOUR is hindering its ability to do so.[63]   It also *does not* imply that the PGA TOUR had monopoly or monopsony power before LIV Golf entered, as antitrust economics teaches that adding a competitor increases competitive pressure even in cases where firms did not have monopoly power pre-entry; such a conclusion is the basis for investigating and challenging mergers even if they are not mergers to monopoly.

---

[61]     Specifically, Forbes estimated that LIV Golf guaranteed $200 million to Phil Mickelson, $125 million to Dustin Johnson, more than $125 million to Bryson DeChambeau, and $100 million to Brooks Koepka. (Birnbaum, Justin, "The World's Highest-Paid Golfers 2022: LIV Golf Reshuffles Top Earners and Sends Pay Soaring," *Forbes*, July 29, 2022, available at https://www.forbes.com/sites/justinbirnbaum/2022/07/28/the-worlds-highest-paid-golfers-2022-liv-golf-reshuffles-top-earners-and-sends-pay-soaring/?sh=6d162475724a.) The career prize money winnings on the PGA TOUR for those for players is roughly $95 million, $75 million, $27 million, and $38 million, respectively.  ("Statistics – Career Money Leaders," *PGA TOUR*, available at https://www.pgatour.com/stats/stat.110.html; and "Spotrac – PGA Career Earnings," *Spotrac*, available at https://www.spotrac.com/pga/earnings/.)

[62]     See, e.g., "PGA TOUR announces 'significant changes,'" *PGA TOUR*, June 22, 2022, available at https://www.pgatour.com/news/2022/06/22/pga-tour-commissioner-jay-monahan-returns-to-calendar-year-schedule-sizable-purse-increases-reimagines-fall-revises-field-fedexcup-playoffs.html.

[63]     Leitzinger Declaration, ¶ 76 ("the Challenged Conduct greatly stacks the competitive deck against LIV Golf.").

48.     LIV Golf's format (team-based competition, only 54-holes, no cuts, and shotgun starts) also offers fans an alternative to the PGA TOUR's more traditional format.  Economists typically view such innovation and differentiation to be beneficial to consumers.[64]  Indeed, the need for competitors to invest in new, differentiated offerings—thus expanding the options available to consumers—is cited by economists as a benefit to preventing competitors from free-riding on one another's investments.[65]

49.     Currently, LIV Golf events can only be watched via streaming, but it has attracted top media personalities (e.g., David Feherty, a very well-known golf commentator[66]), and it will be able to compete for the media coverage that best fits its strategy using the "elite" roster of players it has attracted and its self-proclaimed innovative competition formats to do so.

---

[64]     See, e.g., Ekelund, Jr., Robert B. and Robert D. Tollison, *Economics – Private Markets and Public Choice (6th ed.)*, Addison-Wesley, 2000, p. 267 ("Does such differentiation increase consumer welfare? The answer is (in the vast majority of cases) a resounding yes! … What critics of innovation and differentiation seem to misunderstand is that the market system, in responding to the particular demands of consumers and groups of consumers, is creating greater welfare for consumers"; see, also, Gilbert, Richard J., and Hillary Greene, "Merging Innovation into Antitrust Agency Enforcement of the Clayton Act," *George Washington Law Review*, vol. 83, no. 6 (November 2015), pp. 1919-1947 at 1929. ("[The U.S. Department of Justice and Federal Trade Commission's 1997 Horizontal Merger Guidelines] explicitly acknowledged that a merger could benefit consumers by enhancing the merged firm's incentive to develop new or improved products, i.e., to be a better innovator.")

[65]     See, e.g., Carlton, Dennis W. and Jeffrey M. Perloff, *Industrial Organization (2nd ed.)*, HarperCollins, 1994, pp. 531, 534; Klein, Benjamin and Andres V. Lerner, "The Expanded Economics of Free-Riding: How Exclusive Dealing Prevents Free-Riding and Creates Undivided Loyalty," *Antitrust Law Journal*, vol. 74, no. 2 (2007), pp. 473-520 at 477-499; DeGraba, Patrick, Patrick Greenlee, and Daniel P. O'Brien, "Conditional Pricing Practices – A Short Primer," *Bureau of Economics – Federal Trade Commission*, September 2017, p. 5 ("Exclusive contracts, for example, can promote efficiency by improving incentives for parties to make beneficial investments when holdup or free-riding might otherwise occur).

[66]     Hall, Mike, "David Feherty Joins LIV Golf Broadcast Team," *Golf Monthly*, July 22, 2022, available at https://www.golfmonthly.com/news/david-feherty-joins-liv-golf-broadcasting-team-as-lead-analyst ("However, one of the biggest names captured by the Greg Norman-fronted Series is in the broadcasting team, with former Golf Channel and NBC Sports pundit David Feherty joining as on-air commentator and co-executive producer of LIV Golf live event coverage. The Northern Irishman won five European Tour events as a player, but it's behind the microphone where he's become established as one of the game's most beloved personalities, and is known for his wit and irreverence.").

B.     **RULES LIKE THE ELIGIBILITY RULES ARE COMMONPLACE AND GENERALLY RAISE NO COMPETITIVE CONCERNS**

50.     The Eligibility Rules are analogous to an exclusive employment contract.  It is common for employment contracts to prohibit employees from working for competing companies during the term of their employment.  Although PGA TOUR members are independent contractors rather than employees, such provisions are common for independent contractors as well, and the underlying economic incentives are the same.  For example, in my own company, Compass Lexecon, we have exclusive relationships with certain academics (who are not employees of Compass Lexecon) that greatly restrict their ability to work with competing economic consulting firms, even though these academics are independent contractors.  We do so in order to enable us to compete more effectively with our rival economic consulting firms—which also compete for exclusives with the academics—and to align incentives between us and the academics:  We promote the academics, and they promote Compass Lexecon, with neither side worrying that too many of those benefits will spill over to the competition.  These pro-competitive rationales for such rules also apply in the case of the Eligibility Rules, as described in more detail below.  And while our competitors might find it easier to compete with us if we would share our best academics, the need to compete for the services of those academics is an example of competition in action.

51.     Importantly, the Eligibility Rules are not akin to a "non-compete" clause.  Such clauses prohibit employees from working for a competitor *even after ceasing to work for their current employer*.  In contrast, under the Eligibility Rules, PGA TOUR members are free to join LIV Golf for any reason at any time, as many players have already done.[67]  They may choose to do so if LIV Golf offers them a more attractive combination of format, schedule, compensation, and other features and terms, i.e., if LIV Golf competes effectively for their services.  Hence, as described more fully below, the Eligibility Rules together with LIV Golf's chosen rules for its league affect the form of competition—the leagues compete for ongoing player involvement

---

[67]     Rivera, Joe, "Who is playing LIV Golf? Updated list of PGA Tour defectors includes Phil Mickelson, Dustin Johnson, Bryson DeChambeau, others," *The Sporting News*, July 29, 2022, available at https://www.sportingnews.com/us/golf/news/liv-golf-tour-list-mickelson-johnson-dechambeau-pga/rlwprhtsx6uwgq73zq0e7ryc.

rather than specific players week to week—but they do not mean that there is not competition for players.  Instead, the competition to keep a player in one league or the other may be intense.

52.     Similarly, the requirement that members who resign from the PGA TOUR to join LIV Golf will have to apply to rejoin the PGA TOUR if in the future they decide to leave LIV Golf is analogous to a company telling a contractor who stops working on a project to work on a project for a competitor that the contractor is not guaranteed to be retained for future projects even if she is available.  Rather, it would be only natural for the company to consider factors such as the contractor's past performance, the length of their previous relationship, and their past commitment to the company's projects when deciding whether to use the contractor again.

### C.     THE ELIGIBILITY RULES DO NOT STIFLE COMPETITION; THEY MERELY SHIFT THE FORM OF COMPETITION

53.     There are two ways that competition for men professional golfers could take place—on an event-by-event basis or on a league-versus-league basis.  Either of these is a valid form of competition.  In the following paragraphs, I comment on the form of competition that occurs between golf leagues, and explain why the competition playing out between LIV Golf and the PGA TOUR is particularly intense.

54.     First, I stress that the Eligibility Rules do not entirely prevent new entrants from choosing a different model from the one LIV Golf has now chosen and competing with the PGA TOUR on an event-by-event basis.  For example, an entrant could organize a new tournament and attract PGA TOUR members by: (i) scheduling events on days that do not conflict with PGA TOUR events; or (ii) convincing PGA TOUR members to request a conflicting event release to participate in their event, as more than two dozen PGA TOUR members did for the 2022 PIF Saudi International tournament.

55.     However, even for entrants like LIV Golf that are trying to create a new league in a way that requires its players to violate the Eligibility Rules, those rules do not stifle competition with the PGA TOUR; they merely shift the competitive emphasis to the league level.  The leagues compete with one another for overall player affiliation, not event-by-event player choices.  Such an emphasis can enhance competition in the same way that exclusive contracts can lead to more

intense competition by making the competition for each customer (in the present context, each golfer) an all-or-nothing proposition.[68]

56.     In the present context, it is likely that competition at the league level will lead to better outcomes for players and fans than competition at the event level.  First, for players, the competition to attract players to a league is likely to be quite intense, as we have already seen.  Plaintiffs acknowledge that LIV Golf would not have offered such large signing bonuses to its players if it did not need to compete for (rather than share) players with the PGA TOUR.[69]

57.     Second, in terms of the products produced and offered to fans, if competition between the PGA TOUR and LIV Golf were to occur on an event-by-event basis, with players free to move back-and-forth between leagues, the overall quality of a league and its season would matter relatively less than the attractiveness of a particular tournament (except insofar as the two are related).  In contrast, in a situation where players have to choose between the PGA TOUR and LIV Golf (or another league), the competitive emphasis shifts to the league level.  This provides the leagues with a greater incentive to invest more broadly in cultivating an overall league product that is attractive to fans (and players) over the course of the entire season and also over the longer-term. This is precisely what LIV Golf has done by seeking commitments from players to participate on a season-long or even multi-season basis, and by designing its league play

---

[68]     See, e.g., Mathewson, G. Frank, and Ralph A. Winter, "The Competitive Effects of Vertical Agreements: Comment," *The American Economic Review*, vol. 77, no. 5 (December 1987), pp. 1057–1062; O'Brien, Daniel P. and Greg Shaffer, "Nonlinear Supply Contracts, Exclusive Dealing, and Equilibrium Market Foreclosure," *The Journal of Economics & Management Strategy*, vol. 6, no. 4 (Winter 1997), pp. 755-785; Klein, Benjamin and Kevin M. Murphy, "Exclusive Dealing Intensifies Competition for Distribution," *Antitrust Law Journal*, vol. 75, no. 2 (2008), pp. 433-466; and Calzolari, Giacomo, and Vincenzo Denicolò, "Competition with Exclusive Contracts and Market-Share Discounts," *The American Economic Review*, vol. 103, no. 6 (2013), pp. 2384-2411; DeGraba, Patrick, Patrick Greenlee, and Daniel P. O'Brien, "Conditional Pricing Practices – A Short Primer," Bureau of Economics – Federal Trade Commission, September 2017, p. 10 ("the imposition of exclusivity may intensify competition with firm B for the right to be the exclusive supplier, putting downward pressure on price. … As is true under linear pricing, [under non-linear pricing] exclusive dealing or market-share discounts may intensify competition.").

[69]     Complaint, ¶ 276 ("LIV Golf … had to pay excessively higher guaranteed payments to recruit a number of marquee players than would be required in a competitive market.").

around the full-season participation of those players, with a structure that is quite differentiated from the PGA TOUR.[70]

58.     The Eligibility Rules do not prevent new entrants from offering a different format of play from the PGA TOUR (e.g., players compete on teams and individually in the LIV Golf Invitational Series, whereas they compete only individually on the PGA TOUR) or pay structure (e.g., LIV Golf has given players signing bonuses to join, whereas player pay in the PGA TOUR is primarily tied to their performance).  In fact, the Eligibility Rules encourage this type of differentiation by creating an incentive for a new league to innovate in order to attract players and fans.  Such incentives to invest in innovative and differentiated products have important consumer welfare benefits.[71]

59.     Lastly, the clearest evidence that the Eligibility Rules do not stifle competition is that LIV Golf has not been stifled.  As discussed above, it has succeeded in attracting many top players in a short period of time despite the Eligibility Rules being in place.  Plaintiffs claim that LIV Golf would have done even better but-for the Eligibility Rules,[72] but any entrant would do better if the incumbent would only agree to raise its prices, share its competitive assets, and

---

[70]     See, e.g., Rivera, Joe, "Who is playing LIV Golf? Updated list of PGA Tour defectors includes Phil Mickelson, Dustin Johnson, Bryson DeChambeau, others," *The Sporting News*, July 29, 2022, available at https://www.sportingnews.com/us/golf/news/liv-golf-tour-list-mickelson-johnson-dechambeau-pga/rlwprhtsx6uwgq73zq0e7ryc ("LIV Golf signed [Dustin] Johnson to a four-year contract worth a reported $125 million."); Camenker, Jacob, "Bryson DeChambeau LIV Golf contract: Golfer shares details, plans for spending nine-figure salary," *The Sporting News*, July 5, 2022, available at https://www.sportingnews.com/us/golf/news/bryson-dechambeau-liv-golf-contract-details-salary/igifhr8zcsyk9nh1m84idxhr ("[W]e now know that DeChambeau is set to make more than $125 million over a four-and-a-half-year deal." [Emphasis omitted]).

[71]     See, e.g., Gilbert, Richard J., and Hillary Greene, "Merging Innovation into Antitrust Agency Enforcement of the Clayton Act," *George Washington Law Review*, vol. 83, no. 6 (November 2015), pp. 1919-1947 at 1929 ("[The U.S. Department of Justice and Federal Trade Commission's 1997 Horizontal Merger Guidelines] explicitly acknowledged that a merger could benefit consumers by enhancing the merged firm's incentive to develop new or improved products, i.e., to be a better innovator."); see, also, Ekelund, Jr., Robert B. and Robert D. Tollison, *Economics – Private Markets and Public Choice (6ᵗʰ ed.)*, Addison-Wesley, 2000, p. 267 ("Does such differentiation increase consumer welfare? The answer is (in the vast majority of cases) a resounding yes! … What critics of innovation and differentiation seem to misunderstand is that the market system, in responding to the particular demands of consumers and groups of consumers, is creating greater welfare for consumers."

[72]     Complaint, ¶ 283.

generally agree to compete less aggressively.  By its very nature, competition makes it more difficult for competitors to succeed, but that is not anti-competitive, rather it is the very essence of competition.

60.     Dr. Leitzinger raises two objections to the shifting of competition from the event level to the league level.  First, he claims that PGA TOUR members may face a "collective action problem," whereby PGA TOUR members might collectively prefer to move to LIV Golf—thereby ensuring its success—but that having to make that choice individually, without knowing what other members plan to do, would be seen as too risky in light of the PGA TOUR's Eligibility Rules.[73]  The first obvious flaw in this objection is that multiple PGA TOUR members could talk to each other and decide to switch leagues together.[74]  In addition, this theoretical possibility is rejected by the facts.  Numerous top players have already joined LIV Golf (and reportedly committed to staying with LIV Golf for four years), so a current PGA TOUR member contemplating joining LIV Golf knows that he will face a high-level mix of players if he does so.[75]  And the players who have joined LIV Golf have done so at different times—often with one or two new players joining in a given week[76]—belying the suggestion that players would be reluctant to make such a switch individually.

---

[73]     Leitzinger Declaration, ¶¶ 80, 82.

[74]     There have been reports that LIV Golf required players to sign non-disclosure agreements.  (See, e.g., Hibbitt, James, "Saudi-Backed LIV Golf Series - Everything We Know," *Golf Monthly*, July 27, 2022, available at https://www.golfmonthly.com/news/saudi-golf-league-everything-we-know-so-far ("For a long time, LIV Golf participants were shrouded in mystery with multiple reports that players had signed non-disclosure agreements.").)  If such an agreement had to be signed prior to a player joining LIV Golf, and if it prevented multiple PGA TOUR members from deciding to join LIV Golf together, then it is LIV Golf's insistence on such agreements that has prevented (and may continue to prevent) players from engaging in the type of "collective action" that Dr. Leitzinger claims could increase players' willingness to join LIV Golf.

[75]     As noted above, according to Dr. Leitzinger's definition of an "elite" golfer, 31% of LIV Golf's roster is comprised of elite golfers, as compared to only 16% for the average PGA TOUR event.

[76]     "LIV Golf: Dustin Johnson, Sergio Garcia, Lee Westwood and Ian Poulter to play in first event," *BBC*, June 1, 2022, available at https://www.bbc.com/sport/golf/61641439; McDonald, Patrick, "Phil Mickelson joins LIV Golf Invitational Series: Six-time major winner enters tournament field in London," *CBS Sports*, June 6, 2022, available at https://www.cbssports.com/golf/news/phil-mickelson-joins-liv-golf-invitational-series-six-time-major-winner-enters-tournament-field-in-london/; Harig, Bob, "Report: Bryson DeChambeau and Patrick Reed Will Be Joining LIV Golf for First U.S. Event," *Sports Illustrated*, June 8, 2022,

61.     Second, Dr. Leitzinger claims that the Eligibility Rules force the PGA TOUR and LIV Golf to "compete *for* the market, not *within* it,"[77] and he further claims that "[t]here is a consensus among antitrust economists that competition for the market often does not work as effectively as competition within the market" (an incorrect claim for which he notably provides no citations).[78]  These arguments fail.  As an initial matter, the Eligibility Rules do not force the leagues to "compete for the market," which would entail a competition in which one league would necessarily end up with all the elite golfers and the other would end up with none.  In the present context, the leagues are competing separately for each elite player, not for all players or none.  So this is player-by-player competition, not competition for the market.  In addition, as noted above, economists have recognized that competition for an exclusive contract can be, and often is, more intense than competition for each unit.  In the present case, that conclusion means that competition for a golfer to join one league and not the other can be more intense than competition for a golfer on an event-by-event basis.  It is a question of the form of competition, not whether competition is occurring and is intense, which is beyond reasonable doubt.

62.     Dr. Leitzinger laments that, if competition occurred at the event level, PGA TOUR members could test out the new and risky league by playing just a few events and seeing whether they liked it or not, rather than having to make an all-or-nothing choice between leagues.[79]  As noted above, of course any new entrant would prefer to share the incumbent's assets—in this case, the players—but the incumbent is under no obligation to share those assets just to make it easier for the entrant to establish itself.  This is particularly true when, as here, there are legitimate, pro-competitive business reasons for the incumbent not to share those assets (see

---

available at https://www.si.com/golf/news/bryson-dechambeau-and-patrick-reed-will-be-joining-liv-golf-for-first-u-s-event; "Hearing date set for Talor Gooch, Hudson Swafford and Matt Jones seeking right to play PGA Tour's playoffs - LIV Golf updates," *Golf Digest*, August 4, 2022, available at https://www.golfdigest.com/story/super-golf-league-updates-2022; Boone, Kyle, and Patrick McDonald, "Bubba Watson joins LIV Golf: Two-time Masters champion becomes latest star to defect from PGA Tour," *CBS Sports*, July 29, 2022, available at https://www.cbssports.com/golf/news/bubba-watson-joins-liv-golf-two-time-masters-champion-becomes-latest-star-to-defect-from-pga-tour/.

[77]     Leitzinger Declaration, ¶ 74 [emphasis in original].

[78]     Leitzinger Declaration, ¶ 74.

[79]     Leitzinger Declaration, ¶ 76.

discussion below).  Moreover, as also noted above, professional golfers—and especially the ones that have joined LIV Golf (including Plaintiffs)—have likely benefited in the form of higher payments due to the fact that the Eligibility Rules have shifted competition from the event level to the league level.  Put another way, Plaintiffs have pocketed the higher payments that they acknowledge they received because competition is occurring at the league level, and now they want to have their cake and eat it too by also having the flexibility to play in both leagues that would prevail if competition had occurred at the event level.  Again, there may be different forms in which competition could occur, and one could debate which would be better for particular players, but none of that means that the intense competition we see playing out now is anti-competitive.  If it did, it would imply that the conduct in any market, even if competition is intense, is anti-competitive as long as some alternative engineering of the form of that competition might be more intense by some particular metric.

63.     Moreover, the way LIV Golf structured its league is simply not conducive for sharing its players with another league.  For example, starting in 2023, LIV Golf will have fourteen events, and its players will be committed to competing in all fourteen events.  Dr. Leitzinger states that the average PGA TOUR member plays in 23 events per year.[80]  If such a player were to play in fourteen LIV Golf events, all four Majors, and either the Ryder Cup or President's Cup, that player would end up playing only *four* events on the PGA TOUR.[81]  Thus, LIV Golf's chosen structure would make it extremely unlikely that LIV Golf's players could participate in a committed or substantial way on the PGA TOUR, even if the PGA TOUR allowed LIV Golf's players to do so.  LIV Golf did not have to structure its league this way; it could have structured it in a way that was more conducive to sharing its players with another league.

D.     **DR. LEITZINGER'S EXAMPLES OF HISTORICAL RESTRICTIONS ON PLAYERS' MOBILITY IN OTHER SPORTS ARE INAPT**

64.     Dr. Leitzinger points to a series of examples in which player mobility was restricted in other sports as alleged evidence that such restrictions often "depress[] player payments."[82]

---

[80]     Leitzinger Declaration, ¶ 73.

[81]     That is, 23 – 14 – 5 = 4.

[82]     Leitzinger Declaration, ¶ 89.

However, in his discussion, he neglects to mention two critical facts that render his analogies at least inapposite, and, in some cases, affirmatively supportive of the pro-competitive nature of the PGA TOUR policies by contrast.

65.     The first critical fact is that, as discussed above, LIV Golf has entered and successfully competed for numerous top players, and those LIV Golf players (including Plaintiffs) as well as PGA TOUR members have benefitted from higher payments as a result, i.e., payments to players are currently the opposite of "depressed."

66.     The second critical fact is that the Eligibility Rules do not impose any of the restrictions on mobility that Dr. Leitzinger cites as examples, none of which allowed a player to leave his league or team to join a competitor whenever he wished to do so, as the Eligibility Rules allow. Below is a brief summary of the historical examples that Dr. Leitzinger describes and how each differs from the Eligibility Rules.

- Dr. Leitzinger cites the MLB's "reserve clause," which "permitted a team to 'reserve' a player for the following season at a rate at least as high as the player's current-year compensation."[83]  The reserve clause enabled a team to prevent one of its players from going to a competitor in perpetuity.  In contrast, the Eligibility Rules do not prevent a player from going a competitor for any length of time—players are free to resign from the PGA TOUR and join a competitor at any time.  Dr. Leitzinger then cites the arrival of MLB free agency (which players qualify for after six years of service) as the end of the reserve system.  Notably, MLB free agency—like the Eligibility Rules—does not grant players the freedom to play for competing leagues (or teams) at the same time.  Instead, it permits either/or competition, like is occurring in men's professional golf, with the associated benefits in the form of large payments to players.  In fact, unlike MLB free agency, the Eligibility Rules do not even require PGA TOUR members to wait until the expiration of a contract that runs for a minimum of one year to go to a competitor, and PGA TOUR members do not need to have six years of service to obtain the freedom to play for a competitor.  Any player is

---

[83]     Leitzinger Declaration, ¶ 91.

free to take advantage of competition between the PGA TOUR and LIV Golf at any
time.

- Dr. Leitzinger also cites the NFL's version of the reserve clause, which gave teams
  "the right to re-sign its players each season in perpetuity."[84]  As noted above, the
  Eligibility Rules do not include any such restrictions.  He then cites the NFL's
  subsequent "Rozelle Rule" rule that "required a team wanting to sign a player from
  another team to compensate that team."[85]  The Eligibility Rules do not require LIV
  Golf to compensate the PGA TOUR when a player leaves the latter to join the former,
  making this comparison inapposite.  He also cites the more recent rule that "gave
  teams the right to protect 37 players on its then 47-man active rosters from becoming
  free agents."[86]  In contrast, the Eligibility Rules do not enable the PGA TOUR to
  prohibit any players from joining a competitor.

- Dr. Leitzinger cites the NBA's reserve clause, which was "similar in form to
  football's Rozelle Rule."[87] As noted above, the Eligibility Rules do not impose any of
  the restrictions imposed by the Rozelle Rule.

- Dr. Leitzinger cites the NHL's reserve rule—again, with no similarity to the
  Eligibility Rules—and rules forbidding "negotiating with, offering employment or
  discussing employment" with a competitor's players.[88]  The Eligibility Rules do not
  prohibit players from negotiating with a competitor to the PGA TOUR.

- Dr. Leitzinger cites a Supreme Court case involving exclusive contracts employed by
  boxing promoters.[89]  However, the contracts in question spanned "a period of three
  (and sometimes five) years."[90]  The Eligibility Rules do not prohibit PGA TOUR

---

[84]     Leitzinger Declaration, ¶ 92.

[85]     Leitzinger Declaration, ¶ 93.

[86]     *Id*.

[87]     Leitzinger Declaration, ¶ 94.

[88]     Leitzinger Declaration, ¶ 95.

[89]     Leitzinger Declaration, ¶ 97.

[90]     *United States v. International Boxing Club of New York*, 348 U.S. 236 (1955) at 240.

members from joining a competitor for three years—they can join today.  That is, the present case does not involve an exclusive contract that extends for any period of time.

- Lastly, Dr. Leitzinger observes that the UFC is currently alleged to have: (1) used "long-term exclusive contracts," (2) "force[d] fighters to [re-sign] when those contracts expired," and (3) "acquired and terminated rival … organizations."[91]  I am not aware of any such allegations in the extant matter:  The Eligibility Rules do not constitute a long-term exclusive (since PGA TOUR members can resign from the PGA TOUR at any time), there is no long-term contract for PGA TOUR members to re-sign, and the PGA TOUR has not "acquired" or "terminated" any rival organizations.

67.    Dr. Leitzinger points to evidence that, following the removal of some of the restrictions on mobility, payments to players in the corresponding league increased.[92]  However, this is a red herring, since, as described above, the Eligibility Rules do not impose on PGA TOUR members the restrictions referenced in any of the examples that Dr. Leitzinger cites.  Thus, the removals of those restrictions provide no indication of the effect that the Eligibility Rules have on payments to players.  To the contrary, the large payments that players (including Plaintiffs) have received to join LIV Golf are analogous to the payments players receive from free agency in other sports:  Those players must choose one team or the other, and as a result of that competition, they receive large payments for their services, as is happening in professional golf.

68.    Dr. Leitzinger also cites several examples in which payments to players increased following entry by a new league and the ensuing competition between that league and the incumbent league.[93]  And this is precisely what is going on today—LIV Golf has entered, it is competing successfully with the PGA TOUR to attract the top players, and payments to players have risen as a result.  Competition is working as it should.

---

[91]    Leitzinger Declaration ¶ 98.

[92]    Leitzinger Declaration, ¶¶ 103-104.

[93]    Leitzinger Declaration, ¶¶ 99-102.

69.     Finally, it is notable that none of Dr. Leitzinger's historical examples suggest that a new league could have entered, scheduled a full season that overlapped with the incumbent's season, insisted that the incumbent league share its players, and required the shared players to play in its league when both leagues had an event at the same time.  Yet this is what Plaintiffs are asking for here.

## V.     LIV GOLF'S SUCCESSFUL ENTRY DEMONSTRATES THAT THE PGA TOUR DOES NOT HAVE MONOPSONY POWER

70.     It is clear from LIV Golf's successful entry that the PGA TOUR does not possess monopsony (the buyer-side analog of monopoly) power in the alleged relevant market.[94]  I understand that, as a legal matter, in order to possess monopsony power, a firm must be able to exclude or limit its competitors, and the PGA TOUR has shown no ability to do so.  This

---

[94]     Plaintiffs and Dr. Leitzinger allege that the relevant geographic market is limited to the U.S. However, they have not demonstrated that this is the case, and in fact they acknowledge that the relevant geographic market may be global.  The fact that numerous professional golfers that play in tournaments in the U.S. also play in tournaments outside U.S. suggests that that many of them do consider tournaments held outside the U.S. to be close substitutes for tournaments held in the U.S., which suggests that the relevant geographic market is broader than the U.S.  The most prominent example is that one of the four Majors (The Open Championship) is held in the United Kingdom, and the field is always heavily populated with PGA TOUR members.  The strength of The Open Championship (and other prestigious international events such as the Ryder Cup and President's Cup) indicates that a U.S.-only market would violate an accepted principle for market definition—sometimes called the "circle principle"—which says that if you include one product in a market you should also include any other products that are stronger competitors than the ones you have included. (See, e.g., "Horizontal Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, August 19, 2010, § 4.1.1; see, also, Keating, Bryan, Jonathan Orszag, and Robert Willig, "The Role of the Circle Principle in Market Definition," *The Antitrust Source*, April 2018, pp. 1-6.

Players also travel around the world for numerous less prestigious events. (See, e.g., Wacker, Brian, "The ups and downs of traveling," PGA TOUR, January 27, 2016, available at https://www.pgatour.com/tour-insider/2016/01/27/traveling-ups-and-downs.html ("Consider Jordan Spieth's recent travel schedule: Since November, he has been in China, Australia, the Bahamas, Hawaii, Abu Dhabi and this week Singapore," "[Rickie] Fowler has endured a similar stretch of world travels with visits to China, the Bahamas, Hawaii and then Abu Dhabi," and "Patrick Reed's itinerary has been more stuffed than either Spieth's or Fowler's. Beginning in late October he went from Hong Kong, to Malaysia, to China (twice), to Dubai, to the Bahamas, to Florida, to Hawaii, to California.").)  Moreover, the Plaintiffs' own actions indicate that they consider tournaments outside the U.S. to be attractive alternatives, since they—and all the other golfers who have joined LIV Golf—have committed to playing in LIV Golf tournaments outside of the U.S.

definition also makes sense as a matter of economics to distinguish monopoly or monopsony power from more common market power, which requires only that a firm faces a downward sloping demand curve (or an upward sloping supply curve for inputs) and thus can pay a price different from the perfectly competitive level.[95]  Nearly all firms have some degree of market power—for example, small local restaurants can often charge a price for food above the marginal cost of providing that food, meaning above the perfectly competitive level.  In contrast, monopoly or monopsony power requires a much greater degree of market dominance, well captured by the ability to exclude competition.

71.     The PGA TOUR plainly cannot exclude competition, as the success of LIV Golf has revealed.  As discussed above, LIV Golf has already signed a roster of numerous "elite" players less than five months after launching, and the competition for players, attention, and fans has been intense.

72.     Despite LIV Golf's success, Plaintiffs and Dr. Leitzinger claim that the relevant market is characterized by substantial entry barriers, and that these entry barriers are exacerbated by the Eligibility Rules.[96]  In particular, Dr. Leitzinger cites the challenges a new and unproven men's professional golf league such as LIV Golf faces in attracting top-end talent, and claims that this challenge is only heightened if the players know they will have to forgo the potential earnings

---

[95]     "Glossary of Statistical Terms – Monopoly," *OECD*, available at https://stats.oecd.org/glossary/detail.asp?ID=3262 ("Monopoly should be distinguished from market power. The latter is a term which refers to all situations in which firms face downward sloping demand curves and can profitably raise price above the competitive level.").

[96]     Complaint, ¶¶ 275-277; Leitzinger Declaration, ¶ 53.  Plaintiffs also claim that the PGA TOUR's media rights create an entry barrier by "compromis[ing] LIV Golf's ability to secure a television broadcast contract, a critical component of any sustainable elite golf tour." (Complaint, ¶ 63)  According to Plaintiffs, "United States platforms are disinclined to sign a broadcast contract with LIV Golf while the Tour claims to control the media rights of the players participating in LIV Golf tournaments." (*Id*.)  I understand that the PGA TOUR's position is that it does not retain media rights for a player's future performances once that player resigns from the PGA TOUR.  I further understand that the PGA TOUR's position is that it continues to retain such media rights for player that are still members of the PGA TOUR, even if those members are suspended.  Thus, it appears that LIV Golf could have obtained a broadcast contract by stipulating that its players resigned from the PGA TOUR when they joined LIV Golf, thereby enabling LIV Golf to obtain media rights for its events.

and reputational benefits they could otherwise obtain from playing PGA TOUR co-sponsored events.[97]  However, this claim is misguided for two reasons.

73.     First, it is clear that LIV Golf has offered some if not all of its players more in performance-based payments and signing bonuses than they could earn from playing on the PGA TOUR.  As discussed above, the signing bonuses that LIV Golf has reportedly given out to some players are alone greater than those players' *career* earnings from prize money on the PGA TOUR.  Additionally, even though the total purse for the entire PGA TOUR season, plus the Player Impact Payment, is larger than the total purse for the entire LIV Golf season ($502.5 million vs. $255 million),[98] the 2022 PGA TOUR prize money has been shared by 247 players,[99] for an average of just over $2 million per player, whereas the 2022 LIV Golf prize money will be shared by 48 players, for an average of more than $5 million per player.  This point is critical: LIV Golf has been able to pursue a strategy that makes sense for an entrant—focus on a smaller number of players and build a league product around them, thus enabling higher payments per player that attract the player, but *not* requiring LIV Golf to match the total purse size for the full PGA TOUR season.

74.     Second, players that join LIV Golf can supplement their LIV Golf earnings by competing in other events for which non-members of the PGA TOUR are eligible.  For example, the Eligibility Rules do not prevent players that join LIV Golf from playing any of the four Majors, which are the most lucrative and prestigious tournaments in the world. The two Majors that have been held since players started joining LIV Golf—the U.S. Open and The Open Championship— have allowed those players to participate,[100] and as of yet no major has announced that it will not

---

[97]     Leitzinger Declaration, ¶ 53.

[98]     The total purse for the 45 tournaments on the PGA TOUR that were scheduled for the 2021-2022 season (including the FedEx Cup Playoffs) is $452.8 million, with an additional $50 million available to PGA TOUR members through its Player Impact Program, for a total of $502.8 million. ( "2021-2022 Tournament Schedule," *PGA TOUR*, available at https://www.pgatour.com/tournaments/schedule.html.)

[99]     "Statistics – Official Money – 2022," *PGA TOUR*, available at https://www.pgatour.com/stats/stat.109.y2022.html.

[100]    "LIV Golf members allowed to play 150th Open Championship at St. Andrews, R&A announces," *ESPN*, June 22, 2022, available at

allow LIV Golf players to participate. And in any case, the PGA TOUR does not determine the rules for eligibility at any of the Majors.

75.     There are also other professional golf events in which the Eligibility Rules do not prevent players that join LIV Golf from participating.  In particular, LIV Golf players will be allowed to participate in Asian Tour tournaments. Moreover, as noted above, LIV Golf and the Asian Tour recently introduced the co-sanctioned International Series, which will consist of ten events in 2022 and eleven events in 2023. The CEO of the Asian Tour, Cho Minn Thant, stated that he expects to see an increase in the participation of golfers joining LIV Golf at Asian Tour events, and predicted that they would sign up for an event as a group in order to boost the strength of the field and thereby increase the world ranking points associated with the event.[101]

76.     Thus, there is every indication that LIV Golf has offered players substantially more money than the PGA TOUR, and in doing so has enticed many of the top players to join in a short time span, which indicates that entry barriers in this industry are not substantial.

77.     Plaintiffs might claim LIV Golf could only succeed to the extent it has because of how well-capitalized it is, and that for anyone else, it would be too costly and impractical to enter with a new league at the scale of LIV Golf.  However, even if this were true, it would not mean that entry barriers in this industry are high.  A new league could instead opt to enter at a smaller scale and successfully build its business over time.  That sort of incremental growth strategy is a standard model for successful entry in many businesses, and Plaintiffs have not shown it is not a viable option here.  A new league could also enter on a smaller scale by recruiting just a small number of top golfers.  The evidence that exhibitions among as few as two players, such as "The Match," have been successful demonstrates that not many players are required to have a commercially successful event.  The first edition of The Match featured just two players, Tiger

---

        https://www.espn.com/golf/story/_/id/34129315/liv-golf-series-members-allowed-play-150th-
        open-championship-st-andrews-ra-announces.

[101]   Keating, Steve, "Asian Tour embraces LIV Series as golfers look to Far East for points," *Reuters*,
        July 13, 2022, available at https://www.reuters.com/lifestyle/sports/asian-tour-embraces-liv-
        series-golfers-look-far-east-points-2022-07-13/.

Woods and Phil Mickelson, as did the November 2021 contest featuring Bryson DeChambeau and Brooks Koepka. [102]

78.     Additionally, LIV Golf might not have had to pay as much to convince players to join its league if it were not encumbered by an association with Saudi Arabia.  Bottom line, any claim that the PGA TOUR has monopsony power, including the ability to exclude competition, is being tested in real time, and the claim is failing the test.

79.     Plaintiffs and Dr. Leitzinger ignore the evidence that the PGA TOUR does not have the ability to exclude competitors.  Instead, they point to the fact that the PGA TOUR has increased its payments to players in recent years and claim that this has been response to competitive pressure from LIV Golf, which they claim is "direct evidence of the [PGA TOUR's] monopsony power."[103]  However, Plaintiffs and Dr. Leitzinger have this completely backwards.  If a firm responds to entry by cutting its price (or in the present context, increasing its payments), that merely indicates that the firm has some amount of *market* power.[104]  But it actually *rejects* the idea that the firm has *monopsony* power, as it proves that the firm was not able to exclude effective competition, but rather that the competition entered and was effective enough that the firm was forced to respond, here by raising its payments.  Thus, to the extent the firm responded in this fashion, it demonstrates that the firm *does not* have monopsony power.

80.     Dr. Leitzinger claims that, even after the recent increases, the PGA TOUR is not paying its players "competitive compensation."  As evidence, he points to the fact that the average purse size for a LIV Golf event is higher than for a PGA TOUR event and says that the amounts paid

---

[102]     Porter, Kyle, "Tom Brady, Aaron Rodgers, Patrick Mahomes, Josh Allen to square off in latest The Match golf event this June," *CBS Sports*, April 18, 2022, available at https://www.cbssports.com/golf/news/tom-brady-aaron-rodgers-patrick-mahomes-josh-allen-to-square-off-in-latest-the-match-golf-event-this-june/ ("The Match has been both an entertainment and seemingly an economic success.").

[103]     Leitzinger Declaration, ¶ 55; Complaint, ¶ 111 ("This increased compensation to players in response to competitive entry is direct proof of the PGA Tour's monopsony power and the anticompetitive effects on players (including Plaintiffs) from excluding competition.")

[104]     For example, in a market with two equivalent firms (i.e., a duopoly, not a monopoly), adding a third firm could still be expected to increase competition.  If that were not the case, then all attempts by government agencies to block mergers that reduce the number of competitors in an industry from three firms to two would be unjustified.

by LIV Golf "may be more suggestive of competitive levels."[105]  However, it is not unusual for a new entrant with a lesser-known product to offer more favorable terms than an incumbent in order to compete, which does not mean that such terms represent the competitive level for the incumbent.  As noted above, LIV Golf is able to offset these higher payments per player by using its strategy to build a league with fewer total players, thus restricting total player costs for the league.

81.    I also stress that Dr. Leitzinger contradicts himself when he argues that these payments by LIV Golf may be suggestive of competitive levels, as elsewhere in his declaration, he describes LIV Golf's payments to its golfers as "not sustainable."[106]  Similarly, LIV Golf's Chief Operating Officer describes the payments it has made to players as "supra-competitive." (Khosla Declaration, ¶ 22.)  I do not at this time have enough information to analyze these claims, but if such payments are "not sustainable" or "supra-competitive," then they are *above* the competitive level and could not be used to show that the PGA TOUR's payments are below the competitive level.  As noted above, Dr. Leitzinger and Plaintiffs also fail to acknowledge that one additional reason why LIV Golf likely has needed to pay players more than the PGA TOUR is to compensate those players for the sponsorship income they could expect to lose as a result of joining a league that is closely associated with Saudi Arabia.

82.    Dr. Leitzinger claims that direct evidence of the PGA TOUR's monopsony power can be found in the fact that the share of PGA TOUR revenue that it paid to players generally declined from 2011-2019, and that this share was typically lower than the shares given out by the NFL, MLB, NBA, and NHL to their players.[107]  As an initial matter, Dr. Leitzinger points to no economic logic that would link a *change* in the share of revenues that the PGA TOUR paid out to players during this time period to monopsony power at any particular point in time.  In fact, it is not clear as a matter of economics why the *change* in revenue share says anything one way or the other about the presence or absence of monopsony power at a point in time.  Dr. Leitzinger has not argued that some change in market condition has led the PGA TOUR to only have

---

[105]    Leitzinger Declaration, ¶ 57.

[106]    Leitzinger Declaration, ¶ 88.

[107]    Leitzinger Declaration, ¶ 54 and Figure 1.

monopsony power recently.  In fact, according to Plaintiffs, the last meaningful threat of
competitive entry to challenge the PGA TOUR occurred in 1994, well before the time period of
Dr. Leitzinger's chart.[108] Dr. Leitzinger also neglects to mention that his chart that shows that the
share of the PGA TOUR's revenues going to its players declined from 2011-2019 also shows
that the share of revenue earned by players in the NFL, MLB, NBA, and NHL also generally
declined during this time period.

83.     Regarding the fact that the share of PGA TOUR's revenues that was paid to its players
was typically lower than the analogous shares for the NFL, MLB, NBA, and NHL, such a
comparison is of no probative value without accounting for all of the differences in revenue and
cost structures between the different leagues.  One such difference is that, in the NFL, MLB,
NBA, and NHL, players generally cannot earn sponsorship money for displaying logos on their
uniforms—this revenue goes to the league and its teams.[109]  In contrast, the PGA TOUR allows
its players to earn money in exchange for displaying sponsors' logos on their apparel while
performing at PGA TOUR events.[110] Such earnings are not reflected in Dr. Leitzinger's analysis
because they are not paid to the players by the PGA TOUR.  Nevertheless, it is a monetary
benefit conveyed by the PGA TOUR to its players and reflects one of the manifestations of those
players' bargaining power vis-à-vis the PGA TOUR.[111]  As a matter of economics, a proper

---

[108]     Complaint, ¶ 75.

[109]     See, e.g., Tracy, Jeff, "Advertising invades sports jerseys," *Axios*, April 21, 2022, available at
https://www.axios.com/2022/04/21/sports-jersey-advertising-invasion.  The lone exception is that
NBA players "are allowed to wear any brand of sneakers that they want since sneakers are not
considered part of the uniform, and are allowed to sign endorsement deals for doing so. (Frieser,
Joshua, "Why NCAA Athletes Are Not Allowed to Wear Sponsored Apparel In-Game but
Professional Athletes (Sometimes) Can," *Frieser Legal*, December 7, 2021, available at
https://frieserlegal.com/why-ncaa-athletes-are-not-allowed-to-wear-sponsored-apparel-in-game-
but-professional-athletes-sometimes-can/).

[110]     Marksbury, Jessica, "Big-time bucks: Here's how much money is made (and paid) by the average
Tour pro," *Golf.com*, October 15, 2018, available at https://golf.com/travel/big-time-bucks-heres-
how-much-money-is-made-and-paid-by-the-average-tour-pro/ ("The front of the hat is your No. 1
real estate. … A player who keeps his card should have a minimum of three to five corporate
partners. Maybe that's a chest deal, a sleeve deal, and a collar deal—plus maybe two other name-
and-likeness deals that don't require a logo.").

[111]     Dr. Leitzinger points to the PGA TOUR's retained earnings as a purported indicator that "is at
minimum consistent with the existence of market power." (Leitzinger, ¶ 61 and Figure 2.) Of
course, it would not be surprising if the PGA TOUR had some degree of market power—most

38

analysis of the share of revenue going to players would account for the revenue from these sponsorship agreements as part of the total, and attribute that amount to players' share of that total.  Dr. Leitzinger fails to do so.

84.      Finally, I would note that any consideration of what constrains the strategic choices that the PGA TOUR can make and thus whether it has monopsony power over its players—which requires that the PGA TOUR does not face significant competitive constraints—must consider the power of the top few players in golf.  If just the top few truly elite players in golf—including Tiger Woods, Phil Mickelson, Rory McIlroy, and a few others—were to leave the PGA TOUR or reduce their support for the PGA TOUR, this would likely have an enormous negative impact on the PGA TOUR's popularity and performance.  Few other sports have so much of their popularity tied up in a very small number of players—as seen, for example, in the effect that Tiger Woods alone has on the PGA TOUR's performance[112]—and even those that do generally also have teams that drive as much or more fan interest than individual players (as reflected by fans maintaining loyalty to a team even when top players leave).  Hence, if the PGA TOUR were to make decisions that drove those top few players to leave or reduce support, the league would suffer greatly.  Hence, contrary to claiming that the PGA TOUR has monopsony power over its players, it seems more natural to conclude that it is the top few players who have the most power and who place clear competitive constraints on choices the PGA TOUR can make.

---

firms do, but the earnings data presented by the Dr. Leitzinger provide no indication that such market power rises to the level of monopsony power, which is what is relevant for assessing the potential for harm to competition.

[112]   See, e.g., Fitzpatrick, Michael, "Tiger Woods' Masters Absence Sends Television Ratings and Ticket Prices Plunging," *Bleacher Report*, April 15, 2014, available at https://bleacherreport.com/articles/2030309-tiger-woods-masters-absence-sends-television-ratings-and-ticket-prices-plunging ("It is no secret that Tiger Woods has been the main driver in the PGA Tour's transformation from a low-budget traveling circus into a billion-dollar organization.").

## VI.   THERE ARE STRONG PRO-COMPETITIVE RATIONALES FOR THE ELIGIBILITY RULES

### A.   THE PGA TOUR'S INVESTMENTS  GREATLY BENEFIT ITS MEMBERS

85.   The PGA TOUR's investments greatly benefit its players, supporting their career development and providing a platform through which they can both earn pay for their performance, and also grow their personal brands, leading to substantial payments via endorsements.  At the top level, the PGA TOUR organizes the entire tour, working with tournament organizers to create a schedule, partnering with sponsors and media to maximize tour and ultimately player income, creating and enforcing rules that give structure to the competition (from event to event as well as over the course of a season), determine player eligibility for events, and guide player conduct.  The PGA TOUR's investments in these regards have given and continue to give rise to a league that is immensely popular.[113]  As a result, PGA TOUR members benefit greatly from their association with the PGA TOUR—both directly through performance-based earnings and indirectly through increased popularity among fans that can translate into greater earnings through endorsements.[114]

86.   The PGA TOUR makes investments in its members in other ways.  For example, it recently introduced its Player Partnerships program, which helps match sponsors with players based on criteria such as whether the player has that sponsorship category open; the player's age,

---

[113]   See, e.g., Schupak, Adam, "State of the PGA Tour is strong, as evidenced by growing purses and expanded coverage," *Golf Week*, March 10, 2020, available at https://golfweek.usatoday.com/2020/03/10/state-of-the-pga-tour-growing-purses-expanded-coverage/.

[114]   See, e.g., "PGA TOUR's unprecedented momentum results in increased purses," *PGA TOUR*, November 22, 2021, available at https://www.pgatour.com/news/2021/11/22/pga-tours-unprecedented-momentum-results-in-increased-purses.html#:~:text=Monday%20to%20players.-,An%20increase%20in%20purses%20is%20one%20immediate%20benefit%20of%20the,has%20doubled%20to%20%2420%20million; "The Official 2021-22 PGA TOUR Media Guide – Money – Growth of Purses," *PGA TOUR*, available at https://www.pgatourmediaguide.com/records/all-time/259; and Marksbury, Jessica, "Big-time bucks: Here's how much money is made (and paid) by the average Tour pro," *Golf.com*, October 15, 2018, available at https://golf.com/travel/big-time-bucks-heres-how-much-money-is-made-and-paid-by-the-average-tour-pro/.  Of course, the PGA TOUR benefits as well from its members' increased popularity, but, as discussed in the next section, this benefit may be limited if a competing league can free-ride on the PGA TOUR's investments by capitalizing on the popularity that the PGA TOUR has helped those members achieve.

geographic ties, and interests; the sponsor's budget; and various player metrics related to the inputs used to calculate the Player Impact Payments.[115]

87.     The PGA TOUR also makes investments that benefit players at earlier stages of their career.  The PGA TOUR's investments start at young ages with its investments in promoting golf to youth through programs such as First Tee,[116] and they continue through its investment in and management of the Korn Ferry Tour, which entails many of the same responsibilities as managing the PGA TOUR, albeit at a smaller scale.  In recent years, the PGA TOUR has annually offered PGA TOUR membership to the top 25 players on the Korn Ferry Tour, with that number set to increase to 30 in 2023.[117]  The Korn Ferry Tour is currently the primary path that players take to obtaining PGA TOUR membership, with Korn Ferry Tour alumni making up 80% of the PGA TOUR's current membership and having combined to win more than 600 PGA TOUR events, including 27 Majors.[118]  The PGA TOUR also invests in the Advocates Professional Golf Association ("APGA"), which seeks to bring greater diversity to the game of golf.[119] Lastly, the PGA TOUR invests in the PGA TOUR Champions, which is a tour for golfers aged 50 and older, and which provides a forum for older players to continue their career.[120]

---

[115]     Rothman, Evan, "How the PGA Tour's new sponsorship matchmaking service aims to enrich players," *Golf.com*, January 13, 2022, available at https://golf.com/news/pga-tour-player-partnerships-sponsors-players/.

[116]     "About Us," *First Tee*, available at https://firsttee.org/about/.

[117]     "Korn Ferry Tour to award an unprecedented 30 TOUR cards in 2023," *PGA TOUR*, June 28, 2022, available at https://www.pgatour.com/korn-ferry-tour/news/2022/06/28/qualification-eligibility-changes-structure-explained-2023-finals-q-school-pga-tour-cards.html.

[118]     "Korn Ferry Tour to award an unprecedented 30 TOUR cards in 2023," *PGA TOUR*, June 28, 2022, available at https://www.pgatour.com/korn-ferry-tour/news/2022/06/28/qualification-eligibility-changes-structure-explained-2023-finals-q-school-pga-tour-cards.html.

[119]     "Our Mission," *APGA Tour*, available at https://www.apgatour.org/mission.

[120]     Richardson, Savannah, "What is the PGA Tour Champions?," *GolfLink*, available at https://www.golflink.com/about_35128_what-is-the-pga-tour-champions-.html.

B.   PRO-COMPETITIVE BENEFITS OF LIMITING FREE-RIDING

1.   **Limiting free-riding and thus preserving investment incentives is an important benefit of the Eligibility Rules**

88.   It is well-known in economics that exclusive contracts can be efficiency-enhancing by limiting or preventing free-riding on investments, thereby increasing a firm's incentives to invest.[121]   As discussed above, the PGA TOUR invests heavily in developing and promoting its players and events, both early in their careers and on an ongoing basis.   As a result of the PGA TOUR's past and ongoing investments and resulting success, playing on the tour conveys benefits to its members that carry over beyond a particular tournament, both to performance in other tournaments but also to the ability to earn endorsements.

89.   The Eligibility Rules limit the potential for competing leagues to free-ride on the PGA TOUR's investments by limiting their ability to fill their tournaments with players who are still active PGA TOUR members (and preventing them from creating a full season on this basis). This enables the PGA TOUR to continue to invest in its players with an assurance that at least those players who remain active with the PGA TOUR are not simultaneously supporting a competitor, which would allow that competitor to free-ride on the PGA TOUR's ongoing investment in those players.   Competing tours at least have to compete to get those players to switch, rather than using them to promote their tournaments even as they continue to benefit from PGA investments. In this way, the PGA TOUR's incentives to invest are maintained, while competing tours like LIV Golf also must invest in the quality of their own players and product in order to differentiate themselves.

---

[121]   See, e.g., Carlton, Dennis W. and Jeffrey M. Perloff, *Industrial Organization (2nd ed.)*, HarperCollins, 1994, pp. 531, 534; Klein, Benjamin and Andres V. Lerner, "The Expanded Economics of Free-Riding: How Exclusive Dealing Prevents Free-Riding and Creates Undivided Loyalty," *Antitrust Law Journal*, vol. 74, no. 2 (2007), pp. 473-520 at 477-499; DeGraba, Patrick, Patrick Greenlee, and Daniel P. O'Brien, "Conditional Pricing Practices – A Short Primer," *Bureau of Economics – Federal Trade Commission*, September 2017, p. 5 ("Exclusive contracts, for example, can promote efficiency by improving incentives for parties to make beneficial investments when holdup or free-riding might otherwise occur); and Heide, Jan B., Shantanu Dutta and Mark Bergen, "Exclusive Dealing and Business Efficiency: Evidence from Industry Practice," *Journal of Law & Economics*, vol. 41, no. 2 – Part 1 (October 1998), pp. 387-408 at 389 ("We provide evidence in support of existing theoretical arguments that exclusive dealing is used to minimize free riding on manufacturer services.").

90.     For example, success on the PGA TOUR helps establish a player's reputation as a top-tier golfer and increases the player's visibility.  When a PGA TOUR member plays in a non-PGA TOUR event instead of a PGA TOUR event, the organizers/sponsors of the non-PGA TOUR event, rather than the PGA TOUR itself, capitalize on the player's reputation, which reduces the PGA TOUR's incentive to make ongoing investments to support its players' development, success, and exposure.  This is especially the case if the player participates in an event that takes place on the same day during the same time frame as a PGA TOUR event, so that the two events directly compete.  In that case, not only is the PGA TOUR not capitalizing on its investments via the player participating in the competing event, but the player may be actively reducing the PGA TOUR's revenues from its own event by drawing viewers from the PGA TOUR event to the competing event.  Consistent with this view, the PGA TOUR's conflicting events policy applies only to tournaments played on the same day as a PGA TOUR co-sponsored event.[122]

91.     If a PGA TOUR member were to play in a same-day, non-PGA TOUR event in North America, this would likely have the largest effect on the PGA TOUR's ability to capitalize on its investments, to the extent that a North-American-based event would draw relatively more heavily from the same potential television audience and sponsors as targeted by the PGA TOUR.  Consistent with this view, the Eligibility Rules allow PGA TOUR members potentially to obtain releases to play conflicting events held outside North America (subject to certain conditions), but they do not allow players to obtain such releases for conflicting events held North America.

92.     In the case of LIV Golf, which is competing directly with the PGA TOUR, the free-riding risks are particularly large, and thus the Eligibility Rules have been enforced for all LIV Golf events.  If the PGA TOUR were to allow its players to join LIV Golf while remaining members

---

[122]     The Eligibility Rules also protect PGA TOUR event sponsors that also sponsor PGA TOUR players from having one of their sponsored players participate in a non-PGA TOUR event that conflicts with one of their sponsored events.  For example, Royal Bank of Canada ("RBC") sponsors the RBC Canadian Open and, until recently, also sponsored Dustin Johnson.  Dustin Johnson's participation in LIV Golf's London event helped promote that event at the expense of the RBC Canadian Open, which was held on the same weekend. ("RBC reportedly terminates sponsorship with Dustin Johnson, Graeme McDowell," *Golf Channel*, May 31, 2022, available at https://www.golfchannel.com/news/rbc-extremely-disappointed-ambassador-dustin-johnson-skipping-canadian-open-liv-golf-event.)

of the PGA TOUR, it would enable LIV Golf to free-ride on the PGA TOUR's investments while preventing the PGA TOUR from fully capitalizing on those investments. In particular, LIV Golf would be able to build a league around players who continue to benefit from the platform of the PGA TOUR, thus allowing LIV Golf to benefit from the PGA TOUR's ongoing investments in that platform and those players. This would reduce the PGA TOUR's incentive to invest (because its ability to capitalize on those investments would be reduced), and it would also reduce LIV Golf's incentive to invest (because it could free-ride on the PGA TOUR's investments instead), both of which would be to the detriment of players and fans.

93.     If the PGA TOUR were to allow players to join LIV Golf while remaining members of the PGA TOUR, LIV Golf would benefit not only from the popularity those players have achieved—in large part due to the PGA TOUR's investments—but also from the specific promotion of PGA TOUR events in the weeks leading up to the LIV Golf event. For example, LIV Golf has scheduled a tournament in Boston for the week after the TOUR Championship,[123] which is the final event of the PGA TOUR's three-tournament FedEx Playoffs. Clearly, the excitement created in North America by the FedEx Cup Playoffs and TOUR Championship would create added interest in the following week's LIV Golf event, particularly if many of the top performers from the playoffs were to also participate in LIV Golf event. In that scenario, LIV Golf could promote its Boston tournament based on how its participants had fared in the FedEx Cup Playoffs and TOUR Championship. The relevant economic point is that all of these spillover benefits to LIV Golf—while beneficial to LIV Golf—would mean that investments made by the PGA TOUR and its partners in promoting the TOUR Championship would also benefit a competitor. This would undermine much of the competitive incentive to invest, which is to perform better *relative to competitors*. Rules like the Eligibility Rules are thus pro-competitive in that they preserve the incentive to invest in order to outperform, rather than help, the competition.

---

[123]     The LIV Golf event in Boston is scheduled for September 2-4, 2022. ("Events," *LIV Golf*, available at https://www.livgolf.com/events.) The TOUR Championship is scheduled for August 25-28, 2022. ("Tournament Schedule," *PGA TOUR*, available at https://www.pgatour.com/tournaments/schedule.html.)

94.     The Eligibility Rules also limit free-riding on the promotion by the PGA TOUR's media partners of its members, thereby increasing the partners' incentive to engage in such promotion. Such promotion benefits players and fans by increasing the consumption of golf content.  It also benefits the players by increasing the value of the PGA TOUR's media rights, thus enabling the PGA TOUR  to earn greater revenues when licensing those rights, which is the primary source of funding for the PGA TOUR's payments to players.  As an example of how the Eligibility Rules limit free-riding on the PGA TOUR's media partners' promotional efforts, suppose a PGA TOUR broadcaster promoted a Plaintiff's participation in a PGA TOUR event.[124]  The broadcaster's promotion featuring the Plaintiff would likely increase fan interest in future events in which the Plaintiff participated, including LIV Golf events.  This would directly harm the broadcaster by drawing fans to LIV Golf's content and away from whatever the broadcaster was airing in competition with the LIV Golf event.  By preventing PGA TOUR members from also playing in LIV Golf events, the Eligibility Rules thus limit free-riding by LIV Golf and its media partners on player-centric promotion by the PGA TOUR's media partners, which preserves the PGA TOUR's media partners incentive to engage in such promotion.[125]

95.     As a final point in this section, I note that, as a matter of economics, the free-riding benefits laid out above would provide a pro-competitive rationale for exclusive contracts with players that last for some period of time.  That is, the PGA TOUR could (but does not) require that players sign contracts that extend for several years, with financial penalties if a player were

---

[124]    It is common for broadcasters to promote an event by highlighting popular players that are participating in that event.  This indicates that broadcasters consider such promotion to be an effective tool for increasing interest in their content.  This form of promotion is also specifically beneficial to the highlighted players by increasing casual fan awareness and reinforcing those players' media brands.

[125]    Plaintiffs may claim that the PGA TOUR's media partners could always choose not to promote PGA TOUR members who also played for LIV Golf, and that this would not diminish their incentives to promote PGA TOUR events relative to a world in which those players could not play in PGA TOUR events.  However, this is not the relevant comparison.  By forcing players to choose between competing leagues, the Eligibility Rules have caused some players to no longer play on the PGA TOUR, but they are also likely to cause fewer top players to join LIV Golf. Given the potential for free-riding on media partners' promotional efforts when players switch back-and-forth between the two leagues, those partners are likely to have a greater incentive to engage in promotion if a smaller number of top players do not play in any PGA TOUR events than if a much larger number of players switch back and forth between PGA TOUR and LIV Golf events.

to leave early.  This would provide even more protection against free-riding and more assurance that the PGA TOUR could recoup the investments made in player development and promotion. It is not at all uncommon for exclusives with retailers, distributors, or other service providers to extend for some period of time to align incentives in this way.  In the present case, there are no such restrictions; players are free to switch to a competing league such as LIV Golf at any time, with the Eligibility Rules simply saying that the move is, in fact, a switch, and those players who switch cannot be active members of the PGA TOUR at the same time.  In this way, LIV Golf is free to compete for players immediately without needing to induce them to break a long-term exclusive contract with associated financial penalties.  As such, the Eligibility Rules are less restrictive than other rules that could have provided even more protection against free-riding, thus striking a balance between some protection against free-riding while still allowing other leagues to compete for players, as LIV Golf has done, effectively in many cases.

>2.    **Plaintiffs' arguments against the free-riding rationale for the Eligibility Rules do not survive scrutiny**

96.    Plaintiffs and Dr. Leitzinger point to the fact that the PGA TOUR has historically granted conflicting event releases to its members to play in international events, such as on the DP World Tour, while not granting such releases for LIV Golf events as evidence that there is no efficiency rationale for these rules.[126]  For example, Plaintiffs state:

> "[T]he Tour denied all requests from Tour members to participate in LIV Golf Invitational Series events. The denials were striking, because the Tour has historically granted releases to players to permit them to participate in events outside the U.S., but in this case the Tour issued an across-the-board denial for an event taking place in London. In its letter to the players denying the release requests, the Tour made clear that the reason it was departing from past practice was that LIV Golf planned to compete against the PGA Tour in North America.

> There is no possible procompetitive justification for the denial, particularly because—as the Tour acknowledged—it would have granted the release for another event or tour that was not trying to compete against the Tour."[127]

---

[126]    Complaint, ¶¶ 7, 71, 172-173; Leitzinger Declaration, ¶ 114.

[127]    Complaint, ¶¶ 172-173.

97.      However, the Plaintiffs' and Dr. Leitzinger's logic is fundamentally flawed.  As discussed above, the primary purpose of the Eligibility Rules is to limit the extent to which investments made by the PGA TOUR and its media partners enhance demand for a competitor of the PGA TOUR, thus enabling it to free-ride off the PGA TOUR's investments, gaining audience at the expense of the PGA TOUR and its media partners.  By definition, this concern is only relevant if the free-riding league competes with the PGA TOUR, and according to Plaintiffs and Dr. Leitzinger, LIV Golf is the only competitor in recent history that the PGA TOUR has faced.[128]  Thus, contrary to the Plaintiffs' and Dr. Leitzinger's claim, it is perfectly consistent with—in fact *supportive of*—the pro-competitive rationales discussed above, that the PGA TOUR would react differently to requests for a conflicting event release for a LIV Golf event than it typically has for other events.

98.      Moreover, although in the above quotation, the Plaintiffs cite to the PGA TOUR's refusal to grant conflicting event releases to LIV Golf's event in London as particularly inconsistent with the PGA TOUR's historical practices regarding international events, the PGA TOUR letter described in that quotation provides a clear economic rationale for this decision. Namely, the fact that LIV Golf is structured as a season-long individual and team competition means that any added success that LIV Golf's London tournament experienced as the result of the participation of PGA TOUR members could have been expected to result in added interest in the subsequent tournaments that LIV Golf has scheduled for North America (which account for five of LIV Golf's eight events in 2022).[129]  This added interest in the North American LIV Golf events would draw attention away from the PGA TOUR events being held in the same or adjacent

---

[128]      Complaint, ¶ 272; Leitzinger Declaration, ¶¶ 45-46.

[129]      In the case of Dustin Johnson, the PGA TOUR had an additional incentive to deny his request for a conflicting event release for LIV Golf's London event, since it occurred at the same time as the RBC Canadian Open, and Johnson was an RBC ambassador. ("RBC reportedly terminates sponsorship with Dustin Johnson, Graeme McDowell," *Golf Channel*, May 31, 2022, available at https://www.golfchannel.com/news/rbc-extremely-disappointed-ambassador-dustin-johnson-skipping-canadian-open-liv-golf-event.) That is, the PGA TOUR had an incentive to protect the interests of RBC, which is the title sponsor of two PGA TOUR events (the RBC Canadian Open and the RBC Heritage).  ("2021-2022 Tournament Schedule," *PGA TOUR*, available at https://www.pgatour.com/tournaments/schedule.html; Farrell, Dom, "LIV Golf tour schedule 2022: Dates, locations for all eight events in the controversial Saudi-backed PGA Tour rival," *The Sporting News*, July 29, 2002, available at https://www.sportingnews.com/us/golf/news/liv-golf-tour-schedule-2022-dates-locations-prize-money/k8y0uoimtfn96lj6nd0xadhn.)

weeks.[130]  Thus, the structure of LIV Golf is such that allowing PGA TOUR members to participate even in non-North-American LIV Golf events would enable LIV Golf to free-ride on the PGA TOUR's investments and would reduce the PGA TOUR's ability to capitalize on those investments.

99.     Dr. Leitzinger also objects to the notion that the PGA TOUR makes investments on which a competitor could free-ride, noting all of the work and expenses that golfers incur to reach elite status.[131]  As an initial matter, the fact that the players make investments in themselves does not have any bearing on whether the PGA TOUR also makes investments that benefit its players.  Moreover, Dr. Leitzinger's objection is puzzling given that, in the very same paragraph he writes, "Golfers become established, known, and popular to fans *by competing successfully in elite-level events.*"[132]  It is precisely these "elite-level" events—which enable golfers to become "established, known, and popular to fans"—that the PGA TOUR provides, and on which it seeks to limit free-riding by competitors.  Moreover, Dr. Leitzinger fails to acknowledge the various fora in which the PGA TOUR invests—particularly the Korn Ferry Tour—to aid in player development before they reach elite status.  Dr. Leitzinger also completely ignores the benefits to players' popularity and marketability when the PGA TOUR's media partners invest in promoting players in conjunction with promoting PGA TOUR events, and the potential for a rival league to free-ride on those investments in player popularity and marketability.[133]

---

[130]    Four of the five LIV Golf events scheduled in North America in 2022 took place or will take place in the same week as a PGA TOUR event (the lone exception is LIV Golf's upcoming event in Boston) (*Id.*)

[131]    Leitzinger Declaration, ¶ 117.

[132]    Leitzinger Declaration, ¶ 117 [emphasis added].

[133]    Dr. Leitzinger points to the fact that the PGA TOUR has been profitable as purported evidence that "it has not been a net investor, it has been a beneficiary." (Leitzinger Declaration, ¶ 118.) In doing so, Dr. Leitzinger apparently means to imply that the PGA TOUR could not be investing in its players if it is profitable.  There is no basis for such a claim—many companies that make investments also earn profits—in fact, that's why they make investments.  In the present context, there is nothing inconsistent about the PGA TOUR investing in promoting its players and benefitting from those investments even while the players also benefit from those investments.

100.    Dr. Leitzinger also claims that even if the decision by a PGA TOUR member to play for a competitor to the PGA TOUR could result in free-riding, the prevention of such free-riding could not be motivating the Eligibility Rules because PGA TOUR members are allowed under its rules to join a competing league—just not while playing on the PGA TOUR.[134]  Dr. Leitzinger is correct that the Eligibility Rules do not prevent players from leaving the PGA TOUR altogether, and that this exposes the PGA TOUR and its media partners to some risk of free-riding.  But the rules do limit the extent of such free-riding by preventing the player from continuing to build his reputation on the PGA TOUR while also playing for a competitor.  The fact that the PGA TOUR did not take the maximalist position in this regard—e.g., by signing players to long-term exclusive contracts—does not imply that limiting free-riding is not an important motivation for (and pro-competitive benefit of) the Eligibility Rules.  As noted above, it merely reflects a balancing on the PGA TOUR's part between having some protection against free-riding while still allowing other leagues to compete for players, as LIV Golf has done.

C.    PRO-COMPETITIVE BENEFITS OF RETAINING CONTROL OVER REPUTATION

101.    In addition to limiting the ability of LIV Golf to free-ride on the PGA TOUR's investments, the Eligibility Rules also enhance the PGA TOUR's incentive to invest in—and preserve—its reputation by allowing it to maintain greater control over that reputation.  This is particularly important with respect to LIV Golf, because it is majority-owned by the sovereign wealth fund of a country with a widely criticized human rights record.

102.    Current and former players that have been associated with LIV Golf have been criticized over that association and their comments about Saudi Arabia's human rights record.  For example, in February 2022, several sponsors cut ties with PGA TOUR member Phil Mickelson following revelations that he was considering joining LIV Golf despite acknowledging Saudi Arabia's human rights record.[135]  LIV Golf CEO Greg Norman was widely criticized for remarks that were characterized by some as downplaying Saudi Arabia's involvement in the killing of

---

[134]    Leitzinger Declaration, ¶ 120.

[135]    Porter, Kyle, "Phil Mickelson's Saudi Arabia comments prove costly as sponsors cut ties with embattled golfer," *CBS Sports*, February 27, 2022, available at https://www.cbssports.com/golf/news/phil-mickelsons-saudi-arabia-comments-prove-costly-as-sponsors-cut-ties-with-embattled-golfer/.

Washington Post journalist Jamal Khashoggi.[136]  Members of Portland's Pumpkin Ridge Golf
Club resigned in protest of the club owner's decision to host a LIV Golf event.[137]  Survivors of
9/11 and their families have been protesting at LIV Golf events due to its ties to Saudi Arabia, of
which fifteen of the nineteen 9/11 attackers were citizens.[138]

103.    If the PGA TOUR were to allow players who joined LIV Golf to remain members of the
PGA TOUR, any reputational repercussions for the players from associating (even indirectly)
with Saudi Arabia could spill over to the PGA TOUR, for example, through a decrease in the
popularity of such players, fan disinterest in watching or attending PGA TOUR events in which
those players participated, or through media questions about the regime distracting from more
positive stories surrounding PGA TOUR tournaments.  Thus, by preventing players who join
LIV Golf from concurrently playing in the PGA TOUR, the Eligibility Rules limit the extent to
which the reputational decisions made by LIV Golf (such as accepting funding from the Saudi
PIF) can undermine the PGA TOUR's investments in its own reputation.

104.    Making decisions to protect a firm's reputation is hardly unique to the PGA TOUR and is
pro-competitive, in the sense that it enables the firm to protect and enhance the perception of its
offering to consumers, thus enabling it to compete more effectively.  For example, many
sponsors have independently chosen to disassociate from players who have joined LIV Golf,
indicating that association with a league funded by money from Saudi Arabia would be harmful

---

[136]    See, e.g., Bonesteel, Matt, "Greg Norman criticized for downplaying Saudis' killing of Jamal
Khashoggi," *Washington Post*, May 12, 2022, available at
https://www.washingtonpost.com/sports/2022/05/12/greg-norman-saudi-golf-mistake/.

[137]    Longman, Jeré, "Big Names, Big Money and a Big Pushback at LIV Golf's Oregon Event," *The
New York Times*, June 29, 2022, available at
https://www.nytimes.com/2022/06/29/sports/golf/big-names-big-money-and-a-big-pushback-at-
liv-golfs-oregon-event.html ("There is vehement opposition by some to holding the three-day
tournament at the Pumpkin Ridge Golf Club, about 20 miles northwest of Portland. The
disapproval has come from politicians, a group of 9/11 survivors and family members, club
members who have resigned in protest and at least one outspoken club board member. Critics
have decried what they describe as Saudi Arabia's attempt to use sports to soften the perception
in the West of its grim human rights record.").

[138]    Scribner, Herb, "9/11 families protest outside Trump golf course as Saudi-backed LIV kicks off,"
*Axios*, July 29, 2022, available at https://www.axios.com/2022/07/29/liv-golf-event-trump-911-
families.

to their reputation.[139]  In that sense, the PGA TOUR is simply making a decision similar to the one many of its sponsors have made, choosing not to associate with players associated with a Saudi-funded league.  More generally, firms regularly disassociate themselves from individuals who take actions that would be harmful to the firm's reputation.[140]  Allowing firms the freedom to do so is part of allowing the competitive process, in which each firm chooses how to design and market its products, to play out.

### D.   Pro-competitive Benefits of Allowing the PGA TOUR to Protect the Competitive Integrity of Its Tournaments

105.   Like most professional sports leagues, the PGA TOUR has put in place rules to protect the competitive integrity of its tournaments.  For example, the PGA TOUR has extensive rules governing player conduct that could be construed as helping another player during the course of a tournament.[141]  I understand that the PGA TOUR's prohibition on a player having a "direct or indirect" financial interest in the performance of another player at a PGA TOUR event is another rule intended to preserve the competitive integrity of the PGA TOUR's events.

---

[139]   See, e.g., Suggs, David, "Dustin Johnson, Phil Mickelson and other prominent LIV Golf defectors to lose major sponsorships after leaving PGA Tour," *The Sporting News*, June 11, 2022, available at https://www.sportingnews.com/us/golf/news/liv-golf-lost-sponsorships-dustin-johnson-phil-mickelson/tnzxyoc3nnag9fztrjdlbrty ("A growing list of golfers have lost sponsors in recent weeks, a consequence of their leaving the PGA Tour and joining the LIV competition despite the Saudis' history of human rights abuses.").

[140]   See, e.g., Rovell, Darren, "Nike cuts ties with Manny Pacquiao after derogatory comments," *ESPN*, February 17, 2016, available at https://www.espn.com/boxing/story/_/id/14793389/nike-ends-endorsement-contract-manny-pacquiao; Seamark, Michael, "Wayne's £2.5m comeuppance: Rooney now axed as face of Coca-Cola following his foul-mouthed tirade on live TV," *Daily Mail*, April 6, 2011, available at https://www.dailymail.co.uk/news/article-1374088/Wayne-Rooney-axed-Coca-Cola-foul-mouthed-tirade-live-TV.html; Walker, James, "Champion drops Rashard Mendenhall," *ESPN*, May 6, 2011, available at https://www.espn.com.au/nfl/news/story?id=6493301; and Keith, Braden, "Rice Loses Jaguar Sponsorship for Using Homophobic Slur, Reminds Us of Increased Exposure of Swimming," *SwimSwam*, September 7, 2010, available at https://swimswam.com/rice-loses-jaguar-sponsorship-for-using-homophobic-slur-reminds-us-of-increased-exposure-of-swimming/.

[141]   McAfee, James, "Pros Can't Give Each Other Advice," *The A Position*, http://theaposition.com/jamesamcafee/golf/110/pros-can-t-give-each-other-advice.

106.    Taking steps to ensure the competitive integrity of its tournaments represents a choice about the type of product the PGA TOUR wants to offer.  The ability of competitors to structure their products in the manner they think will best attract customers is pro-competitive.

107.    As noted above, LIV Golf plans to give the principal player(s) on each team equity in that team.  If LIV Golf players were allowed to play on the PGA TOUR, a player with an equity stake in a LIV Golf team might have a financial incentive (or at least the appearance of a financial incentive) to assist another player from that team when the two are ostensibly competing at a PGA TOUR tournament, since a better performance could improve the second player's reputation and ranking and thus increase the marketability of the LIV Golf team for which he plays.  If the PGA TOUR believes that such a financial arrangement could damage the competitive integrity of PGA TOUR events, then prohibiting LIV Golf players from participating in the PGA TOUR is a way to protect a legitimate business interest.

## VII.   DR. LEITZINGER PRESENTS NO ECONOMIC ANALYSIS OF THE ALLEGED BOYCOTT

108.    Plaintiffs allege that "the tour has unlawfully agreed with others to boycott players under Section 1 of the Sherman Act."[142]  In particular, Plaintiffs allege that the PGA TOUR "coerced and coordinated with the [DP World Tour] … to boycott any players that work with LIV Golf."[143]  Plaintiffs also allege that the putative agreement between the PGA TOUR and DP World Tour "effectuated the removal of an important potential LIV Golf partner."[144]

109.    Notably, Dr. Leitzinger does not present any economic analysis of these allegations.  As such, he provides no economic substance to react to on this topic.

110.    Nevertheless, it is important to note that, even if taken at face value, these allegations *do not* describe a conspiracy between competitors in the same market.  Plaintiffs and Dr. Leitzinger

---

[142]    Notice Of Motion and Motion for Temporary Restraining Order, *Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Abraham Ancer, Carlos Ortiz, Ian Poulter, Pat Perez, Jason Kokrak and Peter Uihlein v. PGA TOUR, Inc.*, Civil Action No. 3:22-cv-04486, August 3, 2022 ("Motion for TRO"), p. 19.

[143]    Motion for TRO, p. 19.

[144]    Motion for TRO, p. 19.

claim that LIV Golf is the only competitor in recent history that the PGA TOUR has faced.[145] Dr. Leitzinger specifically states that the DP World Tour is not a substitute for the PGA TOUR, and therefore it does not compete within the same market with the PGA TOUR.[146] If correct, Plaintiffs' and Dr. Leitzinger's claims in this regard imply that even if some agreement was reached between the PGA TOUR and the DP World Tour, it would not constitute a horizontal conspiracy from an economic perspective (because the entities are not competitors).

**DATE: August 7, 2022**

_____

Mark A. Israel

---

[145]      Complaint, ¶ 272; Leitzinger Declaration, ¶¶ 45-46.

[146]      Leitzinger Declaration, ¶¶ 45-46, 50.

Exhibit A

**Mark A. Israel**                                              **July 2022**
**Senior Managing Director, Compass Lexecon**

555 12th Street NW, Suite 501
Washington, DC 20004
(202) 753-5205 (direct)
misrael@compasslexecon.com

## PROFESSIONAL EXPERIENCE HIGHLIGHTS

- Served as an expert for the Federal Government and private parties in cases involving: fixed and mobile telecommunications, cable television, broadband internet service, airlines, social media, other high technology industries, food distribution, coal and other energy markets, railroads, shipping, health insurance, financial markets, credit cards, retail, and many others.

- Testified in Federal Court, in multiple state courts, in front of the United States Copyright Royalty Judges, in front of international competition authorities, and in arbitration proceedings. Appeared in front of government agencies including DOJ, FTC, and FCC, and state agencies on behalf of numerous clients.

- Submitted expert reports in Federal Court, and affidavits, declarations, and papers to U.S. competition agencies, FCC, DOT, international competition authorities, and state regulators.

- Written numerous academic articles on topics including competition economics, merger policy, telecommunications, airlines, insurance markets, and labor markets. Research published in leading scholarly and applied journals including *The American Economic Review*, *The Rand Journal of Economics*, *International Journal of Industrial Organization*, *The Journal of Competition Law and Economics,* and many others, and presented to business, government, and academic audiences worldwide.

- Co-author of the chapter on Econometrics and Regression Analysis in the ABA Treatise, *Proving Economic Damages: Legal and Economic Issues,* 2017.

## AREAS OF EXPERTISE

- Antitrust and competition economics; industrial organization economics

- Applied econometrics

- Economic and econometric analysis of horizontal and vertical mergers

- Economic and econometric analysis of antitrust litigation topics, including: Class certification, damages, and liability issues in cases involving price fixing, exclusive dealing, monopolization, bundling, price discrimination, and exclusionary practices

## EDUCATION

- Ph.D., Economics, STANFORD UNIVERSITY, June 2001.
- M.S., Economics, UNIVERSITY OF WISCONSIN-MADISON, August 1992.
- B.A., Economics, ILLINOIS WESLEYAN UNIVERSITY, Summa Cum Laude, May 1991.

## EMPLOYMENT HISTORY

Compass Lexecon: *Senior Managing Director*, Head of Compass Lexecon North American Antitrust Practice, January 2016 – Present.

(Previously: *Executive Vice President*, April 2013 – January 2016; *Senior Vice President*, January 2009 – March 2013; *Vice President*, January 2008 – December 2008; *Economist*, January 2006 – December 2007.)

Kellogg School of Management, Northwestern University: *Assistant Professor of Management and Strategy*, 2000 – 2006; *Associate Professor of Management and Strategy*, 2007 – 2008.

State Farm Insurance: *Research Administrator*, 1992 – 1995.

## RECENT PROFESSIONAL RECOGNITIONS

Global Competition Review Who's Who Legal, Thought Leader in Competition: 2019, 2020.

Global Competition Review Who's Who Legal, Global Leader in Competition – Economists 2020; Experts – Economics – Competition Economists 2020; Experts – Financial Advisory and Valuation – Quantum of Damages 2020.

Global Arbitration Review's International Who's Who of Commercial Arbitration, Leading Expert Witness, 2018.

## LIVE TESTIMONIAL EXPERIENCE

Testimony as Economic Expert on behalf of Arconic, Inc. et al., In the Matter of *Arconic, Corp., and Howmet Aerospace, Inc. v Novelis, Inc., and Novelis, Corp.,* United States District Court for the Western District of Pennsylvania, Case No. 2:17-cv-014340-JFC, Deposition: April 29, 2022.

Testimony as Economic Expert on behalf of Norfolk Southern Railway Corporation, "Reciprocal Switching," In Front of the Surface Transportation Board, Docket No. EP 711 (Sub-No. 1), Live Testimony: March 16, 2022.

Live testimony in front of arbitration panel in confidential arbitration regarding wholesale roaming rate for wireless telecommunications: December 13-14, 2021.

Testimony as Economic Expert on behalf of Nippon Chemi-Con and United Chemi-Con, *In Re Capacitors Antitrust Litigation,* United States District Court for the Northern District of California Division, No. 3:14-CV-03264, Deposition: March 14, 2020; Live Jury Trial Testimony: December 8, 2021.

Testimony as Economic Expert on behalf of Norfolk Southern Railway Company, *In Re Rail Freight Fuel Surcharge Antitrust Litigation*, In the United States District Court for the District of Columbia, MDL No. 1869, Case No. 07-0489 (PLF/GMH), Deposition: November 18, 2021.

Testimony as Economic Expert on behalf of JPMorgan, Goldman Sachs and Glencore, *In Re Aluminum Warehousing Antitrust Litigation*, MDL 2481, In the United States District Court Southern District of New York, No. 16-CV-5955, Deposition: November 5, 2021.

Testimony as Economic Expert on behalf of Cox Automotive, Inc. et al., In the Matter between *Cox Automotive, Inc., Autotrader.com, Inc., Dealer Dot Com, Inc., Dealertrack, Inc.; Homenet, Inc.; Kelley Blue Book Co., Inc.; Vauto, Inc.; Vinsolutions, Inc.; and Xtime, Inc. vs. The Reynolds and Reynolds Company*, American Arbitration Association, Case No. 01-19-0000-4548, Deposition: October 21, 2021.

Testimony as Economic Expert on behalf of the Joint Defense Group, In the Matter between *Cygnus Electronics Corporation and Sean Allott and Panasonic Corporation et al.*, In the Ontario Superior Court of Justice, Court File No. 3795-14 CP, Deposition: September 29, 2021.

Testimony as Economic Expert on behalf of American Express, In the Matter of *B & R Supermarket, Inc., d/b/a Milam's Market, et al., Individually and on Behalf of All Others Similarly Situated v. Visa, Inc., et al.*, In the United States District Court Eastern District of New York, Case No. 117-cv-02738-MKB-VMS, Deposition: August 6, 2021.

Testimony as Economic Expert on behalf of Bio-Rad Laboratories, Inc., In the Matter of *Bio-Rad Laboratories, Inc. and President and Fellow of Harvard College v. 10X Genomics, Inc., and 10X Genomics, Inc. v. Bio-Rad Labs, Inc. and President and Fellow of Harvard College as Counterclaimants,* In the United States District Court for the District of Massachusetts, Civil Action No. 1:19-cv-12533-wgy, Deposition: June 1, 2021.

Testimony as Economic Expert on behalf of Joint Applicants, In the Matter of *TracFone Wireless, Inc. (U4321C), América Móvil, S.A.B. de C.V. and Verizon Communications, Inc. for Approval of Transfer of Control over TracFone Wireless, Inc.*, Public Utilities Commission of the State of California, Application 20-11-001, Opening Testimony: March 12, 2021; Rebuttal Testimony: April 9, 2021; Live Trial Testimony: May 5, 2021; Supplemental Testimony: May 28, 2021.

Testimony as Economic Expert on behalf of Peabody Energy Corporation and Arch Coal, Inc., In the Matter of *Federal Trade Commission v. Peabody Energy Corporation and Arch Coal, Inc.*, In the United States District Court for the Eastern District of Missouri, Civil Action No. 4-20-cv-000317-SEP, Deposition: June 29, 2020; Live Trial Testimony: July 24, 2020.

Testimony as Economic Expert on behalf of Authenticom, Inc., *In Re Dealer Management Systems Antitrust Litigation*, MDL 2817, United States District Court for the Northern District of Illinois Eastern Division, No. 1:18-CV-864, Deposition: January 16-17, 2020.

Testimony as Economic Expert on behalf of Trinity, In the Matter of *Jackson County, Missouri, Individually and on behalf of a class of others similarly situated, v. Trinity Industries, Inc., and Trinity Highway Products, LLC*, In the Circuit Court of Jackson County, Missouri at Independence, Case No. 1516-CV23684, Stage 1 Testimony: May 24, 2017; Stage 2 Deposition: November 14, 2019.

Testimony as Economic Expert on behalf of Joint Applicants, In the Proposed Merger of T-Mobile US, Inc. and Sprint Communications, Inc., Public Utilities Commission, State of California, San Francisco, California, Docket Nos. A.18-07-011 and A.18-07-012, Direct Rebuttal Testimony: January 29, 2019; Live Testimony: February 7, 2019; Direct Supplemental Testimony: November 7, 2019.

Testimony as Economic Expert on behalf of Turner Network Sales, Inc., In the Matter of *DISH Network L.L.C. v. Turner Network Sales, Inc.*, JAMS Arbitration No. 1100103066, Deposition: August 9, 2019; Live Trial Testimony: August 29, 2019.

Testimony of Economic Expert on behalf of Marriott Vacations Worldwide Corporation, et al., In the Matter of *RCHFU, LLC, et al. v. Marriott Vacations Worldwide Corporation, et al.*, In the United States District Court for the Eastern District of Colorado, Civil Action No. 1:16-cv-01301-PAB-GPG, Deposition: July 12, 2019.

Testimony as Economic Expert on behalf of Oscar Insurance Company of Florida, In the Matter of *Oscar Insurance Company of Florida v. Blue Cross and Blue Shield of Florida, Inc., d/b/a/ Florida Blue; Health Options Inc., d/b/a/ Florida Blue HMO; and Florida Health Care Plan Inc., d/b/a/ Florida Health Care Plans*, In the United States District Court Middle District of Florida Orlando Division, Case No. 6:18-cv-01944, Live Preliminary Injunction Hearing Testimony: January 23, 2019.

Testimony as Economic Expert on behalf of Wilh. Wilhelmsen Holding ASA, In the Matter of the *Federal Trade Commission v. Wilh. Wilhelmsen Holding ASA Wilhelmsen Maritime Services As Resolute Fund II, L.P. Drew Marine Intermediate II B.V. and Drew Marine Group, Inc.*, In the United States District Court for the District of Columbia, No. 1:18-cv-00414-TSC, Deposition: May 24, 2018; Live Trial Testimony: June 12, June 13, 2018.

Testimony as Economic Expert on behalf of Joint Sports Claimants, In the Matter of *Determination of Cable Royalty Funds*, United States Copyright Royalty Judges in the Library of Congress, Docket No. 14-CRB-0010-CD (2010-2013), Live Testimony: March 12, 2018.

Testimony as Economic Expert on behalf of Comcast Corporation, In the Matter of *Viamedia, Inc. v. Comcast Corporation and Comcast Spotlight, LP*, In the United States District Court Northern District of Illinois Eastern Division, Case No. 16-cv-5486, Deposition: January 5, 2018.

Testimony as Economic Expert on behalf of Energy Solutions, Inc., In the Matter of the *United States of America v. Energy Solutions, Inc., Rockwell Holdco, Inc., Andrews County Holdings, Inc., and Waste Control Specialists, LLC*, In the United States District Court for the District of Delaware, Civil Action No. 16-cv-01056-SLR, Deposition: April 17, 2017; Live Trial Testimony: May 2, May 3, 2017.

Testimony as Economic Expert on behalf of Facebook, Inc., In the Matter of *Social Ranger, LLC v. Facebook, Inc.*, In the District Court of Delaware, C.A. No. 14-1525-LPS, Deposition: March 6, 2017.

Testimony as Economic Expert on behalf of Regal Entertainment Group, In the Matter of *iPic – Gold Class Entertainment, LLC et al., v. Regal Entertainment Group, AMC Entertainment Holdings, Inc., et al.*, In the District Court of Harris County, Texas, 234th Judicial District, No. 2015-68745, Deposition: January 12, 2016, February 15, 2017; Live Trial Testimony: January 21, 2016.

Testimony as Economic Expert on behalf of Anthem Inc., In the Matter of the *United States of America et al. v. Anthem Inc. and Cigna Corp.*, In the District Court of the District of Columbia, No. 16-cv-01493 (ABJ), Deposition: November 9, 2016; Phase 1 Live Trial Testimony: December 1, December 2, 2016; Phase 2 Live Trial Testimony: December 22, 2016.

Testimony as Economic Expert on behalf of Defendants, In the Matter of *Darren Ewert v. Nippon Yusen Kabushiki Kaisha et al.*, Supreme Court of British Columbia, No. S-134895, Deposition: September 14, 2016.

Testimony in Commercial Arbitration on Issues Related to Mobile Wireless Competition, New York, NY, April 12, 2016.

Testimony as Economic Expert on behalf of Federal Trade Commission, In the Matter of *Federal Trade Commission et al. v. Sysco Corporation and USF Holding Corp.*, Civil Action No. 15-cv-00256 (APM), Deposition: April 28, 2015; Live Trial Testimony: May 7, May 8, May 14, 2015.

Appearances in Federal Communications Commission, Economists Panels:
- Comcast/Time Warner, January 2015
- AT&T/T-Mobile, July 2011
- Comcast/NBCUniversal, August 2010

Appearance before California Public Utility Commission, Public Hearings on Comcast/Time Warner Merger, Los Angeles, April 2015.

Appearance as Economic Expert in front of Department of Justice, Federal Trade Commission, Federal Communications Commission, and State Regulatory Agencies in many additional transactions, including: Danaher/NetScout, AT&T/Leap Wireless, T-Mobile/MetroPCS, American Airlines/US Airways, SpectrumCo/Cox/Verizon Wireless, oneworld antitrust immunity application, PepsiCo/bottlers, Houghton Mifflin/Harcourt, Chicago Mercantile Exchange/Chicago Board of Trade.

## **EXPERT REPORTS, AFFIDAVITS, AND DECLARATIONS**

Expert Report of Mark A. Israel, Ph.D., In the Matter of *United States of America, et al. v. American Airlines Group Inc. and JetBlue Airways Corporation*, In the United States District Court for the District of Massachusetts, Civil Action No. 1:21-cv-11558-LTS, July 11, 2022.

Expert Reports of Mark A. Israel, Ph.D., *In Re Rail Freight Fuel Surcharge Antitrust Litigation*, In the United States District Court for the District of Columbia, MDL No. 1869, Case No. 07-489, Initial Report: April 15, 2021; Surrebuttal Report: May 10, 2022.

Expert Reports of Mark A. Israel, Ph.D., In the Matter of *Arconic Inc. v. Novelis Inc., Novelis Corp.*, In the United States District Court for the Western District of Pennsylvania, No. 2:17-CV-01434, Initial Report: February 11, 2022; Reply Report: March 18, 2022.

Verified Statement of Mark A. Israel, Ph.D., "Reciprocal Switching," Surface Transportation Board, Docket No. EP 711 (Sub-No. 1), February 14, 2022.

Expert Report of Mark A. Israel, In the Matter between *Sean Allott and Panasonic Corporation; Panasonic Corporation of North American; Panasonic Canada Inc.; KOA Corporation; KOA Speer Electronics, Inc., et al.,* In the Ontario Superior Court of Justice, Court File No. 1899-2015 CP, January 17, 2022.

Expert Reports of Mark A. Israel, Ph.D., *In Re Aluminum Warehousing Antitrust Litigation*, In the United States District Court Southern District of New York, MDL No. 2481, Initial Report: September 17, 2021; Supplemental Declaration: January 14, 2022.

Affidavits in confidential arbitration regarding wholesale roaming rate for wireless telecommunications, Initial Affidavit: August 23, 2021; Reply Affidavit: November 15, 2021.

Expert Report of Mark A. Israel, In the Matter of *Bio-Rad Laboratories, Inc. and President and Fellow of Harvard College v. 10X Genomics, Inc., and 10X Genomics, Inc. v. Bio-Rad Labs., Inc. and President and Fellow of Harvard College as Counterclaimants*, In the United States District Court for the District of Massachusetts, Civil Action No. 1:19-cv-12533-wgy, May 14, 2021.

Expert Report of Mark A. Israel, In the Matter of *B & R Supermarket, Inc., d/b/a Milam's Market, Grove Liquors LLC, Strouk Group LLC, d/b/a Monsieur Marcel, and Palero Food Corp. and Cagueyes Food Corp., d/b/a Fine Fare Supermarket v. Mastercard International Inc., Visa Inc., Visa U.S.A., Inc., Discover Financial Services, and American Express Company*, In the United States District Court for the Eastern District of New York, Case No. 17-CV-02738 (MKB) (JO), March 22, 2021.

Expert Report of Dr. Mark A. Israel, In the Matter of *Joshua M. Harman Qui Tam v. Trinity Industries, Inc., et al.,* In the Commonwealth of Massachusetts, Superior Court Department, Civil Action No. 2014-02364-D, February 26, 2021.

Verified Statement of Mark Israel, "Review of Commodity, Boxcar, and TOFC/COFC Exemptions," Surface Transportation Board, Docket No. EP 704 (Sub-No. 1), January 29, 2021.

Expert Report of Mark A. Israel, Ph.D., *In Re Comtech/Gilat Merger Litigation*, Court of Chancery of the State of Delaware, Consolidated C.A. No. 2020-0605-JRS, September 24, 2020.

Declaration of Mark Israel and Allan Shampine, In the Matter of *AMC Networks Inc. v. AT&T Inc.*, Before the Federal Communications Commission, MB Docket No. 20-254, File No. CSR-8993, August 20, 2020.

Expert Report of Mark A. Israel, In the Matter between *Ryan Kett and Mitsubishi Materials Corporation, Mitsubishi Cable Industries, Ltd., Mitsubishi Shindoh Co., Ltd., Mitsubishi Aluminum Co., Ltd., Tachibana Metal Mfg. Co., Ltd., and Diamet Corporation,* In the Supreme Court of British Columbia, Case No. VLC-S-S-1813758, July 15, 2020.

6

Expert Reports of Mark A. Israel, Ph.D., In the Matter of *Federal Trade Commission v. Peabody Energy Corporation and Arch Coal, Inc.*, In the United States District Court for the Eastern District of Missouri, Civil Action No. 4-20-cv-000317-SEP, Initial Report: May 26, 2020; Reply Report: June 19, 2020.

Expert Reports of Mark A. Israel, Ph.D., *In Re Dealer Management Systems Antitrust Litigation*, United States District Court for the Northern District of Illinois Eastern Division, MDL 2817, No. 1:18-CV-864, Initial Report: August 26, 2019; Reply Report: December 19, 2019.

Expert Reports of Mark A. Israel, Ph.D., *In Re Domestic Airline Travel Antitrust Litigation*, United States District Court for the District of Columbia, MDL Docket No. 2656, Misc. No. 15-1404 (CKK), Initial Report: September 30, 2019; Rebuttal Report: November 14, 2019.

Expert Reports of Mark A. Israel, In the Matter of *DISH Network L.L.C. v. Turner Network Sales, Inc.*, JAMS Arbitration No. 1100103066, Initial Report: July 23, 2019; Reply Report: August 2, 2019.

Submission of Mark A. Israel, Maya Meidan, and Robert J. Calzaretta, Jr., "The Atlantic Joint Business Generates Substantial Consumer Benefits," Competition and Markets Authority, United Kingdom, July 1, 2019.

Submission of Philip Haile and Mark Israel, "Alternative Approaches to Airport Slot Allocation: Objectives and Challenges," Department for Transport, United Kingdom, June 20, 2019.

Submission of Mark A. Israel, Maya Meidan, and Robert J. Calzaretta, Jr., "The Atlantic Joint Business Has Not Harmed Competition on Nonstop Overlap Routes, Including Focus Routes," Competition and Markets Authority, United Kingdom, June 14, 2019.

Expert Reports of Mark A. Israel, In the Matter of *RCHFU, LLC, et al. v. Marriott Vacations Worldwide Corporation, et al.,* In the United States District Court for the District of Colorado, Civil Action No. 16-01301-PAB-GPG, Initial Report: December 28, 2018; Supplemental Rebuttal Report, June 14, 2019.

Submission of Mark Israel, "The Fidelity/Stewart Merger Does Not Raise Competitive Concerns in the New York Title Insurance Industry," Revised Section 1506 Application Regarding the Proposed Acquisition of Stewart Title Insurance Company by Fidelity National Financial, Inc., New York State Department of Financial Services, April 12, 2019.

Second Report of Dr. Mark A. Israel, Between *UK Trucks Claim Limited and (1) – (5) Fiat Chrysler Automobiles NV and (1) – (4) MAN Truck & Bus AG & ORS*, In the Competition Appeal Tribunal, Case No. 1282/7/7/18, April 11, 2019.

Expert Report of Mark A. Israel, In the Matter between *Ryan Kett, Erik Oun and Jim Wong and Kobe Steel, Ltd., Shinko Metal Products Co., Ltd., Shinko Aluminum Wire Co., Ltd., Shinko Wire Stainless Company, Ltd., Kobelco & Materials Copper Tube Co., and Nippon Koshuha Steel Co., Ltd.*, In the Supreme Court of British Columbia, Case No. S-1710805, March 28, 2019.

Expert Report of Dr. Mark A. Israel, Between *Road Haulage Association and (1) – (10) MAN SE and Others and (1) Daimler AG, (2) Volvo Lastvagnar Aktiebolag*, In the Competition Appeal Tribunal, Case No. 1289/7/7/18, March 22, 2019.

Submission of Robert J. Calzaretta, Jr., Mark A. Israel, and Maya Meidan, "Assessing the Effects of ATI and JV Overlaps on Nonstop Fares: An Event Study Approach," submitted as part of a Supplement to Joint Motion to Amend Order 2010-7-8 for Approval of and Antitrust Immunity for Amended Joint Business Agreement, In the Application of American Airlines, Inc., British Airways PLC, OpenSkies SAS, Iberia Líneas Aéreas de España, S.A., Finnair OYJ, Aer Lingus Group DAC, Before the U.S. Department of Transportation, Washington, DC, Docket DOT-OST-2008-0252-, January 11, 2019.

Declarations of Mark A. Israel, In the Matter of *Oscar Insurance Company of Florida v. Blue Cross and Blue Shield of Florida, Inc., d/b/a Florida Blue; Health Options Inc., d/b/a Florida Blue HMO; and Florida Health Care Plan Inc., d/b/a Florida Health Care Plans,* In the United States District Court Middle District of Florida Orlando Division, Case No. 6:18-cv-01944, Declaration: November 19, 2018; Supplemental Declaration: December 21, 2018.

Reply Declaration of Mark Israel, Michael Katz, and Bryan Keating, In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations, Federal Communications Commission, WT Docket No. 18-197, September 17, 2018.

Expert Report of Gustavo Bamberger, Robert Calzaretta, and Mark Israel, In the Joint Application of Hawaiian Airlines, Inc. and Japan Airlines, Co., Ltd., Appendix 6 to "Joint Application for Approval of and Antitrust Immunity for Alliance Agreements," Department of Transportation, Case No. DOT-OST-2018-0084, June 13, 2018.

Expert Reports of Mark A. Israel, In the Matter between *Cygnus Electronics Corporation and Sean Allott and Panasonic Corporation et al.,* In the Ontario Superior Court of Justice, Court File No. 3795/14CP, Initial Report: November 17, 2017; Reply Report: February 23, 2018; Supplemental Report: May 22, 2018.

Expert Report of Mark A. Israel, In the Matter of the *Federal Trade Commission v. Wilh. Wilhelmsen Holding ASA Wilhelmsen Maritime Services As Resolute Fund II, L.P. Drew Marine Intermediate II B.V. and Drew Marine Group, Inc.*, In the United States District Court for the District of Columbia, No. 1:18-cv-00414-TSC, May 11, 2018.

Reports of Dr. Mark A. Israel, In the Matter of *Viamedia, Inc. v. Comcast Corporation and Comcast Spotlight, LP,* In the United States District Court for the Northern District of Illinois Eastern Division, Case No. 16-cv-5486, Rebuttal Report: November 30, 2017; Errata Sheet for Rebuttal Report: January 4, 2018.

Declaration of Mark A. Israel, In the Matter between *Robert Foster and Murray Davenport and Sears Canada Inc. et al.*, In the Ontario Superior Court of Justice, Court File No. 766-2010 CP, November 1, 2017.

Expert Report of Mark Israel and Bryan Keating, "Economic Analysis of Dr. Evans' Claims as They Relate to *Restoring Internet Freedom*," Federal Communications Commission, WC Docket No. 17-108, October 31, 2017.

Written Rebuttal Testimony of Dr. Mark A. Israel, In the Matter of *Distribution of Cable Royalty Funds*, Before the Copyright Royalty Judges, Washington, D.C., No. 14-CRB-0010-CD, September 15, 2017; Written Direct Testimony: December 22, 2016.

Declaration of Mark A. Israel, Allan L. Shampine, and Thomas A. Stemwedel, In the Matter of *Restoring Internet Freedom*, Federal Communications Commission, WC Docket No. 17-108, July 17, 2017.

Expert Report of Dr. Mark A. Israel, In the Matter of *St. Clair County, Illinois, and Macon County, Illinois, Individually and on behalf of all other counties in the State of Illinois, v. Trinity Industries, Inc. and Trinity Highway Products, LLC*, In the United States District Court for the Southern District of Illinois, Civil Action No.: 3:14-cv-1320, April 25, 2017.

Expert Reports of Mark A. Israel, In the Matter of the *United States of America v. Energy Solutions, Inc., Rockwell Holdco, Inc., Andrews County Holdings, Inc., and Waste Control Specialists, LLC*, In the United States District Court for the District of Delaware, Civil Action No. 16-cv-01056-SLR, Initial Report: March 27, 2017; Rebuttal Report: April 10, 2017.

Expert Report of Mark A. Israel, In the Matter of *Jackson County, Missouri, Individually and on behalf of a class of others similarly situated, v. Trinity Industries, Inc., and Trinity Highway Products, LLC*, In the Circuit Court of Jackson County, Missouri at Independence, Case No. 1516-CV23684, March 24, 2017.

Expert Report of Mark A. Israel, In the Matter of *Honeywell International Inc. v. iControl Networks, Inc. and Alarm.com Holdings, Inc.*, In the United States District Court for the District of New Jersey, No. 2:17-cv-01227, February 26, 2017.

Expert Report of Mark Israel, In the Matter of *Social Ranger, LLC v. Facebook, Inc.*, In the United States District Court for the District of Delaware, C.A. No. 14-1525-LPS, November 23, 2016.

Expert Report of Mark A. Israel, In the Matter between *Darren Ewert and DENSO Corporation et al.*, In the Supreme Court of British Columbia, Vancouver Registry, No. S-135610, November 15, 2016.

Expert Reports of Mark A. Israel, In the Matter of the *United States of America et al. v. Anthem Inc. and Cigna Corp.*, In the United States District Court, District of Columbia, No. 16-cv-01493 (ABJ), Initial Report: October 7, 2016; Supplemental and Rebuttal Report: October 28,2016.

Verified Statements of Mark Israel and Jonathan Orszag, "Review of Commodity, Boxcar, and TOFC/COFC Exemptions," Surface Transportation Board, Docket No. EP 704 (Sub-No. 1), Initial Verified Statement: July 26, 2016; Reply Verified Statement: August 26, 2016.

Declarations of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, "Analysis of the Regressions and Other Data Relied Upon in the Business Data Services FNPRM And a Proposed Competitive Market Test," Federal Communications Commission, WC Docket Nos. 16-143, 15-247, 05-25, RM-10593, Second Declaration: June 28, 2016; Third Declaration: August 9, 2016.

Expert Declaration of Mark A. Israel, In the Matter of *Liberman Broadcasting, Inc. and LBI Media, Inc. v. Comcast Corporation and Comcast Cable Communications, LLC*, Federal Communications Commission, MB Docket No. 16-121, June 7, 2016.

Expert Report of Mark A. Israel, In the Matter of *La Crosse County, Individually, and on behalf of all others similarly situated v. Trinity Industries, INC. and Trinity Highway Products, LLC*, In the United States District Court, Western District of Wisconsin, Case No. 3:15-cv-00117-scl, May 27, 2016.

Expert Report of Mark A. Israel, In the Matter between *Darren Ewert and Nippon Yusen Kabushiki Kaisha et al.*, In the Supreme Court of British Columbia, Vancouver Registry, No. S-134895, May 20, 2016.

Declarations of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, In the Matter of *Special Access Rates for Price Cap Local Exchange Carriers*, Federal Communications Commission, WC Docket No. 05-25, Declaration: February 19, 2016; Supplemental Declaration: March 24, 2016; Second Supplemental Declaration: April 20, 2016.

Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, "Competitive Analysis of the FCC's Special Access Data Collection," Federal Communications Commission, WC Docket No. 05-25, January 26, 2016.

Declaration of Dr. Mark Israel, In the Matter of *iPic – Gold Class Entertainment, LLC et al., v. Regal Entertainment Group, AMC Entertainment Holdings, Inc., et al.*, In the District Court of Harris County, Texas, 234th Judicial District, No. 2015-68745, January 18, 2016.

Declaration of Dennis Carlton, Mark Israel, Allan Shampine & Hal Sider, "Investigation of Certain Price Cap Local Exchange Carrier Business Data Services Tariff Pricing Plans," Federal Communications Commission, WC Docket No. 15-247, January 7, 2016.

Declaration of Mark A. Israel, Attached to "Response of AT&T Mobility LLC to Notice of Apparent Liability for Forfeiture," Federal Communications Commission, File No. EB-IHD-14-00017504, July 17, 2015.

Reports in the Matter of *Federal Trade Commission et al. v. Sysco Corporation and USF Holding Corp.*, In the United States District Court for the District of Columbia, Civil Action No. 1:15-cv-00256 (APM), Declaration: February 18, 2015; Report: April 14, 2015; Rebuttal Report: April 21, 2015.

Declaration of Mark A. Israel, Bryan G. M. Keating, and David Weiskopf, "Economic Analysis of the Effect of the Comcast-TWC Transaction on Voice and Broadband Services in California," December 3, 2014.

Expert Report of Mark A. Israel, "Economic Analysis of the Effect of the Comcast-TWC Transaction on Broadband: Reply to Commenters," Federal Communications Commission, MB Docket No. 14-57, September 22, 2014.

Supplemental Declaration of Mark Israel and Allan Shampine, In the Matter of *Amendment of the Commission's Rules Related to Retransmission Consent, Appendix A to "Reply Comments of the National Association of Broadcasters*," Federal Communications Commission, MB Docket No. 10-71, July 24, 2014.

Declaration of Mark Israel and Allan Shampine, In the Matter of *Amendment of the Commission's Rules Related to Retransmission Consent, Appendix B to "Comments of the National Association of Broadcasters*," Federal Communications Commission, MB Docket No. 10-71, June 26, 2014.

Expert Report of Mark A. Israel, "Implications of the Comcast/Time Warner Cable Transaction for Broadband Competition," Federal Communications Commission, MB Docket No. 14-57, April 8, 2014.

Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Sprint's Proposed Weighted Spectrum Screen Defies Economic Logic and Is Inconsistent with Established Facts," Federal Communications Commission, WT Docket No. 12-269, March 14, 2014.

Reply Declaration of Mark A. Israel, "Competitive Effects and Consumer Benefits from the Proposed Acquisition of Leap Wireless by AT&T: A Reply Declaration," Federal Communications Commission, WT Docket No. 13-193, October 23, 2013.

Declaration of Mark A. Israel, "An Economic Analysis of Competitive Effects and Consumer Benefits from the Proposed Acquisition of Leap Wireless by AT&T," Federal Communications Commission, WT Docket No. 13-193, August 1, 2013.

Supplemental Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Comments on Appropriate Spectrum Aggregation Policy with Application to the Upcoming 600 MHz Auction," Federal Communications Commission, WT Docket No. 12-269, June 13, 2013.

Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Comment on the Submission of the U.S. Department of Justice Regarding Auction Participation Restrictions," Federal Communications Commission, WT Docket No. 12-269, June 13, 2013.

Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Spectrum Aggregation Policy, Spectrum-Holdings-Based Bidding Credits, and Unlicensed Spectrum," Federal Communications Commission, GN Docket No. 12-268, March 12, 2013.

Declaration of Igal Hendel and Mark A. Israel, "Econometric Principles That Should Guide the Commission's Analysis of Competition for Special Access Service," Federal Communications Commission, WC Docket No. 05-25, February 11, 2013.

Declarations of Mark A. Israel and Michael L. Katz, "Economic Analysis of Public Policy Regarding Mobile Spectrum Holdings," Federal Communications Commission, WT Docket No. 12-269, Declaration: November 28, 2012; Reply Declaration: January 7, 2013.

Declaration of Mark Israel, "An Economic Assessment of the Prohibition on Exclusive Contracts for Satellite-Delivered, Cable-Affiliated Networks," Federal Communications Commission, MB Docket Nos. 12-68, 07-18, & 05-192, September 6, 2012.

Expert Report of Mark Israel, "Implications of the Verizon Wireless & SpectrumCo/Cox Commercial Agreements for Backhaul and Wi-Fi Services Competition," Federal Communications Commission, WT Docket No. 12-4, August 1, 2012.

Expert Report of Mark A. Israel, Michael L. Katz, and Allan L. Shampine, "Promoting Interoperability in the 700 MHz Commercial Spectrum," Federal Communications Commission, WT Docket No. 12-69, July 16, 2012.

11

Affidavits of Dr. Mark A. Israel in the Matter of *Bloomberg L.P. v. Comcast Cable Communications, LLC*, Federal Communications Commission, MB Docket No. 11-104, Declaration: June 21, 2012; Declaration: June 8, 2012; Supplemental Declaration: September 27, 2011; Declaration: July 27, 2011.

Expert Report of Robert Willig, Mark Israel, Bryan Keating, and Jonathan Orszag, "Response to Supplementary Comments of Hubert Horan," Docket DOT-OST-2009-1055, October 22, 2010.

Expert Report of Robert Willig, Mark Israel, Bryan Keating, and Jonathan Orszag, "Measuring Consumer Benefits from Antitrust Immunity for Delta Air Lines and Virgin Blue Carriers," Docket DOT-OST-2009-1055, October 13, 2010.

Expert Report of Mark Israel and Michael L. Katz, "Economic Analysis of the Proposed Comcast-NBCU-GE Transaction," Federal Communications Commission, MB Docket No. 10-56, July 20, 2010.

Expert Report of Mark Israel and Michael L. Katz, "The Comcast/NBCU Transaction and Online Video Distribution," Federal Communications Commission, MB Docket No. 10-56, May 4, 2010.

Expert Report of Mark Israel and Michael L. Katz, "Application of the Commission Staff Model of Vertical Foreclosure to the Proposed Comcast-NBCU Transaction," Federal Communications Commission, MB Docket No. 10-56, February 26, 2010.

Expert Report of Robert Willig, Mark Israel, and Bryan Keating, "Competitive Effects of Airline Antitrust Immunity: Response of Robert Willig, Mark Israel, and Bryan Keating" in Docket DOT-OST-2008-0252, January 11, 2010.

Affidavit of Dr. Mark A. Israel on Class Certification in the Matter of Puerto Rican Cabotage Antitrust Litigation, in the United States District Court for the District of Puerto Rico, MDL Docket No. 3:08-md-1960 (DRD), December 10, 2009.

Expert Report of Robert Willig, Mark Israel, and Bryan Keating, "Competitive Effects of Airline Antitrust Immunity," Docket DOT-OST-2008-0252, September 8, 2009.

Expert Report and Supplemental Expert Report of Dennis W. Carlton and Mark Israel in the Matter of *Toys "R" Us-Delaware, Inc., and Geoffrey Inc. v. Chase Bank USA N.A.*, in American Arbitration Association New York, New York, Commercial Arbitrations No. 13-148-02432-08, Expert Report: February 27, 2009; Supplemental Expert Report: March 20, 2009.

Expert Reports of James Levinsohn and Mark Israel, In the Matter of *2006 NPM Adjustment Proceeding pursuant to Master Settlement Agreement*, October 6, 2008; January 16, 2009; March 10, 2009.

## SELECTED OTHER EXPERT WORK IN REVIEW OF MERGERS/TRANSACTIONS

*Successful merger of Sony's Cruncyhroll and AT&T's Funimation anime streaming platforms. 2021.* Served as lead economic expert for AT&T. Made multiple presentations to DOJ, demonstrating lack of significant competitive interaction between the parties, including extremely limited consumer switching between them, as well as extensive competition with a broader marketplace including Netflix, Amazon, and others. DOJ closed the investigation allowing the merger to proceed with no conditions.

*Successful acquisition of Innovative Industries, Inc. by Ex Libris. 2020.* Served as lead economist in interactions with FTC. Demonstrated that the acquisition would not harm competition due to the *de minimis* extent of head-to-head competition between Ex Libris and Innovative and the recent decline of Innovative's business. FTC closed investigation allowing acquisition to proceed with no conditions.

*Successful acquisition of TD Ameritrade by Charles Schwab. 2020.* Served as lead economist in interactions with DOJ. Presented analyses demonstrating broad market for investor dollars rather than narrow market for RIA Custodian Services. DOJ closed investigation allowing acquisition to proceed with no conditions.

*Successful acquisition of Reinhart Foodservice by Performance Food Group Company. 2019.* Served as lead economics expert on behalf of the parties in the FTC's investigation of the merger. Presented detailed data analyses showing ample competition and lack of harm to competition in any geographic market. FTC closed the investigation with no divestitures required in late 2019.

*Successful acquisition of SGA's Food Group of companies by US Foods. 2019.* Served as lead economic expert on behalf of the parties in the FTC's investigation of the merger. Presented detailed economics and econometric analyses showing ample competition and lack of harm to competition in any geographic market. FTC cleared the merger subject to divestitures in three geographic markets in the Fall of 2019.

*Successful acquisition of Time Warner by AT&T Inc. 2017-2019.* Lead economist throughout the DOJ investigation. Then director of all economic work during trial, serving as the central connection point between all experts and counsel and directing development of all aspects of the economic case. Defendants ultimately prevailed in trial and the merger closed in June 2018.

*Successful acquisition of Keystone Foods by Tyson Foods, Inc. 2018.* Served as lead economic expert for U.S. jurisdiction. Presented economic analyses demonstrating that competition would remain strong post-merger. Ultimately, antitrust agencies in the U.S., China, Japan, and Korea cleared the transaction.

*Successful acquisition of NEX Group PLC by CME Group Inc. 2018.* Co-lead economic expert with Thomas Stemwedel. Presented several econometric analyses demonstrating that Treasury futures contracts and cash Treasury securities were economic complements rather than substitutes. Based heavily on these Compass Lexecon submissions, the DOJ and CMA closed their investigations without requiring any divestitures.

*Successful acquisition of VCA Inc. by Mars, Inc.* 2017. Co-lead economic expert with Mary Coleman. Made multiple presentations to FTC demonstrating ample competition in general, emergency, and specialty veterinary services, including econometric analyses showing lack of direct competitive impact of Mars and VCA on one another. Transaction was ultimately cleared subject to a small number of divestitures.

*Successful acquisition of Mobileye by Intel.* 2017. Served as lead economic expert for Intel. Assisted counsel in preparing FTC presentations and materials demonstrating lack of significant head-to-head competition and lack of valid vertical foreclosure theories. Investigation was closed without Second Request.

*FTC litigation against DraftKings, Inc. and FanDuel Inc. (Civil Action No. 17-cv-1195 (KBJ)).* 2017. Served as lead economic expert for FTC and prepared to serve as FTC's testifying expert against the merger, prior to the parties' abandonment of the proposed merger. Developed economic and econometric evidence that the merging parties were closest substitutes and thus likely would have increased prices as a result of their proposed merger.

*Successful merger of ASE Group and SPIL.* 2017. Lead economic expert on behalf of ASE Group. Submitted reports and testified to the Taiwan Fair Trade Commission, which ultimately cleared the transaction, then made multiple presentations to U.S. FTC, which also cleared the transaction. Economic analyses focused on implications of profit margins for market definition and competitive effects, ultimately demonstrating that the transaction was unlikely to cause significant harm to competition.

*Successful acquisition of Alarm.com of two business units (Connect and Piper) from iControl Networks.* 2017. Led team that demonstrated substantial and growing competition in home security and connected home marketplace and thus lack of competitive harm from acquisition. Work focused on importance of downstream market definition as well as empirical evidence of impact of competition on Alarm.com pricing and profitability.

*Successful acquisition of Samsung Electronics, Ltd.'s printer business by HP Inc.* 2016. Led team in evaluating the competitive effects of the acquisition, including assessing shares and competitive effects in overlap areas. Notably, the transaction gained regulatory approval in the U.S. during the initial review period without issuing a Second Request.

*Successful acquisition of Sun Products Corp. by Henkel AG.* 2016. Led team demonstrating lack of competitive impact despite overlaps in laundry detergent and related products.

*Successful acquisition of Starwood Hotels & Resorts by Marriott International.* 2016. Led team that performed detailed analysis of competitive conditions, extensive econometric analysis of pricing, and full review of Marriott's internal pricing models to demonstrate that Starwood and Marriott were not close competitors, combined ownership of the brands would not lead to upward pricing pressure, and competition would remain robust post-merger.

*Successful acquisition of PR Newswire by GTCR.* 2016. Lead economic expert for GTCR. Made presentations to DOJ showing lack of competitive harm from the transaction, based on detailed analysis of win/loss data, including calculations showing no possible upward pricing pressure (UPP) concerns regardless of the level of margins.

*Successful acquisition of Schurz Communications' Broadcast Stations by Gray Television.* 2015. Lead economic expert for Gray. Made presentations to DOJ demonstrating output expanding effects of proposed transaction in light of the scale economies in television production and advertising and the small size of the DMAs affected by the transaction.

*Successful acquisition of the Communications Business of Danaher Corporation by NetScout Systems.* 2015. Lead economic expert for NetScout. Made presentations to DOJ describing proper economic framework for analysis of competition and potential merger harms, and demonstrated that the presence of multiple viable competitors and numerous other credible threats to be used by powerful buyers in a dynamic industry made theories of anti-competitive harm from the merger implausible.

*Successful acquisition of Windmill Distribution Co. by Manhattan Beer Distributors.* 2015. Lead economic expert for Manhattan Beer Distributors. Submitted White Paper to DOJ demonstrating, based on margin data, that the merger would be highly unlikely to lead to anti-competitive effects. Transaction was granted early termination from the Hart Scott Rodino process by the DOJ.

*Proposed acquisition of Time Warner Cable by Comcast Corporation.* 2014-2015. Served as lead economic expert on broadband issues on behalf of Comcast Corporation. Submitted multiple Declarations and made multiple presentations to DOJ and FCC, explaining lack of horizontal, bargaining, or vertical/foreclosure concerns with regard to broadband competition as a result of the transaction.

*Successful acquisition of Leap Wireless by AT&T.* 2014. Lead economic expert for AT&T. Submitted multiple Declarations to FCC and made presentation to DOJ, demonstrating the transaction would generate substantial consumer benefits, while generating at most minimal upward pricing pressure in a properly defined mobile wireless services market and no issues related to spectrum concentration or other competitive concerns.

*Successful merger of American Airline and US Airways.* 2013. Lead consulting expert, managing Compass Lexecon team of over 25 economists supporting multiple experts. Made multiple presentations to DOJ, worked on expert reports in litigation, and assisted counsel with the analysis leading to settlement of litigation, permitting transaction to close.

*Successful merger of T-Mobile USA and MetroPCS.* 2013. Lead economic expert for T-Mobile USA. Conducted economic analyses of competitive effects of the transaction, as well as consumer benefits from reduced costs and increased network quality. Presented analyses to both DOJ and FCC.

*FTC investigation of acquisition of Dollar Thrifty Automotive Group by* Hertz. 2012. Served as a lead economic expert for FTC and prepared to serve as FTC's testifying expert against the merger, prior to case settlement. Conducted empirical analyses based on previous rental car mergers demonstrating likely price increases from the transaction.

*Decision by Federal Communications Commission not to extend the ban on exclusive contracts for satellite-delivered, cable-affiliated networks.* 2012. Lead economic expert for National Cable and Telecommunications Association. Submitted economic analysis demonstrating that the ban on exclusive distribution of satellite-delivered, cable affiliated networks is no longer warranted given increased marketplace competition. FCC made decision to allow the ban to sunset.

*Successful sale of wireless spectrum by SpectrumCo and Cox ("Cable Companies") to Verizon Wireless and successful completion of related commercial agreements*. 2012. On behalf of the Cable Companies, performed economic analyses demonstrating lack of competitive harm from the transaction on markets for backhaul and Wi-Fi services. Presented analyses to FCC.

*Successful acquisition by LIN Media of broadcast television stations from NVTV*. 2012. Lead economic expert for LIN Media. Prepared economic analysis demonstrating lack of competitive concern over potential issues related to Shared Service and Joint Sale Arrangements.

*Proposed acquisition of T-Mobile USA by AT&T*. 2011. Served as one of the lead economists, initially for T-Mobile (along with Michael Katz) and ultimately for both parties (along with Michael Katz and Dennis Carlton). Made multiple presentations to DOJ and FCC. Appeared in FCC Workshop, ex parte meeting.

S*uccessful application for antitrust immunity by Delta and Virgin Blue*. 2010. Together with Robert Willig, Bryan Keating, and Jon Orszag, prepared economic analyses demonstrating substantial net consumer benefits from antitrust immunity. Submitted results in expert reports to Department of Transportation.

*Successful joint venture between Comcast and NBC Universal (and ultimate full acquisition of NBC Universal by Comcast)*. 2010. Served as one of the lead economists (along with Michael Katz) on behalf of the merging parties. Wrote multiple reports submitted to FCC (with Michael Katz) demonstrating lack of significant competitive concerns from the transaction. Made multiple presentations to DOJ and FCC. Appeared in FCC Workshop of economists, ex parte meeting.

*Successful application for antitrust immunity for oneworld alliance and associated joint venture of American Airlines, British Airways, and Iberia Airlines*. 2009-2010. Together with Robert Willig and Bryan Keating, prepared economic analyses demonstrating substantial net consumer benefits associated with antitrust immunity for the joint venture. Submitted results in expert reports to Department of Transportation.

*Successful acquisition by PepsiCo of bottlers, PBG and PAS*. 2009. Performed econometric and simulation analyses demonstrating pro-competitive effect of merger on PepsiCo's own brands, other brands distributed by PBG and PAS, and overall marketplace. Presented results to FTC (together with Dennis Carlton).

*Successful merger of Delta Airlines and Northwest Airlines*. 2008. In support of Dennis Carlton, developed empirical and theoretical analyses to demonstrate merger's pro-competitive nature. Work focused on (ultimately settled) private litigation opposing the merger.

*Successful acquisition of Harcourt Education by Houghton Mifflin*. 2007. Along with Daniel Rubinfeld and Frederick Flyer, developed econometric analyses demonstrating lack of competitive harm from proposed merger. Presented results to DOJ.

*Successful acquisition of Chicago Board of Trade by Chicago Mercantile Exchange*. 2007. Along with Robert Willig and Hal Sider, developed and presented multiple empirical analyses demonstrating lack of competitive harm from merger. Submitted multiple white papers and made multiple presentations to DOJ.

## SELECTED OTHER EXPERT/CONSULTING WORK

Led team supporting Dennis Carlton's testimony in Toshiba/Hannstar TFT-LCD Antitrust litigation vs. Plaintiff Best Buy, 2013.

Led team supporting Dennis Carlton's testimony in Toshiba's TFT-LCD Class Action Antitrust litigation. Named Litigation Matter of the Year for 2012 by *Global Competition Review*, 2012.

As economic expert for US Airways, developed econometric analysis of air traffic at major US airports, presented to Philadelphia Airport management team, 2011.

Prepared analysis of the competitive impact of low-cost-carrier competition in Washington, D.C. and New York airports. Filed with DOT, 2011.

On behalf of major pharmaceutical firm, developed econometric model to forecast pharmaceutical expenditures, 2009.

Developed econometric model to measure of the importance of network effects in credit cards in the context of measuring damages incurred by a major credit card issuer, 2007-2008.

## OTHER CONFIDENTIAL CONSULTING WORK IN THE FOLLOWING INDUSTRIES

Automobiles and Components

Consumer Durables

Consumer Services

Financial Services

Energy

Food, Beverage, and Tobacco

Healthcare Equipment and Services

Media

Pharmaceuticals, Biotechnology, and Life Sciences

Retail

Semiconductors and Semiconductor Equipment

Software and Related Services

Technology: Hardware and Equipment

Telecommunication Services

Transportation

Utilities

## PUBLICATIONS

"A Retrospective Analysis of the AT&T/Time Warner Merger" (with Dennis W. Carlton, Georgi V. Giozov, and Allan L. Shampine), Forthcoming in the *Journal of Law and Economics*, available at *https://ssrn.com/abstract=3911492*, October 1, 2021.

"Vertical Mergers with Bilateral Contracting and Upstream and Downstream Investment," (with Daniel P. O'Brien), available at *https://ssrn.com/abstract=3886048*, July 15, 2021.

"International Broadband Price Comparisons Tell Us Little about Competition and Do Not Justify Broadband Regulation," working paper (with Michael Katz and Bryan Keating), commissioned by NCTA – The Internet & Television Association, May 11, 2021.

"Effects of the 2010 Horizontal Merger Guidelines on Merger Review: Based on Ten Years of Practical Experience," (with Dennis W. Carlton), Volume 58, Issue 2, in the *Review of Industrial Organization*, March 2021.

"Lessons from *AT&T/Time Warner*," (with Dennis W. Carlton and Allan L. Shampine), *Competition Policy International*, July 2019.

"Are You Pushing Too Hard? Lower Negotiated Input Prices as a Merger Efficiency," (with Thomas A. Stemwedel and Ka Hei Tse), Volume 82, Issue 2, Pages 623-642, in the *Antitrust Law Journal*, April 2019.

"Vertical Integration in Multichannel Television Markets: Revisiting Regional Sports Networks Using Updated Data," (with Georgi Giozov, Nauman Ilias, and Allan Shampine), Volume 4:1 in *The Criterion Journal on Innovation*, 2019.

"Are Legacy Airline Mergers Pro- or Anti-Competitive? Evidence from Recent U.S. Airline Mergers," (with Dennis Carlton, Ian MacSwain, and Eugene Orlov), Volume 62, Pages 58-95, in the *International Journal of Industrial Organization*, January 2018.

"Competitive Effects of International Airline Cooperation," (with Robert J. Calzaretta and Yair Eilat), Volume 13, Issue 3, Pages 501-548, in the *Journal of Competition Law & Economics*, September 2017.

"Econometrics and Regression Analysis," (with Chris Cavanagh, Paul Denis, and Bryan Keating), Chapter 6 in the *American Bar Association's Proving Antitrust Damages: Legal and Economic Issues, Third Edition*, 2017.

"Complementarity without Superadditivity," (with Steven Berry, Philip Haile, and Michael Katz), Volume 151, Pages 28-30, in *Economics Letters*, February 2017.

"Antitrust in a Mobile World," (with Yonatan Even, Jonathan M. Jacobson, Scott Martin, and Dr. Helen Weeds), Chapter 17 of *International Antitrust Law & Policy: Fordham Competition Law 2015*, Edited by James Keyte, Juris Publishing, Inc., 2016.

"Buyer Power in Merger Review," (with Dennis W. Carlton and Mary Coleman), Chapter 22 of *The Oxford Handbook of International Antitrust Economics*, Volume 1, Roger D. Blair and D. Daniel Sokol, eds, Oxford University Press, 2015.

"The Evolution of Internet Interconnection from Hierarchy to 'Mesh': Implications for Government Regulation," (with Stanley M. Besen), *Information Economics and Policy*, December 2013.

"Airline Network Effects and Consumer Welfare," (with Bryan Keating, Dan Rubinfeld, and Robert Willig), *Review of Network Economics*, November 2013.

"The Delta-Northwest Merger: Consumer Benefits from Airline Network Effects (2008)," (with Bryan Keating, Daniel L. Rubinfeld, and Robert D. Willig), *The Antitrust Revolution*, Sixth Edition, Edited by John E. Kwoka, Jr. and Lawrence J. White, Oxford University Press, New York, July 2013.

"Proper Treatment of Buyer Power in Merger Review," (with Dennis W. Carlton), *Review of Industrial Organization*, July 2011.

"Response to Gopal Das Varma's Market Definition, Upward Pricing Pressure, and the Role of the Courts: A Response to Carlton and Israel," (with Dennis W. Carlton), *The Antitrust Source*, December 2010.

"Will the New Guidelines Clarify or Obscure Antitrust Policy?" (with Dennis W. Carlton), *The Antitrust Source,* October 2010.

"Should Competition Policy Prohibit Price Discrimination?" (with Dennis W. Carlton), *Global Competition Review*, 2009.

"The Empirical Effects of Collegiate Athletics: An Update Based on 2004-2007 Data," (with Jonathan Orszag), Paper commissioned by National Collegiate Athletic Association, available *at http://www.epi.soe.vt.edu/perspectives/policy_news/pdf/NCAASpending.pdf,* February 2009.

"Services as Experience Goods:  An Empirical Examination of Consumer Learning in Automobile Insurance," *The American Economic Review*, December 2005.

"Tenure Dependence in Consumer-Firm Relationships:  An Empirical Analysis of Consumer Departures from Automobile Insurance Firms," *The Rand Journal of Economics*, Spring 2005.

"The Impact of Youth Characteristics and Experiences on Transitions Out of Poverty," (with Michael Seeborg), *Journal of Socio-Economics*, 1998.

"Racial Differences in Adult Labor Force Transition Trends," (with Michael Seeborg), *Journal of Economics*, 1994.


## SELECTED RECENT PRESENTATIONS

American Bar Association Section of Antitrust Law, "Nuts & Bolts of Presenting Economic Evidence to the Agencies: Common Pitfalls and Best Practices, Panelist, October 2019.

Dechert LLP, 2019 Annual Antitrust Spring Seminar, Keynote Speaker, March 2019.

Concurrences Review and The George Washington University Law School, 6th Bill Kovacic Antitrust Salon: Where is Antitrust Policy Going?, "A Judge's Eye View on Antitrust: Mergers, Cartels, Remedies…," Panelist, September 2018.

Fordham Competition Law Institute, 45th Annual Conference on International Antitrust Law and Policy, "Merger Remedies," Panelist, September 2018.

Georgetown Center for Business and Public Policy, "Airline Competition Conference," Panelist, July 2017.

J.P. Morgan Special Situations Investor Forum, "The Antitrust Merger Review Process," Panelist, March 2017.

American Bar Association Section of Antitrust Law, "Economic Issues Raised In The Comcast – Time Warner Cable Merger," Panelist, February 2016.

Fordham Competition Law Institute, 42nd Annual Conference on International Antitrust Law and Policy, "Antitrust in a Mobile World," Panelist, October 2015.

American Bar Association Section of Antitrust Law, "Merger Practice Workshop," Faculty Member, October 2015.

Searle Center Conference on Antitrust Economics and Competition Policy, Panel on Recent Transactions in the Telecom Industry, Panelist, September 2015.

National Bureau of Economic Research, Summer Institute 2015, Industrial Organization Meetings, "Panel Discussion of the Comcast-Time Warner Merger," Panelist, July 2015.

Federal Communications Bar Association, "How the Antitrust Agencies and the FCC are Likely to Analyze Vertical Mergers," Panelist, November 2014.

The Coca Cola Company Global Antitrust Forum, "Round Table Discussion on Use of Economics and Economists," Panel Chair, November 2014.

Compass Lexecon Competition Policy Forum, Lake Como Italy, "Consolidation of the Telecoms Industry in the EU and the U.S.," Panelist, October 2014.

The IATA Legal Symposium 2014, Aviation Law: Upfront and Center, "Merger Analysis – A sudden shift in approach by DOJ in the American Airlines and US Airways merger," Panelist, February 2014.

Georgetown Law 7th Annual Global Antitrust Enforcement Symposium, "Merger Enforcement and Policy," Panelist, September 2013.

American Bar Association Section of Antitrust Law, "Airline Mergers: First Class Results or Middle-Seat Misery?" Panelist, May 2013.

American Bar Association Section of Antitrust Law, "Go Low or Go Home!  Monopsony a Problem?" Panelist, March 2012.

Federal Communications Bar Association Transactional Committee CLE Seminar, "The FCC's Approach to Analyzing Vertical Mergers," Panelist, October 2011.

The Technology Policy Institute Aspen Forum, "Watching the Future: The Economic Implications of Online Video," Panelist, August 2011.

American Bar Association Forum on Air & Space Law, 2011 Update Conference, "Antitrust Issues: What's on the Horizon for the Industry," Panelist, February 2011.

American Bar Association Section of Antitrust Law, "Antitrust in the Airline Industry," Panelist, September 2010.

## GRANTS AND HONORS

Searle Fund for Policy Research Grant, 2004-2006, for "An Empirical Examination of
Asymmetric Information in Insurance Markets."

Kellogg School of Management Chairs' Core Course Teaching Award, 2003 & 2005.

Bradley Dissertation Fellowship, Stanford University, 1999-2000.

Stanford University, Outstanding Second Year Paper Prize, 1997.


## ADVISORY, EDITORIAL, AND TRUSTEE BOARDS

Global Competition Review, Editorial Board, Member

Holton-Arms School, Board of Trustees, Trustee

Illinois Wesleyan University, Board of Trustees, Trustee


## REFEREE FOR ACADEMIC JOURNALS

American Economic Review

The Journal of Industrial Economics

The Rand Journal of Economics

Journal of the European Economic Association

The Review of Economic Studies

The Review of Economics and Statistics

Journal of Risk and Insurance

Exhibit B

# List of Materials Relied Upon

**Legal Filings**

Complaint, Jury Trial Demanded, *Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Abraham Ancer, Carlos Ortiz, Ian Poulter, Pat Perez, Jason Kokrak and Peter Uihlein v. PGA TOUR, Inc.,* Civil Action No. 3:22-cv-04486, August 3, 2022

Notice Of Motion and Motion for Temporary Restraining Order, *Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Abraham Ancer, Carlos Ortiz, Ian Poulter, Pat Perez, Jason Kokrak and Peter Uihlein v. PGA TOUR, Inc.*, Civil Action No. 3:22-cv-04486, August 3, 2022

**Expert Materials**

Expert Declaration of Jeffrey Leitzinger, Ph.D., August 2, 2022

**Declarations**

Declaration of Atul Khosla, August 3, 2022

**Case Law**

United States v. International Boxing Club of New York, 348 U.S. 236 (1955)

**PGA Documents**

2021-2022, PGA TOUR – Application for Membership

PGA TOUR Handbook

**Public Documents**

"Horizontal Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, August 19, 2010

DeGraba, Patrick, Patrick Greenlee, and Daniel P. O'Brien, "Conditional Pricing Practices – A Short Primer," Bureau of Economics – Federal Trade Commission, September 2017

**Academic Literature**

Calzolari, Giacomo, and Vincenzo Denicolò, "Competition with Exclusive Contracts and Market-Share Discounts," *The American Economic Review*, vol. 103, no. 6 (2013), pp. 2384-2411

Carlton, Dennis W. and Jeffrey M. Perloff, *Industrial Organization* (2nd ed.), HarperCollins, 1994, pp. 531, 534

Ekelund, Jr., Robert B. and Robert D. Tollison, *Economics – Private Markets and Public Choice* (6th ed.), Addison-Wesley, 2000, p. 267

Gilbert, Richard J., and Hillary Greene, "Merging Innovation into Antitrust Agency Enforcement of the Clayton Act," *George Washington Law Review*, vol. 83, no. 6 (November 2015), pp. 1919-1947

Heide, Jan B., Shantanu Dutta and Mark Bergen, "Exclusive Dealing and Business Efficiency: Evidence from Industry Practice," *Journal of Law & Economics*, vol. 41, no. 2 – Part 1 (October 1998), pp. 387-408

Keating, Bryan, Jonathan Orszag, and Robert Willig, "The Role of the Circle Principle in Market Definition," *The Antitrust Source*, April 2018, pp. 1-6

Klein, Benjamin and Andres V. Lerner, "The Expanded Economics of Free-Riding: How Exclusive Dealing Prevents Free-Riding and Creates Undivided Loyalty," *Antitrust Law Journal*, vol. 74, no. 2 (2007), pp. 473-520

Klein, Benjamin and Kevin M. Murphy, "Exclusive Dealing Intensifies Competition for Distribution," *Antitrust Law Journal*, vol. 75, no. 2 (2008), pp. 433-466

Mathewson, G. Frank, and Ralph A. Winter, "The Competitive Effects of Vertical Agreements: Comment," *The American Economic Review*, vol. 77, no. 5 (December 1987), pp. 1057–1062

O'Brien, Daniel P. and Greg Shaffer, "Nonlinear Supply Contracts, Exclusive Dealing, and Equilibrium Market Foreclosure," *The Journal of Economics & Management Strategy*, vol. 6, no. 4 (Winter 1997), pp. 755-785

**News, Press, and Websites**

"2021-2022 Tournament Schedule," *PGA TOUR*, available at https://www.pgatour.com/tournaments/schedule.html

"About Us," *First Tee*, available at https://firsttee.org/about/

"DP World Tour Schedule – 2022," *European Tour*, available at https://www.europeantour.com/dpworld-tour/schedule/2022/

"Events," *LIV Golf*, available at https://www.livgolf.com/events

"FedEx Cup – Overview," *PGA TOUR*, available at https://www.pgatour.com/fedexcup/fedexcup-overview.html

"Glossary of Statistical Terms – Monopoly," *OECD*, available at https://stats.oecd.org/glossary/detail.asp?ID=3262

"Hearing date set for Talor Gooch, Hudson Swafford and Matt Jones seeking right to play PGA Tour's playoffs - LIV Golf updates," *Golf Digest*, August 4, 2022, available at https://www.golfdigest.com/story/super-golf-league-updates-2022

"How It Works," *LIV Golf*, available at https://www.livgolf.com/format

"Korn Ferry Tour to award an unprecedented 30 TOUR cards in 2023," *PGA TOUR*, June 28, 2022, available at https://www.pgatour.com/korn-ferry-tour/news/2022/06/28/qualification-eligibility-changes-structure-explained-2023-finals-q-school-pga-tour-cards.html

"LIV Golf Announces 2023 League Launch with 48 Players, 12 Established Team Franchises, 14-Event Schedule," *LIV Golf Press Release*, July 27, 2022, available at https://www.livgolf.com/news/liv-golf-announces-2023-league-launch-48-players-12-established-teams-14-events

"LIV Golf members allowed to play 150th Open Championship at St. Andrews, R&A announces," *ESPN*, June 22, 2022, available at https://www.espn.com/golf/story/_/id/34129315/liv-golf-series-members-allowed-play-150th-open-championship-st-andrews-ra-announces

"LIV Golf Unveils Iconic Team Brands, London Team Captains and Draft Results for Inaugural London Invitational," *LIV Golf Press Release*, June 7, 2022, available at https://www.livgolf.com/news/liv-golf-unveils-iconic-team-brands-london-team-captains-and-draft-results

"LIV Golf: Dustin Johnson, Sergio Garcia, Lee Westwood and Ian Poulter to play in first event," *BBC*, June 1, 2022, available at https://www.bbc.com/sport/golf/61641439

"LIV Leadership," *LIV Golf*, available at https://www.livgolf.com/leadership

"Our Mission," *APGA Tour*, available at https://www.apgatour.org/mission

"PGA Tour and European Tour to co-sanction three tournaments in 2022," *SportsPro Media*, August 3, 2021, available at https://www.sportspromedia.com/news/european-tour-pga-co-sanctioned-tournaments-2022-scottish-open-genesis/

"PGA TOUR announces 'significant changes,'" *PGA TOUR*, June 22, 2022, available at https://www.pgatour.com/news/2022/06/22/pga-tour-commissioner-jay-monahan-returns-to-calendar-year-schedule-sizable-purse-increases-reimagines-fall-revises-field-fedexcup-playoffs.html

"PGA TOUR's unprecedented momentum results in increased purses," *PGA TOUR*, November 22, 2021, available at https://www.pgatour.com/news/2021/11/22/pga-tours-unprecedented-momentum-results-in-increased-purses.html

"RBC reportedly terminates sponsorship with Dustin Johnson, Graeme McDowell," *Golf Channel*, May 31, 2022, available at https://www.golfchannel.com/news/rbc-extremely-disappointed-ambassador-dustin-johnson-skipping-canadian-open-liv-golf-event

"Sean Bratches on the Golf Super League," *Unofficial Partner Podcast*, Episode 243, May 2, 2022

"Spotrac – PGA Career Earnings," *Spotrac*, available at https://www.spotrac.com/pga/earnings/

"Statistics – Career Money Leaders," *PGA TOUR*, available at https://www.pgatour.com/stats/stat.110.html

"Statistics – Official Money – 2022," *PGA TOUR*, available at https://www.pgatour.com/stats/stat.109.y2022.html

"Teams and Players," *LIV Golf*, available at https://www.livgolf.com/teams-players

"The Official 2021-22 PGA TOUR Media Guide – Money – Growth of Purses," *PGA TOUR*, available at https://www.pgatourmediaguide.com/records/all-time/259

"Tournament Schedule," *PGA TOUR*, available at https://www.pgatour.com/tournaments/schedule.html

Birnbaum, Justin, "The World's Highest-Paid Golfers 2022: LIV Golf Reshuffles Top Earners and Sends Pay Soaring," *Forbes*, July 29, 2022, available at https://www.forbes.com/sites/justinbirnbaum/2022/07/28/the-worlds-highest-paid-golfers-2022-liv-golf-reshuffles-top-earners-and-sends-pay-soaring/?sh=6d162475724a

Bonesteel, Matt, "Greg Norman criticized for downplaying Saudis' killing of Jamal Khashoggi," *Washington Post*, May 12, 2022, available at https://www.washingtonpost.com/sports/2022/05/12/greg-norman-saudi-golf-mistake/

Boone, Kyle, and Patrick McDonald, "Bubba Watson joins LIV Golf: Two-time Masters champion becomes latest start to defect from PGA Tour," *CBS Sports*, July 29, 2022, available at https://www.cbssports.com/golf/news/bubba-watson-joins-liv-golf-two-time-masters-champion-becomes-latest-star-to-defect-from-pga-tour/

Byers, Justin, "Asian Tour Gets $300M Investment from LIV Golf," *Front Office Sports*, February 1, 2022, available at https://frontofficesports.com/asian-tour-gets-300m-investment-from-liv-golf/

Camenker, Jacob, "Bryson DeChambeau LIV Golf contract: Golfer shares details, plans for spending nine-figure salary," *The Sporting News*, July 5, 2022, available at https://www.sportingnews.com/us/golf/news/bryson-dechambeau-liv-golf-contract-details-salary/igifhr8zcsyk9nh1m84idxhr

Colgan, James, "Phil Mickelson has 2 reasons why LIV Golf works. Neither is about money," *Golf.com*, July 31, 2022, available at https://golf.com/news/2-reasons-why-phil-mickelson-loves-liv/#:~:text=Unlike%20the%20PGA%20Tour%20%E2%80%94%20in,of%20field%20strength%20each%20week

Cradock, Matt, "How Much Are LIV Players Being Paid?," *Golf Monthly*, June 10, 2022, available at https://www.golfmonthly.com/news/how-much-are-liv-players-being-paid

Farrell, Dom, "LIV Golf tour schedule 2022: Dates, locations for all eight events in the controversial Saudi-backed PGA Tour rival," *The Sporting News*, July 29, 2002, available at https://www.sportingnews.com/us/golf/news/liv-golf-tour-schedule-2022-dates-locations-prize-money/k8y0uoimtfn96lj6nd0xadhn

Fitzpatrick, Michael, "Tiger Woods' Masters Absence Sends Television Ratings and Ticket Prices Plunging," *Bleacher Report*, April 15, 2014, available at https://bleacherreport.com/articles/2030309-tiger-woods-masters-absence-sends-television-ratings-and-ticket-prices-plunging

Frieser, Joshua, "Why NCAA Athletes Are Not Allowed to Wear Sponsored Apparel In-Game but Professional Athletes (Sometimes) Can," *Frieser Legal*, 2022, available at https://frieserlegal.com/why-ncaa-athletes-are-not-allowed-to-wear-sponsored-apparel-in-game-but-professional-athletes-sometimes-can/

Hall, Mike, "David Feherty Joins LIV Golf Broadcast Team," *Golf Monthly*, July 22, 2022, available at https://www.golfmonthly.com/news/david-feherty-joins-liv-golf-broadcasting-team-as-lead-analyst

Harig, Bob, "Report: Bryson DeChambeau and Patrick Reed Will Be Joining LIV Golf for First U.S. Event," *Sports Illustrated*, June 8, 2022, available at https://www.si.com/golf/news/bryson-dechambeau-and-patrick-reed-will-be-joining-liv-golf-for-first-u-s-event

Heath, Elliott, "Tiger Woods Turned Down $700m-$800m To Join LIV - Greg Norman," *Golf Monthly*, August 2, 2022, available at https://www.golfmonthly.com/news/tiger-woods-turned-down-dollar700m-dollar800m-to-join-liv-greg-norman

Hibbitt, James, "Saudi-Backed LIV Golf Series - Everything We Know," *Golf Monthly*, July 27, 2022, available at https://www.golfmonthly.com/news/saudi-golf-league-everything-we-know-so-far

Hoggard, Rex, "Seven more players suspended by PGA Tour; Patrick Reed resigns card," *Golf Channel*, July 1, 2022, available at https://www.golfchannel.com/news/seven-more-players-suspended-pga-tour-patrick-reed-resigns-card#:~:text=This%20wave%20of%20suspended%20players,has%20resigned%20his%20Tour%20membership

Keating, Steve, "Asian Tour embraces LIV Series as golfers look to Far East for points," *Reuters*, July 13, 2022, available at https://www.reuters.com/lifestyle/sports/asian-tour-embraces-liv-series-golfers-look-far-east-points-2022-07-13/

Keith, Braden, "Rice Loses Jaguar Sponsorship for Using Homophobic Slur, Reminds Us of Increased Exposure of Swimming," *SwimSwam*, September 7, 2010, available at https://swimswam.com/rice-loses-jaguar-sponsorship-for-using-homophobic-slur-reminds-us-of-increased-exposure-of-swimming/

Lavner, Ryan, "PGA Tour suspends players competing in LIV Golf Invitational Series," *Golf Channel*, June 9, 2022, available at https://www.golfchannel.com/news/pga-tour-suspends-players-competing-liv-golf-invitational-series

Longman, Jeré, "Big Names, Big Money and a Big Pushback at LIV Golf's Oregon Event," *The New York Times*, June 29, 2022, available at https://www.nytimes.com/2022/06/29/sports/golf/big-names-big-money-and-a-big-pushback-at-liv-golfs-oregon-event.html

Marksbury, Jessica, "Big-time bucks: Here's how much money is made (and paid) by the average Tour pro," *Golf.com*, October 15, 2018, available at https://golf.com/travel/big-time-bucks-heres-how-much-money-is-made-and-paid-by-the-average-tour-pro/

McAfee, James, "Pros Can't Give Each Other Advice," *The A Position*, http://theaposition.com/jamesamcafee/golf/110/pros-can-t-give-each-other-advice

McDonald, Patrick, "Phil Mickelson joins LIV Golf Invitational Series: Six-time major winner enters tournament field in London," *CBS Sports*, June 6, 2022, available at https://www.cbssports.com/golf/news/phil-mickelson-joins-liv-golf-invitational-series-six-time-major-winner-enters-tournament-field-in-london

Morfit, Cameron, "Tiger Woods finishes atop inaugural Player Impact Program," *PGA TOUR*, March 2, 2022, available at https://www.pgatour.com/news/2022/03/02/tiger-woods-tops-player-impact-program-pip-phil-mickelson-finsihes-second.html

Poindexter, Owen, "LIV Golf Announces $2B Investment, Expanded Schedule for 2023-2025," *Front Office Sports*, May 10, 2022, available at https://frontofficesports.com/liv-golf-announces-2b-investment-expanded-schedule-for-2023-2025/

Porter, Kyle, "LIV Golf prize money will not be drawn against player contracts, to be paid in addition to signing bonuses," *CBS Sports*, June 29, 2022, available at https://www.cbssports.com/golf/news/liv-golf-prize-money-will-not-be-drawn-against-player-contracts-to-be-paid-in-addition-to-signing-bonuses/

Porter, Kyle, "Phil Mickelson's Saudi Arabia comments prove costly as sponsors cut ties with embattled golfer," *CBS Sports*, February 27, 2022, available at https://www.cbssports.com/golf/news/phil-mickelsons-saudi-arabia-comments-prove-costly-as-sponsors-cut-ties-with-embattled-golfer/

Porter, Kyle, "Tom Brady, Aaron Rodgers, Patrick Mahomes, Josh Allen to square off in latest The Match golf event this June," *CBS Sports*, April 18, 2022, available at https://www.cbssports.com/golf/news/tom-brady-aaron-rodgers-patrick-mahomes-josh-allen-to-square-off-in-latest-the-match-golf-event-this-june/

Rapaport, Dan, "PGA Tour draws hard line with rival tour, won't grant players releases to compete elsewhere," *Golf Digest*, May 10, 2022, available at https://www.golfdigest.com/story/pga-tour-releases-first-liv-golf-invitational-event

Richardson, Savannah, "What is the PGA Tour Champions?," *GolfLink*, available at https://www.golflink.com/about_35128_what-is-the-pga-tour-champions-.html

Rivera, Joe, "Who is playing LIV Golf? Updated list of PGA Tour defectors includes Phil Mickelson, Dustin Johnson, Bryson DeChambeau, others," *The Sporting News*, July 29, 2022, available at https://www.sportingnews.com/us/golf/news/liv-golf-tour-list-mickelson-johnson-dechambeau-pga/rlwprhtsx6uwgq73zq0e7ryc

Rothman, Evan, "How the PGA Tour's new sponsorship matchmaking service aims to enrich players," *Golf.com*, January 13, 2022, available at https://golf.com/news/pga-tour-player-partnerships-sponsors-players/

Rovell, Darren, "Nike cuts ties with Manny Pacquiao after derogatory comments," *ESPN*, February 17, 2016, available at https://www.espn.com/boxing/story/_/id/14793389/nike-ends-endorsement-contract-manny-pacquiao

Saul, Derek, "LIV Golf Signs Yet Another Masters Champ in Bubba Watson," *Forbes*, July 29, 2022, available at https://www.forbes.com/sites/dereksaul/2022/07/29/liv-golf-signs-yet-another-masters-champ-in-bubba-watson/?sh=20f49d8678cb

Schlabach, Mark, "Jason Kokrak, Charles Howell III join LIV Golf Invitational Series," *ESPN*, July 20, 2022, available at https://www.espn.com/golf/story/_/id/34272706/jason-kokrak-charles-howell-iii-join-liv-golf-invitational-series

Schupak, Adam, "State of the PGA Tour is strong, as evidenced by growing purses and expanded coverage," *Golf Week*, March 10, 2020, available at

https://golfweek.usatoday.com/2020/03/10/state-of-the-pga-tour-growing-purses-expanded-coverage/

Schwarb, John "PGA Tour Suspends Current and Former Players Now Competing in LIV Golf," *Sports Illustrated*, June 9, 2022, available at https://www.si.com/golf/news/pga-tour-suspends-current-and-former-players-now-competing-in-liv-golf

Scribner, Herb, "9/11 families protest outside Trump golf course as Saudi-backed LIV kicks off," *Axios*, July 29, 2022, available at https://www.axios.com/2022/07/29/liv-golf-event-trump-911-families

Seamark, Michael, "Wayne's £2.5m comeuppance: Rooney now axed as face of Coca-Cola following his foul-mouthed tirade on live TV," *Daily Mail*, April 6, 2011, available at https://www.dailymail.co.uk/news/article-1374088/Wayne-Rooney-axed-Coca-Cola-foul-mouthed-tirade-live-TV.html

Silverman, Alex, "Which Golfers Are in Line for Huge Pay Days Under the PGA Tour's New Popularity Program?," *Morning Consult*, September 23, 2021, available at https://morningconsult.com/2021/09/23/pga-tour-golfers-popularity-poll/

Suggs, David, "Dustin Johnson, Phil Mickelson and other prominent LIV Golf defectors to lose major sponsorships after leaving PGA Tour," *The Sporting News*, June 11, 2022, available at https://www.sportingnews.com/us/golf/news/liv-golf-lost-sponsorships-dustin-johnson-phil-mickelson/tnzxyoc3nnag9fztrjdlbrty

Tracy, Jeff, "Advertising invades sports jerseys," *Axios*, April 21, 2022, available at https://www.axios.com/2022/04/21/sports-jersey-advertising-invasion

Tremlett, Sam, "How Do You Qualify for The Open Championship?," *Golf Monthly*, July 14, 2021, available at https://www.golfmonthly.com/tour/open-championship/how-do-you-qualify-for-the-open-championship-238952.

Wacker, Brian, "The ups and downs of traveling," *PGA TOUR*, January 27, 2016, available at https://www.pgatour.com/tour-insider/2016/01/27/traveling-ups-and-downs.html

Walker, James, "Champion drops Rashard Mendenhall," *ESPN*, May 6, 2011, available at https://www.espn.com.au/nfl/news/story?id=6493301