```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4
      MICKELSON ET AL,               )  CV-22-4486-BLF
 5                                    )
                       PLAINTIFF,     )  SAN JOSE, CALIFORNIA
 6                                    )
                   VS.                )  AUGUST 9, 2022
 7                                    )
      PGA TOUR, INC.,                 )  PAGES 1-94
 8                                    )
                   DEFENDANT.         )
 9                                    )
      _____ )
10
                    TRANSCRIPT OF PROCEEDINGS
11         BEFORE THE HONORABLE BETH LABSON FREEMAN
                 UNITED STATES DISTRICT JUDGE
12
13                A P P E A R A N C E S

14      FOR THE PLAINTIFF:    BY:  RACHEL S. BRASS
                              GIBSON, DUNN & CRUTCHER LLP
15                            555 MISSION STREET
                              SAN FRANCISCO, CA 94105
16

17      FOR THE DEFENDANT:    BY:  ELLIOT PETERS
                                   DAVID SILBERT
18                                 SOPHIE HOOD
                                   ADAM LAURIDSEN
19                                 NICHOLAS GOLDBERG
                              KEKER, VAN NEST & PETERS LLP
20                            633 BATTERY STREET
                              SAN FRANCISCO, CA 94111
21

22         APPEARANCES CONTINUED ON THE NEXT PAGE

23      OFFICIAL COURT REPORTER:    SUMMER FISHER, CSR, CRR
                                    CERTIFICATE NUMBER 13185
24

25         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
```

```
1        APPEARANCES CONTINUED:

2        FOR THE PLAINTIFF:      BY:  ROBERT P. FELDMAN
                                 QUINN EMANUEL URQUHART & SULLIVAN
3                                555 TWIN DOLPHIN DRIVE, 5TH FL
                                 REDWOOD SHORES, CA 94065
4

5        FOR THE PLAINTIFF:      BY:  KEVIN TERUYA
                                 QUINN EMANUEL URQUHART & SULLIVAN
6                                865 SOUTH FIGUEROA ST., 10TH FL
                                 LOS ANGELES, CA 90017
7

8        FOR THE DEFENDANT:      BY:  KAREN HOFFMAN LENT
                                 SKADDEN ARPS
9                                4 TIMES SQUARE
                                 NEW YORK, NY 10036
10

11       FOR THE DEFENDANT:      BY:  ANTHONY DREYER
                                 SKADDEN ARPS
12                               ONE MANHATTAN WEST
                                 NEW YORK, NY 10001
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1      SAN JOSE, CALIFORNIA              AUGUST 9, 2022

2                     P R O C E E D I N G S

3          (COURT CONVENED AT 1:00 P.M.)

4              THE COURT:  GOOD AFTERNOON, EVERYONE.  WELCOME.

5      PLEASE BE SEATED.

6              ALL RIGHT.  LET'S CALL OUR CASE AND GET YOUR APPEARANCES.

7              THE CLERK:  CALLING CASE 22-4486.  MICKELSON, ET AL.

8      VERSUS PGA TOUR.

9          COUNSEL, PLEASE STATE YOUR APPEARANCES.  AND IF WE COULD

10     BEGIN WITH PLAINTIFF.

11             MR. WALTERS:  YES.

12         GOOD AFTERNOON, YOUR HONOR.  ROB WALTERS WITH GIBSON DUNN,

13     HERE ON BEHALF OF THE PLAINTIFFS.

14             THE COURT:  GOOD AFTERNOON.

15             MR. HVIDT:  SCOTT HVIDT WITH GIBSON DUNN ON BEHALF OF

16     THE PLAINTIFFS.

17             MR. TERUYA:  KEVIN TERUYA FROM QUINN EMANUEL ON

18     BEHALF OF THE PLAINTIFFS.

19             MR. FELDMAN:  ROBERT FELDMAN FROM QUINN EMANUEL ON

20     BEHALF OF THE PLAINTIFFS.

21         GOOD AFTERNOON, YOUR HONOR.

22             THE COURT:  GOOD AFTERNOON.

23             MR. PETERS:  GOOD AFTERNOON, YOUR HONOR.

24         ELLIOT PETERS FROM KEKER VAN NEST APPEARING ON BEHALF OF

25     THE DEFENDANTS.  AND I WILL JUST INTRODUCE MY PARTNER,
```

1   NICHOLAS GOLDBERG, OUR CLIENT, NEERA SHETTY.  ANTHONY DREYER

2   AND KAREN LENT ARE CO-COUNSEL FROM THE SKADDEN ARPS FIRM.

3           THE COURT:  WELCOME TO EVERYONE.

4           MR. PETERS:  THANK YOU, YOUR HONOR.

5           THE COURT:  ALL RIGHT.  YOU ARE WELCOME TO TAKE YOUR

6   MASK OFF AS COUNSEL IF YOU ARE ADDRESSING THE COURT.  PLEASE

7   LEAVE IT ON IF YOU FEEL MORE COMFORTABLE.

8       IT'S IMPORTANT TO SPEAK DIRECTLY INTO THE MICROPHONE SO

9   THAT I CAN HEAR YOU AND OUR COURT REPORTER CAN MAKE A GOOD

10  RECORD.

11      THIS IS THE TIME SET FOR PLAINTIFF'S MOTION FOR TEMPORARY

12  RESTRAINING ORDER.  THANK YOU FOR ALL OF THE PAPERS THAT YOU

13  HAVE SUBMITTED.  YOU KEPT ME BUSY OVER THE WEEKEND.  I ALWAYS

14  LIKE THAT, ESPECIALLY WHEN I'M NOT EXPECTING IT.

15      I WANTED TO MAKE SOME INITIAL COMMENTS, AND THEN I REALLY

16  WANT TO TURN THIS OVER TO YOUR ARGUMENTS.  THERE IS URGENCY IN

17  A RULING FROM THE COURT, AND I FULLY EXPECT TO BE ABLE TO MAKE

18  A RULING BEFORE YOU LEAVE HERE.  I WILL MAKE THAT ORALLY AND

19  FOLLOW UP WITH A WRITTEN ORDER.

20      I WILL COMMENT THAT I DID RECEIVE THE PLAINTIFF'S REVISED

21  PROPOSED ORDER.  AND MR. WALTERS, THANK YOU FOR THAT, I THINK

22  THAT THAT IS A MORE REALISTIC APPROACH TO THE TEMPORARY

23  RESTRAINING ORDER, AND FRANKLY, CONSISTENT REALLY WITH YOUR

24  BRIEFING, AND SO THAT'S GREATLY APPRECIATED.

25          MR. WALTERS:  THANK YOU.

1          THE COURT:  IN REVIEWING THE GROUNDS FOR THE

2     TEMPORARY RESTRAINING ORDER, ALTHOUGH THIS IS NOT A TENTATIVE

3     RULING, I REALLY WANT YOU TO KNOW WHERE I'M THINKING SO THAT

4      YOU CAN ADDRESS YOUR COMMENTS.

5          I CERTAINLY UNDERSTAND THAT THIS KIND OF RELIEF IS

6     EXTRAORDINARY, AND IT IS A RELATIVELY HIGH BAR TO RECEIVE THIS

7     KIND OF RELIEF.  I AM FIRST AND FOREMOST LOOKING AT THE ISSUES

8     OF WHETHER YOU HAVE ESTABLISHED IRREPARABLE HARM AND THE

9     EXIGENCY THAT WOULD BE REQUIRED FOR A TEMPORARY REMAINING

10    ORDER.

11          I HAVE CONCERNS THAT THE PLAINTIFFS HAVE NOT MADE OUT

12    THEIR CASE FOR IRREPARABLE HARM.  THIS IS NOT A CASE WHERE THE

13    PLAINTIFFS, THE THREE BRINGING THE TRO, WOULD BE RESTRICTED AND

14    UNABLE TO PLAY GOLF.  THEY CERTAINLY HAVE THE OPPORTUNITY WITH

15    LIV AND HAVE AVAILED THEMSELVES OF THIS OPPORTUNITY, AND

16    THEREFORE I SEE THIS CASE PERHAPS MORE IN LINE WITH THE ELITE

17    RODEO CASE, AND THE HELDMAN CASE, AND UNLIKE THE O.M. CASE.

18          IN TERMS OF THE EMERGENCY, I MUST SAY I'M LEANING TOWARD

19    THE DEFENDANT'S POSITION THAT THIS IS AN EMERGENCY OF THE

20    PLAINTIFF'S OWN MAKING.

21          AND I NOTE THAT IN THE EVIDENCE, IT'S UNDISPUTED THAT THE

22    SUSPENSIONS WERE ISSUED ON JUNE 9TH AND THAT THESE TRO

23    PLAINTIFFS WERE WELL AWARE OF THE CONSEQUENCES OF THEIR

24    ACTIONS, WELL AWARE OF THE UPCOMING FEDEX PLAYOFFS, AND THEY

25    WAITED UNTIL JUST A FEW DAYS AGO WHEN THEIR REQUEST FOR A STAY

1    OF THE SUSPENSION WAS DENIED.  AND SO I HAVE CONCERNS THERE AS

2    WELL.

3         THERE ARE MANY ISSUES ON THE MERITS OF THE CASE THAT I

4    THINK ARE PREMATURE FOR A FULL DECISION AT THIS POINT, AND THAT

5    REALLY GOES TO THE FACT THAT I THINK THAT THE PLAINTIFFS HAVE

6    MADE AN APPEALING ARGUMENT ON THE ANTITRUST VIOLATIONS,

7    SUPPORTED BY SIGNIFICANT EVIDENCE.  BUT THE DEFENDANTS, IN

8    RESPONSE, HAVE IDENTIFIED AND PINPOINTED KEY WEAKNESSES IN THAT

9    EVIDENCE THAT MAY PREVENT ME FROM BEING ABLE TO DETERMINE THAT

10   THERE IS A LIKELIHOOD OF SUCCESS ON THE MERITS AT THIS STAGE.

11        THAT'S NOT TO SAY THAT A FULLY -- WELL, IT'S HARD TO

12   IMAGINE MORE BRIEFING, I CALL THIS FULLY BRIEFED, FRANKLY, BUT

13   I WOULD SAY THAT AS A PRELIMINARY INJUNCTION HEARING WHERE,

14   FRANKLY, IT WOULD BE APPROPRIATE TO MAKE THAT A LIVE

15   EVIDENTIARY HEARING, SOME OF THOSE ISSUES MAY BE MORE

16   APPROPRIATE.

17        AND I AM CONCERNED THAT IN THE SECTION II MONOPOLIZATION

18   CLAIM, I AM CONCERNED THAT IN FACT THERE IS SIGNIFICANT

19   EVIDENCE THAT LIV HAS NOT BEEN PREVENTED FROM ENTERING THE

20   MARKET.  AND IT WAS INTERESTING THAT THE PLAINTIFFS'S OWN

21   EXPERT INDICATES THAT LIV PROJECTS A 20 PERCENT MARKET SHARE

22   WITHIN THE NEXT YEAR.  THAT IS SIGNIFICANT WHEN YOU ARE

23   STARTING AT ZERO.

24        ON THE GROUP BOYCOTT CLAIM, IT SEEMS UNDISPUTED THAT THERE

25   IS NO HORIZONTAL COMPETITOR TO PGA TOUR.  AND SO ANY SUPPOSED

1    CONSPIRACY WITH THE EUROPEAN GOLF TOUR MAY NOT SATISFY THE

2    GROUP BOYCOTT HORIZONTAL AGREEMENT AMONG COMPETITORS

3    REQUIREMENT.

4         I HAVE GREAT CONCERN ABOUT THE REACH OF THE STRONG-ARMING

5    BY PGA TOUR TO THE -- ALL OF THE SUPPLIERS OF THE TOURNAMENT,

6    DOWN TO THE TECH SUPPLIERS, THE VENDORS, THE AGENTS, THE

7    CLOTHING MANUFACTURERS, THAT'S CONCERNING TO ME, I'M NOT SURE

8    THE CASE HAS BEEN MADE OUT.

9         WE THEN GET TO THE ISSUE THAT IS PROBABLY WHERE WE WILL

10   FOCUS TODAY, BECAUSE I DON'T THINK IT COMES AS ANY SURPRISE

11   THAT I'M NOT WILLING TO ISSUE A TRO BASED ON THE SECTION I AND

12   SECTION II CLAIMS, AND THAT IS THE ISSUE OF THE REGULATIONS

13   THEMSELVES AND THE DISCIPLINARY ACTION.  I THINK THAT'S A HARD

14   ONE.

15        WHEN I READ THE RULES THEMSELVES, I DIDN'T ACTUALLY READ

16   THEM THE WAY THE DEFENDANTS COUCHED THEM IN THEIR DECLARATIONS.

17   AND I -- AND SO I DO NEED SOME MORE ARGUMENT ON THIS.

18        BUT AS I READ SECTION E ARTICLE VII, SECTION II SAYS, "AN

19   APPEAL SHALL OPERATE TO STAY THE EFFECTIVE DATE," AND THIS IS

20   THE IMPORTANT PART, "OF ANY PENALTY."  AND I READ THAT TO APPLY

21   TO ANY PENALTY.  I THINK MR. WALTERS PROBABLY DID TOO, BUT I AM

22   MINDFUL OF THE DEFENDANT'S BRIEFING THAT THE COURT SHOULD GIVE

23   DEFERENCE TO A PRIVATE ORGANIZATION'S INTERPRETATION AND

24   APPLICATION OF ITS OWN RULES AND PROCESSES.

25        SO I THINK WE DO NEED TO FOCUS THERE, ESPECIALLY IN LIGHT

1    OF THE MODIFIED PROPOSED ORDER, AND SEEING THAT THE REACH OF

2    THIS TRO, IF IT HAS ANY REACH, WILL BE TO ALLOW THESE THREE

3    GOLFERS TO COMPETE IN THE FEDEX TOURNAMENT LATER THIS WEEK.

4    AND THEN IT WOULD ESSENTIALLY EXPIRE OF ITS OWN FORCE, AND WE

5    WOULD THEN BE LOOKING AT WHETHER OR NOT THERE MAY BE A

6    PRELIMINARY INJUNCTION DOWN THE ROAD.

7         SO I'M HOPING THAT'S MOST OF WHAT I HAVE TO SAY TODAY,

8    ALTHOUGH YOU CAN EXPECT ME TO BE AN ACTIVE QUESTIONER SO THAT I

9    CAN REALLY PROBE THIS, BECAUSE I DON'T HAVE THE LUXURY OF GOING

10   BACK TO THE BOOKS AND GIVING YOU A DECISION IN SIX WEEKS.

11        SO LET ME START THEN WITH THE MOVING PARTY, WITH THE

12   PLAINTIFFS, AND HEAR YOUR ARGUMENT.

13        YOU CAN EITHER BOTH COME UP TO THE PODIUM, OR ONE AT A

14   TIME.  I DON'T KNOW HOW YOU FEEL IT WOULD BE MOST EFFECTIVE.

15             MR. WALTERS:  THANK YOU, YOUR HONOR.

16             MR. PETERS:  YOUR HONOR, IF I MAY, BEFORE MR. WALTERS

17   BEGINS, JUST ONE KIND OF HOUSEKEEPING MATTER, WHICH IS HOW WE

18   SHOULD DEAL WITH THE PLAINTIFF'S LIV GOLF AGREEMENTS.

19        WE FILED THEM PROVISIONALLY UNDER SEAL, NOT BECAUSE WE

20   THOUGHT THAT THAT WAS APPROPRIATE, BUT BECAUSE IT WAS REQUESTED

21   BY THE PLAINTIFFS.  THEY DIDN'T INCLUDE THEM IN THEIR PAPERS,

22   ALTHOUGH THEIR DECLARATIONS REFERRED TO THEM, WE THEN GOT THEM

23   ON FRIDAY FROM THE PLAINTIFFS, WHO SAID WE WOULD ONLY GET THEM

24   IF WE AGREED TO TREAT THEM AS AEO.

25        THEREFORE, FOLLOWING 79.5(B) OF THIS COURT'S RULES, WE

1    FILED THEM PROVISIONALLY UNDER SEAL.  I DON'T THINK THEY

2    CONSIST OF TRADE SECRETS, THEY ARE NOT PRIVILEGED, I DON'T

3    THINK IT APPLIES, BUT OBVIOUSLY I WANT TO MAKE SURE THAT I

4    HANDLE THAT MATTER APPROPRIATELY, AND I'M SURE MR. WALTERS DOES

5    TOO IN HIS ARGUMENT.

6         AND SO I THINK IT'S THE PLAINTIFF'S BURDEN TO ESTABLISH

7    THAT THEY ARE PROPERLY SEALED.  I THINK THAT WE SHOULD BE ABLE

8    TO DISCUSS THEM, BUT I JUST WANT THE COURT'S GUIDANCE, AND I'M

9    SURE MR. WALTERS DOES TOO, ON HOW WE SHOULD HANDLE THOSE

10   DOCUMENTS PROVISIONALLY, ALL UNDER SEAL, THE THREE TRO

11   PLAINTIFF'S AGREEMENTS.

12        THANK YOU, YOUR HONOR.  AND EXCUSE ME, MR. WALTERS.

13            THE COURT:  ALL RIGHT.

14        MR. WALTERS, WE CERTAINLY DO WANT TO RESPECT THE

15   LEGITIMATE PRIVACY RIGHTS AND CONFIDENTIALITY RIGHTS OF THESE

16   THREE PARTIES.  WHAT'S YOUR VIEW ON A DISCUSSION ON THE RECORD?

17            MR. WALTERS:  OBVIOUSLY, THERE'S NO FORMAL DISCOVERY

18   THAT OCCURRED BEFORE THE TRO.  WE VOLUNTARILY PROVIDED THEM,

19   JUST AS A MATTER OF COURTESY.  WE DID SO ON AN AEO BASIS

20   BECAUSE THESE ARE CONFIDENTIAL AGREEMENTS, THEY ARE PROPRIETARY

21   TO THE PLAYERS, AND OF COURSE TO LIV GOLF.

22        THEY ARE VERY IMPORTANT AGREEMENTS AND THEY ARE ALWAYS

23   HELD CONFIDENTIAL BECAUSE IT AFFECTS THE PLAYERS' NEGOTIATIONS

24   WITH SPONSORS, WITH OTHER POTENTIAL COMPETITORS FOR THEIR

25   SERVICES.  AND SO THEY ARE HIGHLY SENSITIVE, PARTICULARLY THE

1    NUMBERS IN THEM.

2         AND I HAVE APPRISED MR. PETERS THAT IF HE WANTS TO SPEAK

3    GENERALLY ABOUT THE AGREEMENTS, WE CAN PROBABLY DO THAT, BUT I

4    THINK THE NUMBERS THEMSELVES, AND THE NUMBERS FRANKLY AREN'T

5    PROBATIVE OF ANY ISSUE, I DON'T THINK, AND YOUR HONOR HAS THEM,

6    THAT THERE'S REALLY NO REASON TO SPEAK MORE BROADLY ABOUT THEM.

7         THE COURT:  I THINK THAT PERHAPS THE ONLY ISSUE I

8    WOULD BE CONCERNED ABOUT, I DON'T NEED TO DISCUSS IT, BUT YOU

9    MAY WISH TO, IS THE COMPARISON IN THE AMOUNTS THAT HAVE BEEN

10   EARNED IN THE PGA TOUR AND WILL BE EARNED UNDER THE CONTRACTS

11   WITH LIV.  THE COMPARATIVE NUMBER -- THE COMPARATIVE MULTIPLES

12   OR PERCENTAGES, IS THAT CONFIDENTIAL AS WELL?

13        MR. WALTERS:  YOU KNOW, I THINK WE COULD PROBABLY

14   SPEAK IN PERCENTAGES, BUT OF COURSE YOU KNOW THE NUMBERS, WE

15   KNOW THE NUMBERS, SO WE OUGHT TO BE ABLE TO SPEAK ABOUT THEM

16   WITHOUT ARTICULATING THE NUMBERS, CERTAINLY THE RELATIVE

17   COMPARISONS, THERE'S NOTHING CONTROVERTED ABOUT THAT.

18        THE COURT:  THANK YOU.

19        MR. PETERS, IF YOU ARE MAKING AN ARGUMENT AND YOU ARE NOT

20   CERTAIN, YOU CAN ASK TO CONFIDENTIALLY SPEAK TO MR. WALTERS TO

21   SEE IF YOU ARE HEADED INTO THE WRONG TERRITORY.

22        MR. PETERS:  THAT'S FINE, YOUR HONOR.

23        THERE'S ALSO SOME PROVISIONS IN THE AGREEMENT WHICH WE

24   THINK IS RELEVANT -- WHICH WE THINK ARE RELEVANT TO THE

25   ANALYSIS.  THEY ARE ALL THE SAME IN THE THREE AGREEMENTS, I

1    JUST -- I WILL TREAD CAREFULLY.  I DON'T WANT TO CROSS THAT

2    LINE, AND IF I GET CLOSE TO IT, I'M SURE YOUR HONOR WILL TELL

3    ME, BUT I WILL TRY AND HANDLE IT CAREFULLY.

4         IT'S OUR VIEW THAT THESE PLAYER AGREEMENTS ARE HIGHLY

5    RELEVANT, THEY ARE NOT TRADE SECRET, THEY ARE NOT PRIVILEGED,

6    AND IF THERE'S SENSITIVITY IN A PUBLIC COURTROOM, DOESN'T

7    REALLY CARRY THE DAY.

8         THE COURT:  THESE ARE LIKE LICENSING AGREEMENTS THAT

9    WE SEE ALL THE TIME, AND THE DOLLAR AMOUNTS, BECAUSE THERE IS A

10   COMPETITIVE ADVANTAGE TO BE MADE BY KEEPING THE NUMBERS SECRET.

11        THE NEGOTIATION WITH THESE THREE, WITH LIV AND WHAT THEY

12   ARE PAID, IT SHOULD NOT BE A NEGOTIATING POINT IN THE NEXT

13   THREE GOLFERS COMING UP, AND I CERTAINLY APPRECIATE THAT.

14        SO MR. PETERS, I'M NOT THE ONE WHO WILL BE ABLE TO ANSWER

15   THAT QUESTION, BECAUSE MR. WALTERS IS GOING TO UNDERSTAND THE

16   SCOPE OF THE PRIVILEGE THAT HE'S CLAIMING.  AND I HAVE NOT MADE

17   ANY PARTICULAR RULINGS, WE ARE JUST GOING TO TRY TO MOVE

18   THROUGH THIS.

19        SO LET ME NOW TURN TO MR. WALTERS FOR YOUR ARGUMENT.

20        MR. WALTERS:  THANK YOU, YOUR HONOR.

21        FIRST OF ALL, THANK YOU FOR HEARING THIS.  WE UNDERSTAND

22   THE DEMANDS ON THIS COURT, AND WE APPRECIATE IT VERY MUCH, VERY

23   DEEPLY, AND THE COURT STAFF.

24        MY THOUGHT WAS TO SPEAK TO FOUR ISSUES TODAY, BUT I'M

25   GOING TO SORT OF REALLY FOCUS ON THE ISSUES THAT YOUR HONOR HAS

1    IDENTIFIED.  AND THE FIRST ISSUE IS WHY ARE WE HERE NOW?  AND

2    IT'S AN IMPORTANT ISSUE.  AND I WOULD SAY IT'S BY NO MEANS AN

3    ISSUE THAT WE HAVE IN ANY WAY MANUFACTURED, AND I THINK I CAN

4    EXPLAIN THAT HERE VERY QUICKLY.

5         SECONDLY, I DO WANT TO SPEAK TO THE QUESTION OF

6    IRREPARABLE HARM AND WHY THIS TOURNAMENT IS NOT JUST A GARDEN

7    VARIETY GOLF TOURNAMENT AND WHY THAT REALLY MATTERS.  AND

8    FRANKLY, I THINK THAT'S SUPPORTED BY THE GILDER CASE.  THE

9    NINTH CIRCUIT DECISION SPEAKS EXACTLY TO THE QUALITATIVE

10   BENEFITS OF THIS TOURNAMENT THAT, INDEED, LEAD TO IRREPARABLE

11   HARM.

12        I WILL BRIEFLY TOUCH ON THE MERITS.  AND I DON'T PLAN ON

13   DOING AN EXEGESIS ON THE ANTITRUST LAWS, BUT I WILL FOCUS IN

14   PARTICULAR ON THE RULES AND HOW THE RULES WARRANT THE

15   RESTRAINING ORDER THAT WE ARE SEEKING, AND FINALLY, JUST AN

16   OBSERVATION ABOUT THE IMPORTANCE OF THIS FROM A OUR STANDPOINT.

17        IF YOUR HONOR WOULD PERMIT, WE HAVE PREPARED A GROUP OF

18   SLIDES.  MIGHT I PRESENT THOSE TO THE COURT?

19             THE COURT:  YES, THANK YOU.

20             MR. WALTERS:  AND THEN A FEW BACKUP MATERIALS,

21    INCLUDING THE RULES, JUST FOR YOUR HONOR'S CONVENIENCE.  AND

22    HERE'S A SECOND SET.

23             THE COURT:  THANK YOU.

24             MR. PETERS:  DO YOU HAVE A COPY OF THOSE MATERIALS

25    FOR US?

1           MR. WALTERS:  OH, OF COURSE.

2           MR. PETERS:  THANK YOU VERY MUCH.

3           MR. WALTERS:  I THINK THE MOST IMPORTANT THING IS TO

4    UNDERSTAND THE TIMELINE OF HOW WE GOT HERE TODAY.

5           YOUR HONOR IS CORRECT THAT ON JUNE 30TH, THAT'S WHEN THE

6    LEAGUE ACTUALLY SUSPENDED THE PLAYERS, AND SO THAT'S WHEN THE

7    PROCESS, FOR ALL PRACTICAL, PURPOSES BEGAN.  AND THE SUSPENSION

8    WAS, YOU PLAYED IN ONE LIV GOLF TOURNAMENT, AND WE ARE GOING TO

9    SUSPEND YOU, ESSENTIALLY, FOR A YEAR, FOR ANY COMPETITION IN

10   THE PGA, THROUGH MARCH 31ST OF 2023.  AND THAT WAS THE

11   SUSPENSION.

12          NOW AT THAT JUNCTURE THE PROTOCOLS OF THE RULES KICKS INTO

13   GEAR.  AND SO ON JULY 13TH, THE PLAINTIFFS SUBMITTED THEIR

14   APPEAL OF THAT RENDERING.  AND THE DOCUMENT THEY SUPPLIED ON

15   THAT IS A COMPREHENSIVE DOCUMENT THAT SAYS YOU HAVE NO LEGAL

16   BASIS TO SUSPEND US, FOR A WHOLE PANOPLY OF REASONS, PRIMARILY

17   THAT THESE UNDERLYING RULES THAT YOU HAVE UTILIZED TO SUSPEND

18   US ARE UNENFORCEABLE UNDER THE ANTITRUST LAWS.  AND SO THAT WAS

19   A SUBMISSION THAT WAS MADE ON JULY 23RD.

20          NOW INTERESTINGLY -- LET'S GO TO THE NEXT SLIDE.  THIS IS

21   THE ACTUAL -- THIS IS THE ACTUAL IMPOSITION OF THE SUSPENSION,

22   THE JUNE 30TH DOCUMENT.  BUT LET'S GO TO THE NEXT ONE.

23          THIS IS THE PLAYERS' APPEAL.  AND IT'S A MULTI-PAGE

24   DOCUMENT.  AND I THINK IT'S ACTUALLY IN THE BINDER IN SUPPORT,

25   BUT THE SIGNIFICANT PART OF THIS IS IN THE OPENING PREAMBLE,

1    THE PLAYERS MADE CERTAIN, IN UNAMBIGUOUS TERMS, THAT UNDER

2    SECTION VII.E.2 OF THE REGULATIONS, WHICH IS THE APPELLATE

3    MECHANISM YOUR HONOR REFERRED TO EARLIER, THE PLAYER, IN THIS

4    CASE, TALOR GOOCH, "MY APPEAL," AND ALL THREE OF THEM FILED

5    THIS, "MY APPEAL OF THE MAJOR PENALTY SHALL OPERATE TO STAY THE

6    EFFECTIVE DATE OF ANY PENALTY UNTIL AFTER THE FINAL DECISION OF

7    THE APPEAL."

8         SO THEY SET FORTH THEIR UNDERSTANDING THAT INDEED THE

9    APPEAL WAS UNDER WAY, AND THAT A STAY OF THAT APPEAL WOULD BE

10   IN PLACE, AND THEY RELIED ON THAT.

11        NOW, AFTER THE 13TH, WHEN THEY FILED THAT, THE SILENCE WAS

12   DEAFENING.  THE PGA NEVER SAID NO, YOU MISUNDERSTAND THE RULES,

13   WE HAVE SUSPENDED YOU UNDER ANOTHER SECTION, THIS IS AN ONGOING

14   VIOLATION.  NONE OF THE STUFF THAT WE HAVE HEARD IN THE LAST

15   72 HOURS BEFORE WE FILED FOR THIS TRO OCCURRED, IT WAS

16   ACCEPTANCE, THAT THAT WAS THE POSITION, THAT THE STAY WOULD BE

17   IN EFFECT, AND NOT A WORD WAS UTTERED TO THE CONTRARY.

18        INDEED, ON JULY 30TH, TWO WEEKS LATER, THE TOUR

19   COMMISSIONER ACTUALLY REFERRED THAT APPEAL TO AN APPEALS PANEL,

20   JUST OTHER MEMBERS OF THE MANAGEMENT.  DID NOT DISABUSE THESE

21   PLAYERS AND SAY, BY THE WAY, THERE IS NO STAY, DIDN'T SPEAK TO

22   ANY OF THESE SPECIFIC ISSUES THAT THE PLAYERS HAD MADE CRYSTAL

23   CLEAR AT THE FRONT END OF THEIR APPELLATE DOCUMENT.

24        SO TWO DAYS LATER AFTER THAT, ON AUGUST 1ST, ONE OF THE

25   PLAYERS, AND THE REASON THIS PLAYER DID IT, AND THE PLAYER DID

1    IT THROUGH SEPARATE COUNSEL -- NOT THROUGH THE COUNSEL, BUT

2    COUNSEL HELPED THEM PREPARE IT, WAS THIS CONFIRMATION.  AND

3    THIS IS ON AUGUST 1ST, TWO DAYS LATER.

4         AND YOU WILL SEE THAT WHAT THE PLAYER WRITES, THIS IS

5    TALOR GOOCH, "THE REGULATIONS PROVIDE THAT I SHOULD BE

6    PERMITTED TO PLAY IN PGA TOURNAMENTS PENDING MY APPEAL TO THE

7    APPEALS COMMITTEE.  I THEREFORE WRITE TO YOU TO INFORM YOU THAT

8    I INTEND TO PARTICIPATE IN THE FEDEX ST. JUDE CHAMPIONSHIP AND

9    THE PLAYOFFS.  PLEASE CONFIRM BY AUGUST 2ND THAT THAT IS

10   YOUR -- THAT THE PGA TOUR WILL COMPLY WITH THIS RULE THAT STAYS

11   THE APPEAL."

12        AND YOU SAY, WELL, WHY DID THEY DO THAT?  WELL, THE REASON

13   HE TRIED TO DO THAT WAS HE TRIED TO REGISTER ON THE COMPUTER

14   FOR THE FEDEX CUP OVER THE WEEKEND, AND IT POPPED OUT, AND HE

15   SAID I WANT TO CONFIRM, OKAY.  SO HE CONFIRMED THAT ON

16   AUGUST 1ST.

17        NOW ON AUGUST 2ND, MUCH TO HIS SURPRISE, HE GOT TWO

18   LETTERS BACK, ONE FROM THE PGA OFFICE ITSELF, OFFERING ONE

19   EXPLANATION OF WHY THE APPEAL WAS NOT -- THE STAY WAS NOT

20   EFFECTIVE, AND THEN ALSO A LETTER FROM MR. PETERS'S FIRM

21   OFFERING YET ANOTHER EXPLANATION, BOTH OF WHICH DON'T SYNC UP

22   WITH THE EXPLANATION THAT IS NOW CONTAINED IN THE DEFENDANT'S

23   RESPONSIVE BRIEF ABOUT WHY THEY ARE SOMEHOW EXCUSED FROM THIS

24   STAY.

25        SO THAT WORD CAME IN ON AUGUST 2ND.  AND THEN WE, ON

1    BEHALF OF THE PLAYERS WHO WERE ELIGIBLE, THE VERY NEXT DAY,

2    SOUGHT THE TEMPORARY RESTRAINING ORDER.  BUT FOR THAT

3    NOTIFICATION ON THE 2ND, THEY WOULD BE PLAYING GOLF IN MEMPHIS

4    THIS WEEK AS PART OF THEIR FEDEX CUP.  BUT IT WAS ONLY BECAUSE

5    ON THE 2ND, FOR THE VERY FIRST TIME, DID THE PGA INDICATE THAT

6    SOMEHOW THE STAY OF THE APPEAL, WHICH THESE PLAYERS HAVE MADE

7    CRYSTAL CLEAR THAT THEY BELIEVE TO BE EFFECTIVE AND WERE

8    RELYING ON TO BE EFFECTIVE, IT WAS ONLY ON AUGUST 2ND.

9         SO FRANKLY, THERE WOULD BE NO REASON TO COME IN EARLIER

10   BECAUSE NOBODY HAD EVER TAKEN ISSUE WITH THE EFFECTIVENESS OF

11   THE STAY, AND ONCE THEY DID TAKE ISSUE, THE PLAYERS WERE IN

12   COURT WITHIN 24 HOURS.

13        SO FRANKLY, I THINK IT'S THE ONLY TIME THAT ONE WOULD SEEK

14   AN APPEAL FOR THIS SPECIFIC DISCREET ISSUE, WHICH IS A VERY

15   DIFFERENT MATTER THAN, OBVIOUSLY, A PRELIMINARY INJUNCTION ON

16   THE MERITS.

17             THE COURT:  WELL, BUT, YOU KNOW, I HAVE TO SAY THAT

18   WHEN YOU SUBMITTED THESE PAPERS, YOUR INITIAL REQUEST FOR A

19   TEMPORARY RETRAINING ORDER WAS FAR BROADER AND WOULD HAVE

20   LIFTED THE APPLICATION OF THE REGULATIONS FROM ALL PLAY UNTIL

21   THIS CASE TERMINATES OR UNTIL THE PRELIMINARY INJUNCTION

22   ISSUES.

23             MR. WALTERS:  YES.

24             THE COURT:  SO YOU HAVE ONLY NOW, THIS MORNING, COME

25   IN WITH A MODIFICATION, WHICH I STILL COMMEND YOU FOR BECAUSE

1    IT'S MORE REALISTIC, BUT MR. PETERS WASN'T RESPONDING TO WHAT

2    YOU SUBMITTED TODAY.

3            MR. WALTERS:  WELL, HE IS IN PART, IN THE SENSE THAT

4    HE'S SAYING THAT EVEN IF YOU ARE JUST LOOKING FOR A TRO FOR THE

5    STAY PERIOD, YOU ARE NOT ENTITLED TO IT BASED ON THE

6    INTERPRETATION OF THE REGULATIONS.

7            BUT YOUR HONOR IS CORRECT, AND I THINK IT IS MUCH MORE

8    APPROPRIATE THAT WE ARE LITERALLY JUST SEEKING TRO TO REFLECT

9    OUR LEGAL ENTITLEMENT TO THE STAY UNDER THE REGULATIONS, WHICH

10   BECAUSE OF THE WAY THE FEDEX CUP WORKS, BECAUSE IT'S A SINGLE

11   UNIFIED EVENT, WOULD CAPTURE THE FEDEX -- JUST THE FEDEX CUP

12   ITSELF, BUT NO OTHER TOURNAMENTS FOR NO OTHER PERIOD OF TIME,

13   JUST THAT DISCREET PREMISE.

14           SO I THINK WE ARE HERE, AT LEAST ON THAT RELIEF, AT THE

15   APPROPRIATE JUNCTURE, FRANKLY, THE ONLY APPROPRIATE JUNCTURE.

16           NOW, WHY IS -- LET ME JUST SPEAK FOR A MINUTE TO THE

17   IRREPARABLE HARM.  WHAT'S THE BIG DEAL ABOUT THE FEDEX CUP?

18   WHY IS IT THAT THIS IS NOT INTERCHANGEABLE OR FUNGIBLE WITH

19   OTHER GOLF TOURNAMENTS, INCLUDING YOUR HONOR MENTIONED, THE

20   PLAY WITH THE LIV TOURNAMENT?

21           FIRST OF ALL, THERE IS NO LIV TOURNAMENT THAT'S GOING TO

22   APPEAR AT THE SAME TIME AS THE FEDEX CUP, SO IT IS JUST THE

23   FEDEX CUP OR NOTHING.  BUT HERE THE MUCH MORE FUNDAMENTAL

24   POINT, THE FEDEX CUP IS, BY THE DESCRIPTION OF THE PGA ITSELF,

25   IS EFFECTIVELY THE SUPERBOWL OF GOLF, OKAY.  THIS IS THEIR

1    PLAYOFFS, THIS IS THEIR SUPERBOWL, THIS IS THEIR WORLD SERIES,

2    THIS IS THEIR NBA PLAYOFFS, AND THE WHOLE SEASON IS DESIGNED TO

3    GET YOU TO THIS POINT, TO PARTICIPATE IN THE FEDEX CUP AND

4    ULTIMATELY WIN IT.

5         AND IT IS, ON TWO LEVELS, THE BIGGEST PRIZE IN GOLF.  THE

6    FIRST LEVEL IS, AS A FINANCIAL MATTER, IT OVERWHELMS ANY

7    POSSIBLE OTHER EARNINGS.

8         THE COURT:  WELL, ACTUALLY, I THINK THE EVIDENCE

9    WOULD SUGGEST THAT LIV OVERWHELMS ANY OTHER POTENTIAL EARNINGS.

10        MR. WALTERS:  WELL, NOT ON THIS ONE THOUGH, BECAUSE

11   THERE'S UP TO $75 MILLION IN BONUSES AVAILABLE IN THE FEDEX CUP

12   TOUR.  SO IT ACTUALLY IS LARGER.  THERE'S ONE TOURNAMENT THAT

13   LIV IS DOING IN NOVEMBER, THEIR YEAR END, WHERE $50 MILLION IS

14   AVAILABLE.  BUT THAT'S THE ONLY ONE THAT EVEN COMES REMOTELY --

15        THE COURT:  WELL, THEN HOW MUCH DO I NEED TO CONSIDER

16   THE LIKELIHOOD THAT THESE PLAYERS ARE IN ACTUAL CONTENTION TO

17   WIN THE WHOLE THING WITH THIS KIND OF BONUS?  I MEAN, ANYONE

18   CAN MISS A THREE FOOT PUT AND LOSE A TOURNAMENT.  BUT THESE

19   PLAYERS, THEY HAVE DONE WELL, BUT THEY ARE NOT RANKED NUMBERS

20   1, 2 AND 3.

21        MR. WALTERS:  WELL, THEY ARE NOT, BUT TALOR GOOCH IS

22   RANKED 20.  AND THERE HAVE BEEN PLENTY OF PLAYERS IN THE FEDEX

23   CUP THAT HAVE MIGRATED MANY POSITIONS UP AND DOWN.

24        SO HE, FOR EXAMPLE, WOULD HAVE ACCESS TO THE HIGHEST

25   LEVELS OF EARNINGS IN THE FEDEX CUP, THE OTHERS ARE, I THINK IN

1    THE HIGH 40'S OR LOW 50'S, IN THAT RANGE, AND IT WOULD BE MORE

2    DIFFICULT FOR THEM.  BUT THE EARNINGS POTENTIAL ON THIS

3    TOURNAMENT, SAVE THE ONE LIV TOURNAMENT YOUR HONOR AND I HAVE

4    SPOKEN ABOUT, JUST MAKE ALL THE OTHERS PALE BY COMPARISON.

5         FOR EXAMPLE, THE MASTERS, THE BRITISH OPEN, THE U.S. OPEN,

6    THEY ARE, LIKE, A TOTAL PURSE OF $14 MILLION, AS COMPARED TO

7    THESE EARNINGS.  BECAUSE THIS IS THE PGA'S GRAND DESIGN, THEY

8    ARE SAYING, WHAT DO WE HAVE TO COMPETE WITH THE SUPERBOWL, WHAT

9    DO WE HAVE TO COMPETE WITH THE WORLD SERIES, AND THAT IS WHAT

10   THE FEDEX CUP IS.

11        THE COURT:  SO YOU ARE SUGGESTING THAT THE OVERALL

12   WINNER OF THE FEDEX CUP CAN WIN $75 MILLION?

13        MR. WALTERS:  NO, THAT'S THE RANGE --

14        THE COURT:  THAT'S THE TOTAL PURSE DIVIDED AMONG

15   THOSE WHO CAN WIN.

16        MR. WALTERS:  INCLUDING THE BONUS.  I THINK THE TOTAL

17   FOR THE WINNER IS $18 MILLION.

18        THE COURT:  OKAY.  HOW MUCH?

19        MR. WALTERS:  $18 MILLION.

20        THE COURT:  OKAY.  THANK YOU.  THAT'S A DIFFERENT

21   NUMBER.

22        MR. WALTERS:  THAT'S $18 MILLION FOR THE TOP WINNER.

23        NOW THAT WOULD COMPARE TO, AND I THINK I HAVE THESE

24   NUMBERS RIGHT, FOR EXAMPLE THE MASTERS, IS LIKE $1.8 MILLION OR

25   $2.3 MILLION.  THE TOTAL, THE TOP INDIVIDUAL AWARD FOR ANY LIV

1    TOURNAMENT TODAY HAS BEEN $4.3, WHICH OVERWHELMS SOME OF THE

2    OTHER TOURNAMENTS.  SO IT IS ORDERS OF MAGNITUDE GREATER THAN

3    ANY OTHER TOURNAMENT OUT THERE.

4         THE COURT:  WELL, BUT THE LIV MODEL IS TO PAY ALL

5    PLAYERS TO PLAY AND THEN TO GIVE AWARDS TO THOSE WHO ACTUALLY

6    WIN OR PLACE.

7         MR. WALTERS:  THAT'S CORRECT.

8         THE COURT:  SO THE $4.3 MILLION YOU CITE ISN'T

9    ACTUALLY THE COMPARATIVE NUMBER.

10        MR. WALTERS:  WELL, THE GUARANTEED NUMBER IS

11   $160,000, WHICH IS ADMITTEDLY A LOT OF MONEY.

12        THE COURT:  WELL, THESE CONTRACTS PROVIDE FOR

13   PAYMENTS SIMPLY FOR SHOWING UP FOR THE FIRST TOURNAMENT.

14        MR. WALTERS:  WELL, THEY DO, BUT THEN THEY HAVE TO

15   WIN MONEY IN ORDER TO RECOUP AGAINST THE CONTRACT.  SO THEY ARE

16   ALL A LITTLE BIT DIFFERENT.

17        AND THE REASON THEY DO THAT, IT'S VERY INTERESTING WHY

18   THEY GOT MONEY UP FRONT, IT KIND OF GOES TO THIS WHOLE

19   ANTITRUST ISSUE OF US OR THEM, BECAUSE THEY REQUIRE THAT FOR

20   THEM TO SAY, WE ARE NOT GOING TO PLAY WITH THE PGA, OR WE ARE

21   GOING TO TAKE THE RISK OF NOT PLAYING WITH THE PGA IN ORDER TO

22   PLAY WITH LIV.

23        BUT I THINK THE POINT HERE IS THAT THIS IS AN

24   EXTRAORDINARILY ATTRACTIVE FINANCIAL OPPORTUNITY, BUT IT'S MUCH

25   MORE THAN THAT, THAT'S JUST THE STARTING POINT.

```
 1              THE COURT:  YES, THAT'S A LOT MORE MONEY THAN A
 2      FEDERAL JUDGE MAKES, SO THAT'S A LOT OF MONEY.
 3              BUT IF WE ARE QUANTIFYING THIS AND SHOWING HOW LUCRATIVE
 4      IT IS, THEN YOU ARE NOT GOING TO GET A TRO, BECAUSE AT THE END
 5      OF THE DAY, I CAN COMPENSATE THE PLAYERS IF THEY ARE
 6      SUCCESSFUL, WITH THE APPROPRIATE AMOUNT OF MONEY.
 7              MR. WALTERS:  THAT'S WHY I WANTED TO GO ON TO THE
 8      NEXT SLIDE, BECAUSE THIS IS THE QUALITATIVE POINT.
 9              AND THIS IS THE REAL IRREPARABLE HARM, BECAUSE THIS IS NOT
10      JUST ABOUT MONEY.  AND IN FACT, THAT'S EXACTLY WHAT THE PGA
11      SAYS, IT'S NOT JUST ABOUT MONEY.
12              WHAT THE PGA HAS SAID IS THAT WINNING THE FEDEX CUP IS AN
13      OPPORTUNITY FOR PLAYERS TO STAMP THEMSELVES AMONG THE ELITE IN
14      GOLF.  AND IT IS MORE THAN ABOUT MONEY.  THAT'S HOW THEY
15      CHARACTERIZE IT.  IT PUTS YOU UP THERE IN THE NICHOLAS, YOU
16      KNOW, GREG NORMAN, CATEGORY OF THE ELITE GOLFERS.
17              TWO YEARS AGO, PATRICK CANTLAY WON IT, AND THAT'S EXACTLY
18      HOW THEY DESCRIBED HIM, YOU GET TO BE UP THERE IN THE RARIFIED
19      AIR OF THE ELITE GOLFERS.  THEIR VERY OWN COMMISSIONER, JAY
20      MONAHAN SAID, "THE FEDEX CUP IS THE HARDEST CHAMPIONSHIP TO WIN
21      IN GOLF.  IT IS NOW, IF NOT THE NUMBER ONE GOAL, CERTAINLY THE
22      TOP GOAL FOR EVERY SINGLE PLAYER AT THE START OF EVERY SINGLE
23      SEASON."
24              SO IT'S A HIGHLY, HIGHLY PRESTIGIOUS AWARD.  ONE OF THE
25      REASONS FOR THAT IS IT GIVES YOU THE RARE OPPORTUNITY FOR YOU
```

1    TO QUALIFY FOR THE HOLY GRAIL, WHICH ARE THE MAJOR TOURNAMENTS,

2    THE BRITISH OPEN, THE MASTERS, THE U.S. OPEN, OKAY.  AND

3    BECAUSE IF YOU FINISH IN THE TOP 30, WHICH ANY OF THESE THREE

4    PLAYERS COULD FINISH IN THE TOP 30, ONE OF THEM IS ALREADY AT

5    20, THAT GIVES YOU AN AUTOMATIC PASS INTO THE MAJORS NEXT YEAR.

6         NOW THAT'S AN ENORMOUS DEAL, IT'S A PARTICULARLY ENORMOUS

7    DEAL TODAY, BECAUSE IF YOU AFFILIATE WITH LIV, YOUR PATH THERE

8    IS SEVERELY COMPROMISED BECAUSE OF THE WAY YOU AGGREGATE

9    POINTS.

10        THE COURT:  YOU JUST SAID TO ME THE LIV CONTRACTS

11   HAVE CALCULATED THE VALUE TO THE PLAYERS BY GIVING UP THEIR

12   OPPORTUNITY TO PLAY ON THE TOUR.

13        MR. WALTERS:  BUT THESE ARE NOT THE TOUR.  THESE

14   TOURNAMENTS ARE NOT TOUR TOURNAMENTS.

15        THE COURT:  THIS IS THE GATEWAY TO THE MAJORS, IS

16   WHAT YOU ARE TELLING ME.

17        MR. WALTERS:  WELL, IT IS.  THIS TOURNAMENT IS A

18   GATEWAY TO THE MAJORS, AND I NEED TO UNPACK THIS A LITTLE BIT

19   BECAUSE THIS IS REALLY IMPORTANT.  THE MAJORS ARE NOT PGA

20   TOURNAMENTS.

21        THE COURT:  I UNDERSTAND.

22        MR. WALTERS:  AND SO THE QUESTION IS, AND AS WE PUT

23   FORWARD IN THE EVIDENCE, THE PGA HAS BEEN LEANING ON THE MAJORS

24   TO TILT THE FIELD, OKAY, AGAINST LIV GOLF, AS A COMPETITIVE

25   ADVANTAGE.

1       NOW HOW DO YOU GET TO THE MAJORS?  THERE ARE SEVERAL

2    VEHICLES FOR GETTING TO THE MAJORS.  THIS IS THE BEST POSSIBLE

3    OPPORTUNITY FOR THESE PLAYERS.  BECAUSE THERE'S ALSO AN

4    ORGANIZATION CALLED THE OWGR, OFFICIAL WORLD GOLF RANKINGS, AND

5    THEY DO POINTS.  AND THE POINTS ARE ALSO A WAY FOR SOME PEOPLE

6    TO GET INTO THESE MAJORS.

7       WELL, WHO DOMINATES THE OWGR?  THE BOARD IS COMPRISED OF

8    THE PGA AND EUROPEAN TOUR, AND THAT PROCESS IS RIGHT UNDER WAY,

9    WHERE LIV GOLF HAS SAID, COULD WE PLEASE HAVE POINTS SO THAT WE

10   ARE NOT PUT AT AN UNFAIR ADVANTAGE.  THAT PROCESS IS UNDER

11   CONSIDERATION NOW.

12      NOW UNLESS THEY GRANT POINTS IN A FAIR AND EQUITABLE

13   FASHION, THESE PLAYERS, THIS IS THEIR BEST POSSIBLE -- BECAUSE

14   NOBODY CAN CHALLENGE THIS VEHICLE FOR GETTING TO THE MAJORS.

15   AND THIS IS -- AND THIS IS THE HOLY GRAIL, BECAUSE EVERYBODY

16   WANTS TO COMPETE IN AND PREVAIL IN MAJOR CHAMPIONSHIPS.

17      BUT IT'S NOT JUST THE MAJORS, IT'S ALSO A VEHICLE FOR --

18   THERE'S A SECOND RUNG JUST BELOW THAT, OF THE MARQUIS

19   INVITATIONALS, THAT OCCUR IN THE PGA TOUR, LIKE THE

20   ARNOLD PALMER INVITATIONAL IN OHIO.

21      THE TOP 70 PLAYERS QUALIFY FOR THAT.  IF THESE PLAYERS

22   DON'T HAVE AN OPPORTUNITY TO COMPETE IN THE FEDEX, IN THIS ONE

23   TOURNAMENT, THEN THOSE VEHICLES TO PLAY IN THOSE ELITE EVENTS

24   ARE COMPROMISED.  IF THAT HAPPENS, THEN ALL OF THESE THINGS,

25   THESE NON-QUANTIFIED OPPORTUNITIES OF BEING AMONG GOLF'S ELITE

1    AND RARIFIED HANDFUL, WHICH IT IS CONSIDERED TO BE, WHICH LEADS

2    TO SPONSORSHIPS, AND IT BECOMES A VIRTUOUS CYCLE OF BENEFITS.

3         AND THAT'S WHY THIS TOURNAMENT IS SO IMPORTANT.  FRANKLY,

4    YOUR HONOR, IF THIS WERE ANY OTHER TOURNAMENT, WE WOULDN'T BE

5    HERE.  THIS IS THE FEDEX CUP, THIS IS THE WORLD SERIES, THIS IS

6    THE SUPERBOWL.

7         THE COURT:  HOW MANY -- YOU INDICATED THAT THE FEDEX

8    TOURNAMENT IS THE BEST WAY FOR THESE PLAINTIFFS TO QUALIFY FOR

9    THE MAJORS.  YOU SAID IT'S AN AUTOMATIC -- HOW MANY PLAYERS TOP

10   PLAYERS FROM FEDEX GET THIS --

11        MR. WALTERS:  30.

12        THE COURT:  THE TOP 30?

13        MR. WALTERS:  YES, YOUR HONOR.  THE TOP 30.

14        THE COURT:  AND HOW MANY ARE PLAYING IN FEDEX?

15        MR. WALTERS:  125.  AND THEY GO IN WITH A CERTAIN

16   AMOUNT OF POINTS.  SO IF YOU GO IN AT 20, YOUR CHANCES OF

17   ENDING UP THERE ARE FAR BETTER THAN IF YOU GO IN AT 120.

18        THE COURT:  SURE.

19        MR. WALTERS:  SO EVERYBODY STARTS AT A DIFFERENT

20   POINT.  YOU GET CREDIT STROKES.  SO IT'S HUGELY IMPORTANT WHERE

21   YOU START.  SO YOU GO IN WITH THESE ADVANTAGES, AND THAT'S WHY

22   THESE PLAYERS ARE UNUSUALLY WELL SITUATED TO EITHER QUALIFY FOR

23   THE TOP 30, OR AT A MINIMUM, THE TOP 70, WHICH ARE THE

24   VEHICLES, THE RARIFIED AIR OF GOLF.

25        NOW WE WOULD SAY THESE FACTS ARE ON ALL FOURS WITH WHAT

1    THE NINTH CIRCUIT SAID IN THE GILDER DECISION.  IN THE GILDER

2    DECISION IT SAID, WE ARE GOING TO GRANT YOU -- WE ARE GOING TO

3    ACKNOWLEDGE YOUR IRREPARABLE HARM FOR THE VERY SAME

4    CONSIDERATIONS.

5         AND THERE, WHAT WAS IN CONTROVERSY WAS USING A KIND OF

6    CLUB THAT MIGHT OR MIGHT NOT BE DISQUALIFIED, THE SO CALLED

7    SQUARE GROOVES CLUB, WHICH I HAVE TO CONFESS, YOUR HONOR, I'M

8    NOT MUCH OF A GOLFER, BUT I DID TRY THOSE, AND I FRANKLY DIDN'T

9    NOTICE A BIG DIFFERENCE.

10        THE COURT:  IF THAT'S ALL IT WOULD TAKE TO IMPROVE MY

11    GOLF GAME, I WOULD TRY THEM TOO.

12        BUT I THINK THE GILDER CASE IS REALLY QUITE DIFFERENT.

13    BECAUSE THERE THE COURT ALSO SAID, THIS ISN'T EVEN REALLY ANY

14    PARTICULAR PROOF THAT THAT SQUARE GROOVE HELPS.

15        MR. WALTERS:  RIGHT.  BUT WHAT THE GILDER COURT DID

16    SAY IS, WE ARE GOING TO GRANT THE EQUITABLE RELIEF BECAUSE NOT

17    USING THOSE CLUBS MIGHT DENY YOU CERTAIN THINGS.

18        AND WHAT DID THEY FOCUS ON ABOUT WHAT THEY WOULD BE

19    DENIED?  ACCESS TO ELITE TOURNAMENTS, SPONSORSHIPS, AND ACCESS

20    TO GOLF'S ELITE.

21        THAT IS PRECISELY WHAT WE ARE TALKING ABOUT HERE.

22        THE COURT:  WAS THERE A BAN ON THE CLUBS IN ALL

23    TOURNAMENT PLAY, AS OPPOSED TO THE ABILITY TO PLAY IN A SINGLE

24    TOURNAMENT?

25        MR. WALTERS:  WELL, IT WAS, IT WAS A BAN ON -- BUT

1    THE LOGIC IS THE SAME, IT SAID IF YOU CAN'T USE THESE CLUBS,

2    THEN YOU ARE NOT GOING TO BE AS COMPETITIVE AND THEN YOU WON'T

3    HAVE ACCESS TO THE ELITE TOURNAMENTS, THE SPONSORSHIP, GOLF

4    RARIFIED AIR.  AND THAT CONSTITUTES IRREPARABLE INJURY.

5          THE COURT:  BUT WHY ISN'T THE ELITE RODEO AND THE

6    HELDMAN CASE MORE ON POINT WHERE THE COURT SAID, YOU MADE A

7    CHOICE TO PLAY IN ONE TOURNAMENT OR ONE TOUR, AS OPPOSED TO THE

8    OTHER, AND YOU ARE NOT BARRED FROM CONTINUING YOUR PLAY IN THE

9    SPORT?

10         MR. WALTERS:  BECAUSE YOU HAVE BEEN DENIED -- I MEAN,

11   FIRST OF ALL, THE HELDMAN DECISION, I THINK -- FRANKLY, I

12   THOUGHT THOSE FACTS WERE VERY, VERY DIFFERENT.

13         ALL THAT HAPPENED THERE IS THEY SAID, LOOK, BILLIE JEAN

14   KING, YOU HAVE SHORTENED THE AMOUNT OF TIME, THAT'S ALL YOU

15   HAVE DONE, TO MAKE A DECISION ABOUT YOUR COMPETITIVE CHOICES.

16         THAT'S NOT IRREPARABLE HARM.  YOU HAVEN'T FOREGONE THOSE

17   CHOICES, YOU SIMPLY SHORTENED THE TIME.

18         AND IN THE ELITE RODEO CASE, THEY WEREN'T ACCESSING WHAT

19   WE ARE TALKING ABOUT HERE.  AGAIN, I WOULDN'T BE HERE CLAIMING

20   THERE'S IRREPARABLE INJURY IF YOU COULDN'T PLAY IN THE

21   JOHN DEERE CLASSIC AND MAKE A CERTAIN AMOUNT OF MONEY.  AND I

22   DON'T MEAN TO MALIGN THE JOHN DEERE CLASSIC, IT COULD BE THE

23   BYRON NELSON CLASSIC, OR ANY OF THEM.  WE WOULDN'T BE HERE.

24   IT'S ONLY BECAUSE IT'S QUALITATIVELY DIFFERENT IN WHAT IT DOES

25   TO ADVANCE A CAREER.  THAT'S WHY WE ARE HERE ON THIS PARTICULAR

1    TOURNAMENT, AND FOR NO OTHER REASON.

2         YOUR HONOR DID NOT MENTION THE BALANCE OF THE EQUITIES,

3    BUT I DO THINK IT'S WORTH AN OBSERVATION ABOUT THE BALANCE OF

4    THE EQUITIES.  AND I HOPE IT'S AN UNNECESSARY OBSERVATION, BUT

5    LOOK, ALL WE ARE TALKING ABOUT HERE IS ADDING THREE PLAYERS.

6    IT'S ONE TEE TIME, ONE TEE TIME.  THEY HAVE 125 PLAYERS, THEY

7    ADD ONE TEE TIME, WE ARE DONE.  NO PLAYERS NEED TO BE TAKEN OFF

8    THE LIST.  THAT'S IT.  THESE ARE THREE LONG-TIME MULTI-DECADE

9    PLAYERS WITH THE PGA, ALWAYS ON UNIMPEACHABLE BEHAVIOR, THERE'S

10   NO ISSUES THERE.  THAT'S ALL WE ARE TALKING ABOUT, AND THAT IS

11   NOT AN IMPOSITION.

12        FRANKLY, THIS SAME ISSUE CAME UP --

13        THE COURT:  WELL, BUT I ACTUALLY THINK THAT THE ISSUE

14   IS MORE THE PGA TOUR'S ABILITY TO DEVELOP AND ENFORCE ITS RULES

15   FAIRLY ACROSS ALL OF ITS MEMBERS.  THAT'S HOW MR. PETERS

16   COUCHES IT IN HIS BRIEF, AS OPPOSED TO, I DON'T THINK ANYONE

17   SUGGESTS THAT THESE THREE PLAYERS WHO HAVE BEEN SLOTTED TO PLAY

18   ARE CAUSING A DISINTEGRATION OF THE FEDEX TOURNAMENT ITSELF.

19        MR. WALTERS:  WELL, THEY HAVE SUGGESTED TWO THINGS.

20        ON THE ENFORCEMENT OF THE RULES, I WOULD SAY YES, SO LET'S

21   ENFORCE YOUR RULES, WHICH IS YOU GUYS HAVE SAID THAT AN APPEAL

22   IS STAYED.  SO I MEAN, WHAT'S GOOD FOR THE GOOSE IS GOOD FOR

23   THE GANDER.  WELL, LET'S ENFORCE OUR RULES, ALL FOR THAT.

24        MOREOVER, THERE'S A SERIOUS QUESTION, AS YOUR HONOR I

25   BELIEVE HAS CORRECTLY OBSERVED, ABOUT THE UNDERLYING RULES AND

1    WHETHER THEY ARE A LAWFUL BASIS TO EVEN EXACT THIS PENALTY.

2    AND SO I THINK AT BEST, IT BEGS THE QUESTION OF ENFORCEMENT OF

3    THE RULES AS BEING A JUSTIFICATION FOR SOMEHOW IN THE BALANCE

4    OF THE EQUITIES.

5         NOW THE OTHER ISSUE THEY RAISE IN THE BALANCE OF THE

6    EQUITIES, AND I DON'T WANT TO DWELL ON THIS TOO MUCH, BUT THEY

7    SAID WELL, HOLD IT, THESE PLAYERS HAVE AFFILIATED WITH LIV

8    GOLF, LIV GOLF IS A WHOLLY OWNED COMPANY OF A SOVEREIGN WEALTH

9    FUND, OKAY.  THE PUBLIC INVESTMENT FUND OF SAUDI ARABIA.  WE

10   ARE TAINTED BY THESE THREE GUYS PLAYING IN OUR TOURNAMENT.

11   THAT GOES INTO THE BALANCE OF THE EQUITIES.

12        NOW WHAT WE ARE TALKING ABOUT IS THREE GUYS WHO HAVE

13   PLAYED WITH THEM FOR DECADES, SOMEHOW TAINTING THEM WAS SORT OF

14   THE STENCH OF THE FACT THAT THEY HAVE AFFILIATED WITH A

15   UNITED STATES COMPANY, LIV GOLF, WHO IS A PROMOTER OF GOLF THAT

16   HAPPENS TO BE OWNED BY A PORTFOLIO COMPANY OF THE PUBLIC

17   INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA.

18        NOW I WOULD JUST SAY THAT, RESPECTFULLY, I THINK THAT IS,

19   AT BEST, DISINGENUOUS.  THE PGA, FOR THE LAST SEVERAL YEARS,

20   HAS AUTHORIZED SOME OF THEIR VERY BEST PLAYERS, DOZENS OF THEIR

21   PLAYERS, YEAR IN AND YEAR OUT, TO GO PLAY IN THE SAUDI

22   INTERNATIONAL, OKAY.  NOT A LIV GOLF TOURNAMENT IN THE UNITED

23   STATES, THE SAUDI INTERNATIONAL IN RIYADH OR IN JEDDAH, OKAY.

24   THEY HAVE DONE THAT.  THEY NEVER SAID, WELL THAT'S GOING TO

25   SOMEHOW LEAD TO STENCH OR TAINT ON US, THEY HAVE DONE THAT YEAR

1    IN AND YEAR OUT.

2          NOW THE REASON THEY DID THAT IS BECAUSE IT WASN'T A

3    COMPETITOR, AND WE WILL GET TO THOSE ISSUES IN A SECOND, IT WAS

4    NOT A COMPETITOR, THAT'S THE ONLY REASON THEY DENIED IT IN THIS

5    INSTANCE.

6          SO I DON'T SEE HOW YOU CAN LIVE IN THIS EGG SHELL SKULL

7    WORLD OF THIS IS A BIG PROBLEM, WHEN YEAR IN AND YEAR OUT, YOU

8    HAVE AUTHORIZED YOUR BEST PLAYERS TO GO AFFILIATE NOT WITH THE

9    PUBLIC INVESTMENT FUND, BUT LITERALLY THE GOVERNMENT OF SAUDI

10   ARABIA, IN THE SAUDI INTERNATIONAL.

11         MOREOVER, I WOULD SAY THE HYPOCRISY IS REALLY BREATHTAKING

12   HERE.  THE PGA'S TOP 20, 25 SPONSORS DO TENS, HUNDREDS OF

13   BILLIONS OF DOLLARS WITH AND IN THE KINGDOM OF SAUDI ARABIA,

14   AND THEY EMBRACE THOSE SPONSORS.  THAT'S NOT AN ISSUE.  THEY

15   HAVE THEIR FAN STORE, OKAY, WHICH IS WHERE THEY SELL STUFF TO

16   ALL THE FANS.  WELL, GUESS WHO THE PEOPLE WHO OPERATE -- THEIR

17   PRINCIPAL INVESTOR, LARGEST INVESTOR IS THE PUBLIC INVESTMENT

18   FUND OF SAUDI ARABIA.

19         NOW HOW CAN THAT BE IN THAT SOMEHOW THIS BRINGS A TAINT

20   FOR THESE THREE POOR KIDS TO GO PLAY IN THE FEDEX CUP?  SO ON

21   THE BALANCE OF THE EQUITIES, YOUR HONOR, RESPECTFULLY, WE THINK

22   IT'S OVERSTATED.

23              THE COURT:  OKAY.

24              MR. WALTERS:  LET ME JUST TURN FOR A MINUTE TO THE

25    REGULATIONS, BECAUSE YOUR HONOR I THINK WILL APPRECIATE THAT, I

1    THINK CORRECTLY FOCUSES ON THAT AS BEING CENTRAL ISSUES AS A

2    BASIS FOR THE TRO.

3         SO LET'S JUST GO TO THE PROVISION THAT YOUR HONOR FOCUSED

4    ON.  AND THIS IS THE PROVISION IN SECTION VII.E.2, IT SAYS "AN

5    APPEAL SHALL OPERATE TO STAY THE EFFECTIVE DATE OF ANY

6    PENALTY," OKAY, "ANY PENALTY," IT'S NOT QUALIFIED, "UNTIL AFTER

7    A FINAL DECISION ON THE APPEAL."

8         AND I WOULD SAY, JUST TO DIGRESS FOR A SECOND, THESE

9    RULES, AND I KNOW WE SHOULD RESPECT TO AN EXTENT, A LARGE

10   EXTENT, THESE RULES, BUT THESE RULES ARE DESPERATELY SLANTED

11   AGAINST THE PLAYERS, RIGHT, TOTAL DISCRETION IN THE

12   COMMISSIONER, THIS COMMISSIONER IN PARTICULAR --

13            THE COURT:  YEAH, BUT THIS ISN'T A CONSTITUTIONAL

14   CASE.

15            MR. WALTERS:  IT'S NOT A CONSTITUTIONAL CASE.

16            THE COURT:  THEY CAN BE SKEWED.  THIS IS A MEMBERSHIP

17   ORGANIZATION.

18            MR. WALTERS:  IT IS A MEMBERSHIP ORGANIZATION.  IT IS

19   A MEMBERSHIP ORGANIZATION THAT DOES HAVE A PUBLIC QUALITY TO

20   IT, BUT WE DON'T NEED TO GO THERE.

21            THE COURT:  I'M NOT GOING THERE TODAY.

22            MR. WALTERS:  OKAY.  WE DON'T NEED TO GO THERE.

23            THE COURT:  OKAY.

24            MR. WALTERS:  SO THAT'S THE RULE.  YOU ARE ENTITLED

25   TO A STAY OF ANY PENALTY, ALL RIGHT.

1    SO WHAT'S ANY PENALTY?  ANY PENALTY, IF YOU GO TO SECTION

2    VII.E.2, OKAY, SAYS "A MAJOR PENALTY," AND IT SAYS THE SAME

3    THING ABOUT "AN INTERMEDIATE PENALTY, IS A FINE OR SUSPENSION

4    FROM TOURNAMENT FOR PLAY."

5    SO THERE'S NO QUESTION THAT SUSPENSIONS ARE PENALTIES.

6    AND WE ARE ENTITLED TO A STAY FOR ANY PENALTY.  AND SO WE WOULD

7    SAY THAT OUGHT TO END THE INQUIRY.  WHAT IS IT ABOUT ANY

8    PENALTY THAT THE PGA DOESN'T UNDERSTAND IN ITS OWN RULES?

9    NOW, THEY OFFER UP A COUPLE OF ARGUMENTS, AND AGAIN, THESE

10   ARGUMENTS HAVE SORT OF EVOLVED FROM AUGUST 2ND TO THE BRIEFS,

11   BUT AS I DISTILLED THEM AND READ THESE RULES A DOZEN TIMES, BUT

12   DISTILLED THE ARGUMENTS, IS THEY SAY WELL, THERE'S SORT OF THIS

13   SECOND PATH YOU ARE IGNORING, AND THE SECOND PATH IS YOU CAN

14   PUT SOMEBODY ON PROBATION, AND THEN THE COMMISSIONER SAYS WELL,

15   YOU CAN SUSPEND THEM.

16   AND THAT'S TRUE, YOU COULD DO IT THAT WAY, YOU COULD DO A

17   NOTICE OF DISCIPLINARY ACTION.  YOU PUT THEM ON PROBATION, BUT

18   ALL ROADS LEAD TO A SUSPENSION.

19   THERE'S NOTHING ABOUT THAT SECTION, THOUGH, THAT SUGGESTS

20   TOPSIDE OR BOTTOM, THAT SOMEHOW THAT SUSPENSION IS NOT SUBJECT

21   TO AN APPEAL LIKE ANY OTHER SUSPENSION.  INDEED, THEY HAVE TO

22   BE WRONG ABOUT THAT BECAUSE IT'S CONTRARY TO THE PLAIN LANGUAGE

23   OF ANY PENALTY; FRANKLY, IT'S CONTRARY TO THEIR BEHAVIOR UNTIL

24   THE CONFIRMATION ON AUGUST 1ST, BECAUSE THEY NEVER DISABUSED

25   ANYBODY.

1      BUT MUCH MORE FUNDAMENTALLY, IF YOU JUST THINK ABOUT IT

2   FOR A SECOND, IF THEY WERE RIGHT ABOUT THAT, IT WOULD GUT THIS

3   ONE SLIVER OF A RIGHT PLAYERS HAVE IN THESE PROTOCOLS, WHICH IS

4   TO APPEAL AND TO GET A STAY OF THAT APPEAL.

5      BECAUSE ANY TIME THE COMMISSIONER WANTED TO, THEY WOULD

6   SAY, WELL, YOU KNOW WHAT, I'M GOING TO ZIG INSTEAD OF ZAG, I'M

7   GOING TO DO A PROBATION INSTEAD OF A NOTICE OF DISCIPLINARY

8   ACTION, AND LOW AND BEHOLD, IT IS NOT SUBJECT TO THAT APPELLATE

9   RIGHT.

10      WELL, THAT WOULD GUT THE RIGHTS AFFORDED UNDER THIS STAY

11   PROVISION IN THIS APPEAL SECTION.  YOU MIGHT AS WELL READ IT

12   OUT IF THE COMMISSIONER WOULD HAVE UNMITIGATED DISCRETION TO DO

13   THAT AT THE COMMISSIONER'S WHIM.  SO IT JUST SIMPLY DOESN'T ADD

14   UP THAT THAT COULD SOMEHOW BE THE CASE.

15      AND SO IF I'M RIGHT ABOUT THAT, AND WE ACTUALLY DO HAVE A

16   LEGAL RIGHT TO AN APPEAL, AND AS A CONSEQUENCE, A LEGAL RIGHT

17   TO A STAY, THEN WE HAVE A SOLID FOUNDATION TO SUPPORT THE

18   INJURY WE HAVE SUFFERED BY VIRTUE OF THE DEPRIVATION OF THAT,

19   AND THAT IS THE IRREPARABLE INJURY OF PLAYING IN THIS SINGLE

20   GOLF TOURNAMENT.

21      THE COURT:  LET ME ASK YOU A QUESTION.

22   LET'S SAY I AGREE WITH YOU AND ISSUE THIS ORDER, IT'S

23   EFFECTIVE TONIGHT, PLAY STARTS ON THURSDAY, CAN THE APPELLATE

24   PANEL MAKE ITS DECISION TOMORROW?

25      MR. WALTERS:  NO, BECAUSE THEY HAVE ALREADY, IN THEIR

1    JUNE 30TH LETTER, THEY HAVE GIVEN US THROUGH THE 10TH TO FILE

2    SUPPLEMENTAL.

3              THE COURT:  THAT'S TOMORROW.

4              MR. WALTERS:  WELL, TO THE 10TH, THROUGH TOMORROW

5    NIGHT, THE 10TH, OKAY.

6         AND SO I THINK THE WAY THIS WORKS HERE IS TOMORROW, WE ARE

7    GOING TO FILE SUPPLEMENTAL MATERIALS ON BEHALF OF THESE

8    PLAYERS, OKAY.  NOW THEY ALSO HAVE PROMISED US TO SEND IT TO

9    THEIR APPEALS PANEL.

10             THE COURT:  YES.

11             MR. WALTERS:  NOW IF THEIR APPEALS PANEL IS SORT OF

12   COMMUNING AROUND THE COFFEE TABLE AT 12:01 AND SAY, APPEAL

13   DENIED, I DON'T THINK THAT WORKS.  I DON'T THINK IT WORKS LIKE

14   THAT.  THIS TOURNAMENT STARTS TOMORROW.  THEY ARE DUTY BOUND TO

15   BE THERE.  THEY MIGHT BE DUTY BOUND TO BE THERE TODAY.  THEY

16   ARE DUTY BOUND TO BE THERE TOMORROW, AND THEY HAVE AN

17   OBLIGATION TO PLAY IN THE PRO AM EVENT TOMORROW, AND THEN THEY

18   START THE PLAY ON THURSDAY AND FRIDAY.

19        SO OUR VIEW IS, AND I THINK IT'S A PERFECTLY APPROPRIATE

20   VIEW, BECAUSE IT WOULD BE SORT OF LIKE, IT'S TOO CLEVER TO SAY

21   THEY START THE TOURNAMENT, THEY DISCHARGE THEIR DUTIES BY BEING

22   A PARTICIPANT IN THE TOURNAMENT.  TOMORROW, AT THE PRO AM, IF

23   THE APPEALS PANEL, AFTER WE SUPPLY THE SUPPLEMENTAL MATERIAL,

24   SAYS, YOU'RE OUT.

25        I WOULD ALSO SAY ONE OTHER THING TOO, BECAUSE WE WERE JUST

1    POKING AROUND, AND THIS ISSUE HAS ACTUALLY COME UP ONCE BEFORE,

2    AND IT CAME UP IN -- THESE THINGS RARELY PERCOLATE INTO THE

3    COURTS, AS YOU CAN IMAGINE, THEY SORT OF DISAPPEAR WITHOUT A

4    TRACE, IN SORT OF THE DISCIPLINARY MORASS, BUT IT IS

5    SIGNIFICANT THAT THE ONE TIME THAT WE COULD FIND ANYWHERE WHERE

6    THE PGA HAS TAKEN A POSITION ON THAT, THE COMMISSIONER, BASED

7    ON THE SAME RULE, WORD FOR WORD, THE SAME RULE, SAYS,

8    UNQUALIFIEDLY DID ANYTHING IN THE O'GRADY DECISION, THE APPEAL

9    OPERATES TO STAY THE EFFECTIVE DATE OF THE PENALTY, WITHOUT

10    QUALIFICATION.

11        SO WE THINK SIMPLY BASED ON BOTH THEIR BEHAVIOR HERE AND

12    THEIR PREVIOUS POSITION JUDICIALLY, IS THAT THEY HAVE INDEED

13    SUPPORTED THE INTERPRETATION THAT WE ARE OFFERING TO

14    YOUR HONOR.

15            THE COURT:  LET'S JUST -- I'M MINDFUL OF THE CLOCK

16    AND I WANT TO MOVE THIS ALONG A LITTLE BIT.

17            MR. WALTERS:  I WOULD NOTE -- IF YOU GO TO SLIDE 15.

18        I WOULD NOTE THIS IS NOT OUR FIRST RODEO ON THIS ISSUE,

19    THIS CAME UP IN EUROPE AND THE SAME THING HAPPENED, AND THE

20    COURT THERE SAID, THIS JUST ISN'T RIPE.  WHAT THE COURT THERE

21    SAID WAS --

22            THE COURT:  WELL, THAT WAS AN ARBITRATION, WASN'T IT?

23            MR. WALTERS:  ARBITRATION.  EXCUSE ME.  ARBITRATOR.

24        WE WENT TO THE HIGH COURT, AND THEN THE EUROPEAN TOUR

25    ITSELF SAID, YOU KNOW WHAT, HAD SOME SORT OF SENSE OF

1    COMPUNCTION, LET'S SEND IT TO AN INDEPENDENT, AND THE

2    INDEPENDENT SAID, THE CHIEF EXECUTIVE WAS BIASSED HERE, RIGHT,

3    HE SAID IT HAD A LONG STANDING OPPOSITION TO LIV GOLF, JUST AS

4    THE PGA COMMISSIONER HAS HERE.  AND THEY SAID LOOK, IN

5    FAIRNESS, LET'S STAY IT, WHAT'S THE BIG DEAL, YOU ADD A TEE

6    TIME, THE SUN STAYS UP FOREVER IN SCOTLAND, AND SO WHAT'S THE

7    ISSUE.  AND LOW AND BEHOLD IT'S BEEN MUCH A BIG ADO ABOUT

8    NOTHING.  AND WE THINK THIS IS THE ANALOGOUS CIRCUMSTANCE ON

9    THIS SIDE OF THE POND.

10         YOUR HONOR, I DON'T KNOW WHAT TO DO ABOUT THE ANTITRUST

11   CLAIM.  I WOULD LOVE FOR US TO SPEND THE AFTERNOON AND INTO THE

12   EVENING TALKING ABOUT THE ANTITRUST CLAIMS, AND POTENTIALLY WE

13   WILL HAVE A CHANCE TO DO THAT, I THINK YOUR HONOR, MAYBE I

14   COULD JUST RESPOND TO A COUPLE OF THINGS YOU MENTIONED, WOULD

15   THAT BE USEFUL?

16         THE COURT:  YOU KNOW, I THINK IT CAN COME AS NO

17   SURPRISE TO YOU THAT A COURT WOULD BE RETICENT TO WADE INTO

18   THESE COMPLICATED ISSUES AT A TRO.

19         SO ALTHOUGH YOUR ARGUMENTS AND YOUR EVIDENCE, AS I SAID,

20   HAVE SUPERFICIAL APPEAL, MR. PETERS HAS COME BACK WITH SOME

21   PINPOINT ISSUES THAT MAY THWART YOU AT THIS STAGE.

22         AND SO OF COURSE I ALWAYS LOOK FOR THE SIMPLEST WAY TO

23   ADDRESS THE ISSUES, I THINK THAT'S PRUDENT, AND MOST COURTS

24   HAVE SAID IN THIS ARENA, THAT A DEVELOPED RECORD AND AN

25   EVIDENTIARY RECORD WITH WITNESSES AND CROSS-EXAMINATION IS A

```
 1     BETTER WAY TO APPROACH IT.
 2              MR. WALTERS:  YES, YOUR HONOR.  AND WE RESPECT THAT
 3     JUDGMENT, AND SO I WILL DEFER.
 4         YOU DID MAKE ONE POINT ABOUT, SORT OF,
 5     COMPETITOR/NON-COMPETITOR.
 6              THE COURT:  RIGHT.  ON THE SECTION 1 --
 7              MR. WALTERS:  ON THE SECTION 1 CLAIM ON THE GROUP
 8     BOYCOTT.  AND I THINK YOUR HONOR, THAT COULD VERY WELL BE
 9     CORRECT ON THE DISTINCTION BETWEEN A PER SE TREATMENT AND A
10     RULE OF REASON TREATMENT --
11              THE COURT:  YES.
12              MR. WALTERS:  -- BUT NOT ON THE STATEMENT OF A CLAIM.
13         YOU CAN STILL HAVE A GROUP BOYCOTT UNDER SECTION 1,
14     ALBEIT, IT MIGHT GET A DIFFERENT TREATMENT, BUT IT DOESN'T MEAN
15     YOU DON'T HAVE THE CLAIMS.
16              THE COURT:  BUT THIS ISN'T A MOTION TO DISMISS, THIS
17     IS YOUR LIKELIHOOD OF SUCCESS.
18              MR. WALTERS:  CORRECT.
19              THE COURT:  SO YOU REALLY, IN MY VIEW, BRIEFED THIS
20     ISSUE AS A PER SE VIOLATION.  AND YOU DROPPED A FOOTNOTE, AND
21     YOU KNOW I DON'T READ FOOTNOTES.  SO I KNOW IT'S THERE, AND I
22     WANT YOU TO KNOW IF THAT'S AN ARGUMENT ON RULE OF REASON, IT
23     WENT RIGHT BY ME, BECAUSE I DON'T TAKE ARGUMENTS IN FOOTNOTES.
24              MR. WALTERS:  OKAY.  THANK YOU, YOUR HONOR.
25              THE COURT:  BUT I DON'T THINK YOU REALLY BRIEFED IT.
```

1          IF YOU GAVE ME FOUR LINES IN A SINGLE-SPACED FOOTNOTE, I

2     DON'T THINK YOU REALLY SERIOUSLY WERE BRIEFING THAT ISSUE.

3     THAT'S SIMPLY NOT ADEQUATELY PUT BEFORE ME.

4          MR. WALTERS:  RIGHT.

5          AND THE ISSUE THERE, IT ACTUALLY DIDN'T OCCUR UNTIL THEIR

6     PAPERS WHERE THEY SAID IT WAS A CASE, SO IT WAS REALLY

7     RESPONSIVE TO THEIR PAPERS.

8          THE COURT:  I DO AGREE WITH YOU THAT THE ISSUE OF THE

9     LACK OF A COMPETITOR CONSPIRACY MAY SIMPLY PUT US INTO RULE OF

10    REASON.  I DIDN'T MEAN TO SAY THAT THERE'S NOT A BOYCOTT CLAIM,

11    THIS ISN'T A MOTION TO DISMISS.  I'M NOT SURE YOUR COMPLAINT

12    REALLY DRAWS THAT OUT.  I DON'T -- I DID READ YOUR WHOLE

13    COMPLAINT, I DON'T REMEMBER IT DISCUSSING -- IT WAS A LOT OF

14    READING, I DON'T REMEMBER IT TALKING ABOUT RULE OF REASON.

15         MR. WALTERS:  IT DID NOT.

16         THE COURT:  I DIDN'T THINK SO.

17         OKAY.  SO I THINK I MIGHT BE REVISITING THAT AT A MOTION

18    TO DISMISS.

19         MR. WALTERS:  I'M BEING A LAWYER ON A COMPREHENSIVE

20    PRESENTATION ON ANTITRUST LAWS, BUT I'M PASSING ON IT ENTIRELY,

21    YOUR HONOR.

22         THE COURT:  WHY DON'T YOU SPEND ANOTHER TEN MINUTES,

23    IT'S HELPFUL TO ME, I DON'T KNOW THAT I WILL REACH THOSE

24    ISSUES.  I WAS -- YOU KNOW, IT'S AN INTERESTING ISSUE, NO ONE

25    IS DEALING WITH -- NO ONE IS CONTESTING YOUR DEFINITION OF THE

```
1      MARKET.
2              MR. WALTERS:  YES.
3              THE COURT:  THE GEOGRAPHIC SCOPE IS INTERESTING, IF
4      IT IS THE MARKET FOR ELITE GOLF IN THE UNITED STATES, IT
5      APPEARS EVERYONE AGREES THERE IS NO COMPETITOR OTHER THAN LIV
6      GOLF.
7              AND SO THE EUROPEAN TOUR, YOUR OWN EXPERT SAYS THAT THEY
8      ARE NOT A COMPETITOR, AND THEY DON'T COMPETE FOR TOURNAMENTS IN
9      THE UNITED STATES.  SO, YOU KNOW, I THINK ON THE BOYCOTT, WE
10     ARE INTO RULE OF REASON, IT HASN'T BEEN BRIEFED, IT'S NOT
11     REALLY BEFORE ME AT THIS TIME.  YOU MAY BE AMENDING YOUR
12     COMPLAINT TO MAKE THAT CLEARER, OR MAYBE YOU FEEL IT JUST IS
13     THE ALTERNATIVE WHEN YOU DON'T HAVE EVIDENCE OF A CONSPIRACY
14     WITH A COMPETITOR.
15             ON THE MONOPOLIZATION CLAIM, IN TERMS OF A TRO WITH A HIGH
16     STANDARD, I AM JUST CONCERNED THAT, AGAIN, YOUR OWN EXPERT HAS
17     INDICATED THAT LIV IS PROJECTING A 20 PERCENT MARKET SHARE AT
18     THE END OF A YEAR.  AND SO WOULDN'T THAT SUGGEST TO ME THAT
19     WHATEVER PGA TOUR IS DOING, IT CAN BE A LEGAL MONOPOLY, IT JUST
20     CAN'T USE IT'S MONOPOLY POWER IN AN ILLEGAL WAY.
21             MR. WALTERS:  YOUR HONOR, I WOULD TAKE ISSUE WITH
22     THAT.  I DON'T THINK HE'S SAYING THAT THEY WILL HAVE 20 PERCENT
23     OF THE MARKET, HE SAID THEY WILL HAVE 20 PERCENT NEXT YEAR OF
24     THE TOURNAMENTS.
25             WELL, THAT'S NOT HOW YOU WOULD MEASURE MARKET, YOU WOULD
```

1    MEASURE MARKET -- ON A REVENUE BASIS, IT MIGHT BE ONE TENTH OF

2    ONE PERCENT OF THE MARKET.  ON A FANS IN ATTENDANCE BASIS, IT

3    MIGHT BE TWO TENTHS OF ONE PERCENT OF THE MARKET.  HE WAS JUST

4    SIMPLY MAKING THE OBSERVATION THAT THEY WERE SLATED TO HAVE TEN

5    TOURNAMENTS NEXT YEAR AND THE PGA IS SLATED TO HAVE 40 PERCENT.

6    THAT IS, BY NO MEANS, A CONCESSION AROUND MARKET POWER.

7         MOREOVER, IF YOU HAVE 80 PERCENT OF THE MARKET, YOU ARE A

8    MONOPOLIST FOR PURPOSES OF EVALUATION OF YOUR CONDUCT.  SO I

9    DON'T THINK THAT THAT IS PROBLEMATIC.

10        NOW I COULD SIT HERE AND TAKE A FEW MINUTES, I COULD

11   REGALE YOU WITH THE MARKET PRESENCE OF THE PGA, AND LET ME JUST

12   PULL UP SLIDES.

13        SCOTT, IF YOU WOULDN'T MIND.

14        THE COURT:  TO A CERTAIN EXTENT, YOU COULD SAY THEY

15    HAVE A HUNDRED PERCENT OF THE MARKET.

16        MR. WALTERS:  THEY DO HAVE A HUNDRED PERCENT OF THE

17    MARKET.  IF YOU PULL UP SLIDE 16 --

18        THE COURT:  I DON'T THINK THAT'S ACTUALLY AT ISSUE

19    HERE, SO I THINK WE CAN KIND OF USE THAT AS A FOUNDATION.

20        MR. WALTERS:  VERY GOOD, YOUR HONOR.

21        AND SO WHAT I WOULD SAY, LET ME JUST MAKE ONE OBSERVATION

22   ABOUT THE ANTITRUST CLAIM.  AND MAYBE YOUR PRESAGE FOR THE

23   FUTURE, WHICH IS WHEN YOU REALLY BOIL THIS DOWN TO ITS ESSENCE,

24   OKAY, WHAT THE PGA IS DOING IS IT IS SAYING, THROUGH THIS

25   EXCLUSIVE DEALING ARRANGEMENT PLUS THESE LIFETIME BAN

1    PENALTIES, OKAY, THEY ARE SAYING THAT IT'S EITHER US OR THEM,

2    ALL RIGHT.  THEY ARE SETTING UP THAT DICHOTOMY.  IT'S EITHER US

3    OR THEM.  YOU MAY NOT, AS AN INDEPENDENT CONTRACTOR, WHICH WE

4    ALL CONCEDE YOU ARE, YOU MAY NOT CHOOSE.  AND SO THE IDEA IS IF

5    THEY WOULD SAY TO THEIR ELECTRICIAN, YOU CAN WORK FOR US, BUT

6    YOU CAN'T WORK FOR ANYBODY ELSE, THEY ARE AN INDEPENDENT

7    CONTRACTOR.  AND WHAT WE WOULD SAY IS THAT IS A CLEAR VIOLATION

8    OF THE ANTITRUST LAWS, GIVEN THAT THEY ARE A MONOPOLIST, OKAY.

9    AND THEY SET THAT UP.

10          THE COURT:  WELL, BUT MAYBE ANOTHER WAY OF LOOKING AT

11   IT IS THAT FOR THESE THREE PLAYERS, THEY SIGNED AN AGREEMENT,

12   THE AGREEMENT IS GOING TO LAST FOR A YEAR, WHY DIDN'T THEY JUST

13   FINISH THEIR YEAR AND THEN GO TO LIV, WHY DID THEY HAVE TO

14   BREACH IT?

15          MR. WALTERS:  BECAUSE THEY WOULD HAVE FOREGONE

16   TREMENDOUS OPPORTUNITY TO MAXIMIZE THEIR VALUE IN THE

17   MARKETPLACE, HAD THEY DONE THAT.

18          THE COURT:  I DON'T THINK THERE IS ANY EVIDENCE THAT

19   LIV WAS SAYING, TAKE IT NOW OR WE WILL NEVER TALK TO YOU AGAIN.

20   YOU HAVEN'T GIVEN ME ANY EVIDENCE ON THAT.

21          MR. WALTERS:  BUT FOR PURPOSES OF TRO, I AGREE

22   YOUR HONOR, I WAS JUST MAKING AN OBSERVATION ABOUT WHAT IS THE

23   NATURE OF THIS ANTITRUST.

24          THE COURT:  WHEN WOULD THEIR CURRENT AGREEMENT WITH

25   THE PGA TOUR END?

1          MR. WALTERS:  IT WOULD HAVE ENDED, I BELIEVE, AT

2     THE -- I'M NOT SURE IF IT'S THE END OF THE CALENDAR YEAR, IF

3     THEY HAVE A YEAR, IT IS SOME TIME BETWEEN THE END OF THIS YEAR

4     OR IN THE SPRING, I DON'T KNOW FOR SURE.

5          THE COURT:  OKAY.

6          MR. WALTERS:  SO I JUST DON'T THINK -- I WON'T IMPOSE

7     ON YOU WITH THE ANTITRUST CLAIM, BECAUSE I DO BELIEVE THAT THE

8     REGULATIONS IS WHAT'S GOING TO GET US -- SHOULD GET US TO THE

9     OPPORTUNITY TO PLAY IN THIS TOURNAMENT.

10          ONE LAST OBSERVATION, AND THAT'S JUST ABOUT THE PUBLIC

11     INTEREST.  AND I DO THINK THERE IS A PUBLIC INTEREST IN -- I

12     THOUGHT ABOUT THIS, AND I THOUGHT, WELL, WHAT IS IT, IS IT

13     ANTITRUST ENFORCEMENT, IS IT THE IDEA OF CONTAINING A MONOPOLY

14     BEHAVIOR, BECAUSE THIS MONOPOLY, THAT BEHAVIOR HAS ABSOLUTELY

15     COMPROMISE THIS MARKETPLACE, IT HAS BEEN ANTICOMPETITIVE, IT

16     HAS CAUSED PLAYERS TO NOT MOVE WHEN THEY OTHERWISE WOULD, IT

17     HAS RAISED THEIR RIVALS' COSTS, IT HAS CHILLED INNOVATION AND

18     IT HAS REDUCED OUTPUT AND IT HAS LIMITED ACCESS TO THE VIEWING

19     TELEVISION AND IN-PERSON PUBLIC.

20          IT HAS HAD ALL OF THOSE EFFECTS, THESE RESTRAINTS HAVE.

21     AND IT'S SET FORTH IN DETAIL IN DR. LEITZINGER'S AFFIDAVIT

22     ABOUT HOW IT HAS HAD THOSE ANTICOMPETITIVE EFFECTS.

23          THE COURT:  SO IN ORDER TO MAKE THOSE FINDINGS, I

24     WOULD HAVE TO GO DEEP INTO YOUR ANTITRUST CLAIMS AND FIND A

25     LIKELIHOOD OF SUCCESS.  I'M REALLY FOCUSSING, BECAUSE I DON'T

1    THINK YOU'VE MADE YOUR CASE THERE, I WOULD BE FOCUSSING ON

2    APPLICATION OF THESE RULES.  AND SO I WOULD LIKE TO HEAR YOUR

3    ARTICULATION OF A PUBLIC INTEREST.

4         MR. WALTERS:  OKAY.  THE PUBLIC INTEREST, IN MY

5    JUDGMENT, YOUR HONOR, IS IT'S IN THE INTEREST OF INDEPENDENT

6    CONTRACTORS, WHICH EVERYBODY AGREES THESE PLAYERS ARE.  THEY

7    FUND THEIR OWN BUSINESSES, THEY PAY THEIR OWN CADDIES, THEY PAY

8    THEIR OWN HOTEL BILLS, THEY DO ALL OF THAT STUFF.  THAT'S WHY

9    THIS WHOLE FREE-RIDER NEGOTIATION, I THINK, IS ALMOST SILLY.

10   BUT THEY DO ALL OF THOSE THINGS, THEY RUN THEIR OWN BUSINESSES.

11        IT IS A REALLY IMPORTANT THING IN THE PUBLIC ARENA THAT

12   INDEPENDENT CONTRACTORS, WHETHER THEY ARE GOLFERS OR

13   ELECTRICIANS, OR WHOEVER YOU MIGHT BE, HAVE THE OPPORTUNITY TO

14   MAXIMIZE YOUR VALUE, GET YOUR HIGHEST NET WORTH IN THE ECONOMY.

15        THESE PLAYERS ARE BEING DENIED THAT BY VIRTUE OF SIMPLY

16   BEING DENIED THE STAY THAT THEY ARE ENTITLED TO ON THE APPEAL.

17   THAT IS IN THE PUBLIC INTEREST.

18        THE COURT:  AND LAST QUESTION FOR YOU, IT'S RAISED IN

19   MR. PETERS'S PAPERS, HE SUGGESTS THAT WHAT YOU ARE ASKING FOR

20   IS A MANDATORY INJUNCTION.  NOW, THAT WAS BEFORE YOU MODIFIED

21   YOUR PROPOSED ORDER, AND IN LOOKING AT THIS, OF COURSE ANY OF

22   US CAN COUCH THE LANGUAGE OF A RESTRAINING ORDER TO SOUND LIKE

23   MANDATORY OR TO SOUND LIKE PROHIBITORY.  SO --

24        MR. WALTERS:  I ALWAYS FIND THIS A METAPHYSICAL

25   QUESTION OF MANDATORY VERSUS NEGATIVE OR POSITIVE VERSUS

1    NEGATIVE INJUNCTIONS.  ALL WE ARE REALLY SAYING IS, JUST HONOR

2    YOUR RULE, JUST HONOR YOUR RULE, RIGHT.  WE ARE NOT ASKING YOU

3    TO DO ANYTHING.  HONOR YOUR RULE, AND THESE PLAYERS HAVE

4    PROPERLY REGISTERED FOR IT.  YOU DON'T HAVE TO LIFT A FINGER.

5    DON'T DO A THING, JUST DON'T STEP IN THEIR WAY AND SAY, YOU

6    CAN'T PLAY IN A TOURNAMENT THAT YOU OUGHT TO BE ABLE TO PLAY ON

7    BECAUSE YOUR SUSPENSION HAS BEEN STAYED.

8            THE COURT:  DON'T I HAVE TO ISSUE AN ORDER THAT THERE

9    MUST BE A STAY IN PLACE, BECAUSE I'M ENFORCING THE RULE UNDER

10   YOUR INTERPRETATION?

11           MR. WALTERS:  WE TRIED TO FASHION THIS IN A WAY THAT

12   WOULD WORK, WHICH IS PARAGRAPH 2, WHICH IS DEFENDANT IS

13   ENJOINED FROM PROHIBITING PLAINTIFFS FROM PLAYING IN THE FEDEX

14   CUP.

15       SO YOU CAN'T PROHIBIT THEM FROM PLAYING.  SO THEIR

16   REGISTRATIONS ARE LIVE AND THEY MAY GO FORWARD.

17           THE COURT:  SO IN FACT, IT HAS NOTHING TO DO WITH THE

18   STAY, YOU ARE NOT ASKING ME TO ENFORCE THE STAY PROVISION WITH

19   THIS LANGUAGE.  IT'S NOT THERE.  I HAVE NO HANDLE.

20           MR. WALTERS:  WELL, WE ARE ASKING YOU TO ENFORCE THE

21   STAY PROVISION AS BEING THE LEGAL BASIS TO PROHIBIT THEM

22   FROM -- TO ENJOIN THEM FROM KEEPING THEM FROM PLAYING.

23       SO YES, WE ARE ASKING YOU TO ENFORCE THE STAY PROVISION AS

24   THE LEGAL BASIS FOR KEEPING THEM FROM PLAYING IN THE TOURNAMENT

25   THAT THEY HAVE REGISTERED FOR AND HAVE A RIGHT TO PLAY IN UNDER

1        THE TOUR'S OWN RULES.

2                THE COURT:  OKAY.

3        ALL RIGHT.  WELL, WHY DON'T YOU -- MAYBE SOMEONE CAN BE

4   THINKING ABOUT THAT LANGUAGE.  AND I HAVEN'T HEARD THE OTHER

5   ARGUMENT, SO I DON'T KNOW THAT YOU ARE GOING TO WIN OR LOSE

6   HERE, BUT I HAVE SOME CONCERN WITH THE LANGUAGE, BECAUSE IF

7   IT'S MANDATORY, I THINK WE ARE IN A WHOLE DIFFERENT PLACE.

8                MR. WALTERS:  ALL RIGHT.  I WILL CONTINUE TO WORK ON

9    THAT.  THANK YOU, YOUR HONOR.

10               THE COURT:  THANK YOU.  ALL RIGHT.  THANK YOU VERY

11   MUCH.

12        MR. PETERS, LET ME HEAR YOUR ARGUMENT.

13               MR. PETERS:  THANK YOU, YOUR HONOR.

14       MAY I REMOVE MY MASK, YOUR HONOR?

15               THE COURT:  YOU ARE WELCOME TO.

16               MR. PETERS:  THANK YOU.

17        YOUR HONOR, I HAVE OBVIOUSLY BEEN LISTENING CAREFULLY TO

18   THE COURT'S COMMENTS AND QUESTIONS.  I TOO HAVE A POWERPOINT,

19   SOME OF WHICH IS MADE A LITTLE BIT OBSOLETE BY SOME OF YOUR

20   OBSERVATIONS, BECAUSE I WANT TO OBVIOUSLY DIRECT MY COMMENTS TO

21   WHAT'S MOST RELEVANT TO THE COURT.

22        I DO WANT TO START OUT BY ACKNOWLEDGING AND COMMENTING ON

23   THE COURT'S COMMENTS THAT HELDMAN AND ELITE RODEO ARE THE MOST

24   SIGNIFICANT CASES HERE.  HELDMAN, AND I WILL TALK MORE ABOUT IT

25   IN A FEW MINUTES, IS DIRECTLY ON POINT.  ELITE RODEO IS VERY

1    CLOSE, AND THE GILDER CASE, WHICH THE PLAINTIFFS RELY ON, IS

2    REALLY VERY, VERY DIFFERENT, BECAUSE WHAT THAT CASE TURNS ON IS

3    THE OBSERVATION THAT IN TERMS OF IRREPARABLE HARM, THE MONETARY

4    EFFECTS OF USING A GOLF CLUB WITH A DIFFERENT KIND OF FACE ARE

5    ALMOST INCALCULABLE.  THAT'S WHAT GILDER TURNS ON, IT HAS

6    NOTHING TO DO WITH THIS CASE.

7         BY CONTRAST, HELDMAN INVOLVED BILLIE JEAN KING AGREEING TO

8    PLAY WITH WHAT BECAME THE VIRGINIA SLIMS, AND ABANDONING THE --

9    I THINK IT WAS CALLED THE USLTA.  AND THE COURT, I'M GOING TO

10   READ A QUOTE FROM IT IN A MINUTE, BUT MAKING AN OBSERVATION IN

11   THE CONTEXT OF A PRELIMINARY INJUNCTION, WHICH IS EXACTLY ON

12   ALL FOURS WITH THIS CASE.  AND SO I THOUGHT YOUR COMMENT ON

13   THAT, I TOOK NOTE OF.

14        I ALSO TOOK NOTE OF COUNSEL'S TIMELINE ABOUT THE

15   SUSPENSIONS, BECAUSE IT'S FACTUALLY WRONG.  HE ELIMINATED THE

16   JUNE 5TH LETTER BY WHICH HIS CLIENTS WERE PLACED ON PROBATION

17   UNDER ARTICLE VII.C, NOT E, AND HE ELIMINATED THE JUNE 9TH

18   LETTER WHERE HE WAS INFORMED THAT THE COMMISSIONER, UNDER THAT

19   SECTION, HAD SUSPENDED HIM.  AND THEN HE DISCUSSES THE ISSUE OF

20   THE STAY, ONLY WITH REFERENCE TO ARTICLE VII.E, AND NOT C, AND

21   THE SUSPENSION TOOK PLACE UNDER C.

22        AND YOUR HONOR, IT'S MY INTENTION TO START TALKING TO THE

23   COURT ABOUT IRREPARABLE HARM AND SOME OF THE FACTUAL MATTERS.

24   BUT IF YOU WOULD PREFER, I WOULD JUMP RIGHT INTO THAT STAY

25   QUESTION.  I THINK LOGICALLY, THE CONTRACT ISSUE UNDER THE STAY

1    IS A MERITS QUESTION, BUT IF YOU WANT TO HEAR ABOUT THAT --

2              THE COURT:  WHICHEVER YOU PREFER.

3              MR. PETERS:  THANK YOU.

4         I WILL BACK UP AND START WITH SOME FACTUAL ISSUES AND

5    IRREPARABLE HARM.  I'M NOT GOING TO -- I HAVE A SECTION ON

6    MONOPOLY AND ANTITRUST LAW AND THE DUTY TO DEAL AND

7    FREE-RIDING, I UNDERSTAND THE COURT'S COMMENTS THAT TO WADE

8    INTO THAT AT THIS TIME WHERE YOU HAVE TO DECIDE A CLEAR

9    LIKELIHOOD OF SUCCESS ON THE MERITS, IS SOMETHING THAT'S ALMOST

10   IMPOSSIBLE FOR YOUR HONOR TO DO, AND I DON'T WANT TO SPEND YOUR

11   TIME HERE --

12             THE COURT:  SO I WOULD SAY THAT TODAY YOU ARE NOT

13   LOSING ON THOSE ISSUES.

14             MR. PETERS:  OKAY.  I UNDERSTAND THERE'S A TOMORROW.

15   I'M HERE IN THE TODAY.

16        SO MR. GOLDBERG, IF WE COULD JUST START AT SLIDE 3.

17             THE COURT:  DO YOU HAVE A COPY OF THOSE YOU WILL BE

18   ABLE TO GIVE ME?

19             MR. PETERS:  OH, I'M SORRY.  I DO HAVE A HARD COPY.

20             THE COURT:  I'M GOING TO LOOK AT THEM RIGHT HERE, BUT

21   IF I KNOW I'M GOING TO BE ABLE TO KEEP THEM, THAT WOULD HELP

22   ME.

23             MR. PETERS:  I AM GOING TO TALK ABOUT A LITTLE BIT

24   ABOUT THOSE AGREEMENTS.  WHAT I'M GOING TO SHOW THE COURT IS

25   REDACTED, BUT WHAT I'M GOING TO GIVE THE COURT IS GOING TO

```
 1      CONTAIN --

 2               THE COURT:  I KNOW I REQUIRE A LOT OF PAPER FROM YOU,

 3      BUT WE ACTUALLY DO USE IT.

 4               MR. PETERS:  I THINK OUR TEAM AND THE COURT'S TEAM

 5      HAVE HAD A LOT OF WORK TO DO IN THE LAST FEW DAYS.

 6               THE COURT:  YES.

 7               MR. PETERS:  I KNOW WE HAVE, AND IT'S OBVIOUS HOW

 8      MUCH WORK THE COURT HAS DONE.  I MEAN, IT'S AMAZING, AND WE

 9      APPRECIATE IT.

10          I WANT TO TALK A LITTLE BIT ABOUT THESE ISSUES, BUT I'M

11      GOING TO SKIP NUMBER 6, WHICH IS THE DISCUSSION OF THE

12      ANTITRUST CLAIMS.  AND SOME OF THE FACTS, I WILL MOVE QUICKLY

13      THROUGH, BUT I DO THINK THAT THE FACTS ARE SIGNIFICANT IN

14      PUTTING INTO PERSPECTIVE WHAT THE PGA TOUR REALLY IS.  IT'S NOT

15      A MONOLITH, IT'S NOT A HUGE CORPORATION.  IT IS -- IN FACT, IF

16      WE COULD GO TO SLIDE 5, THE NEXT SLIDE THERE, PLEASE.

17          IT IS A MEMBER-OWNED ORGANIZATION, IT'S A

18      501(C)(6)NONPROFIT.  THERE ARE 250 ACTIVE PGA TOUR MEMBERS.

19      AND THE WAY THE OTHER MEMBERS LOOK AT IT, AND I APPRECIATED THE

20      COURT'S COMMENT ABOUT FAIRNESS TO THE OTHER MEMBERS, BECAUSE AS

21      ONE OF THE MEMBERS SAID, "THEY ARE SUING ME, THEY ARE SUING THE

22      200 CARD-CARRYING MEMBERS OF THE PGA TOUR.  THEY CHOSE THIS

23      ROUTE."

24          AND THE PGA TOUR IS THESE PEOPLE IN SLIDE 6.  THAT'S WHO

25      THE TOUR IS.  IT'S OWNED BY THE MEMBERS, IT'S OPERATED FOR THE
```

1     BENEFIT OF THE MEMBERS.  THE NEXT SLIDE SHOWING THE

2     $916 MILLION, 98 PERCENT OF THE TOUR'S NET REVENUE IS ALLOCATED

3     TO PLAYERS, TOURNAMENTS AND CHARITIES.

4          NOW HOW DO THEY GENERATE THE MONEY THAT THE PLAYERS CAN

5     WIN IN THE PGA TOUR?  IT'S VERY IMPORTANT, OBVIOUSLY, TO

6     UNDERSTAND THAT IN THIS CASE, BECAUSE THE PGA TOUR COMPETES

7     WITH ALL OTHER FORMS OF ENTERTAINMENT, AND CERTAINLY WITH ALL

8     OTHER FORMS OF SPORTSCASTING ENTERTAINMENT FOR MEDIA DOLLARS.

9          PRIZE MONEY AT THE TOURNAMENTS IS DERIVED FROM THE SALE OF

10    BROADCAST MEDIA RIGHTS AND SPONSORSHIP DOLLARS.  THAT'S WHERE

11    IT COMES FROM.  AND THE SPONSORS, OF COURSE, ARE ATTRACTED TO

12    THE PRESENCE OF BROADCAST MEDIA COVERAGE AT THESE EVENTS.

13    THAT'S WHY THEY PUT LOGOS AND THE NAMES OF COMPANIES ON

14    GOLFERS' HATS AND SHIRTS AND BAGS AND SO ON.

15         THE PGA TOUR HANDBOOK AND TOURNAMENT REGULATIONS MAINTAIN

16    THE VALUE OF THE POOLED MEDIA RIGHTS.  THE MEMBERS AGREE TO

17    PLAY IN NON-TOUR GOLF EVENTS IN NORTH AMERICA.  AND THE MEMBERS

18    AGREE NOT TO GRANT MEDIA RIGHTS TO NON-TOUR GOLF EVENTS IN

19    NORTH AMERICA.  WITHOUT THAT PROMISE, IT WOULD BE IMPOSSIBLE TO

20    PACKAGE AND SELL MEANINGFULLY, THESE EVENTS TO THE BROADCASTERS

21    AND THE SPONSORS.

22         AND IT SAYS SO IN THE RULES, AND YOUR HONOR ASKED A

23    QUESTION ABOUT, IT'S A ONE-YEAR CONTRACT, YOU ARE ABSOLUTELY

24    RIGHT, IT ENDS AFTER THE FEDEX CUP.

25              THE COURT:  THAT WOULD HAVE SEEMED LIKE A REASONABLE

1    ENDING.

2            MR. PETERS:  SO IT ENDS SOON.

3        AND OF COURSE A LOT OF THE OTHER PLAYERS THAT JOINED LIV,

4    JUST RESIGNED FROM THE PGA.  AND THERE'S OTHER PLAYERS THAT

5    QUALIFIED FOR THE FEDEX CUP WHO AREN'T PLAINTIFFS.

6            THE COURT:  AM I CORRECT THAT THERE'S NO EVIDENCE IN

7    THE RECORD FROM THE PLAINTIFFS THAT THE OFFERS OF CONTRACTS AND

8    PAYMENTS THEY RECEIVE FROM LIV THAT THEY SIGNED WOULD NOT HAVE

9    BEEN AVAILABLE HAD THEY WAITED UNTIL THEIR TOUR CONTRACTS

10   TERMINATED?

11           MR. PETERS:  THERE'S NO SUCH EVIDENCE IN THE RECORD

12   WHATSOEVER.

13           THE COURT:  I DIDN'T RECALL ANY, BUT --

14           MR. PETERS:  AND I WANT TO BE CAREFUL ABOUT HOW I SAY

15   THIS, BUT I COULDN'T HELP BUT THINK, AS I WAS LISTENING TO

16   MR. WALTERS TALK ABOUT THE EXTRAORDINARY FINANCIAL BENEFITS

17   AVAILABLE IF ONE WERE TO WIN THE FEDEX CUP, AND THEN TO COMPARE

18   THAT, FOR EXAMPLE, TO WHAT MR. GOOCH RECEIVED SIMPLY FOR

19   SIGNING AN AGREEMENT.

20           THE COURT:  SO WITHOUT GIVING IT OUT, SAY THAT TO ME

21   AGAIN.

22           MR. PETERS:  I WAS TRYING TO BE CAREFUL WITH THAT.

23       I HEARD MR. WALTERS SAY THAT IF YOU WIN THE FEDEX CUP, YOU

24   GET $17 MILLION, THAT'S LIFE CHANGING, AND INCREDIBLE AND

25   IRREPARABLE HARM.  FIRST OF ALL, IT'S MONEY, IT'S NOT

1    IRREPARABLE HARM.  BUT SECOND OF ALL, IN MY MIND, I WAS

2    COMPARING THAT TO WHAT MR. GOOCH RECEIVED MERELY FOR SIGNING A

3    CONTRACT.  AND THE COURT KNOWS WHAT THAT IS.

4         THE COURT:  I DO.

5         MR. PETERS:  THE REGULATIONS, AND THIS GOES MORE TO

6    THE ANTITRUST, SO I'M JUST GOING TO GO THROUGH IT REALLY,

7    REALLY QUICKLY, BUT THE REGULATIONS MAKE IT CLEAR WHY YOU NEED

8    TO HAVE A CONFLICTING EVENT POLICY.

9         AND IT SAYS SO RIGHT HERE IN THIS SLIDE.  "TO CONTRIBUTE

10   TO THE SUCCESS OF A PGA TOUR TOURNAMENT OR EVENT OR TO PERMIT

11   THE PGA TOUR TO FULFILL ITS CONTRACTURAL OBLIGATIONS CONCERNING

12   REPRESENTATIVE FIELDS," AND THEN IT GOES INTO THE NO

13   CONFLICTING EVENT POLICY, AND THE CONTRACTURAL OBLIGATIONS

14   CONCERNING REPRESENTATIVE FIELDS IS AN OBVIOUS REFERENCE TO

15   CONTRACTURAL OBLIGATIONS TO BROADCASTERS AND MEDIA PARTNERS AND

16   SPONSORS WHO WANT TO SEE A COMPETITIVE FIELD IN THE EVENT.

17        SIMILARLY, THE AGREEMENT, WHICH EACH OF THESE PLAINTIFFS

18   SIGNED, REQUIRES THAT THE -- OR INVOLVES AN AGREEMENT THAT THE

19   MEMBER SHALL NOT PARTICIPATE IN ANY LIVE OR RECORDED GOLF

20   PROGRAM WITHOUT THE PRIOR APPROVAL OF THE COMMISSIONER.

21        NOW LET ME JUST TALK FOR A FEW SECONDS ABOUT SOME FACTS

22   ABOUT THESE TRO PLAINTIFFS AND LIV GOLF, WHICH ARE RELEVANT.

23        LIV GOLF WAS FOUNDED IN 2021, FUNDED BY THE SOVEREIGN

24   WEALTH FUND OF SAUDI ARABIA, THE PUBLIC INVESTMENT FUND.  AND

25   IT'S BEEN REFERRED TO AS SPORTS WASHING.  AND THE POINT IS NOT

1    OH, PLAYERS -- THE PGA HAS PERMITTED PLAYERS TO PLAY IN

2    SAUDI ARABIA, THE POINT IS THAT HERE IN THE UNITED STATES,

3    PEOPLE HAVE COME OUT AND DEMONSTRATED, AND ARE UPSET, AND

4    SPONSORS ARE UPSET ABOUT THAT ASSOCIATION.  AND THAT IS VERY

5    DIFFERENT THAN HAVING GOLFERS PLAY IN SAUDI ARABIA.

6        THEY HAVE ACCESS TO NEARLY UNLIMITED FUNDING, $2 BILLION

7    COMMITTED TO DATE.  YOU WILL NOTICE THAT THE REVENUE FROM THE

8    PGA TOUR FROM MY PIE CHART WAS ABOUT A BILLION IN 2021.  SO

9    THEY HAVE COMMITTED TWICE THAT.  THEY HAVE A LOT OF RESOURCES.

10       THE NEXT SLIDE IS REDACTED.  IT REFLECTS -- BUT THE COURT

11   HAS THE INFORMATION -- IT REFLECTS THE MONEY THAT THEY RECEIVED

12   SIMPLY FOR SIGNING THESE AGREEMENTS.

13       THE NEXT SLIDE IS ALSO REDACTED, BUT WHAT IT SHOWS IS HOW

14   THE EXECUTION OF THE LIV AGREEMENTS NECESSARILY INVOLVED AN

15   AGREEMENT TO BREACH THE PGA TOUR AGREEMENTS.  THAT WHEN THESE

16   PLAYERS SIGNED THE LIV AGREEMENTS, THE PROVISIONS, WHICH IN THE

17   COPY THAT YOUR HONOR AND THE COURT'S CLERKS HAVE, ARE

18   SIDE-BY-SIDE, THEY ARE NOT HARMONIZABLE, THEY ARE NOT

19   RECONCILABLE.

20       SO THAT THE PLAYERS' AGREEMENT TO ENTER INTO THE LIV

21   CONTRACT, WHICH WAS AN ECONOMIC DECISION FOR A SIGNIFICANT

22   AMOUNT OF MONEY, INVOLVED AN AGREEMENT, NOT JUST TO BREACH THE

23   PGA TOUR AGREEMENT ONCE, BUT TO BREACH IT EVERY TIME THERE WAS

24   GOING TO BE A CONFLICTING EVENT.  AND EVERY TIME THESE GOLFERS

25   PLAYED IN A LIV GOLF EVENT, THEY WOULD BE BREACHING THE MEDIA

1    RIGHTS AGREEMENT THAT THEY HAD ENTERED INTO WITH THE PGA TOUR.

2              THE COURT:  SO WHAT YOU ARE SAYING IS THE LIV

3    CONTRACT HAS TERMS IN IT THAT WOULD, IN ESSENCE, BE A VIOLATION

4    OF, BECAUSE YOU ARE NOT SUGGESTING THAT THERE WAS AN OBLIGATION

5    TO BREACH, IT'S THE IRRECONCILABLE CONFLICT.

6              MR. PETERS:  I'M NOT GOING THERE.  YOU SAID IT

7    EXACTLY RIGHT, YOUR HONOR.  YOU SAID IT EXACTLY RIGHT.

8         NOW JUST TO GET A SENSE OF SORT OF THE SCOPE WHAT'S GOING

9    ON HERE -- CAN I SEE THAT NEXT SLIDE, PLEASE.

10        THESE ARE THE LIV GOLFERS, JUST TO GIVE YOU AN

11   APPRECIATION THAT THESE PLAINTIFFS ARE SORT OF OUTLIERS AND

12   THAT A LOT OF THE OTHER GOLFERS DON'T VIEW THE FEDEX CUP THE

13   WAY COUNSEL DESCRIBED IT.

14        SO LET'S GO AHEAD.  THESE LIV GOLF MEMBERS AREN'T PGA TOUR

15   MEMBERS.  SO WE WILL MOVE ON.  THOSE LIV GOLF PLAYERS RESIGNED

16   FROM THE TOUR, FROM THE PGA TOUR.  THEY RECOGNIZED, I CAN'T

17   HAVE MY CAKE AND EAT IT TOO, I CAN'T DO BOTH.  BECAUSE THEY

18   LOOKED AT THE CONTRACT, OR WHATEVER THEIR THOUGHT PROCESS WAS,

19   THEY RECOGNIZED, I CAN'T DO BOTH.  BUT I MAKE A BUSINESS

20   DECISION, I'M BEING VERY WELL COMPENSATED, I LIKE THE FORMAT,

21   WHATEVER IT IS, I THINK A LOT OF IT WAS ECONOMIC.

22             THE COURT:  AND THAT LIST, DID ALL OF THOSE PEOPLE

23    QUALIFY FOR THE FEDEX?

24             MR. PETERS:  NO, I'M GETTING THERE, BUT THAT'S AN

25    EXACTLY UNDERSTANDABLE QUESTION.  LET ME JUST KEEP GOING HERE.

1          THOSE PLAYERS ARE NOT ELIGIBLE FOR THE FEDEX CUP.  THE

2     NEXT GROUP WERE FEDEX CUP ELIGIBLE BUT ARE NOT PLAINTIFFS.  THE

3     NEXT GROUP ARE FEDEX CUP ELIGIBLE AND ARE PLAINTIFFS, BUT ARE

4     NOT PARTIES TO THIS TRO APPLICATION.

5          SO APPARENTLY, THEY THINK THAT THEY CAN LIVE THEIR LIVES

6     AS GOLFERS WITHOUT IRREPARABLE HARM, WITHOUT PLAYING IN THE

7     FEDEX CUP.

8          AND THEN THE LAST THREE, MR. GOOCH, MR. JONES AND

9     MR. SWAFFORD, ARE THE PLAINTIFFS HERE WHO TAKE THE POSITION

10    THAT, REALLY, NO ONE ELSE HAS TAKEN, THAT NOT ONLY THAT THEY

11    SHOULD BE ABLE TO DO BOTH, THAT THEY ARE IRREPARABLY HARMED IF

12    THEY ARE NOT PERMITTED TO.

13          THE COURT:  SO THAT IS NINE TOTAL PLAYERS WERE

14     ELIGIBLE FOR FEDEX?

15          MR. PETERS:  YES -- NO.

16          THE COURT:  AND SOME DIDN'T SUE -- OF THE NINE THAT

17     WERE ELIGIBLE, SIX DIDN'T --

18          MR. PETERS:  OF THE LIV GOLFERS.

19          THE COURT:  OF THE LIV GOLFERS, THERE WERE NINE WHO

20     WERE ELIGIBLE FOR FEDEX.

21          MR. PETERS:  YOU KNOW, THE ONE THING I'M NOT SURE

22     ABOUT, IS WHETHER ANY OF THOSE THAT RESIGNED WOULD HAVE BEEN

23     ELIGIBLE OR NOT.

24          THE COURT:  OH, SO THE FAR RIGHT COLUMN ARE PEOPLE

25     WHO DID NOT RESIGN FROM PGA, THAT'S WHAT I'M TRYING TO

1    UNDERSTAND.

2              MR. PETERS:  THAT'S CORRECT.

3         THE LAST COLUMN ARE GOLFERS WHO DIDN'T RESIGN, AND THEN

4    THAT TOP GROUP, THEY ARE NOT ELIGIBLE, AND THEN THE NEXT GROUP,

5    WE CAN GO TO THAT NEXT -- THERE WE GO.  THEY WERE ELIGIBLE AND

6    THEY ARE LIV GOLFERS, BUT THEY ARE NOT PARTIES TO THIS CASE AT

7    ALL, THOSE NEXT THREE.

8         AND THEN THE NEXT THREE ARE PLAINTIFFS, BUT THEY ARE NOT

9    PARTIES TO THIS MOTION.  THEY ARE NOT SEEKING A TRO.

10        AND THEN YOU'VE GOT THE LAST THREE.

11             THE COURT:  SO THOSE WHO ARE NOMINALLY MEMBERS OF THE

12   PGA TOUR.

13             MR. PETERS:  UNDER SUSPENSION, SOME OF THEM.

14             THE COURT:  THAT'S WHY I SAY NOMINALLY.  THEY ARE

15   MEMBERS, AND ONLY THREE OF THEM ARE ASSERTING THE RIGHT UNDER

16   THE TRO.

17             MR. PETERS:  THAT'S CORRECT.

18             THE COURT:  OKAY.  I'M JUST TRYING TO QUANTIFY WHAT

19   THAT GROUP IS.

20             MR. PETERS:  YOU GOT IT EXACTLY RIGHT.

21        ON THIS MANDATORY INJUNCTION POINT THAT THE COURT RAISED

22   AND WAS DISCUSSING, THEY ARE ASKING YOU FOR AN ORDER THAT THE

23   TOUR LIFT ITS SUSPENSIONS OR STAY THE SUSPENSIONS.

24        THE STATUS QUO IS THAT THESE PLAYERS ARE SUSPENDED.  AND

25   THEY ARE ASKING FOR A CHANGE IN THE STATUS QUO.  THEY ARE NOT

1        ASKING TO PRESERVE IT, IT'S A MANDATORY INJUNCTION.

2            IN THIS CIRCUIT, IT'S A HIGHER STANDARD, IT'S A CLEARLY

3        FAVORING, THE COURT IS WELL FAMILIAR WITH THE STANDARD, I WON'T

4        BELABOR IT, BUT I THINK YOU JUST HAVE TO DO TOO MANY GYMNASTICS

5        TO AVOID THE FACT THAT WHAT THEY ARE ASKING FOR IS AN ORDER TO

6        LIFT THE SUSPENSIONS OR STAY THE SUSPENSIONS, WHICH WOULD

7        CHANGE THE STATUS QUO.

8            IRREPARABLE HARM.  AN OVERVIEW.  THE PLAINTIFFS DELAYED

9        FOR MONTHS, AND ONLY BY ELIMINATING SOME OF THE CORRESPONDENCE,

10       CAN YOU SAY OTHERWISE.  THE ALLEGED HARM CAN BE REDRESSED WITH

11       MONETARY DAMAGE, AND ANY PURPORTED NON-MONETARY HARM IS

12       SPECULATIVE.

13           I DIRECT THE COURT TO EXHIBITS 8 AND 9 TO THE LEVINSON

14       DECLARATION WHICH WE SUBMITTED, WHICH ARE THE LETTERS DATED

15       JUNE 5TH AND JUNE 9TH TO TALOR GOOCH, TELLING HIM HE WAS BEING

16       PLACED ON PROBATION, AND TELLING HIM HE WAS SUSPENDED, WHICH

17       WERE NOT IN THE TIMELINE THAT THE PLAINTIFFS SHOWED THE COURT

18       AT THE BEGINNING OF THIS ARGUMENT.

19               THE COURT:  YOU KNOW, MR. PETERS, WE STILL COME DOWN

20       TO THAT PLAIN LANGUAGE OF THE REGULATIONS THAT SAYS --

21               MR. PETERS:  DO YOU WANT ME TO GET THERE RIGHT NOW?

22               THE COURT:  NO, BUT I DO WANT TO MAKE SURE YOU GET

23       THERE.

24               MR. PETERS:  OH BOY, I'M ABSOLUTELY READY TO GET

25       THERE, BUT LET ME JUST WALK THROUGH IRREPARABLE HARM, BECAUSE

1    OBVIOUSLY IF THERE'S NO IRREPARABLE HARM, WE DON'T GET THERE.

2    BUT I AM GOING TO ADDRESS THAT, I PROMISE YOU.  I WOULD BE

3    SILLY NOT TO.  BUT I AM GOING TO, AND I THINK WE HAVE A VERY,

4    VERY CLEAR AND DISPOSITIVE ANSWER FOR YOU.

5             THE COURT:  OKAY.

6             MR. PETERS:  THESE PLAINTIFFS KNEW BEFORE JUNE 9TH

7    THAT THEY WERE LIKELY TO BE SUSPENDED, BECAUSE THEY SAID SO.

8    THEY KNEW THAT IF THEY VIOLATED THE TOUR'S REGULATIONS, THAT

9    THEY WOULD FORFEIT THEIR ABILITY TO PLAY IN THE FEDEX CUP.

10   THEY KNEW THEY WOULD BE SUSPENDED BECAUSE THEY HAD ALREADY BEEN

11   PLACED ON PROBATION BECAUSE OF THIS.

12            THE COURT:  THAT WAS THE FIRST WEEK IN JUNE THEY WERE

13   PLACED ON PROBATION?

14            MR. PETERS:  YES, YOUR HONOR, IT WAS JUNE 5TH.

15            THE COURT:  UH-HUH.

16            MR. PETERS:  AND THEY WERE SUSPENDED ON JUNE 9TH.

17        I WOULD LIKE TO TALK A LITTLE BIT ABOUT IRREPARABLE HARM

18   AND MONEY DAMAGES, BECAUSE OBVIOUSLY ECONOMIC HARM IS GENERALLY

19   NOT CONSIDERED IRREPARABLE.  AND YOU KNOW, ALL OF THE

20   PLAINTIFFS' HARMS COLLAPSE INTO MONEY.

21        AND MR. WALTERS EVEN INADVERTENTLY SAID SO WHEN HE WAS

22   TALKING ABOUT THE GREAT OPPORTUNITY TO PLAY IN THE FEDEX CUP.

23   AND HE SAID IF THEY DID WELL, THEY COULD GET SPONSORSHIPS.

24   IT'S ABOUT WINNING PRIZE MONEY, IT'S ABOUT GETTING

25   SPONSORSHIPS, IT'S ABOUT MAKING MONEY.

1        AND THIS IS WHERE WE GET TO HELDMAN AND WE GET TO THE

2    PLAINTIFF'S OWN EXPERT.  IN HELDMAN, WHICH OBVIOUSLY THE COURT

3    IS VERY FAMILIAR WITH, HERE IS WHAT THE DISTRICT COURT SAID,

4    "KING," REFERRING TO BILLIE JEAN KING, "SAW A VALUABLE

5    OPPORTUNITY IN PLAINTIFF'S CONTRACT AND OPTED FOR IT.  SHE HAS

6    AVAILABLE TO HER, THE CHANCE TO WIN LARGE SUMS OF PRIZE MONEY,

7    AND WITH THAT, THE SUBSEQUENT OPPORTUNITIES OF ENDORSEMENTS

8    THAT ACCRUE TO ATHLETIC STARS.  THAT OTHER TOURNAMENT

9    OPPORTUNITIES MAY BE LOST TO HER, DOES NOT, ON THIS RECORD,

10   SUPPORT A PRELIMINARY INJUNCTION."

11       YOU COULD TAKE OUT "KING" AND PUT IN "GOOCH" OR "SWAFFORD"

12   AND IT'S THE SAME THING.  IN FACT, THEIR CHOICE WASN'T JUST THE

13   OPPORTUNITY TO WIN MORE MONEY, THEY MADE A BUSINESS DECISION TO

14   RECEIVE MONEY.  THEY HAVE MADE, IN THE LAST TWO MONTHS, MORE

15   MONEY THAN THEY EVER HAVE MADE ON THE PGA TOUR.

16       AND I WOULD LIKE TO POINT OUT SOMETHING THAT I THOUGHT WAS

17   VERY INTERESTING IN THE SUBMISSION, THE DECLARATION FROM

18   MR. JEFFREY LEITZINGER, THE PLAINTIFF'S ECONOMIST, BECAUSE HE

19   MAKES THE POINT THAT ELITE GOLFERS HAVE ASSESSED THE COSTS

20   ASSOCIATED WITH THE LOSS OF EXPECTED LIFETIME PLAYING REVENUES

21   ON THE TOUR.

22           THE COURT:  SURE.

23           MR. PETERS:  THE LOSS OF OPPORTUNITIES TO EARN

24    RANKING POINTS, AND THE LOSS OF OPPORTUNITIES TO EARN ENTRY

25    INTO THE MAJORS WHEN DETERMINING WHAT LARGE UP FRONT PAYMENTS

 1      WOULD BE REQUIRED FOR THEM TO JOIN LIV.  THAT'S IN PARAGRAPH 9.

 2          SO LET'S JUST THINK ABOUT WHAT HE'S SAYING FOR A SECOND.

 3      HE'S SAYING TWO THINGS:  HE'S SAYING ONE, THE MONETARY DAMAGES

 4      ARE CALCULABLE.  WE HAVE CALCULATED THEM.  IT'S NOT IRREPARABLE

 5      HARM, BECAUSE THESE ELITE GOLFERS HAVE ASSESSED THIS AND

 6      FIGURED IT OUT.

 7          AND OF COURSE IT'S NOT COMPLETELY PRECISE, BUT THESE KINDS

 8      OF CALCULATIONS ARE MADE IN COURTS ALL THE TIME BY EXPERTS AND

 9      ARGUED BY LAWYERS AND DECIDED BY COURTS AND JURIES.  FUTURE

10      EARNINGS.  THAT'S THE FIRST POINT IS THAT IT'S CALCULABLE AND

11      IT'S NOT IRREPARABLE HARM.

12          THE SECOND POINT IS THEY HAVE ALREADY BEEN PAID FOR IT.

13      THEY HAVE ALREADY BEEN PAID TO COMPENSATE THEM FOR WHAT THEY

14      ARE HERE COMPLAINING ABOUT IS IRREPARABLE.

15          AND THAT WAS THE CALCULATION THAT THEY MADE.  THAT'S THE

16      BUSINESS DECISION THEY MADE THAT WAS REFERRED TO.  AND ELITE

17      RODEO, BECAUSE IT'S AN ATHLETE IN AN INDIVIDUAL SPORT WITH TWO

18      COMPETING LEAGUES, I THINK RODEO IS TOO, BUT MAYBE IT'S JUST

19      HARDER FOR ME TO RELATE TO RODEO, MAYBE MR. WALTERS COULD

20      RELATE TO IT A LITTLE BIT.

21          THE COURT:  I COULD SEE YOU RIDE A HORSE, ARE YOU

22      KIDDING?

23          MR. PETERS:  I'M A BIG FELLOW.  I DON'T KNOW.

24          ANYWAY, IT'S ALSO IMPORTANT, AND THIS IS MORE OF A

25      MONOPOLY POINT, BUT I ALSO THINK IT GOES TO IRREPARABLE HARM.

1    THESE PLAINTIFFS AREN'T BARRED FROM PARTICIPATING IN ELITE

2    GOLF.

3         THE PGA TOUR REGULATIONS DON'T HAVE A NON-COMPETE IN THE

4    FORM OF, LIKE, AN EMPLOYMENT AGREEMENT WHICH SAYS AFTER YOU

5    LEAVE HERE, YOU CAN'T GO DO X, Y, AND Z.  THERE'S NO SUCH

6    THING.  THEY ARE ABSOLUTELY FREE TO RESIGN FROM THE PGA AND GO

7    PLAY FOR LIV GOLF, AS A LOT OF PLAYERS HAVE DONE.  THERE'S NO

8    IMPEDIMENT FOR THEM DOING THAT.  AND LIV GOLF HAS BEEN VERY

9    SUCCESSFUL AT ATTRACTING TOP PLAYERS.

10        SO THE CASES THAT THEY CITE TALKING ABOUT LOST OPPORTUNITY

11   TO PLAY SPORTS, AND YOUR HONOR IS EXACTLY RIGHT, OH, THERE THAT

12   YOUNG SOCCER PLAYER, I THINK SHE WAS 14 OR 15, DIDN'T HAVE ANY

13   OPPORTUNITY TO PLAY PROFESSIONAL GOLF UNLESS SHE WAS -- TO PLAY

14   PROFESSIONAL SOCCER, AND THEN THE COURT GAVE HER THAT

15   OPPORTUNITY.  BUT IT'S VERY DIFFERENT IN THIS CASE.

16            THE COURT:  AND IT SEEMS AS THOUGH THE NBA CASES ARE

17   ALONG THE SAME.

18            MR. PETERS:  EXCUSE ME?

19            THE COURT:  THE NBA CASES WERE ALONG THE SAME, THERE

20   WAS NO OPPORTUNITY TO PLAY BASKETBALL.

21            MR. PETERS:  YES.  AND THIS IS OBVIOUSLY VERY

22   DIFFERENT BECAUSE THEY HAVE A HIGHLY LUCRATIVE AND VERY

23   COMPETITIVE OPPORTUNITY TO PLAY.

24        ON THE BALANCING OF THE EQUITIES IN THE PUBLIC INTEREST, I

25   THINK IT'S IMPORTANT TO UNDERSTAND THAT GIVEN THE PGA TOUR'S

1    ECONOMIC MODEL, IF THE TOUR CAN'T ENFORCE ITS CONFLICTING

2    EVENTS AND MEDIA RIGHTS REGULATIONS, WHICH ARE ITS LIFE BLOOD,

3    IT FACES THE REAL REALITY OF NOT BEING ABLE TO GENERATE THE

4    KIND OF REVENUE THAT THE MEMBERS EXPECTED TO GENERATE FROM TV

5    DEALS AND SPONSORSHIP DEALS.

6         AND HELDMAN SPOKE TO THAT TOO.  IT WOULD UNDULY DAMAGE THE

7    PRESTIGE AND THE OPERATION OF THE INCUMBENT TENNIS ASSOCIATION

8    TO ENJOIN ITS RULES BEFORE AN ADVERSE DETERMINATION ON THE

9    MERITS.

10        WE TOUCHED ON THE NEXT POINT BRIEFLY, BUT THE PGA TOUR

11   WOULD SUFFER IRREPARABLE HARM IF THE TRO WAS GRANTED.  AND I'M

12   NOT TALKING ABOUT JUST THE ASSOCIATION NOW WITH THE SAUDIS, I

13   THINK THAT THAT'S BAD AND THAT'S NOT IN THE PUBLIC INTEREST.

14        BUT THINK ABOUT IN THE CONTEXT OF THE DUTY TO DEAL AND

15   FREE-RIDING, THE REQUIREMENT THAT THESE -- IF THESE PLAYERS, IF

16   WE ARE ORDERED TO LIFT THE SUSPENSION AND THEY SHOW UP THURSDAY

17   MORNING TO PLAY WITH THEIR LIV GOLF HATS AND THEIR LIV GOLF

18   SHIRTS, AND THEIR PRESS CONFERENCE IS ABOUT LIV GOLF, OUR EVENT

19   BECOMES A STAGE FOR OUR COMPETITOR IN COMPLETE CONTRAVENTION OF

20   THE JURISPRUDENCE UNDER THE DUTY TO DEAL AND FREE-RIDING.

21        WOULDN'T LIV GOLF LOVE THAT, THE OPPORTUNITY TO HAVE ITS

22   PLAYERS PROMOTING IT AT OUR MARQUIS EVENT.  AND THAT'S NOT FAIR

23   TO THE PGA TOUR, THAT'S NOT EQUITABLE, THAT'S NOT IN THE PUBLIC

24   INTEREST.

25        AND JUST AS AN EXAMPLE --

1     THE COURT:  SO LET ME JUST ASK YOU, IF UNDER

2  MR. WALTERS'S PROPOSED INJUNCTION, I WERE TO REQUIRE THAT

3  THE -- THAT THESE PLAINTIFFS PLAY, THEY WOULD BE PLAYING

4  WITHOUT ANY OF THE RESTRICTIONS OF THE RULES OF THEIR

5  MEMBERSHIP.

6     MR. PETERS:  YEAH, THEY WOULD BE FREE OF OUR RULES.

7  I MEAN, THEY WOULD HAVE A GET-OUT-OF-SCHOOL-FREE CARD.

8     THE COURT:  AND NO ONE HAS ASKED ME THIS, BUT I GUESS

9  I CAN'T ORDER THAT IF THEY PLAY, THEY PLAY UNDER THE PGA RULES.

10     ON THE MEDIA RIGHTS, I MEAN, I DON'T -- WELL, LET ME BACK

11  UP, BECAUSE I THINK THEY HAVE THE RIGHT TO WEAR SPONSORSHIPS ON

12  THEIR OWN CLOTHING, THAT IS UNRESTRICTED BY THE PGA TOUR; IS

13  THAT CORRECT?

14     MR. PETERS:  THEY HAVE AN OBLIGATION.

15     THE COURT:  NOT TO DISPARAGE THE PGA TOUR, BUT --

16     MR. PETERS:  I THINK IT GETS TRICKY, BECAUSE THEY --

17  THEY HAVE AN OBLIGATION UNDER THEIR LIV CONTRACTS WEAR LIV

18  STUFF.  SO I GUESS UNLESS THEY ARE GOING TO BREACH THAT

19  CONTRACT, THEY ARE GOING TO SHOW UP AT THE FEDEX CUP AND BE

20  PROMOTING LIV EVERY SHOT THEY TAKE AT OUR EVENT.

21     THE COURT:  UNDER YOUR RULES, LET'S JUST TALK ABOUT

22  YOUR RULES AND NOT THE CONTRACTS, CAN ANY OF THESE PLAYERS GIVE

23  ANY PRESS CONFERENCE THAT THEY WANT DURING THE TOURNAMENT?  CAN

24  THEY SPEAK TO ANY MEMBER OF THE PRESS THAT STICKS A MICROPHONE

25  UNDER THEIR MOUTH?

```
1              MR. PETERS:  I THINK SO, YEAH.  I LOOKED AT MY CLIENT

2    WHO IS NODS YES, SHE KNOWS THE RULES BETTER THAN I DO.

3              THE COURT:  OKAY.  SO THEY ARE NOT VIOLATING THE PGA

4    TOUR RULES IF THEY GIVE PRESS CONFERENCES.

5              MR. PETERS:  NO.

6              THE COURT:  AND I DON'T RECALL ANYTHING IN THE RULES

7    THAT RESTRICT THEM, OTHER THAN ACTUALLY DISPARAGING THE PGA

8    TOUR, RESTRICTS THEM IN WHAT THEY SAY, THEY CAN PROMOTE

9    SOMETHING ELSE, THERE'S NO RESTRICTION, IS THERE?

10             MR. PETERS:  NO, THEY WOULDN'T BE VIOLATING THE PGA'S

11   RULES, BUT THEY WOULD BE HARMING THE PGA BY DOING THAT, AND

12   THEY WOULD HAVE VIOLATED THE PGA'S RULES.  I MEAN, THEY WOULD

13   BE THERE NOTWITHSTANDING HAVING VIOLATED THE PGA RULES, AND

14   THEY WOULD ALSO BE --

15             THE COURT:  I UNDERSTAND THAT.

16             MR. PETERS:  I MEAN, UNDER ANTITRUST LAW, THE DUTY TO

17   DEAL CASES, WHICH OBVIOUSLY TRINKO AND ALL THE COURT IS WELL

18   FAMILIAR WITH, WE WOULD BE REQUIRED TO GIVE THEM -- NOT JUST TO

19   DEAL WITH THEM, BUT TO GIVE THEM A FABULOUS PLATFORM TO PROMOTE

20   THEIR COMPETING SERVICES IN VIOLATION OF THE DUTY TO DEAL.

21        I THINK IT'S A HUGE PROBLEM UNDER THE ANTITRUST LAWS UNDER

22   THIS TRO THAT THEY SEEK, AND JUST NOT FAIR TO MAKE US BE A

23   PLATFORM FOR OUR COMPETITOR'S PROMOTION OF ITS COMPETING

24   PRODUCT.

25             CAN WE JUST LOOK AT SLIDE 36.  I'M NOT GOING TO GO THROUGH
```

1    THESE COMPETITION SLIDES, BUT I JUST WANT TO GIVE YOU AN IDEA.

2         SO THIS IS JUST A SLIDE WHICH SHOWS THE TEN MOST IMPACTFUL

3    GOLFERS IN 2021, AS IDENTIFIED BY THE TOUR.  THOSE ARE THE TOP

4    TEN.  THAT'S WHERE THEY ARE NOW.  I MEAN, YOU LOOK AT

5    COMPETITION, I MEAN, AS COMPETITORS OF LIV GOLF, WE ARE NOT

6    OVERJOYED TO REPORT THIS TO YOU, YOUR HONOR, BUT IT'S A FACT

7    THAT THE COMPETITION IS FIERCE AND THESE PLAYERS HAVE MADE

8    THEIR DECISION AND THERE IS RICH COMPETITION.

9         THE COURT:  DO I HAVE THIS EVIDENCE FROM THAT SLIDE?

10   DID YOU SUBMIT THAT AS EVIDENCE, THAT LAST SLIDE?

11        MR. PETERS:  DID WE SUBMIT IT?

12        THE COURT:  I JUST DIDN'T --

13        MR. PETERS:  I DON'T THINK THAT WAS IN THE BRIEF.  I

14   DON'T THINK THAT WAS IN THE BRIEF.

15        THE COURT:  OKAY.  THAT'S REMARKABLE.  IT LOOKS LIKE

16   WE ARE GOING 50/50 THERE, DOESN'T IT.

17        MR. PETERS:  WELL, THAT'S WHAT IT SHOWS.

18        I MEAN, LET'S LOOK AT THE NEXT SLIDE TOO.  AND THIS,

19   THERE'S AN OVERLAY HERE BETWEEN THE CONFLICTING EVENTS AND

20   MEDIA RIGHTS RULES.  AND THIS CHART, YOU WILL SEE THAT THESE

21   EVENTS TAKE PLACE ON THE SAME WEEKEND, THE ONES THAT WE HAVE

22   IDENTIFIED HERE.  AND THERE IN THE LAST COUPLE OF MONTHS, THEY

23   ARE ALL SINCE THE SUSPENSIONS.

24        AND THESE PLAINTIFFS PLAYED IN THE LIV EVENTS,

25   NOTWITHSTANDING THEIR PGA TOUR AGREEMENTS.  AND YOU HAVE --

1        IT'S PRETTY MUCH 50/50 HERE, IN TERMS OF THE ELITE GOLFERS

2    PLAYING IN THESE EVENTS.

3            THE IDEA THAT THERE'S -- I MEAN, MONOPOLY POWER, THAT'S

4    THE ABILITY TO EXCLUDE COMPETITORS.  LIV GOLF IS EXHIBIT A FOR

5    WHY THE PGA TOUR DOESN'T HAVE MONOPOLY POWER, BECAUSE THEY ARE

6    COMPETING EFFECTIVELY, AND THERE'S PLENTY OF CASES WHICH MAKE

7    THAT OBSERVATION IN SITUATIONS WHERE IT'S APPROPRIATE LIKE THIS

8    ONE.  BUT I UNDERSTAND THAT IN SOME WAYS, THOSE ARE ISSUES FOR

9    ANOTHER DAY.

10            THE COURT:  WELL, I CAN JUST SEE THE FOLLOW-ON SUIT

11    WHERE YOU CLAIM THAT LIV IS THE MONOPOLIST USING ITS MONOPOLY

12    POWER.

13            MR. PETERS:  WE ARE NOT THE PLAINTIFF HERE, WE HAVE

14    ASSERTED CLAIMS.  I MEAN -- THIS, I THINK, IS SOMETHING THAT

15    YOUR HONOR ALLUDED TO, THAT THE SUCCESSFUL ENTRY BY LIV GOLF

16    WOULD PROVIDE A NEW AND SIGNIFICANT COMPETITOR, THE RESPECTIVE

17    BENEFITS OF THAT COMPETITION FOR GOLFERS ARE ALREADY EVIDENCED

18    BY INCREASED COMPENSATION THAT LIV HAS OFFERED AND THE PGA TOUR

19    HAS OFFERED IN RESPONSE.  THAT'S THE OTHER TEST OF A

20    MONOPOLIST, CAN YOU CONTROL PRICES?

21        ANYWAY, LET ME -- I DON'T WANT TO BELABOR THOSE POINTS, I

22    WANT TO TURN TO THE STAY, UNLESS THE COURT HAS QUESTIONS.

23            THE COURT:  I THINK -- NO, I THINK THAT IS REALLY THE

24    BIG ISSUE HERE.

25            MR. PETERS:  OKAY.  I WOULD LIKE -- ALL THE MORE

1     REASON WHY I PROBABLY SHOULD HAVE ADDRESSED IT EARLIER, BUT I'M

2      GOING TO ADDRESS IT NOW.

3          IF WE COULD GO TO SLIDE 44.  AND THIS IS JUST KIND OF AN

4     OVERVIEW OF OUR ARGUMENT.  AND YOUR HONOR HAS OBSERVED THAT THE

5     COURT PROPERLY DEFERS TO THE JUDGMENT OF A PRIVATE ORGANIZATION

6     THAT ESTABLISHED REGULATIONS AND DISCIPLINARY PROCEDURES FOR

7     ITS MEMBERS.  AND THE PGA TOUR HAS FOLLOWED ITS REGULATIONS TO

8     THE LETTER, AND I WILL EXPLAIN THAT.

9          THE REGULATIONS DIFFERENTIATE BETWEEN THE COMMISSIONER'S

10    AUTHORITY TO IMMEDIATELY SUSPEND RECIDIVISTS WHOSE CONDUCT

11    THREATENS THE TOUR AND THE FORMAL PENALTY PROVISIONS.

12          THERE'S TWO SEPARATE PARALLEL TRACKS.  UNDER ARTICLE

13    VII.C, WHICH I'M ABOUT TO SHOW YOU THE TEXT OF, THE

14    COMMISSIONER MAY IMMEDIATELY SUSPEND PROBATION VIOLATORS, AND

15    THERE'S NO STAY PENDING APPEAL.  UNDER ARTICLE VII.E, MEMBERS

16    MAY STAY ENFORCEMENT OF INTERMEDIATE OR MAJOR PENALTIES,

17    INCLUDING SUSPENSION, PENDING APPEAL.

18          NOW LET'S GO TO THE NEXT SLIDE.  THAT'S JUST THE OAKLAND

19    RAIDERS CASE, IN TERMS OF ABSTENTION FROM INTRA-ASSOCIATION

20    DISPUTES.  AND IT'S THE POINT YOUR HONOR MADE THAT IT'S THE

21    COMMISSIONER THAT GETS TO INTERPRETER THESE RULES AND THE COURT

22    IS -- IT'S NOT THE COURT'S JOB TO INTERPRET THEM OR REWRITE

23    THEM OR ANYTHING LIKE THAT, AND THEREFORE A CERTAIN AMOUNT OF

24    DEFERENCE IS APPROPRIATE.

25                THE COURT:  BUT I THINK MR. WALTERS MADE AN

1    INTERESTING POINT THAT THE COMMISSIONER'S INTERPRETATION SEEMS

2    TO HAVE EVOLVED OVER THE LIFE OF THIS SUSPENSION.  THAT DOES

3    NOT BODE WELL FOR THE CREDIBILITY OF THE POSITION.

4         MR. PETERS:  HE CAN SAY THAT ONLY BECAUSE HE DIDN'T

5    TELL YOU ABOUT THE JUNE 5TH OR THE JUNE 9TH LETTERS WHERE THE

6    PROBATION -- PLEASE LOOK AT EXHIBIT 8 AND 9 TO THE LEVINSON

7    DECLARATION, THE JUNE 5TH LETTER INVOKES VII.C IN MAKING THE

8    PROBATION.

9         LET'S LOOK AT THE LANGUAGE OF VII.C, BECAUSE IT'S

10   IMPORTANT.  AND YOUR HONOR, YOU FOCUSED ON THE PRESENCE OF THE

11   WORD "PENALTY" IN VII.E, UNDERSTANDABLY, BUT LET'S TALK ABOUT

12   VII.C, AND THEN WE WILL TALK ABOUT THE INTERPLAY.

13        THE COURT:  YOU CAN'T BE SUGGESTING VII.C ISN'T A

14   PENALTY.

15        MR. PETERS:  BEG YOUR PARDON?

16        THE COURT:  YOU ARE NOT SUGGESTING WHAT HAPPENS UNDER

17   VII.C IS NOT A PENALTY.

18        MR. PETERS:  WELL, LET'S LOOK AT THE LANGUAGE AND WE

19   WILL TALK ABOUT IT.

20        THE COURT:  OKAY.

21        MR. PETERS:  BECAUSE IT DOES, IT SAYS, AND I WILL --

22   LET ME READ THE LANGUAGE AND THEN WE WILL TALK ABOUT IT.

23        "IN ANY INSTANCE WHERE A MEMBER OF THE PGA TOUR HAS, FOR

24   ANY REASON, BEEN PLACED ON PROBATION FOR AN INFRACTION OF ANY

25   RULE OF THE PGA TOUR, THEN AND IN THAT EVENT, IF AT ANY TIME

1    DURING THE PROBATION PERIOD, THAT MEMBER SHALL VIOLATE ANY RULE

2    OF THE PGA TOUR, IRRESPECTIVE OF WHETHER THAT VIOLATION CARRIES

3    WITH IT A PENALTY DESIGNATED MINOR, INTERMEDIATE OR MAJOR, THE

4    COMMISSIONER MAY IMMEDIATELY SUSPEND THE MEMBER'S PLAYING

5    PRIVILEGES."

6         NOW WHAT'S THE LOGIC OF THIS?  BECAUSE IT DOES SAY

7    IRRESPECTIVE OF WHETHER IT CARRIES WITH IT A PENALTY.  WHAT'S

8    THE LOGIC?  THIS IS A VERY UNUSUAL SITUATION WHERE YOU HAVE

9    TOUR MEMBERS, PLAYERS, WHO HAVE INDICATED THAT THEY ARE -- NOT

10   JUST THAT THEY ARE GOING TO VIOLATE A PGA TOUR RULE ONCE, BUT

11   THAT THEY ARE GOING TO DO IT OVER AND OVER AGAIN.  THEY ARE

12   GOING TO DO IT EVERY WEEKEND IN JUNE AND IN JULY.

13        AND THEY ARE PLACED ON PROBATION FOR VIOLATING THOSE

14   REGULATIONS.  AND THE COMMISSIONER THEN HAS THE AUTHORITY TO

15   SAY, IF YOU ARE GOING TO CONTINUE, I PUT YOU ON PROBATION AND

16   YOU ARE GOING TO CONTINUE TO VIOLATE THE REGULATIONS, I HAVE

17   THE AUTHORITY TO IMMEDIATELY SUSPEND YOU.

18        AND THAT'S SEPARATE FROM THE PENALTIES IN SECTIONS D(1),

19   D(2) AND D(3), WHICH -- TO WHICH SECTION E APPLIES, WHEN IT

20   TALKS ABOUT A STAY, BECAUSE IT SAYS -- THE LANGUAGE OF E SAYS

21   THE TIMING OF THE PENALTY IS STAYED.

22             THE COURT:  I'M LOOKING AT E, THAT'S NOT EXACTLY WHAT

23    IT SAYS.  E IS CALLED APPEALS, THERE'S AN APPEAL UNDER SECTION

24    C.

25             MR. PETERS:  YES.

1          THE COURT:  SO THIS IS NOT APPEAL OF, THEN IT DEFINES

2     AN APPEAL OF A MINOR PENALTY, AND A MINOR PENALTY IS DEFINED AS

3     A PERIOD OF TIME, AND AN INTERMEDIATE AND MAJOR PENALTIES ARE

4     LENGTHY PENALTIES.

5          MR. PETERS:  YES.

6          THE COURT:  AND SO THIS IS A -- I JUST DON'T SEE HOW

7     WHAT HAPPENED UNDER C WASN'T A PENALTY.

8          MR. PETERS:  BECAUSE IT'S SEPARATE.

9          THE COURT:  IT DOESN'T SAY AN APPEAL UNDER THIS -- A

10    PENALTY UNDER SECTION E, THAT'S NOT WHAT THIS SAYS.  YOU ARE

11    READING LANGUAGE INTO THIS PARAGRAPH, AN APPEAL SHALL OPERATE

12    TO STAY THE EFFECTIVE DATE OF ANY PENALTY.

13         MR. PETERS:  RIGHT.

14         THE COURT:  OF ANY PENALTY.  IT'S UNQUALIFIED.

15         MR. PETERS:  AND THEY GOT A PENALTY, ON JUNE 30TH,

16    THEY GOT A PENALTY, UNDER THAT SECTION, THEY WERE NOTIFIED OF

17    IT IN A LETTER, AND THEY HAD APPELLATE RIGHTS, AND ALL OF THE

18    PROCEDURE THAT THEY WERE ENTITLED TO, THAT'S BASED ON JUNE --

19    SO THESE PROCESSES ARE RUNNING IN PARALLEL.

20         THE COURT:  SO YOU ARE SAYING THAT THEY HAVE TWO

21    SEPARATE DISCIPLINARY ACTIONS GOING AGAINST THEM?

22         MR. PETERS:  IN ESSENCE, YES, BECAUSE THE

23    COMMISSIONER NEEDS THE ABILITY TO PROTECT THE TOUR.

24       THINK ABOUT THIS HYPOTHETICAL, YOUR HONOR, BECAUSE IT

25    MAKES A LOT OF SENSE IF YOU THINK ABOUT IT.  A PLAYER GETS AN

1    ENDORSEMENT FROM A HATE SPEECH ORGANIZATION.  HE'S SPONSORED BY

2    A HATE SPEECH ORGANIZATION.  HE SAYS, I'M GOING TO COME AND

3    PLAY AND PROMOTE SOME ORGANIZATION THAT THE TOUR ABSOLUTELY

4    DOESN'T WANT.  AND THEY SAY, WE ARE GOING TO PUT YOU ON

5    PROBATION RIGHT NOW.

6         HE SHOWS UP TO PLAY AND HE GETS SUSPENDED.  HE COMES BACK

7    TWO WEEKS LATER TO AVOID THIS THING ABOUT THE WEEK OF, HE SHOWS

8    UP TWO WEEKS LATER AND HE SAYS, I FILED AN APPEAL, I GET TO

9    PLAY EVERY WEEK UNTIL MY APPEAL IS DECIDED.  AND I GET 14 DAYS

10   TO SUBMIT EVIDENCE, AND I CAN TAKE MY TIME DURING WHICH I GET

11   TO DO THIS.

12        UNDER THESE RULES, THE COMMISSIONER HAS TO HAVE -- AND

13   THAT'S WHY SECTION C EXISTS -- THE COMMISSIONER HAS TO HAVE THE

14   DISCRETION TO SUSPEND, TO PUT A PLAYER ON PROBATION, AND TO

15   SUSPEND THEM SO THAT THEY DON'T HARM ALL THE OTHER TOUR

16   MEMBERS.  AND THEN THEY INITIATE THE DISCIPLINARY PROCESS

17   SUBSEQUENTLY WHICH GIVES HIM THE RIGHT TO AN APPEAL, BUT HE

18   DOESN'T GET A STAY.

19        AND I THINK IT'S IMPORTANT TO THINK ABOUT THE LANGUAGE,

20   THE, COMMISSIONER MAY IMMEDIATELY SUSPEND THE MEMBER'S PLAYING

21   PRIVILEGES.  THAT'S IN VII.C.

22        THE REASON YOU GIVE THE COMMISSIONER THAT POWER, IS SO

23   THAT HE CAN PROTECT THE TOUR AND ITS MEMBERS FROM A PERSON WHO

24   HAS INDICATED A WILLINGNESS TO REPEATEDLY VIOLATE THE TOUR'S

25   RULES.

1            THIS IS A VERY DIRE SITUATION FOR THE TOUR, BECAUSE THESE

2     PLAYERS SIGNED AGREEMENTS WHICH BASICALLY PROMISED TO KEEP

3     BREAKING THE TOUR'S RULES EVERY WEEK.  AND THE COMMISSIONER,

4     UNDER HIS INTERPRETATION OF THE RULES, AND A VERY FAIR ONE,

5     PARTICULARLY WITH A DEFERENTIAL STANDARD REQUIRED TO THIS

6     COURT, THE COMMISSIONER DID WHAT HE WAS ENTITLED TO DO, HE PUT

7     THEM ON PROBATION, AND THEN HE IMMEDIATELY SUSPENDED THE

8     MEMBER'S PLAYING PRIVILEGES.

9            WHY WOULD YOU GIVE THE COMMISSIONER THE RIGHT TO

10    IMMEDIATELY SUSPEND A MEMBER'S PLAYING PRIVILEGES IF HE COULD

11    THEN WRITE AN APPEAL AN HOUR LATER AND GET A STAY?

12            THE COURT:  SO THAT IS A COMPELLING ARGUMENT, BUT I

13    HAVE TO BE SURE IT'S WRITTEN IN THESE REGULATIONS.

14            AND WHAT I'M SEEING HERE IS THAT WHEN WE'VE GOT SECTION C

15    INCORPORATING THE DEFINITION OF THE CLASSES OF PENALTIES IN D,

16    THAT'S EXPRESSLY DONE, IT ALLOWS FOR AN IMMEDIATE SUSPENSION OF

17    PLAYING PRIVILEGES.  IT SAYS NOTHING ABOUT WHETHER, UNDER THE

18    APPEAL RIGHTS, A STAY IS AVAILABLE.

19            MR. PETERS:  WELL, RESPECTFULLY, I THINK THIS

20    LANGUAGE -- IRRESPECTIVE OF WHETHER THAT VIOLATION CARRIES WITH

21    IT A PENALTY.  IRRESPECTIVE.  IT'S A CARVE OUT OF THE PENALTY.

22            THE COURT:  BUT THE PROBLEM IS THAT THE COMMISSIONER

23    SAID, YOU ARE SUSPENDED UNTIL MARCH OF 2023.  THAT'S WHAT

24    HAPPENED ON JUNE 9TH.  ON JUNE 30TH, I THINK IT WAS EXTENDED AN

25    ADDITIONAL YEAR; ISN'T THAT CORRECT?

1          MR. PETERS:  ON JUNE -- IT WAS EXTENDED, BUT ON

2    JUNE 30TH -- ON JUNE 30TH, THE PROCESS THAT INITIATES SECTION E

3    WAS INITIATED BY THE LETTER.  THAT SUSPENSION GAVE HIM THE

4    APPELLATE RIGHTS AND THE RIGHTS TO STAY THAT PART OF THE

5    PROCESS --

6          THE COURT:  HE HAD NO APPELLATE RIGHTS ON JUNE 9TH?

7          MR. PETERS:  HE DIDN'T HAVE APPELLATE RIGHTS AT THAT

8    TIME, BUT HE WAS GIVEN THE PENALTY ON JUNE 30TH, WHICH

9    TRIGGERED HIS APPELLATE RIGHTS, WHICH IS APPROPRIATE.  I MEAN,

10   THAT'S WHY I SAID THE TOUR APPLIED ITS REGULATIONS PROPERLY.

11   THEY FIRST SUSPENDED THEM --

12         THE COURT:  LET'S SAY THE JUNE 30TH PENALTY NEVER

13   CAME INTO PLAY.  HE GOT A ONE-YEAR SUSPENSION, AND YOU ARE

14   TELLING ME HE HAD NO APPELLATE RIGHTS?

15         MR. PETERS:  WELL, THAT WOULDN'T HAVE HAPPENED,

16   BECAUSE THE TOUR DID -- WOULD HAVE DONE WHAT IT DID, WHICH IS

17   SAY IN ADDITION TO THIS SUSPENSION UNDER SECTION C, WE ARE ALSO

18   SUSPENDING YOU IN A WAY WHICH GIVES YOU APPELLATE RIGHTS.

19         BUT IT DOESN'T GIVE YOU A STAY BECAUSE YOU HAVE BEEN

20   SUSPENDED UNDER C.  AND THAT'S THE POINT OF C, AND I THINK THE

21   LANGUAGE REALLY DOES MAKE IT CLEAR.  IRRESPECTIVE OF WHETHER

22   THAT VIOLATION CARRIES WITH IT A PENALTY, IS CARVING OUT THE

23   PENALTY, AND IT GIVES THE COMMISSIONER THE RIGHT TO TAKE

24   IMMEDIATE ACTION SUSPENDING THE MEMBER'S PLAYING PRIVILEGES.

25         THE COMMISSIONER NEEDS THAT ABILITY IN A VERY RARE CASE

1    WHERE THE ENTIRE STRUCTURE OF THE PGA TOUR IS THREATENED.

2         THE COURT:  SO I GUESS THIS IS WHERE I DISAGREE WITH

3    YOU, BECAUSE WHAT WE ARE FORGETTING IS SUBSECTION A, WHICH IN

4    THE NORMAL CIRCUMSTANCE, THE COMMISSIONER WOULD GIVE NOTICE OF

5    ANTICIPATED DISCIPLINARY ACTION, AND THE DISCIPLINE WOULD NOT

6    TAKE EFFECT UNTIL 14 DAYS AFTER THE NOTICE.

7         MR. PETERS:  RIGHT.

8         THE COURT:  SO THAT'S ONE.  OKAY, THAT'S FINE.

9       THEN I APPRECIATE THAT THERE CAN BE SOME CONDUCT THAT

10   REQUIRES IMMEDIATE SUSPENSION AND NOT ALLOW THE NOTICE PERIOD

11   IN ADVANCE IMPOSITION OF PENALTIES.  BUT I DON'T SEE ANYTHING

12   IN C THAT ABROGATES THE APPELLATE RIGHTS AFTER THE APPLICATION

13   OF THE PENALTY OR THE IMPOSITION OF THE PENALTY.

14        MR. PETERS:  WELL, TWO THINGS.

15      ONE IS JUST THE LOGIC THAT --

16        THE COURT:  I'M ACTUALLY JUST TRYING TO INTERPRET THE

17   PLAIN LANGUAGE OF THE REGULATION AND NOT HOW YOU WOULD LIKE IT

18   TO WORK IN THIS INSTANCE.

19        MR. PETERS:  OKAY.

20      I THINK THAT THE PLAIN LANGUAGE OF IRRESPECTIVE OF WHETHER

21   THAT VIOLATION CARRIES WITH IT A PENALTY, IS A CARVE OUT OF THE

22   PENALTY PROVISION, SO THAT THERE'S NOT A STAY.

23      AND THE PROVISION BECOMES SOMEWHAT MEANINGLESS IF THE

24   PLAYER CAN STAY IT.  I KNOW THAT -- I WANT TO ANSWER YOUR

25   COURT'S QUESTION ABOUT THE TEXT.

1           THE COURT:  WELL, WE JUST DISAGREE, AND THAT'S FINE.

2     IT'S UP TO YOU, BUT --

3           MR. PETERS:  NO, I UNDERSTAND THAT.  BUT GIVEN THE

4     NEED FOR THE COURT TO BE DEFERENTIAL TO THE COMMISSIONER'S

5     AUTHORITY TO INTERPRET THESE RULES, THE RULES SAY IT'S THE

6     COMMISSIONER'S JOB TO DO IT, AND WHERE THERE IS A RULE WHICH

7     GIVES HIM THE AUTHORITY TO IMMEDIATELY SUSPEND THE MEMBER'S

8     PLAYING PRIVILEGES.

9           THE COURT:  NO ONE IS CONTESTING THAT, YOU ARE RIGHT.

10      IT'S THE QUESTION OF ONCE HE IMMEDIATELY SUSPENDS WITHOUT

11     NOTICE, IS THERE A STAY ALLOWED?  AND THAT'S WHERE YOUR REGS

12     FALL APART.

13           MR. PETERS:  WELL, IT MAY BE THAT THE REGS AREN'T AS

14     CLEAR AS THEY SHOULD BE, BUT THEY DON'T MAKE SENSE TO BE

15     INTERPRETED THAT WAY, BECAUSE THEN THE COMMISSIONER'S ABILITY

16     TO IMMEDIATELY SUSPEND A PLAYER'S -- A MEMBER'S PLAYING

17     PRIVILEGES, BECOME PRETTY MEANINGLESS BECAUSE HE CAN

18     IMMEDIATELY JUST FILE AN APPEAL AND GET A STAY, EVEN THOUGH

19     THIS LANGUAGE CARVES OUT THE PENALTY PROVISIONS, WHICH IS WHAT

20     GIVES YOU THE RIGHT TO A STAY, IS THE PENALTY PROVISIONS.

21      AND I WOULD SUBMIT THIS IS SIMPLY A DIFFERENT MECHANISM, C

22     IS A DIFFERENT MECHANISM THAN E, THAT'S NECESSARY FOR THIS

23     PRIVATE ASSOCIATION TO FUNCTION UNDER ITS COMMISSIONER, WHERE

24     YOU HAVE PEOPLE WHO HAVE EXPRESSED A WILLINGNESS TO REPEATEDLY

25     BREAK THE RULES, EVEN WHEN YOU ARE ON PROBATION.

1          THE COURT:  YEAH.

2      I'M NOT SUGGESTING THE VIOLATION WAS MINOR, THAT'S NOT FOR

3  ME TO DECIDE.  THE FACT THAT THE COMMISSIONER FOUND THIS TO BE

4  A SUBSTANTIAL OR MAJOR VIOLATION, IS PERFECTLY REASONABLE UNDER

5  THESE CIRCUMSTANCES.

6          MR. PETERS:  UH-HUH.

7      I'M JUST GOING TO, BEFORE I SIT DOWN, YOUR HONOR, UNLESS

8  YOU HAVE OTHER QUESTIONS, I WANT TO CIRCLE BACK TO THE ISSUE OF

9  IRREPARABLE HARM.

10     THERE SIMPLY IS NO IRREPARABLE HARM IN THIS CASE.

11 MR. LEITZINGER'S DECLARATION MAKES IT CLEAR THAT THESE PLAYERS

12 CAN CALCULATE THE MONETARY HARM, THE MONETARY PRICE OF THEIR

13 BUSINESS DECISION.  THEY DID SO, AND THEY HAVE RECEIVED THAT

14 MONEY ALREADY.  MONETARY DAMAGES, IF ANY, ARE SATISFACTORY,

15 THERE IS NO IRREPARABLE HARM IN THIS CASE.

16     AND ON THAT BASIS, EVEN IF YOU DISAGREE WITH OUR

17 INTERPRETATION OF THE CONTRACT, THERE WOULD BE NO BASIS TO

18 GRANT A TRO.  ALL THAT THE PLAYERS ARE COMPLAINING ABOUT IS THE

19 INABILITY TO ENJOY THE ECONOMIC BENEFITS OF PLAYING IN THE

20 FEDEX CUP, HAVING ALREADY CALCULATED THOSE AND BEEN PAID FOR

21 DOING SO BY LIV GOLF.  AND THEY'RE NOT ENTITLED TO THIS RELIEF.

22 THEY HAVE KNOWN THEY WERE SUSPENDED SINCE JUNE 9TH.  THEY

23 WAITED TO COME INTO COURT, AND THEY HAVE NO BASIS FOR A TRO.

24          THE COURT:  AND SO MR. PETERS, WOULD IT BE YOUR

25  POSITION THAT EVEN IF I DISAGREE WITH YOU ON THE INTERPRETATION

1    OF ARTICLE VII, IF I FIND AN ABSENCE OF IRREPARABLE HARM, THAT

2    THE TRO CAN'T ISSUE?

3              MR. PETERS:  YES.

4              THE COURT:  I THINK THAT'S THE RULE TOO, BUT ALL

5    RIGHT.

6              MR. PETERS:  I THINK THAT'S RIGHT.  THAT'S WHY WE

7    STARTED WITH IRREPARABLE HARM AND WE GOT TO OUR DISCUSSION OF

8    SECTION 7.

9         BUT I ALSO THINK THAT THE COMMISSIONER'S DISCRETION IS

10   IMPORTANT, AND UNLESS HE'S DOING IT IN SOME ARBITRARY OR

11   CAPRICIOUS, UNFAIR WAY, HE'S APPLYING THE RULES IN A CONSISTENT

12   WAY TO DEAL WITH A VERY UNUSUAL SITUATION.  BUT A TRO CAN'T

13   ISSUE IN THIS CASE WITHOUT IRREPARABLE HARM, PARTICULARLY WHERE

14   THE EQUITIES TIP IN FAVOR OF THE PGA TOUR, AND THE ISSUANCE OF

15   A TRO CASE WOULD BE DEVASTATING TO THE PGA TOUR.

16             THE COURT:  WELL, IF THERE'S NO IRREPARABLE HARM, I

17   DON'T EVEN HAVE TO BALANCE THE EQUITIES.

18             MR. WALTERS:  EXACTLY.  THANK YOU, YOUR HONOR.

19        UNLESS YOU HAVE ANY OTHER QUESTIONS.  AND TRULY, THANK THE

20   COURT, AND I'M SURE BOTH SIDES FEEL THIS WAY, FOR THE AMOUNT OF

21   TIME AND WORK YOU SPENT IN A VERY SHORT AMOUNT OF TIME.

22             THE COURT:  I EXACTED MY POUND OF FLESH, I WILL HAVE

23   YOUR PAPERS DUE AT 8AM ON MONDAY.

24             MR. PETERS:  A LOT OF THE MEMBERS OF OUR TEAM DIDN'T

25   GET MUCH SLEEP ON SUNDAY NIGHT.

```
1              THE COURT:  I KNOW.

2              MR. PETERS:  THANK YOU, YOUR HONOR.

3              THE COURT:  THANK YOU.

4        MR. WALTERS, IT'S YOUR MOTION, I'M GOING TO GIVE YOU THE

5   LAST WORD.

6              MR. WALTERS:  THANK YOU, YOUR HONOR.  I WILL BE

7    BRIEF.

8        OF COURSE THE COMMISSIONER HAS DISCRETION UNDER SOME

9   PROVISIONS RULES, BUT HE DOESN'T HAVE DISCRETION TO CHANGE THE

10  RULES, AND THE RULES SAY YOU ARE ENTITLED TO A STAY BASED ON A

11  PENALTY.

12       THERE IS NOTHING IN SECTION C, THERE'S NOTHING IN THIS

13  THICK HANDBOOK, YOU COULD SQUEEZE A LEMON ON THIS LANGUAGE AND

14  NO NEW WORDS COME UP.  IT IS, YOU ARE ENTITLED TO A STAY FOR

15  ANY PENALTY, AND THE PENALTY IS A SUSPENSION.

16       AND THE LANGUAGE THAT MR. PETERS CITES TO ABOUT

17  INTERMEDIATE, AND LESSER, AND MORE, ARE JUST DIFFERENT KINDS OF

18  PENALTIES, IT'S NOT ACCEPTING IT OUT IN SOME FASHION UNDER

19  SECTION C.

20       AND FRANKLY, WE ARE VERY HAPPY TO PUT THOSE PREVIOUS

21  LETTERS IN FRONT OF YOU.  THE WHOLE POINT IS THEY SENT A COUPLE

22  LETTERS, WE DIDN'T ACTUALLY HAVE THE SPECIFICS OF THE

23  SUSPENSION UNTIL JUNE 30TH, BECAUSE BEFORE THAT, THEY JUST SAID

24  WE SUSPENDED YOU.  SO IT WAS JUNE 30TH WHEN THEY SAID, NOW YOU

25  ARE SUSPENDED TO MARCH 31ST OF THE NEXT YEAR, AND THAT
```

1     TRIGGERED THE OPPORTUNITY TO APPEAL THAT BECAUSE IT JUST REALLY

2     WASN'T RIPE YET.  SO YES, IT IS TRUE THAT THEY SENT SOME

3     PREDECESSOR LETTERS ON IT, BUT IT WAS ALL STILL UNDER THE SAME

4     MECHANISMS.

5          NOW, MR. PETERS IS RIGHT, THEY DO HAVE THEIR RIGHT TO

6     IMMEDIATELY SUSPEND, OKAY, WE ARE NOT TAKING ISSUE WITH THAT.

7     BUT THAT DOESN'T HAVE ANYTHING TO DO WITH ALSO THE RIGHT TO

8     APPEAL THAT SUSPENSION.

9          AND BY THE WAY, JUST AS A SIDE, THAT PROVISION IS FOR USE

10    FOR CONDUCT UNBECOMING A GOLFER, OKAY.  PLAYING GOLF IS HARDLY

11    CONDUCT UNBECOMING A GOLFER.  SO IT WAS AN EXTREME EXERCISE OF

12    DISCRETION TO EMPLOY THAT PROVISION.  BUT WHETHER IT WAS OR

13    WASN'T, IT IS STILL SUBJECT TO AN APPEAL.

14         AND IT IS JUST -- I DON'T KNOW, I MEAN, IT WOULD BE A --

15    IT WOULD LITERALLY KIND OF -- IT GETS ME BACK TO -- AND I DON'T

16    MEAN TO REPEAT THIS, BUT IF THEY WERE RIGHT ABOUT THIS, THEY

17    COULD JUST CALL IT SECTION C ANY TIME THEY WANTED, AND NEVER

18    HAVE AN APPEAL, JUST COMPLETELY GUT THE APPEAL RIGHTS.  YOU

19    MIGHT AS WELL READ SECTION VII.E.2 RIGHT OUT OF THIS HANDBOOK.

20         LET ME SPEAK TO THE ISSUE OF IRREPARABLE HARM.  AND WE PUT

21    UP A SLIDE ABOUT ALL OF THE THINGS THAT THE PGA, ITSELF, HAS

22    SAID ABOUT THIS VERY SPECIAL TOURNAMENT, OKAY.  AND AGAIN, WE

23    WOULDN'T BE HERE FOR ANY TOURNAMENT.  THIS HAS NOTHING REALLY

24    TO DO WITH THE ECONOMICS, IT HAS EVERYTHING TO DO WITH THE SAME

25    KINDS OF ACCESS THAT THE NINTH CIRCUIT SPEAKS TO IN GILDER.

1          AND AGAIN, THE BILLIE JEAN KING DECISION WAS JUST A

2     QUESTION OF HOW MUCH TIME, BUT I REALLY WANT TO SPEAK TO THE

3     ELITE RODEO DECISIONS AND THEN THE OTHER DECISIONS THAT WE

4     CITED THERE, BECAUSE IF YOU LOOK AT, LIKE THE DENVER ROCKETS

5     CASE OR THE WORLD HOCKEY ASSOCIATION CASE, THE LINSEMAN CASE,

6     THE OTHER PROFESSIONAL RODEO COWBOYS AND BEDLAM CASE, OR EVEN

7     THE YOUNG SOCCER PLAYERS CASE, IN EACH OF THOSE CASES, THEY HAD

8     SOMEWHERE ELSE TO PLAY, SO IT WASN'T A DICHOTOMY THAT THEY

9     DIDN'T HAVE ANYWHERE ELSE TO PLAY.

10          THE COURT:  THEY HAD SOMEWHERE ELSE TO PLAY ON THE

11     CIA TEAM?

12          MR. WALTERS:  OH, THE DENVER ROCKETS, YOU COULD PLAY

13     IN EUROPE, RIGHT.  THERE ARE A LOT OF PROFESSIONAL LEAGUES

14     AROUND THE WORLD.  IT WOULD BE LIKE YOU COULD GO PLAY IN EUROPE

15     IN GOLF.  SO THERE ARE PLACES TO PLAY, THAT WOULD BE THE CASE.

16          IN THE WORLD HOCKEY ASSOCIATION, YOU COULD PLAY IN EUROPE,

17     YOU COULD PLAY IN CANADA, THERE ARE OTHER PROFESSIONAL LEAGUES

18     THAT YOU COULD GO PLAY.  THEY DIDN'T GIVE YOU THE ACCESS TO BE,

19     JOIN THE ELITE, AND THAT WAS THE DIFFERENTIATOR THERE.

20          AND EVEN IN THE PROFESSIONAL RODEO COWBOYS DECISION, THERE

21     WERE STILL OTHER RODEOS WHERE YOU COULD GO PARTICIPATE.  SO IT

22     WASN'T AN ALL OR NOTHING PROPOSITION, SO THAT WOULD BE AN

23     UNFAIR WAY TO CHARACTERIZE THE DECISION.

24          IN FACT, EVEN IN THE YOUNG SOCCER PLAYER, THE O.M.

25     DECISION, SHE COULD HAVE PLAYED IN COLLEGE.  NOW THAT'S NOT A

1    PROFESSIONAL, ADMITTEDLY, YOU COULD PLAY IN COLLEGE.

2              THE COURT:  SO HOW MUCH DO YOU EARN IN COLLEGE?  LET

3    ME THINK, ZERO.

4              MR. WALTERS:  WELL, NOT THEN.

5              THE COURT:  WELL, THEY WERE SUING THEN.  IT WAS ZERO.

6              MR. WALTERS:  AND I DON'T MEAN TO OVERSTATE THAT,

7    THAT WAS NOT THE KIND OF ALTERNATIVE THAT EXISTED IN THESE

8    OTHERS, BUT IN THE OTHERS, YOU COULD GO AND PLAY PROFESSIONALLY

9    AND EARN A LIVING.  ALL THOSE DECISIONS WENT OFF ON, BUT THAT

10   DOESN'T GIVE YOU THE ABILITY TO DO THE ELITE STATUS AND JOIN

11   RARE TOP TIER.

12             THE COURT:  I THINK THE COURTS HAVE ALSO SAID THAT

13   THE OPPORTUNITY TO GO TO MOVE TO EUROPE IS NOT A REALISTIC

14   OPPORTUNITY, AND SO IT IS A BAR FROM THE ENTIRE SPORT WHEN YOU

15   CAN'T PLAY IN THE ELITE, YOU CAN'T PLAY IN THE NBA.  IT'S NOT

16   AN OPTION TO SAY, WELL, WHY DON'T YOU GO PLAY IN ITALY.

17             MR. WALTERS:  WELL, I DON'T THINK THEY GO THAT FAR.

18   I THINK THE FOCUS OF THOSE DECISIONS IS -- IN FACT, IF YOU LOOK

19   AT, IN THE DENVER ROCKETS CASE, THE COURT RECOGNIZED THAT

20   "PARTICIPATING IN PROFESSIONAL BASKETBALL AS A PLAYER AGAINST

21   THE BEST COMPETITION THIS SPORT HAS TO OFFER IS AS NECESSARY

22   FOR THE MENTAL AND PHYSICAL WELL BEING TO PLAINTIFF AS IS

23   BREATHING, EATING AND SLEEPING."  AND "HIS PUBLIC ACCEPTANCE AS

24   A SUPERSTAR WILL DIMINISH TO THE DETRIMENT OF HIS CAREER,

25   SELF-ESTEEM, AND HIS PRIDE WILL BE INJURED."

1      SO IT WAS THAT SUPERSTAR STATUS THAT WAS THE FOCUS OF THE

2      COURT.  AND THAT'S EXACTLY WHAT'S GOING ON IN THE -- WITH THE

3      FEDEX CUP.  IT IS THE SUPERSTAR STATUS.  IT IS NOTHING SHORT OF

4      THAT.  AND YOU DON'T HAVE TO BELIEVE ME AND TAKE MY OPINION FOR

5      IT, THAT'S WHAT THE PGA, THAT'S WHAT THEY TOUT, TIME AND TIME

6      AGAIN.  COMMISSIONER MONAHAN, "THIS IS YOUR CHANCE TO JOIN THE

7      PANTHEON OF GOLF'S GREATS."

8      AND THAT'S WHY THIS IS SO IMPORTANT AND THAT'S WHERE THE

9      IRREPARABLE HARM IS GROUNDED.

10     LET ME JUST MAKE A COUPLE OF OTHER COMMENTS, I JUST FEEL

11     COMPELLED.  BY THE WAY, AND I DON'T MEAN TO BELABOR THIS, THAT

12     MAC O'GRADY DECISION, THAT WAS ALSO A SUSPENSION FOR SAYING ALL

13     THESE HORRIFIC THINGS AGAINST THE COMMISSIONER, AND THEY STILL

14     GOT APPEAL, RIGHT.  SO THAT WAS ONE OF THOSE IMMEDIATE

15     SUSPENSIONS, AND THEY DIDN'T TAKE ISSUE WITH IT THERE.  THIS

16     ARGUMENT NEVER MADE ITS WAY INTO PLAY IN THAT DECISION.

17     JUST A COUPLE OTHER QUICK THINGS.  I JUST HAVE TO

18     DISABUSE.  MR. PETERS SAYS, WELL, THESE RULES ARE INDISPENSABLE

19     TO MEDIA RIGHTS, RIGHT, THE AGGREGATION.  AND IT'S NOT, IT'S

20     NOT, IT'S ABSOLUTELY NOT.  THEY HAVE THE ABILITY, OKAY, WE

21     DON'T HAVE THIS RULE, THE PLAYERS WHO PLAY WITH LIV GOLF, THE

22     LIV GOLF PLAYERS.

23          THE COURT:  THIS IS A SPIGOT THAT PUTS OUT MONEY, SO

24     IT'S A LITTLE BIT DIFFERENT MODEL, ISN'T IT?

25          MR. WALTERS:  IT IS A DIFFERENT MODEL, BUT THESE

1    PEOPLE AFFILIATED WITH LIV GOLF, THEY ARE INDEPENDENT

2    CONTRACTORS, WHICH IS, BY THE WAY, WHY THAT NOTION OF TRINKO IS

3    ALL WRONG, RIGHT.  THESE AREN'T THE INTELLECTUAL PROPERTY, THE

4    ASSETS OF LIV GOLF, THESE ARE MERELY INDEPENDENT CONTRACTORS,

5    AS THOSE CONTRACTS REFLECT.

6         AND SO THOSE GOLFERS, THEY ARE FREE TO DO WHATEVER THEY

7    WANT WHEN THEY ARE NOT CONTRACTED TO PLAY WITH LIV GOLF.  THEY

8    CAN DO -- THEY CAN PLAY IN ANY OTHER TOURNAMENT, THEY CAN DO

9    WHATEVER THEY WANT.  AND SO THIS IS BY NO MEANS SYMMETRICAL,

10   AND YET, LIV GOLF HAS THE ABILITY TO AGGREGATE THE MEDIA RIGHTS

11   AND SELL THEM TO A BROADCASTER.  THEY HAVEN'T HAD ANY LUCK, BUT

12   THEY COULD, POTENTIALLY.

13        THE PGA DOESN'T HAVE TO HAVE THIS RESTRICTION TO AGGREGATE

14   THEIR MEDIA RIGHTS.  IN FACT, THEY ACTUALLY HAVE A MINIMUM

15   EVENTS REQUIREMENT.  AND SO THAT'S WHERE THEY GET THEIR

16   STRENGTH OF FIELD, THEY SAY YOU GUYS HAVE TO PLAY 15 EVENTS.

17   THAT GIVES THEM A CRITICAL MASS THAT THEY CAN THEN GO MARKET

18   TO -- UNDER THEIR MEDIA RIGHTS.

19        THIS MEDIA RIGHTS RESTRICTION, LIKE THE CONFLICTING

20   EVENTS, DOES NOTHING TO GET THEM TO MARKET THEIR MEDIA RIGHTS,

21   OR CREATE A STRENGTH OF FIELD, ALL IT DOES IS REQUIRE THAT

22   THESE PLAYERS SIT AT HOME.  IT DOES NOTHING TO ADVANCE THEIR

23   PRODUCT, IT HAS EVERYTHING TO DO WITH THE PRECLUSION OF

24   COMPETITION.

25        AND I SHOULD REMIND YOUR HONOR, THE KEY MEMORANDUM,

```
1     JAY MONAHAN, THE SECRET INTERNAL MEMORANDUM, THE MONAHAN
2     MONOPOLY MANIFESTO.
3               THE COURT:  YOU KNOW, I DIDN'T BRING THAT UP BEFORE.
4               MR. WALTERS:  DID YOU LIKE THE ITERATION, OR NO?
5               THE WITNESS:  I LOVED IT WHEN I READ THE COMPLAINT
6     THEN I WENT AND READ THE EXHIBIT, AND IT JUST DIDN'T DELIVER ON
7     IT.
8          THIS LOOKS LIKE A PRETTY NORMAL MEMO THAT A CHIEF OPERATOR
9     OR CEO WOULD WRITE TO SAY, WE NEED TO PROTECT OUR BRAND.  IT'S
10    JUST NOT AS GOOD AS --
11              MR. WALTERS:  WELL, IT SAYS WE NEED TO PROTECT
12    OURSELVES FROM COMPETITION.  IT SAYS --
13              THE COURT:  WELL, EVERYONE DOES.
14              MR. WALTERS:  WAIT, WAIT.  OKAY.  BUT NOT BY LOCKING
15    UP THE KEY SOURCE OF SUPPLY.  THE KEY SOURCE OF SUPPLY, THE KEY
16    INGREDIENT, AND HE SAYS SO.
17              THE COURT:  THEY DON'T LOCK THEM UP, THEY ARE WELCOME
18    TO WALK OUT THE DOOR.
19              MR. WALTERS:  BUT HE'S SAYING THESE RULES ARE OUR
20    BEST SHOT AT LOCKING UP THE SOURCE OF SUPPLY.  HE DOESN'T SAY
21    THESE ARE NECESSARY TO DO OUR MEDIA RIGHTS OR WHATEVER, HE
22    LITERALLY SAYS, IF YOU LOOK AT WHAT HE SAYS, OKAY, "OUR
23    TOURNAMENT REGULATIONS PROVIDE A SIGNIFICANT HURDLE FOR THE PGA
24    MEMBERS WITH RESPECT TO CONTRACTING, AND THEY ARE THE
25    CONFLICTING EVENTS AND MEDIA RIGHTS RELEASES."  THAT'S WHAT
```

1    THEY DO.  THEY ARE SIGNIFICANT HURDLE TO A COMPETITOR EMERGING,

2    OKAY.  AND IN FACT, WE EVEN CHANGED IT IN NOVEMBER '19 IN ORDER

3    TO MOVE THOSE UP TO A GLOBAL BASIS TO KEEP A COMPETITOR OUT.

4         NOW LET'S GO TO THE NEXT ONE, OKAY.  "WE LEARNED THAT

5    THEIR IMMEDIATE GOAL IS TO OBTAIN COMMITMENTS FROM HIGH PROFILE

6    GOLFERS."  THE IMPACT THEY COULD HAVE IS DEPENDENT ON THE LEVEL

7    OF SUPPORT IT MAY RECEIVE FROM THE PLAYERS.  THAT'S THE AIR

8    SUPPLY, IT'S ALL ABOUT THE TALENT, OKAY.

9         "WITHOUT THIS SUPPORT, THEIR ABILITY TO TRACK MEDIA AND

10   CORPORATE PARTNERS WOULD BE SIGNIFICANTLY MARGINALIZED."

11        SO WHAT THEY ARE SAYING IS THESE RULES ARE INTENDED TO

12   PRECLUDE COMPETITION.  THESE RULES ARE NOT INTENDED TO GIVE US

13   A PRODUCT TO MARKET.

14            THE COURT:  YOU KNOW, I MEAN, CERTAINLY LIV DOES NOT

15   HAVE MONOPOLY POWER AS WE SIT HERE TODAY.

16            MR. WALTERS:  RIGHT.

17            THE COURT:  THEY ARE A STARTUP FLEDGLING

18   ORGANIZATION.  BUT FROM WHAT I UNDERSTAND OF THESE CONTRACTS,

19   THESE ARE -- THESE CONTRACTS LOCKUP THESE PLAYERS IN WAYS THAT

20   THE PGA TOUR NEVER IMAGINED.  THEY ARE SO RESTRICTIVE.

21            MR. WALTERS:  I THINK THAT'S UNFAIR, YOUR HONOR.

22        ALL THEY SAY IS COMMIT TO US FOR FOUR YEARS OR TWO YEARS,

23   OR WHATEVER IT MIGHT BE, OKAY, IN EXCHANGE FOR COMPENSATION.

24   BUT YOU GUYS CAN DO ANYTHING -- YOU ARE AN INDEPENDENT

25   CONTRACTOR, KNOCK YOURSELVES OUT, DO ANYTHING YOU WANT IN YOUR

1      FREE TIME.  AND THAT'S ALL WE WOULD EXPECT OF THE PGA.

2              THE COURT:  BUT THE FREE TIME IS NOT JUST WHAT THEY

3      CHOOSE TO BE FREE TIME, THEY HAVE OBLIGATIONS.

4              MR. WALTERS:  OH, THEIR OBLIGATIONS ARE VERY DISCREET

5      AND AROUND SPECIFIC TOURNAMENTS.

6          AND BY THE WAY, ON THAT UNIFORM ISSUE, THAT'S JUST ALL

7      WRONG, OKAY, THEY DON'T SHOW UP IN THEIR LIV GEAR.  WHAT THAT'S

8      TALKING ABOUT IS -- AND IN FACT THE WHOLE BUSINESS MODEL IS

9      DIFFERENT.  AND IT'S WORTH UNDERSTANDING --

10             THE COURT:  ARE YOU TELLING ME THAT THESE THREE

11     PLAYERS, IF I GRANT THIS INJUNCTION, WILL NOT TURN UP IN ANY

12     LIV GEAR?

13             MR. WALTERS:  ABSOLUTELY NOT.  THEY WILL WEAR THEIR

14     MASTERCARD OR WHATEVER THEY HAVE ALWAYS WORN, AND THEY

15     ABSOLUTELY WILL NOT.

16         WHAT THEY ARE TALKING ABOUT THERE IS THIS WHOLE BUSINESS

17     MODEL, IT TURNS ON THE CREATION OF TEAMS, AND THIS IS

18     INTERESTING -- THIS IS INTERESTING.

19         SO THE IDEA IS LIV GOLF WILL COME UP WITH A DOZEN TEAMS.

20     EACH TEAM WILL THEN HAVE TEAM STUFF ON.  THAT'S WAY INTO THE

21     FUTURE.  THAT'S WHAT THAT'S TALKING ABOUT.  AND THE WHOLE

22     BUSINESS MODEL IS, IT'S HARD TO MAKE MONEY ON JUST A CASH FLOW

23     BASIS IN THE SPORTS BUSINESS.  WHERE YOU MAKE MONEY IS THE

24     APPRECIATION IN FRANCHISE VALUE, OKAY.  AND SO THEY ARE

25     CREATING THESE TEAMS IN ORDER TO HAVE A FIGHTING CHANCE,

1       NOTWITHSTANDING THIS MASSIVE INVESTMENT.

2               THE COURT:  OKAY.  THEIR BUSINESS MODEL IS FINE, IT

3       DOESN'T MATTER TO ME, THEY ARE NOT A PARTY EITHER.

4               MR. WALTERS:  I WAS TRYING TO UNDERSTAND --

5               THE COURT:  I THINK WE GOT A LITTLE FAR AFIELD.

6       LET'S TRY TO WRAP THIS UP.

7           I DO THINK IRREPARABLE HARM IS A BIG PROBLEM FOR YOU.  I

8       DO THINK DR. LEITZINGER DOES MAKE -- GIVE SOME OPINIONS THAT

9       WOULD SAY THE PLAYERS HAVE, IN ADVANCE OF SIGNING THE LIV

10      CONTRACT, HAVE MONETIZED THE COST OF LEAVING THE PGA TOUR AND

11      THEY HAVE ALREADY -- AND SO THEY HAVE HAD THAT NEGOTIATING

12      POWER.

13          I ALSO STILL DON'T UNDERSTAND WITH CONTRACTS ENDING, IF

14      THEY HAD SO MUCH AT STAKE, IF YOUR CLIENTS HAD SO MUCH AT

15      STAKE, YOU HAVE GIVEN ME NO EVIDENCE THAT THE MONEY ON THE

16      TABLE FROM LIV GOLF WAS NOW OR NEVER.  I HAVE NO EVIDENCE OF

17      THAT.

18              MR. WALTERS:  THE EVIDENCE IS THERE ARE 48 SPOTS,

19      OKAY.  THAT'S IT.  AND ALL 48 SPOTS HAVE BEEN SIGNED.  AND HAD

20      THEY NOT BEEN ONE OF THEM, THEY VERY WELL MIGHT NOT HAVE BEEN

21      ONE OF THEM.

22              THE COURT:  BUT I DON'T HAVE THAT EVIDENCE.

23              MR. WALTERS:  WELL, NO, I THINK YOU DO, THAT THERE

24      ARE 48 SPOTS.  AND IN FACT, THEY CITED THEMSELVES, MR. NORMAN'S

25      STATEMENT THAT WE ARE FULL AND THAT WE CAN'T SAY YES.  THEY, IN

1          THEIR OWN SUBMISSION, CITED THAT STATEMENT THAT WE ARE FULL.

2          AND THAT'S THE EVIDENCE OF IT.

3                AND SO YES, IT WAS VERY MUCH A RISK THAT EITHER YOU DO IT

4          NOW OR YOU COULD VERY LIKELY FOREGO YOUR OPPORTUNITY.  AND WE

5          ARE ONLY SITTING HERE IN THE MIDDLE OF AUGUST.  AND SO IF THEY

6          HADN'T DONE IT AND THEY PLAYED THE FEDEX AND WAITED, THEY WOULD

7          JUST BE OUT OF LUCK.  SO THE EVIDENCE IS RIGHT THERE IN THIS

8          RECORD, YOUR HONOR, ON THAT VERY ISSUE.

9                THE COURT:  THANK YOU.

10                MR. WALTERS:  UNLESS YOUR HONOR HAS ANY FURTHER

11          QUESTIONS.  THANK YOU AGAIN FOR YOUR TIME.

12                THE COURT:  ALL RIGHT.

13          ALL RIGHT.  WE HAVE BEEN GOING FOR A WHILE.  I DON'T HAVE

14          THE LUXURY OF TIME HERE, SO WHAT I'M GOING TO DO IS LET'S TAKE

15          A 15-MINUTE BREAK, AND I WILL GATHER MY THOUGHTS AND MY NOTES

16          AND MAKE A HIGH LEVEL RULING SO THAT THESE THREE PLAYERS KNOW

17          WHERE THEY NEED TO REPORT ON TOMORROW MORNING.

18          ALL RIGHT.  WE WILL COME BACK IN 15 MINUTES.

19          (RECESS FROM 3:05 P.M. UNTIL 3:20 P.M.)

20                THE COURT:  PLEASE BE SEATED.  WE ARE BACK ON THE

21          RECORD.  THANK YOU ALL, I'M SURE EVERYONE COULD USE THAT SHORT

22          BREAK.

23          IT IS IMPORTANT THAT THE PLAYERS KNOW WHAT THEIR JOB IS

24          GOING TO BE TOMORROW.  AND SO AS I SAID TO YOU WHEN WE BEGAN, I

25          INTENDED TO RULE AND I WILL.

1          I WANT TO THANK BOTH OF YOU FOR REALLY DEVELOPING POWERFUL

2     ARGUMENTS AND COMPELLING ARGUMENTS FOR ME TO CONSIDER.  THERE'S

3     NO QUESTION THAT THERE'S A LOT AT STAKE HERE ON BOTH SIDES.

4     AND THIS LITIGATION WILL CONTINUE AND I WILL SEE YOU OFTEN, I

5     IMAGINE.

6          IN TERMS OF THE TEMPORARY RESTRAINING ORDER, AND LOOKING

7     AT THE REVISED PROPOSED ORDER REQUESTING THAT THE PLAYERS BE

8     GIVEN THE COURT'S APPROVAL TO PLAY IN THE FEDEX TOURNAMENT THIS

9     WEEK, THIS IS MY RULING ON THE TEMPORARY RESTRAINING ORDER.

10         I DO FIND THAT THE FILING OF THE TEMPORARY RESTRAINING

11    ORDER MOTION WAS TIMELY, UNDER THE TIMELINE THAT MR. WALTERS

12    HAS PROVIDED TO ME.  THERE MIGHT HAVE BEEN AN EARLIER

13    OPPORTUNITY TO FILE THIS REQUEST, BUT IT BECAME CRYSTALLIZED

14    WITH THE AUGUST 2ND DENIAL OF THE STAY, THAT IT ABSOLUTELY

15    WOULD PRECLUDE THE PLAYING IN THE TOURNAMENT.

16         I NEXT TURN TO THE ISSUE OF IRREPARABLE HARM, AND THIS IS

17    WHERE WE STARTED.  I THINK THIS IS ALSO WHERE WE ENDED IN OUR

18    DISCUSSION.  THE COURT DOES ACCEPT THAT THE FEDERAL EXPRESS

19    TOURNAMENT IS A MAJOR TOURNAMENT OF THE YEAR.  IT IS THE

20    GATEWAY TO THE MAJORS, IT PROVIDES SPONSORSHIPS AND CAREER

21    STATUS.  I'M ALSO SATISFIED THAT THE PLAINTIFF'S EVIDENCE

22    REGARDING EACH OF THESE TRO PLAINTIFFS' STANDING GOING INTO THE

23    FEDERAL EXPRESS TOURNAMENT, WOULD GIVE EACH OF THEM A

24    REASONABLE OPPORTUNITY TO REACH THE THRESHOLDS OF THE TOP 30 OR

25    THE TOP 70 TO QUALIFY FOR MAJORS OR THE MARQUIS INVITATIONAL

1    EVENTS.

2         THAT SAID, I TURN TO DR. LEITZINGER'S OPINIONS.  AND IN

3    READING WHAT HE SAYS, IT APPEARS TO THE COURT THAT THE LIV

4    CONTRACTS NEGOTIATED BY THE PLAYERS AND CONSUMMATED BETWEEN THE

5    PARTIES, WERE BASED UPON THE PLAYERS' CALCULATION OF WHAT THEY

6    WOULD BE LEAVING BEHIND AND THE AMOUNT THE PLAYERS WOULD NEED

7    TO MONETIZE TO COMPENSATE FOR THOSE LOSSES.

8         I DO AGREE WITH THE DEFENDANTS THAT THOSE LOSSES WERE WELL

9    KNOWN TO THE PLAYERS AT THE TIME AND CLEARLY MONETIZED.

10        IN ADDITION TO THAT, IN OUR DISCUSSION REGARDING WHETHER

11   THE PLAYERS COULD MERELY HAVE WAITED UNTIL THEIR PGA

12   TOURNAMENT -- THE FEDEX TOURNAMENT HAD COMPLETED, IT DOES

13   APPEAR THAT THE PLAYERS WOULD REASONABLY HAVE ESTIMATED THAT

14   THE WINDOW OF OPPORTUNITY WOULD HAVE CLOSED, HAD THEY WAITED.

15   BUT BASED ON DR. LEITZINGER'S OPINION, THEY CALCULATED THAT IN

16   THE MONETIZATION OF THE LIV CONTRACT.

17        I ALSO FIND THAT THE LIV CONTRACT PROVIDES AN OPPORTUNITY

18   FOR EACH OF THESE PLAINTIFFS TO PLAY ELITE GOLF IN THE

19   UNITED STATES WITH GUARANTEED PAY; AND IN FACT, THE EVIDENCE

20   SHOWS THAT, IT SEEMS ALMOST WITHOUT A DOUBT THAT THEY WILL BE

21   EARNING MORE THAN THEY HAVE MADE, AND COULD REASONABLY HAVE

22   EXPECTED TO MAKE, IN A REASONABLE PERIOD OF TIME UNDER THE PGA

23   TOURNAMENT.  THEREFORE, I FIND THAT THE PLAINTIFFS HAVE NOT

24   ESTABLISHED IRREPARABLE HARM.

25        I ALSO WANT TO MAKE COMMENTS ON THE REGULATION.  I KNOW I

1    DON'T NEED TO AND I FIND NO IRREPARABLE HARM, I THINK IT IS --

2    I AGREE WITH THE DEFENDANTS THAT THE COURT MUST GIVE PROPER

3    DEFERENCE TO A PRIVATE ORGANIZATION'S INTERPRETATION AND

4    APPLICATION OF ITS DISCIPLINARY RULES.  THAT'S NOT TO ALLOW

5    ARBITRARY AND CAPRICIOUS APPLICATION, AND I PRESSED MR. PETERS

6    PRETTY HARD ON THE SECTION VII.C AND SECTION VII.E.

7        I DO FIND THAT AT THIS STAGE, AND ONLY IN CONSIDERATION OF

8    A TEMPORARY RESTRAINING ORDER, THE DEFENDANT'S INTERPRETATION

9    OF THE COMMISSIONER'S AUTHORITY UNDER SECTION VII.C IS NOT

10   UNREASONABLE, AND I THEREFORE FIND THAT THE PLAINTIFF HAS NOT,

11   AT THIS STAGE, ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE

12   MERITS UNDER THE APPLICATION OF THE REGULATIONS AND THE RIGHT

13   TO A STAY UNDER THESE CIRCUMSTANCES.

14       OF COURSE WITH A MORE DEVELOPED RECORD, ALL OF THAT IS

15   SUBJECT TO CHANGE.  AND BASED UPON THESE FINDINGS, THE COURT

16   WILL DENY THE TEMPORARY RESTRAINING ORDER.

17       I WANT TO TALK TO YOU ABOUT OUR NEXT STEPS.  AND

18   MR. WALTERS, IT'S NOT CLEAR TO ME WHETHER YOU WANT TO MOVE

19   QUICKLY THROUGH THIS LITIGATION.  I ACTUALLY WORKED OUT A

20   SCHEDULE THAT WOULD BRING YOU BACK TO MY COURTROOM IN A YEAR

21   FOR TRIAL, BUT YOU WOULD BE FILING -- THIS IS THE SCHEDULE YOU

22   WOULD LIVE WITH.

23       AND LET ME TELL YOU THAT IF IT'S NOT THIS SCHEDULE, WHICH

24   I HAVE FOUND OPENINGS FOR, I'M SETTING TRIALS IN 2025 NOW.

25   IT'S NOT LIKE YOU CAN JUST GET SIX MONTHS MORE.  PARTIES SETTLE

1    CASES CLOSE TO TRIAL AND NOT YEARS IN ADVANCE, YOU BOTH DO THAT

2    AS WELL.

3         LET ME TELL YOU THIS SCHEDULE, AND I WANT YOU TO GET BACK

4    TO ME AFTER YOU THINK ABOUT IT.  I THINK THAT THERE SHOULD BE

5    AN EVIDENTIARY HEARING ON A PRELIMINARY INJUNCTION IF THE

6    PLAINTIFFS CHOOSE TO BRING THE PRELIMINARY INJUNCTION.  I WOULD

7    BE ABLE TO SET ASIDE AS MUCH AS THREE DAYS, AT THE VERY END OF

8    SEPTEMBER OR BEGINNING OF OCTOBER.  WE CAN WORK OUT THE

9    SPECIFIC DATES.

10        I WOULD BE AVAILABLE TO HEAR A SUMMARY JUDGEMENT MOTION ON

11   MARCH 9TH OF 2023.  YOU WOULD BE FILING THAT IN JANUARY.  I

12   WOULD SET YOUR FINAL PRETRIAL CONFERENCE ON JUNE 22ND OF 2023,

13   AND TRIAL ON AUGUST 7TH OF 2023.

14        IF THOSE DATES DON'T WORK, AND BELIEVE ME, I HAVE A LOT OF

15   OTHER WORK TO DO, I'M NOT ASKING FOR IT, I'M TRYING TO MAKE THE

16   COURT AVAILABLE IN WHAT I CONSIDER TO BE AN IMPORTANT CASE, IF

17   NOT, THEN WE HAVE LOTS OF TIME TO FIND DATES IN 2025 THAT WORK

18   OUT.

19        SO I WANTED TO GIVE YOU THOSE DATES WHILE YOU WERE HERE.

20   WHAT I WOULD LIKE YOU TO DO IS TO MEET WITH YOUR OWN TEAM AND

21   YOUR OWN EXPERTS AND CALCULATE THE WORK THAT WOULD NEED TO GO

22   INTO THIS AND THEN TALK, MR. WALTERS AND MR. PETERS, TO TALK

23   BETWEEN YOURSELVES TO DETERMINE IF THIS IS REASONABLE.

24        AND I JUST NEED -- I'M SORRY TO SAY, AT THIS POINT I CAN'T

25   JUST GIVE YOU AN EXTRA 90 DAYS OR 180 DAYS, I JUST DON'T HAVE

1       IT AVAILABLE.  AND I CAN'T SAY WHETHER YOU CAN PUT THIS

2       TOGETHER IN A YEAR, I HAVEN'T BEEN A PRACTICING LAWYER FOR

3       DECADES, AND SO I LEAVE THAT IN YOUR CAPABLE HANDS.

4               MR. WALTERS:  THE ONE THING I MISSED WERE THE

5       POSSIBLE DATES FOR PRELIMINARY INJUNCTION HEARING.

6               THE COURT:  SO THAT WOULD BE THE HEARING, AND YOU

7       WOULD BE -- I DON'T KNOW THAT MORE BRIEFING IS NECESSARY, I AM

8       AVAILABLE SEPTEMBER 27, 28 AND 29, AND OCTOBER 1, 2, 3 AND 4.

9               MR. WALTERS:  THANK YOU, YOUR HONOR.

10              THE COURT:  AND I'M LOOKING AT --

11              MR. WALTERS:  THAT'S VERY GENEROUS OF YOU.

12              THE COURT:  I'M LOOKING AT A MAXIMUM OF THREE DAYS.

13      YOU MAY SUGGEST THAT ONE DAY FOR EACH SIDE IS PLENTY, BUT I

14      WANT TO GIVE YOU SOME PARAMETERS ON THAT AS WELL.

15          THERE WOULDN'T BE MUCH TIME FOR ADDITIONAL BRIEFING, AND

16      SO IT MAY BE THAT EACH OF YOU JUST AGREES TO ONE SUPPLEMENTAL

17      BRIEF IN ADDITION TO WHAT I ALREADY HAVE.  THE BRIEFS WERE

18      EXCELLENT, AND THEN TO LINE UP WITNESSES, AND I WILL BE ABLE TO

19      HEAR MORE EVIDENCE AT THAT POINT.

20              MR. PETERS:  WE WILL MEET AND CONFER ABOUT IT AND

21      DISCUSS IT.  WE MAY NEED RELIEF FROM RULE 26, BECAUSE IF WE ARE

22      GOING TO JUMP INTO A SCHEDULE AS COMPRESSED AS WHAT THE COURT

23      IS CONTEMPLATING, WE MAY NEED TO GET GOING QUICKLY, AND

24      OBVIOUSLY, NORMALLY IN THIS DISTRICT, BUT MAYBE WE CAN

25      STIPULATE TO THAT OR CONTACT THE COURT ABOUT THAT.

1        IF WE ARE GOING TO PROCEED, I THINK WE ARE PROBABLY GOING

2    TO HAVE TO GET GOING WITH DISCOVERY PRETTY DARN QUICK.

3            THE COURT:  THAT'S RIGHT.

4        AND IT WOULD PROBABLY ELIMINATE ANY CHANCE FOR A MOTION TO

5    DISMISS, BECAUSE I'M SETTING MOTIONS TO DISMISS OUT FIVE MONTHS

6    FROM THE FILING.  SO YOU HAVE TO THINK ABOUT THAT.  I'M GIVING

7    YOU SUMMARY JUDGEMENT, BUT I'M SETTING MOTIONS TO DISMISS IN

8    NOVEMBER, MAYBE A LITTLE LATER.

9            THE CLERK:  YES, YOUR HONOR.  WE START IN DECEMBER.

10           THE COURT:  I'M NOT FORECLOSING IT, I'M NOT GIVING

11   YOU ANY SPECIAL DATE FOR THAT.  YOU RESERVE IT 14 DAYS IN

12   ADVANCE OF FILING.

13           MR. PETERS:  WE HAVE THOUGHT ABOUT NOTHING BUT THIS

14   SINCE WE WERE SERVED LAST WEDNESDAY.  AND MY TEAM, WHO IS

15   SITTING OVER HERE, WE WILL COLLECT OUR THOUGHTS AND THINK IF WE

16   WANT TO FILE A MOTION TO DISMISS.  AND IF SO, WE WILL DEAL WITH

17   THE SCHEDULING, BUT WE HAVEN'T HAD A CHANCE TO THINK ABOUT IT,

18   WE HAVE BEEN JUST --

19           THE COURT:  THAT'S ABSOLUTELY REASONABLE.

20       AND IF I'M RULING ON A PRELIMINARY INJUNCTION THAT'S HEARD

21   AT THE END OF SEPTEMBER, I DON'T KNOW WHEN I'M GOING TO RULE ON

22   A MOTION TO DISMISS.  YOU MAY END UP AT YOUR SUMMARY JUDGEMENT

23   DATE WITHOUT A RULING ON THE MOTION TO DISMISS, AND IN MY VIEW,

24   THAT'S THE WAY IT GOES.

25           MR. PETERS:  AND I WOULD IMAGINE TO THE EXTENT

1    THERE'S GOOD ARGUMENTS ON A MOTION TO DISMISS, THEY WILL BE

2    ROLLED INTO THE PRELIMINARY INJUNCTION ISSUES.

3              THE COURT:  I WOULD THINK SO.

4              MR. PETERS:  IF WE COULD DISMISS THEIR COMPLAINT,

5    THEY PROBABLY DON'T HAVE A REAL LIKELIHOOD OF SUCCESS ON IT.  I

6    THINK THERE'S SOME REAL OVERLAP THERE, BUT I REALLY HAVEN'T HAD

7    A CHANCE TO THINK IT THROUGH.

8              THE COURT:  FAIR ENOUGH.  I JUST WANTED TO PUT THAT

9    IN YOUR HANDS.

10      WHY DON'T YOU CONTACT MY COURTROOM DEPUTY AND LET'S SET UP

11   A CALL ON THIS, RATHER THAN YOU TRYING TO WRITE SOMETHING.

12   LET'S JUST TALK ABOUT IT SOME TIME, LET'S DO IT NEXT WEEK,

13   BECAUSE THEN I START TRIAL NEXT FRIDAY, SO I WILL BE PRETTY

14   UNAVAILABLE.

15             MR. WALTERS:  THAT WOULD BE IDEAL, YOUR HONOR.

16             MR. PETERS:  I'M SURE I SPEAK FOR COUNSEL WHEN I

17   THANK THE COURT FOR ALL THIS EFFORT AND ATTENTION AND THE

18   POSSIBILITY OF MOVING QUICKLY THIS WAY.  WE REALLY ALL DO

19   APPRECIATE IT.

20             THE COURT:  WELL, WE ARE BUSY BECAUSE WE ARE HERE FOR

21   LITIGANTS LIKE YOU.  THANK YOU ALL.

22             MR. PETERS:  THANK YOU, YOUR HONOR.

23             MR. WALTERS:  THANK YOU, YOUR HONOR.

24        (THE PROCEEDINGS WERE CONCLUDED AT 3:35 P.M.)

25

1

2

3

4                           **CERTIFICATE OF REPORTER**

5

6

7

8                I, THE UNDERSIGNED OFFICIAL COURT

9 REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10 THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11 FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12 CERTIFY:

13                THAT THE FOREGOING TRANSCRIPT,

14 CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15 CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16 SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17 HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18 TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24 _____

25 SUMMER A. FISHER, CSR, CRR
   CERTIFICATE NUMBER 13185        DATED: 8/10/22