KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS - # 158708
epeters@keker.com
DAVID SILBERT - # 173128
dsilbert@keker.com
R. ADAM LAURIDSEN - # 243780
alauridsen@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
SOPHIE HOOD - # 295881
shood@keker.com
633 Battery Street
San Francisco, CA  94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
ANTHONY J. DREYER (*pro hac vice*)
anthony.dreyer@skadden.com
KAREN M. LENT (*pro hac vice*)
karen.lent@skadden.com
One Manhattan West
New York, NY 10001
Telephone:    212 735 3000
Facsimile:    212 735 2000

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
PATRICK FITZGERALD (*pro hac vice
forthcoming*)
patrick.fitzgerald@skadden.com
155 North Wacker Drive
Chicago, IL  60606
Telephone:    312 407 0700
Facsimile:    312 407 0411

Attorneys for Defendant PGA TOUR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PHIL MICKELSON; TALOR GOOCH; HUDSON SWAFFORD; MATT JONES; BRYSON DECHAMBEAU; ABRAHAM ANCER; CARLOS ORTIZ; IAN POULTER; PAT PEREZ; JASON KOKRAK; and PETER UIHLEIN, <br><br> Plaintiffs, <br><br> v. <br><br> PGA TOUR, INC., <br><br> Defendant. | Case No. 5:22-cv-04486-BLF <br><br> **DEFENDANT PGA TOUR, INC.'S OPPOSITION TO TRO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** <br><br> Judge:    Hon. Beth Labson Freeman <br> Date:    August 9, 2022 <br> Time:    1:00 p.m. <br> Dept.:    Courtroom 1, 5th Floor <br><br> Date Filed:  August 3, 2022 <br><br> Trial Date:  None Set |

■REDACTED COPY – FILED CONDITIONALLY UNDER SEAL

1879527

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND ..............................................................................3

    A.    The PGA TOUR ......................................................................................3

    B.    Saudi-Backed LIV Golf .........................................................................5

    C.    TRO Plaintiffs' Contracts with LIV That Breach Their Agreements with
           the TOUR ................................................................................................7

    D.    The PGA TOUR's Right to Suspend Players Who Violate TOUR
           Regulations .............................................................................................8

    E.    TRO Plaintiffs Delay Filing This Action ...............................................9

    F.    TRO Plaintiffs Mischaracterize the Facts ............................................10

III.  ARGUMENT ....................................................................................................11

    A.    TRO Plaintiffs Have Failed to Show They Are Likely to Suffer Irreparable
           Harm ......................................................................................................11

    B.    The Balance of Equities Tips Sharply in the PGA TOUR's Favor ......16

    C.    An Injunction Would Harm the Public Interest ....................................17

    D.    The Law and Facts Do Not Clearly Favor TRO Plaintiffs on the Merits .............17

IV.   CONCLUSION .................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.,*
141 F.3d 947 (9th Cir. 1998) ........................................................................22

*Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
190 F.3d 1051 (9th Cir. 1999) ......................................................................18

*Amazing Ins., Inc. v. Dimanno,*
2019 WL 3406941 (E.D. Cal. July 26, 2019) ..............................................15

*Anderson v. United States,*
612 F.2d 1112 (9th Cir. 1979) ......................................................................11

*Animal Legal Def. Fund v. U.S.D.A.,*
2017 WL 2352009 (N.D. Cal. May 31, 2017) ..............................................11

*Atl. Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) ......................................................................................18

*Blankenship v. Newsom,*
477 F. Supp. 3d 1098 (N.D. Cal. 2020) ........................................................11

*Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.,*
622 F.3d 36 (1st Cir. 2010) ...........................................................................14

*Brown v. Hansen Publ'ns, Inc.,*
556 F.2d 969 (9th Cir. 1977) ........................................................................21

*Caribbean Marine Servs. Co. v. Baldrige,*
844 F.2d 668 (9th Cir. 1988) ........................................................................15

*Cogan v. Harford Mem'l Hosp.,*
843 F. Supp. 1013 (D. Md. 1994) .................................................................20

*Collins v. Nat'l Football League,*
566 F. Supp. 3d 586 (E.D. Tex. 2021) ..........................................................12

*Copperweld Corp. v. Indep. Tube Corp.,*
467 U.S. 752 (1984) ......................................................................................22

*Disney Enters., Inc. v. VidAngel, Inc.,*
869 F.3d 848 (9th Cir. 2017) ........................................................................17

*E. Bay Sanctuary Covenant v. Biden,*
993 F.3d 640 (9th Cir. 2021) ........................................................................11

*E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, Inc.,*
   357 F.3d 1 (1st Cir. 2004)................................................................................21

*Elite Rodeo Ass'n v. Prof. Rodeo Cowboys Ass'n, Inc.,*
   159 F. Supp. 3d 738 (N.D. Tex. 2016) .....................................................14, 19

*Flaa v. Hollywood Foreign Press Ass'n,*
   2020 WL 8256191 (C.D. Cal. Nov. 20, 2020)................................................24

*FTC v. Qualcomm Inc.,*
   969 F.3d 974 (9th Cir. 2020) .........................................................................20

*Garcia v. Google, Inc.,*
   786 F.3d 733 (9th Cir. 2015) ....................................................................11, 12

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,*
   711 F.3d 68 (2d Cir. 2013).............................................................................18

*Gilder v. PGA Tour, Inc.,*
   936 F.2d 417 (9th Cir.1991) ..........................................................................14

*Heldman v. United States Lawn Tennis Ass'n,*
   354 F. Supp. 1241 (S.D.N.Y. 1973)........................................................13, 16

*hiQ Labs, Inc. v. LinkedIn Corp.,*
   31 F.4th 1180 (9th Cir. 2022) ........................................................................13

*Jessup v. Am. Kennel Club, Inc.,*
   862 F. Supp. 1122 (S.D.N.Y. 1994)..............................................................15

*Mir v. Little Co. of Mary Hosp.,*
   844 F.2d 646 (9th Cir. 1988) .........................................................................14

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,*
   883 F.3d 32 (2d Cir. 2018).............................................................................21

*Nova Designs, Inc. v. Scuba Retailers Ass'n,*
   202 F.3d 1088 (9th Cir. 2000) .......................................................................22

*Oakland Trib., Inc. v. Chron. Pub. Co.,*
   762 F.2d 1374 (9th Cir. 1985) .......................................................................12

*Omega Env't, Inc. v. Gilbarco, Inc.,*
   127 F.3d 1157 (9th Cir. 1997) .......................................................................20

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
   555 U.S. 438 (2009)...........................................................................1, 3, 20

*PNY Techs., Inc. v. SanDisk Corp.,*
   2014 WL 2987322 (N.D. Cal. July 2, 2014).................................................21

iv

*Qualcomm Inc. v. Compal Elecs., Inc.*,
  283 F. Supp. 3d 905 (S.D. Cal. 2017)....................................................................13

*Roland Mach. Co. v. Dresser Indus., Inc.*,
  749 F.2d 380 (7th Cir. 1984) ...............................................................................21

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) .............................................................................21

*Sampson v. Murray*,
  415 U.S. 61 (1974).......................................................................................11, 13

*SCFC ILC, Inc. v. Visa USA, Inc.*,
  36 F.3d 958 (10th Cir. 1994) ...............................................................................21

*Scheire v. Int'l Show Car Ass'n (ISCA)*,
  717 F.2d 464 (9th Cir. 1983) ...............................................................................23

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
  739 F.2d 1415 (9th Cir. 1984) .............................................................................11

*Stanley v. Univ. of S. Cal.*,
  13 F.3d 1313 (9th Cir. 1994) ...............................................................................11

*Sulmeyer v. Coca Cola Co.*,
  515 F.2d 835 (5th Cir. 1975) ...............................................................................21

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998)............................................................................19, 22

*United States v. Cienfuegos*,
  462 F.3d 1160 (9th Cir. 2006) .............................................................................14

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ....................................................................18, 19, 22

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
  914 F.2d 1256 (9th Cir. 1990) .............................................................................20

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004).............................................................................................20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).................................................................................................12

**State Cases**

*Ezekial v. Winkley*,
  20 Cal. 3d 267 (1977) ..........................................................................................25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*McCune v. Wilson*,
    237 So. 2d 169 (Fla. 1970)..................................................................................24

*Oakland Raiders v. Nat'l Football League*,
    131 Cal. App. 4th 621 (2005) ............................................................................23

*Pinsker v. Pac. Coast Soc'y of Orthodontists*,
    12 Cal. 3d 541 (1974) ......................................................................................25

*Yari v. Producers Guild of Am., Inc.*,
    161 Cal. App. 4th 172 (2008) ............................................................................24

PGA TOUR'S OPPOSITION TO MOTION FOR A TEMPORARY RESTRAINING ORDER
Case No. 5:22-cv-04486-BLF

## I.    INTRODUCTION

Throughout their careers, TRO Plaintiffs Talor Gooch, Hudson Swafford, and Matt Jones have enjoyed the benefits of the PGA TOUR's ("PGA TOUR" or "TOUR") unique structure and role in the sport of golf. By enabling professional golfers to pool their media rights, the TOUR has driven media and sponsorship money into the sport for the benefit of all TOUR members. But the TOUR could not function in this mutually beneficial way without TOUR members' annual agreement to abide by the terms of the PGA TOUR Handbook & Tournament Regulations (the "Regulations"). Under these Regulations, members agree not to play in, and thereby contribute their media rights to, non-TOUR golf events held in North America that conflict with PGA TOUR events. These Regulations thus maintain the value of the TOUR's pooled media rights.

Despite knowing full well that they would breach TOUR Regulations and be suspended for doing so, Plaintiffs have joined competing golf league LIV Golf, which has paid them tens and hundreds of millions of dollars in guaranteed money supplied by Saudi Arabia's sovereign wealth fund to procure their breaches. TRO Plaintiffs now run into Court seeking a mandatory injunction to force their way into the TOUR's season-ending FedExCup Playoffs, an action that would harm all TOUR members that follow the rules. The antitrust laws do not allow Plaintiffs to have their cake and eat it too. The TOUR is "free to choose the parties with whom [it] will deal," *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009), and it has no duty to provide Plaintiffs and LIV a platform to freeride off the TOUR's investments. As one TOUR member aptly put it, "I don't have an issue with anyone going to LIV. I have an issue with them wanting to comeback and play [on the TOUR]. If the grass is so green, why do you want to come back?" As another said about Plaintiffs' gambit: "They're suing the 200 card-carrying members of the PGA Tour. They chose to go this route and play less and now they want to play more."

The injunction TRO Plaintiffs seek is legally baseless. TRO Plaintiffs bear the burden of showing (1) a substantial likelihood of success on the merits; (2) that they will be irreparably injured without relief; (3) that the threatened injury outweighs the harm a TRO would inflict on the TOUR; and (4) that the TRO would serve the public interest. TRO Plaintiffs cannot satisfy *any*, let alone *all*, of the well-established requirements for the Court to enter such a drastic

order—particularly under the Ninth Circuit's heightened standard for mandatory injunctions.

TRO Plaintiffs have waited nearly ***two months*** to seek relief from the Court, fabricating an "emergency" they now maintain requires immediate action. It doesn't. Their ineligibility for TOUR events was foreseeable when they accepted millions from LIV to breach their agreements with the TOUR, and they knew for a fact that they were suspended on June 9. The harm they now allege from their suspensions is 100% economic and capable of redress with money damages. Indeed, several other LIV players, including four other Plaintiffs ***in this case***, recognize there is no emergency or irreparable harm; they too have qualified to play in the FedExCup but have not asked the Court for the extraordinary relief sought through this motion. The Court should use its equitable powers to redress real emergencies, not engineered ones by parties who knowingly accepted multi-million-dollar payouts to place themselves in the situation they are in.

Moreover, neither the equities nor the public interest tip in favor of TRO Plaintiffs, who willfully breached their contracts with the TOUR for a pile of cash supplied by LIV. LIV is not a rational economic actor, competing fairly to start a golf tour. It is prepared to lose billions of dollars to leverage Plaintiffs and the sport of golf to "sportswash" the Saudi government's deplorable reputation for human rights abuses. If Plaintiffs are allowed to breach their TOUR contracts without consequence, the entire mutually beneficial structure of the TOUR, an arrangement that has grown the sport and promoted the interests of golfers going back to Arnold Palmer and Jack Nicklaus, would collapse.

Finally, TRO Plaintiffs have not proved that the facts and law clearly favor them on any of their claims. TRO Plaintiffs cannot establish that they are likely to win their antitrust claims— they lack antitrust standing, cannot show that the TOUR has monopoly power given LIV's successful entrance, fail to demonstrate any restriction of competition, and challenge Regulations that are procompetitive. Nor can TRO Plaintiffs prevail on their argument that their suspensions should be "abated" during their appeals. The TOUR's Regulations empower the Commissioner to immediately suspend serial offenders like TRO Plaintiffs, and to maintain those suspensions for their ongoing violations during their appeals. TRO Plaintiffs' attempt to upend the TOUR's disciplinary process on procedural grounds is also meritless. The motion should be denied.

## II.      FACTUAL BACKGROUND

**A.      The PGA TOUR**

### 1.      The PGA TOUR promotes all members' interests

The PGA TOUR began in 1968 when a small group of professional golfers left the PGA of America and formed the Association of Professional Golfers, a member organization that eventually became the TOUR. Declaration of Andrew Levinson ("Levinson Decl.") ¶ 3. The founding members elected to pool their media rights and negotiate jointly for television exposure and corporate sponsorship. *Id.* ¶ 4. They wanted to increase prize money and improve playing conditions by aggregating their rights—thereby increasing their collective value—while preserving the freedom to plan their own travel and playing schedules, practice as and when they saw fit, and otherwise operate their respective "golf businesses" independently. *Id.*

The PGA TOUR has remained a membership organization ever since. *Id.* ¶¶ 5, 8. Unlike other sports organizations such as the NFL or NBA, there are no "owners" on the TOUR that control or contract with individual golfers or teams of golfers. *Id.* ¶ 8. The TOUR is a 501(c)(6) non-profit membership organization. *Id.* ¶¶ 2, 8. Its revenues come principally from the sale of its members' bundled media rights and sponsorships, and are used to fund its operations, tournament purses, membership benefits (e.g., healthcare and retirement plans), investments in growing the game of golf, and significant charitable initiatives. *Id.* ¶ 5. These revenue streams depend on assurances to sponsors and media outlets that the TOUR has been assigned and is authorized to sell its members' rights. *Id.* As one recent article noted, "if the [PGA TOUR's] media rights were fragmented—say, if CBS Sports didn't have the exclusive rights to air this weekend's Genesis Invitational and players could individually sell their live and archived broadcast rights—the TV deals would be worthless." Declaration of Nicholas Goldberg ("Goldberg Decl.") Ex. 45.

These increased sponsorship, broadcast, and other revenues are distributed to members in the form of tournament purses, bonuses, retirement plan contributions, and other benefits. Levinson Decl. ¶ 6. In 2021, $916 million—approximately ***98%*** of the TOUR's net revenue— was allocated to players, tournaments (i.e., a portion of the sponsorship revenue related to a specific tournament is paid to the tournament), and charities. *Id.* Of that amount, $770 million

was allocated to players, including $443 million to player prize money and benefits, $110 million to player bonus programs, $17 million to Player Retirement Plan contributions, and $200 million to Player Retirement Plan earnings. *Id.* The TOUR's structure and marketing creates the opportunity for aspiring golfers—as TRO Plaintiffs once were—to hone their skill, establish their reputation, and leverage the collective efforts of their predecessors and peers to raise their profile and obtain sponsorships. *Id.* ¶¶ 2–25.

TOUR members are also directly involved in TOUR governance. *Id.* ¶¶ 7, 14. The TOUR is governed by its Policy Board, which includes four player directors, and a fifth player director is slated to join in January 2023. *Id.* The TOUR also includes a sixteen-member Player Advisory Council, elected by TOUR members, which advises and consults with the Policy Board, including membership-elected player directors, and Commissioner on major TOUR decisions. *Id.*

### 2. The Regulations serve TOUR members' interests by driving up media and sponsorship revenues that are distributed to players

Like all membership organizations, the TOUR has Regulations that provide certain obligations flowing both from the TOUR to its members and from the members to the TOUR. Levinson Decl. ¶¶ 14–35 & Ex. 6. Among the TOUR's long-standing player Regulations are ones that limit participation in events that conflict with scheduled TOUR events and in non-TOUR golf programs live or recorded on media. *Id.* ¶¶ 17–25 & Ex. 6 at Art. V.A–B. These Regulations contribute to the success of scheduled TOUR events by ensuring representative fields and provide substantial benefits to sponsors and media partners. *Id.* ¶ 17. As a result, the Regulations make the TOUR's media rights more valuable, leading to higher sponsorship and broadcast revenues, which in turn are distributed to members. *Id.*

Players are eligible in certain circumstances for three or more conflicting event releases per season to play in non-TOUR tournaments outside North America. *Id.* ¶ 18. Conflicting event releases are not permitted for non-TOUR tournaments held in North America because those tournaments directly conflict with TOUR events for which the TOUR's domestic television partners have paid substantial fees. *Id.* ¶ 20. Conflicting event releases for tournaments outside North America may be denied if the Commissioner determines that it would cause the TOUR to violate a contractual commitment to a tournament sponsor or would otherwise significantly and

4

unreasonably harm the TOUR and its sponsors. *Id.* ¶ 19. The TOUR has regularly granted conflicting event releases for players where appropriate. *Id.*

Nothing in the Regulations prevents members from resigning their TOUR membership at any time to play on a competing tour, including LIV, or to start their own competing tour or events. Levinson Decl. ¶¶ 21, 25, 101–103. The Regulations do not have any non-compete provision. *Id.*  ***Plaintiffs themselves*** joined LIV. Numerous other golfers have joined LIV as well, reportedly in exchange for massive contracts, including Dustin Johnson, Sergio Garcia, and Graeme McDowell, who resigned their TOUR memberships upon joining LIV, recognizing that they cannot participate in TOUR events and work for LIV at the same time. Goldberg Decl. Exs. 52, 54.

As discussed in the accompanying declaration of economist Dr. Mark Israel, the eligibility and media provisions of the TOUR's Regulations do not thwart competition but rather promote it. Declaration of Mark Israel ("Israel Decl.") ¶¶ 10–13, 40–63, 85–107. The eligibility and media provisions reduce inefficiencies by limiting competitors' ability to freeride on the PGA TOUR's substantial investments in developing and promoting its players and the TOUR. *Id.* ¶¶ 85–95. They enhance incentives for the TOUR's media partners to invest in promoting the TOUR's events and players, thereby increasing the value of the media rights and the revenues the TOUR uses to compensate players. *Id.* ¶ 94. And the Regulations protect the TOUR's investment in and preservation of its reputation, by seeking to limit its association with LIV and LIV players' Saudi Arabian backers. *Id.* ¶¶ 101–104. Allowing Plaintiffs to vitiate the TOUR's eligibility and media rights Regulations would force the TOUR to cooperate with its competitor LIV, by providing a platform for Plaintiffs and other LIV golfers. *Id.* ¶¶ 92–93. And it would impose severe harm on the TOUR and its rule-abiding members by devaluing their media rights and upending the TOUR's substantial investments in media partnerships and sponsorships. *Id.* ¶¶ 88–93.

**B.    Saudi-Backed LIV Golf**

LIV Golf was founded in 2021 with financial backing from the Public Investment Fund ("PIF"), the sovereign wealth fund of Saudi Arabia, which holds more than $500 billion in assets. Goldberg Decl. Ex. 43. LIV is the most recent example of "sportswashing," a strategy by the

Saudi government to use sports in an effort to improve its reputation for human rights abuses and other atrocities. *Id.* Exs. 44, 57, 61, 81. With access to nearly unlimited funding through the PIF, LIV has been able to compete for elite players quickly and successfully and operate without consideration of profitability. *Id.* Exs. 65, 80. To date, PIF has committed at least $2 billion of funding to LIV, which LIV is using to pay eight- and nine-figure advances to some TOUR members, provide free tournament tickets to spectators, and fully fund all of its operational costs, including hundreds of millions of dollars in tournament purses. *Id.* Exs. 48, 65, 82. There is no discernible plan for how the PIF will recoup its $2 billion investment in LIV. *Id.*

During its short existence, LIV has established itself as a competing golf tour, having already successfully recruited more than twenty PGA TOUR members, including TRO Plaintiffs. *Id.* Ex. 85. Far from struggling to recruit golfers, LIV's CEO stated in a televised interview with Tucker Carlson just two days before Plaintiffs filed this lawsuit that LIV is oversubscribed for golfers and that "the list gets longer, longer, longer for the players that want to" join LIV. *Id.* Ex. 84. It has also been reported that players joining LIV have received tens-of-millions of dollars, and in some cases hundreds-of-millions of dollars, in guaranteed payments to play for LIV. *Id.* Exs. 80, 83. Plaintiff Phil Mickelson reportedly received $200 million to join LIV, and other prominent TOUR members such as Plaintiff Bryson DeChambeau and Dustin Johnson have reportedly received more than $100 million each. *Id.* Ex. 80.

LIV represents a stark departure from golf's long-earned reputation as a meritocracy in which players are paid based on their skill and performance. Unlike the PGA TOUR, LIV's golf tournaments feature guaranteed money to every participant. Khosla Decl. ¶¶ 9, 15–17. LIV has also adopted a team format that provides additional opportunities for its golfers to play for exorbitant prize money financed by the Saudi PIF. *Id.* ¶¶ 8, 12, 15–17; Goldberg Decl. Ex. 47. LIV's inaugural season includes eight events, five of which are in North America. Khosla Decl. ¶ 16. By its second season in 2023, LIV has announced plans to expand to fourteen events, including ten in North America, with prize money totaling $405 million. Goldberg Decl. Ex. 78.

LIV's direct ties to the Saudi government have cast a black cloud over its events and its players. Goldberg Decl. Ex. 63. Even before LIV officially launched, Plaintiff Phil Mickelson

admitted to a golf writer that LIV was nothing more than "sportswashing" by the Saudi's brutally repressive regime. *Id.* Ex. 46. "They're scary mother****ers to get involved with," he said. *Id.* "We know they killed [*Washington Post* reporter and U.S. resident Jamal] Khashoggi and have a horrible record on human rights. They execute people over there for being gay." *Id.* While Mickelson and the other Plaintiffs nevertheless accepted the enormous paychecks that LIV offered them, many golfers refused to do so, presumably due to concerns over LIV's ties to the Saudi government or their preference for the TOUR's competitive offering, or both. *Id.* Exs. 59, 60, 62, 74. Tiger Woods, for example, rejected an offer from LIV of $700–$800 million. *Id.* Ex. 84. Fans and community members have also protested LIV's events, including, organizations seeking justice for the victims and families affected by the 9/11 attacks. *Id.* Exs. 68, 70, 73, 77.

**C.      TRO Plaintiffs' Contracts with LIV That Breach Their Agreements with the TOUR**

TRO Plaintiffs Gooch, Swafford, and Jones have collectively earned $37 million in official prize money on the PGA TOUR, including over $7 million to date this season. Levinson Decl. ¶ 36. Yet months ago, with full knowledge of the repercussions for doing so, they signed contracts with LIV that compel them to violate their agreements with the TOUR. Declaration of Elliot Peters ("Peters Decl.") Exs. 2–4. REDACTED

REDACTED

*Id.* Exs. 2 (Gooch § 1.4), 3 (Swafford at 1–2), 4 (Jones at 1–2). By agreeing to these LIV contract terms, TRO Plaintiffs were promising to repeatedly breach the TOUR's conflicting event and media-rights provisions in Article V.A.2 and V.B.1 of the Regulations. Levinson Decl. Ex. 6. REDACTED

*Id.* TRO Plaintiffs' LIV contracts position them as direct competitors to the TOUR, its members, and its sponsors in other respects as well. REDACTED

1   REDACTED

2      TRO Plaintiffs chose to breach their agreements with the TOUR in exchange for

3   REDACTED

4

5

6

7

8

9

10

11   **D.    The PGA TOUR's Right to Suspend Players Who Violate TOUR Regulations**

12      Under the rules approved by the Policy Board, the TOUR has the authority to impose

13   discipline on members who violate the Regulations or otherwise threaten the TOUR's well-being

14   or integrity. Levinson Decl. ¶¶ 26–35 & Ex. 6 at Art. VII. The Regulations establish a probation

15   procedure to deal with players who serially violate the rules in a manner that the Commissioner

16   determines requires that they be suspended from play while the disciplinary process against them

17   runs its course. *Id*. ¶¶ 33–35 & Ex. 6 at Art. VII.C. If a member breaks the rules, he may be

18   notified that he is being placed on probation. *Id.* If he then commits another infraction, the

19   Commissioner, in his discretion, may immediately suspend the member's playing privileges,

20   preventing him from playing in TOUR events until his disciplinary process concludes. *Id.* This

21   probation procedure prevents a serial offender from disrupting TOUR events while his

22   disciplinary process unfolds, which goes to the heart of the Commissioner's duty to protect the

23   TOUR, its members, its partners, its sponsors, and their reputations. *Id*. ¶ 35.

24      The Regulations establish a separate disciplinary procedure for the Commissioner to

25   impose minor, intermediate, or major penalties for violations of TOUR Regulations. *Id*. ¶¶ 30–32

26   & Ex. 6 at Art. VII.D. Members receive notice of violations and proposed penalties, are provided

27   an opportunity to respond, and may appeal the imposition of an intermediate or major penalty to

28   the Appeals Committee, which is comprised of independent (non-player) members of the TOUR

1  Policy Board. *Id.* ¶¶ 30–31 & Ex. 6 at Art. VII.A and VII.E. In some cases, the effective date of a

2  penalty may be stayed while a member pursues an appeal. *Id.* ¶ 32 & Ex. 6 at Art. VII.E.2.

3          Both the probation and penalty procedures were invoked against TRO Plaintiffs here.

4  First, under the probation procedure, the TOUR notified all three TRO Plaintiffs in the first week

5  of June that they were being placed on probation under Article VII.C. *Id.* ¶¶ 39–40, 61–62, 80–

6  81. The probation notices, which were sent to Swafford and Jones on June 3, and to Gooch on

7  June 5, warned them that under the probation procedure they could be immediately suspended

8  from playing in TOUR events if they committed further violations. *Id.* Exs. 8, 21, 32. After they

9  violated the rules again—and made clear that they intended to continue doing so—the TOUR

10  notified each of them on June 9 that the Commissioner was exercising his authority under Article

11  VII.C to suspend them from play immediately. *Id.* ¶¶ 41, 43, 63, 65, 82, 84 & Exs. 9, 22, 33.

12  Those suspensions have not been revoked and remain in effect through the completion of TRO

13  Plaintiffs' disciplinary proceedings. *Id.* ¶¶ 51, 57, 73, 92.

14          Separately, under the penalty procedure in Article VII.D, TRO Plaintiffs, who repeatedly

15  played in conflicting LIV Golf events without releases, each received four notices of disciplinary

16  inquiries: Gooch on June 3, June 9, June 25, and June 30; and Swafford and Jones on June 1, June

17  9, June 25, June 29, and June 30. *Id.* ¶¶ 38, 42, 45, 47, 60, 64, 68, 71, 80, 84, 88, 90 & Exs. 7, 9,

18  10, 12, 20, 22, 24, 26, 31, 33, 35, 36, 37. After considering the information they submitted in

19  response, the TOUR imposed major penalties on each of them. *Id.* ¶¶ 46, 48–57, 66, 69–76, 86–

20  96 & Exs. 13, 15, 25, 28, 36, 39. They have appealed those penalties, and the appeal process is

21  currently underway. *Id.* ¶¶ 50, 54, 72, 92. However, because the TOUR suspended them under the

22  separate probation procedure in Article VII.C, and due to their ongoing violations, their appeals

23  of their major penalties do not stay their suspensions. *Id.* ¶¶ 51, 57, 73, 93 & Ex. 6 at Art. VII.C.

24  **E.     TRO Plaintiffs Delay Filing This Action**

25          TRO Plaintiffs have known since June 9—and indeed, earlier—that they would violate the

26  TOUR's Regulations and forfeit their ability to play in the FedExCup Playoffs in exchange for

27  accepting massive payments from LIV Golf. *Id.* Exs. 9, 22, 33. For example, a week before his

28  suspension, Plaintiff Matt Jones stated publicly "[y]ou've got to expect" that he would be banned

for committing to play in LIV events without a release. Goldberg Decl. Ex. 51. When asked

following his suspension about the possibility of never playing again on the PGA TOUR, Jones

stated, "I did come to this [LIV] series and this tournament with the understanding that [] could

be the case." *Id.* Ex. 55. Unsurprisingly, TRO Plaintiffs have not played in any of the TOUR's

last seven events and did not seek any mandatory injunction to do so. Levinson Decl. ¶ 98. To the

extent this motion presents any "emergency," it is one that TRO Plaintiffs chose to create.

Notwithstanding the knowledge that he would be suspended and ineligible to participate in the

FedExCup, Jones stated that he was "very happy with the decision [he] made," and that he was

"more than happy to play in this LIV Golf series for the rest of the year." Goldberg Decl. Ex 55.

## F.    TRO Plaintiffs Mischaracterize the Facts

Unable to establish their claims based on any fair interpretation of admissible evidence,

TRO Plaintiffs have resorted to mischaracterizing the record. The TOUR does not have the space

to correct all of TRO Plaintiffs' half-truths and falsehoods in this brief, and instead has created a

separate chart identifying an exemplary set of them. *See* Goldberg Decl. Ex. 42. To cite a few

examples: TRO Plaintiffs begin their motion on page 1 with an egregious mischaracterization of a

comment they attribute to a "Tour representative," presented in bold text. Mot. at 1. The comment

was actually from Davis Love III, a hall-of-fame golfer. Love is *not* a TOUR official and did *not*

say that the TOUR "hold[s] all the cards" or "[doesn't] care what the courts say"; that would be

absurd. He said that *golfers* hold all the cards, and that if a court ordered the TOUR to permit LIV

golfers to play in TOUR events despite breaking the TOUR's rules, other golfers might simply

boycott those events, because they "respect the rules," are "fed up," and "don't want those guys

. . . coming and cherry-picking our tournaments." Dkt. 2-8 at 276–77. His comments do not

reveal some purported arrogance by the TOUR; rather, they demonstrate the disruption and

damage to all rule-abiding PGA TOUR members that would ensue if TRO Plaintiffs get their

way. Likewise, TRO Plaintiffs mischaracterize TOUR Commissioner Jay Monahan's comment

that LIV Golf is "an irrational threat." Mot. at 3–4. He did *not* say that it is irrational to compete

with the PGA TOUR. He said that LIV is an *irrational market actor*, "one not concerned with the

return on investment or true growth of the game." Dkt. 2-3 at 4. TRO Plaintiffs' moving papers

are littered with similar mischaracterizations and half-truths. Goldberg Decl. Ex. 42.

### III.    ARGUMENT

A TRO is an "extraordinary remedy never awarded as of right." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). TRO Plaintiffs bear "the heavy burden" of demonstrating: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tip in their favor, and (4) an injunction is in the public interest. *Blankenship v. Newsom*, 477 F. Supp. 3d 1098, 1103 (N.D. Cal. 2020). A TRO is typically a procedure "for preserving the status quo." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). Mandatory injunctions, by contrast, go "well beyond" preserving the status quo and are "particularly disfavored." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)). The Court must deny a mandatory injunction "unless the facts and law clearly favor the moving party." *Anderson*, 612 F.2d at 1114. The status quo is the state of affairs at "the time the complaint was filed." *Animal Legal Def. Fund v. U.S.D.A.*, 2017 WL 2352009, at *3 (N.D. Cal. May 31, 2017). TRO Plaintiffs seek a mandatory injunction to compel the PGA TOUR to take affirmative action to allow them to play in the FedExCup, while continuing to breach the TOUR's Regulations. They fail to meet the standard for issuing any TRO, let alone the "doubly demanding" standard required for mandatory injunctive relief. *Garcia*, 786 F.3d at 740.

### A.    TRO Plaintiffs Have Failed to Show They Are Likely to Suffer Irreparable Harm

"Irreparable harm is 'harm for which there is no adequate legal remedy, such as an award for damages.' For this reason, economic harm is not generally considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (quoting *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014)). "[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury. . . . Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Additionally, irreparable harm must be "likely," not just possible. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

1.      **TRO Plaintiffs delayed seeking relief**

TRO Plaintiffs' motion should be denied because "delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *see also Garcia v. Google, Inc.*, 786 F.3d at 746 ("months" delay in seeking injunction undercut claim of irreparable harm); *Collins v. Nat'l Football League*, 566 F. Supp. 3d 586, 603–04 (E.D. Tex. 2021) (two-week delay weighed against finding of irreparable harm). TRO Plaintiffs knew about their suspensions but sat on their purported claims for months. They were informed that their violations of the Regulations resulted in their suspensions on June 9. Levinson Decl. Exs. 9, 22, 33. Even before being notified, they expected to be suspended. Goldberg Decl. Ex. 51. And the citations in their hefty filings demonstrate that they have spent months preparing this legal challenge. Dkt. 2-13 at p.15 n.31 (declaration stating that cited source was "accessed 6/9/2022"). Yet TRO Plaintiffs waited nearly two months before seeking the "emergency" relief to which they now claim they are entitled. TRO Plaintiffs' delay weighs heavily against a finding of irreparable harm. *See* Rutter Group Prac. Guide Fed. Civ. Proc. Before Trial (Nat Ed.) Ch. 13-D at ¶ 13:95 ("Delay in seeking relief may be evidence of laches or negate the alleged threat of 'immediate' irreparable injury. The court has discretion to deny the application on either ground." (citations omitted)).

2.      **TRO Plaintiffs' claimed harm can be redressed through monetary remedies**

TRO Plaintiffs' motion also should be denied because the only arguably concrete injuries they claim are compensable by damages. They provide a list of five purported harms, but the first three—lost opportunities (1) "to qualify for the 2023 Majors," (2) "to accumulate points," and (3) "to qualify for other premier tournaments"—ultimately collapse into the final two—(4) lost "income earning opportunities" and (5) "losses to goodwill, reputation, and brand." Mot. at 22. The tournaments and points are merely means to earn financial and reputational rewards. Even if TRO Plaintiffs were actually suffering those purported harms, neither would justify extraordinary relief they seek. Loss of income that could have been earned in future tournaments is entirely compensable by monetary damages. And TRO Plaintiffs' conclusory, tag-along allegations regarding reputational harm are too remote and speculative to qualify as irreparable injury.

*First*, "monetary injury is not normally considered irreparable." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson*, 415 U.S. at 90. "An injury is not irreparable if it can be compensated by the court when, and if, the plaintiff prevails on the merits. Stated differently, only harm that the district court cannot remedy following a final determination on the merits may constitute irreparable harm." *Qualcomm Inc. v. Compal Elecs., Inc.*, 283 F. Supp. 3d 905, 915 (S.D. Cal. 2017) (internal quotation marks and citation omitted).

Here, TRO Plaintiffs expressly seek "monetary damages, treble damages, and economic damages." Compl. at 103. Although the TOUR has committed to pay TRO Plaintiffs for their achievements through the dates of their suspensions, they now seek redress for their inability to play for money in TOUR events postdating their breaches of contract and suspensions. TRO Plaintiffs' claims are fundamentally economic and may be redressed through monetary relief. In *Heldman v. United States Lawn Tennis Ass'n*, 354 F. Supp. 1241, 1251 (S.D.N.Y. 1973), the court denied injunctive relief for similar claims by an athlete, Billie Jean King, barred from events in one league because of unauthorized participation in another. There, the athlete "saw a valuable opportunity in plaintiff's contract and opted for it; she has available to her the chance to win large sums of prize money and with that the subsequent opportunities of endorsements that accrue to athletic stars. That other tournament opportunities may be lost to her … does not, on this record, support a preliminary injunction." *Id*. So too here, where TRO Plaintiffs claim that LIV offered them **superior** compensation for foregoing TOUR opportunities, and LIV has indemnified them for losses associated with their breaches of TOUR Regulations. Gooch Decl. ¶ 16 ("LIV Golf offered to compensate me in amounts in addition to its already strong compensation offering—including the highest purses in golf history and guaranteed compensation."); Jones Decl. ¶ 16 (same); Swafford Decl. ¶ 16 (same); Khosla Decl. ¶ 23 (LIV has offered players "extensive indemnification" "to take on the risk" of players' TOUR punishments).

The fact that TRO Plaintiffs' purported lost earnings would occur in the future and may be "difficult to predict" because they are "based on performance" does not justify extraordinary

relief. Gooch Decl. ¶ 45; Jones Decl. ¶ 45; Swafford Decl. ¶ 45. Courts routinely award compensation for lost income, including projected future income. *United States v. Cienfuegos*, 462 F.3d 1160, 1169 (9th Cir. 2006) ("concepts and analysis involved" in calculating future lost income "are well-developed in federal law"); *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 650 (9th Cir. 1988) ("The mere fact that the extent of the injury may be uncertain would not have prevented recovery" because plaintiff "could have easily presented evidence of his projected lost income"). In fact, TRO Plaintiffs' own economist concludes that golfers have calculated the costs associated with "the loss of expected lifetime playing revenues on the TOUR," "the loss of opportunities to earn ranking points," and the loss of opportunities "to earn entry into the Majors" when determining what "large upfront payments" would be "required" for them to join LIV. Leitzinger Decl. ¶ 9. TRO Plaintiffs' assertion that lost earnings would be "difficult to quantify" ignores the fact that their own economist admits that these projected lost earnings have already been quantified—and paid. *See Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42 (1st Cir. 2010) (finding no irreparable injury where plaintiff claimed "it might be difficult to determine retrospectively how much these missed opportunities were actually worth.").

TRO Plaintiffs' irreparable injury claims are easily distinguishable from cases where athletes were barred entirely from participation at the elite level of their sport. *See* Mot. at 22–23 & n.10. TRO Plaintiffs are not barred from professional golf entirely by age restrictions, rights of first refusal, or some other improper mechanism.[1] *See Elite Rodeo Ass'n v. Prof. Rodeo Cowboys Ass'n, Inc.*, 159 F. Supp. 3d 738, 745 (N.D. Tex. 2016) ("In cases recognizing lost playing time alone as constituting irreparable harm, athletes were entirely locked out of their sports."). TRO Plaintiffs themselves argue that they may still compete at an elite level at LIV Golf tournaments.

---

[1] TRO Plaintiffs' reliance on *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir.1991), also is misplaced. *Gilder* concerned the requirement that members use certain clubs while playing on the TOUR, not suspension from the TOUR itself. The court held that the marginal effect of using different clubs was an injury that could defy calculation. *Id.* The purported injury here is not so subtle, and damages could be calculated using established methodologies, as described above.

Mot. at 23 ("The only elite golf leagues in existence today are the Tour and LIV Golf."). Their choice to breach their agreements with the TOUR and join another "elite" golf league—one that they claim has offered them superior compensation—is not an irreparable injury.

*Second*, to the extent TRO Plaintiffs purport to allege non-monetary harm, their allegations are fatally speculative and conclusory. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). "[A] plaintiff who attempts to establish irreparable harm via loss of business reputation and goodwill must proffer evidence of that loss— a district court may not base a finding of reputational harm on platitudes rather than evidence." *Amazing Ins., Inc. v. Dimanno*, 2019 WL 3406941, at *3 (E.D. Cal. July 26, 2019).

Here, TRO Plaintiffs' boilerplate claims that they will suffer harms to their "goodwill, reputation, and brand" do not even rise to the level of platitudes. *See* Gooch Decl. ¶ 44 ("Participating in the FedEx Cup would provide me opportunities to enhance my sponsor relationships and compensation.") & ¶ 46 ("To retaliate against me and to disparage me for living out the purpose of the organization the PGA TOUR has harmed my reputation and goodwill."); Jones Decl. ¶¶ 44 & 46 (same); Swafford Decl. ¶¶ 44 & 46 (same). Moreover, those claimed harms—to the extent they are even identifiable—are too remote and speculative to warrant injunctive relief. *See Jessup v. Am. Kennel Club, Inc.*, 862 F. Supp. 1122, 1128 (S.D.N.Y. 1994) (finding conclusory affidavits failed to establish irreparable injury to reputation). Any reputational harms TRO Plaintiffs may suffer are far more likely to arise from their alignment with LIV and its efforts to paper over Saudi Arabia's long and well-documented history of human rights abuses than their suspension from the TOUR for violating its rules.

*Third*, the true lack of exigency here is revealed by the actions of other Plaintiffs. Four other Plaintiffs are similarly situated to the TRO Plaintiffs—they have qualified to play in the FedExCup Playoffs but are suspended from TOUR events—but those four have not sought emergency relief from the Court. Levinson Decl. ¶ 97. If suspension from the TOUR and the consequences that flow from it were truly irreparable, one would expect uniform action by the affected Plaintiffs. The fact that other Plaintiffs face the same purportedly dire consequences and

1   have not sought immediate relief underscores that their purported injuries are not irreparable.

2   **B.    The Balance of Equities Tips Sharply in the PGA TOUR's Favor**

3          Though TRO Plaintiffs have not shown that they are threatened with irreparable harm, the

4   TOUR and its members will be immediately and irreparably injured if this Court orders that TRO

5   Plaintiffs must play in the FedExCup despite their repeated violations of the Regulations.

6          The TOUR and its members will suffer irreparable harm if the TOUR cannot enforce its

7   Regulations and, by doing so, ensure the exclusive media rights those Regulations protect. *See*

8   *Heldman*, 354 F. Supp. at 1252 ("It would unduly damage the prestige and the operation of the

9   [incumbent tennis association] to enjoin its rules before an adverse determination on the merits.").

10  If Plaintiffs are permitted to play for both the TOUR and LIV, the TOUR will be forced to

11  provide a platform for golfers who have denigrated the TOUR and devalued its product for all

12  TOUR members. Levinson Decl. ¶¶ 106–116; Israel Decl. ¶¶ 88–95, 101–104.

13  REDACTED

15  Peters Decl. Exs. 2–4. In other

16  words, the requested relief will allow LIV and its players to use the TOUR's platform to attempt

17  to draw viewers, sponsors, and other golfers away from the TOUR, while simultaneously

18  allowing TRO Plaintiffs to flout their promise to adhere to the TOUR's rules.

19         Moreover, the TOUR will suffer irreparable reputational damage if it is forced to give a

20  stage to players engaged with LIV and to associate the PGA TOUR brand with the Saudi

21  government's efforts to "sportswash" its deplorable reputation. Goldberg Decl. Ex. 44. This fear

22  is well-founded, as LIV has already been a constant distraction at recent TOUR events. During a

23  June 8 press conference for the TOUR's RBC Canadian Open, questions about LIV dominated;

24  half of the questions to reigning champion Rory McIlroy were about LIV rather than the

25  tournament. *Id.* Ex. 53. Similarly, at the recent 150th Open Championship, one of professional

26  golf's most historic tournaments, prominent TOUR members expressed frustration with the

27  unwanted media focus on LIV rather than the tournament. As Justin Thomas explained, "I think

28  it's very obvious why we're sick of talking about it because . . . it's taking away from a lot of –

1    whether it's great storylines or just great things happening in the game of golf." *Id.* Ex. 75.

2        The public outrage and political backlash aimed at golfers who have joined LIV reinforces

3    the TOUR's concerns. After Pumpkin Ridge Golf Club (outside Portland, Oregon) announced

4    that it would host a LIV tournament on July 1–3, eleven mayors in Washington County (where

5    Pumpkin Ridge is located) signed an open letter opposing the tournament, numerous members of

6    the club protested the decision, and an estimated forty club members resigned. *Id.* Ex. 64. U.S.

7    Senator Ron Wyden, spoke out against the Oregon LIV event, citing a hit-and-run accident that

8    killed an Oregon teen and how the Saudi-national defendant was shuttled out of the U.S. by the

9    Saudi government before he could stand trial. *Id.* Ex. 66. In addition, several protesters, including

10   members of 9/11 survivor families, gathered outside Pumpkin Ridge and again at the Trump

11   resort in Bedminster, New Jersey, to protest LIV events. *Id.* Exs. 71, 81. The irreparable harm to

12   the TOUR that would necessarily flow from forcing the TOUR to provide LIV golfers and their

13   Saudi backers a greater platform weighs heavily against granting the requested relief.

14   **C.    An Injunction Would Harm the Public Interest**

15       The Court also must "pay particular regard for the public consequences in employing the

16   extraordinary remedy of injunction." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867

17   (9th Cir. 2017). A temporary restraining order would permit LIV and TRO Plaintiffs to unfairly

18   reap the benefits of the TOUR's media and sponsorship rights, which are exclusive to TOUR

19   members, and force the TOUR's partners and sponsors to be associated with LIV and its backers.

20   Many of the TOUR's partners and sponsors have made independent decisions to have no

21   relationship with LIV but would be forced into an affiliation with them. A preliminary injunction

22   also will engender consumer confusion because players with dual, conflicting loyalties may

23   promote LIV over the PGA TOUR while participating in TOUR events. Finally, as explained

24   below, the TOUR's enforcement of its Regulations is not anticompetitive. Those Regulations are

25   key to protect rule-abiding TOUR members and are procompetitive.

26   **D.    The Law and Facts Do Not Clearly Favor TRO Plaintiffs on the Merits**

27       **1.    TRO Plaintiffs lack antitrust standing**

28       Plaintiffs' antitrust claims under Section 1 and 2 fail at square one because Plaintiffs lack

antitrust standing. "A plaintiff may only pursue an antitrust action if it can show 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). Plaintiffs allege that the TOUR's Regulations are anticompetitive, but the injury they claim is exclusion from the benefits of a contract they knowingly breached, not the exclusion of themselves or LIV from any relevant market. Compl. ¶¶ 7, 9, 11, 58–77. Having breached their agreements with the TOUR and thrown their lot in with LIV, Plaintiffs have no "right to the [TOUR] platform and the public exposure provided by playing on the Tour." *Id*. ¶¶ 212, 215, 218. Their purported "injury"—being denied the benefits of a contract they breached—is not the type of injury "the antitrust laws were intended to prevent." *Atl. Richfield*, 495 U.S. at 334. Moreover, Plaintiffs' antitrust claims are merely a stalking horse for claimed injury to LIV. Compl. ¶¶ 283–286, 290–293, 297; Dkt. 3 (disclosure of LIV as interested entity). Plaintiffs (falsely) allege that the TOUR is engaged in an "effort to exclude competition from LIV Golf," Mot. at 9, but Plaintiffs are not the "efficient enforcer" of any such claim and "therefore lack[] antitrust standing on that basis as well," *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78–80 (2d Cir. 2013) (plaintiff that agreed to and then was excluded from alleged anticompetitive contract lacked standing because it was not "efficient enforcer" of alleged antitrust violation).

    **2.**    **The law and facts do not clearly favor TRO Plaintiffs on their Section 2 claim**

        **a.**    **The TOUR lacks monopoly power**

Plaintiffs' Section 2 claim fails because Plaintiffs cannot clearly show that the TOUR has "the power to exclude competition or control prices." *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990). The "successful entry by LIV Golf" demonstrates that the TOUR lacks the power to exclude competition. Mot. at 13. In just its first year, LIV has established a tour that competes directly with the PGA TOUR, has more financial resources than the TOUR, and offers more guaranteed money to players than the TOUR. Plaintiffs' own economist states that LIV is on track to go from 0% of the market in 2021 to 20% of the market in 2023, while filling its fields with a greater percentage of elite golfers on average (24%) than the TOUR averages (16%).

1  Letizinger Decl. ¶¶ 33, 62–64; Goldberg Decl ¶ 49. LIV's recruitment of Plaintiffs as part of a

2  full complement of 48 professional golfers and its "successful entry [into the market] itself refutes

3  any inference of the existence of monopoly power that might be drawn from [the TOUR's]

4  market share." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998); *see also*

5  *Syufy Enters.*, 903 F.2d at 665 (evidence that new competitor entered market and began taking

6  market share from defendant was "conclusive" proof of defendant's lack of monopoly power);

7  *Elite Rodeo*, 159 F. Supp. 3d at 745 (denying injunctive relief where competitor's "initial

8  success" entering market demonstrated that defendant "does not have the ability to exclude

9  competitors from the market"). Likewise, the fact that the TOUR responded to LIV's entrance

10 into the market by increasing player pay refutes any argument that the TOUR has the power to

11 "control prices." *Syufy Enters.*, 903 F.2d at 664.

### b.      The TOUR's Regulations do not restrict competition

13        TRO Plaintiffs' monopolization claim also falls short because the TOUR's Regulations do

14 not "prevent PGA TOUR members from selling their services" to TOUR competitors like LIV.

15 Mot. at 14. Unlike "non-compete" clauses, the TOUR's Regulations do ***not*** prohibit members

16 from playing on a competing tour. Levinson Decl. ¶¶ 101–103; Israel Decl. ¶ 51. Any TOUR

17 member is free to "sell[] their services" to LIV or any other TOUR competitor. Mot. at 14.

18 Indeed, players including Dustin Johnson, Sergio Garcia, and Graeme McDowell have resigned

19 from the TOUR in favor of doing so. Plaintiffs themselves have also already sold their services to

20 join LIV, only without resigning. What Plaintiffs cannot do, however, is enter into annual

21 agreements with the TOUR that grant the TOUR their media rights, breach those agreements by

22 granting conflicting media rights to LIV, and then force the TOUR to allow LIV to freeride off

23 the TOUR's investment and goodwill by compelling the TOUR to allow Plaintiffs to play in both

24 TOUR and LIV events. The TOUR's eligibility and media rights provisions are analogous to an

25 exclusive services contract. Israel Decl. ¶¶ 11, 50. Such agreements are common, including for

26 independent contractors. *Id.*; *see also Cogan v. Harford Mem'l Hosp.*, 843 F. Supp. 1013, 1018,

27 1020 (D. Md. 1994) (rejecting antitrust claims where defendant hospital terminated contract with

28 plaintiff independent contractor physician who operated a competing clinic because plaintiff "has

not been eliminated as a competitor in the market"). As Dr. Israel notes, Compass-Lexecon has

exclusive relationships with independent contractor academics that prevent those academics from

providing consulting services to different firms simultaneously. Israel Decl. ¶ 50. Such provisions

are commonplace and procompetitive. *Id.*

Moreover, suspending Plaintiffs from the TOUR based on their breaches of the

Regulations is perfectly legal: "businesses are free to choose the parties with whom they will

deal, as well as the prices, terms, and conditions of that dealing." *linkLine Commc'ns*, 555 U.S. at

448. Plaintiffs' theory of exclusionary conduct boils down to their claim that the TOUR has an

antitrust duty to allow Plaintiffs to play in TOUR events, even while Plaintiffs are breaching their

contracts and competing against the TOUR as agents and "equity owner[s]" of LIV. Mot. at 14–

15; Khosla Decl. ¶ 8. But the antitrust laws do not require the TOUR "to aid competitors."

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410–11 (2004);

*see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 994 (9th Cir. 2020).

> **c.    Any alleged harm to competition does not outweigh the procompetitive benefits of the TOUR's eligibility and media rights Regulations**

TRO Plaintiffs also cannot show that any alleged anticompetitive harm outweighs the

TOUR's procompetitive justifications. *See Qualcomm*, 969 F.3d at 991. The TOUR's Regulations

are justified by several "legitimate business purpose[s]." *Universal Analytics, Inc. v. MacNeal-*

*Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990).

**First**, the TOUR's eligibility and media rights Regulations promote competition between

tours—including not only LIV, but tours based outside North America as well—because they are

an exclusive dealing agreement between the TOUR and its members during the applicable season.

In exchange for TOUR membership benefits, members agree not to play in competing events in

North America. Courts routinely acknowledge the "well-recognized economic benefits to

exclusive dealing arrangements, including the enhancement of interbrand competition." *Omega*

*Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). "Exclusive dealing agreements

are often entered into for entirely procompetitive reasons, and generally pose little threat to

competition." *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *4 (N.D. Cal. July 2,

2014) (citation omitted); *see Brown v. Hansen Publ'ns, Inc.*, 556 F.2d 969, 971 (9th Cir. 1977).

Here, as Dr. Israel explains, Plaintiffs' limited exclusivity commitment to the TOUR increases competition by requiring the TOUR and LIV to compete vigorously against one another to attract and retain the top players, which is already occurring. Israel Decl. ¶¶ 53–63.

*Second*, the Regulations are procompetitive because they encourage TOUR members to use their best efforts to support and promote the TOUR rather than competing tours. Without those obligations, players with conflicting interests would be incentivized to promote LIV at the expense of the TOUR, including by recruiting players for LIV while participating in TOUR events and forgoing conflicting TOUR tournaments in favor of LIV events. Israel Decl. ¶¶ 13, 88–95; Peters Decl. Exs. 2–4. Courts frequently recognize as procompetitive exclusive contracts that, like the Regulations here, are designed to encourage the best efforts and undivided commitment of a venture's participants. *See, e.g.*, *E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 8 (1st Cir. 2004); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984); *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 840 n.2 (5th Cir. 1975).

*Third*, Plaintiffs' agreement to play exclusively in TOUR events in North America and to grant the TOUR their exclusive media rights prevents LIV from freeriding on the TOUR's platform and reputation. "Eliminating free riders" is a well-recognized "procompetitive advantage of alleged restraints on competition." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 43 (2d Cir. 2018); *see, e.g.*, *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 222–23 (D.C. Cir. 1986); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 969–70 (10th Cir. 1994). The TOUR has invested heavily to grow the game of golf and generate interest in its product. Levinson Decl. ¶¶ 2 –25. If Plaintiffs, in breach of their agreements with the TOUR, were permitted to play in TOUR and LIV events in North America, the TOUR would effectively be subsidizing its competitor by allowing LIV and its players to freeride off the TOUR's efforts in the United States. Israel Decl. ¶¶ 88–107. LIV would be using the TOUR's platform and hard-earned reputation to promote LIV and its players at TOUR events. *Id.* The TOUR's freeriding concerns explain why it grants releases to players for certain events on tours based outside of North America but withholds releases from players seeking to play in LIV events regardless of location. Because the majority of LIV's events are held in North America, they pose greater risk

1    to the TOUR's investment in its platform and reputation. *Id.* ¶¶ 96–98. Such freeriding harms

2    players and fans because it disincentivizes the TOUR from continuing to invest in its product,

3    players, and platform and disincentivizes LIV from doing the same. *Id.*

4        **3.    The law and facts do not clearly favor TRO Plaintiffs on their Section 1 claim**

5            TRO Plaintiffs' jumble of conspiracy allegations fare no better than their Section 2 claim.

6    TRO Plaintiffs assert the TOUR conspired with the DP World Tour either to boycott players who

7    work with LIV or to boycott LIV itself. *See* Mot. at 19. Whatever claim they are making, neither

8    is supported by anything other than counsel's mischaracterization of selective news reports, third-

9    party statements, and LIV press releases. *Compare* Brass Decl. Ex. 22 *with* Goldberg Decl. Ex.

10   42. Even if Plaintiffs' hearsay upon hearsay upon hearsay were sufficient, their Section 1 theory

11   bears no relationship to the relief TRO Plaintiffs seek here. Nor could it. As a matter of law,

12   Plaintiffs cannot allege a Section 1 claim based on the TOUR's enforcement of its ***own*** eligibility

13   and media rights Regulations. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)

14   ("[I]t is perfectly plain that an internal 'agreement' to implement a single, unitary firm's policies

15   does not raise the antitrust dangers that § 1 was designed to police.").

16           Plaintiffs' conspiracy allegations fail for two other reasons. ***First***, their boycott theory is

17   "limited to cases involving horizontal agreements among *direct competitors*." *Nova Designs, Inc.*

18   *v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) (emphasis added). But Plaintiffs'

19   own economist contends that the DP World Tour does ***not*** compete with the TOUR. Leitzinger

20   Decl. ¶¶ 42–46. ***Second***, to establish a Section 1 boycott claim, TRO Plaintiffs must show that the

21   TOUR "possesses a dominant market position." *Adaptive Power Sols., LLC v. Hughes Missile*

22   *Sys. Co.*, 141 F.3d 947, 950 (9th Cir. 1998) (citation omitted). But LIV's successful entry into the

23   market is "conclusive" proof that that the TOUR does ***not*** have such power. *Syufy Enters.*, 903

24   F.2d at 665; *Tops Mkts.*, 142 F.3d at 99. TRO Plaintiffs have not established that the law or the

25   facts clearly favor them on their Section 1 claim.

26       **4.    TRO Plaintiffs are not entitled to play in TOUR events pending their appeals**

27           Nor can TRO Plaintiffs prevail on their misguided argument that their suspensions must

28   be "abated" while they appeal their intentional and ongoing violations of TOUR Regulations.

Mot. at 11–12. Nothing in the Regulations entitles TRO Plaintiffs to violate the rules repeatedly and deliberately but continue to play in TOUR events to the detriment of all other rule-abiding members, merely because they have lodged an appeal. On the contrary, Article VII.C of the Regulations empowers the Commissioner to immediately suspend serial offenders like Plaintiffs, and to maintain their suspensions until any appeal of an ensuing disciplinary action is concluded. The Commissioner exercised that authority here with respect to all three TRO Plaintiffs—a fact that they conveniently ignore in their pleadings. The Commissioner's power to suspend serial offenders goes to the heart of his duty to protect and promote the interests and reputations of the TOUR and its members. And it would be rendered all but meaningless if players with nefarious intent could override his decision by merely lodging appeals.

When private organizations establish regulations and disciplinary procedures for their members, courts must defer to their judgment on how those procedures should operate and avoid interfering with them. *See Scheire v. Int'l Show Car Ass'n (ISCA)*, 717 F.2d 464, 465 (9th Cir. 1983) (articulating "[t]he principle of judicial noninterference in internal disputes of voluntary associations"); *Oakland Raiders v. Nat'l Football League*, 131 Cal. App. 4th 621, 645–46 (2005) (warning that "judicial intervention in such disputes will have the undesired and unintended effect of interfering with the [organization]'s autonomy in matters where the [organization] and its commissioner have much greater competence and understanding than the courts"); Levinson Decl. Ex. 6 at 95 (Commissioner has power to "interpret and apply" the Regulations).

TRO Plaintiffs invite the Court to ignore the deference that should be afforded to the TOUR's interpretation of its own rules, and to do so with no basis in either the rules or common sense. Under Article VII.E, PGA TOUR members may stay enforcement of an Intermediate or Major ***penalty*** while it is being appealed. But there is ***no*** corresponding stay pending appeal for suspensions under Article VII.C resulting from a ***probation*** violation, as the plain language of the Regulations makes clear. The ***penalty*** procedures described in Section A include a 14-day period for notice and a 14-day period for member response, and expressly include a stay pending appeals under Section E. By contrast, the ***probation*** procedures described in Section C contain no reference to an appeal. Nor would such a procedure make any sense because the probation rule

exists to fill the gap while the disciplinary process runs its course, which may span several months. TRO Plaintiffs' interpretation—that repeat, willful, and ongoing violators of the rules can override the Commissioner's decision to immediately suspend them—would only invite abuse and would eviscerate the Commissioner's power to protect the TOUR and its members from parties who are actively trying to harm them.

Moreover, the continuous and ongoing nature of TRO Plaintiffs' violations presents a second, independent reason why they are not entitled to play in TOUR events during their appeals. Even for appeals of penalties under Section E, no stay applies to suspensions "from a tournament then in progress or scheduled for the calendar week in which the alleged violation occurred." Levinson Decl. Ex. 6 at Art. VII.E.2. By these means, the Regulations afford a stay to players who in good faith wish to contest a Penalty imposed for a discrete incident that occurred in the past, but ***not*** to players who continue actively violating the Regulations during their appeals. For this additional reason, TRO Plaintiffs are not entitled to stay their suspensions.

### 5.    TRO Plaintiffs' "fair process" claim is meritless

Finally, TRO Plaintiffs' challenge to the TOUR's disciplinary process gains no traction. As TRO Plaintiffs concede, "fair process" claims apply only to organizations that are "tinged with public purpose." Mot. at 20 (quoting *McCune v. Wilson*, 237 So. 2d 169, 173 (Fla. 1970) (internal ellipses omitted)). But "the right to fair procedure is a limited one that applies to an organization that operates in the public interest—and not one that engages in activity of some interest to the public." *Flaa v. Hollywood Foreign Press Ass'n*, 2020 WL 8256191, at *4 (C.D. Cal. Nov. 20, 2020). Fair process claims have "not been applied in the field of entertainment." *See id.* (press association); *Yari v. Producers Guild of Am., Inc.*, 161 Cal. App. 4th 172, 180 (2008) (film producers' association). TRO Plaintiffs' lone case on this point, *McCune v. Wilson*, 237 So. 2d 169, 173 (Fla. 1970), is easily distinguishable because it involved a "quasi-public organization." Nor can TRO Plaintiffs establish that the TOUR has "monopolistic control" in any relevant market, as demonstrated by the emergence of LIV and the existence of other competitors. Section III.D.2, *supra*. Thus, Plaintiffs' fair process claim fails as a matter of law.

Even if TRO Plaintiffs' fair process claim applied to the TOUR's private disciplinary

procedures, it would not support any request for extraordinary injunctive relief. There is no "rigid procedure that must invariably be observed" to provide "fair procedure." *Ezekial v. Winkley*, 20 Cal. 3d 267, 278 (1977). All that is required is "adequate notice of the 'charges'" and a "reasonable opportunity to respond." *Id.* (citing *Pinsker v. Pac. Coast Soc'y of Orthodontists,* 12 Cal. 3d 541, 555 (1974)). The TOUR's disciplinary process easily meets this test. It is undisputed that the TRO Plaintiffs received adequate notice of the charges and have had a reasonable opportunity to respond. Levinson Decl. ¶¶ 26–99. Nothing more is required.

TRO Plaintiffs complain that the TOUR's Appeals Committee fails to provide "impartial review." Mot. at 21. But the Appeals Committee, which has not yet made any determinations, is comprised of independent non-player members of the TOUR Policy Board and "may affirm, modify (increase or decrease), or reverse the decision of the Commissioner." Levinson Decl. Ex. 17. TRO Plaintiffs have not and cannot explain how they would suffer irreparable injury by allowing their appeals to play out. TRO Plaintiffs also suggest that the Commissioner is supposedly "bias[ed]" against them. Mot. at 21. That's false. But regardless, the Commissioner has referred their appeals to the Appeals Committee, a separate body, for review. Levinson Decl. ¶¶ 55, 75, 94 & Exs. 17, 29, 40. Finally, TRO Plaintiffs' allegations about other supposed minor flaws in TOUR processes, Mot. at 21, are belied by the facts. Mr. Gooch *was* timely provided notice; the TOUR *did* send disciplinary notice letters to each TRO Plaintiff; and, as discussed above, the TOUR was under no obligation to "abate" TRO Plaintiffs' suspensions for their ongoing violations. Levinson Decl. ¶¶ 36–99. Regardless, none of these complaints change the ultimate fact that the TOUR's Regulations provide a "fair procedure," which TRO Plaintiffs continue to avail themselves of to this day. *Pinsker*, 12 Cal. 3d at 555.

## IV.   CONCLUSION

For the foregoing reasons, the PGA TOUR respectfully requests that the Court deny TRO Plaintiffs' motion for a temporary restraining order.

1

Dated:  August 8, 2022                          KEKER, VAN NEST & PETERS LLP

2

3                                    By:    /s/ Elliot R. Peters
                                            ELLIOT R. PETERS
4                                           DAVID SILBERT
                                            R. ADAM LAURIDSEN
5                                           NICHOLAS S. GOLDBERG
                                            SOPHIE HOOD
6
                                            Attorneys for Defendant
7                                           PGA Tour, Inc.

8                                           SKADDEN, ARPS, SLATE, MEAGHER
                                            & FLOM LLP
9
                                            PATRICK FITZGERALD
10                                          ANTHONY J. DREYER
                                            KAREN M. LENT
11
                                            Attorneys for Defendant
12                                          PGA Tour, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28