# EXHIBIT A

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**PLAYER PARTICIPATION AGREEMENT**

This Agreement dated as of 28ᵗʰ May, 2022 (this **Agreement** which shall include each Schedule and Annex to it) is made between (1) LIV Golf Holdings Ltd, a private limited company incorporated under the laws of Jersey (**League HoldCo**), LIV Golf Incorporated, a Delaware corporation (**US OpCo**), **LIV Golf Ltd**, a private limited company incorporated under the laws of England and Wales (**UK OpCo**) , and Talor Gooch, an individual of ████████ (**Player**).

**IT IS HEREBY AGREED as follows:**

**1.**   **Engagement**

1.1   The Player is engaged as a professional golfer (a) by the League Operator before the Designation Date (as defined in Section 2.2 below) and (b) by the Team Operator following the Designation Date and when the Team Operator becomes a Party to this Agreement.

1.2   It is agreed that the Player shall not be eligible for relegation until the end of the 2025 Season.

1.3   ███████████████████████████████████████████████████ The Player shall not refuse to participate fully in any Event due to a conflict with a Key Event unless such Key Event is scheduled to take place within 5 days of the applicable Event.

1.4   It is acknowledged that (a) the League Operator currently intends (but does not guarantee) to schedule a Season of 8 "Invitational Series" Tournaments during Fiscal Year 2022 (the "**2022 Season**"), a Season of 10 "Invitational Series" Tournaments during Fiscal Year 2023 (the "**2023 Season**") and a Season of 14 Tournaments (plus the League Qualification Event if applicable) during each subsequent Season but that (b) the actual number of such Tournaments in any Season may be determined by the League Operator at its sole discretion. The Player agrees, as a fundamental condition of this Agreement, to participate in each no less than █ Tournaments in the 2022 Season (including the Team World Championship in 2022) and in each Tournament in each subsequent Season during the Term in accordance with this Agreement and the League Regulations (the "**Playing Commitment**").

1.5   The Player agrees that both before and after the Designation Date he will perform this Agreement as an independent contractor and that nothing in this Agreement may be construed or relied upon as evidence that the League Operator or the Team Operator, as the case may be, is an employer, joint-employer, and/or co-employer of the Player.



**2.**   **Designation**

2.1

2.2

2.3

2.4

**3.**   **Term**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY                    PLAYERS0000001

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

3.1 This Agreement shall come into effect on the Effective Date and shall remain in force until 60 days after the final Tournament of the ▮ Season unless this Agreement is terminated earlier in accordance with its terms (the "Term"). If the Player finishes the ▮ Season with an individual ranking of ▮ or better then the Player in his sole discretion will have the option to renew the Term for the ▮ Season and if such ranking in is ▮ or better the Player in his sole discretion will have the option to renew the Term for the ▮ Seasons. If applicable, the Player shall inform the League Operator and/or Team Operator whether he intendes to exercise this renewal option within 60 days of the final Tournament of the ▮ season.

3.2 Not later than 6 months before the end of the Term the Player and its Representatives shall negotiate, exclusively and in good faith with the League Operator and the Team Operator (and not, for the avoidance of doubt, any Other Team Operator), in respect of the terms and conditions on which the Player would be willing to extend the Term. Any such extension shall be recorded in writing and signed by all Parties.

**4.  Payments**

4.1 In consideration for the Player fully performing this Agreement, and in each case, subject to this Agreement, the League Regulations and all Team Rules and Policies the relevant Payor Entity (as applicable) shall pay to the Player during the Term: (a) Individual and Team Prize Money as set out below, (b) Commitment Fees in accordance with Schedule 1, (c) Annual Payments in accordance with Schedule 2, and (d) Adjusted Earnings Payments in accordance with Schedule 3.

4.2 **Individual Prize Money:** The Player shall be paid his share of the following sums:

(a) with respect to each Season (i) ▮▮▮ (or such greater amount as the League Operator determines in its discretion) in respect of each Regular Tournament to be allocated to League Players based on their performance as set out in the League Regulations, and (ii) a share of ▮▮▮ (or such greater amount as the League Operator determines in its discretion) if the Player finishes in the top 3 League Players at the end of the series of Regular Tournaments (the League's "**Individual World Championship**," as set out in the League Regulations) provided that the Player has complied fully with his Playing Commitment in respect of the relevant Fiscal Year; and

(b) ▮▮▮, to be paid to the Player if, following the Exercise Date and during the Term, he wins the Masters, the US Open, the Open Championship or the United States PGA Championship provided that he has, while competing in such tournament, complied with all of his obligations in this Agreement including as regards apparel and has satisfied the Full Season Condition in respect of the relevant Fiscal Year (such sum to be paid within 30 days of the end of the relevant Season).

4.3 **Team Prize Money**: The Player shall be paid his share of the following sums in respect of each Season:

(a) ▮▮▮ (or such greater amount as the League Operator determines in its discretion) to be allocated among the top 3 League Teams competing in each Regular Tournament as set out in the League Regulations (with the entitlement to such share ending on the Designation Date); and

(b) ▮▮▮ (or such greater amount as the League Operator determines in its discretion) to be allocated among the League Teams competing in the Team World Championship, based on their performance as set out in the League Regulations.

4.4 Before the Designation Date the League Operator shall pay or cause the applicable Payor Entity to pay to the Player (i) Prize Money and Commitment Fees and (ii) following the Exercise Date Annual Payments.

4.5 After the Designation Date: (a) the League Operator shall pay or cause the applicable EventCo to pay, (i) Individual Prize Money (if any) and Commitment Fees to the Player and (ii) Team Prize Money (if any) to the Team Operator and (b) the Team Operator shall pay the Player (i) following the Exercise Date, Annual Payments under Schedule 2 to the Player, (ii) the Player's share of Team Prize Money received by the Team Operator in respect of each Fiscal Year during the Term and (iii) Adjusted Earnings Payments in accordance with Schedule 3.

4.6 

REDACTED

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY          PLAYERS0000002

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

4.7    All payments required to be made to the Player shall be made by check or wire transfer of funds to such bank account as the Player may provide to the League Operator and the Team Operator in writing from time to time.

4.8    ███████████████████████████████████████████████████████████████████████████

**5.     Player Rights, Obligations and Acknowledgements**

5.1    The Player confirms that he has been provided with and has read the League Regulations and that by signing this Agreement and by participating in each Tournament he agrees that he is bound by and shall comply fully at all times with the League Regulations (as the same may be amended from time to time). The Player will be notified of any changes to the League Regulations and it shall be his obligation to promptly to familiarize himself with such changes. It is agreed that if there is any inconsistency between the League Regulations and this Agreement then the provisions of this Agreement shall prevail.

5.2    The Player acknowledges and agrees that the League Regulations include a number of obligations in relation to conduct before, at and in relation to Events including Tournaments (such as registration in good time and a requirement to insure) and that such obligations are an essential part of the Player's obligations in respect of each Tournament.

5.3    In addition to the obligations under the League Regulations, throughout the Term the Player agrees to do the following throughout the Term:

   (a)  comply fully with the League Regulations and Team Rules and Policies including as regards Team Apparel;

   (b)  and at any time thereafter not to assert any claim, or bring any action or proceeding arising out of or relating to the League Regulations or Team Rules and Policies, except, in each case, for any claims, actions or proceedings properly brought in accordance with the League Regulations and Team Rules and Policies;

   (c)  following the Designation Date, without first obtaining League Operator Approval, not play for, or otherwise become engaged by or on behalf of, any Other Team in a Tournament;

   (d)  inform the Team Operator and the League Operator in writing immediately (and, in any event, within two (2) Business Days) if the Player is unable or is unlikely to be able to participate in any Event or otherwise comply with any provision of this Agreement, including as a result of any injury (including a Golf-Related Injury), illness or Player Emergency;

   (e)  if requested by the Team Operator and/or the League Operator participate fully in respect of Team Promotional Activities and League Activities  regardless of whether the Player is able to participate in a Tournament due to an injury (but taking into account any limitation imposed by such injury);

   (f)  if requested by the League Operator or Team Operator with reasonable notice participate fully in in up to 7 additional Service Days in Fiscal Year 2022 and 12 additional Service Days in each subsequent Fiscal Year but no Service Day may occur on the same day as the Player is competing in any Covered Golf Activity. The Player shall be excused from attending any such Service Days in the event of a Player Emergency or pre-existing personal commitment provided that the Player notifies the Team Operator and/or League Operator, as applicable, of such Player Emergency or commitment as soon as practicable and, in any event within 5 days of being informed of the proposed date(s) of any such Service Days;

   (g)  not act or omit to act in any way which would cause, or would reasonably be expected to cause, either the League Operator or Team Operator to be in breach of any League Rights Agreement or Team Rights Agreement respectively, any Venue Agreement or of any agreement or arrangement with any Distributor;

   (h)  on and following the Exercise Date when involved in any League Activity, Team Promotional Activity or any other Covered Golf Activity: (i) the Player shall wear and use only the appropriate Team Apparel and not display any badge, mark, logo, insignia, or trading name (including any Intellectual Property owned by the Team Operator or the League Operator) without first obtaining the Specified Approval. It is agreed that the Player may display a single badge, mark, logo, insignia, or trading name of one third-party supplier of golf technical equipment on the right side of the Player's hat or cap, which hat

3

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

or cap shall otherwise meet all requirements for Team Apparel as set out in this Agreement and the League Regulations; and (ii) subject as provided in this Agreement refrain from using or otherwise appearing with or using any product (e.g., any hard goods like a coffee mug) bearing any badge, mark, logo, insignia, or trading name without first obtaining the Specified Approval;

(i) not to grant or seek to grant, directly or indirectly, to any person any rights of any kind in respect of the League Rights, the Team Rights and/or the League;

(j) not act or fail to act in any manner which brings or could be expected to bring any Relevant Person into disrepute, scandal or ridicule including as a result of any comment made to the media, via any Social Media channels or in any other public forum;

(k) refrain from (i) being accredited to act as a journalist or in any other capacity for any media organization in relation to the League or any Tournament or (ii) providing exclusive interviews or commentaries or entering into any agreements or arrangements involving exclusive interviews with or appearances in or on any media or Social Media of any kind in relation to any Event or League Activity in each case without obtaining the Specified Approval;

(l) comply with any policy of insurance taken out by the League Operator or Team Operator, the terms of which the Player has been notified, and not knowingly do anything which will cause to be void or voidable or invoke any exclusion of coverage in any such insurance policy;

(m) act in accordance with (i) all applicable Laws in any jurisdiction where a Tournament or Event is held and (ii) all reasonable instructions of the League Operator or Team Operator (and their duly authorized personnel) in connection with the performance of this Agreement;

(n) not make any statement or commit any act (or fail to act), nor make, post, publish or communicate to any Person or in any public forum any false, defamatory, libelous, or slanderous remarks, comments or statements, which could reasonably be expected to, or actually does, adversely affect (i) the Player's ability to participate in and on connection with any Tournament or Event or (ii) the reputation or public image of any Relevant Person;

(o) not own, directly or indirectly, any interest in any Other Team Operator, Other Team, Event, or Tournament;

(p) ensure that the Player's Caddie enters into and complies with the terms of the Player's Caddie Contract (it being understood that a Caddie may not participate in any Event if such Caddie is not then party to a Caddie Contract);

(q) ensure that the Player has all necessary visas, work permits and other approvals or permissions to enable the Player to perform this Agreement including as regards travel to and participation in each Event in each case in a timely fashion.

5.4 If in respect of any Fiscal Year and in accordance with this Agreement and the League Regulations, the Player satisfies the Full Season Condition then he shall not be obliged to play in any additional Tournaments in such Season unless otherwise agreed by him.

5.5 The Player shall at all times be entitled to use clubs, balls and shoes of his choosing when playing competitive golf and to display the branding of the manufacturer on the same save where the Team Operator elects to exercise the rights to gloves and shoes on a teamwide basis following the Designation Date in which case the Team Operator shall consult with the Player in respect of any additional compensation due to the Player as a result of such exercise. If the Team Operator elects to exercise the rights to gloves and shoes on a teamwide basis, the use of those gloves and shoes shall be subject to the Player's consent, which shall not be unreasonably withheld or delayed.

5.6 On and after the Effective Date, the Player shall not enter into or commit to enter into any agreement or arrangement (oral or written) which  conflicts with, or would reasonably be expected to conflict with, the Player's grant of rights and other obligations in this Agreement (a "**Conflicting Contract**").

5.7 The Player agrees that he has no rights of any kind in or to the League and each Event which exist at the Effective Date or come into being at any time thereafter and that all such rights (including all of the League Rights and Team Rights) are vested in the League Operator and the Team Operator respectively (a shall be reflected in the Designation Agreements).

5.8

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY                    PLAYERS0000004

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

5.9    The Player now hereby grants to the League Operator an exclusive, perpetual, royalty-free, worldwide, transferable, fully paid-up irrevocable right and license (with the right to grant sublicenses) to Exhibit, Exploit, copy, reproduce and otherwise use the Player Identification as follows:

(a)   as at the Effective Date solely in connection with promotional activities of any kind which are organized by or on behalf of the League Operator, any Affiliate thereof or any League Rights Holder, in order to promote the League, future Tournaments, the Team and all Other Teams, the Player (solely in respect of the Player's participation in the League), other Team Members (solely in respect of such Team Members' participation in the League), any League Player (solely in respect of such League Player's participation in the League) and any Other Team Operator ("**Launch Rights**"); and

(b)   as from the Exercise Date in connection with (a)

(b) all Content created, recorded or otherwise generated by or on behalf of the League and/or the Team or any licensee or assignee thereof during the Term, and create derivative works thereof, in any manner whatsoever, alone or together with any other materials or Content, on, via or through any and all media of any kind (now known or subsequently developed) in connection with, related to, in furtherance of, or for the purposes of any League Activity, League Rights, Promotional Activity, Team Rights, Team Promotional Activity or otherwise in relation to the League or any Event.

5.10   The Player  further agrees that the League Operator has the exclusive and unrestricted right in perpetuity (including after termination of this Agreement), exercisable in its sole and absolute discretion, to Exhibit, Exploit, sell, assign license, sublicense use, dispose of, or otherwise exercise any or all the rights granted in Section 5.9 above (including with respect to any Content created during the Term), to retain the proceeds therefrom and to do all things necessary for the full and complete use, Exhibition, Exploitation, and exercise of such rights.

5.11   The Player agrees that the League Operator owns and controls any and all rights to Tournament Content, Ancillary Content, Team Content, or any other Content captured, recorded, taken or otherwise created by the League Operator or, as permitted by the League Operator the Team Operator, in each case during the Term, in connection with the League, any Event or this Agreement.

5.12   Subject to this Agreement, the Player may enter into any endorsement or sponsorship arrangement with a third party and grant such third party (on a non-exclusive, non-assignable and non-sublicensable basis) the right to Exploit the Player's Player Identification, except to the extent that such arrangement conflicts with the Player's obligations under this Agreement or brings, or would reasonably be expected to bring, any Relevant Person, into disrepute, scandal or ridicule, or shock or offend a portion or group of the public, in a manner that would result in, or would reasonably be expected to result in, material and demonstrable harm to any Relevant Person.

5.13   The Player agrees that personal details and background information concerning him including live and delayed recordings, which may include images of him may be used by the League Operator and the Team Operator as contemplated by this Agreement.

5.14   The Player understands that if he is determined to be physically or mentally unable to participate in any Event, he will not be able to do so and the Player also agrees to execute a copy of the form of Emergency Medical Release set out in the League Regulations.

5.15   The Player acknowledges that if the Player withdraws from any Event at any time such withdrawal shall not affect any of the rights assigned by the Player or any of the representations, warranties, covenants, agreements, waivers, releases or indemnities made by the Player in this Agreement or any other agreement related to such Event, all of which shall survive.  If the Player voluntarily withdraws from any Event he shall forfeit any prize or other consideration already received or to which he may otherwise be entitled unless otherwise provided by the League Regulations.

5.16   If the Player Retires he shall, at all times during the Term, continue to comply with any reasonable non-playing requests from the League Operator or Team Operator relating to the League or the Team, as applicable

5

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

including duties relating to team captaincy, promotion of the League, fulfilment of media obligations and attendance at Events (including with respect to wearing and displaying Team Apparel).

**6.    League and Team Operator Obligations**

6.1    Neither the League Operator nor the Team Operator may use the Player Identification in any way which would imply any personal commercial endorsement by the Player of any business, product, or service, and the League Operator shall, and shall cause the Team Operator to, use its commercially reasonable efforts to ensure that the Player Identification is not used in connection with any sponsorship or commercial endorsement other than in connection with similar Player Identifications of at least 2 Other Players (except that nothing shall prevent the League Operator from Exhibiting, Exploiting, copying, reproducing, editing or otherwise using the Player Identification in connection with any Team Apparel under Section 5).

6.2    Neither the League Operator nor the Team Operator shall knowingly and intentionally authorize the Player Identification to be used in any defamatory manner but for the avoidance of doubt nothing in this Section shall prevent the Player Identification from being used on an individual basis in connection with an endorsement of the League or any Event or otherwise as permitted under this Agreement.

**7.    Termination**

7.1    Each of the Team Operator (with League Operator Approval) and the League Operator may by written notice terminate this Agreement with immediate effect and without consideration if at any time (a) the Team Participation Agreement is terminated for any reason, or (b) the Player commits a Fundamental Default, which, if capable of remedy, has **not been remedied to the terminating Party's reasonable satisfaction within** 20 Business Days of written notice requesting the Player to remedy the same, or (c) a Multi-Player Fundamental Default occurs in respect of which the League Operator has not waived its rights in writing (to be decided at its sole discretion), or (d) the Player commits an irremediable Fundamental Breach, or (e) the Player claims, in writing or orally, and whether directly or through any of its Representatives or Affiliates, that this **Agreement or any other League Document, or any of the Player's obligations hereunder or thereunder,** is illegal, invalid or unenforceable in accordance with its or their respective terms.

7.2    

7.3    In the event that the League Operator files any bona fide petition for the winding up or bankruptcy of the League Operator, then, provided the Player is then in compliance in all material respects with its obligations under the League Documents, the Player may terminate this Agreement by written notice to all Parties.

7.4    The termination of this Agreement for any reason shall not (a) affect those of its provisions to the extent expressed to survive, or to the extent by implication are intended to survive, such termination including Sections 5.7, 5.9, 5.10, 7, 8, Sections 2 and 3 of Schedule 1 and paragraphs 1-3, 5, 9, 11-21, 23 and 24 of Schedule 5 or (b) relieve a Party of remedies against it for any Willful Breach of any of its  representations,

6

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

warranties, covenants or agreements in this Agreement before such termination. Further, the Player further acknowledges that the termination of this Agreement shall not affect any of the rights the Player has assigned or granted to the Team Operator and to the League Operator or others in this Agreement or any other agreement relating to the League or any Event including in relation to Content.

7.5 Upon the termination of this Agreement the Player shall return to the Team Operator (or, prior to the Designation Date, the League Operator) in a reasonable and proper condition any property (including any car and any equipment or other item of any kind) and all Confidential Information which has been provided or made available to the Player by or on behalf of the Team Operator or the League Operator in connection with this Agreement.

7.6 If the League Operator fails to stage the first Tournament on or before the 2 year anniversary of the Effective Date (a **"Non-Performance Event"**) then, provided the Player is in compliance in all material respects with its obligations under this Agreement, the Player may by written notice terminate this Agreement provided (but not otherwise) that such notice is properly served within 30 days of the Non-Performance Event in which event this Agreement shall terminate on the 40th day following service of such termination notice unless before such date the first Tournament has begun in which case this Agreement shall not terminate. Any Non-Performance Event shall not constitute a breach of this Agreement and the Player's sole and exclusive remedy in relation to it shall be as described in this Section.

**8.     Intellectual Property**

8.1 As of the Exercise Date, the Player hereby unconditionally and irrevocably assigns to the League Operator the Player's entire right, title and interest in and to all copyright and other Intellectual Property rights of any kind or nature (including performer's rights) in respect of any appearance or activity by the Player in connection with any Event, League Activity or Team Promotional Activity and any exercise of the rights granted to the League Operator under this Agreement (all such Intellectual Property rights, collectively, the **"Subject IP"**). The Player shall not during the Term or thereafter, challenge (a) the rights of the League Operator in or to the Subject IP, or (b) the right of the League Operator to grant any other Person (including the Team Operator) any rights or licenses relating to any of the Subject IP.

8.2 Upon any request by the League Operator, the Player agrees during the Term and following termination of this Agreement (for no charge but at no cost to the Player) to execute such documents and do such acts as may be necessary to give full effect to the terms of this Agreement, including Section 8.1 above.

8.3 To the fullest extent allowable by applicable Law the Player waives all moral rights (if any) including any rights of attribution to which the Player is or may become entitled under the applicable Laws of any country or other jurisdiction in relation to the Player's performance of this Agreement and the rights granted to the League Operator under this Agreement.

8.4 The Player agrees and acknowledges that all right, title and interest in the Marks shall be vested in the League Operator, and that the Team Operator has been, or will be, in the League Operator's sole and absolute discretion, granted certain rights in respect thereof by the League Operator, and that: (a) the Player has no interest of any kind and shall not assert any interest of any kind in the same at any time, both during and after the termination of this Agreement, (b) the Player shall not, directly or indirectly, seek to make use of any of the Marks without first obtaining the Specified Approval, and (c) the Player shall not, directly or indirectly, take any action which is inconsistent with or which might otherwise adversely affect the Marks. Nothing in this Agreement serves to or shall be deemed to assign, convey or transfer any ownership right to the Player in any of the Intellectual Property rights pertaining to the League Operator, the Team Operator, the League Rights, the Team Rights, any Tournament, League Activity, Team Promotional Activity or other Promotional Activity.

**IN WITNESS WHEREOF**, the Parties caused this Agreement to be executed as of the Effective Date.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**LIV GOLF HOLDINGS LTD**



By: _____
Name: Stephen McCormack        steven bowen

Title: Zedra Directors (Jersey) Limited as corporate director and Zedra Corporate Officers (Jersey) Limited as corporate director.

**LIV GOLF INCORPORATED**

By: _____
Name: Atul Khosla

Title: COO

**LIV GOLF LTD**

By: _____
Name: Louise Savage

Title: Director

**TALOR GOOCH**



8

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**SCHEDULE 1**
**Commitment Fees**

1.    **Payment of Commitment Fee**

1.1    Subject as provided in this Agreement and the League Regulations, the Payor Entity shall pay the following Commitment Fees in the following instalments: (a) ██████████ on signature of this Agreement and ██████████ on the date on the date falling 7 days after the Player's participation in his first Regular Tournament in the ███████ Season.

1.2    ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1.3    The Commitment Fees shall be paid in cash.

1.4    No Commitment Fee Payments shall become due following the termination of this Agreement.

2.    **Default**

2.1    ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

9

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**3.**   **Commitment Fee Repayment**

3.1



3.2

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY          PLAYERS0000010

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**SCHEDULE 2**
**Annual Payments**

1.   **Annual Payment**
1.1

2.   **Annual Payment Reductions/Repayments**
2.1

2.2

3.   **Annual Payment Repayment**
3.1

3.2



11

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**SCHEDULE 3**
**Adjusted Earnings Payment**

**1.     Definitions**

1.1    "**Accounting Principles**" means the methods, principles, policies and procedures, judgments and valuation and estimation methodologies (including with respect to the calculation of reserves and accruals) applied by the League Operator from time to time.  Unless otherwise determined by the League Operator (from time to time), the Accounting Principles shall be applied consistent with the International Financial Reporting Standards ("**IFRS**") as then in effect.

1.2    "**Adjusted Earnings**" means with respect to each Fiscal Year during the Term, an amount equal to the Profit or Loss (as such term is defined in IFRS) of the Team Operator and its controlled subsidiaries, during such Fiscal Year (determined on a consolidated basis), in accordance with the Accounting Principles. Adjusted Earnings shall exclude any income or capital receipt (including any dividends, profit distributions, returns of capital, liquidation proceeds and disposal proceeds) arising to the Team Operator and its controlled subsidiaries which derives from direct or indirect participation in the equity interests of the Team Operator and/or such controlled subsidiaries.

1.3    "**Adjusted Earnings Payment**" means, in respect of any Fiscal Year during the Term, an amount equal to the product of (a)                                              and (b) the Adjusted Earnings for such period.  For the avoidance of doubt, if net income in respect of any Fiscal Year is zero or less than zero, the Adjusted Earnings Payment for such corresponding Fiscal Year shall be deemed equal to zero.

**2.     Full Season Condition**

2.1    No Adjusted Earnings Payment shall be made to the Player in respect of any Season occurring before the Designation Date. After the Designation Date the Team Operator's obligation to pay the Adjusted Earnings Payment to a Player for a given Fiscal Year is wholly conditional on the Player's satisfaction of the Full Season Condition in relation to such Fiscal Year and if the Player fails to do so in any given Fiscal Year, the Player shall not be entitled to any  Adjusted Earnings Payment for such Fiscal Year.

**3.     Adjusted Earnings Calculation Procedures**

3.1    As soon as reasonably practicable following each Fiscal Year after the Designation Date for which the Player has satisfied the Full Season Condition, the Team Operator shall deliver to the Player a certificate (the "**Adjusted Earnings Certificate**") setting out the Adjusted Earnings and the Adjusted Earnings Payment for such Fiscal Year (the date on which such certificate is delivered or, if later, the date on which such amount otherwise becomes final and binding on the Parties, the "**Determination Date**").

3.2    The calculation and the amounts of Adjusted Earnings and the Adjusted Earnings Payment set out in any Adjusted Earnings Certificate shall be final and binding on the Player unless subsequently adjusted by the Team Operator in which event the calculation and amounts of the Adjusted Earnings and the Adjusted Earnings Payment as so adjusted shall be final and binding on the Player.

**4.     Adjusted Earnings Payment**

4.1    Within 30 calendar days of the Determination Date in each Fiscal Year the Team Operator shall, subject to this Schedule 3, pay to the Player the applicable Adjusted Earnings Payment to the bank account notified in writing by the Player to the Team Operator.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY                    PLAYERS0000012

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**SCHEDULE 4**
**Schedule of Exceptions**

1.     Section V.B.1 of the 2021-2022 PGA Tour Player Handbook & Tournament Regulations is in effect and binding on the Player in his capacity as a member of the PGA Tour as of the Effective Date.

2.     [*Other disclosures*].

13

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

## SCHEDULE 5
### Miscellaneous Provisions

1.  **Fees and Expenses.**  Except as otherwise provided herein, all fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such fees or expenses. In this regard, the Player agrees that, except as expressly provided in this Agreement, the Player is responsible for all fees, costs and expenses incurred by or on behalf of the Player in connection with the Player's evaluation, negotiation and performance of this Agreement, including any sums payable to any of the Player's Representatives or other third party in connection with this Agreement.

2.  **Amendments and Waivers**. This Agreement may be amended, supplemented or restated only with a written instrument adopted, executed and agreed by the Parties.  No waiver of any breach of any of the terms of this Agreement shall be effective unless it is made expressly in writing and executed by the Party against whom such waiver is claimed.  No waivers of or exceptions to any provision of this Agreement shall be deemed to be a further or continuing waiver of any such provision and no failure or delay of any Party to exercise to exercise any right under this Agreement shall operate as a waiver thereof.  Notwithstanding the foregoing the Player agrees that the League Operator and the Team Operator, respectively, shall be entitled to amend, supplement or rescind any provision of the League Regulations or the Team Rules and Policies from time to time, in their respective sole and absolute discretion, and no such amendment, supplement or rescission shall be deemed to be an amendment of or supplement to this Agreement.

3.  **Payments.**  Payment of any sums under this Agreement shall be subject to such reporting and withholding for applicable taxes and other amounts to the extent required by applicable Law.  If requested by the Team Operator or the League Operator, the Player agrees to complete and submit such IRS or other tax forms, and to provide such other cooperation, as the Team Operator or the League Operator may reasonably require from time to time and that payment shall be conditional on receipt of those forms and provision of such other cooperation to the Team Operator or the League Operator, as applicable.  If a tax or related form or filing requires the disclosure of the Player's personal information (such as the Player's full Social Security Number or tax ID), the Player acknowledges that the Player will be required to make the required disclosure before the Player can receive payment from the Team Operator, the League Operator or the applicable EventCo, as may be applicable.  For the avoidance of doubt, the Player will not be treated as an employee of the League Operator or the Team Operator with respect to services performed by the Player under this Agreement for federal, state or local tax purposes, and shall be solely responsible to pay all taxes owed in accordance with applicable Law.

4.  **Force Majeure.** (a) If any Party is totally or partially prevented or delayed in the performance of any of its obligations under this Agreement by a Force Majeure Event and if such Party gives written notice thereof to each other Party specifying the matters constituting the Force Majeure Event referring to this paragraph (a), then the Party so prevented or delayed shall, subject to paragraphs (b) and (c) be excused from the performance of the affected obligation from the date of such notice for so long as such cause or delay shall continue.  The Party affected by any Force Majeure Event shall promptly notify each other Party in writing upon the cessation of any Force Majeure Event and shall, in such circumstances, resume its full performance of the previously affected obligations under this Agreement. (b) If any notice is given under paragraph (a), each Party shall use reasonable best efforts to mitigate the effect of the matters referred to in such notice and, in particular, but without limitation, shall negotiate in good faith to agree to a solution to the consequences of the matters constituting the relevant Force Majeure Event to achieve, to the greatest extent practicable, a resolution. (c) The provisions of this paragraph 4 shall not excuse, in relation to a Force Majeure Event, the performance of any obligations under this Agreement that can be performed notwithstanding the relevant Force Majeure Event.

5.  **Confidentiality**. (a) The Player shall not disclose to any Person (via any means) that the Player has been chosen to play in the League or otherwise entered into any agreement, arrangement or understanding with the League Operator or in relation to the League, until such time as the League Operator has publicly made such an announcement. (b) The Parties shall during the Term and thereafter treat this Agreement as being private and confidential and shall not disclose its contents either directly or indirectly to any person except in accordance with paragraph (a) above and otherwise (i) with the prior written agreement of the League Operator, (ii) as may be required by any statutory, regulatory or governmental or quasi-Governmental Authority, pursuant to the rules of any recognized stock exchange or as otherwise required by applicable Law,

14

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

(iii) by the Team Operator or the League Operator, to any or all of their respective Affiliates, or its or their respective directors, officers, employees, members, equity holders, agents or other Representatives or any potential licensee, sponsor or business partners of the Team Operator or the League Operator (or any of their respective Affiliates) or (iv) by the Player to the Player's Representatives or professional adviser(s) in each case to whom such disclosure is strictly necessary for the purposes of such disclosees' duties and then only to the extent so necessary (it being understood and agreed that each such Person to whom the Player makes any such disclosure shall be subject to customary confidentiality obligations with the Player that are no less restrictive than those set forth in this Agreement). (c) Each Party shall, subject to paragraph (a), be entitled to refer to the fact that they have entered into this Agreement without being in breach of the above provisions. (d) The obligations in this paragraph shall not apply to the Parties as regards information which (i) a Party is able to prove was already in the Party's possession at the date it was received or obtained other than as a consequence of a breach of confidentiality, (ii) a Party subsequently obtains from some other person with good legal title to the same, or (iii) comes into the public domain otherwise than through the default or negligence of the applicable Party. (e) Each Party shall direct each Person to whom it discloses any information in accordance with paragraph (b) above to comply with this paragraph 5 as if such Person were such party to this Agreement and bound by this paragraph 5, and such Party shall be liable for any breach of this paragraph 5 any Person to whom it discloses any information in accordance with paragraph (b).

6.   **Representations and Warranties** (a) Each Party represents, warrants and covenants to each other Party that it has at the Effective Date and shall continue to have during the Term the power, authority and legal right to execute and perform this Agreement and all other League Documents to which it is a party (including the power, authority and legal right to grant all rights actually or purportedly granted by the Player under this Agreement and such League Documents) and the performance of this Agreement and such League Documents shall not result in such Party being in breach of or otherwise in conflict with any other agreement or arrangement which is binding on it.  (b) The Player represents, warrants and covenants and confirms to the League Operator that the form of Player Participation Agreement hereby executed and delivered by them is the League Operator's approved form for the League as supplied to the Player by the League Operator without any changes of any kind save where any such changes have been expressly approved in writing by the League Operator. (c) The Player acknowledges and agrees that none of the League Operator, the Team Operator, their respective Affiliates nor any of their respective Representatives is acting as a fiduciary or financial or investment adviser for it, and the Player is not relying upon any advice, information, counsel or representations of the League Operator, the Team Operator, their respective Affiliates or any of their respective Representatives.  The Player has consulted with its own respective legal, regulatory, tax, investment, financial and accounting advisers to the extent it has deemed necessary, has made its own respective investment decisions and has entered into this Agreement and all other League Documents to which it is a party (or will enter into such other League Documents) based upon its own judgment and the advice of its advisors and not upon any view expressed by the League Operator, the Team Operator, their respective Affiliates, any of their respective Representatives or any other Person. (d) The Player has received from the League Operator and/or the Team Operator certain projections, forward-looking statements and other forecasts.  The Player specifically acknowledges and agrees that there are uncertainties inherent in attempting to make such projections, forward-looking statements and other forecasts, that the Player are familiar with such uncertainties, that the Player is taking full responsibility for making its own respective evaluation of the adequacy and accuracy of all projections, forward-looking statements and other forecasts so furnished to it (including, for the avoidance of doubt, the reasonableness of the assumptions underlying such projections, forward-looking statements and other forecasts), and that none of the League Operator, the Team Operator, any of their respective Affiliates and any of its or their respective Representatives, whether in an individual, corporate or any other capacity, (i) is making, directly or indirectly, any representation or warranty with respect to, and (ii) will have or be subject to any liability or indemnification obligation to the Player or any other Person resulting from (nor shall the Player have any claim with respect to), the distribution to the Player, or the Player's use of, or reliance on, any information, documents, projections, forward-looking statements and forecasts (including, for the avoidance of doubt, the reasonableness of the assumptions underlying such projections, forward-looking statements and forecasts), regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise. (e) None of the League Operator,

15

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

the Team Operator nor any of their respective Affiliates, nor any of their respective Representatives shall have any liability to the Player or any of his Affiliates or Representatives resulting from the use of any information, documents, or materials made available to the Player or any of his Affiliates or Representatives, whether orally or in writing, in any confidential information memoranda, "data rooms," "virtual data rooms," management presentations, due diligence (whether or not received from the League Operator, the Team Operator or any of their respective Affiliates or Representatives) in any form (including via discussion or presentation) in expectation of the transactions contemplated by the League Documents. (f) The Player is aware that the League Operator and, following the Designation Date, the Team Operator, have each been recently formed and have a limited operating history and of the risks associated with the League, and understands the business pursued by the League Operator and the Team Operator.  (g) The Player understands, acknowledges and agrees that none of the League Operator, the Team Operator, their respective Affiliates, nor any of their respective Representatives has (i) given the Player any assurance, guarantee or representation whatsoever nor to the expected or projected success, performance, profitability, return or consequence of the League or (ii) made any representations or warranties to the Player regarding the League Operator or the League.  The Player is not relying, has not relied and specifically disclaims all reliance upon any statements, representations or warranties (whether oral, written, expressed or implied) that may have been made by any other Person, and acknowledges and agrees that the League Operator, the Team Operator, their respective Affiliates and their respective Representatives have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any other Person.

7.    **Player Representations and Warranties**.  The Player represents, warrants and covenants to the Team Operator and to the League Operator that: (a) he is of sound mind; (b) before each Event he has been thoroughly examined by a licensed medical doctor previously approved in writing by the League Operator and that such medical doctor, in such medical doctor's best medical opinion, has confirmed that the Player does not have any medical conditions or limitations which would interfere with his ability to participate in each such Event or that would put the Player or other participants at risk of harm (and, if requested by the League Operator or the Team Operator, shall deliver a complete and copy of a certificate executed by such medical doctor to such requesting Party confirming the same). The Player acknowledges and agrees that the League Operator (i) and Team Operator will have no obligation to independently determine whether there are any physical, or mental health issues that may affect the Player's participation in any Event, (ii) shall have the right to arrange, and the Player shall provide the Player's reasonable cooperation in respect of, an examination by a medical doctor nominated by the League Operator in order to support the determination or certificate of any medical doctor presented to the League Operator; (c) other than the PGA Tour, he is not a member of any trade union, workers association or guild or any similar body (and the Player's membership in the PGA Tour  does not and shall not interfere with or abrogate the Player's obligations in this Agreement or any other League Documents); (d) he is eligible to travel to and to work in each country where Events are held (as shall be notified to Player by the Team Operator or the League Operator at least 30 days before the start of each Season); (e) he understands that Content will be created and used that includes the Player, and the disclosure of personal or other information about the Player in connection with the Tournament and the advertising, promotion and publicity therefor;  (f) except as set out in Schedule 4, as of each of the Effective Date, the Exercise Date and the Designation Date that, at all times commencing as of the Exercise Date and thereafter during the Term (i) the Player exclusively owns and otherwise controls the Player Identification and is entitled to grant the League Operator the licenses and other rights granted in this Agreement, and the Player has not (and prior to the Exercise Date will have not), nor has any Person acting by or on behalf of the Player (and prior to the Exercise Date no such Person will have), granted any of such rights to any other Person, (ii) other than as set out in Schedule 4, the Player is not party to or otherwise bound by any Conflicting Contract, and to the extent the Player was previously bound by a Conflicting Contract, the Player has caused such Conflicting Contract to be terminated as of the Effective Date without any liability or obligation of the League Operator, the Team Operator or any of their respective Affiliates, (iii) the use by the League Operator and its Affiliates (or its or their sublicensees, which may include the Team Operator) of the Player Identification in accordance with this Agreement will not infringe the rights (including Intellectual Property rights) of any third party, (iv) no third party of any kind is entitled to any fee or commission or similar payment in connection with the execution and performance of this Agreement by the Player other than any such fee or commission that will be paid in full by the Player.

16

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

8.  The Player agrees that if any representation or warranty made by the Player in this Agreement fails to be true in any respect or if the Player breaches any provision of this Agreement, then without prejudice to any other remedies, the Player may be disqualified from participating in any Tournament and/or from receiving any other payment, prize or award which the Player or the Team Operator would otherwise have received pursuant to this Agreement and/or may be removed from the Team, and the League Operator and the Team Operator shall each be entitled to make any announcement or provide any explanation as they in their absolute discretion decide concerning the same.

9.  **Notices**. All notices and other communications delivered under this Agreement shall be in writing and shall be deemed duly given on (a) the delivery date if delivered personally, (b) the delivery date if sent by email by 5:00 p.m. Eastern time on a Business Day or, if not, on the next Business Day, (c) the first Business Day following the date of dispatch if delivered via a next-day service by a recognized next-day courier service, or (d) the earlier of confirmed receipt or the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices under this Agreement shall be delivered to the addresses set out below or such other address as a Party may in writing designate as its address for service of notices under this Agreement:

    (i)



    (ii)
    (iii)

10. **Approvals**. Where any reference is made to the requirement for any approval or consent under this Agreement then such approval or consent must be in writing to be effective and, in the case of any League Operator Approval, may be given or withheld at the League Operator's discretion

11. **Interpretation**. Reference in this Agreement to a Section, Exhibit, Schedule or Annex such reference shall be to a Section, Exhibit, Schedule or Annex of this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement or in any Exhibit, Schedule or Annex are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Any capitalized terms used in any Schedule or Appendix but not otherwise defined therein shall have the meaning as defined in this Agreement. All Schedules and Annexes annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein. The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified. The term "or" is not exclusive. The word "will" shall be construed to have the same meaning and effect as the word "shall." Other than as provided for in the definition of "Schedule of Exceptions," any reference to any contract is a reference to such contract as it may be amended, modified, restated or otherwise supplemented from time to time. References to days mean calendar days unless otherwise specified. Time is of the essence with respect to the performance of obligations under this Agreement. Any reference in this Agreement to "$" or "Dollars" shall mean United States Dollars, and unless otherwise specified herein, all payments made in accordance with this Agreement shall be made in United States Dollars. References to the "termination" of this Agreement shall include its termination for any reason or expiry

17

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

12. **Releases/Affirmations.**(a)The Player affirms that this Agreement and minimum compensation designated by the League Operator and other policies applicable to Players and Caddies are mandated solely to ensure that the League is competitive and the Team is at all times operated in conformity with the League's standards and League attributes known to and desired by the public and associated with the Marks. (b)The Player acknowledges that the nature of Events involves certain risk such as the chance of various injuries and/or medical conditions, being struck by golf balls, exposure to extreme weather of any kind, disease or pandemics (including COVID-19 or other similar diseases), confirms that he is voluntarily participating in Events and agrees to assume any and all such risks. (c) On behalf of the Player and the Releasing Parties, the Player unconditionally and irrevocably agrees, other than in as provided in paragraph (d) below to release, indemnify and hold harmless the Released Parties in respect of any loss, damage, cost or expense suffered or incurred by the Player, by any of the Releasing Parties or by the Released Parties in connection with the Player's preparation for, participation and appearance in any Event, or activities associated with any Event, including the Exploitation of any Content, except where such loss, damage, cost or expense is suffered or incurred as a result of a breach of this Agreement or any of the League Documents, or is otherwise caused by the gross negligence or Willful Breach of a League Document, by any of the Released Parties. (d) On behalf of the League Operator and its Affiliates, the League Operator unconditionally and irrevocably agrees to release the Player in respect of any loss, damage, cost or expense to the extent suffered or incurred by the League Operator or its Affiliates arising directly out of any item expressly set out in Schedule 4 provided such release shall not apply (a) to any loss, damage, cost or expense suffered or incurred by the League Operator or its Affiliates arising out of any breach or inaccuracy of any representations, warranties, covenants or agreements made by the Player in any League Document and (b) in the event of any breach by the Player of his obligations in this Agreement to wear the Team Apparel. Nothing in this Section shall operate to release liability for death or personal injury arising as a result of negligence.

13. **Third-Party Beneficiaries**. Except as expressly provided, including nothing herein is intended to or shall confer upon any Person other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement.

14. **Entire Agreement**. The League Documents (including all Schedules and Annexes thereto) constitute the entire agreement, and supersede all prior written or oral agreements or arrangements and understandings between the Parties with respect to the subject matter hereof and thereof. No Party has relied on any representation or warranty in entering into this Agreement save is set out in this Agreement.

15. **Assignment**.  Other than in respect of any Designation and as set out below, neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Party without the prior written consent of each other Party, and any such assignment without such prior written consent shall be null and void. The League Operator may assign any of  its rights or obligations hereunder by written notice to the other Parties but shall remain primarily liable if such Affiliates fails to perform any obligation so assigned to it.

16. **Governing Law/Waiver of Jury Trial** This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby, whether arising in contract or in tort, shall be governed by, and construed in accordance with, the Laws of the State of New York, without regard to the Laws of the State of New York governing conflicts of law or the Laws of any other jurisdiction that might be applied because of the conflicts of laws principles of any state. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY LITIGABLE ACTION (AS DEFINED HEREIN), OR ANY OTHER DISPUTE.

17. **Dispute Resolution**. (a) Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof (including the determination of the scope or applicability of this agreement to arbitrate) (a "**Dispute**"), shall be determined by arbitration in New York, New York or any other location determined by the League Operator, before one (1) arbitrator; provided, however, that in no event shall this paragraph apply to any dispute or claim arising out of or relating to the League Regulations, the Team Rules and Policies or the breach, termination, enforcement, interpretation or validity thereof, which shall, subject to the provisions of the League Regulations and the Team Rules and Policies, be resolved by the League Operator in its sole and absolute discretion as the owner and operator of the League.  The Parties party to any such Dispute shall make a good faith effort to agree upon an arbitrator. If no agreement can be reached, JAMS shall send such Parties no fewer than 5 arbitrators who are available

18

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

to hear the matter within the time frame set forth in this Agreement.  If no agreement can be reached, each such Party may remove 2 names on such list of arbitrators, and shall rank the remaining arbitrator candidates in order of preference. The arbitrator with the highest composite ranking shall be appointed the arbitrator in the case. The arbitration shall be administered by Judicial Arbitration and Mediation Services ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures then in effect, except to the extent they are inconsistent with the express procedures set forth in this Agreement or with those procedures that are required by applicable Law as a prerequisite to a valid and enforceable agreement to arbitrate claims under applicable Law.  The Parties specifically agree and recognize that the procedures and remedies set forth by JAMS Emergency Relief (Rule 2) apply to Disputes requiring immediate resolution, and that the Parties will make a good faith effort to promptly and expeditiously resolve such claims once JAMS Rule 2 is invoked.  The Federal Arbitration Act shall govern the interpretation and enforcement of such arbitration proceeding. The arbitrator shall apply the Law of the State of New York, pursuant to paragraph 16. (b) The provisions of this paragraph shall not apply to any dispute arising under the League Regulations or Team Rules and Policies, which separately bind the League Players as set out in this Agreement.  The Parties agree and acknowledge that the dispute resolution procedures set forth in the League Regulations or Team Rules and Policies (as may be in effect from time to time) are reasonable, have been specifically bargained for by the Parties, are an integral part of the transactions contemplated by this Agreement and were specifically taken into account in granting the rights hereunder and determining the amounts and other consideration payable hereunder, and that, without such agreement, the Parties would not otherwise enter into this Agreement. The Parties further acknowledge and agree that the League Operator or Team Operator, as the case may be, may, in accordance with the League Regulations or Team Rules and Policies, as the case may be, designate one or more arbitrators, including the Commissioner or Chief Executive Officer of the League, to resolve disputes arising under the League Regulations or Team Rules and Policies, as applicable, and that the determination of any such arbitrator or arbitrators shall be binding on the Players in accordance with the terms of the League Regulations or Team Rules and Policies, as applicable.  For the avoidance of doubt, in the event that a dispute arises under the League Regulations or Team Rules and Policies, under no circumstance shall such dispute be determined or settled in accordance with the provisions of this paragraph. (c) To the extent permitted by applicable Law, the Parties agree that arbitration as provided in this Section shall be the exclusive and binding remedy for any Dispute and will be used instead of any court action, which is hereby expressly waived, except for any legal right a Party may have to file an administrative claim with an administrative agency such as the National Labor Relations Board, U.S. Department of Labor or the Equal Employment Opportunity Commission. (d) The Parties agree that they will attempt, and they intend that they and the arbitrator should use their best efforts in that attempt, to conclude the arbitration proceeding and have a final decision from the arbitrator within 150 days from the date of selection of the arbitrator; provided, however, that the arbitrator shall be entitled to extend such 150-day period one or more times to the extent the arbitrator deems it necessary to adjudicate the claim. The arbitrator shall promptly deliver a written and reasoned decision with respect to the Dispute to each of the Parties, who shall promptly act in accordance therewith.  Each party to such arbitration agrees that any decision of the arbitrator shall be final, conclusive and binding.  It is specifically understood and agreed that any Party may (i) enforce any award rendered pursuant to the arbitration provisions of this Section, or (ii) seek injunctive relief, by bringing suit in any court having jurisdiction pursuant to paragraph 18.  The arbitrator may grant any individual remedy or relief that would have been available to the Parties had the matter been heard in court on an individual basis, including injunctive or other forms of equitable relief to any Party to such arbitration that prevails in any such arbitration. (d) Each Party shall maintain strict confidentiality with respect to all aspects of any arbitration commenced pursuant to this Agreement, including the documents and testimony and any transcripts of that testimony, and shall not disclose the fact, conduct or outcome of the arbitration to any non-parties or non-participants, except to the minimum extent required by applicable Law or to the extent necessary to recognize, confirm or enforce the final award or decision in the arbitration, without League Operator Approval and the prior written consent of the Player. This confidentiality provision is not intended to hinder any Party's ability to engage in discovery or otherwise prepare for the arbitration hearing, including gathering information from or contacting witnesses. The arbitrator shall maintain the confidentiality of the arbitration and shall have the authority to make appropriate rulings to safeguard the confidentiality or make disclosures as provided by Law. (e) Each Party acknowledges and agrees that: (i) the arbitrator will not have authority or jurisdiction to hear the

19

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

arbitration as a class action or collective action proceeding; (ii) the arbitrator will not have authority to consolidate, join or consider claims of different individuals or entities in one proceeding, other than cross or counter-claims as between the individual Player and the League Operator asserted on a non-class or non-collective action basis; (iii) there is no right or authority for any Dispute to be arbitrated, adjudicated, decided or resolved through court proceedings on a class action or collective action basis or to utilize class action or collective action procedures; and (iv) the League Operator and the Player will not have the right to participate as a class or collective action representative, or as a member or claimant of any class or collective action for any dispute or controversy.  UNDER NO CIRCUMSTANCES DOES THE PLAYER, THE TEAM OPERATOR OR THE LEAGUE OPERATOR AGREE TO CLASS OR COLLECTIVE ACTION PROCEDURES IN ARBITRATION OR COURT PROCEEDINGS OR THE JOINDER OF CLAIMS IN ARBITRATION OR COURT PROCEEDINGS ("CLASS ACTION WAIVER").  Disputes regarding the scope, validity and enforceability of this Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator.  To the extent any portion of the Class Action Waiver is found to be unenforceable, that portion shall be severable and the remainder shall be enforced, in accordance with paragraph 21.  In any case in which the Dispute is filed or pursued as a class or collective action and all or part of the Class Action Waiver is found to be unenforceable: (i) the individual claims asserted by claimant in the class or collective action shall be severed and shall proceed individually in arbitration; (ii) the class or collective action claims asserted by claimant shall be stayed in their entirety pending the outcome of the arbitration of individual claims; and (iii) upon conclusion of the arbitration, the class or collective claims must be litigated in a civil court of a competent jurisdiction. (f) Each Party acknowledges and agrees that, to the extent permitted by applicable Law: (i) the arbitrator will not have authority or jurisdiction to hear the arbitration as a private attorney general or representative action proceeding; (ii) the arbitrator will not have authority to utilize private attorney general or representative action procedures; (iii) there is no right or authority for any dispute to be arbitrated, adjudicated, decided or resolved through court proceedings on a private attorney general or representative action basis or to utilize private attorney general or representative action procedures; and (iv) the League Operator and the Player will not have the right to participate as a private attorney general or representative action representative, or as a member or claimant of any private attorney general or representative action for any Dispute.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY EXPRESSLY WAIVES ANY PRIVATE ATTORNEY GENERAL OR REPRESENTATIVE ACTION PROCEDURES IN ARBITRATION OR COURT PROCEEDINGS (THE "REPRESENTATIVE ACTION WAIVER").  Disputes regarding the scope, validity and enforceability of this Representative Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator.  To the extent any portion of the Representative Action Waiver is found to be unenforceable, that portion shall be severable and the remainder shall be enforced.  To the extent permitted by applicable Law, in any case in which the Dispute is filed or pursued as a private attorney general or representative action and all or part of the Representative Action Waiver is found to be unenforceable: (i) the individual claims asserted by claimant in the action shall be severed and shall proceed individually in arbitration; (ii) the private attorney general or representative action claims asserted by claimant shall be stayed in their entirety pending the outcome of the arbitration of individual claims; and (iii) upon conclusion of the arbitration, the private attorney general or representative action claims must be litigated in a civil court of a competent jurisdiction. (g) The cost of any arbitration conducted pursuant to this Agreement will be paid equally by the League Operator and by the Player, except to the extent required by applicable Law.  The Parties will each bear their own costs for legal representation, discovery, deposition, expert witnesses, and other legal costs ordinarily borne by a party in litigation to the extent permitted by applicable Law; provided, however, that the arbitrator shall, in addition to any other relief that may be awarded, have the authority to issue an award of costs and fees to the prevailing Party to the same extent available in court.

18.   **Submission to Jurisdiction**. Each of the Parties irrevocably agrees that any Dispute brought by any other Party or its successors or assigns that is a request by a Party for temporary or preliminary injunctive relief pursuant to paragraph 17 pending arbitration in accordance with applicable Law (a "**Litigable Action**"), shall be brought and determined as required according to the applicable rules of venue and jurisdiction, in the New York state courts in the borough of Manhattan, or the courts of the United States of America for the Southern District of New York, and appellate courts thereof, and each of the Parties irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such Dispute. Each of the Parties agrees not to commence any Dispute relating thereto

20

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

except in the courts described above in New York, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described herein. Each of the Parties further agrees that written notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (x) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (y) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (z) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

19.   **Enforcement of Award**.  The Parties recognize that the Federal Arbitration Act governs the enforcement of any arbitral award issued pursuant to paragraph 17. Further, if any Party to the arbitration is not a United States citizen, that Party explicitly recognizes and agrees that any enforcement of the arbitral award will be governed by Chapter 2 of the Federal Arbitration Act and the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208).

20.   **Enforcement**.  Any and all rights and remedies provided herein, in the League Regulations and the Team Rules and Policies will be deemed cumulative with, and not exclusive of, any other right or remedy conferred hereby or by the League Regulations, the Team Rules and Policies or by Law or equity, upon such Party, and the exercise by a Party of any one right or remedy (including the election to pursue an injunction or specific performance) shall not restrict, impair or otherwise limit a Party from seeking to exercise such other rights or obtain such other remedies and will not preclude the exercise of any other right or remedy.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each of the Parties shall be entitled to seek specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which such Party is entitled at law or in equity.  Each of the Parties hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate, and (b) any requirement under any applicable Law to post security as a prerequisite to obtaining equitable relief.

21.   **Severability**.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent and purpose of the Parties as closely as possible so that the transactions contemplated hereby will be consummated as originally contemplated to the fullest extent possible.

22.   **Counterparts**.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to each other Party.  A signed copy of this Agreement delivered by email (including .pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com), or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

23.   **No Presumption Against Drafting Party**.  Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions and other instruments and agreements contemplated by this Agreement.  Accordingly, any rule of Law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement or any instrument delivered in connection herewith against the drafting Party has no application and is expressly waived.

21

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY                    PLAYERS0000021

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

24. **No Recourse**. Notwithstanding anything that may be expressed or implied in this Agreement, the Parties covenant, agree and acknowledge that no recourse under this Agreement or any documents or instruments **delivered** in connection with this Agreement shall be had against any Non-Recourse Party, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any Non-Recourse Party, as such, for any obligation of any Party under this Agreement (including any payment obligation under this Agreement), or any part thereof, or any documents or instruments delivered in connection with this Agreement for any claim based on, in respect of or by reason of or otherwise related to such obligations or their creation, except to the extent that any such Person is Party to and, by its terms, is individually liable thereunder.

25. **Nature of Relationship**. It is not the intention of the Parties (whether prior to, on or following the Designation Date) to create, by virtue of this Agreement, any employment relationship, trust, partnership, joint venture or franchise between the Player and the Team Operator, the League Operator, or any of **their** respective Affiliates, to make them legal representatives or agents of each other or to create any fiduciary relationship or additional contractual relationship among them except as specifically provided in this Agreement or as otherwise required under applicable Law.

26. **Player Guarantee**. If at any time the Player is represented by any third party, then the Player shall cause such third party to comply with all applicable obligations in this Agreement and to not take (or fail to take) any action which would cause the Player to be in breach of this Agreement. The Player shall be responsible for any act (or failure to act) of any of such third party acting on its behalf in breach of this Section.

27. **Definitions**. The following terms shall have the following meanings in this Agreement:

**Advertising Rights**: all rights of any kind throughout the world to Exploit any advertising of any kind in relation to the advertising, marketing or Promotional Activities of the League, each Event and each League Team (including the right to sell any advertising that occurs before, during or after the Exhibition or Exploitation of any Content) and, for this purpose, to Exploit, Exhibit and otherwise use in any manner and create derivative works of all Content, in each case by any means or through any media now known or subsequently developed, including via (a) any Team Website, the League Website and any Other Team's website and all Social Media and other present and future digital channels, together with those of any Official Partner; (b) broadcast, television, print and online advertising; (c) billboards, posters, signs and displays; (d) product catalogues and packaging; (e) press releases, newsletters and e-alerts; and (f) any other advertising or promotional materials developed by the League Operator, the Team Operator or any Other Team Operator or League Rights Holder from time to time.

**Affiliate:** with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person (it being agreed that the Team Operator is not an Affiliate of the League Operator and its Affiliates.

**Ancillary Tournament Activity:** in relation to any golf tournament, any activity organized by any Person in connection with such tournament which takes place shortly before, during or shortly after such tournament including any press conference, media events, opening/closing ceremonies, pro-am, presentations, prize-givings and interviews, promotional activity (such as sponsor activations, lunches, dinners, photoshoots and other activities) any other official events in relation to such tournament which take place shortly before, during or shortly after it.

**Ancillary Content:** any Content created in relation to the League or any Event other than Tournament Content and Team Content whether the same is created by the Player, any Caddie Device or otherwise.

**Betting Platform**: any website, application, OTT media service or other digital platform hosting sports betting or gambling content.

**Business Day**: any day (other than a Saturday or Sunday) on which banks are generally open for business in New York.

**Caddie:** means the Player's caddie during any Event and the contract between the Player, the League Operator (if appropriate) and such caddie for any Event shall be a **Caddie Contract**.

**Caddie Device:** any device of any kind to record Data or other information (whether audio, audio-visual or otherwise) worn or required to be worn by any Caddie during any Event.

**Code**: the Internal Revenue Code of 1986, as amended from time to time. All references in this Agreement to sections of the Code shall include any corresponding provision or provisions of succeeding Law.

22

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**Commercial Rights**: collectively, the Digital Rights, Film Rights, Games Rights, Licensing Rights, Merchandising Rights and Gaming Rights.

**Commitment Fee**: the sums referred to in Schedule 1.

**Competition Day**: any of the days on which a Tournament is scheduled to take place.

**Confidential Information**: all information in whatever form relating to this Agreement or to the business or affairs of one Party and its Affiliates and their commercial partners, in each case, as may be communicated to or which otherwise comes to be known by another Party in connection with this Agreement.

**Content**: any document, content, photograph, audio or video recording, material, footage, feed, statistics, records, data (including any Data), type of information or experience in each case of any kind capable of being captured or recorded by any means in any form, format or medium whatsoever in each case whether now existing or developed in the future including Tournament Content, Team Content, and Ancillary Content, and any content and footage created and/or generated by or on behalf of any League Player or Caddie (including by a Caddie Device) as part of, relating to, or in conjunction with any League Activity or Tournament Play.

**Content Distribution Rights**: the exclusive worldwide right at any time to Exhibit and otherwise Exploit any Content including Tournament Content, Team Content, and/or Ancillary Content (whether on a live, delayed or on-demand basis, as highlights or clips, or otherwise), in whole or in part,  by any and all means or media of any kind whatsoever now known or subsequently developed (including via the Commercial Rights) and via any device of any kind including all forms of television, the internet and whether scheduled or on demand and in whatever format (whether linear, OTT, interactive, virtual reality, augmented reality, hologram, non-fungible token, free to air, pay or otherwise) and in each case the right to appoint or engage a Content production company in relation to any of the same **and a "Distributor" is any Person** to which any Content Distribution Rights are granted, licensed, assigned or otherwise transferred at any time.

**Content Guidelines**: the guidelines published by the League Operator in relation Content (as amended from time to time).

**control**: the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person and  **"controlled by"** and **"under common control with,"** shall be construed accordingly.  For the avoidance of doubt, a limited partnership shall be deemed to be "controlled" by its general partner.

**Covered Golf Activity:** any professional golf tournament (including any related Ancillary Tournament Activity) and any other golf-related event  or practice other than any League Activity and Excluded Events.

**Data**: all data, statistics or information (a) used to analyze or relating to the Player's condition or performance during any Event, including that generated from the use of devices to measure and record swing speed, ball flight, launch angles, energy transfer, heart rate, adrenalin levels and other biometric data and other statistics, data or information, or (b) captured or stored in relation to each Event or the League, such as fan-and/or consumer-related data, and all rights in relation to such Data shall be **"Data Rights"**.

**Default:** any material breach of this Agreement by the Player at any time during the Term.

**Digital Rights**: the exclusive worldwide rights of any kind the right to own and Exploit all digital rights (whether now known or subsequently developed)  in any way whatsoever in relation to the League or any Event, including in relation to the League and Team Websites, League Teams, all Social Media and other digital channels, in each case whether by way of selling advertising, Licensed Products or other merchandise, goods or services, Exploiting Content or in any other means whatsoever and in each case whether now existing or developed or thought of in the future.

**Effective Date**: the date set out at the start of this Agreement.

**Event**: collectively, each Tournament and any League Activity during any Tournament Week.

**EventCos**: any company designated at any time by the League Operator to host or otherwise manage any Event (not being League IP ManagementCos).

**Excluded Events**: the Olympic Games, the Ryder Cup and the Presidents Cup.

**Exhibit**: to transmit, broadcast, distribute, display or exhibit and **"Exhibition"** shall be construed accordingly.

23

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**Exploit**: in relation to any rights, to create, commercialize, exercise or otherwise exploit such rights on a worldwide basis by any means whatsoever including through any licensing or sublicensing of such rights to one or more third persons, whether on an exclusive or non-exclusive basis.

**Film Rights**: all rights of any kind whatsoever to make, Exhibit, or Exploit or otherwise use any film, motion picture or other audiovisual recording (of whatever length and whether in documentary-style, purely fictional or otherwise) based in whole or in part on the Content, and sequels or prequels thereto and remakes thereof and all other types of derivative works based thereon, intended for Exploitation in any medium now or hereafter devised (including, by way of illustration only, any form of theatrical, television, home video, digital, internet, wireless or other computer assisted or new media Exploitation).

**Film Rights**: all rights of any kind whatsoever to make, Exhibit or Exploit any film or other recording relating to the League and any League Team including by using any Tournament Content or Team Content.

**Fiscal Year**: subject to Internal Revenue Code section 706, the period selected or determined by the League Regulations in accordance with applicable Law.

**Fit and Proper Person**: has the meaning in the League Regulations.

**Force Majeure Event:** any cause, event or circumstance affecting the performance of this Agreement arising beyond the reasonable control of the Party affected including terrorist action or the threat thereof, civil commotion, disruption due to general or local elections, invasion, war, threat or preparation for war, fire, explosion, storm, flood, earthquake, any other such natural physical disaster, epidemic or pandemic (including COVID-19) and any legislation, regulation or ruling of any government, court or other such competent authority save that for the avoidance of doubt the introduction of any Legal Requirements, or any other rules or requirements, in each case other than those of a Governmental Authority, **or the Player's** contractual or membership obligations to another Party or Person, shall not constitute a Force Majeure Event.

**Full Season**: a Season shall be a Full Season if the Player fully satisfies his Playing Commitment under Section



**Fundamental Default**: shall occur if the Player (a) commits Gross Misconduct, or (b) is suspended permanently, indefinitely or for 14 or more Tournaments in the aggregate under the League Regulations, or (c) suffers any Insolvency Event, or (d) ceases to be a Fit and Proper Person, or (e) is ineligible to participate in the League under the League Regulations, or (f)

**Games Rights**: the right to Exhibit and Exploit the Content or any Player Identification, in whole or in part, in any interactive video game, including virtual reality, augmented reality, and mixed reality experiences, skill development, role play, and/or fantasy or real simulation, whether played or engaged in alone, or with another person, or in a social community or network, and whether by computer, on-line means, via a console, cartridge or computer peripheral device, via telephony or a mobile device, or a proprietary gaming tool, device or product.

**Gaming Rights**: means the right: (a) to Exhibit any Content, any other content of any kind and other Data to facilitate gambling or betting in relation to any Tournament or other Covered Golf Activity, (b) to include within the Transmission of any Content and other Data any facility for viewers to gamble or bet on any element of Tournament Play or any Covered Golf Activity play during the such Transmission, (c) to Exhibit Content and other Data in licensed betting premises; (d) the right to provide Content and other Data to licensed bookmakers; (e) to use official scoring data relating to Tournament Play or the play of any other Covered Golf Activity on any Betting Platform; and (f) to operate any competition, quiz, fantasy league, contest or other game using any Content and/or the Marks.

24

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**Golf-Related Injury**: an injury directly resulting from playing golf on condition that (a) the injury did not occur from any golf in violation of the Player's obligations under this Agreement (b) the Player is not engaged in conduct unbecoming a professional (as determined in accordance with the League Regulations) and (c) the Player is in fact injured and such injury prevents the Player from competing in a Tournament as supported by any certified medical evidence required by the League Operator and in case of doubt an independent doctor shall be appointed by the Player and League Operator to determine the extent of an such injury.

**Governmental Authority**: any United States or non-United States federal, national, supranational, state, provincial, local or similar government, governmental, regulatory or administrative authority, branch, agency or commission, or any court, tribunal, or arbitral or judicial body (including any grand jury) of any of the foregoing Persons excluding all laws, statutes, rules, regulations, permits, licenses, authorizations, directors or requirements of any sports federation or other similar authority.

**Gross Misconduct**: any serious or persistent action (or attempted action) or omission by the Player which the League Operator determines, in its reasonable discretion, to be gross misconduct including (a) any theft or fraud; (b) any statement by or on behalf of the Player which disparages, is injurious to the reputation of or which could be expected to cause harm to any Relevant Person, (c) intentional material damage to any property belonging to the Team Operator, the League Operator or which otherwise relates to the League; (d) any use or possession of or trafficking in a Prohibited Substance, (e) incapacity through alcohol affecting the Player's performance at an Event, (f) any material breach of this Agreement and/or the League Regulations which, if capable of remedy, has not been remedied to the Team Operator's and the League Operator's satisfaction within 7 Business Days of written request to do so, (g) conviction of any criminal offence anywhere in the world (other than a motor vehicle-related offence for which the punishment does not involve a custodial sentence), (h) assault or threatened assault or causing or attempting to cause bodily harm or  (i) any other conduct which results in, or would reasonably be expected to result in, material and demonstrable harm to the any Relevant Person.

**Hospitality Rights**: the right to organize any concessions, restaurant, bar, catering (or other supply or provision of food and beverage) of any kind, together with any related sponsorship, marketing or branding rights.

**Insolvency Event**: shall occur in respect of a Party that is (a) an individual person if they are declared bankrupt or  (b) a legal entity if (i) any bona fide petition is presented or any bona fide demand is served on that Party or an order is made or resolution passed for the winding up or bankruptcy of that Party or a bona fide notice is issued convening a meeting for the purpose of passing any such resolution, (ii) any bona fide petition is presented for an administration order or any bona fide notice of the appointment of or of an intention to appoint an administrator of that Party is filed in court or an administration order or interim order is made in relation to that Party, (iii) any administrative or other receiver or manager is appointed of that Party or of all or any material part of its assets and/or undertaking or any other bona fide step is taken to enforce any encumbrance over all or any part of the assets and/or undertaking of that Party, (iv) any bona fide step is taken by that Party with a view to proposing any kind of composition, compromise or arrangement involving that Party and any of its creditors, including but not limited to a voluntary arrangement, (v) it ceases to carry on business in the normal course or any event which is similar, equivalent or analogous to the circumstances in sub-clauses (a) and (b) above occurs in relation to such Party or its assets under any applicable legislation anywhere in the world.

**Intellectual Property**: all intellectual property rights of any kind whatsoever anywhere in the world whether un registered, registered or capable of registration, including copyrights and copyrightable works, trademarks, service marks, trade names, logos, registered designs, and domain names, moral rights, and rights of publicity, privacy and similar rights of any type under the laws or regulations of any governmental, regulatory or judicial authority, and with respect to each of the foregoing, any applications, registrations, renewals, extensions or continuations now or hereafter enforced throughout the world.

**Key Event:** the Summer Olympic Games, the Masters, the US Open, the Open Championship, the United States PGA Championship, Presidents Cup and/or the Ryder Cup, in each case provided that such events remain in substantially the same form and last for the same period of time as is the case at the Effective Date.

**Law**: any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any Governmental Authority.

25

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**League**: the professional worldwide golf competition comprising the Regular Tournaments, the Team World Championship and any League Qualification Event (in each case as further described in the League Regulations).

**League Activity**: any activity (excluding Tournament Play) organized by or on behalf of the League Operator in relation to the League and/or any Event including any Ancillary Tournament Activity, Promotional Activity and Player Draft.

**League Documents**: means this Agreement, each Other Player Participation Agreement, the Services Agreement, the Team Participation Agreement, each Other Team Participation Agreement, the Team Operator Governing Agreements, the League Regulations and each confidentiality agreement (or similar agreement) or other written agreement, arrangement or understanding (including any side letter) executed and delivered by and between, on the one hand, the League Operator and/or its Affiliates and, on the other hand, the Team Operator, any Persons owning equity interests in the Team Operator, the Player and/or any of its or their respective Affiliates or Representatives, as the case may be, from time to time.

**League IP ManagementCos**: any company designated by the League Operator to Exploit or otherwise manage the Intellectual Property rights of any League Player.

**League Marks**: all Intellectual Property rights of any kind used from time to time by the League Operator or any of its Affiliates in connection with the League Operator, the League or any Event, including all goodwill associated therewith and/or generated thereby.

**League Operator**: (a) in respect of Events, League Activities and Promotional Activities, or any other obligations (including payment) to or of the "League Operator" hereunder conducted or otherwise taken or omitted to be taken, paid to or payable by, (i) within the USA, US OpCo, and (ii) outside the USA, UK OpCo, and (b) otherwise, League HoldCo.

**League Operator Approval**: any written approval required to be obtained from the League Operator or its Affiliates under this Agreement or the League Regulations.

**League Players**: means, collectively, the Player and all Other Players.

**League Qualification Event**: each Tournament at the end of each Season from the end of the 2023 Season onwards to decide the qualification of certain golfers for the League for the next Season.

**League Regulations**: means all rules, regulations and guidelines (including any Content Guidelines) published by or on behalf of the League Operator from time to time in relation to the League or in relation to any Season including regarding the participation of League Players in the League, brand guidelines, codes of conduct, and policies relating to anti-doping policies and anti-corruption, as may be modified or supplemented by the League Operator from time to time in its sole and absolute discretion.

**League Rights**: all rights of any kind whatsoever relating to the League or any Event from time to time (other than the Team Rights), including Intellectual Property rights relating to the League and each Event (including rights in the Marks), Advertising Rights, all rights to Content, all Content Distribution Rights, the right to organize and operate the League and every aspect of each Event during each Season, Data Rights, Commercial Rights, Hospitality Rights, Official Partner Rights, Ticketing Rights, Licensing Rights, Merchandising Rights and **League Rights Agreement** means any agreement or arrangement whereby any Person acquires or is otherwise granted any of the League Rights at any time, such Person being a "**League Rights Holder.**"

**League Teams**: means, collectively, the Team and all Other Teams.

**League Website**: the official League website owned and operated by the League Operator.

**Legal Requirements**: all laws, statutes, rules, regulations, permits, licenses, authorizations, directions and requirements of any Governmental Authority, or sports federation or other authority that may at any time be applicable to this Agreement, the Team Operator, the Team and the operation thereof.

**Licensed Products**: any products, service or merchandise of any kind (a) bearing any one or more of the Marks with or without any other marks of any kind or (b) featuring any Player Identification.

**Licensing Rights**: all rights to sell or license the sale of Licensed Products and/or the grant of any rights by the League Operator in relation to any relevant merchandising or licensing of services relating to the League.

**Marks**: together, the League Marks and Team Marks.

**Merchandising Rights**: the right to Exploit all goods and services of every kind by any means now known or hereafter devised that are based upon or derived from the Content.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY                    PLAYERS0000026

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**Multi-Player Fundamental Default**: shall occur if at any time 4 or more League Players  (a) refuse to participate in the League, or (b) participate in a professional golf tournament (other than a Key Event) during any calendar week in which an Event is scheduled to be played.

**Non-Recourse Party**: any Affiliate of the League Operator, or any former, current or future director, officer, employee, agent, general or limited partner, member, manager, controlling Person, shareholder or equity holder of the League Operator or any Affiliate of the League Operator or any assignee thereof.

**Official Partner Rights**: all sponsorship, marketing, licensing, and suppliership rights in relation to the League and each Event and any Person who is granted any such rights shall be an **"Official Partner"**.

**Other Player**: a golfer, other than the Player, who has committed to play in any Tournament or Event from time to time.

**Other Team**: any team of players, other than the Team, operating in the League under an **"Other Team Participation Agreement"** or otherwise under the League Regulations.

**Other Team Operator**: any Person other than the Team Operator granted the right to operate any Other Team from time to time.

**Party**: a party to this Agreement.

**Payor Entity:** before the Designation Date, the League Operator (unless the League Operator decides that another League HoldCo Affiliate should be the Payor Entity), and after the Designation Date  the League Operator or  the Team Operator unless, and then solely to the extent that the League Operator decides  that it or another League HoldCo Affiliate should remain the Payor Entity.

**Person**: an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

**Player Draft:**  the process for selection of League Players and **"Draft Date"** means the date of any such draft.

**Player Emergency:** any bona fide emergency involving serious illness affecting the Player or his immediate family (being his partner, children, parents or in-laws).

**Player Identification**: all of the Player's personal attributes including his name, nickname, initials, autograph, signature, endorsement, reputation, public persona, voice, video, film portrayal, computer generated or animated portrayal, avatar, caricature, photograph, image, likeness, game play data and statistics, records, biographical information and all Intellectual Property rights in connection with such personal attributes belonging to the Player and all beneficial rights and goodwill that subsist in relation to any of the foregoing, including the right to Exhibit, Exploit or otherwise use, or create derivative works based on, any of the foregoing.

**Prize Money**: together, the Individual Prize Money and Team Prize Money.

**Prohibited Substance**: has the meaning set out in the League Regulations.

**Promotional Activity**: any activity of any kind organized by or on behalf of the League Operator, the Team Operator and any Other Team Operator  or any League Rights Holder (and any Affiliate of any of the foregoing), to promote the League, any Tournament, any League Player, any League Team, the Team Operator, any Other Team Operator, the game of golf, or any sponsor of any the foregoing and any other activity involving the grant of any League Rights to a League Rights Holder, including any sponsor activations, pro-ams, dinners, photo shoots and Social Media activities.

**Regular Tournament**: each Tournament forming part of the League in each Season but excluding each  Team World Championship and League Qualification Event.

**Released Parties**: each of the Team Operator, the League Operator, any League Rights Holder or Distributor, all other participants in the League, any participants in a Tournament or Event, and/or any stations that may broadcast the Tournament, sponsors of the Tournament, all medical personnel rendering services in connection with the Tournament, and each of their respective Affiliates successors and assigns, and the respective present and former directors, officers, employees, agents, contractors, subcontractors, partners, shareholders, Representatives and members of each of the foregoing entities, and the heirs, next of kin, spouses, guardians, Representatives, executors, administrators, successors and assigns of each of the foregoing.

**Releasing Parties**: each of the Player, the Player's heirs, next of kin, spouse, partner (or spousal equivalent or life partner), minors, guardians, Representatives, executors, administrators, successors and assigns.

27

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**Relevant Person**: the Player, the Team, the Team Operator, the League Operator or any of its Affiliates and any of their respective shareholders, directors, officers or employees, the game of golf, the League, any Team Member, Other Player and/or any Other Team Operator, any League Rights Holder or Team Rights Holder.

**Representatives**: with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors, legal counsel, bankers and other representatives of such Person.

**Retirement**: shall occur if during the Term the Player retires from professional golf such that he is unable to play in all or a material number of Tournaments as a result of physical or mental incapacity or injury save where any such injury or incapacity occurs as a result of alcohol or substance abuse or as a result of the Player becoming injured as a result of undertaking any activity prohibited by the League Regulations and "**Retires**" shall be construed accordingly.

**Rules of Golf**: the tournament Rules of Golf, as promulgated by the United States Golf Association and the R&A (with the League Regulations taking precedence in the event of any conflict or inconsistency between them and the Rules of Golf).

**Schedule of Exceptions**: all agreements or arrangements expressly set out in Schedule 4 in each case as in effect and legally binding as of the Effective Date not including any amendment, supplement or waiver of any such agreements or arrangement occurring or otherwise becoming effective on or after the Effective Date.

**Season**: the period of time in any Fiscal Year during the Term in which the Tournaments in respect of such period of time are played, with the 2022 Season being the season in which the first Tournament occurs in 2022 (and so on for further years).

**Service Day**: any day (or part thereof) during the Term (other than during a Tournament Week) during which the Player is required to participate in and assist the League Operator and/or the Team Operator with meetings, negotiations and/or other activities with corporate sponsors or other business partners of the League including Team Promotional Activities and League Activities. It is agreed that (a) no single Service Day shall exceed 8 consecutive hours and to determine Player participation in a Service Day, each Service Day shall be measured in "half-day" increments of up to 4 consecutive hours and (b) in calculating the same any time spent by the Player other than actually participating in the relevant activity (such as travelling, makeup, wardrobe, meals or rest periods) shall not be counted towards the amount of time spent by the Player in satisfaction of these Service Day obligations.

**Social Media**: any digital websites, applications, services or other platform that enable users to create, share and publish content via an online social environment or to otherwise participate in what is commonly known as "social networking," in each case whether now existing or developed in the future including Facebook, Snapchat, Instagram, TikTok and Twitter.

**Specified Approval**: the League Operator Approval or the Team Operator Approval.

**Team**: the Team Members selected in accordance with a Player Draft and/or the League Regulations in each case that will represent a Team in the League in accordance with the League Regulations.

**Team Apparel**: all apparel of any kind including all Tournament and training apparel, hats, gloves, patches, badges, insignia, logoed items and footwear, accessories and related products of any kind (including bags, golf bags, umbrellas, golf club head covers, towels, headwear, pads, arm, wrist and similar bands, water bottles, sports performance eyewear or watches, heart, speed or distance monitoring or other biometric devices (including any device designed to measure or collect Data or other biometric output), and personal digital coaching, training or monitoring tools) provided to the Player to be worn, used or displayed by the Player as required under this Agreement.

**Team Content**: the Content expressly designated as "Team Content" in the Content Guidelines.

**Team Mark**: any Intellectual Property rights of any kind used from time to time by the Team Operator or any of its Affiliates in connection with the Team Operator and/or the Team including all goodwill associated therewith and/or generated thereby.

**Team Member**: any golfer (including the Player) properly contracted and registered to play for the Team in accordance with the League Regulations.

28

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**Team Operator**: the Person designated as a "Team Operator" under the applicable Team Participation Agreement and who executes and a Joinder in accordance with Section 2.6.

**Team Operator Approval**: any written approval required to be obtained from the Team Operator or its Affiliates under this Agreement or the League Regulations.



**Team Promotional Activity**: any activity of any kind organized by or on behalf of the Team Operator or any Team Rights Holder in order to promote the Team or such Team Rights Holder.

**Team Rights**: those commercial rights in respect of the Team that may be exploited by the Team Operator under and in accordance with the Team Participation Agreement, this Agreement and the League Regulations excluding all League Rights, all Subject IP and all rights reserved for the League Operator under the Team Participation Agreement, this Agreement or otherwise.

**Team Rights Agreement**: any agreement or arrangement (written or oral) between the Team Operator and any other Person which **acquires any Team Rights and "Team Rights Holder"** shall be construed accordingly.

**Team Rules and Policies**: the rules, regulations and guidelines adopted by the Team or any of the Other Teams, as applicable, from time to time in accordance with the League Documents.

**Team Services Provider**: all Team Members, caddies and all of the other individuals who provide services to the Team Operator in any capacity other than the League Operator and its Affiliates (and excluding the Team Operator and its Affiliates), in each case, solely in their capacity as Persons providing services to the Team Operator or participating in the League.

**Team Staff**: any person employed or engaged in relation to the operation of the Team Operator and/or commercialization of the Team.

**Team Website**: the official Team website, ownership or which shall form part of the Digital Rights.

**Team World Championship**: the final Tournament of each Season (excluding any League Qualification Event) to determine the "Team World Champions" as set out in the League Regulations.



**Ticketing Rights**: the right to design, print, distribute, sell, market and coordinate the re-sale and transfer of tickets or other indicia of admission in relation to any event, including any Event.

**Tournament**: each of the tournaments occurring during a Season comprising the Regular Tournaments, the Team World Championship and the League Qualification Event, in each case, in accordance with the League Regulations.

**Tournament Amount**: the total number of Regular Tournaments scheduled to occur during any Season plus one.

**Tournament Content**: all Content in relation to each Tournament including the period before, during and after Tournament Play (such as practice sessions and interviews) as may be further set out in the Content Guidelines.

**Tournament Play**: any competitive golf played as part of any Tournament.

**Tournament Week**: the period during which each Event occurs, beginning at 10.00 am local time on the date that is 2 days immediately preceding such Event up to and including the final day of Tournament Play and, where appropriate, the day following such final day as may be specified in the League Regulations.

**Transmission**: any and all forms of television broadcasts, video and/or audio broadcasts or streaming whether scheduled or on demand by any means and in whatever format (whether linear, OTT, interactive, free to air, pay or otherwise).

**Venue**: any venue which hosts a Tournament and the agreement pursuant to which such venue is contracted for the Tournament shall be a "**Venue Agreement**."

29

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**Willful Breach**: a breach that is a consequence of an act or omission knowingly undertaken or knowingly omitted by the breaching party with the intent of causing a breach of the applicable provision of this Agreement.

30

DocuSign Envelope ID: DCB48E46-1677-463A-B873-E47D611039A3

**ANNEX A**

**JOINDER AGREEMENT**

This Joinder Agreement (this "**Joinder**"), dated _____, 20___, is delivered pursuant to that certain Player Participation Agreement (as may be amended, modified or supplemented from time to time, the "**Agreement**"), dated as of _____, 20___, by and among LIV Golf Holdings Ltd, a private limited company incorporated under the laws of Jersey ("**League HoldCo**"), LIV Golf Incorporated, a Delaware corporation ("**US OpCo**"), LIV Golf Ltd, a private limited company incorporated under the laws of England and Wales ("**UK OpCo**"; collectively with League HoldCo and US OpCo, the "**League Operator**") and [.    ], an individual who lives at the address set forth on the signature pages to the Agreement (the "**Player**"). Capitalized terms not defined herein shall have the meanings set forth in the Agreement.

WHEREAS, League HoldCo, through its wholly owned operating subsidiaries US OpCo and UK OpCo, will own and operate the professional worldwide golf competition (the "**League**") comprising the Regular Tournaments, the Team World Championship and the League Qualification Events (in each case as further described in the League Regulations);

WHEREAS, the League Operator previously selected the Player to initially represent a team in the League to be designated by the League Operator, and the Player previously agreed to represent such team in the League designated by the League Operator, in each case on the terms and subject to the conditions of the Agreement, the Regulations and, as may be applicable, the Team Rules and Policies;

WHEREAS, the undersigned has entered into a Team Participation Agreement with League Operator whereby, subject to the League Regulations and among other things, the undersigned has been granted the right to operate a team in the League; and

WHEREAS, the League Operator has selected the Team operated by the undersigned to be the Team represented by the Player, and the undersigned wishes to join the Agreement as the Team Operator.

NOW, THEREFORE, the undersigned hereby agrees as follows:

1.      The undersigned hereby agrees that effective immediately, it shall become a party to the Agreement as the Team Operator, and shall be fully bound by and subject to all of the covenants, terms and conditions set forth in the Agreement and the annexes, schedules and exhibits thereto that are applicable to the Team Operator.

2.      The undersigned hereby represents and warrants to the League Operator and the Player as follows: (a) The undersigned has full legal capacity, right, power and authority (including, if the undersigned is an entity, full organizational power and authority) to execute and deliver this Joinder, to consummate the transactions contemplated hereby and by the Agreement and to perform its obligation hereunder and under the Agreement. (b)The undersigned has received and reviewed a copy of the Agreement and has had the opportunity to consult with legal counsel, tax accountants and other professional advisors concerning the legal, tax, accounting and other matters related to this Joinder and the Agreement. (c) This Joinder has been duly and validly executed and delivered by the undersigned and constitutes a legal, valid and binding obligation of the undersigned, enforceable against the undersigned in accordance with the terms hereof, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights or by general equity principles.  All consents necessary for the execution and delivery by the undersigned of this Joinder have been obtained, and the undersigned need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order to consummate the transactions contemplated hereby and by the Agreement. (d) The execution and delivery of this Joinder by the undersigned does not, the consummation of the transactions contemplated hereby and by the Agreement, and the performance of its obligation hereunder and under the Agreement by the undersigned will not conflict with or violate any law or other restriction of any Governmental Authority applicable to the undersigned or by which the undersigned or any of the undersigned's properties is bound or affected, or, if the undersigned is a corporation, limited liability company or partnership, any provision of its charter and bylaws or comparable organizational documents.

3.      This Joinder may only be amended or supplemented by an instrument in writing signed by the undersigned and US OpCo, and no waiver by the undersigned or League Operator of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the person so waiving. This Joinder shall become effective immediately upon the execution hereof by the undersigned. The provisions of Sections 16-20 (inclusive) of Schedule 5 of the Agreement  shall , *mutatis mutandis*, apply to this Joinder as if they had been fully set forth herein. This Joinder may be executed and delivered in two or more counterparts, including by electronic delivery in a .pdf file, each of which shall be deemed an original and all of which will constitute one and the same instrument. This Joinder, together with the Agreement, the League Documents and their respective exhibits, schedules and annexes together represent the entire understanding of the parties hereto with reference to the subject matter hereof and thereof and supersede any and all other oral or written agreements heretofore or theretofore made.

31