Pages 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan van Keulen, Magistrate Judge

PHIL MICKELSON, et al.,          )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )     NO. C 22-04486 BLF (SVK)
                                 )
PGA TOUR, INC.,                  )
                                 )
          Defendant.             )
_____  )

San Jose, California
Monday, October 24, 2022

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
RECORDING 1:30 - 2:18 p.m.

APPEARANCES:

For Plaintiffs:
                    GIBSON, DUNN & CRUTCHER LLP
                    555 Mission Street - Suite 3000
                    San Francisco, California  94105
               BY:  RACHEL S. BRASS, ATTORNEY AT LAW
                    LAUREN DANSEY, ATTORNEY AT LAW

For Defendant:
                    KEKER & VAN NEST LLP
                    633 Battery Street
                    San Francisco, California  94111
               BY:  ROBERT A. LAURIDSEN, ATTORNEY AT LAW
                    NICHOLAS S. GOLDBERG, ATTORNEY AT LAW

Transcribed By:   Marla F. Knox, RPR, CRR, RMR
                  United States Official Court Reporter

```
 1   Monday - October 24, 2022                          1:30 p.m.

 2                     P R O C E E D I N G S

 3                          ---000---

 4        THE CLERK:  Calling case 22-CV-4486, Mikelson, et al.

 5   versus PGA Tour, Inc.

 6        Counsel, please identify yourself for the record beginning

 7   with the Plaintiff.  And you can come up to the podium.

 8        MS. BRASS:  Good afternoon, Your Honor, Rachel Brass

 9   from Gibson Dunn & Crutcher.  I'm joined by my colleague Lauren

10   Damsey, also from Gibson Dunn.

11        Our colleague from Quinn Emanuel, Mr. Surprenant, has had

12   just the worst possible travel luck.  He has been in route to

13   San Jose since Saturday and has not yet made it.  He has now

14   landed at SFO and he will join us as soon as he can.  He

15   apologies for the delay.

16        THE COURT:  Oh dear.  But we can proceed without him?

17        MS. BRASS:  Absolutely.

18        THE COURT:  All right.  That is truly a horrible

19   story.

20        MR. LAURIDSEN:  Good afternoon, Your Honor, Adam

21   Lauridsen, Keker Van Nest & Peters, for Defendant PGA Tour.

22        I'm joined by my colleague Nicholas Goldberg.

23        THE COURT:  Thank you, Mr. Lauridsen.  Thank you.

24   Mr. Goldberg.  All right.  Thank you-all for being here.

25        I did follow the parties' exchanges last week.  I was
```

1   hopeful that you had worked through this, but I understand that

2   there is a follow-on issue.

3       So I have reviewed the submission.  Thank you for that.  I

4   have the supplemental interrogatory response.

5       And as I understand it from the response, there were 31

6   Tour representatives identified, 30 of whom are indicated to

7   have had verbal communications with various entities.

8       And it looks like on that, there are, by my count, seven

9   of the Tour representatives identified had communications with

10  either one or one and two -- one or two entities; and the other

11  23 have multiple entities and it looks like probably across

12  multiple categories.

13      It is a little hard for me to tell.  They may be a little

14  more specialized than that, but that's generally what we are

15  looking at in terms of verbal communications.

16      So my first question is to LIV, I take the measure of the

17  dispute -- and we will talk for a moment about whether other

18  representatives should be included or what additional

19  information, if any, should be provided, whether that's

20  pursuant to the pending interrogatory or additional

21  interrogatories -- but it looks to me like we are drilling down

22  and more focused at this point on verbal communications with

23  regards to this interrogatory.  That's the path we are on.

24      Is that right, Ms. Brass?  Am I understanding that

25  correctly?

1          **MS. BRASS:**  Your Honor, I don't think that has been

2     LIV's position.

3          The Tour has certainly maintained that written

4     communications are more ably obtained through document

5     discovery.  They certainly have not offered to add the 19

6     individuals on their list as custodians -- the 19 who are on

7     this RFP response but who have not been identified as

8     custodians.  So I'm not sure exactly how that would happen.

9          You know, we believe this is at minimum a path towards

10    oral communications; and we need some path towards the written

11    communications as well.  That has not been in the offering.

12         You know, so our position is, you know, is we think the

13    base level of information we have been asking for, they could

14    do, you know, who spoke to whom, both for oral and written; but

15    if their position is who spoke to whom in writing is better

16    than through a request for production, then it seems that they

17    should produce those documents.  And there has been no offer to

18    do so.

19          **THE COURT:**  Okay.  Would communications from these

20    representatives to these entities, at least generally, be

21    covered by already existing RFPs?  I know there have been

22    dozens served by both sides.

23          **MS. BRASS:**  Yes, Your Honor.  And we do think there

24    are reasons, you know, on our custodial list, you know, which

25    we are happy to explain to you.

1          **THE COURT:**  You think what?  I'm sorry.

2          **MS. BRASS:**  There are reasons, for example, that, you

3     know, many of these people were not included in the

4     custodial --

5          **THE COURT:**  Oh, to be sure.

6          **MS. BRASS:**  Yes.

7          **THE COURT:**  And I assume a lot of these people don't

8     need to be on the general custodian list, but you may well --

9     now that you see that, you know, Mr. Pincus -- of course I pick

10    one with a name I can't pronounce -- had communications with

11    these specific sponsors --

12         **MS. BRASS:**  That's a great example.

13         **THE COURT:**  I assume that would be covered by an

14    existing RFP.

15         **MS. BRASS:**  It is, Your Honor.  But, you know, he is a

16    great example.  He and the ten other of the people who were

17    identified were not even on the org charts they gave to LIV.

18         **THE COURT:**  Well, that's fine.

19         **MS. BRASS:**  So that's sort of how difficult it has

20    been for us to drill down on who has information.

21         **THE COURT:**  Well, that -- and we have made progress.

22         **MS. BRASS:**  Yes.

23         **THE COURT:**  And I -- I'm pleased to see that.  We have

24    gone from org charts of 80 some odd numbers -- understanding

25    that, you know, we are not -- it's not a completely linear

1    process -- now, on this list, we are down to 30 -- well, 31 but

2    30 at least in terms of verbal communications.

3        And I know LIV has issues as to whether there should be

4    other people included on this list.  And we will get to that.

5        I'm just trying to figure out first where we are in terms

6    of whether we are talking about written communications or

7    verbal.

8        **MS. BRASS:**  Right.  And we haven't reached a

9    resolution of that; but, you know, one may be possible.

10       **THE COURT:**  Oh, it will be possible.

11                        (Laughter)

12       **THE COURT:**  Because it will be done.  All right.  Then

13   let's focus for the moment on oral communications.  And,

14   Ms. Brass, I will just ask you first since you are closest to

15   the podium.

16       With regards to verbal communications, I see LIV's

17   position of:  Well, you know, if a person on this list spoke to

18   a director or a player and told them to talk to the Japan tour,

19   for example, about the subject matters, that then that player

20   or director communication should be reflected on here.  Am I

21   understanding that issue correctly?

22       **MS. BRASS:**  That's correct, Your Honor.  And we can

23   give you some examples of where, you know, talking points were

24   written for --

25       **THE COURT:**  Well, and you pointed those out in your

1   papers.

2          **MS. BRASS:**  Yeah.

3          **THE COURT:**  You had one example of a specific

4   golfer -- I believe that was Mr. Day -- and you had the talking

5   points for the directors.

6          **MS. BRASS:**  Right, and talking points for Mr. Woods,

7   another golfer.

8          **THE COURT:**  Right.  So -- but for purposes of this

9   interrogatory if the communication from an acknowledged

10  representative of the Tour to either a player or any of these

11  other third parties or a director, for that matter -- and I

12  know directors aren't on here -- isn't that -- that's -- that's

13  step one.

14       And then whether or not that player or director, in my

15  example, then communicated down the chain -- communicated to

16  the third party is -- is another -- is another step.

17       And as I understand LIV's position it's well, that the

18  director or player is communicating on behalf of the tour;

19  right?

20         **MS. BRASS:**  That's correct.

21         **THE COURT:**  Okay.

22         **MS. BRASS:**  For example, Your Honor, there is a

23  meeting of the PGA Tour and the members and Mr. Monahan --

24  there's draft talking points from Mr. Monahan to get to

25  Mr. Woods that, you know, say we are all together in a meeting.

1    Now, Mr. Monahan will leave.  Mr. Woods will ask everyone to

2    turn off the cameras and the recording devices and then give a

3    presentation to just the members.

4        We think, you know, it is a stretch to say that person

5    isn't authorized or being asked to speak on behalf of the Tour.

6        We understand Mr. Woods may be independent, and they may

7    certainly argue that on the merits.  But as a question of

8    discovery, we would think that's, you know, encompassed within

9    this interrogatory.

10        **THE COURT:**  Well, you are absolutely right; and that's

11    the first thing I wanted to toss out was there is -- there will

12    be a question of fact here about who is -- who is authorized

13    and who is not for certain communications in certain

14    timeframes, et cetera.  And that will be for a finder of fact

15    in some form, and that's -- that's not for me.

16        In terms of discovery, the first phase, which is someone

17    who has been identified as authorized, one of these 31 persons,

18    communicating that first level of communication a direction to

19    players or directors or anybody else -- well, directors,

20    perhaps, is not a good example -- but to players or anyone else

21    will be reflected if we -- if we flesh this out a little bit.

22    So you will have that communication.

23        And then you turn to the person who received that

24    communication as to whether or not they made it any further.

25        So, you-all will fight later about whether or not that

1  ultimate communication to the third party is authorized by the

2  Tour or not, but it seems like we are on a path to get the

3  information that you need.

4       **MS. BRASS:**  We really -- we would hope so.  I think we

5  just have a fundamental disagreement about, you know, if they

6  go and ask Tiger Woods to make a presentation on their behalf

7  to people if that is an authorized person or not.

8       **THE COURT:**  Well, but the -- but from the authorized

9  person to Tiger Woods will show up.  I mean, we will toss this

10  out a little bit.  We will get some of these communications

11  identified.  So that first one will show up; right?

12       **MS. BRASS:**  We would hope so, Your Honor.

13       **THE COURT:**  Well, you are right.  We are going to

14  assume that everyone is following the Court's orders and the

15  discovery rules in good faith.

16       **MS. BRASS:**  And part of why we have some concerns

17  about that, for example, is -- and they have produced now, you

18  know, communications with the number two person at the PGA, Ron

19  Price, the Chief Operating Officer, going out and speaking to

20  third parties and getting e-mails from Jay Monahan that say,

21  you know, "good job," you know, "loyalty results in loyalty."

22       And the -- one person isn't on their list.  And so, you

23  know, if the number two person -- whether, you know, they are

24  asking him to do it -- he is going to do it and then the CEO

25  is, you know, saying "good job" are not on the list, you can

1   understand when they are fighting so hard against producing

2   this information why we remain skeptical that that 31-person

3   list is thorough.

4         **THE COURT:**  Well, I understand.  And you may well have

5   documents that -- you know, if those examples show what you say

6   they show, I mean, that -- you have a lot of good paperwork for

7   depositions and for discovery.

8      I'm trying to focus on a general framework that gets you

9   what you need from here.

10        **MS. BRASS:**  I understand, Your Honor.  Thank you.

11        **THE COURT:**  Let's just talk about directors for a

12  moment and then I would like to turn back to Mr. Lauridsen.

13     So, as I understand it, again, from the submission to me,

14  it's LIV's position is that if someone on this list -- someone

15  authorized is talking to a director, that that communication

16  should be identified; and it's not.  Directors aren't a

17  receiver of communication aren't a category on here.

18        **MS. BRASS:**  Well, I think our position would be if Jay

19  Monahan asked the Chairman Of The Board to go out and speak in

20  the world on behalf of the Tour, that the Chairman Of The Board

21  in that context is an authorized speaker on behalf of the Tour,

22  and that -- and that person should be listed as well as other

23  directors if they are asked to go out and speak in a similar

24  capacity.

25     We also think if the Chairman then a second step, more

1   akin to the players, asks the other directors, that should also

2   be included.  And it's neither that first step -- you know, we

3   have asked the --

4          **THE COURT:**  There is nothing about directors in the

5   current response.

6          **MS. BRASS:**  Exactly.  And we believe, you know, in a

7   classic scope of who is authorized to speak, people like the

8   Chairman Of The Board and other directors have asked to do so,

9   you know, by the organization would be authorized.

10         **THE COURT:**  Okay.  And LIV knows that the -- who are

11  the Tour direct -- the Tour directors of the PGA is publically

12  available information; is that correct?

13         **MS. BRASS:**  Yes, Your Honor.

14         **THE COURT:**  That's what I thought.

15         **MS. BRASS:**  And to be transparent, we have served

16  subpoenas on many of them given the Tour's position that it,

17  you know, does not control them and they are independent.

18         **THE COURT:**  Okay.  All right.  That's very helpful.

19  Thank you.  Let me get a little bit more information from

20  Mr. Lauridsen and let's see how we can work through this.

21  Okay.

22         **MR. LAURIDSEN:**  Good afternoon, Your Honor.

23         **THE COURT:**  Good afternoon.  So we are going to put

24  aside for a moment written communications and focus with

25  regards to the Tour's response to interrogatory number 1

1   following the Court's guidance from -- was it just a week ago?

2            **MR. LAURIDSEN:**  Ten days ago.

3            **THE COURT:**  -- ten days ago.  Time flies.

4            **MR. LAURIDSEN:**  Yes.

5            **THE COURT:**  So we have got a list of persons.  We have

6   an indication as to verbal communications, which is pretty much

7   everybody.  And that's really the -- oh, what was my intention

8   in kind of breaking this down into steps was not necessarily to

9   foreclose additional information pursuant to this interrogatory

10  and certainly not as to follow-on interrogatories, but to first

11  let's see what we are -- what we are talking about.

12       And I was pleased to see that the parties were able to

13  meet and confer and work out subject matter and the entities;

14  that those seem to be workable lists.  And that -- you know, we

15  have to start somewhere.  So I think both sides are to be

16  commended for that effort.

17       So, okay, now, we have authorized speakers.  We have a

18  wide variety of categories.  So someone at the Tour -- and I

19  don't know who is who except for Mr. Monahan, is it, because he

20  has been referenced in the papers -- so probably not a good

21  example -- but someone who is authorized asks -- you know,

22  tells a player to, you know, "Look, you are going to be having

23  lunch with XYZ and we'd like you to follow up with regards to

24  the subject matter," you know, one of the categories in the

25  subject matter.

1          **MR. LAURIDSEN:**  Uh-huh.

2          **THE COURT:**  So, where does that authorized -- where

3    are we?

4          **MR. LAURIDSEN:**  Yes, Your Honor.  Backing up to a

5    point you made earlier, we believe we have exhausted

6    interrogatory number 1 in terms of the next steps but that

7    there is fruitful other discovery that this has set up LIV to

8    take.

9          And one of those other areas of discovery could be:  Give

10   us a description of a specific category of communication made

11   by a specific person.

12         But to apply that writ large to 30 or 31 people over all

13   of the different categories that are laid out here is going to

14   put us right back in the incredibly burdensome world we were

15   speaking about ten days ago where we are having to conduct deep

16   interviews to get every oral communication; identify specific

17   speakers.  And that's simply too broad.

18         So we have worked with LIV.  We will continue to work with

19   LIV to figure out specific descriptions of communications and

20   further discovery that they could take, but I don't think we

21   can simply overlay that upon this interrogatory.

22         And a second reason for that is because Your Honor's

23   absolutely right that there is a dispute over agency here.

24         When they talk about authorized -- and they cite this in

25   their paper -- they talk about authority to bind.  As

1  Your Honor knows, that is likely going to be a factual dispute

2  in this case.

3      And it is inappropriate for them to try to backdoor

4  resolution on that factual dispute in a discovery fight.

5      They would love to get people's names added by court order

6  to this list saying "we have resolved that this person has

7  authority to bind," but that's not appropriate for this

8  discovery fight.

9      They can take further discovery on that.  It will be in

10  front of a fact-finder at some point, but now is not the time.

11      So when we are dealing with people like directors and

12  players, I think Your Honor has put your finger on what the

13  next discovery would be, which is out of this list of

14  authorized persons, you could go ahead and ask for who are the

15  players that you reached out to to communicate to LIV or to

16  others about LIV.

17      And that's a different interrogatory.  That's not

18  interrogatory 1.  So we have completed in good faith the

19  meet-and-confer here.  We have developed a lot of facts.

20      We have given what Your Honor asked for last week, which

21  is the list of the people making the communications that are

22  going to be relevant for their case.

23      And now we kick into the next round of discovery.  So

24  whether that's additional interrogatories, depositions,

25  reviewing the many documents we have produced, there are ample

1    means for them to pursue this information.  They are already

2    doing it; the subpoenas, for example, to the independent

3    directors.

4        And so in order to make most efficient use of our time, I

5    think we should focus on those narrower discovery matters where

6    we can really put a point on it and further meet and confer

7    rather than simply dealing with a very broad -- broad one where

8    we have made a lot of progress and we have likely exhausted

9    what we can do with this interrogatory.

10       **THE COURT:**  All right.  Thank you, Mr. Lauridsen.  All

11   right.  Here is what I am thinking how it would make sense to

12   proceed:  And it's -- it is a compromise between the positions,

13   and let me -- let me tell you what that is.  And I will hear

14   briefly from each side.

15       I assume at the moment you have the -- and I seem to

16   recall in the papers -- the standard limit on interrogatories;

17   is that right?

18       **MS. BRASS:**  Yes.

19       **THE COURT:**  So what I think, excuse me, makes sense is

20   for a second interrogatory, an interrogatory 2, which would be

21   along lines of the following:  For the persons identified in

22   interrogatory 1, for each entity with whom they communicated,

23   identify the -- the, you know, the person or persons that they

24   had verbal communications with and the year in which those

25   communications took place.

1          And I see this as some sort -- as a table.  And, yes,

2     it's -- and it's a fair amount of information, but it is --

3     it's not asking to recall each and every communication, but it

4     is providing a framework that then LIV can really begin to make

5     discovery selections out of on which to pursue, either with

6     further written discovery or will also probably help in

7     searching the current document productions and will even help

8     to inform the deposition list.

9          So, for example, for Mr. Hardy on this list, who spoke

10    with a variety of tours as well as IMG, it would be:  Okay, so

11    Mr. Hardy gets his own table and on one side you have got the

12    list of the entities he spoke with.

13         And then across -- okay, in 1991 -- excuse me, in the

14    fourth quarter 2019, which I think is roughly where the time

15    period starts, you know, who at the European tour did you speak

16    with about the subject matter?  And then into 2020, who did you

17    speak with?

18         Now, some of these people, perhaps, have had this position

19    for a long time; and there is not a lot of change over time and

20    some may be much more -- there might be a lot more turnover.

21    So some charts will be quite condensed and some may be more

22    expansive.

23         But that would then give LIV better insight as to the

24    verbal communications and importantly identify who at these

25    entities the Tour representatives in response to interrogatory

1    number 1 are speaking with and the general timeframe that they

2    are speaking in.

3        And so I think that that would be a way to -- is the way

4    to proceed.  An interrogatory number 2, what would be the

5    persons identified in interrogatory number 1.  For each entity

6    identify the person and the year of contact.

7        And, yes, that is work for the Tour, obviously to drill

8    down but it's work the Tour will have to do any way if you

9    haven't already.

10       I mean, it's -- it's respond to the interrogatory/prepare

11   for depos/it's discovery going on on both sides.

12       With regards to the director issue, again, it seems like

13   there is -- there is -- there are many paths to get information

14   from the directors.  So -- but if LIV wants to drill down again

15   through an interrogatory, that is one way to do it and that

16   would seem to be permissible; but it would have to be an

17   additional interrogatory.

18       It would be interrogatory number 3 if, in fact, you just

19   move down this path, which is, you know, would be for everyone

20   who was authorized to speak on behalf of the Tour or anyone who

21   is authorized to -- you know, which -- who spoke with a

22   director, which directors and in which year.

23       And, though, we are very cautious about subparts in

24   interrogatories, I think in this instance, again, where we are

25   trying to get some framework around people and dates and we are

1  dealing with a group of 30 or 31, which is a substantial

2  improvement over 80 -- I think that -- that that makes sense

3  and would be -- meet the needs and be proportional to the needs

4  presented in this case.

5        So, Ms. Brass, from LIV, does that get you, I think, to a

6  suitable place?

7            **MS. BRASS:**  Your Honor, I think -- I think for the

8  fact -- that that could generally work.  I think, you know,

9  there are some additional things we would want to ask; like

10  where they say "broadcaster," you know, like which one?  Is

11  that CBS?  Is that ESPN?  Is that NBC?  I don't know if that's

12  encompassed in the --

13            **THE COURT:**  Well, if they are identifying who they

14  spoke with --

15            **MS. BRASS:**  One would hope.

16            **THE COURT:**  -- it should be -- you know, if

17  "broadcaster" is as fine as the category is defined -- and I

18  know that's what we talked about last time.  I'm not seeing it

19  on here, but I know it's on here -- then it would be, you know,

20  "I spoke with John Smith or Jane Smith at ABC."

21        Yeah, the entity -- some of these are by entity

22  obviously --

23            **MS. BRASS:**  Yeah.

24            **THE COURT:**  -- the sponsors, and some are -- are,

25  perhaps, more general.  So it should be the contact, who did

1    you speak with.  And if it is not clear from this, who are they

2    with.

3         I mean, this isn't hide the ball.  This is let's get this

4    information out and move on.

5              MS. BRASS:  And then I think the other, you know,

6    concern we have is just timing.  You know, it has obviously

7    taken us four weeks to get from the initial interrogatory

8    response to today.

9         And the deadline for substantial completion of document

10   production is 25 days from now.  So, we, you know --

11             THE COURT:  Well, it will be expedited.

12             MS. BRASS:  That's really our question but otherwise,

13   what you are --

14             THE COURT:  Everything in this case is expedited.

15             MS. BRASS:  Yeah.  Otherwise, what you are proposing

16   seems like a reasonable compromise to us, Your Honor.

17             THE COURT:  And then as for documents, I'm assuming

18   that that is being handled appropriately through the

19   appropriate meet-and-confer process in response to the RFPs.

20        And I would expect that documents for the persons

21   identified on this list for the communications identified on

22   this list are being provided.

23        I'm not going to order documents being identified in

24   response to an interrogatory provided that they will be

25   covered.  It sounds like they are covered in an outstanding RFP

1    request, so I would expect the production to reflect that.

2    **MS. BRASS:**  Thank you, Your Honor.

3    **THE COURT:**  Let me hear from Tour.  Mr. Lauridsen.

4    **MR. LAURIDSEN:**  Thank you, Your Honor.  Taking up the

5    document point first, what you just described is actually a

6    substantial expansion beyond what the parties have agreed to in

7    document discovery and in meet-and-confer.

8    We have negotiated a roughly proportional number of

9    custodians that will be subject to e-mail searches often using

10    search terms.

11    If we are going to search for the communications made by

12    e-mail for everybody on this list, that's more than doubling

13    the number of custodians and is going to substantially increase

14    the number of documents that need to be reviewed in the final

15    days as we approach the substantial completion deadline.

16    **THE COURT:**  So here is my -- here is how that plays

17    out, though, Mr. Lauridsen, which is:  You have your

18    custodians -- and I think you have 14 or 15 -- and you have

19    your search terms and that's good and those terms, I assume,

20    get run across all custodians when you are trying to sweep in

21    the relevant documents.

22    This is -- these people aren't all custodians.  It is much

23    more specific, which is going back to my example of Mr. Pincus,

24    if he is talking to Callaway in 2020, we are talking about a

25    search of his e-mails with Callaway in 2020.

1          Yes, that's more and it is more than the custodian in

2    terms of a search; but he has communications -- he was

3    authorized to speak on behalf of the Tour and he had

4    communications with these people.

5          MR. LAURIDSEN:  The devil is in the details,

6    Your Honor.

7          THE COURT:  Always.

8          MR. LAURIDSEN:  The example you just brought up of

9    Callaway, some of these people have a relationship with a

10   vendor, for example, where they deal with a ton of things that

11   have nothing to do with LIV.

12         And so, if we are going to do a search for those types of

13   documents, we would want it limited to the subject matter that

14   has already been negotiated under the interrogatory.

15         THE COURT:  Absolutely, absolutely.

16         MR. LAURIDSEN:  And so it would be a much narrower

17   search term driven review of these individuals.

18         THE COURT:  Granted.  It would not just be Mr. Pincus

19   searching e-mail for Callaway.  It would be Callaway plus or

20   Callaway with -- however that gets formed out -- and then your

21   agreed subject matter terms.

22         I'm not trying to broaden it beyond its -- but, we are

23   talking about a case based on communications, and we need to --

24   we have got -- we made good progress and we want to be sure

25   that what we needs to be produced gets produced.

1        Often in these cases, especially on this kind of a

2   schedule, the producing party on both sides runs out of runway

3   to get eyes on every document before it gets produced.

4        You use your search terms.  You collect the documents.  It

5   gives lawyers heartburn, but you -- just as a matter of getting

6   it done, you have to do that.

7        You have -- I don't have your full ESI order here in front

8   of me -- but you should have in either that or the protective

9   order a 502 clawback provision.

10           **MR. LAURIDSEN:**  Uh-huh.

11           **THE COURT:**  And I've said this in cases before, I

12  understand and I understand the dynamic and if you have -- you

13  know, there is a clawback provision and however you have

14  negotiated it, that's the way it will operate.

15       So if something inadvertent gets produced, it will get

16  pulled back and no one will be -- no one will be using it in

17  any way, shape or form.

18       Now, that's a little bit of horse out of the barn, but

19  that provision is there and we use it and we enforce it -- I

20  enforce it robustly because I appreciate that, you know,

21  it's -- you are not going to get eyes on every document,

22  especially on this schedule.

23           **MR. LAURIDSEN:**  And on the schedule for document

24  production -- and then we will turn to the other half of

25  this -- we would ask that for the document piece that the

1    substantial completion deadline, since it's already just going

2    to be in 25 days, be the deadline for these additional

3    documents that will be produced because we do have a lot of

4    document review that is running and it would be more efficient.

5              THE COURT:  Okay.  Yeah, for document production.  We

6    are going to do the next round of interrogatory responses much

7    more quickly.

8              MR. LAURIDSEN:  Yes.  And on that, Your Honor I think

9    understands this fully.  Interviewing 30 people about oral

10   communications that they have had over a number of years is a

11   substantial undertaking.  We will do it if ordered by the

12   Court.

13       But we are concerned -- because we have seen some of this

14   in the meet-and-confer correspondence, and Your Honor has seen

15   some of it in the briefing -- we are limited by our witness'

16   memories, obviously.

17       And it is entirely possible that there is going to be a

18   witness who doesn't remember a communication he had in the last

19   week of 2019, and we will be back in front of Your Honor, I'm

20   sure, if LIV has an issue with the completeness of our

21   response; but we will do our best but there are limits to human

22   memory.

23             THE COURT:  Well, I think everyone understands.  We

24   are asking -- and in one -- in part why we are keeping the

25   questions fairly general, which is by year.  Who did you talk

1    to in which year.  But you are correct.

2        If someone is convening with a sponsor or a governing body

3    or for a long period of time, I don't remember the

4    conversations I've had with the Chief Judge I can't break them

5    down by year.  I can break them down pre and post COVID --

6                        (Laughter)

7            THE COURT:  -- as we all probably can.  So, I mean,

8    you can only do what a reasonable investigation reveals.

9    That's why the document production will be important.

10       And, yes, these responses -- and they will be verified

11   that, but they are limited by what -- what can be recalled, but

12   there has to be diligent investigation and a good-faith effort

13   to answer them thoroughly.

14           MR. LAURIDSEN:  And I would give the admonition to the

15   witness I'm interviewing the same as in a deposition where they

16   have to answer to the best of their ability but that may be a

17   limitation here.  There may be some witnesses who say it was

18   2019 or 2020.  They may say it was this person or that person

19   or they may not even be able to recall, but we will do our

20   best.

21           THE COURT:  They may.  Hopefully they at least know

22   who they spoke to and if they can fit it in a year.  And we are

23   dealing with:  Well, do you remember, if that was before

24   COVID -- because that's kind of our 2019 piece -- do you

25   remember, had everything already shut down?  Was there a tour

1  that year?  You know, there are -- just like in depos, there

2  are sort of the times you try your best --

3  　　　　MR. LAURIDSEN:  Right.

4  　　　　THE COURT:  -- and information that comes out comes

5  out.  That's why the document production will be important

6  because that may better inform LIV down the road and your side

7  as well.

8  　　　　MR. LAURIDSEN:  And then just in terms of thinking

9  about realistic schedule, I don't know if Your Honor has

10  something in mind; but scheduling interviews with 30 people is

11  in and of itself an undertaking and --

12  　　　　THE COURT:  You will need to get your team organized,

13  and you will need to divide and conquer but time is -- time is

14  of the essence.  But I -- I understand all people, not just

15  people involved with professional golf -- are busy and they

16  have families and jobs and maybe -- maybe talking to a lawyer

17  is not at the very top of their list, but this lawsuit is

18  important to both sides and --

19  　　　　MR. LAURIDSEN:  Your Honor --

20  　　　　THE COURT:  I'm sure you can get it done.

21  　　　　MR. LAURIDSEN:  -- one more piece, if I may, just on

22  the timing, the substantial completion deadline is coming up

23  for document production but that's not the close of discovery.

24  　　And so to the extent that there is some follow-up

25  discovery, whether it is asking for a further interrogatory

1   memo or communication or subpoenas going to third parties

2   because they have learned about something, that's still on the

3   table.  And so, the world doesn't end for discovery 25 days

4   from now, and they won't be precluded from pursuing the avenues

5   that we have laid out.

6           **THE COURT:**  But discovery does close in January.

7           **MR. LAURIDSEN:**  It does, Your Honor.

8           **THE COURT:**  And there are the usual holidays between

9   here and there.  It is not a straight and most efficient time.

10  I understand.  And I appreciate it's not the close.

11      But we still have a very expedited schedule in this case.

12          **MR. LAURIDSEN:**  Understood, Your Honor.  And we are

13  working hard, as you have seen, to try to get there.

14          **THE COURT:**  I'm confident.  And, as I say, I was

15  pleased to see the progress that both sides did make; and I

16  think we have a clear path forward.

17      What I want LIV to do is to serve the second interrogatory

18  relating to the further identification of the communications

19  exactly as I laid it out here on the record today.  And I want

20  you to serve that tomorrow.

21      And if you want an interrogatory that relates to the --

22  you know, the directors, if you want to follow up as to the

23  people identified in interrogatory 1, who is talking to

24  directors, to whom did they speak and in what year, you can

25  serve that as well tomorrow.

1        **MR. LAURIDSEN:**  Your Honor, my colleague corrected me.

2   March 3rd is actually the close of fact discovery but your

3   point is taken.  This is all accelerated.

4        **THE COURT:**  Is it March 3rd?  What's the January -- I

5   thought it was in January.  Okay.  All right.  Well --

6        **THE CLERK:**  (inaudible).

7        **THE COURT:**  -- I stand corrected.  I'm making up dates

8   now.  It's good that you correct me.

9      Okay.  Then --

10       **MS. BRASS:**  Your Honor, may I ask one point of

11  clarification?

12       **THE COURT:**  Yeah, in just a minute.  Just let me

13  finish my thought with Mr. Lauridsen on timing.  Okay.

14     So I think for the responses -- the further response to

15  interrogatory number 2, which will be served tomorrow, let's do

16  that in two weeks and get that response served on November 8th.

17  Is that two weeks?  Yes, it is.

18       **MR. LAURIDSEN:**  Your Honor -- Your Honor, could we

19  have three weeks for that?

20       **THE COURT:**  Let me hear from Ms. Brass.

21       **MR. LAURIDSEN:**  And, Your Honor, just a bit of color

22  on that, that's not an arbitrary date.  I have been involved in

23  scheduling with my client in the last couple of weeks, and this

24  next ten-day period is going to be very difficult for us to

25  schedule; and we will do whatever the Court orders, but an

 1   additional week would make it much more manageable on our end.

 2        **THE COURT:**  Okay, all right.  We do want good

 3   information.  Let me just hear from Ms. Brass.

 4        **MS. BRASS:**  Your Honor, perhaps we could have a

 5   rolling update of this.  If they are talking to people

 6   periodically, I'm not sure that we would need to wait three

 7   weeks, which puts us into the middle of Thanksgiving week

 8   already.

 9             **MR. LAURIDSEN:**  No, not quite.

10        **MS. BRASS:**  Not quite, you're right.  But, you know,

11   assuming they are not going to wait until the week of the 14th

12   to talk to everyone and they are doing charts by witnesses,

13   perhaps there might be an initial production after two weeks

14   and then they can complete it after three weeks rather than us

15   having to wait for it all.

16        **THE COURT:**  All right.  Thank you.  Okay.  All right.

17   Mr. Lauridsen, you can have three weeks.  The response to the

18   interrogatory that will be served tomorrow for the additional

19   communications will be due on the 15th.  As the additional

20   information is available, make it available to LIV.

21             **MR. LAURIDSEN:**  Yes, Your Honor.

22        **THE COURT:**  If you want to do one final complete

23   response, but as it becomes available.  That's not an

24   unreasonable request.  Some of these are pretty self-contained.

25   As I say, seven of these folks only deal with one or two

1  people.

2        MR. LAURIDSEN:  Yes, Your Honor.

3        THE COURT:  So those should be fairly easy to at least

4  get their work done and out the door.

5        MR. LAURIDSEN:  Understood.

6        THE COURT:  All right.  Other questions or concerns

7  from LIV today?

8        MS. BRASS:  Your Honor, just because we do want to

9  serve an interrogatory that is verbatim what you read -- and I

10  know Ms. Dansey has been typing furiously -- but if you have

11  clear notes such that you can read it again, I think that would

12  be in all of our interests to avoid dispute.

13        THE COURT:  I will try.  My notes are never clear.

14                    (Laughter)

15        THE COURT:  This is literally my notes along with my

16  sample chart on the back.

17        MS. BRASS:  Should we submit something to the court

18  reporter?

19        THE COURT:  Sure.  I believe it is as follows:  For

20  the persons identified in interrogatory number 1, identify for

21  each entity the person and the year of contact.  And that would

22  be for each entity identified.

23      And, again, if it's a category such as broadcaster, you

24  know, okay, "I deal with NBC" or "I deal with the Golf

25  Channel."  Okay, well, who at the Golf Channel do you deal

 1   with?  Give the name or the more specific entity.

 2          **MR. LAURIDSEN:**  And, Your Honor, just a point of

 3   clarity, in the previous rog response, we were identifying the

 4   entities with whom people were authorized to speak to.

 5          So, in the follow-up interviews, it may become clear that

 6   there may not be a person for every single entity.  So I just

 7   don't want that to come as a surprise to everyone.

 8          **THE COURT:**  May not be a person for every entity.

 9          **MR. LAURIDSEN:**  So, for example, if you were

10   authorized to speak for -- speak with broadcasters and there

11   are seven different broadcast companies --

12          **THE COURT:**  Oh, yeah, you may not have dealt with all

13   seven.

14          **MR. LAURIDSEN:**  Correct.

15          **THE COURT:**  I understand.

16          **MR. LAURIDSEN:**  And for some of these, they may be the

17   Tour representative who deals with a specific vendor; and they

18   were authorized to speak to that vendor.

19          And if we put a star or asterisk by them, we believe that

20   they had oral communication and so I would expect it there; but

21   because some of them are more specific.  Some of them are

22   categorical, it may look a bit different when we get down to

23   brass tacks.

24          **THE COURT:**  I understand.  Here should be the guiding

25   principle for both sides, which is communications took place,

oral and in writing; and at least the framework of those

communications; who initiated, who received, and in what -- in

what timeframe -- and we have already set the subject matter

up -- and in what timeframe is in the knowledge -- to the

extent it exists, that knowledge exists, it is in the knowledge

of the folks associated with the Tour.

So the Tour has that information and LIV has asked for it

so it needs to be imparted.

There is no hiding the ball at this level.  You-all are

good lawyers, and you will fight about what those

communications mean at a later date.  But for right now, we are

getting them identified.

And, again, that's why this approach on the interrogatory

at this point -- as I said, we've limited this to oral

communications -- and, Ms. Dansey, that should be clear in the

interrogatory that we are talking about oral communications --

for purposes of the interrogatory, I do expect that in terms of

the document production -- there is already an outstanding

request -- and the appropriate search will be done for these

individuals so that their written communications, if any, on

the relevant subject matter will be produced.

**MR. LAURIDSEN:**  Understood, Your Honor.

**MS. BRASS:**  Thank you, Your Honor.

**THE COURT:**  All right.  Very good.  I appreciate it.

I appreciate the folks' effort.  Just double-checking my

1  calendar.  That looks fine.

2      I will issue a short order capturing the ruling here

3  today; but more importantly, I want everyone to take away the

4  admonitions of the Court so that you can continue to make good

5  progress and work well together.  That will be in both sides'

6  best interests.

7      I won't get my order out probably until tomorrow and the

8  interrogatory will be served tomorrow.

9          **MS. BRASS:**  Yes, Your Honor.

10         **THE COURT:**  Okay.  And let me just -- we didn't -- on

11  the player issue, communications from the 30 or 31 to players

12  will be identified, so -- in this process.  And what the

13  players then do with that is the subject of other discovery

14  down the road, whether by interrogatory or by deposition or

15  however that works out.

16         **MS. BRASS:**  Thank you, Your Honor.

17         **THE COURT:**  Okay.  All right.  Thank you.

18         **MR. LAURIDSEN:**  Thank you, Your Honor.

19         **THE COURT:**  All right.  That concludes this proceeding

20  and we are adjourned.  Thank you.

21             (Proceedings adjourned at 2:18 p.m.)

22                    ---oOo---

23

24

25

**CERTIFICATE OF REPORTER**

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, October 25, 2022

    *Marla Knox*

_____

    Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
    United States District Court - Official Reporter