# EXHIBIT A

JUDGE LIMAN

OCT 28 2022

22 MC 00302

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PGA TOUR, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA and YASIR OTHMAN AL-RUMAYYAN,<br><br>Defendants. | Misc. Case No.<br><br>[underlying action: *Jones, et al. v. PGA TOUR, Inc.*, Case No. 5:22-cv-04486-BLF, United States District Court for the Northern District of California] |

**PGA TOUR'S MOTION TO COMPEL PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S COMPLIANCE WITH DOCUMENT AND DEPOSITION SUBPOENAS**

U.S. DISTRICT COURT
2022 OCT 28 P
S.D. OF N.Y.

ORIGINAL

**NOTICE OF MOTION AND MOTION**

Please take notice that on _________, 2022, at 9:00 a.m., or as soon thereafter as this matter can be heard in the Courtroom _______ of the above-entitled Court, located at 500 Pearl St., New York, New York, 10007, PGA Tour, Inc. ("the TOUR") will and hereby does move, pursuant to the Federal Rules of Civil Procedure, Rule 45, for an Order Compelling Compliance with Subpoenas on the Public Investment Fund of the Kingdom of Saudi Arabia ("PIF") and Yasir Othman Al-Rumayyan. This motion is brought pursuant to Rule 45 of the Federal Rules of Civil Procedure on the grounds that PIF and Mr. Al-Rumayyan have failed to provide deposition testimony or and relevant, non-privileged documents responsive to the subpoenas served on them. The subpoenas at issue relate to an action currently pending in the United States District Court for the Northern District of California. The TOUR and PIF and Mr. Al-Rumayyan have agreed that this motion to compel should be transferred to the United States District Court for the Northern District of California pursuant to Federal Rule of Civil Procedure 45(f). Concurrently with the filing of this Motion, the TOUR has filed an unopposed Motion to Transfer.

This Motion is based on this Notice of Motion and Motion to Compel PIF and Mr. Al-Rumayyan's Compliance with Subpoenas, the attached Memorandum of Law, the Declaration of Brook Dooley and accompanying exhibits, all pleadings and papers on file herein, and upon such further oral and documentary evidence as may be presented at or before the hearing on this Motion.

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 37.3(A)**

Pursuant to Local Rule Local Civil Rule 37.3(a) the TOUR hereby certifies that its counsel has corresponded with counsel for PIF and Mr. Al-Rumayyan both by teleconference and in writing regarding the disputed issues, including one formal meet and confer call to address

these disputed issues on October 10, 2022, and that such attempts to resolve these issues were

unsuccessful.  *See* Declaration of Brook Dooley ("Dooley Decl.") at ¶ 2.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated: Oct. 20, 2022

By: ______________________

ELLIOT R. PETERS
BROOK DOOLEY *(pro hac vice* to be filed)
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
epeters@keker.com
bdooley@keker.com

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
ANTHONY J. DREYER
KAREN M. LENT
MATTHEW M. MARTINO
One Manhattan West
New York, NY 10001
Telephone: 212 735 3000
Facsimile: 212 735 2000
anthony.dreyer@skadden.com
karen.lent@skadden.com
matthew.martino@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
PATRICK FITZGERALD
155 North Wacker Drive
Chicago, Il 60606
Telephone: 312 407 0700
Facsimile: 312 407 0411
patrick.fitzgerald@skadden.com

*Attorneys for Plaintiff PGA TOUR, INC.*

JUDGE LIMAN

22 MC 00302

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PGA TOUR, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA and YASIR OTHMAN AL-RUMAYYAN<br><br>Defendants. | Misc. Case No.<br><br>[underlying action: *Jones, et al. v. PGA TOUR, Inc.*, Case No. 5:22-cv-04486-BLF, United States District Court for the Northern District of California] |

**MEMORANDUM OF LAW IN SUPPORT OF PGA TOUR'S MOTION TO COMPEL PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S COMPLIANCE WITH DOCUMENT AND DEPOSITION SUBPOENAS**

REDACTED - PUBLIC VERSION

OFFICE COPY

**TABLE OF CONTENTS**

**PAGE**

MEMORANDUM OF LAW ..... 1

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 3

A. The Underlying Action in the Northern District of California ..... 3

B. LIV's promises that PIF will cooperate with discovery ..... 4

C. PIF and Mr. Al-Rumayyan's creation and control of LIV ..... 6

D. PIF and Mr. Al-Rumayyan's contacts with the United States and New York ..... 8

E. PIF and Mr. Al-Rumayyan's claims of immunity ..... 10

III. LEGAL STANDARD ..... 12

IV. ARGUMENT ..... 12

A. PIF and Mr. Al-Rumayyan control evidence that is central to the TOUR's defenses and counterclaim that is unavailable elsewhere ..... 12

B. This Court has personal jurisdiction over PIF and Mr. Al-Rumayyan ..... 15

1. This Court has personal jurisdiction over PIF under FSIA ..... 15

2. The Court has personal jurisdiction over PIF and Mr. Al-Rumayyan under the traditional standard ..... 19

C. The Court's personal jurisdiction is consistent with principles of international comity. ..... 26

D. The subpoenas are valid under Rule 45(c) ..... 27

V. CONCLUSION ..... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*,
457 F. Supp. 3d 401 (S.D.N.Y. 2020) ........ 21

*Ambac Assurance Corp. v. U.S Bank Nat'l Ass'n*,
2020 WL 526404 (S.D.N.Y. Feb. 3, 2020) ........ 12

*Andros Compania Maritima, S.A. v. Intertanker Ltd.*,
718 F. Supp. 1215 (S.D.N.Y. 1989) ........ 23

*Application to Enforce Admin. Subpoenas Duces Tecum of S.E.C. v. Knowles*,
87 F.3d 413 (10th Cir. 1996) ........ 21

*Ayyash v. Bank Al-Madina*,
2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ........ 28

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
305 F.3d 120 (2d Cir. 2002) ........ 23, 24

*Broumand v. Joseph*,
522 F. Supp. 3d 8 (S.D.N.Y 2021) ........ 24

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ........ 21

*Colo. River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976) ........ 26

*In re del Valle Ruiz*,
939 F.3d 520 (2d Cir. 2019) ........ 21, 22

*Embassy of the Arab Republic of Egypt v. Lasheen*,
603 F.3d 1166 (9th Cir. 2010) ........ 17

*Enzo Biochem, Inc. v. PerkinElmer, Inc.*,
2014 WL 12789255 (S.D.N.Y. Feb. 19, 2014) ........ 12

*Everard Findlay Consulting, LLC v. Republic of Suriname*,
831 F. App'x 599 (2d Cir. 2020) ........ 17

*First Am. Corp. v. Price Waterhouse LLP*,
154 F.3d 16 (2d Cir.1998) ........ *passim*

*Gucci Am., Inc. v. Weixing Li*,
135 F. Supp. 3d 87 (S.D.N.Y. 2015)....................19, 24

*Gucci Am., Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014)....................21

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945)....................21

*Jones et al. v. PGA Tour, Inc.*,
22-cv-04486-BLF (N.D. Cal.) ....................3

*Joseph v. Office of the Consulate Gen. of Nigeria*,
830 F.2d 1018 (9th Cir. 1987) ....................15

*Matar v. Dichter*,
563 F.3d 9 (2d Cir. 2009) ....................27

*Ministry of Supply, Cairo v. Universe Tankships, Inc.*,
708 F.2d 80 (2d Cir. 1983)....................17

*Nash v. Life Ins. Co. of N. Am.*,
2009 WL 1181605 (N.D. Ill. Apr. 29, 2009) ....................22

*Negrete v. Citibank, N.A.*,
2017 WL 3206330 (S.D.N.Y. July 26, 2017) ....................12

*Nike, Inc. v. Wu*,
349 F. Supp. 3d 310 (S.D.N.Y.), *aff'd*, 349 F. Supp. 3d 346 (S.D.N.Y. 2018) ....................20

*Pablo Star Ltd. v. Welsh Gov't*,
961 F.3d 555 (2d Cir. 2020)....................17

*Republic of Argentina v. NML Cap., Ltd.*,
573 U.S. 134 (2014)....................26

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992)....................16, 18

*Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*,
466 F.3d 88 (2d Cir. 2006)....................26, 27

*Samantar v. Yousuf*,
560 U.S. 305 (2010)....................3, 15, 27

*Shapiro v. Republic of Bolivia.*,
930 F.2d 1013 (2d Cir. 1991)....................15

*Verlinden B.V. v. Cent. Bank of Nigeria*,
461 U.S. 480 (1983).....27

**Statutes**

NY CPLR § 302.....20

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et. seq. ..... *passim*

**Rules**

Federal Rules of Civil Procedure Rule 26 .....12, 25, 28

Federal Rules of Civil Procedure Rule 45 ..... *passim*

## MEMORANDUM OF LAW

The TOUR respectfully files this memorandum of law in support of its motion to compel production of documents, information, and testimony from the Public Investment Fund of the Kingdom of Saudi Arabia and Yasir Al-Rumayyan.

## I. INTRODUCTION

The PGA TOUR ("TOUR") moves to compel testimony and documents from the Public Investment Fund of the Kingdom of Saudi Arabia ("PIF") and its Governor Yasir Othman Al-Rumayyan in response to subpoenas (the "Subpoenas") properly served on them in the United States. The Subpoenas seek evidence that is relevant to the antitrust and breach of contract action that LIV Golf, Inc. ("LIV") and several golfers who joined LIV filed against the TOUR in the United States District Court for the Northern District of California. The Subpoenas also seek discovery relevant to the TOUR's counterclaims against LIV for tortious interference.

There is no serious dispute that PIF and Mr. Al-Rumayyan possess highly relevant discovery in the underlying action. PIF created, funded, and owns LIV; PIF and Mr. Al-Rumayyan have had effective control over LIV from its inception; and LIV's own Managing Director has publicly acknowledged that Mr. Al-Rumayyan is "the boss" of LIV. PIF's role is so central that one of the lawyers for PIF and Mr. Al-Rumayyan—who also represents LIV—represented to the court in the underlying action that he would "never insist [on] any sort of formal service" and would "cooperate" with the TOUR's efforts to take discovery from PIF.

But after agreeing to accept service of the Subpoenas, PIF and Mr. Al-Rumayyan have done a complete about face. They have flatly objected to the TOUR's Subpoenas, refused to produce a single responsive document, and declined to appear for deposition. Instead, PIF and Mr. Al-Rumayyan have asserted a panoply of spurious objections to forestall critical discovery

the TOUR needs from LIV's owners. Notwithstanding their prior stated willingness to cooperate with discovery, PIF and Mr. Al-Rumayyan now assert that there is no court in the United States with jurisdiction over them; claim to be immune from discovery altogether; and deny that they are relevant to LIV's lawsuit in any way. The Court should overrule PIF and Mr. Al-Rumayyan's baseless objections and order them to comply with the Subpoena for the following reasons.

***First***, PIF and Mr. Al-Rumayyan are directly relevant to LIV's lawsuit because they own and control LIV. PIF, the sovereign wealth fund of the Kingdom of Saudi Arabia, launched LIV in 2021 after an earlier golf tour that they sponsored to compete against the TOUR folded. PIF invested over $2 billion to launch LIV to compete with the TOUR, and it now has an 85% ownership stake in LIV. [REDACTED] Dooley Decl. Ex. 40. Further, Mr. Al-Rumayyan, along with LIV CEO Greg Norman, is the public face of LIV, appearing regularly at LIV tournaments, participating in trophy presentation ceremonies at LIV events, and even announcing at a LIV event that any player who shoots a perfect score of 54 would be awarded $54 million. *Id.* Ex. 47.

***Second,*** the discovery the TOUR seeks is relevant to its claims and defenses and unlikely to be obtained from LIV. For example, the TOUR seeks evidence related to PIF's financial projections for LIV and its assessment of LIV's business plans, both of which are relevant to LIV's claims that its entrance into the market was intended to have, and has had, procompetitive effects. PIF and Mr. Al-Rumayyan are likely to have testimony and documents on these topics that LIV does not because their involvement pre-dates LIV's creation. The TOUR also seeks

evidence related to the competing tour that PIF created before LIV—called the Premier Golf League ("PGL")—which Plaintiffs claim the TOUR destroyed through anticompetitive conduct. Again, LIV will not have evidence regarding the PGL.

***Third***, PIF and Mr. Al-Rumayyan's jurisdictional objections do not withstand scrutiny in light of their substantial, purposeful, and commercial contacts with the United States. PIF and Mr. Al-Rumayyan claim sovereign immunity, but the Foreign Sovereign Immunities Act ("FSIA") actually "makes personal jurisdiction [over them] automatic" because of their extensive commercial activity in the United States. *Samantar v. Yousuf*, 560 U.S. 305, 325 n.20 (2010). Likewise, they waived any immunity claim by approving LIV's lawsuit in the United States that seeks to enforce United States antitrust laws. Finally, given their extensive contacts with the United States—PIF, for example, currently holds $40 billion of equity in more than fifty companies publicly traded in the United States, *id.* Ex. 21,—their due process objections to the Court's jurisdiction fail.

Therefore, the Court should grant the TOUR's motion to compel in its entirety, order PIF and Mr. Al-Rumayyan to substantially complete their production of documents no later than November 18, 2022 (the deadline in the Scheduling Order in the underlying action), and appear for deposition at a mutually-agreeable date and time.

## II. BACKGROUND

### A. The Underlying Action in the Northern District of California

In 2021, PIF and its Governor, Mr. Al-Rumayyan, founded and financed LIV, a new professional golf tour built to compete with the PGA TOUR. Dkt. 83 (Am. Compl.) ¶ 102.[1] PIF,

[1] All docket references are to the underlying action, *Jones et al. v. PGA Tour, Inc.*, 22-cv-04486-BLF (N.D. Cal.).

the sovereign wealth fund for the Kingdom of Saudi Arabia with approximately half a trillion dollars in assets under management, owns [redacted] of LIV. Dooley Decl. Exs. 1-2. LIV launched its inaugural season this year by signing top TOUR golfers to lucrative guaranteed contracts and inducing them to breach their agreements with the TOUR in the process. *Id.* Ex. 32. LIV's inaugural season consists of eight tournaments, including five in the United States. *Id.*

On August 3, 2022, eleven professional golfers (the "Player Plaintiffs") who had recently left the TOUR to sign with LIV filed a lawsuit against the TOUR in the United States District Court for the Northern District of California asserting antitrust and breach of contract claims. Dkt. 1 (Compl.) ¶ 298-345. Plaintiffs alleged that the TOUR is an "entrenched monopolist" engaged in anticompetitive behavior, including suspending them from the TOUR in retaliation for joining LIV; "threaten[ing] sponsors, vendors, and agents to coerce players to abandon opportunities to play in LIV Golf events"; and "orchestrat[ing] a per se unlawful group boycott with the European Tour to deny LIV Golf access to" to elite golfers. *Id.* ¶¶ 1-3. Three of the Player Plaintiffs simultaneously sought a temporary restraining order seeking to force the TOUR to allow them to participate in the TOUR's season-ending championship, the FedEx Cup Playoffs. Dkt. 2. The Court denied the TRO request. Dkt. 63. Two weeks later, LIV—represented by the same two law firms as the Player Plaintiffs—joined the lawsuit in an Amended Complaint that added claims for tortious interference with contract. Dkt. 83. The TOUR has since counterclaimed against LIV for tortious interference with the TOUR's contracts. Dkt. 108 (TOUR Answer).

**B. LIV's promises that PIF will cooperate with discovery**

After the Court denied Plaintiffs' TRO and shortly before LIV joined the case, the Court held a status conference to address Plaintiffs' request for an expedited case schedule. Dkt. 71, Dooley Decl. Ex. 4. Counsel for the TOUR expressed concern about an expedited schedule,

noting that the TOUR expected to seek discovery from PIF as an owner and "key decision maker" for LIV, and that the TOUR was concerned about how long such discovery would take given that Saudi Arabia is not a signatory to the Hague Convention and counsel for LIV and Plaintiffs had not yet agreed to accept service of a subpoena. Dooley Decl. Ex. 4 at 9. Plaintiffs' counsel called the TOUR's concern a "non issue" and accused the TOUR of "throw[ing] as much furniture in the way [to] avoid th[e] trial for as long as possible." *Id.* at 14. Plaintiffs' counsel assured the Court that "to the extent there's appropriate discovery of the Public Investment Fund, we will find a way to cooperate with that," that they would "never insist that [the TOUR] do any sort of formal service," and that discovery of PIF would "come together swimmingly." *Id.*

Following the status conference, one of the law firms representing LIV and the Player Plaintiffs informed the TOUR that it would be representing PIF and Mr. Al-Rumayyan. The TOUR then negotiated with counsel for PIF and Mr. Al-Rumayyan a letter agreement (the "Service Agreement") pursuant to which they agreed to treat the TOUR's subpoenas "as if the PGA Tour had personally delivered a copy of" the subpoenas to Mr. Al-Rumayyan or an officer or managing agent of PIF in the United States. Dooley Decl. Ex. 5.

Consistent with the Service Agreement, the TOUR then served the "Subpoenas" on PIF and Mr. Al-Rumayyan on September 22, 2022. *Id.* The Subpoenas seek, among other evidence, testimony and documents related to PIF's management and promotion of LIV; its decision-making relating to LIV; its involvement in the recruiting of professional golfers to join LIV; PIF and LIV's objectives in entering the market for professional golf events; and PIF's funding and promotion of the PGL. Dooley Decl. Exs. 6-7. The Subpoenas identify New York City as the

place of compliance because PIF maintains an office there and Mr. Al-Rumayyan frequently appears there on PIF business.

As explained in greater detail in Section II.D., notwithstanding their counsel's representations to the Court regarding their willingness to facilitate discovery from PIF and notwithstanding their agreement to accept service of the subpoenas, PIF and Mr. Al-Rumayyan now refuse to produce any documents whatsoever or appear for deposition. Instead, they now take the position that no court in the United States has jurisdiction over them, they are immune from compulsory process, and they have no information or documents relevant to the case. That is all incorrect, as discussed further below.

**C. PIF and Mr. Al-Rumayyan's creation and control of LIV**

Founded in 1971, PIF was "reborn" in 2015 with a mandate to further Saudi Arabia's "Vision 2030"—an effort to diversify Saudi Arabia's economy, alleviate its dependence on oil and better integrate itself with the international economy. Dooley Decl. Exs. 8-9. Part of PIF's Vision 2030 strategy is to invest in sports—especially those popular among the investment class. *Id.* Ex. 10. In addition to its investment in a Formula One team and an English Premier League soccer club, PIF sponsored and funded the PGL in 2019. *Id.* Ex. 50. When the PGL folded, PIF created LIV in 2021. *Id.* Ex. 10, 50. Dkt. 83 ¶ 77-78. To date, [REDACTED] Dooley Decl. Exs. 2, 46. LIV has used PIF's funds to pay eight- and nine-figure advances to lure certain TOUR golfers away from the TOUR and tens of millions of dollars in tournament purses. *Id.* Exs. 2, 11-13.

PIF's involvement in LIV is not limited to public and financial support. Documents produced by LIV indicate that PIF and Mr. Al-Rumayyan in particular play a direct role in managing LIV's day-to-day affairs. [REDACTED]



*Id.* Exs. 15, 47. *Id.* Ex. 40. *id.* Ex.16, *id.* Ex. 17. The highest levels of LIV management report to Mr. Al-Rumayyan, who has led PIF since 2015, first as managing director and now as Governor. For example, *Id.* Ex. 18. In a recent New Yorker article, Majed Al-Sorour, LIV's Managing Director, was quoted as referring to Mr. Al-Rumayyan as "the boss." *Id.* Exs. 19, 50.

Mr. Al-Rumayyan—a Harvard educated banker and reported golf enthusiast—is also the public face of PIF's involvement in LIV. *Id.* Ex. 20. He has appeared at LIV tournaments in the United States, including those at the Trump resort in Bedminster, New Jersey in July 2022, and in Sugar Grove, Illinois, in September 2022. He has also participated in trophy ceremonies at LIV events with LIV CEO Greg Norman and announced that any golfer who shot a perfect score of 54 would be awarded with $54 million. *Id.* Ex. 47. At those tournaments, Mr. Rumayyan has been photographed in LIV-branded apparel alongside Mr. Norman, TOUR-turned-LIV players who would go on to sue the TOUR in the underlying action, and other prominent figures in United States golf. Pictured below, for example, is (1) Mr. Norman, Mr. Al-Rumayyan, Mr. Al-Sorour, and former Player Plaintiff Pat Perez photographed at the LIV Golf Invitational in

1933980

Bedminster, New Jersey, on July 31, 2022,[2] (2) Former President Donald Trump with Mr. Al-Rumayyan and Mr. Al-Sorour at the LIV Golf Invitational in Bedminster, New Jersey, on July 30, 2022,[3] and (3) Mr. Al-Rumayyan with former Player Plaintiff Hudson Swafford, Mr. Al-Sorour, and TOUR-turned-LIV player Harold Varner III at the LIV Golf Invitational in Sugar Grove, Illinois on September 15, 2022.[4]

**D. PIF and Mr. Al-Rumayyan's contacts with the United States and New York**

In furtherance of its mission to advance Saudi Arabia's "Vision 2030," PIF has invested heavily in the United States in recent years. As of June 2022, PIF had invested over $40 billion in more than 50 companies publicly traded in the United States. *Id.* Ex. 21. This includes a $17 billion stake in Lucid, an electric vehicle manufacturer, a $1.5 billion stake in Uber, where PIF has a board seat, and substantial investments in Costco, Starbucks, and Microsoft among others. *Id.* Exs. 21, 41, 48. PIF has also committed $20 billion to Blackstone's Infrastructure Fund Program, which is principally invested in infrastructure assets in the United States. *Id.* Ex. 21. To

---

[2] Mr. Al-Rumayyan (in blue jacket) with Greg Norman, Mr. Al-Sorour, Pat Perez at Bedminster, Getty Images, available at: https://www.gettyimages.com/detail/news-photo/greg-norman-ceo-and-commissioner-of-liv-golf-his-excellency-news-photo/1412089248?adppopup=true

[3] Mr. Al-Rumayyan with others at Bedminster, Getty Images, available at: https://www.gettyimages.com/detail/news-photo/former-president-donald-trump-yasir-al-rumayyan-governor-of-news-photo/1242204646?adppopup=true

[4] Mr. Al-Rumayyan with others in Chicago, Getty Images, available at: https://www.gettyimages.co.uk/detail/news-photo/harold-varner-iii-of-niblicks-gc-putts-on-the-third-green-news-photo/1424000044?phrase=yasir%20al-rumayyan&adppopup=true

manage its United States investments, PIF created a wholly owned United States-based subsidiary, and it announced in February 2019 that it intended to open offices in New York and San Francisco. *Id.* Exs. 23-24. By February of this year, PIF's New York offices had opened. *Id.* Ex. 24.

Mr. Al-Rumayyan himself regularly conducts PIF-related business in the United States, and New York in particular. *Id.* Exs. 25-27. For example, in addition to his July 2022 trip to Bedminster, N.J. for the LIV event (located 43 miles from New York City), Mr. Al-Rumayyan spoke at a summit hosted by a PIF-run organization in New York City in September 2022, and later appeared at the U.S. Chamber of Commerce. *Id.* Exs. 28, 29. In November 2022, Mr. Al-Rumayyan is expected to appear yet again in New York at a dinner hosted in his honor, where he will receive an award in recognition of his "proven commitment to positive professional cooperation between the U.S. and the Middle East and North Africa." *Id.* Ex. 30.

LIV—funded and operated by PIF and Mr. Al-Rumayyan—also has a substantial presence in the United States. LIV is a Delaware corporation with its principal place of business in New York City, it has recruited 20 American golfers to join the LIV tour, and five of the eight LIV events held in 2022 were located in the United States. *Id.* Ex. 31-32. Of the fourteen LIV tournaments currently scheduled for 2023, nine will occur in the United States. *Id.* Ex. 33. In fact,



*Id.* Ex. 17.

*Id.*

1933980

[redacted]

*Id.* [redacted]

[redacted] *Id.* Ex. 17. Indeed, the central claim in LIV's Compliant is that the TOUR is frustrating its attempts to enter the market for elite golf events in the United States, and LIV alleges that, because of the TOUR, it "has been unable to broadcast its events in the United States." Dkt. 83 ¶¶ 266, 331.

PIF and Mr. Al-Rumayyan conduct other business related to PIF's investments in golf in the United States, and in New York in particular. In October 2021, for example, [redacted] Dooley Decl. Ex. 34. And later this month, another PIF-backed golf tournament will take place at the Trump Golf Links at Ferry Point in the Bronx. *Id.* Ex. 35.

**E. PIF and Mr. Al-Rumayyan's claims of immunity**

On October 3, 2022, despite their earlier promises to cooperate with discovery, PIF and Mr. Al-Rumayyan responded to the TOUR's Subpoenas by refusing to produce a single document or appear for a deposition. Instead, they flatly objected to the Subpoenas and asserted that (1) they are not subject to the personal jurisdiction of any United States court in connection with the Subpoenas; (2) it would be unreasonable for any United States court to exercise personal jurisdiction over them under the principles of international comity; and (3) the deposition subpoenas did not comply with the 100-mile rule of Rule 45(c)(1)(A) of the Federal Rules of Civil Procedure because neither PIF nor Mr. Al-Rumayyan regularly transacts business in person within 100 miles of New York City. *Id.* Exs. 36-37. Both PIF and Mr. Al-Rumayyan

declined to testify at a deposition and refused to search for or produce documents in response to each document request.

On October 10, counsel the TOUR met and conferred with counsel for PIF and Mr. Al-Rumayyan regarding their refusal to respond to the Subpoenas. *Id.* ¶ 2; Ex. 38. They confirmed their position that they are not subject to the jurisdiction of any United States court in connection with the Subpoenas, that they did not regularly transact business in person within 100 miles of New York City for purposes of Rule 45(c)(1)(A), and that principles of international comity precluded any compulsory production. *Id.* They added that the discovery that the TOUR seeks is in no way relevant to its defenses or claims in the LIV lawsuit and raised, for the first time, the objection that they are immune under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et. seq. Although PIF and Mr. Al-Rumayyan suggested that they would consider voluntarily producing certain categories of documents, they did not identify a single category of documents that they were willing to produce. *Id.* ¶ 2; Ex. 39.

In an effort to reach some compromise, the TOUR agreed on October 12, 2022, to withdraw over half of its document requests to both PIF and Mr. Al-Rumayyan and to withdraw five deposition topics to PIF. *Id.* PIF and Mr. Al-Rumayyan have continued to refuse to comply even with these narrowed requests. Accordingly, the TOUR now brings this motion to compel, seeking an order requiring PIF and Mr. Al-Rumayyan to comply with the subpoenas as narrowed.[5]

---

[5] PIF and Mr. Al-Rumayyan did reach agreement with the TOUR that this Motion to Compel is suitable for transfer to the Northern District of California, where the underlying action is pending, under Rule 45(f) of the Federal Rules of Civil Procedure. Accordingly, concurrently with the filing of this Motion, the TOUR has filed an unopposed Motion to Transfer.

## III. LEGAL STANDARD

Upon the filing of a motion to compel, the party objecting to the discovery requests "bears the burden of showing why discovery should be denied." *Negrete v. Citibank, N.A.*, 2017 WL 3206330, at *1 (S.D.N.Y. July 26, 2017). The scope of permissible discovery for subpoenas issued under Rule 45 of the Federal Rules of Civil Procedure is equivalent to other discovery promulgated under Rule 26. *Ambac Assurance Corp. v. U.S Bank Nat'l Ass'n*, 2020 WL 526404, at *2 (S.D.N.Y. Feb. 3, 2020). The "allowable scope of discovery has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Enzo Biochem, Inc. v. PerkinElmer, Inc.*, 2014 WL 12789255, at *2 (S.D.N.Y. Feb. 19, 2014) (cleaned up).

## IV. ARGUMENT

### A. PIF and Mr. Al-Rumayyan control evidence that is central to the TOUR's defenses and counterclaim that is unavailable elsewhere

Though not named as parties to the underlying litigation, PIF and Mr. Al-Rumayyan are, by all indications, the money and the authority behind LIV, its entry into the United States golf market, and the underlying lawsuit. Accordingly, the discovery the TOUR seeks is not only relevant, but central, to the underlying litigation.[6]

***First,*** the TOUR seeks evidence concerning PIF's financial projections for LIV. Dooley Decl., Exs. 6-7. This evidence is relevant to LIV's claim that its entrance into the market has produced pro-competitive effects on golf and player compensation. The TOUR, on the other hand, contends that PIF's commitment of billions of dollars to LIV without any discernible plan

---

[6] For its part, LIV—represented by the same counsel as PIF and Mr. Al-Rumayyan—has conceded the relevance of PIF and Mr. Al-Rumayyan, first by telling the Court that it would facilitate discovery from LIV and then by agreeing to produce documents and communications related to PIF and Mr. Al-Rumayyan without objection. Dooley Decl. Exs. 6, 49.

for recouping its investment reflects other motivations. *Id.*, Exs. 11-13. PIF and Mr. Al-Rumayyan's reasons for backing LIV are thus relevant to assessing whether the compensation paid to golfers by LIV reflects competitive pricing or reflects Saudi Arabia's attempt at "sportswashing,"—a strategy by which governments use sports to improve their reputation for human rights abuses and other atrocities—with no real expectation of profitability. Given PIF and Mr. Al-Rumayyan's central role in conceiving and approving of LIV's financial model, they are likely to have evidence relevant to these issues not in the possession of LIV.

***Second,*** the TOUR seeks evidence relating to PIF's communications with PGA TOUR golfers and the compensation and agreements offered to them. *Id.* Exs. 6-7. This evidence is integral to the TOUR's tortious-interference-with-contract counterclaim against LIV because those communications cover the former TOUR members that were induced to breach their contracts with the TOUR. Relevant evidence of PIF and LIV's courting of these players will not be exclusively in LIV's custody. Indeed, PIF and Mr. Al-Rumayyan appear to have established personal relationships with PGA TOUR golfers, including those that went on to sue the TOUR, and recruited TOUR members to join a competing tour prior to the formal establishment of LIV. Dooley Decl. Exs. 50, 52; Dkt. 83 ¶ 79.

***Third***, the TOUR seeks evidence related to PIF's communications with other golf tours and with potential broadcasters, advertisers, sponsors, and vendors, all of which is relevant to LIV's claim that the TOUR conspired to keep LIV out of the "golf ecosystem." Indeed, LIV's Amended Complaint alleges that PIF met with the DP World Tour (formerly the European Tour) in July 2021, to discuss a partnership, at which meeting the DP World Tour acknowledged its fear of reprisal from the TOUR. Dkt. 83 (Am. Compl.) ¶ 138. PIF cannot deny the relevance of, or its involvement in, these communications.

***Fourth,*** the TOUR seeks evidence that its enforcement of its Regulations serves the pro-competitive purpose of protecting the TOUR's reputation from association with LIV and LIV players' controversial Saudi Arabian backers. The TOUR thus seek documents and testimony relating to reasons and concerns given by sponsors, media corporations, advertisers, and tournament hosts for why they did or did not agree to work with LIV or PIF. Dooley Decl., Exs. 6-7. Such evidence will illustrate the kind of fallout from which the TOUR is trying to insulate itself by distancing itself from LIV and LIV players. This evidence is also likely to be uniquely in PIF and Mr. Al-Rumayyan's hands given their proximity to the Saudi government, their sponsorship of LIV, and their recruiting efforts on behalf of LIV.

***Fifth***, the TOUR seeks evidence related to LIV's allegation that it blocked the entrance into the market of the PGL, the first startup golf tour funded by PIF. Plaintiffs allege in the Complaint that PIF funded the PGL as competitor to the TOUR, but the TOUR destroyed its viability. Dkt. 83 ¶¶ 77-81. The TOUR is entitled to defend itself against these allegations by seeking discovery regarding PIF's involvement in PGL and the true reasons for PGL's collapse. Evidence regarding these allegations will be exclusively in PIF's—and not LIV's—custody.

PIF and Mr. Al-Rumayyan's burden objections, which are supported by nothing more than attorney say-so, are meritless. Their refusal to identify even a single category of documents they are willing to produce (even after the TOUR withdrew more than half of its requests) shows that these objections are not made in good faith. PIF and Mr. Al-Rumayyan's true position is not that it would be too burdensome to produce the requested documents but that they are beyond the authority of any court of the United States. As explained below, they are not.

**B.    This Court has personal jurisdiction over PIF and Mr. Al-Rumayyan**

**1.    This Court has personal jurisdiction over PIF under FSIA**

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602, *et seq.*,
provides that foreign states, as well as their "agenc[ies]" and "instrumentalit[ies]" are immune
from the jurisdiction of United States courts, subject to certain exceptions. 28 U.S.C. § 1604,
1603(a). Importantly, when one of those exceptions applies, FSIA "***makes personal jurisdiction
over a foreign state automatic***" in federal courts, so long as there was valid service of process.
*Samantar v. Yousuf*, 560 U.S. 305, 325 n.20 (2010) (citing 28 U.S.C. § 1330) (emphasis added);
*see also Shapiro v. Republic of Bolivia.*, 930 F.2d 1013, 1020 (2d Cir. 1991). Service may be
obtained under FSIA through the delivery of documents "in accordance with any special
arrangement for service between the plaintiff and the agency or instrumentality" of the foreign
state. 28 U.S.C. § 1608(b)(1).

Both elements necessary to establish jurisdiction under FSIA are met here as to PIF.[7]
***First***, there is no question that PIF was validly served. PIF agreed to accept service of the
Subpoena and treat it as if it had been "personally delivered" to an officer or managing agent of
PIF "in the United States." Dooley Decl., Ex. 5. ***Second***, PIF is subject to at least two FSIA
exceptions: the "commercial activities exception" set out in 28 U.SC. § 1605(b), and the waiver
exception set out in 28 U.S.C. § 1605(a). In light of the evidence offered below that these FSIA
exceptions apply, it is PIF's burden to prove otherwise, which it cannot carry. *Joseph v. Office of
the Consulate Gen. of Nigeria*, 830 F.2d 1018, 1021 (9th Cir. 1987).

---

[7] Individual foreign officials such as Mr. Al-Rumayyan (to the extent he is in fact an "official"
and not merely a state-employed investor) are not foreign states entitled to immunity from suit
under FSIA. *Samantar*, 560 U.S. at 325.

**a. PIF's investment in, and management of, LIV constitutes commercial activity in the United States**

Under the commercial activities exception, no foreign state, agency, or instrumentality of the state is immune from the jurisdiction of United States courts for any action based upon (1) "a commercial activity carried on in the United States by the foreign state"; (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Whether a state's activities are commercial in nature is determined "by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992). To constitute "commercial activity carried on in the United States by a foreign state," the commercial activity must have "substantial contact with the United States." 28 U.S.C. § 1603(e).

PIF's creation and control of LIV is quintessential "commercial activity carried on in the United States." PIF has invested ***billions of dollars*** into LIV, a United States company with its principal place of business in the New York City. LIV has used PIF's funding to enter the market for "the purchase of services of professional golfers for elite events in the United States." Dkt. 83 ¶ 266. PIF has funded LIV's headline-grabbing contracts with former TOUR golfers, many of whom live in the United States, as well as the large purses, free tickets and the "festival-like" atmosphere at LIV's United States events. Dooley Decl. Ex. 3. And, as discussed above, far from being a passive investor, PIF actively manages LIV's day-to-day activities and maintains a prominent in-person presence at LIV's events in the United States.

Courts uniformly find that PIF's activities—directing advertisements and services at the United States public and entering into or funding contracts carried out in the United States—

meet the "substantial contact" standard of section 1603(e). For example, the Second Circuit held that the commercial activities exception applied to a foreign government's distribution of national promotional materials for display in the United States where those materials were printed under contract with New York companies and directed at the United States public. *See Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 565 (2d Cir. 2020); *see also Everard Findlay Consulting, LLC v. Republic of Suriname*, 831 F. App'x 599, 601 (2d Cir. 2020) (applying the commercial activities exception where the foreign government "chose to deal with an American company," "the contract targeted the U.S. travel market," and "many aspects of the contract were performed in New York.").

Even in circumstances where there is no evidence of the foreign entity's *direct* involvement in the commercial activity underlying the action, evidence that the foreign entity *financed* the commercial activity is sufficient to apply the commercial activities exception. *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1171 (9th Cir. 2010) (applying commercial activities exception to insurance dispute where the premiums were paid by Egypt, the insurance plan was otherwise funded by the Egyptian Government, and the Government of Egypt approved all documents related to the administration of the plan.). Indeed, a foreign state's substantial contact with the United States "can be met by as little activity as receiving financing from a private or public lending institution located in the United States." *Ministry of Supply, Cairo v. Universe Tankships, Inc.*, 708 F.2d 80, 84 (2d Cir. 1983) (cleaned up). If the receipt of financing from the United States is sufficient to meet the commercial activities exception, then the billions of dollars that PIF has invested into LIV's United States-based operations and its active management of LIV surely subjects PIF to the same exception.

To the extent that PIF insists that its relationship to LIV is merely that of a foreign investor to a United States subsidiary, its actions in the United States and evidence of its close control over LIV belie that position. Indeed, there is plenty of evidence that PIF has exercised control over LIV in the United States, including Mr. Al-Rumayyan's repeated appearance at LIV events in the United States. But even if PIF's management of LIV mostly occurs abroad, such activity nevertheless constitutes commercial activity that "causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2)(3). Thus, whatever commercial activity PIF has carried out in connection with LIV *outside* of the United States still grants this Court jurisdiction to enforce these Subpoenas.

Finally, PIF's actions in creating, funding and overseeing LIV are fundamentally commercial even if PIF is funding LIV in order to burnish its national reputation rather than to make a profit. FSIA directs courts to consider the *nature* of the state's activity—and not its purpose—in determining the activity's commercial status. 28 U.S.C. 1603(d); *Republic of Argentina*, 504 U.S. at 614."[T]he question is not whether the foreign government is acting with a profit motive... Rather, the issue is whether the particular actions that the foreign state performs... are the type of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.*

**b. PIF waived any immunity from jurisdiction by consenting to the filing of LIV's lawsuit in the United.**

FSIA also establishes automatic personal jurisdiction over any foreign state, agency, or instrumentality that "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). On information and belief, PIF waived its immunity by authorizing LIV and several players to file their lawsuit against the TOUR in the Northern District of California. LIV and several players—represented by the same lawyers—filed a lawsuit against the TOUR ***(1) in***

***the United States, (2) invoking United States antitrust law, (3) seeking entry into a market that it defines, in part, as "the purchase of services of professional golfers for elite events in the United States."*** Dkt. 83 ¶ 266 (emphasis added). In the few documents that LIV has produced thus far, it is apparent that PIF has taken a controlling hand in LIV's every move—almost certainly to include its decision to file the underlying lawsuit. Indeed, [REDACTED] Dooley Decl. Ex. 2, 40. PIF should not be permitted to seek out the protection of United States courts and United States law only to disclaim United States courts' authority to compel discovery necessary to the TOUR's defenses and claims. Whether it was aware of, authorized, or directed the filing of the underlying litigation, PIF has subjected itself to the authority of United States courts in connection with LIV's lawsuit.

**2. The Court has personal jurisdiction over PIF and Mr. Al-Rumayyan under the traditional standard**

Both Saudi Parties are also subject to the Court's jurisdiction under the traditional test for personal jurisdiction. Courts must satisfy three requirements to exercise personal jurisdiction over a nonparty for purposes of enforcing a Rule 45 subpoena: "(1) the [nonparty] must have been properly served, (2) the court must have a statutory basis for exercising personal jurisdiction, and (3) the exercise of personal jurisdiction must comport with constitutional due process." *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 93 (S.D.N.Y. 2015) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 59–60 (2d Cir. 2012)). Here, PIF and Mr. Al-Rumayyan were properly served, and the other two elements are easily met here.

1933980

        **a. New York's long-arm statute gives this court a statutory basis for exercising personal jurisdiction over PIF and Mr. Al-Rumayyan**

New York's long-arm statute authorizes personal jurisdiction over foreign third parties in the context of Rule 45 subpoenas where (1) the non-domiciliary in person or through an agent transacts any business within the state, and (2) there is a "connection between the nonparty's contacts with the forum and the discovery order at issue." *Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 328 (S.D.N.Y.), *aff'd,* 349 F. Supp. 3d 346 (S.D.N.Y. 2018); N.Y. CPLR § 302. The second prong of this analysis "does not require a causal relationship between the business transaction and legal claim asserted, only that the latter is not completely unmoored from the former." *Id.* (cleaned up).

PIF and Mr. Al-Rumayyan transact business within New York, and those transactions have a connection to the legal claims asserted by LIV and the evidence the TOUR seeks. PIF has invested tens of billions of dollars into companies traded on New York exchanges. Dooley Decl. Ex. 41. PIF created a United States subsidiary based in New York City to manage these investments, and it maintains a New York City office. Dooley Decl. Exs. 24, 42. Mr. Al-Rumayyan regularly visits New York to speak publicly on PIF's behalf, attending PIF-organized events in at least 2017, 2018, 2019, 2021, and 2022. *See* Dooley Decl., Exs. 25-28 ("New York: As the clocks ticked to midnight in New York's Plaza Hotel, Yasir Al-Rumayyan was nearing the end of a busy day in a hectic week.").

Moreover, PIF and Mr. Al-Rumayyan regularly transact business specifically related to LIV in New York. LIV established its principal place of business in New York. Dkt. 83 ¶ 23. [REDACTED] Dooley Decl. Ex. 15. [REDACTED]

*Id.* The strong connection between PIF and Mr. Al-Rumayyan's business conduct in New York, the subject of this litigation, and the TOUR's discovery requests satisfies the New York long-arm statute and confers this court with personal jurisdiction.

**b. The exercise of specific personal jurisdiction over the PIF and Mr. Al-Rumayyan comports with due process**

Due process traditionally requires a defendant—or here, subpoenaed party—have sufficient "minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014). Jurisdiction exists where those contacts are directed "purposefully" at the forum, and the litigation arises from those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). In assessing specific jurisdiction over nonparties, the Second Circuit looks *first* to "the connection between the nonparty's contacts with the forum and the [discovery] order at issue" and *second,* "decide[s] whether exercising jurisdiction for the purposes of the [discovery] order would comport with fair play and substantial justice." *In re del Valle Ruiz*, 939 F.3d 520, 529 (2d Cir. 2019) (quoting *Gucci Am.*, 768 F.3d at 137).

When a case arises under federal antitrust law, the relevant forum for determining whether a court has personal jurisdiction is the United States as a whole. *Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 408 (S.D.N.Y. 2020) (subsequent history omitted); *see also Gucci Am., Inc.*, 768 F.3d at 142 n.21 (collecting cases) ("when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole.") Under this approach, "[s]pecific contacts with the district in which enforcement is sought . . . are unnecessary." *Application to Enforce Admin. Subpoenas Duces Tecum of S.E.C. v.*

*Knowles*, 87 F.3d 413, 417 (10th Cir. 1996). The underlying case here arises from federal antitrust law. Accordingly, the Court should look to PIF and Mr. Al-Rumayyan's contacts with the entire United States to determine whether personal jurisdiction over them comports with due process.

In creating, funding, and overseeing LIV, PIF and Mr. Al-Rumayyan have had abundant, purposeful contact with the United States, which far exceed the requirement for "some *causal* relationship" between PIF and Mr. Al-Rumayyan's United States contacts and the underlying litigation. *In re del Valle Ruiz*, 939 F.3d at 530. As noted above, PIF founded and funded LIV. PIF manages LIV closely, [REDACTED] Dooley Decl., Exs. 40, 45. The highest levels of LIV management seek Mr. Al-Rumayyan's [REDACTED] Dooley Decl., Exs. 18, 44. Moreover, PIF created LIV to recruit elite United States golfers, host golf tournaments in the United States, and compete with the TOUR in the United States.

Indeed, LIV brought this lawsuit in the United States seeking to enforce United States antitrust laws in connection with its "nascent entry into the markets" of the United States. Dkt. 83 (Am. Compl.) ¶ 9. And in that lawsuit, ***LIV is represented by the same counsel as PIF and Mr. Al-Rumayyan***. LIV, PIF, and Mr. Al-Rumayyan's "actions in concert along with their representation by the same counsel only underscores the relevancy of their relationship." *See Nash v. Life Ins. Co. of N. Am.*, 2009 WL 1181605, at *3 (N.D. Ill. Apr. 29, 2009) (compelling discovery of a nonparty where there was evidence that the nonparty had acted in concert with the defendant). And here, all indications are that PIF and Mr. Al-Rumayyan knew of, authorized, and even directed the filing of the underlying litigation against the TOUR in the United States. There is perhaps no

way to purposefully avail oneself of a forum more than by initiating a lawsuit in United States federal court. *Andros Compania Maritima, S.A. v. Intertanker Ltd.*, 718 F. Supp. 1215, 1217 (S.D.N.Y. 1989) ("seeking affirmative relief from the Court is the paradigm of" a waiver of a personal jurisdiction defense).

Given PIF and Mr. Al-Rumayyan's role in creating and controlling LIV—and likely in bringing this lawsuit—the discovery sought from them is central to the TOUR's defenses and counterclaim in the underlying action brought by LIV. As explained above, the TOUR seeks from PIF (1) evidence of PIF's financial projections to establish whether PIF ever anticipated profiting from LIV; (2) evidence relating to PIF's communications with TOUR golfers and employees to in support of the TOUR's tortious-interference-with-contract counterclaim; (3) evidence of the PIF's communications with golf tours and potential partners to test LIV's allegations that the TOUR kept LIV out of the "golf ecosystem"; (4) evidence that the TOUR's regulations serve a pro-competitive purpose, which will be established by PIF's communications with potential media outlets, tournament hosts, and advertisers who opted out of LIV partnerships due to its controversial backing; and (5) evidence related to LIV's allegation that the TOUR blocked the PGL's entrance into the market.

At the second stage of the due process analysis, *the party challenging jurisdiction* bears the burden of establishing "a compelling case" that "jurisdiction [is] unreasonable," *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002), which PIF and Mr. A-Rumayyan cannot do here. To determine whether exercising personal jurisdiction would comport with "traditional notions of fair play and substantial justice," courts generally consider five factors: (1) "the burden that the exercise of jurisdiction will impose on the [entity]," (2) "the interests of the forum state in adjudicating the case," (3) "the [moving party's] interest in

obtaining convenient and effective relief," (4) "the interstate judicial system's interest in obtaining the most efficient resolution of the controversy," and (5) "the shared interest of the states in furthering substantive social policies." *Id.*

Where "the national contacts approach is involved," many courts "effectively assume that a party's 'minimum contacts' with the United States automatically satisfy due process." *Broumand v. Joseph*, 522 F. Supp. 3d 8, 20-21 (citing *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994); *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir. 1987)). But even applying the traditional five factors, PIF and Mr. Al-Rumayyan cannot carry their burden of showing that exercising personal jurisdiction here is unreasonable. ***First***, the exercise of jurisdiction here will impose minimal burden on PIF and Mr. Al-Rumayyan. PIF already has a physical office located in New York City, and Mr. Al-Rumayyan regularly travels and stays in New York City to conduct business. There would thus be minimal burden imposed on two parties who often or already are "physically present in the forum." *Gucci Am.*, 135 F. Supp. 3d at 100. Also, PIF and Mr. Al-Rumayyan are represented by United States counsel with offices in New York who are already representing the Plaintiffs in this litigation. ***Second***, New York has a strong interest in PIF and Mr. Al-Rumayyan's compliance with their discovery obligations relating to federal claims made by and against LIV—a corporation with its principal place of business in New York. *See id.* (describing New York's strong interest in discovery compliance when relating to claims under a federal statute). ***Third***, the TOUR has a powerful interest in obtaining compliance with its Subpoenas because—as explained above—the evidence sought is relevant to its defenses and counterclaim and may be under the exclusive control of PIF and Mr. Al-Rumayyan. ***Fourth***, enforcing the subpoena request here would serve the interstate judicial system's interest in efficient case resolution, providing the "fastest and

most practical means of resolving this dispute." *Id.* ***Finally***, the TOUR's interest in compelling PIF and Mr. Al-Rumayyan to comply with the subpoenas outweighs any interest they may have in resisting compliance after their counsel explicitly agreed to "cooperate" and facilitate discovery.

#### c. The Court has "tag" personal jurisdiction over PIF and Mr. Al-Rumayyan

A district court can establish personal jurisdiction over an individual for purposes of nonparty discovery if the individual is properly served while in the court's district—i.e., via "tag" jurisdiction. *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 20–21 (2d Cir.1998) (holding that *Burnham v. Superior Court*, 495 U.S. 604 (1990), which held that "tag" jurisdiction does not violate due process, applies to non-U.S. citizens).

PIF and Mr. Al-Rumayyan both agreed to treat the service of subpoena as if a copy of the subpoena had been "personally delivered" to them "in the United States." Dooley Decl., Ex. 5. Since proper service of a person within a forum subjects the person to the forum's jurisdiction, PIF and Mr. Al-Rumayyan's agreements regarding acceptance of service subject them to the Court's personal jurisdiction. *See In re Application for Ord. Quashing Deposition Subpoenas, dated July 16, 2002*, 2002 WL 1870084, at *3 (S.D.N.Y. Aug. 14, 2002). Given that PIF and Mr. Al-Rumayyan "may be subjected to liability by the exercise of so-called 'tag' jurisdiction far from home without the Due Process Clause being violated, there is no reason why service of a subpoena under Rule 45(b)(2), 'which is simply a discovery mechanism and does not subject [them] to liability, requires more.'" *Id.* (quoting *In re Edelman*, 295 F.3d 171, 179 (2d Cir. 2002)). Accordingly, tag jurisdiction provides an independent basis for the Court to exercise jurisdiction over PIF and Mr. Al-Rumayyan.

### C. The Court's personal jurisdiction is consistent with principles of international comity.

PIF and Mr. Al-Rumayyan also invoke the "principles of comity" in their objections, but there is no principle of comity that calls for the Court to abstain from exercising personal jurisdiction over PIF or Mr. Al-Rumayyan. Rather, United States law calls for the exercise of jurisdiction in precisely the circumstances presented here.

As a preliminary matter, the "principles of comity" that PIF and Mr. Al-Rumayyan invoke in their objections derive from "the old executive-driven, factor intensive, loosely common-law based immunity regime," which was "replaced" by FSIA's "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 140-141 (2014). Accordingly, "after the enactment of FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity." *Id.* (cleaned up). Because PIF and Mr. Al-Rumayyan's comity-based immunity defense does not "stand on the Act's text," the Supreme Court has declared that "it must fall." *Id.* at 141-142. This Court should thus ignore any aspect of their immunity defense that seeks protection beyond what FSIA extends. And as explained above, FSIA does not confer PIF and Mr. Al-Rumayyan with *any* immunity to the Subpoenas.

To the extent that any common-law comity principles may be considered in the case of Mr. Al-Rumayyan who, as an individual, is not protected by FSIA at all, they counsel *in favor* of exercising jurisdiction. *First*, doctrines of abstention based on international comity are highly disfavored. The Supreme Court has instructed that federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given" to them. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *see also Royal & Sun All. Ins. Co. of Canada v.*

*Century Int'l Arms, Inc.*, 466 F.3d 88, 93 (2d Cir. 2006). In the few cases in which courts do invoke comity-based abstention, they do so because of parallel foreign proceedings, which are not present here, and even then only in "exceptional circumstances." *Royal & Sun All. Ins. Co. of Canada*, 466 F.3d at 93.

*Second*, the common law regime of international comity and sovereign immunity that FSIA replaced contains the same exception for commercial activity. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487 (1983) ("immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts."); *see also Samantar*, 560 U.S. at 312; *Matar v. Dichter*, 563 F.3d 9, 13 (2d Cir. 2009). For the reasons given above, there is no question that Mr. Al-Rumayyan's activities giving rise to the Subpoenas were commercial.

*Finally,* setting aside the above mandates from the common law principles of comity, the circumstances here simply do not implicate any traditional comity concerns, for example, the concern about dragging an independent foreign entity unwillingly into a court of the United States. As explained above, LIV—by all indications with PIF and Mr. Al-Rumayyan's permission and potentially at their direction—chose to file this lawsuit in the United States. LIV—and by extension PIF—sought out United States' courts, not the other way around. No principle of comity in such circumstances calls for abstention or immunity.

**D. The subpoenas are valid under Rule 45(c)**

A subpoena may command a person to attend a deposition "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(1)(A). Similarly, it may command production of documents "within 100 miles of where the person resides, is employed, or regularly transacts in person." Fed. R. Civ. P. 45(c)(2)(A).

As detailed above in the discussion of personal jurisdiction, both PIF and Mr. Al-Rumayyan "regularly transact[]" in person in and around New York City. In addition to those regular transactions, Mr. Al-Rumayyan spent multiple days in July 2022 conducting LIV-related business at the LIV Golf Invitational Bedminster hosted in Bedminster, New Jersey, less than 50 miles from Manhattan. *See* supra, pg. 9. All of these regular, in-person transactions suffice to satisfy the 100-mile requirement, and New York City is an appropriate location to command the attendance of deposition witnesses and production of documents by PIF and Mr. Al-Rumayyan.[8]

## V. CONCLUSION

For the foregoing reasons, the Court should compel PIF and Mr. Al-Rumayyan to comply with the Subpoenas as narrowed by the TOUR. The Court should order PIF and Mr. Al-Rumayyan to substantially complete their document productions no later than November 18, 2022 (the same deadline in the Scheduling Order in the underlying action) and sit for deposition at a mutually agreeable date and time.

///

///

///

///

///

///

[8] The evidence cited herein is sufficient to establish personal jurisdiction over PIF and Mr. Al-Rumayyan and compliance with Rule 45's 100-mile rule. But should the Court harbor any doubts, jurisdictional discovery—which requires only "a threshold showing" of "facts that would support a colorable claim of jurisdiction"—should be ordered, as that minimal standard is far surpassed here. *Ayyash v. Bank Al-Madina*, 2006 WL 587342, at *5 (S.D.N.Y. Mar. 9, 2006) (cleaned up).

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated: Oct. 20, 2022

By: ______________________

ELLIOT R. PETERS
BROOK DOOLEY (*pro hac vice* to be filed)
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
epeters@keker.com
bdooley@keker.com

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
ANTHONY J. DREYER
KAREN M. LENT
MATTHEW M. MARTINO
One Manhattan West
New York, NY 10001
Telephone: 212 735 3000
Facsimile: 212 735 2000
anthony.dreyer@skadden.com
karen.lent@skadden.com
matthew.martino@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
PATRICK FITZGERALD
155 North Wacker Drive
Chicago, Il 60606
Telephone: 312 407 0700
Facsimile: 312 407 0411
patrick.fitzgerald@skadden.com

*Attorneys for Plaintiff PGA TOUR, INC.*

JUDGE LIMAN

22 MC 00302

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

PGA TOUR, INC.,

Plaintiff,

v.

PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA and YASIR OTHMAN AL-RUMAYYAN,

Defendants.

Misc. Case No.

[underlying action: *Jones, et al. v. PGA TOUR, Inc.*, Case No. 5:22-cv-04486-BLF, United States District Court for the Northern District of California]

**DECLARATION OF BROOK DOOLEY IN SUPPORT OF PGA TOUR INC.'S MOTION TO COMPEL PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S COMPLIANCE WITH DOCUMENT AND DEPOSITION SUBPOENAS**

OFFICE COPY

I, Brook Dooley, declare that:

1. I am an attorney, duly licensed to practice law in California, and a partner with the law firm of Keker, Van Nest & Peters LLP, counsel for Plaintiff, PGA TOUR, Inc. ("TOUR"), in the above-captioned action and in the underlying action, *Jones, et al. v. PGA TOUR, Inc.*, Case No. 5:22-cv-04486-BLF, pending in the United States District Court for the Northern District of California. I submit this declaration in support of the TOUR's Motion to Compel Public Investment Fund of the Kingdom of Saudi Arabia and Yasir Othman Al-Rumayyan's Compliance with Document and Deposition Subpoenas. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently as to them under oath.

2. I have corresponded with counsel for Public Investment Fund of the Kingdom of Saudi Arabia ("PIF") and Mr. Al-Rumayyan both by teleconference and in writing regarding the disputed issues, including one formal meet and confer call to address these disputed issues on October 10, 2022., Such attempts to resolve these issues were unsuccessful.

3. Attached hereto as **Exhibit 1** is a true and correct copy of an article by Wael Mahdi, *PIF to exceed Q2 objective with assets under management of $480bn,* Arab News, dated December 13, 2021.

4. Attached hereto as **Exhibit 2** is a true and correct copy of an email from Rim Taylor to Atul Khosla regarding Project Wedge – Model Discussion, dated April 18, 2022, produced by LIV Golf, Inc. ("LIV") in the underlying litigation with the bates numbers LIV000001249-52.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of an article by Rick Maese, *Is LIV "the future of golf" – or just golf with a soundtrack?* Washington Post, dated July 30, 2022.

6.      Attached hereto as **Exhibit 4** are excerpted portions of the August 18, 2022, Transcript of Proceedings before the Honorable Beth Labson Freeman, United States District Judges in the underlying action.

7.      My partner Elliot R. Peters and I negotiated with the law firm representing PIF and Mr. Al-Rumayyan a letter agreement, pursuant to which Mr. Al-Rumayyan and PIF agreed to treat the TOUR's subpoenas, "as if the PGA Tour had personally delivered a copy of" the subpoenas to Mr. Al-Rumayyan or an officer or managing agent of PIF in the United States. Attached hereto as **Exhibit 5** is a true and correct copy of the September 22, 2022, Letter Agreement re: Third Party subpoenas.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of the Subpoena to Testify at a Deposition in a civil action for Yasir bin Othman Al-Rumayyan, served on September 22, 2022.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of the Subpoena to Testify at a Deposition in a civil action for Public Investment Fund of the Kingdom of Saudi Arabia, served on September 22, 2022.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of the PIF's homepage, https://www.pif.gov.sa/en/Pages/About-Timeline.aspx, (as of October 17, 2022).

11.     Attached hereto as **Exhibit 9** is a true and correct copy of the Vision 2030 homepage, https://www.vision2030.gov.sa/v2030/overview/ (as of October 17,

2022).

12. Attached hereto as **Exhibit 10** is a true and correct copy of an article by Bob Harig, *Golf Legend Greg Norman set to run competing tour that hopes to begin play in 2022*, ESPN.com, dated October 29, 2021.

13. Attached hereto as **Exhibit 11** is a true and correct copy of an article *LIV Golf Outlines Plans for Next Two Years After $2 Billion Investment*, Golf Channel Digital, dated May 10, 2022

14. Attached hereto as **Exhibit 12** is a true and correct copy of an article by The Athletic Staff, *Brooks Koepka, Abraham Ancer the latest to leave PGA Tour for LIV Golf: Reports*, The Athletic.com, dated June 21, 2022.

15. Attached hereto as **Exhibit 13** is a true and correct copy of an article by Jason Lemon, *LIV Golf Tournamenet at Trump Club Sees Thin Crowds, $1 Tickets: Reports*, Newsweek, dated July 30, 2022.

16. Attached hereto as **Exhibit 14** is a true and correct copy of an email from Atul Khosla to Kerri Edwards regarding Deloitte Request list, dated April 5, 2022, produced by LIV in the underlying litigation with the bates numbers LIV000000661-664.

17. Attached hereto as **Exhibit 15** is a true and correct copy of an email between Alhanouf Almarshad and Anna Chaldysheva regarding Updated MIC draft, dated August 15, 2022, produced by LIV in the underlying litigation with the bates numbers LIV000000793-805

18. Attached hereto as **Exhibit 16** is a true and correct copy of a presentation entitled “Project Wedge, Case Comparison,” dated July 2022, produced by LIV in the

underlying litigation with the bates numbers LIV000000676-83.

19. Attached hereto as **Exhibit 17** is a true and correct copy of a presentation entitled "League Media Strategy – Updated," dated October 1, 2021, produced by LIV in the underlying litigation with the bates numbers LIV000001858-1917.

20. Attached hereto as **Exhibit 18** is a true and correct copy of an email from Kerri Edwards to Atui Khosla and others regarding Comms update for PIF/HE, dated July 10, 2022, produced by LIV in the underlying litigation with the bates numbers LIV000000950-51.

21. Attached hereto as **Exhibit 19** is a true and correct copy of a LIV organizational chart, produced by LIV in the underlying litigation with the bates number LIV000000001.

22. Attached hereto as **Exhibit 20** is a true and correct copy of Yasir Al Rumayyan's LinkedIn profile page: https://www.linkedin.com/in/yasiralrumayyan/?originalSubdomain=sa (as of October 17, 2022).

23. Attached hereto as **Exhibit 21** is a true and correct copy of a GACI First Investment Company Offering Circular dated September 27, 2022, https://www.rns-pdf.londonstockexchange.com/rns/8852A_1-2022-9-27.pdf (as of October 17, 2022).

24. Attached hereto as **Exhibit 22** is a true and correct copy of an article by Bloomberg, *Saudi Arabia's PIF to Hire Tens of Staff for New York Subsidiary,* dated September 20, 2022.

25. Attached hereto as **Exhibit 23** is a true and correct copy of an article by Matthew

Martin, *Saudi Wealth Fund Plans San Francisco Office*, dated February 13, 2019.

26. Attached hereto as **Exhibit 24** is a true and correct copy of an article by Saeed Azhar, *Saudi Sovereign Fund PIF Opens London, NY and Hong Kong Offices*, Reuters, dated February 24, 2022.

27. Attached hereto as **Exhibit 25** is a true and correct copy of an article by Bradley Hope, *How a Reality-TV Producer Became Rainmaker to $300 Billion Saudi Fund*, The Wall Street Journal, dated February 10, 2020.

28. Attached hereto as **Exhibit 26** is a true and correct copy of an article by Frank Kane, *A new force shaping the future of the global economy: Saudi Arabia PIF chief*, Arab News, dated April 10, 2018.

29. Attached hereto as **Exhibit 27** is a true and correct copy of an article by Katie Paul, *Saudi wealth fund aims to nearly double size by 2020*, Reuters, dated October 25, 2017.

30. Attached hereto as **Exhibit 28** is a true and correct copy of a presentation for the Priority A Summit powered by FII Institute, dated September 22, 2021, https://fii-institute.org/wp-content/uploads/2022/07/FII-PRIORITY-PROGRAM-AGENDA-21.09.22-1.pdf (as of October 17, 2022).

31. Attached hereto as **Exhibit 29** is a true and correct copy of a Twitter posting from the U.S. Chamber (@USChamber), dated September 18, 2022.

32. Attached hereto as **Exhibit 30** is a true and correct copy of an announcement of the 2022 ABANA Achievement Award Dinner Honoring Yasir Al-Rumayyan, The Plaza Hotel, 768 Fifth Avenue, New York, N.Y., November 28, 2022, https://www.abana.co/events/all/2022-abana-achievement-award-dinner/ (as of

October 17, 2022).

33. Attached hereto as **Exhibit 31** is a true and correct copy of the LIV Golf, Players Directory, https://www.livgolf.com/players-directory (as of October 19, 2022).

34. Attached hereto as **Exhibit 32** is a true and correct copy of the LIV Golf Invitational Series Schedule: Complete Dates, Winners, Purses, https://www.si.com/golf/news/2022-liv-golf-invitational-series-schedule-complete-dates-winners-purses (as of October 19, 2022).

35. Attached hereto as **Exhibit 33** is a true and correct copy of an article by Alex Miceli, *LIV Golf is Drawing Up a 2023 Schedule to Start in February and Include Events in Spain, Australia*, Sports Illustrated, dated September 2, 2022.

36. Attached hereto as **Exhibit 34** is a true and correct copy of an email from Chris Campbell to Greg Norman regarding Invite | Aramco team Services – New York 2021, dated September 14, 2021, produced by LIV in the underlying litigation with the bates numbers LIV000001934-39.

37. Attached hereto as **Exhibit 35** is a true and correct copy of an article by Joel Beall, *Another Trump property will host the latest Saudi-backed golf tournament*, GolfDigest.com, dated August 29, 2022.

38. Attached hereto as **Exhibit 36** is a true and correct copy of Yasir Al-Rumayyan's Responses and Objections to PGA TOUR, Inc.'s Subpoena to Testify at a Deposition, dated October 3, 2022.

39. Attached hereto as **Exhibit 37** is a true and correct copy of PIF's Responses and Objections to PGA TOUR, Inc.'s Subpoena to Testify at a Deposition, dated October 3, 2022.

40. Attached hereto as **Exhibit 38** is a true and correct copy of an email string between Maile Yeats-Rowe, counsel for PGA TOUR and Kevin Teruya, counsel for PIF and Mr. Al-Rumayyan, dated October 10, 2022.

41. Attached hereto as **Exhibit 39** is a true and correct copy of an email string between Maile Yeats-Rowe, counsel for PGA TOUR and Dominic Surprenant counsel for PIF and Mr. Al-Rumayyan, dated October 12, 2022.

42. Attached hereto as **Exhibit 40** is a true and correct copy of an email from Jane Macneille to Tim Taylor regarding PR slide for PIF Board deck, dated February 10, 2022, produced by LIV in the underlying litigation with the bates numbesr LIV000001290-91.

43. Attached hereto as **Exhibit 41** is a true and correct copy of an article by Adam Lucente, *Saudi Public Investment Fund acquires shares in Amazon, Google, Uber*, Al-Monitor, dated August 16, 2022.

44. Attached hereto as **Exhibit 42** is a true and correct copy of an article *Saudi Arabia's PIR to hire 50 staff to expand New York office: Bloomberg report*, Arab News, dated September 20, 2022.

45. Attached hereto as **Exhibit 43** is a true and correct copy of an article by Aya Batrawy, *Saudi Arabia's triumphant week reclaims the West's embrace*, AP News, dated September 26, 2022.

46. Attached hereto as **Exhibit 44** is a true and correct copy of an article by Joel Beall and Dan Rapaport, *The PGA Tour vs. LIV: Inside the battle between a giant that won't budge and a startup that won't stop*, Golf Digest, dated August 9, 2022.

47. Attached hereto as **Exhibit 45** is a true and correct copy of an email from Atul

Khosia to Kerri Edwards regarding Weekly update for PIF, dated March 31, 2022, produced by LIV in the underlying litigation with the bates numbers LIV000000657-59.

48. Attached hereto as **Exhibit 46** is a true and correct copy of LIV Golf, Inc press release entitled "LIV Golf announces 2023-2025 expanded event schedule with $2 billion dedicated to golf's global growth," LIVGolf.com, dated May 10, 2022.

49. Attached hereto as **Exhibit 47** is a true and correct copy of an article *Inside the wildest two weeks in the history of professional golf*, ESPN.com, dated June 20, 2022.

50. Attached hereto as **Exhibit 48** is a true and correct copy of an article by Reuters Staff, *Uber raises $3.5 billion from Saudi Arabia's sovereign wealth fund*, Reuters, dated June 1, 2016.

51. Attached hereto as **Exhibit 49** is a true and correct copy of the relevant excerpts from LIV, Inc.'s Responses and Objections to PGA TOUR, Inc,'s First Set of Requests for Production, dated September 27, 2022.

52. Attached hereto as **Exhibit 50** is a true and correct copy of an article by Zach Helfand, titled *Will the Saudis and Donald Trump Save Golf—or Wreck it?* NewYorker.com, published in the October 24, 2022 issue.

I declare under penalty of perjury that the foregoing is true and correct, and that this Declaration was executed on October 20, 2022, in San Francisco, California.

BROOK DOOLEY

# EXHIBIT 1

# PIF to exceed Q2 objective with assets under management of $480bn

- **The Public Investment Fund is a key player in the Kingdom's diversification strategy**

RIYADH: Saudi Arabia's sovereign wealth fund is on track to surpass its objective for the second quarter of 2022, and reach SR1.8 trillion ($480 billion) in assets under management, the fund's Governor Yasir Al-Rumayyan said.

The Public Investment Fund, or the PIF, is a key player in the Kingdom's diversification strategy, particularly in achieving the Vision 2030 goals.

Al-Rumayyan said the fund established a department called National Development to focus on supporting local supply chains, and increasing the role of local suppliers in the ecosystem.

The new department, he told a Saudi budget media forum in Riyadh on Monday, will assess and monitor, on a quarterly basis, the impact of projects and companies on the economy — in terms of job creation, and increasing local content. He said the Kingdom's Shareek program aims to strengthen cooperation between the public and private sectors and increase local investments to reach SR5 trillion by 2030.

Al-Rumayyan said the fund has offered stakes in several companies for initial public offering in the Saudi stock exchange. Very recently, it offered part of the fund's shares in stc, in the first-ever secondary public offering.

The PIF chief said efforts are also underway to boost the fund's contributions to the green energy sector in line with the Saudi Green Initiative.

He cited Al-Sudair Solar Power Plant as an example. The project will be developed by ACWA Power to meet the power needs of 185,500 housing units.

Al-Rumayyan said the PIF is also working on launching a platform for trading carbon in the Middle East.

Despite all the challenges posed by the coronavirus disease pandemic, the fund was able to maintain its performance and to take advantage of many investment opportunities, he added.

Al-Rumayyan said the fund seeks to develop many other sectors, as the capital of the fund will help ensure long-term investment.

Since the approval of its new strategy in 2016, PIF has created 47 companies and generated more than 400,000 jobs directly and indirectly through their projects and ventures, Al-Rumayyan added.

As well as working towards the Vision 2030 goal, the PIF also has targets to hit before then.

Al-Rumayyan said: "The PIF continues to achieve its 2025 strategy, which is to pump about SR1 trillion in new national projects, and to increase its own assets under the fund's management from SR1.8 trillion to SR4 trillion, and contribute in the national non oil sector with an amount reaching SR 1.2 trillion."

The PIF governor highlighted other areas of investment in the Kingdom, including the fact that about 70 percent of the Red Sea Development contracts were signed with Saudi companies, worth more than SR13 billion.

King Abdullah financial center signed contracts worth SR10 billion to complete and activate the center, while real estate developers ROSHN also signed strategic partnerships with Saudi companies to push ahead with its first phase in Riyadh.

Qiddiya company signed contracts worth more than SR5.5 billion to complete the primary phase of its infrastructure and to develop its first entertainment facility “Qiddiya six flags.”

Additionally, investment management firm Jada Fund of Funds aims to enhance the small and medium enterprise sector by investing SR1.2 billion in 17 investment funds — with SR200 million already handed over and helping to create more than 4,000 jobs.

The Fund contributed in green energy sectors in line with the Kingdom’s initiative, launching renewable energy projects, including the Sudair Solar PV, which will be implemented by ACWA Power and will meet the needs of 185,000 housing units.

Tarshid, National Energy Services Company, has replaced more than a million and a half of regular street lighting lamps with LEDs.

The Fund’s presence on the world stage has grown as it invests in various global markets, which contributes to diversifying sources of income and bringing international expertise to the Kingdom.

Firms to see investment include Lucid Motors, with about $2.9 billion, bringing global investors at its initial public offering listing in July 2021, making it one of the most significant companies in the electric vehicle sector.

The company's value has risen from $3 billion to $65 billion.

PIF also ploughed $2.8 billion into Indian companies, such as the mobile network operator Jio Platforms and the conglomerate Reliance.

# EXHIBIT 2

# DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 3

The Washington Post
*Democracy Dies in Darkness*

# Is LIV 'the future of golf' — or just golf with a soundtrack?

By Rick Maese
July 30, 2022 at 9:28 p.m. EDT

BEDMINSTER, N.J. — The players who have absconded to the LIV Golf Invitational Series have consistently said their decision to join the deep-pocketed, Saudi-backed venture was not about the money.

"There's many facets to making this decision," Jason Kokrak said.

"There's a lot more to my decision of sitting here than just a financial opportunity and less golf," Paul Casey said.

"No, money was not a factor," Charles Howell III said this week to a room of skeptical reporters.

So, then, what is this all about? What makes this nascent series, steeped in controversy and determined to buck tradition, "the future of golf," as Phil Mickelson, Sergio Garcia and others who have signed on keep calling it.

This weekend's LIV Golf event at Trump National Golf Club involved serious money — a total purse of $25 million — and took great efforts to present itself as golf with attitude. Or at least a personality. There were paratroopers before the first tee shot and T-shirt guns during breaks in the action. Music — stadium rock, Top 40, dance — blared from speakers across the course, even as players lined up tricky putts.

With a different competition format, LIV is trying to be more than a fresh coat of paint on a sport that has resisted big changes. But thus far, with relatively thin crowds, modest online viewership numbers and much of the attention focused on peripheral controversies, it's not yet clear whether there's an audience for LIV's version of the sport — or whether that even matters to the circuit's wealthy benefactors.

"We firmly believe that we can attract a younger audience," Atul Khosla, the LIV president and chief operating officer, said in an interview. " … If you look at golf over the years, it's aged. I think the average viewership is 65 and older. And I think from our perspective, when we looked at launching a new product, we've always viewed it from the lens of, 'What are we trying to solve for?' And what we're trying to solve for is get younger people playing golf, watching golf, becoming fans of golf. And we think we can do that by changing how the product is packaged."

For the uninitiated, LIV presents golf as both an individual and a team sport. There are 12 teams, with names such as Crushers, Majesticks and Aces. The winning four-man team this week will split $3 million; the event's individual winner will take home $4 million. But the tournament is unlike other organizations in that it features a shotgun start — every player begins his round at the same time from a different hole on the course — there is no cut, and the entire event lasts three days, not four.

Traditionalists might deride the format as gimmicky, but LIV defenders will counter that the format is not trying to cater to traditionalists.

Mickelson is perhaps the biggest believer — and he has millions of reasons to be, courtesy of Saudi Arabia's Public Investment Fund. He has noted that LIV Golf intends to target a global audience with events staged around the world. The players can't skip faraway stops; they're contractually obligated to show up.

"We receive a ton of money, and we give up our schedule, and we commit to wherever they hold the events," Mickelson said.

The play inside the ropes would feel familiar for any golf fan, but the format and the delivery are the biggest departures.

"One, it's not a 12-hour day, having to watch golf all day. You've got a 4½-hour window," Mickelson said. "Second, when I think a streaming partner comes about, I think it's going to revolutionize the way golf is viewed because you'll have no commercials and you'll have shot after shot after shot and it will capture that younger generation's attention span."

The Bedminster event aimed for a festival-like atmosphere, with a stage set up for a Chainsmokers concert at the conclusion of Sunday's final round.

"We view this course as our stadium, and the things that you could experience at a stadium or an arena, how do we best bring those things to a golf course?" said Khosla, a former executive with the NFL's Tampa Bay Buccaneers and before that with the Chicago Fire of MLS.

With taps flowing and drinks easy to find across the course, the mood was light from tee to green. Fans are close to the action — "Nice shot, Phil," a fan near the 14th green said, "you just cost me 20 bucks" — but the crowds at Bedminster were rarely two deep, even around the most popular players.

At times, the LIV product can feel merely like golf with a soundtrack. Despite the big names LIV officials have lured from the PGA and European tours — the 48-man field this weekend included 11 major champions — the field was still an uneven mix of the who's-who and who's-that of the golf world.

Measuring its popularity is tricky, in part because the start-up doesn't seem concerned about traditional metrics in these early stages. Unlike at other pro golf events, there aren't corporate logos and signage littering the course. Though the LIV Golf social media accounts are active, there is no television rights deal and no commercials on the streaming broadcasts.

Fewer than 1,000 people were concurrently watching the Facebook Live feed for much of the first two rounds this weekend, while LIV Golf's YouTube channel was at or above 60,000 viewers for much of Saturday's second round. On the course, there were far fewer people. Event officials didn't announce attendance, though most estimates suggested only a few thousand spectators. Tickets sold for $75 per day but could be had on the secondary market for $1 apiece (plus $5.05 in fees via StubHub).

Meanwhile, with its controversial Saudi backing, the alliance with former president Donald Trump — whose courses will host two LIV events — and the peril it poses to the pro golf establishment, the actual competition has drawn scant attention through three events. (Henrik Stenson, who lost his Ryder Cup captaincy after he joined LIV, leads this weekend's event through two rounds; the first two events were won by South Africans Charl Schwartzel and Branden Grace.)

The days leading up to the Bedminster event were overshadowed by Trump and the families of 9/11 victims, who are protesting LIV Golf events because of the Saudi benefactors. On Friday afternoon, a couple hundred spectators surrounded the 10th tee box to watch Mickelson begin his round. As the golfer approached his ball, someone shouted, "Do it for the Saudi royal family!" and Mickelson quietly backed away. He regrouped and smacked his shot into a bunker as a staffer approached the fan and issued a warning.

But most fans strolling around Trump's Bedminster club were supportive of the assembled golfers, hoisting cameras in the air to record tee shots, shouting encouragement for big drives, studying the giant leader boards throughout the course and trying to make sense of the format.

The team element could take time for golf fans to digest, but players have repeatedly cited it as part of the appeal. "I love being able to look up at that leader board and not just see my name but also look for my guys," golfer Patrick Reed said.

LIV officials think the format is the draw, but it's also what could jeopardize LIV players from being able to perform on the sport's biggest stages. Players have voiced few misgivings about leaving their former tours, but many have said they hope they still will be eligible for majors and Ryder Cup events.

While a handful of players have exemptions into some majors, other could miss out because the Official World Golf Ranking board hasn't yet decided whether it will recognize LIV Golf events.

"I feel like it would be kind of crazy not to get any points if we're playing in these big-time events," Abraham Ancer said.

LIV Golf officials have publicized plans for the future but have made no indication they will be tweaking their competition format. The breakaway outfit announced plans for a full 2023 season that will include 12 teams competing in 14 events. A news release last week made no mention of the 54-hole format or shotgun starts, but Khosla said LIV Golf is committed to its format for now and that officials are hopeful the OWGR will recognize its events.

While many of the game's stakeholders fret over the upheaval fracturing the sport, the players who have made the LIV leap have said they're hopeful the game can support both the preexisting tours and this start-up, complete with its bouncing soundtrack.

"The landscape in golf is looking good," golfer Ian Poulter said.

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION.

MICKELSON ET AL, ) CV-22-4486-BLF
)
PLAINTIFF, ) SAN JOSE, CALIFORNIA
)
VS. ) AUGUST 18, 2022
)
PGA TOUR, INC., ) PAGES 1-25
)
DEFENDANT. )
)
)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

FOR THE PLAINTIFF: **BY: ROBERT C. WALTERS**
GIBSON DUNN
2100 MCKINNEY, STE. 1100
DALLAS, TX 75201

FOR THE DEFENDANT: **BY: ELLIOT PETERS**
**SOPHIA HOOD**
**ERIC MACMICHAEL**
**NICHOLAS GOLDBERG**
KEKER, VAN NEST & PETERS LLP
633 BATTERY STREET
SAN FRANCISCO, CA 94111

APPEARANCES CONTINUED ON THE NEXT PAGE

OFFICIAL COURT REPORTER: SUMMER FISHER, CSR, CRR
CERTIFICATE NUMBER 13185

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES CONTINUED:

FOR THE PLAINTIFF: **BY: WILLIAM ROPPOLO**
BAKER MCKENZIE
1111 BRICKELL AVE., 1700
MIAMI, FL 33131

FOR THE PLAINTIFF: **BY: DOMINIC SURPRENANT**
QUINN EMANUEL URQUHART & SULLIVAN
865 S. FIGUEROA STREET
10TH FLOOR
LOS ANGELES, CA 90017

FOR THE PLAINTIFF: **BY: RACHEL S. BRASS**
GIBSON, DUNN & CRUTCHER LLP
555 MISSION STREET
SAN FRANCISCO, CA 94105

FOR THE DEFENDANT: **BY: KAREN HOFFMAN LENT**
SKADDEN ARPS
4 TIMES SQUARE
NEW YORK, NY 10036

ARE GOING TO BE INCREDIBLY USER-FRIENDLY. I MEAN, WE WOULD VERY MUCH WELCOME EVEN A MASTER OR A MAGISTRATE AS SOME WAY TO RESOLVE ANY ISSUES THAT WE HAVE.

BUT THERE'S JUST NO REASON IN THE WORLD THAT WORKING COOPERATIVELY, WE CAN'T MAKE THIS SCHEDULE, AND DO SO IN A WAY THAT MEETS YOUR HONOR'S COMMITMENT TO A MARCH 9TH SUMMARY JUDGEMENT DATE AND THEN TO AN AUGUST 7TH TRIAL DATE.

AND WE STAND READY TO MOVE HEAVEN AND EARTH, DO WHATEVER IS NECESSARY, TO REACH THAT TRIAL DATE.

THE COURT: ALL RIGHT. MR. WALTERS, THANK YOU.

MR. ROPPOLO, DO YOU JOIN IN MR. WALTER'S COMMENTS?

MR. ROPPOLO: YOUR HONOR, I DO. THANK YOU.

THE COURT: OKAY. GOOD.

MR. PETERS, LET ME HEAR FROM YOU.

MR. PETERS: THANK YOU, YOUR HONOR.

WHEN WE WERE BEFORE YOU JUST A WEEK AGO YESTERDAY, YOU THREW OUT THIS AUGUST 7TH DATE, YOU PROPOSED THE AUGUST 7TH DATE. AND WHAT YOU SAID WAS, IS IT REASONABLE, AND ARE THERE CONFLICTS? AND WE UNDERSTAND THAT THE COURT MAY WANT TO MOVE THIS CASE QUICKLY, WE ARE PREPARED TO COMPLY WITH THAT, BUT THIS SCHEDULE, AN AUGUST 7TH TRIAL DATE, IS NOT REASONABLE, AND THERE ARE CONFLICTS. AND LET ME TELL YOU WHY, AND THEN I CAN MAKE SORT OF TWO PROPOSALS ABOUT HOW THE COURT MAY WANT TO PROCEED, IF YOU WILL ALLOW ME TO DO THAT.

IT'S NOT REASONABLE, IN FIRST PART, BECAUSE WE DON'T EVEN

 HAVE THE OPERATIVE PLEADING. WE WERE TOLD YESTERDAY THAT THE PLAINTIFFS ARE GOING TO AMEND THEIR COMPLAINT, HOPEFULLY SOON, BUT WE DON'T KNOW WHEN.

THEY ARE DROPPING PLAINTIFFS, BUT THERE'S 11 DIFFERENT PLAINTIFFS NOW, MAYBE THERE WILL BE NINE, OR I'M NOT SURE HOW MANY THERE WILL BE, AND SO THERE'S UNCERTAINTY ABOUT WHAT THE PLEADING IS.

DOCUMENT DISCOVERY IN THIS CASE WHERE YOU ARE INVOLVING NINE INDIVIDUAL PLAYERS AND YOU HAVE TO THEN HARVEST -- FIRST THE PARTIES HAVE TO AGREE ON CUSTODIANS, SEARCH TERMS, HARVEST ELECTRONIC DATA, REVIEW IT AND PRODUCE IT FROM A VARIETY OF ENTITIES, AND AT LEAST NINE INDIVIDUAL PLAINTIFFS, THAT, AS A PRACTICAL MATTER, IS TIME CONSUMING. THEIR PROPOSED SCHEDULE, I THINK THAT HAS THAT HAPPENING IN 45 DAYS. THAT IS NOT REASONABLE OR REALISTIC TO DO THAT.

ALSO, THEIR SECTION 1 CLAIM INVOLVES FOREIGN PARTIES. IT INVOLVES THE DP WORLD TOUR, WHICH IS LOCATED IN THE UK. IT INVOLVES THE OFFICIAL WORLD GOLF RANKINGS, WHICH IS LOCATED IN THE UK. OF COURSE LIV IS OWNED BY THE SAUDI PUBLIC INVESTMENT FUND, AND WILL WANT TO TAKE DISCOVERY, I WOULD ASSUME, FROM KEY DECISION MAKERS OF THE BE OWNERS OF LIV.

UNFORTUNATELY, SAUDI ARABIA IS NOT A SIGNATORY TO THE HAGUE TREATY, SO IT'S NOT CLEAR TO ME EXACTLY HOW WE ARE GOING TO DO THAT. AND WHEN I ASKED COUNSEL YESTERDAY, WHETHER THEY WERE IN A POSITION TO ACCEPT SERVICE OF THE SUBPOENA, PRODUCE

YOUR HONOR? THANK YOU.

FOR STARTERS, WE ARE THE PLAINTIFFS, WE KNOW WHAT IT TAKES TO GET TO TRIAL, AND WE WILL MOVE HEAVEN AND EARTH. I MEAN, SOME OF THESE OBJECTIONS ARE JUST NON ISSUES.

THESE PLAYERS, WE ARE GOING TO WINNOW IT DOWN, BECAUSE SOME PLAYERS WERE INTERESTED IN THE TRO, BUT THEY DON'T HAVE MANY DOCUMENTS, THOSE ARE QUITE EASY TO DO.

LIV, ITSELF, WILL BE HIGHLY COOPERATIVE AND WON'T INSIST ON ANY TIME TABLES, THEY CAN SEND US THEIR REQUEST TOMORROW IF THEY WANT, AND WE WILL BE UNDER WAY. IT'S NOT GOING TO BE AN ISSUE.

TO THE EXTENT THERE'S APPROPRIATE DISCOVERY OF THE PUBLIC INVESTMENT FUND, WE WILL FIND A WAY TO COOPERATE WITH THAT. WE WOULD NEVER INSIST THAT THEY DO ANY SORT OF FORMAL SERVICE, SO WE WILL FIGURE OUT A WAY TO DO THAT. ALL OF THAT WILL COME TOGETHER SWIMMINGLY.

YOU KNOW, IT'S PRETTY CLEAR TO ME THAT THEY LIKE TO THROW AS MUCH FURNITURE IN THE WAY AND AVOID THIS TRIAL FOR AS LONG AS POSSIBLE, BECAUSE IT REALLY, REALLY DOES MATTER ABOUT THE STATE OF THE MARKETPLACE AND COMPETITION, AND SORT OF WHETHER THESE PLAYERS CAN GET TO FREE AGENCY STATUS. SO, YOU KNOW, WE REALLY HEARD NOTHING THAT IS AN ENCUMBRANCE.

AS FOR THE PLEADING, IT'S NOT GOING TO CHANGE THAT MUCH, WE ARE GOING TO WINNOW IT DOWN, WE ARE GOING TO RESHAPE IT SLIGHTLY. WE TOLD THEM THAT WE COULD HAVE IT TO THEM EARLY

**CERTIFICATE OF REPORTER**

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED TRANSCRIPTION TO THE BEST OF MY ABILITY.

_________________________
SUMMER A. FISHER, CSR, CRR
CERTIFICATE NUMBER 13185 DATED: 8/18/22

# EXHIBIT 5

**quinn emanuel** trial lawyers | los angeles
865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3200**

WRITER'S EMAIL ADDRESS
**johnquinn@quinnemanuel.com**

September 22, 2022

**VIA E-MAIL**
**EPETERS@KEKER.COM**

Elliot R. Peters
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111

Re: *Mickelson, et al., v. PGA Tour, Inc.*, Case No. 5:22-cv-04486-BLF (N.D. Cal.)

Dear Elliot:

Upon execution by all parties, this letter constitutes the agreement, in relation to *Mickelson, et al., v. PGA Tour, Inc.*, Case No. 5:22-cv-04486-BLF (N.D. Cal.), by and between Plaintiff LIV Golf, Inc., Defendant PGA Tour, Inc. ("PGA Tour"), and third-parties His Excellency Yasir Al-Rumayyan's ("His Excellency") and the Public Investment Fund of the Kingdom of Saudi Arabia's ("PIF"), regarding His Excellency's and PIF's acceptance of service, pursuant to the below conditions, of the subpoenas attached hereto as Exhibits A and B.

In this instance only, His Excellency agrees to treat the PGA Tour's sending to Quinn Emanuel Urquhart & Sullivan LLP the subpoena attached hereto as Exhibit A as if the PGA Tour had personally delivered a copy of it to His Excellency in the United States.

In this instance only, PIF agrees to treat the PGA Tour's sending to Quinn Emanuel Urquhart & Sullivan LLP the subpoena attached hereto as Exhibit B as if the PGA Tour had personally delivered a copy of it to a PIF officer or managing agent in the United States.

The PGA Tour agrees that in doing so His Excellency and PIF waive no objections or rights whatsoever to the subpoenas attached hereto as Exhibits A and B, and reserve all rights and privileges with respect thereto.

quinn emanuel urquhart & sullivan, llp
ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

Page **2** of **2**

Very truly yours,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

John B. Quinn
Attorney for Plaintiffs LIV Golf, Inc., Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, Peter Uihlein, and Third-Parties His Excellency Yasir Al-Rumayyan and the Public Investment Fund of the Kingdom of Saudi Arabia.

JBQ

Attachments: Exhibits A and B

cc: Robert C. Walters

____________________________________

Elliot R. Peters
Attorney for Defendant PGA Tour, Inc.

Letter Agreement re Third-Party Subpoenas_KVP Eds.docx

quinn emanuel urquhart & sullivan, llp

ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

# EXHIBIT 6

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

Phil Mickelson, et al.
*Plaintiff*
v.
PGA Tour, Inc.
*Defendant*

Civil Action No. 5:22-cv-04486-BLF

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Yasir bin Othman Al-Rumayyan

*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Skadden, Arps, Slate, Meagher & Flom LLP<br>One Manhattan West<br>New York, 10001 | Date and Time:<br>12/05/2022 9:00 am |
|---|---|

The deposition will be recorded by this method: Stenographic, audio, video, real-time reporting

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See Attachment A. Please produce any responsive documents by October 3, 2022.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 09/22/2022

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* PGA Tour, Inc. , who issues or requests this subpoena, are:

Brook Dooley, Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111, bdooley@keker.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 5:22-cv-04486-BLF

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named individual as follows: ______________________
______________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ______________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ ____________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

**ATTACHMENT A**

**DEFINITIONS**

1. The terms "You" or "Your" refer to Yasir bin Othman Al-Rumayyan.

2. The term "Saudi PIF" refers to the Public Investment Fund of the Kingdom of Saudi Arabia and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

3. The term "LIV" refers to LIV Golf Holdings Ltd, LIV Golf Incorporated, LIV Golf Investments Ltd, LIV Golf Ltd, and includes without limitation all predecessors (including the Premier Golf League or "PGL"), predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers (including Greg Norman), agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

4. The term "this litigation" refers to the following action: *Mickelson et al. v. PGA Tour, Inc.*, No. 5:22-cv-04486-BLF, pending currently in the United States District Court for the Northern District of California.

5. The term "complaint" refers to the operative complaint by Plaintiffs in this litigation.

6. The term "Golf Saudi" refers to Golf Saudi and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents (including the Saudi Golf Federation), subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

7. The term "PGA TOUR" refers to PGA TOUR, Inc. and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities

acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

8.      The term "DP World Tour" refers to the PGA European Tour, now known as DP World Tour, and the European Tour Group, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

9.      The term "PGA TOUR Regulations" refers to any and all versions ever in effect of the PGA TOUR Player Handbook & Tournament Regulations.

10.     The term "sponsor" or "sponsorship" refers to any endorsement, name and likeness arrangement, or other promotional activity by a third party of you, including any endorsement covered by the PGA TOUR Regulations "Player Endorsement Policy."

11.     The term "Asian Tour" refers to the Asian Tour and Asian Tour Limited, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

12.     The term "professional golfer" refers to any golfers receiving compensation for their golf performance or appearances, including any current or former member of the PGA TOUR, LIV, DP World Tour, or Asian tour.

13.     The term "Major tournament" refers to the Masters, the U.S. Open, The Open (or The British Open), and the PGA Championship, and any sponsoring or managing entity thereof, as referred to in ¶ 30 of the Amended Complaint.

14.     The term "Competition Agency" refers to any Federal or State agency or person charged with enforcing or empowered to enforce competition-related statutes or policies, including but not limited to the Federal Trade Commission and the Department of Justice.

15. The term "Official World Golf Ranking" refers to the Private Limited Company Official World Golf Ranking (OWGR) and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

16. The term "Alleged Relevant Markets" refers to the national and global market for the services of professional golfers for elite golf events as alleged in ¶ 263 of the Amended Complaint in this litigation and the national and global market for the promotion of elite professional golf events as alleged in ¶ 263 of the Amended Complaint.

17. The term "agreement" refers to any oral or written contract, arrangement or understanding, whether formal or informal, implicit or explicit, between two or more persons or entities, together with all drafts thereof, and modifications and amendments thereto.

18. The term "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term. Unless otherwise stated, any request for production of Documents shall include all Communications.

19. The term "Person" is defined as any natural person or any legal entity, including without limitation any business or governmental entity or association.

20. The term "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any method, written or verbal.

21. The term "Third Party" means any Person that is not you or PGA TOUR, Inc.

22. The terms "All," "Any," and "Each" shall each be construed as encompassing any and all.

23. The terms "related to," "relating to," or "concerning" mean referring to, reflecting, describing, evidencing or constituting.

24. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

25. All pronouns shall be construed to refer to the masculine, feminine, or neuter gender, in singular or plural, as in each case makes the request more inclusive.

26. The use of the singular form of any word includes the plural and vice versa.

**INSTRUCTIONS**

1. These requests for production shall be deemed to be requests for all documents, whether prepared by You or by any other party or any other person, which are in Your custody, possession or control; or that You own in whole or in part; or that You have a right by contract, statute or otherwise to use, access, inspect, examine or copy on any terms; or that You have, as a practical matter, the ability to use, access, inspect, examine or copy on any terms.

2. Documents produced in response to these requests are to be produced as they are kept in the usual course of business or organized and labeled to correspond with the categories in this request for production.

3. Documents should be produced on a rolling basis as soon as they have been located and processed for production. Documents should be produced in digitized form, either imaged in single-page TIFF format or, for documents whose native format prohibits or renders impractical their printing on standard-size paper (e.g., audio, video, spreadsheets, database materials, source code, executable code, or oversized documents such as maps), produced in their native format. Each TIFF document should be accompanied by corresponding Concordance load files (for both documents and images), including corresponding searchable text files and indicators where the document begins and ends. The documents produced should be stamped with sequential Bates numbering and the image filename should correspond to its Bates number.

4. Subject to any future agreement on ESI productions, which order shall control in the event of any conflict, You should also provide the following metadata with each document:

- Production beginning
- Production end
- Attachment beginning
- Attachment end
- Author
- Confidentiality designation
- Custodian
- Creation date (attachments and loose files)
- Creation time (attachments and loose files)
- Document type
- Document title
- Email attachments
- Email attachment count
- Email date sent
- Email time sent
- Email date received
- Email time received
- E-mail to
- E-mail cc
- E-mail bcc
- E-mail subject
- E-mail message ID
- Extension
- File location (*e.g.*, directory, structure, or pathname)
- Filename
- Last modified date (attachments and loose files)
- Last modified time (attachments and loose files)

- Master date (email date sent or loose file date modified)
- Master time (email time sent or loose file time modified)
- MD5HASH
- Production date
- Pages
- Text (extracted or OCR for all files)

5. Each document requested herein should be produced in its entirety without redaction or excision (except as qualified by Instruction 6 below) regardless of whether You consider the entire document to be relevant or responsive to these requests. If any documents cannot be produced in full, then You should produce it to the extent possible, specifying the reasons for Your inability to produce the remainder and stating what information, knowledge or belief You have concerning the portion that You cannot produce.

6. If You believe that any individual request in these requests for production calls for documents subject to a claim of privilege or that are not subject to discovery, produce so much as is not objected to, state the part of each request to which You raise an objection, and set forth the basis of Your claim of privilege, including a statement identifying the nature of the information withheld. Furthermore, for all responsive documents You do not produce, You shall provide a privilege log stating: (a) the type of document (e.g. brief, email, memo, handwritten note, letter, excel spreadsheet, etc.); (b) the title of the document; (c) the name and title of each author; (d) the name and title of each addressee; (e) all persons to whom the document or its contents were disclosed in whole or part; (f) the date of the document; (g) the subject matter of the document; (h) the number of pages; (i) an identification of any attachments or appendices; and (j) a statement of the basis on which privilege or other protection is claimed.

7. If any requested document has been lost or destroyed, state the type of document, its subject matter, author and date and the circumstances in which it was lost or destroyed.

8. The responsive timeframe for these requests is January 1, 2019 to the present, unless otherwise specified in the request.

9.     You are reminded that You are under a continuing obligation to amend any and all responses to requests for production and supplement any production for inspection and copying to the extent required by Rule 26(e) of the Federal Rules of Civil Procedure.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All communications with LIV.

**REQUEST FOR PRODUCTION NO. 2:**

All agreements with LIV.

**REQUEST FOR PRODUCTION NO. 3:**

All documents and communications related to LIV.

**REQUEST FOR PRODUCTION NO. 4:**

All documents related to the formation of LIV.

**REQUEST FOR PRODUCTION NO. 5:**

All documents and communications related to the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 6:**

All communications with professional golfers, their agents, or anyone acting on their behalf, related to the PGA TOUR, Saudi PIF, Golf Saudi, the PGL, LIV, the DP World Tour, the Asian Tour, any other actual or potential professional golf league, or this litigation.

**REQUEST FOR PRODUCTION NO. 7:**

All agreements with professional golfers, including but not limited to all drafts of agreements.

**REQUEST FOR PRODUCTION NO. 8:**

All documents and communications related to negotiations between you or Saudi PIF and any professional golfer.

**REQUEST FOR PRODUCTION NO. 9:**

All agreements with any current or former PGA TOUR employee, including but not limited to all drafts of agreements.

**REQUEST FOR PRODUCTION NO. 10:**

All documents and communications related to negotiations between you or Saudi PIF and any current or former PGA TOUR employee, including but not limited to offer letters.

**REQUEST FOR PRODUCTION NO. 11:**

All documents related to the DP World Tour's relationship to the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 12:**

All communications between you or Saudi PIF and any professional golf tour, including the DP World TOUR and the Asian Tour, related to the PGA TOUR, Golf Saudi, Saudi PIF, the PGL, LIV, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 13:**

All documents and communications related to meetings between you or Saudi PIF and any professional golf tour, including the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 14:**

All communications between LIV and any professional golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA, related to the PGA TOUR, Golf Saudi, Saudi PIF, the PGL, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and communications related to meetings between LIV and any professional golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 16:**

All documents and communications related to LIV's partnering with, co-sponsoring or co-sanctioning events with, or establishing a professional golf league with, any other golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA.

**REQUEST FOR PRODUCTION NO. 17:**

All communications between Golf Saudi and any professional golf tour, including the DP World Tour and the Asian Tour, related to the PGA TOUR, you, the PGL, LIV, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 18:**

All documents and communications related to meetings between Golf Saudi and any professional golf tour, including the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 19:**

All documents and communications related to Golf Saudi partnering with, co-sponsoring or co-sanctioning events with, or establishing a professional golf league with, any other golf tour, including the DP World Tour and the Asian Tour.

**REQUEST FOR PRODUCTION NO. 20:**

All communications between Golf Saudi, Saudi PIF, you, the PGL, or LIV, on the one hand, and the Official World Golf Ranking, on the other hand.

**REQUEST FOR PRODUCTION NO. 21:**

All documents and communications related to the Official World Golf Ranking.

**REQUEST FOR PRODUCTION NO. 22:**

All documents and communications related to money or other benefits you or Saudi PIF have provided to professional golfers.

**REQUEST FOR PRODUCTION NO. 23:**

All documents and communications related to money or other benefits you or Saudi PIF expect or project to provide to professional golfers in the future.

**REQUEST FOR PRODUCTION NO. 24:**

All documents related to LIV's rules and regulations, including all versions and drafts.

**REQUEST FOR PRODUCTION NO. 25:**

All documents related to the enforcement of LIV's rules and regulations, including actual or potential discipline resulting from violations thereof.

**REQUEST FOR PRODUCTION NO. 26:**

All agreements with actual or potential sponsors of LIV or the PGL, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 27:**

All documents and communications related to LIV or the PGL's actual or potential sponsors, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the sponsor's reasons for agreeing or not agreeing to sponsor LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 28:**

All agreements with LIV or the PGL's actual or potential advertisers, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 29:**

All documents and communications related to LIV or the PGL's actual or potential advertisers, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the advertiser's reasons for agreeing or not agreeing to advertise with you.

**REQUEST FOR PRODUCTION NO. 30:**

All agreements between LIV or the PGL and any media corporation, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 31:**

All documents and communications related to LIV or the PGL's relationship with media corporations, including but not limited to communications between LIV or the PGL and any

media corporation concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the media corporation's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 32:**

All agreements with LIV or the PGL's actual or potential broadcasters, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 33:**

All documents and communications related to LIV or the PGL's actual or potential broadcasters, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the sponsor's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 34:**

All agreements with LIV or the PGL's actual or potential vendors, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 35:**

All documents and communications related to LIV or the PGL's actual or potential vendors, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the vendor's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 36:**

All agreements between LIV or the PGL and any actual or potential tournament host, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 37:**

All documents and communications related to LIV or the PGL's actual or potential tournament hosts, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the tournament host's reasons for hosting or not hosting a LIV or PGL event.

**REQUEST FOR PRODUCTION NO. 38:**

All agreements between LIV or the PGL and the Major tournaments, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 39:**

All documents and communications related to LIV or the PGL's relationship to the Major tournaments, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia, the OWGR, OWGR rankings, or LIV or PGL golfer's ability to participate in the Major tournaments.

**REQUEST FOR PRODUCTION NO. 40:**

All communications related to the solicitation of golfers to join LIV Golf, including but not limited to communications with agents of professional golfers.

**REQUEST FOR PRODUCTION NO. 41:**

All communications with any actual, potential, or past plaintiff in this litigation related to this litigation.

**REQUEST FOR PRODUCTION NO. 42:**

All communications with any third party related to this litigation.

**REQUEST FOR PRODUCTION NO. 43:**

All documents related to any payments of, or contributions towards, legal fees related to this litigation.

**REQUEST FOR PRODUCTION NO. 44:**

All documents related to any joint-defense agreement or common-interest agreement in this litigation.

**REQUEST FOR PRODUCTION NO. 45:**

All documents related to any cooperation, settlement, or indemnification agreement in this litigation.

**REQUEST FOR PRODUCTION NO. 46:**

All documents related to any conflicts waiver in this litigation.

**REQUEST FOR PRODUCTION NO. 47:**

All documents related to any allegations concerning you or Saudi PIF in the complaint in this litigation.

**REQUEST FOR PRODUCTION NO. 48:**

All documents related to any actual or potential benefit to you, Golf Saudi, Saudi PIF, the Kingdom of Saudi Arabia, or the Saudi Arabian monarchy of hosting golf events or associating with professional golf.

**REQUEST FOR PRODUCTION NO. 49:**

All documents related to any actual or potential benefit to you, Golf Saudi, Saudi PIF, the Kingdom of Saudi Arabia, or the Saudi Arabian monarchy of associating with LIV.

**REQUEST FOR PRODUCTION NO. 50:**

All communications with the Kingdom of Saudi Arabia concerning the current or projected financial plans and expectations for LIV.

**REQUEST FOR PRODUCTION NO. 51:**

All documents related to complaints, criticism, or negative opinions about you, Golf Saudi, Saudi PIF, LIV, the Kingdom of Saudi Arabia, professional golfers participating in LIV events, or the Saudi Arabian monarchy.

**REQUEST FOR PRODUCTION NO. 52:**

All documents and communications related to reservations or concerns about doing business with you, Golf Saudi, Saudi PIF, LIV, the PGL or any of Saudi PIF's other portfolio companies due to the Kingdom of Saudi Arabia's human rights records, its civil rights record, the murder of Jamal Khashoggi, or the September 11, 2001, terrorist attack on the World Trade Center.

**REQUEST FOR PRODUCTION NO. 53:**

Documents sufficient to show all investors and investments in LIV, including but not limited to investments by Saudi PIF and Performance54 Group Ltd.

**REQUEST FOR PRODUCTION NO. 54:**

Documents sufficient to show projected or future investments in LIV, including but not limited to projected or future investments by you, Saudi PIF, and Performance54 Group Ltd.

**REQUEST FOR PRODUCTION NO. 55:**

Documents sufficient to show Saudi PIF's organizational structure and personnel, including of each of its units, departments, divisions, parents, subsidiaries or other entities associated with you.

**REQUEST FOR PRODUCTION NO. 56:**

Documents sufficient to identify Saudi PIF's current leadership.

**REQUEST FOR PRODUCTION NO. 57:**

Documents sufficient to show all stockholders, owners, and investors in Saudi PIF.

**REQUEST FOR PRODUCTION NO. 58:**

All Saudi PIF board minutes, board presentations, board meeting agendas, and other board or leadership materials related to Golf Saudi, the PGL, LIV, the PGA TOUR, or this litigation.

**REQUEST FOR PRODUCTION NO. 59:**

All documents and communications related to LIV's business or strategic plans.

**REQUEST FOR PRODUCTION NO. 60:**

All documents and communications related to LIV's sales and marketing strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 61:**

All documents and communications related to LIV's actual or projected market share in the Alleged Relevant Markets.

**REQUEST FOR PRODUCTION NO. 62:**

All documents and communications related to LIV's media and broadcast strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 63:**

Documents sufficient to show, at a line-item level, the PGL's quarterly and annual revenues (including all sources of revenue), costs (including research and development costs, product development costs, investment costs, employee costs, material costs, manufacturing costs, sales and marketing costs) and profits (including gross profits, net profits and operating profits).

**REQUEST FOR PRODUCTION NO. 64:**

Documents sufficient to show the PGL's projected quarterly and annual revenues, costs, and profits.

**REQUEST FOR PRODUCTION NO. 65:**

All documents and communications related to the PGL's business or strategic plans.

**REQUEST FOR PRODUCTION NO. 66:**

All documents and communications related to the PGL's sales and marketing strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 67:**

All documents and communications related to the PGL's actual or projected market share in the Alleged Relevant Markets.

**REQUEST FOR PRODUCTION NO. 68:**

All documents and communications related to the PGL's media and broadcast strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 69:**

All communications between the PGL and professional golfers, their agents, or anyone acting on their behalf, related to the PGA TOUR, Golf Saudi, Saudi PIF, you, the PGL, the DP World Tour, the Asian Tour, or any other actual or potential professional golf league or tour.

**REQUEST FOR PRODUCTION NO. 70:**

All actual or proposed agreements between the PGL and professional golfers related to playing in the PGL, including but not limited to all drafts of agreements.

**REQUEST FOR PRODUCTION NO. 71:**

All communications between the PGL and any golf professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour, related to the PGA TOUR, Golf Saudi, you, the PGL, partnering, or co-sponsoring or co-sanctioning events.

**REQUEST FOR PRODUCTION NO. 72:**

All documents related to meetings between the PGL and any professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 73:**

All documents related to the PGL partnering with, or co-sponsoring or co-sanctioning events with, any professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour.

**REQUEST FOR PRODUCTION NO. 74:**

All communications between the PGL and the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 75:**

All documents and communications related to Saudi PIF's review, analysis, or assessment of LIV's or PGL's financial projections, business or strategic plans, sales and marketing plans, or media plans.

**REQUEST FOR PRODUCTION NO. 76:**

All documents related to Saudi PIF's decision to no longer invest in the PGL.

**REQUEST FOR PRODUCTION NO. 77:**

All documents related to Greg Norman's role at LIV, including, but not limited to, his performance as the Chief Executive Officer and Commissioner of LIV.

**REQUEST FOR PRODUCTION NO. 78:**

All communications with Greg Norman, including, but not limited to, prior to and during his employment with LIV.

**REQUEST FOR PRODUCTION NO. 79:**

Documents sufficient to show your roles with the Saudi PIF and LIV.

# EXHIBIT 7

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | | |
|---|---|---|
| Phil Mickelson, et al.<br>*Plaintiff*<br>v.<br>PGA Tour, Inc.<br>*Defendant* | ) | Civil Action No. 5:22-cv-04486-BLF |

**SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION**

To: Public Investment Fund of the Kingdom of Saudi Arabia

*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters: See Attachment A.

| Place: Skadden, Arps, Slate, Meagher & Flom LLP<br>One Manhattan West<br>New York, NY 10001 | Date and Time:<br>12/06/2022 9:00 am |
|---|---|

The deposition will be recorded by this method: Stenographic, audio, video, real-time reporting

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See Attachment B. Please produce any responsive documents by October 3, 2022.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 09/22/2022

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

[signature]

*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* PGA Tour, Inc. , who issues or requests this subpoena, are:

Brook Dooley, Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111, bdooley@keker.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 5:22-cv-04486-BLF

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named individual as follows: ______________
______________________________________________________________
______________________________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ______________________________
______________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

**ATTACHMENT A**

**DEFINITIONS**

1. The terms "You" or "Your" refer to the Public Investment Fund of the Kingdom of Saudi Arabia and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

2. The term "LIV" refers to LIV Golf Holdings Ltd, LIV Golf Incorporated, LIV Golf Investments Ltd, LIV Golf Ltd, and includes without limitation all predecessors (including the Premier Golf League or "PGL"), predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers (including Greg Norman), agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

3. The term "this litigation" refers to the following action: *Mickelson et al. v. PGA Tour*, *Inc.*, No. 5:22-cv-04486-BLF, pending currently in the United States District Court for the Northern District of California.

4. The term "complaint" refers to the operative complaint by Plaintiffs in this litigation.

5. The term "Golf Saudi" refers to Golf Saudi and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents (including the Saudi Golf Federation), subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

6. The term "PGA TOUR" refers to PGA TOUR, Inc. and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

7. The term "DP World Tour" refers to the PGA European Tour, now known as DP World Tour, and the European Tour Group, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

8. The term "PGA TOUR Regulations" refers to any and all versions ever in effect of the PGA TOUR Player Handbook & Tournament Regulations.

9. The term "sponsor" or "sponsorship" refers to any endorsement, name and likeness arrangement, or other promotional activity by a third party of you, including any endorsement covered by the PGA TOUR Regulations "Player Endorsement Policy."

10. The term "Asian Tour" refers to the Asian Tour and Asian Tour Limited, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

11. The term "professional golfer" refers to any golfers receiving compensation for their golf performance or appearances, including any current or former member of the PGA TOUR, LIV, DP World Tour, or Asian tour.

12. The term "Major tournament" refers to the Masters, the U.S. Open, The Open (or The British Open), and the PGA Championship, and any sponsoring or managing entity thereof, as referred to in ¶ 30 of the Amended Complaint.

13. The term "Competition Agency" refers to any Federal or State agency or person charged with enforcing or empowered to enforce competition-related statutes or policies, including but not limited to the Federal Trade Commission and the Department of Justice.

14. The term "Official World Golf Ranking" refers to the Private Limited Company Official World Golf Ranking (OWGR) and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers,

agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

15.     The term "Alleged Relevant Markets" refers to the national and global market for the services of professional golfers for elite golf events as alleged in ¶ 263 of the Amended Complaint in this litigation and the national and global market for the promotion of elite professional golf events as alleged in ¶ 263 of the Amended Complaint.

16.     The term "agreement" refers to any oral or written contract, arrangement or understanding, whether formal or informal, implicit or explicit, between two or more persons or entities, together with all drafts thereof, and modifications and amendments thereto.

17.     The term "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.  Unless otherwise stated, any request for production of Documents shall include all Communications.

18.     The term "Person" is defined as any natural person or any legal entity, including without limitation any business or governmental entity or association.

19.     The term "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any method, written or verbal.

20.     The term "Third Party" means any Person that is not you or PGA TOUR, Inc.

21.     The terms "All," "Any," and "Each" shall each be construed as encompassing any and all.

22.     The terms "related to," "relating to," or "concerning" mean referring to, reflecting, describing, evidencing or constituting.

23.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

24. All pronouns shall be construed to refer to the masculine, feminine, or neuter gender, in singular or plural, as in each case makes the request more inclusive.

25. The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1. Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, you are directed to designate one or more of your officers, directors, managing agents, or other persons who consent to testify on your behalf and who have knowledge of and are adequately prepared to testify concerning the topics enumerated below.

2. Your responses to these requests shall be in accordance with Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of California, and the Court's orders in this action.

## DEPOSITION TOPICS

**DEPOSITION TOPIC NO. 1:**

Your organizational structure, leadership, investors, and other sources of funding.

**DEPOSITION TOPIC NO. 2:**

Your relationship to LIV, including, but not limited to, your investment in and management of LIV.

**DEPOSITION TOPIC NO. 3:**

LIV's business or strategic plans, sales and marketing plans, past or future market share, and media strategies.

**DEPOSITION TOPIC NO. 4:**

LIV's actual and projected financial performance, including revenue, costs, and profits.

**DEPOSITION TOPIC NO. 5:**

Your relationship to the PGL, including, but not limited to, your investment in and management of LIV.

**DEPOSITION TOPIC NO. 6:**

The PGL's business or strategic plans, sales and marketing plans, past or future market share, and media strategies.

**DEPOSITION TOPIC NO. 7:**

The PGL's actual and projected financial performance, including revenue, costs, and profits.

**DEPOSITION TOPIC NO. 8:**

Any internal analysis you did of LIV or the PGL, including any internal communications about the business or strategy of LIV or the PGL.

**DEPOSITION TOPIC NO. 9:**

Communications and agreements between you and any professional golfer.

**DEPOSITION TOPIC NO. 10:**

Communications and agreements between you and any professional golf league or tour.

**DEPOSITION TOPIC NO. 11:**

Communications and agreements between you and any actual or potential sponsor, advertiser, media partner, vendor, or tournament host of LIV or the PGL.

**DEPOSITION TOPIC NO. 12:**

Communications and agreements between you and any Major tournament.

**DEPOSITION TOPIC NO. 13:**

Communications and agreements between you and the OWGR.

**DEPOSITION TOPIC NO. 14:**

Communications and agreements related to this litigation.

**DEPOSITION TOPIC NO. 15:**

Allegations related to you in the complaint in this litigation.

**DEPOSITION TOPIC NO. 16:**

Actual or potential costs and benefits to the Kingdom of Saudi Arabia of hosting golf events and associating with professional golf.

**DEPOSITION TOPIC NO. 17:**

Reservations communicated by any person or entity about doing business with you, LIV, or any of your other portfolio companies due to Saudi Arabia's human rights or civil rights record, the murder of Jamal Khashoggi, or the September 11, 2001, terrorist attack on the World Trade Center.

**DEPOSITION TOPIC NO. 18:**

Your preservation of, search for, and collection of documents responsive to this subpoena.

**DEPOSITION TOPIC NO. 19:**

The documents produced by you in this litigation, including, but not limited to, the authenticity of those documents.

# ATTACHMENT B

**ATTACHMENT B**

**DEFINITIONS**

1. The terms “You” or “Your” refer to the Public Investment Fund of the Kingdom of Saudi Arabia and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

2. The term “LIV” refers to LIV Golf Holdings Ltd, LIV Golf Incorporated, LIV Golf Investments Ltd, LIV Golf Ltd, and includes without limitation all predecessors (including the Premier Golf League or “PGL”), predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers (including Greg Norman), agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

3. The term “this litigation” refers to the following action: *Mickelson et al. v. PGA Tour*, *Inc.*, No. 5:22-cv-04486-BLF, pending currently in the United States District Court for the Northern District of California.

4. The term “complaint” refers to the operative complaint by Plaintiffs in this litigation.

5. The term “Golf Saudi” refers to Golf Saudi and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents (including the Saudi Golf Federation), subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

6. The term “PGA TOUR” refers to PGA TOUR, Inc. and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

7. The term "DP World Tour" refers to the PGA European Tour, now known as DP World Tour, and the European Tour Group, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

8. The term "PGA TOUR Regulations" refers to any and all versions ever in effect of the PGA TOUR Player Handbook & Tournament Regulations.

9. The term "sponsor" or "sponsorship" refers to any endorsement, name and likeness arrangement, or other promotional activity by a third party of you, including any endorsement covered by the PGA TOUR Regulations "Player Endorsement Policy."

10. The term "Asian Tour" refers to the Asian Tour and Asian Tour Limited, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

11. The term "professional golfer" refers to any golfers receiving compensation for their golf performance or appearances, including any current or former member of the PGA TOUR, LIV, DP World Tour, or Asian tour.

12. The term "Major tournament" refers to the Masters, the U.S. Open, The Open (or The British Open), and the PGA Championship, and any sponsoring or managing entity thereof, as referred to in ¶ 30 of the Amended Complaint.

13. The term "Competition Agency" refers to any Federal or State agency or person charged with enforcing or empowered to enforce competition-related statutes or policies, including but not limited to the Federal Trade Commission and the Department of Justice.

14. The term "Official World Golf Ranking" refers to the Private Limited Company Official World Golf Ranking (OWGR) and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers,

agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

15.     The term "Alleged Relevant Markets" refers to the national and global market for the services of professional golfers for elite golf events as alleged in ¶ 263 of the Amended Complaint in this litigation and the national and global market for the promotion of elite professional golf events as alleged in ¶ 263 of the Amended Complaint.

16.     The term "agreement" refers to any oral or written contract, arrangement or understanding, whether formal or informal, implicit or explicit, between two or more persons or entities, together with all drafts thereof, and modifications and amendments thereto.

17.     The term "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.  Unless otherwise stated, any request for production of Documents shall include all Communications.

18.     The term "Person" is defined as any natural person or any legal entity, including without limitation any business or governmental entity or association.

19.     The term "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any method, written or verbal.

20.     The term "Third Party" means any Person that is not you or PGA TOUR, Inc.

21.     The terms "All," "Any," and "Each" shall each be construed as encompassing any and all.

22.     The terms "related to," "relating to," or "concerning" mean referring to, reflecting, describing, evidencing or constituting.

23.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

24. All pronouns shall be construed to refer to the masculine, feminine, or neuter gender, in singular or plural, as in each case makes the request more inclusive.

25. The use of the singular form of any word includes the plural and vice versa.

**INSTRUCTIONS**

1. These requests for production shall be deemed to be requests for all documents, whether prepared by You or by any other party or any other person, which are in Your custody, possession or control; or that You own in whole or in part; or that You have a right by contract, statute or otherwise to use, access, inspect, examine or copy on any terms; or that You have, as a practical matter, the ability to use, access, inspect, examine or copy on any terms.

2. Documents produced in response to these requests are to be produced as they are kept in the usual course of business or organized and labeled to correspond with the categories in this request for production.

3. Documents should be produced on a rolling basis as soon as they have been located and processed for production. Documents should be produced in digitized form, either imaged in single-page TIFF format or, for documents whose native format prohibits or renders impractical their printing on standard-size paper (e.g., audio, video, spreadsheets, database materials, source code, executable code, or oversized documents such as maps), produced in their native format. Each TIFF document should be accompanied by corresponding Concordance load files (for both documents and images), including corresponding searchable text files and indicators where the document begins and ends. The documents produced should be stamped with sequential Bates numbering and the image filename should correspond to its Bates number.

4. Subject to any future agreement on ESI productions, which order shall control in the event of any conflict, You should also provide the following metadata with each document:

- Production beginning
- Production end
- Attachment beginning

- Attachment end
- Author
- Confidentiality designation
- Custodian
- Creation date (attachments and loose files)
- Creation time (attachments and loose files)
- Document type
- Document title
- Email attachments
- Email attachment count
- Email date sent
- Email time sent
- Email date received
- Email time received
- E-mail to
- E-mail cc
- E-mail bcc
- E-mail subject
- E-mail message ID
- Extension
- File location (*e.g.*, directory, structure, or pathname)
- Filename
- Last modified date (attachments and loose files)
- Last modified time (attachments and loose files)
- Master date (email date sent or loose file date modified)
- Master time (email time sent or loose file time modified)
- MD5HASH

- Production date
- Pages
- Text (extracted or OCR for all files)

5. Each document requested herein should be produced in its entirety without redaction or excision (except as qualified by Instruction 6 below) regardless of whether You consider the entire document to be relevant or responsive to these requests. If any documents cannot be produced in full, then You should produce it to the extent possible, specifying the reasons for Your inability to produce the remainder and stating what information, knowledge or belief You have concerning the portion that You cannot produce.

6. If You believe that any individual request in these requests for production calls for documents subject to a claim of privilege or that are not subject to discovery, produce so much as is not objected to, state the part of each request to which You raise an objection, and set forth the basis of Your claim of privilege, including a statement identifying the nature of the information withheld. Furthermore, for all responsive documents You do not produce, You shall provide a privilege log stating: (a) the type of document (e.g. brief, email, memo, handwritten note, letter, excel spreadsheet, etc.); (b) the title of the document; (c) the name and title of each author; (d) the name and title of each addressee; (e) all persons to whom the document or its contents were disclosed in whole or part; (f) the date of the document; (g) the subject matter of the document; (h) the number of pages; (i) an identification of any attachments or appendices; and (j) a statement of the basis on which privilege or other protection is claimed.

7. If any requested document has been lost or destroyed, state the type of document, its subject matter, author and date and the circumstances in which it was lost or destroyed.

8. The responsive timeframe for these requests is January 1, 2019 to the present, unless otherwise specified in the request.

9. You are reminded that You are under a continuing obligation to amend any and all responses to requests for production and supplement any production for inspection and copying to the extent required by Rule 26(e) of the Federal Rules of Civil Procedure.

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

All communications with LIV.

**REQUEST FOR PRODUCTION NO. 2:**

All agreements with LIV.

**REQUEST FOR PRODUCTION NO. 3:**

All documents and communications related to LIV.

**REQUEST FOR PRODUCTION NO. 4:**

All documents related to the formation of LIV.

**REQUEST FOR PRODUCTION NO. 5:**

All communications with the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 6:**

All documents and communications related to the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 7:**

All communications with professional golfers, their agents, or anyone acting on their behalf, related to the PGA TOUR, Golf Saudi, the PGL, LIV, the DP World Tour, the Asian Tour, any other actual or potential professional golf league, or this litigation.

**REQUEST FOR PRODUCTION NO. 8:**

All agreements with professional golfers, including but not limited to all drafts of agreements.

**REQUEST FOR PRODUCTION NO. 9:**

All documents and communications related to negotiations between you and any professional golfer.

**REQUEST FOR PRODUCTION NO. 10:**

All agreements with any current or former PGA TOUR employee, including but not limited to all drafts of agreements.

**REQUEST FOR PRODUCTION NO. 11:**

All documents and communications related to negotiations between you and any current or former PGA TOUR employee, including but not limited to offer letters.

**REQUEST FOR PRODUCTION NO. 12:**

All documents related to the DP World Tour's relationship to the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 13:**

All communications between you and any professional golf tour, including the DP World TOUR and the Asian Tour, related to the PGA TOUR, Golf Saudi, the PGL, LIV, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 14:**

All documents and communications related to meetings between you and any professional golf tour, including the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and communications related to your partnering with, co-sponsoring or co-sanctioning events with, or establishing a professional golf league with, any other golf tour, including the DP World Tour and the Asian Tour.

**REQUEST FOR PRODUCTION NO. 16:**

All communications between LIV and any professional golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA, related to the PGA TOUR, Golf Saudi, you, the PGL, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 17:**

All documents and communications related to meetings between LIV and any professional golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 18:**

All documents and communications related to LIV's partnering with, co-sponsoring or co-sanctioning events with, or establishing a professional golf league with, any other golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA.

**REQUEST FOR PRODUCTION NO. 19:**

All communications between Golf Saudi and any professional golf tour, including the DP World Tour and the Asian Tour, related to the PGA TOUR, you, the PGL, LIV, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 20:**

All documents and communications related to meetings between Golf Saudi and any professional golf tour, including the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 21:**

All documents and communications related to Golf Saudi partnering with, co-sponsoring or co-sanctioning events with, or establishing a professional golf league with, any other golf tour, including the DP World Tour and the Asian Tour.

**REQUEST FOR PRODUCTION NO. 22:**

All communications between Golf Saudi, you, the PGL, or LIV, on the one hand, and the Official World Golf Ranking, on the other hand.

**REQUEST FOR PRODUCTION NO. 23:**

All documents and communications related to the Official World Golf Ranking.

**REQUEST FOR PRODUCTION NO. 24:**

All documents and communications related to money or other benefits you have provided to professional golfers.

**REQUEST FOR PRODUCTION NO. 25:**

All documents and communications related to money or other benefits you expect or project to provide to professional golfers in the future.

**REQUEST FOR PRODUCTION NO. 26:**

All documents related to LIV's rules and regulations, including all versions and drafts.

**REQUEST FOR PRODUCTION NO. 27:**

All documents related to the enforcement of LIV's rules and regulations, including actual or potential discipline resulting from violations thereof.

**REQUEST FOR PRODUCTION NO. 28:**

All agreements with actual or potential sponsors of LIV or the PGL, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 29:**

All documents and communications related to LIV or the PGL's actual or potential sponsors, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the sponsor's reasons for agreeing or not agreeing to sponsor LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 30:**

All agreements with LIV or the PGL's actual or potential advertisers, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 31:**

All documents and communications related to LIV or the PGL's actual or potential advertisers, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the advertiser's reasons for agreeing or not agreeing to advertise with you.

**REQUEST FOR PRODUCTION NO. 32:**

All agreements between LIV or the PGL and any media corporation, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 33:**

All documents and communications related to LIV or the PGL's relationship with media corporations, including but not limited to communications between LIV or the PGL and any

media corporation concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the media corporation's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 34:**

All agreements with LIV or the PGL's actual or potential broadcasters, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 35:**

All documents and communications related to LIV or the PGL's actual or potential broadcasters, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the sponsor's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 36:**

All agreements with LIV or the PGL's actual or potential vendors, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 37:**

All documents and communications related to LIV or the PGL's actual or potential vendors, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the vendor's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 38:**

All agreements between LIV or the PGL and any actual or potential tournament host, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 39:**

All documents and communications related to LIV or the PGL's actual or potential tournament hosts, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the tournament host's reasons for hosting or not hosting a LIV or PGL event.

**REQUEST FOR PRODUCTION NO. 40:**

All agreements between LIV or the PGL and the Major tournaments, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 41:**

All documents and communications related to LIV or the PGL's relationship to the Major tournaments, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia, the OWGR, OWGR rankings, or LIV or PGL golfer's ability to participate in the Major tournaments.

**REQUEST FOR PRODUCTION NO. 42:**

All documents and communications related to your review, analysis, or assessment of LIV or PGL's financial projections and business, sales and marketing, and media plans.

**REQUEST FOR PRODUCTION NO. 43:**

All communications related to the solicitation of golfers to join LIV Golf, including but not limited to communications with agents of professional golfers.

**REQUEST FOR PRODUCTION NO. 44:**

All communications with any actual, potential, or past plaintiff in this litigation related to this litigation.

**REQUEST FOR PRODUCTION NO. 45:**

All communications with any other third party related to this litigation.

**REQUEST FOR PRODUCTION NO. 46:**

All documents related to any payments of, or contributions towards, legal fees related to this litigation.

**REQUEST FOR PRODUCTION NO. 47:**

All documents related to any joint-defense agreement or common-interest agreement in this litigation.

**REQUEST FOR PRODUCTION NO. 48:**

All documents related to any cooperation, settlement, or indemnification agreement in this litigation.

**REQUEST FOR PRODUCTION NO. 49:**

All documents related to any conflicts waiver in this litigation.

**REQUEST FOR PRODUCTION NO. 50:**

All documents related to any allegations concerning you in the complaint in this litigation.

**REQUEST FOR PRODUCTION NO. 51:**

All documents related to any actual or potential benefit to you, the Kingdom of Saudi Arabia, or the Saudi Arabian monarchy of hosting golf events or associating with professional golf.

**REQUEST FOR PRODUCTION NO. 52:**

All documents related to any actual or potential benefit to you, the Kingdom of Saudi Arabia, or the Saudi Arabian monarchy of associating with LIV.

**REQUEST FOR PRODUCTION NO. 53:**

All communications with the Kingdom of Saudi Arabia concerning the current or projected financial plans and expectations for LIV.

**REQUEST FOR PRODUCTION NO. 54:**

All documents related to complaints, criticism, or negative opinions about LIV, you, the Kingdom of Saudi Arabia, professional golfers participating in LIV events, or the Saudi Arabian monarchy.

**REQUEST FOR PRODUCTION NO. 55:**

All documents and communications related to reservations or concerns about doing business with you, LIV or any of your other portfolio companies due to the Kingdom of Saudi Arabia's human rights records, its civil rights record, the murder of Jamal Khashoggi, or the September 11, 2001, terrorist attack on the World Trade Center.

**REQUEST FOR PRODUCTION NO. 56:**

Documents sufficient to show all investors and investments in LIV, including but not limited to investments by you and Performance54 Group Ltd.

**REQUEST FOR PRODUCTION NO. 57:**

Documents sufficient to show projected or future investments in LIV, including but not limited to projected or future investments by you and Performance54 Group Ltd.

**REQUEST FOR PRODUCTION NO. 58:**

Documents sufficient to show your organizational structure and personnel, including of each of your units, departments, divisions, parents, subsidiaries or other entities associated with you.

**REQUEST FOR PRODUCTION NO. 59:**

Documents sufficient to identify your current leadership.

**REQUEST FOR PRODUCTION NO. 60:**

Documents sufficient to show all stockholders, owners, and investors in you.

**REQUEST FOR PRODUCTION NO. 61:**

All board minutes, board presentations, board meeting agendas, and other board or leadership materials related to Golf Saudi, the PGL, LIV, the PGA TOUR, or this litigation.

**REQUEST FOR PRODUCTION NO. 62:**

All agreements with third parties, including but not limited to consultants and banks, related to the development of a professional golf league or tour.

**REQUEST FOR PRODUCTION NO. 63:**

All communications with third parties, including but not limited to consultants and banks, related to the development of a professional golf league or tour.

**REQUEST FOR PRODUCTION NO. 64:**

All documents and communications related to LIV’s business or strategic plans.

**REQUEST FOR PRODUCTION NO. 65:**

All documents and communications related to LIV’s sales and marketing strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 66:**

All documents and communications related to LIV's actual or projected market share in the Alleged Relevant Markets.

**REQUEST FOR PRODUCTION NO. 67:**

All documents and communications related to LIV's media and broadcast strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 68:**

Documents sufficient to show, at a line-item level, the PGL's quarterly and annual revenues (including all sources of revenue), costs (including research and development costs, product development costs, investment costs, employee costs, material costs, manufacturing costs, sales and marketing costs) and profits (including gross profits, net profits and operating profits).

**REQUEST FOR PRODUCTION NO. 69:**

Documents sufficient to show the PGL's projected quarterly and annual revenues, costs, and profits.

**REQUEST FOR PRODUCTION NO. 70:**

All documents and communications related to the PGL's business or strategic plans.

**REQUEST FOR PRODUCTION NO. 71:**

All documents and communications related to the PGL's sales and marketing strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 72:**

All documents and communications related to the PGL's actual or projected market share in the Alleged Relevant Markets.

**REQUEST FOR PRODUCTION NO. 73:**

All documents and communications related to the PGL's media and broadcast strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 74:**

All communications between the PGL and professional golfers, their agents, or anyone acting on their behalf, related to the PGA TOUR, Golf Saudi, you, the PGL, the DP World Tour, the Asian Tour, or any other actual or potential professional golf league or tour.

**REQUEST FOR PRODUCTION NO. 75:**

All actual or proposed agreements between the PGL and professional golfers related to playing in the PGL, including but not limited to all drafts of agreements.

**REQUEST FOR PRODUCTION NO. 76:**

All communications between the PGL and any golf professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour, related to the PGA TOUR, Golf Saudi, you, the PGL, partnering, or co-sponsoring or co-sanctioning events.

**REQUEST FOR PRODUCTION NO. 77:**

All documents related to meetings between the PGL and any professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 78:**

All documents related to the PGL partnering with, or co-sponsoring or co-sanctioning events with, any professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour.

**REQUEST FOR PRODUCTION NO. 79:**

All communications between the PGL and the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 80:**

All documents related to your decision to no longer invest in the PGL.

**REQUEST FOR PRODUCTION NO. 81:**

All documents related to Greg Norman's role at LIV, including, but not limited to, his performance as the Chief Executive Officer and Commissioner of LIV.

**REQUEST FOR PRODUCTION NO. 82:**

All communications with Greg Norman or his agents, including, but not limited to, prior to and during his employment with LIV.

# EXHIBIT 8

10/19/22, 11:34 AM PIF - Our History | About PIF

About PIF PIF Investments The Program PIF Impact Newsroom Investors
Ar

## Our History

Since its founding, PIF has evolved and grown from a financial support fund for strategic projects to one of the world's largest sovereign wealth funds.

Who We Are Our History Our Leadership Governance & Investment Decisions Dummy Link

https://www.pif.gov.sa/en/Pages/About-Timeline.aspx 1/3

Who We Are

Our History

Our Leadership

Governance
& Investment Decisions

Established in 1971, under Royal Decree No. (M/24), the Fund has been a national economic tributary that has contributed to the establishment of major vital companies locally.

# Our Journey

Established in 1971 under Royal Decree No. M/24, the Fund initially helped establish companies of foundational importance to the Saudi economy, including many "national champions."

PIF was "reborn" in March 2015, when the Kingdom's Council of Ministers issued Resolution 270, which placed the Fund under the direction of the newly formed Council of Economic and Development Affairs (CEDA), with the Crown Prince, HRH Mohammed bin Salman bin Abdulaziz as chairman. This major step gave PIF greater autonomy and better-defined national strategic responsibilities.

This change enabled Saudi Arabia's economy to progress at an accelerated pace, and positioned PIF to be a key driver for Vision 2030, achieving positive, sustainable economic and social change.

# 1971

PIF establishment as part of Ministry of Finance

# 2015

PIF to report to the Council of Economic and Development Af (CEDA)

1971

2021

صندوق الاستثمارات العامة
Public Investment Fund

All rights reserved to Public Investment Fund © 2017 - 2022

# EXHIBIT 9



VISION رؤية 2030
المملكة العربية السعودية
KINGDOM OF SAUDI ARABIA
EN
Homepage: The Progress & Achievements of Saudi Arabia
Vision 2030
Overview
Saudi Vision 2030
An ambitious vision for an ambitious nation.



# Vision 2030 Overview





Leadership Message

Under the leadership of the Custodian of the Two Holy Mosques, Vision 2030 was launched, a roadmap drawn up by His Royal Highness the Crown Prince, to harness the strengths God bestowed upon us – our strategic position, investment power and place at the center of Arab and Islamic worlds. The full attention of the Kingdom, and our Leadership, is on harnessing our potential to achieve our ambitions.

Since the launch of the vision, we have built a foundation, during which unprecedented reforms were made in the public sector's operating model, the economy and society as a whole. This laid the foundations of success for the future. We faced

**many challenges and gained a myriad of experiences, which boosted our confidence in achieving our future goals. We worked on improving the effectiveness and response of the government, unlocked opportunities for growth and investment, opened Saudi to the world, built and launched platforms for future growth, and increased citizens' quality of life. These achievements belong to the sons and daughters of this great nation.**

## Vision 2030 Draws on The Nation's Intrinsic Strengths

01 Saudi Arabia is the land of the Two Holy Mosques which positions the Kingdom at the heart of the Arab and Islamic worlds

02 Saudi Arabia is using its investment power to create a more diverse and sustainable economy

03 The Kingdom is using its strategic location to build its role as an integral driver of international trade and to connect three continents: Africa, Asia and Europe

10/17/22, 5:34 PM Overview - Vision 2030

Case 5:22-cv-04284-BD Document 65 (42-1) Filed 10/12/22 Page 129 of 153

The Vision was cascaded into **strategic objectives** to enable
effective implementation through Vision Realization Programs.
Ambitious Nation
Thriving Economy
Vibrant Society
Enhance government effectiveness
Enable social responsibility
Grow & diversify the economy
Increase employment
Strengthen Islamic & national identity
Offer a fulfilling & healthy life
6
Level 1
Overarching Objectives
27
Level 2
Branch Objectives
96
Level 3
Strategic Objectives
Quality of Life Program
Fiscal Sustainability Program
Housing Program
Health Sector Transformation Program
Financial Sector Development Program
Pilgrim Experience Program
National Transformation Program
Public Investment Fund Program
Privatization Program
National Industrial Development and Logistics Program
Human Capability Development Program

Choose a

A Vibrant Sc

https://www.vision2030.gov.sa/v2030/overview/ 4/8



Case 5:22-cv-04486-BLF Document 142-1 Filed 10/21/22 Page 130 of 153

A Thriving Ec

An Ambitous

As we continue this transformation, we reaffirm our commitment towards achieving our goals by 2030. We will continue to enable citizens and businesses to unleash their fullest potential, and we will work on diversifying the economy, supporting local content and develop innovative opportunities for the future. This will be through creating an attractive environment for local and foreign investments, in addition to the Public Investment Fund developing and unlocking new sectors.

What has been achieved, and what we seek to achieve, are the fruits of the continuous hard work by Saudi citizens, partnerships with the private and third sectors, which work in harmony to elevate the country's position in the developing world.

**What has been achieved, and what we seek to achieve, are the fruits of the continuous hard work by Saudi citizens, partnerships with the private and third sectors, which work in harmony to elevate the country's position in the developing world.**

# The Vision Themes

.

## A Vibrant Society

A vibrant society is vital to achieving the Vision and establishing a strong foundation for economic prosperity.

+

## A Thriving Economy

A thriving economy provides opportunities for all by building an education system aligned with market needs to give the youth the skills for the jobs of the future, and creating economic opportunities for the entrepreneur, the small enterprise as well as the large corporation.

+

## An Ambitious Natio

An ambitious nation applies o efficiency and responsibility at levels in order to deliver the Visi including building an effective transparent, accountable, enabl and high-performing governme

+

## Additional files

**Saudi Vision 2030 Document**

File Size : 3.6 mb

File Type : PDF

EN

HOME

VISION 2030

ABOUT THE KINGDOM

MEDIA CENTER

CONTACT

© All rights reserved to Saudi Vision 2030 - Kingdom of Saudi Arabia 2022

# EXHIBIT 10

 **ESPN.com:** Golf

[Print without images]

**Friday, October 29, 2021**

# Golf legend Greg Norman set to run competing tour that hopes to begin play in 2022

By Bob Harig
ESPN

Golf icon Greg Norman will put his successful business enterprise aside to become the commissioner of a long-rumored and long-discussed golf league that hopes to begin play in 2022, and he is seeking to sign players to lucrative guaranteed deals with big-money purses.

Norman, 66, announced his association with LIV Golf Investments, backed by the Public Investment Fund (PIF), which is the sovereign wealth fund of Saudi Arabia. Norman will be chief operating officer of the enterprise, as well as commissioner of the new league.

As part of the announcement, Norman said Liv Golf Investments, which will be investing in various golf ventures, has committed a nine-figure sum to help the Asian Tour stage an additional 10 events over the next 10 years.

"This is the biggest decision of my life," Norman said in an interview.

Norman will continue to be based in South Florida to run the new venture while keeping a hand in his golf-course design business.

"What do I do with the Greg Norman Company? It has 12 divisions. I can't do both. I can't put both feet in both office buildings and give 100 percent effort," he said. "So I decided to step away from Greg Norman Company. I'm handing the reins over for the first time in my life to other individuals to run my company.

"That was a big, big decision because that's how much I believe in this. That's how much I believe in the people who have been behind this to get it to a point where we are now taking it and to a point where we will be live and have the first ball in the air in the [spring] of next year."

Norman, a 20-time winner on the PGA Tour who captured two major titles and won 88 times, would not disclose the name or other details or whether any players have signed on to the new league. He would not specify the length of his contract but said he is on board for a "four- to seven-year commitment." In 1993-94, when Norman was in the prime of his playing career, which saw him ranked No. 1 in the world for 331 weeks, he put forth an idea for a World Golf Tour that would see the top players come together in a series of big-money, small-field events. Tim Finchem, commissioner of the PGA Tour at the time, successfully fought the creation of the rival tour, which Norman maintained then and now could have worked had players been allowed to compete on both circuits.

That will remain an issue going forward with the launch of a new league, various iterations of which have been discussed and floated for several years. This venture is not part of a previously disclosed Premier Golf League, which is based in London and has laid out a plan for 18 tournaments and 48-player fields to begin in 2023.

The Liv Golf Investments foray into the Asian Tour is the first step in unveiling what is planned. It suggests some sort of arrangement with the new league as a pathway for players to join it. When the European Tour entered into a strategic alliance with the PGA Tour, it ended its relationship with the Asian Tour that saw a certain number of players earn exemptions while also co-sanctioning several events.

The investment in the Asian Tour will see a commitment of at least $200 million in prize money over a 10-year period to help fund a series of 10 annual marquee events. The series of tournaments will be added to the Asian Tour schedule in 2022.

In turn, the new league likely would be sanctioned by the Asian Tour, which means players could earn World Ranking points, a big issue as news of rival tours surfaced over the past two years. The World Rankings are one of the avenues for qualification for the major championships.

Norman noted the "untapped potential" in the Asia region and suggested the relationship with the Asian Tour is just the start of Liv Golf Investments in various golf endeavors. The Asian Tour's commissioner, Cho Minn Thant, hailed it as a significant milestone, especially in light of losing the association with the European Tour. "This will secure unprecedented new playing opportunities," he said.

The Public Investment Fund is a sovereign wealth fund considered one of the largest in the world, with assets of more than $500 billion. It invests funds on behalf of the government of Saudi Arabia and has been the subject of controversy due to the country's poor human rights record.

"I am pleased that the investor base is 100 percent commercially driven by the opportunity to improve golf for all involved," Norman said. "I am happy to partner with this group of investors to bring the significant resources to bear that are necessary for the fundamental changes required for the greater good of the sport."

The announcement follows a recent one of a 10-year partnership between the Asian Tour and Golf Saudi, which runs the Saudi International, an event formerly part of the European Tour. When the tournament lost its European sanctioning, the PGA Tour said it would not grant releases for its players to play in the tournament.

The event's association with the sanctioned Asian Tour has left the situation unclear. Dustin Johnson, the defending champion, is among several players who have sought releases to play in the tournament in February.

The tournament will become the flagship event of the Asian Tour, although it will not be one of the 10 new events that is part of the series that will take place throughout 2022 and beyond.

---

# EXHIBIT 11

# LIV Golf Outlines Plans for Next Two Years After $2 Billion Investment

*By Golf Channel Digital May 10, 2022 at 3:17 PM*

LIV Golf announced Tuesday that it will host two additional tournaments in 2023 before launching its full super league in 2024, thanks to another $2 billion investment.

The eight-tournament LIV Golf Invitational Series kicks off next month outside London with a record $25 million event, including $4 million to the winner and approximately $120,000 for the last-place finisher in the 54-hole event. Because the tournament conflicts with the PGA Tour's RBC Canadian Open, any interested player had to request a release to play in the June 9-11 event. The deadline for PGA Tour commissioner Jay Monahan to grant or deny those releases was Tuesday.

Phil Mickelson, Lee Westwood and Sergio Garcia are among the players who have publicly disclosed that they requested a release. Six of the top 50 players in the world, and 19 of the top 100, have signed up for the inaugural event.

LIV Golf CEO Greg Norman told the BBC that the first event at the Centurion Golf Club will be streamed live on YouTube.

In the press release Tuesday, LIV officials said that 10 tournaments will be played in 2023, with a full 14 events scheduled for 2024 and 2025, after the breakaway tour secured $2 billion of extra funding from Saudi Arabia's Public Investment Fund. Norman defended the source of the money and told the BBC that they're looking at "decades" in the future as they look to reshape the golf landscape.

"We have a long-term vision and we're here to stay," Norman said in a statement. "We're going to grow the game, give more opportunities to play, and create a more entertaining product for fans. ... We realize it won't happen overnight, and we're excited for the opportunities LIV Golf will add to the game as we continue to grow."

# EXHIBIT 12

# Brooks Koepka, Abraham Ancer the latest to leave PGA Tour for LIV Golf: Reports

*By The Athletic Staff*

*June 21, 2022Updated 7:30 PM PDT*

Brooks Koepka, a four-time major winner and former world No. 1, will leave the PGA Tour for the LIV Golf International Series, according to multiple reports on Tuesday. The PGA Tour announced Koepka withdrew from the Thursday's Travelers Championship in Connecticut and replaced by Mark Hubbard.

Abraham Ancer, No. 20 in the Official World Golf Ranking, will also join LIV, he said in an interview with Boardroom, giving the new circuit two of their highest-ranked golfers to date.

Koepka, 32, will make his LIV Golf debut in the circuit's second event next week in Oregon, the Telegraph and Sky Sports reported. He is the third major winner to join LIV since its first event, joining Bryson DeChambeau and Patrick Reed, who will also make their LIV debuts next week. Phil Mickelson, Dustin Johnson and Sergio Garcia headlined the 48-player field for the first event in Hemel Hempstead, Hertfordshire, which was won by Charl Schwartzel on June 11.

At Nos. 19 and 20 in the world, Koepka and Ancer become LIV's second- and third-ranked golfers behind Johnson (No. 16). Ancer, 31, has won once on the PGA Tour (in 2021) and finished tied for ninth at the PGA Championship in May.

Koepka most recently competed at the U.S. Open last week, finishing 55th. When asked last Tuesday if he planned to remain on the PGA Tour permanently, Koepka did not give a definitive answer, saying, "There's been no other option to this point, so where else are you going to go?"

"I wasn't playing last week," Koepka said. "I'm here. I'm here at the U.S. Open. I'm ready to play U.S. Open, and I think it kind of sucks, too, you are all throwing this black cloud over the U.S. Open. It's one of my favorite events. I don't know why you guys keep doing that.

"The more legs you give it, the more you keep talking about it."

The LIV Golf series is controversial for a number of reasons, including that it's backed by Saudi financing and will play two of its eight tournaments this year at Donald Trump-owned courses. Its massive purses — $255 million in prize money will be awarded over eight events — have now attracted eight top-50 golfers: Johnson, Koepka, Ancer, Louis Oosthuizen, DeChambeau, Kevin Na, Reed and Talor Gooch. Koepka's brother, Chase Koepka, also played in the first LIV event.

The PGA Tour responded as soon as the first LIV event teed off on June 9, suspending all current and future players who participate in the new circuit. The USGA allowed LIV golfers to play in the 2022 U.S. Open, and it seems likely they'll be able to participate in The Open Championship next month, though nothing is official as of now.

Koepka, who won back-to-back U.S. Opens in 2017 and 2018 and PGA Championships in 2018 and 2019, has not been nearly the player who was considered easily one of the top golfers in the world a few years ago. His best finish in this year's majors is 55th, where he finished at both the U.S. Open and PGA Championship after missing the cut at the Masters. He'll likely finish the year with his worst year-end world ranking since 2014.

No current top-10 golfer has joined LIV Golf. Collin Morikawa, the world No. 4 who finished tied for fifth at the U.S. Open, tweeted Tuesday he's "here to stay" on the PGA Tour.

LIV Golf's next event begins June 30 at Pumpkin Ridge Golf Club in North Plains, Ore.

*(Photo: John David Mercer / USA Today)*

# EXHIBIT 13

# LIV Golf Tournament at Trump Club Sees Thin Crowds, $1 Tickets: Reports

*Jason Lemon*   On 7/30/22 at 6:07 PM EDT



0:00 / 0:00

Video

Video Player is loading.

Current Time 0:00

Duration 0:00

Remaining Time 0:00

What Is LIV Golf And Why Is The PGA Rival League Controversial?

Thin crowds were reported at the Saudi-backed LIV Golf tournament taking place at former President Donald Trump's New Jersey club this weekend—with tickets reportedly being sold for as little as $1 online.

LIV Golf, which aims to rival the near century-old PGA Tour, has drawn substantial controversy due to it being financed by Saudi Arabia's Public Investment Fund. The kingdom has faced strong criticism from Democrats and Republicans alike for its documented human rights abuses, and particularly for the grisly murder of *Washington Post* contributor Jamal Khashoggi at the Saudi consulate in Istanbul in 2018.

While LIV Golf managed to attract some high-profile professional golfers, the PGA Tour barred its members from participating in the competition. Trump, however, embraced the new tournament after the PGA Tour ended its plan to host its championship at his Bedminster club following the events of January 6, 2021.



Donald Trump walks the driving range during day two of the LIV Golf Invitational at Trump National Golf Club Bedminster on Friday in New Jersey. Jared C. Tilton/LIV via Getty Images

*The New York Times* reported Friday that the crowds at the event were "thin and scant at many holes," although it also noted the "easy camaraderie" among the players. Similarly, *The Wall Street Journal* reported that many holes "had just a smattering of fans as the day progressed" on Friday. The conservative newspaper additionally reported that tickets for the event were being sold for as little as $1 on StubHub.com.

A search by *Newsweek* on Saturday afternoon showed tickets for the Sunday event at Trump's Bedminster club being sold for as little as $7 and $8 on the ticketing website. Some event tickets were going for as much as $150 as well.

"The golf itself, meanwhile, wasn't exactly supercharged—light crowds were spread across much of the vast grounds here on the first day of the tournament," the *Journal* reported.

*Golfweek*, meanwhile, described the crowd as "lively." Some attendees reportedly chanted "Four more years!" and "Let's go Brandon!" when Trump made his first appearance to tee-off at the event. "Let's go Brandon" has become a popular slogan by right-wing critics of President Joe Biden, as it stands in for "F*** Joe Biden."

Trump shrugged off criticism of the Saudi financing behind the event, saying the funders were his friends

"I've known these people for a long time in Saudi Arabia and they have been friends of mine for a long time," Trump said Thursday, according to *The Times*.

"They've invested in many American companies. They own big percentages of many, many American companies and frankly, what they are doing for golf is so great, what they are doing for the players is so great. The salaries are going to go way up," the former president said.

*Newsweek* reached out to LIV Golf for comment.

Case 1:22-mc-00294 Document 1-42-1 Filed 11/22/22 Page 1 of 1

# EXHIBIT 14

# DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 15

# DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 16

# DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 17

# DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 18

# DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 19

# DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 20

 

  

Home

My Network

Jobs

# Yasir Al Rumayyan · 3rd

Governor of the Public Investment Fund (PIF) & Chairman of Saudi Aramco

- Public Investment Fund (PIF)
- Harvard Business School

Saudi Arabia · Contact info

500+ connections

Follow  More

## Activity

27,065 followers

+ Follow

**Yasir hasn't posted lately**

Yasir's recent posts and comments will be displayed here.

Show all activity →

## Experience

**Public Investment Fund (PIF)**

7 yrs 2 mos

**Governor & Board Member**

May 2019 - Present · 3 yrs 6 mos

 Home

My Network

Jobs

Sep 2015 - May 2019 · 3 yrs 9 mos

**Aramco**
6 yrs 3 mos

**Chairman Of The Board**
Sep 2019 - Present · 3 yrs 2 mos

**Board Member**
Aug 2016 - Sep 2019 · 3 yrs 2 mos

**Chairman**
Maaden
Sep 2019 - Present · 3 yrs 2 mos

**Director**
Arm
May 2018 - Present · 4 yrs 6 mos

**Chairman**
Sanabil Investments
Jul 2017 - Present · 5 yrs 4 mos

Show all 18 experiences →

## Education

**Harvard Business School**
GMP
2007 - 2007

**King Faisal University**
Accounting
1989 - 1993

## Interests

Companies Schools

**Arm**

                                         
                                                                              **SoftBank Group Corp.**

134,571 followers

+ Follow

Show all 13 companies →

Ad •••

Kathleen F., explore jobs at **Public Investment Fund** that match your skills

See jobs

## People you may know

**Ryan Keats**

Partner at Morrison & Foerster LLP

Connect

**Caitlin Sinclaire Blythe**

Office Managing Partner (SF) at Morrison Foerster LLP

Connect

**Morgan Sharma**

Associate at Keker, Van Nest & Peters LLP

Connect

**Marco Place**

Legal Secretary

Connect

**Justin Baumli**