# EXHIBIT 21

**IMPORTANT NOTICE**

**NOT FOR DISTRIBUTION DIRECTLY OR INDIRECTLY IN OR INTO THE UNITED STATES OR, IN THE CASE OF THE BEARER NOTES, TO ANY U.S. PERSON (AS DEFINED UNDER THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED AND THE TREASURY REGULATIONS PROMULGATED THEREUNDER).**

**IMPORTANT**: **You must read the following notice before continuing**. The following notice applies to the attached preliminary offering circular (the "**Offering Circular**"), whether received by e-mail, accessed from an internet page or otherwise received as a result of electronic communication, and you are therefore advised to read this notice carefully before reading, accessing or making any other use of the Offering Circular. In reading, accessing or making any other use of the Offering Circular, you agree to be bound by the following terms and conditions and each of the restrictions set out in the Offering Circular, including any modifications made to them from time to time, each time you receive any information from GACI First Investment Company (the "**Issuer**") and the Public Investment Fund ("**PIF**" or the "**Fund**") as a result of such access.

**NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE OR SOLICITATION IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THE SECURITIES DESCRIBED IN THE OFFERING CIRCULAR HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES AND MAY NOT BE OFFERED OR SOLD OR PLEDGED OR OTHERWISE TRANSFERRED, DIRECTLY OR INDIRECTLY WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT ("REGULATION S")), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE OR LOCAL SECURITIES LAWS. IN THE CASE OF NOTES (AS DEFINED BELOW) IN BEARER FORM, SUCH BEARER NOTES MAY NOT BE OFFERED, SOLD OR DELIVERED WITHIN THE UNITED STATES, OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED AND THE TREASURY REGULATIONS PROMULGATED THEREUNDER).**

**THE OFFERING CIRCULAR MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER AND, IN PARTICULAR, MAY NOT BE FORWARDED TO ANY U.S. ADDRESS. THE OFFERING CIRCULAR MAY ONLY BE DISTRIBUTED TO INVESTORS OUTSIDE THE UNITED STATES IN "OFFSHORE TRANSACTIONS" AS DEFINED IN, AND IN RELIANCE ON, REGULATION S. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THE OFFERING CIRCULAR IN WHOLE OR IN PART IS UNAUTHORISED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS. IF YOU HAVE GAINED ACCESS TO THIS TRANSMISSION CONTRARY TO ANY OF THE FOREGOING RESTRICTIONS, YOU ARE NOT AUTHORISED AND WILL NOT BE ABLE TO PURCHASE ANY OF THE SECURITIES DESCRIBED THEREIN.**

The document and any offer of the securities described in the document when made are only addressed to and directed at persons in member states of the European Economic Area ("**EEA**") who are "qualified investors" within the meaning of Article 2(e) of Regulation (EU) 2017/1129 (the "**Prospectus Regulation**") ("**EEA Qualified Investors**"). In addition, in the United Kingdom (the "**UK**"), this document is being distributed only to, and is directed only at, qualified investors within the meaning of Article 2(e) of Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 (the "**EUWA**") (the "**UK Prospectus Regulation**") (i) who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended (the "**Order**"), and qualified investors falling within Article 49 of the Order, and (ii) to whom it may otherwise lawfully be communicated (all such persons together being referred to as "**Relevant Persons**"). This document must not be acted on or relied on (i) in the UK, by persons who are not Relevant Persons, and (ii) in any member state of the EEA, by persons who are not EEA Qualified Investors. Any investment or investment activity to which this document relates is available only to (i) in the UK, Relevant Persons, and (ii) in any member state of the EEA, EEA Qualified Investors, and will be engaged in only with such persons.

**CONFIRMATION OF YOUR REPRESENTATION**: In order to be eligible to view the Offering Circular or make an investment decision with respect to the Notes described therein, (A) each prospective investor in respect

of the Notes being offered outside of the United States in an offshore transaction pursuant to Regulation S must be outside of the United States and (B) each prospective investor in respect of the securities being offered in the UK must be a Relevant Person. Additionally, Notes in bearer form may not be offered, sold or delivered within the United States, or to, or for the account or benefit of, "U.S. persons" as defined in the U.S. Internal Revenue Code of 1986, as amended and the Treasury regulations promulgated thereunder. By accepting this e-mail and accessing, reading or making any other use of the Offering Circular, you shall be deemed to have represented to each of BNP Paribas, Citigroup Global Markets Limited, Deutsche Bank AG, London Branch, Goldman Sachs International and J.P. Morgan Securities plc (the "**Arrangers**") and Crédit Agricole Corporate and Investment Bank, First Abu Dhabi Bank PJSC, HSBC Bank plc, Mizuho International plc, SMBC Nikko Capital Markets Limited, SNB Capital Company, Société Générale and Standard Chartered Bank (together with the Arrangers, the "**Dealers**") that: (i) you understand and agree to the terms set out herein; (ii) you are a Relevant Person; (iii) you are not a U.S. person and you are purchasing the Notes outside the United States in an "offshore transaction" in reliance on Regulation S under the Securities Act, and, to the extent that you purchase the securities described herein, you will be doing so pursuant to Regulation S, and that the electronic mail address that you have given is not located in the United States (including the State and District of Columbia), its territories and possessions (including Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, Wake Island and the Northern Mariana Islands) (and in the case of Notes in bearer form, not a "U.S. person" (as defined in the U.S. Internal Revenue Code of 1986, as amended and the Treasury regulations promulgated thereunder) and not purchasing the Notes for the account or benefit of, a "U.S. person" (as defined in the U.S. Internal Revenue Code of 1986, as amended and the Treasury regulations promulgated thereunder)); (iv) you are a person who is permitted under applicable law and regulation to receive the Offering Circular; (v) you consent to delivery of the Offering Circular and any supplements thereto by electronic transmission; (vi) you will not transmit the Offering Circular (or any copy of it or part thereof) or disclose, whether orally or in writing, any of its contents to any other person; and (vii) you acknowledge that you will make your own assessment regarding any credit, investment, legal, taxation or other economic considerations with respect to your decision to subscribe or purchase any of the securities.

The Offering Circular may not be distributed in the Kingdom of Saudi Arabia (the "**Kingdom**") except to such persons as are permitted under the Rules on the Offer of Securities and Continuing Obligations as issued by the board of the Capital Market Authority (the "**CMA**") pursuant to its Resolution number 3-123-2017 dated 9/4/1439H (corresponding to 27 December 2017), as amended by the board of the CMA resolution number 5-5-2022 dated 2/6/1443H (corresponding to 5 January 2022) (the "**Offer of Securities Rules**").

The CMA does not make any representation as to the accuracy or completeness of the Offering Circular, and expressly disclaims any liability whatsoever for any loss arising from, or incurred in reliance upon, any part of the Offering Circular. Prospective purchasers of the Notes offered hereby should conduct their own due diligence on the accuracy of the information relating to the Notes. If you do not understand the contents of the Offering Circular, you should consult an authorised financial adviser.

The distribution of the Offering Circular and the offering, sale and delivery of the Notes in any jurisdiction other than the Kingdom may be restricted by law.

You are reminded that the Offering Circular has been delivered to you on the basis that you are a person into whose possession the Offering Circular may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorised to, deliver or disclose the contents of the Offering Circular, electronically or otherwise, to any other person and in particular to any U.S. address. Failure to comply with this directive may result in a violation of the Securities Act or the applicable laws of other jurisdictions.

The Offering Circular does not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that an offering of securities described in the Offering Circular be made by a licensed broker or dealer and the Arrangers and the Dealers (as defined in the Offering Circular) or any affiliate of the Arrangers or the Dealers is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by such Arranger or Dealer or such affiliate on behalf of the Fund, the Issuer or holders of the applicable securities in such jurisdiction.

Under no circumstances shall the Offering Circular constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of these securities in any jurisdiction in which such offer, solicitation or sale would be unlawful.

The Offering Circular has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission and consequently none

of the Arrangers, the Dealers, the Issuer, the Fund nor any person who controls or is a director, officer, employee or agent of any Arranger, Dealer, the Issuer, the Fund nor any affiliate of any such person accepts any liability or responsibility whatsoever in respect of any difference between the Offering Circular distributed to you in electronic format and the hard copy version available to you on request from the Fund, the Issuer, the Arrangers and the Dealers. If you received the Offering Circular by e-mail, you should not reply by e-mail to this announcement. Any reply e-mail communications, including those you generate by using the "Reply" function on your e-mail software, will be ignored or rejected. If you receive the Offering Circular by e-mail, your use of this e-mail is at your own risk and it is your responsibility to take precautions to ensure that it is free from viruses and other items of a destructive nature.

**MiFID II product governance / target market** – The Pricing Supplement in respect of any Notes may include a legend entitled "MiFID II Product Governance" which will outline the target market assessment in respect of the Notes and which channels for distribution of the Notes are appropriate. Any person subsequently offering, selling or recommending the Notes (a "**distributor**") should take into consideration the target market assessment; however, a distributor subject to Directive 2014/65/EU (as amended, "**MiFID II**") is responsible for undertaking its own target market assessment in respect of the Notes (by either adopting or refining the target market assessment) and determining appropriate distribution channels.

A determination will be made in relation to each issue about whether, for the purpose of the MiFID Product Governance rules under EU Delegated Directive 2017/593 (the "**MiFID Product Governance Rules**"), any Dealer subscribing for any Notes is a manufacturer in respect of such Notes, but otherwise neither the Arrangers nor the Dealers nor any of their respective affiliates will be a manufacturer for the purpose of the MiFID Product Governance Rules.

**UK MiFIR product governance / target market** – The Pricing Supplement in respect of any Notes may include a legend entitled "UK MiFIR Product Governance" which will outline the target market assessment in respect of the Notes and which channels for distribution of the Notes are appropriate. Any distributor should take into consideration the target market assessment; however, a distributor subject to the UK Financial Conduct Authority Handbook Product Intervention and Product Governance Sourcebook (the "**UK MiFIR Product Governance Rules**") is responsible for undertaking its own target market assessment in respect of the Notes (by either adopting or refining the target market assessment) and determining appropriate distribution channels.

A determination will be made in relation to each issue about whether, for the purpose of the UK MiFIR Product Governance Rules, any Dealer subscribing for any Notes is a manufacturer in respect of such Notes, but otherwise neither the Arranger nor the Dealers nor any of their respective affiliates will be a manufacturer for the purpose of the UK MiFIR Product Governance Rules.

**Prohibition of sales to EEA retail investors** – If the Pricing Supplement in respect of any Notes includes a legend entitled "Prohibition of Sales to EEA Retail Investors", the Notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the EEA. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of MiFID II; or (ii) a customer within the meaning of Directive (EU) 2016/97 (the "**Insurance Distribution Directive**"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II. Consequently, no key information document required by Regulation (EU) No 1286/2014 (as amended, the "**PRIIPs Regulation**") for offering or selling the Notes or otherwise making them available to retail investors in the EEA has been prepared and therefore offering or selling the Notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation.

**Prohibition of sales to UK retail investors** – If the Pricing Supplement in respect of any Notes includes a legend entitled "Prohibition of Sales to UK Retail Investors", the Notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the UK. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (8) of Article 2 of Regulation (EU) No 2017/565 as it forms part of domestic law by virtue of the EUWA; or (ii) a customer within the meaning of the provisions of the Financial Services and Markets Act 2000 (the "**FSMA**") and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of UK MiFIR. Consequently, no key information document required by the PRIIPs Regulation as it forms part of domestic law by virtue of the EUWA (the "**UK PRIIPs Regulation**") for offering or selling the Notes or otherwise making them available to retail investors in the UK has been prepared and therefore offering or selling the Notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

**The distribution of the Offering Circular in certain jurisdictions may be restricted by law. Persons into whose possession the Offering Circular comes are required by the Arrangers, the Dealers, the Issuer and the Fund to inform themselves about, and to observe, any such restrictions**.

**OFFERING CIRCULAR DATED 27 SEPTEMBER 2022**



# GACI First Investment Company

*(an exempted company incorporated in the Cayman Islands with limited liability)*

## Guaranteed Euro Medium Term Note Programme
### guaranteed by
## the Public Investment Fund

*(established as a public legal personality in the Kingdom of Saudi Arabia)*

Under the Guaranteed Euro Medium Term Note Programme described in this offering circular (this "**Offering Circular**") (the "**Programme**"), GACI First Investment Company (the "**Issuer**"), subject to compliance with all relevant laws, regulations and directives, may from time to time issue Guaranteed Euro Medium Term Notes guaranteed (the "**Guarantee**") by the Public Investment Fund (the "**Guarantor**", "**PIF**" or the "**Fund**") (the "**Notes**").

Application has been made to the London Stock Exchange plc (the "**London Stock Exchange**") for Notes issued under the Programme during the period of 12 months from the date of this Offering Circular to be admitted to trading on the London Stock Exchange's International Securities Market (the "**ISM**"). This Offering Circular comprises admission particulars for the purposes of admission to trading of the Notes on the ISM. The ISM is not a regulated market for the purposes of Article 2(1)(13A) of Regulation (EU) No 600/2014 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 (the "**EUWA**") ("**UK MiFIR**").

**The ISM is a market designated for professional investors. Notes admitted to trading on the ISM are not admitted to the Official List of the Financial Conduct Authority (the "FCA"). The London Stock Exchange has not approved or verified the contents of this Offering Circular.** The relevant pricing supplement document (the "**Pricing Supplement**") in respect of the issue of any Notes will specify whether or not such Notes will be admitted to trading on the ISM (or any other stock exchange). References in this Offering Circular to Notes being "admitted to trading" (and all related references) shall mean that such Notes have been admitted to trading on the ISM.

This Offering Circular does not constitute a prospectus for the purposes of a listing or an admission to trading on any market in the United Kingdom (the "**UK**") which has been designated as a regulated market for the purposes of UK MiFIR. This Offering Circular does not constitute a prospectus for the purposes of a listing or an admission to trading on any market in the European Economic Area (the "**EEA**") which has been designated as a regulated market for the purposes of the Markets in Financial Instruments Directive (Directive 2014/65/EU) (as amended, "**MiFID II**").

Notice of the aggregate nominal amount of Notes, interest (if any) payable in respect of Notes, the issue price of Notes and certain other information which is applicable to each Tranche (as defined under "*Terms and Conditions of the Notes*" (the "**Conditions**")) of Notes will be set out in the relevant Pricing Supplement which will be delivered to the London Stock Exchange and, with respect to Notes to be admitted to trading on the ISM, will also be published on the website of the London Stock Exchange through a regulatory information service or may be published in such other manner permitted by the International Securities Market Rulebook effective as of 1 January 2021 (as may be modified and/or supplemented and/or restated from time to time, the "**ISM Rulebook**").

The Programme also permits Notes to be issued on the basis that they will not be admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system or will be admitted to listing, trading and/or quotation by such other or further competent authorities, stock exchanges and/or quotation systems as may be agreed with the Issuer, the Guarantor and the relevant Dealer(s). The relevant Pricing Supplement will state whether or not the relevant Notes will be listed and/or admitted to trading and, if so, on which exchange(s) the Notes are to be listed.

The Issuer and the Guarantor may agree with any Dealer that Notes may be issued in a form or with terms and conditions not contemplated by the Conditions herein, in which event a supplemental Offering Circular, if appropriate, will be made available which will describe the effect of the agreement reached in relation to such Notes.

Each Series (as defined in "*Overview of the Programme – Method of Issue*") of Notes in bearer form ("**Bearer Notes**") will be represented on issue by a temporary global note in bearer form (each a "**temporary Global Note**") or a permanent global note in bearer form (each a "**permanent Global Note**" and together with the temporary Global Notes, the "**Global Notes**"). Notes in registered form ("**Registered Notes**") will be represented by registered certificates (each a "**Certificate**"), one Certificate being issued in respect of each Noteholder's entire holding of Registered Notes of one Series. Registered Notes issued in global form will be represented by registered global certificates ("**Global Certificates**").

Bearer Notes are subject to U.S. tax law requirements. Subject to certain exceptions, the Bearer Notes may not be offered, sold or delivered within the United States or its possessions or to, or for the account or benefit of, U.S. persons (as defined in the U.S. Internal Revenue Code of 1986, as amended (the "**Code**")).

The Global Notes may be deposited on the issue date of the relevant Tranche with a common depositary (the "**Common Depositary**") on behalf of Euroclear Bank SA/NV ("**Euroclear**") and Clearstream Banking S.A. ("**Clearstream, Luxembourg**").

The provisions governing the exchange of interests in Global Notes for other Global Notes and definitive Notes are described in "*Summary of Provisions Relating to the Notes while in Global Form*".

The Notes have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), or with any securities regulatory authority of any state or other jurisdiction of the United States, and the Notes may include Bearer Notes that are subject to U.S. tax law requirements. Subject to certain exceptions, the Notes may not be offered or sold within the United States or to the, or for the account or benefit of, U.S. persons (as defined in Regulation S under the Securities Act ("**Regulation S**")) other than pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirement of the Securities Act and applicable state or local securities laws. The Notes are being offered and sold only to investors outside the United States in "offshore transactions" as defined in, and in reliance on, Regulation S. Bearer Notes may not be offered, sold or delivered within the United States to, or for the account or benefit of, "U.S. persons" as defined in U.S. Internal Revenue Code of 1986, as amended and the Treasury regulations promulgated thereunder. Registered Notes are subject to certain restrictions on transfer. See "*Subscription and Sale*".

The Guarantor has been rated A1 by Moody's Investors Service Limited ("**Moody's**") and A by Fitch Ratings Limited ("**Fitch**"). The Programme is expected to be rated A1 by Moody's and A by Fitch Ratings Limited**.**

Each of Fitch and Moody's is established in the United Kingdom (the "**UK**") and is registered in accordance with Regulation (EC) No. 1060/2009 as it forms part of domestic law by virtue of the EUWA (the "**UK CRA Regulation**"). The ratings issued by Fitch and Moody's have been endorsed by Fitch Ratings Ireland Limited and Moody's Deutschland GmbH, respectively, in accordance with Regulation (EC) No. 1060/2009 (the "**CRA Regulation**"). Each of Fitch Ratings Ireland Limited and Moody's Deutschland GmbH is established in the European Union and is registered under the CRA Regulation. As such, each of Fitch Ratings Ireland Limited and Moody's Deutschland GmbH is included on the list of credit rating agencies published by the European Securities and Markets Authority on its website at https://www.esma.europa.eu/supervision/credit-rating-agencies/risk.

Certain tranches of Notes (each, a "**Tranche**") to be issued under the Programme may be rated or unrated and, if rated, the credit rating agency issuing such rating will be specified in the Pricing Supplement. Where a Tranche is rated, such rating will not necessarily be equivalent to the ratings assigned to the Issuer. A rating is not a recommendation to buy, sell or hold the Notes, does not address the likelihood or timing of repayment and may be subject to revision, suspension or withdrawal at any time by the assigning rating organisations.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time by the assigning rating agency.

Prospective investors should have regard to the factors described under the section headed "*Risk Factors*" in this Offering Circular.

### *Arrangers and Dealers*

|  |  |
|---|---|
| **BNP PARIBAS** | **Citigroup** |
| **Deutsche Bank** | **Goldman Sachs International** |

**J.P. Morgan**

### *Dealers*

|  |  |  |
|---|---|---|
| **Crédit Agricole CIB** | **First Abu Dhabi Bank** | **HSBC** |
| **Mizuho** | **SMBC Nikko** | **SNB Capital** |
| **Société Générale Corporate & Investment Banking** | **Standard Chartered Bank** | |

**IMPORTANT NOTICES**

This Offering Circular comprises admission particulars for the purpose of the ISM Rulebook. This Offering Circular does not comprise a prospectus for the purposes of either Regulation (EU) 2017/1129 (the "**Prospectus Regulation**") or Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the EUWA (the "**UK Prospectus Regulation**"), and has not been approved as such by the competent authority in any member state of the EEA or the FCA.

The Issuer and the Guarantor accept responsibility for the information contained in this Offering Circular and the relevant Pricing Supplement. Having taken all reasonable care to ensure that such is the case, the information contained in the Offering Circular and the Pricing Supplement, to the best of the knowledge of the Issuer and the Guarantor, is in accordance with the facts, and this Offering Circular as completed by the relevant Pricing Supplement makes no omission likely to affect the import of such information.

This Offering Circular is to be read in conjunction with all documents which are incorporated herein by reference (see "*Documents Incorporated by Reference*").

No person has been authorised to give any information or to make any representation not contained in this Offering Circular in connection with the issue or sale of the Notes and, any information or representation not so contained must not be relied upon as having been authorised by the Issuer, the Guarantor or any of the Dealers or the Arrangers (as defined in "*Overview of the Programme*"). Neither the delivery of this Offering Circular nor any sale made in connection herewith shall, under any circumstances, create any implication that there has been no change in the affairs of the Issuer or the Guarantor since the date hereof or the date upon which this Offering Circular has been most recently amended or supplemented or that there has been no adverse change in the financial position of the Issuer or the Guarantor since the date hereof or the date upon which this Offering Circular has been most recently amended or supplemented or that the information contained in it or any other information supplied in connection with the Programme is correct as of any time subsequent to the date on which it is supplied or, if different, the date indicated in the document containing the same.

The distribution of this Offering Circular and the offering or sale of the Notes in certain jurisdictions may be restricted by law. Persons into whose possession this Offering Circular comes are required by the Issuer, the Guarantor, the Dealers and the Arrangers to inform themselves about and to observe any such restriction. The Notes have not been and will not be registered under the Securities Act and include Notes in bearer form that are subject to U.S. tax law requirements. Subject to certain exceptions, the Notes may not be offered, sold or delivered within the United States or to the account or benefit of U.S. persons. Bearer Notes may not be offered, sold or delivered within the United States to, or for the account or benefit of, "U.S. persons" as defined in the U.S. Internal Revenue Code of 1986, as amended and the Treasury regulations promulgated thereunder.

No representation or warranty is made or implied by the Arrangers or the Dealers or any of their respective affiliates and, to the fullest extent permitted by law, none of the Arrangers or the Dealers or any of their respective affiliates makes any representation or warranty or accepts any responsibility for the contents of, or the accuracy or completeness of the information contained in, this Offering Circular or for any other statement, made or purported to be made by an Arranger or a Dealer or any of their respective affiliates or on their behalf for any acts or omissions of the Issuer, the Guarantor or any other person, in each case in connection with the Issuer, the Guarantor, this Offering Circular or the issue and offering of the Notes under the Programme. Each Arranger and each Dealer and each of their respective affiliates accordingly disclaims all and any liability whether arising in tort or contract or otherwise (save as referred to above) which it might otherwise have in respect of this Offering Circular or any such statement.

Neither this Offering Circular nor any other information supplied in connection with the Programme or any Notes is intended to provide the basis of any credit or other evaluation and should not be considered as a recommendation by any of the Issuer, the Guarantor, the Arrangers or the Dealers that any recipient of this Offering Circular or any other information should purchase the Notes. Each potential purchaser of Notes should determine for itself the relevance of the information contained in this Offering Circular and its purchase of Notes should be based upon such investigation as it deems necessary. None of the Arrangers or the Dealers undertakes to review the financial condition or affairs of the Issuer or the Guarantor during the life of the arrangements contemplated by this Offering Circular nor to advise any investor or potential investor in the Notes of any information coming to the attention of any of the Arrangers or the Dealers.

The Notes may not be a suitable investment for all investors. Each potential investor in the Notes must determine the suitability of the investment in light of its own circumstances. In particular, each potential investor should (a) have sufficient knowledge and experience to make a meaningful evaluation of the Notes, the merits and risks of investing in the Notes and the information contained in this Offering Circular or any applicable supplement; (b) have access to, and knowledge of, appropriate analytical tools to evaluate, in the context of its particular financial situation, an investment in the Notes and the impact such investment will have on its overall investment portfolio; (c) have sufficient financial resources and liquidity to bear all of the risks of an investment in the Notes, including where the currency for principal or interest payments is different from the potential investor's currency; (d) understand thoroughly the terms of the Notes and be familiar with the behaviour of any relevant indices and financial markets; and (e) be able to evaluate (either alone or with the help of a financial adviser) possible scenarios for economic, interest rate and other factors that may affect its investment and its ability to bear the applicable risks.

**EACH PROSPECTIVE INVESTOR IS ADVISED TO CONSULT ITS OWN TAX ADVISER, LEGAL ADVISER AND BUSINESS ADVISER AS TO TAX, ZAKAT, LEGAL, BUSINESS AND RELATED MATTERS CONCERNING THE PURCHASE OF ANY NOTES.**

### OFFER RESTRICTIONS

This Offering Circular does not constitute an offer of, or an invitation by or on behalf of the Issuer, the Guarantor or the Dealers to subscribe or purchase, any of the Notes. The distribution of this Offering Circular and the offering of the Notes in certain jurisdictions may be restricted by law. Persons into whose possession this Offering Circular comes are required by the Issuer, the Guarantor, the Arrangers and the Dealers to inform themselves about and to observe any such restrictions.

For a description of further restrictions on offers and sales of Notes and distribution of this Offering Circular, see "*Subscription and Sale*" below.

### MIFID II PRODUCT GOVERNANCE / PROFESSIONAL INVESTORS AND ECPS ONLY TARGET MARKET

The Pricing Supplement in respect of any Notes may include a legend entitled "MiFID II product governance" which will outline the target market assessment in respect of the Notes and which channels for distribution of the Notes are appropriate. Any person subsequently offering, selling or recommending the Notes (a "**distributor**") should take into consideration the target market assessment; however, a distributor subject to MiFID II is responsible for undertaking its own target market assessment in respect of the Notes (by either adopting or refining the target market assessment) and determining appropriate distribution channels.

A determination will be made in relation to each issue about whether, for the purpose of the MiFID Product Governance rules under EU Delegated Directive 2017/593 (the "**MiFID Product Governance Rules**"), any Dealer subscribing for any Notes is a manufacturer in respect of such Notes, but otherwise neither the Arrangers nor the Dealers nor any of their respective affiliates will be a manufacturer for the purpose of the MIFID Product Governance Rules.

### UK MIFIR PRODUCT GOVERNANCE / PROFESSIONAL INVESTORS AND ECPS ONLY TARGET MARKET

The Pricing Supplement in respect of any Notes may include a legend entitled "UK MiFIR Product Governance" which will outline the target market assessment in respect of the Notes and which channels for distribution of the Notes are appropriate. Any distributor should take into consideration the target market assessment; however, a distributor subject to the FCA Handbook Product Intervention and Product Governance Sourcebook (the "**UK MiFIR Product Governance Rules**") is responsible for undertaking its own target market assessment in respect of the Notes (by either adopting or refining the target market assessment) and determining appropriate distribution channels.

A determination will be made in relation to each issue about whether, for the purpose of the UK MiFIR Product Governance Rules, any Dealer subscribing for any Notes is a manufacturer in respect of such Notes, but otherwise neither the Arrangers nor the Dealers nor any of their respective affiliates will be a manufacturer for the purpose of the UK MiFIR Product Governance Rules.

## PROHIBITION OF SALES TO EEA RETAIL INVESTORS

If the Pricing Supplement in respect of any Notes includes a legend entitled "Prohibition of Sales to EEA Retail Investors", the Notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the EEA. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of MiFID II; or (ii) a customer within the meaning of Directive (EU) 2016/97 (the "**Insurance Distribution Directive**"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II. Consequently, no key information document required by Regulation (EU) No 1286/2014 (as amended, the "**PRIIPs Regulation**") for offering or selling the Notes or otherwise making them available to retail investors in the EEA has been prepared and therefore offering or selling the Notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation.

## PROHIBITION OF SALES TO UK RETAIL INVESTORS

If the Pricing Supplement in respect of any Notes includes a legend entitled "Prohibition of Sales to UK Retail Investors", the Notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the UK. For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (8) of Article 2 of Regulation (EU) No 2017/565 as it forms part of domestic law by virtue of the EUWA; or (ii) a customer within the meaning of the provisions of the Financial Services and Markets Act 2000 (the "**FSMA**") and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of UK MiFIR. Consequently, no key information document required by the PRIIPs Regulation as it forms part of domestic law by virtue of the EUWA (the "**UK PRIIPs Regulation**") for offering or selling the Notes or otherwise making them available to retail investors in the UK has been prepared and therefore offering or selling the Notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

## SINGAPORE SFA PRODUCT CLASSIFICATION

In connection with Section 309B of the Securities and Futures Act 2001 of Singapore (the "**SFA**") and the Securities and Futures (Capital Markets Products) Regulations 2018 of Singapore (the "**CMP Regulations 2018**"), unless otherwise specified in the applicable Pricing Supplement, the Issuer has determined, and hereby notifies all relevant persons (as defined in Section 309A(1) of the SFA), that the Notes are 'prescribed capital markets products' (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

## NOTICE TO RESIDENTS OF QATAR

The Notes have not been and will not be offered, sold or delivered at any time, directly or indirectly, in the State of Qatar ("**Qatar**") (including the Qatar Financial Centre), in a manner that would constitute a public offering. This Offering Circular has not been and will not be reviewed or approved by or registered with the Qatar Central Bank, the Qatar Financial Markets Authority, the Qatar Financial Centre Regulatory Authority or the Qatar Stock Exchange (the "**QSE**") in accordance with their regulations or any other regulations in Qatar (including the Qatar Financial Centre). The Notes are not and will not be traded on the QSE. The Notes and interests therein will not be offered to investors domiciled or resident in Qatar and do not constitute an issue of bonds by a Qatari company under the Qatar Commercial Companies Law No. (11) of 2015 or otherwise under the laws of Qatar.

## NOTICE TO RESIDENCES OF THE KINGDOM OF BAHRAIN

In relation to investors in the Kingdom of Bahrain ("**Bahrain**"), Notes issued in connection with this Offering Circular and related offering documents may only be offered in registered form to existing accountholders and accredited investors as defined by the Central Bank of Bahrain (the "**CBB**") in Bahrain where such investors make a minimum investment of at least US$100,000 or any equivalent amount in another currency or such other amount as the CBB may determine.

This Offering Circular does not constitute an offer of securities in Bahrain pursuant to the terms of Article (81) of the Central Bank and Financial Institutions Law 2006 (decree Law No. 64 of 2006). This Offering Circular and related offering documents have not been and will not be registered as a prospectus with the CBB. Accordingly, no Notes may be offered, sold or made the subject of an invitation for subscription or purchase, nor will this Offering Circular or any other related document or material be used in connection with any offer, sale or invitation

to subscribe or purchase Notes, whether directly or indirectly, to persons in Bahrain, other than to accredited investors for an offer outside Bahrain.

The CBB has not reviewed, approved or registered this Offering Circular or related offering documents and it has not in any way considered the merits of the Notes to be offered for investment, whether in or outside Bahrain. Therefore, the CBB assumes no responsibility for the accuracy and completeness of the statements and information contained in this Offering Circular and expressly disclaims any liability whatsoever for any loss howsoever arising from reliance upon the whole or any part of the content of this Offering Circular. No offer of Notes will be made to the public in Bahrain, and this Offering Circular must be read by the addressee only and must not be issued, passed to, or made available to the public generally.

### NOTICE TO RESIDENTS IN THE KINGDOM OF SAUDI ARABIA

This Offering Circular may not be distributed in the Kingdom of Saudi Arabia (the "**Kingdom**") except to such persons as are permitted under the Offer of Securities Rules. Any offer of Notes to any investor in the Kingdom or who is a Saudi person (a "**Saudi Investor**") must be made in compliance with Article 8(a)(1) (including the definitions included in the Glossary of Defined Terms used in the Regulations and Rules of the Capital Market Authority (the "**CMA**") issued by the board of the CMA pursuant to resolution number 4-11-2004 dated 20/8/1425H (corresponding to 4 October 2004), as amended by the board of the CMA resolution number 4-77-2022 dated 23/11/1443H (corresponding to 22 June 2022) (the "**CMA Glossary of Defined Terms**")) or Articles 8(a)(2) and 9 of the Offer of Securities Rules and, in each case, in accordance with Article 10 of the Offer of Securities Rules.

The CMA does not make any representations as to the accuracy or completeness of this Offering Circular, and expressly disclaims any liability whatsoever for any loss arising from, or incurred in reliance upon, any part of this Offering Circular. Prospective purchasers of Notes issued under the Programme should conduct their own due diligence on the accuracy of the information relating to the Notes. If you do not understand the contents of this Offering Circular, you should consult an authorised financial adviser.

### NOTICE TO RESIDENTS OF ONTARIO

The Notes may be sold only to purchasers purchasing, or deemed to be purchasing, as principal, that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligations. Any resale of the Notes must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this Offering Circular (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal adviser.

If applicable, pursuant to section 3A.3 (or, in the case of securities issued or guaranteed by the government of a non-Canadian jurisdiction, section 3A.4) of National Instrument 33-105 Underwriting Conflicts (NI 33-105) or Ontario Instrument 33-507 (Exemption from Underwriting Conflicts Disclosure Requirements), the Dealers are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

### NOTICE TO RESIDENTS OF MALAYSIA

Any Notes to be issued under the Programme may not be offered for subscription or purchase and no invitation to subscribe for or purchase such Notes in Malaysia may be made, directly or indirectly, and this Offering Circular or any document or other materials in connection therewith may not be distributed in Malaysia other than to persons falling within the categories of person set out in Schedule 6 or Section 229(1)(b), Schedule 7 or Section 230(1)(b) and Schedule 8 or Section 257(3) of the Capital Market and Services Act 2007 of Malaysia, as may be amended and/or varied from time to time and subject to any amendments to the applicable laws from time to time.

The Securities Commission of Malaysia shall not be liable for any non-disclosure on the part of the Issuer or the Guarantor and assumes no responsibility for the correctness of any statements made or opinions or reports expressed in this Offering Circular.

## NOTICE TO CAYMAN ISLAND RESIDENTS

No invitation, whether directly or indirectly, may be made to any member of the public of the Cayman Islands to subscribe for the Notes, and this Offering Circular shall not be construed as an invitation to any member of the public of the Cayman Islands to subscribe for the Notes.

## CAYMAN ISLANDS DATA PROTECTION

Under the Cayman Islands Data Protection Act 2017 and, in respect of EU data subjects, the EU General Data Protection Regulation (together, the "**Data Protection Legislation**"), individual data subjects have rights and the Issuer as data controller has obligations with respect to the processing of personal data by the Issuer and its affiliates and delegates. Breach of the Data Protection Legislation by the Issuer could lead to enforcement action.

Prospective investors should note that personal data may in certain circumstances be required to be supplied to the Issuer in order for an investment in the Notes to continue or to enable the Notes to be redeemed. If the required personal data is not provided, a prospective investor will not be able to continue to invest in the Notes or to redeem the Notes.

The Issuer has published a privacy notice (the "**Data Privacy Notice**"), which provides prospective investors with information on the Issuer's use of their personal data in accordance with the Data Protection Legislation.

The Data Privacy Notice can be accessed at https://www.walkersglobal.com/external/SPVDPNotice.pdf.

v

**STABILISATION**

**In connection with the issue of any Tranche, the Dealer or Dealers (if any) named as the stabilisation manager(s) (the "Stabilisation Manager(s)") (or any person acting on behalf of any Stabilisation Manager(s)) in the applicable Pricing Supplement may over-allot Notes or effect transactions with a view to supporting the market price of the Notes at a level higher than that which might otherwise prevail. However, stabilisation may not necessarily occur. Any stabilisation action may begin on or after the date on which adequate public disclosure of the terms of the offer of the relevant Tranche is made and, if begun, may be ended at any time, but it must end no later than the earlier of 30 days after the issue date of the relevant Tranche and 60 days after the date of the allotment of the relevant Tranche. Any stabilisation action or over-allotment must be conducted by the relevant Stabilisation Manager(s) (or any person acting on behalf of any Stabilisation Manager(s)) in accordance with all applicable laws and rules.**

## SECOND PARTY OPINION AND EXTERNAL VERIFICATION

In connection with the issue of Green Bonds (as defined below) under the Programme, the Issuer and/or the Guarantor may request a provider of second party opinions to issue a Second Party Opinion (as defined below) on the Framework (as defined below) (see "*Risk Factors–Factors related to the market generally–There can be no assurance that the use of proceeds of Notes identified as Green Bonds in the relevant Pricing Supplement will be suitable for the investment criteria of an investor*" and "*Risk Factors–Factors related to the market generally– The Guarantor and the Issuer cannot provide any assurances regarding the suitability or reliability of any second party opinion or admission to any index obtained with respect to Green Bonds*"). The Guarantor has established a Green Finance Framework dated February 2022 (as updated from time to time, the "**Framework**") which specifies certain eligibility criteria for green financing projects. The Framework and the Second Party Opinion will be accessible through the Guarantor's website (https://www.pif.gov.sa/). However, any information on, or accessible through, the Guarantor's website and the information in such opinion, report or certification is not, nor shall it be deemed to be, incorporated in and/or form part of this Offering Circular and should not be relied upon in connection with making any investment decision with respect to any Notes to be issued under the Programme. None of the Arrangers nor any of the Dealers are responsible for the use of proceeds for any Green Bonds issued under the Programme, nor the impact or monitoring of such use of proceeds. In addition, no assurance or representation is given by the Issuer, the Guarantor, any other member of the Group (as defined in "*Presentation of Financial and Other Information—Presentation of Other Information*"), the Arrangers, any Dealer or any other person to investors as to the suitability or reliability for any purpose whatsoever of any opinion, report or certification of any third party in connection with the offering of any Green Bonds, nor is any such opinion or certification a recommendation by any Dealer to buy, sell or hold any Green Bonds. Any such opinion, report or certification and any other document related thereto is not, nor shall it be deemed to be, incorporated in and/or form part of this Offering Circular.

## FORWARD-LOOKING STATEMENTS

This Offering Circular includes statements that are, or may be deemed to be, "forward-looking statements". These forward-looking statements may be identified by the use of forward-looking terminology, including the terms "believes", "estimates", "plans", "projects", "anticipates", "expects", "intends", "may", "will" or "should" or, in each case, their negative or other variations or comparable terminology, or by discussions of strategy, plans, objectives, goals, future events or intentions. These forward-looking statements include all matters that are not historical facts. They appear in a number of places throughout this Offering Circular and include, but are not limited to, statements regarding the intentions of the Issuer and/or the Guarantor, beliefs or current expectations concerning, among other things, the business, results of operations, financial position and/or prospects of the Issuer and/or the Guarantor.

By their nature, forward-looking statements involve risk and uncertainty because they relate to future events and circumstances. Forward-looking statements are not guarantees of future performance and the financial position and results of operations of the Group, and the development of the markets and the industries in which members of the Group operate, may differ materially from those described in, or suggested by, the forward-looking statements contained in this Offering Circular. In addition, even if the Group's results of operations and financial position, and the development of the markets and the industries in which the Group operates, are consistent with the forward-looking statements contained in this Offering Circular, those results or developments may not be indicative of results or developments in subsequent periods. A number of risks, uncertainties and other factors could cause results and developments to differ materially from those expressed or implied by the forward-looking statements. See "*Risk Factors*" below.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

**PRESENTATION OF FINANCIAL INFORMATION: AUDITED SPECIAL PURPOSE CONSOLIDATED FINANCIAL STATEMENTS**

The financial statements relating to the Guarantor incorporated by reference in this Offering Circular are (i) the audited special purpose consolidated financial statements of the Guarantor as at 31 December 2021 for the year then ended (the "**2021 Audited Special Purpose Consolidated Financial Statements**") and (ii) the audited special purpose consolidated financial statements of the Guarantor as at 31 December 2020 for the year then ended (the "**2020 Audited Special Purpose Consolidated Financial Statements**"), in each case together with the notes thereto, prepared in accordance with the basis of preparation set out therein and summarised below in "*Basis of Preparation: The Audited Special Purpose Consolidated Financial Statements*". The 2021 Audited Special Purpose Consolidated Financial Statements and the 2020 Audited Special Purpose Consolidated Financial Statements are referred to herein as the "**Audited Special Purpose Consolidated Financial Statements**".

The Audited Special Purpose Consolidated Financial Statements diverge in certain respects from International Financial Reporting Standards as issued by the International Standards Board ("**IFRS**"). For further information, see "*Risk Factors—The Audited Special Purpose Consolidated Financial Statements diverge in certain material respects from IFRS*".

See "*Selected Historical Financial Data*".

Since the date of its incorporation, no financial statements of the Issuer have been prepared. The Issuer is not required by Cayman Islands law, and does not intend, to publish audited financial statements.

**Basis of Preparation: The Audited Special Purpose Consolidated Financial Statements**

***The 2021 Audited Special Purpose Consolidated Financial Statements***

The 2021 Audited Special Purpose Consolidated Financial Statements comprise the consolidated statement of financial position as at 31 December 2021 and the comparative consolidated statement of financial position as at 31 December 2020, and the consolidated statement of profit or loss, comprehensive income, changes in equity and cash flows for the year ended 31 December 2021 and the comparative consolidated statements of profit or loss, comprehensive income, changes in equity and cash flows for the year ended 31 December 2020, and notes thereto, including summary of significant accounting policies and other explanatory information.

The application of the basis of preparation of the 2021 Audited Special Purpose Consolidated Financial Statements has resulted in material departures from IFRS as endorsed in the Kingdom, as set out below.

| Relevant IFRS Rule | Departures |
| --- | --- |
| IFRS 1 - First Time Adoption of IFRS; and IFRS 3 – Business Combination | In presenting the consolidated statement of financial position as at 31 December 2020 in the 2021 Audited Special Purpose Consolidated Financial Statements, the Guarantor has used the opening statement of financial position as it would be prepared for the purpose of preparing a complete set of first time IFRS-compliant financial statements for the year ending 31 December 2022. Accordingly, applicable exemptions under IFRS 1 have been applied as at 31 December 2020. This has resulted in the following material departures from the requirements of IFRS 1: |

1. the Group has not complied with the requirements of IFRS 1 as of 1 January 2020 and three statements of financial position have not been presented; and

2. for all the business acquisitions up to 31 December 2020, the Group has not applied the requirements of IFRS 3. Accordingly, the Group has calculated the amount of goodwill on consolidation of previously unconsolidated subsidiaries as at 31 December 2020 as being the difference between:

    o  the cost of the investment of subsidiaries; and

viii

> o   the Guarantor's interest in the carrying amount of the net assets of the subsidiaries based on their IFRS financial statements as at 31 December 2020.

> If the cost of the investment in subsidiaries is lower than the proportionate share in carrying amount of net assets, the difference is recognised in the retained earnings as bargain purchase gain.

> Accordingly, as at 31 December 2020, the Group recognised goodwill of SAR 2,684 million and a bargain purchase gain of SAR 711 million.

> Cost of investment in subsidiaries is the actual amount of investments including transaction costs. This is adjusted for the Group's share of net assets of the subsidiaries as at 31 December 2020, dividends earned up to 31 December 2020 and accumulated impairment losses up to 31 December 2019, if any.

The 2021 Audited Special Purpose Consolidated Financial Statements are presented in SAR.

***The 2020 Audited Special Purpose Consolidated Financial Statements***

The 2020 Audited Special Purpose Consolidated Financial Statements comprise the consolidated statement of financial position as at 31 December 2020, the consolidated statement of profit or loss, consolidated statement of comprehensive income, consolidated statement of changes in equity and consolidated statement of cash flows for the year then ended, and the notes thereto, including a summary of significant accounting policies and other explanatory information.

The 2020 Audited Special Purpose Consolidated Financial Statements are not a complete set of financial statements under IFRS endorsed in the Kingdom since a complete set of consolidated financial statements would also comprise, in addition to the above, the comparative financial information in respect of the equivalent preceding period and explanatory notes.

The consolidated statement of financial position included in the 2020 Audited Special Purpose Consolidated Financial Statements was prepared in line with the consolidated preliminary opening IFRS statement of financial position of the Guarantor and its subsidiaries. Such statement may be subject to amendment and adjustment before constituting the opening consolidated statement of financial position as at 1 January 2021 in connection with the preparation of the first complete set of consolidated financial statements of the Group (as defined below), under IFRS as endorsed in the Kingdom, as at and for the year ending 31 December 2022.

The application of the basis of preparation of the 2020 Audited Special Purpose Consolidated Financial Statements has resulted in material departures from IFRS as endorsed in the Kingdom, as set out below.

| **Relevant IFRS Rule** | **Departures** |
| --- | --- |
| IFRS 1 - First Time Adoption of IFRS; and IFRS 3 – Business Combination | In presenting the consolidated statement of financial position as at 31 December 2020 in the 2020 Audited Special Purpose Consolidated Financial Statements, the Guarantor has used the opening statement of financial position as it would be prepared for the purpose of preparing a complete set of first time IFRS-compliant financial statements for the year ending 31 December 2022. Accordingly, applicable exemptions under IFRS 1 have been applied as at 31 December 2020. This has resulted in the following material departures from the requirements of IFRS 1:  <br><br>1.  the Group has not complied with the requirements of IFRS 1 as of 1 January 2019 and three statements of financial position have not been presented;  <br><br>2.  practical expedients for IFRS 1 first time adoptions have been applied as at 31 December 2020 and their impact on the statement of profit or loss for the year are not identified; and  <br><br>3.  for all the business acquisitions up to 31 December 2020, the Group has not applied the requirements of IFRS 3. Accordingly, the Group has calculated the amount of |

ix

goodwill on consolidation of previously unconsolidated subsidiaries as at 31 December 2020 as being the difference between:

- o the cost of the investment of subsidiaries; and

- o the Guarantor's interest in the carrying amount of the net assets of the subsidiaries based on their IFRS financial statements as at 31 December 2020.

If the cost of the investment in subsidiaries is lower than the proportionate share in carrying amount of net assets, the difference is recognised in the retained earnings as bargain purchase gain.

Accordingly, as at 31 December 2020, the Group recognised goodwill of SAR 2,684 million and a bargain purchase gain of SAR 711 million.

Cost of investment in subsidiaries is the actual amount of investments including transaction costs. This is adjusted for the Group's share of net assets of the subsidiaries as at 31 December 2020, dividends earned up to 31 December 2020 and accumulated impairment losses up to 31 December 2019, if any.

| IAS 1 – Presentation of Financial Statements | The Group has not presented the consolidated statement of financial position as at 31 December 2019, or the consolidated statement of profit or loss, the consolidated statement of comprehensive income, the consolidated statement of changes in equity or the consolidated statement of cash flows for the period ended 31 December 2019 and related notes. |
|---|---|

The 2020 Audited Special Purpose Consolidated Financial Statements are presented in SAR.

**Qualified Audit Opinions**

***Qualified Audit Opinion: 2021 Audited Special Purpose Consolidated Financial Statements***

KPMG Professional Services' audit opinion in respect of the 2021 Audited Special Purpose Consolidated Financial Statements has been incorporated by reference into this Offering Circular and is qualified in respect of the comparative consolidated financial statements for the year ended 31 December 2020 as follows:

- In the Group's consolidated statement of cash flows for the year ended 31 December 2020, the impact of certain intercompany transactions relating to working capital movements during the year, were not considered due to non-availability of the relevant information from underlying subsidiaries. As a result KPMG Professional Services was unable to determine whether any adjustments were required within the reported movements in working capital, without affecting the "net cash from operating activities."

- The Group has defined Key Management Personnel under International Accounting Standards (IAS) 24 "Related Party Disclosures" to include members of the Board of Directors (the "**Board**") and their close family members, members of Board Level Committees' and their close family members and members of Management Level Committees' and their close family members. Balances and transactions associated with members of the Board, members of Board Level Committees', and their close family members were not identified as at and for the year ended 31 December 2020. As a result, KPMG Professional Services has been unable to obtain sufficient appropriate audit evidence as to the completeness of the information with respect to the related party relationships and the disclosures as required by IAS 24 "Related Party Disclosures", and the consequential impact, if any, of the same on the accompanying 2020 Audited Special Purpose Consolidated Financial Statements.

***Qualified Audit Opinion: 2020 Audited Special Purpose Consolidated Financial Statements***

KPMG Professional Services' audit opinion in respect of the 2020 Audited Special Purpose Consolidated Financial Statements has been incorporated by reference into this Offering Circular and is qualified as follows:

- In the Group's consolidated statement of cash flows, the impact of certain intercompany transactions relating to working capital movements during the year, were not considered due to non-availability of the relevant information from underlying subsidiaries. As a result KPMG Professional Services was unable to determine whether any adjustments were required within the reported movements in working capital, without affecting the "net cash from operating activities."

- The Group has not complied with the requirements of IFRS 8 "Operating Segments" as they have not disclosed information relating to the operating segments of the Group.

- The Group has defined Key Management Personnel under International Accounting Standards (IAS) 24 "Related Party Disclosures" to include members of the Board and their close family members, members of Board Level Committees' and their close family members and members of Management Level Committees' and their close family members. Balances and transactions associated with members of the Board, members of Board Level Committees', and their close family members were not identified as at and for the year ended 31 December 2020. As a result, KPMG Professional Services has been unable to obtain sufficient appropriate audit evidence as to the completeness of the information with respect to the related party relationships and the disclosures as required by IAS 24 "Related Party Disclosures", and the consequential impact, if any, of the same on the accompanying 2020 Audited Special Purpose Consolidated Financial Statements.

## PRESENTATION OF FINANCIAL INFORMATION: UNAUDITED SPECIAL PURPOSE UNCONSOLIDATED FINANCIAL STATEMENTS AND UNAUDITED UNCONSOLIDATED FINANCIAL INFORMATION

In addition to the Audited Special Purpose Consolidated Financial Statements incorporated by reference herein, selected financial information from the following unaudited, unconsolidated special purpose financial statements of the Guarantor, which are extracted from management accounts, is included in this Offering Circular:

- the unaudited, unconsolidated special purpose financial statements of the Guarantor as at 31 December 2020 and for the year then ended, which include comparative financial information as at and for the period ended 31 December 2019, prepared in accordance with the "*Basis of Preparation: The Unaudited Special Purpose Unconsolidated Financial Statements*" set out below (the "**2020 Unaudited Special Purpose Unconsolidated Financial Statements**"); and

- the unaudited, unconsolidated special purpose financial statements of the Guarantor as at 31 December 2019 and for the period then ended, prepared in accordance with the "*Basis of Preparation: The Unaudited Special Purpose Unconsolidated Financial Statements*" set out below (the "**2019 Unaudited Special Purpose Unconsolidated Financial Statements**" and together with the 2020 Unaudited Special Purpose Unconsolidated Financial Statements, the "**Unaudited Special Purpose Unconsolidated Financial Statements**").

In addition to the above, selected financial information from the Guarantor's unaudited, unconsolidated management accounts and/or management records as at and for the six months ended 30 June 2022 (the "**Unaudited Unconsolidated Financial Information**") is included in this Offering Circular. The Unaudited Unconsolidated Financial Information included in this Offering Circular has been prepared on a basis consistent with the Unaudited Special Purpose Unconsolidated Financial Statements as set out below.

The Unaudited Special Purpose Unconsolidated Financial Statements and the Unaudited Unconsolidated Financial Information have been prepared on a basis other than IFRS.

### Basis of Preparation: The Unaudited Special Purpose Unconsolidated Financial Statements

The Unaudited Special Purpose Unconsolidated Financial Statements were prepared by the Guarantor for restricted use. The Unaudited Special Purpose Unconsolidated Financial Statements comprise the statement of financial position and statements of comprehensive income, changes in equity and cash flows, together with the related notes. The basis of accounting of the Unaudited Special Purpose Unconsolidated Financial Statements is a basis of accounting other than IFRS.

The Guarantor has accounted for its subsidiaries, associates and joint ventures using the equity method of accounting. Equity accounting by the Guarantor is performed without adjusting for any differences in the accounting policies of the subsidiaries, associates or joint ventures.

Under the equity method of accounting, investments in subsidiaries, associates and joint ventures are initially recognised at cost (which includes transaction cost). The Guarantor accounts for additional interest in the investee (step acquisition), which results in the Guarantor obtaining control over the investee, using the accumulated cost approach. Under this approach, the carrying amount of the investment is adjusted to recognise changes in the Guarantor's share of net assets of the subsidiaries, associates and joint ventures from the acquisition date to the date on which control or significant influence or joint control ceases, adjusted for any dividend earned and accumulated impairment loss, if any. Goodwill, determined as the difference between the book value of the net assets acquired and the consideration paid, relating to the subsidiaries, associates and joint ventures is included in the carrying amount of the investment and is not tested for impairment separately. The statement of comprehensive income reflects the Guarantor's share of the results of operations (net of zakat and tax) of the subsidiaries, associates and joint ventures and any change in other comprehensive income ("**OCI**") of those investees is presented as part of the Guarantor's OCI. In addition, when there has been a change recognised directly in the equity of the subsidiaries, associates or joint ventures, the Guarantor recognises its share of any changes, when applicable, in the statement of changes in equity. The aggregate of the Guarantor's share of profit or loss of subsidiaries, associates and joint ventures is shown in the statement of comprehensive income.

***Key differences from IFRS in applying significant accounting policies in preparing the Unaudited Special Purpose Unconsolidated Financial Statements***

The significant differences between the basis of accounting used by the Guarantor in preparing the Unaudited Special Purpose Unconsolidated Financial Statements and IFRS are as follows:

| Relevant IFRS Rule | Difference |
|---|---|
| IFRS 3: Business Combination<br><br>IFRS 10: Consolidated Financial Statements<br><br>IFRS 12: Disclosure of Interest in Other Entities | Investments in subsidiaries are accounted for using the equity method of accounting. However, for subsidiary classification, the principles of IFRS 10 are applied. Accounting policies adopted by subsidiaries do not conform with the accounting policies of the Guarantor. For disclosure purposes, investments in subsidiaries follows the requirements of associates under IAS 28. Goodwill is calculated as the difference between consideration paid and book value of net assets acquired. |
| IAS 28: Investments in Associates and Joint Ventures | Accounting policies adopted by associates and joint ventures do not conform with the accounting policies of the Guarantor. Goodwill is calculated as the difference between consideration paid and book value of net assets acquired. |
| IAS 24: Related Party Disclosures | Key Management Personnel (as defined by IAS 24) for the Guarantor include:<br><br>• Members of Board of Directors and their close family members;<br>• Members of Board Level Committees and their close family members; and<br>• Members of Management Level Committees and their close family members.<br><br>For the purpose of related party disclosure, the Guarantor has complied with the disclosure requirements with respect to currently serving Members of Management Level Committees and their close family members only. |

**Accounting convention**

The Unaudited Special Purpose Unconsolidated Financial Statements were prepared on a going concern basis, applying the historical cost convention, except for certain financial assets measured at fair value, assets held for sale measured at the lower of the carrying amount and fair value less costs to sell and parcels of land received from the Government that are measured at nominal value.

The Guarantor has presented its statement of financial position in the Unaudited Special Purpose Unconsolidated Financial Statements in order of liquidity. The Guarantor has elected to present a single statement of comprehensive income in the Unaudited Special Purpose Unconsolidated Financial Statements and has presented its expenses by nature. The Guarantor has reported its statement of cash flows from operating activities using the indirect method.

The Guarantor changed its fiscal year end from 30 December to 31 December for the fiscal year ended 31 December 2019 to align with its core investee; therefore, the 2019 fiscal review period is from 31 December 2018 to 31 December 2019, i.e. one day longer than the comparative period. Accordingly, the comparative information as at and for the period ended 30 December 2018 included in the 2019 Unaudited Special Purpose Unconsolidated Financial Statements and the financial information as at and for the period ended 31 December 2019 included in the 2020 Unaudited Special Purpose Unconsolidated Financial Statements are not comparable. The change in fiscal year had no material impact on the 2019 Unaudited Special Purpose Unconsolidated Financial Statements and the 2020 Unaudited Special Purpose Unconsolidated Financial Statements.

**Functional and presentation currency**

The Guarantor's functional and presentation currency is SAR, which is the currency of the primary economic environment in which it operates. All amounts have been rounded off to the nearest million, unless otherwise mentioned.

**PRESENTATION OF OTHER INFORMATION**

In this Offering Circular, references to:

- "**AUM**" are to assets under management representing the total Fair Value of all assets at the relevant measurement date. The "**Fair Value**" of any such asset is defined as the price that would be received to sell an asset in an orderly transaction between market participants at the relevant measurement date. The Guarantor follows the fair value definition principles as described in IFRS 13 'Fair Value Measurement' and the International Valuation Standards (IVS) as published by the International Valuation Standards Council (IVSC);

- "**EU**" are to the European Union;

- "**EUR**", "**euro**" or "**€**" or are to the currency introduced at the start of the third stage of European economic and monetary union pursuant to the Treaty establishing the European Community, as amended;

- "**Fund**" or "**PIF**" or "**Guarantor**" means the Public Investment Fund;

- "**Government**" are to the Government of the Kingdom;

- "**Group**" are to the Guarantor and its consolidated subsidiaries;

- "**Kingdom**" are to the Kingdom of Saudi Arabia;

- a "**Member State**" are, unless the context does not permit, references to a Member State of the EEA;

- "**OPEC**" are to the Organisation of the Petroleum Exporting Countries;

- "**Saudi Riyal**" or "**SAR**" are to the lawful currency of the Kingdom;

- "**US$**" or "**U.S. dollars**" are to the lawful currency of the United States;

- "**U.S.**" or "**United States**" are to the United States of America; and

- "**£**" or "**sterling**" are to the lawful currency of the UK.

For all periods presented in this Offering Circular, the Saudi Riyal has been pegged to the U.S. dollar at a fixed exchange rate of SAR 3.75 = US$1.00. In cases where amounts included in Offering Circular were converted from Saudi Riyals into U.S. dollars, this fixed exchange rate has been used for convenience.

Certain figures and percentages included in this Offering Circular have been subject to rounding adjustments. Accordingly, figures shown in the same category presented in different tables may vary slightly and figures shown as totals in certain tables may not be an arithmetic aggregation of the figures which precede them.

**DOCUMENTS INCORPORATED BY REFERENCE**

This Offering Circular should be read and construed in conjunction with (i) the 2021 Audited Special Purpose Consolidated Financial Statements and (ii) the 2020 Audited Special Purpose Consolidated Financial Statements, together, in each case, with the accompanying audit reports (together, the "**Documents Incorporated by Reference**").

The Documents Incorporated by Reference have been previously published or are published simultaneously with this Offering Circular. The Documents Incorporated by Reference shall be incorporated in and form part of this Offering Circular, save that any statement contained in a document which is incorporated by reference herein shall be modified or superseded for the purpose of this Offering Circular to the extent that a statement contained herein modifies or supersedes such earlier statement (whether expressly, by implication or otherwise). Any statement so modified or superseded shall not, except as so modified or superseded, constitute a part of this Offering Circular. Those parts of the documents incorporated by reference in this Offering Circular which are not specifically incorporated by reference in this Offering Circular are either not relevant for prospective investors in the Notes or the relevant information is included elsewhere in this Offering Circular. Any documents themselves incorporated by reference in the documents incorporated by reference in this Offering Circular shall not form part of this Offering Circular.

Copies of documents incorporated by reference in this Offering Circular may be obtained (without charge) from the Guarantor's website at *https://www.pif.gov.sa/*.

**TABLE OF CONTENTS**

Page

IMPORTANT NOTICES ................................................................................................................i

PRESENTATION OF FINANCIAL AND OTHER INFORMATION.................................................viii

DOCUMENTS INCORPORATED BY REFERENCE ......................................................................xv

RISK FACTORS ..........................................................................................................................1

OVERVIEW OF THE PROGRAMME............................................................................................31

TERMS AND CONDITIONS OF THE NOTES ..............................................................................37

SUMMARY OF PROVISIONS RELATING TO THE NOTES WHILE IN GLOBAL FORM.......................64

USE OF PROCEEDS ....................................................................................................................69

FORM OF PRICING SUPPLEMENT .............................................................................................71

DESCRIPTION OF THE ISSUER...................................................................................................81

SELECTED HISTORICAL FINANCIAL DATA ..............................................................................83

DESCRIPTION OF THE PUBLIC INVESTMENT FUND .................................................................88

RELATIONSHIP WITH THE GOVERNMENT.................................................................................116

MANAGEMENT AND EMPLOYEES ............................................................................................119

OVERVIEW OF THE KINGDOM OF SAUDI ARABIA ...................................................................132

TAXATION ................................................................................................................................138

SUBSCRIPTION AND SALE .......................................................................................................145

GENERAL INFORMATION..........................................................................................................154

# RISK FACTORS

*Each of the Issuer and the Guarantor believes that the following factors may affect its ability to fulfil its obligations under the Notes and the Deed of Guarantee (as defined below), as the case may be. In addition, factors that the Issuer and the Guarantor believe are material for the purpose of assessing the market risks associated with the Notes are described below.*

*Prospective investors should also read the detailed information set out elsewhere in this Offering Circular and reach their own views prior to making any investment decision. Prospective investors should also consult their own financial and legal advisers about risks associated with an investment in the Notes and the suitability of investing in the Notes in light of their particular circumstances, without relying on the Issuer, the Guarantor, the Arrangers or the Dealers. Prospective investors are advised to make, and will be deemed by the Arrangers, the Dealers, the Issuer and the Guarantor to have made, their own investigations in relation to such factors before making any investment decision.*

*Investing in the Notes involves certain risks. Each of the Issuer and the Guarantor believes that the factors described below represent the principal risks inherent in investing in the Notes, but the inability of the Issuer or the Guarantor to pay interest, principal or other amounts on or in respect of the Notes may occur for other reasons which may not be considered significant risks by the Issuer and the Guarantor based on information currently available to them or which they may not currently be able to anticipate and neither the Issuer nor the Guarantor represents that the statements below regarding the risks of holding any Notes are exhaustive.*

*Words and expressions defined in the "Terms and Conditions of the Notes" below or elsewhere in this Offering Circular have the same meanings in this section.*

## FACTORS THAT MAY AFFECT THE ISSUER'S ABILITY TO FULFIL ITS OBLIGATIONS UNDER NOTES ISSUED UNDER THE PROGRAMME

### *The Issuer has no operating history*

The Issuer is an exempted company with limited liability incorporated under the laws of the Cayman Islands on 25 November 2021 and has no operating history. The Issuer is not an operating company. The Issuer is a special purpose vehicle with no other business other than issuing Notes. The Issuer will not engage in (and has not to date engaged in) any business activity other than the issuance of Notes under this Programme, the making of loans to the Guarantor or other companies controlled by the Guarantor and other activities incidental or related to the foregoing. The Issuer is not expected to have any income, but will receive payments from the Guarantor and/or from other companies controlled by the Guarantor in respect of loans made by the Issuer to those companies, which will be the only material sources of funds available to meet the claims of the Noteholders. As a result, the Issuer is subject to all the risks to which the Guarantor is subject, to the extent that such risks could limit the Guarantor's ability to satisfy in full and on a timely basis its obligations to the Issuer under any such loans or its obligations under the Guarantee. See "—*Factors that may affect the Guarantor's ability to fulfil its obligations under the Guarantee*" for a further description of certain of these risks.

All funds raised by the Issuer will be on-lent to the Guarantor and the Issuer is therefore dependent on repayment of principal, interest and/or additional amounts (if any) from the Guarantor for the purposes of meeting its obligations under the Notes. The Issuer will only be able to make payments under the Notes to the Noteholders in an amount equivalent to sums of principal, interest, and/or additional amounts (if any) it actually receives from the Guarantor. Consequently, if the Guarantor fails to meet its obligations to the Issuer in respect of the funds on-lent, the Noteholders could receive less than the full amount of principal, interest and/or additional amounts (if any) on the relevant due date from the Issuer and would have recourse under the Guarantee for the balance.

## FACTORS THAT MAY AFFECT THE GUARANTOR'S ABILITY TO FULFIL ITS OBLIGATIONS UNDER THE GUARANTEE

### Risks relating to the Fund's business

### *The Fund is partly reliant on the performance of, and dividend distributions and other revenue flows from, its portfolio companies and other investments, and is subject to the industry and business-specific risks faced by its portfolio companies*

As the sovereign wealth fund of the Kingdom, the Fund holds a portfolio of domestic and international investments, diversified across sectors, geographies and asset classes, on behalf of the Kingdom. The Fund is

therefore partly dependent on the operations, revenues and cash flows generated by its investments, including the Fund's subsidiaries, associates and joint ventures (all referred to herein as the Fund's "**portfolio companies**"), and other investments (e.g., stocks, bonds, funds, etc.). The Fund also funds its activities through other sources, including: (i) capital injections from the Government; (ii) assets transferred to the Fund from the Government; (iii) financing raised in the local and global credit markets; and (iv) investment returns from the Fund's investments (see further "*Description of the Public Investment Fund—Funding Principles*"). Consequently, the Fund's cash flows and ability to meet its cash requirements, including its obligations under the Guarantee, depend partly upon the profitability of, and cash flows generated by, the Fund's portfolio companies and other investments, including their ability to make dividend distributions to the Fund and to repay intercompany loans extended to them by the Fund.

The Fund's portfolio companies and other investments are involved and hold assets in a diverse range of projects, businesses and operations, and are subject to differing risks and challenges, largely relating to the industries and countries in which they operate. In addition, the Fund's exposure to these industry and business-specific risks may increase proportionally if the Fund does not develop or maintain a diversified portfolio of investments. For example, as at the date of this Offering Circular, a majority of the Fund's AUM is attributable to its Saudi portfolio companies that are listed on the Saudi Stock Exchange (Tadawul) Company (the "**Tadawul**") (see further "*—The majority of the Fund's portfolio companies and other assets and investments are based in the Kingdom*"). Accordingly, the exposure of the Fund's portfolio companies to these factors and other industry and business-specific risks may in the future adversely impact the business, financial condition, results of operations and prospects of these portfolio companies, which, in turn, may have a material adverse effect on the Fund's business, financial condition, results of operations and prospects, and this could therefore affect the ability of the Issuer to perform its obligations in respect of the Notes and the ability of the Fund to perform its obligations in respect of the Guarantee. See also "*—Risks relating to the Fund's investment activities generally*".

***Although the Fund and its portfolio companies may have significant financing or refinancing requirements, the Government is not committed to provide financial or other support to the Fund. Furthermore, the Government is not guaranteeing any of the Issuer's obligations in respect of the Notes or the Fund's obligations in respect of the Guarantee***

The Fund has in the past made, and anticipates that it may continue to make, significant capital expenditures and investments. The Fund intends to finance its future expenditures, investments and financial obligations through capital injections from the Government, asset transfers from the Government, loans and debt instruments, and investment returns from the Fund's assets. See "*Description of the Public Investment Fund—Funding Principles*".

The Fund's ability to obtain external financing and the cost of such financing depends on numerous factors, including general economic and market conditions, international interest rates, the availability of credit from banks or other financiers, investor confidence in the Fund and the Kingdom, the financial condition of the Fund and the performance of the individual businesses of the Fund's portfolio companies. There can be no assurance that external financing will be available when required or, if available, that such financing will be obtainable on terms that are commercially acceptable to the Fund. Although the Government has, in the past, provided monetary and non-monetary contributions to the Fund from time to time (primarily in the form of capital injections and asset transfers) to support the Fund's investment objectives, the Government is not legally obliged to fund any of the Fund's investments and, accordingly, may elect not to do so in the future (even if the Government has previously approved the funding of the investment concerned). For further details of historic contributions by the Government to the Fund, see "*Relationship with the Government—Contributions from the Government*". Furthermore, the Government is not guaranteeing any of the Issuer's obligations in respect of the Notes or the Fund's obligations in respect of the Guarantee, and Noteholders therefore do not benefit from any legally enforceable claim against the Government (see also "*—Risks relating to the Fund's relationship with the Government—The Fund's financial obligations, including its obligations in respect of the Guarantee, are not guaranteed by the Government*").

If the Fund is not able to obtain adequate financing to make capital and investment expenditures in the future, this could have a material adverse effect on the Fund's business, results of operations, financial condition and prospects and therefore on the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The majority of the Fund's portfolio companies and other assets and investments are based in the Kingdom***

As at the date of this Offering Circular, the majority of the Fund's assets are represented by portfolio companies domiciled in the Kingdom. The concentration of the Fund's assets and investments in the Kingdom exposes the Fund to the prevailing economic and political conditions in the Kingdom, as well as in the Middle East and North

Africa ("**MENA**") region. Should economic growth or performance in the Kingdom decline, or should the Kingdom be affected by political instability in the future, this could have a material adverse effect on the Fund's and its portfolio companies' business, results of operations, financial condition and prospects and, in turn, on the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee. See also "—*Risks relating to the Kingdom and the Middle East*".

***The Fund's past performance is not necessarily indicative of its future results, and its historical financial performance may not be reflective of future financial performance***

The Fund has engaged in sizeable investment activities in recent periods, including new investments and acquisitions both in the Kingdom and internationally. Such activities have resulted in a rapid growth of its assets. Primarily as a result of the Fund's investment activities, the Fund's AUM increased to approximately SAR 2,281 billion as at 30 June 2022 from approximately SAR 570 billion as at 31 December 2015. The Fund expects to continue growing its asset base and engaging in significant investment activities in future periods. In particular, the PIF Program (as defined below) includes, among other things, a strategy to increase the Fund's AUM to over US\$1.07 trillion by 2025 (see "*Description of the Public Investment Fund—PIF Strategy (2021-2025)*").

The Fund cannot give any assurance that any of its ongoing investment activities will meet its targets, or that these investments will not be susceptible to changes in the macroeconomic environment and performance of financial markets generally. Changes in the macroeconomic environment and performance of financial markets could materially and adversely affect the Fund's ability to execute its investment strategy, and in turn significantly impact its business, future cash flows, results of operations or rate of growth and its expected future performance. Accordingly, the Fund's historical financial performance and previous rapid growth are not necessarily determinative of its likely future cash flows, results of operations or rate of growth, and its past performance should not be relied upon as an indication of its future performance. Any deterioration in the Fund's performance due to the above factors or otherwise could adversely affect its ability to perform its future obligations in respect of the Guarantee.

***The Fund and its portfolio companies depend significantly on the members of their respective boards of directors and senior management teams***

The Fund has a level of dependence on the diligence and skill of its senior management team for the execution of its investment strategy and for the final selection, structuring, completion and ongoing management of its investments (including its portfolio companies). In addition, the Fund's continued success depends, to a significant extent, on the continued service and co-ordination of the senior management teams of its portfolio companies. Given the corporate governance requirements of the Fund's portfolio companies and the need to follow appropriate replacement procedures, none of these individuals would be easy to replace at short notice. If the Fund's portfolio companies are unable to retain experienced, capable and reliable directors and senior and middle management with appropriate professional qualifications, or fail to recruit skilled professionals in line with their growth, their business and financial performance may be adversely affected. This, in turn, may materially affect the Fund's ability to execute its investment strategy and its business and financial performance, which is largely reliant on the sustained profitability and cash flows received from its portfolio companies. Any impact on the Fund's overall business, results of operations, financial condition and prospects, could in turn affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The Fund is exposed to risks relating to the various strategic and operational initiatives that its publicly listed portfolio companies may be pursuing and the Fund does not typically direct the commercial or operational decisions of some portfolio companies***

The Fund holds both majority and minority investments in a number of publicly listed companies, both in the Kingdom and internationally. Although the boards of directors of these companies might include representatives appointed by the Fund (some of whom are executive managers of the Fund), the Fund does not typically direct the commercial or operational decisions of some publicly listed portfolio companies. Each of these portfolio companies are managed by their respective management teams and guided and supervised by their respective boards of directors in accordance with applicable corporate governance frameworks.

The Fund's publicly listed portfolio companies may pursue strategic and operational initiatives that are deemed by their respective management teams as being necessary to further their business objectives, such as pursuing acquisitions or divestments or undergoing significant operational reorganisations. Any failure by such portfolio companies to successfully execute any of these strategic and operational initiatives or to achieve the desired results

could have a material adverse effect on the Fund's business, financial condition, results of operations and prospects, which could consequently affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The industries in which the Fund's portfolio companies operate are highly competitive***

The Fund's portfolio companies operate in a number of sectors, including aerospace and defence, automotive, transport and logistics, food and agriculture, construction and building components and services, entertainment, leisure and sports, financial services, real estate, utilities and renewables, metals and mining, healthcare, consumer goods and retail, and telecom, media and technology, all of which are highly competitive. The Fund's portfolio companies compete with companies that may possess greater technical and/or financial resources.

If the Fund's portfolio companies are unable to compete effectively, their business, results of operations, financial condition and prospects could be materially and adversely affected, which could significantly affect the Fund's business, results of operations, financial condition and prospects, and in turn affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The Fund is exposed to material and currently not fully quantifiable disruptions arising from the COVID-19 pandemic***

In December 2019, the respiratory disease caused by the virus SARS-CoV-2 and its variants, known as "**COVID-19**", was reported to the World Health Organisation (the "**WHO**") by the Chinese public health authorities. The initial outbreak of COVID-19 spread rapidly across the world and was ultimately declared a pandemic by the WHO on 11 March 2020. Since then it has infected people around the world, causing a substantial number of deaths. Almost all countries that were significantly affected introduced measures to try to contain the spread of the virus, including border closures and restricting the movement of their citizens. These measures resulted in the closure of numerous businesses in those countries (particularly those related to the travel and hospitality industries) and widespread job losses. To address these factors, many governments introduced significant support programmes for qualifying citizens and businesses.

Multiple vaccines have now been approved and vaccination programmes have been rolled out in many countries. However, an increase in infections and the prevalence of new strains of the virus could prolong, or lead to a reintroduction of, measures restricting mobility, and threaten to reduce the effectiveness of vaccines. As of the date of this Offering Circular, developments around the COVID-19 pandemic will continue to influence economic activity.

Since the beginning of March 2020, the economies of a number of countries in which the Fund operates, including the Kingdom, have been adversely affected by the outbreak of COVID-19, which ultimately restricted the level of business activity of the Fund and its portfolio companies. For example, the aviation and hospitality industries have been significantly impacted by the pandemic. Such disruptions caused by the pandemic may affect operations in certain industries and cause companies within these sectors to incur additional costs or prevent them from carrying out their core activities and initiatives.

Notwithstanding various measures taken by the Government to date to mitigate the effects of the COVID-19 pandemic, the Fund is not able to predict how long the effects of COVID-19 and of the efforts to contain it will continue to impact its business or if additional restrictive measures to combat the pandemic will be implemented. Any such measures could result in a worsening of the effects of the pandemic on the Fund's business, cash flows and results of operations. The extent to which COVID-19 could impact the Fund's business depends on future developments that are highly uncertain and are outside of the Fund's control, including new information which may quickly emerge concerning the severity of the virus (including new vaccine-resistant strains), the scope of the pandemic and actions to contain the virus or treat its impact and the efficacy of such actions, among others. Accordingly, the exposure of the Fund's portfolio companies to these factors may adversely impact the business, financial condition, results of operations and prospects of these portfolio companies, which, in turn, may have a material adverse effect on the Fund's business, financial condition, results of operations and prospects, and therefore affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The Fund is exposed to risks associated with the use of information technology***

The Fund relies on a number of information technology ("**IT**") systems in order to carry out its day-to-day operations. As a result of the increasing complexity of electronic information and communication technology, the

Fund is exposed to various risks, ranging from the loss or theft of data, cyber-attacks, stoppages and interruptions to the business, to systems failure and technical obsolescence of IT systems.

Increased global information security threats and more sophisticated cyber-crimes pose a risk to the confidentiality, availability and integrity of data, operations and infrastructure of the IT systems, networks, facilities, products and services of the Fund. The non-availability, violation of confidentiality, or the manipulation of data in critical IT systems and applications can lead to the uncontrolled outflow of data and expertise and have a direct impact on the Fund's business operations.

While the Fund maintains back-up systems there can be no assurance that these will work as efficiently or quickly as expected if at all. Should such threats overcome the information security measures implemented by the Fund, they could potentially lead to the compromise of confidential information, improper use of systems and networks, manipulation and destruction of data, production downtime and operational disruptions, which in turn could have a material adverse effect on the Fund's business, results of operations and financial condition.

**Risks relating to the Fund's investment activities generally**

***The Fund's investments, in particular its planned "Giga-Projects", may in the future require significant further capital and investment expenditures, which are subject to a number of risks and uncertainties***

The Fund anticipates that it will continue to incur capital and investment expenditures in future years, and may have material funding needs in relation to particular projects or to refinance existing indebtedness. A large portion of the Fund's future capital and investment expenditures are expected to be with respect to its planned "Giga-Projects" (see "—*The Fund is undertaking large-scale and complex projects, the implementation of which entails significant risks*").

The Fund intends to fund its future capital and investment expenditures and its financial obligations (including obligations to pay principal and interest on the Notes) through capital injections from the Government, asset transfers from the Government, loans and debt instruments, and investment returns from the Fund's assets. See "*Description of the Public Investment Fund—Funding Principles*" and "*Relationship with the Government*".

In the event that appropriate sources of financing are not available or are only available on onerous terms and the Fund does not have sufficient operating cash flow or cash generated from asset monetisation or does not receive additional capital from the Government, this could adversely affect the Fund's business through increased borrowing costs and reductions in capital and investment expenditure. In addition, any affected portfolio company of the Fund may be forced, amongst other measures, to do one or more of the following: (i) delay or reduce capital expenditures; (ii) forgo business opportunities, including acquisitions and joint ventures; (iii) sell assets on sub-optimal terms; or (iv) restructure or refinance all or a portion of its debt on or before maturity. The occurrence of any of the foregoing could adversely affect the Fund's business, results of operations, financial condition or prospects, thereby affecting the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The Fund is undertaking large-scale and complex projects, the implementation of which entails significant risks***

Two of the Fund's eight strategic pillars include the development of the Kingdom's real estate and infrastructure sector, and the development of large-scale and complex "Giga-Projects" (see "*Description of the Public Investment Fund—PIF Strategy (2021-2025)*" and "*Description of the Public Investment Fund—Portfolio—Saudi Giga-Projects*").

As at the date of this Offering Circular, the Fund has four Giga-Projects under development in the Kingdom: Neom, the Red Sea Project, Qiddiya and ROSHN. The Fund expects to invest a significant amount of resources in each of these Giga-Projects, and there can be no assurance that the Fund's investment in these Giga-Projects will generate the expected return or have the intended economic impact. The typical risks that are faced in project implementation are significantly exacerbated by the size and complexity of these planned Giga-Projects. Furthermore, there can be no assurance that the Fund's current or future projects, including but not limited to the proposed Giga-Projects, will be completed within the anticipated timeframe or at all, whether as a result of the factors specified above or for any other reason.

When undertaking major projects of this nature, the Fund faces a number of risks, including:

- requirements to make significant capital expenditures without receiving cash flow from the project concerned until future periods;

- possible shortage of available cash to fund construction and capital improvements and the related possibility that financing for such construction and capital improvements may not be available to the Fund on suitable terms or at all;

- delays in obtaining, or a failure to obtain, all necessary governmental and regulatory permits, approvals and authorisations;

- uncertainties as to market demand or a decline in market demand for the products or services to be generated by the project after construction has begun;

- an inability to complete projects on schedule or within budgeted amounts;

- methodological errors or erroneous assumptions in the financial models used by the Fund to make investment decisions; and

- fluctuations in demand for the products or services produced by the project due to a number of factors, including market and economic conditions and competition from third parties, that may result in the Fund's investment not being profitable or not generating the originally anticipated level of cash flows.

The Fund's ongoing projects are also exposed to a number of construction risks, including the following:

- major design and/or construction changes, whether caused by changes in technological demand, market conditions or other factors;

- an inability to find a suitable contractor either at the commencement of a project or following a default by an appointed contractor;

- default or failure by the Fund's contractors to finish projects on time and within budget;

- disruption in service and access to third parties;

- delays arising from shortages and long lead times for the delivery of complex plant and equipment or defective materials;

- shortages of materials, equipment and labour, adverse weather conditions, natural disasters, labour disputes, disputes with sub-contractors, accidents and other unforeseen circumstances; and

- escalating costs of construction materials, manpower and global commodity prices.

Moreover, continued growth through projects and initiatives (including new Giga-Projects) may also divert management's capacity to deal with existing projects. Any of these factors could materially delay the completion of a project or materially increase the costs associated with a project.

If any of the foregoing risks were to occur or if the Fund failed to correctly identify the risks associated with a major project, the Fund's business, results of operations, financial condition or prospects could be significantly affected, thereby affecting the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***Significant acquisitions could prove to be costly in terms of the Fund's time and resources, and may expose it to post-acquisition integration risks and such businesses may be unprofitable when acquired, which may adversely affect the Fund's results of operations and increase its funding requirements***

The Fund may from time to time make substantial acquisitions or obtain a controlling interest in other businesses. For example, in 2018 the Fund committed an initial amount of US$1 billion in Lucid Group Inc., an electric vehicle manufacturer. This, and any other significant acquisitions the Fund may make in the future, expose the Fund to numerous risks, including:

- exposure to unanticipated financial or other weaknesses of the acquired business;

- unexpected losses of key employees, customers and suppliers of the acquired operations;

- difficulties in integrating the financial, technological and management standards, processes, procedures and controls of the acquired business with those of the Fund's existing operations;

- challenges in managing the increased scope, geographic diversity and complexity of the Fund's operations;

- difficulties in obtaining any financing necessary to support the growth of the acquired businesses; and

- exposure to unanticipated litigation, liabilities and/or difficulties in mitigating contingent and/or assumed liabilities.

In addition, acquired businesses may be operating at a loss when acquired and/or may have significant accumulated deficits, which may limit their ability to pay dividends to the Fund until they develop distributable reserves. Unless and until any such business becomes profitable, this may also adversely affect the Fund's results of operations in periods after the acquisition is effective and may increase the Fund's funding requirements. This may adversely affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***Dispositions involve risks and uncertainties, including announced dispositions not being completed***

From time to time, the Fund may make strategic dispositions, including by way of initial public offering ("**IPO**") of certain portfolio companies, private sales of significant interests in existing businesses to strategic shareholders (for instance, the Fund's disposal of a 70% stake in Saudi Basic Industries Corporation ("**SABIC**") to Saudi Arabian Oil Company ("**Saudi Aramco**") for a total price of US$69.1 billion in 2020), and sales of non-core and other businesses and assets, with the expectation that these transactions will have a positive impact on the Fund's financial condition and/or results of operations, including reducing outstanding debt.

The Fund's ability to successfully consummate dispositions and achieve its commercial goals is subject to numerous uncertainties and risks, including geopolitical considerations, regulatory review, market conditions, and the ability of prospective buyers to obtain financing and numerous other factors specific to the business or assets that it is disposing. Moreover, the Fund could be exposed to post-transaction liabilities resulting from the terms of any sale agreement. In addition, any disposition, even if announced, may be subject to significant delays and may not be completed for various reasons, including regulatory requirements or review, failure to satisfy closing conditions or other factors, such as a re-evaluation of the Fund's strategic priorities or other unexpected developments, including potential reputational impact. The above could adversely affect the Fund's business, results of operations, financial condition or prospects, thereby affecting the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***Certain of the Fund's investments in companies or joint ventures are non-controlling stakes, and the Fund may be reliant on the expertise of its co-investors or joint venture partners, which may expose the Fund to additional risks***

The Fund conducts certain business operations through joint ventures or minority investments that are not controlled by the Fund, and it may enter into additional joint ventures or minority investments in the future. Current or future investments in which the Fund does not have, or ceases to have (for example, through divestitures), a controlling stake, are subject to the risk that the other shareholders of the company in which the investment is made may have different business or investment objectives to the Fund. As a result, such shareholders may have the ability to block and/or control business, financial or management decisions which the Fund believes are crucial to the success of the investment concerned, or may take risks or otherwise act in a manner that does not take into account the interests of the Fund. Some of the Fund's joint ventures or minority investments are managed by such entity's own board of directors, who are mandated to make business, financial and management decisions by taking into account the corporate interest of the relevant entity. Such decisions may, therefore, not solely serve the interests of the Fund and may also or instead serve the interests of the other stakeholders, including in relation to dividend distributions.

In addition, the Fund's joint venture partners may breach their obligations to the Fund or the relevant joint venture, have economic or business interests inconsistent with the Fund's or the joint venture's interests and/or take actions

contrary to the Fund's objectives or policies, any of which may result in disputes between the Fund and its joint venture partners that could result in litigation or reputational harm to the Fund. Any decline in the profitability of such portfolio companies or investments could affect their ability to pay dividends, interest and/or make other payments to the Fund and, in turn, could have a significant effect on the Fund's results of operations and financial condition.

Furthermore, any of the Fund's joint venture partners may be unable or unwilling to fulfil their obligations under the relevant joint venture or other agreements or may experience financial or other difficulties that may materially and adversely affect the Fund's investment. In certain of its joint ventures, the Fund may be reliant on the particular expertise of its joint venture partners and any failure by any such partner to perform its obligations in a timely and/or diligent manner could also materially and adversely affect the Fund's investment. The Fund can give no assurance as to the future performance of any of its joint venture partners. Furthermore, the Fund's equity investments in such companies may be diluted if it does not participate in future equity or equity-linked fundraising opportunities.

If any of the foregoing were to occur, the Fund's business, results of operations, financial condition or prospects could be materially and adversely affected, which could in turn affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The due diligence process that the Fund undertakes in connection with its projects and investments may not reveal all relevant facts***

Before implementing a project or making a new investment, the Fund conducts due diligence to the extent it deems reasonable and appropriate based on the applicable facts and circumstances. The objective of the due diligence process is to identify attractive investment opportunities, identify relevant risks, and prepare a framework that may be used from the date of investment to drive operational performance and value creation. When conducting due diligence in respect of a project or investment, the Fund evaluates a number of important business, political, financial, tax, accounting, regulatory, environmental and legal issues in determining whether or not to proceed. External consultants, including legal advisers, accountants, investment banks and industry experts, are involved in the due diligence process in varying degrees depending on the type of project or investment, and in many cases these exercises involve significant cost to the Fund. In some cases, information cannot be verified by reference to the underlying sources to the same extent as the Fund could for information produced from its own internal sources. The due diligence process may at times be qualitative and the Fund can offer no assurance that any due diligence investigation it carries out with respect to any project or investment opportunity will reveal or highlight all relevant facts that may be necessary or helpful in evaluating such opportunity. Any failure by the Fund to identify relevant facts through the due diligence process may mean that projected rates of return and other relevant factors considered by the Fund in making investment decisions prove to be inaccurate over time, which could adversely affect the Fund's business, results of operations, financial condition or prospects, thereby affecting the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***Some of the Fund's current investments are in illiquid assets, which may affect the Fund's ability to divest its investments or generate income or gains upon divestment in a timely manner***

The Fund's long-term investment approach and the relative illiquidity of its privately held investments may make it difficult to sell certain investments, and/or to realise the full value of all of its investments, if the need arises or if the Fund determines it would be in its best interests to sell. In addition, if the Fund were required to liquidate all or a portion of an investment quickly, it may realise significantly less than the carrying value of that investment. Such factors could materially and adversely affect the Fund's business, financial condition, results of operations and prospects, which could in turn affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The Fund may choose to pursue investment opportunities in countries where it has no previous investment experience, including in markets that have greater social, economic and political risks than those in which the Fund typically invests***

Although the Fund has a comprehensive investment risk policy and monitoring system in place, to the extent that the Fund undertakes projects or makes investments in countries where it has little or no previous investment experience, the Fund may not be able to assess the full risks of investing in such countries adequately, or may be unfamiliar with the laws and regulations of such countries governing the Fund's projects and investments. The

Fund cannot guarantee that its strategy will be successful in such countries. The projects and investments that the Fund makes in those countries could lose some or all of their value and may generate returns that are substantially lower than those achieved by the Fund in connection with other projects and investments, which could adversely affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

In addition, investments made by the Fund in emerging market securities involve a greater degree of risk than an investment in securities of issuers based in developed countries for a wide range of reasons, including a lack of adequate publicly available information, greater market volatility, less sophisticated securities market regulation, less predictable tax provisions, less stable or predictable legal systems, a greater likelihood of severe inflation, unstable currency exchange rates, corruption, war, terrorism and expropriation of personal property. In addition, investment opportunities in certain emerging markets may be restricted by legal limits on foreign investment in local securities.

***The Fund may not be able to manage its growth successfully to achieve its growth objectives***

The Fund's ability to achieve its investment objectives and long-term target return will depend on its ability to grow and diversify its investment base, which will depend, in turn, on its ability to identify, invest in and monitor a suitable number of investments and implement the various aspects of its investment strategy (see further "*Description of the Public Investment Fund—Planning and Investment Process*"). Acquisitions expose the Fund to numerous risks, including challenges in managing the increased strategic and financial risks that come with the increased scope and geographic and sector diversity of its portfolio companies and asset classes. In addition, acquired businesses may be operating at a loss when acquired by the Fund and, unless and until they become profitable, this may significantly affect the Fund's results of operations in periods after the acquisition is effective and may increase the Fund's funding requirements.

Achieving growth on a cost-effective basis will be, in part, a function of how the investment process is structured, the Fund's ability to reinvest its capital and the Fund's ability to obtain additional capital on acceptable terms (see also "*—Significant acquisitions could prove to be costly in terms of the Fund's time and resources, and may expose it to post-acquisition integration risks and such businesses may be unprofitable when acquired, which may adversely affect the Fund's results of operations and increase its funding requirements*"). Future growth may place a significant strain on the Fund's managerial, operational, financial and other resources. The need to manage the Fund's investments may require continued development of procedures and management controls, and hiring and training additional personnel, as well as training and retaining its employee base. Such growth may also significantly increase costs, including the cost of compliance arising from exposure to additional activities and jurisdictions.

If the Fund is not successful in meeting the challenges associated with any significant acquisitions it may make or managing its growth successfully, this could have a material adverse effect on the Fund's business, results of operations, financial condition or prospects, which could in turn affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

**Risks relating to the Fund's relationship with the Government**

***The Fund's financial obligations, including its obligations in respect of the Guarantee, are not guaranteed by the Government***

Although the Fund is organisationally connected to the Council of Economic and Development Affairs (the "**CEDA**"), a central council to provide a uniform direction for the Kingdom's economic growth and development, the Fund is considered a distinct public entity with full financial and administrative autonomy, and as such the Issuer's obligations in respect of the Notes and the Fund's obligations in respect of the Guarantee are not guaranteed by the Government. In addition, although in the past the Government has provided funding to companies in which it has ownership interests, the Government is under no obligation to extend financial support to the Fund (see further "*Relationship with the Government*"). Accordingly, the Fund's financial obligations, including its obligations in respect of the Guarantee, are not and should not be regarded as obligations of the Government. The Fund's ability to meet its financial obligations in respect of the Guarantee is solely dependent on its ability to fund such amounts from its operating revenues, profits and cash flows. Therefore, any decline in the Fund's operating revenues, profits and cash flows, or any difficulty in securing external funding, may have a material adverse effect on the Fund's business, financial condition, results of operations and prospects, which

could in turn affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The Fund's objectives may, in certain circumstances, be different from the interests of the Noteholders***

Pursuant to Article 3 of the Public Investment Fund Law (the "**PIF Law**"), one of the Fund's objectives is to promote socio-economic development in the Kingdom. The Fund has previously undertaken, and may in the future undertake, projects or provide material financial assistance for initiatives in furtherance of the Kingdom's macroeconomic, social or other objectives. The Fund and/or its portfolio companies may also work on important strategic investments or divestments in order to contribute to the overall economy of the Kingdom. For example, some of the domestic infrastructure projects in the Kingdom have been delegated to, and are managed by, the Fund. As a result, the Fund's strategy and investment policy may therefore need to take into account national objectives, including strategic and development objectives, which may be different from the interests of the Fund's creditors, including the Noteholders.

While these projects and initiatives have generally been of national importance to the Kingdom and in the Fund's long-term commercial interests, certain projects may be inconsistent with profit maximisation and/or may be undertaken on terms which are adverse to the commercial interests of the Fund. As a result, the Fund may not receive optimal investment returns on such projects and initiatives, which could adversely affect the Fund's business, results of operations, financial condition or prospects, thereby affecting the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee. Furthermore, there can be no assurance that such strategic investments will receive any Government funding.

***The Government has the right to request that the Board consider distributions of the Fund's profits or assets to the Government***

The receipt of dividends and returns are key financial rewards of the Government's investment in the Fund, and the Government has the right to request that the Board consider distributions of the Fund's profits or assets to the Government in compliance with the laws of the Kingdom. The Fund, from time to time, has made, and may in the future make, distributions of dividends to the Government and such distributions are decided by the Board after having: (i) considered the best interests of the Fund; (ii) applied its investment and other income towards, among other things, payment of interest and payment of principal and other amounts in respect of its maturing debt liabilities; and (iii) budgeted for a retention of certain of its income for future investment purposes and for the Fund's own general purposes.

However, distributions can be made to the Government based on pre-determined dividend distribution policies. If the Fund is requested to make such distributions or other contributions to the Government in the future, this could have a significant effect on the Fund's business, results of operations, financial condition and prospects, and subsequently affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee (see further "*Relationship with the Government—Distributions of Dividends to the Government*").

Any dividend or distribution made by the Fund must be in accordance with its dividend distribution policy, which requires the Board to consider the Fund's objectives under the PIF Program (as defined below), its long-term sustainability, and amongst others, the following factors:

- the need to maintain sufficient liquidity in order to avoid any shortage of funds;

- any contractual restrictions and covenants imposed by existing borrowing;

- the current macroeconomic climate and outlook both locally and globally;

- the impact of a distribution on the Fund's short- and long-term investment strategy;

- the Fund's financial performance and profitability in the current fiscal year; and

- the Fund's future capital expenditure and expansion plans.

***The Fund's mandate may be limited or amended by legislative changes and the Government may limit the amount of support granted to the Fund***

The Fund's mandate may be limited or amended by changes in law (including, but not limited to, changes in the PIF Law) and the Government may limit the amount of support (financial or otherwise) provided to, or assets granted to, the Fund. Any such changes in the law or actions by the Government could have a material and adverse effect on the Fund's business, results of operations, financial condition and prospects, and subsequently affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

**Financial risks relating to the Fund**

***The Audited Special Purpose Consolidated Financial Statements diverge in certain material respects from IFRS***

Investors are strongly cautioned that the financial statements and financial information with respect to the Guarantor which are contained or incorporated by reference in this Offering Circular differ from financial statements and financial information which might typically be provided by other obligors in analogous offerings of debt securities. In particular, the financial statements and financial information contained or incorporated by reference in this Offering Circular (1) include financial statements for financial years ended 31 December 2021 and 31 December 2020 which depart in a number of material respects from IFRS and each of which are the subject of an audit report containing material qualifications (see "*Presentation of Financial and Other Information– Qualified Audit Opinions*"); and (2) include financial information that is extracted from unaudited financial statements that are not available to potential investors and which have been prepared on a basis other than IFRS (see "*Presentation of Financial and Other Information–Presentation of Financial Information: Unaudited Special Purpose Unconsolidated Financial Statements and Unaudited Unconsolidated Financial Information*"). No investor should invest in Notes unless they have sufficient knowledge and experience to make a meaningful evaluation of the financial information contained in this Offering Circular and the risks associated with the limitations in respect of the financial information contained herein.

During the year ended 31 December 2020, the Fund commenced a transition process with a view to reporting its financial results in accordance with IFRS. Accordingly, the Audited Special Purpose Consolidated Financial Statements have been prepared in accordance with Note 2 (*Basis of Preparation*) to each of the 2021 Audited Special Purpose Consolidated Financial Statements and the 2020 Audited Special Purpose Consolidated Financial Statements, as summarised in "*Presentation of Financial and Other Information–Presentation of Financial Information–Basis of Preparation: The Audited Special Purpose Consolidated Financial Statements*".

Accordingly, potential investors should not invest in any Notes unless they have a full understanding of the Audited Special Purpose Consolidated Financial Statements and the manner in which the basis of their preparation has resulted in material departures from IFRS.

KPMG Professional Services' qualified audit opinion relating to the 2021 Audited Special Purpose Consolidated Financial Statements contains certain qualifications and an emphasis of matter that were carried over from the 2020 Audited Special Purpose Consolidated Financial Statements, as described in "*Presentation of Financial and Other Information–Qualified Audit Opinion: 2021 Audited Special Purpose Consolidated Financial Statements*". The audit opinion is qualified as follows:

- In the Group's consolidated statement of cash flows for the year ended 31 December 2020, the impact of certain intercompany transactions relating to working capital movements during the year, were not considered due to non-availability of the relevant information from underlying subsidiaries. As a result KPMG Professional Services was unable to determine whether any adjustments were required within the reported movements in working capital, without affecting the "net cash from operating activities."

- The Group has defined Key Management Personnel under International Accounting Standards (IAS) 24 "Related Party Disclosures" to include members of the Board and their close family members, members of Board Level Committees' and their close family members and members of Management Level Committees' and their close family members. Balances and transactions associated with members of the Board, members of Board Level Committees', and their close family members were not identified as at and for the year ended 31 December 2020. As a result, KPMG Professional Services has been unable to obtain sufficient appropriate audit evidence as to the completeness of

the information with respect to the related party relationships and the disclosures as required by IAS 24 "Related Party Disclosures", and the consequential impact, if any, of the same on the accompanying 2020 Audited Special Purpose Consolidated Financial Statements.

KPMG Professional Services' qualified audit opinion relating to the 2020 Audited Special Purpose Financial Statements contains certain qualifications and an emphasis of matter, as described in "*Presentation of Financial and Other Information–Qualified Audit Opinion: 2020 Audited Special Purpose Consolidated Financial Statements*". The audit opinion is qualified as follows:

- In the Group's consolidated statement of cash flows, the impact of certain intercompany transactions relating to working capital movements during the year, were not considered due to non-availability of the relevant information from underlying subsidiaries. As a result KPMG Professional Services was unable to determine whether any adjustments were required within the reported movements in working capital, without affecting the "net cash from operating activities."

- The Group has not complied with the requirements of IFRS 8 "Operating Segments" as they have not disclosed information relating to the operating segments of the Group.

- The Group has defined Key Management Personnel under International Accounting Standards (IAS) 24 "Related Party Disclosures" to include members of the Board and their close family members, members of Board Level Committees' and their close family members and members of Management Level Committees' and their close family members. Balances and transactions associated with members of the Board, members of Board Level Committees', and their close family members were not identified as at and for the year ended 31 December 2020. As a result, KPMG Professional Services has been unable to obtain sufficient appropriate audit evidence as to the completeness of the information with respect to the related party relationships and the disclosures as required by IAS 24 "Related Party Disclosures", and the consequential impact, if any, of the same on the accompanying 2020 Audited Special Purpose Consolidated Financial Statements.

The Fund expects its audited consolidated financial statements for the period ending 31 December 2022 and all subsequent periods to be fully IFRS-compliant. However, there can be no assurance that the Fund will produce such consolidated financial statements in a timely manner.

For the year ended 31 December 2020 and the period ended 31 December 2019, the Fund prepared the Unaudited Special Purpose Unconsolidated Financial Statements in accordance with the equity accounting method. The 2020 Unaudited Special Purpose Unconsolidated Financial Statements and the 2019 Unaudited Special Purpose Unconsolidated Financial Statements both include unaudited financial information for the prior periods. The Unaudited Special Purpose Unconsolidated Financial Statements are not compliant with IFRS and have been prepared in accordance with the basis of presentation as summarised in "*Presentation of Financial and Other Information–Presentation of Financial Information–Basis of Preparation: The Unaudited Special Purpose Unconsolidated Financial Statements*". The Fund considers that the Unaudited Special Purpose Unconsolidated Financial Statements may not be suitable for inclusion in this Offering Circular for various reasons, including that their inclusion may be misleading for investors due to non-comparability of such information with the financial information presented in the Audited Special Purpose Consolidated Financial Statements. Accordingly, this Offering Circular does not include audited historical financial statements of the Fund for the period ended 31 December 2019 or any period prior to that.

### *The Fund is subject to a range of financial risks*

The Fund is exposed to a range of financial risks including, in particular, the risk of losses arising as a result of adverse changes in equity prices, foreign exchange rates and interest rates. Some of the key financial risks faced by the Fund are summarised as follows:

- The Fund holds a significant portfolio of publicly listed financial assets at fair value which are valued on a daily basis and, principally as a result of volatility in stock market valuations, the Fund has in the past recorded, and may continue in the future to record, fair value gains and losses of varying amounts on these financial assets.

- The Fund's principal foreign currency risks are its exposure to the effect of movements in USD exchange rates on certain of its borrowings and investments.

- The Fund's principal interest rate risk results from its exposure to the effect of increases in interest rates on its variable rate interest-bearing financial liabilities.

The Fund is also exposed to a certain degree of credit risk. Although the Fund believes that it has in place appropriate risk management procedures, if any of the foregoing financial risks materialise and are not appropriately managed, the Fund's business, results of operations, financial condition or prospects could be materially and adversely affected, which could affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

### *The availability of operating cash flow to the Fund may be limited*

The Fund conducts its operations principally through, and derives all of its revenue from, its portfolio companies and other investments, and it does not anticipate that this will change in the near future. A significant proportion of the Fund's consolidated indebtedness has been incurred by the Fund's portfolio companies. Such indebtedness, in certain cases, may contain covenants that prevent or restrict distributions to the Fund until such time as the relevant indebtedness has been repaid. In addition, the ability of the Fund's portfolio companies to pay dividends or make other distributions or payments to the Fund is subject to the availability of profits or funds for the purpose, which, in turn, depends on the future performance of the entity concerned, which, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that may be beyond its control. Any such entity may also be subject to restrictions on the making of distributions pursuant to applicable laws and regulations. There can be no assurance that the Fund's portfolio companies will generate sufficient cash flow from operations or that alternative sources of financing will be available at any time in an amount sufficient to enable these businesses to service their indebtedness, fund their other liquidity needs and make distributions to the Fund to enable it, among other things, to service its indebtedness. Such limitations in cash flow may adversely affect the Fund's business, results of operations, financial condition or prospects which could affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

### *Claims in respect of the Guarantee will be structurally subordinated to the claims of creditors of the Fund's portfolio companies*

The Fund's portfolio companies have incurred indebtedness, and in the future will continue to incur indebtedness, to finance their operations. In the event of the insolvency of any of the Fund's portfolio companies, claims of secured and unsecured creditors of such entity, including trade creditors, banks and other lenders, will have priority with respect to the assets of such entity over any claims that the Fund or the creditors of the Fund, as applicable, may have with respect to such assets. However, such claims are limited to the assets of the relevant portfolio company only. Accordingly, if the Fund became insolvent at the same time, claims of the Noteholders against the Fund in respect of the Guarantee to the assets of the Fund's portfolio companies would be structurally subordinated to the claims of all such creditors of the Fund's portfolio companies. The Conditions do not restrict the amount of indebtedness that the Fund may incur, including indebtedness of its portfolio companies.

### *The terms of indebtedness of certain of the Fund's portfolio companies contain financial and operating covenants, which may limit the Fund's operating flexibility*

Certain of the Fund's portfolio companies have significant indebtedness outstanding and the terms of certain such indebtedness may contain financial and operating covenants. In order to comply with any such financial covenants, such portfolio companies of the Fund may be restricted from undertaking certain activities and/or required to postpone or alter their performance objectives.

If any of the Fund and/or its portfolio companies were to fail to satisfy any of its debt service obligations or to breach any related financial or operating covenants, the relevant lender could declare the full amount of the indebtedness to be immediately due and payable and could foreclose on any assets pledged as collateral. As a result, any default under any indebtedness to which a portfolio company of the Fund is party could result in a loss to the Fund, which could adversely impact the ability of the Issuer to perform its financial obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

### *The Fund's credit ratings may change and any ratings downgrade could adversely affect the value of Notes issued under the Programme*

The Fund has been rated A1 by Moody's and A by Fitch. These ratings match those given to the Kingdom by the respective rating agencies. The Fund cannot be certain that it will be able to maintain each of its credit ratings for

any given period of time or that any of its ratings will not be downgraded or withdrawn entirely by a rating agency if, in its judgment, circumstances so warrant.

Any future downgrade or withdrawal of a credit rating of the Fund or the Kingdom by any rating agency could have a material adverse effect on the Fund's or its portfolio companies' cost of borrowing and could limit its access to debt capital markets, and therefore could adversely impact the ability of the Issuer to perform its financial obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee. Furthermore, any future downgrade or withdrawal of a credit rating of the Kingdom would likely result in a downgrade of the credit rating of the Fund. A downgrade may also adversely affect the market price of Notes issued under the Programme and cause trading in such Notes to be volatile.

***The Fund's international activities increase the compliance risks associated with economic and trade sanctions imposed by the United States, the European Union, the United Kingdom and other jurisdictions***

International sanctions continue to be imposed on companies engaging in certain types of transactions with specified countries or companies or individuals in those countries. Companies operating in or investing in, among others, certain countries in Africa, Europe and Asia have been and are currently subject to such sanctions. The terms of legislation and other rules and regulations that establish sanctions regimes are often broad in scope and difficult to interpret. The Fund is not currently the target of any such sanctions and the Fund has adopted policies and procedures designed to comply with applicable sanctions regulations.

The Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**"), as well as other departments of the United States government, administer regulations that restrict the ability of U.S. persons to invest in, or otherwise engage in business with, certain countries, specially designated nationals and certain other individuals and entities (together, "**Sanctions Targets**"). As the Fund is not a Sanctions Target, OFAC regulations do not prohibit U.S. persons from investing in, or otherwise engaging in business with, the Fund. However, to the extent that the Fund becomes the subject of such sanctions or invests in, or otherwise engages in business with, Sanctions Targets, U.S. persons investing in the Fund, including through the purchase of securities issued or guaranteed by the Fund or any of its portfolio companies, may incur the risk of indirect contact with Sanctions Targets.

**Other general risks relating to the Fund**

***The Fund could be materially adversely affected by changes in global economic and political conditions or external shocks, which could impair the value of some or all of the Fund's investments or prevent it from increasing its investment base***

Adverse changes in global economic and political conditions or external shocks could have a material adverse effect on the Fund's business and that of its portfolio companies. Most recently, global economic markets have been adversely impacted by the military conflict between the Russian Federation and Ukraine (the "**Russia Ukraine Conflict**"), escalating trade disputes between the United States and China, as well as other countries and uncertainties regarding global monetary policies. To the extent that economic and political uncertainty continues or trade disputes or other policies cause further economic uncertainty and disruption in the global financial markets, this may have adverse consequences for the global economy and demand for the products and services of the Fund's portfolio companies. No assurance can be given that a further global economic downturn or financial crisis will not occur and, to the extent that further instability in the global financial markets occurs, it is likely that this would have an adverse effect on the Fund.

In addition, a significant proportion of the Fund's investments are in projects and companies that are susceptible to such economic recessions or downturns. During periods of adverse economic conditions, these projects and companies may experience decreased revenue, financial losses from impairments or otherwise, difficulty in obtaining access to financing and increased funding costs, all of which could materially adversely affect the Fund. During such periods, these projects and companies may also face difficulty in expanding their businesses and operations and be unable to meet their debt service obligations or other expenses as they become due, which could cause the value of the Fund's affected projects and investments to decline, in some cases significantly.

Further, the above risks may be exacerbated by rising global political tensions such as those arising from the Russia Ukraine Conflict, which have, and are expected to continue to have, significant economic, social, geopolitical and financial implications globally. The outcome and progression of the Russia Ukraine Conflict is uncertain and its ultimate impact on the operations, financial condition and performance of the Fund or any particular industry, business, currency or country and the duration and severity of those effects, is not possible to

predict. The portfolio companies of the Fund may, as a result of the ongoing conflict, suffer increases in operating costs (including, among other reasons, as a result of the substantial increase in energy prices), reductions in customers or new subscriptions for services, losses from cyberattacks, reductions in revenue and growth, increased foreign exchange risk and/or unexpected operational losses and liabilities. In addition, countries around the world, including the United States, the European Union and the United Kingdom, have implemented sanctions targeting the Russian government, the Russian central bank, Russian financial institutions and corporates and certain Russian individuals, including government officials. Such sanctions, and any future sanctions or measures taken by U.S. and non-U.S. governments, have had, and are likely to continue to have, significant global economic and market consequences, the full effects of which are difficult to predict or determine.

Further, global capital and credit markets have experienced, and may continue to experience, considerable volatility as a result of the rapidly developing and escalating Russia Ukraine Conflict, which have impacted and may continue in future periods to impact portfolio company valuations which, in turn, could have an adverse effect on the Fund's business, financial condition, results of operations or prospects.

The financial performance of the Fund could be adversely affected in the future by any deterioration of general economic conditions in the markets in which the Fund operates, as well as by United States and international trading market conditions and/or related factors. In addition, changes in investment markets, including changes in interest rates, exchange rates and returns from equity, property and other investments, may also materially adversely affect the financial performance of the Fund, and in turn adversely impact the ability of the Issuer to perform its financial obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***Changes in laws or regulations, or a failure to comply with any laws and regulations, may adversely affect the Fund's and its portfolio companies' businesses***

The Fund and its portfolio companies are subject to laws and regulations enacted by national, regional and local governments of jurisdictions in which they operate. Such laws and regulations, among other things, relate to licensing requirements, environmental obligations, health and safety obligations, asset and investment controls and a range of other requirements. Compliance with, and monitoring of, applicable laws and regulations may be difficult, time-consuming and costly. These regulations may be extensive and may change unexpectedly and at times with only a very short period of notice and consultation. Existing laws and regulations may be amended, the manner in which laws and regulations are enforced or interpreted may change, and new laws or regulations may be adopted in ways that are unfavourable to the Fund's operations, which could adversely affect the way the Fund operates its business. The Fund is unable to predict what regulatory changes may be imposed in the future as a result of regulatory initiatives in the Kingdom or any other jurisdiction where the Fund operates. Although the Fund continually monitors the situation, future changes in regulation, fiscal or other policies can be unpredictable and are beyond the control of the Fund.

Failure to comply with any of the laws and regulations could potentially expose the Fund to civil or criminal liability, reputational damage and sanctions including fines, the loss or limitation of licences, authorisations or permits necessary for the Fund's business and stricter regulatory scrutiny or supervision by the applicable authorities. Such failures may arise despite the Fund's risk management systems. Accordingly, violations of rules and regulations, whether intentional or unintentional, or failure to comply with licensing or other requirements, may adversely affect the Fund's business, financial condition, results of operations and prospects, which could consequently affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The Fund's and its portfolio companies' insurance policies may not be sufficient to cover all risks faced by them***

The Fund and its portfolio companies maintain a range of insurance policies, which indemnify either the relevant policyholder or third parties for loss or damage to assets and any associated liabilities. The Fund believes that these insurance policies provide coverage in amounts and on terms that are generally consistent with relevant industry practice. There is, however, no assurance that such insurance coverage will continue to be available in the market from either capacity or commercial standpoints. Further, the Fund or a third party could be subject to a material loss to the extent that a claim is made against the Fund or its portfolio companies which is not covered in whole or in part by insurance and for which third-party indemnification is not available. In the event of such a material loss, the financial position of the Fund may be adversely affected which could impact the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The Fund's results of operations could be materially adversely affected by changes in tax-related matters***

The Fund holds investments in various countries outside of the Kingdom and, as a result, might be subject to taxation and audit by a number of taxing authorities. Tax rates vary in the jurisdictions in which the Fund holds its investments. Changes in tax laws, regulations and related interpretations in these countries may adversely affect the Fund's investment returns.

In addition, the Fund's investments are subject to laws and regulations in various jurisdictions that determine how much profit has been earned on the Fund's investments and when such profit is subject to taxation in that jurisdiction. Changes in these laws and regulations could affect the locations where the Fund's investments are deemed to earn income, which could in turn adversely affect the Fund's investment returns.

***During the ordinary course of business, the Fund's portfolio companies may become subject to legal disputes and litigation, which could materially and adversely affect the Fund***

Given the global expanse of the Fund's investments and the highly competitive nature of its business environment, the Fund and its portfolio companies are exposed to legal disputes and litigation with competitors, operators and joint venture partners, among others. These actions may seek, among other things, compensation for alleged losses, civil penalties or injunctive or declaratory relief. In the event that any such action is ultimately resolved unfavourably at amounts exceeding the Fund's accrued liability, or at material amounts, the outcome could materially and adversely affect the Fund's results of operations. The settlement of any legal dispute or litigation can be time-consuming and expensive, which can create significant uncertainty in relation to the outcome for a sustained period of time. Further, the ability of the Fund to obtain a favourable decision could be impacted by the jurisdiction as well as the domicile of its counterparty in any litigation. See "*Description of the Public Investment Fund—Litigation*".

From time to time, the Fund or its portfolio companies may be involved in litigation with joint venture partners, which is not only likely to impact the performance of the joint venture concerned but may also mean that the Fund may experience difficulty in exiting the joint venture should it wish to following settlement of the dispute. Such difficulties may affect the Fund's financial position, which could adversely affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

## RISKS RELATING TO THE KINGDOM AND THE MIDDLE EAST

***The Fund is subject to general economic and political conditions in the Kingdom and the Middle East***

The Fund is based in the Kingdom and the majority of its operations and interests are located in the Kingdom. Investors should be aware that investments in emerging markets are subject to greater risks than those in more developed markets, and carry in some cases significant legal, economic and political risks. Accordingly, investors should exercise particular care in evaluating the risks involved and must decide for themselves whether, in the light of those risks, their investment is appropriate. Generally, investments in emerging markets are only suitable for sophisticated investors who fully appreciate the significance of the risks involved.

The hydrocarbon industry is the single largest contributor to the Kingdom's economy and oil revenues account for a majority of the Government's total revenues and export earnings. According to The General Authority for Statistics ("**GASTAT**") and the Ministry of Finance ("**MoF**"), the oil sector accounted for 39.0% and 40.2% of the Kingdom's real GDP and 29.7% and 23.2% of the Kingdom's nominal GDP in each of 2021 and 2020, respectively. Oil revenues accounted for an estimated 60% and 52.8% of total Government revenues in the fiscal years 2021 and 2020, respectively. Oil exports accounted for 73.2% and 68.7% of the Kingdom's total exports by value in the years ended 31 December 2021 and 2020, respectively.

As oil is the Kingdom's most important export, any change in oil prices affects various macroeconomic and other indicators, including, but not limited to, GDP, Government revenues, balance of payments and foreign trade, which could ultimately impact the Fund. International oil prices have fluctuated significantly over the past two decades and may remain volatile in the future. For example, in 2018 and 2019 the yearly average OPEC Reference Basket price (a weighted average of prices per barrel for petroleum blends produced by the OPEC countries) was US$69.78 and US$64.04, respectively. In 2020, the yearly average OPEC Reference Basket price was US$41.47, reflecting a sharp drop in April 2020 (driven by OPEC actions and significantly reduced demand as a result of COVID-19 and a slow recovery throughout the remainder of the year), and as of 31 December 2021, the average OPEC Reference Basket price per barrel was US$77.97.

On 6 March 2020, OPEC members and certain non-OPEC oil producing countries participating in the Declaration of Cooperation, including Russia, failed to reach an agreement to extend the voluntary crude oil production adjustments due to expire on 31 March 2020. Subsequently, the Kingdom adjusted its crude oil export prices and increased its crude oil sale allocations for April 2020. The Government also instructed Saudi Aramco to evaluate its requirements and increase its maximum sustained daily production capacity from 12 million barrels to 13 million barrels.

These events, combined with the global challenges posed by the COVID-19 pandemic, caused a sharp drop in oil prices. The OPEC Reference Basket price reached US\$34.71 per barrel on 9 March 2020 and had further fallen to US\$16.85 per barrel by 1 April 2020, compared to a monthly average of US\$66.48 per barrel in December 2019. In mid-April 2021, the countries participating in the Declaration of Cooperation agreed to reduce their overall oil production in stages between 1 May 2020 and 30 April 2022. These measures, together with the gradual easing of restrictions on travel imposed around the world to combat the COVID-19 pandemic, helped prices to generally recover in 2020 and into 2021, with the monthly average OPEC Reference Basket price being US\$77.97 in December 2021. The price per barrel of Arabian Light Crude Oil (which is produced by the Kingdom and constitutes part of the OPEC Reference Basket) has also generally moved in line with these trends.

Oil prices rose over the course of 2021 and, as of 31 December 2021, the average OPEC Reference Basket price per barrel was US\$77.97. Since the beginning of 2022, global oil prices have risen sharply, which can be attributed to a number of factors, including, but not limited to, production cuts by OPEC and partners to counter falling oil prices as a result of the COVID-19 pandemic, the rebound in global oil demand as economies continue to recover from the impact of the COVID-19 pandemic and, most notably, the Russian invasion of Ukraine in February 2022, following which the average monthly OPEC Reference Basket price per barrel for March 2022 rose to US\$113.48.

In general, international prices for crude oil are also affected by the economic and political developments in oil producing regions, particularly the Middle East; prices and availability of new technologies; and the global climate and other relevant conditions. There can be no assurance that these factors, in combination with others, will not result in a prolonged or further decline in oil prices, which may continue to have an adverse effect on the Kingdom's GDP growth, Government revenues, balance of payments and foreign trade. In addition to the negative impact of low oil prices on Government reserves and revenues, lower oil prices have also negatively impacted the Kingdom's current account position, which could make it more vulnerable to adverse changes in global markets. Furthermore, if the Kingdom increases its oil production in the future, there can be no assurance that the Kingdom's export earnings will also increase, to the extent that such increase in production is offset by any decline in international oil prices due to conditions in the global oil market. Conversely, if the Kingdom decreases its oil production in the future, this could result in a decline in the Kingdom's export earnings to the extent that such lower production is not offset by any increase in international oil prices due to conditions in the global oil market.

Potential investors should also note that many of the Kingdom's other economic sectors are in part dependent on the oil sector, and the above analysis does not take into account the indirect impact that a prolonged or further decline in oil prices may have on the Kingdom's economy. Sectors such as education, healthcare and housing, may, indirectly, be adversely affected by lower levels of economic activity that may result from lower Government revenues from the oil sector.

In addition, the Kingdom's economy could be adversely affected by economic conditions or related developments both within and outside the Middle East (which in turn could result in a general downturn in, or instability of, the Kingdom's economy) because of the inter-relationships between the global financial markets. The Kingdom's economy is influenced by global economic conditions (including regional and international economic growth) and financial developments in neighbouring countries or European countries more broadly, in addition to those of emerging markets more generally. Recent political and economic developments in the global economy have affected, and continue to have the potential to negatively impact, the global economy and the Kingdom (see "— *The Kingdom is located in a region that has been subject to ongoing political and security concerns*").

Moreover, the outbreak of COVID-19, and the measures implemented by governmental authorities to contain it, such as travel restrictions, border controls and other measures to discourage or prohibit the movement of people, have had and are expected to continue to have a material adverse impact on the level of economic activity across the globe, including in the Kingdom. At present, the extent of the impact posed by COVID-19 in the future is unclear and concerns remain as to whether the stimulus and other economic actions taken by a number of countries to mitigate its impact will counter the anticipated macroeconomic risks. It is also unclear as to when any restrictive measures currently imposed in countries to contain the virus will be deemed successful and therefore relaxed or reduced, or how long and the manner in which any such preventive measures will remain in place (including any potential re-introduction of such measures, whether any further measures are implemented and the extent of any

such measures), and how the different sectors of the economy respond to any removal, lifting or re-introduction of any such measures.

In line with global economic trends, the financial performance of the Fund and its portfolio companies has been affected by these trends, and could be materially adversely affected in the future, by a continuation of the aforementioned challenging economic conditions and uncertainty. No assurance can be given that the Fund's ability to access capital or sustain its growth and revenues will not be adversely affected by financial and/or economic crises that are existing or may occur in the future, including, but not limited to, the factors mentioned above, any of which could materially adversely affect the Fund's business, results of operations, financial condition and prospects and, therefore, the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***The Kingdom is located in a region that has been subject to ongoing political and security concerns***

The Kingdom is located in a region that is strategically important, and parts of this region have been subject to political and security concerns, especially in recent years. Several countries in the region are currently subject to armed conflicts and/or social and political unrest, including conflicts or disturbances in Yemen, Syria, Libya and Iraq. In some instances, the recent and ongoing conflicts are a continuation of the significant political and military upheaval experienced by certain regional countries from 2011 onwards, commonly referred to as the "Arab Spring", which gave rise to several instances of regime change and increased political uncertainty across the region. Furthermore, in March 2015, a coalition of countries, led by the Kingdom and supported by the international community, commenced military action against the Al-Houthi rebels in Yemen. Although the coalition scaled back its military operations in Yemen in March 2016 and a ceasefire was declared in April 2016, the conflict in Yemen is not yet fully resolved and military operations continue at a reduced scale. The Kingdom was targeted on several occasions by ballistic missiles fired by the Al-Houthi rebels in Yemen during 2017, 2018, 2019, 2020 and 2021, most of which were successfully intercepted by the Kingdom's defence systems. The more recent attacks in 2021 by the Al-Houthi rebels targeted civilians, including at the airport in Abha and in residential areas of Dammam and there can be no assurance that the conflict in Yemen will not escalate further. Additionally, on 14 September 2019, the Abqaiq processing facility and the Khurais oil field in the Kingdom were damaged in a major act of sabotage, which resulted in the partial and temporary interruption of some of the Kingdom's oil and gas production. The Al-Houthi rebels claimed responsibility for the act of sabotage, although this claim has not been verified and has been disputed. On 23 November 2020, an explosion took place as a result of a terrorist attack by a projectile, causing a fire in a fuel tank at a Saudi Aramco petroleum products distribution terminal in the north of Jeddah. While there were no casualties nor any interruption to Saudi Aramco's fuel supplies as a result of the attack, there can be no assurance as to the impact such acts of terrorism and sabotage may have on the geopolitical situation in the region, including any potential escalation of tensions.

In addition, the Kingdom has experienced terrorist attacks and other disturbances in recent years, including incidents in Jeddah, Medina and Qatif in July 2016 and the acts of sabotage discussed above. There can be no assurance that extremists or terrorist groups will not attempt to target the Kingdom or commit or attempt to commit violent acts in the future. Any occurrences or escalation of terrorist incidents or other disturbances in the Kingdom could have an adverse impact on the Kingdom's economic and financial condition.

Tensions have also persisted between the Kingdom and Iran, as exemplified in January 2016 by the Kingdom recalling its ambassador to Iran. In addition, on 8 May 2018, the United States announced its withdrawal from the comprehensive agreement between the U.N. Security Council's five permanent members plus Germany and Iran that was reached in July 2015, reinstating U.S. nuclear sanctions on the Iranian regime. The United States also announced that it would not renew exceptional waivers for importing Iranian oil for several oil-importing countries, effective from May 2019, and on 3 January 2020, the United States carried out a military strike which killed a senior Iranian military commander. As a result of this military strike, Iran launched missile attacks on U.S. forces based in Iraq. Any continuation or escalation of international or regional tensions regarding Iran, including further attacks on, or seizures of, oil tankers which disrupt international trade, including any impairment of trade flow through the Strait of Hormuz, or any military conflict, could have a destabilising impact on the Gulf region, including with respect to the Kingdom and its ability to export oil.

These geopolitical events may contribute to instability in the Middle East and surrounding regions (that may or may not directly involve the Kingdom) and may have a material adverse effect on the Kingdom's attractiveness for foreign investment and capital, its ability to engage in international trade and, subsequently, its economy and financial condition. Furthermore, such geopolitical events may also contribute to increased defence spending, which could in turn have an adverse impact on the Kingdom's fiscal position or the budget available for other projects. It is not possible to predict the occurrence of events or circumstances such as, or similar to, a war or

hostilities, the cessation of diplomatic ties, or the impact of such occurrences, and no assurance can be given that the Fund would be able to sustain its current profit levels if such events or circumstances were to occur. Continued instability affecting the countries in the MENA region could adversely impact the Kingdom and, consequently, the Fund.

The Kingdom is, and will continue to be, affected by economic and political developments in or affecting the Kingdom and the wider MENA region, and investors' reactions to developments in any country in the MENA region may affect securities of issuers in other markets, including the Kingdom. All the above factors could have a material adverse effect on the Fund's business, results of operations and financial condition, and thereby adversely affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***Investing in securities involving emerging markets such as the Kingdom generally involves a higher degree of risk***

Investing in securities involving emerging markets, such as the Kingdom, generally involves a higher degree of risk than investments in securities of issuers from more developed countries. Generally, investments in emerging markets are only suitable for sophisticated investors who fully appreciate, and are familiar with, the significance of the risks involved in investing in emerging markets.

The Kingdom's economy is susceptible to future adverse effects similar to those suffered by other emerging market countries. In addition, as a result of "contagion", the Kingdom could be affected by negative economic and financial developments in other emerging market countries, which could in turn affect the trading price of the Notes. Key factors affecting the environment include the timing and size of increases in interest rates in the United States, evidence of an economic slowdown in China, geopolitical tensions in the Middle East and in the Korean peninsula and other similar significant global events.

Accordingly, there can be no assurance that the market for securities bearing emerging market risk, such as the Notes, will not be affected negatively by events elsewhere, especially in other emerging markets.

***The Kingdom's sovereign credit rating may be downgraded in the future***

The Kingdom has been assigned the following credit ratings: A1 (stable outlook) by Moody's and A (positive outlook) by Fitch. The credit ratings assigned to the Kingdom by Moody's and Fitch are a result of a downgrade by each of these credit ratings agencies. In the case of Moody's, the Kingdom's credit rating was downgraded from Aa3 to the current A1 in May 2016, which was affirmed in June 2021, November 2021 and again in June 2022. In the case of Fitch, the Kingdom's credit rating was downgraded from AA- to A+ in March 2017, and further downgraded from A+ to A in September 2019, which was affirmed in July 2021 and again in April 2022. Fitch also revised its outlook on the Kingdom from stable to positive in April 2022. Furthermore, in February 2016, S&P Global Ratings Europe Limited ("**S&P**"), which rates the Kingdom on an unsolicited basis, cut the Kingdom's foreign and local currency credit ratings by two levels from A+ (negative) to A- (stable), which was affirmed in September 2021 and again in March 2022. S&P updated its outlook for the Kingdom from stable to positive in March 2022. For the downgraded ratings mentioned above, the relevant ratings agency cited a fall in oil prices having led to a material deterioration in the Kingdom's credit profile and the expectation of an increased Government budget deficit as among the reasons for the downgrade.

Ratings are an important factor in establishing the financial strength of debt issuers and are intended to measure an issuer's ability to repay its obligations based upon criteria established by the rating agencies. Any further downgrade in the Kingdom's sovereign credit rating or in the credit ratings of instruments issued, insured or guaranteed by related institutions or agencies, could negatively affect the price of the Notes. To the extent that major Government-related institutions or agencies are subject to further downgrades in the future, this may adversely affect the finances of the Government to the extent that the Government provides explicit or implicit guarantees or credit support for the indebtedness of those entities, or to the extent that such entities contribute to Government revenues.

Any further decline in the Kingdom's credit rating could have a material adverse effect on its cost of borrowing and could adversely affect its ability to access debt capital markets or other sources of liquidity.

A credit rating is not a recommendation to buy, sell or hold the Notes. Credit ratings are subject to revisions or withdrawal at any time by the assigning rating agency. The Fund cannot be certain that the Kingdom's credit rating will remain for any given period of time or that a credit rating will not be downgraded or withdrawn entirely by the relevant rating agency if, in its judgement, circumstances in the future so warrant. A suspension, downgrade

or withdrawal at any time of the credit rating assigned to the Kingdom may adversely affect the market price of the Notes.

***The Fund's business may be materially and adversely affected if the SAR/U.S. dollar peg were to be removed or adjusted***

The Fund's financial statements are presented in SAR, which is the Fund's functional and presentation currency. Each of the Fund's portfolio companies determines its own functional currency and items included in the financial statements of each entity are measured using that functional currency.

The SAR has been pegged to the U.S. dollar since 1986 and remains pegged as at the date of this Offering Circular. Currently, it is pegged at the rate of 1 U.S. dollar = 3.75 SAR. In addition, certain other oil-producing Gulf Cooperation Council ("**GCC**") countries have their currencies pegged to the U.S. dollar as at the date of this Offering Circular. In response to the volatility of oil prices in 2015, oil-producing countries with currencies that had been traditionally pegged to the U.S. dollar faced pressure to de-peg and, in certain cases, did de-peg their currencies. For example, Kazakhstan de-pegged the Kazakhstani tenge from the U.S. dollar on 20 August 2015, which was followed on 21 December 2015 by the removal of the U.S. dollar peg against the Azerbaijani manat. While the likelihood of the GCC states pursuing a similar course of action is unclear, there is a risk that additional countries may choose to unwind their existing currency peg to the U.S. dollar, both in the GCC and the wider region (in the event that the current challenging market conditions or the volatility in global crude oil prices persist for a prolonged period). While the long-term impacts of such actions are uncertain, it is likely that any such de-pegged currency would face a devaluation against the U.S. dollar immediately post-removal of the peg. Given the levels of exposure amongst regional financial institutions to other pegged currencies, it is also likely that such currency de-valuation(s) would adversely impact the banking systems in the Kingdom and across the wider GCC.

While the Saudi Central Bank has, most recently in May 2020, re-iterated its intention to retain the SAR peg against the U.S. dollar, there can be no assurance that the SAR will not be de-pegged in the future or that the existing peg will not be adjusted in a manner that adversely affects the Fund's results of operations and financial condition. Additionally, any such de-pegging either in the Kingdom or across the wider region, particularly if such de-pegging is accompanied by the anticipated currency de-valuations against the U.S. dollar (as described above), could have an adverse effect on the Fund's business, results of operations and financial condition, and thereby affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

***Tax changes in the Kingdom may have an adverse effect on the Fund***

As at the date of this Offering Circular, the Fund and those of its wholly-owned portfolio companies operating in the Kingdom are not currently subject to corporation tax on their earnings within the Kingdom. The Fund is also not required to settle zakat.

With effect from 1 January 2018, the Government implemented a value-added tax ("**VAT**") regime within the Kingdom at a rate of 5%. Subsequently, with effect from 1 July 2020, the Government increased the VAT rate to 15%.

With effect from 4 October 2020, transfers of real estate are generally subject to real estate transfer tax at 5%. In addition, the Kingdom has separate regimes for zakat, customs and excise duty in place.

If the Government introduces new, or alters existing, tax or zakat regimes, this may have a material adverse effect on the Fund's business, results of operations, cash flows and financial condition, which in turn could affect the ability of the Issuer to perform its obligations in respect of any Notes and the ability of the Fund to perform its obligations in respect of the Guarantee.

**FACTORS WHICH ARE MATERIAL FOR THE PURPOSE OF ASSESSING THE MARKET RISKS ASSOCIATED WITH NOTES ISSUED UNDER THE PROGRAMME**

***Notes are subject to optional redemption by the Issuer. If the Issuer has the right to redeem any Notes at its option, this may limit the market value of the Notes concerned and an investor may not be able to reinvest the redemption proceeds in a manner which achieves a similar effective return***

An optional redemption feature is likely to limit the market value of Notes. During any period when the Issuer may elect to redeem Notes, the market value of those Notes generally will not rise substantially above the price at which they can be redeemed. This also may be true prior to any redemption period.

The Issuer may be expected to redeem Notes when its cost of borrowing is lower than the interest rate on the Notes. At those times, an investor generally would not be able to reinvest the redemption proceeds at an effective interest rate as high as the interest rate on the Notes being redeemed and may only be able to do so at a significantly lower rate. Potential investors should consider reinvestment risk in light of other investments available at that time.

*Interest rate risks*

Investment in Fixed Rate Notes involves the risk that subsequent changes in market interest rates may adversely affect the value of Fixed Rate Notes. A drop in the level of interest rates will have a positive impact on the price of the Fixed Rate Notes, as such Notes pay a fixed annual rate of interest. Conversely, an increase in the interest rate level will have an adverse impact on the price of the Fixed Rate Notes. For investors holding the Fixed Rate Notes until maturity, any changes in the interest rate level during the term will not affect the yield of the Fixed Rate Notes, as the Fixed Rate Notes will be redeemed at par.

***Notes which are issued at a substantial discount or premium may experience price volatility in response to changes in market interest rates***

The market values of securities issued at a substantial discount (such as Zero Coupon Notes) or premium to their principal amount tend to fluctuate more in relation to general changes in interest rates than do prices for more conventional interest-bearing securities. Generally, the longer the remaining term of such securities, the greater the price volatility as compared to more conventional interest-bearing securities with comparable maturities. Such volatility could have a material adverse effect on the value of and return on any such Notes.

In any event, the market price of the Notes may be volatile, which could cause the value of a purchaser's investment to decline. Securities markets worldwide experience significant price and volume fluctuations. This market volatility, and corresponding fluctuations in the prices of the Notes, may not be correlated in a predictable way to the performance or operating results of the Guarantor. Events and factors that may cause the prices of the Notes to fluctuate or decrease significantly from the issue price include variations in interest rates; general business, political, social and economic developments; and variations in actual or anticipated operating results of the Guarantor.

## FACTORS RELATED TO THE NOTES GENERALLY

***The Conditions contain provisions which may permit the amendment or modification of the Notes without the consent of all Noteholders***

The Conditions contain provisions for calling meetings of Noteholders (including by way of telephony or electronic platform or facility) to consider matters affecting their interests generally and to obtain Written Resolutions (as defined in the Agency Agreement (as defined below)) on matters relating to the Notes from Noteholders without calling a meeting. A Written Resolution signed by or on behalf of the holders of not less than 75% in principal amount of the Notes of the relevant Series who for the time being are entitled to receive notice of a meeting in accordance with the provisions of the Agency Agreement and whose Notes are outstanding shall, for all purposes, take effect as an Extraordinary Resolution.

In certain circumstances, where the Notes are held in global form in the clearing systems, the Issuer and the Guarantor (as the case may be) will be entitled to rely upon:

(i) where the terms of the proposed resolution have been notified through the relevant clearing system(s), approval of a resolution proposed by the Issuer or the Guarantor (as the case may be) given by way of electronic consents communicated through the electronic communications systems of the relevant clearing systems in accordance with their operating rules and procedures by or on behalf of the holders of not less than 75% in nominal amount of the Notes of the relevant Series for the time being outstanding; and

(ii) where electronic consent is not being sought, consent or instructions given in writing directly to the Issuer and/or the Guarantor (as the case may be) by accountholders in the clearing systems with entitlements to such global note or certificate or, where the accountholders hold such entitlement on behalf of another person, on written consent from or written instruction by the person for whom such entitlement is ultimately beneficially held (directly or via one or more intermediaries), provided that the Issuer and the Guarantor have obtained commercially reasonable evidence to ascertain the validity of such holding and

taken reasonable steps to ensure such holding does not alter following the given of such consent/instruction and prior to effecting such resolution.

A Written Resolution or an electronic consent as described above may be effected in connection with any matter affecting the interests of Noteholders, including the modification of the Conditions, that would otherwise be required to be passed at a meeting of Noteholders satisfying the special quorum in accordance with the provisions of the Agency Agreement, and shall for all purposes take effect as an Extraordinary Resolution passed at a meeting of Noteholders duly convened and held. These provisions permit defined majorities to bind all Noteholders including Noteholders who did not attend and vote at the relevant meeting and Noteholders who voted in a manner contrary to the majority.

***The value of the Notes could be adversely affected by a change in English law or administrative practice***

The Conditions are governed by English law in effect as at the date of this Offering Circular. No assurance can be given as to the impact of any possible judicial decision or change to English law or administrative practice after the date of this Offering Circular nor whether any such change could adversely affect the ability of the Issuer to make payments under the Notes.

***Investors who hold less than the minimum Specified Denomination may be unable to sell their Notes and may be adversely affected if Definitive Notes are subsequently issued***

The Conditions of the Notes do not permit the sale or transfer of Notes in such circumstances as would result in amounts being held by a holder which are lower than the minimum Specified Denomination (as defined in the Conditions). However, in the event that a holder holds a principal amount of less than the minimum Specified Denomination, such holder would need to purchase an additional amount of Notes such that it holds an amount equal to at least the minimum Specified Denomination to be able to trade such Notes. Noteholders should be aware that Notes which have a denomination that is not an integral multiple of the minimum Specified Denomination may be illiquid and difficult to trade.

If a Noteholder holds an amount which is less than the minimum Specified Denomination in their account with the relevant clearing system at the relevant time, such Noteholder may not receive a Definitive Note (as defined below) in respect of such holding (should Definitive Notes be issued) and would need to purchase a principal amount of Notes such that its holding amounts to at least a Specified Denomination in order to be eligible to receive a Definitive Note.

If Definitive Notes are issued, holders should be aware that Definitive Notes which have a denomination that is not an integral multiple of the minimum Specified Denomination may be illiquid and difficult to trade.

***Holders of Notes held through Euroclear and Clearstream, Luxembourg must rely on procedures of those clearing systems to effect transfers of Notes, receive payments in respect of Notes and vote at meetings of Noteholders***

Notes issued under the Programme will be represented on issue by one or more Global Notes that may be deposited with a common depositary for Euroclear and Clearstream, Luxembourg (each as defined under "*Summary of provisions relating to the Notes while in global form*"). Except in the circumstances described in each Global Note, investors will not be entitled to receive Definitive Notes. Each of Euroclear and Clearstream, Luxembourg and their respective direct and indirect participants will maintain records of the beneficial interests in each Global Note held through it. While the Notes are represented by a Global Note, investors will be able to trade their beneficial interests only through the relevant clearing systems and their respective participants.

While the Notes are represented by Global Notes, each of the Issuer and the Guarantor will discharge its payment obligations under the Notes by making payments through the relevant clearing systems. A holder of a beneficial interest in a Global Note must rely on the procedures of the relevant clearing system and its participants to receive payments under the Notes. The Issuer and the Guarantor have no responsibility or liability for the records relating to, or payments made in respect of, beneficial interests in any Global Note.

Holders of beneficial interests in a Global Note will not have a direct right to vote in respect of the Notes so represented. Instead, such holders will be permitted to act only to the extent that they are enabled by the relevant clearing system and its participants to appoint appropriate proxies. Similarly, holders of beneficial interests in the Global Notes will not have a direct right under the Global Notes to take enforcement action against the Issuer or the Guarantor in the event of a default under the relevant Notes, but will have to rely upon their rights under the Deed of Covenant (as defined below).

*Risks related to Notes which are linked to "benchmarks"*

Reference rates and indices, including interest rate benchmarks, which are used to determine the amounts payable under financial instruments or the value of such financial instruments ("**Benchmarks**"), have, in recent years, been the subject of political and regulatory scrutiny as to how they are created and operated. This has resulted in regulatory reform and changes to existing Benchmarks, with further changes anticipated. These reforms and changes may cause a Benchmark to perform differently than it has done in the past or to be discontinued. Any change in the performance of a Benchmark or its discontinuation, could have a material adverse effect on any Notes referencing or linked to such Benchmark.

Where Screen Rate Determination is specified as the manner in which the Rate of Interest in respect of Floating Rate Notes is to be determined, the Conditions provide that the Rate of Interest shall be determined by reference to the Relevant Screen Page (or its successor or replacement). In circumstances where such Original Reference Rate is discontinued, neither the Relevant Screen Page, nor any successor or replacement may be available.

Where the Relevant Screen Page is not available, and no successor or replacement for the Relevant Screen Page is available, the Conditions provide for the Rate of Interest to be determined by the Calculation Agent by reference to quotations from banks communicated to the Calculation Agent.

Where such quotations are not available (as may be the case if the relevant banks are not submitting rates for the determination of such Original Reference Rate), the Rate of Interest may ultimately revert to the Rate of Interest applicable as at the last preceding Interest Determination Date before the Original Reference Rate was discontinued. Uncertainty as to the continuation of the Original Reference Rate, the availability of quotes from reference banks, and the rate that would be applicable if the Original Reference Rate is discontinued may adversely affect the value of, and return on, the Floating Rate Notes.

Benchmark Events include (amongst other events) (i) the Original Reference Rate ceasing to be published as a result of such benchmark ceasing to be calculated or administered for a period of at least 5 Business Days or ceasing to exist and (ii) a public statement or publication of information by the administrator of the Original Reference Rate that it has ceased or that it will, by a specified future date, cease publishing the Original Reference Rate permanently or indefinitely (in circumstances where no successor administrator has been appointed that will continue publication of the Original Reference Rate). If a Benchmark Event occurs in relation to an Original Reference Rate when any Rate of Interest (or any component part thereof) remains to be determined by reference to such Original Reference Rate, the Issuer shall use its reasonable endeavours to appoint an Independent Adviser, as soon as reasonably practicable, to determine a Successor Rate, failing which an Alternative Rate. The use of any such Successor Rate or Alternative Rate to determine the Rate of Interest is likely to result in Notes initially linked to or referencing the Original Reference Rate performing differently (which may include payment of a lower Rate of Interest) than they would do if the Original Reference Rate were to continue to apply in its current form. In addition, the market (if any) for Notes linked to any such Successor Rate or Alternative Rate may be less liquid than the market for Notes linked to the Original Reference Rate. Prospective investors should note that an Independent Adviser appointed pursuant to the Conditions shall, in the absence of bad faith or fraud have no liability whatsoever to the Issuer, the Guarantor, the Fiscal Agent, the Paying Agents, the Noteholders or the Couponholders for any determination made by it pursuant to the Conditions.

Furthermore, if a Successor Rate or Alternative Rate for the Original Reference Rate is determined by the Independent Adviser, the Conditions provide that the Issuer may vary the Agency Agreement and the Conditions, as necessary to ensure the proper operation of such Successor Rate or Alternative Rate, without any requirement for consent or approval of the Noteholders.

If a Successor Rate or Alternative Rate is determined by the Independent Adviser, the Conditions also provide that an Adjustment Spread will be determined by the Independent Adviser and applied to such Successor Rate or Alternative Rate. The Adjustment Spread is (i) the spread, formula or methodology which is formally recommended in relation to the replacement of the Original Reference Rate with the Successor Rate by any Relevant Nominating Body (which may include a relevant central bank, supervisory authority or group of central banks and/or supervisory authorities), (ii) if no such recommendation has been made, or in the case of an Alternative Rate, the spread, formula or methodology which the Independent Adviser determines is customarily applied to the relevant Successor Rate or the Alternative Rate (as the case may be) in international debt capital markets transactions to produce an industry-accepted replacement rate for the Original Reference Rate, or (iii) if the Independent Adviser determines that no such spread is customarily applied, the spread, formula or methodology which the Independent Adviser determines is recognised or acknowledged as being the industry

standard for over-the-counter derivative transactions which reference the Original Reference Rate, where such rate has been replaced by the Successor Rate or the Alternative Rate, as the case may be.

Accordingly, the application of an Adjustment Spread may result in the Notes performing differently (which may include payment of a lower Rate of Interest) than they would do if the Original Reference Rate were to continue to apply in its current form. The choice of replacement Benchmark is uncertain and could result in the replacement Benchmark being unavailable or indeterminable.

The Issuer may be unable to appoint an Independent Adviser or the Independent Adviser may not be able to determine a Successor Rate or Alternative Rate in accordance with the Conditions.

Where the Issuer is unable to appoint an Independent Adviser, or the Independent Adviser fails to determine a Successor Rate or Alternative Rate before the date which is 10 business days prior to the next Interest Determination Date, the Rate of Interest for the next succeeding Interest Accrual Period will be the Rate of Interest last determined in relation to the Notes in respect of the immediately preceding Interest Accrual Period before the occurrence of the Benchmark Event, or where the Benchmark Event occurs before the first Interest Payment Date, the Rate of Interest will be the initial Rate of Interest.

Applying the initial Rate of Interest, or the Rate of Interest applicable as at the last preceding Interest Determination Date before the occurrence of the Benchmark Event is likely to result in Notes linked to or referencing the relevant Benchmark performing differently (which may include payment of a lower Rate of Interest) than they would do if the relevant Benchmark were to continue to apply, or if a Successor Rate or Alternative Rate could be determined.

If the Issuer is unable to appoint an Independent Adviser or the Independent Adviser fails to determine a Successor Rate or Alternative Rate for the life of the relevant Notes, the initial Rate of Interest, or the Rate of Interest applicable as at the last preceding Interest Determination Date before the occurrence of the Benchmark Event, will continue to apply to maturity. This will result in the Floating Rate Notes, in effect, becoming Fixed Rate Notes.

Where ISDA Determination is specified as the manner in which the Rate of Interest in respect of Floating Rate Notes is to be determined, the Conditions provide that the Rate of Interest in respect of the Notes shall be determined by reference to the relevant Floating Rate Option in the 2006 ISDA Definitions or 2021 ISDA Definitions. Where the Floating Rate Option specified is an "IBOR" Floating Rate Option, the Rate of Interest may be determined by reference to the relevant screen rate or the rate determined on the basis of quotations from certain banks. If the relevant IBOR is permanently discontinued and the relevant screen rate or quotations from banks (as applicable) are not available, the operation of these provisions may lead to uncertainty as to the Rate of Interest that would be applicable, and may, adversely affect the value of, and return on, the Floating Rate Notes.

### *Appointment of Dealers as Calculation Agents*

The Issuer may appoint a Dealer as Calculation Agent in respect of an issuance of Notes. In such a case, the Calculation Agent is likely to be a member of an international financial group that is involved, in the ordinary course of its business, in a wide range of banking activities out of which conflicting interests may arise. Whilst such a Calculation Agent will, where relevant, have information barriers and procedures in place to manage conflicts of interest, it may in its other banking activities from time to time be engaged in transactions involving an index or related derivatives which may affect amounts receivable by Noteholders during the term and on the maturity of the Notes or the market price, liquidity or value of the Notes and which could be deemed to be adverse to the interests of the Noteholders.

## FACTORS RELATED TO THE MARKET GENERALLY

### *An active secondary market in respect of the Notes may never be established or may be illiquid and this would adversely affect the value at which an investor could sell their Notes*

Notes issued under the Programme will (unless they are to be consolidated into a single Series with any Notes previously issued) be new securities which may not be widely distributed and for which there is currently no active trading market. Notes may have no established trading market when issued, and one may never develop. If a market does develop, it may not be very liquid, and Notes may trade at a discount to their initial offering price depending on prevailing interest rates, market for similar securities, general economic conditions and the Guarantor's financial condition. Therefore, investors may not be able to sell their Notes easily or at prices that will provide them with a yield comparable to similar investments that have a developed secondary market. This

is particularly the case for the Notes that are especially sensitive to interest rate, currency or market risks, are designed for specific investment objectives or strategies or have been structured to meet the investment requirements of limited categories of investors. These types of Notes generally would have a more limited secondary market and more price volatility than conventional debt securities. Illiquidity may have a severely adverse effect on the market value of the Notes. In addition, liquidity may be limited if the Issuer makes large allocations to a limited number of investors.

***Credit ratings assigned to the Issuer, the Guarantor, the Programme or any Notes may not reflect all the risks associated with an investment in those Notes***

One or more independent credit rating agencies may assign credit ratings to the Issuer, the Guarantor and the Programme. The ratings may not reflect the potential impact of all risks related to structure, market, additional factors discussed above and other factors that may affect the value of the Notes.

In general, European regulated investors are restricted under the CRA Regulation from using credit ratings for regulatory purposes in the EEA, unless such ratings are issued by a credit rating agency established in the EEA and registered under the CRA Regulation (and such registration has not been withdrawn or suspended, subject to transitional provisions that apply in certain circumstances). Such general restriction will also apply in the case of credit ratings issued by third-country non-EEA credit rating agencies, unless the relevant credit ratings are endorsed by an EEA-registered credit rating agency or the relevant third country rating agency is certified in accordance with the CRA Regulation (and such endorsement action or certification, as the case may be, has not been withdrawn or suspended, subject to transitional provisions that apply in certain circumstances). The list of registered and certified rating agencies published by the European Securities and Markets Authority ("**ESMA**") on its website in accordance with the CRA Regulation is not conclusive evidence of the status of the relevant rating agency being included in such list, as there may be delays between certain supervisory measures being taken against a relevant rating agency and the publication of an updated list.

Investors regulated in the UK are subject to similar restrictions under the UK CRA Regulation. As such, in general, UK regulated investors are required to use for UK regulatory purposes ratings issued by a credit rating agency established in the UK and registered under the UK CRA Regulation. In the case of ratings issued by third country non-UK credit rating agencies, third country credit ratings can either be: (a) endorsed by a UK-registered credit rating agency; or (b) issued by a third country credit rating agency that is certified in accordance with the UK CRA Regulation. Note this is subject, in each case, to (x) the relevant UK registration, certification or endorsement, as the case may be, not having been withdrawn or suspended, and (y) transitional provisions that apply in certain circumstances.

If the status of the rating agency rating the Notes changes for the purposes of the CRA Regulation or the UK CRA Regulation, relevant regulated investors may no longer be able to use the rating for regulatory purposes in the EEA or UK, as applicable, and the Notes may have a different regulatory treatment, which may impact the value of the Notes and their liquidity in any secondary market. Certain information with respect to the credit rating agencies and ratings is set out on the cover of this Offering Circular.

***Exchange rate risks and exchange controls***

The Issuer (failing which, the Guarantor) will pay principal and interest on the Notes in the Specified Currency. This presents certain risks relating to currency conversions if an investor's financial activities are denominated principally in a currency or currency unit (the "**Investor's Currency**") other than the Specified Currency. These include the risk that exchange rates may significantly change (including changes due to devaluation of the Specified Currency or revaluation of the Investor's Currency) and the risk that authorities with jurisdiction over the Investor's Currency may impose or modify exchange controls. An appreciation in the value of the Investor's Currency relative to the Specified Currency would decrease (1) the Investor's Currency-equivalent yield on the Notes, (2) the Investor's Currency-equivalent value of the principal payable on the Notes and (3) the Investor's Currency-equivalent market value of the Notes.

Government and monetary authorities may impose (as some have done in the past) exchange controls that could adversely affect an applicable exchange rate. As a result, investors may receive less interest or principal than expected, or no interest or principal. Even if there are no actual exchange controls, it is possible that the Specified Currency for any particular Note not denominated in U.S. dollars would not be available at the maturity of a series of Notes. In that event, the Issuer would make required payments in U.S. dollars on the basis of the market exchange rate on the date of such payment, or if such rate of exchange is not then available, on the basis of the market exchange rate as at the most recent practicable date.

*Legal investment considerations may restrict certain investments*

The investment activities of certain investors are subject to legal investment laws and regulations, or review or regulation by certain authorities. Each potential investor should consult its legal advisers to determine whether and to what extent (i) the Notes are legal investments for it, (ii) the Notes can be used as collateral for various types of borrowing and (iii) other restrictions apply to its purchase or pledge of the Notes. Financial institutions should consult their legal advisers or the appropriate regulators to determine the appropriate treatment of the Notes under any applicable risk-based capital or similar rules.

*There can be no assurance that the use of proceeds of Notes identified as Green Bonds in the relevant Pricing Supplement will be suitable for the investment criteria of an investor*

The Pricing Supplement relating to any specific Tranche of Notes may provide that such Notes will constitute "Green Bonds" ("**Green Bonds**") in accordance with the principles set out by the International Capital Markets Association ("**ICMA**"), and certain Pricing Supplements may further specify that the Notes have been issued in accordance with the Climate Bonds Standard set out by the Climate Bonds Initiative.

In both cases, it will be the Issuer's and the Guarantor's intention to apply an amount at least equal to the net proceeds of such Notes to finance, refinance and/or invest, in whole or in part, in new or existing Eligible Green Projects (as defined in the Framework). The Issuer and the Guarantor will exercise their judgment and sole discretion in determining the businesses and projects that will be financed by the proceeds. Prospective investors should have regard to the information set out in "*Use of Proceeds*" below and/or the applicable Pricing Supplement relating to such Notes and must determine for themselves the relevance of such information for the purpose of any investment in the Notes together with any other investigation such investors deem necessary, and must assess the suitability of that investment in light of their own circumstances. In particular, no assurance is given by the Issuer, the Guarantor or the Dealers that the use of such proceeds for the funding of any Eligible Green Projects will satisfy, whether in whole or in part, any present or future investor expectations or requirements as regards any investment criteria or guidelines with which such investor or its investments are required to comply, whether by any present or future applicable law or regulations or by its own by-laws or other governing rules or investment portfolio mandates.

There is no clear definition (legal, regulatory or otherwise) of, nor any market consensus as to what constitutes, a "green" or similarly labelled project or as to what attributes are required for a particular project to be so considered, nor can any assurance be given that such a clear definition or consensus will develop over time or that any prevailing market consensus will not significantly change. The EU's regulation on the establishment of a framework to facilitate sustainable investment, which is subject to a phased implementation, may provide some definition for such topics within the EU.

As such, no assurance is or can be given by the Issuer, the Guarantor, any other member of the Group, the Arrangers, any Dealer or any other person to investors that (a) the use of proceeds of any Green Bonds, or the business or projects funded thereby, will satisfy, whether in whole or in part any future legislative or regulatory requirements, or any present or future investor expectations or requirements with respect to investment criteria or guidelines with which any investor or its investments are required to comply under its own by-laws or other governing rules or investment portfolio mandates; (b) any Notes will comply with any future standards or requirements regarding any "green" or other equivalently-labelled performance objectives and, accordingly, the status of any Notes as being "green" (or equivalent) could be withdrawn at any time; (c) any adverse environmental and/or other impacts will not occur during the implementation of any projects or uses the subject of, or related to, any Eligible Green Projects; or (d) any event with an adverse environmental or other connotation (such as, for example, the acquisition by the Fund of a company that is not aligned with environmental, social and governance values) will not occur during the life of any Green Bond, which event may affect the value of such Green Bonds, and/or have adverse consequences for certain investors in such Green Bond.

While it is the intention of the Issuer and the Guarantor to apply an amount at least equal to the net proceeds and obtain and publish the relevant reports and opinions of any Green Bonds in, or substantially in, the manner described in the Framework and the applicable Pricing Supplement, there can be no assurance that the application of such proceeds to the relevant Eligible Green Projects will be capable of being implemented in, or substantially in, such manner and/or in accordance with any timeframe, or that such proceeds will be totally or partially disbursed as planned. Nor can there be any assurance that such Green Bonds or the activities or projects they finance, refinance or invest in will have the results or outcome (whether or not related to environmental or other objectives) originally expected or anticipated by the Issuer and the Guarantor. Any such event or failure by the Issuer and/or the Guarantor to apply the proceeds to the relevant Eligible Green Projects, or to obtain and publish

any such reports and opinions, will not give rise to any claim in contract of a holder of any Green Bonds against the Issuer, the Guarantor, any other member of the Group, the Arrangers, any Dealer or any other person. Any such event or failure by the Issuer and/or the Guarantor will not constitute an Event of Default with respect to any Green Bonds. Similarly, while the Issuer and the Guarantor intend to provide regular information on the use of proceeds of any Green Bonds, any failure to do so will not constitute an Event of Default in respect of any Green Bonds. In addition, prospective investors should note that the Issuer and the Guarantor have no contractual obligation to use the proceeds as stated in, or to provide the reports described in the Framework and as such, may change the Framework and/or the selection criteria it uses to select Eligible Green Projects at any time.

Any such event or failure to apply an amount at least equal to the net proceeds of any issue of Green Bonds as intended, any withdrawal of any applicable report, opinion, assessment or certification to the effect that either the Issuer or the Guarantor is not complying in whole or in part with criteria or requirements covered by such report, opinion, assessment or certification or any change to the Framework and/or selection criteria may have an adverse effect on the value of Green Bonds, and may result in adverse consequences for certain investors with portfolio mandates to invest in securities to be used for a particular purpose.

No Dealer makes any representation as to (i) the suitability of any Green Bonds to fulfil environmental criteria required by prospective investors, (ii) whether an amount at least equal to the net proceeds of the issuance of any Green Bonds will be used to finance, refinance and/or invest in relevant Eligible Green Projects, including their green criteria or (iii) the characteristics of relevant Eligible Green Projects, or businesses to whom the proceeds of Green Bonds are applied or invested, including their green characteristics. No Dealer involved in the issue of a specific tranche of Green Bonds has undertaken, nor is responsible for, any assessment of the eligibility criteria, any verification of whether the Eligible Green Projects meet the eligibility criteria, or the monitoring of the use of proceeds. Investors should refer to the Guarantor's website and second-party opinion for information and should determine for themselves the relevance of the information contained in this Offering Circular regarding the use of proceeds and its investment in any Green Bonds should be based upon such investigation as it deems necessary.

***The Guarantor and the Issuer cannot provide any assurances regarding the suitability or reliability of any second party opinion or admission to any index obtained with respect to Green Bonds***

No assurance or representation can be given as to the suitability or reliability for any purpose whatsoever of the second party opinion provided by DNV Business Assurance Services UK Limited or any opinion or certification of any third party (whether or not solicited by the Guarantor or the Issuer) which may be made available in connection with the Framework or any issue of any Green Bonds (any such second party opinion, a "**Second Party Opinion**"). No such Second Party Opinion or other certification schemes provided by any third party should be deemed or understood, or relied upon as, a recommendation by the Guarantor or the Issuer, any Dealer or any other person to buy, sell or hold any such Green Bonds. Any such Second Party Opinion is only current as of the date that such Second Party Opinion was initially issued, and is based upon the judgment of the opinion provider. Prospective investors must determine for themselves the relevance of any such Second Party Opinion and/or the information contained therein, or the reliability of the provider of such Second Party Opinion for the purpose of any investment in Green Bonds. Currently, the providers of such Second Party Opinion are not subject to any specific regulatory or other regime or oversight. Furthermore, a Second Party Opinion may not reflect the potential impact of all the risks related to the structure or market, or the additional risk factors discussed above or the other factors that may affect the value of the Notes or the projects financed or refinanced thereby, in an amount corresponding to an amount at least equal to the net proceeds of the relevant issue of Green Bonds. A withdrawal of the Second Party Opinion may affect the value of such Green Bonds, and/or may have consequences for certain investors with portfolio mandates to invest in green assets.

If a Tranche of Notes is at any time listed on, admitted to or included in any dedicated "green", "environmental" or other equivalently-labelled index, no representation or assurance is given by the Issuer, the Guarantor, the Arrangers, any Dealer or any other person that such listing on, admission to or inclusion in such index satisfies any present or future investor expectations or requirements as regards to any investment criteria or guidelines with which such investor or its investments are required to comply, whether by any present or future applicable law or regulations or by its own constitutive documents or other governing rules or investment portfolio mandates, in particular with regard to any direct or indirect environmental impact of any projects or uses, the subject of or related to, any of the businesses and projects funded with the proceeds from any Green Bonds. Furthermore, it should be noted that the criteria for any such listings or admission to trading may vary from one stock exchange or securities market to another. Nor is any representation or assurance given or made by the Issuer, the Guarantor, the Arrangers, any Dealer or any other person that any such listing or admission to trading will be obtained in

respect of any such Notes or, if obtained, that any such listing or admission to trading will be maintained during the life of the Notes.

## FACTORS RELATED TO ENFORCEMENT

### *Noteholders may only enforce the Notes or the Guarantee through arbitration before the LCIA*

The payments under the Notes are dependent upon the Issuer making payments to investors in the manner contemplated under the Notes. If the Issuer fails to do so, it may be necessary to bring an action against the Issuer and (if the Guarantor should fail to make payments under the Guarantee) the Guarantor to enforce its obligations and/or to claim damages, as appropriate, which may be costly and time consuming.

Pursuant to the Guarantee, the Guarantor has unconditionally and irrevocably guaranteed that, among other matters, if the Issuer does not pay any sum payable by it under the Notes by the time and on the date specified for such payment (whether on the normal due date, on acceleration or otherwise), the Guarantor shall pay that sum to each Noteholder before close of business on that date in the city to which payment is so to be made.

Enforcement of the Guarantee against the Guarantor will be subject to certain defences available to the Guarantor in the Kingdom (see "—*Limitations on enforcement of the Guarantee*"). Limitations on the enforceability of foreign arbitral awards in the Kingdom could limit the enforceability of the Guarantee against the Guarantor.

The Notes, the Agency Agreement, the Deed of Covenant, the Deed of Guarantee and the Dealer Agreement are governed by English law and the parties to such documents have agreed to refer any unresolved dispute in relation to such documents to arbitration under the Rules of the LCIA. Noteholders will therefore only have recourse to LCIA arbitration in order to enforce their contractual rights under the Notes or the Guarantee and will not have the right to bring proceedings relating to the Notes or the Guarantee before the English courts.

The Guarantor is the sovereign wealth fund of the Kingdom and a substantial portion of its assets and operations are located in the Kingdom. As such, any delay in the enforcement of, or any inability to enforce, an arbitral award relating to the Notes or the Guarantee in the Kingdom could have a material adverse effect on Noteholders' recourse to the Guarantor's assets to satisfy amounts due under the Notes and the Guarantee.

The Kingdom is a party to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958 (the "**New York Convention**"). Accordingly, courts in the Kingdom have an obligation to recognise and enforce foreign arbitral awards unless (i) the party opposing enforcement can prove one of the grounds under Article V of the New York Convention to refuse enforcement, which include, without limitation, that the agreement is not valid under the law governing it, the party against whom the award is invoked was not given proper notice of the arbitration proceeding, the award contains decisions beyond the scope of the matters submitted to arbitration and the award has been set aside or suspended by a competent authority of the country in which, or under the law of which, the award was made, or (ii) Saudi Arabian courts find that the subject matter of the dispute is not capable of settlement by arbitration or enforcement or would be contrary to the public policy of the Kingdom. In reliance on such public policy exception, Saudi Arabian adjudicatory bodies would enforce only those portions of the award which, in the view of the Saudi Arabian adjudicatory bodies, do not contravene the principles of *Shari'ah* or Saudi Arabian public policy such as, award of interest. There can, therefore, be no assurance that the Saudi Arabian courts will enforce a foreign arbitral award in accordance with the terms of the New York Convention (or any other multilateral or bilateral enforcement convention). In addition, enforcement of any arbitral award in the Kingdom is subject to filing a legal action for recognition and enforcement of the foreign arbitral award with the enforcement departments of the general courts in the Kingdom, which can take considerable time.

If, for whatever reason, a foreign arbitral award was not enforced in whole or in part under the aforementioned procedures, the claimants would need to institute a new proceeding in the Kingdom before the appropriate adjudicatory body and the outcome of such proceeding would be governed in all respects by Saudi Arabian law and procedure.

### *Service of process on the Guarantor and enforcement of an arbitral award against the Guarantor's assets in the Kingdom may be subject to a newly issued and untested law that is not yet in force*

The enforcement of foreign judgments and foreign arbitral awards against public entities (such as the Guarantor which has public legal personality) are to be subject to the recently issued Saudi law of enforcement before the Board of Grievances issued by Royal Decree M/15 dated 27/01/1443H (corresponding to 4 September 2021) (the "**Administrative Enforcement Law**"). The Administrative Enforcement Law is to come into force within two

years of its issuance but as at the date of this Offering Circular is not yet in force. Pursuant to the Administrative Enforcement Law, a circuit court may issue an enforcement order against a public entity after notifying the public entity of the enforcement claim and the lapse of a warning period. Even though the Administrative Enforcement Law provides clarity on the process for enforcing against public entities, it remains entirely untested. The Administrative Enforcement Law will be implemented at the latest by 4 September 2023 and its implementing regulations have not yet been issued.

As such, there remains substantial uncertainty as to the approach that the judiciary will take in implementing and interpreting the Administrative Enforcement Law and in turn as to the process and timeframe for enforcement of arbitral awards against public entities, including the Guarantor.

### Limitations on enforcement of the Guarantee

Under Saudi Arabian law there is no distinction between a guarantee as a secondary obligation and an indemnity as a primary obligation, and it is likely that a court or judicial committee in the Kingdom would treat both obligations as being in the nature of a guarantee. Therefore, the limitations discussed in this section apply equally to obligations expressed to be guarantees and obligations expressed to be indemnities.

If any of the guaranteed obligations of the Issuer under the transaction documents proves to be illegal or unenforceable under Saudi Arabian law, the Guarantee provided by the Guarantor and any obligation held by a Saudi court or judicial committee to constitute a guarantee would, in respect of those underlying obligations, also be held to be unenforceable by the courts or judicial committees of the Kingdom. For example, given a court or judicial committee in the Kingdom may refuse to recognise the failure of the Issuer to pay any amount in the nature of, or otherwise related to the payment of, interest or deemed interest as an event of default, the Noteholders may, in turn, be unable to rely upon such a failure as an event of default under the terms of such agreements which may in turn limit their recourse against the Guarantor. A court or judicial committee in the Kingdom may also refuse to give a judgment in respect of principal amounts to the Noteholders in an amount greater than the principal sums found by such court or judicial committee to be due and payable less the sums in the nature of interest already paid by the Issuer or the Guarantor to the Noteholders, as any amount in excess of the principal amounts due may be regarded as unlawful interest. See also "*Enforcing payments of interest*".

In addition, the obligations of the Guarantor cannot be stricter than the guaranteed obligations of the Issuer. Accordingly, the Guarantor would have, in addition to its own defences arising out of the Guarantee, the right to avail itself of any defences under Saudi Arabian law arising out of the underlying guaranteed obligations. Moreover, an open-ended guarantee that does not specify any limit on the guaranteed obligations (such as the Guarantee) may not be enforceable under Saudi Arabian law.

Additionally, there are certain limitation periods within which a claim would have to be filed before the relevant court or judicial committee in the Kingdom, failing which such claim could be time-barred. Under the Administrative Enforcement Law, the party seeking enforcement must seek the right, prior to raising it under the law, within ten years of the date in which the judgment became final, or from the date the right arose by virtue of other enforcement instruments.

If one or more of these defences and limitations is applicable, the Guarantor may have no liability or decreased liability under the Guarantee. If a court voided the Guarantee, or found it to be invalid or unenforceable, in whole or in part, for any reason, holders of the Notes may cease to have any claim against the Guarantor and may become a creditor solely of the Issuer. If, in such circumstance, the Issuer is unable to satisfy its obligations under the Notes, there is no assurance that the Issuer will be able to repay in full any amounts outstanding under the Notes.

### Enforcing payments of interest

Contractual obligations governing the payment of interest may not be enforceable under Saudi Arabian law. The legal regime in the Kingdom governing transactions such as the issuance of the Notes includes *Shari'ah* principles which are often expressed in general terms, providing Saudi Arabian courts and adjudicatory bodies with considerable discretion as to how to apply such principles. Under *Shari'ah* principles as applied in the Kingdom, the charging and payment of interest, which is deemed to constitute unlawful gain (*riba*), is prohibited. Consequently, a court or adjudicatory body in the Kingdom applying a strict interpretation of *Shari'ah* may not enforce such contractual provisions and the future consistency of Saudi courts or adjudicatory bodies regarding the payment of interest (which may include payments on the Notes) cannot be predicted.

***There can be no assurance as to whether the waiver of immunity provided by the Issuer and the Guarantor will be valid and binding under the laws of the Kingdom***

Under Saudi Arabian law, no seizure of or execution may be made against state-owned assets and the taking of enforcement action against a public entity is prohibited. The Issuer and the Guarantor have waived their rights in relation to sovereign or other immunity in respect of Notes issued under the Programme. See Condition 16(c) (*Waiver of Immunity*). However, there can be no assurance as to whether such waivers of immunity from execution or attachment or other legal process by it under the Notes, the Agency Agreement, the Deed of Guarantee and the Deed of Covenant are valid and binding under the laws of the Kingdom. If the waiver is not valid and binding, there is a risk that investors may not be able to enforce any claim, award or judgment against the Issuer or the Guarantor in the Kingdom.

## OVERVIEW OF THE PROGRAMME

*The following overview does not purport to be complete and is taken from, and is qualified in its entirety by, the remainder of this Offering Circular and, in relation to the terms and conditions of any particular Tranche of Notes, the applicable Pricing Supplement. The Issuer, the Guarantor and the relevant Dealer(s) may agree that Notes shall be issued in a form other than that contemplated in the Conditions, in which event, a new offering circular or a supplement to the Offering Circular, if appropriate, will be made available which will describe the effect of the agreement reached in relation to such Notes.*

*Words and expressions defined in "Terms and Conditions of the Notes" shall have the same meanings in this overview.*

| | |
|---|---|
| **Issuer:** | GACI First Investment Company. |
| **Legal Entity Identifier of the Issuer:** | 558600TU1PWGNLZ3XM88. |
| **Guarantor:** | The Public Investment Fund. |
| **Legal Entity Identifier of the Guarantor:** | 558600EF1LZ82YHRMV66. |
| **Website of the Guarantor:** | https://www.pif.gov.sa/ |
| **Description:** | Guaranteed Euro Medium Term Note Programme. |
| **Size:** | The programme is unlimited in amount. |
| **Arrangers:** | BNP Paribas, Citigroup Global Markets Limited, Deutsche Bank AG, London Branch, Goldman Sachs International and J.P. Morgan Securities plc. |
| **Dealers:** | The Arrangers and Crédit Agricole Corporate and Investment Bank, First Abu Dhabi Bank PJSC, HSBC Bank plc, Mizuho International plc, SMBC Nikko Capital Markets Limited, SNB Capital Company, Société Générale and Standard Chartered Bank. |
| | The Issuer may from time to time terminate the appointment of any dealer under the Programme or appoint additional dealers either in respect of one or more Tranches or in respect of the whole Programme. References in this Offering Circular to "Permanent Dealers" are to the persons listed above as Dealers and to such additional persons that are appointed as dealers in respect of the whole Programme (and whose appointment has not been terminated) and references to "Dealers" are to all Permanent Dealers and all persons appointed as a dealer in respect of one or more Tranches. |
| **Fiscal Agent:** | Deutsche Bank AG, London Branch. |
| **Registrar:** | Deutsche Bank Luxembourg S.A. |

| | |
|---|---|
| **Method of Issue:** | The Notes will be issued on a syndicated or non-syndicated basis. The Notes will be issued in series (each a "**Series**") having one or more issue dates and on terms otherwise identical (or identical other than in respect of the first payment of interest), the Notes of each Series being intended to be interchangeable with all other Notes of that Series. Each Series may be issued in tranches (each a "**Tranche**") on the same or different issue dates. The specific terms of each Tranche (which will be completed, where necessary, with the relevant terms and conditions and, save in respect of the issue date, issue price, first payment of interest and nominal amount of the Tranche, will be identical to the terms of other Tranches of the same Series) will be completed in the relevant Pricing Supplement. |
| **Denomination:** | Notes will be issued in minimum denominations of at least €100,000 (or its equivalent in other currencies), subject to compliance with all applicable legal and/or regulatory requirements. |
| **Issue Price:** | Notes may be issued at their nominal amount or at a discount or premium to their nominal amount. The price and amount of Notes to be issued will be determined by the Issuer, the Guarantor and the relevant Dealer(s). |
| **Form of Notes:** | The Notes may be issued in bearer form or in registered form only. During the 40-day "distribution compliance period" (as such term is defined in Rule 902 of Regulation S), book-entry interests in the Global Notes may be transferred only outside the United States to non-U.S. persons under Regulation S. Each Tranche of Bearer Notes will be represented on issue by a temporary Global Note if (i) definitive Notes are to be made available to Noteholders following the expiry of 40 days after their issue date or (ii) such Notes have an initial maturity of more than one year and are being issued in compliance with the D Rules (as defined in "–*Selling Restrictions*" below), otherwise such Tranche will be represented by a permanent Global Note. Registered Notes will be represented by Certificates, one Certificate being issued in respect of each Noteholder's entire holding of Registered Notes of one Series. Certificates representing Registered Notes that are registered in the name of a nominee for one or more clearing systems are referred to as "**Global Certificates**". |
| **Clearing Systems:** | Clearstream, Luxembourg, Euroclear and, in relation to any Tranche, such other clearing system as may be agreed between the Issuer, the Fiscal Agent and the relevant Dealer. |
| **Initial Delivery of Notes:** | On or before the issue date for each Tranche, the Global Note representing Bearer Notes or the Global Certificate representing Registered Notes may be deposited with a common depositary for Euroclear and Clearstream, Luxembourg. Global Notes or Global Certificates may also be deposited with any other clearing system or may be delivered outside any clearing system provided that the method of such delivery has been agreed in advance by the Issuer, the Fiscal |

Agent and the relevant Dealer. Registered Notes that are to be credited to one or more clearing systems on issue will be registered in the name of nominees or a common nominee for such clearing systems.

**Currencies:**

Subject to compliance with all applicable legal and/or regulatory requirements, Notes may be issued in any currency agreed between the Issuer, the Guarantor and the relevant Dealers.

**Maturities:**

Any maturity, subject to compliance with all applicable legal and/or regulatory requirements.

**Notes having a maturity of less than one year:**

Notes (including Notes denominated in sterling) which have a maturity of less than one year and in respect of which the issue proceeds are to be accepted by the Issuer in the UK or whose issue otherwise constitutes a contravention of section 19 of the FSMA will have a minimum denomination of £100,000 (or its equivalent in other currencies).

**Guarantee:**

The payment obligations of the Issuer under the Notes will be unconditionally and irrevocably guaranteed by the Guarantor.

**Fixed Rate Notes:**

Fixed interest will be payable in arrear on the date or dates in each year specified in the relevant Pricing Supplement.

**Floating Rate Notes:**

Floating Rate Notes will bear interest determined separately for each Series as follows:

(a) on the same basis as the floating rate under a notional interest rate swap transaction in the relevant Specified Currency governed by an agreement incorporating the ISDA Definitions; or

(b) by reference to the relevant Reference Rate (as specified in the relevant Pricing Supplement) as adjusted for any applicable margin and subject to the Benchmark discontinuation provisions set out in Condition 4(h) (*Benchmark Discontinuation*).

Interest periods will be specified in the relevant Pricing Supplement.

**Zero Coupon Notes:**

Zero Coupon Notes (as defined in Condition 4 (*Interest and other Calculations*)) may be issued at their nominal amount or at a discount to it and will not bear interest.

**Interest Periods and Interest Rates:**

The length of the interest periods for the Notes and the applicable interest rate or its method of calculation may differ from time to time or be constant for any Series. Notes may have a maximum interest rate, a minimum interest rate, or both. The use of interest accrual periods permits the Notes to bear interest at different rates in the same interest period. All

<table>
<tr><td></td><td>such information will be set out in the relevant Pricing Supplement.</td></tr>
<tr><td>**Redemption:**</td><td>The relevant Pricing Supplement will specify the basis for calculating the redemption amounts payable. Unless permitted by then current laws and regulations, Notes (including Notes denominated in sterling) which have a maturity of less than one year and in respect of which the issue proceeds are to be accepted by the Issuer in the UK or whose issue otherwise constitutes a contravention of section 19 of the FSMA must have a minimum redemption amount of £100,000 (or its equivalent in other currencies).</td></tr>
<tr><td>**Optional Redemption:**</td><td>The Pricing Supplement issued in respect of each issue of Notes will state whether such Notes may be redeemed prior to their stated maturity at the option of the Issuer (either in whole or in part) and/or the holders, and if so the terms applicable to such redemption.</td></tr>
<tr><td>**Maturity Par Call Option:**</td><td>If so specified in the applicable Pricing Supplement, the Issuer will have the option to redeem the Notes in accordance with Condition 5(e) (*Redemption at the Option of the Issuer— Maturity Par Call Option).*</td></tr>
<tr><td>**Clean Up Call Option:**</td><td>If so specified in the applicable Pricing Supplement and 75% or more of the initial aggregate principal amount of the Notes then outstanding have been redeemed and/or purchased pursuant to Condition 5 (*Redemption, Purchase and Options*), the Issuer may, in accordance with Condition 5(f) (*Redemption at the Option of the Issuer – Clean Up Call Option*), redeem or purchase all of the remaining Notes at their principal amount, together with interest accrued to but excluding the date of such redemption.</td></tr>
<tr><td>**Put Option:**</td><td>If so specified in the applicable Pricing Supplement, the Noteholders will have the option to require the Issuer to redeem the Notes in accordance with Condition 5(g) (*Redemption at the Option of Noteholders – Put Option*).</td></tr>
<tr><td>**Status of Notes and the Guarantee:**</td><td>The Notes constitute unsecured obligations of the Issuer and shall at all times rank pari passu and without any preference among themselves. The payment obligations of the Issuer under the Notes and of the Guarantor under the Guarantee shall, save for such exceptions as may be provided by applicable legislation, at all times rank at least equally with all other unsecured and unsubordinated indebtedness of the Issuer and the Guarantor, respectively, present and future.</td></tr>
<tr><td>**Cross-Acceleration:**</td><td>The Notes will have the benefit of cross-acceleration as described in Condition 9 (*Events of Default*).</td></tr>
<tr><td>**Ratings:**</td><td>The Guarantor has been rated A1 by Moody's and A by Fitch. The Programme is expected to be rated A1 by Moody's and A</td></tr>
</table>

34

by Fitch. Each of Moody's and Fitch is established in the United Kingdom and registered under the CRA Regulation.

Tranches of Notes will be rated or unrated. Where a Tranche of Notes is to be rated, such rating will be specified in the relevant Pricing Supplement.

A rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time by the assigning rating agency.

**Early Redemption:** Except as provided in "*—Optional Redemption*", *"—Maturity Par Call Option*" and "*—Clean Up Call Option*" above, Notes will be redeemable at the option of the Issuer prior to maturity only for tax reasons. See Condition 5 (*Redemption, Purchase and Options*).

**Withholding Tax:** All payments of principal and interest in respect of the Notes will be made free and clear of withholding taxes of the Kingdom or the Cayman Islands, as the case may be, unless the withholding is required by law. In such event, the Issuer or the Guarantor shall, subject to the exceptions in Condition 7 (*Taxation*), pay such additional amounts as shall result in receipt by the Noteholder of such amounts as would have been received by it had no such withholding been required, all as described in "*Terms and Conditions of the Notes – Taxation*".

**Governing Law:** English law.

**Listing and Admission to Trading:** Application has been made to the London Stock Exchange for Notes to be issued under the Programme to be admitted to trading on the ISM or as otherwise specified in the relevant Pricing Supplement and references to listing shall be construed accordingly. As specified in the relevant Pricing Supplement, a Series of Notes may be unlisted.

**Immunity:** Each of the Issuer and the Guarantor explicitly acknowledges that its execution of the Deed of Covenant, Deed of Guarantee and Agency Agreement constitutes, and its exercise of its rights and performance of its obligations thereunder will constitute, private and commercial acts done and performed for private and commercial purposes (rather than an act in its or any other sovereign capacity) and has waived irrevocably, to the fullest extent permitted by law: (i) any immunity from suit, attachment or execution to which it might otherwise be entitled by virtue of its sovereign status under the State Immunity Act 1978 of the United Kingdom or otherwise in any action arising out of or based on the Conditions which may be instituted as provided for in the Conditions in any arbitration having its seat in London, England; and (ii) any immunity from attachment or execution to which it might otherwise be entitled by virtue of its sovereign status in any other jurisdiction in an action to enforce an arbitral award properly obtained in England and Wales as referred to in (i) above. See Condition 16(c) (*Waiver of Immunity*).

| **Selling Restrictions:** | The United States, the EEA, the UK, the Cayman Islands, the Kingdom, the State of Qatar (including the Qatar Financial Centre), the Kingdom of Bahrain, the United Arab Emirates (excluding the Dubai International Financial Centre ("**DIFC**")), the DIFC, Japan, Hong Kong, the Republic of Korea ("**Korea**"), Singapore, Belgium, the People's Republic of China (excluding Taiwan, Hong Kong and Macau), Malaysia, the State of Kuwait, Switzerland, Indonesia, Brunei, the Republic of Italy ("**Italy**"), Taiwan and such other restrictions as may be required in connection with the offering and sale of the Notes. See "*Subscription and Sale*". |
|---|---|

The Issuer and the Guarantor are Category 2 for the purposes of Regulation S under the Securities Act, as amended.

Bearer Notes will be issued in compliance with U.S. Treas. Reg. §1.163-5(c)(2)(i)(D) or any successor regulation in substantially the same form for the purposes of Section 4701 of the U.S. Internal Revenue Code of 1986, as amended (the "**D Rules**") unless (i) the relevant Pricing Supplement states that Notes are issued in compliance with U.S. Treas. Reg. §1.163-5(c)(2)(i)(C) or any successor regulation in substantially the same form for the purposes of Section 4701 of the U.S. Internal Revenue Code of 1986, as amended (the "**C Rules**") or (ii) the Notes are issued other than in compliance with the D Rules or the C Rules but in circumstances in which the Notes will not constitute "registration required obligations" under the United States Tax Equity and Fiscal Responsibility Act of 1982 ("**TEFRA**"), which circumstances will be referred to in the relevant Pricing Supplement as a transaction to which TEFRA is not applicable.

# TERMS AND CONDITIONS OF THE NOTES

*The following is the text of the terms and conditions that, subject to completion and amendment and as supplemented or varied in accordance with the provisions of Part A of the relevant Pricing Supplement, shall be applicable to the Notes in definitive form (if any) issued in exchange for the Global Note(s) representing each Series. Either (i) the full text of these terms and conditions together with the relevant provisions of Part A of the Pricing Supplement or (ii) these terms and conditions as so completed, amended, supplemented or varied (and subject to simplification by the deletion of non-applicable provisions), shall be endorsed on such Bearer Notes or on the Certificates relating to such Registered Notes. All capitalised terms that are not defined in these Conditions will have the meanings given to them in Part A of the relevant Pricing Supplement. Those definitions will be endorsed on the definitive Notes or Certificates, as the case may be. References in the Conditions to "**Notes**" are to the Notes of one Series only, not to all Notes that may be issued under the Programme.*

The Notes are issued pursuant to an Agency Agreement (as amended or supplemented as at the Issue Date, the "**Agency Agreement**") dated 27 September 2022 between the Issuer, the Guarantor, Deutsche Bank, London Branch as fiscal agent and the other agents named in it and with the benefit of a Deed of Covenant (as amended or supplemented as at the Issue Date, the "**Deed of Covenant**") dated 27 September 2022 executed by the Issuer in relation to the Notes and a Deed of Guarantee (as amended or supplemented as at the Issue Date, the "**Deed of Guarantee**") dated 27 September 2022 executed by the Guarantor in relation to the Notes. The fiscal agent, the paying agents, the registrar, the transfer agents and the calculation agent(s) for the time being (if any) are referred to below respectively as the "**Fiscal Agent**", the "**Paying Agents**" (which expression shall include the Fiscal Agent), the "**Registrar**", the "**Transfer Agents**" and the "**Calculation Agent(s)**". The Noteholders (as defined below), the holders of the interest coupons (the "**Coupons**") relating to interest bearing Notes in bearer form and, where applicable in the case of such Notes, talons for further Coupons (the "**Talons**") (the "**Couponholders**") are deemed to have notice of all of the provisions of the Agency Agreement applicable to them.

As used in these terms and conditions (the "**Conditions**"), "**Tranche**" means Notes which are identical in all respects, including as to Issue Date.

Copies of the Agency Agreement, the Deed of Covenant and the Deed of Guarantee are available for inspection at the specified offices of each of the Paying Agents, the Registrar and the Transfer Agents.

1        **Form, Denomination and Title**

The Notes are issued in bearer form ("**Bearer Notes**") or in registered form ("**Registered Notes**") in each case in the Specified Denomination(s) shown hereon.

This Note is a Fixed Rate Note, a Floating Rate Note, a Zero Coupon Note, a combination of any of the foregoing or any other kind of Note, depending upon the Interest and Redemption/Payment Basis shown hereon.

Bearer Notes are serially numbered and are issued with Coupons (and, where appropriate, a Talon) attached, save in the case of Zero Coupon Notes in which case references to interest (other than in relation to interest due after the Maturity Date), Coupons and Talons in these Conditions are not applicable.

Registered Notes are represented by registered certificates ("**Certificates**") and, save as provided in Condition 2(c), each Certificate shall represent the entire holding of Registered Notes by the same holder.

Title to the Bearer Notes and the Coupons and Talons shall pass by delivery. Title to the Registered Notes shall pass by registration in the register that the Issuer shall procure to be kept by the Registrar in accordance with the provisions of the Agency Agreement (the "**Register**"). Except as ordered by a court of competent jurisdiction or as required by law, the holder (as defined below) of any Note, Coupon or Talon shall be deemed to be and may be treated as its absolute owner for all purposes, whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it, any writing on it (or on the Certificate representing it) or its theft or loss (or that of the related Certificate) and no person shall be liable for so treating the holder.

In these Conditions, "**Noteholder**" means the bearer of any Bearer Note or the person in whose name a Registered Note is registered (as the case may be), "**holder**" (in relation to a Note, Coupon or Talon) means the bearer of any Bearer Note, Coupon or Talon or the person in whose name a Registered Note is registered (as the case may be) and capitalised terms have the meanings given to them in these Conditions, the absence of any such meaning indicating that such term is not applicable to the Notes.

2        **No Exchange of Notes and Transfers of Registered Notes**

(a)        **No Exchange of Notes**: Registered Notes may not be exchanged for Bearer Notes. Bearer Notes of one Specified Denomination may not be exchanged for Bearer Notes of another Specified Denomination. Bearer Notes may not be exchanged for Registered Notes.

(b)        **Transfer of Registered Notes**: One or more Registered Notes may be transferred upon the surrender (at the specified office of the Registrar or any Transfer Agent) of the Certificate representing such Registered Notes to be transferred, together with the form of transfer endorsed on such Certificate, (or another form of transfer substantially in the same form and containing the same representations and certifications (if any), unless otherwise agreed by the Issuer), duly completed and executed and any other evidence as the Registrar or Transfer Agent may reasonably require. In the case of a transfer of part only of a holding of Registered Notes represented by one Certificate, a new Certificate shall be issued to the transferee in respect of the part transferred and a further new Certificate in respect of the balance of the holding not transferred shall be issued to the transferor. All transfers of Notes and entries on the Register will be made subject to the detailed regulations concerning transfers of Notes scheduled to the Agency Agreement. The regulations may be changed by the Issuer, with the prior written approval of the Registrar and the Noteholders. A copy of the current regulations will be made available by the Registrar to any Noteholder upon request.

(c)        **Exercise of Options or Partial Redemption in Respect of Registered Notes**: In the case of an exercise of an Issuer's or Noteholders' option in respect of, or a partial redemption of, a holding of Registered Notes represented by a single Certificate, a new Certificate shall be issued to the holder to reflect the exercise of such option or in respect of the balance of the holding not redeemed. In the case of a partial exercise of an option resulting in Registered Notes of the same holding having different terms, separate Certificates shall be issued in respect of those Notes of that holding that have the same terms. New Certificates shall only be issued against surrender of the existing Certificates to the Registrar or any Transfer Agent. In the case of a transfer of Registered Notes to a person who is already a holder of Registered Notes, a new Certificate representing the enlarged holding shall only be issued against surrender of the Certificate representing the existing holding.

(d)        **Delivery of New Certificates**: Each new Certificate to be issued pursuant to Conditions 2(b) or Condition 2(c) shall be available for delivery within three business days of receipt of the form of transfer or Exercise Notice (as defined in Condition 5(g)) and surrender of the Certificate for exchange. Delivery of the new Certificate(s) shall be made at the specified office of the Transfer Agent or of the Registrar (as the case may be) to whom delivery or surrender of such form of transfer, Exercise Notice or Certificate shall have been made or, at the option of the holder making such delivery or surrender as aforesaid and as specified in the relevant form of transfer, Exercise Notice or otherwise in writing, be mailed by uninsured post at the risk of the holder entitled to the new Certificate to such address as may be so specified, unless such holder requests otherwise and pays in advance to the relevant Transfer Agent or the Registrar, as applicable, the costs of such other method of delivery and/or such insurance as it may specify. In this Condition 2(d), "**business day**" means a day, other than a Saturday or Sunday, on which banks are open for business in the place of the specified office of the relevant Transfer Agent or the Registrar (as the case may be).

(e)        **Transfers Free of Charge**: Transfers of Notes and Certificates on registration, transfer, partial redemption or exercise of an option shall be effected without charge by or on behalf of the Issuer, the Registrar or the Transfer Agents, but upon payment of any tax or other governmental charges that may be imposed in relation to it (or the giving of such indemnity as the Registrar or the relevant Transfer Agent may require).

(f)        **Closed Periods**: No Noteholder may require the transfer of a Registered Note to be registered (i) during the period of 15 days prior to any date on which Notes may be called for redemption by the Issuer at its option pursuant to Condition 5(d), Condition 5(e) or Condition 5(f), (ii) after any such Note has been called for redemption or (iii) during the period of seven days ending on (and including) any Record Date.

3       **Guarantee and Status**

(a)     **Guarantee**: The Guarantor has unconditionally and irrevocably guaranteed the due payment of all sums expressed to be payable by the Issuer under the Notes and the Coupons. Its obligations in that respect are contained in the Deed of Guarantee.

(b)     **Status of Notes and Guarantee**: The Notes and the Coupons relating to them constitute unsecured obligations of the Issuer and shall at all times rank pari passu and without any preference among themselves. The payment obligations of the Issuer under the Notes and the Coupons relating to them and of the Guarantor under the Deed of Guarantee shall, save for such exceptions as may be provided by applicable legislation, at all times rank at least equally with all other unsecured and unsubordinated indebtedness of the Issuer and the Guarantor respectively, present and future.

4       **Interest and other Calculations**

(a)     **Interest on Fixed Rate Notes**: Each Fixed Rate Note bears interest on its outstanding nominal amount from and including the Interest Commencement Date at the rate per annum (expressed as a percentage) equal to the Rate of Interest, such interest being payable in arrear on each Interest Payment Date. The amount of interest payable shall be determined in accordance with Condition 4(f).

(b)     **Interest on Floating Rate Notes**:

(i)     *Interest Payment Dates*: Each Floating Rate Note bears interest on its outstanding nominal amount from and including the Interest Commencement Date at the rate per annum (expressed as a percentage) equal to the Rate of Interest, such interest being payable in arrear on each Interest Payment Date. The amount of interest payable shall be determined in accordance with Condition 4(f). Such Interest Payment Date(s) is/are either shown hereon as Specified Interest Payment Dates or, if no Specified Interest Payment Date(s) is/are shown hereon, Interest Payment Date shall mean each date which falls the number of months or other period shown hereon as the Interest Period after the preceding Interest Payment Date or, in the case of the first Interest Payment Date, after the Interest Commencement Date.

(ii)     *Business Day Convention*: If any date referred to in these Conditions that is specified to be subject to adjustment in accordance with a Business Day Convention would otherwise fall on a day that is not a Business Day, then, if the Business Day Convention specified is (A) the Floating Rate Business Day Convention, such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event (x) such date shall be brought forward to the immediately preceding Business Day and (y) each subsequent such date shall be the last Business Day of the month in which such date would have fallen had it not been subject to adjustment, (B) the Following Business Day Convention, such date shall be postponed to the next day that is a Business Day, (C) the Modified Following Business Day Convention, such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event such date shall be brought forward to the immediately preceding Business Day or (D) the Preceding Business Day Convention, such date shall be brought forward to the immediately preceding Business Day.

(iii)     *Rate of Interest*: The Rate of Interest in respect of Floating Rate Notes for each Interest Accrual Period shall be determined in the manner specified hereon and the provisions below relating to either ISDA Determination or Screen Rate Determination shall apply, depending upon which is specified hereon.

(A)     **ISDA Determination**

Where ISDA Determination is specified hereon as the manner in which the Rate of Interest is to be determined, the Rate of Interest for each Interest Accrual Period shall be determined by the Calculation Agent as a rate equal to the relevant ISDA Rate. For the purposes of this sub-paragraph (A), "**ISDA**

Rate" for an Interest Accrual Period means a rate equal to the Floating Rate that would be determined by the Calculation Agent under a Swap Transaction under the terms of an agreement incorporating the ISDA Definitions and under which:

(x)    if the Pricing Supplement specifies either "2006 ISDA Definitions" or "2021 ISDA Definitions" as the applicable ISDA Definitions:

    (1)    the Floating Rate Option (as defined in the relevant ISDA Definitions) is as specified herein;

    (2)    the Designated Maturity (as defined in the relevant ISDA Definitions) is a period specified herein;

    (3)    the relevant Reset Date (as defined in the relevant ISDA Definitions) is the first day of that Interest Accrual Period unless otherwise specified herein;

    (4)    if the specified Floating Rate Option is an Overnight Floating Rate Option (as defined in the relevant ISDA Definitions), Compounding is specified to be applicable hereon and:

        (I)    Compounding with Lookback is specified hereon as the Compounding Method, Lookback is the number of Applicable Business Days (as defined in the relevant ISDA Definitions) specified hereon;

        (II)    Compounding with Observation Period Shift is specified hereon as the Compounding Method, (a) Observation Period Shift is the number of Observation Period Shift Business Days (as defined in the relevant ISDA Definitions) specified hereon and (b) Observation Period Shift Additional Business Days (as defined in the relevant ISDA Definitions), if applicable, are the days specified hereon; or

        (III)    Compounding with Lockout is specified hereon as the Compounding Method, (a) Lockout is the number of Lockout Period Business Days (as defined in the relevant ISDA Definitions) specified hereon and (b) Lockout Period Business Days (as defined in the relevant ISDA Definitions), if applicable, are the days specified hereon;

    (5)    if the specified Floating Rate Option is an Index Floating Rate Option (as defined in the relevant ISDA Definitions) and Index Provisions are specified to be applicable hereon, the Compounded Index Method with Observation Period Shift shall be applicable and, (a) Observation Period Shift is the number of Observation Period Shift Business Days (as defined in the relevant ISDA Definitions) specified hereon and (b) Observation Period Shift Additional Business Days (as defined in the relevant ISDA Definitions) are the days, if applicable, specified hereon; and

    (6)    references in the relevant ISDA Definitions to:

        (I)    "**Confirmation**" shall be deemed to be references to the applicable Pricing Supplement;

        (II)    "**Calculation Period**" shall be deemed to be references to the relevant Interest Accrual Period;

<p style="margin-left:3em">(III)    "**Termination Date**" shall be deemed to be references to the Maturity Date; and</p>

<p style="margin-left:3em">(IV)    "**Effective Date**" shall be deemed to be references to the Interest Commencement Date; and</p>

(y)    if the Pricing Supplement specifies "2021 ISDA Definitions" as the applicable ISDA Definitions:

    (1)    Administrator/Benchmark Event shall be disapplied; and

    (2)    if the Temporary Non-Publication Fallback for any specified Floating Rate Option is specified to be "Temporary Non-Publication Fallback – Alternative Rate" in the Floating Rate Matrix of the 2021 ISDA Definitions, the reference to "Calculation Agent Alternative Rate Determination" in the definition of "Temporary Non-Publication Fallback – Alternative Rate" shall be replaced by "Temporary Non-Publication Fallback – Previous Day's Rate".

(B)    **Screen Rate Determination**

(x)    Subject to Condition 4(h), where Screen Rate Determination is specified hereon as the manner in which the Rate of Interest is to be determined, the Rate of Interest for each Interest Accrual Period will, subject as provided below, be either:

    (1)    the offered quotation; or

    (2)    the arithmetic mean of the offered quotations,

(expressed as a percentage rate per annum) for the Reference Rate which appears or appear, as the case may be, on the Relevant Screen Page as at the Relevant Time on the Interest Determination Date in question as determined by the Calculation Agent. If five or more of such offered quotations are available on the Relevant Screen Page, the highest (or, if there is more than one such highest quotation, one only of such quotations) and the lowest (or, if there is more than one such lowest quotation, one only of such quotations) shall be disregarded by the Calculation Agent for the purpose of determining the arithmetic mean of such offered quotations;

(y)    if the Relevant Screen Page is not available or, if sub-paragraph (x)(1) applies and no such offered quotation appears on the Relevant Screen Page or if sub-paragraph (x)(2) applies and fewer than three such offered quotations appear on the Relevant Screen Page, in each case as at the Relevant Time, subject as provided below, the Issuer shall request, the principal Relevant Financial Centre office of each of the Reference Banks to provide the Calculation Agent with its offered quotation (expressed as a percentage rate per annum) for the Reference Rate at the Relevant Time on the Interest Determination Date in question. If two or more of the Reference Banks provide the Issuer with such offered quotations, the Rate of Interest for such Interest Accrual Period shall be the arithmetic mean of such offered quotations as determined by the Calculation Agent; and

(z)    if paragraph (y) above applies and the Issuer determines that fewer than two Reference Banks are providing offered quotations, subject as provided below, the Rate of Interest shall be the arithmetic mean of the rates per annum (expressed as a percentage) as communicated to (and at the request of) the Issuer by the Reference Banks or any two or more of them, at which such banks were offered at the Relevant Time on the relevant Interest Determination Date, deposits in the Specified Currency for a period equal to that which would have been used for the Reference Rate by leading banks in the Relevant Financial Centre inter-bank market or, if fewer than two of the Reference Banks provide

the Issuer with such offered rates, the offered rate for deposits in the Specified Currency for a period equal to that which would have been used for the Reference Rate, or the arithmetic mean of the offered rates for deposits in the Specified Currency for a period equal to that which would have been used for the Reference Rate, at which, the Relevant Time on the relevant Interest Determination Date, any one or more banks (which bank or banks is or are in the opinion of the Issuer suitable for such purpose) informs the Issuer it is quoting to leading banks in the Relevant Financial Centre inter-bank market, provided that, if the Rate of Interest cannot be determined in accordance with the foregoing provisions of this paragraph, the Rate of Interest shall be determined as at the last preceding Interest Determination Date (though substituting, where a different Margin or Maximum or Minimum Rate of Interest is to be applied to the relevant Interest Accrual Period from that which applied to the last preceding Interest Accrual Period, the Margin or Maximum or Minimum Rate of Interest relating to the relevant Interest Accrual Period, in place of the Margin or Maximum or Minimum Rate of Interest relating to that last preceding Interest Accrual Period).

(C)     **Linear Interpolation**

Where Linear Interpolation is specified hereon as applicable in respect of an Interest Accrual Period, the Rate of Interest for such Interest Accrual Period shall be calculated by the Calculation Agent by straight line linear interpolation by reference to two rates based on the relevant Reference Rate (where Screen Rate Determination is specified hereon as applicable) or the relevant Floating Rate Option (where ISDA Determination is specified hereon as applicable), one of which shall be determined as if the Applicable Maturity were the period of time for which rates are available next shorter than the length of the relevant Interest Accrual Period and the other of which shall be determined as if the Applicable Maturity were the period of time for which rates are available next longer than the length of the relevant Interest Accrual Period provided however that if there is no rate available for the period of time next shorter or, as the case may be, next longer, then the Calculation Agent shall determine such rate at such time and by reference to such sources as it determines appropriate.

"**Applicable Maturity**" means: (a) in relation to Screen Rate Determination, the period of time designated in the Reference Rate, and (b) in relation to ISDA Determination, the Designated Maturity.

(c)     **Zero Coupon Notes**: Where a Note the Interest Basis of which is specified to be Zero Coupon is repayable prior to the Maturity Date and is not paid when due, the amount due and payable prior to the Maturity Date shall be the Early Redemption Amount of such Note. As from the Maturity Date, the Rate of Interest for any overdue principal of such a Note shall be a rate per annum (expressed as a percentage) equal to the Amortisation Yield (as described in Condition 5(b)(i)).

(d)     **Accrual of Interest**: Interest shall cease to accrue on each Note on the due date for redemption unless, upon due presentation, payment is improperly withheld or refused, in which event interest shall continue to accrue (both before and after judgment) at the Rate of Interest in the manner provided in this Condition to the Relevant Date (as defined in Condition 7).

(e)     **Margin, Maximum/Minimum Rates of Interest and Redemption Amounts and Rounding:**

(i)     If any Margin is specified hereon (either (x) generally, or (y) in relation to one or more Interest Accrual Periods), an adjustment shall be made to all Rates of Interest, in the case of (x), or the Rates of Interest for the specified Interest Accrual Periods, in the case of (y), calculated in accordance with Condition 4(b) by adding (if a positive number) or subtracting the absolute value (if a negative number) of such Margin subject always to the next paragraph

42

(ii) If any Maximum or Minimum Rate of Interest or Redemption Amount is specified hereon, then any Rate of Interest or Redemption Amount shall be subject to such maximum or minimum, as the case may be

(iii) For the purposes of any calculations required pursuant to these Conditions (unless otherwise specified), (x) all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point (with 0.000005 of a percentage point being rounded up), (y) all figures shall be rounded to seven significant figures (provided that if the eighth significant figure is a 5 or greater, the seventh significant figure shall be rounded up) and (z) all currency amounts that fall due and payable shall be rounded to the nearest unit of such currency (with half a unit being rounded up), save in the case of yen, which shall be rounded down to the nearest yen. For these purposes "**unit**" means the lowest amount of such currency that is available as legal tender in the country or countries of such currency.

(f) **Calculations**: The amount of interest payable per Calculation Amount in respect of any Note for any Interest Accrual Period shall be equal to the product of the Rate of Interest, the Calculation Amount specified hereon, and the Day Count Fraction for such Interest Accrual Period, unless an Interest Amount (or a formula for its calculation) is applicable to such Interest Accrual Period, in which case the amount of interest payable per Calculation Amount in respect of such Note for such Interest Accrual Period shall equal such Interest Amount (or be calculated in accordance with such formula). Where any Interest Period comprises two or more Interest Accrual Periods, the amount of interest payable per Calculation Amount in respect of such Interest Period shall be the sum of the Interest Amounts payable in respect of each of those Interest Accrual Periods. In respect of any other period for which interest is required to be calculated, the provisions above shall apply save that the Day Count Fraction shall be for the period for which interest is required to be calculated.

(g) **Determination and Publication of Rates of Interest, Interest Amounts, Final Redemption Amounts, Early Redemption Amounts and Optional Redemption Amounts**: The Calculation Agent shall, as soon as practicable on each Interest Determination Date, or at such other time and on such date as the Calculation Agent may be required to calculate any rate or amount, obtain any quotation or make any determination or calculation, determine such rate and calculate the Interest Amounts for the relevant Interest Accrual Period, calculate the Final Redemption Amount, Early Redemption Amount or Optional Redemption Amount, obtain such quotation or make such determination or calculation, as the case may be, and cause the Rate of Interest and the Interest Amounts for each Interest Accrual Period and the relevant Interest Payment Date and, if required to be calculated, the Final Redemption Amount, Early Redemption Amount or Optional Redemption Amount to be notified to the Fiscal Agent, the Issuer, each of the Paying Agents, the Noteholders, any other Calculation Agent appointed in respect of the Notes that is to make a further calculation upon receipt of such information and, if the Notes are listed and/or admitted to trading on a stock exchange and the rules of such exchange or other relevant authority so require, such exchange or other relevant authority as soon as possible after their determination but in no event later than (i) the commencement of the relevant Interest Period, if determined prior to such time, in the case of notification to such exchange of a Rate of Interest and Interest Amount, or (ii) in all other cases, the fourth Business Day after such determination. Where any Interest Payment Date or Interest Period Date is subject to adjustment pursuant to Condition 4(b)(ii), the Interest Amounts and the Interest Payment Date so published may subsequently be amended (or appropriate alternative arrangements made by way of adjustment) without notice in the event of an extension or shortening of the Interest Period. If the Notes become due and payable under Condition 9, the accrued interest and the Rate of Interest payable in respect of the Notes shall nevertheless continue to be calculated as previously in accordance with this Condition but no publication of the Rate of Interest or the Interest Amount so calculated need be made. The determination of any rate or amount, the obtaining of each quotation and the making of each determination or calculation by the Calculation Agent(s) shall (in the absence of manifest error) be final and binding upon all parties.

(h) **Benchmark Discontinuation**

(i) *Independent Adviser*: If a Benchmark Event occurs in relation to an Original Reference Rate when any Rate of Interest (or any component part thereof) remains to be determined by reference to such Original Reference Rate, the Issuer shall use its reasonable endeavours to appoint an Independent Adviser, as soon as reasonably practicable, to determine a Successor Rate, failing which an Alternative Rate (in accordance with Condition 4(h)(ii)) and, in either case, an Adjustment Spread and any Benchmark Amendments (in accordance with Condition 4(h)(iv)).

In making such determination, an Independent Adviser appointed pursuant to this Condition 4(h) shall act in good faith and in a commercially reasonable manner as an expert. In the absence of bad faith, wilful default or fraud, the Independent Adviser shall have no liability whatsoever to the Issuer, the Guarantor, the Fiscal Agent, the Paying Agents, the Noteholders or the Couponholders for any determination made by it pursuant to this Condition 4(h).

If (A) the Issuer is unable to appoint an Independent Adviser; or (B) the Independent Adviser appointed by the Issuer fails to determine a Successor Rate or, failing which, an Alternative Rate in accordance with this Condition 4(h) prior to the date which is 10 business days prior to the relevant Interest Determination Date, the Rate of Interest applicable to the next succeeding Interest Accrual Period shall be equal to the Rate of Interest last determined in relation to the Notes in respect of the immediately preceding Interest Accrual Period. If there has not been a first Interest Payment Date, the Rate of Interest shall be the initial Rate of Interest. Where a different Margin or Maximum or Minimum Rate of Interest is to be applied to the relevant Interest Accrual Period from that which applied to the last preceding Interest Accrual Period, the Margin or Maximum or Minimum Rate of Interest relating to the relevant Interest Accrual Period shall be substituted in place of the Margin or Maximum or Minimum Rate of Interest relating to that last preceding Interest Accrual Period. For the avoidance of doubt, this paragraph shall apply to the relevant next succeeding Interest Accrual Period only and any subsequent Interest Accrual Periods are subject to the subsequent operation of, and to adjustment as provided in, the first paragraph of this Condition 4(h). For the purposes of this Condition 4(h)(i) and Condition 4(h)(v) only, "**business day**" means a day, other than a Saturday or Sunday, on which banks are open for business in the place of the specified office of the Calculation Agent.

(ii) *Successor Rate or Alternative Rate*: If the Independent Adviser determines that:

(A) there is a Successor Rate, then such Successor Rate and the applicable Adjustment Spread shall subsequently be used in place of the Original Reference Rate to determine the Rate of Interest (or the relevant component part thereof) for all future payments of interest on the Notes (subject to the operation of this Condition 4(h)); or

(B) there is no Successor Rate but that there is an Alternative Rate, then such Alternative Rate and the applicable Adjustment Spread shall subsequently be used in place of the Original Reference Rate to determine the Rate of Interest (or the relevant component part thereof) for all future payments of interest on the Notes (subject to the operation of this Condition 4(h)).

(iii) *Adjustment Spread*: The Adjustment Spread (or the formula or methodology for determining the Adjustment Spread) shall be applied to the Successor Rate or the Alternative Rate (as the case may be). If the Independent Adviser is unable to determine the quantum of, or a formula or methodology for determining, such Adjustment Spread, then the Successor Rate or Alternative Rate (as applicable) will apply without an Adjustment Spread.

(iv) *Benchmark Amendments*: If any Successor Rate or Alternative Rate and, in either case, the applicable Adjustment Spread is determined in accordance with this Condition 4(h) and the Independent Adviser determines (A) that amendments to the Agency Agreement and/or these Conditions, including, but not limited to amendments to the Day Count Fraction, Relevant Screen Page, Business Day Convention, Interest

Determination Date, the definition of Business Days, and/or the definition of Reference Rate applicable to the Notes, are necessary to ensure the proper operation of such Successor Rate or Alternative Rate and/or (in either case) the applicable Adjustment Spread (such amendments, the "**Benchmark Amendments**") and (B) the terms of the Benchmark Amendments, then the Issuer shall, subject to giving notice thereof in accordance with Condition 4(h)(v), without any requirement for the consent or approval of Noteholders, vary the Agency Agreement and/or these Conditions (as applicable) to give effect to such Benchmark Amendments with effect from the date specified in such notice.

Notwithstanding any other provision of this Condition 4(h), the Calculation Agent or any Paying Agent is not obliged to concur with the Issuer, the Guarantor or the Independent Adviser in respect of any changes or amendments as contemplated under this Condition 4(h) which, in the sole opinion of the Calculation Agent or the relevant Paying Agent, as the case may be, would impose more onerous obligations upon it or expose it to any additional duties, responsibilities or liabilities or reduce or amend the protective provisions afforded to the Calculation Agent or the relevant Paying Agent (as applicable) in the Agency Agreement and/or these Conditions.

In connection with any such variation in accordance with this Condition 4(h)(iv), the Issuer shall comply with the rules of any stock exchange on which the Notes are for the time being listed or admitted to trading.

(v)  *Notices, etc.*: Any Successor Rate, Alternative Rate, Adjustment Spread and the specific terms of any Benchmark Amendments, determined in accordance with this Condition 4(h) will be notified at least 10 business days prior to the relevant Interest Determination Date by the Issuer to the Fiscal Agent, the Calculation Agent and the Paying Agents. In accordance with Condition 13, notice shall be provided to the Noteholders promptly thereafter. Such notice shall be irrevocable and shall specify the effective date of the Benchmark Amendments, if any.

No later than notifying the Noteholders of the same, the Issuer shall deliver to the Fiscal Agent, the Calculation Agent and the Paying Agents a certificate signed by two authorised signatories of the Issuer:

(A)  confirming (w) that a Benchmark Event has occurred, (x) the Successor Rate or, as the case may be, the Alternative Rate, (y) the applicable Adjustment Spread and (z) the specific terms of the Benchmark Amendments (if any), in each case as determined in accordance with the provisions of this Condition 4(h);

(B)  certifying that the Benchmark Amendments (if any) are necessary to ensure the proper operation of such Successor Rate or Alternative Rate and (in either case) the applicable Adjustment Spread; and

(C)  certifying that (i) the Issuer has duly consulted with an Independent Adviser with respect to each of the matters above or, if that is not the case, (ii) explaining, in reasonable detail, why the Issuer has not done so.

Such certificate shall be available for inspection by the Noteholders at all reasonable times during normal business hours (i) at the principal office of the Fiscal Agent and/or (ii) in electronic form from the Fiscal Agent upon Noteholder request.

Each of the Fiscal Agent, the Calculation Agent and the Paying Agents shall be entitled to rely on such certificate (without liability to any person) as sufficient evidence thereof. The Successor Rate or Alternative Rate and the Adjustment Spread and the Benchmark Amendments (if any) specified in such certificate will (in the absence of manifest error or bad faith in the determination of the Successor Rate or Alternative Rate and the Adjustment Spread and the Benchmark Amendments (if any) and without prejudice to the Fiscal Agent's or the Calculation Agent's or the Paying Agents' ability

to rely on such certificate as aforesaid) be binding on the Issuer, the Guarantor, the Fiscal Agent, the Calculation Agent, the Paying Agents and the Noteholders.

Notwithstanding any other provision of this Condition 4(h), if following the determination of any Successor Rate, Alternative Rate, Adjustment Spread or Benchmark Amendments (if any), in the Calculation Agent's opinion there is any uncertainty between two or more alternative courses of action in making any determination or calculation under this Condition 4(h), the Calculation Agent shall promptly notify the Issuer and the Guarantor thereof and the Issuer and the Guarantor shall direct the Calculation Agent in writing as to which alternative course of action to adopt. If the Calculation Agent is not promptly provided with such direction, or is otherwise unable (other than due to its own gross negligence, wilful default or fraud) to make such calculation or determination for any reason, it shall notify the Issuer and the Guarantor thereof and the Calculation Agent shall be under no obligation to make such calculation or determination and (in the absence of such gross negligence, wilful default or fraud) shall not incur any liability for not doing so.

(vi)     *Survival of Original Reference Rate*: Without prejudice to the obligations of the Issuer and the Guarantor under Conditions 4(h)(i), 4(h)(ii), 4(b)(iii) and 4(h)(iv), the Original Reference Rate and the fallback provisions provided for in Conditions 4(b)(iii)(A) and 4(b)(iii)(B) will continue to apply unless and until a Benchmark Event has occurred.

(i)     **Definitions**: In these Conditions, unless the context otherwise requires, the following defined terms shall have the meanings set out below:

"**Adjustment Spread**" means either (a) a spread (which may be positive, negative or zero) or (b) a formula or methodology for calculating a spread, in each case to be applied to the Successor Rate or the Alternative Rate (as the case may be) and is the spread, formula or methodology which:

(i)     in the case of a Successor Rate, is formally recommended in relation to the replacement of the Original Reference Rate by the Successor Rate by any Relevant Nominating Body; or (if no such recommendation has been made, or in the case of an Alternative Rate)

(ii)    the Independent Adviser determines, is customarily applied to the relevant Successor Rate or the Alternative Rate (as the case may be) in international debt capital markets transactions to produce an industry-accepted replacement rate for the Original Reference Rate; or (if the Independent Adviser determines that no such spread is customarily applied) or

(iii)   the Independent Adviser determines is recognised or acknowledged as being the industry standard for over-the-counter derivative transactions which reference the Original Reference Rate, where such rate has been replaced by the Successor Rate or the Alternative Rate (as the case may be)

"**Alternative Rate**" means an alternative benchmark or screen rate which the Independent Adviser (following consultation with the Guarantor) determines in accordance with Condition 4(h)(ii) is customarily applied in international debt capital markets transactions for the purposes of determining rates of interest (or the relevant component part thereof) in the same Specified Currency as the Notes

"**Benchmark Amendments**" has the meaning given to it in Condition 4(h)(iv)

"**Benchmark Event**" means:

(i)     the Original Reference Rate ceasing to be published for a period of at least 5 Business Days or ceasing to exist or

(ii)    a public statement or publication of information by the administrator of the Original Reference Rate that it has ceased or that it will cease publishing the Original Reference

Rate permanently or indefinitely (in circumstances where no successor administrator has been appointed that will continue publication of the Original Reference Rate) or

(iii) a public statement or publication of information by the supervisor of the administrator of the Original Reference Rate, that the Original Reference Rate has been or will be permanently or indefinitely discontinued or

(iv) a public statement by the supervisor of the administrator of the Original Reference Rate as a consequence of which the Original Reference Rate will be prohibited from being used either generally, or in respect of the Notes or

(v) a public statement by the supervisor of the administrator of the Original Reference Rate that the Original Reference Rate is or will be (or is or will be deemed by such supervisor to be) no longer representative of its relevant underlying market or

(vi) it has become unlawful for any Paying Agent, the Calculation Agent, the Issuer or other party to calculate any payments due to be made to any Noteholder using the Original Reference Rate

provided that the Benchmark Event shall be deemed to occur (a) in the case of sub-paragraphs (ii) and (iii) above, on the date of the cessation of publication of the Original Reference Rate or the discontinuation of the Original Reference Rate, as the case may be, (b) in the case of sub-paragraph (iv) above, on the date of the prohibition of use of the Original Reference Rate and (c) in the case of sub-paragraph (v) above, on the date with effect from which the Original Reference Rate will no longer be (or will be deemed by the relevant supervisor to no longer be) representative of its relevant underlying market and which is specified in the relevant public statement, and, in each case, not the date of the relevant public statement.

The occurrence of a Benchmark Event shall be determined by the Issuer and promptly notified to the Fiscal Agent, the Calculation Agent and the Paying Agents. For the avoidance of doubt, neither the Fiscal Agent, the Calculation Agent nor the Paying Agents shall have any responsibility for making such determination.

"**Business Day**" means:

(i) in the case of a currency other than euro, a day (other than a Saturday or Sunday) on which commercial banks and foreign exchange markets settle payments in the principal financial centre for such currency and/or

(ii) in the case of euro, a day on which the TARGET System is operating (a "**TARGET Business Day**") and/or

(iii) in the case of a currency and/or one or more Business Centres, a day (other than a Saturday or a Sunday) on which commercial banks and foreign exchange markets settle payments in such currency in the Business Centre(s) or, if no currency is indicated, generally in each of the Business Centres

"**Day Count Fraction**" means, in respect of the calculation of an amount of interest on any Note for any period of time (from and including the first day of such period to but excluding the last) (whether or not constituting an Interest Period or an Interest Accrual Period, the "**Calculation Period**"):

(i) if "**Actual/Actual**" or "**Actual/Actual - ISDA**" is specified hereon, the actual number of days in the Calculation Period divided by 365 (or, if any portion of that Calculation Period falls in a leap year, the sum of (A) the actual number of days in that portion of the Calculation Period falling in a leap year divided by 366 and (B) the actual number of days in that portion of the Calculation Period falling in a non-leap year divided by 365)

(ii) if "**Actual/365 (Fixed)**" is specified hereon, the actual number of days in the Calculation Period divided by 365

(iii) if "**Actual/365 (Sterling)**" is specified hereon, the actual number of days in the Calculation Period divided by 365 or, in the case of an Interest Payment Date falling in a leap year, 366

(iv) if "**Actual/360**" is specified hereon, the actual number of days in the Calculation Period divided by 360

(v) if "**30/360**", "**360/360**" or "**Bond Basis**" is specified hereon, the number of days in the Calculation Period divided by 360, calculated on a formula basis as follows:

$$\text{Day Count Fraction} = \frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$M_1$" is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"$M_2$" is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$D_1$" is the first calendar day, expressed as a number, of the Calculation Period, unless such number would be 31, in which case D1 will be 30; and

"$D_2$" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless such number would be 31 and D1 is greater than 29, in which case D2 will be 30 [22]

(vi) if "**30E/360**" or "**Eurobond Basis**" is specified hereon, the number of days in the Calculation Period divided by 360, calculated on a formula basis as follows:

$$\text{Day Count Fraction} = \frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$M_1$" is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"$M_2$" is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$D_1$" is the first calendar day, expressed as a number, of the Calculation Period, unless such number would be 31, in which case $D_1$ will be 30; and

"$D_2$" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless such number would be 31, in which case $D_2$ will be 30

(vii)     if "**30E/360 (ISDA)**" is specified hereon, the number of days in the Calculation Period divided by 360, calculated on a formula basis as follows:

$$\text{Day Count Fraction} = \frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$M_1$" is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"$M_2$" is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$D_1$" is the first calendar day, expressed as a number, of the Calculation Period, unless (i) that day is the last day of February or (ii) such number would be 31, in which case $D_1$ will be 30; and

"$D_2$" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless (i) that day is the last day of February but not the Maturity Date or (ii) such number would be 31, in which case $D_2$ will be 30

(viii)    if "**Actual/Actual-ICMA**" is specified hereon,

(a)     if the Calculation Period is equal to or shorter than the Determination Period during which it falls, the number of days in the Calculation Period divided by the product of (x) the number of days in such Determination Period and (y) the number of Determination Periods normally ending in any year; and

(b)     if the Calculation Period is longer than one Determination Period, the sum of:

(x)     the number of days in such Calculation Period falling in the Determination Period in which it begins divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year; and

(y)     the number of days in such Calculation Period falling in the next Determination Period divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year where:

"**Determination Period**" means the period from and including a Determination Date in any year to but excluding the next Determination Date and

"**Determination Date**" means the date(s) specified as such hereon or, if none is so specified, the Interest Payment Date(s)

"**Euro-Zone**" means the region comprised of member states of the European Union that adopt the single currency in accordance with the Treaty establishing the European Community, as amended

"**Independent Adviser**" means an independent financial institution of international repute or an independent financial adviser with appropriate expertise appointed by the Issuer under Condition 4(h)(i)

49

"**Interest Accrual Period**" means the period beginning on and including the Interest Commencement Date and ending on but excluding the first Interest Period Date and each successive period beginning on and including an Interest Period Date and ending on but excluding the next succeeding Interest Period Date

"**Interest Amount**" means:

(i) in respect of an Interest Accrual Period, the amount of interest payable per Calculation Amount for that Interest Accrual Period and which, in the case of Fixed Rate Notes, and unless otherwise specified herein, shall mean the Fixed Coupon Amount or Broken Amount specified herein as being payable on the Interest Payment Date ending the Interest Period of which such Interest Accrual Period forms part and

(ii) in respect of any other period, the amount of interest payable per Calculation Amount for that period

"**Interest Commencement Date**" means the Issue Date or such other date as may be specified herein

"**Interest Determination Date**" means, with respect to a Rate of Interest and Interest Accrual Period, the date specified as such hereon or, if none is so specified, (i) the day falling two Business Days in London for the Specified Currency prior to the first day of such Interest Accrual Period if the Specified Currency is not euro or (ii) the day falling two TARGET Business Days prior to the first day of such Interest Accrual Period if the Specified Currency is euro

"**Interest Period**" means the period beginning on and including the Interest Commencement Date and ending on but excluding the first Interest Payment Date and each successive period beginning on and including an Interest Payment Date and ending on but excluding the next succeeding Interest Payment Date unless otherwise specified herein

"**Interest Period Date**" means each Interest Payment Date unless otherwise specified herein

"**ISDA Definitions**" means (i) if "2006 ISDA Definitions" is specified as being applicable hereon, the 2006 ISDA Definitions, as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**"), as amended and updated as at the Issue Date of the first Tranche of the Notes; or (ii) if "2021 ISDA Definitions" is specified as being applicable hereon, the latest version of the 2021 ISDA Interest Rate Derivatives Definitions, including any Matrices referred to therein, as published by ISDA as at the Issue Date of the first Tranche of the Notes

"**Original Reference Rate**" means the originally-specified benchmark or screen rate (as applicable) used to determine the Rate of Interest (or any component part thereof) on the Notes

"**Rate of Interest**" means the rate of interest payable from time to time in respect of this Note and that is either specified or calculated in accordance with the provisions hereon

"**Reference Banks**" means four major banks selected by the Issuer or the Guarantor in the inter-bank market that is most closely connected with the Reference Rate

"**Reference Rate**" means one of the following benchmark rates as specified hereon in respect of the currency and period specified hereon:

(i) Euro-Zone interbank offered rate ("**EURIBOR**")

(ii) Shanghai interbank offered rate ("**SHIBOR**")

(iii) Hong Kong interbank offered rate ("**HIBOR**")

(iv) Emirates interbank offered rate ("**EIBOR**")

(v) Saudi Arabia interbank offered rate ("**SAIBOR**")

(vi) Australia Bank Bill Swap ("**BBSW**")

(vii) Prague interbank offered rate ("**PRIBOR**") and

(viii) CNH Hong Kong interbank offered rate ("**CNH HIBOR**")

"**Relevant Financial Centre**" means the financial centre specified as such hereon

"**Relevant Nominating Body**" means, in respect of a benchmark or screen rate (as applicable)

(i) the central bank for the currency to which the benchmark or screen rate (as applicable) relates, or any central bank or other supervisory authority which is responsible for supervising the administrator of the benchmark or screen rate (as applicable) or

(ii) any working group or committee sponsored by, chaired or co-chaired by or constituted at the request of (a) the central bank for the currency to which the benchmark or screen rate (as applicable) relates, (b) any central bank or other supervisory authority which is responsible for supervising the administrator of the benchmark or screen rate (as applicable), (c) a group of the aforementioned central banks or other supervisory authorities or (d) the Financial Stability Board or any part thereof

"**Relevant Screen Page**" means such page, section, caption, column or other part of a particular information service as may be specified hereon (or any successor or replacement page, section, caption, column or other part of a particular information service)

"**Relevant Time**" means the time specified as such hereon

"**Specified Currency**" means the currency specified as such hereon or, if none is specified, the currency in which the Notes are denominated

"**Successor Rate**" means a successor to or replacement of the Original Reference Rate which is formally recommended by any Relevant Nominating Body and

"**TARGET System**" means the Trans-European Automated Real-Time Gross Settlement Express Transfer (known as TARGET2) System which was launched on 19 November 2007 or any successor thereto.

(j) **Calculation Agent:** The Issuer shall procure that there shall at all times be one or more Calculation Agents if provision is made for them hereon and for so long as any Note is outstanding (as defined in the Agency Agreement). Where more than one Calculation Agent is appointed in respect of the Notes, references in these Conditions to the Calculation Agent shall be construed as each Calculation Agent performing its respective duties under these Conditions. If the Calculation Agent is unable or unwilling to act as such or if the Calculation Agent fails duly to establish the Rate of Interest for an Interest Accrual Period or to calculate any Interest Amount, Final Redemption Amount, Early Redemption Amount or Optional Redemption Amount, as the case may be, or to comply with any other requirement, the Issuer shall appoint a leading bank or financial institution engaged in the interbank market (or, if appropriate, money, swap or over-the-counter index options market) that is most closely connected with the calculation or determination to be made by the Calculation Agent (acting through its principal London office or any other office actively involved in such market) to act as such in its place. The Calculation Agent may not resign its duties without a successor having been appointed as aforesaid.

**5    Redemption, Purchase and Options**

(a) **Final Redemption:**

Unless previously redeemed, purchased and cancelled as provided below, each Note shall be finally redeemed on the Maturity Date specified hereon at its Final Redemption Amount (which, unless otherwise provided, is its nominal amount).

(b) **Early Redemption:**

(i) *Zero Coupon Notes:*

(A)   The Early Redemption Amount payable in respect of any Zero Coupon Note, upon redemption of such Note pursuant to Condition 5(c), Condition 5(d), Condition 5(e), Condition 5(f) or Condition 5(g), or upon it becoming due and payable as provided in Condition 9 shall be the Amortised Face Amount (calculated as provided below) of such Note unless otherwise specified hereon.

(B)   Subject to the provisions of sub-paragraph (C) below, the Amortised Face Amount of any such Note shall be the scheduled Final Redemption Amount of such Note on the Maturity Date discounted at a rate per annum (expressed as a percentage) equal to the Amortisation Yield (which, if none is shown hereon, shall be such rate as would produce an Amortised Face Amount equal to the issue price of the Notes if they were discounted back to their issue price on the Issue Date) compounded annually.

(C)   If the Early Redemption Amount payable in respect of any such Note upon its redemption pursuant to Condition 5(c), Condition 5(d), Condition 5(e), Condition 5(f) or Condition 5(g), or upon it becoming due and payable as provided in Condition 9 is not paid when due, the Early Redemption Amount due and payable in respect of such Note shall be the Amortised Face Amount of such Note as defined in sub-paragraph (B) above, except that such sub-paragraph shall have effect as though the date on which the Note becomes due and payable were the Relevant Date. The calculation of the Amortised Face Amount in accordance with this sub-paragraph shall continue to be made (both before and after judgment) until the Relevant Date, unless the Relevant Date falls on or after the Maturity Date, in which case the amount due and payable shall be the scheduled Final Redemption Amount of such Note on the Maturity Date together with any interest that may accrue in accordance with Condition 4(d).

Where such calculation is to be made for a period of less than one year, it shall be made on the basis of the Day Count Fraction shown hereon.

(ii)   *Other Notes:* The Early Redemption Amount payable in respect of any Note (other than Notes described in (i) above), upon redemption of such Note pursuant to Condition 5(c) Condition 5(d), Condition 5(e), Condition 5(f) or Condition 5(g), or upon it becoming due and payable as provided in Condition 9, shall be the Final Redemption Amount unless otherwise specified hereon.

(c)   **Redemption for Taxation Reasons**: The Notes may be redeemed at the option of the Issuer in whole, but not in part, on any Interest Payment Date (if this Note is a Floating Rate Note) or, at any time, (if this Note is not a Floating Rate Note), on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable), at their Early Redemption Amount (as described in Condition 5(b) above) (together with interest accrued to the date fixed for redemption), if (i) the Issuer (or, if the guarantee under the Deed of Guarantee were called, the Guarantor) has or will on the occasion of the next payment due under the Notes become obliged to pay additional amounts as described under Condition 7 as a result of any change in, or amendment to, the laws or regulations of the Cayman Islands or the Kingdom of Saudi Arabia (in the case of payment by the Issuer) or the Kingdom of Saudi Arabia (in the case of payment by the Guarantor) or, in each case, any political subdivision or any authority thereof or therein having power to tax, or any change in the application or official interpretation of such laws or regulations, which change or amendment becomes effective on or after the date on which agreement is reached to issue the first Tranche of the Notes, and (ii) such obligation cannot be avoided by the Issuer (or the Guarantor, as the case may be) taking reasonable measures available to it, provided that no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer (or the Guarantor, as the case may be) would be obliged to pay such additional amounts were a payment in respect of the Notes (or the Deed of Guarantee, as the case may be) then due. Prior to the publication of any notice of redemption pursuant to this Condition 5(c) the Issuer shall deliver to the Fiscal Agent a certificate signed by two directors of the Issuer (or the Guarantor, as the case may be) stating that the Issuer is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Issuer so to redeem have occurred, and an opinion of independent

legal or tax advisers of recognised standing to the effect that the Issuer (or the Guarantor, as the case may be) has or will become obliged to pay such additional amounts as a result of such change or amendment.

(d) **Redemption at the Option of the Issuer – Call Option:** If Call Option is specified hereon as being applicable, unless an Exercise Notice has been given pursuant to Condition 5(g), the Issuer may, on giving not less than 10 nor more than 30 days' notice to the Noteholders (or such other notice period as may be specified hereon) redeem, all or, if so provided, some, of the Notes on any Optional Redemption Date (provided that if the Maturity Par Call Option is specified as being applicable hereon, such Optional Redemption Date falls on a date prior to the commencement of the Maturity Par Call Period). Any such redemption of Notes shall be at their Optional Redemption Amount specified hereon (which may be the Early Redemption Amount (as described in Condition 5(b) above)), together with interest accrued to (but excluding) the relevant Optional Redemption Date(s). Any such redemption or exercise must, if applicable, relate to Notes of a nominal amount at least equal to the Minimum Redemption Amount to be redeemed specified hereon and no greater than the Maximum Redemption Amount to be redeemed specified hereon.

If Make-whole Amount is specified hereon as the Optional Redemption Amount:

(i) the Optional Redemption Amount per Note shall be equal to the higher of the following, in each case together with interest accrued to but excluding the relevant Optional Redemption Date(s):

(A) the nominal amount of the Note; and

(B) the amount equal to the sum of the then present values of the remaining scheduled payments of principal and interest in respect of the Note from and including the Optional Redemption Date to but excluding the Maturity Date (or, if Maturity Par Call Option is specified hereon as being applicable, the Maturity Par Call Period Commencement Date specified hereon) in each case discounted to such Optional Redemption Date at the Make-whole Redemption Rate plus any applicable Make-whole Redemption Margin specified hereon, all as determined by the Independent Investment Banker;

(ii) the Issuer or the Guarantor shall cause the Optional Redemption Amount to be notified to the Fiscal Agent, the Registrar, each of the Paying Agents and any Calculation Agent appointed in respect of the Notes and, if the Notes are listed and/or admitted to trading on a stock exchange and/or admitted to trading on a stock exchange and the rules of such exchange or other relevant authority so require, such exchange or other relevant authority, as soon as possible after its determination but in no event later than the date of the notice of redemption; and

(iii) the determination of the Optional Redemption Amount and the obtaining of any quotation and/or the making of any determination or calculation in connection therewith by the Independent Investment Banker shall (in the absence of manifest error) be final and binding upon all parties.

Any notice of redemption given under Condition 5(c) will override any notice of redemption given (whether previously, on the same date or subsequently) under this Condition 5(d).

All Notes in respect of which any such notice is given shall be redeemed on the date specified in such notice in accordance with this Condition 5(d).

Any such notice may, at the Issuer's or the Guarantor's (as applicable) discretion, be subject to one or more conditions precedent. In such event, such notice shall describe each such condition and, if applicable, may state that, at the Issuer's or the Guarantor's discretion, the Optional Redemption Date may be delayed until such time as any or all such conditions shall be satisfied or waived, or such redemption may not occur and such notice may be rescinded in the event that any or all such conditions shall not have been satisfied (or waived by the Issuer (or the Guarantor, as the case may be) in its sole discretion) by the Optional Redemption Date, or by the Optional Redemption Date as so delayed.

In the case of a partial redemption the notice to Noteholders shall also contain the certificate numbers of the Bearer Notes, or in the case of Registered Notes shall specify the nominal amount of Registered Notes drawn and the holder(s) of such Registered Notes, to be redeemed, which shall have been drawn in such place and in such manner as may be fair and reasonable in the circumstances, taking account of prevailing market practices, subject to compliance with any applicable laws and stock exchange or other relevant authority requirements.

In this Condition 5(d):

"**Comparable Security**" means the benchmark security selected by the Independent Investment Banker as being denominated in the same currency as the Notes and having a maturity comparable to the remaining term of the Notes to be redeemed (taking into account any adjustment to such term where Maturity Par Call Option is specified as being applicable hereon) that would be utilised, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Notes (taking into account any adjustment to such term where Maturity Par Call Option is specified as being applicable hereon)

"**Comparable Security Price**" means: (i) if the Independent Investment Banker obtains four or more Reference Dealer Quotations, the average of such Reference Dealer Quotations after excluding the highest and lowest of such Reference Dealer Quotations; (ii) if the Independent Investment Banker obtains less than four but more than one Reference Dealer Quotations, the average of such Reference Dealer Quotations; or (iii) if the Independent Investment Banker obtains one Reference Dealer Quotation, such Reference Dealer Quotation

"**Independent Investment Banker**" means one of the Reference Dealers appointed by the Issuer (or the Guarantor, as the case may be) to act in such capacity

"**Make-whole Reference Rate**" means, with respect to any redemption date, the rate per annum equal to the annual or semi-annual (as the case may be) yield to maturity or interpolated yield to maturity (on the relevant day count basis) of the applicable Comparable Security, assuming a price for such Comparable Security (expressed as a percentage of its principal amount) equal to the applicable Comparable Security Price for such redemption date

"**Reference Dealer**" means the banks specified as such hereon (or, if any of their respective affiliates is a primary dealer in the Comparable Security, such affiliate) and, if applicable, their respective successors provided that if any of the Reference Dealers ceases to be a primary dealer in the Comparable Security, the Issuer or the Guarantor will substitute such bank with another bank and "Reference Dealers" shall be construed accordingly

"**Reference Dealer Quotation**" means, with respect to each Reference Dealer, the average of the bid and asked prices for the Comparable Security (expressed as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Dealer at the Reference Quotation Time and

"**Reference Quotation Time**" means the time specified as such hereon or, if no such time is specified, 5.00 p.m. on the day falling three Business Days prior to the Optional Redemption Date.

(e)     **Redemption at the Option of the Issuer – Maturity Par Call Option**: If Maturity Par Call Option is specified hereon as being applicable, unless an Exercise Notice has been given pursuant to Condition 5(g), the Issuer may, on giving not less than 10 nor more than 30 days' irrevocable notice to the Noteholders (or such other notice period as may be specified hereon) redeem the Notes in whole, but not in part, at any time during the Maturity Par Call Period specified hereon, at their Early Redemption Amount (as described in Condition 5(b)) together with interest accrued to (but excluding) the date fixed for redemption.

Any notice of redemption given under Condition 5(c) will override any notice of redemption given (whether previously, on the same date or subsequently) under this Condition 5(e).

All Notes in respect of which any such notice is given shall be redeemed on the date specified in such notice in accordance with this Condition 5(e).

(f) **Redemption at the Option of the Issuer – Clean Up Call Option:** If Clean Up Call Option is specified hereon as being applicable and 75 per cent. or more of the initial aggregate principal amount of the Notes issued have been redeemed or purchased pursuant to this Condition 5, the Issuer may, on giving not less than 10 nor more than 30 days' irrevocable notice to the Noteholders (or such other notice period as may be specified hereon) redeem or purchase (or procure the purchase of), at its option, all (but not some only) of the remaining outstanding Notes at their Early Redemption Amount (as described in Condition 5(b)), together with interest accrued to (but excluding) the date fixed for such redemption or purchase.

(g) **Redemption at the Option of Noteholders – Put Option:** If Put Option is specified hereon as being applicable, the Issuer shall, at the option of the holder of any such Note, upon the holder of such Note giving not less than 15 nor more than 30 days' notice to the Issuer (or such other notice period as may be specified hereon) redeem, purchase or procure the purchase of such Note on the Optional Redemption Date(s) at its Optional Redemption Amount specified hereon (which may be the Early Redemption Amount (as described in Condition 5(b) above)), together with interest accrued to (but excluding) the date fixed for redemption.

To exercise such option the holder must deposit (in the case of Bearer Notes) such Note (together with all unmatured Coupons and unexchanged Talons) with any Paying Agent or (in the case of Registered Notes) the Certificate representing such Note(s) with the Registrar or any Transfer Agent at its specified office, together with a duly completed option exercise notice ("**Exercise Notice**") in the form obtainable from any Paying Agent, the Registrar or any Transfer Agent (as applicable) within the notice period. No Note or Certificate so deposited and option exercised may be withdrawn (except as provided in the Agency Agreement) without the prior consent of the Issuer.

(h) **Purchases:** Each of the Issuer, the Guarantor and its Subsidiaries (as defined in the Agency Agreement) may at any time purchase Notes (provided that all unmatured Coupons and unexchanged Talons relating thereto are attached thereto or surrendered therewith) in the open market or otherwise at any price.

(i) **Cancellation:** All Notes purchased by or on behalf of the Issuer, the Guarantor or any of their Subsidiaries may be surrendered for cancellation, in the case of Bearer Notes, by surrendering each such Note together with all unmatured Coupons and all unexchanged Talons to the Fiscal Agent and, in the case of Registered Notes, by surrendering the Certificate representing such Notes to the Registrar and, in each case, if so surrendered, shall, together with all Notes redeemed by the Issuer, be cancelled forthwith (together with all unmatured Coupons and unexchanged Talons attached thereto or surrendered therewith). Any Notes so surrendered for cancellation may not be reissued or resold and the obligations of the Issuer and the Guarantor in respect of any such Notes shall be discharged.

**6        Payments and Talons**

(a) **Bearer Notes:** Payments of principal and interest in respect of Bearer Notes shall, subject as mentioned below, be made against presentation and surrender of the relevant Notes (in the case of all payments of principal and, in the case of interest, as specified in Condition 6(f)(v)) or Coupons (in the case of interest, save as specified in Condition 6(f)(v)), as the case may be, at the specified office of any Paying Agent outside the United States by a cheque payable in the relevant currency drawn on, or, at the option of the holder, by transfer to an account denominated in such currency with, a Bank. "**Bank**" means a bank in the principal financial centre for such currency or, in the case of euro, in a city in which banks have access to the TARGET System.

(b) **Registered Notes**:

(i) Payments of principal in respect of Registered Notes shall be made against presentation and surrender of the relevant Certificates at the specified office of any of the Transfer Agents or of the Registrar and in the manner provided in paragraph (ii) below.

(ii) Interest on Registered Notes shall be paid to the person shown on the Register at the close of business on the fifteenth day before the due date for payment thereof (the "**Record Date**"). Payments of interest on each Registered Note shall be made in the

relevant currency by cheque drawn on a Bank and mailed to the holder (or to the first-named of joint holders) of such Note at its address appearing in the Register. Upon application by the holder to the specified office of the Registrar or any Transfer Agent before the Record Date, such payment of interest may be made by transfer to an account in the relevant currency maintained by the payee with a Bank.

(c)     **Payments in the United States:** Notwithstanding the foregoing, if any Bearer Notes are denominated in U.S. dollars, payments in respect thereof may be made at the specified office of any Paying Agent in New York City in the same manner as aforesaid if (i) the Issuer shall have appointed Paying Agents with specified offices outside the United States with the reasonable expectation that such Paying Agents would be able to make payment of the amounts on the Notes in the manner provided above when due, (ii) payment in full of such amounts at all such offices is illegal or effectively precluded by exchange controls or other similar restrictions on payment or receipt of such amounts and (iii) such payment is then permitted by United States law, without involving, in the opinion of the Issuer, any adverse tax consequence to the Issuer.

(d)     **Payments Subject to Laws:** Payments will be subject in all cases to (i) any fiscal or other laws, regulations and directives applicable thereto in the place of payment, but without prejudice to the provisions of Condition 7 and (ii) any withholding or deduction required pursuant to an agreement described in Section 1471(b) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), or otherwise imposed pursuant to Sections 1471 through 1474 of the Code, any regulations or agreements thereunder, any official interpretations thereof, or (without prejudice to the provisions of Condition 7) any law implementing an intergovernmental approach thereto. No commission or expenses shall be charged to the Noteholders or Couponholders in respect of such payments.

(e)     **Appointment of Agents:** The Fiscal Agent, the Paying Agents, the Registrar, the Transfer Agents and the Calculation Agent initially appointed by the Issuer and the Guarantor and their respective specified offices are listed below. The Fiscal Agent, the Paying Agents, the Registrar, Transfer Agents and the Calculation Agent(s) act solely as agents of the Issuer and the Guarantor and do not assume any obligation or relationship of agency or trust for or with any Noteholder or Couponholder. The Issuer and the Guarantor reserve the right at any time to vary or terminate the appointment of the Fiscal Agent, any other Paying Agent, the Registrar, any Transfer Agent or the Calculation Agent(s) and to appoint additional or other Paying Agents or Transfer Agents, provided that the Issuer shall at all times maintain (i) a Fiscal Agent, (ii) a Registrar in relation to Registered Notes, (iii) a Transfer Agent in relation to Registered Notes, (iv) one or more Calculation Agent(s) where these Conditions so require and (v) such other agents as may be required by any other stock exchange on which the Notes may be listed and/or admitted to trading.

In addition, the Issuer and the Guarantor shall forthwith appoint a Paying Agent in New York City in respect of any Bearer Notes denominated in U.S. dollars in the circumstances described in paragraph (c) above.

Notice of any such change or any change of any specified office shall promptly be given to the Noteholders.

(f)     **Unmatured Coupons and unexchanged Talons:**

(i)     Upon the due date for redemption of Bearer Notes which comprise Fixed Rate Notes, those Notes should be surrendered for payment together with all unmatured Coupons (if any) relating thereto, failing which an amount equal to the face value of each missing unmatured Coupon (or, in the case of payment not being made in full, that proportion of the amount of such missing unmatured Coupon that the sum of principal so paid bears to the total principal due) shall be deducted from the Final Redemption Amount, Early Redemption Amount or Optional Redemption Amount, as the case may be, due for payment. Any amount so deducted shall be paid in the manner mentioned above against surrender of such missing Coupon within a period of 10 years from the Relevant Date for the payment of such principal (whether or not such Coupon has become void pursuant to Condition 8).

56

(ii) Upon the due date for redemption of any Bearer Note comprising a Floating Rate Note, unmatured Coupons relating to such Note (whether or not attached) shall become void and no payment shall be made in respect of them.

(iii) Upon the due date for redemption of any Bearer Note, any unexchanged Talon relating to such Note (whether or not attached) shall become void and no Coupon shall be delivered in respect of such Talon.

(iv) Where any Bearer Note that provides that the relative unmatured Coupons are to become void upon the due date for redemption of those Notes is presented for redemption without all unmatured Coupons, and where any Bearer Note is presented for redemption without any unexchanged Talon relating to it, redemption shall be made only against the provision of such indemnity as the Issuer may require.

(v) If the due date for redemption of any Note is not a due date for payment of interest, interest accrued from the preceding due date for payment of interest or the Interest Commencement Date, as the case may be, shall only be payable against presentation (and surrender if appropriate) of the relevant Bearer Note or Certificate representing it, as the case may be. Interest accrued on a Note that only bears interest after its Maturity Date shall be payable on redemption of such Note against presentation of the relevant Note or Certificate representing it, as the case may be.

(g) **Talons:** On or after the Interest Payment Date for the final Coupon forming part of a Coupon sheet issued in respect of any Bearer Note, the Talon forming part of such Coupon sheet may be surrendered at the specified office of the Fiscal Agent in exchange for a further Coupon sheet (and if necessary another Talon for a further Coupon sheet) (but excluding any Coupons that may have become void pursuant to Condition 8).

(h) **Non-Business Days:** If any date for payment in respect of any Note or Coupon is not a business day, the holder shall not be entitled to payment until the next following business day nor to any interest or other sum in respect of such postponed payment. In this paragraph, "**business day**" means a day (other than a Saturday or a Sunday) on which banks and foreign exchange markets are open for business in the relevant place of presentation, in such jurisdictions as shall be specified as "**Financial Centres**" hereon and:

(i) (in the case of a payment in a currency other than euro) where payment is to be made by transfer to an account maintained with a bank in the relevant currency, on which foreign exchange transactions may be carried on in the relevant currency in the principal financial centre of the country of such currency or

(ii) (in the case of a payment in euro) which is a TARGET Business Day.

7 **Taxation**

All payments of principal and interest by or on behalf of the Issuer or the Guarantor in respect of the Notes and the Coupons or under the Deed of Guarantee shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or on behalf of the Cayman Islands or the Kingdom or any authority therein or thereof having power to tax, unless such withholding or deduction is required by law. In that event, the Issuer or, as the case may be, the Guarantor shall pay such additional amounts as shall result in receipt by the Noteholders and Couponholders of such amounts as would have been received by them had no such withholding or deduction been required, except that no such additional amounts shall be payable in respect of any Note or Coupon:

(a) to, or to a third party on behalf of, a holder who is liable to such taxes, duties, assessments or governmental charges in respect of such Note or Coupon by reason of such holder having some connection with the Cayman Islands or the Kingdom other than the mere holding of the Note or Coupon or

(b) presented (or in respect of which the Certificate representing it is presented) for payment more than 30 days after the Relevant Date except to the extent that the holder of it would have been entitled to such additional amounts on presenting it for payment on the thirtieth such day.

Notwithstanding anything to the contrary in these Conditions, the Issuer, the Guarantor, a Paying Agent or any other person shall be permitted to withhold or deduct any amounts required by Sections 1471 to 1474 of the Code ("**FATCA**"), any treaty, law, regulation or other official guidance implementing FATCA, or any agreement (or related guidance) between the Issuer, the Guarantor, a Paying Agent or any other person and the United States, any other jurisdiction, or any authority of any of the foregoing implementing FATCA or any intergovernmental agreement to implement FATCA and none of the Issuer, the Guarantor, any Paying Agent or any other person shall be required to pay any additional amounts with respect to any such withholding or deduction imposed on or with respect to any Note or Coupon.

As used in these Conditions, "**Relevant Date**" in respect of any Note or Coupon means the date on which payment in respect of it first becomes due or (if the full amount of the money payable has not been duly paid on or prior to such due date) the date on which payment in full of the amount outstanding is made or (if earlier) the date seven days after that on which notice is duly given to the Noteholders that, upon further presentation of the Note (or relative Certificate) or Coupon being made in accordance with these Conditions, such payment in full will be made, provided that payment is in fact made upon such presentation. References in these Conditions to (i) "principal" shall be deemed to include any premium payable in respect of the Notes, Final Redemption Amounts, Early Redemption Amounts, Optional Redemption Amounts, Amortised Face Amounts and all other amounts in the nature of principal payable pursuant to Condition 5 or any amendment or supplement to it, (ii) "**interest**" shall be deemed to include all Interest Amounts and all other amounts payable pursuant to Condition 4 or any amendment or supplement to it and (iii) "**principal**" and/or "**interest**" shall be deemed to include any additional amounts that may be payable under this Condition 7.

**8       Prescription**

Claims against the Issuer and/or the Guarantor for payment in respect of the Notes and Coupons (which for this purpose shall not include Talons) shall be prescribed and become void unless made within 10 years (in the case of principal) or five years (in the case of interest) from the appropriate Relevant Date in respect of them.

**9       Events of Default**

If any of the following events ("**Events of Default**") occurs and is continuing, the holder of any Note may give written notice to the Fiscal Agent at its specified office that such Note is immediately repayable, whereupon the Early Redemption Amount of such Note together with accrued interest to the date of payment shall become immediately due and payable:

(i)     **Non-Payment**: default is made for more than 30 days in the payment on the due date of interest or principal in respect of any of the Notes or

(ii)    **Breach of Other Obligations**: the Issuer or the Guarantor does not perform or comply with any one or more of its other obligations in the Notes or the Deed of Guarantee which default is incapable of remedy or (if capable of remedy) is not remedied within 60 days after notice of such default shall have been given to the Fiscal Agent at its specified office by any Noteholder or

(iii)   **Cross-Acceleration**: (A) any other Indebtedness becomes due and payable prior to its stated maturity by reason of any default, or (B) any such Indebtedness (including any principal, interest or profit thereon) is not paid when due, or (C) the Issuer or the Guarantor fails to pay when due any amount payable by it under any present or future guarantee for, or indemnity in respect of, any Indebtedness of any other Person, and, in the case of either sub-paragraph (B) or (C) above, such failure continues beyond any applicable grace period, provided that the amount of the Indebtedness referred to in sub-paragraph (A) above and/or (B) and/or the amount payable under any guarantee or indemnity referred to in sub-paragraph (C) above, as applicable, either alone or when aggregated with all other Indebtedness in respect of which one or more of the events mentioned above in this paragraph (iii)) shall have occurred equals or exceeds US$250,000,000 (or its equivalent in any other currency or currencies) or

(iv)    **Enforcement Proceedings**: a distress, attachment, execution, sequestration or other legal or other process is levied, enforced or sued out on or against all or any material

part of the property, undertaking, assets or revenues of the Issuer or the Guarantor and is not discharged or stayed within 60 days or

(v)     **Security Enforced**: any Security Interest created or assumed by the Issuer or the Guarantor and securing an amount which equals or exceeds (whether individually or in aggregate) US$250,000,000 or its equivalent (on the basis of the middle spot rate for the relevant currency against the U.S. dollar as quoted by any leading bank on the day on which this paragraph operates) becomes enforceable and any step is taken to enforce it (including the taking of possession or the appointment of a receiver, administrative receiver, administrator manager or other similar person) unless the full amount of the debt which is secured by the relevant Security Interest is discharged within 30 days of the first date on which a step is taken to enforce the relevant Security Interest or

(vi)    **Insolvency**: any of the Issuer or the Guarantor is unable or admits in writing inability to pay all or substantially all of its Indebtedness as it falls due, or stops or suspends or threatens to stop or suspend making payments on all or substantially all of its Indebtedness, or is deemed unable to pay its debts pursuant to or for the purpose of any applicable law, or is adjudicated or found bankrupt or insolvent or

(vii)   **Winding-up**:

(a)     any action, legal proceedings or other formal procedure or step is taken in relation to:

(A)     the suspension or ceasing of payments of all or substantially all of the Indebtedness of the Issuer or the Guarantor

(B)     a composition, compromise, assignment or arrangement with the Issuer's or the Guarantor's creditors generally or

(C)     the Issuer or the Guarantor seeking liquidation, reorganisation or other relief with respect to it or its debts under any applicable liquidation, insolvency, composition, reorganisation or other similar laws,

or any analogous procedure or step is taken in any jurisdiction

(b)     a winding-up, dissolution, administration or liquidation of the Issuer or the Guarantor has commenced (or an order or decree is made or an effective resolution passed for such winding-up, dissolution, administration or liquidation) or a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer has been appointed in respect of the Issuer or the Guarantor or substantially all of its assets (as applicable) (or an application is made or documents filed with a court for such appointment and such application is not being actively contested in good faith by the Issuer or the Guarantor, as the case may be) or

(c)     the Issuer or the Guarantor initiates proceedings, or consents to proceedings, or to the entry of a decree or order for relief in a proceeding, in each case relating to itself under any applicable liquidation, insolvency, composition or other similar bankruptcy laws (including the obtaining of a moratorium)

provided that paragraphs (a), (b) and (c) above shall not apply if any such procedure or step is taken for the purpose of, and followed by, a reconstruction, amalgamation, reorganisation, merger or consolidation on terms approved by an Extraordinary Resolution of the Noteholders

(viii)  **Illegality**: the validity of the Notes is contested by the Issuer or it is or will become unlawful for the Issuer or the Guarantor to perform or comply with any one or more of its obligations under any of the Notes, the Deed of Guarantee or the Agency Agreement, as the case may be, or any of such obligations are not or cease to be valid, binding or enforceable

(ix)     **Analogous Events**: any event occurs that under the laws of any relevant jurisdiction has an analogous effect to any of the events referred to in paragraphs (iv) to (vii)

(x)      **Guarantee**: the Guarantor repudiates and/or challenges the validity of its obligations under the Deed of Guarantee or

(xi)     **Issuer**: if the Issuer ceases to be a subsidiary wholly-owned and controlled, directly or indirectly, by the Guarantor.

For the purposes of this Condition 9:

"**Indebtedness**" means present or future indebtedness, and guarantees or indemnities in respect of such indebtedness, of the Issuer or the Guarantor for or in respect of moneys borrowed or raised (whether or not evidenced by bonds, notes, sukuk, certificates or other similar instruments, and for the avoidance of doubt, excludes obligations of the Issuer and the Guarantor owed to their trade creditors) and for the avoidance of doubt, "**Indebtedness**" shall be deemed to include any debt or other financing arrangement issued (or intended to be issued) in compliance with the principles of *Shari'ah*, whether entered into directly or indirectly by the Issuer or the Guarantor, as the case may be (including any undertaking or other obligation to pay money given in connection with the issue of *sukuk* or trust certificates whether or not in return for consideration of any kind).

**10      Meeting of Noteholders and Modifications**

(a)      **Meetings of Noteholders**: The Agency Agreement contains provisions for convening meetings (including by way of telephony or electronic platform or facility) of Noteholders to consider any matter affecting their interests, including the sanctioning by Extraordinary Resolution of a modification of any of these Conditions. Such a meeting may be convened by Noteholders holding not less than 10 per cent. in nominal amount of the Notes for the time being outstanding. The quorum for any meeting convened to consider an Extraordinary Resolution shall be two or more persons holding or representing a clear majority in nominal amount of the Notes for the time being outstanding, or at any adjourned meeting two or more persons being or representing Noteholders whatever the nominal amount of the Notes held or represented, unless the business of such meeting includes consideration of proposals, inter alia, (i) to amend the dates of maturity or redemption of the Notes or any date for payment of interest or Interest Amounts on the Notes, (ii) to reduce or cancel the nominal amount of, or any premium payable on redemption of, the Notes, (iii) to reduce the rate or rates of interest in respect of the Notes or to vary the method or basis of calculating the rate or rates or amount of interest or the basis for calculating any Interest Amount in respect of the Notes (other than any Benchmark Amendments), (iv) if a Minimum and/or a Maximum Rate of Interest or Redemption Amount is shown hereon, to reduce any such Minimum and/or Maximum, (v) to vary any method of, or basis for, calculating the Final Redemption Amount, the Early Redemption Amount or the Optional Redemption Amount, including the method of calculating the Amortised Face Amount, (vi) to vary the currency or currencies of payment or denomination of the Notes, or (vii) to modify the provisions concerning the quorum required at any meeting of Noteholders or the majority required to pass the Extraordinary Resolution, or (viii) to modify or cancel the Deed of Guarantee, in which case the necessary quorum shall be two or more persons holding or representing not less than 75 per cent. or at any adjourned meeting not less than 25 per cent. in nominal amount of the Notes for the time being outstanding. Any Extraordinary Resolution duly passed shall be binding on Noteholders (whether or not they were present at the meeting at which such resolution was passed) and on all Couponholders.

The Agency Agreement provides that a resolution in writing signed by or on behalf of the holders of not less than 75 per cent. in nominal amount of the Notes outstanding shall for all purposes be as valid and effective as an Extraordinary Resolution passed at a meeting of Noteholders duly convened and held. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(b)      **Modification of Agency Agreement:** The Issuer and the Guarantor shall only permit any modification of, or any waiver or authorisation of any breach or proposed breach of or any failure

to comply with, the Agency Agreement, if to do so could not reasonably be expected to be prejudicial to the interests of the Noteholders.

**11      Replacement of Notes, Certificates, Coupons and Talons**

If a Note, Certificate, Coupon or Talon is lost, stolen, mutilated, defaced or destroyed, it may be replaced, subject to applicable laws, regulations and stock exchange or other relevant authority regulations, at the specified office of the Fiscal Agent (in the case of Bearer Notes, Coupons or Talons) and of the Registrar (in the case of Certificates) or such other Paying Agent or Transfer Agent, as the case may be, as may from time to time be designated by the Issuer for the purpose and notice of whose designation is given to Noteholders, in each case on payment by the claimant of the fees and costs incurred in connection therewith and on such terms as to evidence, security and indemnity (which may provide, *inter alia*, that if the allegedly lost, stolen or destroyed Note, Certificate, Coupon or Talon is subsequently presented for payment or, as the case may be, for exchange for further Coupons, there shall be paid to the Issuer on demand the amount payable by the Issuer in respect of such Notes, Certificates, Coupons or further Coupons) and otherwise as the Issuer may require. Mutilated or defaced Notes, Certificates, Coupons or Talons must be surrendered before replacements will be issued.

**12      Further Issues**

The Issuer may from time to time without the consent of the Noteholders or Couponholders create and issue further securities having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest on them) and so that such further issue shall be consolidated and form a single series with an outstanding Series. References in these Conditions to the Notes include (unless the context requires otherwise) any other securities issued pursuant to this Condition and forming a single series with the Notes.

**13      Notices**

Notices required to be given to the holders of Registered Notes pursuant to these Conditions shall be mailed to them at their respective addresses in the Register and deemed to have been given on the fourth weekday (being a day other than a Saturday or a Sunday) after the date of mailing. Notices required to be given to the holders of Bearer Notes pursuant to these Conditions shall be valid if published in a daily newspaper of general circulation in London (which is expected to be the *Financial Times*). So long as the Notes are listed and/or admitted to trading, notices required to be given to the holders of the Notes pursuant to these Conditions shall also be published (if such publication is required) in a manner which complies with the rules and regulations of any stock exchange or other relevant authority on which the Notes are listed/and or admitted to trading. If any such publication is not practicable, notice required to be given pursuant to these Conditions shall be validly given if published in another leading daily English language newspaper with general circulation in Europe. Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the date of the first publication as provided above.

Couponholders shall be deemed for all purposes to have notice of the contents of any notice given to the holders of Bearer Notes in accordance with this Condition 13.

**14      Currency Indemnity**

Any amount received or recovered in a currency other than the currency in which payment under the relevant Note or Coupon is due (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the insolvency, winding-up or dissolution of the Issuer or the Guarantor or otherwise) by any Noteholder or Couponholder in respect of any sum expressed to be due to it from the Issuer or the Guarantor shall only constitute a discharge to the Issuer or the Guarantor, as the case may be, to the extent of the amount in the currency of payment under the relevant Note or Coupon that the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If the amount received or recovered is less than the amount expressed to be due to the recipient under any Note or Coupon, the Issuer, failing whom the Guarantor, shall indemnify it against any loss sustained by it as a result. In any event, the Issuer, failing whom the Guarantor, shall indemnify the recipient against the cost of making any such purchase. For the purposes of this Condition 14, it shall be sufficient for the Noteholder or Couponholder, as the case may be, to

demonstrate that it would have suffered a loss had an actual purchase been made. These indemnities constitute a separate and independent obligation from the Issuer's and the Guarantor's other obligations, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Noteholder or Couponholder and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or Coupon or any other judgment or order.

**15      Contracts (Rights of Third Parties) Act 1999**

No person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999.

**16      Governing Law and Jurisdiction**

(a)      **Governing Law:** The Notes, the Coupons and the Talons and any non-contractual obligations arising out of or in connection with them are governed by, and shall be construed in accordance with, English law.

(b)      **Arbitration**: Any dispute, claim, difference or controversy arising out of, relating to or having any connection with the Notes, the Coupons and/or the Talons (including any dispute as to their existence, validity, interpretation, performance, breach or termination or the consequences of their nullity and any dispute relating to any non-contractual obligations arising out of or in connection with them) (a "**Dispute**") shall be referred to and finally resolved by arbitration under the Arbitration Rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**"), which Rules (as amended from time to time) are incorporated by reference into these Conditions. In relation to any such arbitration:

(i)      the arbitral tribunal shall consist of three (3) arbitrators, each of whom shall be an arbitrator experienced in international securities transactions;

(ii)      the claimant(s) and the respondent(s) shall each nominate one (1) arbitrator within fifteen (15) days from receipt by the Registrar of the LCIA of the Response to the Request for arbitration as defined in the Rules, and the presiding arbitrator of the arbitral tribunal shall be nominated by the two (2) party-nominated arbitrators within fifteen (15) days of the last of their appointments. If the presiding arbitrator of the arbitral tribunal is not so nominated, he shall be chosen by the LCIA;

(iii)      the seat of arbitration shall be London, England;

(iv)      the language of the arbitration shall be English;

(v)      the claimant(s) and the respondent(s) undertake to waive any right of application to determine a preliminary point of law under section 45 of the Arbitration Act 1996 of the United Kingdom;

(vi)      if any Dispute raises issues which are substantially the same as or connected with issues raised in a Dispute which has already been referred to arbitration under the Notes, the Coupons and/or the Talons (an "**Existing Dispute**") or arises out of substantially the same facts as are the subject of an Existing Dispute (a "**Related Dispute**"), then the arbitral tribunal nominated or appointed in respect of any such Existing Dispute shall also be nominated as the arbitral tribunal in respect of any Related Dispute, save where the arbitral tribunal considers such appointment would be inappropriate;

(vii)      where the same arbitral tribunal has been appointed in relation to two (2) or more Existing and/or Related Disputes, the arbitral tribunal may, with the agreement of all of the parties concerned or upon the application of one (1) of the parties, being a party to each of such Disputes, order that the whole or part of the matters at issue shall be heard together upon such terms or conditions as the arbitral tribunal thinks fit; and

(viii)      upon request of a party to a Dispute which itself wishes to be joined to any reference to arbitration proceedings in relation to a Dispute, the arbitral tribunal may join any such party to any reference to arbitration proceedings in relation to that Dispute between

them. Each of the Issuer and the Guarantor hereby consents to be joined to any reference to arbitration proceedings in relation to any Dispute at the request of a party to that Dispute, and to accept the joinder of a party requesting to be joined pursuant to this paragraph (viii).

(c)     **Waiver of Immunity**: Each of the Issuer and the Guarantor has in the Deed of Covenant, Deed of Guarantee and Agency Agreement waived irrevocably, to the fullest extent permitted by law:

(i)     any immunity from suit, attachment or execution to which it might otherwise be entitled by virtue of its sovereign status under the State Immunity Act 1978 of the United Kingdom or otherwise in any action arising out of or based on these Conditions which may be instituted as provided for in these Conditions in any arbitration having its seat in London, England; and

(ii)    any immunity from attachment or execution to which it might otherwise be entitled by virtue of its sovereign status in any other jurisdiction in an action to enforce an arbitral award properly obtained in England and Wales as referred to in paragraph (i) above.

Notwithstanding anything to the contrary in the Agency Agreement, the Deed of Covenant and/or the Deed of Guarantee, such waiver of immunity shall not be deemed or interpreted to include any waiver of immunity in respect of (i) present or future "premises of the mission" as defined in the Vienna Convention on Diplomatic Relations signed in 1961; (ii) "consular premises" as defined in the Vienna Convention on Consular Relations signed in 1963; (iii) any other property or assets used solely or mainly for governmental or public purposes in the Kingdom or elsewhere; (iv) military property or military assets or property or assets of the Kingdom related thereto; (v) rights or immunities or property held by individuals or by entities, agencies, or instrumentalities distinct from the Issuer and/or the Guarantor (regardless of their relationship to the Issuer and/or the Guarantor (as applicable)); or (vi) other procedural or substantive rights enjoyed by the Guarantor by virtue of its sovereign status besides immunity from suit, attachment, and execution. Without prejudice to the generality of the above, none of the provisions of this Condition 16(c) shall apply to actions brought under the United States federal securities law or any securities laws of any state thereof.

**SUMMARY OF PROVISIONS RELATING TO THE NOTES WHILE IN GLOBAL FORM**

**1      Initial Issue of Notes**

Global Notes and Global Certificates may be delivered on or prior to the original issue date of the Tranche to a Common Depositary.

Upon the initial deposit of a Global Note with the Common Depositary or registration of Registered Notes in the name of any nominee for Euroclear and Clearstream, Luxembourg and delivery of the relative Global Certificate to the Common Depositary, Euroclear or Clearstream, Luxembourg will credit each subscriber with a nominal amount of Notes equal to the nominal amount thereof for which it has subscribed and paid.

Notes that are initially deposited with the Common Depositary may also be credited to the accounts of subscribers with (if indicated in the relevant Pricing Supplement) other clearing systems through direct or indirect accounts with Euroclear and Clearstream, Luxembourg held by such other clearing systems. Conversely, Notes that are initially deposited with any other clearing system may similarly be credited to the accounts of subscribers with Euroclear, Clearstream, Luxembourg or other clearing systems.

**2      Relationship of Accountholders with Clearing Systems**

Each of the persons shown in the records of Euroclear, Clearstream, Luxembourg or any other clearing system ("**Alternative Clearing System**") as the holder of a Note represented by a Global Note or a Global Certificate must look solely to Euroclear, Clearstream, Luxembourg or any such Alternative Clearing System (as the case may be) for its share of each payment made by the Issuer to the bearer of such Global Note or the holder of the underlying Registered Notes, as the case may be, and in relation to all other rights arising under the Global Notes or Global Certificates, subject to and in accordance with the respective rules and procedures of Euroclear, Clearstream, Luxembourg, or such Alternative Clearing System (as the case may be). Such persons shall have no claim directly against the Issuer in respect of payments due on the Notes for so long as the Notes are represented by such Global Note or Global Certificate and such obligations of the Issuer will be discharged by payment to the bearer of such Global Note or the holder of the underlying Registered Notes, as the case may be, in respect of each amount so paid.

**3      Exchange**

**3.1    Temporary Global Notes**

Each temporary Global Note will be exchangeable, free of charge to the holder, on or after its Exchange Date (as defined below):

    (i)     if the relevant Pricing Supplement indicate that such Global Note is issued in compliance with the C Rules or in a transaction to which TEFRA is not applicable (as to which, see "*Overview of the Programme—Selling Restrictions*"), in whole, but not in part, for the Definitive Notes defined and described below; and

    (ii)    otherwise, in whole or in part upon certification as to non-U.S. beneficial ownership in the form set out in the Agency Agreement for interests in a permanent Global Note or, if so provided in the relevant Pricing Supplement, for Definitive Notes.

**3.2    Permanent Global Notes**

Each permanent Global Note will be exchangeable, free of charge to the holder, on or after its Exchange Date in whole but not, except as provided under paragraph 3.4 below, in part for Definitive Notes:

    (i)     if the permanent Global Note is held on behalf of Euroclear or Clearstream, Luxembourg or an Alternative Clearing System and any such clearing system is closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or announces an intention permanently to cease business or in fact does so; or

(ii)    if principal in respect of any Notes is not paid when due, by the holder giving notice to the Fiscal Agent of its election for such exchange.

In the event that a Global Note is exchanged for Definitive Notes (as defined below), such Definitive Notes shall be issued in Specified Denomination(s) only. A Noteholder who holds a principal amount of less than the minimum Specified Denomination will not receive a Definitive Note in respect of such holding and would need to purchase a principal amount of Notes such that it holds an amount equal to one or more Specified Denominations.

## 3.3    Permanent Global Certificates

If the applicable Pricing Supplement state that the Notes are to be represented by a permanent Global Certificate on issue, the following will apply in respect of transfers of Notes held in Euroclear or Clearstream, Luxembourg or an Alternative Clearing System. These provisions will not prevent the trading of interests in the Notes within a clearing system while they are held on behalf of such clearing system, but will limit the circumstances in which the Notes may be withdrawn from the relevant clearing system.

Transfers of the holding of Notes represented by any Global Certificate pursuant to Condition 2(b)(*Transfer of Registered Notes*) may only be made in part:

(i)    if the relevant clearing system is closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so; or

(ii)    if principal in respect of any Notes is not paid when due; or

(iii)    with the consent of the Issuer,

provided that, in the case of the first transfer of part of a holding pursuant to paragraph 3.3(i) or 3.3(ii) above, the Registered Holder has given the Registrar not less than 30 days' notice at its specified office of the Registered Holder's intention to effect such transfer.

## 3.4    Partial Exchange of Permanent Global Notes

For so long as a permanent Global Note is held on behalf of a clearing system and the rules of that clearing system permit, such permanent Global Note will be exchangeable in part on one or more occasions for Definitive Notes if principal in respect of any Notes is not paid when due.

## 3.5    Delivery of Notes

On or after any due date for exchange the holder of a Global Note may surrender such Global Note or, in the case of a partial exchange, present it for endorsement to or to the order of the Fiscal Agent. In exchange for any Global Note, or the part thereof to be exchanged, the Issuer will (i) in the case of a temporary Global Note exchangeable for a permanent Global Note, deliver, or procure the delivery of, a permanent Global Note in an aggregate nominal amount equal to that of the whole or that part of a temporary Global Note that is being exchanged or, in the case of a subsequent exchange, endorse, or procure the endorsement of, a permanent Global Note to reflect such exchange or (ii) in the case of a Global Note exchangeable for Definitive Notes, deliver, or procure the delivery of, an equal aggregate nominal amount of duly executed and authenticated Definitive Notes. In this Offering Circular, "**Definitive Notes**" means, in relation to any Global Note, the definitive Bearer Notes for which such Global Note may be exchanged (if appropriate, having attached to them all Coupons in respect of interest that have not already been paid on the Global Note and a Talon). Definitive Notes will be security printed in accordance with any applicable legal and stock exchange requirements in or substantially in the form set out in the Schedules to the Agency Agreement. On exchange in full of each permanent Global Note, the Issuer will, if the holder so requests, procure that it is cancelled and returned to the holder together with the relevant Definitive Notes.

## 3.6    Exchange Date

"**Exchange Date**" means, in relation to a temporary Global Note, the day falling after the expiry of 40 days after its issue date and, in relation to a permanent Global Note, a day falling not less than 60 days,

or in the case of failure to pay principal in respect of any Notes when due 30 days, after that on which the notice requiring exchange is given and on which banks are open for business in the city in which the specified office of the Fiscal Agent is located and in the city in which the relevant clearing system is located.

## 4        Amendment to Conditions

The temporary Global Notes, permanent Global Notes and Global Certificates contain provisions that apply to the Notes that they represent, some of which modify the effect of the Conditions set out in this Offering Circular. The following is a summary of certain of those provisions:

### 4.1       Payments

No payment falling due after the Exchange Date will be made on any Global Note unless exchange for an interest in a permanent Global Note or for Definitive Notes is improperly withheld or refused. Payments on any temporary Global Note issued in compliance with the D Rules before the Exchange Date will only be made against presentation of certification as to non-U.S. beneficial ownership in the form set out in the Agency Agreement. All payments in respect of Notes represented by a Global Note will be made against presentation for endorsement and, if no further payment falls to be made in respect of the Notes, surrender of that Global Note to or to the order of the Fiscal Agent or such other Paying Agent as shall have been notified to the Noteholders for such purpose. A record of each payment so made will be endorsed on each Global Note, which endorsement will be *prima facie* evidence that such payment has been made in respect of the Notes. For the purpose of any payments made in respect of a Global Note, the relevant place of presentation shall be disregarded in the definition of "**business day**" set out in Condition 6(h) (*Non-Business Days*).

All payments in respect of Notes represented by a Global Certificate will be made to, or to the order of, the person whose name is entered on the Register at the close of business on the record date which shall be on the Clearing System Business Day immediately prior to the date for payment, where "**Clearing System Business Day**" means Monday to Friday inclusive except 25 December and 1 January.

### 4.2       Prescription

Claims against the Issuer in respect of Notes that are represented by a permanent Global Note will become void unless it is presented for payment within a period of 10 years (in the case of principal) and five years (in the case of interest) from the appropriate Relevant Date (as defined in Condition 7 (*Taxation*)).

### 4.3       Meetings

The holder of a permanent Global Note or of the Notes represented by a Global Certificate shall (unless such permanent Global Note or Global Certificate represents only one Note) be treated as being two persons for the purposes of any quorum requirements of a meeting of Noteholders (including by way of telephony or electronic platform or facility) and, at any such meeting, the holder of a permanent Global Note shall be treated as having one vote in respect of each integral currency unit of the Specified Currency of the Notes. All holders of Registered Notes are entitled to one vote in respect of each integral currency unit of the Specified Currency of the Notes comprising such Noteholder's holding, whether or not represented by a Global Certificate.

### 4.4       Cancellation

Cancellation of any Note represented by a permanent Global Note that is required by the Conditions to be cancelled (other than upon its redemption) will be effected by reduction in the nominal amount of the relevant permanent Global Note.

### 4.5       Purchase

Notes represented by a permanent Global Note may only be purchased by the Issuer, the Guarantor or any of their respective subsidiaries if they are purchased together with the rights to receive all future payments of interest (if any) thereon.

4.6    **Issuer's Options**

Any option of the Issuer provided for in the Conditions of any Notes while such Notes are represented by a permanent Global Note shall be exercised by the Issuer giving notice to the Noteholders within the time limits set out in and containing the information required by the Conditions, except that the notice shall not be required to contain the serial numbers of Notes drawn in the case of a partial exercise of an option and accordingly no drawing of Notes shall be required. In the event that any option of the Issuer is exercised in respect of some but not all of the Notes of any Series, the rights of accountholders with a clearing system in respect of the Notes will be governed by the standard procedures of Euroclear, Clearstream, Luxembourg or any other clearing system (as the case may be).

4.7    **Noteholders' Options**

Any option of the Noteholders provided for in the Conditions of any Notes while such Notes are represented by a permanent Global Note may be exercised by the holder of the permanent Global Note giving notice to the Fiscal Agent within the time limits relating to the deposit of Notes with a Paying Agent or Transfer Agent set out in the Conditions, in accordance with the rules and procedures of Euroclear and Clearstream, Luxembourg and any Alternative Clearing System, as applicable, failing which, in the form of the notice available from any Paying Agent and stating the nominal amount of Notes in respect of which the option is exercised and at the same time presenting the permanent Global Note to the Fiscal Agent, or to a Paying Agent acting on behalf of the Fiscal Agent, for notation.

4.8    **Events of Default**

Each Global Note provides that the holder may cause such Global Note, or a portion of it, to become due and repayable in the circumstances described in Condition 9 *(Events of Default)* by stating in the notice to the Fiscal Agent the nominal amount of such Global Note that is becoming due and repayable. If principal in respect of any Note is not paid when due, the holder of a Global Note or Registered Notes represented by a Global Certificate may elect for direct enforcement rights against the Issuer under the terms of a Deed of Covenant executed as a deed by the Issuer on 27 September 2022 to come into effect in relation to the whole or a part of such Global Note or one or more Registered Notes in favour of the persons entitled to such part of such Global Note or such Registered Notes, as the case may be, as accountholders with a clearing system. Following any such acquisition of direct rights, the Global Note or, as the case may be, the Global Certificate and the corresponding entry in the register kept by the Registrar will become void as to the specified portion or Registered Notes, as the case may be. However, no such election may be made in respect of Notes represented by a Global Certificate unless the transfer of the whole or a part of the holding of Notes represented by that Global Certificate shall have been improperly withheld or refused.

4.9    **Notices**

So long as any Notes are represented by a Global Note and such Global Note is held on behalf of a clearing system, notices to the holders of Notes of that Series may be given by delivery of the relevant notice to that clearing system for communication by it to entitled accountholders in substitution for publication as required by the Conditions or by delivery of the relevant notice to the holder of the Global Note. The Issuer shall also ensure that notices are duly published in a manner that complies with any relevant rules of any stock exchange or other relevant authority on which the Notes are listed and/or admitted to trading.

5    **Electronic Consent and Written Resolution**

While any Global Note is held on behalf of, or any Global Certificate is registered in the name of any nominee for, a clearing system, then:

(i)    in respect of any resolution proposed by the Issuer or the Guarantor where the terms of the resolution proposed by the Issuer or the Guarantor (as the case may be) have been notified to the Noteholders through the relevant clearing system(s), each of the Issuer and the Guarantor shall be entitled to rely upon approval of such resolution given by way of electronic consents communicated through the electronic communications systems of the relevant clearing system(s) in accordance with their operating rules and procedures by or on behalf of the holders of not less than 75% in nominal amount of the Notes outstanding (an "**Electronic Consent**" as defined in the Agency Agreement).

Any resolution passed in such manner shall be binding on all Noteholders and Couponholders, even if the relevant consent or instruction proves to be defective. Neither the Issuer nor the Guarantor shall be liable or responsible to anyone for such reliance; and

(ii)     where Electronic Consent is not being sought, for the purpose of determining whether a Written Resolution (as defined in the Agency Agreement) has been validly passed, the Issuer and the Guarantor shall be entitled to rely on: (a) consents or instructions given in writing directly to the Issuer and/or the Guarantor, as the case may be, by accountholders in the clearing system with entitlements to such Global Note or Global Certificate; and/or (b) where the accountholders hold any such entitlement on behalf of another person, written consent from or written instruction by the person identified by that accountholder as the person for whom such entitlement is held. For the purpose of establishing the entitlement to give any such consent or instruction, the Issuer and the Guarantor shall be entitled to rely on any certificate or other document issued by, in the case of (a) above, Euroclear, Clearstream, Luxembourg or any other relevant Alternative Clearing System (the "**relevant clearing system**") and, in the case of (b) above, the relevant clearing system and the accountholder identified by the relevant clearing system for the purposes of (b) above. Any resolution passed in such manner shall be binding on all Noteholders and Couponholders, even if the relevant consent or instruction proves to be defective. Any such certificate or other document shall, in the absence of manifest error, be conclusive and binding for all purposes. Any such certificate or other document may comprise any form of statement or print out of electronic records provided by the relevant clearing system (including Euroclear's EUCLID or Clearstream, Luxembourg's CreationOnline system) in accordance with its usual procedures and in which the accountholder of a particular principal or nominal amount of the Notes is clearly identified together with the amount of such holding. The Issuer and/or the Guarantor shall not be liable to any person by reason of having accepted as valid or not having rejected any certificate or other document to such effect purporting to be issued by any such person and subsequently found to be forged or not authentic.

A Written Resolution and/or Electronic Consent shall take effect as an Extraordinary Resolution. A Written Resolution and/or Electronic Consent will be binding on all Noteholders and holders of Coupons and Talons, whether or not they participated in such Written Resolution and/or Electronic Consent.

## USE OF PROCEEDS

An amount at least equal to the net proceeds from the issue of each Tranche of Notes will be loaned by the Issuer to the Guarantor under a Notes Loan Agreement and applied by the Guarantor (i) for general corporate purposes; (ii) to finance, refinance and/or invest, in whole or in part, in one or more Eligible Green Projects, as described in the Pricing Supplement and further described in the Framework which is available on its website; or (iii) to finance or refinance, in whole or in part, one or more Eligible Green Projects, as described in the Pricing Supplement and further described in the Framework that fall into investment areas set forth in the Climate Bonds Standard. If, in respect of any particular issue, there is a particular identified use of proceeds, this will be stated in the applicable Pricing Supplement.

### Green Bonds

The Framework describes the use of proceeds, the process for project evaluation and selection, the management of proceeds and reporting in respect of Green Bonds. The Framework complies with the Green Bond Principles 2021 (the "**GBP**") published by ICMA.

Where the applicable Pricing Supplement denotes a Tranche of Notes as "Green Bonds", an amount at least equal to the net proceeds of such Notes will be on-lent by the Issuer to the Guarantor to finance, refinance and/or invest, in whole or in part, in new or existing projects under development and/or projects in operation from any Eligible Green Project categories, as set out in the Framework. All Eligible Green Projects are aligned with the United Nations Sustainable Development Goals and are expected to provide significant environmental benefits towards Climate Change Mitigation while avoiding significant harm to either Climate Change Adaptation, Sustainable Use of Water Resources, the Transition to a Circular Economy, Pollution Prevention and Control and Biodiversity Preservation.

The Issuer has appointed DNV Business Assurance Services UK Limited to provide the Second Party Opinion, assessing the validity of the Framework and its alignment with the GBP. The Second Party Opinion is available on the Guarantor's website (https://www.pif.gov.sa/). Any amendment to the Second Party Opinion, or any new Second Party Opinion, to be provided following an amendment to the Framework, the publication of a new framework or in application of any new legislation or regulation, will be made available on the Guarantor's website. Furthermore, the Fund intends to engage a third-party reviewer to provide an annual assessment on the alignment of the allocation of proceeds in accordance with the Framework (until the proceeds have been fully allocated).

Prior to any investment in Green Bonds, investors are advised to review the Framework for further information.

As at the date of this Offering Circular, "**Eligible Green Projects**" include the following:

- Renewable energy, including investments and expenditures in the production, transmission and storage of energy from renewable sources;

- Energy efficiency, including installation of energy-efficient technologies and products, for example LED lighting, to increase operational energy efficiency by at least 30%;

- Sustainable water management, including investments and expenditures in projects and infrastructure that increase water-use efficiency, such as water recycling and reuse projects, water saving systems, technologies and water metering;

- Pollution prevention and control, including investment and expenditures for the acquisition, development, construction and operation of facilities;

- Green buildings, including investments and expenditure in low energy consuming or low emission transportation; and

- Clean transportation, including investments and expenditure in low energy consuming or low emission transportation.

### Climate Bonds Initiative

The Climate Bonds Initiative (the "**CBI**") is an international not-for-profit organisation which was launched in December 2009. As part of its stated aim to promote large-scale investments that will deliver a global low-carbon

economy, the CBI developed eligibility criteria for certain bonds known as the Climate Bonds Standard. Eligible projects and assets under the Climate Bonds Standard are projects or physical assets, indebtedness incurred to finance such projects or physical assets, or expenditures related to and supporting such projects or physical assets, that contribute to the delivery of a low-carbon economy and satisfy the prescribed eligibility criteria within the terms of the Climate Bonds Standard and Sector Eligibility Criteria published by the CBI.

For so long as any Green Bonds issued in accordance with the Climate Bond Standard ("**Climate Bonds**") remain outstanding, the Issuer and/or the Fund will retain a CBI-approved third party assurance provider to perform an assurance engagement in relation to the compliance of its use of proceeds from such Climate Bonds, as at the relevant balance date, with the requirements of the Climate Bonds Standard and Sector Eligibility Criteria published by the CBI. Subject to the outcome of the assurance engagement, the third-party assurance provider will prepare reports, at least on an annual basis, that will provide a reasonable assurance opinion on the matters referred to above. The assurance engagement will be conducted in accordance with the Climate Bonds Standard, and the reports of the third-party assurance provider will be prepared solely to comply with the Climate Bonds Standard.

None of the GBP, the Second Party Opinion or the Framework or any of the above reports, verification assessments or the contents of any of the above websites are incorporated in, or form part of, this Offering Circular.

A certification, if obtained, of any series of Climate Bonds as "climate bonds" by the Climate Bonds Initiative will be based solely on the Climate Bond Standard and will not, and will not be intended to, make any representation or give any assurance with respect to any other matter relating to the Notes or any Eligible Green Projects, including but not limited to this Offering Circular, the transaction documents, the Issuer, the Guarantor or the management of the Issuer or the Guarantor.

A certification, if obtained, of any series of Climate Bonds as "climate bonds" by the Climate Bonds Initiative would be addressed solely to the board of directors of the Issuer and/or the Guarantor and is not a recommendation to any person to purchase, hold or sell the Notes and such certification will not, and will not be intended to address the market price or suitability of the Notes for a particular investor. The certification also would not address the merits of the decision by the Issuer, and/or the Guarantor, or any third party to participate in any Eligible Green Projects and would not express and should not be deemed to be an expression of an opinion as to the Issuer and/or the Guarantor or any aspect of any Eligible Green Projects (including but not limited to the financial viability of any Eligible Green Projects) other than with respect to conformance with the Climate Bond Standard.

In issuing or monitoring, as applicable, the certification, the Climate Bonds Initiative has assumed and relied upon and will assume and rely upon the accuracy and completeness in all material respects of the information supplied or otherwise made available to the Climate Bonds Initiative. The Climate Bonds Initiative will not, and will not be intended to assume or accept any responsibility to any person for independently verifying (and it has not verified) such information or to undertake (and it has not undertaken) any independent evaluation of any Eligible Green Projects or the Issuer. In addition, the Climate Bonds Initiative does not assume any obligation to conduct (and it has not conducted) any physical inspection of any Eligible Green Projects. The certification may only be used with the Notes and may not be used for any other purpose without the Climate Bonds Initiative's prior written consent.

The certification would not, and would not in any way be intended to, address the likelihood of timely payment of interest when due on the Notes and/or the payment of principal at maturity or any other date.

The certification may be withdrawn at any time in the Climate Bonds Initiative's sole and absolute discretion and there can be no assurance that such certification will not be withdrawn.

**FORM OF PRICING SUPPLEMENT**

The form of Pricing Supplement that will be issued in respect of each Tranche, subject only to the deletion of non-applicable provisions, is set out below:

[**PROHIBITION OF SALES TO EEA RETAIL INVESTORS** - The Notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area ("**EEA**"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, "**MiFID II**"); or (ii) a customer within the meaning of Directive (EU) 2016/97 (the "**Insurance Distribution Directive**"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II. Consequently, no key information document required by Regulation (EU) No 1286/2014 (as amended, the "**PRIIPs Regulation**") for offering or selling the Notes or otherwise making them available to retail investors in the EEA has been prepared and therefore offering or selling the Notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation.][1]

[**PROHIBITION OF SALES TO UK RETAIL INVESTORS** – The Notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the United Kingdom ("**UK**"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No 2017/565 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 ("**EUWA**"); or (ii) a customer within the meaning of the provisions of the Financial Services and Markets Act 2000 (the "**FSMA**") and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No 600/2014 as it forms part of domestic law by virtue of the EUWA ("**UK MiFIR**"). Consequently, no key information document required by Regulation (EU) No 1286/2014 as it forms part of domestic law by virtue of the EUWA (the "**UK PRIIPs Regulation**") for offering or selling the Notes or otherwise making them available to retail investors in the UK has been prepared and therefore offering or selling the Notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.][2]

**Pricing Supplement dated [ ● ]**

**GACI First Investment Company**
**(LEI: 558600TU1PWGNLZ3XM88)**

**Issue of [Aggregate Nominal Amount of Tranche] [Title of Notes]**
**Guaranteed by the Public Investment Fund**
**under the Euro Medium Term Note Programme**

[**MiFID II product governance / Professional investors and ECPs only target market** – Solely for the purposes of [the/each] manufacturer's product approval process, the target market assessment in respect of the Notes has led to the conclusion that: (i) the target market for the Notes is eligible counterparties and professional clients only, each as defined in MiFID II; and (ii) all channels for distribution of the Notes to eligible counterparties and professional clients are appropriate. Any person subsequently offering, selling or recommending the Notes (a "**distributor**") should take into consideration the manufacturer['s/s'] target market assessment; however, a distributor subject to MiFID II is responsible for undertaking its own target market assessment in respect of the Notes (by either adopting or refining the manufacturer['s/s'] target market assessment) and determining appropriate distribution channels.]

[**UK MiFIR product governance / Professional investors and ECPs only target market** – Solely for the purposes of [the/each] manufacturer's product approval process, the target market assessment in respect of the Notes has led to the conclusion that: (i) the target market for the Notes is only eligible counterparties, as defined in the FCA Handbook Conduct of Business Sourcebook, and professional clients, as defined in Regulation (EU) No 600/2014 as it forms part of domestic law by virtue of the [European Union (Withdrawal) Act 2018]/[EUWA] (the "**UK MiFIR**"); and (ii) all channels for distribution of the Notes to eligible counterparties and professional clients are appropriate. Any [person subsequently offering, selling or recommending the Notes (a "**distributor**")] [distributor] should take into consideration the manufacturer['s/s'] target market assessment; however, a

---

[1]    Include where item 7(f) of Part B of the Pricing Supplement specifies "Applicable".

[2]    Include where item 7(g) of Part B of the Pricing Supplement specifies "Applicable".

distributor subject to the FCA Handbook Product Intervention and Product Governance Sourcebook (the "**UK MiFIR Product Governance Rules**") is responsible for undertaking its own target market assessment in respect of the Notes (by either adopting or refining the manufacturer['s/s'] target market assessment) and determining appropriate distribution channels.]

[**Singapore SFA Product Classification**: In connection with Section 309B of the Securities and Futures Act 2001 of Singapore (the "**SFA**") and the Securities and Futures (Capital Markets Products) Regulations 2018 of Singapore (the "**CMP Regulations 2018**"), the Issuer has determined, and hereby notifies all relevant persons (as defined in Section 309A(1) of the SFA), that the Notes are ['prescribed capital markets products']/[capital markets products other than 'prescribed capital markets products'] (as defined in the CMP Regulations 2018) and [are] [Excluded]/[Specified] Investment Products (as defined in MAS Notice SFA 04 N12: Notice on the Sale of Investment Products and MAS Notice FAA N16: Notice on Recommendations on Investment Products).][3]

## PART A – CONTRACTUAL TERMS

[Terms used herein shall be deemed to be defined as such for the purposes of the terms and conditions (the "**Conditions**") set forth in the offering circular dated 27 September 2022 [and the supplemental offering circular(s) thereto dated [ ● ]], which [together] constitute[s] an offering circular (the "**Offering Circular**"). This document constitutes the Pricing Supplement of the Notes described herein and must be read in conjunction with the Offering Circular in order to obtain all the relevant information.

The Offering Circular and this Pricing Supplement are available for viewing during normal business hours at the registered offices of the Issuer at c/o TMF (Cayman) Ltd., 4th Floor, Monaco Towers, 11 Dr. Roy's Drive, P.O. Box 10338, Grand Cayman KY1-1003, Cayman Islands and the Fiscal Agent at Winchester House, 1 Great Winchester Street, London EC2N 2DB, United Kingdom and copies may be obtained from such offices.

[*Include whichever of the following apply or specify as "Not Applicable" (N/A). Note that the numbering should remain as set out below, even if "Not Applicable" is indicated for individual paragraphs (in which case the sub-paragraphs of the paragraphs which are not applicable can be deleted). Italics denote guidance for completing the Pricing Supplement.*]

| 1 | (a) Issuer: | GACI First Investment Company |
|---|---|---|
|  | (b) Guarantor: | The Public Investment Fund |
| 2 | [(a) Series Number: | [ ● ] |
|  | [(b) Tranche Number: | [ ● ] |
|  | [(c) Date on which the Notes become fungible: | [Not Applicable/The Notes shall be consolidated, form a single series and be interchangeable for trading purposes with the [*insert description of the Series*] on [insert date/the Issue Date/exchange of the Temporary Global Note for interests in the Permanent Global Note, as referred to in paragraph [23] below [which is expected to occur on or about [*insert date*]]]. |
| 3 | **Specified Currency or Currencies:** | [ ● ] |
| 4 | **Aggregate Nominal Amount of Notes:** | [ ● ] |
|  | [(a) Series: | [ ● ] |
|  | [(b) Tranche: | [ ● ] |
| 5 | **Issue Price:** | [ ● ] per cent. of the Aggregate Nominal Amount [plus accrued interest from [ ● ]] |

---

[3]   For any Notes to be offered to Singapore investors, the Issuer is to consider whether it needs to reclassify the Notes pursuant to Section 309B of the SFA prior to the launch of the offer.

| 6 | [(a)] Specified Denominations:[4] | [ ● ] |
| | (b) Calculation Amount: | [ ● ] |
| 7 | (a) Issue Date: | [ ● ] |
| | (b) Interest Commencement Date: | [[ ● ]/Issue Date/Not Applicable] |

8  **Maturity Date:**  [ ● ] [*Specify date or (for Floating Rate Notes) Interest Payment Date falling in or nearest to the relevant month and year*]

9  **Interest Basis:**  [[ ● ] per cent. Fixed Rate]

[[ ● ] +/- [ ● ] per cent. Floating Rate] [Zero Coupon] (See paragraph [14/15/16] below)

10  **Redemption/Payment Basis:**  Subject to any purchase and cancellation or early redemption, the Notes will be redeemed on the Maturity Date at [[ ● ]/[100]] per cent. of their nominal amount.

11  **Change of Interest Basis:**  [Not Applicable/[ ● ]]

12  **Put/Call Options:**  [Put Option]
[Call Option]
[Maturity Par Call Option]
[Clean Up Call Option]
[(See paragraph 17/18/19/20 below)]

| 13 | (a) Status of the Notes: | Senior |
| | (b) Status of the Guarantee: | Senior |
| | (c) [Date [Board] approval for issuance of Notes [and Guarantee] obtained: | [ ● ] [and [ ● ], respectively] |

[*N.B Only relevant where Board (or similar) authorisation is required for the particular tranche of Notes or related Guarantee*]

**PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE**

14  **Fixed Rate Note Provisions:**  [Applicable/Not Applicable]

(a) Rate[s] of Interest:  [ ● ] per cent. per annum [payable [annually/semi-annually/quarterly/monthly/[ ● ]] in arrear on each Interest Payment Date]

(b) Interest Payment Date(s):  [ ● ] in each year

(c) Fixed Coupon Amount[(s)]:  [ ● ] per Calculation Amount

(d) Broken Amount(s):  [ ● ] per Calculation Amount payable on the Interest Payment Date falling [in/on] [ ● ]

(e) Day Count Fraction:  [30/360]
[360/360]

[Actual/Actual]

[Actual/Actual (ICMA)]
[Actual/Actual (ISDA)]
[Actual/365 (Fixed)]

---

[4] For any notes to be admitted to trading on the London Stock Exchange's International Securities Market, the minimum denomination is €100,000.

|  | | [Actual/365 (Sterling)]<br>[Actual/360] |
|---|---|---|
|  | | [30E/360]<br>[30E/360 (ISDA)] |
| (f) | [Determination Dates: | [[ ● ] in each year]/[Not Applicable] |
| (g) | Other terms relating to the method of calculating interest for Fixed Rate Notes: | [Not Applicable/[ ● ]] |
| **15** | **Floating Rate Note Provisions:** | [Applicable/Not Applicable] |
| (a) | Interest Period(s): | [[ ● ][, subject to adjustment in accordance with the Business Day Convention specified in paragraph 15(e) below/, not subject to any adjustment[, as the Business Day Convention in paragraph 15(e) below is specified to be Not Applicable.]] |
| (b) | Interest Accrual Period | [ ● ] |
| (c) | Specified Interest Payment Dates: | [[ ● ] in each year[, subject, in each case, to adjustment in accordance with the Business Day Convention specified in paragraph 15(e) below/, not subject to any adjustment[, as the Business Day Convention in paragraph 15(e) below is specified to be Not Applicable]] |
| (d) | First Interest Payment Date: | [ ● ] |
| (e) | Interest Period Date: | [Not Applicable]/[[ ● ] in each year[, subject, to adjustment in accordance with the Business Day Convention specified in paragraph 15(e) below/, not subject to any adjustment[, as the Business Day Convention in paragraph 15(e) below is specified to be Not Applicable]] |
| (f) | Business Day Convention: | [Floating Rate Business Day Convention/Following Business Day Convention/Modified Following Business Day Convention/Preceding Business Day Convention]<br>[Not Applicable] |
| (g) | Business Centre(s): | [ ● ] |
| (h) | Manner in which the Rate(s) of Interest is/are to be determined: | [Screen Rate Determination/ISDA Determination] |
| (i) | Party responsible for calculating the Rate of Interest and/or Interest Amount (if not the Fiscal Agent): | [[ ● ] shall be the Calculation Agent] |
| (j) | Party responsible for calculating the Rate(s) of Interest and/or Interest Amount(s) (if not the [Fiscal Agent]): | [Not Applicable/[ ● ]] |
| (k) | Screen Rate Determination: | |
|  | — Reference Rate: | [BBSW/CNH HIBOR/EIBOR/EURIBOR/HIBOR/PRIBOR/SAIBOR/SHIBOR]<br>[[ ● ] is provided by [*administrator legal name*] [*repeat as necessary*].] [As at the date hereof, [*administrator legal name*] [appears]/[does not appear] [*repeat as necessary*] in the register of |

administrators and benchmarks established and maintained by [ESMA pursuant to Article 36 (*Register of administrators and benchmarks*) of Regulation (EU) 2016/1011, as amended (the "**BMR**")]/[FCA pursuant to Article 36 of the Benchmarks Regulation (Regulation (EU) 2016/1011) as it forms part of domestic law by virtue of the EUWA (the "**UK BMR**")]/[As far as the Issuer is aware, as at the date hereof, the [*specify benchmark*] does not fall within the scope of the [BMR]/[UK BMR]/[Not Applicable]

| | |
|---|---|
| — Interest Determination Date(s): | [ ● ]<br>[The first day of such Interest Accrual Period]<br>[Two Business Days prior to the first day of such Interest Accrual Period]<br>[Two TARGET Business Days prior to the first day of such Interest Accrual Period] |
| — Relevant Time: | [ ● ] |
| — Relevant Screen Page: | [ ● ] |
| — Relevant Financial Centre: | [ ● ] |
| — Fallback Provisions: | [Condition [4(h)(i)] (*Independent Adviser*)] |
| (l)  ISDA Determination: | |
| — Floating Rate Option: | [ ● ] |
| — Designated Maturity: | [ ● ] |
| — Reset Date: | [ ● ] |
| — Compounding: | [Applicable/Not Applicable] |
| —[Compounding Method: | (*If not applicable, delete the remaining items of this subparagraph*)<br>[Compounding with Lookback<br>    Lookback: [●] Applicable Business Days]<br>[Compounding with Observation Period Shift<br>    Observation Period Shift: [ ● ] Observation Period Shift Business Days<br>    Observation Period Shift Additional Business Days: [●]/Not Applicable]]<br>[Compounding with Lockout<br>Lockout: [●] Lockout Period Business Days<br>Lockout Period Business Days: [●]/[Applicable Business Days]] |
| — Index Provisions: | [Applicable/Not Applicable]<br>(*If not applicable, delete the remaining items of this subparagraph*) |
| — [Index Method: | Compounded Index Method with Observation Period Shift<br>Observation Period Shift: [ ● ] Observation Period Shift Business Days<br>Observation Period Shift Additional Business Days: [ ● ]/[Not Applicable]] |
| (m) Linear Interpolation: | [Not Applicable/Applicable – the Rate of Interest for the [long/short][first/last] Interest Period shall be calculated using Linear Interpolation (*specify for each short or long Interest Period*)] |
| (n) Margin(s): | [+/-][ ● ] per cent. per annum |
| (o) Minimum Rate of Interest: | [ ● ] per cent. per annum |
| (p) Maximum Rate of Interest: | [ ● ] per cent. per annum |

| | | |
|---|---|---|
| (q) | Day Count Fraction: | [ ● ] |
| (r) | Fall back provisions, rounding provisions, denominator and any other terms relating to the method of calculating interest on Floating Rate Notes, if different from those set out in the Conditions: | [ ● ] |
| (s) | ISDA Definitions: | [2006 ISDA Definitions/]/[2021 ISDA Definitions] |

**16   Zero Coupon Note Provisions:**          [Applicable/Not Applicable]

| | | |
|---|---|---|
| (a) | Amortisation Yield: | [ ● ] per cent. per annum |
| (b) | Day Count Fraction in relation to Early Redemption Amounts: | [30/360]<br>[360/360]<br><br>[Actual/Actual]<br><br>[Actual/Actual (ICMA)]<br>[Actual/Actual (ISDA)]<br>[Actual/365 (Fixed)]<br>[Actual/365 (Sterling)]<br>[Actual/360]<br>[30E/360]<br>[30E/360 (ISDA)] |
| (c) | Any other formula/basis of determining amount payable: | [ ● ] |

**PROVISIONS RELATING TO REDEMPTION**

**17   Call Option:**          [Applicable/Not Applicable]

| | | |
|---|---|---|
| (a) | Optional Redemption Date(s): | [ ● ] |
| (b) | Optional Redemption Amount(s): | [[ ● ] per Calculation Amount]<br><br>[Condition  [5(b)]  (*Early Redemption*)  applies]  [Make-whole Redemption Amount]<br>*[If Make-whole Redemption Amount is selected, include items (A) to (E) below or relevant options as are set out in the Conditions]* |
| | (A) [Make-whole Redemption Margin: | [[ ● ] per cent.]] |
| | (B) [Reference Dealer(s): | [ ● ]] |
| | (C) [Reference Quotation Time: | [ ● ]] |
| (c) | If redeemable in part: | [Applicable/Not Applicable] |
| | (i) Minimum Redemption Amount: | [ ● ] per Calculation Amount |
| | (ii) Maximum Redemption Amount: | [ ● ] per Calculation Amount |
| (d) | Notice period (if other than as set out in the Conditions): | [[ ● ] days]/[Not Applicable] |

**18   Maturity Par Call Option:**          [Applicable/Not Applicable]

| | | |
|---|---|---|
| (a) | Maturity Par Call Period Commencement Date: | [ ● ] |

|  | (b) Maturity Par Call Period: | From (and including) the Maturity Par Call Period Commencement Date to (but excluding) the Maturity Date |
|---|---|---|
|  | (c) Notice period (if other than as set out in the Conditions): | [[ ● ] days]/[Not Applicable] |
| **19** | **Put Option:** | [Applicable/Not Applicable] |
|  | (a) Optional Redemption Date(s): | [ ● ] |
|  | (b) Optional Redemption Amount(s) of each Note: | [ ● ] per Calculation Amount [Condition [5(b)] (*Early Redemption*) applies] |
|  | (c) Notice period (if other than as set out in the Conditions): | [ ● ] days |
| **20** | **Clean Up Call Option:** | [Applicable/Not Applicable] |
|  | (a) Notice period (if other than as set out in the Conditions): | [ ● ] days |
| **21** | **Final Redemption Amount:** | [ ● ] per Calculation Amount |
| **22** | **Early Redemption Amount:** | [Applicable/Not Applicable] |
|  | Early Redemption Amount(s) per Calculation Amount payable on redemption for taxation reasons or on event of default or other early redemption: | [ ● ][Par] per Calculation Amount |

**GENERAL PROVISIONS APPLICABLE TO THE NOTES**

| **23** | **Form of Notes:** | **Bearer Notes**: |
|---|---|---|
|  |  | [Temporary Global Note exchangeable for a Permanent Global Note which is exchangeable for Definitive Notes in the limited circumstances specified in the Permanent Global Note] |
|  |  | [Temporary Global Note exchangeable for Definitive Notes on [ ● ] days' notice] |
|  |  | [Permanent Global Note exchangeable for Definitive Notes in the limited circumstances specified in the Permanent Global Note] |
|  |  | **Registered Notes**: |
|  |  | Regulation S Global Note (US$[ ● ] nominal amount) registered in the name of a nominee for a common depositary for Euroclear and Clearstream, Luxembourg |
| **24** | **Talons for future Coupons to be attached to Definitive Notes (and dates on which such Talons mature):** | [Yes. As the Notes have more than 27 coupon payments, talons may be required if, on exchange into definitive form, more than 27 coupon payments are still to be made./No] |

**THIRD PARTY INFORMATION**

[[ ● ] has been extracted from [ ● ]. [Each of the] [The] Issuer [and the Guarantor(s)] confirms that such information has been accurately reproduced and that, so far as it is aware, and is able to ascertain from information published by (specify source), no facts have been omitted which would render the reproduced information inaccurate or misleading.]

Signed on behalf of GACI First Investment Company:

By: ...........................................................
       Duly authorised


By: ...........................................................
Duly authorised

Signed on behalf of the Public Investment Fund

By: ...........................................................
       Duly authorised

# PART B — OTHER INFORMATION

**1     Listing and Admission to Trading**

|  | |
|---|---|
| (a)  Listing and admission to trading: | [Application has been made by the Issuer (or on its behalf) for the Notes to be admitted to trading on the London Stock Exchange's International Securities Market with effect from [ ● ].] |
| | [Application is expected to be made by the Issuer (or on its behalf) for the Notes to be admitted to trading on the London Stock Exchange's International Securities Market with effect from [ ● ].] |
| | [Not Applicable.] |
| (b)  Estimate of total expenses related to admission to trading: | [ ● ] |

**2     Ratings:**

[[The Notes to be issued [have been/are expected to be] rated]/[The following ratings reflect ratings assigned to Notes of this type issued under the Programme generally]]:

[S&P: [ ● ]]

[Moody's: [ ● ]]

[Fitch: [ ● ]]

[*Need to include a brief explanation of the meaning of the ratings if this has previously been published by the rating provider.*]

**3     [Interests of Natural and Legal Persons Involved in the Issue/Offer]**

[Save for any fees payable to the [Managers/Dealers], so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer. The [Managers/Dealers] and their affiliates have engaged, and may in the future engage, in investment banking and/or commercial banking transactions with, and may perform other services for, the Issuer and the Guarantor and their affiliates in the ordinary course of business.]

**4     Reasons for the Offer and Estimated Net Proceeds**

|  | |
|---|---|
| (a)  Reasons for the offer: | [ ● ] |
| | [*See* ["*Use of Proceeds*"] *in Offering Circular - if the reasons for the offer are different, include reasons here. In the case of Green Bonds, Eligible Green Projects will need to be specified.*][5] |
| [(b)] Estimated net proceeds: | [ ● ] |
| (c)  Green Bonds: | [Applicable]/[Not Applicable] |

**5     [Fixed Rate Notes only—Yield**

---

[5] If climate bond certification obtained, this should be specified here.

|                     | (a) Indication of yield:                                                                                                                                                        | [ ● ]                                                                                                      |
|---------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----------------------------------------------------------------------------------------------------------|
|                     |                                                                                                                                                                               | The yield is calculated at the Issue Date on the basis of the Issue Price. It is not an indication of future yield.] |

**6    Operational Information**

(a)  ISIN:                                                  [ ● ]

(b)  Common Code:                                           [ ● ]

(c)  CFI:                                                   [ ● ] [Not Applicable/Not Available]

(d)  FISN:                                                  [ ● ] [Not Applicable/Not Available]

(e)  Any clearing system(s) other than, Euroclear Bank SA/NV and Clearstream Banking S.A. and the relevant identification number(s):        [Not Applicable/[ ● ]]

(f)  Delivery                                               Delivery [against/free of] payment

(g)  Names and addresses of additional Paying Agent(s) (if any):        [ ● ]

**7    Distribution**

(a)  Method of distribution:                               [Syndicated/Non-syndicated]

(b)  If syndicated, names of Managers:                     [Not Applicable/*give names*]

    (A)  Names of Managers:                              [Not Applicable/give names]

    (B)  Stabilisation Manager(s) (if any):              [Not Applicable/give names]

(c)  If non-syndicated, name of Dealer:                    [Not Applicable/*give name*]

(d)  US Selling Restrictions:                              Reg. S Compliance Category [1/2/3]

                                                        [TEFRA C/TEFRA D/TEFRA not applicable]

(e)  Additional selling restrictions:                     [Not Applicable/*give details*]

(f)  [Prohibition of Sales to EEA Retail Investors:        [Applicable/Not Applicable][6]

(g)  [Prohibition of Sales to UK Retail Investors:         [Applicable/Not Applicable][7]

---

[6]   If the Notes clearly do not constitute "packaged" products or the Notes do constitute "packaged" products and a Key Information Document ("KID") will be prepared, "Not Applicable" should be specified. If the Notes potentially constitute "packaged" products and no KID will be prepared, "Applicable" should be specified.

[7]   If the Notes clearly do not constitute "packaged" products or the Notes do constitute "packaged" products and a Key Information Document ("KID") will be prepared, "Not Applicable" should be specified. If the Notes potentially constitute "packaged" products and no KID will be prepared, "Applicable" should be specified.

## DESCRIPTION OF THE ISSUER

**Registered office**

The registered office of the Issuer is at c/o TMF (Cayman) Ltd., 4th Floor, Monaco Towers, 11 Dr. Roy's Drive, P.O. Box 10338, Grand Cayman KY1-1003, Cayman Islands and the telephone number is +1 345-949-7232.

**Date of incorporation and legal form**

The Issuer is an exempted company with limited liability incorporated in the Cayman Islands under the Companies Act (as amended) of the Cayman Islands on 25 November 2021 (with registration number 383946).

The authorised share capital of the Issuer is US$50,000 divided into 50,000 shares of a nominal or par value of US$1.00 each with the issued share capital of the Issuer comprised of one (1) ordinary share of US$1.00 par value. The Issuer is a wholly-owned subsidiary of the Fund.

**Purpose and business activity**

The principal objects of the Issuer are unrestricted and, as set out in its Memorandum of Association, the Issuer has full power and authority to carry out any object not prohibited by law.

The Issuer is organised as a special purpose entity and consequently does not have any employees or own any physical assets.

The Issuer has been established to raise capital for the Guarantor by the issue of debt instruments.

The Issuer does not engage in, and has not, since its incorporation, engaged in, any activities other than those incidental to: (i) its registration as an exempted company; (ii) the authorisation of the offering and issue of debt instruments to which it is or will be a party; (iii) the ownership of such interests and other assets referred to herein; (iv) the other matters contemplated in this Offering Circular or any other offering circular related to the offering and issue of debt instruments to which it is or will be a party; (v) the authorisation and execution of the other documents referred to in this Offering Circular or any other Offering Circular related to the offering and issue of debt instruments, to which it is or will be a party; and (vi) other matters which are incidental or ancillary to those activities.

The Issuer's ongoing activities will principally comprise: (i) the issue of the Notes under the Programme; (ii) the entering into of any documents related to the update of the Programme and the issue of Notes under the Programme; and (iii) the exercise of related rights and powers and other activities referred to in this Offering Circular or reasonably incidental to those activities.

The Issuer does not have subsidiaries or non-executive directors.

**Management**

The directors of the Issuer and their respective business addresses and principal activities are as follows:

| Name | Occupation |
| --- | --- |
| Yasir Abdullah AlSalman | Director |
| Fahad Abduljalil AlSaif | Director |

The business address of each of the directors of the Issuer is TMF (Cayman) Ltd., 4th Floor, Monaco Towers, 11 Dr. Roy's Drive, P.O. Box 10338, Grand Cayman KY1-1003, Cayman Islands.

There are no potential conflicts of interest between the private interests or other duties of the directors listed above and their duties to the Issuer.

The corporate services provider of the Issuer is TMF (Cayman) Ltd (the "**Corporate Services Provider"**).

Pursuant to the standard terms of engagement of the Corporate Services Provider (the "**Registered Office Agreement**") the Corporate Services Provider has agreed to provide certain administrative services to the Issuer. The Registered Office Agreement is governed by the law of the Cayman Islands.

**Independent auditors**

The Issuer is not required by Cayman Islands law, and does not intend, to publish audited financial statements or appoint any auditors. Since the date of its incorporation, no financial statements of the Issuer have been prepared.

## SELECTED HISTORICAL FINANCIAL DATA

The tables below set forth selected historical financial information for the Fund extracted from the Audited Special Purpose Consolidated Financial Statements.

The selected financial information set forth below should be read in conjunction with, and is subject to, "*Presentation of Financial and Other Information*", "*Description of the Public Investment Fund*" and the Audited Special Purpose Consolidated Financial Statements, appearing elsewhere, or incorporated by reference, in this Offering Circular. The results of operations for any period are not necessarily indicative of the results to be expected for any future period. Investors should also read the selected financial information set forth below together with KPMG Professional Services' qualified audit opinions in respect of the Audited Special Purpose Consolidated Financial Statements. For further information, see "*Presentation of Financial and Other Information–Qualified Audit Opinions*".

The Audited Special Purpose Consolidated Financial Statements diverge in certain aspects from IFRS. Investors are strongly cautioned that the financial statements and financial information with respect to the Fund which are contained or incorporated by reference in this Offering Circular differ from financial statements and financial information which might typically be provided by other obligors in analogous offerings of debt securities. For further information, see "*Risk Factors— The Audited Special Purpose Consolidated Financial Statements diverge in certain material respects from IFRS*".

**Audited Special Purpose Consolidated Financial Statements**

*Consolidated Special Purpose Statement of Financial Position Data*

The table below shows the Fund's consolidated special purpose statements of financial position as at 31 December 2021 and 31 December 2020 on a consolidated basis:

| | As at 31 December 2020 (Consolidated Special Purpose Financial Statements) | As at 31 December 2021 (Consolidated Special Purpose Financial Statements) |
|---|---|---|
| | *(SAR millions, Audited)* | *(SAR millions, Audited)* |
| **ASSETS** | | |
| **Non-current assets** | | |
| Property, plant and equipment ................................................. | 143,284 | 165,502 |
| Mine properties ....................................................................... | 10,672 | 11,688 |
| Intangible assets ..................................................................... | 17,740 | 68,492 |
| Right-of-use assets ................................................................. | 8,722 | 10,049 |
| Investment properties ............................................................. | 24,588 | 37,105 |
| Investments in associates and joint ventures........................... | 116,523 | 118,470 |
| Deferred tax assets ................................................................. | 846 | 881 |
| Inventories .............................................................................. | 195 | 877 |
| Derivatives ............................................................................. | 9,373 | 8,667 |
| Promissory notes .................................................................... | 217,151 | 188,553 |
| Investment securities.............................................................. | 548,643 | 759,927 |
| Other non-current assets......................................................... | 43,428 | 24,219 |
| Financing and advances ......................................................... | 354,655 | 505,103 |
| Cash and deposits with banks and other financial institutions.. | 13,631 | 1,263 |
| | **1,509,451** | **1,900,796** |
| **Current assets** | | |
| Inventories .............................................................................. | 8,808 | 11,669 |
| Derivatives ............................................................................. | 207 | 1,269 |
| Promissory notes .................................................................... | 18,750 | 33,750 |
| Trade receivables .................................................................... | 31,765 | 54,330 |
| Investment securities.............................................................. | 166,841 | 160,238 |
| Other current assets................................................................ | 34,466 | 56,292 |
| Financing and advances ......................................................... | 28,099 | 30,259 |
| Cash and deposits with banks and other financial institutions.. | 258,109 | 285,262 |
| | **547,045** | **633,069** |

83

| | As at 31 December 2020 (Consolidated Special Purpose Financial Statements) | As at 31 December 2021 (Consolidated Special Purpose Financial Statements) |
|---|---|---|
| Assets classified as held for sale | 3,303 | 5,204 |
| | **550,348** | **638,273** |
| **TOTAL ASSETS** | **2,059,799** | **2,539,069** |
| **EQUITIES AND LIABILITIES** | | |
| **Equity** | | |
| Capital contribution | 364,673 | 364,673 |
| Additional capital contribution | 288,813 | 315,281 |
| Retained earnings | 486,534 | 595,579 |
| General reserve | 30,589 | 30,589 |
| Other reserves | 12,995 | 25,033 |
| Equity attributable to owner of the Fund | **1,183,604** | **1,331,155** |
| Non-controlling interests | 91,206 | 172,617 |
| **Total equity** | **1,274,810** | **1,503,772** |
| **Liabilities** | | |
| **Non-current liabilities** | | |
| Employees' benefits | 8,898 | 10,413 |
| Deferred tax liabilities | 1,155 | 1,797 |
| Provisions | 2,981 | 3,977 |
| Loans and borrowings | 117,546 | 140,329 |
| Lease liabilities | 7,375 | 8,151 |
| Deferred government grants | 3,947 | 3,373 |
| Derivatives | 11,687 | 14,702 |
| Customer deposits | 191,999 | 305,025 |
| Trade and other payables | 11,207 | 7,140 |
| | **356,795** | **494,907** |
| **Current liabilities** | | |
| Employees' benefits | 37 | 51 |
| Provisions | 5,625 | 9,759 |
| Loans and borrowings | 79,087 | 109,012 |
| Lease liabilities | 1,655 | 2,468 |
| Deferred government grants | 31 | 581 |
| Derivatives | 827 | 1,480 |
| Trade and other payables | 80,265 | 109,674 |
| Customer deposits | 255,224 | 298,356 |
| Zakat and income tax | 4,296 | 4,996 |
| | **427,047** | **536,377** |
| Liabilities directly associated with assets classified as held for sale | 1,147 | 4,013 |
| | **428,194** | **540,390** |
| **Total liabilities** | **784,989** | **1,035,297** |
| **TOTAL EQUITY AND LIABILITIES** | **2,059,799** | **2,539,069** |

*Consolidated Special Purpose Statement of Comprehensive Income Data*

The table below shows the Fund's consolidated special purpose statements of comprehensive income for the years ended 31 December 2021 and 31 December 2020:

| | For the year ended 31 December 2020 (Consolidated Special Purpose Financial Statements) | For the year ended 31 December 2021 (Consolidated Special Purpose Financial Statements) |
|---|---|---|
| | *(SAR millions, Audited)* | *(SAR millions, Audited)* |
| **Continuing Operations** | | |
| Revenue | 179,040 | 228,239 |
| Cost of revenue | (66,662) | (82,220) |
| Other operating income, net | 2,530 | 7,647 |
| Selling and distribution expenses | (6,221) | (6,976) |
| Administrative expenses | (31,725) | (63,622) |
| Net impairment losses on financial assets | (4,691) | (6,236) |
| Share of profit of associates and joint ventures, net | 4,852 | 8,635 |
| **Operating Profit** | **77,123** | **85,467** |
| Other finance costs | (3,596) | (2,543) |
| Other finance income | 5,945 | 7,031 |
| **Profit Before Zakat And Income Tax From Continuing Operations** | **79,472** | **89,955** |
| Zakat and income tax expense | (3,349) | (4,197) |
| **Profit For The Year From Continuing Operations** | **76,123** | **85,758** |
| | | |
| **Discontinued Operations** | | |
| Profit after zakat and income tax for the year from discontinued operations | 145,124 | (31) |
| **Profit for the year** | **221,247** | **85,727** |
| | | |
| **Attributable to:** | | |
| Owner of the Fund | 212,723 | 81,787 |
| Non-controlling interests | 8,524 | 3,940 |
| | **221,247** | **85,727** |
| | | |
| Profit for the year | **221,247** | **85,727** |
| **Other Comprehensive Income** | | |
| *Other comprehensive income/(loss) that may be reclassified to in subsequent periods (net of tax):* | | |
| Net gain (loss) on hedge of a net investment – change in fair value | (4) | – |
| Foreign currency translation differences of foreign operations | (1,049) | (1,633) |
| Foreign currency translation differences of foreign operations transferred to profit or loss | – | 35 |
| Cash flow hedges – effective portion of changes in fair value | (117) | (84) |
| Cash flow hedges – reclassified to profit or loss | (31) | 92 |
| Net gain (loss) on debt instruments measured at FVOCI-change in fair value | 1,364 | (365) |
| Amount of debt instruments measured at FVOCI reclassified to profit or loss upon derecognition | (494) | (596) |
| Other comprehensive loss from discontinued operations | (1,083) | – |
| Share of other comprehensive loss of associates and joint ventures | (532) | 670 |
| Share of other comprehensive income (loss) of associates and joint ventures transferred to profit or loss | – | 152 |
| Reclassification of OCI losses on deemed disposal of an associate to profit or loss | – | 43 |
| | (1,946) | (1,686) |
| *Net other comprehensive income/(loss) that will not be reclassified to statement of income in subsequent periods (net of tax):* | | |
| Net gain (loss) on equity instruments designated at fair value through other comprehensive income | 15,593 | 11,337 |

85

| | For the year ended 31 December 2020 (Consolidated Special Purpose Financial Statements) | For the year ended 31 December 2021 (Consolidated Special Purpose Financial Statements) |
|---|---|---|
| | *(SAR millions, Audited)* | *(SAR millions, Audited)* |
| Remeasurement gain (loss) on employees' defined benefits obligation | (730) | 358 |
| Remeasurement loss on employees' defined benefits obligation from discontinued operations | (2) | – |
| Share of other comprehensive loss of associates and joint ventures | (408) | (210) |
| | **14,453** | **11,485** |
| Total other comprehensive income for the year | **12,507** | **9,799** |
| **Total comprehensive income for the year** | **233,754** | **95,526** |
| **Attributable to:** | | |
| Owner of the Fund | 225,488 | 92,794 |
| Non-controlling interests | 8,266 | 2,732 |
| | **233,754** | **95,526** |

*Consolidated Cash Flow Special Purpose Statement Data*

The table below shows the Fund's consolidated cash flow statements for the years ended 31 December 2021 and 31 December 2020:

| | For the year ended 31 December 2020 (Consolidated Special Purpose Financial Statements) | For the year ended 31 December 2021 (Consolidated Special Purpose Financial Statements) |
|---|---|---|
| | *(SAR millions, Audited)* | *(SAR millions, Audited)* |
| Net cash used in operating activities | (88,589) | (11,543) |
| Net cash used in/from investing activities | 9,236 | (36,139) |
| Net cash flow from financing activities | 122,350 | 54,627 |
| Net increase in cash and cash equivalents | 42,997 | 6,945 |
| Net foreign exchange differences | (47) | (746) |
| Cash and cash equivalents at the beginning of the year | 170,403 | 213,353 |
| **Cash and cash equivalents at the end of the year** | **213,353** | **219,552** |

**Selected Unaudited and Unconsolidated Financial Information for the period from 1 January 2022 to 30 June 2022**

As at 30 June 2022, the Fund's total indebtedness amounted to SAR 78.75 billion, relating to the US$11 billion international syndicated loan that was raised by the Fund in September 2018, and a drawdown of a revolving credit facility in June 2022 for an amount of US$10 billion.

As at 30 June 2022, the Fund's AUM was SAR 2,281 billion, an increase of SAR 302 billion from SAR 1,980 billion as at 31 December 2021.

As at 30 June 2022, the AUM of the Fund's Treasury Assets (as defined below) amounted to SAR 321 billion.

As at 30 June 2022, the Fund had SAR 168.53 billion in cash and cash equivalents on an unconsolidated basis.

## DESCRIPTION OF THE PUBLIC INVESTMENT FUND

**OVERVIEW**

The Fund is the sovereign wealth fund of the Kingdom, established in accordance with Royal Decree No. M/24 dated 25/06/1391H (corresponding to 18 August 1971) ("**Royal Decree No. M/24**") and regulated by the Law of the Public Investment Fund issued pursuant to Royal Decree No. M/92 dated 12/08/1440H (corresponding to 17 April 2019). The Fund became "organisationally connected" to the CEDA pursuant to Article 5 of Council of Ministers' Resolution No. 270 dated 3/6/1436H (corresponding to 23 March 2015) and has since been a distinct public legal entity with full administrative and financial autonomy, as well as absolute independence in carrying out its investment management and operations, as ratified pursuant to Article 2 of Royal Decree No. M/92. The Fund reports to the CEDA, whose chairman, HRH Prince Mohammed bin Salman bin Abdulaziz Al Saud, Crown Prince of Saudi Arabia ("**HRH The Crown Prince**"), acts as the chairman of the Fund (the "**Chairman**") (see further "*Relationship with the Government*").

Historically, the Fund's mandate was to provide financial support for key projects and companies considered strategically significant for the development of the economy of the Kingdom. The Fund's mandate has evolved over the years and, pursuant to its central role within the Kingdom's Vision 2030, the Fund has continued to actively contribute to domestic economic development, while also expanding its international assets by investing in global sectors and markets, establishing strategic partnerships and launching large-scale initiatives and projects. The Fund now holds a portfolio of high-quality domestic and international investments, diversified across sectors, geographies and asset classes and aims to maximise sustainable returns in line with the goals and objectives of Vision 2030.

Through Vision 2030, the Fund has launched a strategic transformation programme, with the aim of: (i) growing the assets of the Fund; (ii) unlocking new sectors of the Kingdom's economy through the Fund; (iii) building strategic economic partnerships through the Fund; and (iv) localising cutting-edge technology and knowledge through the Fund.

The Fund operates and makes investments through the following six investment pools, two of which are internationally focused and four of which are domestically focused:

- **Saudi Equity Holdings**. This investment pool includes equity holdings in listed and unlisted companies in the Kingdom across different sectors. The Fund seeks to maximise the value of its portfolio companies in this investment pool and generate long-term sustainable returns. Investments within this pool also include shares in listed or private companies in the Middle East and North Africa region ("**MENA**"), and indirect investments in MENA companies through other parties or externally managed funds.

- **Saudi Sector Development**. This investment pool includes direct and indirect investments in new sectors and companies in the Kingdom. Through these investments, the Fund seeks to unlock the potential of key new sectors to support the diversification and development of the Kingdom's economy, increase private sector participation, localise knowledge and technology, and create high-skilled jobs and opportunities for small and medium enterprises. The Fund has identified a number of sectors that it expects will contribute to the Kingdom's economic development, including, for example, the entertainment and recycling sectors.

- **Saudi Real Estate and Infrastructure Development**. This investment pool includes real estate and infrastructure assets in the Kingdom. The Fund has identified a number of initiatives intended to improve the utilisation of its land bank and maximise its value, and upgrade critical infrastructure to support the Kingdom's economic development. The Fund also intends to leverage these investments to attract capital from local and foreign investors. Examples of such initiatives include programmes for the re-generation of inner cities, the development of hotel and housing capacity in strategic locations and developing the new Jeddah downtown.

- **Saudi Giga-Projects**. This investment pool includes investments in large-scale and complex ecosystems that aim to significantly transform the Saudi economy (referred to as "**Giga-Projects**"). These Giga-Projects are multifaceted, globally unique in scope and ambition, and are designed to stimulate overall growth and add significant value to the economy. Moreover, these projects are expected to generate significant value for the Fund in the medium- to long-term. This pool includes four Giga-Projects currently under development: Neom, the Red Sea Project, Qiddiya and ROSHN.

- **International Strategic Investments**. This investment pool includes long-term direct and indirect investments through selected strategic partnerships globally. Through this pool, the Fund targets investments in industries with the potential for future growth, fosters relationships with innovative companies and investors and strengthens links with international counterparts, influential investors and investment managers. This pool includes the Fund's substantial investments made in, among others, the SoftBank Vision Fund L.P. (the "**SoftBank Vision Fund**"), the Blackstone Infrastructure Fund Programme and Lucid Group Inc.

- **International Diversified Pool**. This investment pool includes international global investments in public and private markets, diversified across fixed income, equity, hedge funds, real estate and infrastructure. International investments are those that are not domiciled in the Kingdom or the MENA region. This investment pool's objective is to generate strong long-term returns that provide a source of future income.

For further detail regarding the Fund's investment policies and funding principles, see "—*Planning and Investment Process*" and "—*Funding Principles*" below.

On a consolidated basis, the Fund had total assets of SAR 2.54 trillion as at 31 December 2021, an increase of SAR 0.48 trillion from SAR 2.06 trillion as at 31 December 2020. For the year ended 31 December 2021, the Fund generated SAR 228.2 billion of revenue and SAR 85.5 billion of operating profit, an increase of SAR 49.2 billion and SAR 8.4 billion from SAR 179.0 billion of revenue and SAR 77.1 billion of operating profit, respectively, for the year ended 31 December 2020, each on a consolidated basis. For the year ended 31 December 2021, the Fund had SAR 285.3 billion in cash and deposits with banks and other financial institutions in current assets, an increase of SAR 27.2 billion from SAR 258.1 billion for the year ended 31 December 2020, each on a consolidated basis.

For further details, see "*Selected Historical Financial Data*".

The Fund is an active investor and constantly reviews opportunities to invest in sectors and asset classes aligned with its investment strategy. As at 30 June 2022, the volume of the Fund's international investments had increased to constitute 23% of the Fund's AUM, as compared to 9% as at 31 December 2017, illustrating the geographical diversification of the Fund's portfolio.

## HISTORY

The Fund was established by Royal Decree No. M/24, which ratified and approved Council of Ministers' Resolution No. 468 dated 25/6/1391H (corresponding to 18 August 1971), confirming a draft regulation for the Fund's establishment as proposed by the Minister of Finance and National Economy. The Fund therefore operated as an administrative department of the MoF (until 22 March 2015) with the authority to carry out the functions for which it was established.

Royal Decree No. M/24 was subsequently supplemented by Council of Ministers' Resolution No. 508 dated 2/4/1394H (corresponding to 2 May 1974) ("**Resolution No. 508**"), which gave the Fund an explicit mandate to invest in and hold equity in certain joint stock companies on behalf of the Government. As mentioned in Resolution No. 508, the intention of the Government at that time was to facilitate greater ownership by Saudi citizens in such companies.

Pursuant to Royal Decree No. M/62 dated 4/10/1435H (corresponding to 31 July 2014) ("**Royal Decree No. M/62**"), which ratified and approved Council of Ministers' Resolution No. 386 dated 24/09/1435H (corresponding to 21 July 2014), the Fund was further authorised to invest in existing companies or establish new companies, within or outside of the Kingdom, either alone or in partnership with third parties from the public or private sector. Royal Decree No. M/62 provides that, other than with respect to matters covered by the provisions in the articles of association of the companies to be formed or participated in by the Fund, the provisions of the Companies Law promulgated by Royal Decree No. M/6 dated 22/03/1385H (as amended) (corresponding to 22 July 1965) and other relevant regulations shall apply to such companies.

The Fund became "organisationally connected" to the CEDA pursuant to Article 5 of Council of Ministers' Resolution No. 270 dated 3/6/1436H (corresponding to 23 March 2015) ("**Resolution No. 270**"), with the Chairman of the CEDA assuming the role of Chairman of the Fund. The CEDA provides general oversight to the Fund but has no involvement in the Fund's day-to-day operations (for further details, see "*Relationship with the Government*").

In 2017, the Fund announced its Vision Realisation Programme (2018–2020) as part of its strategy to facilitate the realisation of Vision 2030, and to complement the set of executive programmes that were announced in connection therewith. Upon conclusion of the Vision Realisation Programme (2018–2020), a five-year strategy for the Fund was announced in January 2021, including the PIF Program (as defined below). See "*PIF Strategy (2021-2025)*" below for further details.

## STRENGTHS

### *Strategic Importance– Unlocking the Kingdom's Potential*

The Fund is the sovereign wealth fund of the Kingdom. The Fund is a key enabler of the Kingdom's Vision 2030 and the Fund has continued to actively contribute to domestic economic development, while also expanding its international assets by investing in global sectors and markets, establishing strategic partnerships and launching large-scale programmes and initiatives. In January 2021, the Fund announced its five-year strategy, including the PIF Program (as defined below). As part of the strategy, the Fund, among other initiatives, plans to: (a) invest a minimum of US$40 billion annually in domestic projects and investments; (b) contribute US$320 billion to non-oil GDP cumulatively through its portfolio companies; (c) increase AUM to US$1.07 trillion; and (d) create 1.8 million direct, indirect and induced jobs in each case by the end of 2025. The Fund aims to act as a driver of economic diversification for the Kingdom by developing strategic sectors and solid economic partnerships that deepen the Kingdom's regional and global influence.

### *Catalysing the Green Agenda in the Kingdom and Globally*

The Fund aims to take a leadership role with respect to environmental, social and governance investing among sovereign wealth funds and the broader global investment community, and is mandated to develop 70% of the Kingdom's renewable energy programme. The Fund has played, and continues to play, a critical role in expanding the use of new technologies and industries that will help the Kingdom to deliver its goal of net zero emissions by 2060. In addition, the considerations from the Paris Climate Change Agreement have been embedded in the Fund's investment decision processes since 2016. The Fund expects to make more than US$10 billion of investment in Eligible Green Projects by 2026 on the basis of its working assumptions as at the date of this Offering Circular.

The Fund's notable investments in sustainability projects include:

- NEOM, which is a 26,500km² development project in the Kingdom, fully powered by renewable energy, and will utilise green technology in building water capabilities and maximising usage efficiency;

- ACWA Power, which is one of the largest developers, investors, and operators of power generation and desalinated water plants in the region;

- The Red Sea Development Company, which is one of the most ambitious tourism development projects that aims to protect, preserve, and enhance the natural environment, and is fully powered by renewable energy;

- AMAALA, which is an ultra-luxury destination that focuses on transformative personal journeys inspired by wellness, arts, culture, and the purity of the Red Sea. AMAALA aims to operate with a zero-carbon footprint, fully powered by renewable energy;

- Lucid Group Inc., which produces electric vehicles and is headquartered in the US;

- King Abdullah Financial District Development & Management Company ("**KAFD**"), which will become the largest mixed-use financial district in the world to achieve full LEED Platinum certification;

- Saudi Investment Recycling Company, which aims to develop, own, operate, and finance various activities across all waste types to establish recycling capacities in the Kingdom;

- National Energy Services Company, which has replaced more than 1 million streetlights across cities in the Kingdom and had rehabilitated more than 1,200 government buildings in the Kingdom, in each case to reduce costs and boost efficiency; and

- Saudi Agriculture and Livestock Investment Company, which invests in agricultural technologies that aim to rationalise water consumption and raise production efficiency.

See further "*Description of the Public Investment Fund—Portfolio*".

### *Diversified & Commercially Driven Investments*

The Fund operates and makes investments through four domestically focused investment pools (Saudi Equity Holdings, Saudi Sector Development, Saudi Real Estate and Infrastructure Development and Saudi Giga-Projects) and two internationally focussed investment pools (International Strategic Investments and International Diversified Pool). The Fund aims to maintain the geographical diversification of its portfolio as well as the current diversification between liquid and illiquid assets.

As a result of the Fund's strategic importance within the Kingdom, in particular with respect to Vision 2030 and senior oversight from its Board, the Fund has access to unique investment opportunities in the Kingdom and globally.

The Fund's investment process is governed by a principle-based methodology to allocate capital with the aim of achieving high returns over the medium to long term. First, each investment must feature an investment rationale, such as synergies to Vision 2030's objectives, economic contributions to the Kingdom, and compliance with environmental, social and governance ("**ESG**") standards. Second, the expected cash flows from the transaction must meet internal rate of return hurdles and fall within the acceptable bounds of value at risk for the Fund's portfolio. Investment decisions are made by the Fund's Board and Executive Managemnt (defined below) investment committees comprising of senior members and subject to rigorous analysis and scrutiny.

As a result of the Fund's disciplined investment process, total shareholder returns since the First VRP (as defined below) were an average of 12% per annum while the total shareholder returns for the year ended 31 December 2021 were 25%.

### *Funding Flexibility and Liquidity*

The Fund funds its activities through the following sources: (i) retained earnings from investments; (ii) capital injections from the Government; (iii) Government assets transferred to the Fund; and (iv) financing raised in the local and global credit markets. The scale of the Fund's current and projected asset base, and its limited level of financial leverage, means that the Fund has considerable scope to incur indebtedness while remaining at a conservative level of leverage. The Fund also seeks to hold an ample amount of liquid assets at all times to meet liquidity needs, and as at 30 June 2022 the AUM of the Fund's Treasury Assets amounted to SAR 321 billion.

### *Disciplined Financial Policies*

<u>Indicators of credit quality</u>

The Fund sets out borrowing indicators (the "**Indicators**") that cover a range of credit ratios which include debt affordability, liquidity and leverage measures. The purpose of the Indicators is to ensure the Fund's borrowing remains highly sustainable with positive impact on the public sector debt and the credit ratings of the Kingdom.

The Fund's Indicators provide a quantitative snapshot of its credit quality and the strength of its financial position. These key indicators of credit quality cover three main dimensions, namely, interest coverage, liquidity and leverage:

- The indicator of interest coverage is the ratio of net cash flows generated from operations (which consists of divestments, dividends and distributions received, income from investments and interest income less operating expenses) to interest expenses.

- The indicator of liquidity is the number of years that liquid assets and committed undrawn credit facilities cover upcoming debt maturities. Liquid assets include cash and cash equivalents, undrawn committed credit lines and short-term investments (investments in securities expected to be realised in one year or less).

- The indicator of leverage is the ratio of net debt to AUM. The net debt is computed as gross debt less cash and cash equivalents, term deposits and highly liquid money market instruments.

Such information is presented as additional measures as management believes that investors would find such information useful for assessing the Fund's credit quality as an investment company. Such information is not determined in accordance with IFRS as IFRS does not prescribe the provision of such information, nor the computation methodology of such information. Such information may not be comparable to that of other companies that may determine similarly titled credit quality indicators differently. Such information should not be considered in isolation or as alternatives to the Fund's financial results based on its consolidated financial statements as measures of its consolidated financial performance.

As at each of 31 December 2020 and 31 December 2021, on an unconsolidated basis, the Indicators are as follows:

|  | 31 December 2020 | 31 December 2021 |
| --- | --- | --- |
| Interest coverage ratio (multiple)....................................... | 51.2 | 169.4 |
| Liquidity ratio (years) ...................................................... | n.m.[1] | n.m.[1] |
| Leverage ratio (%) ........................................................... | -10.7 | -5.2 |

(1) Not meaningful. The Fund had a net cash position where cash balance at the end of the year was higher than outstanding debt.

The Indicators are calculated frequently and in accordance with the methodology set out above. The Indicators are considered at the end of each financial year. The Fund aims to complement the Indicators by maintaining its financial ratios consistent with the highest scores defined by credit rating agencies, and is committed to a very strong credit profile over the long term.

Liquidity

The Fund's primary sources of funds are proceeds from portfolio divestments and dividends and investment distributions from its portfolio companies. In addition, the Fund's funding sources are supplemented by borrowings, asset transfers from the government and capital contributions from the government.

The Fund believes that it currently maintains sufficient liquidity to meet its existing requirements. The Fund regularly evaluates its capital structure to ensure that it is optimal for its objectives. The Fund remains open and flexible to various financing options as long as they meet its objectives. Depending on market conditions, the Fund may access the capital markets to raise additional liquidity or redeem or repurchase its outstanding notes to manage its debt maturity profile and enhance its capital efficiency.

For the year ended 31 December 2021, the Fund maintained a strong balance sheet. This provides the Fund the flexibility to invest with a long term horizon, to take advantage of market dislocations, and to reposition its portfolio for the future.

*Ambitious Governance and Transparency Agenda*

Through its continuous enhancements of governance and transparency standards, the Fund strives to maintain leadership among global sovereign wealth funds.

The Fund has a robust risk management framework which entails three lines of defence. Firstly, the Fund's risk governance framework includes Board-level committees (Risk Committee, Audit and Compliance Committee) and appropriate delegated authorities, following the principles set out in the Fund's Risk Appetite Statement. Secondly, the Fund's risk controls include an independent risk division which is responsible for reviewing exposures, challenging decisions made by operational teams, as well as reporting and escalating concerns. Lastly, the Fund's risk data and reporting infrastructure aggregates portfolio-level analysis for regular Board and management reports.

The Fund also seeks to enhance transparency and raise its own profile globally through international credit rating processes, publication of consolidated financial statements, and other disclosures required in connection with listed bond issuances.

# PIF STRATEGY (2021-2025)

In January 2021, the Fund announced its five-year strategy, including its Vision Realisation Programme 2021-2025 (the "**PIF Program**"). As part of the PIF Program, among other initiatives, the Fund plans to (a) invest a minimum of US$40 billion annually in domestic projects and investments, (b) contribute up to US$320 billion to non-oil GDP cumulatively through its portfolio companies, (c) increase AUM to US$1.07 trillion, of which international assets are expected to comprise 24% and (d) create up to 1.8 million direct and indirect jobs in each case by the end of 2025.

The Fund has developed eight strategic pillars through which it designs and develops its initiatives. These strategic pillars comprise initiatives across several sectors and asset classes globally to achieve the Fund's 2025 and 2030 aspirations, given their direct compatibility with the goals of Vision 2030. The strategic pillars are also compatible with the directives issued by the CEDA's Strategic Management Committee and the Board.

The Fund's eight strategic pillars are described below:

***Launch and Grow Domestic Sectors***

This strategic pillar seeks to drive the Kingdom's economic transformation, develop local sectors and maximise the value of the Fund's investments in Saudi companies. It comprises all initiatives that aim to develop new sectors or further develop established sectors that can benefit from the Kingdom's significant economic growth. The initiatives that fall within this strategic pillar are identified at a sector level and are categorised into four themes for domestic investment: (i) creating industries at scale; (ii) diversifying revenue sources; (iii) unlocking potential resources; and (iv) improving quality of life.

Accordingly, over the next five years, the Fund plans to focus on 13 sectors as part of its core domestic strategy, namely: aerospace and defence; automotive; transport and logistics; food and agriculture; construction and building components and services; entertainment, leisure and sports; financial services; real estate; utilities and renewables; metals and mining; health care; consumer goods and retail; and telecom, media and technology. As of 31 December 2021, the Fund had already established 54 companies in the 13 priority sectors mentioned above, and had generated more than 500,000 direct and indirect jobs.

***Develop Domestic Real Estate Projects***

The development of the Kingdom's real estate and infrastructure sector is a key part of Vision 2030 and is different in scale and nature from other real estate and infrastructure sectors globally. This strategic pillar seeks to develop local real estate and infrastructure projects and companies along the value chain. It covers all initiatives in connection with building development companies or supporting new companies in the real estate and infrastructure sector in the Kingdom.

The initiatives within this strategic pillar are delineated by region (Central, West, South, East and North) and include projects in each region. The initiatives in this sector aim to achieve several goals, including:

- Contributing to the Vision 2030 objective of increasing the rate of homeownership within the Kingdom to 70% of the population;

- Diversifying revenue sources;

- Improving the Hajj and Umrah experience for both local and international visitors;

- Instilling construction and design best practices into the sector, in line with global best practices;

- Reinforcing strategic partnerships with investors (local and international);

- Cultivating and fostering innovation;

- Developing world-class urban communities;

- Enhancing the quality of life for Saudi citizens;

- Developing and promoting the Kingdom as a tourism destination;

- Improving the primary infrastructure of the Kingdom and supporting economic development; and

- Driving local supply chain growth for the real estate sector.

***Develop Giga-Projects***

This strategic pillar focuses on the Kingdom's projects of exceptional scale and ambition, which enable the creation of new ecosystems and unlock new sectors. This is facilitated by the promotion of technology and knowledge in the Kingdom. For example, the Giga-Projects are designed to stimulate the economy and their

benefits are expected to be realised beyond the real estate and infrastructure sectors, helping to diversify the economy away from oil. They are intended to support the Kingdom's economic transformation efforts and promote investments in several sectors, with the objective of achieving high returns over the medium and long term. The Fund will lead the investment in these programmes in order to build a strong foundation, creating new jobs, contributing to GDP growth and attracting both local and foreign direct investments in lucrative sectors. See "*—Saudi Giga-Projects*" below.

### *Grow and Diversify the Fund's Assets Internationally*

The main goal of this pillar is to diversify the Fund's sources of income by growing and diversifying the Fund's international portfolio investments broadly, across geographies, asset classes and sectors, and away from the domestic economy and oil and gas industries. By allocating capital to public and private market investments internationally, the Fund intends to increase the number of its strategic partnerships. Moreover, additional international investments will reduce portfolio risk by providing greater diversification. The initiatives under this pillar aim to: (i) enhance and diversify returns; (ii) strengthen the Kingdom's position internationally as a leader and enabler of the future global economy and build its reputation as a preferred investor and partner of choice; and (iii) achieve high, long-term returns by taking part in diversified global investments in public and private markets, and provide future sources of wealth and returns.

### *Support National Development and Act as an Enabler of Vision 2030*

This strategic pillar focuses on the Fund's value creation and supporting national development through:

- o **Securing supply chain and localisation:** The Fund has developed a supply chain strategy to avoid delays to projects, ensure availability of materials and services for the projects at reasonable prices, increase localisation through large local spending and make use of investment opportunities in the supply chains in connection with the Fund's projects, without over-saturating the private sector.

- o **Enhancing private sector engagement**: Increasing private sector participation in the Kingdom's economy is an important component of the Fund's business model. The Fund consistently evaluates the potential impact of an investment initiative in the private sector. The Fund has developed a strategy to include the private sector as:

  - o **Investors**: by engaging the private sector as an investor in the Fund's projects and in investment opportunities in companies' supply chains, in sectors led by the Fund's portfolio companies;

  - o **Suppliers**: by opening the Fund's procurement opportunities to a wider breadth of private sector suppliers within the Kingdom and building the capabilities of private sector suppliers that are important for the Fund; and

  - o **Financiers**: by involving the private sector as third-party funds providers to the Fund, its portfolio companies and its projects.

- o **Enabling Vision 2030 through collaboration with other vision realisation programmes ("VRPs"):** The Fund's Vision Realisation Programme was launched by the CEDA in September 2017 ("**First VRP**") as part of a series of programmes to achieve the objectives of Vision 2030. The Fund will also collaborate with other VRPs, investing in opportunities that are commercially viable across various sectors in the Kingdom that are also aligned with the Fund's strategy and investment requirements.

This strategic pillar is expected to drive domestic value creation and maximise long-term economic growth, and enable the Fund to facilitate other VRPs in the Kingdom.

### *Exploit Portfolio Synergies and Create Strategic and Operational Value*

This strategic pillar aims to: (i) build an interconnected network of the Fund's portfolio companies across geographies and sectors, with a focus on increasing collaboration and realising synergies between them; and (ii) establish and grow the Fund's centre for governance to drive sustainable value creation through Board representatives and promote investments related to sustainability and ESG, which are intended to address the Kingdom's long-term prosperity and resilience goals.

Such initiatives will impact investments across all of the Fund's six investment pools, with the aim of building an interconnected network of portfolio companies across sectors. These initiatives will also support the Fund's overall investment agenda to promote prosperity and resilience in the Kingdom.

***Diversify Funding and Strengthen the Fund's Balance Sheet***

The Fund leverages several sources of funding, such as earnings in the form of dividends and divestments, capital injections, asset transfers from the Government, loans, and debt instruments raised at the Fund level. Funding optimisation and balance sheet strengthening is expected to be a key part of the Fund's growth strategy for several reasons, including: (i) maximising risk-adjusted returns; (ii) increasing diversification in its portfolio; (iii) engaging the private sector and (iv) supporting capital recycling to reinvest in high-growth projects, which will help the Fund to achieve its strategic objectives.

The initiatives in this pillar are aimed at: (i) supporting the Fund and its portfolio companies in achieving and optimising their targeted capital structure; (ii) enhancing the participation of international institutional investors in the local equity and debt market; (iii) developing the Fund's funding strategy at fund and investment levels and designing debt programmes targeting a wide pool of local and international investors while leveraging the Fund's relationships; and (iv) supporting companies through their IPO and encouraging private sector participation in the Kingdom's markets.

***Strengthen the Fund as an Institution***

This strategic pillar will enable the Fund as an institution to create even more value across other strategic pillars by elevating the Fund's thought leadership in economic development and forecasting topics, transforming the Fund into a leading digitalised organisation, implementing a common culture across the Fund and developing a communication strategy.

To meet the objectives of the PIF Program and in line with its key role in achieving Vision 2030, the Fund seeks to strengthen its institutional capacity through the following initiatives: (i) establish PIF Centre for Economic Insight; (ii) position the Fund as a digitised, intellectually leading organisation of the future; (iii) build a common, unified the Fund culture in a fast-growing organisation; and (iv) communicate the Fund's purpose locally and globally.

**PLANNING AND INVESTMENT PROCESS**

Under the guidance of its Chairman, the Board is responsible for overseeing the Fund's long-term strategy, investment policy and performance. The Fund has adopted a governance and operating model that reflects its mandate and objectives, and builds on global best practices to enable well-informed decision making. As an independent entity with full administrative and financial autonomy in carrying out its investment management and operations activities, the Fund reports directly to the CEDA (see further "*Relationship with the Government*") and is managed by the Board. For further details, see "—*Management and Employees*".

One of the Board's core areas of responsibility is to oversee investment-related decisions by the Fund. The Board has also established a sub-committee, the Board Investment Committee, which reviews and endorses the Fund's investment activities, namely investments in and governance of portfolio companies, new direct and indirect investments, establishment of new companies, asset transfers and investment policy. The members of this sub-committee are all non-executive members (with the exception of His Excellency the Governor of the Fund) with local and international expertise in different fields.

Under the Board and the Board Investment Committee, the Management Investment Committee reviews all investment proposals prior to submission to the Board and its sub-committees, in addition to utilising the investment powers granted to the Fund's Executive Management (as defined in "*Management and Employees*") through delegation of authority by the Board.

The Fund has developed and approved investment policies which provide more detailed instructions with respect to management of the Fund's investment portfolios, including:

- a Total Programme Investment Policy (the "**TPIP**"), which is a comprehensive investment strategy for the whole investment programme that provides common guidelines to all portfolios and identifies how the Fund's assets are distributed within such portfolios. The TPIP sets out the high-level investment strategies of each investment pool, the allocation of capital and assets, and the relevant investment restrictions;

95

- investment policies specifically tailored for each investment pool; and

- the investment policy in respect of the treasury portfolio, being the Fund's non-investment portfolio.

The Fund's investment policies enable it to adopt the best global investment practices by identifying the objective of each investment portfolio, providing details of the relevant asset categories, and allocating targets, performance standards and risk tolerance. The Fund's Risk Appetite Statement sets out the level of risk that can be tolerated by the Fund in achieving its objectives. The Fund currently reviews and updates the Risk Appetite Statement annually in line with its objectives. The Fund also has a detailed policy and procedural manual with respect to its investment process, including any required inputs from support control functions.

Given the Fund's wide-ranging goals and investment opportunities, the Fund adopts a flexible, principle-based methodology to determine how to balance and allocate capital. A "priority system" is used to allocate capital across the six investment pools. Under the priority system, available capital will go to the top priority in the list, up to a pre-determined limit, and then to the next highest priority on the list, up to a pre-determined limit, until the capital has been allocated. The Fund has established a list of capital priorities which is reviewed on a quarterly basis or after each substantial capital placement. The list of capital priorities is developed by comparing the Fund's objectives and key performance indicators with available investment opportunities. The Fund takes into account the following when developing its list of capital priorities:

- **Investment return measures**: return on shareholder's capital, internal rate of return, investment multiples;

- **Investment risk measures**: downside risks, value at risk (scaled to the size of capital investment) and risk of capital loss;

- **Business activity**: whether it is a new company or new sector, and synergies with existing businesses;

- **Impact on local economy**: employment impact and contribution to sector growth; and

- **Innovation measures**: acquisition of patents and contribution to the domestic development of a highly educated workforce.

**FUNDING PRINCIPLES**

Pursuant to its investment policies, the Fund expects to invest at least SAR 150 billion within the Kingdom each year for the next 10 years. The Fund is also expected to invest an aggregate amount of SAR 1 trillion in the local economy over the next five years, and an aggregate amount of SAR 3 trillion in the local economy over the next 10 years.

*Sources of Funds*

The Fund funds its activities through the following sources:

1. retained earnings from investments;

2. capital injections from the Government;

3. Government assets transferred to the Fund; and

4. loans and debt instruments.

The scale of the Fund's current and projected asset base, and its limited level of financial leverage, means that the Fund has considerable scope to incur indebtedness while remaining at a conservative level of leverage.

A significant portion of the Fund's land bank has been transferred to it from the Government. This includes 141 land parcels in the Kingdom which were transferred by the Government to the Fund between 2016 to 2021 at a nominal value of SAR 1 each. In 2020, the Government transferred US$40 billion to the Fund.

As of 31 December 2021, the Fund's debt structure included US$11 billion of debt fully guaranteed by the Fund, which was raised in September 2018 pursuant to a loan agreement with a syndicate of international commercial

banks and is scheduled to be repaid in full in 2023. The Fund's capital structure also includes a US$15 billion multi-currency revolving credit facility entered into with a syndicate of international banks in March 2021. The facility was put in place as a liquidity tool and had not yet been drawn as at 31 December 2021. For the year ended 31 December 2021, the Fund's dividends received from associates and joint ventures amounted to SAR 4.4 billion on a consolidated basis. For the years ended 31 December 2021 and 31 December 2020, the Fund's total dividends received (comprising (i) dividends received from subsidiaries; (ii) dividends received from associates and (iii) dividends received from equities) amounted to SAR 18,028 million and SAR 17,387 million, respectively, each on an unconsolidated and unaudited basis.

The majority of the Fund's equity funding is SAR-denominated. The Fund's long-term funding strategy aims to rebalance this capital structure through diversifying its funding sources, including issuing debt (while retaining a modest leverage ratio and strong credit metrics).

### *Capital Recycling*

The Fund also aims to monetise its equity holdings through a "capital recycling" approach to its investment portfolio, whereby it may partially exit from strong and established industry leaders in both the local and international equity markets and reinvest in certain emerging sectors. The Fund will recycle available capital by following a three-tier approach based on the available pipeline of investment opportunities. Recent disposals made in line with the Fund's strategy of recycling capital includes (i) the sale of the Fund's 70% stake in SABIC for US$69.1 billion in 2020; (ii) the listing of ACWA Power on the Tadawul in October 2021; (iii) the sale of a minority stake in Saudi Telecom in December 2021 and (iv) the IPO of Saudi Tadawul Group in December 2021. Recent investments made in line with the Fund's strategy of recycling capital and recent notable investments include: (i) the Fund's US$1.3 billion investment in Reliance Retail Ventures Limited in November 2020; and (ii) the Fund's acquisition of Newcastle United Football Club on 7 October 2021 along with PCP Capital Partners and RB Sports & Media.

This "capital recycling" approach is expected to also benefit the Fund's portfolio companies themselves through: (i) access to additional sources of funding for future growth plans; (ii) closer public market scrutiny ensuring increased focus on stronger financials, governance and reporting; (iii) increased market visibility; and (iv) providing funding for investments. If the asset is already a publicly listed company, the Fund may seek to reduce its holding in that asset while maintaining a controlling stake. The proceeds received from the monetisation can then be used to fund the investment pipeline pursuant to the asset allocation strategy, subject to the overall objectives of the Fund and the Kingdom.

### *SABIC Disposal*

In 2020, the Fund completed the sale of a 70% stake in SABIC to Saudi Aramco, for a total price of US$69.1 billion, as part of the Fund's strategy of recycling capital. The purchase price will be paid over nine instalments between 2020 and 2028 pursuant to a seller loan provided by the Fund. The schedule of loan repayments as agreed between the Fund and Saudi Aramco, which are represented by promissory notes denominated in U.S. dollars (the "**Aramco Promissory Notes**"), is as follows:

|  | Principal Loan Amount (SAR millions) | Loan Charge (SAR millions) |
| --- | --- | --- |
| On or before 2 August 2020 | 26,250 | - |
| On or before 7 April 2021 | 18,750 | - |
| On or before 7 April 2022 | 31,875 | 1,875 |
| On or before 7 April 2023 | 39,375 | 1,875 |
| On or before 7 April 2024 | 39,375 | 2,250 |
| On or before 7 April 2025 | 39,375 | 3,000 |
| On or before 7 April 2026 | 64,125 | 5,625 |
| On or before 7 April 2027 | - | 3,750 |
| On or before 7 April 2028 | - | 3,750 |
| **Total purchase price and loan charges** | **259,125** | **22,125** |
| Payments received as at 30 June 2022 | (143,645)[(1)] | (1,875) |
| **Total amount of outstanding instalments as at 30 June 2022** | **107,250** | **20,250** |

(1) Excluding a SAR 8,230 million discount as mutually agreed between the Fund and Aramco in exchange for a prepayment of principal amount ahead of the originally agreed repayment date.

As at 30 June 2022, Aramco had partially prepaid to the Fund a portion of each of the following Aramco Promissory Notes in an aggregate notional amount of SAR 75 billion: (i) Promissory Note due 7 April 2024; (ii) Promissory Note due 7 April 2025; and (iii) Promissory Note due 7 April 2026.

For further details, see "—*PIF Strategy (2021-2025)—Diversify Funding and Strengthen the Fund's Balance Sheet*" above.

**PORTFOLIO**

The Fund operates and makes investments through the six investment pools as set out above. The Fund's AUM also includes a separate pool of treasury assets (the "**Treasury Assets**"). The Treasury Assets pool is not an investment pool. (See "—*Treasury Assets Pool*" section for further details).

The Fund's AUM as at 30 June 2022, 31 December 2021, 31 December 2020, 31 December 2019 and 30 December 2018 was SAR 2,281 billion, SAR 1,980 billion, SAR 1,544 billion, SAR 1,208 billion and SAR 972 billion, respectively.

The table below sets out the AUM of the Fund by asset class as at 31 December 2021:

| Asset Class | Percentage (%) |
|---|---|
| Public Equity | 44 |
| Private Equity | 21 |
| Private Real Estate and Infrastructure Investments | 13 |
| Private Fixed Income | 2 |
| Money Market | 7 |
| Aramco Promissory Notes | 12 |
| Others (multisector funds/mandates) | 1 |

The table below sets out the AUM of the Fund by geographical breakdown as at 31 December 2021:

| Geography | Percentage of AuM (%) |
|---|---|
| Americas (North & South) | 19 |
| Europe | 5 |
| Kingdom & GCC | 69 |
| Asia | 7 |
| Others | 0 |

The table below sets out the top 5 assets of the Fund in the MENA region as at 31 December 2021:

| Asset Name | AUM (SAR Billion) | Price Return Per Annum Since First VRP (%) | Dividend Return Per Annum Since First VRP (%) | Percentage of Ownership (%) | Classification[1] | Accounting Treatment |
|---|---|---|---|---|---|---|
| Saudi Telecom Company (STC) | 144 | 13 | 4 | 64.00[2] | Subsidiary | Consolidated |
| Saudi National Bank (SNB) | 107 | 17 | 3 | 37.24 | Subsidiary | Consolidated |
| Saudi Electricity Company (SEC) | 75 | 0 | 1 | 75.10 | Associate | Equity Accounted |
| Saudi Arabian Mining Company (MA'ADEN) | 65 | 12 | - | 67.18 | Subsidiary | Consolidated |
| Tahakom Investment Company | 59 | 25 | 1 | 100.00 | Subsidiary | Consolidated |

*All figures presented above are unaudited and taken from management accounts as at 31 December 2021.*

(1)   Accounting classifications are based on 2021 Audited Special Purpose Consolidated Financial Statements.

(2)   As at 31 December 2021, post-sale of STC shares to external parties.

The table below sets out the top 5 international assets of the Fund as at 31 December 2021:

| Asset Name | AUM (SAR Billion) | Price Return Per Annum Since First VRP (%) | Dividend Return Per Annum Since First VRP (%) | Percentage of Ownership (%) | Accounting Treatment |
|---|---|---|---|---|---|
| Lucid Group Inc..................... | 145 | 128 | 1 | 61.62 | Consolidated |
| SoftBank Vision Fund ........... | 131 | 8 | 5 | Investment Fund, the Fund is an LP | FVTPL[1] |
| Blackstone Infrastructure Partners ................................. | 24 | 4 | 0 | Investment Fund, the Fund is an LP | FVTPL |
| Hapag Lloyd ......................... | 21 | 62 | 1 | 10.20 | FVOCI[2] |
| Uber Technologies Inc........... | 11 | -3 | - | 4.21 | FVOCI |

_All figures presented above are unaudited and taken from management accounts as at 31 December 2021._

(1)   FVTPL: Fair value through profit and loss account

(2)   FVOCI: Fair value through Other comprehensive income

The table below sets out the Fund's holdings in securities publicly listed in the U.S. as at 30 June 2022:

| Company | PIF Stake (US$ Million) |
|---|---|
| Lucid Group Inc. | 17,421.7 |
| Activision Blizzard Inc. | 2,948.6 |
| Select Sector SPDR TR | 2,313.3 |
| Electronic Arts Inc. | 1,947.8 |
| Uber Technologies Inc. | 1,490.3 |
| Take-Two Interactive Software, Inc. | 1,398.6 |
| Live Nation Entertainment Inc. | 1,037.6 |
| Air Prods & Chems Inc. | 645.8 |
| Zoom Video Communications, Inc. | 507.2 |
| Costco Wholesale Corporation | 496.8 |
| NextEra Energy, Inc. | 493.3 |
| Paypal Holdings, Inc. | 493.0 |
| American Tower Corporation | 483.8 |
| Starbucks Corporation | 482.3 |
| Meta Platforms, Inc. | 474.2 |
| Microsoft Corporation | 474.0 |
| Alphabet Inc. | 464.2 |
| BlackRock, Inc. | 451.7 |
| The Home Depot, Inc. | 450.3 |
| Carnival Corporation | 439.7 |
| Salesforce, Inc. | 437.4 |
| JPMorgan Chase & Co. | 433.7 |
| Amazon.com, Inc. | 432.0 |
| Datadog, Inc. | 428.5 |
| Adobe Inc. | 420.0 |
| Freeport-McMoRan Inc. | 377.3 |
| Booking Holdings Inc. | 373.4 |
| Advanced Micro Devices, Inc. | 359.6 |
| Cummins Inc. | 348.4 |
| Automatic Data Processing, Inc. | 311.2 |
| Multiplan Corporation | 281.4 |
| FedEx Corporation | 255.6 |
| Visa Inc. | 216.8 |
| Avery Dennison Corporation | 137.4 |
| Alibaba Group Holdings Limited | 117.7 |
| Walmart Inc. | 96.1 |
| Prologis Inc. | 95.9 |
| Pinduoduo Inc. | 95.1 |
| Plug Power Inc. | 94.0 |
| Novagold Resources Inc. | 77.6 |
| Compute Health Acquision Corp. | 73.9 |
| Pinterest Inc. | 73.6 |
| Ballard Power Systems Inc. | 61.2 |
| Beigene, Ltd. | 51.4 |

| | |
|---|---|
| Carnival Corporation (Notes) | 44.8 |
| Shopify Inc. | 39.1 |
| Coupang Inc. | 36.4 |
| Babylon Holdings Limited | 34.6 |
| Signa Sports United N.V. | 32.5 |
| Farfetch Ltd | 23.7 |
| Hyzon Motors Inc. | 23.6 |
| Sea Limited | 16.0 |
| MultiPlan Corporation (Warrants) | 2.8 |
| **Total** | **40,816.8** |

The table below sets out the top 10 dividend paying Subsidiaries and Associates of the Fund for the year ended 31 December 2021 as extracted from the Fund's financial records:

| Subsidiaries and Associates | Amount (SAR millions) |
|---|---|
| Saudi Telecom Company (STC) | 7,000 |
| Saudi National Bank (SNB) | 2,418 |
| Saudi Electricity Company | 2,190 |
| Tahakom Investment Company | 1,500 |
| Saudi Tadawul Group Holding Company | 1,120 |
| Riyad Bank | 653 |
| Water & Electricity Holding Co (Badeel) | 580 |
| USCI First Investment Company | 224 |
| Southern Province Cement Company | 197 |
| National Shipping Company of Saudi Arabia (Bahri) | 178 |

The table below sets out the top 10 dividend paying Subsidiaries and Associates of the Fund for the year ended 31 December 2020 as extracted from the Fund's financial records:

| Subsidiaries and Associates | Amount (SAR millions) |
|---|---|
| Saudi Telecom Company (STC) | 5,600 |
| Saudi Basic Industries Corporation (SABIC) | 4,620 |
| National Commercial Bank (NCB) | 1,595 |
| Tahakom Investment Company | 1,000 |
| International Company for Water & Power Projects (ACWA) | 901 |
| Riyad Bank | 359 |
| Samba Financial Group | 321 |
| Southern Province Cement Company | 236 |
| National Shipping Company of Saudi Arabia (Bahri) | 178 |
| Saudi Stock Exchange (Tadawul) | 120 |

The table below sets out the top 10 dividend paying Subsidiaries and Associates of the Fund for the period ended 31 December 2019 as extracted from the Fund's financial records:

| Subsidiaries and Associates | Amount (SAR millions) |
|---|---|
| Saudi Basic Industries Corporation (SABIC) | 9,240 |
| Saudi Telecom Company (STC) | 8,400 |
| National Commercial Bank (NCB) | 2,923 |
| Samba Financial Group | 788 |
| Riyad Bank | 600 |
| National Shipping Company of Saudi Arabia (Bahri) | 178 |
| Alinma Bank | 150 |
| Saudi Stock Exchange Company (Tadawul) | 120 |
| Southern Province Cement Company | 118 |
| Industrialization & Energy Services Company (Taqa) | 69 |

The Fund classifies assets held as "liquid" or "illiquid". The Fund classifies "liquid assets" as those that are highly liquid during a period of turmoil in the markets, and therefore such assets can be converted into cash quickly with minimum impact on the asset price in the market. Such assets are allocated at full value to meet the liquidity requirements of the Fund.

Characteristically, liquid assets are those assets which:

(a)    can be easily converted into cash with very little or no loss in its market value;

(b)    have low credit and market risks, short investment period, low price volatility, low inflation risk, and are held in a convertible currency with low exchange risk, all of which enhance the liquidity of the assets; and

(c)    have active selling markets or active repurchase markets at all times.

As at the date of this Offering Circular, all of the assets in the Fund's Treasury Pool are liquid assets. The table below sets out the AUM of the Fund held in the Treasury Assets Pool:

| Treasury Assets | AUM (SAR billions) | Percentage of AUM (%) |
|---|---|---|
| As at 31 December 2021 | 397 | 20 |
| As at 31 December 2020 | 477 | 31 |
| As at 31 December 2019 | 206 | 17 |

**Saudi Equity Holdings**

The assets in this investment pool include listed and unlisted companies in the Kingdom and in the MENA region in a number of sectors, along with indirect investments through other parties or externally managed funds. The Fund seeks to maximise the value of its portfolio companies and generate long-term sustainable returns.

Set out below are summaries of the key assets within the Saudi Equity Holdings pool.

*Saudi Aramco*

On 13 February 2022, HRH The Crown Prince announced the transfer of 4% of Saudi Aramco's shares to the Fund. The transfer was part of the Kingdom's strategy to restructure its economy and to support the Fund's strategy to grow its AUM. The transfer was structured as a private transaction between the Government and the Fund. Saudi Aramco is publicly listed on the Tadawul and as at 31 December 2021, its market capitalisation was SAR 7,160 billion.

*Saudi Telecom Company*

Saudi Telecom Company ("**STC**") is a Saudi Arabia-based digital company that offers telecommunications services, landline, mobile, Internet services, enterprise digital solutions, entertainment, fintech and computer networks. The company was founded on 21 April 1998 and is headquartered in Riyadh, Saudi Arabia. It is publicly listed on the Tadawul and as at 31 December 2021, its market capitalisation was SAR 224.8 billion.

In 2021, the Fund sold 6% of its stake in STC in a secondary public offering to international and local institutional investors, as well as retail investors. As at 31 December 2021, the Fund owned 64% of STC.

*Saudi Electricity Company*

Saudi Electricity Company ("**SEC**") is the Kingdom's electric energy company. It enjoys a monopoly on the generation, transmission and distribution of electric power in the Kingdom through 45 power generation plants throughout the Kingdom. In 2021, SEC was ranked by Forbes as the fifth largest company in the Kingdom, with total annual sales of over SAR 68.5 billion in 2020. SEC is publicly listed on the Tadawul and as at 31 December 2021 its market capitalisation was SAR 99.9 billion. As at 31 December 2021, the Fund owned 75.1% of SEC.

*Saudi National Bank*

Saudi National Bank ("**SNB**") was formed in 2021 as a result of the merger of the National Commercial Bank ("**NCB**") and Samba Financial Group ("**SFG**"). NCB was the first bank to be officially licensed and operate in the Kingdom, while SFG played a key role in supporting small- and medium-sized enterprises ("**SMEs**") in the Kingdom as well as offering a wide range of banking products and services to retail, corporate, private and investment clients. SNB holds a leading position with more than 7.4 million active customers. SNB is publicly listed on the Tadawul and as at 31 December 2021 its market capitalisation was SAR 288.4 billion. As at 31 December 2021, the Fund owned 37.24% of SNB.

*Saudi Arabian Mining Company*

Saudi Arabian Mining Company ("**MA'ADEN**") is a diversified mining company, active in the fields of phosphate, aluminium, gold, base metals and industrial minerals. MA'ADEN was formed as a Saudi joint stock company in 1997 for the purpose of facilitating the development of the Kingdom's mineral resources. It is the largest mining company in the Kingdom and is publicly listed on the Tadawul. As at 31 December 2021 its market capitalisation was SAR 96.6 billion. In 2022, as a result of internal reorganisation, the Fund has reallocated MA'ADEN to its Saudi Sector Development investment pool. As at 31 December 2021, the Fund owned 67.18% of MA'ADEN.

*National Gas and Industrialization Company*

National Gas and Industrialization Company ("**GASCO**") was established in 1963 after the merger of the National Gas Company in Dammam and its two branches in Riyadh and Jeddah, with the Saudi Gas and Industrial Company in Riyadh and its branch in Dammam. As at 31 December 2021 its market capitalisation was SAR 4.1 billion. As at 31 December 2021, the Fund owned 10.91% of GASCO.

*Power and Water Utility Company for Jubail and Yanbu*

Power and Water Utility Company for Jubail and Yanbu ("**Marafiq**") is owned by four major shareholders: the Royal Commission for Jubail and Yanbu; SABIC; Saudi Aramco; and the Fund. Seven private-sector investors make up the remaining shareholders. Marafiq started operating as a private power and water utility company on 1 January 2003, with SAR 2.5 billion of initial equity. Marafiq's main objective, as stated in its charter, is to undertake the operation, maintenance, management, expansion and construction of seawater cooling systems, district cooling systems, desalinated and treated water systems, sanitary and industrial wastewater systems, electric power systems and transmission and distribution pipeline networks to provide essential utility services to industrial, commercial and residential customers in the industrial cities of Jubail and Yanbu.

*Qassim Cement Company*

Qassim Cement Company ("**QACCO**") is a Saudi Joint Stock company registered in Buraydah City on 2 August 1978. The principle activity of QACCO is to manufacture and sell cement and its related products and perform all related works, directly or indirectly, to achieve those purposes. As at 31 December 2021 its market capitalisation was SAR 6.8 billion. As at 31 December 2021, the Fund owned 23.35% of QACCO.

*Riyad Bank*

Riyad Bank was established in 1957 and operates both a corporate and retail banking franchise. Riyad Bank is a leading financier and arranger of syndicated loans in the oil and petrochemicals space, which includes most of the Kingdom's notable infrastructure projects. Riyadh Bank has a branch in London and has international offices in Houston and Singapore. Riyad Bank's investment banking arm, Riyad Capital, is a leading player in the IPO advisory business and asset management in the Kingdom, having won numerous investment awards in categories ranging from "best mutual performance" to "best fund manager." As at 31 December 2021, its market capitalisation was SAR 81.3 billion. As at 31 December 2021, the Fund owned 21.75% of Riyad Bank.

*Alinma Bank*

Alinma Bank, established in 2006, is licensed to operate in the Kingdom's financial services sector. Alinma Bank seeks to become an integrated financial institution that operates in complete accordance with *Shari'ah*-compliant banking standards in all services and transactions. As at 31 December 2021, its market capitalisation was SAR 47.9 billion. As at 31 December 2021, the Fund owned 10% of Alinma Bank.

*Eastern Province Cement Company*

Eastern Province Cement Company ("**EPCC**") was founded in 1982 and produces different kinds of clinker and cement to cater to the needs of local and Gulf markets. As at 31 December 2021, its market capitalisation was SAR 3.8 billion. As at 31 December 2021, the Fund owned 10% of EPCC.

*Saudi Ceramic Company*

Saudi Ceramic Company, established in 1977, is a leading provider of quality building solutions that includes various types of ceramic products (ceramic tiles, porcelain tiles, sanitary wares and accessories), electric water

heaters and bathroom fittings, including baths, shower trays, mirrors and mixers. Saudi Ceramic Company is the largest manufacturer of its kind in the Kingdom and a well-recognised brand. As at 31 December 2021, its market capitalisation was SAR 4.4 billion. As at 31 December 2021, the Fund owned 5.4% of Saudi Ceramic Company.

*Southern Province Cement*

Southern Province Cement Company ("**SPCC**") was established in 1978 and produces cement and related products. It owns three factories in the Jazan, Assir and Makkah regions. The total production capacity is 40,000 tons/day. As at 31 December 2021, its market capitalisation was SAR 9.8 billion. As at 31 December 2021, the Fund owned 37.43% of SPCC.

*Yanbu Cement*

Yanbu Cement Company, a Saudi joint stock company, is one of the major cement manufacturers in the Kingdom and the largest cement company in the Western Region with a total installed capacity above 7.0 million tons of clinker and cement dispatch capacity above 10.0 million tons per annum. Yanbu Cement is ranked as one of the top 50 companies in KSA with a paid up capital of SAR 1.575 billion. Its manufacturing facilities are located at Ras Baridi, on the coast of the Red Sea, 70 km north-west of the Port of Yanbu. Yanbu Cement's corporate office is located at Jeddah. As at 31 December 2021, its market capitalisation was SAR 5.7 billion. As at 31 December 2021, the Fund owned 10% of Yanbu Cement.

**Saudi Sector Development**

This investment pool comprises direct and indirect investments in new and emerging sectors and companies. Through such investments, the Fund aims to improve and launch new sectors that promote diversification and development of the Kingdom's economy, particularly the private sector, and to establish knowledge and technology and create job opportunities in small and medium enterprises. The Fund aims to establish new sectors in different areas of the value chain and invest in such areas to unlock private sector growth. The general objective of this portfolio is to enhance growth in a sector.

Set out below are summary descriptions of the key assets within the Saudi Sector Development pool.

*ACWA Power*

ACWA Power is a developer, investor, and operator of power generation and desalinated water plants. As at 30 June 2022, it had 67 assets in operation, construction, or advanced development across 13 countries, and more than 3,900 employees. In 2018, the Fund made its first direct investment in ACWA Power. ACWA Power has completed water desalination projects across various countries, including the Kingdom, Bahrain, Oman and the United Arab Emirates.

ACWA Power was publicly listed on the Tadawul on 11 October 2021. As at 31 December 2021, the Fund owned 44.16% of ACWA Power.

ACWA Power is a national champion and is expected to support the development of the Fund's domestic capacity in renewable energy. Including ACWA Power's assets that are under construction, or in advanced development, 74% of the total gross capacity of ACWA Power's portfolio is dedicated to clean and low carbon power technologies.

ACWA Power leads the consortium, comprised of ACWA Power and Badeel (as defined below), a 100% PIF-owned company as at 31 December 2021, to develop the Sudair solar photovoltaics (PV) plant in Sudair Industrial City. With an investment value of approximately SAR 3.4 billion, Sudair solar PV project will be able to power 185,000 homes, and offsetting nearly 2.9 million tons of emissions per year. The project has also achieved the second lowest cost globally for solar PV electricity production (US$1.239 cents/kwh). In April 2021, the Sudair solar PV plant signed a power purchase agreement with the Saudi Power Procurement Company for 25 years.

*Saudi Arabian Industrial Investments Company*

Saudi Arabian Industrial Investments Company ("**Dussur**") focuses on the development of key industrial sectors and their desired value chains in the Kingdom, notably the downstream development in strategically important industries. The shareholders of Dussur are the Fund, Saudi Aramco and SABIC.

### *Dur Hospitality Company*

Dur Hospitality Company, established in 1976, is a publicly listed company specialising in the hospitality sector in the Kingdom. It is recognised for its track record stretching well over four decades in managing, developing and operating hotels and residential communities across the Kingdom. Its diversified portfolio encompasses 29 properties, in addition to several new hospitality and residential projects under development across the Kingdom. As at 31 December 2021, its market capitalisation was SAR 3.1 billion. As at 31 December 2021, the Fund owned 16.62% of the company.

### *National Shipping Company of Saudi Arabia*

National Shipping Company of Saudi Arabia ("**Bahri**") was established by Royal Decree as a public shareholding company on 21 January 1978. As at 31 December 2021, the Fund and Saudi Aramco Development Company (SADCO) owned 22.55% and 20% of Bahri, respectively, and 57.45% of the company's shares are listed on Tadawul. As at the date hereof, Bahri is the Kingdom's leading shipping company. Its business activities span the purchase, sale and operation of ships and vessels for the transportation of cargo, oil, chemicals, oil products and dry bulk, logistical services, cargo clearance, storage on board ships, other means of transportation, and all maritime shipping activities. It conducts its operations through four different channels: crude oil, chemicals, breakbulk and dry bulk transportation. As at 31 December 2021 its market capitalisation was SAR 12.8 billion.

### *Gulf International Bank*

Gulf International Bank B.S.C. ("**GIB**") was established in the Kingdom of Bahrain in 1975, and commenced operations in 1976. In 2017, GIB became the first foreign domiciled bank to be granted a local commercial banking licence in the Kingdom. GIB completed the conversion of its existing branches in the Kingdom into a locally incorporated bank in April 2019.

GIB has a paid-up capital of SAR 9.3 billion, and employs over 1,000 professionals across its offices around the globe, providing wholesale, treasury, asset management, investment banking, retail banking, and *Shari'ah*-compliant banking services. GIB is owned by the governments of six Gulf Cooperation Council countries and the bank's principal shareholder is the Fund, with a majority stake of 97.23% as at 31 December 2021.

### *Kuwaiti Food Co.*

Established in 1964, Kuwaiti Food Co. operates across two main business segments: restaurants and food manufacturing and distribution. It owns exclusive franchise rights for the management and the operation of over 1,800 restaurants that represent some of the world's leading food and beverage outlets in 13 markets across the Middle East, North Africa, and the CIS. It is also responsible for the manufacturing and distribution of a diversified food product portfolio including red meat, chicken products, canned beans, dairy, frozen vegetables, pastries, cold sandwiches, biscuits and cakes, chips and snacks. As at 31 December 2021, the Fund owned 48% of the company.

### *The National Unified Procurement Company*

Established in 2009, the National Unified Procurement Company ("**NUPCO**") is fully owned by the Fund and a reliable source of medical supply services and logistical services. NUPCO's focus is to provide a solution for the urgent need to systemise demand in the healthcare sector.

### *Saudi Tadawul Group*

Tadawul is the sole entity authorised to act as a securities exchange in the Kingdom (the "**Exchange**"). Its main business involves facilitating the listing and trading of securities, as well as deposit, transfer, clearing, settlement, and registry of ownership of securities traded on the Exchange. The legal status, duties, and responsibilities of the Exchange and depository centre are explicitly defined in the Capital Market Law issued by Royal Decree No. (M/30), dated 16 June 2003. The Exchange is also the official source of all market information. Tadawul is an affiliate member of the International Organization of Securities Commissions, the World Federation of Exchanges, and the Arab Federation of Exchanges. The Exchange was 100% owned by the Fund prior to its IPO on 7 December 2021, in which the Fund floated 30% of its shares in the Exchange. Following the IPO, its market capitalisation was SAR 15.1 billion as at 31 December 2021, of which the Fund owned 70%.

*Fund of Funds Company*

Fund of Funds Company ("**Jada**") was established in August 2018 and as at 31 December 2021 was 100% owned by the Fund. Jada aims to increase opportunities for SMEs to access capital by investing in private equity funds and venture capital. Jada has also launched initiatives such as the "Improving Emerging Fund Managers" programme, which is intended to provide mentoring and professional development.

*The National Energy Services Company*

The National Energy Services Company ("**Tarshid**") was established in April 2017 and as at 31 December 2021 was 100% owned by the Fund. Tarshid was established to support the energy efficiency sector and the Kingdom's objectives of building a diversified, sustainable economy. Tarshid plays a key role in developing this sector by attracting foreign investment and top-tier global drivers of the energy industry, as well as contributing to the number of highly skilled jobs in the Kingdom. Key initiatives achieved by Tarshid include the replacement of more than one million streetlights across cities in the Kingdom, and rehabilitating more than 1,200 government buildings to cut costs and boost efficiency.

*Elm Information Security Company*

Elm Information Security Company ("**Elm**") was established in June 1988 and then converted into a joint-stock company in November 2007. As at 31 December 2021, Elm was 100% owned by the Fund. Elm offers a range of technological solutions, e-products, and consulting services, in addition to solutions for digital outsourcing, and provides training courses for its clients from the public and private sectors.

Elm's robust human resource base, across 13 sectors, provides innovative and customised solutions and products to public and private sectors clients in various fields, such as general government services for individuals and companies, including public services for the Ministry of Interior, municipalities, labour and social development, in addition to the healthcare, financial, real estate, transportation, Hajj and legal sectors.

In 2020, Elm agreed to acquire digital services company Tabadul (Saudi Company for Exchanging Digital Information), forming a national champion in the IT services sector. Tabadul, previously a 100% owned subsidiary of the Fund, became a 100% owned subsidiary of Elm while preserving its brand and its executive management team. On 23 January 2022, Elm announced its IPO to list on the Tadawul and its shares started trading on the Tadawul on 16 February 2022. As at 30 June 2022, its market capitalisation was SAR 20.4 billion. As at 30 June 2022, the Fund owned 67% of Elm.

*Noon.com*

Noon.com ("**Noon**") contributes to developing and expanding the Kingdom's e-commerce sector. As at 31 December 2021, the Fund owned 50% of the shares in Noon. Noon's services cover more than 120 cities and provinces in the Kingdom, the United Arab Emirates and Egypt. Noon also has one of the largest delivery fleets in the region, which played a vital role in supporting its customers during the COVID-19 pandemic. Noon recently launched the "Mahali" platform to support SMEs by advertising their products on the platform and expanding their reach to new customer segments.

*Saudi Agricultural and Livestock Investment Company*

As at 31 December 2021, the Fund owned 100% of Saudi Agricultural and Livestock Investment Company ("**SALIC**"), which was established in 2009. Its primary role is to contribute to the Kingdom's food security strategy through various local and foreign investments that guarantee sustainability and growth.

SALIC has invested in several international companies in agriculture and trades in grains, rice and meat in Ukraine, Canada, India, Brazil, Australia and the United Kingdom. In 2020, SALIC established the National Company for Grains in a strategic partnership with the Bahri Company to build a Yanbu grain station. It also supplied the first shipment of wheat from the production of its investments in Ukraine with 64,000 tonnes of high-quality wheat to be available upon request by Saudi Grains Organisation. In addition, SALIC plays a vital role in ensuring continuation in the supply of basic food commodities (such as eggs, onions and red meat) and stabilising prices.

In March 2021, the Fund transferred its shares in Almarai (16.32%), the National Agricultural Development Company (20%), and the Saudi Fisheries Company (39.99%) to SALIC. The transfer aims to develop and support

SALIC's mission as the Fund's investment arm in the food and agriculture sector, stimulate growth in the sector, and leverage synergies with other portfolio companies of the Fund.

### National Security Services Company

In December 2020, the Fund created National Security Services Company, designed to develop and grow the private security sector in the Kingdom. As at 31 December 2021, the company was 100% owned by the Fund. The company provides security consulting, security solutions, training and development, as well as a range of specialised services.

### Red Sea Cruise Company (Cruise Saudi)

In 2021, the Fund launched Red Sea Cruise Company (Cruise Saudi). As at 31 December 2021, Red Sea Cruise Company was 100% owned by the Fund. The company aims to establish and develop the cruise industry in the Kingdom, enhance the Kingdom's efforts to become a tourist destination on the international cruise map, and develop the tourism sector in line with Saudi Vision 2030. The company is responsible for the port development at key destinations as well as scaling cruise services from marketing, to shore excursions coordination and vessel operations. Red Sea Cruise Company is working hand-in-hand with regulatory and ministerial authorities to develop the cruise ecosystem offshore and onshore so that the Kingdom's coastline will become a premiere global cruise destination.

### Saudi Real Estate Refinancing Company

The Saudi Real Estate Refinance Company ("**SRC**") was established in 2017 with the purpose of developing the housing finance market in the Kingdom by enabling lenders to offer long-term and short-term financing solutions to home buyers. SRC played and continues to play an important role in the National Transformation Plan 2020 and Vision 2030 housing sector plan to increase the number of citizens owning their own homes to 60% by 2020 and 70% by 2030. As at 31 December 2021, SRC was 100% owned by the Fund. SRC is licensed to operate in the secondary real estate market by the Saudi Central Bank ("**SAMA**"). While SRC does not offer mortgages direct to home buyers, it offers funding to lenders, to enable them to offer accessible home loans for homebuyers. SRC increases liquidity of mortgages in the Kingdom by creating an effective secondary market, where home loans and servicing rights are bought from lenders and sold to investors.

### Saudi Arabia Investment Company

Saudi Arabia Investment Company ("**Sanabil Investments**") is a financial investment company that commits approximately US$2 billion in capital per annum into private investments that include venture capital and growth and small buyout assets. As at 31 December 2021, the company was 100% owned by the Fund.

### Saudi Investment Recycling Company

As at 31 December 2021, the Saudi Investment Recycling Company ("**SIRC**") was 100% owned by the Fund. Headquartered in Riyadh, the company was founded in 2017 to develop, own, operate, and finance various activities across all waste types to establish recycling capacities in the Kingdom and build a circular economy for a sustainable future. Through its achievements, SIRC will help meet and exceed the objectives of Vision 2030 and support the success of various initiatives identified by the revised Waste Management National Regulatory Framework.

### Saudi Information Technology Company

Saudi Information Technology Company ("**SITE**") was established in 2017 to offer secure digital services and cybersecurity solutions developed by Saudi experts to protect and secure the Kingdom's critical digital assets. SITE contributes, through its services and solutions, to the enrichment of local content in the digital, cybersecurity and data science industries by fulfilling its role as a leading consultant for major government bodies and other vital national entities. As at 31 December 2021, SITE was 100% owned by the Fund.

### The Helicopter Company

The Helicopter Company (THC) offers commercial helicopter transportation services to enhance the tourism and business sectors in the Kingdom. It is the first and only licensed helicopter operator for commercial flights in the Kingdom. As at 31 December 2021, the company was 100% owned by the Fund.

### *Water and Electricity Holding Company*

Water and Electricity Holding Company ("**Badeel**") is an investment company that invests in water and electricity production projects, managing these projects, and carrying out all activities related to its purposes. Badeel has participated in the first two independent water and power projects in the Kingdom (Shuaibah Water and Electricity Company and Shuqaiq Water and Electricity Company). Badeel currently manages four assets in total, generating a capacity of 4.4GW of power and 2,042,000 m3/day of desalinated water. As at 31 December 2021, Badeel was 100% owned by the Fund.

### *Saudi Entertainment Ventures*

Saudi Entertainment Ventures (SEVEN) was established in 2018 to create opportunities for the Kingdom through entertainment. The company aims to develop 50 cinemas, 20 entertainment complexes, and two theme parks. As at 31 December 2021, the company was 100% owned by the Fund.

### *Saudi Global Ports Company*

Saudi Global Ports Company is a joint-venture company formed between the Fund and PSA International. The company aims to develop, operate and manage the second container terminal in the King Abdul Aziz port in Dammam, a key gateway to the Arabian Gulf. The Saudi Global Ports terminal will be equipped with the latest equipment and technology to serve the fast growing economy of the Kingdom and the regional economies of the Arabian peninsula, and transform Dammam into a preferred port of call. Being the biggest port in the Kingdom, it is located close to the Kingdom's economic heart and capital city Riyadh, and linked by an existing railway network and excellent highways to the rest of the Kingdom. As at 31 December 2021, the Fund owned 51% of the Saudi Global Ports Company.

### *Aircraft Leasing Company*

The Aircraft Leasing Company ("**AviLease**") operates in the aviation leasing market, with a core focus on leasing and trading the latest generation of aircraft, as well as asset management services. AviLease is currently focused on expanding through purchase-and-lease-back transactions with airlines, portfolio acquisitions and direct orders from aircraft manufacturers. It will also consider expansions through corporate acquisitions. As at 30 June 2022, the company was 100% owned by the Fund.

### *Saudi Coffee Company*

The Saudi Coffee Company aims to grow the national coffee industry by developing sustainable coffee production in the southern Jazan region. In addition to investing directly in the national coffee industry and boosting production capacity, the Saudi Coffee Company plans to establish a dedicated academy to train local talents, entrepreneurs, coffee plantation owners and farmers as part of the Fund's focus on creating opportunities for small businesses and start-ups. As at 31 December 2021, the company was 100% owned by the Fund.

### **Saudi Real Estate and Infrastructure Development**

Assets in this investment pool include the Fund's investments in real estate development and infrastructure projects in the Kingdom. The Fund has identified a number of initiatives intended to improve utilisation and maximise the value of its land bank, and upgrade critical infrastructure to support economic development. Such projects are intended to meet the population's increasing need for relaxation, recreation, retail and entertainment. The Fund's investments also contribute to the promotion of the Kingdom as a tourism destination, improve urban livelihood and develop basic infrastructure to support economic development. Examples of such initiatives include establishing a housing community development programme, re-generation of inner city programmes, the development of hotels and housing capacity in strategic locations, and developing the international airports in Jeddah and Riyadh.

### *AlSoudah Development Company*

AlSoudah Development Company was established in 2020 and aims to develop a unique tourist attraction on the highest mountain peak in the Kingdom. It offers a range of recreational activities, adventures and extreme sports, alongside a rich and inspiring cultural experience. The development is located in the Asir region (near to the AlSoudah Mountain and surrounding areas). As at 31 December 2021, AlSoudah Development Company was 100% owned by the Fund.

*AMAALA*

AMAALA was established in 2019 and is designed to develop an ultra-luxury destination that focuses on transformative personal journeys inspired by wellness, arts, culture, and the purity of the Red Sea. It is set in the Prince Mohammad bin Salman Natural Reserve across three unique communities. The 4,155 square kilometre year-round destination will comprise 3,000 hotel rooms across around 25 hotels as well as private residential villas, apartments and estate homes, alongside 200 high-end retail establishments, fine dining, wellness and recreational facilities. As at 31 December 2021, AMAALA was 100% owned by the Fund.

### Boutique Group

Boutique Group is a hospitality brand which aims to manage and convert a collection of historic and cultural palaces in the Kingdom into luxury boutique hotels. The first phase of the project will focus on the development of three palaces: Al Hamra Palace in Jeddah, Tuwaiq Palace in Riyadh, and Red Palace in Riyadh. As at 31 December 2021, Boutique Group was 100% owned by the Fund.

### Jeddah Central Development Company

The Jeddah Central Development Company was established with the aim of developing and executing projects in the city of Jeddah. The first phase will involve the creation of a large public beach, marina and seafront development, and is aimed to be completed by 2027. The second phase will focus on development of key facilities, such as a public garden, educational facilities, and other cultural attractions, like museums and villas, and is planned to be completed in 2030. Beyond 2030, the aim will be to develop green spaces and healthcare facilities, in addition to creating a district centred around culture and innovation. As at 31 December 2021, Jeddah Central Development Company was 100% owned by the Fund.

### King Abdullah Financial District Development & Management Company (KAFD)

KAFD was established in April 2018 to expedite the pace of construction and development in an area of 1.6 million square metres. KAFD develops and manages more than 70 towers, offices, residential buildings and hotels in the Kingdom, the largest of which is the PIF Tower, which has 77 floors. KAFD is the largest mixed-use financial district in the world to achieve a LEED-Platinum certification; LEED being a widely used green building rating system. KAFD offers high-end residential units, and world-class amenities and home facilities for its residents. The residential units are designed with a human-centred approach that promotes a healthy and green lifestyle. As at 31 December 2021, KAFD was 100% owned by the Fund.

### Saudi Real Estate Company (Al Akaria)

Al Akaria is engaged in land acquisition for development of both residential and commercial assets. It has a variety of activities in the real estate industry, which include selling, leasing and asset management. Al Akaria also offers asset management services to third parties. As at 31 December 2021, the market capitalisation of Al Akaria was SAR 4.87 billion and the Fund owned 64.58% of Al Akaria.

**Saudi Giga-Projects**

Assets in this investment pool include projects that are large-scale and form complex ecosystems that are intended to significantly transform the economy of the Kingdom. These investments, classified by the Fund as "Giga-Projects", are multifaceted, unique in scope and ambition, and designed to stimulate overall growth and add significant value to the Kingdom's economy, with benefits such as non-oil GDP growth, job creation, sector development and foreign direct investment. The benefits of these Giga-Projects are expected to be realised beyond the real estate and infrastructure sectors, helping to diversify the Kingdom's economy away from oil. They are intended to support the Kingdom's economic transformation efforts and promote investment in several sectors, with the objective of achieving high returns over the medium and long term. Moreover, these projects are expected to generate significant value for the Fund in the medium to long term. There are currently four Giga-Projects under development in the Kingdom:

*Neom*

Neom, which was announced by HRH The Crown Prince in October 2017, is a planned transnational city and economic zone located in Tabuk by the north-western border of the Kingdom, with a planned area of 26,500 square kilometres. Neom is intended to be a global model for living and innovation, and is expected to contribute to diversifying the Kingdom's economy and further support the non-oil sector. Neom is planned to

operate under an independent legal and regulatory framework, including its own tax and labour laws and an autonomous judicial system. The Fund expects the total capital expenditure of the Neom project to be approximately US$500 billion, which is expected to be funded by a combination of equity from the Fund and external sources of funding.

In 2019, the Fund incorporated a closed joint stock company, named NEOM Company, to own and develop the project. As at 31 December 2021, NEOM Company was 100% owned by the Fund. Development of the Neom project is divided into two phases. Plans for phase one, which commenced in 2019 and is expected to be completed in 2025, include establishing the main pillars for the Neom project, defining its general strategy, establishing the institutions and city council responsible for the development of the project, identifying the lead investors, preparing the initial master plan for the project and launching development works of the basic infrastructure for the city. Plans for phase two, which is expected to run from 2025 onwards, include focusing on the sustainable growth of Neom's key sectors. In June 2019, Neom Bay Airport was opened and received its first commercial flights. In 2020, Neom's headquarters moved from Riyadh to Neom, and more than 450 employees relocated to live and work in Neom's main village.

Neom's strategy is structured around developing sectors that can promote entrepreneurship and innovation: energy, water, transportation, biotechnology, food, manufacturing, media, entertainment, culture and fashion, technology and digital sciences, tourism, sports, design and construction, financial services, health and well-being, education, and liveability.

Neom is also intended to contribute to arts and culture in the Kingdom, facilitate the development and diversification of entertainment opportunities and the tourism sector. Neom will aim to localise promising industries, create special zones and rehabilitate economic cities, and increase local content in non-oil sectors. Neom is also intended to support the growth of domestic investment in the communications and information technology sector, and develop the tourism and national heritage sectors.

Neom is planned to be a "smart city", entirely powered by renewable energy sources. Neom is in the process of building an environmentally friendly hydrogen production facility, providing sustainable solutions to the global transport sector and addressing the challenges of climate change through practical solutions that reduce carbon emissions. Neom will utilise integrated renewable energy systems that rely entirely on renewable energy sources and produce clean fuels.

At the beginning of 2021, HRH The Crown Prince announced "The Line" project, a mega-development comprising a planned city of 170 km in length, which is intended to provide an attractive environment for inventors, entrepreneurs and investors, with a future vision centred on people and nature. The Line is planned to have:

- an artificial-intelligence-enabled infrastructure;

- an automobile-free community that preserves 95% of the natural environment;

- an ultra-high-speed transit system;

- an energy sector in which power is sourced exclusively from clean energy; and

- conveniently located amenities.

*The Red Sea Development Company*

In July 2017, HRH The Crown Prince announced the Red Sea Project, a project aiming to attract tourism to the Kingdom by developing marine-oriented resorts across 34,000 square kilometres of the Red Sea coastline, covering 22 islands and 6 inland sites, with a development target of 50 resorts, 8,000 hotel rooms and more than 1,000 residential properties by 2030. The area covered by the Red Sea Project is intended to operate under an independent legal and regulatory framework, including unique visitor visa requirements aimed at encouraging international tourism. With a focus on wellness, luxury travel, healthcare retreats and cultural tourism, the Red Sea Project aims to attract more than one million tourists per annum on completion.

In 2018, the Fund incorporated a closed joint stock company named The Red Sea Development Company ("**TRSDC**") to own and develop the Red Sea Project. As at 31 December 2021, TRSDC was 100% owned by the Fund. The master plan for the Red Sea Project was approved in December 2018, and enabling works commenced in 2019 to provide the essential infrastructure for the project. These works include temporary roads, bridges,

jetties, utilities, workforce accommodation and a management village, which will support the development of the luxury tourism destination. The first phase of the Red Sea Project is expected to be completed by the end of 2023, including luxury hotels, a yachting marina, entertainment facilities and an airport, together with supporting logistics and utilities infrastructure. The development of Coastal Village, the residential area that will house staff and management of the Red Sea Project, also commenced in 2019. The first hotel of the Red Sea Project is expected to be completed by the end of 2022. In July 2020, TRSDC awarded a contract for development of the Red Sea International Airport, which is expected to commence operations by the end of 2023. TRSDC has also entered into a public-private partnership agreement with ACWA Power to build the infrastructure for water services and sewage treatment, solar and wind energy generation, and construct the largest battery storage station in the world, in addition to building a cooling plant.

On 27 April 2021, TRSDC secured a SAR 14.12 billion green financing accredited term loan facility and revolving credit facility, without recourse to the Fund, with four Saudi banks in order to finance the first phase of the Red Sea Project.

### *Qiddiya*

In 2017, HRH The Crown Prince announced Qiddiya, an entertainment city located approximately 40 kilometres west of Riyadh, which is expected to cover an area of over 300 square kilometres. Qiddiya's vision is to develop a global entertainment hub centred around five themes: Sports & Wellness; Nature & Environment; Parks & Attractions; Motion & Mobility; and Arts & Culture.

In May 2018, the Fund incorporated a closed joint stock company named Qiddiya Investment Company ("**QIC**") to own and develop the Qiddiya project. As at 31 December 2021, QIC was 100% owned by the Fund. QIC unveiled the master plan for Qiddiya in August 2019, and construction of Qiddiya commenced in 2019. QIC has signed several contracts to start infrastructure construction work, and is working with various local and international companies to build infrastructure, roads, bridges, site security and other support operations for the project. Qiddiya is intended to be linked to Riyadh Airport via metro and other public transport. Phase one of the Qiddiya project is intended to include more than 60 projects and more than 300 activities relating to creativity, arts, hospitality, culture, entertainment and sports. Phase one will also feature "Six Flags Qiddiya" as a key attraction. The second and subsequent phases are expected to expand Qiddiya's offerings and have been planned to enable sustainable growth and ensure high turnaround.

### *ROSHN*

ROSHN is a national real estate master developer, which was announced by the Fund in August 2020. ROSHN is dedicated to developing integrated urban communities across the Kingdom that follow leading international principles and practices in community planning and design. ROSHN is working to leverage available opportunities in the real estate market stemming from demand for housing in the Kingdom, while supporting the Kingdom's efforts to increase the homeownership rate in the Kingdom to 70%, in line with the objectives of Vision 2030.

ROSHN will develop modern and integrated residential communities in four regions and more than nine major cities in the Kingdom. These communities will unlock new growth opportunities for local companies through strategic partnerships with local and global institutions to enhance the growth of the Kingdom's real estate sector.

Since its launch in August 2020, ROSHN has announced its first residential neighbourhoods in Riyadh, covering an area of more than 20 million square metres and more than 30,000 housing units, the first milestone in a plan to develop communities and residential neighbourhoods across the Kingdom over the next 10 years. In 2021, ROSHN awarded contracts worth SAR 1.6 billion to a number of local and international companies to commence the first phase of its first district in Riyadh, which includes construction and development of earthworks, a sales centre and other enabling operations such as site supervision and selection of other necessary equipment. Off-plan sales commenced in the second half of 2021.

### International Strategic Investments

The International Strategic Investments pool has grown significantly since its inception. It currently encompasses many international direct and indirect investments in growth companies and strategic partnerships, including the Fund's investment in the SoftBank Vision Fund, one of the largest private equity funds ever raised. The Fund intends to continue to contribute and invest in international sectors, in line with the objectives of Vision 2030,

which include growing and diversifying the Fund's assets and returns, establishing economic and strategic partnerships, and expanding the Kingdom's reach and influence as a leading presence in the global economy.

Set out below are summaries of the key investments within the International Strategic Investments pool.

### SoftBank Vision Fund

The Fund is the majority investor in the SoftBank Vision Fund, one of the world's largest technology-focused investment funds, after committing US$45 billion in 2017. Since its inception, the SoftBank Vision Fund has invested and continues to invest across many technology sectors such as the Internet of Things, artificial intelligence, healthtech and fintech.

The Fund considers its investment in SoftBank Vision Fund to be an investment in an unconsolidated structure entity. Further details of this investment can be found in notes 4.8 and 45 of the 2021 Audited Special Purpose Consolidated Financial Statements incorporated by reference herein.

### Blackstone – U.S. Infrastructure Investment Programme

The Fund has committed up to US$20 billion to the Blackstone Infrastructure Fund Program, one of the largest dedicated infrastructure fund programmes in the world, which principally aims to modernise U.S. infrastructure at scale.

### Russian Direct Investment Fund

Between 2015 and 2017, the Fund and the Russian Direct Investment Fund ("**RDIF**") entered into a series of platform agreements for investments (including co-investments) of up to US$10 billion in joint projects between the Kingdom and Russia. As at 30 June 2022, the Fund had invested nearly US$2 billion in various sectors through this programme, including infrastructure, manufacturing, logistics and retail sectors. In light of the ongoing Russia Ukraine Conflict and the imposition of international sanctions on RDIF, the Fund does not currently intend to use any proceeds from any offering under this Programme for the funding of projects in Russia or with RDIF in breach of any applicable sanctions regulations.

### Investment programme in Brazil

In October 2019, during the Future Investment Initiative, the Fund announced its intention to invest up to US$10 billion in the Federative Republic of Brazil. The Fund is currently building relationships to facilitate the execution of this programme in accordance with the Fund's goals and strategy. As at 30 June 2022, the Fund had committed to two funds in private equity and infrastructure.

### Uber

The Fund invested US$3.5 billion in Uber Technologies in 2016 and as at 31 December 2021, the Fund owned 4.21% of the company. Uber is a global leader in the transportation, food delivery and technology sectors, which is transforming mobility at a global scale.

### French Private Equity Investment Initiative

A memorandum of understanding was signed with the Association Française des Investisseurs en Capital in June 2015, to invest US$2 billion with French asset managers, whereby the Fund has invested in eight funds for private equity, credit and infrastructure.

### Jio Platforms

Jio Platforms, a subsidiary of Reliance Industries, is a next-generation technology company focused on providing high-quality and affordable digital services across India, with more than 400 million subscribers as at 31 December 2021. Jio Platforms has made significant investments across its digital ecosystem, powered by leading technologies spanning broadband connectivity, smart devices, cloud and edge computing, big data analytics, artificial intelligence, Internet of Things, augmented and mixed reality and blockchain. Jio Platforms has secured investments from leading global investors including Facebook, Silver Lake, and Mubadala Investment Company, among others. The Fund invested US$1.5 billion to acquire a 2.32% equity stake in the company in June 2020.

*Reliance Retail*

Reliance Retail, a subsidiary of Reliance Retail Ventures Limited (RRVL), is a market leading retailer in the Indian organised physical retail market, serving close to 640 million footfalls across its 12,000 stores across the country, and seeks to transform India's retail sector by further integrating the Indian retail markets through its "New Commerce" strategy. India's retail sector is one of the largest in the world and accounts for over 10% of its gross domestic product (GDP). The Fund invested US$1.3 billion to acquire a 2.04% equity share in Reliance Retail Ventures Limited in November 2020.

*Jio Fiber*

Jio Fiber, also known as Digital Fiber Investment Trust, is an infrastructure investment trust (InvIT) sponsored by Reliance Industries, which owns a network of over 1.1 million km of fibre optic cable across India, connecting over 1,600 Indian cities and towns. The Fund invested US$513 million to acquire units in the trust in November 2020.

*Lucid Group Inc.*

In 2018, the Fund invested in Lucid Group Inc., a U.S. electric vehicle manufacturer. Since then, Lucid Group Inc. has made a number of breakthroughs, including unveiling the "Lucid Air", a pure-electric luxury sedan, in September 2020, and completing the first phase of the construction of its factory in Casa Grande, Arizona, with an annual initial production capacity of 30,000 units per year initially and up to 400,000 units annually, in December 2020. Lucid Group Inc. went public in July 2021, and the Fund owned more than 60% of Lucid Group Inc.'s publicly traded shares as at 31 December 2021.

*AccorInvest*

The Fund, in partnership with a group of investors, acquired a 55% stake in AccorInvest in 2018. AccorInvest is both owner and operator of hundreds of hotels worldwide, largely focused in Europe.

*Babylon Health*

Babylon Health is a telemedicine company that offers virtual consultations with doctors, a symptoms checking service and a chronic condition management service through its mobile application. The Fund, along with a group of investors, has invested in the company, which targets putting accessible and affordable healthcare services in the hands of people all around the world. The company went public through a merger with a special purpose acquisition company in October 2021. As at 31 December 2021, the Fund owned 8.64% of Babylon Health.

*Magic Leap*

Magic Leap is an augmented reality technology company in the U.S. The Fund is a major investor in the company. As at 31 December 2021, the Fund owned 54.9% of the company.

*Newcastle United Football Club*

Newcastle United Football Club is an English professional football club that plays in the Premier League. The Fund, along with PCP Capital Partners and RB Sports & Media, acquired 100% of Newcastle United Limited and Newcastle United Football Club Limited on 7 October 2021.

*ESL FACEIT Group*

The Fund announced on 25 January 2022 that Savvy Gaming Group, a subsidiary of the Fund, acquired ESL, a leading global organiser of entertainment and esports events, and FACEIT, a leading digital esports platform. The Fund merged them to form "ESL FACEIT Group".

*Nintendo Co.*

Nintendo Co. is a Japanese video games maker based in Kyoto. In May 2022, the Fund acquired a 5.01% stake in the company.

**International Diversified Pool**

The International Diversified Pool includes international global investments in public and private markets, diversified across fixed income, equity, hedge funds, real estate and infrastructure. International investments are those that are not domiciled in the Kingdom or the MENA region. This investment pool's objective is to generate strong long-term returns that provide a source of future income.

Recently, the Fund has developed connections with various asset managers, investment banks, and international brokerage companies to become one of the world's largest investors. Such measures have led to its significant growth in commitments and investments with various global fund managers across multiple asset classes, such as public and private equity, credit, real estate and infrastructure, in different geographical areas.

Within this investment pool, the majority of assets are externally managed, with 6% of assets being internally managed by the Fund as at 31 December 2021. The majority of the assets are allocated to externally managed investment strategies within the private equity, real estate, multi-asset and infrastructure spaces. Notable investments include investments in the BlackRock Fiduciary Programme and the KKR Americas XII fund, among others.

**Treasury Assets Pool**

Investments in this asset pool are organised into two liquidity tiers: tier 1 (working capital) ("**Tier 1 Assets**") and tier 2 (medium term investments) ("**Tier 2 Assets**").

Tier 1 Assets are expected to be used to cover the Fund's near-term disbursements. These assets are primarily invested in bank deposits and money market funds or similar investment products. The overall portfolio is expected to maintain an average credit quality sufficient to minimize the probability of credit losses and a maturity profile reasonably consistent with projections of near-term expenditures. Tier 1 Assets are expected to have maturities of 397 days or less.

Tier 2 Assets are expected to be used to cover projected expenditures beyond one year and borrowing expenses at the Fund level, while also acting as a contingency reserve if working capital in Tier 1 Assets unexpectedly becomes depleted due to spending requirements, market stress or other unanticipated reasons. Tier 2 Assets are expected to be invested primarily to generate income and capital appreciation from high quality, low risk investments. Tier 2 Assets may also include equity investments limited to diversified exchange traded funds and equity index tracker funds, which reference broad market equity indices or similar investments.

The assets in this pool also include a legacy portfolio of loans and the Aramco Promissory Notes, which are independent from the aforementioned two liquidity tiers.

**COMPETITION**

As the sovereign wealth fund of the Kingdom, the Fund has a unique mandate, meaning there are few organisations that undertake the same activities as the Fund. However, the Fund does face competition from international competitors which may be interested in pursuing similar investments, and certain of the Fund's business units and/or managed investments face competition in their specific business areas. The nature and extent of this competition, and its effect on the Fund as a whole, varies depending on the business concerned. Notwithstanding, the Fund is diversifying its activities to limit its exposure to risks associated with over-concentration.

**LITIGATION**

Neither the Fund nor the Issuer is involved in any litigation, arbitration or administrative proceedings relating to claims which could have a material adverse effect on its financial condition and results of operations or is aware of any such litigation, arbitration or administrative proceeding that is pending or threatened.

**ENVIRONMENT, SOCIAL AND GOVERNANCE**

The ESG investing sector doubled in size between 2018 and 2020. The Fund aims to take a leadership role with respect to ESG among sovereign wealth funds and the broader global investment community, which will in turn support the Kingdom in achieving its Vision 2030 targets regarding ESG. The Fund has already taken significant steps towards achieving this goal, such as being a founding member of the One Planet SWF Initiative, an initiative in which a group of leading sovereign wealth funds work together to accelerate efforts to transition to a low greenhouse gas emissions economy and address the risks related to climate change in the management of large,

long-term and diversified asset pools. Furthermore, the Fund has also launched several internal initiatives, such as:

1.  incorporating the Paris Climate Change Agreement in the investment decision process, in line with related Royal Decree issued in 2016;

2.  referencing ESG in the Fund's Investment Policy Statement;

3.  developing a Responsible Investing Policy focused on: integrating ESG factors in investment decisions, allocating capital to sustainable themes, actively engaging with portfolio companies on ESG and screening sectors and companies that are misaligned with the Fund's ESG values;

4.  incorporating ESG considerations into the investment sourcing process; and

5.  establishing an ESG Centre of Excellence to lead ESG implementation.

Pursuant to the Framework (as defined in "*Use of Proceeds*"), the Fund intends to allocate an amount at least equal to the net proceeds of certain Green Financing Instruments (as defined in the Framework) to finance, refinance and/or invest, in whole or in part, in Eligible Green Projects, including, among others, renewable energy projects, energy efficiency projects and sustainable water management projects.

The Fund may in the future obtain a certification under the Climate Bonds Initiative Certification Scheme in respect of certain Notes.

On 21 March 2022, the Fund announced that Aramco, SAUDIA, ACWA Power, MA'ADEN and ENOWA (a subsidiary of Neom) (the "**Partners**") have each signed a separate non-binding memorandum of understanding to become the first potential partners of the MENA regional Voluntary Carbon Market ("**VCM**"). The VCM aims to connect the supply of carbon credits with demand from investors, corporates and institutions wanting to reduce their carbon footprint by offsetting carbon emissions they generate as they work towards net zero targets. As part of the agreement, the Partners will support the Fund in the development of the VCM through the supply, purchase and trading of carbon credits. The VCM is expected to be established in 2023.

**INTELLECTUAL PROPERTY**

The ownership and control of intellectual property generated by the Fund and its portfolio companies is an important consideration for the Fund when negotiating new joint ventures. Broadly, where practicable, the Fund endeavours to ensure that any intellectual property developed remains in the ownership of the joint venture and also aims to ensure that such intellectual property is protected against infringement using appropriate tools available.

**INFORMATION TECHNOLOGY**

The Fund's IT department is responsible for designing, implementing, and maintaining state-of-the-art digital and technology capabilities in order to empower and enable the Fund to achieve the PIF Program, and in turn, Vision 2030. The IT department provides services and solutions that support the implementation and delivery of various projects of the business units across the Fund.

The Fund leverages a robust structured framework to manage IT capabilities and services end-to-end. This framework covers all aspects of the technology capabilities that help drive and enable business to manage their core functionalities, including the IT strategic mandate, the enterprise architecture and the IT operating model.

The framework is designed with cybersecurity as its overarching goal. Firstly, the framework aims to identify the business requirements that the Fund's IT department needs to respond to. The IT department will take into account the IT strategic mandate in order to align its processes and systems with the overall organisation strategy. The IT department will also consider the enterprise architecture in order to facilitate the management to best provide digital and technology services to different divisions of the Fund. Lastly, the framework embraces the IT organisational and functioning model, which includes people, processes and governance factors that assist the Fund to achieve its objectives efficiently and effectively.

Currently, the Fund is in the process of transitioning from a traditional technology structure into a new strategically focused structure. From a process and technology perspective, the Fund is moving away from the waterfall processes and a development-focused approach, towards leaner project management and more agile processes in

order to achieve hybrid solutions. From a governance perspective, the Fund aims to create a more collaborative environment for better decision-making and to embrace a growth-oriented mind-set when providing digital solutions. From an organisational structure perspective, instead of traditionally siloed, large, fixed teams, the Fund seeks to adopt smaller but more agile, integrated and cross-functional teams.

**RELATED PARTY TRANSACTIONS**

Details regarding the Fund's transactions with related parties as at and for the year ended 31 December 2021 are set out in note 22 (Related Party Disclosures) to the 2021 Audited Special Purpose Consolidated Financial Statements. For purposes of the 2021 Audited Special Purpose Consolidated Financial Statements, related parties include the Government of the Kingdom, associated companies, joint ventures, key management personnel (including directors of the Fund) and entities jointly controlled by such parties. However, the transactions with related parties set out in the 2021 Audited Special Purpose Consolidated Financial Statements as at and for the year ended 31 December 2020 do not include those in connection with members of the Board and/or their close family or with members of Board level committees and/or their close family.

The Group enters into transactions with the Government, Government ministries and Government-related entities in the normal course of its business. The Fund's management has complied with the disclosure requirements under IAS 24 in connection with Government-related entities.

In April 2021, the Code of Conduct for the PIF Board of Directors and Board Committee Members (the "**Code of Conduct**") of the Fund became effective. The Code of Conduct is a guide for members of the Board and the Fund's Board level committees to assist them in the performance of their duties and responsibilities in a way that exemplifies the highest professional and governance standards. Based on reporting made by the Board and the Board level committees as at 30 June 2021, there are no balances that require disclosure as per IAS 24.

## RELATIONSHIP WITH THE GOVERNMENT

### Introduction

The Fund is the sovereign wealth fund of the Kingdom. Pursuant to the PIF Law, the Fund's mandate is to invest its assets in accordance with the highest standards to maximise returns for the benefit of the public welfare, to support the Kingdom's economic development and to diversify its sources of income, in the interests of future generations. The Fund is organisationally connected to the CEDA, whose chairman, HRH Prince Mohammed bin Salman bin Abdulaziz Al Saud, Crown Prince of Saudi Arabia, acts as the chairman of the Board.

The Fund plays an integral role in the Government's strategy by seeking to generate sustainable long-term economic benefits for the Kingdom. Through its investment activities, the Fund contributes to the diversification of the Kingdom's economy and the promotion of growth within selected industries and sectors that have a high potential for growth and hold commercial value, therefore contributing to the development of the Kingdom's economy and stimulation of private sector growth.

### The Fund's Role in the Kingdom's Vision 2030 Strategy

The Fund plays a fundamental role in implementing the Kingdom's Vision 2030 strategy, a comprehensive agenda of socioeconomic reforms with the aim of achieving fundamental economic, social and structural changes in the Kingdom by the year 2030 (see "*Overview of the Kingdom of Saudi Arabia—Vision 2030*").

The CEDA has identified 11 executive programmes with the aim of achieving the strategic goals of Vision 2030. With its mandate broadened, the Fund was tasked with a strategic role within Vision 2030 to lead the national economic transformation for positive, sustainable change in the Kingdom.

Vision 2030 assigned the following strategic objectives to the Fund:

- to grow the assets of the Fund;

- to unlock new sectors;

- to localise cutting-edge technology and knowledge; and

- to build strategic economic partnerships.

The Fund is also an enabler for other executive programmes within the Kingdom. As a result, the Fund collaborates with other VRPs, investing in opportunities that are commercially viable across sectors in the Kingdom, provided those opportunities also align with the Fund's strategy and investment requirements.

In January 2021, the Fund announced its five-year strategy, including the PIF Program. As part of the strategy, the Fund, among other initiatives, plans to: (a) invest a minimum of US$40 billion annually in domestic projects and investments; (b) contribute US$320 billion to non-oil GDP cumulatively through its portfolio companies; (c) increase AUM to over US$1.07 trillion; and (d) create 1.8 million direct and indirect jobs by the end of 2025. The Fund aims to act as a driver of economic diversification for the Government by developing strategic sectors and solid economic partnerships that deepen the Kingdom's regional and global influence.

The Fund has identified the following 13 strategic sectors which will constitute a priority in the local market, in order to achieve the best results which can support the national economy: aerospace and defence; automotive; transport and logistics; food and agriculture; construction and building components and services; entertainment, leisure and sports; financial services; real estate; utilities and renewables; metals and mining; healthcare; consumer goods and retail; and telecom, media and technology. Investments in the aforementioned sectors are expected to contribute to the achievement of the targets set in Vision 2030, namely that the Fund and its portfolio companies should contribute to increasing the annual non-oil GDP of the Kingdom by approximately 7%.

### Government Oversight

The Fund became "organisationally connected" to the CEDA pursuant to Article 5 of Council of Ministers' Resolution No. 270 dated 3/6/1436H (corresponding to 23 March 2015) and has since been a distinct public legal entity with full administrative and financial autonomy, as well as absolute independence in carrying out its investment management and operations activities, as ratified pursuant to Article 2 of Royal Decree No. M/92. The Fund reports to the CEDA, which is one of two subcabinets of the Kingdom and oversees the Kingdom's domestic

economic and development affairs (see "*Description of the Public Investment Fund—History*"). Whilst the CEDA, as part of its role, oversees the overall general performance of the Fund, the CEDA is not involved, in any way, with the Fund's investment decisions or management of its investments, nor with the appointment of the Fund's representatives to the boards of its portfolio companies or investments.

The Fund maintains administrative and financial autonomy from the Government (including the CEDA) in the operation of its business and management of its portfolio investments. The Board is responsible for the Fund's investment policies and has general oversight over all of the Fund's strategic activities, whilst day-to-day operations, in addition to selected strategic decisions, are delegated by the Board to the Fund's senior management team (see "*Management and Employees—Management*"). The Fund's investment process is operated entirely through its internal management committees (see "*Description of the Public Investment Fund—Planning and Investment Process*").

Pursuant to Article 7 of the PIF Law, the Board is obliged to submit to the CEDA the bylaws and policies of the Fund (the "**Bylaws and Policies**") or any amendment thereto that regulates the following matters:

- setting investment strategies, policies, and procedures, including targeted returns; and the mechanism for deciding on an investment, monitoring its performance, and exiting therefrom;

- setting a policy for distribution of Fund profits;

- setting risk management procedures and systems;

- determining the accounting standards and policies for drafting and auditing the Fund's financial statements, and determining the beginning and end of the fiscal year; and

- approving the Fund's loans and other forms of debt, including issuing sukuk and bonds, in accordance with relevant rules;

as well as any rules and procedures that regulate the Board's activities (including calling for and holding meetings, and voting on decisions), not less than 15 days or more than 30 days from the entry into force of such Bylaws and Policies, following which the CEDA may direct the Board to make any amendments to the Bylaws and Policies.

The Fund is also required to submit to the CEDA an annual report within 150 days from the end of the Fund's fiscal year. Pursuant to Article 25 of the PIF Law, the CEDA may, upon reviewing the Fund's annual report of the preceding fiscal year, direct the Board to take any action the CEDA deems appropriate.

**Contributions from the Government**

The Government has historically provided financial support to the Fund in the form of equity contributions. The Government has also historically made non-monetary contributions to the Fund from time to time, including in the form of land transfers.

There is no specific budget to determine the amount of funding the Fund receives from the Government, and the Fund is not a recipient of the Government's annual general budget allocations. However, the Government has stated its intention to implement its development plans either through the Kingdom's general budget or through the role played by the Fund and other development funds in the Kingdom. For example, in March and April 2020, SAR 150 billion (US$40 billion) was transferred from the Government to the Fund.

As set out in the Audited Special Purpose Consolidated Financial Statements, the value of the Government's contributions to the Fund amounted to SAR 177.4 billion and SAR 26.5 billion in the years ended 31 December 2020 and 31 December 2021, respectively.

The Fund expects that its future capital and investment expenditure will largely be funded by capital injections from the Government, Government asset transfers, loans and debt instruments, and retained earnings from investments.

**Distributions of Dividends to the Government**

Subject to the approval of the Board, the Fund may, from time to time, make distributions of dividends to the Government (see further "*Risk Factors—The Government has the right to request that the Board consider distributions of the Fund's profits or assets to the Government*").

As set out in the Audited Special Purpose Consolidated Financial Statements, the Fund's distributions to the Government amounted to SAR 24.0 billion and SAR 3.2 billion in the years ended 31 December 2020 and 31 December 2021, respectively. The Fund's deemed dividends amounted to SAR 221 million and nil in the years ended 31 December 2020 and 31 December 2021, respectively. Deemed dividends comprise the payments made by the Fund due to the actions of the Government where the Fund is not the owner of the assets or obligated for liabilities resulting from the Government's actions.

## MANAGEMENT AND EMPLOYEES

### MANAGEMENT

The Fund was established in accordance with Royal Decree No. M/24 dated 25/06/1391H (corresponding to 18 August 1971) as the investment arm under the supervision of the MoF, and with the issuance of resolution No. 270 by the Council of Ministers on 3/6/1436H (corresponding to 23 March 2015), the oversight of the Fund transferred from the MoF to the CEDA, which is a subset of the Saudi Cabinet. Accordingly, the Board was reconstituted with His Royal Highness Prince Mohammed bin Salman bin Abdulaziz Al Saud, Crown Prince, Deputy Prime Minister and Chairman of the CEDA, becoming the Chairman of the Fund. This change broadened the Fund's mandate and expanded its scope to play a strategic national role in the economic transformation which the Kingdom is currently going through. Furthermore, the Fund is one of the cornerstones of Vision 2030, and plays a vital role in supporting the achievement of Vision 2030's objectives and targets.

After issuance of the Royal Decree No. M/92 dated 12/08/1440H (corresponding to 18 April 2019), the PIF Law was approved in order to regulate its activities, become a distinct public entity with full administrative and financial autonomy and highlight that the objectives of the Fund are: to invest its funds and assets in accordance with the highest standards, to achieve returns for the purpose of serving the Kingdom's public interest, to contribute to the economic development of the Kingdom and diversify its sources of income and to take into account the interest of future generations by investing sustainably.

The objectives described above are empowered with the authorities granted to the Fund pursuant to the PIF Law in order for it to carry out its mandate. As set out in the PIF Law, the Fund is empowered to invest both inside and outside the Kingdom, to own and dispose of assets (including real estate, rights in rem, shares, securities, foreign currencies, commodities and financial derivatives) and to set up companies and other special purpose entities. The Fund is also permitted to participate in lending and other forms of financing, and to enter into loans and other forms of indebtedness, including issuing sukuks and bonds.

In accordance with the PIF Law, its Board manages and supervises the affairs of the Fund, and ensures the realisation of its goals and implementation of its powers as per the bylaws of the Fund. To that end, the Fund has the authority to approve and issue internal rules and policies. Different administrative levels are interconnected under the supervision of the Board to ensure transparent communication, effective work and significant progress, in order to achieve specific and clear results. The Board is supported by its five sub-committees, each of which is composed of expert members in their fields, and is further enabled by a well-qualified management team (the "**Executive Management**"), as illustrated in the chart below.

PIF Governance



**The Board**

Under the chairmanship and guidance of HRH Prince Mohammad bin Salman, the CEDA's chairman, the Board is composed of several seasoned experts from a range of fields. Such diversity means that multiple aspects of an issue are covered before a decision is taken, which assists the Fund in continuing to play a leading role in the Kingdom's economic development and ensures proper alignment with other public entities and initiatives. Moreover, the Board is responsible for overseeing the Fund's long-term strategy, investment policy and performance. The Board has four key areas of responsibility:

1.  **Core activities**: investment-related decisions;

2.  **Control activities**: audit, compliance and risk management;

3.  **Support activities**: recruitment and remuneration; and

4.  **Planning and monitoring activities**: strategy and planning; governance and oversight; and reporting and monitoring.

| Name | Title |
|---|---|
| HRH Mohammed Bin Salman Al Saud | Chairman |
| H.E. Dr. Ibrahim Abdulaziz Al-Assaf | Board Member |
| H.E. Dr. Majid Abdullah Al Qasabi | Board Member |
| H.E. Mohammad Abdulmalek Al Shaikh | Board Member |
| H.E. Mohammed Abdullah Al-Jadaan | Board Member |
| H.E. Ahmed Aqeel Al-Khateeb | Board Member |
| H.E. Khalid Abdulaziz Al-Falih | Board Member |
| H.E. Yasir Othman Al-Rumayyan | The Governor and Board Member |
| H.E. Mohamed Mazyed Altwaijri | Board Member |

Article 5 of the PIF Law governs the composition of the Board. Article 5 provides that the Board shall be managed and chaired by the chairman of the CEDA and that the Governor of the Fund shall be a member of the Board, along with no fewer than four other members with different specialisms.

The business address of each of the members of the Board is Alra'idah Digital City, Building MU-04, Prince Turki bin Abdul Aziz Al-Awal Road, Al Nakhil District, P.O. Box 6847, Riyadh 11452, Kingdom of Saudi Arabia.

The Board is responsible for the supervision and management of the Fund, and guides the Fund's strategic direction. It regularly reviews the Fund's operating and financial position. The Board ensures that the necessary resources are in place to enable the Fund to meet its strategic objectives and monitor the performance of management and aims to ensure that the strategy, policies and procedures adopted are for the long-term benefit of the Kingdom, in line with the Fund's mandate. As a result, the strategic direction and management of the Fund's operating and financial position are set by the Board.

Brief biographies of each of the members of the Board and its sub-committees members are set out below:

***HRH Prince Mohammad bin Salman bin Abdulaziz Al-Saud***

*Chairman of the Board*

HRH Prince Mohammad bin Salman is the Crown Prince of Saudi Arabia, appointed in this capacity in June 2017 by the Custodian of the Two Holy Mosques, King Salman bin Abdulaziz Al-Saud. He is also the Deputy Prime Minister, Chairman of the Council for Economic and Development Affairs, Chairman of the Fund and Chairman of the Council of Political and Security Affairs, and Minister of Defence.

HRH is also the Chairman of the Board and the Remuneration Committee of the Fund.

### H.E. Dr. Ibrahim Abdulaziz Al-Assaf

*Board Member*

H.E. Dr. Ibrahim bin Abdulaziz Al-Assaf currently serves as the Minister of State and a Member of the Council of Ministers. He holds membership in the Political and Security Affairs Council, the Council of Economic and Development Affairs, the Saudi Aramco Board of Directors and the PIF Board of Directors. H.E. Al-Assaf holds a Ph.D. in Economics from the University of Colorado, United States of America, a Master in Economics from the University of Denver, United States of America, and a Bachelor of Economics and Political Science from King Saud University.

### H.E. Dr. Majid Abdullah Al Qasabi

*Board Member and Chairman of Audit and Compliance Committee*

H.E. Dr. Majid bin Abdullah Al-Qasabi currently serves as the Minister of Commerce, the Acting Minister of Media and a member of the PIF Board of Directors, while presiding over the Board's Audit and Compliance Committee. Previously, H.E. Al-Qasabi was the Minister of Social Affairs and the Acting Minister of Municipal and Rural Affairs. He was Assistant Professor at the Department of Industrial Engineering at the King Abdulaziz University, and General Manager of Kra Est. for Contracting. Al-Qasabi holds a Ph.D. in Engineering Management (Honors) from the University of Missouri, United States of America.

### H.E. Mohammad Abdulmalek Al Shaikh

*Board Member and Remuneration Committee Member*

H.E. Mohammad bin Abdul Malek Al-Shaikh currently serves as a Minister of State and a Member of the Council of Ministers. He holds membership in the General Committee of the Council of Ministers, the Council of Economic and Development Affairs, the Financial Committee, the PIF Board of Directors and the Board's Remuneration Committee. He previously served as the Chairman of the General Sports Authority and the Capital Markets Authority. He was also a partner at a number of international law firms. Al-Shaikh holds a Master of Laws from Harvard Law School, United States of America, and a Bachelor of Arts from Umm Al-Qura University.

### H.E. Mohammed Abdullah Al-Jadaan

*Board Member and Chairman of Risk Committee*

H.E. Mohammad bin Abdullah Al-Jadaan currently serves as the Minister of Finance, and a Member of the Council of Ministers. He holds membership in the Council of Economic and Development Affairs, the Royal Court's Financial Committee and PIF Board of Directors, while presiding over the Zakat, Tax and Customs Authority Board, the Board's Risk Committee and the State Properties General Authority, among others. He is a Member of the Board of Governors of the Islamic Development Bank, the International Monetary Fund, the World Bank, the Arab Fund for Economic and Social Development, and the Arab Monetary Fund, among others. H.E. Al-Jadaan holds a Higher Diploma in Legal Studies from the Institute of Public Administration and a Bachelor of Islamic Economics from the Imam Mohammad Ibn Saud Islamic University.

### H.E. Ahmed Aqeel Al-Khateeb

*Board Member, Investment Committee Member and Risk Committee Member*

H.E. Ahmed bin Aqeel Al-Khateeb currently serves as the Minister of Tourism and a member of the PIF Board of Directors, the Board's Investment Committee, the Board's Risk Committee, and presides over the Saudi Fund for Development, the Saudi Arabian Military Industries and the Quality of Life Program. He also serves as Secretary General of the Diriyah Gate Development Authority. Previously, he was the Minister of Health, Chairman of General Entertainment Authority and Advisor to the General Secretariat of the Council of Ministers. Al-Khateeb holds a Bachelor of Business Administration from King Saud University and a Certificate in Wealth Management from Dalhousie University.

### H.E. Khalid Abdulaziz Al-Falih

*Board Member*

H.E. Khalid bin Abdulaziz Al-Falih currently serves as the Minister of Investment. He is also on the Board of Directors of King Abdullah University of Science and Technology, the Public Investment Fund, and the Economic Cities and Special Zones Authority. Previously, he served as the Minister of Energy, Industry and Mineral Resources, Minister of Health, and, separately, as Chairman and CEO of Saudi Aramco among other positions. He holds an honorary doctorate from the Korea Advanced Institute of Science and Technology, an MBA from King Fahd University of Petroleum and Minerals, and a Bachelor of Science Degree in Mechanical Engineering from Texas A&M University, United States of America.

### H.E. Yasir Othman Al-Rumayyan

*Board Member, Investment Committee Member, Risk Committee Member, Remuneration Committee Member and the Governor of the Public Investment Fund*

H.E. Yasir Al-Rumayyan currently serves as the Governor and a Board member of the Fund, Chairman of the Royal Court Decision Support Centre, Chairman of MA'ADEN and Chairman of Saudi Aramco, among other roles. He is currently a board member of Uber Technologies, SoftBank Group and ARM Holdings. Previously, H.E. Al-Rumayyan was CEO and a Board Member of Saudi Fransi Capital, a Director of Corporate Finance at the Capital Market Authority, and Head of International Brokerage at Saudi Hollandi Bank. He holds a Bachelor's in Accounting from King Faisal University, Saudi Arabia, and is a graduate of the Harvard Business School's General Management Program. He is also a Fellow of the Saudi Organization for Certified Public Accountants.

### H.E. Mohamed Mazyed Altwaijri

*Board Member and Chairman of Investment Committee*

H.E. Mohammad bin Mazyed Al-Twaijri currently serves as a Royal Court Advisor, PIF Board Member and chairman of the PIF Board Investment Committee. He holds membership in the Council of Economic and Development Affairs, Saudi Aramco and Royal Commission for Makkah City and Holy Sites and is also the chairman of National Transformation Program. Previously, H.E. Al-Twaijri has been Minister of Economy and Planning, Vice Chairman of HSBC, CEO of HSBC MENA and Turkey, Managing Director and CEO of J.P. Morgan in KSA. Al-Twaijri holds a Master of Business Administration from the King Saud University and a Bachelor of Aviation Science from the King Faisal Air Academy.

### H.E. Abdulaziz Saleh Al-Furaih

*Audit and Compliance Committee Member*

H.E. Abdulaziz bin Saleh Al-Furaih currently serves as the Chairman of the Steering Committee at the MoF and a Senior Advisor to H.E. Minister of Finance, while presiding over the MoF's Transformation Program. Previously, H.E. Al-Furaih was the Vice Governor and Vice Chairman of SAMA and held several positions within Riyad Bank, including Deputy CEO. Al-Furaih holds a Master of Accountancy from Ball University, United States of America, and a Bachelor of Science in Accountancy from the San Diego State University, United States of America. He is also a certified Public Accountant (CPA) from Colorado, United States of America.

### H.E. Ayman Mohammad Al-Sayari

*Investment Committee Member*

H.E. Ayman bin Mohammad Al-Sayari currently serves as the Vice Governor and Vice Chairman of SAMA. Previously, H.E. Al-Sayari was SAMA's Deputy Governor for Investment, Acting Head of the MoF's Debt Management Office and worked at the World Bank Group-affiliated International Finance Corporation's Capital Markets Department. Al-Sayari holds a Master of Business Administration in Finance from George Washington University, United States of America, and a Bachelor of Science in Accounting from the King Fahd University of Petroleum and Minerals. Al-Sayari is a CFA Charter holder.

### Dr. Ibrahim Saad Al-Mojel

*Investment Committee Member*

Dr. Ibrahim bin Saad Al-Mojel currently serves as the CEO of the Saudi Industrial Development Fund and is a member of the PIF Board Investment Committee. Previously, Dr. Al-Mojel was Advisor to the Domestic Analysis Department within Strategy and Market Analysis while serving as the CEO of the Saudi Aramco Investment Management Company "Wisayah". Al-Mojel holds a Ph.D. in Decision Analysis (Operations Research), a Master of Electrical Engineering, and a Master of Science in Management from Stanford University, United States of America, and a Bachelor of Electrical Engineering and Mathematics from Vanderbilt University, United States of America.

### Mr. Andrew Liveris

*Investment Committee Member*

Mr. Andrew Liveris is an Advisor to His Royal Highness the Crown Prince and a Special Advisor to the Fund, holding membership of PIF Board Investment Committee, Saudi Aramco, IBM, and Peterson Institute for International Economics. Previously, Liveris worked at Dow Chemical for more than 40 years across Australia and Asia, including as General Manager of Thailand Operations, Head of Asia-Pacific Operations, and CEO and Chairman of Dow Chemical. Liveris holds honorary doctoral degrees from several U.S. universities, including a Doctorate in Engineering from the University of Michigan, United States of America.

### Tareq Abdul Rahman Al-Sadhan

*Audit and Compliance Committee Member*

Mr. Tareq bin Abdul Rahman Al-Sadhan currently serves as the CEO of Riyad Bank and Member of PIF Board Audit and Compliance Committee. Previously, Mr. Al-Sadhan was Advisor to the Chairman of the Saudi Fund for Development, Acting Director General of the General Authority of Zakat and Tax, and Deputy Governor for Control at SAMA. He also held several positions at KPMG Saudi Arabia for over 15 years, including as Managing Partner. Al-Sadhan holds a Master of Business Administration from the École des Ponts Business School, France, and a Bachelor of Accounting from King Saud University.

### Yusuf Mohammad Al-Mubarak

*Audit and Compliance Committee Member*

Mr. Yusuf bin Mohammad Al-Mubarak currently presides over Al-Mubarak Legal Accountancy and Financial Consultancy Office and serves as a Chartered Accountant and Legal Advisor. Al-Mubarak is a Member of PIF Board Audit and Compliance Committee, as well as a member of Audit Committees of a number of other entities. Previously, Al-Mubarak worked in the accounting, auditing, risk management and corporate governance fields across a number of entities and served as the Secretary General of the Saudi Organization for Certified Public Accountants.

### Dr. Khalid Dawood Al-Faddagh

*Risk Committee Member*

Dr. Khalid bin Dawood Al-Faddagh is currently a member of several boards of directors and committees, including the PIF Board Risk Committee, ACWA Power's Risk and Compliance Committee and Bupa Arabia's Risk Committee. Al-Faddagh is also an Independent Member of the Audit Committee of SABIC and SPIMACO. Previously, he worked at Saudi Aramco for over 30 years, including as General Auditor and Secretary of Audit Committee. Al-Faddagh holds a Ph.D. in Mechanical Engineering from Imperial College London, UK. In 2015, Al-Faddagh received the UAE Internal Auditors Association's Lifetime Achievement Award.

### Dr. Roland Toppen

*Risk Committee Member*

Dr. Roland Toppen currently serves as the CFO of Orange Oak Investments, The Netherlands, and CFRO of Golden Age HC Group, The Netherlands, and as a member of the PIF Board Risk Committee, while owning and

presiding over TOPLEAD4U. Previously, Dr. Toppen held several positions within Robeco for over 25 years, the last 15 years of which he served as Chief Finance and Risk Officer, Head of Corporate Development and Business Control, and Chief Financial, Operations and Risk Officer. Toppen holds a Ph.D. in Business Information Technology from Tilburg University, The Netherlands, and a Master of Business Administration from Erasmus University, The Netherlands.

**Board Level committees**

The Board and the committee governance system is based on the need to ensure precision in operation oversight and alignment with the Fund's strategy. Five sub-committees were established to ensure the Board receives adequate advice on its key focus areas, and exercise their delegate authorities accordingly.

*Executive Committee*

The Executive Committee monitors and aligns the Fund's performance with its mandate and sets the strategic direction and guidance for management.

*Board Investment Committee*

The Board Investment Committee reviews and endorses the Fund's investment activities, namely investments in and governance of portfolio companies, new direct and indirect investments, establishment of new companies, asset transfers and investment policy. The members of this committee, except for His Excellency the Governor, are all non-executive members with local and international expertise in different fields.

*Audit and Compliance Committee*

The Audit and Compliance Committee approves the internal and external audit plans, reviews audit reports and the financial statements. It also exercises oversight over the Fund's compliance with all applicable laws and regulations and adherence to international standards of conducting business, including the addressing of financial crime risk. All members of this committee are non-executive members who offer their knowledge in the fields of audit and compliance to ensure the Fund operations are on the right track and match best practices around the globe.

*Board Risk Committee*

This committee ensures that investments comply with risk management policies. It also prepares a risk appetite statement and formulates mitigation plans to avoid any risks the Fund might encounter during its investment and non-investment activities.

*Remuneration Committee*

This committee has oversight of the overall remuneration pool relating to each senior management member, the compensation policy for external members in the Fund committees and the compensation and benefits scheme linked to the performance management of employees.

**Delegation of Authority**

As the Fund matured in its operations, it attracted subject matter experts to guide the delivery of its projects. To ensure efficient operation of the Fund while enticing professional diverse opinions on the feasibility or otherwise of investments, these specialists were integrated with the Fund's governance structure and Executive Management. Consequently, the Board recognised the need to review and amend the extent of delegated authority. It also mandated periodic reporting activities to ensure that proper monitoring of the execution of these delegated authorities are in place. As part of this process, more responsibilities were also entrusted to each sub-committee.

The Executive Management team subsequently developed a mechanism for delegating authority to each function of the Fund and highlighted the roles and responsibilities of all management level committees. Such a governance model enables the Fund to achieve its aspirations to become a global investment powerhouse that diversifies the economy and empowers the private sector to make well-informed decisions. The model also contributes towards the Fund's aspirations to be the leading institution to partner with active investors who deliver valuable input and global impact. The governance model delivers a strong level of oversight and control, with the right level of guidance. This balance helps overcome challenges and mitigates risks that might affect the smooth operation of

124

daily activities. Additionally, the Fund has established audit, compliance and risk functions to ensure proper controls are in place.

**The Fund's Executive Management**

The Fund's Executive Management consists of 13 executives, in addition to His Excellency the Governor. The members of the Executive Management team hold the appropriate level of knowledge to lead the activities within their designated fields and to achieve the desired goals and objectives of the Fund. The 13 executives are experienced in various disciplines, both locally and internationally, and were recruited from top tier organisations around the globe to assist the Fund in achieving its targets.

The business address of each of the members of the Executive Management is Alra'idah Digital City, Building MU-04, Prince Turki bin Abdul Aziz Al-Awal Road, Al Nakhil District, P.O. Box 6847, Riyadh 11452, Kingdom of Saudi Arabia.

The members of the Executive Management are:

| Name | Title |
| --- | --- |
| H.E. Yasir Othman Al-Rumayyan | The Governor |
| Mr. Turqi A. Al-Nowaiser | Deputy Governor, and Head of the International Investments Division |
| Mr. Yazeed A. Al-Humied | Deputy Governor, and Head of MENA Investments Division |
| Mr. Aiman M. AlMudaifer | Head of Local Real Estate Investments Division |
| Mr. Yasir A. AlSalman | Chief Financial Officer |
| Mr. Bander A. Mogren | Chief Operating Officer |
| Mr. Fahad AlSaif | Head of Global Capital Finance Division |
| Ms. Rania Nashar | Head of Compliance & Governance Divisions |
| Mr. Brian Gillespie | General Counsel |
| Mr. Saad A. Alkroud | Chief of Staff and Secretary General to the Board |
| Mr. Kevin Foster | Head of Corporate Affairs Division |
| Mr. Jerry Todd | Head of National Development Division |
| Mr. Mike Cheng | Head of Internal Audit Division |
| Mr. Feta Zabeli | Head of Risk Division |

Brief biographies of each of the members of the Executive Management are set out below:

*H.E. Yasir Othman Al-Rumayyan*

For the biography of H.E. Al-Rumayyan, see "—*The Board*" above.

*Mr. Turqi A. Al-Nowaiser*

Mr. Turqi A. Al-Nowaiser is the Deputy Governor and Head of the International Investments Division of the Fund. He joined the Fund as the Head of the International Investments Division in 2016. He leads the Fund's International Investment strategy across different asset classes, including public markets, private markets, real estate and infrastructure. Mr. Al-Nowaiser is a member of the Fund's Management Committee and Management Investment Committee, and also represents the Fund as a board member on several different companies such as Lucid Group Inc., Noon Investments, SITE, Sanabil Investments and Hapag-Lloyd AG.

Prior to joining the Fund, he held senior roles at the CMA (2007–2008) as well as a number of financial institutions including the Saudi Industrial Development Fund (2004–2007), Morgan Stanley (2008–2011), and Saudi Fransi Capital, where his last position was the Head of Asset Management (2011–2015).

Mr. Al-Nowaiser holds an MBA from the University of San Francisco and a Bachelor's Degree in International Business from King Saud University.

*Mr. Yazeed A. Al-Humied*

Mr. Yazeed Al-Humied is the Deputy Governor and the Head of the MENA Investments Division at the Fund. He is also responsible for managing two key investment pools: Saudi Equity Holdings and Saudi Sector Development. Both of these pools have the highest concentration of assets under management. In addition, he

looks after attracting international strategic partners to invest in the Kingdom to localise cutting edge technologies, as well as enabling effective execution of the Fund's role as a driver of the Kingdom's economy.

Mr. Al-Humied joined the Fund in 2015 as an advisor to the Governor of the Fund to contribute to the restructuring of the Fund and to drive development of its strategy. In 2016, he was appointed as the Chief of Staff, in addition to maintaining his advisory position. During this time, Mr. Al-Humied approved and delivered the Fund's updated strategy and business plan, managing several investment projects involving the establishment of new companies, developing a comprehensive governance model for the Fund's portfolio companies, establishing the foundations and mechanisms for nominating and appointing the Fund's representatives to the board of directors and committees of the Fund's portfolio companies, developing several international strategic partnerships, and enhancing the Fund's role as an enabler for other local entities.

Overall, during his career of over 16 years, Mr. Al-Humied has had extensive experience in both finance and management, starting his career with PricewaterhouseCoopers in 2004 – where he stayed until 2008 when he left to join the CMA, where he worked until 2015. At the CMA, he headed the Mergers and Acquisitions team, and was exposed to international practices. He was also seconded to the Malaysian Securities Commission and the regulatory body of mergers and acquisitions in the United Kingdom, and served as advisor to the Chairman of the CMA, enabling him to develop a comprehensive understanding of the CMA and its practices.

Mr. Al-Humied's contributions extend beyond his executive roles – into the domains of corporate and supervisory governance – through his numerous memberships in several of the Fund's committees, such as the Management Committee, the Portfolio Companies Nomination Committee and Management Investment Committee as well as his memberships on the board of directors of several leading public and private sector organisations. His assignments include Chairman of the National Security Services Company, Vice Chairman of SNB, the Saudi Stock Exchange, STC and the Saudi Egyptian Investments Company, and board membership in Saudi Arabian Airlines, Civil Aviation Holding, Richard Attias & Associates and Flyadeal, in addition to being a member in several sub-committees of the aforementioned boards of directors.

Mr. Al-Humied holds a bachelor's degree in Accounting from the King Saud University and is certified by several top tier international academic institutes such as the London Business School in executive management programs.

### Mr. Aiman M. AlMudaifer

Mr. Aiman AlMudaifer has served as Head of the Local Real Estate Investments Division of the Fund since October 2018 and is a member of the Management Committee.

Prior to joining the Fund, he began his career as a Credit Consultant at the Saudi Industrial Development Fund, following which he served in a number of key positions in both the public and private sectors including as the CEO of Shomoul Holding Company, the CEO of Andalus Company, and as the Licensing Department official manager of the Investigations Department for the CMA. In addition, he is the Chairman of Rua Almadinah Holding Company and Saudi Real Estate Company and a board member of KAFD, among others.

Mr. AlMudaifer holds a Bachelor's degree in Systems Engineering from King Fahad University of Petroleum and Minerals in Dhahran. In addition, he is a graduate of the Cooperation Programme between Chase Manhattan Bank and the Saudi Industrial Development Fund.

### Mr. Yasir A. AlSalman

Mr. Yasir A. AlSalman joined the Fund as the Chief Financial Officer in 2016. He also sits on the board of the National Water Company, the Saudi Railway Company, Bahri, KAFD, SALIC and the Water Solutions Company.

Mr. AlSalman started his career as an auditor at Arthur Andersen in 2001 and then became a senior auditor at PricewaterhouseCoopers from 2002 to 2005, moving to become the Executive Manager of the Finance department at the Kingdom Holding Company in 2008, before joining Mobily Company as General Manager of investments from 2014 to 2015. Following that, Mr. AlSalman was the Chief Financial Officer at SALIC in 2015.

Mr. AlSalman received a postgraduate degree in Accounting and Information Systems from Middle Tennessee State University in 2007 and a Bachelor of Arts in Accounting from King Saud University in 2001. He is a Saudi Organisation for Chartered and Professional Accountants (SOCPA) Certified Accountant.

*Mr. Bander A. Bin Mogren*

Mr. Bander Bin Mogren joined the Fund as the Chief Operating Officer in 2016. He leads the development of the Fund's shared services function as well as the strategic transformation of Information Technology systems and infrastructure.

He is also a member of the Portfolio Companies Nomination Committee, a board member of the Saudi Technology Development and Investment Company (TAQNIA) and the Chairman of its Remuneration Committee. He is the Vice-chairman of the board of directors of the Electronic Games Infrastructure Company and Chairman of its Nominations and Remunerations Committee.

Furthermore, he is also a board member of KAFD and the Chairman of its Nomination Remuneration Committee, and a member of the board of directors of the Gulf International Bank Bahrain and Saudi Arabia and its Nomination and Remuneration Committee (GIB) and a board member of Jassara. In addition, Mr. Bander Bin Mogren is a board member of the Nomination Remuneration Committees of the Saudi Tadawul Group, Sanabil Investments, Noon, and the National Center for Privatization, the Royal Court Decision Support Center (DSC), Neom and Qiddiya Company and a Member at the Saudi Arabian Military Industries company (SAMI) and an NRC Member in the Aviation Services Company.

Prior to joining the Fund, he was the Managing Director of Human Resources and Corporate Services at NCB Capital. Throughout his career, Mr. Bander Bin Mogren held several key positions at several of the Kingdom's leading investment institutions including Head of Human Resources in Jadwa Investments.

Mr. Bander Bin Mogren holds a double major BA in Human Resources and Business Administration from Eastern Washington State.

*Mr. Fahad AlSaif*

Mr. Fahad AlSaif joined the Fund as a Senior Managing Director and the Head of the Global Capital Finance division in January 2021. He oversees the Fund's global capital financing activities according to the Fund's financial policies, and its short, medium, and long term capital raising strategies. Mr. AlSaif is a member of the Management Committee and is also a board member of multiple Vision 2030 realisation program boards of directors, including government related entities and private companies such as ACWA Power, GIB, AviLease and Emaar Economic City.

Prior to joining the Fund, Mr. AlSaif served as the Chief Executive Officer and board member at the National Debt Management Centre (NDMC), where he was also an advisor to H.E. Minister of Finance. He was appointed President and board member of the NDMC in 2020.

Before his appointment as President of the DMO in July 2017, Mr. AlSaif was the Deputy Managing Director of SABB (The Saudi British Bank), an associated company of the HSBC Group. He was previously a board member of HSBC Saudi Arabia Ltd and the advisory committee of the CMA.

In 2016, Mr. AlSaif established and led the Debt Management Office at the MoF during his secondment with the government. He managed the deficit financing process from local and international markets.

Mr. AlSaif holds more than 20 years of Corporate, Investment Banking, Global Banking and Markets experience with SABB and HSBC. He was HSBC's Saudi Arabia principal contact person for corporate finance and capital markets, in relation to ECM (IPO, rights issues, private placements) and to DCM (Sukuk and bond issuances, banks loans, hybrid structure and syndication and financing services solutions). Prior to this, Mr. AlSaif spent 10 years in SABB Treasury managing Trading, Fixed Income and Risk Advisory functions.

During his time at HSBC, Mr. AlSaif was responsible for leading landmark capital markets transactions in the Kingdom, such as the first Government Guaranteed Sukuk of the General Authority of Civil Aviation in 2013 and the US$6 billion IPO of NCB in 2014, which at the time was the largest IPO in the Kingdom and the MENA region. Since then, he has actively influenced developments in the ECM and fixed income segments of the Kingdom's capital markets.

Mr. AlSaif holds a Bachelor's degree in MIS from KFUPM.

*Ms. Rania Nashar*

Ms. Rania Nashar joined the Fund as a Senior Advisor to the Governor in February 2021, where she advises His Excellency Yasir Al-Rumayyan, Governor of the Fund, in areas of Business and Governance, drawing on more than 20 years of professional experience in the banking industry. In addition, she is the Head of Compliance & Governance at the Fund.

Prior to joining the Fund, Ms. Nashar served as the CEO of Samba Financial Group (SFG), making her the first Saudi woman to lead a major banking group in the Kingdom of Saudi Arabia. She first joined SFG in 1997 at the start of her banking career, where she served in various positions across different divisions of the Group and played a pivotal role in bringing vital changes and developments to SFG's business sectors.

Ms. Nashar also holds various other leadership and advisory positions. During her time at SFG, she served as Vice Chair of the SambaCapital board and as a board member of Samba Bank Limited in Pakistan, Samba Global Markets Limited. She also served as a board member at Institute of International Finance "IIF" in USA.

In March 2019, the board of the CMA appointed Ms. Nashar as Vice Chair of the CMA Advisory Committee. Ms. Nashar also serves as board member of STC, the Saudi Stock Exchange, the National Center for Performance Measurement, Saudi Space Commission and Saudi Polo Federation. Also, she chairs the Audit Committee at FII.

Some of Ms. Nashar's other major achievements throughout her career include becoming the first Saudi woman to lead the audit and risk review functions for all business and operations areas at SFG, including investment business, corporate and individual banking, and risk management. She is also the first woman in the GCC financial sector to lead a compliance group and the first Saudi woman to be named a certified anti-money laundering specialist by the Association of Certified Anti-Money Laundering Specialists (ACAMS) in the USA. During KSA G20 Presidency Rania chaired the B20 Women in Business Action Council and G20 EMPOWER Alliance. Currently, she is serving as a Co-Chair in Action Council for B20 Women in Business.

Ms. Nashar holds a Bachelor's degree with Honours in computer science and technology from King Saud University. She has been recognised by Forbes on multiple occasions for her professional achievements, being named among the Top 100 Powerful Women in the World in 2018, 2019 and 2020.

*Mr. Brian Gillespie*

Mr. Brian Gillespie is the General Counsel of the Fund. He is a New York qualified attorney who has been with the Fund since 2019. Mr. Gillespie is a member of the Fund's Management Committee, as well as other executive committees. Mr. Gillespie also serves on a number of steering committees, boards of directors and committees of the Fund's portfolio companies.

Prior to joining the Fund, Mr. Gillespie was a practicing lawyer for over a decade at a leading international law firm, where he focused on mergers and acquisitions, investment funds and equity capital markets transactions. He was also named Rising Star of the Year (IFLR Middle East) and Rising Star in M&A (Chambers Legal Guide, IFLR). Over the course of his career, Mr. Brian Gillespie has led many transactions, with an aggregate value in excess of US$100 billion.

*Mr. Saad A. Alkroud*

Mr. Saad Alkroud is the Chief of Staff and General Secretary of the Board of Directors at the Fund, where his responsibilities include overseeing the Fund's business plan delivery, leading the internal institutional and investment projects, delivering the governance model for the Fund's portfolio companies and managing stakeholders of the Fund.

In 2016, Mr. Alkroud joined the Fund as the Head of Stakeholder Management. His role included overseeing international relationships, increasing collaboration efforts with local and regional governmental entities to deliver strategic initiatives and goals, supporting the Board and its committee affairs, and supervising periodic reports on investment and non-investment activities.

Having developed broad experience in several fields while working at Abdullatif Alissa Group Holding Company (including as Adviser to the Chairman of the group in 2010) prior to joining the Fund, Mr. Alkroud also participated in establishing Mayaas, a private wealth management and diversification company, and served as Vice President from 2012 to 2016.

Mr. Alkroud's contributions extend to non-executive roles, along with participating in governmental committees. From 2010 to 2016, he was appointed as Secretary General of Alissa Corporate Social Responsibility Committee and Managing Director and owner's representative at Jeddah Private International School Company.

Mr. Alkroud holds a Bachelor's degree in Finance from King Fahd University of Petroleum and Minerals, and a Master's degree in Management and Leadership from the University of La Verne, California.

### *Mr. Kevin Foster*

Mr. Kevin Foster has served as Head of Corporate Affairs Division at the Fund since 2019 and is a member of the Management Committee.

Prior to joining the Fund, Mr. Foster spent 12 years at Royal Bank of Canada, where he served in various roles, including Managing Director, Global Head of Corporate Communications and headed communications across the bank's Capital Markets, Investor & Treasury Services, Private Bank, Wealth Management, and Insurance businesses. A member of the firm's Operating Committee, Mr. Foster was appointed to 16 leadership committees at RBC.

Previously, Mr. Foster was the Corporate and Financial practice head at global communications firms Weber Shandwick and GCI Group. He also served as Global Head of Communications, Equities, for S&P. Most recently, he held the position of Chief Brand & Communications Officer at McDonald's Corporation's Ronald McDonald House Foundation where he was a member of the Executive Committee of the board of directors.

Mr. Foster holds a Bachelor's degree in Economics and Political Science from the University of Massachusetts and three postgraduate degrees, including a Master's degrees in Journalism from Northeastern University and an MBA from Boston College, and a certificate degree in Foundations of Financial Management from the University of Western Ontario's Ivey Business School.

### *Mr. Jerry Todd*

Mr. Jerry Todd has served as Head of the National Development Division at the Fund since 2020 and is a member of the Management Investment Committee.

Prior to joining the Fund, he served as a Managing Director and Head of Business Development for NCB Capital (2014–2020). Previously, he was a Managing Director and Head of Private Equity and Investment Banking at Jadwa Investment (2007–2014). Mr Todd was an Associate Principal at McKinsey & Company (1999–2006) and an Energy Engineer for Dobbs International and Johnson Controls (1994–1997).

Mr. Todd holds an MBA from Cornell University (1999) and a B.S. in Mechanical Engineering from Christian Brothers University (1994).

### *Mr. Mike Cheng*

Mr. Mike Cheng has served as Head of the Internal Audit at the Fund since August 2019. Mr. Cheng has more than 25 years of audit experience in the financial services industry. Prior to joining the Fund, he held the position of Managing Director and the Head of Audit for Barclays Bank in Asia and later as the Chief Internal Audit Officer of Prudential Corporation Asia. Prior to that, Mr. Cheng held a number of senior audit positions with Deutsche Bank in London.

Mr. Cheng holds a Bachelor's degree in Aerospace System Engineering from Southampton University, United Kingdom, and is a qualified Chartered Accountant with the Institute of Chartered Accountants in England & Wales and with the Hong Kong Institute of Certified Public Accountants. He is a leader in the audit industry and a founding member of the Internal Audit Centre of Excellence Workgroup with the Singapore Accountancy Commission.

### *Mr. Feta Zabeli*

Mr. Feta Zabeli joined the Fund as the Head of Risk Division in June 2020, bringing 36 years of executive experience to the role.

Prior to joining the Fund, he worked at Morgan Stanley in New York as Managing Director and Chief Risk Officer from 2012 to 2020 where he also performed a variety of board functions for the company's various investment

funds. Prior to that, his career spanned a variety of operational, developmental, research, and risk management functions throughout the U.S., Hong Kong, Tokyo and London.

Mr. Zabeli holds a Master of Business Administration from University of California, Los Angeles in 1992, a Master's of Science in Electrical Engineering from the University of Southern California in 1988, and a Bachelor's of Science in Aeronautical/Mechanical Engineering from Rensselaer Polytechnic Institute in 1982.

**Committees at the Management Level**

The governance model cascades from the Board to the level of the Executive Management, with five management level committees that review the strategic and operational activities. These committees validate both investment and non-investment proposals before they are issued to the Board and its committees for decisions. The authority entrusted by the Board is exercised by Executive Management.

*Management Committee*

Monitors the strategies, execution of business plans, and the annual operating budget from an institutional perspective. It takes the necessary decisions within its mandate and reviews non-investment related proposals that will be issued to the Board and its sub-committee for consideration.

*Portfolio Companies Nomination Committee*

Nominates candidates to represent the Fund in its portfolio companies, reviews the Fund representatives' performance and ensures proper governance practices are in place, in order to maintain integrity and control.

*Management Investment Committee*

Reviews all investment proposals before they are presented to the Board and its sub-committees, in addition to exercising investment powers of the Executive Management vested in it by the Board.

*Management Risk Committee*

Monitors risks and the Fund's compliance with its risk policies, proposes mitigating actions on potential risks and provides updates on internal guiding documents in line with best practice. This committee also identifies business continuity plans to ensure business resilience.

*Management Liquidity Committee*

Monitors the Fund liquidity and develops capital structure. It also ensures its maintenance of liquidity within the target levels to maintain the intended progress rate of the Fund activities. This committee also views developing finance plans and to ensure that they are in line with the Fund's aspired targets.

**CONFLICTS**

There are no potential conflicts of interest between the private interests or other duties of the directors listed above and their duties to the Fund.

**CORPORATE GOVERNANCE**

The Fund has implemented a comprehensive governance model that adheres to global best practices and fully captures its activities in order to facilitate well-informed decision making. Furthermore, over time, the Fund has attracted subject-matter experts to become part of its governance structure and Executive Management, the Board has renewed its delegated authorities and delegated great responsibility to each committee and sub-committee to ensure efficient business operation and effective governance, while mandating periodic reporting activities to ensure proper monitoring is in place. Such periodic reports cover all of the activities conducted by the Fund, whether investment or non-investment related and are issued weekly, quarterly or annually.

The Fund's governance provides oversight and control of activities, to highlight the right level of guidance and to prevent any obstacles and mitigate risks that might affect the smoothness of daily operations. Additionally, the Fund has established several functions to ensure proper controls are in place, such as the audit, compliance and risk functions. The audit function is responsible for reviewing the investment and non-investment activities of the Fund to ensure it adheres to internal policies and guidelines, along with assessing the internal controls and

evaluating their suitability and compliance with them. To ensure the independence of the audit function, it reports directly to the Board.

The Fund's compliance function is responsible for the development of internal policies that govern the behaviour of employees, such as the Fund's code of conduct and personal investment disclosure policy. The compliance function is also responsible for ensuring compliance by all of the Fund's other internal functions with external and internal regulations.

An additional key element of the Fund's governance is its risk function. The risk function is responsible for developing proposals to mitigate potential risks applicable to the Fund, such as the Fund's Risk Appetite Statement, which highlights the levels of tolerable risks to the Fund, and the Fund's risk policies which set out procedures for investment and non-investment activities, in addition to business continuity plans.

The Fund categorises risks as: (i) non-investment risks, which are risks unrelated to any specific investment that imply a probability of loss, or of not achieving expected outcomes; and (ii) investment risks, which include counterparty or country concentration risk, asset liquidity risk, and funding liquidity risk. To combat such risks, the Fund has implemented the following structures:

- **Business Units**: responsible for establishing a departmental control framework and embedding risk-return trade-offs in decision-making processes;

- **Risk Management**: responsible for strategic risk management, risk policy and procedure setting and functional oversight; and

- **Internal Audit**: responsible for developing and maintaining a culture of accountability, independent value assurance, facilitating the integration of controls and risk management into day-to-day business activities and processes, and considering the efficiency, effectiveness, economy and ethics of business activities.

## EMPLOYEES

As at 31 July 2022, the Fund had 1,754 employees, and approximately 29% of employees were women (excluding employees of the Fund's portfolio companies).

The Fund aims to build a common, unified the Fund culture. As a fast-growing organisation, the Fund aims to strengthen alignment between shared values, goals, attitudes, and practices.

In terms of recruitment, the Fund has established a graduate development programme, where, in 2021, more than 150 graduates have been trained and graduated from the Fund's Academy in co-operation with top universities and institutes such as the University of California, Berkeley and the AMT Institute. The number of graduates enrolled on the programme has increased from 40 in 2017 to more than 150 in 2021. Participants of the graduate development programme were trained in six specialised tracks: IT & cybersecurity, investments, project management, finance and treasury, business management and public policy.

In terms of training and development, the Fund offers regular internal and external training courses to its employees in co-operation with top training institutes, such as the University of California, Berkeley, London Business School and Harvard Business School. In 2019, more than 42 internal courses were offered, attended by more than 700 employees. Over 689 external trainings were offered in partnership with top international institutions. In 2020 and 2021, over 550 employees attended internal courses and 71 employees attended the external virtual training courses. The Fund also offers employees various online platforms, including but not limited to LinkedIn Learning, Udemy, Coursera and HMM Spark HBP, and the Fund currently has over 1,830 active users across its various online platforms.

## OVERVIEW OF THE KINGDOM OF SAUDI ARABIA

**Geography**

The Kingdom comprises a land area of approximately 2,150,000 square kilometres, and is located in the Arabian Peninsula, a peninsula of south-west Asia situated north-east of Africa. The Kingdom has coastlines on the Red Sea to the west and the Arabian Gulf to the east. It is bordered in the north and north-east by the Hashemite Kingdom of Jordan and the Republic of Iraq, in the east by the State of Kuwait, the State of Qatar, the island of the Kingdom of Bahrain through the King Fahd Causeway and the United Arab Emirates, in the south-east by the Sultanate of Oman and in the south by the Republic of Yemen. The Kingdom is the largest country in the GCC.

The capital city of the Kingdom is Riyadh. The Kingdom has undergone rapid urbanisation in recent decades and over 80% of the population of the Kingdom currently lives in cities, with approximately half the population of the Kingdom being concentrated in the six largest cities of Riyadh, Jeddah, Makkah, Medina, Ta'if and Dammam. Makkah, the birthplace of the Prophet Muhammad (peace be upon him ("**PBUH**")), is home to the Grand Mosque (*al-masjid al-haram*), which surrounds Islam's holiest site (*al-ka'bah*), which is the direction of Muslim prayer. Medina on the other hand is the burial place of the Prophet Muhammad (PBUH), and is home to the Prophet's Mosque (*al-masjid an-nabawi*) and is Islam's second holiest city after Makkah.

The Kingdom is divided into 13 provinces, being Riyadh, Makkah, Medina, the Eastern Province, Asir, Al Baha, Tabuk, Al Qassim, Ha'il, Al Jouf, the Northern Borders, Jizan and Najran.

In the west of the Kingdom, a geological exposure known as the Arabian-Nubian Shield contains various precious and basic metals such as gold, silver, copper, zinc, lead, tin, aluminium and iron and, mainly in the east of the Kingdom, extensive sedimentary formations containing various industrial minerals. The Kingdom's deeper sedimentary formations in the eastern part of the country contain most of its proven and recoverable oil reserves.

**Population and Demographics**

The population of the Kingdom was estimated to be 35.0 million as at 31 July 2020, representing growth of 2.4% as compared to 34.2 million as at 31 July 2019. The Kingdom has a young population, with just over half of Saudi nationals being under the age of 30 and 31.5% under the age of 15 (source: GASTAT).

The following table sets forth the Kingdom's population estimates as at 31 July 2016, 2017, 2018, 2019 and 2020, respectively:

| | As at 31 July | | | | |
| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Male | 18,259,719 | 18,746,422 | 19,240,956 | 19,739,056 | 20,231,425 |
| Female | 13,527,861 | 13,866,424 | 14,172,704 | 14,479,113 | 14,781,989 |
| **Total population** | **31,787,580** | **32,612,846** | **33,413,660** | **34,218,169** | **35,013,414** |
| **Population growth (annual %)** | **2.3** | **2.6** | **2.5** | **2.4** | **2.3** |

*Source: GASTAT*

The non-Saudi portion of the Kingdom's total population comprises expatriates from neighbouring states as well as significant numbers of expatriates from Asia (mostly from India, Pakistan, Bangladesh, Indonesia and the Philippines), Europe, the Americas and other countries around the world. The official language of the Kingdom is Arabic, although English is widely spoken.

**Government and Political System**

The Kingdom is a monarchy with a political system rooted in the traditions and culture of Islam. The Custodian of the Two Holy Mosques, the King of Saudi Arabia (the "**King**"), is both the head of state as the monarch, and the head of the Government as the Prime Minister. Royal Decree No. A/90 dated 27/08/1412H (corresponding to 1 March 1992) (the "**Basic Law of Governance**") provides that the Holy Quran and Sunnah (the teachings of the Prophet Muhammad (PBUH)) form the primary sources of law in the Kingdom. The Basic Law of Governance specifies that the King must be chosen from among the sons of the founding King, the Late King Abdulaziz bin Abdul Rahman Al Saud ("**King Abdulaziz**"), and their male descendants. In 2006, the Succession Commission (*hay'at al-bay'ah*) was established, to determine which member of the royal family will be the next King and the next Crown Prince, comprising: (i) the sons of King Abdulaziz; (ii) a son of every deceased/incapacitated son of King Abdulaziz; and (iii) a son of the incumbent King and one son of the incumbent Crown Prince, both appointed

by the incumbent King. The current King, Custodian of the Two Holy Mosques King Salman bin Abdulaziz Al Saud, acceded to the throne on 23 January 2015. The current Crown Prince is HRH Prince Mohammed bin Salman bin Abdulaziz Al Saud, who also holds the positions of Deputy Prime Minister, Chairman of the CEDA, Chairman of the Council of Political and Security Affairs and Minister of Defence.

### Council of Ministers (Majlis Al-Wuzara)

As the King holds the position of Prime Minister, he presides over the Council of Ministers (*majlis al-wuzara*), which was established by Royal Decree in 1953, and currently comprises the Deputy Prime Minister, Ministers each who oversee ministerial portfolios and Ministers of State. The Council of Ministers is selected by the King and is responsible for, among other things, executive and administrative matters such as foreign and domestic policy, defence, finance, health and education.

In 1974, in accordance with the Law of the Council of Ministers, the Bureau of Experts (formerly known as the Department of Experts) was established to assist the Council of Ministers. The Bureau of Experts is responsible for, among other things, reviewing and studying cases referred to it by the Council of Ministers and its sub-committees, drafting new laws, proposing amendments to existing laws and drafting forms for High Orders, Royal Decrees and Council of Ministers Resolutions, which are then presented to the Council of Ministers for approval.

### The Shura Council (Majlis Ash-Shura)

In 1992, in conjunction with the promulgation of the Basic Law of Governance, the Law of the Shura Council (*Majlis Ash-Shura / Consultative Council*) was introduced. The Shura Council comprises 150 members, of which at least 20% must be females. The Chairperson, Vice Chairperson and General Secretary of the Shura Council are appointed or removed by the King. The Shura Council has the authority to propose, review and debate legislation, which is then presented to the Council of Ministers for approval. Legislation approved by the Council of Ministers only acquires the force of law once the King has issued his approval by way of a Royal Decree. However, the Council of Ministers or the relevant government ministry or authority may be delegated the power to enact further executive regulations that govern the implementation of such legislation.

### Council of Political and Security Affairs and the Council of Economic and Development Affairs

In January 2015, a Royal Order was issued consolidating 12 existing Government councils and commissions under two new councils: (i) the Council of Political and Security Affairs (the "**CPSA**"); and (ii) the CEDA. The formation of the CPSA and the CEDA was intended to promote greater efficiency and productivity in the various branches of the Government and enhance coordination between Government entities, thereby leading to swift decision-making and execution of proposals.

#### Council of Political and Security Affairs

The CPSA was established in January 2015 and its mandate is to oversee all aspects of the Kingdom's political and security affairs, both internally and externally. The CPSA is chaired by the Crown Prince, HRH Prince Mohammed bin Salman bin Abdulaziz Al Saud, and its membership comprises several ministerial figures holding a mandate with respect to the CPSA's areas of responsibility, such as the Minister of Interior, the Minister of the National Guard and the Minister of Foreign Affairs, amongst others. In addition to these figures, several Ministers of State, as well as the heads of key agencies relating to national security and intelligence, are members of the CPSA.

#### Council of Economic and Development Affairs

The CEDA is intended to consolidate a number of relevant governmental institutions in one central council to provide a uniform direction for the Kingdom's economic growth and development. The CEDA is chaired by HRH the Crown Prince and its membership comprises several ministerial figures who hold a mandate with respect to the CEDA's areas of responsibility, such as the Minister of Culture, the Minister of Health, the Minister of Commerce, the Minister of Environment, Water & Agriculture, the Minister of Energy, the Minister of Industry and Mineral Resources, the Minister of Finance, along with other Ministers of State and governmental figures. The CEDA is responsible for, among other matters, the implementation and monitoring of Vision 2030 (defined below).

**Vision 2030**

On 25 April 2016, the Government announced its new strategy, known as "Vision 2030", which sets forth a comprehensive agenda of socio-economic reforms with the aim of achieving fundamental economic, social and structural changes in the Kingdom by the year 2030. Vision 2030 is based upon three fundamental existing strengths of the Kingdom: (i) its importance in the Arab and Islamic world; (ii) its leading investment capabilities; and (iii) its unique strategic geographical location with the ability to connect the three continents of Asia, Europe and Africa.

Vision 2030 focuses on three broad themes, each of which aims to capitalise on the Kingdom's existing strengths in its society, culture, heritage and economy. The three themes highlighted in Vision 2030 are societal development, economic reform and effective governance.

The key objectives of Vision 2030 include the diversification of the Kingdom's economy and decreased reliance upon oil-related revenues, boosting the private sector's role in the economy, lowering unemployment and raising non-oil revenue. Vision 2030 includes regulatory, budget and policy changes to be implemented in a phased manner. The Council of Ministers has delegated to the CEDA the overall responsibility for establishing and monitoring the measures required for the effective implementation of Vision 2030, and the CEDA has in turn established an integrated governance model to implement detailed programmes to attain the desired results.

**Legal and Judicial System**

Saudi law is derived from the Basic Law of Governance and legislation enacted in various forms, the most common of which are Royal Orders, Royal Decrees, High Orders, Council of Ministers resolutions, ministerial resolutions and ministerial circulars having the force of law.

The Kingdom follows a civil law system. The Kingdom's judicial system comprises the general courts, which have general jurisdiction over most civil and criminal cases, and specialised courts covering certain specific areas of law, including a system of administrative courts known as the Board of Grievances, a Specialised Criminal Court, and various adjudicatory or quasi-judicial committees with special jurisdiction over such matters as banking transactions, securities regulation, intellectual property, labour disputes, tax, electricity industry disputes and medical malpractice.

In 2007, the Government announced a restructuring of the judicial system, including the establishment of courts of appeal and a supreme court, as well as the merger of most special adjudicatory committees into the general courts, though exceptions were made for certain adjudicatory committees. The committees that are exempted from the 2007 reforms include the Banking Disputes Committee, the Committee for the Enforcement of the Banking Control Law and the Committee for Resolution of Insurance Disputes and Violations, each of which operates under the aegis of the Saudi Central Bank; the Committee for the Resolution of Securities Disputes, which operates under the aegis of the CMA; and the Committee for Resolution of Custom Duties Disputes. The 2007 reforms also proposed the transfer of jurisdiction over commercial disputes from the Board of Grievances to the commercial courts which started to hear disputes of a commercial nature pursuant to the Circular of the Supreme Court of Justice No. T/967 dated 01/01/1439H (corresponding to 22 September 2017). Pursuant to the Insolvency Law issued by Royal Decree no. M/50 dated 28/05/1439H (corresponding to 13 February 2018) as amended by Royal Decree No. M/89 dated 9/7/1441H (corresponding to 4 March 2020), the Board of Grievances' exclusive jurisdiction to supervise insolvency and bankruptcy proceedings relating to commercial entities was also transferred to the Commercial Court.

The Board of Grievances has exclusive jurisdiction to hear claims against Government bodies. Pursuant to the administrative enforcement law recently issued pursuant to Royal Decree M/15 dated 27/01/1443H (corresponding to 4 September 2021) (the "**Administrative Enforcement Law**"), this now also includes the enforcement procedures against Government bodies if a valid enforcement instrument is presented. Enforcement instruments include government contracts fulfilling certain criteria as well as arbitral awards and judgments obtained against Government bodies. The circuit court of the Board of Grievances can issue a warning for enforcement within 5 days in the case of an interim order, or within 30 days of general orders, from the date of the entity's notification of the warning and order government entities to take the steps required for enforcement. Once the warning period has elapsed without payment or if the Government body has indicated its refusal to make the payment, the circuit court may further issue an enforcement order against the Government body or, if the circuit finds that the reason for lack of payment is due to the MoF rather than the Government body itself, the circuit can direct the warning to the MoF and take the required steps against it.

134

Judicial departments known as "Enforcement Departments" staffed by specialised "enforcement judges" have exclusive jurisdiction to consider the enforcement of foreign judgments and arbitral awards obtained against private entities and individuals. The Enforcement Departments may, at their discretion, enforce all or any part of a foreign judgment or arbitral award, subject to certain conditions, which include compliance of such judgment or award with public policy in the Kingdom.

The Public Prosecution (formerly known as the Bureau of Investigation and Public Prosecution) is an independent government body belonging to the judiciary that reports directly to the King, headed by a general prosecutor.

**Economy**

The Saudi economy has been resilient despite the impact of the COVID-19 pandemic as a result of, among others, the Government's response measures. The COVID-19 pandemic and the oil market crisis in 2020 significantly affected the local economy, which registered one of the deepest recession in decades. In 2020, the oil sector contracted by 6.7% year on year as oil production dropped to an average of 9.2 million barrels per day, approximately 7% lower than the average in 2019. Additionally, the non-oil sector contracted by 2.3% year on year, the first contraction in decades, due to lockdown measures that reduced business activity and social mobility. Real GDP declined by 4.1% in 2020 as compared to 2019.

During the third quarter of 2021, the Saudi economy grew rapidly at a rate of 6.8% year on year, marking its fastest growth in a decade, supported by a strong recovery in the oil sector, which increased by 9.1% year on year, and improvement in the non-oil sector, which grew by 4.5% year on year. The rebound is largely a result of the Government's fiscal policy, a rapid vaccination roll-out, pro-growth initiatives and continued diversification efforts.

The oil sector was constrained in the first half of 2021 due to a voluntary one-million-barrel cut in oil production. This led to a decline in real GDP of 2.6% year on year during the first quarter of 2021. However, oil GDP increased from May 2021, as OPEC's oil output restrictions were relaxed, following an increase in international oil demand, in particular from Asian countries.

The non-oil economy grew by 4.9% in 2021 as a result of the easing of lockdown measures and recovery in investment, after declining by 2.5% in 2020. Petrochemicals and plastics exports are expected to increase as a result. The non-oil economy was supported by a recovery in key sectors such as manufacturing, transport, and construction which is largely a reflection of the Government's fiscal policy, supported by both rising oil and non-oil activities.

The Saudi economy grew by 3.2% in 2021 as the Government continued to strengthen the role of the private sector as the primary catalyst for growth through stimulus packages and economic support programmes. A greater role of development funds and enhanced private sector partnership under the Saudi Vision 2030 is expected to continue to accelerate growth.

Since registering 42.4 in 2020, the IHS Markit's Saudi Purchasing Managers' Index (PMI) registered 57.0 during June 2022.

Fiscally, the total government expenditures are expected to reach over SAR 955 billion in 2022, while total revenues are projected to reach SAR 1,045 billion. The fiscal deficit for 2021 is estimated to be SAR 85 billion, while the fiscal surplus for 2022 is forecasted to be above SAR 90 billion. By the end of 2021, the level of public debt had reached SAR 938 billion, or 29.2% of GDP, as a result of bond issuances and the use of government reserves.

Inflation in the Kingdom averaged 3.4% in 2020, which increased due to the hike in VAT to 15% from July 2020. The inflation rate in the Kingdom registered a year on year increase of 1.6% in the quarter ended 31 March 2022. Due to their importance in the Saudi consumer market, food prices were the main driver of the inflation rate rise at 0.4% in the quarter ended 31 March 2022, as the price of food and beverages increased by 2.5% year on year. Similarly, transport and education prices increased year on year by 4.6% and 0.2%, respectively. Furthermore, education prices grew by 6.3% year on year, mainly due to the return to school in-person, after a prolonged period of online education as a result of the COVID-19 pandemic.

Despite the recent growth in the non-oil sector, oil revenue is the primary source of income for the Kingdom's economy. Traditionally, the Kingdom's economy has been constructed around the oil industry. However, the government has been implementing ambitious initiatives, including Vision 2030, to diversify the Kingdom's economy and sources of revenue, with the goal to reduce its dependence on oil revenues. According to the

Kingdom's 2022 Budget, total revenues are forecasted to reach SAR 968 billion and SAR 992 billion in 2023 and 2024 respectively.

The Kingdom's economy has in the past been adversely affected by periods of low international oil prices, including in the first half of 2020, primarily due to the impact of the COVID-19 pandemic on the global economy and the increase in supply. Oil prices have recovered since April 2020, with the OPEC Reference Basket price generally fluctuating between US$54.38 and US$73.53 per barrel in the first half of 2021. Oil prices rose over the course of 2021 and, as of 31 December 2021, the average OPEC Reference Basket price per barrel was US$77.97. Since the beginning of 2022, global oil prices have risen sharply, which can be attributed to a number of factors, including, but not limited to, production cuts by OPEC and partners to counter falling oil prices as a result of the COVID-19 pandemic, the rebound in global oil demand as economies continue to recover from the impact of the COVID-19 pandemic and, most notably, the Russian invasion of Ukraine in February 2022, following which the average monthly OPEC Reference Basket price per barrel for March 2022 rose to US$113.48.

The table below shows the Kingdom's daily crude oil production for 2018, 2019 and 2020:

|  | 2018 | 2019 | 2020 |
|---|---|---|---|
|  |  | *(million barrels)* |  |
| Total crude oil production | 10.3 | 9.8 | 9.2 |

*Source: OPEC Annual Statistical Bulletin 2021*

Notwithstanding the challenging economic conditions, according to data from the IMF, the Kingdom's economy is still estimated to have grown during 2019 as a result of ongoing government expenditure on development projects and continued structural and regulatory reforms aimed at achieving sustainable economic growth through diversifying the production base and increasing the contribution of the non-oil sector. Real GDP decreased by 4.1% in 2020, mainly due to the COVID-19 pandemic, compared to an increase of 0.3% in 2019. Data from GASTAT indicates that the non-oil sector experienced a real declining rate of 2.4% in 2020 compared to a real growth rate of 3.3% in 2019.

The table below shows the Kingdom's real GDP and related growth rates and the GDP at constant 2010 prices and related growth rates for 2019, 2020 and 2021:

|  | 2019 | 2020 | 2021 |
|---|---|---|---|
| Real GDP *(SAR billions)* | 2,642 | 2,533 | 2,615 |
| Percentage change in real GDP growth rates *(%)* | 0.3 | (4.1) | 3.2 |

*Source: GASTAT 2020 GDP Report, Saudi Central Bank Yearly Statistics*

The following table shows the contribution by the economic sector to the Kingdom's GDP at constant 2010 prices for 2018, 2019 and 2020:

|  | 2018 | 2019 | 2020[1] |
|---|---|---|---|
|  |  | *(SAR million)* |  |
| **Industries and other producers except producers of Government services** |  |  |  |
| Agriculture, forestry and fishing | 60,501 | 61,202 | 60,187 |
| Mining and quarrying | 1,039,086 | 1,004,884 | 944,636 |
| *(a) Crude oil and natural gas* | 1,028,907 | 994,220 | 933,885 |
| *(b) Other mining and quarrying activities* | 10,178 | 10,664 | 10,751 |
| Manufacturing | 300,421 | 299,971 | 273,074 |
| *(a) Petroleum refining* | 93,410 | 90,871 | 78,779 |
| *(b) Other manufacturing* | 207,011 | 209,100 | 194,294 |
| Electricity, gas and water | 30,836 | 30,391 | 29,151 |
| Construction | 107,533 | 110,399 | 112,529 |
| Wholesale and retail trade, restaurants and hotels | 222,793 | 236,365 | 220,183 |
| Transport, storage and information and communication | 149,303 | 156,870 | 146,910 |
| Finance, insurance, real estate and business services | 247,020 | 255,716 | 263,954 |
| *(a) Real estate activities* | 136,789 | 140,963 | 142,216 |
| *(b) Other* | 110,231 | 114,753 | 121,737 |
| Community, social and personal services | 48,262 | 47,243 | 43,752 |
| *Less*: Imputed bank service charges | (21,232) | (21,966) | (23,444) |
| **Government services** | 368,222 | 373,803 | 374,412 |
| **GDP (excluding net taxes on products)** | 2,552,745 | 2,554,878 | 2,445,342 |

| | 2018 | 2019 | 2020[1] |
|---|---|---|---|
| | | *(SAR million)* | |
| Net taxes on products | 80,403 | 87,059 | 87,280 |
| **GDP** | **2,633,148** | **2,641,937** | **2,532,622** |

(1)   Please note that the 2020 figures are preliminary.

*Source: GASTAT Annual National Accounts Publication 2020*

The following table shows the Kingdom's major import and export partners for the years 2019 and 2020:

| | 2019 | 2020 |
|---|---|---|
| | *(USD billion)* | |
| **Imports** | | |
| UAE | 10.1 | 9.1 |
| Singapore | 1.2 | 1.1 |
| United Kingdom | 2.8 | 2.9 |
| Japan | 6.0 | 6.0 |
| India | 6.1 | 6.6 |
| South Korea | 3.8 | 3.9 |
| United States | 15.5 | 14.8 |
| European Union | 27.8 | 28.9 |
| China | 25.3 | 26.8 |
| | | |
| **Exports** | | |
| UAE | 12.7 | 12.0 |
| Singapore | 8.7 | 5.5 |
| United Kingdom | 2.4 | 0.8 |
| Japan | 26.7 | 16.6 |
| India | 27.2 | 16.8 |
| South Korea | 20.8 | 14.8 |
| United States | 13.3 | 8.8 |
| European Union | 31.8 | 20.1 |
| China | 47.6 | 32.4 |

*Source: IMF Direction of Trade Statistics*

## TAXATION

*The following is a general description of certain tax considerations relating to the Notes issued under the Programme. It does not purport to be a complete analysis of all tax considerations relating to the Notes and is not intended as tax advice. Prospective purchasers of any Notes should consult their tax advisers as to the consequences under the Tax laws of the country in which they are resident for tax purposes of acquiring, holding and disposing of the relevant Notes and receiving payments under those Notes. This summary is based upon the laws as in effect on the date of this Offering Circular and is subject to any change in laws that may take effect after such date.*

**Kingdom of Saudi Arabia**

*Overview of Saudi tax law and Zakat regulations*

*Income Tax*

According to the Income Tax Law issued under Royal Decree No. M/1 dated 15/1/1425 in the Hijri calendar (corresponding to 6 March 2004) and its Implementing Regulations issued under Ministerial Resolution No. 1535 dated 11/6/1425 in the Hijri calendar (corresponding to 11 August 2004), as amended from time to time (the "**Income Tax Law**"), a resident company in the Kingdom with foreign (i.e., non-GCC) ownership (on its foreign partner's (shareholder's) share) and a non-resident who carries out business in the Kingdom through a Permanent Establishment (as defined below, other than a Permanent Establishment of GCC persons that meets the conditions set out under Article 2(4) of the Zakat Regulations) are subject to corporate income tax in the Kingdom at the rate of 20%. Resident companies wholly-owned by GCC Persons (in addition to persons subject to Zakat listed below under the section entitled "Zakat") are subject to Zakat instead of corporate income tax. Resident companies owned jointly by GCC and non-GCC Persons are subject to corporate income tax in respect of the share of their taxable profit attributable to the ownership (legal or beneficial) percentage held by non-GCC Persons and Zakat on the ownership (legal or beneficial) percentage held by GCC Persons.

Shares held directly by GCC Persons or via other GCC companies (where the shareholding structure does not fall outside of the GCC) in a resident company are subject to Zakat and not income tax. In determining the tax/Zakat profile of a Saudi tax/Zakat resident company, the Zakat, Tax and Customs Authority ("**ZATCA**") applies a "look-through" approach to determine whether the up-stream shareholding structure at any point exists outside of the GCC (i.e., at the ultimate shareholder level). The amendments to the implementing regulations of the Income Tax Law issued under Ministerial Resolution No. 1727 dated 25/5/1439 in the Hijri calendar (corresponding to 10 February 2018) have introduced new provisions that may limit the "look-through" approach by ZATCA to up to two layers of shareholding above the relevant Saudi company. Furthermore, Ministerial Resolution (MR) No. 5122 issued dated 24/12/1441 AH (corresponding to 14 August 2020) has repealed the earlier amendment made through MR 1727 dated 25/5/1439 in the Hijri calendar (corresponding to 10 February 2018) and the two layer approach is not applicable. MR 5122 dated 24/12/1441 AH was issued to amend Article (1) Para. (1) of the Saudi Income Tax By-Law, which stated that shares owned, directly or indirectly, by non-Saudis in a resident capital company are subject to corporate income tax. Therefore, ZATCA applies a "look through" approach to the ultimate owner to determine whether an up-stream shareholder structure at any point exists outside of the GCC.

*Zakat*

Zakat is a religious obligation imposed on Muslims under *Shari'ah* to pay a fixed percentage of their wealth for the relief of poverty. The Zakat implementing regulations of the Kingdom were issued by Ministerial Resolution No. 2082, dated 28 February 2017 (the "**Old Zakat Regulations**"). The Old Zakat Regulations are effective from the date of their issuance and supersede all prior directives, resolutions, instructions and circulars issued by ZATCA. Furthermore, the MoF has issued new Zakat implementing regulations under Ministerial Resolution No. 2216 dated 7/7/1440 in the Hijri calendar (corresponding to 14 March 2019) ("**Zakat Regulations**"). The Zakat Regulations are effective (and replace the Old Zakat Regulations) for financial years starting 1 January 2019.

The rules governing the calculation of Zakat are complex. Separate rules are applicable for the calculation of Zakat by Zakat payers who are engaged in the Kingdom in financing activities (licensed by the Saudi Arabian Monetary Authority) and Zakat payers who are engaged in the Kingdom in non-financing activities. This "Taxation" section broadly covers the Zakat consequences of investment in Notes by the investors who are engaged in non-financing activities in the Kingdom.

According to the Zakat Regulations, Zakat is assessed on/applicable to:

- GCC Persons resident in the Kingdom;

- resident companies wholly-owned by GCC Persons and on the ownership (legal or beneficial) percentage held by GCC Persons with respect to a resident company jointly owned by GCC and non-GCC Persons;

- GCC Persons carrying out activities in the Kingdom through a Permanent Establishment for Zakat purposes as defined under Chapter 1—Article 2(4) of the Zakat Regulations (except for non-resident GCC Persons who do not meet certain conditions, as mentioned below, in which case they would be subject to corporate income tax); and

- resident companies listed on a financial market in the Kingdom on the shares held by GCC persons and non-GCC Persons (except for ownership by founder shareholders and those considered founder shareholders based on the articles of association or other legal documents), and on the shares held by government entities.

Notwithstanding the above, Zakat is not assessed/applicable to:

(i)     resident companies operating in the oil and hydrocarbon production sector; and

(ii)    any entity (or Zakat payer) for which ZATCA issues a decision to exempt from Zakat.

For completeness, as per the Zakat Regulations, a Permanent Establishment of GCC Persons in the Kingdom is subject to Zakat on its worldwide activities provided at least two of the following three conditions are met in respect of the central management of such Permanent Establishment (as set out under Chapter 1—Article 2(4)):

(i)     Board of Directors' ordinary meetings which are held regularly and where main policies and decisions relating to management and running of the Permanent Establishment's business are held in and made from the Kingdom;

(ii)    senior executive decisions relating to the Permanent Establishment's functions such as executive directors / deputies' decisions are made in the Kingdom; and

(iii)   the GCC Person's business is mainly (i.e., 50% of its revenues) generated from the Kingdom.

There are certain rules that apply to the method of calculating the Zakat liability. In general, Zakat on Zakat payers engaged in non-financing activities is currently levied on the higher of the adjusted Zakatable profits or the Zakat base (following a Hijri year) which, in general, comprises equity, loans and credit balances (subject to certain conditions) and provisions reduced by, among other items, certain deductible long-term investments and fixed assets. The Zakat rate on the Zakat base is 2.578% if a zakat payer is following the Gregorian financial year and 2.5% if a zakat payer is following Hirji financial year. The Zakat rate on Zakatable profit is 2.5% regardless of the financial year (Gregorian or Hijri) followed by the zakat payer.

GCC individuals resident in the Kingdom for tax/Zakat purposes should in principle be subject to Zakat in the Kingdom if they carry out activities in the Kingdom.

*Withholding Tax*

The Saudi Arabian tax law provides for actual withholding tax ("**WHT**") at different rates (ranging from 5% to 20%) on payments made to non-resident parties (including those located in the GCC) by a Saudi resident or a Permanent Establishment of a non-resident person from a source of income in Saudi Arabia. WHT is imposed on payments against services only but not on goods. Services are defined to mean any work performed for compensation except for the purchase and sale of goods or any other properties. Interest payments or loan charges paid to non-residents generally attract a 5% WHT in the Kingdom, unless such WHT is reduced or eliminated pursuant to the terms of an applicable double tax treaty.

Application of double tax treaties in the Kingdom may take place under one of two methods: (i) refund mechanism, which requires the payor to be subject to the relevant payment of WHT and then a subsequent refund request of the WHT may be submitted to the ZATCA; or (ii) upfront claim method, which provides for the possibility of the

payor to not be subject to the relevant payment to WHT. Both mechanisms require the beneficiary of the relevant payment to provide certain documents and forms to the ZATCA (such as tax residency certificate).

*Capital Gains Tax*

According to Article 2 of the Income Tax Law, persons subject to taxation (as defined below) include non-residents in the Kingdom with taxable income generated from sources in the Kingdom and without a Permanent Establishment for tax purposes in the Kingdom (other than Permanent Establishment of a GCC person as defined under Article 2 of the new Zakat regulations, the treatment of which is discussed in *"—Zakat"* above).

Further, Article 1(2) of the By-Laws to the Income Tax Law defined the applicable tax on such a person as being subject to the following:

(a)     WHT, if the income generated is stipulated under Article 68 of the Income Tax Law (as discussed in "—*Withholding Tax*" and "—*Certain tax and Zakat implications for Noteholders—Noteholders who are not Resident in the Kingdom*"); and

(b)     capital gains tax, if the income is derived from disposal of fixed and traded assets, or from disposal of shares in a resident company under the general provisions of the Income Tax Law.

Based on the above, if the sale of the Notes by the Noteholders is considered a source of income in the Kingdom, then the related gain amount will be subject to 20% corporate income tax in the Kingdom according to the rules for computation of capital gain tax provided in the Income Tax Law for non-residents. However, it is not specifically stated in Article 5 of Tax Law i.e. Source of Income, that gain on sale of Notes is considered as Saudi source of income.

Capital gains realised from disposal of securities (such as the Notes) traded inside or outside the Kingdom are exempt from tax in the Kingdom if the following conditions are met:

• The disposal is carried out in accordance with the regulations of the Tadawul or the disposal is carried out outside of the Kingdom, but such securities are also traded on Tadawul; and

• The investor did not hold the securities before the effective date of the Income Tax Law (i.e. 30 July 2004).

The above exemption provided in the Income Tax Law is not applicable to the Notes, as the Notes will not be listed on Tadawul in the Kingdom and, therefore, the exemption is not considered in the below taxation summary.

Capital gains realised from disposal of the Notes by (a) a resident Noteholder, (b) a non-resident Noteholder with a Permanent Establishment for tax purposes (if such gain is attributed to such Permanent Establishment's activities) and (c) a Permanent Establishment of a Noteholder that is a GCC person as defined under Article 2 of the new Zakat regulations (if such gain is attributed to the Permanent Establishment's activities) will not be subject to capital gains tax. However, such gains will be included in the total income of such Noteholders subject to corporate income tax or Zakat in the Kingdom.

**Certain Tax and Zakat Implications for Noteholders**

*GCC Noteholders who are resident in the Kingdom*

Noteholders who are GCC Persons (as defined below) and resident in the Kingdom for tax purposes (as defined in Chapter 2—Article 3 of the Income Tax Law) are not subject to any Saudi Arabian income tax, whether by way of withholding or direct assessment, in respect of any profit payment received or gain realised in respect of the Notes. However, such Noteholders will be subject to Zakat in respect of any interest payments received or gain realised in respect of the Notes (to the extent they are legal entities registered for Zakat purposes in the Kingdom and not natural persons), including capital gain on sale of Notes. Additionally, an investment in the Notes is not permitted to be deducted from the Zakat base of such a Noteholder, as stipulated under Chapter 2—Article 5(4)of the Zakat Regulations and the current practices of the ZATCA (other than for financing companies in the Kingdom, for which different Zakat rules apply).

*Non-GCC Noteholders who are resident in the Kingdom*

Noteholders who are non-GCC legal entities and resident in the Kingdom for tax purposes (as defined in Chapter 2—Article 3 of the Income Tax Law) should be subject to Saudi Arabian corporate income tax at the rate of 20% (assuming they are owned by non-GCC persons and not listed on a financial market in the Kingdom) on any interest received or gain realised in respect of the Notes, but they will not be subject to any Zakat.

The considerations described above also apply to Saudi Arabian companies wholly-owned by non-GCC Persons (which should be subject to Saudi Arabian corporate income tax) and on the income attributable to the ownership of non-GCC Persons in Saudi Arabian companies (which should be subject to Saudi Arabian corporate income tax on the profits attributable to such non-GCC ownership).

Noteholders who are non-GCC natural persons and resident in the Kingdom who are not performing commercial activities in the Kingdom (as defined in Chapter 1—Article 1 of the Income Tax Law) are not currently subject to Saudi Arabian income tax on any interest payment received or gain realised in respect of the Notes, according to existing practices of ZATCA (as compliance/administration of Income Tax Law is not currently enforced by ZATCA on individuals).

*Noteholders who are not resident in the Kingdom*

Noteholders, either natural persons or legal entities, who are not resident in the Kingdom (whether such Noteholders are GCC nationals or non-GCC nationals (including Noteholders resident in GCC countries other than the Kingdom)) and do not have a Permanent Establishment in the Kingdom for tax purposes, will be subject to Saudi Arabian withholding tax on interest income paid to them, unless such withholding tax is reduced or eliminated pursuant to the terms of an applicable double tax treaty.

Application of double tax treaties in the Kingdom may take place under one of two methods: (i) a refund mechanism which requires the payor to subject the relevant payment to withholding tax after which a refund request of the withholding tax may be submitted to ZATCA or (ii) application of double tax treaties which provides for the possibility of the payor not subjecting the relevant payment to withholding tax. Both mechanisms require the beneficiary to provide certain documents and forms to ZATCA (such as a tax residency certificate).

As the payment of interest on the Notes will be made through the Paying Agents (as defined in the Conditions) and the relevant clearing systems (as defined in the Conditions), some Noteholders (subject to tax advice sought for specific cases and in relevant jurisdictions by the Noteholders) may not be able to prove to their local tax authorities that withholding tax has been applied to interest payments, and therefore may not be able to obtain the benefit of any applicable double tax treaty relief or credit for tax withheld.

Notwithstanding the above, pursuant to the terms of the Notes, to the extent that any withholding tax is deducted, the Issuer will generally be obligated to pay such additional amounts as will result in receipt by the Noteholders, after such withholding or deduction, of such amounts as would have been received by them had no such withholding or deduction been required.

Non-resident entities having a Permanent Establishment in the Kingdom are subject to Saudi Arabian corporate income tax at the rate of 20% in respect of any interest payments received or gain realised in respect of the Notes and attributable to such Permanent Establishment, but will not be subject to Zakat (unless they are GCC Persons with a Permanent Establishment in the Kingdom that meet the conditions set out under Chapter 1—Article 2(4) of the Zakat Regulations).

*Indirect Taxes*

*VAT*

The Kingdom introduced VAT with effect from 1 January 2018 pursuant to ratifying the GCC Framework Agreement with the remaining GCC member states. The VAT legislation was implemented in the Kingdom in line with the GCC Framework Agreement.

All goods and services supplied within or imported into the Kingdom are subject to VAT, unless they are classified as exempt or outside the scope for VAT purposes. Certain supplies are prescribed to be subject to VAT at a rate of zero (including qualifying medicines and medical goods, exports and international transportation). From 1 July 2020, the standard rate of VAT was increased from 5% to 15% and is applicable on all the standard-rated taxable supplies made in the Kingdom.

Certain financial services, including those where the consideration payable in respect of the services is by way of an implicit margin or spread (including but not limited to interest, spread, margin or other implicit margin), are treated as exempt supplies from a Saudi Arabian VAT perspective. Further, the exemption also applies to the issue or transfer of a debt security, equity security, or any other transferable document recognising an obligation to pay a monetary amount to the bearer.

"Note" is not a defined term for Saudi Arabian VAT purposes, but is akin in nature to a debt security and should be exempt for Saudi Arabian VAT purposes where the supply is made by a registered taxpayer in the Kingdom as a part of its regular economic activity. However, the issue of securities by persons residing outside the Kingdom would be outside the scope of VAT in Saudi Arabia. Any additional fee, such as an administration charge in relation to the issue of a security, would be treated as consideration for a taxable supply subject to VAT where the supply is made in Saudi Arabia. Such an additional fee could be subject to VAT under a reverse charge mechanism if it is received by a VAT-registered taxpayer in the Kingdom from a supplier located outside Saudi Arabia.

Profits generated by holding the Note or trading gains from its sale should be treated as VAT-exempt or outside the scope of VAT (depending on the client-specific circumstances of the transaction) for Saudi Arabian VAT purposes. The VAT exemption does not apply to fees charged by brokers or other intermediary parties for their services.

Further, should certain services be subject to Saudi Arabian VAT, supplies that are not related to Saudi Arabian real estate services may qualify for a zero rating if supplied to a Saudi Arabian non-resident who benefits from the service outside of Saudi Arabia, subject to the fulfilment of the relevant conditions as mentioned in Article 33 of the Saudi Arabian VAT implementing regulations. Otherwise, the services would be subject to VAT at the standard rate of 15%.

The precise reporting requirements related to the various payments and receipts associated with the aforementioned transactions will depend on the residence of the Noteholders, their types of activity and whether they are registered for Saudi Arabian VAT purposes. However, with the exception of explicit fees or charges, any trading gains should not be subject to VAT as they should either be treated as outside the scope or exempt for the purposes of Saudi Arabian VAT.

*Real Estate Transaction Tax ("RETT")*

Pursuant to the Royal Decree No. (A/84) dated 1 October 2020, new rules were announced treating certain supplies of real estate as exempt from Saudi Arabian VAT and implementing RETT at the rate of 5%. The tax base for RETT should be the value agreed upon between the parties, or the value of the property, provided that it is not less than the fair market value at the date of disposal. This law became effective on 4 October 2020.

Specifically, the supply of real estate in the Kingdom that results in the transfer of legal ownership or possession will be VAT-exempt. Further, RETT at 5% will be imposed on certain real estate transactions. As explained above, the transactions under consideration refer to any legal act transferring ownership or possession of Saudi Arabian real estate, including - but not limited to - contracts intended for transferring the right of usage or the right to a long-term lease. As an example, this would include the transfer of shares in a so-called "real estate company". The term "real estate company" is not defined in the RETT Regulations approved by the Ministerial Resolution No. 712 dated 2 October 2020 issued by the Saudi Arabian Minister of Finance (with further amendments). However, the guidelines on RETT issued by the Saudi Arabian Zakat, Tax and Customs Authority ("**ZATCA**") clarify that a company will be considered as a "real estate company" if the real estate assets constitute more than 50% by value of the assets or capital. The guidelines further clarify that the rationale behind this principle is that the transfer of shares in a real estate company is, in effect, an indirect transfer of ownership of the real estate assets of such a company.

RETT would not be applicable if the underlying real estate is located outside Saudi Arabia.

Each real estate transaction must be registered with ZATCA and RETT accounted for by the seller on each transaction separately. Certain real estate transactions are exempt from RETT, for example: disposals related to family or charitable endowments; dividing property for inheritance purposes; gifts between relatives up to the third degree; disposal of real estate in accordance with a legally documented will; disposals by a government entity acting in its capacity as a public authority, or a government agency or legal public body for public benefit; temporary disposals for the purpose of a guarantee for financing or credit or transferring between a fund and custodian; a contribution for shares of a company established in the Kingdom (except for joint stock companies), provided the shares are not disposed of within five years; disposals if one of the parties is a foreign government,

international organization, diplomatic or military body, or mission or a member of the diplomatic, consular or military corps accredited in Saudi Arabia, provided reciprocity applies.

### Definitions

For the purposes of this summary:

(a)      A "**GCC Person**" means: (i) a natural person having the nationality of any of the GCC countries and (ii) any legal entity wholly-owned by GCC nationals and established under the laws of a GCC country;

(b)      Subject to the exceptions stipulated in the Income Tax Law, a "Permanent Establishment" of a non-resident in the Kingdom represents a permanent place for the non-resident's activity where such person conducts the activity either fully or partly, which also includes any activity conducted by the non-resident through an agent. A non-resident carrying out an activity in the Kingdom through a licensed branch is considered to have a Permanent Establishment in the Kingdom.

(c)      A person is "resident" in the Kingdom for tax purposes (as defined in Chapter 2—Article 3 of the Income Tax Law), if it meets the following conditions:

       (i)      a natural person is considered a tax resident in the Kingdom for a taxable year if such person meets either of the two following conditions:

           (1)      such person has a permanent place of abode in the Kingdom and is physically present in the Kingdom for a total of not less than 30 days in the taxable year; or

           (2)      such person is physically present in the Kingdom for a period of not less than 183 days in the taxable year; and

       (ii)      a company is considered a tax resident in the Kingdom during a taxable year if it meets either of the following conditions:

           (1)      it is formed in accordance with the Saudi Companies Law; or

           (2)      its place of central control and management is located in the Kingdom.

Noteholders should not be deemed to be resident in the Kingdom solely by reason of holding any Notes.

### Cayman Islands

*The following is a discussion on certain Cayman Islands income tax consequences of an investment in Notes to be issued under the Programme. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It is not intended as tax advice, does not consider any investor's particular circumstances and does not consider tax consequences other than those arising under Cayman Islands law.*

The Issuer has received an undertaking from the Governor in Cabinet of the Cayman Islands pursuant to the Tax Concessions Act (as amended) of the Cayman Islands that, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Issuer or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations (which includes the Notes) of the Issuer or (ii) by way of the withholding, in whole or part, of any relevant payment (as defined in the Tax Concessions Act (as amended)). Under existing Cayman Islands laws, payments on Notes to be issued under the Programme will not be subject to taxation in the Cayman Islands and no withholding will be required on the payments to any holder of Notes, nor will gains derived from the disposal of Notes be subject to Cayman Islands income or corporation tax. The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance or gift tax.

Subject as set out below, no capital or stamp duties are levied in the Cayman Islands on the issue or redemption of Notes. However, an instrument transferring title to any Notes, if brought to or executed in the Cayman Islands, would be subject to Cayman Islands stamp duty. An annual registration fee is payable by the Issuer to the Cayman Islands Registrar of Companies which is calculated by reference to the nominal amount of its authorised capital. At current rates, this annual registration fee is approximately US$853.66. The foregoing is based on current law and practice in the Cayman Islands and this is subject to change therein.

**FATCA Disclosure**

**Foreign Account Tax Compliance Act**

Pursuant to certain provisions of the U.S. Internal Revenue Code of 1986, commonly known as "**FATCA**", a "**foreign financial institution**" (as defined by FATCA) may be required to withhold on certain payments it makes ("**foreign passthru payments**") to persons that fail to meet certain certification, reporting or related requirements. Each of the Issuer and the Guarantor may be a foreign financial institution for these purposes. A number of jurisdictions (including the Kingdom and the Cayman Islands) have entered into, or have agreed in substance to, intergovernmental agreements with the United States to implement FATCA ("**IGAs**"), which modify the way in which FATCA applies in their jurisdictions. Certain aspects of the application of the FATCA provisions and IGAs to instruments such as the Notes, including whether withholding would ever be required pursuant to FATCA or an IGA with respect to payments on instruments such as the Notes, are uncertain and may be subject to change. Even if withholding would be required pursuant to FATCA or an IGA with respect to payments on instruments such as the Notes, proposed regulations have been issued that provide that such withholding would not apply prior to the date that is two years after the date on which final regulations defining "foreign passthru payments" are published in the U.S. Federal Register. In the preamble to the proposed regulations, the U.S. Treasury Department indicated that taxpayers may rely on these proposed regulations until the issuance of final regulations. Additionally, Notes that are characterised as debt (or which are not otherwise characterised as equity and have a fixed term) for U.S. federal tax purposes that are issued on or prior to the date that is six months after the date on which final regulations defining "foreign passthru payments" are filed with the U.S. Federal Register generally would be "grandfathered" for purposes of FATCA withholding unless materially modified after such date. However, if additional notes (as described under "*Terms and Conditions of the Notes—Further Issues*") that are not distinguishable from previously issued Notes are issued after the expiration of the grandfathering period and are subject to withholding under FATCA, then withholding agents may treat all Notes, including the Notes offered prior to the expiration of the grandfathering period, as subject to withholding under FATCA. Holders should consult their own tax advisers regarding how these rules may apply to their investment in the Notes.

**The Proposed Financial Transactions Tax ("FTT")**

On 14 February 2013, the European Commission published a proposal (the "**Commission's Proposal**") for a Directive for a common FTT in Belgium, Germany, Estonia, Greece, Spain, France, Italy, Austria, Portugal, Slovenia and Slovakia (the "**participating Member States**"). However, Estonia has since stated that it will not participate.

The Commission's Proposal has very broad scope and could, if introduced, apply to certain dealings in Notes (including secondary market transactions) in certain circumstances. Primary market transactions referred to in Article 5(c) of Regulation (EC) No 1287/2006 are expected to be exempt.

Under the Commission's Proposal, the FTT could apply in certain circumstances to persons both within and outside of the participating Member States. Generally, it would apply to certain dealings in Notes where at least one party is a financial institution, and at least one party is established in a participating Member State. A financial institution may be, or be deemed to be, "**established**" in a participating Member State in a broad range of circumstances, including (a) by transacting with a person established in a participating Member State or (b) where the financial instrument which is subject to the dealings is issued in a participating Member State.

However, the FTT proposal remains subject to negotiation between participating Member States. It may, therefore, be altered prior to any implementation, the timing of which remains unclear. Additional EU Member States may decide to participate. Prospective holders of Notes are advised to seek their own professional advice in relation to the FTT.

## SUBSCRIPTION AND SALE

**Summary of Dealer Agreement**

Subject to the terms and on the conditions contained in a dealer agreement dated 27 September 2022 (as modified and/or supplemented and/or restated from time to time, the "**Dealer Agreement**") between the Issuer, the Guarantor, the Arrangers and the Permanent Dealers, the Notes will be offered on a continuous basis by the Issuer to the Permanent Dealers. However, the Issuer has reserved the right to sell Notes directly on its own behalf to Dealers that are not Permanent Dealers. The Notes may be resold at prevailing market prices, or at prices related thereto, at the time of such resale, as determined by the relevant Dealer. The Notes may also be sold by the Issuer through the Dealers, acting as agents of the Issuer. The Dealer Agreement also provides for Notes to be issued in syndicated Tranches that are underwritten on the basis set out in the Dealer Agreement by two or more Dealers.

The Issuer will pay each relevant Dealer a commission as agreed between them in respect of Notes subscribed by it. The Issuer has agreed to reimburse the Arrangers and Dealers for their expenses incurred in connection with the establishment of the Programme and the Dealers for certain of their activities in connection with the Programme.

The Issuer has agreed to indemnify the Dealers against certain liabilities in connection with the offer and sale of the Notes. The Dealer Agreement entitles the Dealers to terminate any agreement that they make to subscribe Notes in certain circumstances prior to payment for such Notes being made to the Issuer.

**Selling Restrictions**

**United States**

The Notes have not been and will not be registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except in accordance with Regulation S under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act. Each Dealer has represented and agreed (i) that it has not offered and/or sold any Notes, and will not offer and/or sell any Notes (x) as part of their distribution at any time and (y) otherwise until 40 days after the later of the commencement of the offering of such Notes and the closing date, only in accordance with Rule 903 of Regulation S under the Securities Act; and (ii) that neither it, its affiliates nor any persons acting on its or their behalf have engaged or will engage in any directed selling efforts with respect to any Note, and they have complied and will comply with the offering restrictions requirements of Regulation S; and (iii) that, at or prior to confirmation of any sale of Notes, it will have sent to each distributor, dealer or person receiving a selling concession, fee or other remuneration that purchases Notes from them during the distribution compliance period a confirmation or notice to substantially the following effect:

"The Securities covered hereby have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons by any person referred to in Rule 903 (b)(2)(iii) (x) as part of its distribution at any time or (y) otherwise until 40 days after the later of the commencement of the offering and the closing date, except in either case in accordance with Regulation S under the Securities Act. Terms used above have the meanings given to them by Regulation S."

Terms used in this paragraph have the meanings given to them by Regulation S.

Notes in bearer form having a maturity of more than one year (taking into account any unilateral right to extend or rollover the term) are subject to U.S. tax law requirements and may not be offered, sold or delivered within the United States or its possessions to, or for the account or benefit of, a U.S. person, except in certain transactions permitted by U.S. Treasury regulations. Terms used in this paragraph have the meanings given to them by the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), and Treasury regulations promulgated thereunder.

In respect of Bearer Notes where TEFRA D is specified in the applicable Pricing Supplement, each Dealer will be required to represent, undertake and agree (and each additional Dealer appointed under the Programme will be required to represent, undertake and agree) that:

(a)     except to the extent permitted under the D Rules, (i) that it has not offered or sold, and during the restricted period it will not offer or sell, Bearer Notes to a person who is within the United States or its possessions or to a U.S. person, and (ii) that it has not delivered and it will not deliver within the United States or its possessions definitive Notes in bearer form that are sold during the restricted period;

(b) it has and throughout the restricted period it will have in effect procedures reasonably designed to ensure that its employees or agents who are directly engaged in selling Bearer Notes are aware that such Notes may not be offered or sold during the restricted period to a person who is within the United States or its possessions or to a U.S. person, except as permitted by the D Rules;

(c) if it is a U.S. person, it is acquiring Bearer Notes for purposes of resale in connection with their original issuance and if it retains Bearer Notes for its own account, it will only do so in accordance with the requirements of U.S. Treas. Reg. □1.163-5(c)(2)(i)(D)(6) (or any substantially identical successor United States Treasury regulations issued for the purposes of Section 4701 of the Code);

(d) with respect to each affiliate that acquires Bearer Notes from a Dealer for the purpose of offering or selling such Notes during the restricted period, such Dealer either (i) repeats and confirms the representations and agreements contained in subparagraphs (a), (b) and (c) on such affiliate's behalf or (ii) agrees that it will obtain from such affiliate for the benefit of the Issuer and the Guarantor the representations and agreements contained in subparagraphs (a), (b) and (c); and

(e) it will obtain from any distributor (within the meaning of U.S. Treas. Reg. □1.163-5(c)(2)(i)(D)(4)(ii) (or any substantially identical successor United States Treasury regulation issued for the purposes of Section 4701 of the Code)) that purchases any Bearer Notes from it pursuant to a written contract with such Dealer (except a distributor that is one of its affiliates or is another Dealer), for the benefit of the Issuer and each other Dealer, the representations contained in, and such distributor's agreement to comply with, the provisions of subparagraphs (a), (b), (c) and (d) insofar as they relate to the D Rules, as if such distributor were a Dealer hereunder.

Terms used in this paragraph have the meanings given to them by the Code and Treasury regulations thereunder, including the D Rules.

In addition, to the extent that the Pricing Supplement or the subscription agreement relating to one or more Tranches of Bearer Notes specifies that the applicable TEFRA exemption is TEFRA C, such Notes must be issued and delivered outside the United States and its possessions in connection with their original issuance. In relation to each such Tranche, each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree that it has not offered, sold or delivered, and shall not offer, sell or deliver, directly or indirectly, such Notes within the United States or its possessions in connection with their original issuance. Further, in connection with the original issuance of such Notes, it has not communicated, and will not communicate, directly or indirectly, with a prospective purchaser if either such purchaser or it is within the United States or its possessions, or otherwise involve its U.S. office in the offer or sale of such Notes. Terms used in this paragraph have the meanings given to them by the Code and Treasury regulations thereunder, including under the C Rules.

Until 40 days after the commencement of the offering of any Tranche of Notes, an offer or sale of such Notes within the United States by any dealer (whether or not participating in the offering of such Tranche of Notes) may violate the registration requirements of the Securities Act if such offer or sale is made otherwise than in accordance with an available exemption from registration under the Securities Act.

This Offering Circular has been prepared by the Issuer for use in connection with the offer and sale of the Notes outside the United States. The Issuer and the Dealers reserve the right to reject any offer to purchase the Notes, in whole or in part, for any reason. This Offering Circular does not constitute an offer to any person in the United States.

**Prohibition of Sales to EEA Retail Investors**

Unless the Pricing Supplement in respect of any Notes specifies "Prohibition of Sales to EEA Retail Investors" as "Not Applicable", each Dealer has represented and agreed that it has not offered, sold or otherwise made available and will not offer, sell or otherwise make available any Notes which are the subject of the offering contemplated by this Offering Circular as completed by the Pricing Supplement in relation thereto to any retail investor in the EEA. For the purposes of this provision, the expression "**retail investor**" means a person who is one (or more) of the following:

(a) a retail client as defined in point (11) of Article 4(1) of MiFID II; or

(b) a customer within the meaning of the Insurance Distribution Directive where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II.

**Prohibition of Sales to UK Retail Investors**

Unless the Pricing Supplement in respect of any Notes specifies "Prohibition of Sales to UK Retail Investors" as "Not Applicable", each Dealer has represented and agreed that it has not offered, sold or otherwise made available and will not offer, sell or otherwise make available any Notes which are the subject of the offering contemplated by this Offering Circular as completed by the Pricing Supplement in relation thereto to any retail investor in the UK. For these purposes, a "**retail investor**" means a person who is one (or more) of:

(a)     a retail client, as defined in point (8) of Article 2 of Regulation (EU) No 2017/565 as it forms part of domestic law by virtue of the EUWA; or

(b)     a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of UK MiFIR.

**United Kingdom**

Each Dealer has represented and agreed that:

(a)     in relation to any Notes which have a maturity of less than one year, (a) it is a person whose ordinary activities involve it in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of its business and (b) it has not offered or sold and will not offer or sell any Notes other than to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses where the issue of the Notes would otherwise constitute a contravention of section 19 of the FSMA by the Issuer;

(b)     it has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the FSMA) received by it in connection with the issue or sale of any Notes in circumstances in which section 21(1) of the FSMA does not apply to the Issuer or the Guarantor; and

(c)     it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to any Notes in, from or otherwise involving the UK.

**Cayman Islands**

Each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that it has not made and will not make any offer or invitation, whether directly or indirectly, to the public in the Cayman Islands to subscribe for any Notes.

**Kingdom of Saudi Arabia**

Each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree that, and any Saudi Investor who acquires any Notes pursuant to an offering should note that: (i) no action has been or will be taken by such Dealer in the Kingdom that would permit a public offering of the Notes and (ii) any offer of Notes to a Saudi Investor is being made as a private placement pursuant to Article 8(a)(1) (including the definitions included in the CMA Glossary of Defined Terms) or Articles 8(a)(2) and 9 of the Offer of Securities Rules, made through a capital market institution authorised by the CMA to carry on the securities activity of arranging and following a notification to the CMA and other requirements outlined in Article 10 and other provisions of the Offer of Securities Rules.

The Notes may thus not be advertised, offered or sold to any person in the Kingdom other than to institutional and qualified clients (as defined in the CMA Glossary of Defined Terms) under Article 8(a)(1) of the Offer of Securities Rules or by way of a limited offer under Article 8(a)(2) and Article 9 of the Offer of Securities Rules.

Each offer of Notes shall not therefore constitute a "public offer", an "exempt offer" or a "parallel market offer" pursuant to the Offer of Securities Rules, but is subject to the restrictions on secondary market activity under Article 14 of the Offer of Securities Rules.

Each Dealer has represented and agreed that any offer of the Notes to a Saudi Investor will comply with the Offer of Securities Rules.

**State of Qatar (including the Qatar Financial Centre)**

Each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that it has not offered, sold or delivered, and will not offer, sell or deliver, directly or indirectly, any Notes in the State of Qatar (including the Qatar Financial Centre), except: (a) in compliance with all applicable laws and regulations of the State of Qatar; and (b) through persons or corporate entities authorised and licensed to provide investment advice and/or engage in brokerage activity and/or trade in respect of foreign securities in the State of Qatar. This Offering Circular (x) has not been filed with, reviewed or approved by the Qatar Central Bank, the Qatar Financial Markets Authority, Qatar Financial Centre Regulatory Authority or any other relevant Qatar governmental body or securities exchange; (y) is intended for the original recipient only and must not be provided to any other person; and (z) is not for general circulation in the State of Qatar (including the Qatar Financial Centre) and may not be reproduced or used for any other purpose.

**Kingdom of Bahrain**

Each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that it has not offered or sold, and will not offer or sell, any Notes except on a private placement basis to persons in the Kingdom of Bahrain who are "accredited investors".

For this purpose, an "**accredited investor**" means:

(a)     an individual holding financial assets (either singly or jointly with a spouse) of US$1,000,000 or more excluding that person's principal place of residence;

(b)     a company, partnership, trust or other commercial undertaking which has financial assets available for investment of not less than US$1,000,000; or

(c)     a government, supranational organisation, central bank or other national monetary authority or a state organisation whose main activity is to invest in financial instruments (such as a state pension fund).

**The United Arab Emirates (excluding the Dubai International Financial Centre)**

Each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that the Notes to be issued under the Programme have not been and will not be offered, sold or publicly promoted or advertised by it in the United Arab Emirates (excluding the DIFC) other than in compliance with any laws applicable in the United Arab Emirates governing the issue, offering and sale of securities.

**Dubai International Financial Centre**

Each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that it has not offered and will not offer the Notes to be issued under the Programme to any person in the DIFC unless such offer is:

(a)     an "Exempt Offer" in accordance with the Markets Rules (MKT Module) of the DFSA rulebook (the "**DFSA Rulebook**"); and

(b)     made only to persons who meet the "Professional Client" criteria set out in Rule 2.3.3 of the DFSA Conduct of Business Module of the DFSA Rulebook.

**Japan**

The Notes have not been and will not be registered under the Financial Instruments and Exchange Act of Japan (Act No. 25 of 1948, as amended, the "**Financial Instruments and Exchange Act**"). Accordingly, each of the Dealers has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that it has not, directly or indirectly, offered or sold and will not, directly or indirectly, offer or sell any Notes in Japan or to, or for the benefit of, a resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organised under the laws of Japan) or to others for re-offering or re-sale, directly or indirectly, in Japan or to, or for the benefit of, any resident in Japan except

pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Financial Instruments and Exchange Act and other relevant laws and regulations of Japan.

**Hong Kong**

In relation to each Tranche of Notes issued by the Issuer, each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that:

(a)      it has not offered or sold and will not offer or sell in Hong Kong, by means of any document, any Notes other than: (i) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong (the "SFO") and any rules made under the SFO; or (ii) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap. 32) of Hong Kong (the "C(WUMP)O") or which do not constitute an offer to the public within the meaning of the C(WUMP)O; and

(b)      it has not issued or had in its possession for the purposes of issue, and will not issue or have in its possession for the purposes of issue, whether in Hong Kong or elsewhere, any advertisement, invitation or document relating to the Notes, which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to the Notes which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the SFO and any rules made under the SFO.

**Korea**

Each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that Notes have not been and will not be offered, sold or delivered, directly or indirectly, in Korea or to or for the account or benefit of any Korean resident (as such term is defined in the Foreign Exchange Transaction Law of Korea) except as otherwise permitted under applicable Korean laws and regulations.

Furthermore, a holder of Notes will be prohibited from offering, delivering or selling any Notes, directly or indirectly, in Korea or to any Korean resident for a period of one year from the date of issuance of Notes except:

(a)      in the case where the Notes are issued as bonds other than equity-linked bonds, such as convertible bonds, bonds with warrants and exchangeable bonds (but with respect to exchangeable bonds, only those which are exchangeable into shares, convertible bonds or bonds with warrants), Notes may be offered, sold or delivered to or for the account or benefit of a Korean resident which falls within certain categories of professional investors as specified in the Financial Investment Services and Capital Markets Act, its Enforcement Decree and the Regulation on Securities Issuance and Disclosure, provided that such professional investors are registered as "qualified institutional buyers" ("Korean QIBs") with the Korea Financial Investment Association (the "KOFIA") in advance and complies with the requirement for monthly reports to the KOFIA of their holding of Korean QIB Bonds, and provided further that:

(i)      the Notes are denominated, and the principal and interest payments thereunder are made, in a currency other than Korean Won,

(ii)      the amount of the Notes acquired by such Korean QIBs in the primary market is limited to less than 20% of the aggregate issue amount of the Notes,

(iii)      the Notes are listed on one of the major overseas securities markets designated by the Financial Supervisory Service of Korea, or certain procedures, such as registration or report with a foreign financial investment regulator, have been completed for offering of the Notes in a major overseas securities market,

(iv)      the one-year restriction on offering, delivering or selling of the Notes to a Korean resident other than a Korean QIB is expressly stated in the Notes, the relevant subscription agreement and the offering circular, and

(v)      the Issuer and the relevant Dealers shall individually or collectively keep the evidence of fulfilment of conditions (i) through (iv) above after having taken necessary actions therefore; or

(b)      as otherwise permitted under applicable Korean laws and regulations.

Each Dealer undertakes, and each further Dealer appointed under the Programme will be required to undertake, to use commercially reasonable best measures as a Dealer in the ordinary course of its business so that any securities dealer to which it sells Notes confirms that it is purchasing such Notes as principal and agrees with such Dealer that it will comply with the restrictions described above.

**Singapore**

Each Dealer has acknowledged, and each further Dealer appointed under the Programme will be required to acknowledge, that this Offering Circular has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, each Dealer has represented, warranted and agreed, and each further Dealer appointed under the Programme will be required to represent, represent and agree, that it has not offered or sold any Notes or caused the Notes to be made the subject of an invitation for subscription or purchase and will not offer or sell any Notes or cause the Notes to be made the subject of an invitation for subscription or purchase, and has not circulated or distributed, nor will it circulate or distribute, this Offering Circular or any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the Notes, whether directly or indirectly, to any person in Singapore other than (i) to an institutional investor (as defined in Section 4A of the SFA pursuant to Section 274 of the SFA), (ii) to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the Notes are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(a) a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

securities or securities-based derivatives contracts (each term as defined in Section 2(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the Notes pursuant to an offer made under Section 275 of the SFA except:

(i) to an institutional investor or to a relevant person, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(c)(ii) of the SFA;

(ii) where no consideration is or will be given for the transfer;

(iii) where the transfer is by operation of law;

(iv) as specified in Section 276(7) of the SFA; or

(v) as specified in Regulation 37A of the Securities and Futures (Offers of Investments) (Securities and Securities-based Derivatives Contracts) Regulations 2018 of Singapore.

*Notification under Section 309B of the SFA* — Unless otherwise stated in the relevant Pricing Supplement, all Notes shall be 'prescribed capital markets products' (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in the MAS Notice SFA 04-N12: Notice on the Sale of Investment Product and the MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

**Belgium**

The Note are not intended to be offered, sold or otherwise made available to, and should not be offered, sold or otherwise made available to, any consumer (*consument/ consommateur*) within the meaning of the Belgian Code of Economic Law (*Wetboek van economisch recht/Code de droit économique*), as amended, in Belgium.

**The People's Republic of China**

Each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that the Notes are not being offered or sold and may not be offered or sold, directly or

indirectly, in the People's Republic of China (for such purposes, not including the Hong Kong and Macau Special Administrative Regions or Taiwan), except as permitted by applicable laws of the People's Republic of China.

**Malaysia**

This Offering Circular has not been registered as a prospectus with the Securities Commission of Malaysia under the Capital Markets and Services Act 2007 of Malaysia (the "**CMSA**"). Accordingly, each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that, the Notes have not been and will not be offered, sold or delivered by it, and no invitation to subscribe for or purchase any Notes has been or will be made, directly or indirectly, nor may any document or other material in connection therewith be distributed in Malaysia, other than to persons falling within any one of the categories of persons specified under Schedule 6 or Section 229(1)(b) and Schedule 7 or Section 230(1)(b) and Schedule 8 or Section 257(3), read together with Schedule 9 or Section 257(3) of the CMSA, subject to any law, order, regulation or official directive of the Central Bank of Malaysia, the Securities Commission of Malaysia and/or any other regulatory authority from time to time. Residents of Malaysia may be required to obtain relevant regulatory approvals including approval from the Controller of Foreign Exchange to purchase the Notes. The onus is on the Malaysian residents concerned to obtain such regulatory approvals and none of the Dealers is responsible for any invitation, offer, sale or purchase of the Notes as aforesaid without the necessary approvals being in place.

**State of Kuwait**

Each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that no Notes will be offered, marketed and/or sold by it in the State of Kuwait, except through a licensed person duly authorised to undertake such activity pursuant to Law No.7 of 2010 Concerning the Establishment of the Capital Markets Authority and Regulating Securities Activities and its executive bylaws (each as amended) (the "**CML Rules**") and unless all necessary approvals from the State of Kuwait Capital Markets Authority pursuant to the CML Rules, together with the various resolutions, regulations, guidance principles and instructions issued pursuant thereto, or in connection therewith (regardless of nomenclature) or any other applicable law or regulation in the State of Kuwait, have been given in respect of the offering, marketing, and sale, of the Notes. For the avoidance of doubt, no Notes shall be offered, marketed and/or sold in the State of Kuwait except on a private placement basis to Professional Clients (as defined in Module 1 of the executive bylaws of Law No. 7 of 2010 (each as amended)).

**Switzerland**

In the case of any Notes with a specified denomination of CHF 100,000 (or equivalent in another currency) or more only, the offering of the Notes in Switzerland is exempt from the requirement to prepare and publish a prospectus under the Swiss Financial Services Act (the "**FinSA**"). This Offering Circular does not constitute a prospectus pursuant to the FinSA, and no such prospectus has been or will be prepared for or in connection with the offering of the Notes.

In the case of any Notes with a specified denomination of less than CHF 100,000 (or equivalent in another currency) only, this Offering Circular is not intended to constitute an offer or solicitation to purchase or invest in the Notes. The Notes may not be publicly offered, directly or indirectly, in Switzerland within the meaning of the FinSA and no application has been or will be made to admit the Notes to trading on any trading venue (exchange or multilateral trading facility) in Switzerland. Neither this Offering Circular nor any other offering or marketing material relating to the Notes constitutes a prospectus pursuant to the FinSA and neither this Offering Circular nor any other offering or marketing material relating to the Notes may be publicly distributed or otherwise made publicly available in Switzerland.

**Indonesia**

Each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that Notes have not been offered or sold and will not be offered or sold in Indonesia or to Indonesian nationals, corporations or to Indonesian citizens, wherever they are domiciled or to Indonesian residents, including by way of invitation, offering or advertisement, and neither this Offering Circular nor any other offering materials relating to the Notes have been distributed, or will be distributed, in Indonesia or to Indonesian nationals, corporations or residents in a manner which constitutes a public offering of the Notes under the laws or regulations of the Republic of Indonesia.

**Brunei**

This Offering Circular has not been and will not be registered, delivered to, licensed or permitted by the Autoriti Monetari Brunei Darussalam with the authority designated under the Brunei Darussalam Securities Markets Order (the "**SMO**") nor has it been registered with the Registrar of Companies, Registrar of International Business Companies. As such the Notes may not be offered or sold or made the subject of an invitation for subscription or purchase nor may this Offering Circular or any other document or material in connection with the offer or sale or invitation for subscription or purchase of Notes be circulated or distributed, whether directly or indirectly, to any person in Brunei other than: (a) to an accredited investor under Section 20 of the SMO; (b) an expert investor under Section 20 of the SMO; or (c) an institutional investor under Section 20 of the SMO, and in accordance with the conditions specified in Section 117 of the SMO.

This Offering Circular is for informational purposes only and does not constitute an invitation or offer to the public. It must not be distributed or redistributed to and may not be relied upon or used by any person in Brunei other than the person to whom it is directly communicated: (i) in accordance with the conditions of section 21(3) of the International Business Companies Order 2000; or (ii) whose business or part of whose business is in the buying and selling of shares within the meaning of section 308(4) of the Companies Act (Cap. 39).

Any offers, acceptances, subscription, sales and allotments of the Notes shall be made outside Brunei. Nothing in this Offering Circular shall constitute legal, tax, accounting or investment advice. The recipient should independently evaluate any specific investment with consultation with professional advisors in law, tax, accounting and investments.

**Italy**

The offering of the Notes has not been registered with the *Commissione Nazionale per le Società e la Borsa* ("**CONSOB**") pursuant to Italian securities legislation and, accordingly, each Dealer has represented and agreed and each further Dealer appointed under the Programme will be required to represent and agree, that no Notes may be offered, sold or delivered, nor may copies of this Offering Circular or of any other document relating to the Notes be distributed in Italy, except:

(a)     to qualified investors (*investitori qualificati*), as defined pursuant to Article 2 of the Prospectus Regulation and any application provision of Legislative Decree No. 58 of 24 February 1998, as amended (the "**Financial Services Act**") and Italian CONSOB regulations; or

(b)     in other circumstances which are exempted from the rules on public offerings pursuant to Article 1 of the Prospectus Regulation, Article 34-ter of CONSOB Regulation No. 11971 of 14 May 1999, as amended from time to time, and the applicable Italian laws.

        Any offer, sale or delivery of the Notes or distribution of copies of this Offering Circular or any other document relating to the Notes in Italy under (a) or (b) above must:

        (i)      be made by an investment firm, bank or financial intermediary permitted to conduct such activities in Italy in accordance with the Financial Services Act, CONSOB Regulation No. 20307 of 15 February 2018 (as amended from time to time) and Legislative Decree No. 385 of 1 September 1993, as amended (the "**Banking Act**"); and

        (ii)     comply with any other applicable laws and regulations or requirement imposed by CONSOB, the Bank of Italy (including the reporting requirements, where applicable, pursuant to Article 129 of the Banking Act and the implementing guidelines of the Bank of Italy, as amended from time to time) and/or any other Italian authority.

**Taiwan**

Each Dealer has represented and agreed and each further Dealer appointed under the Programme will be required to represent and agree that no Notes will be, or have been, registered or filed with, or approved by, the Financial Supervisory Commission of Taiwan and/or other regulatory authority or government agency of Taiwan pursuant to applicable securities laws and regulations and may not be sold, offered or otherwise made available within Taiwan through a public offering or in circumstances which constitute an offer within the meaning of the Securities and Exchange Act of the Republic of China ("**ROC**") or relevant laws and regulations and which require a registration, filing or approval of the Financial Supervisory Commission of the ROC and/or other regulatory

authority or government agency of the ROC. No person or entity in the ROC is authorised to offer, sell or otherwise make available any Notes or the provision of information relating to this Offering Circular.

**General**

These selling restrictions may be modified by the agreement of the Issuer, the Guarantor and the Dealers following a change in a relevant law, regulation or directive. Any such modification will be set out in the Pricing Supplement issued in respect of the issue of Notes to which it relates or in a supplement to this Offering Circular.

No representation is made that any action has been taken in any jurisdiction that would permit a public offering of any of the Notes, or possession or distribution of this Offering Circular or any other offering material or any Pricing Supplement, in any country or jurisdiction where action for that purpose is required.

Each Dealer has agreed that it shall, to the best of its knowledge, comply with all relevant laws, regulations and directives in each jurisdiction in which it purchases, offers, sells or delivers Notes or has in its possession or distributes this Offering Circular, any other offering material or any Pricing Supplement in all cases at its own expense.

## GENERAL INFORMATION

(1)     Application has been made to the London Stock Exchange for Notes issued under the Programme during the 12 months from the date of this Offering Circular to be admitted to trading on the ISM. The ISM is not a regulated market within the meaning of UK MiFIR. The ISM is a market designated for professional investors. Notes admitted to trading on the ISM are not admitted to the Official List of the FCA. The London Stock Exchange has not approved or verified the contents of this Offering Circular.

(2)     Notes may be issued pursuant to the Programme which will not be admitted to listing, trading and/or quotation by any competent or listing authority, stock exchange and/or quotation system or which will be admitted to listing, trading and/or quotation by such other or further competent or listing authorities, stock exchanges and/or quotation systems as the Issuer, the Guarantor and the relevant Dealer(s) may agree.

(3)     Each of the Issuer and the Guarantor has obtained all necessary consents, approvals and authorisations in the Cayman Islands and the Kingdom in connection with the establishment of the Programme and the Guarantee. The establishment of the Programme was authorised by the Board of Directors of the Issuer and passed on 6 February 2022 and the giving of the Guarantee by the Guarantor was authorised by the Board and passed on 24 December 2021.

(4)     There has been no significant change in the financial performance or financial position of the Issuer and no material adverse change in the financial position or prospects of the Issuer, in each case, since the date of its incorporation.

(5)     There has been no significant change in the financial performance or financial position of the Guarantor, and no material adverse change in the financial position or prospects of the Guarantor, in each case since 31 December 2021.

(6)     The Issuer and the Guarantor are not, nor have they been, involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Issuer or the Guarantor is aware) during the 12 months preceding the date of this Offering Circular which may have or has had in the recent past significant effects on the financial position or profitability of the Issuer or the Group or the Guarantor.

(7)     Each Bearer Note having a maturity of more than one year, Coupon and Talon will bear the following legend: "Any United States person who holds this obligation will be subject to limitations under the United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code".

(8)     Notes have been accepted for clearance through the Euroclear and Clearstream, Luxembourg systems (which are the entities in charge of keeping the records). The Common Code, the International Securities Identification Number (ISIN) and (where applicable) the identification number for any other relevant clearing system for each Series of Notes will be set out in the relevant Pricing Supplement.

(9)     The address of Euroclear is 1 Boulevard du Roi Albert II, B-1210 Brussels, Belgium and the address of Clearstream, Luxembourg is 42 Avenue JF Kennedy, L-1855 Luxembourg.

(10)    There are no material contracts entered into other than in the ordinary course of the Issuer's or the Guarantor's business, which could result in any member of the Group being under an obligation or entitlement that is material to the Issuer's or Guarantor's ability to meet its obligations to Noteholders in respect of the Notes being issued.

(11)    The Legal Entity Identifier code of the Issuer is 558600TU1PWGNLZ3XM88.

(12)    The Legal Entity Identifier code of the Guarantor is 558600EF1LZ82YHRMV66.

(13)    The website of the Guarantor is *https://www.pif.gov.sa*. The information on *https://www.pif.gov.sa* does not form part of this Offering Circular, except where that information has been incorporated by reference into this Offering Circular.

(14)    Where information in this Offering Circular has been sourced from third parties, this information has been accurately reproduced and as far as the Issuer is aware and is able to ascertain from the information

154

published by such third parties no facts have been omitted which would render the reproduced information inaccurate or misleading. The source of third party information is identified where used.

(15)   The issue price and the amount of the relevant Notes will be determined, before filing of the relevant Pricing Supplement of each Tranche, based on the prevailing market conditions. The Issuer does not intend to provide any post-issuance information in relation to any issues of Notes.

(16)   For so long as Notes may be issued pursuant to this Offering Circular, the following documents may, when published in accordance with the ISM Rulebook, be inspected and/or collected during normal business hours at the registered offices of the Issuer and the Specified Office of the Fiscal Agent:

(i)     the Agency Agreement (which includes the form of the Global Notes, the definitive Bearer Notes, the Certificates, the Coupons and the Talons);

(ii)    the Deed of Covenant;

(iii)   the Deed of Guarantee;

(iv)    the Memorandum and Articles of Association of the Issuer;

(v)     Royal Decree no. M/92 dated 12/8/1440H and PIF Law of the Guarantor;

(vi)    the 2021 Audited Special Purpose Consolidated Financial Statements;

(vii)   the 2020 Audited Special Purpose Consolidated Financial Statements;

(viii)  the most recently published consolidated financial statements of the Guarantor, together with any audit reports thereon and the notes thereto;

(ix)    each Pricing Supplement; and

(x)     a copy of this Offering Circular together with any supplement to this Offering Circular.

This Offering Circular is and, the Pricing Supplement for Notes that are admitted to trading on the ISM will be, published on the website of the London Stock Exchange at http://www.londonstockexchange.com.

(17)   The Issuer is not required by Cayman Islands law, and does not intend, to publish audited financial statements or appoint any auditors. Since the date of its incorporation, no financial statements of the Issuer have been prepared.

(18)   KPMG Professional Services of Riyadh Front, Airport Road, P.O. Box 92876, Riyadh 11663, Kingdom of Saudi Arabia (Certified Public Accountants) have audited, and rendered a qualified audit report on, each of the 2021 Audited Special Purpose Consolidated Financial Statements and the 2020 Audited Special Purpose Consolidated Financial Statements. KPMG Professional Services is an independent auditor regulated by and registered to practice as auditors with the Saudi Organization for Certified Public Accountants in Saudi Arabia.

(19)   Certain of the Dealers and their affiliates have engaged, and may in the future engage, in investment banking and/or commercial banking transactions with, and may perform services to the Issuer, the Guarantor and/or their affiliates in the ordinary course of business. Certain of the Dealers and their affiliates may have positions, deal or make markets in the Notes issued under the Programme, related derivatives and reference obligations, including (but not limited to) entering into hedging strategies on behalf of the Issuer and its affiliates, investor clients, or as principal in order to manage their exposure, their general market risk, or other trading activities. In addition, in the ordinary course of their business activities, the Dealers and their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers. Such investments and securities activities may involve securities and/or instruments of the Issuer or its affiliates. Certain of the Dealers or their affiliates routinely hedge their credit exposures to the Issuer consistent with their customary risk management policies. Typically, such Dealers and their affiliates would hedge such exposure by entering into transactions which consist of either the purchase of credit default swaps or the creation of short

positions in securities, including potentially the Notes issued under the Programme. Any such positions could adversely affect future trading prices of Notes issued under the Programme. The Dealers and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

(20)     Except where such information has been incorporated by reference into this Offering Circular, the contents of the Guarantor's website, any website mentioned in this Offering Circular or any website directly or indirectly linked to these websites have not been verified and do not form part of this Offering Circular and investors should not rely on such information.

**REGISTERED OFFICE OF THE ISSUER**
**GACI First Investment Company**
c/o TMF (Cayman) Ltd.
4th Floor, Monaco Towers
11 Dr. Roy's Drive, George Town
P.O. Box 10338
Grand Cayman KY1-1003
Cayman Islands

**REGISTERED OFFICE OF THE GUARANTOR**
**The Public Investment Fund**
Alraidah Digital City, Building MU04
Al Nakhil District
P.O. Box 6847
Riyadh 11452
Kingdom of Saudi Arabia

**ARRANGERS AND DEALERS**

**BNP Paribas**
16, boulevard des Italiens
75009 Paris
France

**Citigroup Global Markets Limited**
Citigroup Centre
Canada Square
Canary Wharf
London E14 5LB
United Kingdom

**Deutsche Bank AG, London Branch**
Winchester House
1 Great Winchester Street
London EC2N 2DB
United Kingdom

**Goldman Sachs International**
Plumtree Court
25 Shoe Lane
London EC4A 4AU
United Kingdom

**J.P. Morgan Securities plc**
25 Bank Street
Canary Wharf
London E14 5JP
United Kingdom

**DEALERS**

**Crédit Agricole Corporate and Investment Bank**
12, place des Etats-Unis
CS 70052
92547 Montrouge Cedex
France

**First Abu Dhabi Bank PJSC**
FAB Building
Khalifa Business Park – Al Qurm District
P.O. Box 6316
Abu Dhabi
United Arab Emirates

**HSBC Bank plc**
8 Canada Square
London, E14 5HQ
United Kingdom

**Mizuho International plc**
30 Old Bailey
London EC4M 7AU
United Kingdom

**SMBC Nikko Capital Markets Limited**
100 Liverpool Street
London EC2M 2AT
United Kingdom

**SNB Capital Company**
SNB Regional Office
King Saud Road
P.O. Box 22216
11495 Riyadh
Kingdom of Saudi Arabia

**Société Générale**
29, boulevard Haussmann
75009 Paris
France

**Standard Chartered Bank**
7th Floor Building One, Gate Precinct
Dubai International Financial Centre
P.O. Box 999
Dubai, United Arab Emirates

**FISCAL AGENT, PRINCIPAL PAYING AGENT, TRANSFER AGENT AND CALCULATION AGENT**

**Deutsche Bank AG, London Branch**
Winchester House
1 Great Winchester Street
London EC2N 2DB
United Kingdom

**REGISTRAR**

**Deutsche Bank Luxembourg S.A.**
2 Boulevard Konrad Adenauer
L-1115 Luxembourg

**AUDITORS**

**KPMG Professional Services**
Riyadh Front
Airport Road

P.O. Box 92876
Riyadh 11663
Kingdom of Saudi Arabia

**LEGAL ADVISERS**

*To the Issuer and the Guarantor in respect of English law*
**Latham & Watkins (London) LLP**
99 Bishopsgate
London EC2M 3XF
United Kingdom

*To the Issuer and Guarantor in respect of Saudi Arabian law*
**The Law Firm of Salman M. Al-Sudairi**
7th Floor, Tower 1, Al-Tatweer Towers
King Fahad Highway
P.O. Box 17411
Riyadh 11484
Kingdom of Saudi Arabia

*To the Issuer in respect of Cayman Islands Law*
**Walkers (Dubai) LLP**
Level 14, Burj Daman
Dubai International Financial Centre
P.O. Box 50613
Dubai, United Arab Emirates

*To the Arrangers and Dealers in respect of English law*
**Linklaters LLP**
Ninth Floor, Currency House
Dubai International Financial Centre
P.O. Box 506516
Dubai, United Arab Emirates

*To the Arrangers and Dealers in respect of Saudi Arabian law*
**Zamakhchary & Co.**
The Business Gate
Unit no. 13, Ground floor
2362 Qurtubah
Riyadh 13244 - 7440
Kingdom of Saudi Arabia

# EXHIBIT 22



Jobs

# Saudi Arabia's PIF to hire tens of staff for New York subsidiary

The New York team will help oversee trades and bridge the time difference between the Kingdom and the US

By Bloomberg                                                                    Tue 20 Sep 2022





**S**audi Arabia's Public Investment Fund (PIF) is looking to hire a team of about 50 staff for its New York unit amid plans to expand investments in the US.

USSA International, wholly owned by the PIF, will recruit roles for investment research, legal, and compliance, unnamed sources told *Bloomberg*.

It is also expected to build a team for equity trading at a later stage, the sources said.

Saudi wealth fund 'supportive' during supply crunch: electric carmaker Lucid

The Saudi wealth fund currently has a round $40 billion in its US equities portfolio, including stakes in BlackRock, JPMorgan, and Uber.

The New York team will help oversee trades and bridge the time difference between the Kingdom and the US, according to the *Bloomberg* report.

PIF is said to not have plans in applying for a license to trade US stocks directly or through USSA International, and will continue to use intermediaries to execute trades.

---

*For all the latest **business news** from the UAE and Gulf countries, follow us on **Twitter** and **LinkedIn**, like us on **Facebook** and subscribe to our **YouTube** page, which is updated daily.*

## More of this topic



Jobs

AD Ports to hire 7,500 Emiratis in five years

---

Jobs

Abu Dhabi health department launches platform for job listing

---

Banking & Finance

KPMG Lower Gulf's embattled CEO Nader Haffar to step down

## More from this author

Politics & Economics

Ukraine war: Russian general admits Kherson situation 'tense' under shelling

Energy

Global experts at Abu Dhabi event to tackle energy security, sustainability

Capital markets

Upbeat sentiments in real estate, banking sectors push UAE stock markets index

## Recent Podcasts

Photos

In pictures: Apple introduces next-generation iPad Pro

Politics & Economics

Ukraine war: Russian general admits Kherson situation 'tense' under shelling

Energy

**Yellow Door Energy raises $400 million equity to develop sustainable energy projects in MEA region**

Copyright © 2022. ITP Media Group. All Rights Reserved

# EXHIBIT 2

Business

# Saudi Wealth Fund Plans San Francisco Office

- Qatar Investment Authority, Mubadala already have U.S. hubs
- Kingdom wants to win back investor confidence after Khashoggi

By Matthew Martin
February 12, 2019 at 9:55 PM PST  *Updated on February 13, 2019 at 2:29 AM PST*

Saudi Arabia's sovereign wealth fund is following its peers in Abu Dhabi and Qatar by opening an office in the U.S. tech hub of San Francisco.

"We are working on opening up in London and in the U.S., initially New York but also San Francisco and potentially other cities," Managing Director Yasir Al-Rumayyan said at a conference in Abu Dhabi. "We feel we should be closer to our businesses over there."

The Public Investment Fund would join the Qatar Investment Authority and Abu Dhabi's Mubadala Investment Co. in opening in Silicon Valley as they build up technology holdings. The funds are seeking to plow some of their oil and natural gas billions into technology to lessen their reliance on crude and to bring home businesses and skills that will help transform their economies.

Saudi Arabia's U.S. plans come as the world's biggest oil exporter tries to win back investor confidence after the October killing of Jamal Khashoggi sparked a global outcry. It's also seeking to move on from an alleged crackdown on corruption that rattled the kingdom's business elite and weighed on economic growth.

**Tech Investments**

Since unveiling a strategy in 2016 to transform the PIF from a sleepy domestic holding company into the world's largest sovereign fund, Saudi Arabia has made a series of bold investments, many of which have focused on technology companies.

The fund has accumulated a stake in electric carmaker Tesla Inc. for about $2 billion on top of a $3.5 billion investment in ride-sharing company Uber Technologies Inc. It also made a $45 billion commitment to SoftBank Group Corp.'s $100 billion technology fund and could make another $45 billion investment in its second Vision Fund, PIF Chairman Mohammed Bin Salman -- who is also Saudi Arabia's Crown Prince, said in October.

It's also looking to bring vertical-farming startup Plenty Inc., which is backed by Masayoshi Son's Vision Fund, to Saudi Arabia, Al-Rumayyan said. The startup, which has a farm in its hometown of San Francisco, says the company's indoor technology is more efficient than traditional operations and well suited to harsh climates.

The fund plans to build a workforce of about 700 employees by the end of this year, up from 450 currently, Al-Rumayyan said. By 2025, it aims to boost that number to as many as 2,000.

*(Updates with PIF comments in second paragraph.)*

Terms of Service  Do Not Sell My Info (California)   Trademarks  Privacy Policy
©2022 Bloomberg L.P. All Rights Reserved
Careers  Made in NYC  Advertise  Ad Choices     Help

# EXHIBIT 2

10/17/22, 7:29 PM
Case 5:22-cv-04486-BLF   Document 142-2   Filed 11/04/22   Page 191 of 243
Saudi sovereign fund PIF opens London, NY and Hong Kong offices





  

My View    Following    Saved

Funds

1 minute read · February 24, 2022 3:04 AM PST · Last Updated 8 months ago

# Saudi sovereign fund PIF opens London, NY and Hong Kong offices

**Reuters**

Feedback

     

DUBAI, Feb 24 (Reuters) **-** The Public Investment Fund, Saudi Arabia's sovereign wealth fund, said on Thursday it has opened three new subsidiary companies' offices in London, New York and Hong Kong, as the $500 billion fund looks overseas for growth.

Fund's future international growth," it said in a statement.

The PIF is at the centre of Saudi Arabia's plans to transform the economy by creating new sectors and diversifying revenues away from oil.

---

Advertisement · Scroll to continue

---

Since becoming a more active investor in 2015, PIF has taken steps to raise its global profile. It took a $3.5 billion stake in Uber Technologies before its public listing and invested $45 billion in Softbank's inaugural technology fund.

It plans to grow its assets under management to $1.07 trillion by the end of 2025, while continuing to create new sectors, companies and jobs, it said.

Reporting by Saeed Azhar

    

Our Standards: **The Thomson Reuters Trust Principles.**

## Read Next / Editor's Picks

# EXHIBIT 2

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/how-a-reality-tv-producer-became-rainmaker-to-300-billion-saudi-fund-11581380021

# How a Reality-TV Producer Became Rainmaker to $300 Billion Saudi Fund

Carla DiBello has a close relationship with its chief and little formal finance training, and her role is frustrating some officials at the fund

*By Bradley Hope*  [Follow] , *Justin Scheck*  [Follow] , *Summer Said*  [Follow]  *and Rory Jones*  [Follow]

Feb. 10, 2020 7:13 pm ET

RIYADH—Businesses looking for cash from Saudi Arabia's $300 billion sovereign-wealth fund, one of the world's most influential investors, have found it helps to enlist a former reality-TV producer from Sarasota, Fla.

Carla DiBello, 35, has become a high-profile figure in Saudi Arabia's investment scene for her connections with the kingdom's Public Investment Fund, or PIF. She is helping PIF negotiate a $445 million deal to buy a majority stake in England's Newcastle United soccer team, say people familiar with her dealings. She has told acquaintances she was involved in talks around a $15 billion deal with Indian conglomerate Reliance Industries Ltd., say people familiar with the discussions.

Ms. DiBello also has a close relationship with the Saudi fund's 49-year-old chief, Yasir al-Rumayyan. Their relationship has raised concerns among some PIF officials, who have grown frustrated with his attention to Ms. DiBello during a time when the fund's major investments are struggling, Saudi officials at the fund say.

She has been helping foreign companies gain access to top Saudi officials, sometimes via formal business meetings and sometimes in more casual settings, say the people familiar with her dealings. Ms. DiBello arranges compensation for her role in such deals, generally from the company seeking PIF investment or from others involved in a potential transaction, often through her firm, Sarasota-based CDB Advisory, the people say.

Last year in New York City, Ms. DiBello helped a Juul Labs Inc. executive get a rare one-on-one meeting with Mr. Rumayyan, says one of the people. An investment in Juul didn't happen,

the person says, but the meeting was a coup for the Juul executive.

International business executives have become wary of intermediaries paid to use personal relationships to facilitate deals. Compliance executives see a risk that such payments could violate U.S. and European anti-bribery laws.

One company hoping to do business with PIF sought legal advice on whether paying Ms. DiBello for an introduction would violate U.S. antibribery law, says a person familiar with the interactions. The company's executives, this person says, were concerned about the appearance of paying someone with no clear financial expertise for setting up meetings. The investment hasn't happened.



PIF is run differently from many other international money managers, which typically make major investment decisions by committee and vet deals with in-house risk managers and lawyers to ensure they are done in the best interests of the fund and comply with laws.

While PIF has investment committees and risk managers, some major decisions on where to invest and with whom to negotiate are made by Mr. Rumayyan or his boss, Crown Prince Mohammed bin Salman, without relying on the committees' advice, say current and former PIF officials.

A PIF spokesman said the fund "has put in place a world class governance framework around all of its investments based on global best practice."

PIF is the keystone of Prince Mohammed's attempt to overhaul his country's petroleum-dependent economy. Aiming to create a modern fund run by international governance principles, he is trying to use oil money to invest in new industries to diversify the country's income and bring new jobs to its young, underemployed population.

Prince Mohammed has told people close to the Royal Court he wants Saudi Arabia to follow global business norms, these people say, cutting out cronyism and making sure people get paid for generating value for the kingdom, not for their relationships.

Ms. DiBello and Mr. Rumayyan, who is married, display a close relationship, say people who know the pair or have seen them together. They share a passion for golf, some of them say, and have been spotted dining together. They spent time alone together on a boat at a yacht event last October, say people familiar with the event.

At the yacht event, Ms. DiBello met business leaders on a megayacht Mr. Rumayyan chartered, staying aboard several days as part of a Red Sea boating event hosted by Prince Mohammed, say the people familiar with the event.

Together with her associate, British businesswoman Amanda Staveley, Ms. DiBello greeted SoftBank chief Masayoshi Son and Reliance chief Mukesh Ambani on the yacht, these people say. She participated in high-level business meetings, they say. On the event's final night, Mr. Rumayyan took Ms. DiBello and Ms. Staveley as guests to Prince Mohammed's yacht for a special dinner, they say.

Soon afterward, Ms. DiBello began telling people of her growing role as an adviser at PIF, citing her time spent with Mr. Ambani and Mr. Son on the yacht as evidence of her clout, says a person who discussed the matter with her. Mr. Ambani and Mr. Son declined to comment.



A lawyer for Ms. DiBello, Andrew Brettler, said: "There is no truth whatsoever" to the suggestion that based on her relationship "Ms. DiBello is able to provide foreign businesses with unprecedented access to Mr. Al Rumayyan." Ms. DiBello "is an advisor to the various corporations she introduces to the PIF, among other entities in the Middle East and Saudi Arabia," he said. Her company "specializes in making connections between the Middle East and North America and has been involved in more than $250 million of such deals," he said. Ms. DiBello is close with Mr. Rumayyan's family, he said. She isn't a PIF employee and hasn't ever been paid by PIF, he said.

The PIF spokesman said The Wall Street Journal's account of Ms. DiBello's role with PIF is "mis-representing of facts" but didn't detail what facts he alleges the Journal has misrepresented. He said Ms. DiBello isn't an adviser to PIF and isn't paid by PIF, and that the fund's deals are vetted by an investment committee.

"Under Yasir Al-Rumayyan's leadership, PIF has assembled a talented senior executive team comprised of proven, highly respected financial and business leaders from Saudi Arabia and internationally," he said.

Mr. Rumayyan declined to answer questions for this article.

## Economic centerpiece

Today's incarnation of PIF harks to 2015, when Prince Mohammed took a government fund investing domestically and made it the centerpiece of his plan to diversify the Saudi economy. The prince wanted to break what he viewed as his country's overdependence on hired hands from abroad and use PIF to develop new industries, say people who have discussed the fund with him.

At the fund's helm Prince Mohammed put Mr. Rumayyan, a former Saudi bank executive also known for his involvement in Riyadh's golf community and love of Cuban cigars.

At PIF, some investments are driven by the sentiments of the crown prince and Mr. Rumayyan, say people familiar with the fund.

The PIF spokesman said: "In strict adherence with our charters, all decisions on where to invest PIF assets are always made by our investment committees."



The fund has invested billions of dollars in global markets with little of the discipline and institutional controls typical of investment funds of its size, say the people familiar with the fund. One outcome: Investors questioned its $45 billion investment in SoftBank's Vision Fund after portfolio companies like WeWork parent We Co. stumbled.

Sometimes, Mr. Rumayyan's office has told investment teams in PIF to meet with people whose involvement in the talks they didn't understand, some current and former PIF officials said.

That was the case with Ms. DiBello in early 2019, when managers couldn't figure out why they had been scheduled to meet with her when she came to PIF offices to pitch the Newcastle United deal, say people involved in the talks.

Ms. DiBello, who spent years in the entertainment industry, had little experience in banking or formal deal-making and doesn't appear to have a university degree. On her LinkedIn page, the only education she lists is a Certificate in Private Capital Markets, a three-day university course. Her page says she sold insurance to high-net-worth individuals at an insurance-sales and estate-planning firm.

During talks on the Newcastle deal, Ms. DiBello was confident and engaging, says one person who met her then. In Saudi Arabia, where deals are usually made by powerful men with entourages, the person says, it took courage for her to come to PIF on her own.

Ms. DiBello proved adept at making contacts in the Gulf business world. In a region where it is rare to see a woman in a position of power, she built a name and a public profile for herself, getting to know another successful Western businesswoman working in the region, Ms. Staveley.

But she gave perfunctory explanations of the deal terms and couldn't answer follow-up questions about returns and leverage, this person says.

## Uber investment

Mr. Rumayyan and Prince Mohammed are friends with Uber Technologies Inc. founder Travis Kalanick. In 2016, after discussing a $1.5 billion Uber stake, PIF upped its investment to $3.5 billion so Mr. Rumayyan could get a seat on Uber's board, the Journal reported in 2017.

PIF's Uber stake is now valued at about $3 billion. An Uber spokesman declined to comment.

Later, Mr. Kalanick came back to PIF proposing it invest in CloudKitchens, a business building commercial kitchens to cook meals for home delivery. To some PIF officials reviewing the deal before it was completed early last year, it had the hallmarks of a bubble, say people involved with the deal. They say senior PIF executives made it clear that when Mr. Kalanick came into the office, the investment team would ask questions and maybe negotiate on valuation—but would do the deal because that was what Prince Mohammed and Mr. Rumayyan wanted.

Martin Botha, PIF's head of risk, told Mr. Rumayyan in a meeting that the cloud-kitchen deal was too risky, says one of the people involved. Mr. Rumayyan thanked Mr. Botha, the person

says, and told him to stop talking. PIF invested $400 million in Mr. Kalanick's kitchen business, valuing it at $5 billion.

Mr. Kalanick declined to comment. Mr. Botha didn't respond to requests for comment.

In 2016, PIF agreed to become the biggest investor in Softbank's Vision Fund. The Vision Fund's investments helped push up valuations of companies like dog-walking app Wag that have since seen their values decline. Mr. Rumayyan joined SoftBank's board.



A year after the Uber and SoftBank investments, PIF still didn't know the value of its holdings due to years of poor accounting, the Journal reported in 2017. Government officials' estimates at the time ranged from $180 billion to $300 billion.

PIF did hire experienced financial managers from abroad for high-level roles, but many quit after realizing that they had no power to make decisions—and that PIF wasn't run to the standards they expected—several former managers say. Many bristled at Mr. Rumayyan's preferred title, "Your Excellency." While it isn't unusual for people of note in the Gulf to demand such a title, it was unusual to bankers from abroad who were accustomed to calling their bosses by their first names.

## Ms. DiBello's ties

Ms. DiBello's Saudi Arabia ties stretch back more than two decades to a neighbor in the gated Sarasota community where she grew up, according to public records and her statements in the local press.

Close by was a house owned by Essam Ghazzawi, a money manager for family members of Saudi Arabia's King Salman, Crown Prince Mohammed's father. In her teens, Ms. DiBello

became close with Mr. Ghazzawi's daughter Anoud, who was in her early 20s, says a person who spent time with Ms. DiBello and Ms. Ghazzawi back then.

Ms. Ghazzawi left Florida for Saudi Arabia shortly before the 9/11 attacks. U.S. investigators later learned two of the attackers spent time at the family house while taking flight lessons, according to Federal Bureau of Investigation documents revealed through information requests and litigation against the government by a nonprofit news website, Florida Bulldog.

Ms. Ghazzawi, who now has a business designing custom abayas in Dubai, and her father didn't respond to requests for comment.

Ms. DiBello moved to Los Angeles where she worked for an entertainment producer. When she was about 21, she got a job as an assistant to casino magnate Steve Wynn, she wrote in her column, "A Modern Role Model," in Harper's Bazaar Arabia in 2016.

"I still refer to the years I spent working with Steve Wynn as my 'free Harvard tuition.' It was the best business education I could have received," she wrote. A lawyer for Mr. Wynn didn't respond to requests for comment.

In Los Angeles, she worked for a movie producer and later helped produce "Keeping Up with the Kardashians." Ms. DiBello has spoken publicly about her friendship with Kim Kardashian and work on the show, and in Harper's Bazaar Arabia wrote that Ms. Kardashian is one of her "best friends."

A person close to the Kardashians says Ms. Kardashian and Ms. DiBello are no longer in regular contact.

After working on a Dubai film festival in 2005, Ms. DiBello had started spending time in the Gulf, she wrote in Harper's Bazaar Arabia. A story about her last year in a Gulf publication said she had been going to Saudi Arabia since 2014.

She started her own company, CDB, in 2013, the year she left the Kardashian series, according to her LinkedIn page. Since then, she has increased her public presence in the Middle East, writing her column for the local Harper's Bazaar edition and posting pictures on Instagram of herself with local leaders.

"I kind of am that voice for the people in the West coming to the East," she said in a video interview last year. In other local interviews, she said she "helped a private equity group from the U.S. raise capital" in the region and is working on "nine-figure deals."

In 2016, she and Kris Jenner, Ms. Kardashian's mother, appeared in Dubai to announce the opening of a local branch of Legacy Business School, a for-profit university based in Trump Tower in New York. The Journal couldn't determine whether the Dubai office ever opened, and the school didn't respond to requests for comment over the weekend. A person close to Ms. Jenner says it was a paid appearance and Ms. Jenner isn't associated with the school.



Over the past year, Ms. DiBello has increased her public presence in the kingdom. She helped produce a documentary about Saudi Arabia's hosting a Formula E electric-car race, bringing in a Hollywood production company. She posted an Instagram photo of herself with Prince Mohammed.

Early last year, when she came to PIF offices pitching the Newcastle United deal, two of the people involved in the talks say that they had no idea how she got access. They said a superior told them Mr. Rumayyan's office wanted them to meet her. Some Saudi financial analysts were puzzled, wondering what she was doing there, one of them says.

Ms. DiBello told them that Newcastle United's owner wanted to sell, that she and Ms. Staveley wanted to cut a deal for Saudi Arabia to put up the money, and that the two women would play a role in managing the business for a fee and get a portion of equity, the person says. A Newcastle United spokesman declined to comment.

Last month, the Journal reported the deal was close to being completed and that Ms. Staveley planned to purchase 10% of the team if the deal went through. The Journal couldn't determine how Ms. DiBello would be compensated.

*—Julie Steinberg and Lisa Schwartz contributed to this article.*

**Write to** Bradley Hope at bradley.hope@wsj.com, Justin Scheck at justin.scheck@wsj.com, Summer Said at summer.said@wsj.com and Rory Jones at rory.jones@wsj.com

*Appeared in the February 11, 2020, print edition.*

# EXHIBIT 2

Case 5:22-cv-04486-BLF Document 142-2 Filed 11/04/22 Page 205 of 243

# 'A new force shaping the future of the global economy': Saudi Arabia PIF chief



- $200 billion investment in KSA could give Saudi Arabia impetus to lead development of renewable energy from solar power

- Yasir Al-Rumayya has mapped out how PIF would get to the $2 trillion level by 2030

New York: As the clocks ticked to midnight in New York's Plaza Hotel, Yasir Al-Rumayyan was nearing the end of a busy day in a hectic week. But there was one event he simply had to attend, mainly because it might just involve the complete transformation of the renewable energy industry.

In the luxurious hotel's corridors, just outside the Monroe Suite, the managing director and chief executive of Saudi Arabia's Public Investment Fund was waiting, along with a watchful security contingent and an expectant media pack, for the arrival of Crown Prince Mohammed bin Salman and an announcement that everyone had been assured was "big."

Al-Rumayyan shook some hands and took some congratulations on the successful interview he had done that afternoon with Maria Bartiromo, the anchor for Fox Business Network TV channel. He looked tired, but accomplished.

In that interview, he had once again committed PIF to becoming a "global investment powerhouse" with a staggering $2 trillion in assets under management by 2030, and when the small crowd of journalists and cameramen were shown into the presentation suite, it was obvious that the next phase toward achieving that ambition would begin that very evening.

Al-Rumayyan stood locked in contemplation alongside Khalid Al-Falih, the Saudi minister of energy, as the Crown Prince and Masayoshi Son, the founder and chief executive of Japanese hi-tech finance house SoftBank, unveiled an agreement to put Saudi Arabia, and PIF, in charge of the biggest investment ever in solar energy.

The $200 billion investment in the sun-rich Kingdom could give Saudi Arabia the impetus to lead the development of renewable energy from solar power, boost the economy with growth and thousands of jobs, and save it $40 billion a year in energy bills.

It was exactly the kind of transformational deal he had described earlier that day. "We want to enable new sectors and new industries, and make them more practical. Some of the new ideas are really great ideas, but they are not practical," he told Bartiromo.

Just a few years ago solar energy might have fallen into the "not practical" category, but — with PIF and SoftBank's investment — it might just be reaching the tipping point of practicality. This was what he had meant when he said: "We want to present new opportunities to reshape the global economy."

Al-Rumayyan has been chosen as the man at the sharp financial end of the ambitious Vision 2030 strategy to transform the economy of Saudi Arabia away from oil dependency. His education in Saudi Arabia was rounded off at Harvard Business School, and the top job at PIF came after various roles with Saudi financial institutions and market authorities.

He was made managing director and chief executive of PIF just a few months after the Crown Prince took charge of the once-sleepy pensions arm for the Saudi government, and began to change it radically.

"The Crown Prince is a great visionary and he looked at the things that he thought we should be looking at, and I agreed with him totally," said Al-Rumayyan.

Virtually everything has changed at PIF since then. It has a new ambition: To be the biggest single investor in the world measured by assets under management. It has a new investment strategy: To invest in the future. And it has a new corporate culture: To hire the best and the brightest investment minds from around the world to implement the Vision 2030 strategy.

On the first target, he mapped out how PIF would get to the $2 trillion level by 2030. "A year ago, we had $150 billion assets under management. Last September that stood at $250 billion ... By 2020 we should be $400 billion and by 2030 we should be $2 trillion. So how we achieve the target is, of course, challenging, but it's very much doable," he said.

PIF's Vision Realization Program commits it to higher performance targets for the 80-odd companies, of which about 20 are quoted, that are in its biggest pool of assets, the Saudi domestic funds. These had been delivering a return of 3 percent, but this has already increased to between 4 and 5 percent, Al-Rumayyan said.

"We were previously a passive investor, but now we're more active," he added.

The second way to help get to the $2 trillion figure is via the use of funds from the government in the form of cash from the enormous sell-off of government companies set to begin soon. "The government will keep investing capital via the proceeds of the privatization program. That is another good way to increase our assets under management," he said, pointing out that PIF was not obliged to pay anything back to the government in dividends.

That pot would include the proceeds from the forthcoming initial public offering of Saudi Aramco, billed as the biggest single IPO in history. "So that's a minimum of maybe $100 billion coming to us, maybe more, not depending on the valuation only, I would say, but on the size of the IPO we'll be offering," he said.

The third technique to get to the $2 trillion goal is through the new, aggressive investment strategy PIF has adopted under Al-Rumayyan. He reeled off a list of the biggest investments made in the past couple of years: Uber, SoftBank Vision Fund (the $100 billion hi-tech investment fund set up and managed by the

Japanese bank with a $45 billion PIF investment), Blackstone, and the latest —
Magic Leap, the Californian developer of "mixed reality" technology, which he
called "really, a great company."

"All these have outstanding growth rates. They are very disruptive and will add a
lot of value to our portfolio," Al-Rumayyan said.

"So, add it all up, and the $2 trillion is a conservative estimate," he judged.

Not much else about the new PIF can be called conservative. The partnership
with the hi-tech Vision Fund is central to the strategy. "Traditionally our
historical portfolio was in Saudi equities and fixed income with low or even
negative returns. It was all in conventional investments.

"But we see new trends coming to the future want to invest in the future, like
robotics and even autonomous cars. It's coming, it's here. I know we had an
incident recently (the fatal accident with an autonomous Uber vehicle in
Arizona, US) but it's one incident out of 30 million hours of test driving. In the
grand scheme it's really a fraction of a fraction of a percentage," he added
enthusiastically.

Data sciences will also be a focus of the new PIF strategy. "With the Internet of
things, everything will be talking to everything else and the amount of data will
be unprecedented. People will know what you're buying, what you're doing,
your preferences even without you knowing about it," he said.

Medical investment will also be to the fore. "If we're going to have prosperity
people are going to need to have greater lifespans and ages. All these things will
be the focus of our investments. In addition to the greater impact it will have on
our life, it is going to be lucrative," Al-Rumayyan said.

PIF has not given up entirely on conventional investment. Al-Rumayyan pointed
to the recent stake in AccorHotels as an example of investment in a fast-
growing conventional business, but a much bigger focus is on infrastructure,
via its $20 billion share of Blackstone's $40-$50 billion US fund for US
infrastructure.

"It needs to be upgraded. So we created the largest fund in the history of
infrastructure investment. It will close in the coming month or two, and then
we can start work. Streets, bridges, pipelines, tunnels, even airports — all need

to be upgraded in the US and internationally. With the political will we have from the administration I think it's a really good opportunity for us to be here," he said.

And, of course, there are the huge infrastructure investments under way back home in Saudi Arabia. PIF is running three of the big "giga projects" — the Neom development, the Red Sea Resort and the Al Qidiya leisure complex outside Riyadh.

"Giga projects are excellent investment ideas. The growth rates in the Saudi economy will be really great and bigger than the past five years," he said.

Managing these projects presents a challenge for PIF, which just a couple of years ago had a staff of only 40. Now, Al-Rumayyan said, it employs 240, expected to rise to 480 by the end of the year, with new offices planned in the US, London and Tokyo. This is in addition to the large number of investment bank advisers and consultants PIF uses.

One of the challenges, he said, lies in finding the right people to partner with, which he compared to being an orchestral conductor. "Sometimes the biggest challenge is to get people to play together," he said.

But he is convinced that the world can be persuaded of the opportunities presented by the new-look Saudi Arabia.

"It is one of the most stable states in the region with 100 years of track record. Look at some of the countries around us. Some other states attract FDI but are less stable than Saudi.

"You have the history, you have the infrastructure, you have the rules and regulations, you have the enforcement of the law, especially if you look at what we've been doing lately with the war on corruption. We're trying to pave the way for anybody to come in and feel comfortable that they know what it is they're getting themselves into," he added.

He is also convinced that the bold new Saudi world has the support of most people in the Kingdom. "Of course there is change, but it is all about positive changes and most of the people in Saudi Arabia want that. Now we're seeing it and now we all want to participate in it. The year 2018 will be a great year for us and I think we'll see a lot of good things," he said.

Case 5:22-cv-04486-BLF Document 142-2 Filed 11/04/22 Page 210 of 243

**EXHIBIT 2**

10/17/22, 9:21 PM
Saudi wealth fund aims to nearly double size by 2020



THE WEEK    News    World    **Saudi wealth fund aims to nearly double size by 2020**

MIDDLE EAST

# Saudi wealth fund aims to nearly double size by 2020

*By Katie Paul  |  October 25, 2017*




Saudi wealth fund aims to nearly double size by 2020



Saudi Arabia's Public Investment Fund (PIF) managing director Yasir al-Rumayyan speaks at the Bloomberg Global Business Forum in New York City, U.S., September 20, 2017 | Reuters

S audi Arabia's main sovereign wealth fund wants to increase its financial clout to 1.5 trillion riyals ($400 billion) by 2020 as part of the kingdom's efforts to boost private-sector growth and wean itself off oil export dependence.

The assets-under-management goal, laid out by the Public Investment Fund (PIF) on Wednesday, came on the second day of an international conference in Riyadh. It was accompanied by publication of PIF's first comprehensive business programme, outlining targets for investments and

Case 5:22-cv-04486-BLF Document 142-2 Filed 11/04/22 Page 214 of 243

returns for 2018-2020.

PIF, which is expected to receive proceeds from the planned sale of 5 percent of state oil company Saudi Aramco's shares, has currently around $230 billion worth of assets under management.

It plans to create 20,000 direct domestic jobs, and 256,000 construction jobs by 2020. This will increase PIF's contribution to Saudi Arabia's gross domestic product from 4.4 percent to 6.3 percent, it said in a statement on Wednesday.

Investments will be in sectors such as real estate and infrastructure as well as in new areas of activity in the Saudi economy through the establishment of companies such as the Saudi Arabian Military Industries company and the Saudi Real Estate Refinancing Company.

One of the biggest tasks facings PIF will be the delivery of a $500 billion plan to build a business and industrial zone extending into Jordan and Egypt, announced at the start of the conference on Tuesday.

PIF also set a new target to increase total shareholder return to 4-5 percent between now and 2020 from 3 percent, it said on Wednesday.

"The PIF Program represents a vital milestone as we work towards realising Vision 2030," Crown Prince Mohammad bin Salman Al-Saud, the economic reform plan's architect, said in a statement.

The 96-page programme said PIF will structure its investments in six areas: Saudi equity holdings, sector development, real estate and infrastructure, mega projects, international strategic investments and a "diversified pool" across global asset classes.

It said "long-term" average annual return from these areas would be between 6.5 to 9 percent.

Outside of Saudi Arabia, PIF's investments will be in a number of assets such as fixed-income, public equity, private equity and debt, real estate, infrastructure and alternative investments such as hedge funds, the fund said.

PIF Managing Director Yasir Al Rumayyan said the fund was open to investing in more big ticket items such as U.S. ride services company Uber.

It also outlined its four major sources of funding to include capital injections from the government, government asset transfers, loans and debt instruments as well as retained earnings from investments.

— Reuters

Bookmark        Print        Email

TOPICS : #Saudi Arabia | #Middle East | #economy

## Related Reading



Indian economy may touch $30 trillion in next 30 years:



Saudi crown prince receives warm welcome in Turkey, to



Saudi crown prince visits Turkey as countries



Saudi crown prince begins tri-nation tour



India better placed to deal with near-term challenges:

High inflation, muted growth upset economy's post-



India would become $5 trillion economy by 2026-27:

Biden to visit Saudi in July

| News | Magazine | Leisure | Opinion | Review | Education | Follow Us |
|---|---|---|---|---|---|---|
| India | The Week | 2018 | Blogs | Books | Master Article | f 𝕏 g+ |
| World | Health | Lifestyle | Columns | Automobiles | Admissions | |
| Sports | The Wallet | Society | | Gadgets | Distance | |
| Entertainment | | Travel | | Movies | Education | |
| Business | | Open Letter | | 2018 | Exams | |
| Sci/Tech | | | | 2019 | 2019 | |
| Health | | | | 2020 | Latest | |
| Explained | | | | 2021 | 2020 | |
| 2020 | | | | 2022 | 2022 | |
| 2021 | | | | | | |
| 2022 | | | | | | |

Copyright © 2022 All rights reserved.

# EXHIBIT 2





## PROGRAM

| 7:30am | **Breakfast** |
|---|---|
| 8:30am | **The Highest Priority**<br>The FII Institute presents the findings from a global survey revealing the number-one priority in the minds and hearts of people across all demographics and continents. What is the World's highest priority?<br><br>**Speaker**:<br>● **Richard Attias**, CEO, Future Investment Initiative Institute |
| 8:45am | **Global Priorities** |

| | |
|---|---|
| | The role of businesses, institutions, and investors in advancing the world's highest priorities.<br><br>**Moderator:**<br>• **Dr. Judith Rodin,** President Emerita, University of Pennsylvania; Board Chair, Prodigy Finance and Resilient Cities Catalyst<br><br>**Speaker:**<br>• **H.E.Yasir Al-Rumayyan**, Chairman of the FII Institute & Governor of the Public Investment Fund of Saudi Arabia |
| 9:00am | **Do You Agree?**<br>After the uncovering of humanity's highest priority, our speakers will discuss and expand upon the results. Were the results surprising or expected? What will it take to achieve these priorities throughout different communities around the world?<br><br>**Moderator:**<br><br>• **Zain Asher**, Anchor, CNN International<br><br>**Speakers:**<br>• **H.E. Dasho Tshering Tobgay,** Former Prime Minister, Bhutan<br>• **H.E. Helle Thorning-Schmidt**, Former Prime Minister, Denmark<br>• **Kailash Satyarthi**, Nobel Peace Prize Laureate |
| 9:25am | **My Highest Priority Video**<br><br>**Speaker:** |

|  | • **H.R.H. Princess Reema bint Bandar Al Saud**, Saudi Ambassador to the United States |
|---|---|
|  | **ACT I – Myself** |
| 9:30am | **Priority Pulse – How to make 100 Years Old the New 60**<br>Humanity has entered the era of exponential medicine where the future of health is driven by technology and data. How can advances in genomics, AI, stem cells, and other innovations help us extend youth?<br><br>**Speaker:**<br>• **Peter H. Diamandis, M.D.,** Founder & Executive Chairman, XPRIZE |
| 9:40am | **Priority Pulse – The Awakened Brain**<br>The pandemic triggered a 25 percent increase in anxiety and depression worldwide, according to the World Health Organization. How can individuals recovering from lockdown rethink their psychology and turn crisis into opportunity?<br><br>**Speaker:**<br>• **Dr. Lisa Miller,** Professor of Psychology and Education; Columbia University, Teachers College<br><br>**Contributor:**<br>• **Manal Alshamrani,** KAUST Gifted Student Program Scholar; Mawhiba Gifted Alumni; Biomedical Engineering Student, Boston University |
| 9:50am | **The Purpose of Work**<br>There are many critical factors impacting the future of the workforce. Among them: Startup funding is falling, 20% of employees across 44 countries plan to quit their jobs (PwC |

data), and the immigrant population is growing. As companies rethink hiring and retention, they must also consider the role they play in inclusion for underrepresented groups, whether through human capital, financial investment or the services they offer – and how inclusion, equity and access can ultimately help to build a stronger workforce. How can more equitable access to financial services improve our economy? How are businesses rethinking their approach? How does a social mission impact recruitment and retention? And what impact will increased access to wealth and opportunity have on our workforce?

**Introduction:**
- **Dina Powell McCormick**, Global Head, Sustainability and Inclusive Growth & Global Head, Sovereign Business, Goldman Sachs

**Moderator:**
- **Zain Asher,** Anchor, CNN International

**Speakers:**
- **Sutian Dong**, Partner, Multitudes
- **Amir Hemmat,** Co-Founder, Welcome Tech
- **Gosia Karas, PhD**, Fund Co-lead & Investment Director, SoftBank Group's SB Opportunity Fund
- **Anoushka Mehta**, Head of ESG Banking, Americas & Gender Lens Finance, HSBC

| 10:25am | **Priority Pulse– Sustainable Human Performance**<br>Nearly half of all employees have experienced at least some level of burnout, according to a survey by McKinsey. How can people, like Formula 1 drivers, sustain strong performance in fast-paced, high pressure situations while avoiding burnout and maintaining wellbeing?<br><br>**Speaker:**<br>• **Annastiina Hintsa**, CEO, Hintsa Performance |
|---|---|
| | <div align="center">**ACT II - My Community**</div> |
| 10:35am | **The Neo-Renaissance**<br>The creative economy generates nearly 50 million jobs worldwide that earn annual revenue of nearly $2 trillion annually, according to UN estimates. NFTs are now transforming the way art, music, and sporting events are experienced and sold. Globally, nations are prioritizing leisure, culture, art, music, and entertainment as enriching aspects of functional societies and sustainable happiness. As education progresses and new skills are cultivated, there is a shifting paradigm on how to measure human development and the concept of happiness. How can investing in the arts and culture improve the quality of life for people around the world?<br><br>**Moderator:**<br>• **Suzanne Kianpour,** Presenter, BBC's 'Out of the Shadows'<br><br>**Speakers:**<br>• **H.E. Irina Bokova**, Former Director General, UNESCO<br>• **Mohammed bin Dayel**, CEO, Cultural Development Fund of Saudi Arabia<br>• **Alejandro Navia**, Co-Founder & President, nft now |

| | |
|---|---|
| | **Contributor:**<br>• **Rachel Cole**, Founder & Principal, Rachel Cole Art Advisory |
| 10:55am | **Priority Pulse – Internet For Good**<br>Nearly 60 percent of Millennials have donated online to a grassroots fundraiser, according to Fidelity Charitable, while 33 percent have used the internet to research a social cause. From linking Ukrainian refugees with hosts to providing vital information during a global pandemic, how are young innovators transforming the internet into a force for positive change?<br><br>**Moderator:**<br>• **Edie Lush,** Executive Producer & Co-Host, Global GoalsCast<br><br>**Speaker:**<br>• **Avi Schiffmann**, Founder, UkraineTakeShelter.com & nCoV2019.live<br><br>**Contributor:**<br>• **Sanad Al Rashidi,** Mawhiba Gifted Alumni; Computer Science & Economics Student, Boston University |
| 11:05am | **Communities Reimagined**<br>According to the UN, 55% of the global population live in urban areas and this number is expected to reach 68 percent by 2050. Cities and communities need to adapt to a constantly evolving environmental, social, and economic landscape by designing infrastructure that can endure climate change and other socio-economic shocks. What are examples of forward-thinking cities of the future? What investments in |

| | |
|---|---|
| | advanced technology and design are enabling better outcomes? How can businesses and governments work together to make strategic investments in sustainable, resilient communities?<br><br>**Moderator**:<br>• **Dr. Judith Rodin,** President Emerita, University of Pennsylvania; Board Chair, Prodigy Finance and Resilient Cities Catalyst<br><br>**Speakers:**<br>• **Alby Bocanegra**, Vice-President of Global Cities Partnerships, Mastercard<br>• **Tony Cho**, CEO & Founder, Future of Cities<br>• **Martha Schwartz**, Founding Partner, Martha Schwartz Partners<br><br>**Contributor:**<br>• **Amani Alkhiami**, Senior Research Manager, Misk Foundation |
| 11:30am | **Priority Pulse – There's No Place Like Home**<br>During a time when housing costs are rising faster than incomes in most countries and demand for luxury properties are higher than ever before, how are the world's largest property developers and managers innovating to shelter the world?<br><br>**Moderator:**<br>• **Suzanne Kianpour**, Presenter, BBC's 'Out of the Shadows'<br><br>**Speaker:** |

|  | • **Mohamed Alabbar,** Founder, Emaar Properties<br><br>**Contributor:**<br>• **Mohammed Abdulkhaliq Alsalman**, Mawhiba Gifted Alumni & Interior Design Student, Pratt Institute |
|---|---|
| 11:40am | **Priority Pulse – Government for the People**<br>During a time of economic transformation and a shifting global order, governments and corporations are reconfiguring their responsibilities to citizens and stakeholders. Long-standing economic systems are becoming obsolete and social contracts are being rewritten to accommodate the unstoppable forces of technology and global finance. As investments into long-term sustainability collide with urgent real-life priorities, what are innovative solutions emerging to address a breakdown in social order? Are cities a solution? And will decentralization emerge as a key organizing principle — for communities, companies, and nations?<br><br>**Speaker:**<br>• **Dr. Paul Romer,**  Nobel Economic Sciences Prize Laureate |
| 11:55pm | **Priority Pulse – Vaccine Equity**<br>While nearly 3 in 4 people in wealthy countries have been vaccinated with at least one dose of the COVID-19 vaccine, fewer than 1 in 4 people have received a dose in low income countries as of September 2022, according to the UNDP. What can we do to ensure that the distribution of vaccines is equitable for the next pandemic?<br><br>**Speaker:**<br>• **Professor José Manuel Barroso**, Chair of the Board; Gavi, the Vaccine Alliance |
| 12:05pm | **Networking Lunch** |

| ACT III – My World | |
|---|---|
| 12:40pm | **Priority Pulse – Innovation for Everyone**<br>How are disruptive technologies changing the world? What are the key elements to building global prosperity and creating opportunities for people around the world to lead meaningful lives?<br><br>**Speaker:**<br>• **Michael Milken**, Chairman, Milken Institute |
| 12:50pm | **Feeding the Planet: The Challenge**<br>The war in Ukraine disrupted a global food system that was already under attack from climate change, an energy crisis, and COVID. Russia and Ukraine account for 12 percent of traded calories, according to The Economist. Yet, Ukraine has almost entirely ceased exports of grains and oilseeds. The UN estimates there are now 1.6 billion people on Earth who are food insecure. While agricultural innovations promise to feed the world, will nations be able to act together to rethink resource flows and prepare for an increasingly hot, crowded, and hungry planet?<br><br>**Moderator:**<br>• **Michael Moss**, Pulitzer-Prize Winning Investigative Journalist<br><br>**Speaker:**<br>• **Mariana Vasconcelos**, Founder & CEO, Agrosmart |

| 1:00pm | **Priority Pulse – Feeding the Planet: Solutions**<br><br>As the global agricultural and energy markets intersect and become increasingly interconnected, how can technology reduce food insecurity for the decades ahead?<br><br>**Speaker:**<br>● **Sara Menker**, Founder & CEO, Gro Intelligence |
|---|---|
| 1:10pm | **Priority Pulse – Restoring the World's Oceans**<br>Since Jacques Cousteau began exploring the world's oceans in the 20th Century, the world has lost half its marine life, which will have dramatic consequences for life on Earth. With a tipping point for the survival of the oceans likely coming within the next decade, what are the most effective measures for restoring the beauty and vital abundance of the world's oceans?<br><br>**Moderator:**<br>● **Richard Attias**, CEO, Future Investment Initiative Institute<br><br>**Speaker:**<br>● **Alexandra Cousteau**, Co-Founder & President, Oceans 2050<br><br>**Contributor:**<br>● **Daniel Kleinman,** Founder & CEO, Seaworthy Collective |
| 1:25pm | **Priority Pulse – Ecological Harmony**<br>Bioplanning is a new strategy that allows urban designers to rethink cities and reduce urban sprawl by shifting them from the traditional cartesian grid to a more adaptive, cellular planning model. How can bioplanning take off? And how can it enable urban design to become more regenerative, biophilic, |

| | and community driven?<br><br>**Speaker:**<br>● **Dror Benshetrit**, Founder, SuperNature Labs |
|---|---|
| 1:35pm | **The Beauty of Nature**<br>Ancient philosophers described the many benefits of immersion in nature. More recently, scientists and healthcare workers have recommended it as therapeutic. But the march of urbanization and the impacts of climate change make it increasingly difficult for everyday people to spend time outdoors. From educational models such as 'forest schools' to an increased focus on parks, greenspaces, rewilding, and climate action, how can employers, policymakers, designers, city planners, and engaged citizens better promote the healing power of nature?<br><br>**Moderator**:<br>● **Gonzalo Muñoz**, High-Level Climate Action Champion (2019–21), United Nations Framework Convention on Climate Change<br><br>**Speakers:**<br>● **Vanessa Keith,** Principal, Studioteka Design<br>● **Lina Osman**, Regional Head, Sustainable Finance –West, Standard Chartered<br>● **John Pagano**, Group CEO, The Red Sea Development Company<br>● **Oliver Ripley,** CEO, Habitas<br>● **Andrew Zolli**, Chief Impact Officer, Planet |

| 2:05pm | **Priority Pulse – A Web #ForEveryone** |
|---|---|
| | 37% of people across the world still do not have access to the internet. And the pandemic showed how vital connectivity is to social and economic resilience.  What actions are necessary to close the digital divide — and how can individuals capitalize on connectivity to build better lives for themselves, their families, and their communities? |
| | **Speaker:** |
| | - **Nnenna Nwakanma**, Chief Web Advocate, World Wide Web Foundation |
| 2:15pm | **A New Era of Humanitarianism** |
| | Over 272 million people will require some form of humanitarian aid or protection this year. With 62 million girls out of school globally, 100 million refugees in the world and 163 million orphans internationally, what actions must be taken to improve the reach of humanitarian aid to those in need? |
| | **Moderator:** |
| | - **Suzanne Kianpour**, Presenter,  BBC's 'Out of the Shadows' |
| | **Speakers:** |
| | - **Dayle Haddon,** Founder & CEO, WomenOne |
| | - **Jeanne Celestine Lakin**, Founder, One Million Orphans |
| | - **Rana Novack,** Writer, Refugee Advocate, Solution Owner of Refugee & Migration Predictive Analytics Solutions |

| 2:35pm | **Priority Pulse – Megathreats Masterclass with Dr. Doom**<br>There are ten large-scale threats that imperil the future of the world in the next two decades. Here is how to prevent them.<br><br>**Speaker:**<br>● **Dr. Nouriel Roubini**, CEO, Roubini Macro Associates, LLC |
|---|---|
| 2:45pm | **Will the Next Generation Save the World?**<br>According to a new survey from Deloitte, younger generations are "deeply concerned about the state of the world, and actively trying to balance the challenges of their everyday lives with their desire to drive societal change." Cost of living, followed closely by climate change, tops the list of worries for young people. From policies that promote more equitable societies to creating opportunities for the next generation of climate-impact entrepreneurs, what do young leaders want from previous generations? What specific solutions are they promoting? Will their voices be heard in time to save the planet?<br><br>**Special Address:**<br>● **H.E. Shamma bint Suhail Faris Al Mazrui**, Minister of State for Youth Affairs, UAE's Ministry of Culture & Youth; Vice Chairman, the Arab Youth Center<br><br>**Moderators:**<br>● **Miguel A. Rozo**; Co-Chair, Davos Lab (WEF Youth Recovery Plan); Founder, IdeasXChange; International Affairs Advisor<br><br>**Speakers:**<br>● **Nisreen Elsaim**, Chair of the UN Secretary General's Youth Advisory Group on Climate Change |

| | |
|---|---|
| | • **Daniel Kleinman,** Founder & CEO, Seaworthy Collective<br>• **Guillaume Lacroix**, CEO, Brut. |
| 3:15pm | **How to Be Happy in the Metaverse**<br>As the digital and physical worlds continue to converge, designers are considering how to apply the lessons from life in the physical world to life in virtual worlds. Do the same rules — of economy, society, and culture — still apply? Or will life in the metaverse spark new frameworks for commerce, education, wellness, security, relationships, and community?<br><br>**Moderator**:<br>• **Edie Lush,** Executive Producer & Co-Host, Global GoalsCast<br><br>**Speakers:**<br>• **Sam Englebardt**, Co-founder and Partner, Galaxy Digital<br>• **Peggy Johnson**, CEO, Magic Leap |
| 3:30pm | **Life in Space**<br>The Global space economy was worth $469 billion in 2021, according to the Space Foundation's Space Report. Since 2020, the commercial space industry has had 6.4% in revenue growth, and 1,022 space crafts have launched into orbit during the first half of 2022. As people start traveling beyond Earth's atmosphere more frequently and humans begin to venture further into space, the physical needs of space travelers will need to be addressed.  What steps can we take today to help the humans of tomorrow to adapt to life in space — and potentially on other planets — in terms of cultivating food sources, maintaining health in a gravity-free environment and enabling equitable accessibility for all people? |

|  | |
|---|---|
|  | **Moderator**:<br>● **Edie Lush,** Executive Producer & Co-Host, Global GoalsCast<br><br>**Speakers:**<br>● **Barbara Belvisi**, Founder & CEO, Interstellar Lab<br>● **Hélène Huby**, Co-Founder & CEO, The Exploration Company<br>● **Jane Poynter**, Founder & CEO, Space Perspective |
| 3:50pm | **Achieving New Priorities**<br>A recent global survey of people in 28 countries showed that citizens ranked hunger, poverty, and health as their top concerns — exposing a myriad of challenges facing people around the world today. As the United Nations General Assembly convenes in New York, what emerged as the top issues for world leaders? What issues were of top concern for the developed world vs the developing world? How did leaders address food and water security, immigration, housing, energy, climate change, and geopolitical conflict? What are the highest priorities for the Kingdom of Saudi Arabia — and how is the Kingdom achieving these goals?<br><br>**Special Address:**<br>● **Li Junhua**, Under-Secretary-General for Economic and Social Affairs, United Nations<br><br>**Moderator:**<br>● **Richard Attias**, CEO, Future Investment Initiative Institute<br><br>**Speaker:** |

| | |
|---|---|
| | **H.H. Prince Faisal Bin Farhan Al Saud**, Minister of Foreign Affairs, Saudi Arabia |
| 4:10pm | **Investing in Highest Priorities – Part I**<br><br>**Moderator:**<br>• **Suzanne Kianpour**, Presenter, BBC's 'Out of the Shadows'<br><br>**Speaker:**<br>• **H.E. Khalid Al-Falih**, Minister of Investment, Saudi Arabia |
| 4:20pm | **Investing in Highest Priorities – Part II**<br>Investors have a vital role to play in providing the resources and capacity necessary to advance the highest priorities for humanity. How have the transformations of the past two years re-prioritized the way investors see the world? What global challenges are investors most focused on solving today? And what new technologies and industries will investors prioritize over the next decade? From climate change and food security to immigration, urbanization, culture, technology and the future of work, what are the biggest challenges ahead and how are leading investors creating a better tomorrow for everyone?<br><br>**Moderator:**<br>• **Suzanne Kianpour**, Presenter, BBC's 'Out of the Shadows'<br><br>**Speakers:**<br>• **Chinelo Anohu,** Head & Senior Director, Africa Investment Forum<br>• **Marcelo Claure**, Chairman & CEO, Claure Capital<br>• **Nelson Peltz**, Founder, Trian Fund Management |
| 4:40pm | **Technology For Human Priorities** |

|  | At the forefront of the internet's third wave, how can investors create new technologies that solve the problems of the past and make a more positive impact on humanity?<br><br>**Moderator:**<br>- **Courtney Powell,** Chief Operating Officer and Managing Partner, 500 Global<br><br>**Speakers:**<br>- **Sam Bankman-Fried**, Co-Founder & CEO, FTX<br>- **Alfred Chuang,** General Partner, Race Capital |
| 4:55pm | **FII Institute PRIORITY Manifesto and Closing Remarks**<br>**Speaker:**<br>- **Richard Attias**, CEO, Future Investment Initiative Institute |

# EXHIBIT 2

U.S. Chamber on Twitter: "On Fr...

Tweet

U.S. Chamber
@USChamber

On Friday, we were honored to host the Governor of @PIF_en, H.E. Yasir Al-Rumayyan, for a CEO roundtable led by our President & CEO @SuzanneUSCC, which covered PIF's role in creating Saudi Arabia's economic transformation and in creating opportunities for U.S. businesses and partners.

6:07 AM · Sep 18, 2022 · Twitter Web App

48 Retweets   19 Quote Tweets   102 Likes

New to Twitter?

Sign up now to get your own personalized timeline!

Sign up with Google

Sign up with Apple

Sign up with phone or email

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Relevant people

U.S. Chamber
@USChamber
The world's largest business organization. We advocate, connect, inform, and fight for business growth and America's success.

Public Investment ...
@PIF_en
The official English account of the Public Investment Fund #PIF Follow us for updates on our projects and investments. العربية@PIFSaudi

Suzanne Clark
@SuzanneUSCC
President and CEO @USChamber, relentless believer in the power of business to change lives, former CEO & mom to aspiring entrepreneur teen daughter.

Don't miss what's happening
People on Twitter are the first to know.

# EXHIBIT



🔍 ⋮

# 2022 ABANA Achievement Award Dinner



## When

November 28, 2022
6:00pm - 9:00pm

## Where

*The Plaza*
768 Fifth Avenue
New York NY

Register

| Event Information | Sponsorships | Agenda |
|---|---|---|

**H.E. Yasir O. Al-Rumayyan**, Governor of the Public Investment Fund and Chairman of Saudi Aramco, is the 2022 recipient of the ABANA Achievement Award. The November 28th event will be held at **The Plaza, New York City**. Introductory remarks will be delivered by **Ray Dalio**, Founder and CIO Mentor, Bridgewater Associates.

The award recognizes an individual who exemplifies outstanding leadership in banking and finance, and who has displayed a proven commitment to positive professional cooperation between the US and the Middle East and North Africa. The ABANA Achievement Award Dinner has long been the premier U.S. event for the Arab and international finance industry. Held in New York City, the event brings together over 400 guests to celebrate an exemplary business leader. Past recipients of ABANA's Achievement Award include: Stephen A. Schwarzman, Farouk A. Bastaki, David M. Rubenstein, Laurence Fink, Hutham S. Olayan, Mohammed Ali Alabbar, Bader Al Sa'ad, Muhammed Al-Jasser, Mohammed El-Erian, Faisal Al-Ayyar, Lubna Olayan, Richard Debs and Abdul Majeed Shoman.

*You may register for member and non-member tickets below. Members must be logged-in. For tables, or to become a partner or sponsor of this year's ABANA Achievement Award Dinner, please contact ABANA Communications Director Albert Doumar at* adoumar@abana.co.

## Thank you to our sponsors:

*(In Formation)*
































## Registration

| TICKET TYPE | PRICE | SPACES |
| --- | --- | --- |
| Sustaining Member<br>(Sustaining Members may also register up to two guests at the member rate) | $0.00 | **N/A** |
| ABANA Member | $500.00 | **N/A** |

| Institutional Member | | $500.00 | **N/A** |
|---|---|---|---|
| Non-member (May be eligible for a one-year complimentary Individual membership) | | $750.00 | 0 ⌄ |

**First Name ***

**Last Name ***

**Company ***

**Job Title ***

**Email ***

**Telephone ***

**Registration Code**

☐ I consent to my submitted data being collected and stored as outlined by the site .

Please review your details. Clicking the RSVP button will book your reservations.

**Cardholder Name ***

**Credit Card Number***

**Expiry Date***   01 ⌄   /   2022 ⌄

**CCV***

Log in if you already have an account with us.

Username

Password

[Log In]   Remember ☐ Me

**Lost your password?**

**Billing Address**

Address Line
1 *

Address Line
2

City *

State/Province

Zip/Postal
Code

RSVP →

# Speakers



### H.E. Yasir O. Al-Rumayyan

Governor of the Public Investment Fund and Chairman of Saudi Aramco



**Ray Dalio**

Founder and CIO Mentor, Bridgewater Associates





© 2022 ABANA. All Rights Reserved. Privacy Policy