1   RACHEL S. BRASS, SBN 219301
       rbrass@gibsondunn.com
2   LAUREN D. DANSEY, SBN 311886
       ldansey@gibsondunn.com
3   GIBSON, DUNN & CRUTCHER LLP
    555 Mission Street, Suite 3000
4   San Francisco, California 94105-0921
    Telephone: 415.393.8200
5   Facsimile:  415.393.8306

6   ROBERT C. WALTERS, *pro hac vice*
       rwalters@gibsondunn.com
7   SCOTT K. HVIDT, *pro hac vice*
       shvidt@gibsondunn.com
8   GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
9   Dallas, Texas 75201-2911
    Telephone: 214.698.3100
10
    JOSHUA LIPTON, *pro hac vice*
11     jlipton@gibsondunn.com
    KRISTEN C. LIMARZI, *pro hac vice*
12     klimarzi@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
13  1050 Connecticut Avenue, N.W.
    Washington, DC  20036-5306
14  Telephone: 202.955.8500

15  *Attorneys for Plaintiffs Matt Jones, Bryson
       DeChambeau, Peter Uihlein, and LIV Golf Inc.*

JOHN B. QUINN, SBN 90378
   johnquinn@quinnemanuel.com
DOMINIC SURPRENANT, SBN 165861
   dominicsurprenant@quinnemanuel.com
KEVIN TERUYA, SBN 235916
   kevinteruya@quinnemanuel.com
QUINN EMANUEL URQUHART &
   SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
   bobfeldman@quinnemanuel.com
QUINN EMANUEL URQUHART &
   SULLIVAN LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone:  650.801.5000

16
                IN THE UNITED STATES DISTRICT COURT
17           FOR THE NORTHERN DISTRICT OF CALIFORNIA
                         SAN JOSE DIVISION
18

19  MATT JONES, BRYSON DECHAMBEAU,          CASE NO. 5:22-cv-04486-BLF
    PETER UIHLEIN, and LIV GOLF INC.,
20                                          **REQUEST FOR INTERNATIONAL
                 Plaintiffs,                JUDICIAL ASSISTANCE (LETTER
21                                          ROGATORY) KEITH PELLEY**
           v.
22                                          Judge:    Hon. Susan van Keulen
    PGA TOUR, INC.,
23
                 Defendant and Counter-
24               Plaintiff,

25         v.

26  LIV GOLF INC.,

27               Counter-Defendant.

28

The United States District Court for the Northern District of California, the Honorable Susan van Keulen, Magistrate Judge, presents its compliments to the Appropriate Judicial Authority of the United Kingdom, and requests international judicial assistance to obtain evidence to be used at trial in a civil lawsuit before this Court in the above captioned matter.

## CLAIMANT INFORMATION

The parties seeking this judicial assistance are:

> LIV Golf Inc.
> C/O Rachel S. Brass
> Gibson, Dunn & Crutcher LLP
> 555 Mission Street, Suite 3000
> San Francisco, California 94105-0921

## FACTUAL ALLEGATIONS

Plaintiffs filed a civil lawsuit against Defendant PGA Tour Inc. in August 2022 asserting claims for (1) Unlawful Monopsonization of the market for ELITE GOLF EVENT SERVICES in Violation of Sherman Act § 2 (15 U.S.C. § 2); (2) Unlawful Monopolization of the market for the PROMOTION OF ELITE PROFESSIONAL GOLF EVENTS in Violation of Sherman Act § 2 (15 U.S.C. § 2); (3) Unlawful Attempted Monopolization in Violation of Sherman Act § 2 (15 U.S.C. § 2); (4) Unlawful Restraint of Trade in Violation of Sherman Act § 1 (15 U.S.C. § 1); (5) Unlawful Agreement to Restrain Trade in Violation of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720(a), 16726); (6) Breach of Contract; (7) Tortious Interference with LIV Golf's Contractual Relationships; and (8) Tortious Interference with LIV Golf's Prospective Business Relationships.  The factual allegations supporting each claim may be found in the Amended Complaint, attached to this document as **Attachment A**.

## THE WITNESS

Keith Pelley, CEO of the European Tour, is at the center of the PGA Tour's anticompetitive scheme to boycott LIV Golf and any who would associate with LIV Golf.  Mr. Pelley has gone so far as to publicly admit that the European Tour agreed not to compete with the PGA Tour for players as of November 2020, *id.* ¶ 35, and the European Tour and PGA Tour have divided the world to not compete with each other.  The European tour, a potential horizontal competitor to the Tour, has entered agreements with the PGA Tour to restrict competition.  Rather than compete with the PGA Tour, the

European Tour has accepted its role as a mere stepping stone on golfers' road to the PGA Tour. **Attachment A**, ¶¶ 33–34. In furtherance of the PGA Tour's monopoly power, the European Tour and PGA Tour entered into an agreement prohibiting the European Tour from partnering with any new entrants. *Id.* ¶¶ 93–100. Mr. Pelley called LIV Golf a "rebel enterprise" and threatened LIV Golf's prospective partners with exclusion from the world golf "ecosystem." *Id.* ¶¶ 135–137. In one instance, the European Tour met with LIV Golf, and despite admitting that the LIV Golf series had "appeal and fit," nonetheless turned down a partnership that would have benefited the European Tour because of the "mighty power" of the PGA Tour. *Id.* ¶ 138. The PGA Tour has used the European Tour, under Mr. Pelley's direction and leadership, as a weapon in its toolkit to harm competition in the relevant markets. In short, Mr. Pelley's testimony is critical to Plaintiffs' claims.

The structure of the European Tour's governing board makes it particularly susceptible to pressure from the PGA Tour. Indeed, the PGA Tour's Commissioner, Jay Monahan, sits on the board of the European Tour, *id.* ¶ 45, a seat he secured as part of the PGA Tour's deal with the European Tour to exclude any new entrants in exchange for financial incentives. *Id.* ¶ 98. Thus, discovery from Mr. Pelley regarding the PGA Tour's involvement with and/or control over the European Tour, and Mr. Pelley's specific role in facilitating that involvement and/or control, is highly relevant to this lawsuit.

Mr. Pelley's public statements and close relationship with the PGA Tour suggest frequent backchannel communications. Plaintiffs are entitled to examine Mr. Pelley to explore what those communications entailed. And although documentary discovery is helpful, it is not, by itself, sufficient to discover the extent of Mr. Pelley's participation in the PGA Tour's scheme.

It is necessary for the purposes of justice and for the due determination of the matters in dispute between the parties that you cause the following witness, who upon information and belief resides within your jurisdiction, to be examined. The name and address of the witness is, upon information and belief, as follows:

> Keith Pelley
> C/O PGA European Tour
> European Trade Building, Wentworth Drive,
> Virginia Water, Surrey, GU25 4LX
> United Kingdom

1

2 <center>**EVIDENCE**</center>

3      The deposition topics on which Mr. Pelley is to be examined are listed in **Attachment B**.  The Court's protective order in this case is listed as **Attachment C**.

4 <center>**OFFER OF RECIPROCAL ASSISTANCE**</center>

5      The United States District Court for the Northern District of California is willing to provide

6 similar assistance to the Judicial Authorities of the United Kingdom.  *See* 28 U.S.C. § 1782.

7 <center>**REIMBURSEMENT FOR COSTS**</center>

8      Should there be any costs associated with the service herein, including the required fees and

9 costs incurred in executing this letter of request, in serving process to compel the appearance of the

10 witness and his attendance, and in preparing a transcript of the proceedings, pursuant to Article 26 of

11 the Hague Convention, it will be the responsibility of the attorneys for Plaintiffs to reimburse the

12 Appropriate Judicial Authority of the United Kingdom concerning the same.  Please direct any

13 correspondence or communications concerning costs to the following:

14        Rachel S. Brass
         Gibson, Dunn & Crutcher LLP
15        555 Mission Street, Suite 3000
         San Francisco, California 94105-0921
16        Tel: +1 (415) 393-8200
         Email: rbrass@gibsondunn.com
17

18 <center>**REQUEST**</center>

19      The Court requests the assistance described herein as necessary in the interest of justice.  The

20 assistance requested is that the Appropriate Judicial Authority of the United Kingdom compel the

21 deposition of the following person:

22        Keith Pelley
         C/O PGA European Tour
23        European Trade Building, Wentworth Drive,
         Virginia Water, Surrey, GU25 4LX
24        United Kingdom

25      The Court requests that Mr. Pelley appear and testify on the deposition topics set out in

26 **Attachment B** of this Request.  The Court understands the potentially confidential nature of the

27 testimony requested from Mr. Pelley.  As such, **Attachment C** is the protective order in this case to

28 protect the confidentiality of Mr. Pelley's production and testimony.

In connection with his examination, Mr. Pelley will submit to an oath pursuant to California Code of Civil Procedure § 2094 and/or English law, to be administered by an authorized individual at the examination.  Mr. Pelley may claim privilege or duty to refuse to give the evidence under California Evidence Code §§ 900–1070, pursuant to Article 11 of the Hague Convention.

I confirm that it is proposed that the examination of Mr. Pelley take place at the offices of Gibson Dunn & Crutcher LLP at Telephone House, 2-4 Temple Avenue, Temple, London EC4Y 0HB, United Kingdom in February 2023 or otherwise at the earliest available date.

This request shall be sent directly from this tribunal in the United States to the foreign or international tribunal, officer, or agency to whom it is addressed.  28 U.S.C.A. § 1781(b)(2). Counsel for Plaintiffs is directed to timely deliver this request to that foreign or international tribunal, officer, or agency to whom it is addressed.

Finally, I request that you cause the evidence of the said witness to be reduced into writing and all documents produced on such examinations to be duly marked for identification, and that you authenticate such examinations by the seal of your court or in such way as is in accordance with your procedure.

DATED: _____, 2022

_____

Magistrate Judge Susan van Keulen
United States District Court
Northern District of California
280 South 1st Street, Courtroom 6
San Jose, California 95113

_____

(Seal of Court)

REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
(LETTER ROGATORY) KEITH PELLEY
CASE NO. 5:22-CV-04486-BLF

Gibson, Dunn &
Crutcher LLP

# ATTACHMENT A

RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

ROBERT C. WALTERS, *pro hac vice*
  rwalters@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Telephone: 214.698.3100

JOHN B. QUINN, SBN 90378
  johnquinn@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
  bobfeldman@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone:  650.801.5000
Facsimile:  650.801.5100

*Attorneys for Plaintiffs Talor Gooch, Hudson
  Swafford, Matt Jones, Bryson DeChambeau, Ian
  Poulter, Peter Uihlein, and LIV Golf Inc.*

WILLIAM V. ROPPOLO, *pro hac vice*
  william.roppolo@bakermckenzie.com
BAKER McKENZIE LLP
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131 USA
Telephone:  305.789.8900

*Attorneys for Phil Mickelson*

*(additional counsel on signature page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| PHIL MICKELSON, TALOR GOOCH, HUDSON SWAFFORD, MATT JONES, BRYSON DECHAMBEAU, IAN POULTER, PETER UIHLEIN, and LIV GOLF INC.<br><br>Plaintiffs,<br><br>v.<br><br>PGA TOUR, INC.,<br><br>Defendant. | CASE  NO. 5:22-cv-04486-BLF<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

With knowledge as to their own conduct and on information and belief as to all other matters, Plaintiffs Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, Peter Uihlein, and LIV Golf Inc. ("LIV Golf") (collectively, "Plaintiffs") allege:

## INTRODUCTION

1.      The PGA Tour, Inc. (sometimes "the Tour") began when Jack Nicklaus, Arnold Palmer, and other elite golfers in the 1960s determined the PGA of America was not compensating them their market value; they split off the Players Tournament Division and formed the Tour, a tax-exempt entity organized ostensibly to "promote the common interests of professional tournament golfers." From that seemingly laudable origin, the Tour has evolved into an entrenched monopolist with a vice-grip on professional golf. As the Tour's monopoly power has grown, it has employed its dominance to craft an arsenal of anticompetitive restraints to protect its long-standing monopoly. Now, threatened by the entry of LIV Golf, and opposed to its founding mission, the Tour has ventured to harm the careers and livelihoods of any golfers, including Plaintiffs Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, and Peter Uihlein ("Player Plaintiffs"), who have the temerity to defy the Tour and play in tournaments sponsored by the new entrant. The Tour has done so to crush nascent competition before it threatens the Tour's monopoly.

2.      Before LIV Golf's entry, golfers who sold their services in the elite professional golf services market had no meaningful option but to play on the Tour if they wanted to pursue their profession at the highest levels. This provided the Tour with enormous power over the players, including the ability to force players into restrictive terms that foreclose them from playing in competing events and the ability to suppress player compensation below competitive levels. Members of the Tour receive a lower percentage of the Tour's revenues than professional athletes in other major sports, even though the Tour is a tax-exempt non-profit corporation and other major sports leagues are for-profit enterprises. This control has also given the Tour the power to impose restrictions on players—who are independent contractors but are denied independence by the Tour—that make it risky and costly for players to affiliate with another promoter and prohibitively difficult for any would-be entrant to challenge the Tour's monopoly. And, in its response to LIV Golf's competitive challenge, the Tour has exercised this power by punishing the players to choke off the supply of elite professional

golfers—an essential input to LIV Golf's competitive challenge—and cement its dominance over the sport. The Tour's monopoly power has also allowed it to weaken golf itself, by its failure to innovate and broaden the game's appeal and bring the game into the 21st century.

3. As part of its orchestrated plan to defeat competition, the Tour has threatened lifetime bans on players who play in even a single LIV Golf event. It has backed up these threats by imposing unprecedented suspensions on players (including the Player Plaintiffs) that threaten irreparable harm to the players and their ability to pursue their profession. It has threatened sponsors, vendors, broadcasters, and agents to coerce players to abandon opportunities to play in LIV Golf events. And it has orchestrated a group boycott with the European Tour,[1] which is unlawful under either the *per se* rule or the Rule of Reason, to amplify the Tour's anticompetitive attacks and foreclose LIV Golf from having access to players. The PGA Tour also has leaned on other entities in the so-called golf "ecosystem," including certain entities that put on golf's "Majors," to do its bidding in its effort to maximize the threats and harm to any golfer who defies the Tour's monopsonistic requirements and plays in LIV Golf events.

4. The Tour's unlawful strategy has been both harmful to the players and harmful to LIV Golf in threatening its otherwise-promising launch. For example, the Tour's conduct caused LIV Golf to cancel its 2022 business plan to launch its full competing League. LIV Golf was not deterred, however, and it changed its 2022 strategy and launched a smaller version of its concept—the LIV Golf Invitational Series—with no League, no franchises, no broadcast deal, fewer elite players, and fewer tournaments. Some players (including Player Plaintiffs) were interested nonetheless. So, in response, the Tour ratcheted up its strategy and doubled-down on its efforts to punish Plaintiffs and to protect its monopoly. The Tour (1) enforced its unlawful player restrictions that deny players (including Player Plaintiffs) the ability to sell their services to others, (2) imposed lengthy suspensions on players for exercising their right as independent contractors to play in a competing promoter's events, and (3)

---

[1] The European Tour recently changed its name to DP World Tour, but, because it was called European Tour for most of the time period relevant to this case and in most of the relevant documents, it is referred to herein as the European Tour for consistency and clarity.

ramped up its threats targeting Player Plaintiffs and others. The Tour has likewise threatened and blacklisted numerous other third parties with whom LIV Golf has sought to contract, in its effort to defeat LIV Golf's entry and entrench its monopoly.

5.       The Tour's conduct serves no purpose other than to cause harm to players and LIV Golf, and foreclose the entry of the most meaningful competitive threat the Tour has ever faced. Banning Player Plaintiffs and other top professional golfers from its own events degrades the Tour's strength of field and diminishes the quality of the product that it offers to golf fans by depriving them from seeing many top golfers participate in Tour events. The only conceivable benefit to the Tour from degrading its own product in this manner is the destruction of competition. Indeed, the Tour has conceded its anticompetitive purpose in attacking and injuring the players. When the Tour adjusted its rules to render them more effective in defeating competitive entry, a memorandum authored by PGA Tour Commissioner Jay Monahan made clear that the rule change was expressly designed to enable the Tour to foreclose competition. And when the Tour imposed unprecedented punishments on the players for playing in LIV Golf events, the Tour explained to the players that it was doing so precisely because LIV Golf is attempting to compete with the Tour.

6.       Player Plaintiffs have devoted the bulk of their professional careers to growing the PGA Tour. Yet the Tour has repaid them of late with suspensions, punishments, threats, and disparagement for merely playing professional golf for another promoter and embracing competition for their services. The Tour has denied them income-earning opportunities, attacked their goodwill and reputation, interfered with their businesses, attacked their business partners, threatened them with multiple punishments—including threats to deny them from participating in golf's marquee events, even when they have earned placement or exemptions to participate in those tournaments—and unlawfully prevented them from exercising their independent contractor rights. And, at every step, the Tour has repeatedly admitted that it has done this to destroy nascent competition.

7.       The Tour long stood alone as the only tour anywhere in the world that features the best golfers in the world. The PGA Tour Commissioner Jay Monahan boasted on June 22, 2022 that the "Tour is doing everything it possibly can . . . [to] mak[e] certain that the best players in the world are competing on the best Tour in the world, the PGA Tour." The Tour has ensured that remains the case

through its anticompetitive PGA Tour Player Regulations. First, the Tour's Conflicting Events Regulation prohibits its members from participating "in any other golf tournament or event" in North America, without exception, if a Tour-sanctioned event is scheduled in the same week, regardless of whether the players would otherwise have any plans to participate in the Tour's sanctioned event. The Tour has a sanctioned event almost every week of the year, hence the Conflicting Event Regulation effectively prohibits Tour members from playing in any non-Tour golf event in North America. The effect is both a naked restraint on competition and a reduction in output, as Tour members are foreclosed from playing anywhere else when they are not playing in Tour events. For international tours or events, a player may request up to three exemptions a year, but the Tour Commissioner has complete discretion whether to grant these exemptions, something he has refused to do for each of the LIV Golf events. The Conflicting Events Regulation thus invests the leader of the incumbent monopolist with unbridled discretion to foreclose players from participating in any competing events. And while the Tour has historically granted releases to players that allow them to compete in other events throughout the world, Tour Commissioner Monahan has taken a different stance regarding LIV Golf, denying event releases even for LIV Golf events overseas. As Commissioner Monahan admitted, he has departed from past practice in prohibiting members from participating in LIV Golf events outside North America *because* LIV Golf plans to compete with the Tour. And he has enforced the Conflicting Events Regulation to deny players permission to participate in LIV Golf events in North America *because* LIV Golf's North American events compete with the Tour.

8. Second, the Tour uses its Media Rights Regulation as an additional means of foreclosing players from participating in competing events. This regulation prohibits any members from appearing in any "golf program" ("any golf contest, exhibition or play") that takes place "*anywhere in the world*" and is shown on any media of any type. It is fundamental for any organizer of elite-level professional golf tournaments to broadcast the tournament on television and other media, yet the Tour contends no PGA Tour members may participate in any such televised non-Tour golf event anywhere in the world. This broad prohibition is no accident, as the PGA Tour specifically broadened this provision to prevent competitive entry of leagues such as LIV Golf. The provision serves no procompetitive purpose nor benefits consumers, but rather restricts output and forecloses competition, as it prevents all Tour

members from playing golf, even casually, if it is recorded for distribution over any media anywhere in the world during weeks when they are not participating in PGA Tour events.

9. In short, these regulations—the Media Rights Regulation and the Conflicting Event Regulation—foreclose the players, who are independent contractors, from participating in any golf event that the PGA Tour deems to be a competitive threat. These provisions limit output by keeping golfers on the sidelines when not playing on the Tour. And these provisions, in turn, foreclose competition and entrench the PGA Tour's monopoly power. If these provisions are not enjoined, they will foreclose LIV Golf's nascent entry into the markets and prevent LIV Golf from fulfilling its competitive promise, thus harming LIV Golf, the Player Plaintiffs, golf fans, the game of golf, and competition itself.

10. It is no secret that the PGA Tour is targeting players in order to defeat the threat of competitive entry. The PGA Tour has been clear since the threat of competitive entry emerged that its most powerful weapon to defeat competition is to target its members—who comprise virtually all of the elite professional golfers in the world—to prevent them from playing on a competing tour. For example, PGA Tour Commissioner Monahan wrote in a January 2020 strategy memorandum that the best way to prevent a competitor from emerging is to prevent PGA Tour members (including Player Plaintiffs) from supporting the new promoter:

> The impact that [the new league] could have on the PGA TOUR is dependent on the level of support it may receive from these players. Without this support, [the new league's] ability to attract media and corporate partners will be significantly marginalized and its impact on the TOUR diminished.

A nascent golf league without the golfers necessary to put on elite events is no threat at all. Deprive the new league of access to virtually all of the top golfers in the world, and it will pose no challenge to the Tour's dominance.

11. Accordingly, the Tour set out to destroy competition in its infancy by doing everything in its power to lock up its members (including Player Plaintiffs) and deny them the opportunity for sustained competition for their services. The Tour's conduct has included at least seven practices, each of which is exclusionary, anticompetitive and unlawful under the Sherman Act:

a. The Tour has repeatedly threatened its members (including Player Plaintiffs) with

devasting consequences if they join LIV Golf. On multiple occasions, the Tour threatened a *lifetime ban* for any player who joins or participates in LIV Golf. Then, in June and July 2022, the Tour imposed a *career-threatening ban* on Player Plaintiffs (and others) for playing in LIV Golf events. For other golfers who resigned their Tour membership because they did not want to be subject to the Tour's punishments, the Tour responded by actually imposing a *lifetime ban*.

b. The Tour amended and expanded its Media Rights and Conflicting Events Regulations in response to the threat of competitive entry. And it then enforced these unlawful provisions to foreclose members from participating in LIV Golf events.

c. The Tour orchestrated a group boycott with the European Tour to ensure that any golfer who considers defying the Tour's threats by playing in any LIV Golf events (including Player Plaintiffs) cannot pursue his career and livelihood anywhere in the global golf "ecosystem." The Tour's agreement is established through the statements of its partners. For example, during a meeting in Malta in July 2021, representatives of the entity that sponsored LIV Golf met with the CEO and other representatives of the European Tour to seek a partnership with the European Tour in launching the new league. The minutes from that meeting prepared by the European Tour's title sponsor state that the CEO of the European Tour, Mr. Keith Pelley, "Confirmed new series appeal and fit, however, stated main issue is US PGA mighty power and need to avoid a collision course between ET [European Tour] and PGA." Under pressure from the "mighty power" of the PGA Tour, the European Tour agreed to boycott and rejected the opportunity to partner with the new entrant, and instead strengthened its strategic alliance with the PGA Tour. As part of this illegal partnership, the PGA Tour pressured the European Tour to amend its Regulations to restrict European Tour golfers from playing in LIV Golf events, and it pressured the European Tour to punish its members who played in LIV Golf events with ~$125,000 fines and suspension from any tournaments the PGA Tour and the

1  European Tour co-sanction. The European Tour agreed to all of the PGA Tour's

2  demands to implement the group boycott.

3      d.    Similarly, the PGA Tour has encouraged the PGA of America (a separate entity) to

4  threaten to disallow LIV Golf players from playing both in the Major tournament it

5  sponsors (the PGA Championship) and the Ryder Cup, one of golf's marquee

6  events. And it has leaned on other golfing entities to do its bidding. The Tour leaned

7  on Augusta National to pressure golfers against joining LIV Golf. The Tour has

8  also leaned on the Royal & Ancient ("R&A") (sponsor of The Open) to publicly

9  question whether LIV Golf players could play in their respective tournaments. And

10  the Tour has leaned on the Official World Golf Ranking ("OWGR") to call into

11  question whether LIV Golf tournaments would be eligible for OWGR ranking

12  points. This conduct serves no beneficial purpose, but rather serves to harm the

13  careers of the players (including Player Plaintiffs) who play in LIV Golf events, and

14  to deter other players from joining LIV Golf to avoid career destruction at the hands

15  of the Tour.

16      e.    At various points, the Tour has threatened Tour members' agents and business

17  partners with punishment if the players joined LIV Golf. In addition, the Tour has

18  threatened numerous vendors and small companies in the golf and sports production

19  industry that they will be blacklisted from working with the Tour if they work with

20  LIV Golf.

21      f.    The Tour has threatened non-member golfers with exclusion from the golf

22  "ecosystem" if they participate in any LIV Golf events. For example, the Tour

23  threatened college golfers (who are not PGA Tour members and have no obligation

24  to conform to the Tour's rules for its members) that if they played in any LIV Golf

25  events they would be banned from entry into the PGA Tour University program,

26  which provides top college golfers entry into the Tour's developmental tour (Korn

27  Ferry Tour).

28      g.    The Tour has also threatened sponsors and broadcasters that they must sever their

relationships with players who join LIV Golf, or be cut off from having any opportunities with the PGA Tour. Based on these threats, several sponsors have cut ties with players who have joined LIV Golf (including the Player Plaintiffs), sometimes ending years-long relationships. The Tour has also intimidated sponsors and vendors into not doing business with LIV Golf, lest they lose the opportunity to do business with the dominant golf tour in North America, the PGA Tour.

12.     These restraints have damaged competition and harmed Plaintiffs. They have harmed Player Plaintiffs by, for example, (1) diminishing competition for their services and reinforcing the Tour's monopsony power in the markets in which the Plaintiffs sell those services; (2) denying them income-earning opportunities, tournament performance opportunities (including denying them opportunities to participate in tournaments in which they have qualified), sponsorship revenue, and independent contractor rights; and (3) harming their reputations, goodwill, and brands. These restraints have likewise proved effective at harming competition in the relevant markets by preventing other players from joining LIV Golf who would have joined the new league but for these competitive restraints, thus threatening the competitive viability of LIV Golf and any other potential competitor by protecting the PGA Tour's monopoly power and monopsony power over the purchase of services from professional golfers to participate in elite golf events. The Tour's restraints have harmed LIV Golf by, for example, (i) raising to supracompetitive levels its costs to recruit players who are subject to the Tour's threats; (ii) completely preventing LIV Golf from securing the services of many players who have been subjected to the Tour's threats of severe punishments should they participate in LIV Golf events; (iii) forcing LIV Golf to scrap its launch plans for 2022, and instead launch a smaller-scale series; and (iv) preventing LIV Golf from entering into agreements with third parties and raising to supracompetitive levels its costs for contracting with those third parties who are willing to defy the Tour's threats, thus raising LIV Golf's costs and degrading its product offerings. The impacts of the Tour's continuing restraints threaten LIV Golf's competitive viability and existence.

13.     Without fair process, PGA Tour Commissioner Monahan—who is necessarily partial— imposed a 21-month Tour suspension on some Player Plaintiffs, through March 31, 2024 (other Player Plaintiffs' suspensions are indefinite or 9 months as of this Complaint), for exercising their independent

contractor rights to play in the first two LIV Golf events. After imposing these suspensions, the Tour followed its procedurally and substantively unconscionable appeals process to maintain the suspension without giving Player Plaintiffs fair proceedings to be heard by neutral and independent decision-makers. Plaintiffs Gooch, Swafford and Jones (among other Player Plaintiffs) had earned the right to play in the FedEx Cup Playoffs (a series of lucrative and high-profile events scheduled at the end of the PGA Tour's 2022 season) through strong performance and dedication to the Tour, but the Tour banned them from playing in those tournaments, diminishing the strength of its own fields and harming these Plaintiffs. The injury to these players extended beyond mere foreclosure from these tournaments (itself a substantial and irreparable injury), but also crippled their chances of qualifying for both the Majors and the Tour's premier invitationals in future seasons. The punishment that accrued to these players from not being able to play in the FedEx Cup Playoffs is substantial, and involves both monetary injury (as the Tour has maintained) as well as irreparable injuries.

14.    The Tour has argued that the Player Plaintiffs have already been fully compensated by LIV Golf for all suspensions the Tour might impose and all of the consequential harms that may flow from those suspensions (including exclusions from the Majors and other important professional golf tournaments and lost sponsorship opportunities). That is simply not true. While the supracompetitive payments LIV Golf was required to make in order to attract players in the face of the Tour's anticompetitive threats were in many cases above the compensation levels that would have been required in the absence of the Tour's anticompetitive conduct, it is also true that (a) many of the injuries the players will suffer are not compensable through money, (b) the monetary injuries the players have suffered and/or will suffer have exceeded and will exceed substantially the amounts they have been paid by LIV Golf, and (c) the negotiated amounts reflect a mutual understanding by the parties that at some point the PGA Tour would adjust its position and allow fair competition from LIV Golf. None of these Player Plaintiffs has agreed to a potential ban from the Majors or other important tournaments, or a long-term ban from the Tour should the Tour succeed in blocking successful long-term entry by LIV Golf.

15.    Without injunctive relief prohibiting the PGA Tour's anticompetitive conduct, the Tour's antitrust violations will continue. Without injunctive relief prohibiting the PGA Tour's

anticompetitive conduct, Player Plaintiffs will be irreparably harmed, including by the Tour's unlawful suspensions that have denied and will continue to deny them income earning opportunities, tournament performance opportunities, sponsorship revenue, and independent contractor rights that they have earned, as well as by the actions of the Tour and the European Tour that deny them the opportunity to participate in events sponsored by others throughout the golf "ecosystem." LIV Golf will also be irreparably harmed if the Tour's anticompetitive conduct is not abated. While LIV Golf has been able to pursue the launch of its business in the face of supracompetitive costs and artificially reduced access to supply (i.e. players), facing headwinds of this nature is not sustainable. As a result, if the Tour's anticompetitive conduct is not enjoined, LIV Golf's entry will be thwarted and its ability to maintain a meaningful competitive presence in the markets will be destroyed, which will harm not only LIV Golf, but also competition. The Tour will continue to enforce its unlawful Regulations and take anticompetitive actions unless and until a Court enjoins the Tour's unenforceable Regulations and unlawful conduct. Moreover, the Player Plaintiffs will be irreparably harmed in that the Tour's unreasonable control over their media rights and their participation in non-Tour events will continue unless enjoined permanently. And, if LIV Golf's entry into the relevant markets is thwarted by the PGA Tour's anticompetitive conduct, Player Plaintiffs' careers will be detrimentally impacted, they will lose the most significant avenue to gain entry into the Majors, they will lose the platform to display their craft, and they will lose the opportunity to sell their advertising and sponsorship space and sell or license their name image and likeness for their branding, reputation and businesses. On the other hand, with an injunction, the anticompetitive conduct of the PGA Tour will be lifted, LIV Golf will have the opportunity to compete on the merits, and Player Plaintiffs and other professional tournament golfers will enjoy the benefits of competition for their services that the antitrust and other laws protect.

## PARTIES

16. Plaintiff Phil Mickelson is a Hall of Fame American professional golfer who resides in San Diego, California. Mr. Mickelson was a three-time NCAA Champion at Arizona State University. In 1991, he won the Northern Telecom Open, which was the last time an amateur won a tournament on the PGA Tour. He is a 30-year veteran of the PGA Tour who has won 57 worldwide professional events, including six Majors—the most recent in 2021, which earned him the title of the oldest Major

winner in the game's history. He spent over 26 consecutive years in the top 50 of the Official World Golf Ranking (the only player in the history of the sport to ever do so), including over 700 weeks ranked in the top 10 in the world. Mr. Mickelson has represented the United States as a professional golfer in 24 team tournaments, which includes 12 Presidents Cups and 12 Ryder Cups, both American records. He participated as a vice captain in additional United States team tournaments, and played in the Dunhill Cup, World Amateur Team Championship and two Walker Cups for the United States as an amateur. Mr. Mickelson also has a strong commitment to giving back through the Phil and Amy Mickelson Foundation. Since its inception in 2004, the Foundation has focused primarily on supporting a variety of youth and family initiatives. He also founded Birdies for the Brave, the PGA Tour's national military outreach initiative, which raises money for a variety of charities supporting veterans and military families. Mr. Mickelson dedicated his entire professional career, 30 years, to the PGA Tour. He has hosted tournaments on the Tour and engaged in countless endeavors to advance the Tour, its purpose, and the game of golf. Mr. Mickelson has invested in himself and his investment has benefited the Tour's business tremendously over the last 30 years. As a lifetime member—a hard-earned accomplishment and honor, requiring 20 PGA Tour wins and 15 years of membership on the Tour—Mr. Mickelson desires to continue being a member of the Tour and to play in events on the Tour.

17.    Plaintiff Talor Gooch is a 30-year-old professional golfer who resides in Texas. He is a member of the Tour. Mr. Gooch played golf at Oklahoma State University until 2014 when he began his professional career. He joined the PGA Tour Canada in 2015 and earned his way onto the Korn Ferry Tour in 2016. In 2017, Mr. Gooch won the News Sentinel Open (which later became the Visit Knoxville Open on the Korn Ferry Tour) and then earned his way onto the PGA Tour in 2018. In 2021, he won his first PGA Tour tournament at the RSM Classic. Mr. Gooch was on top of the PGA Tour's FedEx Cup Rankings for the 2021-22 season following the RSM Classic. Mr. Gooch has played in over one hundred PGA Tour events. As of the filing of the Complaint in this Action, he was the 20th ranked golfer on the FedEx Cup rankings. Mr. Gooch played in 21 PGA Tour events in the 2021-22 PGA Tour season and qualified for the FedEx Cup Playoffs, but was denied the opportunity to compete in the Playoffs by the Tour's anticompetitive conduct. Mr. Gooch desires to continue to be a member

1    of the Tour and to play in events on the Tour.

2        18.    Plaintiff Hudson Swafford is a 34-year-old professional golfer who resides in Georgia.

3    He is a member of the Tour.  He started his professional golf career in 2011 after graduating with a

4    B.S. in Consumer Economics from the University of Georgia.  Mr. Swafford joined the Nationwide

5    Tour in 2012, and, that same year, won the Stadion Classic at UGA, a golf tournament on the Web.com

6    Tour (which became known as the Korn Ferry Tour in 2019).  In 2013, Mr. Swafford finished 21st in

7    the Web.Com Tour Finals to earn his PGA Tour card for 2014.  Mr. Swafford won his first PGA Tour

8    victory in 2017 at the CareerBuilder Challenge.  In 2018, Mr. Swafford suffered a rib injury and then,

9    in 2019, Mr. Swafford had to undergo a surgery to remove a small bone from the bottom of his foot,

10   forcing him to miss four months of play.   In September 2020, Mr. Swafford won his second PGA Tour

11   victory at the Corales Puntacana Resort and Club Championship.  In 2022, Mr. Swafford earned his

12   third PGA Tour victory at the American Express.  Since the start of his career, Mr. Swafford has played

13   in over 250 Tour events.  Mr. Swafford played in 21 PGA Tour events in the 2021-22 season, and as

14   of the filing of the Complaint in this Action was 67th in the FedEx Cup rankings, and qualified for the

15   FedEx Cup Playoffs. Mr. Swafford was denied the opportunity to compete in the Playoffs by the Tour's

16   anticompetitive conduct.  Mr. Swafford desires to continue to be a member of the Tour and to play in

17   events on the Tour.

18       19.    Plaintiff Matt Jones is a 42-year-old professional golfer who resides in Arizona.  He is

19   a member of the Tour.  He was born in Sydney, Australia, and upon meeting fellow Australian Greg

20   Norman at six years old became determined to become a professional golfer.  Mr. Jones moved to the

21   United States to attend Arizona State University where he was a first-team All-American golfer.  Mr.

22   Jones joined the Nationwide Tour in 2004 and earned his PGA Tour card in 2008.  In 2014, Mr. Jones

23   won the PGA Tour's Shell Houston Open.  In 2015, and again in 2019, he won the Emirates Australian

24   Open on the PGA Tour of Australasia.  In 2021, Mr. Jones won the PGA Tour Honda Classic.  Mr.

25   Jones has played in over 350 Tour events.  Mr. Jones played in 20 PGA Tour events in the 2021-22

26   season, and as of the filing of the Complaint in this Action was ranked 65th in the FedEx Cup rankings,

27   and qualified for the FedEx Cup Playoffs.  Mr. Jones was denied the opportunity to compete in the

28   Playoffs by the Tour's anticompetitive conduct.  Mr. Jones desires to continue to be a member of the

Tour and to play in events on the Tour.

20.     Plaintiff Bryson DeChambeau is a 28-year-old professional golfer who resides in Texas. He is a member of the Tour.  Mr. DeChambeau grew up in California and played golf at Southern Methodist University while majoring in physics.  In 2015, Mr. DeChambeau became just the fifth person to win both the NCAA individual championship and the U.S. Amateur title.  He made his PGA tour debut in 2015 at the FedEx St. Jude Classic.  In 2015, while still an amateur, he was the runner-up in the Australian Masters.  He began his professional career in 2016 at the RBC Heritage event, finishing fourth.  That year, Mr. DeChambeau won the Korn Ferry DAP Championship, earning his Tour card.  In 2017, Mr. DeChambeau won his first PGA Tour event at the John Deere Classic.  In 2018, Mr. DeChambeau won the Memorial Tournament.  He then won the first two FedEx Cup Playoff events at the Northern Trust and Dell Technologies Championship.  Mr. DeChambeau was picked for the U.S. team in the 2018 Ryder Cup.  In 2019, Mr. DeChambeau won the Shriners Hospitals for Children Open and the Omega Dubai Desert Classic.  In 2020, Mr. DeChambeau won the Rocket Mortgage Classic and won the U.S. Open, his first Major.  In 2021, he won the Arnold Palmer Invitational and played on the winning U.S. team at the 2021 Ryder Cup.  In 2022, Mr. DeChambeau underwent surgery on his left wrist from a fracture.  Mr. DeChambeau desires to continue to be a member of the Tour and to play in events on the Tour.

21.     Plaintiff Ian Poulter is a 46-year-old professional golfer who splits his residence between Florida and England.  He is a member of the Tour.  He was born in England, and began playing golf at just four years old before turning professional in 1994.  Mr. Poulter won the 1999 Open de Côte d'Ivoire on the Challenge Tour and was promoted to the European Tour.  He was a member of the victorious 2004 European Ryder Cup team and then joined the PGA Tour in 2005.  In addition to his many international victories, Mr. Poulter won the 2010 World Golf Championship-Accenture Match Play Championship, the 2012 World Golf Championships-HSBC Champions, and the 2018 Houston Open.  Mr. Poulter has played in over 300 Tour events.  Mr. Poulter played in 16 PGA Tour events in the 2021-22 season and, as of the filing of the Complaint in this Action, was ranked 168th in the FedEx Cup rankings.  Mr. Poulter desires to continue to be a member of the Tour and to play in events on the Tour.

22.     Plaintiff Peter Uihlein is a 32-year-old professional golfer.  He is a member of the Korn Ferry Tour, which is owned and controlled by the Tour.  Mr. Uihlein was born in New Bedford, Massachusetts, played golf at Oklahoma State, and resides in Florida.  Mr. Uihlein has two professional victories on the Korn Ferry Tour—the Nationwide Children's Hospital Championship in 2017 and the MGM Resorts Championship in 2021.  Mr. Uihlein has also won on the European Tour in 2013 at the Madeira Islands Open.  Mr. Uihlein has represented the United States in two Walker Cups (2009 and 2011) and won the 2010 Eisenhower Trophy.  Mr. Uihlein won the 2010 U.S. Amateur Championship.  As of the filing of the Complaint in this Action, Mr. Uihlein ranked 59th on the Korn Ferry Tour regular season points list.  Mr. Uihlein desires to be a member of the Tour and/or continue to be a member of the Korn Ferry Tour, and to play in events on the Tour and the Korn Ferry Tour.

23.     LIV Golf is a Delaware corporation with its principal place of business in New York, New York.  LIV Golf is the sponsor of the LIV Golf Invitational Series, an eight-event series of golf tournaments, a majority of which have been or will be set in the United States, from June to October 2022.  LIV Golf also is the sponsor of a planned season-long golf tour, the League, which the PGA Tour's anticompetitive conduct thwarted and which LIV Golf was forced to delay in 2022.

24.     Defendant PGA Tour is a Maryland non-profit corporation, with its principal place of business in Ponte Vedra Beach, Florida.  The PGA Tour sponsors a season-long series of golf tournaments throughout the calendar year called the PGA Tour.  Those events occur primarily in the United States.  In the 2021-22 PGA Tour season, the Tour sponsored events in twenty states, including six events in California.  The Tour is engaged in interstate commerce.

## JURISDICTION AND VENUE

25.     Plaintiffs' action arises under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2.  Plaintiffs seek injunctive relief under 15 U.S.C. § 26 and damages under 15 U.S.C. § 15(a).  This Court has subject matter jurisdiction over the federal antitrust claims under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation); this Court has jurisdiction over the related state-law claims under 28 U.S.C. § 1367 (supplemental jurisdiction).

26.     This Court may exercise personal jurisdiction over the PGA Tour under Section 12 of the Clayton Act, 15 U.S.C. § 22.  The PGA Tour manages or operates two golf courses (TPC Harding

Park and TPC Stonebrae) in this District and employs dozens of individuals who work there. It organizes and promotes annually at least six golf tournaments throughout California (Fortinet Championship, The American Express, Farmers Insurance Open, AT&T Pebble Beach Open, The Genesis Invitational, and the Barracuda Championship), two of which are within the Northern District of California. California hosts more PGA Tour golf tournaments than any other state. The Tour issued the first of its known anticompetitive threats to Player Plaintiffs and other players that is at issue in this lawsuit in La Jolla, California in January 2020. The PGA Tour also threatened Player Plaintiffs and other players with lifetime bans in Los Angeles, California in February 2022. The Tour has unlawfully restricted Player Plaintiffs from participating in events that compete against the PGA Tour, and its conduct has already hindered—and threatens to irrevocably harm—LIV Golf's ability to compete in the market.

27. This Court also may exercise personal jurisdiction over the PGA Tour under California Code of Civil Procedure § 410.10. The Tour operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within this state that harmed Plaintiffs; and is engaged in substantial and not isolated activity within this state.

28. Venue is proper in this district under Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) because the Tour may be found in this District and transacts business in this District through the management or operation of two golf courses, hosting and promoting two golf tournaments, and employing individuals in this District.

## BACKGROUND AND FACTS

### Overview of Professional Golf

29. The business and sport of professional golf are organized around tours and tournaments that combine players of comparable skill levels. These tours and tournaments bring golf competition to fans, financially compensate players, and provide opportunities for sponsors and advertisers to market their products to golf fans of these events.

30. The elite level of men's professional golf is comprised of (1) the PGA Tour, which sponsors and co-sponsors a series of tournaments scheduled from September to September each season; (2) four annual standalone "Major" tournaments sponsored by entities other than the Tour: the Masters,

the U.S. Open, The Open (or The British Open), and the PGA Championship; (3) two bi-annual team events (Ryder Cup and the Presidents Cup); (4) quadrennial Olympic competition; and (5) a handful of standalone events in which Tour members are only permitted to compete if they are given permission by the Tour Commissioner.

31.     Until LIV Golf's nascent entry, the Tour was the sole elite golf tour in the United States and the world.  Other elite professional golf events are standalone events (such as the Majors) that are not part of an organized tour that extends throughout a season.  Professional golfers who qualify for membership on the Tour invariably compete on it, as it offers by far the largest tournament purses, the greatest opportunities to qualify for the Majors, the greatest opportunities for exposure in the golf world and beyond, and the most expansive opportunities to secure large endorsements from sponsors.  As of the filing of the Complaint in this Action, all of the top 30 golfers in the world were active members of the Tour, except those golfers whom PGA Commissioner Monahan suspended or forced to resign.  No other golf tour in the world is a reasonable competitive substitute for the PGA Tour.  For example, the average purse of a PGA Tour event is roughly two-and-a-half times the average purse of a European Tour event, roughly nine times the average purse of an Asian Tour event, and 13 times the average purse of a Korn Ferry Tour event.  The PGA Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour.

32.     The Tour and the four Majors are complements, not competitors.  The Tour schedules no events during the weeks of three of the Majors and schedules only a minor event with a lower prize pool the week of The Open.  Conversely, the Majors do not compete with the Tour; rather, they encourage and incentivize players to participate on certain tours (the PGA Tour in particular) by adopting eligibility requirements that open playing spots to golfers who have performed well on those tours.  Similarly, LIV Golf does not compete with the Majors, as it schedules its Series and will schedule its League around the Majors.

33.     The European Tour is a purchaser of professional golfers' services and a promoter of professional golf events, but it is effectively a feeder into and only a potential competitor to the PGA Tour.  In the 1980s and early 1990s, the European Tour exerted some competitive pressure on the Tour

for certain star international players, including Seve Ballesteros, Nick Faldo, and Bernhard Langer, but that has not been the case for many years.  Instead, when European Tour members qualify for Tour membership, they almost invariably elect to immediately become PGA Tour members.  None of the Top 30 golfers in the world are only members of the European Tour.  PGA Tour superstar Rory McIlroy, originally from Northern Ireland who began his career on the European Tour, has described the European Tour as "a stepping stone,"  explaining "you can go to America and play for more money and more ranking points.  I think as well with the world ranking points, everyone out here, all of their contracts with sponsors, it's all about world ranking points.  If players are getting paid more and earning more world ranking points, why would you play over there [European Tour]?"  The actions of other European players who qualify for the Tour are consistent with McIlroy's views:  they join the PGA Tour when they qualify.

34.     European Tour Board Member Paul McGinley told *The Independent* that "the [European] Tour has accepted it is a junior partner to the PGA Tour now and will act as a feeder tour with more and more co-sanctioned events on both sides of the pond."  McGinley continued:  "We are there to enhance that and enable the PGA Tour to become the premier golf tour in the world.  We realise that the [European] Tour will not be that, but we want to be very much . . . a kind of international arm and create pathways for players to come into the ecosystem via the European Tour and perhaps the Korn Ferry Tour and then graduate onto the premier tour in the world which is the PGA Tour."  Likewise, European Tour Commissioner Keith Pelley told *The New York Times* that the European Tour agreed not to compete with the PGA Tour for player services as of November 2020.

35.     Nonetheless, the European Tour remained a potential competitor to the PGA Tour, particularly as a potential partner of a new entrant that could challenge the Tour's dominance.  Recognizing this potential competition from the European Tour and the substantial threat that a new entrant partnered with the European Tour would pose, the Tour entered into an illegal agreement with the European Tour as part of its scheme to ensure that the European Tour does not partner with any entrant (including LIV Golf) that might seek to become part of the golf "ecosystem."  In a January 2020 strategy memorandum describing the PGA Tour's plan to foreclose new entry, Commissioner Monahan explained that this alliance with the European Tour was aimed at removing the European

17

Tour as a potential partner for a new entrant: "We have continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of" a new entrant. The Tour's strategy was thus designed to ensure no new potential competitor could emerge to challenge its monopoly.

36. The Tour executed Monahan's plan in November 2020, when it announced that it had purchased a minority stake in the European Tour's media production company, and that the two tours would work in concert with one another. As detailed below, since that alliance was formed, the European Tour has joined the PGA Tour in a group boycott aimed at punishing players to foreclose LIV Golf's entry. As set forth in more detail below, that group boycott violates Section 1 of the Sherman Act, under either a *per se* analysis or a Rule of Reason analysis, because it has harmed (and will continue to harm) competition and has no redeeming procompetitive virtue.

37. There are also a number of more limited lower-level tours that operate in the U.S. and throughout the world, but none is a meaningful competitor to the Tour. In fact, the Tour owns, operates, or controls a number of these lower-level tours, ensuring that they do not become meaningful competitors to the PGA Tour and that any bans imposed by the PGA Tour (and its co-conspirator, the European Tour) have a widespread impact on any affected players. These tours include:

- PGA Tour Champions – A tour for players over the age of 50, organized and managed by the Tour;

- Korn Ferry Tour – The PGA Tour's development tour in North America, through which players (like Plaintiff Uihlein) can qualify for the PGA Tour; organized and managed by the PGA Tour and described by the Tour as "the path to the PGA Tour";

- PGA Tour Latinoamerica – A tour with events in Latin America, through which players can qualify for promotion to the Tour, organized and managed by the Tour;

- Mackenzie Tour-PGA Tour Canada – A tour with events in Canada, through which players can qualify for promotion to the Tour, organized and managed by the Tour;

- PGA Tour Series-China – A tour with events in China, organized and managed by the Tour;

- Asian Tour – A tour with events principally in Asia;

18

- Japan Tour – A tour with events in Japan;

- Sunshine Tour – A tour with events in Africa; and

- KPGA Korean Tour – A tour with events in South Korea.

38.     These tours offer considerably lower levels of competition, far lower prize pools, far smaller sponsorship and income opportunities, and far less, if any, broadcast exposure and viewership throughout most of the world.  As a result, players who qualify for the PGA Tour join the PGA Tour. Simply put, until LIV Golf's entry, the PGA Tour had no competition as the premier professional golf tour in the United States and the world.  If the PGA Tour succeeds in thwarting LIV Golf's entry, it will once again face no meaningful competition in the United States or the world.

39.     While the on-course competition among participants in the elite professional golf services market is intense, the Tour itself faces no meaningful competition in the relevant markets. Until LIV Golf arrived on the scene, no other tour came close to the PGA Tour in terms of the money, exposure, quality of on-course competition for players, fan interest, advertising or sponsorship opportunities.

40.     In addition, players in Tour events have a significantly greater opportunity than players in the lower-tier tours to qualify for spots in the Majors, Ryder Cup, Presidents Cup, and the Olympics by winning tournaments that provide entry into the Majors and that provide greater opportunity to earn more points in the world golf ranking system.  A common way for players to qualify for the Majors is by being ranked within the Top 50 of the OWGR.  While players in any tournament recognized by the OWGR can qualify for points, the OWGR awards points based on a tournament's competitive strength and the player's finishing position.  Thus, players on the Tour are eligible to earn far more points than players on lower-tier tours.  In addition, OWGR points are often used to determine the amount of money players receive from sponsors.  Qualification for the Olympics is determined solely by OWGR rankings.  Again, as PGA Tour player Rory McIlroy explained "it's all about world ranking points," and players can earn the most points on the PGA Tour.

41.     The OWGR's Governing Board includes PGA Tour Commissioner Monahan, as well as the top executives from a number of the other bodies:  the CEO of the European Tour (Keith Pelley), the General Counsel of the European Tour (Ben Bye), the COO of the European Tour (Keith Waters),

19

the CEO of the PGA of America (Seth Waugh), the Executive Director of the United States Golf Association (Mike Whan), the Senior Director of the Masters Tournament of the Augusta National Golf Club (Will Jones), the CEO of the R&A (Martin Slumbers), and the former CEO of the R&A (Peter Dawson). As set forth in detail below, the PGA Tour has entered into an unlawful agreement with the European Tour to foreclose competitive entry by locking arms in a group boycott to exclude from the world golf "ecosystem" LIV Golf, any players who play in LIV Golf events (including the Plaintiffs), and any other vendor, tour promoter, or other entity that partners with LIV Golf. And the Tour has leaned on the other world golfing bodies that have representatives on the OWGR Governing Board to do its bidding to heighten threats for associating with LIV Golf.

**PGA Tour Structure**

42.     The Tour's charter promises it will act to "promote the common interests of professional tournament golfers." The Tour certified to the Internal Revenue Service that its non-profit purpose is to promote the sport of professional golf and the common interests of touring golf professionals.

43.     The professional golfers who have earned the right to compete on the Tour are the most skilled and popular professional golfers in the United States and the world. Player Plaintiffs were active members of the Tour until they were given lengthy suspensions for playing in LIV Golf events. Players from the United States who are members of the Tour include Tiger Woods, Plaintiff Mickelson (now suspended), Justin Thomas, Jordan Spieth, Plaintiff DeChambeau (now suspended), Dustin Johnson (now resigned), Scottie Scheffler, Bubba Watson, and Brooks Koepka (now suspended). The PGA Tour's Media Guide also states that its membership includes 94 international players from 29 countries and territories outside the United States, including Justin Rose, Rory McIlroy, Sergio Garcia (now resigned), Jon Rahm, Adam Scott, Henrik Stenson (now suspended), Louis Oosthuizen (now resigned), Hideki Matsuyama, and Cameron Smith. They include some of the biggest names in sports and popular culture in the United States and the world.

44.     All member golfers on the Tour are independent contractors, not employees of the Tour. There is no team or other employer to cover their many and substantial expenses as a professional athlete (e.g., coaches, caddies, trainers, therapists, travel, and lodging).

45.     The Tour is managed by its Commissioner, Jay Monahan, who assumed the role on

January 2, 2017. Commissioner Monahan sits on the Board of the European Tour, the Governing Board of the OWGR, and the Board of Directors and Executive Committee of the International Golf Federation. Through these various roles, Commissioner Monahan assures that the Tour controls what it terms the world golf "ecosystem." Being blacklisted by the PGA Tour means effective expulsion from the golf "ecosystem" anywhere in the world.

## Elite Professional Golf Has Stagnated Under the PGA Tour's Monopoly

46. As Commissioner Monahan acknowledged in a memorandum to the PGA Tour Policy Board (the "January 2020 Monahan Memorandum"), the PGA Tour is "the world's leading professional golf tour" and "is second to none due to the strength of its members." Thus, not surprisingly, virtually every golfer of public prominence worldwide is a member of the PGA Tour.

47. While the quality of play on the PGA Tour continues to flourish, the business of professional golf has stagnated under the Tour's monopoly. In the age of social media, the accessibility and relatability of elite professional golfers should lend itself to a boom in fan interest and viewership, as it has with other sports. The opposite has happened. Without any meaningful competition (prior to LIV Golf's entry), the Tour has failed to innovate and its product has grown stale. At the same time, the Tour's fanbase has shrunk and continues to age (the *average* age of a PGA Tour fan is 64), a trend sharply at odds with other major sports. Likewise, the Tour's compensation to its members fell behind compensation to other professional athletes, as measured by the share of revenue the players receive, reflecting the Tour's monopsony power over players' services.

48. Despite offering a stagnant product with a shrinking and aging fanbase, the Tour has used its monopoly position to extract substantially increased revenues from broadcasters and advertisers. As a monopsonist, however, the Tour has not passed those increased revenues through to its members. For example, the Tour's revenue has increased between 2011 and 2019 by 163 percent, yet the share of revenue it provided its members fell substantially. This is because there is no competition for players' services, allowing the Tour to direct its increased revenues into its bloated bureaucracy, extravagant facilities, and multimillion-dollar compensation and lavish perks for Commissioner Monahan and the other executives who run the monopoly, rather than sharing them with players. Tour data shows that average Tour purses grew an anemic 2.5 percent per year on average

from 2014 through 2019—from $6.62 million in 2014 to $7.47 million in 2019. By comparison, the total salary pool for other major professional sports leagues grew at much stronger rates over the same period—15 percent per year for the NFL, eight percent per year for the NBA, and four percent per year for the NHL, even though the 2014 base levels for the other professional sports were substantially higher.

49.     The Tour has failed to offer its members compensation on par with professional athletes in other sports. The number one player on the Tour money list in 2019 was Brooks Koepka, with $9.68 million in tournament winnings. His winnings were the equivalent to the 129th highest paid NFL player, the 121st highest paid NBA player, and the 128th highest paid MLB player.

50.     It is incongruous that Tour members' share of revenue lags so significantly behind those of players in other sports over the same period, because the Tour is a nonprofit entity that does not compensate players for their travel and other expenses, while the other major professional sports are for-profit enterprises with franchise owners. Unlike those other sports, however, which have free-agency systems that establish competition among franchise owners for players' services, the PGA Tour faced no viable competition before LIV Golf's entry. If LIV Golf's entry is foreclosed, the Tour will once again face no viable competition. As a monopolist, the PGA Tour does not compete for players' services, and the Player Plaintiffs' earnings have been and are suppressed.

51.     The lagging compensation the Tour pays to its members is also striking in light of the expenses and risks that the players bear. Unlike professional athletes in other sports, professional golfers have to pay out-of-pocket to play on the Tour. Tour members pay for their own travel to and lodging at Tour events, and they pay for their coaches, therapists, trainers, and caddies. In addition, the players have no guarantees from the Tour—they earn nothing if they get injured, and they get nothing if they miss the cut. As a result, Tour members can end up with *negative* earnings for the year.

52.     For example, Pat Perez described a fellow Tour member that "one year ma[d]e $22,000 on the Tour. He lost, he was in the hole about 90 grand. Mind you, he didn't play well and I get it, but how can he be out money? He earned his card and he was out like $90 grand that year."

53.     A Tour player agent was quoted as saying: "What I think the average fan doesn't know is how much a player spends to go to work. . . . [T]hey spend so much money or reinvest so much

money in themselves and what they pay their team and what they spend on private airfare, renting homes and [paying] chefs and trainers and physical therapists and everything that goes into it. It's a very lucrative sport, but it's also a very expensive sport for them, unlike team-sport athletes who are flown around every place and supplied all those things." But without competition, elite professional golfers have historically had no option other than the Tour.

54. The Tour's monopoly (and monopsony) hold over elite professional golf is also reflected in its failure to innovate or retain (let alone expand) its audience. The Tour's television ratings have struggled. Out of 27 PGA Tour tournaments for which data are available, 16 tournaments (almost 60 percent) had viewership in 2019 that was below the five-year average for that tournament. In 2020 (before the COVID outbreak shut down the Tour), six out of seven tournaments had viewership that was below the five-year average for that tournament. The PGA Tour's fanbase is aging faster than any other sport, because it has failed to capture the attention of younger viewers. As Rory McIlroy (a PGA Tour Member, President of the Players Advisory Council, and PGA Tour Board Member) recognized, "competition is a good thing" and "any business needs competition for things to progress and move on." But the PGA Tour has faced no competition for many years, it has had no reason to innovate and grow its fan base, and its product has grown stale.

55. LIV Golf promises to bring competition and innovation to the market for the promotion of elite professional golf, which will benefit fans, broadcasters, advertisers, players, and all other stakeholders. As the long-standing monopolist facing competition for the first time in at least decades, the Tour has responded not by competing on the merits, but rather by engaging in a course of anticompetitive conduct designed to choke off LIV Golf's nascent competition, to the detriment of LIV Golf, the players (including Player Plaintiffs), fans, broadcasters, advertisers, and others.

## Anticompetitive PGA Tour Player Regulations

56. Membership on the Tour is governed by the PGA Tour Player Regulations & Tournament Regulations ("Regulations"). Exhibit 1. Several interrelated provisions of the Regulations unreasonably restrict the independent contractor-players' ability to participate in competing events.

57. **Media Rights Regulation.** The Regulations contain two provisions relevant to this case that govern players' media rights. First, Section V.B.1.a. of the Regulations purports to grant to

the PGA Tour the media rights for players when they are participating in Tour-sponsored tournaments. Plaintiffs do not challenge that provision on the understanding that the Tour interprets it to apply to golfers only when they are playing in Tour-sponsored events. However, if the Tour relies on that provision to support its position that it can control Tour members' golf media rights even when they are not participating in a Tour event, the Plaintiffs would challenge that provision as being anticompetitive.

58. A second provision in the Regulations, Section V.B.1.b. (the "Media Rights Regulation") provides that "[n]o PGA Tour member shall participate in any live or recorded golf program without the prior written approval of the Commissioner, except that this requirement shall not apply to PGA Tour cosponsored, coordinated or approved tournaments, wholly instructional programs or personal appearances on interview or guest shows." Exhibit 1. The Tour broadly defines "golf program" to cover "any golf contest, exhibition or play that is shown anywhere in the world in any form of media now known or hereinafter developed." *Id.* According to the PGA Tour, this provision prevents all Tour members from participating in any golf program anywhere in the world, during any time of the year, *even when they are not participating in a Tour event.* According to the PGA Tour, the effect is a year-round prohibition on all Tour-member independent contractors from participating in any competing golf event anywhere in the world that is broadcast on any media. For example, when the Player Plaintiffs participated in a LIV Golf event in London that was streamed on the Internet (but not shown on any television network in the United States), the PGA Tour declared that the Player Plaintiffs had violated this rule.

59. The global prohibition on playing in competing events is not needed to create or improve any product or offering by the Tour, or to improve any aspect of any product for fans. For example, other provisions purportedly grant the Tour the media rights for Tour events in which the players are participating. The global prohibition serves only to prohibit the Tour's independent contractor players from playing in any competing events during weeks when they are not playing in Tour events.

60. The Media Rights Regulation is fundamentally inconsistent with the rights of the Player Plaintiffs as independent contractors, denying them the right to sell their own media rights to other bidders for their services. As a result, the Tour has deprived and continues to deprive the Player

Plaintiffs of the opportunity to pursue their profession, thus depriving them of income-earning, marketing, branding, and charitable opportunities.

61.     Furthermore, this provision has injured and foreclosed entry by LIV Golf at its planned scale and harmed LIV Golf by imposing on it a cost basis that the Tour itself describes as "irrational." In addition, and critically, the Tour has compromised LIV Golf's ability to secure a television broadcast contract, a critical component of any sustainable elite golf tour.  Even though LIV Golf has been able to convince some players to defy the Tour's threatened lifetime bans and to participate in LIV Golf events, the Media Rights Regulation has precluded LIV Golf from securing agreements to broadcast its tournaments because United States platforms are disinclined to sign a broadcast contract with LIV Golf while the Tour claims to control the media rights of the players participating in LIV Golf tournaments.  As the PGA Tour has maintained, the Media Rights Regulation purportedly denies any competing tour the opportunity to broadcast tournaments to fans, an essential element of the business plan of LIV Golf or any other elite professional golf promoter.  Unless it is enjoined, this provision will threaten the competitive entry of LIV Golf or any other potential competitor, which would both harm LIV Golf and also the Player Plaintiffs by denying them the opportunity to sell their services in a competitive market.

62.     The anticompetitive intent of the Media Rights Regulation is exposed by the Tour's amendment of the definition of "golf program" in the provision in November 2019 in response to rumors of potential competitive entry.  Whereas the prohibition had previously applied to "any golf contest, exhibition or play that is shown *in the United States*," the prohibition was expanded to cover "any golf contest, exhibition or play that is shown *anywhere in the world*."  Exhibit 1 (emphasis added). Commissioner Monahan admitted this anticompetitive purpose in his January 2020 Memorandum: "Our current Tournament Regulations provide a significant hurdle for PGA Tour members with respect to contracting with Private Equity Golf under its proposed structure. . .  In particular, the Tournament Regulations governing Conflicting Events and Media Rights/Releases would be applicable. . . .[I]n November 2019 the Policy Board ratified a revised Media Rights/Release regulation to ensure that all golf events are unequivocally covered on a global basis."  The Tour did not negotiate with the Player Plaintiffs or any other Tour Member over its unilateral expansion of the Media Rights Regulation and

does not compensate them for the Tour's purported exclusionary control over their year-round global media rights. The expansion ensures that players are restricted from participating with a competing golf tour anywhere in the world.

63. The anticompetitive purpose of the Media Rights Regulation is further illustrated by comparison with the European Tour. The European Tour does not prohibit its independent contractor golfers from using their media rights when they are not playing in European Tour events. Rather, the European Tour's rules make clear that the players' grant of media rights applies *only* when they participate in European Tour events. During other weeks of the year, that grant of media rights "does not otherwise affect the Member's rights as an independent contractor in respect of their own image except as set out in these Regulations, including Regulation E5(c) [Ryder Cup] below." The European Tour also "recognises the individual rights of all Members operating as independent contractors. . . and will not unreasonably seek to restrain its Members from Participating in certain golf tournaments or events which are not sanctioned by the European Tour. . . ."

64. Some Player Plaintiffs requested releases from the Media Rights Regulation to play in the LIV Golf London Invitational. The PGA Tour denied their request (as well as those of other Tour members) and instead imposed lengthy suspensions on all players who participated in the event.

65. The Tour's anticompetitive use of the Media Rights Regulation is further demonstrated through its selective enforcement of the provision against other events that it does not deem to be competitive threats. For example, the Tour did not require members to obtain releases to participate in a Pro-Am golf competition called the JP McManus held in the Republic of Ireland from July 4–5, 2022, even though the event was broadcast in the United States, Europe, and throughout the world. In contrast, days earlier the Tour enforced the provision with draconian punishments when the Player Plaintiffs and others played in the LIV Golf Portland Invitational from June 30 – July 2, 2022. The key difference between the LIV Golf event and the JP McManus event is that the Tour views only LIV Golf as a competitive threat.

66. The anticompetitive purpose and effect of the Media Rights Regulation is clear. The incumbent monopolist has granted itself the right to foreclose the best golfers in the world from playing in events that create real competition, at its own discretion. And if golfers defy the Tour's threats, the

competitor that is able to secure the players' services is nonetheless foreclosed from securing contracts to broadcast the event on television or any other media.

67. **Conflicting Events Regulation.**  A second exclusionary provision in the Regulations (Section V.A.2–3, the "Conflicting Events Regulation") grants Tour Commissioner Monahan with the discretion to prohibit the Player Plaintiffs and all other Tour members from playing in any other golf tournament anywhere in the world.  Exhibit 1.  Commissioner Monahan has exercised his discretion to foreclose competition from LIV Golf by preventing any Tour members from participating in any LIV Golf events, under penalty of career-threatening suspensions.

68. The Conflicting Events Regulation contains two components, each of which the Tour has employed to attack the Player Plaintiffs in its effort to foreclose LIV Golf's entry.  First, the provision prohibits any Tour member from playing in any other golf tournament in North America during any week when the Tour sponsors or co-sponsors an event—without exception, even when the player is not playing in the Tour event.  Because the Tour typically sponsors or co-sponsors events approximately 48 weeks per year, the Conflicting Events Regulation effectively prevents independent contractor Tour members from ever playing in non-PGA Tour events in North America.  Second, the Regulations also prohibit the Player Plaintiffs and all other Tour members from playing in any events *outside* North America during weeks in which the Tour is sponsoring or co-sponsoring an event, unless the Commissioner grants a release.  These releases are limited to three per year, and the Commissioner has complete discretion to deny them.

69. The releases the Commissioner can choose to grant do not permit meaningful competition by other tours.  No releases are permitted for any event in North America.  Even as to international events, the Commissioner retains "sole discretion" to deny a release.  Exhibit 1.  While the Tour has historically granted releases for international events, the Tour changed its practice once the threat of potential competitive entry became evident.  For the LIV Golf London Invitational, the Tour denied releases for all members.  In doing so, Commissioner Monahan clarified that the Tour denied the requested relief because LIV Golf is organizing a tour that competes with the PGA Tour in North America.  The Commissioner's vice president wrote, "While releases have been granted in limited circumstances for one-off events outside North America or for events outside of North America

on tours based exclusively outside of North America, the event for which you have requested a release is the first in an eight-event "2022 LIV Golf Invitational Series" season, and more than half of them will be held in the United States." Furthermore, even if the Commissioner did not exercise his discretion to attack competition, the Regulation provides that a player may obtain only three Conflicting Event releases per season, and may do so only if he also plays in a minimum of 15 Tour cosponsored or approved tournaments. Also, the PGA Tour Commissioner is only required to give a player a decision 30 days in advance of the event, which makes it difficult for those planning international events to know which players will be permitted by the Tour Commissioner to play in the field.

70. The scope of this Conflicting Events Regulation is expanded by another provision in the Regulations which provides that in any week in which a Tour, PGA Tour Champions, Korn Ferry Tour, PGA Tour *Latinoamerica*, PGA Tour Canada, or PGA Tour China cosponsored tournament is scheduled, no Tour member may participate in any golf activity (including public exhibitions, clinics, and pro-ams) in the same geographic area without the prior approval of the Commissioner.

71. The Tour has made clear that it will weaponize the Conflicting Events and the Media Rights Regulation to attack competition. In January 2020, Commissioner Monahan told a meeting of PGA Tour members that the Tour will impose "strict enforcement of the Conflicting Event and Media Rights/Release rules" on players to prevent them from playing golf on a competing tour. When Player Plaintiffs participated in the LIV Golf London Invitational, Commissioner Monahan summarily suspended them within an hour of tee-off. Then, to expand the *in terrorem* effect of the suspension on all other Tour members, Commissioner Monahan immediately notified all PGA Tour members of his action.

72. The Tour has forced members of the Korn Ferry Tour—the developmental tour—like Plaintiff Uihlein, to be bound by the same Regulations and has enforced them to punish young developing professional golfers who play in LIV Golf events.

73. Furthermore, the Tour's argument that it is merely enforcing its membership rules and its assertion that there is some legitimate justification for those rules in preventing simultaneous Tour membership and participation in LIV Golf events are betrayed as mere pretext by the Tour's attacks on

golfers who play in LIV Golf events but are not PGA Tour members. For example, The PGA Tour has even banned golfers who are members in good-standing of the European Tour from the European Tour events it co-sanctions with the PGA Tour simply because they played in a LIV Golf event, including members of the European Tour who were granted permission to play in the LIV Golf event. Those golfers were not bound by the PGA Tour's membership rules (because they were not Tour members) and did not violate any Tour rule, and yet they were punished by the Tour for playing in a LIV Golf event. Similarly, the Tour has threatened college golfers—who are not Tour members and are not bound by any Tour rule—that they will not be permitted to participate in the pathway onto the Korn Ferry Tour or the PGA Tour if they play in any LIV Golf events.

74. The Tour's attack on LIV Golf is not the first time the Tour has used the Media Rights and Conflicting Events Regulations to attack nascent competitive entry. Before LIV Golf, the last meaningful threat of competitive entry to challenge the PGA Tour was the World Golf Tour, led by Greg Norman, which attempted to launch in 1994. In response, then-Tour Commissioner Tim Finchem wrote to Mr. Norman that the Tour would not grant conflicting event releases for "events held within the United States" and that it would only grant a media rights release if the World Golf Tour would pay a prohibitive sum to the PGA Tour. And even then, the Tour's releases would only be granted for events held on a Monday, Tuesday, or Wednesday. The Commissioner also threatened Tour members that they would lose PGA Tour membership cards if they joined the competing tour. Within days, the World Golf Tour collapsed. No other meaningful competitive threat emerged for more than a quarter century.

75. The Player Plaintiffs are members of the Tour (albeit now subject to lengthy suspensions) and remain subject to the Regulations. They requested releases from the Media Rights and Conflicting Events Regulations to participate in one or more LIV Golf events. The Tour denied their requests and imposed severe punishment when they exercised their rights as independent contractors to play in the LIV Golf events (detailed further below). While the PGA Tour's charter requires that the PGA Tour's acquisition of players' media rights be used "to promote the common interests of professional golfers," the Tour uses its acquisition of players' media rights to prevent other promoters from competing for its members' services.

76.     Furthermore, after dozens of Tour members (including the Player Plaintiffs) sought Conflicting Events releases to participate in a LIV Golf event in London, the Tour amended its Conflicting Events Release request form to require its members to verify the event would not be shown on any medium in the United States—an impossible verification given modern technology.  As the sequence of events makes clear, the Tour added that provision (the Contractual Assurance Confirmation) in response to LIV Golf's attempted competitive entry.  This amendment makes it even harder for the Player Plaintiffs to exercise their independent contractor right to play for other promoters during their off-weeks.

**The PGA Tour's Anticompetitive Response to Potential Competitive Entry in 2020**

77.     After the PGA Tour used its Media Rights and Conflicting Events Regulations to deter entry by the World Golf Tour in 1994, there was no attempted entry into professional golf for over 25 years.  Then, in late 2019 and into 2020, a number of individuals and entities, some of whom later became involved with LIV Golf, attempted to launch a competing tour known as the Premier Golf League ("PGL").  The Tour orchestrated an anticompetitive response that blocked PGL's attempted entry.

78.     PGL was a venture involving the Raine Investor Group SPV, World Golf Group ("WGG"), the Public Investment Fund of Saudi Arabia, and Performance 54.  PGL developed a proposal for a new golf league, and it approached various golf stakeholders as part of its effort to launch a new elite professional golf tour to compete with the Tour.

79.     PGL had discussions with player representatives in the fourth quarter of 2019 and began offering contracts to players in January 2020.

80.     In January 2020, the Tour obtained copies of PGL's marketing materials and the packages the PGL offered Tour players.

81.     In response, Commissioner Monahan distributed his January 2020 Memorandum acknowledging that the PGL "would be competitive to the PGA TOUR," and detailed the PGA Tour's "response" to "mitigate any impact" from this potential competitive threat.

82.     In his January 2020 Memorandum, Commissioner Monahan explained that the principal means to defeat the threat of competition was to prevent players from joining the new league.  As

Commissioner Monahan wrote, "[t]he impact that [the new league] can have on the PGA TOUR is dependent on the level of support it may receive from these players. Without this support, [the new league's] ability to attract media and corporate partners will be significantly marginalized and its impact on the TOUR diminished."

83.     Commissioner Monahan pointed out that PGA Tour members would have "a significant hurdle" to join the new league because the Regulations prohibit players from joining a competing tour. In addition, Commissioner Monahan pointed to a rule he claimed would prevent players from competing in the team format proposed by the new league (based on a rule prohibiting "players having a financial interest in another player") and prevent players from competing in "conflicting events" except under limited circumstances.

84.     In the 2020 memorandum, Commissioner Monahan also informed the Tour Policy Board that in November 2019, in response to rumors about potential competitive entry of an upstart international golf tour, the Tour had amended the Regulations to expand the Media Rights Regulation "to ensure that all golf events are unequivocally covered on a global basis." He also detailed plans to "further crystallize[] these restrictions."

85.     Commissioner Monahan proposed two additional revisions to the Regulations, one that would tighten restrictions on conflicting events and a second that would prohibit players from having an equity interest in another's performance, a direct response to the PGL's team concept. On information and belief, these revisions were later adopted.

86.     In addition, Commissioner Monahan stated that the PGA Tour has "communicated with key members of the Tournament Advisory Council," a group of PGA Tour tournament directors who advise the PGA Tour on its business conditions, "to prepare for a possible entrance of the [new league] to the marketplace." Commissioner Monahan similarly detailed that the PGA Tour has "liaised with each [Major Championships and Governing Bodies] organization to learn of its position regarding [the new league]." And the PGA Tour communicated with the OWGR regarding the new league's eligibility for OWGR ranking points.

87.     The January 2020 Monahan Memorandum described the PGA Tour's efforts to secure commitments from across the global golf ecosystem to foreclose potential competitive entry.

Recognizing that the competitive threat from the new league would be greatly strengthened through a partnership with the European Tour, Commissioner Monahan stated that the PGA Tour has "continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of [the upstart competitor]." As described, the PGA Tour did in fact partner with the European Tour to prevent competitive entry.

88. Commissioner Monahan and the PGA Tour executed this anticompetitive plan to prevent players from joining the PGL and "remov[e]" others in the ecosystem as potential partners of the PGL, ensuring that the competitive threat from the PGL was thwarted before it could launch.

**The PGA Tour Threatens Players Considering Joining The PGL**

89. At a Tour players' meeting in January 2020 at Torrey Pines in La Jolla, California, Commissioner Monahan read aloud a message to Tour players similarly detailing some of his messages from his January 2020 Memorandum. In that meeting, Commissioner Monahan told PGA Tour players, "[t]he schedule for the [PGL] is designed to directly compete and conflict with the PGA Tour's FedExCup schedule, and to not conflict with [and be in addition to] the Masters, PGA Championship, U.S. Open and The Open Championship." Then, Commissioner Monahan threatened the Tour members with a ban from the PGA Tour if they joined the PGL or any other new league, stating: "If the Team Golf Concept or another iteration of this structure becomes a reality in 2022 or at any time before or after, our members will have to decide whether they want to continue to be a member of the PGA Tour or play on a new series."

90. As Commissioner Monahan made clear, the Tour demanded exclusivity from its independent contractor members, under penalty of a ban from the Tour.

91. In March 2020, Monahan repeated his threats to the players, stating that the Tour would "vigilantly protect [the Tour's] business model" from the competitive entrance of a new league.

92. The Tour's threats to the players' livelihoods had their intended effect. As one player was quoted anonymously in a leading golf publication in early 2020, "the risk of getting banned by the PGA Tour has to be an obvious concern." Many other Tour Members felt the same. As of 2020, the potential harm to the Player Plaintiffs resulting from a ban from the Tour made the idea of signing on to a new start-up too risky to bear. Nonetheless, many Tour members—recognizing that they were

disadvantaged by the Tour's monopsonistic control over the market—remained very interested in new playing opportunities in addition to the Tour.

### The Tour Induces The European Tour Into a Group Boycott

93.     As Commissioner Monahan admitted in his January 2020 Memorandum, the PGA Tour agreed with the European Tour to remove the European Tour as a potential partner of any new entrant.

94.     Throughout 2020, the PGL had been negotiating with the European Tour to develop a partnership to co-sponsor events, which would have been a key step toward enabling the PGL to launch.

95.     The co-sponsorship was important because it would have assured that PGL events would qualify players to earn points under the OWGR system.  OWGR rankings are used to determine qualification for the Majors.  Professional golfers are reluctant to join any tour that does not provide a path to qualify for the Majors.

96.     Under the rules of the OWGR (on whose board Commissioner Monahan sits), a brand new tour purportedly cannot qualify for OWGR points for at least three years and must be sponsored by one of the six full members of the International Federation of PGA Tours (PGA Tour, European Tour, Asian Tour, Japan Tour, Australasia Tour, and Sunshine Tour).  This establishes a barrier to the entry of any new tour:  No elite professional tour can sustain in the long-term unless it provides players with a path to earn OWGR points, but no professional tour can secure points until it has existed for at least three years (absent an OWGR waiver of that requirement) and has sponsorship from one of the established International Federation members.  To navigate through this Catch-22, the PGL sought to partner with the European Tour as part of its plan to enter and obtain a sponsor for its OWGR application.

97.     Recognizing the PGL's need for a partnership with the European Tour, the PGA Tour forged an alliance with the European Tour through threats and financial incentives to put a bearhug around the European Tour and cut off a potential partner of the PGL.  To obtain this agreement, the Tour threatened rule changes that would have made it more difficult for top European players who participate on the PGA Tour to play in European Tour events.

98.     The PGA Tour's approach proved highly effective.  In November 2020, the European Tour announced that it would not partner with the PGL, but instead it would enter into an alliance with

the PGA Tour. One condition of the agreement was that the European Tour not partner with or sponsor the PGL, thereby removing a key partner for the PGL's planned entry. Additionally, through the alliance with the European Tour, PGA Tour Commissioner Monahan secured a seat on the Board of Directors of the European Tour and the PGA Tour made a massive investment in the European Tour and its subsidiaries. The Tour's illegal alliance with the European Tour enabled it to require the European Tour to work in concert with the PGA Tour to prevent competitive entry. The Tour used its strategic alliance with the European Tour throughout the next two years to carry out its anticompetitive scheme to thwart LIV Golf's entry. The Tour entered into the illegal agreement with the illegal purpose to eliminate a competitor and future potential entrants.

99.     The PGA Tour's efforts to thwart the PGL's entry were successful. The PGL never got off the ground, the venture as it existed disbanded, and the PGL was left with no real prospect of viability. In 2022, the PGL offered to partner with the PGA Tour, but under the Tour's control. The Tour summarily rejected the proposal.

100.    And through its campaign to destroy the PGL, the PGA Tour had secured an anticompetitive agreement with the European Tour to foreclose any future potential competitive entrants.

## LIV Golf Promises Long-Needed Competition

101.    After the Tour destroyed PGL's viability and the venture disbanded, LIV Golf formed in 2021. LIV Golf is a new golf company whose goal is to improve professional golf for all stakeholders: fans, players, broadcasters, sponsors, and tournament hosts. It seeks to offer more of what fans, broadcasters, and sponsors want, including an exciting new format that will ensure heightened competition among golf's star players. LIV Golf seeks to modernize the professional game by allowing the game's superstars to realize their true market potential, while enhancing the professional golf marketplace with a dynamic, team-inspired format that will complement individual competition.

102.    LIV Golf developed a new golf tour (the League) that would include 48 top golfers who would compete both as individuals and on 12 teams of four. The LIV Golf League's format is inspired

by the globally successful format for Formula 1 racing.[2]  Twelve headline players would be player-owners, each holding an equity interest in their team and having substantial opportunities to guide their team to on-course and commercial success.  Each LIV Golf League team of four was also set to have two substitute players, thereby offering 72 total players the opportunity to play.  The player-owner of each team was to select four of the six players to play in a given week.  By introducing an innovative format highlighting weekly head-to-head competition among the top players in the game, LIV Golf League's format would have created a more desirable product offering than the PGA Tour format, which has not changed for decades and has the lowest youth viewership of any North American major sport.  LIV Golf League was going to include 54-hole tournaments with shotgun starts[3] and no cut, offering a faster-paced format with high levels of competition in every tournament, dramatically improving the fan experience.

103.    The LIV Golf League format was designed as a fan-friendly alternative to the PGA Tour.  The proposed "shotgun" format would reduce the number of hours required to watch a tournament and increase the excitement of the viewer experience.  The team format would provide opportunities for team allegiances among fans and lead to multiple levels of competition within any given tournament.  The LIV Golf League would also benefit sponsors, advertisers, and other stakeholders, as each team was to be independently commercialized with freedom to develop and select team sponsors and a home city or region.  LIV Golf had strategies for improved broadcast output and an entertainment experience with more storylines and content.

104.    The LIV Golf League was also set to improve conditions for players.  In contrast to the PGA Tour's stagnating tournament purses (until LIV Golf emerged), with about half the players not making the cut and earning nothing in any given tournament, LIV Golf League was set to introduce the benefits of competition to players, including offering players greater economic benefits more

---

[2]  Formula 1 is the world's premier international auto racing series.

[3]  Shotgun starts are when all golfers in a tournament tee off of different holes at the same time so that they finish their rounds around the same time, as compared to tournaments where all golfers tee off of the first hole and proceed to the eighteenth hole in consecutive fashion.

commensurate with their ability to attract revenue, equity ownership opportunities in their own success, and guaranteed income for every tournament in which they participated. LIV Golf would not require players to sign away their name, image and likeness rights for non-LIV Golf events. LIV Golf also would not foreclose players from playing in other tournaments during weeks in which LIV Golf is not playing, which would respect players' independent contractor status and allow them to participate in other tournaments and tours (to the extent not banned by the Tour).

105.    The introduction of competition from the LIV Golf League would provide new and improved options for players, fans, and other stakeholders. Innovation would replace stagnation. Players, fans, sponsors, advertisers, and broadcasters would all benefit. The introduction of the LIV Golf franchise model to the sport of golf—with city, country, and regional affiliations—would engage more fans and increase commercial opportunities.

106.    The LIV Golf League also aspired to enhance player opportunities more broadly and add meaningfully to the playing opportunities for professional golfers worldwide. It planned to provide qualification opportunities for players not initially selected and to embrace other tours, providing their players with pathways into the League. This format was designed to ensure a high level of competition throughout each season, as well as a fair and inclusive platform for golfers throughout the world, including younger development golfers.

107.    If not for the anticompetitive conduct of the Tour, the LIV Golf League would have launched in 2022. LIV Golf had developed a ground-breaking business plan. It secured a chief executive officer and Commissioner—Greg Norman, a giant in the world of golf and a highly successful businessman in multiple industries—hired an experienced team of executives, assembled a board, and built out a full front office with dozens of employees and numerous industry consultants and contractors. LIV Golf partnered with the Asian Tour and invested several hundred million dollars in the Asian Tour to sponsor marquee events throughout the world and develop the sport at multiple levels on a worldwide basis. LIV Golf negotiated with broadcast companies, sponsors, venues, advertisers, vendors, and several other business partners who expressed interest in LIV Golf League. All these successful stakeholders indicated, however, that they would commit only when LIV Golf League had signed up the players needed to launch LIV Golf *and*, critically, secured the players' media

1   rights.

2       108.    LIV Golf also sought to cultivate relationships with other tours in the existing golf

3   "ecosystem," in order to ensure that there were further player pathways into and out of LIV Golf events

4   (both within and across seasons) and to ensure that LIV Golf's entry would be additive and beneficial

5   to the sport of golf throughout the world.  For example, LIV Golf made offers to the Ladies European

6   Tour and the LPGA, which rejected those offers due to the PGA Tour's opposition to LIV Golf, and

7   due to the PGA Tour's board seats in those organizations and its control over the golfing world.  As

8   described below, the PGA Tour has thwarted LIV Golf's efforts by spearheading a group boycott

9   designed to exclude LIV Golf from the "ecosystem" and punish any player who plays in any LIV Golf

10  events.

11              **The Tour's Anticompetitive Response to the Potential Entry of LIV Golf**

12      109.    In response to the potential entry of LIV Golf, the PGA Tour has used a carrot-and-stick

13  approach to prevent the Player Plaintiffs and other PGA Tour Members from playing with LIV Golf.

14      110.    The carrot is a loosening of the PGA Tour's purse strings to make somewhat greater

15  compensation available to players than the Tour historically provided.  This increased compensation to

16  players in response to competitive entry is direct proof of the PGA Tour's monopsony power and the

17  anticompetitive effects on players (including the Player Plaintiffs) from excluding competition.  When

18  the PGA Tour faced the meaningful threat of competitive entry for the first time in a quarter-century,

19  it suddenly and substantially increased player compensation, thus providing direct proof of the Tour's

20  monopsony power in suppressing player compensation below competitive levels.[4]  These changes in

21  the Tour's practices made only in response to nascent competitive entry are also indicative of the

22  anticompetitive effects that will be imposed on the markets if the Tour is successful in defeating LIV

23  Golf's nascent entry—once the Tour is free from competitive pressures, it will have both the ability

24  and incentive to suppress player payments, as it did for many years before LIV Golf's nascent entry.

25      111.    The stick used by the Tour is an array of anticompetitive actions by the PGA Tour to

26

27  _____

28  [4]  Despite these increases in compensation in response to LIV Golf's entry, PGA Tour compensation
    for players remains well below competitive levels.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

destroy the careers and livelihood of players who participate in any LIV Golf events (including the Player Plaintiffs), their business partners and agents, and anyone who associates with LIV Golf or its players. It is particularly notable that as LIV Golf's threat of entry grew, and as the press reported increased player interest and player signings, the Tour ramped up the intensity of its punishment and threats. As Commissioner Monahan made clear in his January 2020 Memorandum, the Tour knew that if it could deter players from joining a new league, the new league's "ability to attract media and corporate partners will be significantly marginalized" and "its impact on the [Tour] diminished." Particularly for a 501(c)(6) organization that is required to further the interests of its members, the Tour's commitment to attack and destroy the careers of its members in order to defeat competition is striking. The Tour's conduct is also blatantly anticompetitive, serves no purpose but to harm competition, and cannot be justified under the antitrust laws.

112. **The carrot.** In April 2021, in direct response to rumors of LIV Golf's potential entry into the marketplace, the PGA Tour announced the "Player Impact Program," a $40 million bonus pool for the top 10 players on the PGA Tour who drive engagement with sponsors and fans. This new bonus pool, announced by the PGA Tour in response to potential competitive entry, is a clear indicator of the benefits of competition for players. As the PGA Tour recognized, competition in the labor market from LIV Golf will force it to raise compensation to the players or it will lose its talent to the new entrant. The PGA Tour's "Player Impact Program," however, was a half-measure, and offered far less than the compensation the players would earn in a competitive labor market.

113. In August 2021, in response to reports that LIV Golf's efforts to secure player commitments were gaining momentum and that the new entrant would offer substantially greater compensation, the Tour announced it would increase the purse sizes for tournaments and bonus pools for the 2021–2022 PGA Tour season by 18 percent compared to the purse size and bonus pools for the 2020–2021 PGA Tour season. As noted above, PGA Tour purse sizes had grown at an anemic low-single-digit rate for years, but when competitive entry was rumored, the Tour responded with an 18 percent increase for the next season. This is clear and direct proof of the Tour's monopsony power, the benefits of LIV Golf's competitive entry, and the harm to competition and the Player Plaintiffs if the Tour is permitted to destroy LIV Golf's nascent entry.

114.     In October 2021, the Tour announced it would increase the purse size for the Players Championship by $5 million (from $15 to $20 million) and would provide players with a $50,000 bonus if they compete in 15 PGA Tour events.

115.     In December 2021, the Tour published its increased purse size for 2022 (increasing from $367 million to $427 million in aggregate) including: (1) increasing FedEx Cup bonus pool from $60 million to $75 million; (2) increasing Top 10 Comcast Business Tour bonus from $10 million to $20 million; (3) increasing the Player Impact Program prize pool from $40 million to $50 million; and (4) making official the October 2021 compensation announcements.

116.     In December 2021, the Tour also disclosed initial plans to copy LIV Golf's team-golf, international, prestigious, exclusive, no-cut, high purse, tournament format. Whereas the Tour and its spokespersons had previously used LIV Golf's new format as an excuse for justifying their opposition to the new entrant, the Tour's announcement that it planned to knock off LIV Golf's format revealed that any opposition based on the new format was merely pretext. And again, the Tour's response to LIV Golf's innovations demonstrates the benefits of competition.

117.     In February 2022, the Tour leaked further information about its plan to copy LIV Golf's ideas in creating a fall series of team events with high purses and no cuts. With that announcement, the Tour also discussed further plans to increase player compensation, reflecting further competitive benefits of LIV Golf's nascent entry.

118.     The increased purses and bonuses that the Tour offered in response to LIV Golf's anticipated entry were, however, a half-measure. They are materially less than the compensation the players would earn in a competitive labor market. In a nutshell: before LIV Golf's anticipated entry, the Tour's market power and the barriers to entry it had created allowed the Tour to compensate its players at levels substantially below what would exist in a competitive market. In response to LIV Golf's attempted entry, the Tour increased player compensation on numerous occasions, but still at less than competitive levels. For example, LIV Golf offers tournament purses between 200 percent to 300 percent higher than PGA Tour's purses, including guaranteed income to all participants. The lowest purse on the LIV Golf tour is millions of dollars greater than the largest purse ever offered by the PGA Tour. The point at which compensation becomes competitive will be determined only when the Tour

is enjoined from using its anticompetitive threats, retaliations, and restrictive contractual provisions, and has to compete on a level playing field with LIV Golf to secure players' services.

119.    Nonetheless, even the early effects of the threat of competitive entry were striking.  The Tour increased player compensation several times in response to the potential competitive entry of LIV Golf, totaling *$135 million* in a matter of a few months.  This is clear and direct evidence of the Tour's monopsony power and the benefits of competition from LIV Golf.  It is also direct evidence of the harm to competition that will result if LIV Golf's competitive entry is thwarted.  Without the threat of competition from LIV Golf, the Tour would again face neither competition nor any reasonable likelihood of competition in the future.  The Tour would then have both the ability and incentive to suppress player compensation to the sub-competitive levels that existed in the decades before LIV Golf launched.

120.    In response to the increased compensation from the PGA Tour, players recognized that the threat of competitive entry prompted the changes:

    i.    Plaintiff Mickelson:  "I'm appreciative of the fact that there is competition, and that leverage has allowed for a much better environment on the PGA Tour, meaning we would not have an incentive program like the PIP [Player Impact Program] for the top players without this type of competition.  We would not have the increase in the FedEx Cup money.  We would not have the increase in the Players Championship to $20 million this year if it wasn't for this threat."

    ii.    Joel Dahmen:  "The PGA Tour . . . magically come up with $40 million for PIP and then there paying us all 50 grand to play 15 events, which is another X million dollars.   That's like, $50 million they just magically found laying around overnight.  The money is there.  There's a way to do it."

    iii.    Jason Kokrak:  "I'm curious to see if the PGA Tour would've ever increased any of that without this competition."

121.    As PGA Tour Member and then-PGA Tour Policy Board Member Jordan Spieth said, "I think as a player overall it [competition from LIV Golf] will benefit us . . . . I can only say from my point of view I think that it's been beneficial to the players to have competition."  PGA Tour member

Rickie Fowler said, "I think competition is a good thing, and in business, whatever it may be. . . . if you're trying to be the best, you want to find ways that you can be better than your competitors.  It goes through sport, business, tours, whatever it may be."  And Mr. Fowler noted that these new tours are coming about because the PGA Tour's stale product left players frustrated:  "These tours or leagues, however you want to classify or call them, they wouldn't really be coming up if they didn't see that there was more opportunity out there.  I've always looked at competition being a good thing.  It's the driving force of our game."

122.    Then, after LIV Golf had achieved some success with its first LIV Golf Invitational Series event and contracting with some popular golfers, the Tour managed to come up with yet more money to try to deter golfers from leaving the Tour for LIV Golf.  On June 21, 2022, just days after LIV Golf London Invitational, the Tour copied LIV Golf's concept of limited field, no cut, team events with high purses, and announced its version of the events to begin in 2023.  In that announcement, the Tour announced another increase of approximately $54 million to existing events and, in total, over $100 million purse increases across all of its events.  In its announcement to its players, the Tour admitted the increase came from its "reserves."  The Tour had the money, but didn't compensate the athletes or seek to offer innovative tournament ideas until LIV Golf introduced actual—albeit fragile— competition in the relevant market.  On August 1, 2022, the Tour announced the purse amounts for the entire 2022–2023 schedule, which totaled a record $415 million in prize money in official events and another $145 million in bonuses—further showing how competition from LIV Golf caused the Tour to increase compensation for players.

123.    **The stick.**  The Tour's increased purses were not successful in deterring player interest in LIV Golf.  As noted, the Player Plaintiffs and other players recognized that competition was good for the game of golf and for them, and the promise of true competition for their services fueled player interest in LIV Golf, which offered a more desirable format, more favorable terms for the Player Plaintiffs and other players (such as owning their media rights), and far greater compensation than the Tour was offering even with the recent increases in compensation.  As a result, in a desperate effort to thwart competitive entry and protect its monopoly position, the Tour launched a campaign of threats against its own members, including the Player Plaintiffs, that promised career destruction for any

players who joined LIV Golf.

124.     After news broke in April 2021 that LIV Golf made formal offers to a number of the top players in the world, on May 4, 2021, Commissioner Monahan addressed a meeting of Tour players (including the Player Plaintiffs) and informed the players that any golfer who joined LIV Golf would immediately lose their status as a PGA Tour member and face *a lifetime ban from the PGA Tour*. The players, including the Player Plaintiffs, were understandably intimidated by the Tour's threat.

125.     The Tour intended its threat of lifetime ban to be a serious deterrent. It was. The prospect of leaving the Tour for an upstart golf promoter that could not guarantee its long-term existence, under threat of a lifetime ban from the incumbent monopsonist, was prohibitively risky. If banned from the Tour, the player would face a serious risk of being foreclosed from pursuing his chosen profession, a harrowing prospect for any golfer, and particularly younger golfers capable of 20 or more years of elite play.

126.     In the 24 hours after the Tour announced that it would impose a lifetime ban on players who join LIV Golf, and after the Tour leaned on them for support, other entities in the golf "ecosystem" issued public statements reinforcing and expanding the Tour's threat:

- Seth Waugh, the CEO of the PGA of America, which sponsors the PGA Championship, publicly indicated the PGA of America's support for the PGA Tour and the European Tour in excluding competition from the "ecosystem of the professional game." He stated: "We are in full support of the PGA Tour and the European Tour regarding the current ecosystem of the professional game."

- Augusta National, which sponsors the Masters, issued a statement that "[t]he PGA Tour and European Tour have each served the global game of golf with honor and distinction. . . . As it has for many decades, the Masters Tournament proudly supports both organizations in their pursuit to promote the game and world's best players."

- A spokesperson for the R&A, which sponsors The Open, stated, "we have deep relationships with the [PGA Tour and the European Tour] and are supportive of them."

127.     When the Tour learned that LIV Golf was continuing to talk with players' representatives (including the Player Plaintiffs' representatives) despite the threat of lifetime bans, the Tour threatened certain of the players' representatives, saying that it would harm the representatives' and the players' business interests if they continued to engage in discussions with LIV Golf.  These threats to players' representatives highlight the pretext in the Tour's assertions that it is merely enforcing its own rules.  No Tour rule grants it the authority to threaten the business of a player's agent or representative if a player participates in a LIV Golf tournament.  And there is no conceivable procompetitive justification that could support such bullying.  The Tour's actions are transparently anticompetitive, as they are aimed purely at kneecapping competition from LIV Golf before it can get off the ground and threaten the Tour's monopoly.

128.     Furthermore, the Tour threatened—without basis—the Player Plaintiffs, their representatives, and other players and their representatives, that the Tour would withhold players' vested retirement funds if they were to join LIV Golf.  Again, this threat is not justified under any Tour rule, but rather is targeted purely at undermining LIV Golf's competitive entry.

129.     Several player representatives, including those of the Plaintiffs, were threatened that the Tour would use its connections to pressure their sponsors to revoke sponsorship agreements were they to join LIV Golf.  Upon information and belief, the Tour successfully pressured sponsors to revoke player sponsorships.  This conduct is not justifiable as the enforcement of any Tour rule, but instead is a transparent use of the Tour's muscle to attack players in order to undermine LIV Golf's competitive entry.

130.     Through all of these actions, the Tour has harmed both the Player Plaintiffs and LIV Golf.  Furthermore, the Tour's continued anticompetitive bullying aimed at any players or other parties who do business with LIV Golf (including the Player Plaintiffs) presents a severe threat of thwarting LIV Golf's nascent competitive entry.  If not enjoined by the Court, the Tour's ongoing anticompetitive conduct threatens to irreparably harm LIV Golf, the Player Plaintiffs (both as direct targets of the Tour's anticompetitive conduct and as sellers into the market in which the Tour aims to secure its monopsony power), and competition itself.

**The Tour Uses Its Strategic Alliance with the European Tour to Exclude LIV Golf and Its Partners from the "Ecosystem"**

131.     Before the PGA Tour formed an illegal alliance with the European Tour, the European Tour was a willing partner for prospective innovators and entrants into the global golf ecosystem.  This included Golf Saudi and the Saudi investors who ultimately sponsored LIV Golf.  For example, in a panel discussion in 2019, European Tour CEO Keith Pelley asserted that Saudi Arabia "are at the forefront of helping us develop the game."  In fact, the European Tour partnered with Golf Saudi in launching the Saudi International, co-sanctioning the tournament for three years from 2019 to 2021.

132.     While the Tour and those it has leaned on now use the Saudi sponsorship of LIV Golf as a weapon to smear LIV Golf and the golfers (including the Player Plaintiffs) who play in LIV Golf events and justify their attacks on the golfers, Mr. Pelley's statements reveal that attacks on the Saudi sponsorship of LIV Golf are pure pretext.  The Tour had no problem entering into a partnership with the European Tour at the same time that the European Tour co-sanctioned the Saudi International and while Mr. Pelley gushed about the prospect of partnering with Golf Saudi to grow the sport.  And the Tour has no problem accepting its own sponsorship money from companies that do billions of dollars in business with Saudi Arabia each year.  An estimated 23 PGA Tour sponsors conduct regular business with Saudi Arabia each year—an estimated $40 billion dollars of business with Saudi Arabia.  That the PGA Tour eagerly does business with these companies while criticizing golfers for playing on a tour primarily sponsored by the Public Investment Fund of Saudi Arabia is simply hypocrisy.  And it exposes as pretext any notion that the Tour is orchestrating an attack on the players because the Tour is somehow unable to do business with anyone who has business connections to Saudi Arabia.  The Tour's campaign to destroy these players is about defeating competition even at the cost of punishing its own members.

133.     The European Tour's support for Golf Saudi changed starkly once the European Tour entered into its alliance with the PGA Tour and when Golf Saudi supported a potential competitive entrant to the PGA Tour.

134.     The Tour's agreement with the European Tour to form a group boycott to block competitive entry that could challenge the PGA Tour's dominance is a matter of public record.  For example, on May 4, 2021, the European Tour released a statement that "we are aligned with the PGA

Tour in opposing an alternative golf league, in the strongest possible terms."

135.    Just over a week later, on May 12, 2021, European Tour Commissioner Keith Pelley wrote to representatives of Golf Saudi, noting its understanding that "Golf Saudi appears to be leading the current pursuit of a new golfing enterprise, referred to widely as the Super Golf League or [LIV Golf]."  Commissioner Pelley wrote that the European Tour believed Golf Saudi was "talking to our members about joining this **rebel enterprise**."  In an effort to deter Golf Saudi from supporting a new entrant, Commissioner Pelley threatened that the European Tour would refuse to co-sanction the Saudi International (which the European Tour had co-sanctioned since 2019) unless Golf Saudi "publicly denounce[d] [LIV Golf]."

136.    Commissioner Pelley also made clear that his threats to Golf Saudi were in furtherance of the European Tour's anticompetitive agreement with the Tour to lock arms in a global "ecosystem" to foreclose LIV Golf's entry:

> We had, and indeed still have, aspirations of working with Golf Saudi in continuing to build the Saudi International into a world class event, and indeed look for other opportunities and have shared this view with our Strategic Alliance partners at the PGA TOUR.
>
> It is, however, impossible for us to continue those discussions while Golf Saudi is championing an alternative Tour that we believe is detrimental to both the European Tour, the PGA TOUR and global professional golf.  I know PGA TOUR Commissioner Jay Monahan feels the same.
>
> We would therefore encourage you in the strongest possible terms to publicly denounce SGL as soon as possible which would allow us to reopen dialogue about the Saudi International and how Golf Saudi, operating ***inside*** the ecosystem, could resume the joint vision we began in 2017.[5]

137.    The Tour and the European Tour also threatened other prospective partners of LIV Golf, making clear that they will seek to punish those who support LIV Golf by excluding them from the so-called world golf "ecosystem."  For example, LIV Golf sought to enter into a relationship with the Asian Tour to co-sanction LIV Golf's tournaments to ensure that players would qualify for OWGR points (which, as described above, is essential to the long-term success of an elite level tour) and to establish a broader relationship for investment in the Asian Tour to grow the sport globally.  In

---

[5]  "SGL" in Commissioner Pelley's email stands for Super Golf League and refers to the entity and potential entrant that is now known as LIV Golf.

response, the European Tour sent a list of "Consequences" to the CEO of the Asian Tour—under the logos of the European Tour and the PGA Tour—that the Asian Tour would suffer if it entered into any partnership with LIV Golf.  Those consequences included (1) eliminating a "[p]athway for Asian Tour members onto European Tour," (2) taking away "[e]xisting tournaments we co-sanction, totaling in excess of US$10m of prize money and 250 playing opportunities," (3) eliminating all future "co-sanctioned tournaments between the European Tour/PGA TOUR and Asian Tour" and (4) the Asian Tour would lose its "[p]osition within existing global golf ecosystem."  Notably, the European Tour and Tour threatened not only to punish the Asian Tour directly, but to punish golfers on the Asian Tour by eliminating a "pathway for Asian Tour members onto [the] European Tour" and by removing prize money that had previously been available to Asian Tour members.  Despite these threats, LIV Golf was able to offer constructive collaboration and investment in the Asian Tour sufficient to convince the Asian Tour to partner with LIV Golf in the face of the threats from the European Tour and Tour.

138.    Despite these threats, LIV Golf and its sponsors continued in the effort to work constructively with existing golfing bodies to grow the sport.  For example, on July 5, 2021, representatives of the entities that would sponsor LIV Golf met in Malta with leaders of European Tour.  They presented an offer that would have made the European Tour a partner in innovating in the sport worth up to $1 billion for the European Tour.  As reflected in the meeting minutes provided by a representative of the European Tour's title sponsor (DP World), the representatives from European Tour were "[g]rateful for the detailed work and preparation" and "[c]onfirmed" the LIV Golf series had "appeal and fit."  However, the European Tour representatives "**stated main issue is US PGA mighty power and need to avoid a collision course between ET and PGA**."  Simply put, partnering with LIV Golf was good for the European Tour, its members, and the sport of golf, but the European Tour feared the "mighty power" of the PGA Tour, turning down the opportunity to partner with LIV Golf because of its "need to avoid a collision course between ET and PGA."

139.    When Golf Saudi did not yield to Commissioner Pelley's May 2021 demand that it "publicly denounce" LIV Golf, the European Tour followed through on its threat to refuse to continue sanctioning the Saudi International.  Then, in August 2021, the Tour announced through the press that it would not grant any PGA Tour members conflict releases for the Saudi International as it had done

since 2019, because the Saudi International was no longer sanctioned by the European Tour.

140.    In response to the PGA Tour's threats to deny releases to play in the Saudi International, the players expressed their concerns:

a.  Sergio Garcia:  "When you get banned from playing, or whatever, it hurts the game. . . . People want to see us play all around the world and enjoy us wherever we go."

b.  Rory McIlroy:  "My view as a professional golfer is I'm an independent contractor, I should be able to play where I want if I have the credentials and I have the eligibility to do so. . . .  Just the one thing I would worry about is if guys want to go to Saudi and they are going to make ten percent of their yearly income just by going and playing and [the PGA Tour is] restricting them from doing that, punishing them, that creates resentment for the players and that creates a problem between the tours."

c.  Xander Schauffele:  "I feel like there just needs to be some sort of counter in the way certain things work.  I'll try and do what I need to do, and they'll tell me what I can and can't do at a certain point, but I feel like they need to counter. They can't just tell me no, you can't do this and then just kick rocks, kid. That's not really how I'd want to do things."

141.    Despite the Tour's threat, the demand from the Tour members to play in this non-Tour-sanctioned event was so strong that over 30 players (including Plaintiffs Mickelson and DeChambeau) sought releases to play in the Saudi International.  In response to this pressure from the players, the Tour granted the release requests under the Conflicting Events and Media Rights Regulations, but imposed conditions on the players (including Plaintiffs).  The Tour informed players that the Regulations fully supported the denial of the players' requests but that it would permit players to play in the Saudi International provided that: (1) players who have not played in the AT&T Pebble Beach Pro-Am (a PGA Tour event that takes place annually in this district) at least once in the last five years must commit to playing Pebble Beach at least twice in the next three years; and (2) players who have played Pebble Beach at least once in the last five years must commit to play Pebble Beach at least once in the next two years.  The Tour did not impose these conditions and restrictions when it granted past releases—it did so only after Golf Saudi refused the threat to denounce and boycott LIV Golf.

142. In a message to European Tour members, Commissioner Pelley made clear that the opposition to having players participate in the Saudi International, which the European Tour had co-sanctioned from 2019 to 2021, was an attack on competition from LIV Golf, which he described as "a clear existential threat." As Commissioner Pelley stated, "we have done everything we can to encourage the Asian Tour and LIV Investments to play within our ecosystem," letting golfers play for a partner of LIV Golf would "damage" our business. Commissioner Pelley was blunt in conceding that the tours are acting to protect their own business interests, which diverge from the interests of the players whom they are supposed to support: "We want the best for our members but at the same time will vehemently do everything we can to protect your Tour."

143. Similarly, on December 16, 2021, the PGA Tour and European Tour flexed the muscle of their group boycott and made good on their threats to the Asian Tour. After the Asian Tour accepted investment and partnership with LIV Golf, Asian Tour CEO Cho Minn Thant received a call from Martin Slumbers, the CEO of the R&A, which hosts The Open. Mr. Slumbers told Mr. Thant that the R&A would end its years-long practice of giving the Asian Tour Order of Merit winner entry into The Open because the PGA Tour and European Tour, with whom the R&A was aligned, were displeased about LIV Golf's investment in the Asian Tour. Days later, the media confirmed the R&A would revoke the Asian Tour Order of Merit winner's entry into the Open, identifying punishment of LIV Golf as the basis for harming individual Asian Tour players. Once again, the Tour and those it was pressuring were attacking LIV Golf and its partners by punishing golfers who had any association with LIV Golf.

144. As LIV Golf's player recruitment efforts continued, the Tour encouraged the European Tour to tighten its grip on its members and ensure they would not leave the "ecosystem" to play with LIV Golf. In threatening and imposing punishment on European Tour members, Commissioner Pelley made clear that it was doing so (1) pursuant to its agreement with the PGA Tour, (2) in an effort to thwart competition from LIV Golf, and (3) that the punishments were aimed at coercing players to act contrary to their individual interests. For example, on April 19, 2022, Commissioner Pelley wrote to European Tour members, reminding them of the European Tour's Conflicting Events Regulation. He stated: "Conflicting events, regardless of how attractive they might appear to you personally,

potentially compromise our efforts in these areas and could significantly hurt your Tour in both the short and long term." He continued: "Please, therefore, continue to bear this bigger picture in mind, particularly considering some of these conflicting events in 2022 are scheduled directly opposite some of our most prestigious 'heritage events.'" He also stated: "We are unwavering in our belief that working together with PGA Tour . . . will make our sport less fractured and benefit global golf."

145. As part of their concerted efforts to tighten the reins, on June 24, 2022, the PGA Tour and European Tour suspended golfers who participated in the initial LIV Golf tournament from their three co-sanctioned events—the Scottish Open, Barbasol, and Barracuda Championships—and fined the suspended golfers €100,000. They further threatened to double the sanctions for future violations (which all participants in the second LIV Golf tournament in Portland, Oregon had already committed).

146. Just four days later, on June 28, 2022, the PGA Tour and the European Tour announced a further agreement to solidify their strategic alliance whereby: (1) the PGA Tour invested more in the European Tour Productions (the European Tour's media arm) to take a 40 percent share; and (2) the PGA Tour arranged for the European Tour to be a direct feeder tour into the PGA Tour, with the top 10 performing golfers on the European Tour earning PGA Tour cards. In a press conference announcing the agreement, when asked whether players who play in LIV Golf events could earn the tour cards, European Tour Commissioner Pelley and PGA Tour Commissioner Monahan both struggled to answer, until Commissioner Pelley conceded their plan to impose total bans on golfers who participate in LIV Golf events: "This won't come into place until next year and I honestly don't think we'll have that problem by then" because LIV Golf players will not be permitted to play on the European Tour to earn a PGA Tour card.

147. The PGA Tour's agreement with the European Tour to form a group boycott against LIV Golf and its players is further reflected in the punishments the European Tour imposed on its members who participated in LIV Golf events. The European Tour has historically considered playing in a competing event without a release to be a minor breach of its Regulations, with a punishment of €12,000 for a violation. In contrast, when its members participated in the first LIV Golf event, the European Tour issued punitive sanctions at the behest of the Tour, including fines of approximately €100,000 and suspensions from the three events the European Tour co-sanctions with the PGA Tour

49

(but not other European Tour events not co-sanctioned by the PGA Tour), and threatened that participating in further LIV Golf events would lead to double fines and suspensions. To engineer these punishments, the European Tour first amended its regulations twice—after entering into the illegal alliance with the PGA Tour—to make the relevant violation of the European Tour's Regulation a "Serious Breach," which would give the Commissioner discretion to punish players and expand the scope of the Regulation.

148. On July 1, 2022 three of the golfers suspended from the co-sanctioned events, Ian Poulter, Adrian Otaegui, and Justin Harding, sued the European Tour to stay their suspensions and allow them to participate in the Scottish Open. The players challenged the European Tour's sanction process as unfair and partial, and challenged the legality of its regulations. They also challenged the sanctions as contrary to the European Tour's interest, as it was clear the European Tour was acting in concert with the PGA Tour.

149. The matter was referred to an arbitrator (pursuant to European Tour rules and an agreement between the players and the European Tour to stay the players' suit), who granted the players' request to stay their suspension from the Scottish Open until the merits of their appeal could be heard before an independent panel. The arbitrator reasoned that European Tour CEO and Commissioner Keith Pelley undertook "no process . . . close to replicating the guidelines for a disciplinary hearing" and "was on record as having made strong adverse public statements on LIV," and, as the European Tour stated itself, he was "'necessarily partial.'"

150. On July 1, 2022, the PGA Tour demonstrated its power over the European Tour, and laid bare its anticompetitive motives in banning participants in LIV Golf events from its tournaments, by banning from the co-sanctioned events in the United States (the Barbasol and the Barracuda) all European Tour golfers in good standing who had played in the LIV Golf London Invitational. These golfers were not members of the PGA Tour, and thus could not have violated any PGA Tour rule. And even though they are members of the European Tour, they had not violated any European Tour rule

because they were permitted by the European Tour to participate in the LIV Golf event.[6] Nonetheless, the PGA Tour barred these golfers from playing in co-sanctioned events, because the PGA Tour has a policy of total foreclosure of LIV Golf players from any of its events.

151.    On July 20, 2022, in furtherance of its agreement with the Tour to boycott LIV Golf and those who associate with it, the European Tour removed Henrik Stenson as the European Team's 2023 Ryder Cup Captain because he joined LIV Golf.

### PGA Tour Leans on the Majors to Do Its Bidding Against LIV Golf

152.    The Tour's threats to impose bans on players who join LIV Golf are vastly strengthened if the ban encompasses not only PGA Tour events, but also the four annual Major Championships—the PGA Championship, the Masters, the Open, and the U.S. Open—as well as the biannual Ryder Cup.  Participating in and winning the Majors and the Ryder Cup are the ultimate goal of most top professional golfers.  And, in turn, one of the goals of playing on a tour each year is to secure qualification to the Majors and the Ryder Cup.  The Tour is aware that if it can foreclose LIV Golf players from having access to these events—or even create enough credible doubt about whether participation in LIV Golf will end a player's chance of playing in those events—LIV Golf will find it prohibitively difficult to sign and sustain a critical mass of players to field a competitive elite-level tour.  Accordingly, the Tour has pressured and encouraged the Major organizations to join its group boycott and to prevent LIV Golf from entering the global golf ecosystem.

153.    For example, PGA Tour Commissioner Jay Monahan wrote in his January 2020 Memorandum:  "We have liaised with each [Major] organization to learn of its position regarding Private Equity Golf."

154.    As with the Tour's ramping up of its player threats over time as the threat of LIV Golf's competitive entry has grown, the Tour's pressure on the Major organizations has grown over time as well.  For example, as part of its strategy to pressure the Majors into doing its bidding, in July 2022, the Tour had its 2022 Presidents Cup Captain and Hall of Fame Golfer Davis Love III use his position

---

[6]  The golfers did not need a release from the European Tour to play in the LIV Golf London event because they had not qualified for the conflicting event on the European Tour.  Thus, the golfers had not breached any European Tour rule and were not subject to any discipline from the European Tour.

and influence to publicly encourage Tour members to enter into a group boycott of the Majors if the Majors do not ban all players who have played in LIV Golf. As Mr. Love stated, in encouraging a *per se* unlawful group boycott among Tour members: "Well, here's the biggest lever; and it's not the nice lever. But if a group of veterans and a group of top current players align with 150 guys on the Tour, and we say, 'Guess what? We're not playing,' that solves it, right? If LIV guys play in the U.S. Open, we're not playing. If they sue in court, and they win, well, we're not playing. You know, there won't be a U.S. Open. It's just like a baseball strike." As Mr. Love's comments make clear, the Tour and its representatives view themselves as being above the law, exempt from the requirements of the Sherman Act, and free to engineer a self-help group boycott aimed at frustrating any injunction entered by this Court.

155. *The PGA Championship and the Ryder Cup.* The PGA of America is a separate entity from the PGA Tour, which organizes the PGA Championship and co-organizes the Ryder Cup along with the European Tour. The PGA of America has a representative, President Jim Richerson, on the PGA Tour Policy Board. On May 4, 2021, during a time when LIV Golf was gaining momentum in attracting players' interest and on the eve of the PGA Championship in South Carolina, the CEO of the PGA of America, Seth Waugh, stated publicly that the PGA of America was aligned with the Tour in opposing LIV Golf's competitive entry. Specifically, he said, "We [PGA of America] are in full support of the PGA Tour and the European Tour regarding the current ecosystem of the professional game." Then, two weeks later, Mr. Waugh said that the PGA of America would ban players from future PGA Championships and the Ryder Cup if they joined LIV Golf. Specifically, Mr. Waugh said, "If someone wants to play on a Ryder Cup for the U.S., they're going to need to be a member of the PGA TOUR—excuse me, a member of the PGA of America, and they get that membership through being a member of the TOUR. . . . It's a little murkier in our championship, but to play from a U.S. perspective you also have to be a member of the TOUR and the PGA of America to play in our championship, and we don't see that changing." Mr. Waugh went on to state, "I believe the Europeans feel the same way. And so I don't know that we can be more clear than that." Mr. Waugh's public threat inaccurately characterized the PGA of America's Constitution, as there are many ways to be a member of the PGA of America beyond being a member on the PGA Tour.

156.    At the September 2021 Ryder Cup, PGA of America representatives privately threatened golfers and their representatives that they would be banned from future Ryder Cups and the PGA Championship if they joined LIV Golf.

157.    Mr. Waugh repeated the threat a year later at the 2022 PGA Championship.  He said, "As I said, we're a fan of the current ecosystem and world golf ranking system and everything else that goes into creating the best field in golf.  Right now we really—I don't know what it'll look like next year.  We don't think this [LIV Golf] is good for the game and we are supportive of that ecosystem. We have our own bylaws that we will follow towards those fields."  He was then asked by the media, "I'm sorry do your bylaws preclude letting those players [players who played in LIV Golf] play?"  Mr. Waugh responded, "Not specifically, but our bylaws do say that you have to be a recognized member of a recognized Tour in order to be a PGA member somewhere, and therefore eligible to play."

158.    And then, in June 2022, the 2023 PGA of America Ryder Cup Captain Zach Johnson repeated the same unfounded threat and expanded it to suggest that Plaintiffs will not be eligible for the 2023 Ryder Cup.  When he was asked by the media whether a player who plays in LIV Golf will be eligible for his 2023 Captain Picks, he responded, "The way that we're members of the PGA of America is through the PGA Tour.  I'll let you connect the dots from there."

159.    *The Open.*  The R&A, the global golf rules organization and promoter of The Open Championship, has taken multiple actions to support the PGA Tour's efforts to exclude LIV Golf.  For example, the R&A has taken away the Asian Tour's Order of Merit winner's entry into the Open Championship in order to deter the Asian Tour from partnering with LIV Golf.  Similarly, the CEO of the R&A (Martin Slumbers) and the Chairman of Augusta National (Fred Ridley) called the CEO of the Asian Tour (Cho Minn Thant) to threaten consequences relating to the Asian Tour's position in the current "ecosystem" if the Asian Tour continued to support LIV Golf and its LIV Golf Invitational Series.  More recently, in July 2022, the R&A demonstrated its alignment with the PGA Tour by publicly disinviting two-time Open Championship winner Greg Norman from champions events at the 150th Open Championship because he is the CEO of LIV Golf.  The R&A also informed Mr. Mickelson he was not welcome.  And, at the Open Championship in July 2022, R&A CEO Martin Slumbers suggested that players who play in LIV Golf may not be eligible or qualify for future Open

Championships, and that it would be harder for them to make it in the tournaments.

160.     *The Masters.*  Augusta National, the promoter of The Masters, has taken multiple actions to indicate its alignment with the PGA Tour, thus seeding doubt among top professional golfers whether they would be banned from future Masters Tournaments.  As an initial matter, the links between the PGA Tour and Augusta National run deep.  The actions by Augusta National indicate that the PGA Tour has used these channels to pressure Augusta National to do its bidding.  For example, in February, 2022 Augusta National representatives threatened to disinvite players from The Masters if they joined LIV Golf.  In addition, Augusta National Chairman Fred Ridley personally instructed a number of participants in the 2022 Masters not to play in the LIV Golf Invitational Series.  Plainly, these threats to top players served no beneficial purpose, as they would only serve to weaken the field in the Masters.

161.     In May, 2022 the PGA Tour also encouraged Augusta National representatives to attend Tour Player Advisory Council meetings to discuss ramifications for players participating in LIV Golf events, further demonstrating how the Tour has leaned on Augusta National to aid it in dissuading golfers from joining LIV Golf.

162.     And, when LIV Golf CEO Greg Norman asked Mr. Ridley if he would meet with him to understand LIV Golf's business model and discuss how LIV Golf could operate in the existing professional golf world, Mr. Ridley declined the invitation—another example of LIV Golf trying to work with existing golfing entities and being turned away before even getting an opportunity to show them what LIV Golf is about.

163.     In addition, the Tour and others are utilizing their positions on the Governing Board of the OWGR to create enough credible doubt about whether LIV Golf will be eligible for OWGR points and whether players who participate in OWGR will be able to earn points playing in LIV Golf tournaments.

### The Tour Announces Policy to Permanently Ban Players Who Join LIV Golf

164.     Between January 2020 and February 2022, the Tour increased the severity of its threats of punishment to any player who would consider joining LIV Golf, as well as threats to the players' representatives and entities involved in golf sponsorship and advertisement.  These threats, both individually and in combination, were anticompetitive acts that harmed Plaintiffs and tortiously

1    interfered with the Plaintiffs' business relationships.

2        165.    With multiple press reports in early 2022 describing LIV Golf's forward momentum

3    and reporting that LIV Golf was nearing the critical mass needed to launch its tour, the Tour once again

4    increased its threats to the players.  In February 2022, the Tour gathered the agents of players (including

5    the Player Plaintiffs' agents) who were assembled for a Tour event in Los Angeles, California and

6    informed them that the Tour would impose a lifetime ban on any player who signed with LIV Golf.

7    This threat was a significant deterrent for players to take the risk to join LIV Golf.  At that time, LIV

8    Golf had not held its first tournament, and there was simply too great of a risk of career destruction in

9    the face of such unlawful and brazen threats.  For example, one star player, who had been in favor of

10   joining the LIV Golf League before the threat, stated that younger players were "s***ting in [their]

11   pants" in response to this threat, and that he was not sure how LIV Golf could get the players it needed

12   with the Tour's lifetime ban threat.

13       166.    On February 22, 2022, Commissioner Monahan addressed a meeting of Tour players at

14   the Honda Classic and reiterated that any player who joined LIV Golf would receive a lifetime ban

15   from the Tour.  According to an article quoting an anonymous player present at the meeting,

16   Commissioner Monahan told players that if they were going to play in the league operated by LIV Golf

17   to "walk out that door now" and "made the ban seem like it was in all capital letters."

18       167.    The Tour's threats of punishment and career destruction greatly affected LIV Golf's

19   ability to sign enough elite professional golfers to fill out its League.  Some players (including Plaintiff

20   DeChambeau) who had previously signed contracts with LIV Golf were forced to publicly profess

21   loyalty to the Tour.  Other players who had previously agreed in principle to all terms with LIV Golf

22   informed LIV Golf that they now could not sign, and instead publicly professed loyalty to the Tour.

23   Players who had been enthusiastic about joining LIV Golf informed LIV Golf that they regrettably

24   could not join in light of these threats.  Just as Commissioner Monahan had predicted in his 2020

25   Memorandum outlining the PGA Tour's plan to attack a new entrant, a competing tour without player

26   support would prove unable to pose a competitive threat to the PGA Tour.

27       168.    The Tour's lifetime ban policy had its desired effect, as LIV Golf League's 2022 launch

28   plan died.  LIV Golf was injured by having its launch plans derailed.  And Player Plaintiffs were injured

by losing the opportunity for increased playing and income opportunities and sustained competition for their services.

## LIV Golf Invitational Series

169.     Forced to scrap its plans for a 2022 launch of the League, LIV Golf regrouped and developed a substantially scaled-down launch plan that became known as the LIV Golf Invitational Series.  The Invitational Series did not include franchised teams or other planned League features, and promised two fewer events in 2022.  Instead, on March 16, 2022, LIV Golf announced that the Invitational Series would feature an eight-event series showcasing a new golf format starting in June 2022.  The format features both individual and team play, and offers more than $250 million in prize purses.  The first seven LIV Golf Invitational Series events each carry a purse of $25 million, comprised of $20 million in individual prizes (all players in the field earn a share) and $5 million, split among the top three teams.  Following the first seven LIV Golf Invitational Series events, an Individual Champion will be crowned and a $30 million bonus prize will be split among the top three individual performers throughout the series.  The eighth LIV Golf Invitational Series event will be a Team Championship that will provide an additional $50 million in total prize funds.  The LIV Golf Invitational 2022 schedule started with the LIV Golf London Invitational on June 9–11, 2022, the LIV Golf Portland Invitational at the Pumpkin Ridge Golf Club on June 30–July 2, 2022, and the LIV Golf New York Invitational in Bedminster, New Jersey on July 29–31, 2022.  The remaining LIV Golf scheduled events are:

- Sept. 2–4:  The International – Boston, Massachusetts
- Sept. 16–18:  Rich Harvest Farms – Chicago, Illinois
- Oct. 7–9:  Stonehill Golf Club – Bangkok, Thailand
- Oct. 14–16:  Royal Greens Golf Club – Jeddah, Saudi Arabia
- Oct. 28–30:  Trump Doral Golf Course – Miami, Florida

170.     During weeks in which there is no LIV Golf Invitational Series tournament, LIV Golf encourages players to play wherever they choose, including Tour events, other events on other tours, or events that might be created in the future (and which are currently prevented from developing because of the Tour's restrictive rules).

171.     While LIV Golf has moved forward with its scaled-down plans for the Invitational

Series, it has incurred financial losses that were far more severe than it would have incurred if its original launch plans had not been derailed by the Tour's anticompetitive conduct. These losses are partly due to the supracompetitive increases to player-acquisition costs it has incurred in light of the Tour's anticompetitive conduct, and partly due to the loss in revenue-generating opportunities as a result of the scaled-down nature of the Invitational Series in comparison to the original plans for the League.

### Efforts to Prevent and Harm LIV Golf's Invitational Series

172. On March 15, 2022, LIV Golf Commissioner and CEO Greg Norman sent emails regarding the LIV Golf Invitational Series to approximately 250 top professional golfers (including Plaintiffs). The Player Plaintiffs were excited that LIV Golf was going to host tournaments despite the obstacles the Tour put in its path. On March 23, 2022, LIV Golf formally invited the same group of players to participate in the LIV Golf Invitational Series. Several players (including the Player Plaintiffs) reached out to LIV Golf to say that they were interested in playing in the Invitationals, but they were concerned about doing so in light of the Tour's threats to players. The Player Plaintiffs remained interested in LIV Golf and continued discussions, as did others.

173. The Player Plaintiffs and many other players (at least 170 golfers) filed entry applications for LIV Golf Invitational Series' first event. The Player Plaintiffs and, on information and belief, some 80 Tour members sought conflicting events and media rights releases from the PGA Tour under the Conflicting Events and Media Rights Regulations.

174. In furtherance of its monopoly and its monopsony and its illegal agreement with the European Tour, on May 10, 2022, the Tour denied *all* requests from Tour members to participate in LIV Golf Invitational Series events. The denials were striking, because the Tour has historically granted releases to players to permit them to participate in events outside the U.S., but in this case the Tour issued an across-the-board denial for an event taking place in London. In its letter to the players denying the release requests, the Tour made clear that the reason it was departing from past practice was that LIV Golf planned to compete against the PGA Tour in North America:

> While releases have been granted in limited circumstances for one off-events outside North America or for events outside of North America on tours based exclusively outside of North America, the event for which you have requested

a release is the first in an eight-event "2022 LIV Golf Invitational Series" season, and more than half of them will be held in the United States.

175.    There is no possible procompetitive justification for the denial, particularly because—as the Tour acknowledged—it would have granted the release for another event or tour that was not trying to compete against the Tour.  This was simply an effort to defeat competition.

176.    Then, unsatisfied with prohibiting all current Tour members from participating in LIV Golf events, the Tour extended its threat college golfers, explaining that if they played in any LIV Golf events they would be banned from entry into the PGA Tour University program, which provides top college golfers entry into the Tour's developmental tour (Korn Ferry Tour).  Again, this action served no procompetitive purpose, nor could it plausibly be justified as an enforcement of any Tour member regulations, because the college golfers threatened by the Tour are not Tour members and are not bound by any Tour rules or regulations.  Instead, this was simply aimed at thwarting competition by preventing LIV Golf from being able to secure top golfers to participate in its tournaments.

177.    On May 17, 2022, the European Tour acted in concert with the Tour and sent notices to its members denying them permission to participate in the LIV Golf Invitational Series event in London.  The European Tour stated that the basis for the denial is that the LIV Golf Invitational Series event will compete with its European Tour event.  Notably, however, the European Tour historically did not deny golfers' requests to participate in conflicting events.

178.    In response to these threats, LIV Golf was forced to commit to substantial up-front payments to a number of top golfers to convince the players to take on the risk of punishment from the Tour, as well as the risk of lost sponsorships and other injuries orchestrated by the Tour.  These substantial payments have greatly increased LIV Golf's costs of launching its Invitational Series, and, if the Tour's conduct is not enjoined, the ongoing cash outlays significantly threaten the long-term viability of LIV Golf.  Notably, however, while the increased payments have harmed LIV Golf, they also have not fully compensated the Player Plaintiffs for all of the injuries they have suffered as a result of the Tour's anticompetitive conduct, including both uncompensated monetary injury and ongoing irreparable injury in the form of lost professional playing and other opportunities that cannot be compensated through monetary relief.  As such, both the Player Plaintiffs and LIV Golf have been injured and continue to suffer irreparable injury as a result of the Tour's anticompetitive conduct.

179. On May 31, 2022, LIV Golf announced the field for its London Invitational. In that announcement, the field included 16 PGA Tour players, 22 European Tour players, three promising young amateurs, and a number of other top players from across the world. Players were very interested in the product. But it was not the quality of field LIV Golf set out to have and was not the field of players LIV Golf would have had but for the PGA Tour's unlawful regulations and threats.

180. Tour members who agreed to participate in the LIV Golf London Invitational publicly expressed the difficulty of doing so in light of the Tour's conduct.

a. For example, the agent for PGA Tour member Dustin Johnson released a statement that: "Dustin has been contemplating this opportunity off-and-on for the past couple of years. Ultimately, he decided it was in his and his family's best interest to pursue it. Dustin has never had any issue with the PGA Tour and is grateful for all it has given him, but in the end felt this was too compelling to pass up."

b. Plaintiff Matt Jones averred that participating in the LIV Golf Invitational Series "was a good business opportunity for me and my family. I like the concept, the idea of the three-day tournaments, [and] the team format aspect of things is great. I have thought about that [threat of punishment from the PGA Tour], which is something I had to weigh. I don't think banning players is a good look for the PGA Tour, or for golf in general."

c. PGA Tour member Graeme McDowell stated, "[t]he perceived consequences are definitely concerning. It was an exceedingly difficult decision. It is a difficult decision as a player when there's so many unknowns. We do not know what the reaction is going to be. It just boils down to the fact that I am a business and I have operated all over the world for 20 years. This is a compelling opportunity."

181. Other Tour members who agreed to compete in the LIV Golf London Invitational welcomed the innovations LIV Golf brought to the game. Player Plaintiff Swafford stated that LIV Golf's "[s]chedule is very enticing to a guy who has two small kids. I think the format, the team aspect,

is going to be incredible. Look at Zurich [the Zurich Classic of New Orleans, which is a two-man team event], putting teams together turned an event that was in a tough part of the schedule into one that gets some incredible fields. I'm really looking forward to seeing how that works."

182. After the LIV Golf field was announced, the PGA Tour Player Advisory Council held an emergency meeting with representatives from Augusta National present. They informed the golfers in attendance that the PGA Tour and Augusta National had agreed to work together to address LIV Golf. As described above, the threat of exclusion from the Masters (and the other Majors) is a powerful weapon in the Tour's arsenal to deter players from joining LIV Golf.

183. On information and belief, the Tour also ramped up its pressure on sponsors to prevent them from doing business with players who join LIV Golf, including pressuring a number of sponsors to sever longstanding relationships with players.

184. The Tour also continued its campaign of direct pressure on players to seek to convince them to withdraw from the LIV Golf event. The Tour sent letters to all Tour members listed in LIV Golf's May 31, 2022 press release, notifying them they were in violation of the PGA Tour Member Regulations and that the Tour Commissioner would take "appropriate course of action" against the players unless they withdrew from the LIV Golf Invitational Series event "in a manner reasonably satisfactory to the [PGA] Tour within forty-eight (48) hours." The European Tour sent similar notices to its members who were included in the LIV Golf Invitational Series field.

185. The PGA Tour also enforced its Regulations on players agreeing to participate in LIV Golf Invitational Series who had not even qualified for the Tour but are members of the developmental Korn Ferry Tour owned by the PGA Tour (and subject to nearly identical Regulations). For example, the PGA Tour applied its Regulations to prohibit Korn Ferry Tour members Mr. Uihlein and Turk Pettit from participating in LIV Golf Invitational Series.

186. The PGA Tour also sent a letter to Andy Ogletree, a Korn Ferry Tour Member, threatening him with punishment if he played in the LIV Golf event. In response, Mr. Ogletree reached out to Tour Vice President of Competition Administration Kristen Burgess regarding the Tour's denial of his release request. Mr. Ogletree explained that he had not qualified for the conflicting event on the Korn Ferry Tour taking place the same weekend as the London LIV Golf Invitational Series. Thus, his

participation in the London LIV Golf Invitational Series event did not keep him from otherwise participating in a Korn Ferry Tour event (or, for that matter, a PGA Tour events). Mr. Ogletree informed the Tour that he had "spent thousands and thousands of dollars" in his unsuccessful effort to play in Korn Ferry Tour and PGA Tour events. He asked the PGA Tour: "Should I just sit at home on my couch next week and not make any money? It seems like this is your stance." Mr. Ogletree also noted the inconsistency of the Tour's stance since it had given Mr. Ogletree a release to participate in the Asian Tour International Series event from June 2–5, 2022 sponsored by LIV Golf. In response, the Tour cited the fact the LIV Golf Invitational Series will host events in the United States—specifically, that the LIV Golf Invitational Series competes with the Tour—as the basis for his event release denial.

187. This episode highlights that there is no conceivable procompetitive justification for the Tour's punishment of players for participating in LIV Golf events. Mr. Ogletree was not going to play in any PGA Tour or Korn Ferry Tour event that weekend, because he was not qualified by those tours to participate in their events. The LIV Golf event thus did not pull Mr. Ogletree away from any PGA Tour event. Instead, it simply provided an opportunity for a player to pursue his trade and earn compensation, along with increasing overall output in the market. And yet the PGA Tour denied a release for Mr. Ogletree and subjected him to discipline for the offense of playing in a tournament when he otherwise would have been "just sit[ting] at home on [his] couch."

188. It also demonstrates that the PGA Tour's opposition to LIV Golf is not based on the source of capital for LIV Golf events. The Tour granted a release to Mr. Ogletree to play in the Asian Tour event that was funded by LIV Golf, because the Asian Tour is not competing with the PGA Tour. But when Mr. Ogletree sought to participate in an event that the PGA Tour deemed a competitive threat, the Tour denied the release and threatened punishment against him.

189. The Tour then went further to contact individually players who had chosen to play in the LIV Golf Invitational Series. Among them was Player Plaintiff Gooch. PGA Tour Chief Tournament & Competitions Officer Andy Pazder texted Mr. Gooch on June 2: "Just want to make sure you understand the implications of playing without an approved conflicting event release." Mr. Gooch responded, "Davis [Love III] called yesterday and said jay [Monahan, PGA Tour

Commissioner] is going to suspend, is this true?"  In response, Mr. Pazder told Mr. Gooch that he would be banned from the Tour for life if he played in *one* LIV Golf Invitational Series event:  "Our position has been that a player may choose to be a member of the Tour or to play in the Saudi/LIV events, but he can't do both.  If the player chooses the latter, he should not expect to be welcomed back."

190.    On June 3, 2022, the PGA Tour sent an additional letter to all its members who had agreed to participate in the LIV Golf London Invitational, informing them: "pursuant to Article VII, Section C, you are being placed on probation until further notice.  Specifically, as reflected in the Notice of Disciplinary Inquiry to you dated June 1, 2022, the rule infraction triggering your probation is violation of Article V, Section A.2 of the PGA Tour Player Handbook & Tournament Regulations ("Regulations").  Accordingly, if you violate any other rule of the PGA Tour while on probation including, but not limited to, violating Article V, Section B.1, which prohibits your participation in a live or recorded golf program, such as the LIV Golf Invitational London, for which a media release has been denied, the Commissioner may immediately suspend your playing privileges."  Article VII, Section C of the PGA Tour Regulations relates to "conduct unbecoming a professional."  Thus, the Tour told its members that the act of playing in a professional golf tournament constituted "conduct unbecoming a professional golfer."

191.    Simply put, the Tour's position that merely playing professional golf for another promoter constitutes "conduct unbecoming a professional" golfer is breathtaking.  And it reveals the threat to competition that underlies the PGA Tour's Regulations giving the PGA Tour Commissioner absolute discretion to interpret the Regulations and punish its Members.

192.    On June 4, 2022, former Tour member Kevin Na resigned his PGA Tour membership due to the PGA Tour's refusal to permit him to participate in the LIV Golf Invitational Series.  Mr. Na expressed his desire as an independent contractor to "exercise[e] my right as a free agent" to have "the freedom to play wherever I want," noting that he "cannot remain a PGA Tour member" and exercise his independent contractor rights due to the Tour's Regulations and threats.  He expressed his "sad[ness]" and his desire that PGA Tour Regulations change to enable him to play on the PGA Tour again.

193.   In total, 10 Tour members who agreed to participate in the LIV Golf London Invitational resigned from the PGA Tour in response to these threats to avoid Tour punishment.

194.   When the Tour learned that members were considering resignation to avoid the punishments it had threatened, it informed them that "should a member resign in an effort to avoid disciplinary action for future violations of the Regulations, the member would still be subject to disciplinary actions for violations prior to the date of Resignation.  In addition, a player should not expect that he will be able to rejoin membership or play in any events without membership at any particular time, as such matters would be governed by the Regulations and event requirements in effect at the time, as they may be amended from time to time."  Most PGA Tour tournaments are managed by other nonprofit organizations and offer sponsorship exemptions to PGA Tour and non-PGA Tour golfers.  Thus, in order for the PGA Tour's written threat to play out it requires agreement from other economic actors (the sponsors and tournament hosts).

195.   Minutes after the golfers teed off at the LIV Golf London Invitational on June 9, 2022, the Tour distributed letters to its current and former members immediately suspending them and promising "the same fate [would] hold" for any Tour member playing in future LIV Golf events.

196.   Also on June 9, 2022, Commissioner Monahan sent a letter to all PGA Tour Members and released the letter to the public identifying the golfers the PGA Tour was punishing.  Contrary to its historical practices, the Tour sought to expose and malign these golfers for pursuing their profession.  In particular, the PGA Tour Commissioner wrote:

    a.   Tour members, including the Player Plaintiffs and former members "are suspended or otherwise no longer eligible to participate in PGA Tour tournament play, including the Presidents Cup;"

    b.   The suspension applies to all tours sanctioned by the PGA Tour (Korn Ferry, Champions, Canada, Latinoamerica);

    c.   The golfers participating in the LIV Golf London Invitational Series "did not receive the necessary conflicting events and media rights releases—or did not apply for releases at all—and their participation . . . is in violation" of the Regulations;

d. The Tour Commissioner made clear that any players "who participate in future [LIV Golf Invitational Series] events in violation of our Regulations" will suffer the "same fate" of suspension;

e. Non-PGA Tour members who participated in LIV Golf Invitational Series "will not be permitted to play in PGA Tour tournaments as a non-member via a sponsor exemption or any other eligibility category;"

f. The Commissioner tried to embarrass the Player Plaintiffs by claiming that they and others made "their own financial-based" choice and they cannot demand the same "PGA Tour membership benefits" as other golfers;

g. The Commissioner further acknowledged that "there are true consequences for every shot" taken on the PGA Tour where a golfer could earn no compensation while paying for his travel to the event, whereas LIV Golf compensates its participants; and

h. The Commissioner embraced the notion that the PGA Tour is the "preeminent organization in the world of professional golf."

197. Also on June 9, 2022, the PGA Tour Vice President of Competition Administration, Kristen Burgess, sent letters to all former PGA Tour Members who participated in the LIV Golf London Invitational Series but had resigned from the Tour, informing them they "remain subject to disciplinary action for violations prior to the date of resignation" and they "should not expect that [they] will be able to rejoin membership or play in any events without membership at any particular time."

198. The Tour expanded its punishments by threatening to revoke the agency credentials for agencies that represent golfers who join LIV Golf—thereby threatening to injure the agents' business for merely representing golfers who chose to join LIV Golf.

199. The Tour also enlisted Tiger Woods to do its bidding and publicly criticize golfers—particularly younger golfers—for joining LIV Golf by suggesting they would never play in The Masters, The Open, or other Majors and would not earn OWGR points: "Some of these players may not ever get a chance to play in major championships. That is a possibility. We don't know that for sure yet. It's up to all the major championship bodies to make that determination. But that is a

possibility, that some players will never, ever get a chance to play in a major championship, never get a chance to experience this right here, walk down the fairways at Augusta National. . . , especially if the LIV organization doesn't get world-ranking points and the major championship change their criteria for entering the events." Mr. Woods' comments echoed earlier evidence indicating that the Tour was continuing to pressure the Majors to join the Tour's unlawful group boycott to exclude LIV Golf and punish any players who played in any LIV events.

## PGA Tour Disciplinary Process

200.     On June 9, 2022, PGA Tour Senior Vice President of Tournament Administration Andy Levinson sent letters to all PGA Tour Members who participated in the LIV Golf London Invitational Series event, including the Player Plaintiffs.  In that Letter, Mr. Levinson informed golfers that (1) the PGA Tour considered them in violation of the Media Rights Regulation (V.B.1.b), (2) the PGA Tour considered them in violation of a PGA Tour Regulation against Public Attacks (VI.E.), (3) they were suspended immediately from playing in PGA Tour events "until further notice," and (4) they had 14 days to submit written statements and/or evidence that the PGA Tour Commissioner should consider "before determining an appropriate course of action separate from your current suspension."

201.     The PGA Tour's Regulations detail its Disciplinary Procedures and Appeals, which provide an unconscionable and unfair process by which the players have no legitimate chance of getting fair treatment as it relates to punishments having anything to do with LIV Golf.  Exhibit 1.  The Tour's Regulations provide that the Commissioner has discretion to hear the appeal in the first instance.  The Commissioner can also transfer the appeal to a panel of three Tour policy board members.  The procedures do not give the player a hearing as a matter of right.  After the procedures conclude, the Regulations provide that a player has released any and all claims against "the PGA TOUR Policy Board, the Commissioner or the Appeals Committee, PGA TOUR, Inc., the Professional Golfers' Association of America, and each director, officer, member, employee, agent or representative of any of the foregoing."  Thus, the Tour's Regulations are set up as follows:  (1) the Tour sets the Regulations which bind any player member, including changing those Regulations from time to time without input or consent from the player members, (2) the Regulations give the Commissioner the sole authority to interpret the Regulations in his discretion, (3) the Regulations demand that the biased Commissioner

serve as judge, (4) the Regulations allow that same biased Commissioner to hear any appeals, (5) the Regulations provide no independent review process, as the Tour Board is put in the position of reviewing a Tour commercial policy that it approved and executed over the last few years, and (6) at the end of it all, the Regulations purportedly provide that the player has no right to challenge the punishment having released all involved. That release is unenforceable and the Regulations' Disciplinary Procedures are procedurally and substantively unconscionable.

202. Several golfers submitted letters to the Tour challenging the Tour's indefinite suspension and objecting to any further course of action punishing the golfers.

203. On June 29, 2022, and various other dates, the PGA Tour suspended the Player Plaintiffs until March 31, 2023, issued threats to extend the suspensions based on further violations of the Regulations, including (in the Tour's view) continuing to play in LIV Golf events or even to talk favorably about LIV Golf. Commissioner Monahan considered the golfers in violation of the Conflicting Events Regulation and Media Rights Regulation. Additionally, Commissioner Monahan considered the golfers in violation of the PGA Tour's Regulation Section VI.E ("Public Comments, Public Attacks") provision which provides that:

> The favorable public reputation of PGA TOUR, its players and its tournaments are valuable assets and create tangible benefits for all PGA TOUR members. Accordingly, it is an obligation of membership to refrain from making comments that unreasonably attack or disparage others, including, but not limited to tournaments, sponsors, fellow members/players and/ or PGA TOUR. Speech that could be reasonably viewed as hateful, abusive, obscene and/ or divisive is expressly prohibited. Responsible expressions of legitimate disagreement with PGA TOUR policies are not prohibited. However, public comments that a member knows, or should reasonably know, will harm the reputation or financial best interest of PGA TOUR, a fellow member/player, a tournament sponsor or a charity are expressly covered by this section. Any violation of this section shall be considered conduct unbecoming a professional.

Commissioner Monahan deemed the golfers' reasonable statements of opinion and compliments of LIV Golf in violation of this provision merely because favorable comments regarding a competitor to the PGA Tour supposedly could cause the Tour financial harm.

204. The Tour's punishments put the players in an untenable position: They were banned for roughly nine months, which prevents them from playing in PGA Tour events (and its subsidiary tours) and they have been told that if they play in any LIV Golf events while the suspensions are in

effect, the Tour will deem that an additional violation and impose event greater punishments.  In effect, the Tour's punishments amount to a lifetime ban, because the only chance for a player to be clear of the PGA Tour's suspensions is to refrain from playing in any elite professional events—and thus essentially drop out of his profession.

205.    On July 6, 2022, PGA Tour Board Member and President of the PGA Player Advisory Council Rory McIlroy said that golfers who join LIV Golf are "basically leaving all [their] peers behind to go make more money, which is fine.  But just go over there.  Don't try and come back and play over here again."  Several years ago, Mr. McIlroy left the European Tour to play predominantly on the PGA Tour, and was still permitted by the PGA Tour to remain a European Tour member through his participation in the minimum number of events required by each tour.

206.    On July 13, 2022, the Player Plaintiffs appealed their nine-month suspension (and career threatening ban from the PGA Tour).  The grounds for the players' appeals were:

a.    Provisions of Sections V.A.2, V.A.3, and V.B.1.b are plainly unlawful restraints of trade that violate Section 2 of the Sherman Act, 15 U.S.C. § 2, and various state laws, and therefore (1) no punishment for purportedly violating those unlawful provisions may issue and (2) any purported agreement by any person to adhere to those unlawful provisions is void and unenforceable;

b.    Commissioner Monahan and the PGA Tour (the "Tour") violate Section 2 of the Sherman Act by applying Sections VII.E. and VII.C to unlawfully punish golfers to thwart LIV Golf's competitive entry, and therefore no punishment for purportedly violating those provisions may issue;

c.    Provisions of Sections V.A.2, V.A.3, and V.B.1.b enable Commissioner Monahan to unlawfully control what independent contractor-golfers do when they are not playing on the PGA Tour (the "Tour"), and thus no punishment for purportedly violating those provisions may issue;

d.    The Tour has unlawfully agreed with other entities in the purported golf "ecosystem," including the European Tour, to establish a group boycott to prevent LIV Golf from succeeding and has targeted its Regulations to

impermissibly punish golfers to carry out its coordinated dealings with others in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

e. Commissioner Monahan has violated the Tour's purported nonprofit purpose and violated his fiduciary duties to the Tour and its members by punishing golfers in this way;

f. There was patent injustice and a lack of fair process because Commissioner Monahan cannot be impartial in his determination whether to sanction golfers because he has engaged in a two-year vendetta against prospective and new competitor professional golf promoter(s) and golfers are being punished for participating in a competitive promoter's events;

g. There was injustice and a lack of fair process because the Regulations' Disciplinary Process is procedurally and substantively unconscionable; and

h. In the alternative, the sanction imposed by Commissioner Monahan is grossly disproportionate to the seriousness of the alleged breaches of the Regulations that the Tour contends the players committed.

i. In their appeal letters, Player Plaintiffs indicated their belief that their suspensions would be abated pending appeal of their suspensions.

207. While some of the Player Plaintiffs' appeals of the Commissioner's disciplinary action were pending, on July 23, 2022, Mr. Levinson sent them a letter informing that: (1) the PGA Tour Commissioner believed they violated the Conflicting Events and Media Rights Regulations (Article V, Sections A.2 and B.1) by participating in the June 30 – July 2, 2022 LIV Golf Invitational Portland event; (2) the PGA Tour Commissioner imposed a Major Penalty of suspension from participation in any PGA Tour-affiliated tournaments, including PGA Tour, PGA Tour Champions, Korn Ferry Tour, PGA Tour Latinoamérica, and PGA Tour Canada, and a suspension of their privileges at Tournament Players Clubs, for a period ending no earlier than March 31, 2024 (an additional year suspension), at which time they may seek in writing to have their suspension lifted; (3) the PGA Tour Commissioner may impose further disciplinary action for any additional violation of the Regulations; and (4) they may appeal the sanctions by written notice to the PGA Tour Commissioner within 14 days of the letter.

In other words, the PGA Tour Commissioner unilaterally imposed further sanctions—a full additional year of suspension for playing in a second LIV Golf tournament—while the appeal of the first Notice of Disciplinary Action was still pending.

208.    On July 25, 2022, the Tour informed the Player Advisory Council that golfers who were suspended for playing in LIV Golf would not be permitted to play in the FedEx Cup, even though some of their appeals of the suspensions were pending and should have been abated under the Tour's Regulations.

209.    On July 27, 2022, Commissioner Monahan referred some of the Player Plaintiffs' appeals to the Appeals Committee and requested that any materials in support of appeal be submitted by August 10, 2022.  In response, Plaintiff Gooch requested confirmation that the Tour would abate their suspensions pending appeal to the Appeals Committee.  In response, Commissioner Monahan indicated he would not abate the Player Plaintiffs' suspensions pending appeal.

210.    On July 29, 2022, Mr. Levinson informed some Player Plaintiffs that the Tour would no longer send them Notice of Disciplinary Inquiry letters for "ongoing violations."  The Tour thus chose to abandon its disciplinary process.

211.    And, then on August 2, 2022, the Tour informed Mr. Gooch that the Tour would not abate suspensions pending appeals in violation of the Tour's regulations.

212.    The Tour historically abated players' suspensions pending their appeal of their suspensions, consistent with Section VII.E.2 of the Regulations.

213.    The Player Plaintiffs' suspensions were a critical means employed by the Tour to achieve its anticompetitive end.  Punishing the players is essential to the scheme to eliminate competition in the market.  Absent participants in elite professional golf events, no nascent league can enter the market.  By suspending the Player Plaintiffs and threatening to suspend other players, the Tour endeavored to eliminate competition.

**Specific Player Plaintiffs' PGA Tour Disciplinary Proceedings and Harm**

214.    **Phil Mickelson:**  The Tour's anticompetitive scheme is apparent from the disciplinary action levied against Plaintiff Mickelson.  On March 22, 2022, the Commissioner suspended Plaintiff Mickelson (with the opportunity to apply for reinstatement in May of 2022) for, among other alleged

reasons, "attempting to recruit players to join [LIV Golf]." Following an appeal, the appeals committee (a three-person committee comprised of members of the Tour Policy Board) affirmed the Commissioner's two-month suspension. On June 20, 2022, Mr. Mickelson applied for reinstatement from the two-month suspension. The Tour denied his request, stating that Plaintiff Mickelson violated Tour regulations by participating in the LIV Golf London Invitational. In addition to denying his request for reinstatement, the Tour extended Plaintiff Mickelson's suspension, forbidding him from seeking reinstatement to play professional golf with the Tour until March 31, 2023. While Plaintiff Mickelson was suspended from tournament play, the Tour continued to levy suspensions. On July 23, 2022, the Tour imposed additional sanctions on him for participating in the LIV Golf Invitational in Portland. Specifically, the Tour extended Plaintiff Mickelson's suspension once again, deferring even the mere opportunity to apply for reinstatement until after March 31, 2024.

215. Mr. Mickelson's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Mickelson the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Mickelson the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. Mickelson the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. Mickelson access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff Mickelson endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff Mickelson's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Mickelson the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Mickelson the opportunity to earn deferred compensation pursuant to the

PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. Mickelson's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Mickelson competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Mickelson and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Mickelson will be financially and irreparably harmed. As a lifetime member of the Tour, Mr. Mickelson is particularly harmed by the Tour wrongfully taking away what he has rightfully earned—opportunity to play in Tour events for the remainder of his golfing career.

216. The Tour's unlawful conduct has also denied Mr. Mickelson the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

217. The Tour's unlawful conduct has harmed Mr. Mickelson by denying him access to fans, viewers and playing opportunities in Tour events.

218. **Talor Gooch.** On June 9, 2022, the Tour unlawfully suspended Mr. Gooch on an indefinite basis from playing on the Tour. On June 30, 2022, the Tour unlawfully suspended Mr. Gooch from playing on the Tour (or any affiliated tours) through at least March 31, 2023. On July 23, 2022, the Tour unlawfully extended Mr. Gooch's suspension through at least March 31, 2024. The PGA Tour has threatened to impose further disciplinary sanction on Mr. Gooch if he continues to play in LIV Golf events when he is not playing on the Tour.

219. Mr. Gooch's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Gooch the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Gooch the strong chance to qualify for the 2023 Major Championships by

placing in the Top 30 of the 2022 FedEx Cup Rankings. The Tour's suspension has denied Mr. Gooch the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. Gooch the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. Gooch access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff Gooch endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff Gooch's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Gooch the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Gooch the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. Gooch's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Gooch competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Gooch and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Gooch will be financially and irreparably harmed.

220.     The Tour's unlawful conduct has also denied Mr. Gooch the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

221.     The Tour's unlawful conduct has harmed Mr. Gooch by denying him access to fans, viewers and playing opportunities in Tour events.

222. **Hudson Swafford.** On June 9, 2022, the Tour unlawfully suspended Mr. Swafford on an indefinite basis from playing on the Tour. On June 29, 2022, the Tour unlawfully suspended Mr. Swafford from playing on the Tour (or any affiliated tours) through at least March 31, 2023. On July 23, 2022, the Tour unlawfully extended Mr. Swafford's suspension through at least March 31, 2024. The PGA Tour has threatened to impose further disciplinary sanction on Mr. Swafford if he continues to play in LIV Golf events when he is not playing on the Tour.

223. Mr. Swafford's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Swafford the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Swafford the chance to qualify for the 2023 Major Championships by placing in the Top 30 of the 2022 FedEx Cup Rankings. The Tour's suspension has denied Mr. Swafford the strong chance to qualify for the 2023 premier Invitationals on the Tour by placing in the Top 70 of the 2022 FedEx Cup Rankings. The Tour's suspension has denied Mr. Swafford the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. Swafford the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. Swafford access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff Swafford endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff Swafford's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Swafford the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Swafford the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have

damaged Mr. Swafford's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Swafford competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Swafford and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Swafford will be financially and irreparably harmed.

224. The Tour's unlawful conduct has also denied Mr. Swafford the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

225. The Tour's unlawful conduct has harmed Mr. Swafford by denying him access to fans, viewers and playing opportunities in Tour events.

226. **Matt Jones.** On June 9, 2022, the Tour unlawfully suspended Mr. Jones on an indefinite basis from playing on the Tour. On June 30, 2022, the Tour unlawfully suspended Mr. Jones from playing on the Tour (or any affiliated tours) through at least March 31, 2023. On July 23, 2022, the Tour unlawfully extended Mr. Jones's suspension through at least March 31, 2024. The PGA Tour has threatened to impose further disciplinary sanction on Mr. Jones if he continues to play in LIV Golf events when he is not playing on the Tour.

227. Mr. Jones's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Jones the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Jones the chance to qualify for the 2023 Major Championships by placing in the Top 30 of the 2022 FedEx Cup Rankings. The Tour's suspension has denied Mr. Jones the strong chance to qualify for the 2023 premier Invitationals on the Tour by placing in the Top 70 of the 2022 FedEx Cup Rankings. The Tour's suspension has denied Mr. Jones the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. Jones the

opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. Jones access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff Jones endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff Jones's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Jones the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Jones the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. Jones's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Jones competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Jones and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Jones will be financially and irreparably harmed.

228. The Tour's unlawful conduct has also denied Mr. Jones the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

229. The Tour's unlawful conduct has harmed Mr. Jones by denying him access to fans, viewers and playing opportunities in Tour events.

230. **Bryson DeChambeau.** On June 30, 2022, the Tour unlawfully suspended Mr. DeChambeau on an indefinite basis from playing on the Tour. On July 8, 2022, the Tour unlawfully suspended Mr. DeChambeau from playing on the Tour (or any affiliated tours) through at least March

31, 2023. The PGA Tour has threatened to impose further disciplinary sanction on Mr. DeChambeau if he continues to play in LIV Golf events when he is not playing on the Tour. On July 29, 2022, the Tour sent notice to Mr. DeChambeau that it was sanctioning him for talking to other Tour members about the positive experience he had had with LIV Golf.

231. Mr. DeChambeau's unlawful suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. DeChambeau the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. DeChambeau the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. DeChambeau the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. DeChambeau access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff DeChambeau endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff DeChambeau's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. DeChambeau the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. DeChambeau the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. DeChambeau's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. DeChambeau competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. DeChambeau and his use of his media rights are causing him irreparable, financial and

commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. DeChambeau will be financially and irreparably harmed.

232.    The Tour's unlawful conduct has also denied Mr. DeChambeau the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

233.    The Tour's unlawful conduct has harmed Mr. DeChambeau by denying him access to fans, viewers and playing opportunities in Tour events.

234.    **Ian Poulter**.   On June 9, 2022, the Tour unlawfully suspended Mr. Poulter on an indefinite basis from playing on the Tour.  On June 30, 2022, the Tour unlawfully suspended Mr. Jones from playing on the Tour (or any affiliated tours) through at least March 31, 2023.  On July 23, 2022, the Tour unlawfully extended Mr. Poulter's suspension through at least March 31, 2024.  The PGA Tour has threatened to impose further disciplinary sanction on Mr. Poulter if he continues to play in LIV Golf events when he is not playing on the Tour.

235.    Mr. Poulter's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm.  The Tour's unlawful suspensions are denying Mr. Poulter the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play.  The Tour's suspension has denied Mr. Poulter the opportunity to participate in events that would have permitted him the chance to qualify for the Tour in 2023.  The Tour's suspension has denied Mr. Poulter the right to the platform and the public exposure provided by playing on the Tour.  The Tour's suspension has denied Mr. Poulter the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play.  The Tour's suspension has denied Mr. Poulter access to play professional golf before his fans via live attendance and video broadcast of Tour events.  The Tour's unlawful conduct cost Plaintiff Poulter endorsement deals and sponsorships.  Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour.  The Tour's unlawful conduct eliminated Plaintiff Poulter's opportunity to earn up to $10 million annually in the Player

Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Poulter the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Poulter the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. Poulter's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Poulter competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Poulter and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Poulter will be financially and irreparably harmed.

236. The Tour's unlawful conduct has also denied Mr. Poulter the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

237. The Tour's unlawful conduct has harmed Mr. Poulter by denying him access to fans, viewers and playing opportunities in Tour events.

238. **Peter Uihlein**. On June 9, 2022, the Tour unlawfully suspended Mr. Uihlein on an indefinite basis from playing on the Tour, the Korn Ferry Tour and any affiliated tours. On June 30, 2022, the Tour unlawfully suspended Mr. Uihlein from playing on the Tour, the Korn Ferry Tour, (or any affiliated tours) through at least March 31, 2023. On July 23, 2022, the Tour unlawfully extended Mr. Uihlein's suspension through at least March 31, 2024. The PGA Tour has threatened to impose further disciplinary sanction on Mr. Uihlein if he continues to play in LIV Golf events when he is not playing on the Tour or the Korn Ferry Tour.

239. Mr. Uihlein's unlawful two-year suspension from the PGA Tour and its affiliated tours, including but not limited to the Korn Ferry Tour, has caused him irreparable professional harm, as well

as financial, and commercial harm.  The Tour's unlawful suspensions are denying Mr. Uihlein the right he has earned to play in events on the Korn Ferry Tour, to earn compensation playing on the Korn Ferry Tour, and to have the opportunities that come with such play.  The Tour's suspension has denied Mr. Uihlein the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play.  The Tour's unlawful suspensions are denying Mr. Uihlein to the right he has earned to participate in the Korn Ferry Tour Championship Series finals (three events) to have a chance to earn a PGA Tour card for the 2022-2023 season.  If Mr. Uihlein is prohibited from playing that series then he will have no other way to qualify for the PGA Tour next season.  The Tour's suspension has denied Mr. Uihlein the right to the platform and the public exposure provided by playing on the Korn Ferry Tour (and possibly the Tour).  The Tour's suspension has denied Mr. Uihlein access to play professional golf before his fans via live attendance and video broadcast of Korn Ferry Tour events (and possibly the Tour events).  The Tour's suspension has denied Mr. Uihlein the opportunity to earn Korn Ferry season rankings (and possibly FedEx Cup rankings next season).and OWGR rankings.  The Tour's unlawful suspensions have damaged Mr. Uihlein's goodwill and caused him substantial reputational harm.   The Tour's unlawful Conflicting Events and Media Rights Regulations, which apply to Korn Ferry Tour members just as they apply to Tour member, have denied Mr. Uihlein competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities.  The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Uihlein and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Uihlein will be financially and irreparably harmed.

240.    The Tour's unlawful conduct has also denied Mr. Uihlein the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

241.    The Tour's unlawful conduct has harmed Mr. Uihlein by denying him access to fans, viewers and playing opportunities in Tour events.

**Tour Threatens Small Businesses and Vendors To Boycott LIV Golf**

242.     As part of its efforts to foreclose competition from LIV Golf and to foreclose competition for Plaintiffs' services, the Tour has also threatened companies and individuals in the golf and sports production industry that they will be blacklisted from working with the Tour if they work with LIV Golf.  As a result of these unlawful threats, LIV Golf has suffered (and will continue to suffer) financial injuries because its offerings in the marketplace have been impaired and because it has been denied the opportunity to work with the third parties of its choice on terms that could be reached in a fair and open marketplace.  Furthermore, this conduct threatens ongoing and irreparable harm to LIV Golf, as the headwinds created by the Tour's anticompetitive conduct threaten LIV Golf's competitive viability.

243.     In January 2022, LIV Golf was negotiating with a tent vendor, Arena Americas, about providing tents for LIV Golf events.  Arena Americas indicated that it was interested in working with LIV Golf, and LIV Golf engaged Arena Americas for its LIV Golf Invitational Series.  However, Arena Americas subsequently informed LIV Golf that it could not work with LIV Golf because the Tour had told Arena Americas that it would cease doing business with Arena Americas if it worked with LIV Golf.

244.     LIV Golf had contracted with a technology company to provide live scoring during LIV Golf events for fans watching and following along on the Internet.  On March 23, 2022, LIV Golf received an email from that technology company that it needed to rescind the contract with LIV Golf due to a business issue and needed to discuss the issue with its attorney.  The company later represented to LIV Golf that representatives from the PGA Tour had threatened that the Tour would cease doing business with it if it provided LIV Golf with support.  The company also told LIV Golf that the PGA Tour has a "blacklist" for any vendor that works with LIV Golf.  A Tour representative called the company and threatened to blacklist the company if it worked with LIV Golf.

245.     LIV Golf was in negotiation with Top Tracer to license its shot-tracing technology for use during LIV Golf broadcasts.  The Chief Executive Officer of Top Tracer was engaged with LIV Golf on multiple calls, expressed major interest in providing LIV Golf with a license to Top Tracer technology and developing a broader relationship to deploy and develop innovative products.  Suddenly, however, Top Tracer ceased communication with LIV Golf.  After a period of radio silence,

1    Top Tracer informed LIV Golf that it would not be putting itself up for the potential business with LIV

2    Golf.

3    246.    LIV Golf was in negotiation with Levelwear athletic apparel for LIV Golf volunteer

4    apparel for LIV Golf Invitational Series event staffing.  On March 25, 2022, Levelwear informed LIV

5    that it would not sell LIV Golf any apparel because it did not want to jeopardize its relationship with

6    the Tour.

7    247.    LIV Golf reached out to numerous producer candidates, many of whom are independent

8    contractors, who have communicated to LIV Golf that NBC and Golf Channel personnel have informed

9    all producers that they will not be hired or renewed for any work with NBC or Golf Channel moving

10   forward if they work with LIV Golf.

11   248.    Senior programming executives at CBS revealed to LIV Golf that they cannot touch

12   LIV Golf even for consideration due to its relationship with the PGA Tour.

13   249.    LIV Golf tried to retain the Endeavor Company, which includes IMG, IMG Arena, IMG

14   Media and WME, and despite interest in working with LIV Golf, they have told LIV Golf they cannot

15   work with it because Tour Commissioner Monahan has impressed upon Ari Emmanuel (Endeavor

16   CEO) and Mark Shapiro (Endeavor President) that Endeavor cannot work with LIV Golf.

17   250.    Other vendors, like Intersport (event management company) and Aggreko

18   (Power/HVAC) engaged with LIV Golf but backed out without explanation, likely indicating that they

19   were subjected to pressure from the PGA Tour similar to that expressed by other third-party vendors.

20   251.    LIV Golf negotiated with Provision Events, an event management company.   On

21   February 15, 2020 Provision Events told LIV Golf, "we feel like we can provide exactly what you need

22   and our ambition would be to become your activation partner."   Provision Events and LIV Golf

23   corresponded regarding scope and arranged for a meeting to occur in March 2022.  On March 10, 2022,

24   Provision Events emailed LIV Golf and informed LIV Golf without explanation that it could no longer

25   work with LIV Golf.

26   252.    To supply drug testing procedures for the competing athletes, LIV Golf contacted Drug

27   Free Sport.  A Drug Free Sport representative informed LIV Golf that it would have to take the prospect

28   of doing business with LIV Golf to his boss because of Drug Free Sport's involvement with the Tour,

but stated that "we do business with other organizations, not sure why this would be any different." After checking with the "boss," the Drug Free Sport representative responded to LIV Golf, "I've spoken to our CEO and given current headwinds in our space, we won't be able to engage at this time."

253.   LIV Golf tried to negotiate with a golf shot technology company, Hawk Eye.  Chris Wary of Hawk Eye emailed LIV Golf that "[u]pon careful consideration and following internal discussions, regrettably, at this point in time, we are not in a position to proceed any further with the potential delivery of these technologies due to conflict of interest with our existing relationships." The Tour is a Hawk Eye client.

254.   LIV Golf tried to schedule events at a premier golf course, Sentosa Golf Club.  Bob Tan, Chairman of Sentosa Golf Club, informed LIV Golf that Dominic Wall of the R&A called him and informed him that Sentosa Golf Club would be excluded and shunned by the rest of the world of golf if it worked with LIV Golf.

255.   LIV Golf tried to engage Ticketmaster for ticketing at its events.  Ticketmaster was prepared to work with LIV Golf until Ticketmaster pulled out of helping LIV Golf with ticket sales in response to pressure from the PGA Tour.

256.   LIV Golf tried to engage Pro Secrets, a yardage book company.  Michael Etherington of Pro Secrets informed LIV Golf that the PGA Tour had asked Pro Secrets to not work with LIV Golf.

257.   LIV Golf tried to engage a company known as Cueto to provide software for organizing event volunteers.  Cueto was prepared to work with LIV Golf until Cueto informed LIV Golf that it cannot work with LIV Golf "because of the threat it received from the PGA Tour."

258.   LIV Golf tried to order custom hats through American Needle hat company, and American needle informed LIV Golf that it does not want to do business with LIV Golf because of its relationship with the PGA Tour and Augusta National.

259.   LIV Golf tried to enter into a business relationship with Dick's Sporting Goods.  In response, Dick's Sporting Goods informed LIV Golf that "[g]iven our relationship with the PGA Tour and our Tournament [PGA Tour Champions tournament], [] [Dick's Sporting Goods representatives] agree it's best to pass right now."

260.   The PGA Tour threatened numerous golf courses with adverse consequences if they

hosted LIV Golf events. LIV Golf secured commitments from pristine high level courses, but the PGA Tour and the R&A retaliated against the owners of the venues with which LIV Golf contracted. The R&A punished one golf course owner by adopting a policy that it would not host The Open at his course in the future because he is giving LIV Golf "a platform," and as the R&A is "firmly on the side of the traditional Tours [PGA Tour and European Tour]." The Tour informed the same golf course owner that it would never work with the Tour again because it had worked with LIV Golf.

261. In July 2022, LIV Golf's branding team, Czarnowski, terminated its relationship with LIV Golf due to pressure from the PGA Tour.

262. The Tour threatened sponsors that they would lose opportunities to partner with the Tour if they worked with LIV Golf.

### Relevant Markets and the PGA Tour's Monopoly Position

263. The PGA Tour is a monopolist and/or a monopsonist in two relevant product markets: (1) the market for the services of professional golfers for elite golf events, and (2) the market for the promotion of elite professional golf events.

264. The relevant geographic market for each product market is national; in the alternative, the market for each product market is global in scope.

### The Market for Services of Professional Golfers for Elite Golf Events

265. The first relevant product market is the services of professional golfers for elite golf events. A hypothetical monopsonist in this product market would have the power to suppress compensation for golfers substantially below competitive levels for a sustained period of time, because professional golfers who sell their services for elite golf events have no reasonable substitute to which they could plausibly turn in the event of a suppression of compensation below competitive levels. For example, non-elite golf events do not offer the level of purse sizes, Major qualifying opportunities, public platforms, sponsorship opportunities, OWGR ranking opportunities, or the other attributes of elite events that would make them viable options for professional golfers in the event that a hypothetical monopsonist controlled the market for the purchase of services of elite golf events. This is demonstrated in the evidence surrounding the PGA Tour, which has been able to impose sub-competitive compensation for elite golf events without losing a meaningful number of golfers to

another type of sport or event.

266.    The relevant geographic market for the product market is national; in the alternative, the market for each product is global in scope.  A hypothetical monopsonist in the purchase of services of professional golfers for elite events in the United States would have the power to suppress compensation for golfers substantially below competitive levels for a sustained period of time, because professional golfers would be unlikely to leave the country to pursue their profession in sufficient numbers to make sub-competitive compensation unprofitable for a hypothetical monopsonist in the United States.  This is also demonstrated in the evidence surrounding the PGA Tour, which has been able to impose sub-competitive compensation for its elite golf events in the United States without losing a meaningful number of golfers to golf tours in other countries.  In the alternative, the relevant geographic market is global.  Under either formulation, the Tour has unquestioned monopsony power.

267.    Until LIV Golf's nascent entry, the Tour was the only viable buyer of professional golfer services in the relevant market for the purchase of services of professional golfers for elite golf events because there is no reasonable substitute for playing on the Tour.  The European Tour's participation in the market is limited to events it co-sanctions with the Tour and thus, while it could be a purchaser of services of professional golfers for elite events in the United States, it has entered into an agreement with the Tour to not even try to compete with it.  And, in the alternative global market, the European Tour is not a viable alternative to the Tour because it cannot compete with the Tour on purse size, Major qualifying opportunities, OWGR rankings, public platforms, sponsorship opportunities and other benefits, and, regardless, it has entered into an agreement not to compete with the Tour.

268.    Until LIV Golf's nascent entry, the Tour offered earnings opportunities for professional golfers that are many times greater than any other tour in the world through far greater prize pools and opportunities to secure sponsorships.  The Tour offers far greater opportunities for recognition and exposure, on-course competition, and opportunity to accrue OWGR points than any other tour in the world.  Until LIV Golf's nascent entry, virtually every golfer who qualifies for membership on the PGA Tour joined it.  Until LIV Golf's nascent entry, all of the top 50 golfers in the world were members of the PGA Tour.

269.    The Tour's monopsony control of the purchase of services of professional golfers for

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

elite golf events allows it to compensate players at substantially lower levels than professional golfers would earn in a competitive market, without risk of losing players to other promoters.

270. The Tour has used its monopsony power to impose anticompetitive regulations, notably the Media Rights and Conflicting Events Regulations, which it forces on all of its Members and which have the intent and effect of excluding competition.

271. Until LIV Golf's nascent entry, the Tour controlled the overwhelming share of the relevant market, as nearly all of the elite professional golfers in the United States (and the world) were members of the Tour. Even after LIV Golf's entry—which the Tour's Commissioner has characterized as "irrational"—the Tour's share of the relevant market is dominant, as measured by the Tour's share of purchases in the services market for elite professional golf events. Indeed, all of the top golfers in the world, other than those whom the Tour suspended, are locked into the PGA Tour. The Tour's monopsony power is also reflected in the bonus pool, increased purses, new marquee high-purse events that the Tour established in response to the threat of entry by LIV Golf. The bonus pool and increased purses are direct evidence of the Tour's monopsony power, as the Tour significantly raised its prices in response to LIV Golf's competitive entry. This evidence also shows that compensation for professional golfers for elite events would be significantly greater in a competitive labor market.

272. The Tour excludes competition for independent contractor players to sell their services to others and manage their own name, image, and likeness because the Tour uses its market power to prohibit them from doing so. The Tour's Media Rights and Conflicting Events Regulations prevent competitors from acquiring the services of Tour members. And even when a rival is able to get Tour members to play in its events, the Media Rights Regulation excludes competition because it prevents the competing event from securing broadcast partners for its events. That the Tour is able to require Player Plaintiffs and the Tour's other members to agree to these rules without guaranteed compensation for doing so is powerful evidence of the Tour's monopsony power.

273. The Majors are not substitutes for the PGA Tour in the market for services of elite professional golfers. The Tour schedules its tournaments around the Majors and most qualifying opportunities for the Majors are derived from the players' play in the Tour.

**The Market for the Promotion of Elite Professional Golf**

274. The second relevant product market is the market for the promotion of elite professional golf events. A hypothetical monopolist in this product market would have the power to raise prices substantially above competitive levels for a sustained period of time, because advertisers, sponsors, broadcasters, and fans would not be able to turn to reasonable substitutes in sufficient volumes to make it unprofitable for the hypothetical monopolist to charge prices above competitive levels. This is because the promotion of elite professional golf is uniquely attractive to fans of professional golf and it is uniquely valuable for sponsors, advertisers, broadcast partners, venues, and others who seek to market to fans of elite professional golf.

275. The Tour represents to prospective advertisers that it offers the "most valuable audience in sports." According to its Tour's marketing materials, its audience of golf fans is (a) "affluent," in that it is "55% more likely to have household net worth of $1M+"; (b) "educated," in that it is "43% more likely to have a master's degree"; and (c) comprised of "influencers," in that it is "63% more likely to be top management or C-level." The Tour is differentiated from other sports or entertainment products by the access it offers to such a valuable audience. Because elite golf events offer a unique opportunity to reach this valuable audience, TV advertisers and event sponsors would be expected to continue purchasing elite golf events even with a small but significant nontransitory monopoly premium in the cost of doing so.

276. Furthermore, because the high degree of elite-level competition draws fans to watch elite golf events, the sponsors and TV broadcasters that pay for those events will not be able to reach those fans through events that do not provide similar elite-level competition. Thus, a hypothetical monopolist supplier of elite events (of the sort provided by the Tour) would not be expected to see a material diversion of sponsor or TV network money to other types of golf events in response to a monopoly premium for elite golf events.

277. Similarly, a substantial proportion of golf fans have a particular affinity for the sport, which is often tied to their participation in the sport. As players of the sport themselves, golf fans have a particular connection with golf broadcasts, which cannot readily be replicated by broadcasts of other sports or entertainment events. For the same reason, golf enthusiasts are a particular target of many advertisers on elite golf events, who seek to sell particular products and services (such as golf apparel

and equipment) to golf enthusiasts. Accordingly, a golf broadcaster, its golf advertisers, and the event sponsors cannot simply substitute coverage of another sport and expect the same golf fans to tune in. Thus, replacement of a golf telecast with a baseball game, automobile race, or other sporting event would likely retain some golf fans, but a substantial portion of golf fans—particularly the golf enthusiasts who will be the most loyal viewers and the primary targets for advertisers seeking to advertise to golf enthusiasts—would be lost by substituting to another type of programming.

278. From a geographic perspective, the events organized by the PGA Tour occur mostly in the United States, and the fans who attend those events in person are mostly in the United States. These events and their live network broadcasts are scheduled to provide convenient time slots for fans in the United States, and therefore are focused on generating viewership in the United States. Furthermore, elite golf events taking place in the United States capture the overwhelming share of viewership in the United States, indicating that elite golf events taking place elsewhere in the world are not a substitute for events in the United States for fans, broadcasters, and advertisers. The Tour itself has recognized the national dimension of competition, as it has informed players that they would ordinarily be granted releases for playing in conflicting events taking place outside the United States, but because LIV Golf has plans to organize a tour with events taking place in the United States it has denied releases to the players. This indicates that the Tour itself has far greater concern with competing events in the United States than for events taking place in other countries, which underscores that the United States represents a separate geographic market. In the alternative, however, the only other plausible relevant geographic market would be global. In either potential geographic market, the Tour maintains monopoly power.

279. For all of these reasons, a hypothetical monopolist in the supply of elite golf events in the United States would be able to profitably raise prices above competitive levels, indicating that the promotion of elite golf events in the United States is a relevant market.

### Barriers To Entry To The Relevant Markets

280. The Tour's monopsony power in the market for the services of professional golfers for elite golf events and its monopoly power in the market for the promotion of elite professional golf events are protected by high barriers to entry. To enter these markets, a competing elite professional

golf promoter needs to raise at least hundreds of millions of dollars in capital, recruit a sufficient number of elite professional golfers to comprise a credible competing tour, arrange venues and tournaments, arrange for television coverage of tournaments, recruit sponsors and advertisers, and overcome the Tour's antitrust violations. It also needs to offer OWGR ranking points.

281. As the facts giving rise to this litigation attest, the Tour's Media Rights and Conflicting Events Regulations restrict a competitor's ability to contract for the services of professional golfers for elite golf events. Despite offering far greater prize money, and guaranteed compensation for participating players, LIV Golf was only able to attract a minority of elite golf professionals and had to pay excessively higher guaranteed payments to recruit a number of marquee players than would be required in a competitive market. And LIV Golf has been able to capture only a tiny share in the market for the promotion of elite golf events, as the viewership for LIV Golf events has been dwarfed by that of the PGA Tour's events, despite the more fan-friendly format and superior fan experience LIV Golf offers.

282. The Tour's threats to the Player Plaintiffs, its members, agencies, small businesses, and others, and the threats of those acting in concert with it, erect an additional and substantial barrier to entry. Any entity looking to enter the markets relevant to this litigation now knows what it will face. As Commissioner Monahan put it, the Tour will impose costs on any potential entrant such that there will be "no possibility of a return" on the enormous investment it would take to attempt to enter the market.

283. The last prospective entrant before LIV Golf to garner any meaningful support from players was the World Golf Tour in the mid-1990s. The Tour's Media Rights and Conflicting Events Regulations precluded its entry in short order. After the World Golf Tour folded, there was no meaningful threat of competitive entry for roughly a quarter-century. If the Tour's naked exercise of its market power renders LIV Golf unable to sustain its efforts to enter the market, it would be unreasonable to expect any attempt at competitive entry for the foreseeable future.

284. LIV Golf was able and prepared to enter the markets before the anticompetitive conduct of the Tour diminished its entry to what Commissioner Monahan dismissed as "exhibition matches" that were acquired with a cost structure that offered "no possibility of a return." LIV Golf is as serious

a nascent entrant as the PGA Tour has ever encountered.  And despite all of LIV Golf's attributes and efforts, the Tour's ongoing anticompetitive conduct threatens LIV Golf's competitive viability.  If LIV Golf fails, there will be no alternatives for the participants in elite professional golf events, fans, and sponsors of the game.  They will be left with whatever the Tour chooses to offer.

285.    Absent the Tour's anticompetitive conduct, LIV Golf would be an established and healthy competitor to the Tour in the markets for the services of professional golfers for elite golf events and the promotion of elite professional golf events.  The Tour recognizes that LIV Golf "would be competitive to the PGA Tour."  It denied LIV Golf access to the Player Plaintiffs' and its other members' services because it viewed LIV Golf as a competitor.  But because of the Tour's anticompetitive conduct, LIV Golf is faced with a risk that it will not be able to remain competitively viable.  As such, LIV Golf risks irreparable harm to its business and there is a severe risk of irreparable harm to competition if the Tour's conduct is not enjoined.

286.    The Player Plaintiffs, other professional golfers and Tour members are participants in the restrained markets because they sell their services to the PGA Tour and are thus subject to its monopsony power.  In addition, the Player Plaintiffs, other professional golfers, and Tour members are the target of the Tour's anticompetitive scheme to destroy LIV Golf and monopolize the market.

**Anticompetitive Effects of the Tour's Conduct, Antitrust Injury, and Irreparable Harm**

287.    The Tour's conduct, including (1) unreasonably restrictive regulations, (2) threats of and now imposition of career-threatening bans, (3) suspensions of the Player Plaintiffs and other members who played at LIV Golf events, (4) the promise it will visit the "same fate" on any member who follows their example, (5) the Tour's threats and punishments to non-members who participate in LIV events and a wide range of other businesses who do business with LIV Golf, and (6) its exclusionary group boycott with other golfing bodies in the "ecosystem," all serve no purpose other than to thwart competitive entry and preserve the Tour's entrenched monopoly power.  Faced with punishments of this nature, which could cause incalculable damage to players' careers, the Player Plaintiffs have been denied their right as independent contractors to sell their services to buyers other than the PGA Tour.  And they have been directly and irreparably harmed by being prevented from participating in events in which they have already qualified, including the FedEx Cup Playoffs.  While

some Player Plaintiffs have received higher payments from LIV Golf as a result of the risks they took by playing in LIV Golf events, they have not been compensated in full for the financial injuries they have already suffered and will continue to suffer. Nor have the Player Plaintiffs been compensated for the substantial irreparable injuries they have suffered and will continue to suffer if the Tour's attacks on them are allowed to continue unabated. Many other players are effectively prevented from playing in LIV Golf events due to fear of punishment from the PGA Tour.

288. LIV Golf has also suffered and will continue to suffer severe financial injuries as well as irreparable harms to its business from the Tour's anticompetitive conduct. The fields LIV Golf has been able to attract are weaker than would have been the case in the absence of the punishments from the PGA Tour, because many golfers are simply unwilling to take on the risks of playing in even a single LIV Golf event. This threatens irreparable harm to all of the Plaintiffs because it threatens to thwart LIV Golf's nascent entry and permanently entrench the PGA Tour's monopsony and monopoly power.

289. The punishments from the PGA Tour and others have forced LIV Golf to concentrate funds towards increasing upfront payments, and they have caused LIV Golf to scale down its entry plans and offer fewer tournaments in 2022. This has caused LIV Golf to suffer severe financial injuries as a result of the Tour's anticompetitive conduct.

290. Furthermore, while LIV Golf has the financial resources to make initial cash outlays to launch its product, the ongoing cash outlays significantly impact long-term viability of LIV Golf. Specifically, if the Tour's anticompetitive conduct continues unabated, it will threaten the competitive viability of LIV Golf.

291. The risk that LIV Golf could be driven out of the marketplace only serves to make it more difficult for players (including the Player Plaintiffs) to overcome the threat of punishments from the PGA Tour. It has been suggested that the actions of the PGA Tour and others have simply presented Plaintiffs with a "choice"—stay within the existing "*ecosystem*" or choose to switch to the LIV Golf series. But this is a false choice for several reasons.

292. As Commissioner Monahan admitted in his 2020 Memorandum, the Tour's Media Rights and Conflicting Events Regulations are intended to restrict its member players from offering

their services to others.  The Tour's amendments of its Regulations and the procedures for members being released from them underscore the obvious:  the Tour uses these provisions to create a roadblock to competition.  The Conflicting Events and Media Rights Regulation serve no legitimate business purpose.

293.    The Tour's unlawful conduct has depressed professional golfer wages, denied the Player Plaintiffs labor mobility, blunted the effective entry of the potential entrants into the markets that could challenge the Tour's monopoly, decreased the output of elite professional golf events and tours, decreased opportunities for broadcast of elite professional golf, decreased opportunities for advertising and sponsoring surrounding professional golf, decreased output of elite professional golf entertainment for fans, and diluted LIV Golf's opportunity to compete in the elite professional golf marketplace.  The Tour's unlawful conduct has likewise caused severe financial injuries to LIV Golf in the form of higher costs and lost revenue, while also threatening to impose irreparable injuries to LIV Golf.

294.    The Tour's punishments have deprived the Player Plaintiffs' opportunities to continue playing on the Tour, earning deserved compensation, earning opportunities into Majors, sponsorship relationships and revenue, and future opportunities to play and earn on the Tour.  The Tour's punishments have also caused irreparable harm to the Player Plaintiffs' goodwill, reputation, and brand. The Tour denied Player Plaintiff Gooch, Swafford and Jones entry into the FedEx Cup Playoffs, which they earned through their performance, which has caused and will continue to cause severe injuries to these Plaintiffs.

295.    LIV Golf sought to secure commitments from players by March 2022 to establish its League for the summer 2022.  The Tour's anticompetitive conduct caused top professional golfers not to sign up.  The Tour's conduct thus caused severe financial injury to LIV Golf, and it denied the Player Plaintiffs and other Tour members compensation they would earned from the LIV Golf League.  Its anticompetitive conduct diminished competition, reduced marketwide output, and put LIV Golf League on the shelf for 2022.

296.    Moreover, the Tour's threats of possible punishment for violating its Regulations and its actual punishments have caused even further foreclosure and have caused LIV Golf to employ a cost structure that significantly impacts its long-term viability.

297.     The Tour's Regulations, unilateral and coordinated threats of lifetime bans, and imposition of career-threatening punishment have scared off the large majority of elite professional golfers and other participants in elite professional golf events and have caused LIV Golf to employ a cost structure that significantly impacts its long-term viability.

298.     The Tour's conduct has substantially diminished and impaired the entry of the promoters that could meaningfully threaten the PGA Tour's monopoly, which has stood unchallenged for decades.  Its conduct has denied LIV Golf the opportunity to pursue its innovative business model in 2022.  Its conduct decreased elite professional golf tournaments in 2022 and 2023 as LIV Golf was required to change its model and allocate further capital to try to overcome the Tour's Regulations and threats.

299.     The Tour's conduct has harmed the Player Plaintiffs as they have been suspended from what the Tour calls the "preeminent" golf association in the world for exercising their right as independent contractors to pursue their livelihood, sell their services to buyers other than the incumbent monopolist, and expand their sponsorship opportunities.

300.     The Tour's conduct has also harmed the Player Plaintiffs as they have lost sponsorship opportunities and other business opportunities as a result of the Tour's pressure on sponsors and other entities with which the Plaintiffs do business.

301.     The Tour's conduct has harmed consumers, giving them less choice, less output, and less innovation.  Fans are unable to watch Player Plaintiffs in Tour events.  Fans are unable to watch LIV Golf on television or other streaming services.   Fans suffer from reduced output of elite professional golf events and suffer from getting fewer opportunities to watch Player Plaintiffs, Dustin Johnson, Brooks Koepka and many others whom the Tour has excommunicated from its events.

302.     If the Tour's unlawful conduct is not enjoined, the harm to Plaintiffs will be permanent and irreparable.  While LIV Golf has partially entered the markets at great expense, it has done so on terms that the Tour recognizes are "irrational."  If the Tour's unlawful conduct is not enjoined, LIV Golf faces a risk that it will not be competitive in the long run.  For competition for the Player Plaintiffs' services, the Tour's anticompetitive Regulations and other conduct frustrating the labor mobility of its members and tying up their media rights must be enjoined.

303.    If the Tour can force LIV Golf out of the relevant markets altogether and/or foreclose LIV Golf from offering a set of products and services that provides a meaningful competitive constraint on the Tour, the Tour's monopoly and monopsony power will be cemented for many years to come, and immune to even attempted entry.  Injunctive relief is necessary to restore competition for Tour members' services and to innovate the game that the Tour, only in theory, promises to support.  All of the equities and the public interest support such relief.  Otherwise, the harm to competition will be irreversible and permanent.

### The PGA Tour's Alleged Procompetitive Defenses Are Pretextual

304.    To assert a procompetitive justification for its conduct under the antitrust laws, the Tour must, at a minimum, offer a nonpretextual claim that its conduct is a form of competition on the merits. As set forth in detail above, the Tour cannot make such a showing, because its conduct is aimed at foreclosing the only meaningful competitive threat it has faced in a quarter century.  Rather than competing on the merits, the Tour's conduct is aimed at kneecapping LIV Golf to foreclose nascent competition.

305.    The Tour's purported justifications for its conduct are pretextual.  For example, the Tour asserts that it is merely enforcing its membership rules that have some benign purposes.  This argument is betrayed as pretextual in multiple respects.  First, as detailed in the 2020 Monahan Memorandum, the Tour expressly expanded its membership rules for the purpose of defeating competition from a new entrant such as LIV Golf.  Second, the Tour only enforces its rules to deny releases to players when they are playing in *competing* events, demonstrating that these rules are aimed at defeating competition. Third, the Tour has threatened and imposed punishments on a variety of golfers who are not even Tour members (and therefore are not subject to the Tour's rules at all), including European Tour members, college golfers, and Asian Tour members.  Instead of enforcing its rules on its members, the Tour threatens and imposes punishments on any golfer anywhere in the world who participates in LIV Golf events.  There is nothing *pro*competitive about the Tour's actions—they are aimed at thwarting the only competition it has faced in decades.

306.    Similarly, the Tour's conduct reveals as pretextual its claim that it is acting to prevent some sort of "free-riding" on investments the Tour supposedly makes in players.  As noted, the Tour's

attacks are not limited to those players in whom it has supposedly made some sort of investment, but instead extend to all golfers anywhere, including college players and members of other tours who have never been members of the PGA Tour. At the other end of the spectrum, the Tour's "free-riding" claim is absurd when applied to golfers such as Plaintiff Mickelson, who has devoted 30 years of his Hall of Fame career to playing on the Tour, providing massive benefits to the Tour throughout his career. And any punishments meted out by the Tour to players like Mr. Mickelson (and others) are disproportionate to the unspecified investments the Tour claims to make in the early stages of golfers' careers.

307. The Tour's words and conduct also betray as mere pretext its assertion that it is attacking LIV Golf and any players who participate in its events because the Tour does not want to be associated with any player who participates in a league that is majority funded by the Public Investment Fund of Saudi Arabia. Commissioner Monahan's 2020 Memorandum outlining the Tour's attacks on a new entrant says nothing about Saudi Arabia. Instead, it is focused on the competitive threat that the new entrant—which Commissioner Monahan labeled "Private Equity Golf"—presented to the Tour. The Tour's pretextual arguments about Saudi funding are further betrayed by its willingness to do business with dozens of sponsors who do billions of dollars of business each year in Saudi Arabia. Furthermore, the Tour's pretext is exposed by its willingness to have the PGA Tour Fan Shop operated by Fanatics, which has received substantial funding from the Public Investment Fund of Saudi Arabia—the same fund that the Tour supposedly finds so objectionable when it sponsors LIV Golf.

308. The Tour's own actions also reveal that the Tour's various objections to LIV Golf's innovative format are pretextual. While the Tour has suggested that there is something about LIV Golf's no-cut, high purse tournaments and its team-golf format that justify its opposition to the new entrant, the Tour itself has disclosed plans to copy LIV Golf's format.

309. Furthermore, the Tour and its spokespersons have asserted that they object to LIV Golf because LIV Golf is supposedly operating outside the "ecosystem" and is not cooperating with other existing tours or sanctioning bodies. The facts, however, demonstrate the pretext in any such argument. For example, the sponsors of LIV Golf sought to work with the European Tour, but in the meeting in Malta in July 2021, the European Tour revealed that although it recognized the "appeal and fit" of the new tour, it feared the "mighty power" of the PGA Tour and therefore had to reject the proposed

partnership. LIV Golf has likewise sought to partner with others in the golf "ecosystem" and grow the game at multiple levels, including through proposed partnerships with entities ranging from the Asian Tour, to the LPGA, to the Ladies European Tour. At every turn, the PGA Tour has either directly foreclosed LIV Golf's efforts or exerted extreme pressure on other golfing bodies to exclude LIV Golf. For example, the PGA Tour and the European Tour threatened severe consequences on the Asian Tour and have punished golfers on the Asian Tour in their effort to prevent the Asian Tour from partnering with LIV Golf. The Tour prevented the LPGA and the Ladies European Tour from partnering with LIV Golf, thus harming countless women professional golfers by denying them additional playing opportunities and much-needed funding for their tours—all for the purpose of foreclosing LIV Golf from the "ecosystem." And, as detailed above, the Tour has leaned on the bodies that sponsor the Majors and the OWGR to lock arms with the Tour in excluding LIV Golf. Thus, having used every tool at its disposal to prevent LIV Golf from working with other bodies in the golf "ecosystem," and punishing those who make the choice to partner with LIV Golf, it is pure pretext for the Tour to suggest that it is somehow justified in opposing LIV Golf because LIV Golf has been left to operate largely outside the "ecosystem."

## CLAIMS FOR RELIEF

**COUNT I:** **Unlawful Monopsonization of the market for ELITE GOLF EVENT SERVICES in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

310. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count I.

311. At all relevant times, the Tour has had monopsony power over the market for the services of professional golfers for elite golf events in the United States (or, alternatively, in the world).

312. The Tour has willfully maintained and abused its monopsony power through anticompetitive conduct, including, among other things, by: (1) threatening to expel and impose a lifetime ban on all players who contract with LIV Golf—including both members and non-members of the Tour; (2) imposing unreasonable and anticompetitive restrictions on players' ability to sell their independent contractor services, including the Media Rights Regulation and Conflicting Events Regulation in the Regulations, which have the effect of foreclosing competition; (3) threatening to

enforce the terms of the Regulations beyond their meaning to deny players the freedom to play in competing tours; (4) enforcing the terms of the Regulations to deny Plaintiffs' competitive opportunities; (5) threatening to harm other agencies, businesses or individuals who would otherwise work with Plaintiffs and/or LIV Golf; and (6) suspending and punishing the Player Plaintiffs for playing in LIV Golf and supporting it, all in order to punish and harm Plaintiffs, to prevent competition for the players' services, and to prevent LIV Golf from launching a competitive elite professional golf tour.

313.    The anticompetitive actions of the PGA Tour do not further any procompetitive goals and are not reasonably necessary to achieve any legitimate procompetitive benefits.

314.    The PGA Tour's exclusionary conduct has unreasonably restrained competition in the market for services of professional golfers for elite golf events, including by:

- Preventing vigorous competition for services of professional golfers for elite golf events;
- Suspending the Player Plaintiffs for playing professional golf;
- Preventing LIV Golf from contracting with agencies, vendors, sponsors, advertisers and players needed to offer an elite professional golf entertainment product;
- Impacting competition in contracting for the services of elite professional golfers;
- Depressing compensation for the services of professional golfers for elite golf events below competitive levels;
- Decreasing the output of opportunities for professional golfers for elite golf events;
- Denying the Player Plaintiffs the right to have free agency for their independent contractor services;
- Interfering with the Player Plaintiffs' and others' contractual negotiations with LIV Golf;
- Interfering with LIV Golf's contractual negotiations with agencies, sponsors, venues, vendors, broadcasters, and partners to work with LIV Golf; and
- Preventing LIV Golf from promoting elite professional golf to fans.

315.    As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will continue to be harmed in their business or property; competition in the relevant market will be harmed;

the PGA Tour will unlawfully maintain its monopsony position; and players, consumers, and other stakeholders will be harmed.  Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct.  Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

316.  Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that Plaintiffs need injunctive relief in order to stop immediately the PGA Tour's threats and imposition of onerous punishments on professional athletes to thwart LIV Golf's entry and maintain the PGA Tour's monopsony and an order enjoining enforcement of the PGA Tour's anticompetitive Regulations.

317.  The PGA Tour's anticompetitive acts violate Section 2 of the Sherman Act.  Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a), 26 and any other relief this Court deems just and proper under Count I.

**COUNT II:  Unlawful Monopolization of the market for the PROMOTION OF ELITE PROFESSIONAL GOLF EVENTS in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

318.  Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count II.

319.  At all relevant times, the PGA Tour has had monopoly power over the market for the promotion of elite professional golf events in the United States (or, alternatively, in the world).  The only viable competitor to the PGA Tour's dominant market position in this market is LIV Golf.

320.  The PGA Tour has willfully maintained and abused its monopoly power through anticompetitive conduct, including by: (1) threatening to expel and impose a lifetime ban on all players who contract with LIV Golf—including both members and non-members of the Tour; (2) imposing unreasonable and anticompetitive restrictions on players' ability to sell their independent contractor services, including the Media Rights Regulation and Conflicting Events Regulation in the Regulations, which have the effect of foreclosing competition; (3) threatening to enforce the terms of the Regulations beyond their meaning to deny players the freedom to play in competing tours; (4) enforcing the terms of the Regulations to deny Plaintiffs' competitive opportunities; (5) threatening to harm other agencies,

businesses or individuals who would otherwise work with Plaintiffs and/or LIV Golf; and (6) suspending and punishing the Player Plaintiffs for playing in LIV Golf and supporting it, all in order to punish and harm Plaintiffs, to prevent competition for the players' services, and to prevent LIV Golf from launching a competitive elite professional golf tour.

321. The anticompetitive actions of the PGA Tour do not further any procompetitive goals and are not reasonably necessary to achieve any procompetitive benefits.

322. The PGA Tour's exclusionary conduct has unreasonably constrained competition in the market for the promotion of elite professional golf events, including by:

- Preventing vigorous competition for the promotion of elite professional golf entertainment;

- Preventing LIV Golf from contracting with players regarding their own media rights needed to promote elite professional golf tournaments;

- Preventing Player Plaintiffs from contracting with LIV Golf and others regarding their own media rights;

- Decreasing the output of elite professional golf tournaments;

- Suspending Player Plaintiffs and other golfers for playing professional golf;

- Preventing LIV Golf from contracting with agencies, vendors, sponsors, advertisers and players need to offer elite professional golf entertainment product;

- Impacting competition in contracting for the play of elite professional golfers;

- Depressing compensation for the services of professional golfers in elite events below competitive levels;

- Interfering with LIV Golf's contractual negotiations with players to join LIV Golf;

- Interfering with LIV Golf's contractual negotiations with agencies, sponsors, venues, vendors, broadcasters and partners to work with LIV Golf; and

- Preventing LIV Golf from promoting elite professional golf to fans.

323. As a result of the PGA Tour's anticompetitive conduct, LIV Golf and Player Plaintiffs have been and will continue to be harmed in their business or property; competition in the relevant market will be harmed; the PGA Tour will unlawfully maintain its monopoly position; and players,

consumers, and other stakeholders will be harmed. Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct. Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

324. Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that they need injunctive relief stopping immediately the PGA Tour's threats and imposition of onerous punishments on professional athletes designed to thwart LIV Golf's entry and maintain the PGA Tour's monopoly and enjoining enforcement of the PGA Tour's anticompetitive player Regulations.

325. The PGA Tour's anticompetitive acts violate Section 2 of the Sherman Act. Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a), 26 and any other relief this Court deems just and proper under Count II.

**COUNT III: Unlawful Attempted Monopolization in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

326. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count III.

327. In the event that the PGA Tour's position in the relevant markets does not amount to monopoly and/or monopsony power, either by virtue of LIV Golf's nascent entry or otherwise, Plaintiffs plead in the alternative that the Tour's conduct constitutes unlawful attempted monopolization and monopsonization in violation of Section 2 of the Sherman Act.

328. The Tour has unlawfully attempted to monopolize and monopsonize the relevant markets.

329. At all relevant times, the Tour has had monopoly and/or monopsony power or, at a minimum, a dangerous probability of success in acquiring (or re-acquiring) monopoly and/or monopsony power, over the relevant markets in the United States (or, alternatively, in the world).

330. The PGA Tour has engaged in anticompetitive conduct to try to monopolize the relevant markets, including by: (1) threatening to expel and impose a lifetime ban on all players who contract with LIV Golf—including both members and non-members of the Tour; (2) imposing unreasonable

and anticompetitive restrictions on players' ability to sell their independent contractor services, including the Media Rights Regulation and Conflicting Events Regulation in the Regulations, which have the effect of foreclosing competition; (3) threatening to enforce the terms of the Regulations beyond their meaning to deny players the freedom to play in competing tours; (4) enforcing the terms of the Regulations to deny Plaintiffs' competitive opportunities; (5) threatening to harm other agencies, businesses or individuals who would otherwise work with Plaintiffs and/or LIV Golf; and (6) suspending and punishing the Player Plaintiffs for playing in LIV Golf and supporting it, all in order to punish and harm Plaintiffs, to prevent competition for the players' services, and to prevent LIV Golf from launching a competitive elite professional golf tour.

331.    As set forth in detail above, the Tour's conduct carries a dangerous probability of destroying the competitive viability of LIV Golf.  The Tour's anticompetitive conduct forced LIV Golf to change its commercial strategy for 2022.  LIV Golf was forced to announce a substantially scaled-down version of its League concept by offering 8 invitationals in 2022 (the LIV Golf Invitational Series).  The Tour then attacked LIV Golf's Invitational Series events.  Furthermore, because of the Tour's anticompetitive conduct, LIV Golf has been unable to broadcast its events in the United States—an encumbrance that threatens its long-term viability.

332.    Furthermore, the Tour's conduct has denied and will continue to deny LIV Golf access to many top players.  The Tour's Regulations and unilateral and conspiratorial threats of punishment have scared off the large majority of elite players as well as the pipeline of future elite players.  And for those players whom LIV Golf has been able to sign, it has had to offer supracompetitive compensation well above the levels that would prevail in a market not polluted by the Tour's anticompetitive conduct.  This has forced LIV Golf into an unsustainable business model.  If the Tour's anticompetitive conduct is not enjoined, LIV Golf will be unable to sustain a competitively viable tour.

333.    And, the Tour's attempted monopolization and unlawful exclusionary conduct presents a dangerous probability that the Tour will succeed, to the extent it has not already, in its attempt to monopolize the relevant markets, as shown by its willful and intentional efforts and success in:

- Preventing vigorous competition;

- Preventing the PGL from entering the markets;

- Suspending Player Plaintiffs;

- Preventing Plaintiff LIV Golf from contracting with agencies, vendors, sponsors, advertisers and players needed to offer an elite professional golf entertainment product;

- Impacting competition in contracting for the services of elite professional golfers;

- Depressing compensation for the services of elite professional golfers below competitive levels;

- Decreasing the output of elite professional golfer services opportunities;

- Denying Player Plaintiffs the right to have free agency for their independent contractor services;

- Interfering with Plaintiffs' and others' contractual negotiations;

- Preventing Plaintiff LIV Golf from promoting elite professional golf to fans;

- Encouraging other golfing entities to pressure golfers against joining LIV Golf, including by threatening to disallow LIV Golf players from playing in various tournaments; and

- Orchestrating a group boycott of LIV Golf with the European Tour in furtherance of their agreement to boycott LIV Golf and golfers who would play for a competitive tour.

334.   Absent injunctive relief halting the Tour's anticompetitive conduct, LIV Golf will be unable to sustain a competitively viable business, and it will be unable to meaningfully constrain the Tour's monopoly power.

335.   The Tour's conduct has substantially diminished and impaired the entry of the only entrant that could meaningfully threaten the PGA Tour's monopoly and monopsony power in the relevant markets, which has stood unchallenged for decades.  And if it not enjoined, the Tour's conduct will forever destroy the competitive viability of the only potential challenger to the Tour's monopoly

1    and monopsony power.

2        336.    The Tour has acted with the specific intent to monopolize and monopsonize the relevant

3    markets.  The Tour's actions are irrational but for its anticompetitive effect, including by degrading its

4    own offerings.  The Tour's specific intent to monopolize and monopsonize the relevant markets is

5    shown through its statements and actions, including: (1) the PGA Tour Commissioner's statements in

6    the January 2020 Monahan Memorandum, (2) the Tour's public and private statements since 2020

7    related to the Tour's desire to "protect this business model" and prevent a new entrant from contracting

8    with Tour members through threats and enforcement of unlawful Regulation provisions, (3) statements

9    of Tour officials and Members related to the Tour's desire to destroy LIV Golf, (4) the Tour's May 10,

10   2022 denial of Tour members' requests to participate in the LIV Golf London Invitational, (5) the

11   Tour's coordinated efforts to get others to support its boycott of LIV Golf and those who associate with

12   LIV Golf, (6) the Tour pressuring small businesses not to work with LIV Golf or be blacklisted by the

13   Tour, (7) the Tour's application of its Regulations to impose irreparable punishment on Player Plaintiffs

14   and others for playing professional golf.

15       337.    As a result of the PGA Tour's anticompetitive conduct, LIV Golf and the Player

16   Plaintiffs have been and will continue to be harmed in their business or property; competition in the

17   relevant markets will be harmed; the PGA Tour will unlawfully monopolize and monopsonize the

18   relevant markets; and players, consumers, and other stakeholders will be harmed.

19       338.    Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's

20   unlawful conduct such that they need injunctive relief stopping immediately the PGA Tour's threats

21   and imposition of onerous punishments on professional athletes designed to thwart LIV Golf's entry

22   and maintain the PGA Tour's monopoly and enjoining enforcement of the PGA Tour's anticompetitive

23   player Regulations.  Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were

24   intended to prevent, and each flows from Tour's unlawful conduct.  Such conduct is inherently and

25   manifestly anticompetitive and has an injurious effect on competition.

26       339.    Accordingly, to the extent the Tour argues that LIV Golf's nascent entry means the Tour

27   is not presently a monopolist, the Tour's anticompetitive conduct carriers a dangerous probability of

28   restoring and maintaining the Tour's monopoly and monopsony power in the relevant markets, in

violation of Section 2 of the Sherman Act.

340.    Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a), 26 and any other relief this Court deems just and proper under Count III.

**Count IV:    Unlawful Restraint of Trade in Violation of Sherman Act § 1 (15 U.S.C. § 1) [Group Boycott]**

341.    Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count IV.

342.    The PGA Tour has unlawfully reached an agreement, with the purpose to eliminate competition, with the European Tour, a potential horizontal competitor, (and possibly others) to not compete for players' services and to prevent the entry and competitive viability of LIV Golf into the relevant markets.  Specifically, the PGA Tour and the European Tour have agreed to engage in a group boycott of LIV Golf, other potential competitors, golfers (like Player Plaintiffs) who agree to play in LIV Golf's events, and any other person or entity who seeks to partner with LIV Golf, to harm competition for the services of professional golfers for elite golf events and for the promotion of elite golf events.

343.    The actions of the Tour and the European Tour make clear that they had a conscious commitment to a common scheme: to prevent the entry of new competitors into the market.  The unlawful agreement is evidenced by the actions and statements of the Tour and the European Tour, as set forth in this Complaint, including:

- The Tour admitted the existence of an unlawful agreement with the European Tour. In his January 2020 Memorandum describing the PGA Tour's plan to foreclose new entry, Commissioner Monahan explained that this alliance with the European Tour was aimed at removing the European Tour as a potential horizontal competitor through its potential to partner with a new entrant: "We have continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of" a new entrant;

- As Mr. Pelley detailed, in November 2020 the European Tour and the PGA Tour

103

ceased competing with each other for players' services, and instead formed an illegal alliance to eliminate new competition for players' services;

- Following the agreement, in November 2020, the European Tour announced it would not partner with PGL;

- Pursuant to its illegal alliance, the European Tour agreed not to partner with LIV Golf despite recognizing the "fit and appeal" of partnering with LIV Golf because the European Tour had contracted with the Tour and could not upset the "US PGA mighty power;"

- The Tour and the European Tour then took steps in furtherance of their scheme, including threatening all players with lifetime bans if they competed in the PGL and, later, LIV Golf tournaments; and

- In addition, the Tour and European Tour agreed to suspend players who competed in LIV Golf tournaments.

344. The Tour used its Regulations to implement the unlawful agreement and achieve the anticompetitive purpose of the agreement, harming Plaintiffs and competition.

345. After the agreement was reached, the Tour enforced its unlawful Regulations and proceeded to suspend the Player Plaintiffs for violating the Regulations. Further evidencing the agreement that was in fact reached, the Tour enforced the Regulations in a way that they had not been enforced previously. Historically, the Tour permitted members to associate with multiple tours simultaneously and routinely granted releases for golfers to compete in non-Tour affiliated tournaments. In contrast, the Tour denied all releases for LIV Golf events and imposed effective career-ending suspensions on Plaintiffs. The Tour made clear its enforcement of these Regulations is intended to destroy the entry of LIV Golf, harming the Plaintiffs and competition as a whole in the process. Likewise, as detailed in this Complaint, the European Tour has departed from its longstanding practices regarding conflicting events to align with the Tour in furtherance of their agreement to act jointly to exclude LIV Golf and punish the Player Plaintiffs and other golfers who play in LIV Golf events.

346. Professional golfers (including the Player Plaintiffs) are essential to the Tour's scheme to eliminate competition in the market. As Commissioner Monahan admitted: "The impact that [the

1   new league] could have on the PGA TOUR is dependent on the level of support it may receive from

2   these players. Without this support, [the new league's] ability to attract media and corporate partners

3   will be significantly marginalized and its impact on the TOUR diminished."

4        347.    The Player Plaintiffs are the pawns (and targets) used to effectuate the group boycott

5   and eliminate competition in the markets; the Player Plaintiffs' suspensions are a necessary means to

6   accomplish the Tour's anticompetitive scheme.

7        348.    **Per se violation:**  The agreements constitute unreasonable restraints of trade that are

8   *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  The agreement constitutes a group

9   boycott orchestrated by a monopolist and joined by a potential competitor that is expressly aimed at

10  foreclosing the entry of the only viable alternative to the Tour into the relevant market.  No elaborate

11  analysis is required to demonstrate the anticompetitive character of this group boycott.

12       349.    **Rule of Reason violation:**  The agreements are also unreasonable restraints of trade

13  that are unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, under the rule of reason analytical

14  framework.  The principal tendency of the agreement is to restrain competition, reinforce the market

15  power of the PGA Tour, defeat the nascent entry of LIV Golf, and eliminate competition in the relevant

16  markets.  This harmed the Player Plaintiffs and other professional golfers by eliminating competition

17  in the market for their services and also restricted competition in the market generally.  It has also

18  harmed LIV Golf and competition in the relevant markets by hindering LIV Golf's entry and

19  threatening to destroy its competitive viability.  The agreement between the Tour and the European

20  Tour to lock arms in a joint effort to foreclose competitive entry lacks any legitimate procompetitive

21  justifications.

22       350.    As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will

23  continue to be harmed in their business or property; competition in the relevant markets will be harmed;

24  the PGA Tour will unlawfully maintain its monopoly position; and Plaintiffs, consumers, and other

25  stakeholders will be harmed.  Each of the injuries suffered by Plaintiffs is of the type the antitrust laws

26  were intended to prevent, and each flows from Tour's unlawful conduct.  Such conduct is inherently

27  and manifestly anticompetitive and has an injurious effect on competition.

28       351.    Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's

unlawful conduct such that Plaintiffs need injunctive relief in order to stop the PGA Tour's unlawful conduct.

352. The PGA Tour's anticompetitive acts violate Section 1 of the Sherman Act.

353. Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a) and 26, and any other relief this Court deems just and proper under Count IV.

**Count V: Unlawful Agreement to Restrain Trade in Violation of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720(a), 16726) [Group Boycott]**

354. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count V.

355. The PGA Tour has unlawfully agreed with the European Tour (and potentially others) "[t]o create or carry out restrictions in trade or commerce." Cal. Bus. & Prof. Code §§ 16720(a), 16726. Moreover, the Tour's violation of Section 1 of the Sherman Act necessarily constitutes a violation of the Cartwright Act.

356. The Tour operates six annual tournaments in the state of California, owns golf courses in California, committed multiple acts in furtherance of its unlawful group boycott in California, co-hosted a tournament with the European Tour in California from which it banned any golfers who participated in a LIV Golf event, harmed California resident golfers (including Plaintiff Mickelson), and harmed competition for professional golfers' services for elite events in California. Moreover, the law and public policy of other affected states is materially similar to the law of California.

357. The Tour has unlawfully agreed with the European Tour to not compete for players' services and to act jointly to prevent the entry of LIV Golf into the relevant markets. Specifically, the PGA Tour and the European Tour agreed to boycott LIV Golf, players who work with LIV Golf, and any other person or entity that seeks to partner with LIV Golf. The Tour entered an agreement with the European Tour so as to—as Commissioner Monahan vowed—"remov[e] the European Tour as a potential partner" of a new entrant like LIV Golf.

358. The PGA Tour and the European Tour have taken acts in furtherance of their unlawful boycott. For instance, the European Tour has agreed to suspend and punish golfers for playing in LIV

Golf, to no longer compete with the PGA Tour for players' services, and to not partner with LIV Golf or other potential entrants. The two tours have unlawfully agreed to deny (and taken steps to deny) golfers who play in LIV Golf events the opportunity to play in the tours' co-sanctioned events (including the event they co-sanctioned in California), and to unfairly punish independent contractors for playing with a competitor promoter.

359. The Tour's agreement with the European Tour has the illegal purpose to eliminate a competitor and future potential entrants. In particular, the Tour seeks to deny LIV Golf access to the services of professional golfers for elite golf events along with the other partners and inputs necessary to compete for the services of professional golfers for elite golf events. The two tours have also unlawfully agreed to not compete for players' services in order to suppress wages and decrease output of opportunities.

360. The tours' agreement constitutes an unreasonable restraint of trade that is *per se* illegal under California Business and Professions Code §§ 16720(a), 16726. The agreement constitutes a group boycott orchestrated by a monopolist that is expressly aimed at foreclosing the entry of the only viable alternative to the Tour into the relevant markets. No elaborate analysis is required to demonstrate the anticompetitive character of this group boycott.

361. The agreement also constitutes an unreasonable restraint of trade that is unlawful under California Business and Professions Code §§ 16720(a), 16726, under a rule-of-reason analysis. The principal tendency of the agreements is to restrain competition, reinforce the market power of the PGA Tour, and seriously hamper (or outright defeat) the competitive effectiveness and prospective entry of LIV Golf—by harming professional golfers like the Player Plaintiffs and thus eliminating competition for their services—the only viable alternative in the relevant market, and thereby harm competition in the relevant markets. This harmed the Player Plaintiffs and other professional golfers by eliminating competition in the market for their services and also restricted competition in the markets generally. It has also harmed LIV Golf and competition in the market for the promotion of elite events by hindering LIV Golf's entry and threatening to destroy its competitive viability. The agreement lacks any legitimate procompetitive justifications, because, among other things, the group boycott deprives Plaintiff Mickelson and other Player Plaintiffs of means to practice their profession that are so essential

that they are necessary to compete effectively in the sport of professional golf.

362.    As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will continue to be harmed in their business or property; competition in the relevant markets will be harmed; the PGA Tour will unlawfully maintain its monopoly position and unlawful boycott; and Plaintiffs, LIV Golf, consumers, and other stakeholders will be harmed.  Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct. Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

363.    As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will continue to be irreparably harmed such that they need injunctive relief in order to stop immediately the PGA Tour's unlawful conduct.

364.    The PGA Tour's anticompetitive acts violate the Cartwright Act.  Cal. Bus. & Prof. Code §§ 16720(a), 16726.

365.    Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to Cal. Bus. & Prof. Code § 16750(a), and any other relief this Court deems just and proper under Count V.

### Count VI:    Breach of Contract (Player Plaintiffs)

366.    Player Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count VI.

367.    On various dates, Player Plaintiffs and the Tour entered into a contract when the Plaintiffs submitted their respective membership applications and membership renewal applications and agreed to be bound by the Tour's Regulations.  The Regulations (other than those described in this Complaint that violate the antitrust laws and therefore are unenforceable) are a legally binding agreement by and between Player Plaintiffs, respectively and individually, and the Tour.  Player Plaintiffs maintain that provisions within the Regulations are not enforceable, but the provision the Tour has breached is not one of those provisions.

368.    Player Plaintiffs performed all enforceable provisions in the Tour's Regulations and have complied with all obligations under the Tour's Disciplinary Process detailed in the Tour's Regulations.

369.    The Tour breached Section VII.E.2 of the Regulations because it failed to abate Plaintiffs' suspensions pending their appeals of the Tour's Disciplinary Actions.  Section VII.E.2 provides that "[a]n appeal shall operate to stay the effective date of any penalty, except suspension from a tournament then in progress or scheduled for the calendar week in which the alleged violation occurred, until after the final decision on the appeal."  Exhibit 1.  The Tour was thus required to honor some Player Plaintiffs' requests to participate in Tour events, including the FedEx Cup Playoff events, occurring while Player Plaintiffs' appeals to the Tour's Appeals Committees remained pending.

370.    The Tour's breach caused Player Plaintiffs to incur substantial damages in the form of irreparable harm (in the form of loss of FedEx Cup ranking points, loss of OWGR ranking points, loss of career opportunities, loss of goodwill, and reputational harm), loss of income-earning opportunities, loss of retirement-plan payments, consequential damages, expenses, and costs.

**Count VII:    Tortious Interference with LIV Golf's Contractual Relationships (LIV Golf)**

371.    LIV Golf incorporates by reference the allegations of all preceding paragraphs as though fully set forth in this Count VII.

372.    LIV Golf has entered into contractual relationships with professional golfers and other third parties, such as vendors, sponsors, and broadcasters.

373.    The PGA Tour knew that LIV Golf had entered into contractual relationships with professional golfers and other third parties.

374.    The PGA Tour's unlawful actions detailed herein were intended to prevent professional golfers and other third parties from performing their contracts with LIV Golf.

375.    The professional golfers and other third parties have been unable to perform under their contracts with LIV Golf as a result of the PGA Tour's actions described herein.

376.    There was no legal justification for the PGA Tour's anticompetitive conduct.

377.    As a result of the PGA Tour's anticompetitive and wrongful conduct, LIV Golf has suffered significant and irreparable harm to its business.

378.    LIV Golf has been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that LIV Golf needs expedited injunctive relief stopping immediately the PGA Tour's unlawful conduct.

379.     LIV Golf seeks injunctive relief, economic damages, including compensatory damages, special damages, and consequential damages, costs of this suit, and interest and any other relief this Court deems just and proper under Count VII.  LIV Golf also seeks punitive damages against the PGA Tour for its tortious interference with LIV Golf's business relationships.

### Count VIII:   Tortious Interference with LIV Golf's Prospective Business Relationships (LIV Golf)

380.     LIV Golf incorporates by reference the allegations of all preceding paragraphs as though fully set forth in this Count VIII.

381.     LIV Golf has been on the verge of entering business relationships with professional golfers and other third parties, such as vendors, sponsors, and broadcasters.

382.     The PGA Tour knew that LIV Golf was contacting players and other third parties about entering into a business relationship.

383.     The PGA Tour's actions detailed herein were independently tortious as detailed herein and were intended to prevent professional golfers and other third parties from entering into a business relationship with LIV Golf.

384.     Several professional golfers and other third parties have not entered into such business relationships with LIV Golf to-date as a result of the PGA's Tours anticompetitive actions and restrictions.

385.     There was no legal justification for the PGA Tour's anticompetitive conduct.

386.     As a result of the PGA Tour's anticompetitive and wrongful conduct, LIV Golf has suffered significant and irreparable harm to its business.

387.     LIV Golf has been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that LIV Golf needs expedited injunctive relief stopping immediately the PGA Tour's unlawful conduct.

388.     LIV Golf seeks injunctive relief, economic damages, including compensatory damages, special damages, and consequential damages, costs of this suit, and interest and any other relief this Court deems just and proper under Count VIII.  LIV Golf also seeks punitive damages against the PGA Tour for its tortious interference with LIV Golf's prospective business relationships..

1

**JURY DEMAND**

2

389.     Plaintiffs demand a trial by jury of all issues so triable.

3

**RELIEF REQUESTED**

4

        WHEREFORE, Plaintiffs hereby request that the Honorable Court award the following

5

preliminary injunctive relief against the PGA TOUR:

6

        a.     Stay and enjoin the PGA Tour's suspension and sanctions imposed on the Player

7

               Plaintiffs;

8

        b.     Prevent the PGA Tour from banning or threatening to ban from the PGA Tour

9

               (and its affiliated Tour) players who talk to, contract with, play in, or associate

10

               with LIV Golf;

11

        c.     Prevent the PGA Tour from expelling players from the PGA Tour (and its

12

               affiliated Tours) or PGA Tour tournaments who talk to, contract with, play in,

13

               or associate with LIV Golf;

14

        d.     Prevent the PGA Tour from threatening or imposing any other punishments or

15

               otherwise harming or threatening to harm anyone who talks to, contracts with,

16

               or associates with LIV Golf;

17

        e.     Prevent the PGA Tour from conspiring or unlawfully agreeing with the

18

               European Tour to ban or threaten to ban players from participating in European

19

               Tour events or participating in the Ryder Cup for talking to, contracting with,

20

               playing in, or associating with LIV Golf;

21

        f.     Prevent the PGA Tour from pressuring or coordinating with the R&A, Masters,

22

               and/or PGA of America (or others), to punish, exclude or threaten to exclude

23

               players otherwise eligible under current eligibility rules from participating in

24

               golf events (including the Majors);

25

        g.     Prevent the PGA Tour from amending its rules to prevent players otherwise

26

               eligible from playing in PGA Tour events or co-sponsored events, such as the

27

               FedEx Cup, the WGC tournaments, the Tournament of Champions, the Players,

28

the Memorial, the Arnold Palmer Invitational, the Genesis Invitational, AT&T Pebble Beach Open, and the Presidents Cup;

h.     Prevent the PGA Tour from enforcing its unlawful restrictions on independent-contractor golfers, including the Media Rights Regulation and the Conflicting Events Regulation;

i.     Prevent the PGA Tour from amending its rules to prevent players otherwise eligible from playing in PGA Tour events or co-sponsored events;

j.     Prevent the PGA Tour from applying rules beyond their meaning to punish players who associate with LIV Golf, or otherwise to thwart competition; and

k.     Prevent the PGA Tour from taking any other actions intended to undermine competition on the merits from LIV Golf.

WHEREFORE, Plaintiffs hereby request that the Honorable Court award the following permanent injunctive relief against the PGA TOUR:

a.     Stay and enjoin the PGA Tour's suspension and sanctions imposed on the Player Plaintiffs;

b.     Enjoin the PGA Tour from banning or threatening to ban from the PGA Tour (and its affiliated Tour) players who talk to, contract with, play in, or associate with LIV Golf;

c.     Enjoin the PGA Tour from expelling players from the PGA Tour (and its affiliated Tour) or PGA Tour tournaments who talk to, contract with, play in, or associate with LIV Golf;

d.     Enjoin the PGA Tour from threatening or imposing any other punishments or otherwise harming or threatening to harm anyone who talks to, contracts with, or associates with LIV Golf;

e.     Enjoin the PGA Tour from conspiring or unlawfully agreeing with the European Tour to ban or threaten to ban players from participating in European Tour events or participating in the Ryder Cup for talking to, contracting with, playing in, or associating with LIV Golf;

f.   Enjoin the PGA Tour from agreeing, contracting or threatening the R&A, Masters, and/or PGA of America (or others), to punish, exclude or threaten to exclude players otherwise eligible under current eligibility rules from participating in golf events (including the Majors);

g.   Enjoin the PGA Tour from amending its rules to prevent players otherwise eligible from playing in PGA Tour events or co-sponsored events, such as the FedEx Cup, the WGC tournaments, the Tournament of Champions, the Players, the Memorial, the Arnold Palmer Invitational, the Genesis Invitational, AT&T Pebble Beach Open, and the Presidents Cup;

h.   Enjoin the PGA Tour from enforcing its unlawful restrictions on independent-contractor golfers, including the Media Rights Regulation and the Conflicting Events Regulation;

i.   Enjoin the PGA Tour from amending its rules to prevent players otherwise eligible from playing in PGA Tour events or co-sponsored events;

j.   Enjoin the PGA Tour from applying rules beyond their meaning to punish players who associate with LIV Golf, or otherwise to thwart competition; and

k.   Enjoin the PGA Tour from taking any other actions intended to undermine competition on the merits from LIV Golf.

WHEREFORE, Plaintiffs request that this Honorable Court:

a.   Adjudge and decree that the PGA Tour is unlawfully maintaining its monopoly over the market for the services of professional golfers for elite golf events in violation of Section 2 of the Sherman Act;

b.   Adjudge and decree that the PGA Tour is unlawfully maintaining its monopoly over the market for the promotion of elite golf events in violation of Section 2 of the Sherman Act;

c.   In the alternative, adjudge and decree that the PGA Tour is attempting to monopolize the market for the services of professional golfers for elite golf

events and the market for the promotion of elite golf events in violation of Section 2 of the Sherman Act;

d.      Adjudge and decree that the PGA Tour unreasonably restrained trade in violation of Section 1 of the Sherman Act when it entered agreement with the European Tour to boycott LIV Golf and potential competitors and those who associate with LIV Golf to try to foreclose competition from LIV Golf in the relevant markets;

e.      Adjudge and decree that the PGA Tour breached its Regulations when it refused to abate Player Plaintiffs' suspensions pending their respective appeals;

f.      Adjudge and decree that the PGA Tour unlawfully and tortiously interfered with LIV Golf's contractual and prospective business relationships;

g.      Award Plaintiffs monetary damages, treble damages, and economic damages;

h.      Award LIV Golf punitive damages for the PGA Tour's bad faith and egregious interference with LIV Golf's contractual and prospective business relationships;

i.      Award Plaintiffs their costs in this action, including attorneys' fees; and

j.      Award Plaintiffs any further relief as may be just and proper.

DATED:  August 26, 2022                     Respectfully submitted,

By:     /s/ Rachel S. Brass

RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

ROBERT C. WALTERS, *pro hac vice*
  rwalters@gibsondunn.com
SCOTT K. HVIDT, *pro hac vice*
  shvidt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Telephone: 214.698.3100

JOSHUA LIPTON, *pro hac vice*
  jlipton@gibsondunn.com
KRISTEN C. LIMARZI, *pro hac vice*
  klimarzi@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone: 202.955.8500

JOHN B. QUINN, SBN 90378
  johnquinn@quinnemanuel.com
DOMINIC SURPRENANT, SBN 165861
  dominicsurprenant@quinnemmanuel.com
KEVIN TERUYA, SBN 235916
  kevinteruya@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
  bobfeldman@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone: 650.801.5000
Facsimile: 650.801.5100

*Attorneys for Plaintiffs Talor Gooch, Hudson Swafford,*
*Matt Jones, Bryson DeChambeau, Ian Poulter, Peter*
*Uihlein, and LIV Golf Inc.*

DATED: August 26, 2022        BAKER McKENZIE LLP


By:       */s/ William V. Roppolo*
       William V. Roppolo

WILLIAM V. ROPPOLO, *pro hac vice*
  william.roppolo@bakermckenzie.com
JODI A. AVILA, *pro hac vice*
  jodi.avila@bakermckenzie.com
BAKER McKENZIE LLP
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131 USA
Telephone: 305.789.8900

JEFFREY MARTINO, SBN 222805
  jeffrey.martino@bakermckenzie.com
BAKER McKENZIE LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212.626.4100

*Attorneys for Phil Mickelson*

## <u>ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1</u>

Pursuant to Civil Local Rule 5-1(h)(3) of the Northern District of California, I attest that concurrence in the filing of the document has been obtained from each of the other signatories to this document.

DATED:  August 26, 2022                    GIBSON, DUNN & CRUTCHER LLP


By:    _/s/ Rachel S. Brass_
                    Rachel S. Brass

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

# ATTACHMENT B

## ATTACHMENT B

LIV Golf, Inc., by and through its attorneys, hereby causes the attached subpoena to be served on Keith Pelley, commanding that he appear for a deposition at the offices of Gibson Dunn & Crutcher LLP, located at Telephone House, 2-4 Temple Avenue, Temple, London EC4Y 0HB, United Kingdom at 9:00 AM on February 22, 2023 or at the earliest available date.  LIV Golf, Inc. is willing to confer with the European Tour regarding a mutually agreeable date, time, and format for the deposition.  The European Tour shall designate its corporate representative(s) at least seven (7) calendar days prior to the deposition.

This subpoena relates to the above-captioned action, a lawsuit pending in the United States District Court for the Northern District of California.  **Attachment A** is the Amended Complaint.

## DEFINITIONS

For the purposes of interpreting and adhering to the Deposition Topics, the following definitions shall apply:

1.      The terms "**You**" and "**Your**" refer to Keith Pelley, and include without any limitation any other person or entity acting on Your behalf.

2.      "**Asian Tour**" means the Asian Tour and includes its past and present directors, officers, agents, predecessors, successors, assigns, legal representatives, non-legal representatives, personal representatives, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of the Asian Tour.

3.      "**Communication**," or any variant thereof, means any contact between two or more persons by which any information or knowledge is transmitted or conveyed, or is attempted to be transmitted or conveyed, between two or more persons and shall include, without limitation, written contact by means such as emails, text messages, iMessages, WhatsApp messages, Slack messages, Facebook Messenger, Google Chat, Viber, Signal, Line, WeChat, Snapchat, Telegram, Microsoft Teams, Zoom, social media direct messages, instant messages, letters, memoranda,

telegrams, telecopies, telexes, or any other document, and any oral contact, such as face-to-face meetings or telephone conversations.

4. "**Document**" has the broadest meaning ascribed to it under the Federal Rules of Civil Procedure and includes the original and each non-identical copy of any written, printed, typed, filmed, recorded (electronically or otherwise), or other graphic matter of any kind or description, photographic matter, sound recordings, or reproductions, however produced or reproduced, whether draft or final, as well as any summarization, compilation, or index of any documents.  The term "document" includes, but is not limited to, letters, memoranda, reports, evaluations, x-rays, work records, studies, analyses, tabulations, graphs, logs, work sheets, work papers, medical records, correspondence, photographs, videotapes, films, slides, negatives, summaries, files, records, Communications, agreements, contracts, invoices, checks, journals, ledgers, telegrams, telexes, hand-written notes, periodicals, pamphlets, computer or business machine printouts, accountants' work papers, accountants' statements and writings, notations or records of meetings, printers' galleys, books, papers, speeches, public relations issues, advertising, materials filed with government agencies, office manuals, employee manuals or office rules and regulations, reports of experts, and any other written matter.  A draft or non-identical copy is a separate document within the meaning of this term. Documents shall include any Communication memorialized in written, electronic, or recorded means.

5. "**European Tour**" and/or "**DP World Tour**" means the PGA European Tour, PGA European Tour, Inc., the European Tour, and DP World Tour and includes its past and present directors, officers, agents, predecessors, successors, assigns, legal representatives, nonlegal representatives, personal representatives, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of the European Tour.  "European Tour" also includes any term, nickname, codename, project name or abbreviation that relate to European Tour or are used by You or Your agents to refer to European Tour.

6.      "**Japan Tour**" or any variant thereof means Japan Golf Tour, and includes its past and present directors during the period when they were directors, members of its board, officers, agents, predecessors, successors, assigns, representatives, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of the Japan Tour.

7.      "**Korean Tour**" or any variant thereof means Korean Tour, and includes its past and present directors during the period when they were directors, members of its board, officers, agents, predecessors, successors, assigns, representatives, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of the Korean Tour.

8.      "**LIV Golf**" means LIV Golf, Inc., LIV Golf, Ltd., LIV Golf, Holdings Ltd., LIV Golf Investments Ltd., LIV Golf, LIV Golf International Series, LIV Golf Invitational Series, and includes its past and present directors, officers, agents, predecessors, successors, assigns, representatives, investors, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of LIV Golf Inc. "LIV Golf" also includes any term, nickname, codename, project name or abbreviation that relate to LIV Golf or are used by You or Your agents to refer to LIV Golf.

9.      "**New Tour**" means any prospective or any new professional golf tour or league or promoter of professional golf events, including but not limited to LIV Golf, PGL, SGL, P54, the prospective entrant(s) identified as "Private Equity Golf" in Commissioner Monahan's January 24, 2020 memorandum to the PGA Tour Policy Board, the entity or entities that Commissioner Monahan has described as the "Saudi Golf League," or any other prospective or actual professional golf promoter or professional golfer services buyer.  "New Tour" also includes any term, nickname, codename, project name or abbreviation that relate to a New Tour or are used by You

or Your agents to refer to a New Tour or players playing or considering playing in a New Tour.

10.    "**OWGR**" means the OWGR, Ltd., Official World Golf Rankings, and includes its past and present directors, members, officers, agents, predecessors, successors, assigns, representatives, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of the OWGR, Ltd.

11.    "**Person**" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

12.    "**PGA Tour**" or any variant thereof means PGA Tour, Inc., and includes its past and present directors during the period when they were directors, members of its Policy Board, officers, agents, predecessors, successors, assigns, representatives, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of PGA Tour, Inc.

13.    "**PGA Tour of Australasia**" or any variant thereof means PGA Tour of Australasia, and includes its past and present directors during the period when they were directors, members of its board, officers, agents, predecessors, successors, assigns, representatives, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of PGA Tour of Australasia.

14.    "**PGA Tour Policy Board**," or any variant thereof, means the PGA Tour Policy Board, past or current members of the PGA Tour Policy Board, and carries the same meaning as that term is used in the governing documents of the PGA Tour.

15.    "**PGL**" or any variant thereof, means the Premier Golf League, and includes its past and present directors, officers, agents, predecessors, successors, assigns, legal representatives, non-legal representatives, personal representatives, consultants, attorneys, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated

entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of Premier Golf League.  "PGL" also includes any term, nickname, codename, project name or abbreviation that relate to the Premier Golf League or are used by You or Your agents to refer to the Premier Golf League.

16.    "**Private Equity Golf**" or any variant thereof, means potential, actual, theorized, or defunct concepts for professional golf services with potential to be competitive to the PGA Tour and includes "Team Golf Concept."

17.    The phrases "**relate to**," "**related to**," and "**relating to**," or any variant thereof, include, but are not limited to, the following meanings: referring to, supporting, located in, considered in connection with, bearing, bearing on, evidencing, indicating, reporting on, recording, alluding to, responding to, concerning, opposing, favoring, connected with, commenting on, in respect of, about, regarding, discussing, showing, describing, reflecting, analyzing, constituting, and being.

18.    "**SGL**" or any variant thereof, means Super Golf League, LIV Golf, LIV Golf Inc., LIV Golf, the Saudi League, and includes its past and present directors, officers, agents, predecessors, successors, investors, assigns, legal representatives, non-legal representatives, personal representatives, consultants, attorneys, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of the proposed competitive golf tour that was once referred to as Super Golf League but has officially been named LIV Golf.

19.    "**Strategic Alliance**" or any variant thereof, means the agreement(s) by and between You and the PGA Tour, and includes but is not limited to the agreements announced in November 2020 and referred to as the Strategic Alliance in the PGA Tour's press release dated November 27, 2020, and referred to in June 2022 as a joint venture.

20.    "**Sunshine Tour**" or any variant thereof means the Sunshine Tour, and includes its past and present directors during the period when they were directors, members of its board,

officers, agents, predecessors, successors, assigns, representatives, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of the Sunshine Tour.

21.     "**This Litigation**" refers to the following action: *Mickelson et al. v. PGA Tour, Inc*., No. 5:22-cv-04486-BLF, filed in the United States District Court for the Northern District of California.

22.     For purposes of interpreting or construing the Corporate Representative Deposition Topics contained herein, all terms shall be given their most expansive and inclusive interpretation. To bring within the scope of these Corporate Representative Deposition Topics all information that might otherwise be construed outside of their scope, the following rules of construction apply:

        a.  the singular shall include the plural and vice versa;

        b.  the masculine, feminine or neuter pronoun shall not exclude other genders;

        c.  the connectives "**and**" and "**or**" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside its scope;

        d.  the terms "**any**," "**all**," and "**each**" shall be construed as encompassing any and all;

        e.  the word "**including**" shall be read to mean including without limitation;

        f.  the present term shall be construed to include the past term and vice versa; and

        g.  references to employees, officers, directors, or agents shall include both current and former employees, officers, directors, and agents.

23.     Notwithstanding the above, for any undefined term which You reasonably and on a good-faith basis contend is vague or ambiguous, You shall apply the ordinary dictionary definition of said term, considering the context in which the term is used.

24.     Unless otherwise specified in a particular topic, the time period relevant for these topics is January 1, 2019 to the present.

## DEPOSITION TOPICS

In accordance with the Federal Rules of Civil Procedure, Keith Pelley is directed to appear for deposition to testify about all information known by him or reasonably available to him with respect to the following topics:

1. Actions You took in response to the launch of LIV Golf.

2. Actions You took in response to LIV Golf trying to launch.

3. Actions You took in response to PGL trying to launch.

4. Actions You took in response to professional golfers playing with LIV Golf.

5. Your Communications with Jay Monahan.

6. Your Communications with the PGA Tour related to potential competition from LIV Golf or New Tours.

7. Your Communications with the PGA Tour related to LIV Golf or a New Tour, including any Communications regarding the European Tour's response to LIV Golf or a New Tour.

8. Your Communications with OWGR and members of the OWGR.

9. Your Communications related to this Litigation.

10. Actions You took in response to LIV Golf partnering with the Asian Tour.

11. Actions You took in response to LIV Golf trying to partner with other professional golf tours.

12. Your public comments regarding LIV Golf and golfers considering joining LIV Golf.

13. The PGA Tour and Jay Monahan's role in the European Tour's governance and decision-making.

14. Your Communications with the R&A related to LIV Golf or a New Tour, including any Communications regarding the European Tour's and the R&A's response to LIV Golf or a New Tour.

15.     The European Tour's agreements with the PGA Tour.

16.     The European Tour's coordination with the PGA Tour.

17.     The European Tour's agreements with the R&A.

18.     The European Tour's coordination with the R&A.

19.     The European Tour's agreements and/or coordination with the Sunshine Tour.

20.     The European Tour's agreements and/or coordination with the PGA Tour of Australasia.

21.     The European Tour's agreements and/or coordination with the Japan Tour.

22.     The European Tour's agreements and/or coordination with the Korean Tour.

23.     The European Tour's consideration of partnering with the PGL.

24.     Your public comments regarding the Public Investment Fund of the Kingdom of Saudi Arabia's investment in professional golf.

25.     Your Communications with professional golfers related to LIV Golf.

26.     Your Communications with professional golf agents related to LIV Golf.

27.     Your Communications with European Tour vendors, broadcasters, and sponsors related to LIV Golf.

28.     The July 2021 meetings in Malta related to DP World, LIV Golf, a New Tour, and/or the PGA Tour.

29.     Your consideration of permitting professional golfers who play in LIV Golf to play in European Tour events.

30.     Your coordination with the PGA Tour to threaten, discipline, sanction, or in any way punish professional golfers relating to LIV Golf, PGL, or a New Tour.

31.     Your meetings and Communications with the PGA Tour relating to the Strategic Alliance, PGL, LIV Golf, or a New Tour.

# ATTACHMENT C

1  KEKER, VAN NEST & PETERS LLP
   ELLIOT R. PETERS - # 158708
2  epeters@keker.com
   DAVID SILBERT - # 173128
3  dsilbert@keker.com
   R. ADAM LAURIDSEN - # 243780
4  alauridsen@keker.com
   NICHOLAS S. GOLDBERG - # 273614
5  ngoldberg@keker.com
   SOPHIE HOOD - # 295881
6  shood@keker.com
   633 Battery Street
7  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
8  Facsimile:    415 397 7188

9  Attorneys for Defendant PGA TOUR, INC.

10

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
ANTHONY J. DREYER - (*pro hac vice*)
anthony.dreyer@skadden.com
KAREN M. LENT - (*pro hac vice*)
karen.lent@skadden.com
MATTHEW M. MARTINO (*pro hac vice*)
Matthew.martino@skadden.com
One Manhattan West
New York, Ny 10001
Telephone:    212 735 3000
Facsimile:    212 735 2000

PATRICK FITZGERALD (*pro hac vice*)
patrick.fitzgerald@skadden.com
155 North Wacker Drive
Chicago, Il 60606
Telephone:    312 407 0700
Facsimile:    312 407 0411

11

UNITED STATES DISTRICT COURT

12

NORTHERN DISTRICT OF CALIFORNIA

13

SAN JOSE DIVISION

14

15  PHIL MICKELSON; TALOR GOOCH;
    HUDSON SWAFFORD; MATT JONES;
16  BRYSON DECHAMBEAU; IAN POULTER;
    PETER UIHLEIN, and LIV GOLF INC.

17         Plaintiffs,

18         v.

19  PGA TOUR, INC.,

20         Defendant.

21

Case No. 5:22-cv-04486-BLF

~~[PROPOSED]~~ STIPULATED
PROTECTIVE ORDER
AS MODIFIED BY THE COURT

Judge:    Hon. Beth Freeman

Dept.:    Courtroom 1, 5th Floor

Date Filed: August 3, 2022

Trial Date: January 8, 2024

22

23

24

25

26

27

28

## I. PURPOSES AND LIMITATIONS

Plaintiffs Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, Peter Uihlein, and LIV Golf Inc. and Defendant PGA Tour, Inc. (collectively referred to herein as the "Parties") anticipate that disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the Parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order ("Order"). The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The Parties further acknowledge, as set forth in Section 12.4 below, that this Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a Party seeks permission from the court to file material under seal.

## II. DEFINITIONS

2.1   <u>Challenging Party</u>: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2   <u>"CONFIDENTIAL" Information or Items</u>: information (regardless of how it is generated, stored, or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c). This includes, but is not limited to, information or things containing trade secrets, proprietary research, development, and/or technical information that is not publicly available; sensitive financial, business, or commercial information that is not publicly available; other information required by law or agreement to be kept confidential; or any other category of information hereinafter given CONFIDENTIAL status by the Court.

2.3   <u>Counsel (without qualifier)</u>: Outside Counsel of Record and House Counsel (as well as their support staff).

2.4   <u>Designating Party</u>: a Party or Non-Party that designates information or items that it

produces in disclosures or in responses to discovery as "CONFIDENTIAL," or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

     2.5    <u>Disclosure or Discovery Material</u>: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

     2.6    <u>Expert</u>: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action.

     2.7    <u>"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items</u>: extremely sensitive "Confidential Information or Items" that is highly proprietary or highly sensitive such that disclosure could create a substantial risk of serious harm to the Producing Party or a Non-Party that provided the information to the Producing Party on a confidential basis.

     2.8    <u>House Counsel</u>: attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

     2.9    <u>Non-Party</u>: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

     2.10    <u>Outside Counsel of Record</u>: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

     2.11    <u>Party</u>: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

     2.12    <u>Producing Party</u>: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

     2.13    <u>Professional Vendors</u>: persons or entities that provide litigation support services (*e.g.*, photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.14 <u>Protected Material</u>: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

2.15 <u>Receiving Party</u>: a Party that receives Disclosure or Discovery Material from a Producing Party.

## III. SCOPE

This Order applies not only to Protected Material furnished by a Producing Party, but also to (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, abstracts, analyses, summaries, descriptions, or other forms of recorded information containing, reflecting, compiling, or disclosing Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

## IV. DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

## V. DESIGNATING PROTECTED MATERIAL

5.1 <u>Exercise of Restraint and Care in Designating Material for Protection</u>. Each Party

or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. To the extent it is practical to do so, the Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify—so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2    <u>Manner and Timing of Designations</u>. Except as otherwise provided in this Order (*see, e.g.*, second paragraph of Section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced, provided, however, that the Producing Party's failure to do so shall not constitute a waiver.

Designation in conformity with this Order requires:

(a) <u>for information in documentary form</u> (*e.g.*, paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL," or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." to each page that contains protected material.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL –

ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL," or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.") to each page that contains Protected Material.

(b) <u>for deposition testimony, including transcripts,</u> such testimony shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" until the expiration of twenty-one (21) days after the deposition unless otherwise designated at the time of the deposition or during the twenty-one (21) day period. Pages or entire transcripts of testimony given at a deposition or hearing may be designated as containing "CONFIDENTIAL," or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information by an appropriate statement either at the time of the giving of such testimony or by written notification within twenty-one (21) days after the deposition. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements.  **<u>Any transcript that is prepared before the expiration of the twenty-one (21) day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.</u>**

(c) <u>for transcripts of pretrial and trial proceedings,</u> Parties shall give the other parties notice if they reasonably expect a hearing or other proceeding to include Protected Material so that the other parties can ensure that only authorized individuals and individuals who have signed

the "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those proceedings. Procedures for requesting confidentiality designations of transcripts for pretrial and trial proceedings shall be in accordance with paragraph 5.2(b) and redaction requests shall be made in accordance with General Order No. 59 and any other applicable rules and procedures set forth by the Court. If a Designating Party seeks redaction of portions of a hearing or trial transcript disclosing its Protected Material, the Receiving Party agrees not to unreasonably withhold its consent to such a request.

(d) for information contained in written discovery responses, the responses may be designated as containing "CONFIDENTIAL," or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information by means of a statement at the conclusion of each response that contains such information specifying the level of designation of the Protected Material and by placing a legend of the front page of such discovery responses stating: "CONTAINS CONFIDENTIAL INFORMATION/[the highest level of designation contained in the answers]."

(e) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL," or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

5.3     Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

## VI.     CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1     Timing of Challenges. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic

burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2 <u>Meet and Confer</u>. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of this Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within fourteen (14) days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3 <u>Judicial Intervention</u>. If the Parties cannot resolve a challenge without court intervention, the Parties shall submit a joint statement in accordance with Judge van Keulen's Civil and Discovery Referral Matters Standing Order ~~the Challenging Party shall file and serve a motion to challenge confidentiality~~ ~~under Civil Local Rule 7~~ (and in compliance with Civil Local Rule 79-5, if applicable) within twenty-one (21) days of the initial notice of challenge or within fourteen (14) days of the Parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such joint statement must affirm that the Parties have ~~motion must be accompanied by a competent declaration affirming that the movant has~~ complied with the meet and confer requirements imposed in the preceding paragraph. In addition, the Designating Party may initiate a joint statement seeking ~~file a motion~~ to retain confidentiality in response to a notice of challenge. Any joint statement submitted ~~motion brought~~ pursuant to this provision must affirm that the Parties have ~~be accompanied by a competent~~ ~~declaration affirming that the movant has~~ complied with the meet and confer requirements imposed by the preceding paragraph.

1915821

The burden of persuasion in any such challenge proceeding shall be on the ~~Challenging~~ <span style="color:red">Designating</span> Party. Frivolous challenges and those made for an improper purpose (*e.g.*, to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating party has waived the confidentiality designation by failing to <span style="color:red">initiate a joint statement seeking</span> ~~file a motion~~ to retain confidentiality as described above, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation until the court rules on the challenge.

## VII. ACCESS TO AND USE OF PROTECTED MATERIAL

7.1 <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of Section 13 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order. Protected Material that originates in the United States or the United Kingdom, including all "CONFIDENTIAL" Information or Items, may be transmitted between those jurisdictions as necessary to comply with this Order and other discovery obligations, but may not otherwise be removed from the United States or United Kingdom. Any use of Protected Material, regardless of location, will be governed by this Order and the applicable laws of the United States.

7.2 <u>Disclosure of "CONFIDENTIAL" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation, all of whom have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order; and

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.3     Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(b) no more than two members of the Receiving Party's House Counsel ("Designated House Counsel"), (1) to whom it is reasonably necessary to disclose the information for this

1915821

litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.4(a), below, have been followed;

(c) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in paragraph 7.4(b), below, have been followed;

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this litigation; and

(f) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.4     Procedures for Approving or Objecting to Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items to Designated House Counsel or Experts.

(a) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Party that seeks to disclose to Designated House Counsel (as defined in this Order) any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" pursuant to paragraph 7.3(b) first must provide written notice to the Designating Party that sets forth the full name of the Designated House Counsel.

(b) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Party that seeks to disclose to an Expert (as defined in this Order) any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" pursuant to paragraph 7.3(c) first must provide written notice to the Designating Party that (1) sets forth the full name of the Expert and the city and state of his or her primary residence, (2) attaches a copy of the Expert's current resume, (3) identifies the Expert's current employer(s), (4) identifies each person or entity from whom the Expert has received compensation or funding for work in his or her areas of expertise or to whom the Expert has provided professional services, including in

1915821

connection with a litigation, at any time during the preceding five years,[1] and (5) identifies (by name and number of the case, filing date, and location of court) any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years.

(c) A Party that provides notice and provides the information specified in the preceding paragraphs may disclose the subject Protected Material to the identified Designated House Counsel or Expert unless, within seven (7) calendar days of delivering the request, the Party receives a written objection from the Designating Party. Any such objection must set forth in detail the grounds on which it is based.

(d) A Party that receives a timely written objection must meet and confer with the Designating Party (through direct voice to voice dialogue) to try to resolve the matter by agreement within seven (7) calendar days of the written objection. If no agreement is reached, the Party seeking to make the disclosure to the Designated House Counsel or Expert may ~~file a~~ initiate a joint submission as provided in Judge van Keulen's standing order ~~motion as provided in Civil Local Rule 7~~ (and in compliance with Civil Local Rule 79-5, if applicable) seeking permission from the court to do so. Any such ~~motion~~ joint submission must describe the circumstances with specificity, set forth in detail the reasons why disclosure to the Designated House Counsel or Expert is reasonably necessary, assess the risk of harm that the disclosure would entail, and suggest any additional means that could be used to reduce that risk. In addition, any ~~such motion must be accompanied by a competent declaration describing~~ such joint submission must describe the parties' efforts to resolve the matter by agreement (*i.e.*, the extent and the content of the meet and confer discussions) and setting forth the reasons advanced by the Designating Party for its refusal to approve the disclosure.

_____

[1] If the Expert believes any of this information is subject to a confidentiality obligation to a third- party, then the Expert should provide whatever information the Expert believes can be disclosed without violating any confidentiality agreements, and the Party seeking to disclose to the Expert shall be available to meet and confer with the Designating Party regarding any such engagement.

In any such proceeding, the Party opposing disclosure to the Designated House Counsel or Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Designated House Counsel or Expert.

## VIII. PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.[2]

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material—and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a

---

[2] The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.

lawful directive from another court.

## IX. A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a) The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(3) make the information requested available for inspection by the Non-Party.

(c) If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

## X. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c)

inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

## XI. INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the Order submitted to the court.

If a Party or Third Party inadvertently produces or provides discovery of any Confidential Information without labeling or marking it as provided in this Protective Order, the Party (or Third Party) may give written notice to the Receiving Party or Parties—within ten (10) business days after becoming aware of the inadvertent production—that the information should be treated as Confidential in accordance with the provisions of this Protective Order. If such notice is provided by a Party or Third Party, that party will provide copies of the properly marked information (e.g., documents, discovery responses, transcripts, things, and/or all other information within the scope of this Protective Order). Upon receipt of such notice and properly marked information, the Receiving Party or Parties shall, to the extent practicable, return or destroy the unmarked or incorrectly marked information and not retain copies thereof, and shall undertake a reasonable, good-faith effort to correct any disclosure of such information contrary to the redesignation. The Party receiving such notice shall also make a reasonable, good-faith effort to ensure that any analyses, memoranda, notes, or other such material generated based upon such newly designated information are immediately treated as containing Confidential Information. Prior to receipt of such notice, disclosure of such documents, things, information, responses and testimony to persons not authorized to receive Confidential Information shall not be deemed a violation of this Protective

Order.

## XII. MISCELLANEOUS

12.1 <u>Right to Further Relief</u>. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

12.2 <u>Right to Assert Other Objections</u>. By stipulating to the entry of this Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Order.

12.3 <u>Producing Party's Material</u>. The restrictions on the use of Protected Material established by this Order are applicable only to the use of information received by a party from another Party or from a Non-Party. A Party is free to use its own information as it pleases.

12.4 <u>Filing Protected Material</u>. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. If a request to file Protected Material under seal pursuant to Civil Local Rule 79-5(d) is denied by the court, then the filing party may file the Protected Material in the public record pursuant to Civil Local Rule 79-5(f) unless otherwise instructed by the court.

12.5 <u>Advice of Counsel</u>. Nothing in this Order shall prevent or otherwise restrict Outside Counsel of Record from rendering advice to their clients and, in the course thereof, relying generally on Protected Material; provided, however, that in rendering such advice counsel shall not disclose, reveal or describe any such materials except insofar as allowed (if allowed at all) under the terms of this Order.

## XIII. FINAL DISPOSITION

Within sixty (60) days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts,

compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that confirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

Dated:  Sept. 26, 2022                              KEKER, VAN NEST & PETERS LLP


                                          By:    /s/ Elliot R. Peters
                                                 ELLIOT R. PETERS
                                                 DAVID SILBERT
                                                 R. ADAM LAURIDSEN
                                                 NICHOLAS S. GOLDBERG
                                                 SOPHIE HOOD

                                                 Attorneys for Defendant
                                                 PGA TOUR, INC.


Dated:  Sept. 26, 2022                              SKADDEN, ARPS, SLATE, MEAGHER
                                                    & FLOM LLP


                                          By:    /s/ Anthony J. Dreyer
                                                 ANTHONY J. DREYER
                                                 PATRICK FITZGERALD
                                                 KAREN M. LENT
                                                 MATTHEW M. MARTINO

                                                 Attorneys for Defendant
                                                 PGA TOUR, INC.

[PROPOSED] STIPULATED PROTECTIVE ORDER
Case No. 5:22-cv-04486-BLF

1915821

1    Dated:  Sept. 26, 2022               GIBSON, DUNN & CRUTCER LLP

2                        By:       */s/ Rachel S. Brass*

3

4                        RACHEL S. BRASS, SBN 219301
                         rbrass@gibsondunn.com

5                        GIBSON, DUNN & CRUTCHER LLP
                        555 Mission Street, Suite 3000

6                        San Francisco, California 94105-0921
                        Telephone: 415.393.8200
                        Facsimile:  415.393.8306

7                        ROBERT C. WALTERS, *pro hac vice*

8                         rwalters@gibsondunn.com
                        SCOTT K. HVIDT, *pro hac vice*

9                         shvidt@gibsondunn.com
                        GIBSON, DUNN & CRUTCHER LLP

10                      2001 Ross Avenue, Suite 2100
                        Dallas, Texas 75201-2911

11                      Telephone: 214.698.3100

12                      JOSHUA LIPTON, *pro hac vice*
                         jlipton@gibsondunn.com

13                      KRISTEN C. LIMARZI, *pro hac vice*
                         klimarzi@gibsondunn.com

14                      GIBSON, DUNN & CRUTCHER LLP
                        1050 Connecticut Avenue, N.W.

15                      Washington, DC  20036-5306
                        Telephone:  202.955.8500

16                      JOHN B. QUINN, SBN 90378
                         johnquinn@quinnemanuel.com

17                      DOMINIC SURPRENANT, SBN 165861
                         dominicsurprenant@quinnemmanuel.com

18                      KEVIN TERUYA, SBN 235916
                         kevinteruya@quinnemanuel.com

19                      QUINN EMANUEL URQUHART & SULLIVAN LLP

20                      865 South Figueroa Street, 10th Floor
                        Los Angeles, California 90017

21                      Telephone: 213.443.3000

22                      ROBERT P. FELDMAN, SBN 69602

23                        bobfeldman@quinnemanuel.com
                        555 Twin Dolphin Dr., 5th Floor

24                      Redwood Shores, California 94065
                        Telephone:  650.801.5000

25                      Facsimile:   650.801.5100

26

27                      *Attorneys for Plaintiffs Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, Peter Uihlein, and LIV Golf Inc.*

28

[PROPOSED] STIPULATED PROTECTIVE ORDER
Case No. 5:22-cv-04486-BLF

1915821

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1**

Pursuant to Civil Local Rule 5-1(h)(3) of the Northern District of California, I attest that concurrence in the filing of the document has been obtained from each of the other signatories to this document.

Dated: Sept. 26, 2022                                                    */s/ Sophie Hood*

[PROPOSED] STIPULATED PROTECTIVE ORDER
Case No. 5:22-cv-04486-BLF

1915821

1
2
    PURSUANT TO STIPULATION, IT IS SO ORDERED.

3

4    Dated: October 4, 2022

5                                     HON. SUSAN VAN KEULEN
                                   United States Magistrate Judge

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[PROPOSED] STIPULATED PROTECTIVE ORDER
Case No. 5:22-cv-04486-BLF

1915821

<u>EXHIBIT A</u>
<u>ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND</u>

I, _____ [print or type full name], of _____

[print or type full address], declare under penalty of perjury that I have read in its entirety and

understand the Stipulated Protective Order that was issued by the United States District Court for

the Northern District of California on _____ [date] in the case of *Mickelson et al. v. PGA*

*Tour*, 5:22-cv-04486-BLF. I agree to comply with and to be bound by all the terms of this

Stipulated Protective Order and I understand and acknowledge that failure to so comply could

expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will

not disclose in any manner any information or item that is subject to this Stipulated Protective

Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the

Northern District of California for the purpose of enforcing the terms of this Stipulated Protective

Order, even if such enforcement proceedings occur after termination of this action. I hereby

appoint _____ [print or type full name] of

_____ [print or type full address and telephone number] as my

California agent for service of process in connection with this action or any proceedings related to

enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

1915821