# EXHIBIT 1

# PIF to exceed Q2 objective with assets under management of $480bn



- **The Public Investment Fund is a key player in the Kingdom's diversification strategy**

RIYADH: Saudi Arabia's sovereign wealth fund is on track to surpass its objective for the second quarter of 2022, and reach SR1.8 trillion ($480 billion) in assets under management, the fund's Governor Yasir Al-Rumayyan said.

The Public Investment Fund, or the PIF, is a key player in the Kingdom's diversification strategy, particularly in achieving the Vision 2030 goals.

Al-Rumayyan said the fund established a department called National Development to focus on supporting local supply chains, and increasing the role of local suppliers in the ecosystem.

The new department, he told a Saudi budget media forum in Riyadh on Monday, will assess and monitor, on a quarterly basis, the impact of projects and companies on the economy — in terms of job creation, and increasing local content. He said the Kingdom's Shareek program aims to strengthen cooperation between the public and private sectors and increase local investments to reach SR5 trillion by 2030.

Al-Rumayyan said the fund has offered stakes in several companies for initial public offering in the Saudi stock exchange. Very recently, it offered part of the fund's shares in stc, in the first-ever secondary public offering.

The PIF chief said efforts are also underway to boost the fund's contributions to the green energy sector in line with the Saudi Green Initiative.

He cited Al-Sudair Solar Power Plant as an example. The project will be developed by ACWA Power to meet the power needs of 185,500 housing units.

Al-Rumayyan said the PIF is also working on launching a platform for trading carbon in the Middle East.

Despite all the challenges posed by the coronavirus disease pandemic, the fund was able to maintain its performance and to take advantage of many investment opportunities, he added.

Al-Rumayyan said the fund seeks to develop many other sectors, as the capital of the fund will help ensure long-term investment.

Since the approval of its new strategy in 2016, PIF has created 47 companies and generated more than 400,000 jobs directly and indirectly through their projects and ventures, Al-Rumayyan added.

As well as working towards the Vision 2030 goal, the PIF also has targets to hit before then.

Al-Rumayyan said: "The PIF continues to achieve its 2025 strategy, which is to pump about SR1 trillion in new national projects, and to increase its own assets under the fund's management from SR1.8 trillion to SR4 trillion, and contribute in the national non oil sector with an amount reaching SR 1.2 trillion."

The PIF governor highlighted other areas of investment in the Kingdom, including the fact that about 70 percent of the Red Sea Development contracts were signed with Saudi companies, worth more than SR13 billion.

King Abdullah financial center signed contracts worth SR10 billion to complete and activate the center, while real estate developers ROSHN also signed strategic partnerships with Saudi companies to push ahead with its first phase in Riyadh.

Qiddiya company signed contracts worth more than SR5.5 billion to complete the primary phase of its infrastructure and to develop its first entertainment facility "Qiddiya six flags."

Additionally, investment management firm Jada Fund of Funds aims to enhance the small and medium enterprise sector by investing SR1.2 billion in 17 investment funds — with SR200 million already handed over and helping to create more than 4,000 jobs.

The Fund contributed in green energy sectors in line with the Kingdom's initiative, launching renewable energy projects, including the Sudair Solar PV, which will be implemented by ACWA Power and will meet the needs of 185,000 housing units.

Tarshid, National Energy Services Company,  has replaced more than a million and a half of regular street lighting lamps with LEDs.

The Fund's presence on the world stage has grown as it invests in various global markets, which contributes to diversifying sources of income and bringing international expertise to the Kingdom.

Firms to see investment include Lucid Motors, with about $2.9 billion, bringing global investors at its initial public offering listing in July 2021, making it one of the most significant companies in the electric vehicle sector.

The company's value has risen from $3 billion to $65 billion.

PIF also ploughed $2.8 billion into Indian companies, such as the mobile network operator Jio Platforms and the conglomerate Reliance.

# EXHIBIT 2

## EXHIBIT FILED UNDER SEAL

# EXHIBIT 3

## The Washington Post

*Democracy Dies in Darkness*

# Is LIV 'the future of golf' — or just golf with a soundtrack?

By Rick Maese

July 30, 2022 at 9:28 p.m. EDT

BEDMINSTER, N.J. — The players who have absconded to the LIV Golf Invitational Series have consistently said their decision to join the deep-pocketed, Saudi-backed venture was not about the money.

"There's many facets to making this decision," Jason Kokrak said.

"There's a lot more to my decision of sitting here than just a financial opportunity and less golf," Paul Casey said.

"No, money was not a factor," Charles Howell III said this week to a room of skeptical reporters.

So, then, what is this all about? What makes this nascent series, steeped in controversy and determined to buck tradition, "the future of golf," as Phil Mickelson, Sergio Garcia and others who have signed on keep calling it.

This weekend's LIV Golf event at Trump National Golf Club involved serious money — a total purse of $25 million — and took great efforts to present itself as golf with attitude. Or at least a personality. There were paratroopers before the first tee shot and T-shirt guns during breaks in the action. Music — stadium rock, Top 40, dance — blared from speakers across the course, even as players lined up tricky putts.

With a different competition format, LIV is trying to be more than a fresh coat of paint on a sport that has resisted big changes. But thus far, with relatively thin crowds, modest online viewership numbers and much of the attention focused on peripheral controversies, it's not yet clear whether there's an audience for LIV's version of the sport — or whether that even matters to the circuit's wealthy benefactors.

"We firmly believe that we can attract a younger audience," Atul Khosla, the LIV president and chief operating officer, said in an interview. " ... If you look at golf over the years, it's aged. I think the average viewership is 65 and older. And I think from our perspective, when we looked at launching a new product, we've always viewed it from the lens of, 'What are we trying to solve for?' And what we're trying to solve for is get younger people playing golf, watching golf, becoming fans of golf. And we think we can do that by changing how the product is packaged."

For the uninitiated, LIV presents golf as both an individual and a team sport. There are 12 teams, with names such as Crushers, Majesticks and Aces. The winning four-man team this week will split $3 million; the event's individual winner will take home $4 million. But the tournament is unlike other organizations in that it features a shotgun start — every player begins his round at the same time from a different hole on the course — there is no cut, and the entire event lasts three days, not four.

Traditionalists might deride the format as gimmicky, but LIV defenders will counter that the format is not trying to cater to traditionalists.

Mickelson is perhaps the biggest believer — and he has millions of reasons to be, courtesy of Saudi Arabia's Public Investment Fund. He has noted that LIV Golf intends to target a global audience with events staged around the world. The players can't skip faraway stops; they're contractually obligated to show up.

"We receive a ton of money, and we give up our schedule, and we commit to wherever they hold the events," Mickelson said.

The play inside the ropes would feel familiar for any golf fan, but the format and the delivery are the biggest departures.

"One, it's not a 12-hour day, having to watch golf all day. You've got a 4½-hour window," Mickelson said. "Second, when I think a streaming partner comes about, I think it's going to revolutionize the way golf is viewed because you'll have no commercials and you'll have shot after shot after shot and it will capture that younger generation's attention span."

The Bedminster event aimed for a festival-like atmosphere, with a stage set up for a Chainsmokers concert at the conclusion of Sunday's final round.

"We view this course as our stadium, and the things that you could experience at a stadium or an arena, how do we best bring those things to a golf course?" said Khosla, a former executive with the NFL's Tampa Bay Buccaneers and before that with the Chicago Fire of MLS.

With taps flowing and drinks easy to find across the course, the mood was light from tee to green. Fans are close to the action — "Nice shot, Phil," a fan near the 14th green said, "you just cost me 20 bucks" — but the crowds at Bedminster were rarely two deep, even around the most popular players.

At times, the LIV product can feel merely like golf with a soundtrack. Despite the big names LIV officials have lured from the PGA and European tours — the 48-man field this weekend included 11 major champions — the field was still an uneven mix of the who's-who and who's-that of the golf world.

Measuring its popularity is tricky, in part because the start-up doesn't seem concerned about traditional metrics in these early stages. Unlike at other pro golf events, there aren't corporate logos and signage littering the course. Though the LIV Golf social media accounts are active, there is no television rights deal and no commercials on the streaming broadcasts.

Fewer than 1,000 people were concurrently watching the Facebook Live feed for much of the first two rounds this weekend, while LIV Golf's YouTube channel was at or above 60,000 viewers for much of Saturday's second round. On the course, there were far fewer people. Event officials didn't announce attendance, though most estimates suggested only a few thousand spectators. Tickets sold for $75 per day but could be had on the secondary market for $1 apiece (plus $5.05 in fees via StubHub).

Meanwhile, with its controversial Saudi backing, the alliance with former president Donald Trump — whose courses will host two LIV events — and the peril it poses to the pro golf establishment, the actual competition has drawn scant attention through three events. (Henrik Stenson, who lost his Ryder Cup captaincy after he joined LIV, leads this weekend's event through two rounds; the first two events were won by South Africans Charl Schwartzel and Branden Grace.)

The days leading up to the Bedminster event were overshadowed by Trump and the families of 9/11 victims, who are protesting LIV Golf events because of the Saudi benefactors. On Friday afternoon, a couple hundred spectators surrounded the 10th tee box to watch Mickelson begin his round. As the golfer approached his ball, someone shouted, "Do it for the Saudi royal family!" and Mickelson quietly backed away. He regrouped and smacked his shot into a bunker as a staffer approached the fan and issued a warning.

But most fans strolling around Trump's Bedminster club were supportive of the assembled golfers, hoisting cameras in the air to record tee shots, shouting encouragement for big drives, studying the giant leader boards throughout the course and trying to make sense of the format.

The team element could take time for golf fans to digest, but players have repeatedly cited it as part of the appeal. "I love being able to look up at that leader board and not just see my name but also look for my guys," golfer Patrick Reed said.

LIV officials think the format is the draw, but it's also what could jeopardize LIV players from being able to perform on the sport's biggest stages. Players have voiced few misgivings about leaving their former tours, but many have said they hope they still will be eligible for majors and Ryder Cup events.

While a handful of players have exemptions into some majors, other could miss out because the Official World Golf Ranking board hasn't yet decided whether it will recognize LIV Golf events.

"I feel like it would be kind of crazy not to get any points if we're playing in these big-time events," Abraham Ancer said.

LIV Golf officials have publicized plans for the future but have made no indication they will be tweaking their competition format. The breakaway outfit announced plans for a full 2023 season that will include 12 teams competing in 14 events. A news release last week made no mention of the 54-hole format or shotgun starts, but Khosla said LIV Golf is committed to its format for now and that officials are hopeful the OWGR will recognize its events.

While many of the game's stakeholders fret over the upheaval fracturing the sport, the players who have made the LIV leap have said they're hopeful the game can support both the preexisting tours and this start-up, complete with its bouncing soundtrack.

"The landscape in golf is looking good," golfer Ian Poulter said.

# EXHIBIT 4

```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                          SAN JOSE DIVISION.

 4

    MICKELSON ET AL,                  )   CV-22-4486-BLF
 5                                     )
                        PLAINTIFF,     )   SAN JOSE, CALIFORNIA
 6                                     )
                   VS.                 )   AUGUST 18, 2022
 7                                     )
    PGA TOUR, INC.,                    )   PAGES 1-25
 8                                     )
                        DEFENDANT.     )
 9   _____  )

10                      TRANSCRIPT OF PROCEEDINGS
11             BEFORE THE HONORABLE BETH LABSON FREEMAN
                     UNITED STATES DISTRICT JUDGE
12
                       A P P E A R A N C E S
13

14      FOR THE PLAINTIFF:     BY: ROBERT C. WALTERS
                               GIBSON DUNN
15                             2100 MCKINNEY, STE. 1100
                               DALLAS, TX 75201
16

17      FOR THE DEFENDANT:     BY:  ELLIOT PETERS
                                    SOPHIA HOOD
18                                  ERIC MACMICHAEL
                                    NICHOLAS GOLDBERG
19                             KEKER, VAN NEST & PETERS LLP
                               633 BATTERY STREET
20                             SAN FRANCISCO, CA 94111

21

22             APPEARANCES CONTINUED ON THE NEXT PAGE

23      OFFICIAL COURT REPORTER:     SUMMER FISHER, CSR, CRR
                                     CERTIFICATE NUMBER 13185
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER
```

2

```
 1          APPEARANCES CONTINUED:

 2

 3     FOR THE PLAINTIFF:      BY:  WILLIAM ROPPOLO
                               BAKER MCKENZIE
 4                             1111 BRICKELL AVE., 1700
                               MIAMI, FL 33131
 5

 6     FOR THE PLAINTIFF:      BY:  DOMINIC SURPRENANT
                               QUINN EMANUEL URQUHART & SULLIVAN
 7                             865 S. FIGUEROA STREET
                               10TH FLOOR
 8                             LOS ANGELES, CA 90017

 9

10     FOR THE PLAINTIFF:      BY:  RACHEL S. BRASS
                               GIBSON, DUNN & CRUTCHER LLP
                               555 MISSION STREET
11                             SAN FRANCISCO, CA 94105

12

13     FOR THE DEFENDANT:      BY:  KAREN HOFFMAN LENT
                               SKADDEN ARPS
                               4 TIMES SQUARE
14                             NEW YORK, NY 10036

15

16

17

18

19

20

21

22

23

24

25
```

```
1     ARE GOING TO BE INCREDIBLY USER-FRIENDLY.  I MEAN, WE WOULD

2     VERY MUCH WELCOME EVEN A MASTER OR A MAGISTRATE AS SOME WAY TO

3     RESOLVE ANY ISSUES THAT WE HAVE.

4          BUT THERE'S JUST NO REASON IN THE WORLD THAT WORKING

5     COOPERATIVELY, WE CAN'T MAKE THIS SCHEDULE, AND DO SO IN A WAY

6     THAT MEETS YOUR HONOR'S COMMITMENT TO A MARCH 9TH SUMMARY

7     JUDGEMENT DATE AND THEN TO AN AUGUST 7TH TRIAL DATE.

8          AND WE STAND READY TO MOVE HEAVEN AND EARTH, DO WHATEVER

9     IS NECESSARY, TO REACH THAT TRIAL DATE.

10              THE COURT:  ALL RIGHT.  MR. WALTERS, THANK YOU.

11          MR. ROPPOLO, DO YOU JOIN IN MR. WALTER'S COMMENTS?

12              MR. ROPPOLO:  YOUR HONOR, I DO.  THANK YOU.

13              THE COURT:  OKAY.  GOOD.

14          MR. PETERS, LET ME HEAR FROM YOU.

15              MR. PETERS:  THANK YOU, YOUR HONOR.

16          WHEN WE WERE BEFORE YOU JUST A WEEK AGO YESTERDAY, YOU

17     THREW OUT THIS AUGUST 7TH DATE, YOU PROPOSED THE AUGUST 7TH

18     DATE.  AND WHAT YOU SAID WAS, IS IT REASONABLE, AND ARE THERE

19     CONFLICTS?  AND WE UNDERSTAND THAT THE COURT MAY WANT TO MOVE

20     THIS CASE QUICKLY, WE ARE PREPARED TO COMPLY WITH THAT, BUT

21     THIS SCHEDULE, AN AUGUST 7TH TRIAL DATE, IS NOT REASONABLE, AND

22     THERE ARE CONFLICTS.  AND LET ME TELL YOU WHY, AND THEN I CAN

23     MAKE SORT OF TWO PROPOSALS ABOUT HOW THE COURT MAY WANT TO

24     PROCEED, IF YOU WILL ALLOW ME TO DO THAT.

25          IT'S NOT REASONABLE, IN FIRST PART, BECAUSE WE DON'T EVEN
```

1    HAVE THE OPERATIVE PLEADING.  WE WERE TOLD YESTERDAY THAT THE

2    PLAINTIFFS ARE GOING TO AMEND THEIR COMPLAINT, HOPEFULLY SOON,

3    BUT WE DON'T KNOW WHEN.

4         THEY ARE DROPPING PLAINTIFFS, BUT THERE'S 11 DIFFERENT

5    PLAINTIFFS NOW, MAYBE THERE WILL BE NINE, OR I'M NOT SURE HOW

6    MANY THERE WILL BE, AND SO THERE'S UNCERTAINTY ABOUT WHAT THE

7    PLEADING IS.

8         DOCUMENT DISCOVERY IN THIS CASE WHERE YOU ARE INVOLVING

9    NINE INDIVIDUAL PLAYERS AND YOU HAVE TO THEN HARVEST -- FIRST

10   THE PARTIES HAVE TO AGREE ON CUSTODIANS, SEARCH TERMS, HARVEST

11   ELECTRONIC DATA, REVIEW IT AND PRODUCE IT FROM A VARIETY OF

12   ENTITIES, AND AT LEAST NINE INDIVIDUAL PLAINTIFFS, THAT, AS A

13   PRACTICAL MATTER, IS TIME CONSUMING.  THEIR PROPOSED SCHEDULE,

14   I THINK THAT HAS THAT HAPPENING IN 45 DAYS.  THAT IS NOT

15   REASONABLE OR REALISTIC TO DO THAT.

16        ALSO, THEIR SECTION 1 CLAIM INVOLVES FOREIGN PARTIES.  IT

17   INVOLVES THE DP WORLD TOUR, WHICH IS LOCATED IN THE UK.  IT

18   INVOLVES THE OFFICIAL WORLD GOLF RANKINGS, WHICH IS LOCATED IN

19   THE UK.  OF COURSE LIV IS OWNED BY THE SAUDI PUBLIC INVESTMENT

20   FUND, AND WILL WANT TO TAKE DISCOVERY, I WOULD ASSUME, FROM KEY

21   DECISION MAKERS OF THE BE OWNERS OF LIV.

22        UNFORTUNATELY, SAUDI ARABIA IS NOT A SIGNATORY TO THE

23   HAGUE TREATY, SO IT'S NOT CLEAR TO ME EXACTLY HOW WE ARE GOING

24   TO DO THAT.  AND WHEN I ASKED COUNSEL YESTERDAY, WHETHER THEY

25   WERE IN A POSITION TO ACCEPT SERVICE OF THE SUBPOENA, PRODUCE

1      YOUR HONOR?  THANK YOU.

2            FOR STARTERS, WE ARE THE PLAINTIFFS, WE KNOW WHAT IT TAKES

3      TO GET TO TRIAL, AND WE WILL MOVE HEAVEN AND EARTH.  I MEAN,

4      SOME OF THESE OBJECTIONS ARE JUST NON ISSUES.

5            THESE PLAYERS, WE ARE GOING TO WINNOW IT DOWN, BECAUSE

6      SOME PLAYERS WERE INTERESTED IN THE TRO, BUT THEY DON'T HAVE

7      MANY DOCUMENTS, THOSE ARE QUITE EASY TO DO.

8            LIV, ITSELF, WILL BE HIGHLY COOPERATIVE AND WON'T INSIST

9      ON ANY TIME TABLES, THEY CAN SEND US THEIR REQUEST TOMORROW IF

10     THEY WANT, AND WE WILL BE UNDER WAY.  IT'S NOT GOING TO BE AN

11     ISSUE.

12           TO THE EXTENT THERE'S APPROPRIATE DISCOVERY OF THE PUBLIC

13     INVESTMENT FUND, WE WILL FIND A WAY TO COOPERATE WITH THAT.  WE

14     WOULD NEVER INSIST THAT THEY DO ANY SORT OF FORMAL SERVICE, SO

15     WE WILL FIGURE OUT A WAY TO DO THAT.  ALL OF THAT WILL COME

16     TOGETHER SWIMMINGLY.

17           YOU KNOW, IT'S PRETTY CLEAR TO ME THAT THEY LIKE TO THROW

18     AS MUCH FURNITURE IN THE WAY AND AVOID THIS TRIAL FOR AS LONG

19     AS POSSIBLE, BECAUSE IT REALLY, REALLY DOES MATTER ABOUT THE

20     STATE OF THE MARKETPLACE AND COMPETITION, AND SORT OF WHETHER

21     THESE PLAYERS CAN GET TO FREE AGENCY STATUS.  SO, YOU KNOW, WE

22     REALLY HEARD NOTHING THAT IS AN ENCUMBRANCE.

23           AS FOR THE PLEADING, IT'S NOT GOING TO CHANGE THAT MUCH,

24     WE ARE GOING TO WINNOW IT DOWN, WE ARE GOING TO RESHAPE IT

25     SLIGHTLY.  WE TOLD THEM THAT WE COULD HAVE IT TO THEM EARLY

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8           I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13           THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 8/18/22

# EXHIBIT 5

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3200**

WRITER'S EMAIL ADDRESS
**johnquinn@quinnemanuel.com**

September 22, 2022

<span style="text-decoration: underline;">Via E-Mail</span>
EPETERS@KEKER.COM

Elliot R. Peters
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111

Re:   *Mickelson, et al., v. PGA Tour, Inc.*, Case No. 5:22-cv-04486-BLF (N.D. Cal.)

Dear Elliot:

Upon execution by all parties, this letter constitutes the agreement, in relation to *Mickelson, et al., v. PGA Tour, Inc.*, Case No. 5:22-cv-04486-BLF (N.D. Cal.), by and between Plaintiff LIV Golf, Inc., Defendant PGA Tour, Inc. ("PGA Tour"), and third-parties His Excellency Yasir Al-Rumayyan's ("His Excellency") and the Public Investment Fund of the Kingdom of Saudi Arabia's ("PIF"), regarding His Excellency's and PIF's acceptance of service, pursuant to the below conditions, of the subpoenas attached hereto as Exhibits A and B.

In this instance only, His Excellency agrees to treat the PGA Tour's sending to Quinn Emanuel Urquhart & Sullivan LLP the subpoena attached hereto as Exhibit A as if the PGA Tour had personally delivered a copy of it to His Excellency in the United States.

In this instance only, PIF agrees to treat the PGA Tour's sending to Quinn Emanuel Urquhart & Sullivan LLP the subpoena attached hereto as Exhibit B as if the PGA Tour had personally delivered a copy of it to a PIF officer or managing agent in the United States.

The PGA Tour agrees that in doing so His Excellency and PIF waive no objections or rights whatsoever to the subpoenas attached hereto as Exhibits A and B, and reserve all rights and privileges with respect thereto.

quinn emanuel urquhart & sullivan, llp

ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

Very truly yours,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

John B. Quinn
Attorney for Plaintiffs LIV Golf, Inc., Talor Gooch, Hudson Swafford, Matt Jones, Bryson
DeChambeau, Ian Poulter, Peter Uihlein, and Third-Parties His Excellency Yasir Al-Rumayyan
and the Public Investment Fund of the Kingdom of Saudi Arabia.

JBQ

Attachments: Exhibits A and B

cc:      Robert C. Walters

_____
Elliot R. Peters
Attorney for Defendant PGA Tour, Inc.

Letter Agreement re Third-Party Subpoenas_KVP Eds.docx

**quinn emanuel urquhart & sullivan, llp**

ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM |
MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI |
SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

# EXHIBIT 6

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Northern District of California  ▼

| | |
|---|---|
| Phil Mickelson, et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   5:22-cv-04486-BLF |
| PGA Tour, Inc. | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                          Yasir bin Othman Al-Rumayyan

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Skadden, Arps, Slate, Meagher & Flom LLP<br>One Manhattan West<br>New York, 10001 | Date and Time:<br>12/05/2022 9:00 am |
|---|---|

The deposition will be recorded by this method:   Stenographic, audio, video, real-time reporting

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
         See Attachment A.  Please produce any responsive documents by October 3, 2022.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    09/22/2022

| *CLERK OF COURT* | OR | |
|---|---|---|
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   PGA Tour, Inc.
_____ , who issues or requests this subpoena, are:

Brook Dooley, Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111, bdooley@keker.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 5:22-cv-04486-BLF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

1909578

## ATTACHMENT A
## DEFINITIONS

1.      The terms "You" or "Your" refer to Yasir bin Othman Al-Rumayyan.

2.      The term "Saudi PIF" refers to the Public Investment Fund of the Kingdom of Saudi Arabia and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

3.      The term "LIV" refers to LIV Golf Holdings Ltd, LIV Golf Incorporated, LIV Golf Investments Ltd, LIV Golf Ltd, and includes without limitation all predecessors (including the Premier Golf League or "PGL"), predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers (including Greg Norman), agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

4.      The term "this litigation" refers to the following action: *Mickelson et al. v. PGA Tour, Inc.*, No. 5:22-cv-04486-BLF, pending currently in the United States District Court for the Northern District of California.

5.      The term "complaint" refers to the operative complaint by Plaintiffs in this litigation.

6.      The term "Golf Saudi" refers to Golf Saudi and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents (including the Saudi Golf Federation), subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

7.      The term "PGA TOUR" refers to PGA TOUR, Inc. and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities

1

acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

8.      The term "DP World Tour" refers to the PGA European Tour, now known as DP World Tour, and the European Tour Group, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

9.      The term "PGA TOUR Regulations" refers to any and all versions ever in effect of the PGA TOUR Player Handbook & Tournament Regulations.

10.      The term "sponsor" or "sponsorship" refers to any endorsement, name and likeness arrangement, or other promotional activity by a third party of you, including any endorsement covered by the PGA TOUR Regulations "Player Endorsement Policy."

11.      The term "Asian Tour" refers to the Asian Tour and Asian Tour Limited, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

12.      The term "professional golfer" refers to any golfers receiving compensation for their golf performance or appearances, including any current or former member of the PGA TOUR, LIV, DP World Tour, or Asian tour.

13.      The term "Major tournament" refers to the Masters, the U.S. Open, The Open (or The British Open), and the PGA Championship, and any sponsoring or managing entity thereof, as referred to in ¶ 30 of the Amended Complaint.

14.      The term "Competition Agency" refers to any Federal or State agency or person charged with enforcing or empowered to enforce competition-related statutes or policies, including but not limited to the Federal Trade Commission and the Department of Justice.

15.     The term "Official World Golf Ranking" refers to the Private Limited Company Official World Golf Ranking (OWGR) and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

16.     The term "Alleged Relevant Markets" refers to the national and global market for the services of professional golfers for elite golf events as alleged in ¶ 263 of the Amended Complaint in this litigation and the national and global market for the promotion of elite professional golf events as alleged in ¶ 263 of the Amended Complaint.

17.     The term "agreement" refers to any oral or written contract, arrangement or understanding, whether formal or informal, implicit or explicit, between two or more persons or entities, together with all drafts thereof, and modifications and amendments thereto.

18.     The term "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.  Unless otherwise stated, any request for production of Documents shall include all Communications.

19.     The term "Person" is defined as any natural person or any legal entity, including without limitation any business or governmental entity or association.

20.     The term "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any method, written or verbal.

21.     The term "Third Party" means any Person that is not you or PGA TOUR, Inc.

22.     The terms "All," "Any," and "Each" shall each be construed as encompassing any and all.

23.     The terms "related to," "relating to," or "concerning" mean referring to, reflecting, describing, evidencing or constituting.

24.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

25.     All pronouns shall be construed to refer to the masculine, feminine, or neuter gender, in singular or plural, as in each case makes the request more inclusive.

26.     The use of the singular form of any word includes the plural and vice versa.

<u>**INSTRUCTIONS**</u>

1.     These requests for production shall be deemed to be requests for all documents, whether prepared by You or by any other party or any other person, which are in Your custody, possession or control; or that You own in whole or in part; or that You have a right by contract, statute or otherwise to use, access, inspect, examine or copy on any terms; or that You have, as a practical matter, the ability to use, access, inspect, examine or copy on any terms.

2.     Documents produced in response to these requests are to be produced as they are kept in the usual course of business or organized and labeled to correspond with the categories in this request for production.

3.     Documents should be produced on a rolling basis as soon as they have been located and processed for production.  Documents should be produced in digitized form, either imaged in single-page TIFF format or, for documents whose native format prohibits or renders impractical their printing on standard-size paper (e.g., audio, video, spreadsheets, database materials, source code, executable code, or oversized documents such as maps), produced in their native format.  Each TIFF document should be accompanied by corresponding Concordance load files (for both documents and images), including corresponding searchable text files and indicators where the document begins and ends.  The documents produced should be stamped with sequential Bates numbering and the image filename should correspond to its Bates number.

4.     Subject to any future agreement on ESI productions, which order shall control in the event of any conflict, You should also provide the following metadata with each document:

4

- Production beginning
- Production end
- Attachment beginning
- Attachment end
- Author
- Confidentiality designation
- Custodian
- Creation date (attachments and loose files)
- Creation time (attachments and loose files)
- Document type
- Document title
- Email attachments
- Email attachment count
- Email date sent
- Email time sent
- Email date received
- Email time received
- E-mail to
- E-mail cc
- E-mail bcc
- E-mail subject
- E-mail message ID
- Extension
- File location (*e.g.*, directory, structure, or pathname)
- Filename
- Last modified date (attachments and loose files)
- Last modified time (attachments and loose files)

5

- Master date (email date sent or loose file date modified)
- Master time (email time sent or loose file time modified)
- MD5HASH
- Production date
- Pages
- Text (extracted or OCR for all files)

5.      Each document requested herein should be produced in its entirety without redaction or excision (except as qualified by Instruction 6 below) regardless of whether You consider the entire document to be relevant or responsive to these requests.  If any documents cannot be produced in full, then You should produce it to the extent possible, specifying the reasons for Your inability to produce the remainder and stating what information, knowledge or belief You have concerning the portion that You cannot produce.

6.      If You believe that any individual request in these requests for production calls for documents subject to a claim of privilege or that are not subject to discovery, produce so much as is not objected to, state the part of each request to which You raise an objection, and set forth the basis of Your claim of privilege, including a statement identifying the nature of the information withheld.  Furthermore, for all responsive documents You do not produce, You shall provide a privilege log stating: (a) the type of document (e.g. brief, email, memo, handwritten note, letter, excel spreadsheet, etc.); (b) the title of the document; (c) the name and title of each author; (d) the name and title of each addressee; (e) all persons to whom the document or its contents were disclosed in whole or part; (f) the date of the document; (g) the subject matter of the document; (h) the number of pages; (i) an identification of any attachments or appendices; and (j) a statement of the basis on which privilege or other protection is claimed.

7.      If any requested document has been lost or destroyed, state the type of document, its subject matter, author and date and the circumstances in which it was lost or destroyed.

8.      The responsive timeframe for these requests is January 1, 2019 to the present, unless otherwise specified in the request.

6

9.      You are reminded that You are under a continuing obligation to amend any and all responses to requests for production and supplement any production for inspection and copying to the extent required by Rule 26(e) of the Federal Rules of Civil Procedure.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All communications with LIV.

### REQUEST FOR PRODUCTION NO. 2:

All agreements with LIV.

### REQUEST FOR PRODUCTION NO. 3:

All documents and communications related to LIV.

### REQUEST FOR PRODUCTION NO. 4:

All documents related to the formation of LIV.

### REQUEST FOR PRODUCTION NO. 5:

All documents and communications related to the PGA TOUR.

### REQUEST FOR PRODUCTION NO. 6:

All communications with professional golfers, their agents, or anyone acting on their behalf, related to the PGA TOUR, Saudi PIF, Golf Saudi, the PGL, LIV, the DP World Tour, the Asian Tour, any other actual or potential professional golf league, or this litigation.

### REQUEST FOR PRODUCTION NO. 7:

All agreements with professional golfers, including but not limited to all drafts of agreements.

### REQUEST FOR PRODUCTION NO. 8:

All documents and communications related to negotiations between you or Saudi PIF and any professional golfer.

**REQUEST FOR PRODUCTION NO. 9:**

All agreements with any current or former PGA TOUR employee, including but not limited to all drafts of agreements.

**REQUEST FOR PRODUCTION NO. 10:**

All documents and communications related to negotiations between you or Saudi PIF and any current or former PGA TOUR employee, including but not limited to offer letters.

**REQUEST FOR PRODUCTION NO. 11:**

All documents related to the DP World Tour's relationship to the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 12:**

All communications between you or Saudi PIF and any professional golf tour, including the DP World TOUR and the Asian Tour, related to the PGA TOUR, Golf Saudi, Saudi PIF, the PGL, LIV, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 13:**

All documents and communications related to meetings between you or Saudi PIF and any professional golf tour, including the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 14:**

All communications between LIV and any professional golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA, related to the PGA TOUR, Golf Saudi, Saudi PIF, the PGL, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and communications related to meetings between LIV and any professional golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA, including agendas, presentations, and minutes of such meetings.

1909578

**REQUEST FOR PRODUCTION NO. 16:**

All documents and communications related to LIV's partnering with, co-sponsoring or co-sanctioning events with, or establishing a professional golf league with, any other golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA.

**REQUEST FOR PRODUCTION NO. 17:**

All communications between Golf Saudi and any professional golf tour, including the DP World Tour and the Asian Tour, related to the PGA TOUR, you, the PGL, LIV, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 18:**

All documents and communications related to meetings between Golf Saudi and any professional golf tour, including the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 19:**

All documents and communications related to Golf Saudi partnering with, co-sponsoring or co-sanctioning events with, or establishing a professional golf league with, any other golf tour, including the DP World Tour and the Asian Tour.

**REQUEST FOR PRODUCTION NO. 20:**

All communications between Golf Saudi, Saudi PIF, you, the PGL, or LIV, on the one hand, and the Official World Golf Ranking, on the other hand.

**REQUEST FOR PRODUCTION NO. 21:**

All documents and communications related to the Official World Golf Ranking.

**REQUEST FOR PRODUCTION NO. 22:**

All documents and communications related to money or other benefits you or Saudi PIF have provided to professional golfers.

**REQUEST FOR PRODUCTION NO. 23:**

All documents and communications related to money or other benefits you or Saudi PIF expect or project to provide to professional golfers in the future.

**REQUEST FOR PRODUCTION NO. 24:**

All documents related to LIV's rules and regulations, including all versions and drafts.

**REQUEST FOR PRODUCTION NO. 25:**

All documents related to the enforcement of LIV's rules and regulations, including actual or potential discipline resulting from violations thereof.

**REQUEST FOR PRODUCTION NO. 26:**

All agreements with actual or potential sponsors of LIV or the PGL, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 27:**

All documents and communications related to LIV or the PGL's actual or potential sponsors, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the sponsor's reasons for agreeing or not agreeing to sponsor LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 28:**

All agreements with LIV or the PGL's actual or potential advertisers, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 29:**

All documents and communications related to LIV or the PGL's actual or potential advertisers, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the advertiser's reasons for agreeing or not agreeing to advertise with you.

**REQUEST FOR PRODUCTION NO. 30:**

All agreements between LIV or the PGL and any media corporation, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 31:**

All documents and communications related to LIV or the PGL's relationship with media corporations, including but not limited to communications between LIV or the PGL and any

1909578

media corporation concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the media corporation's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 32:**

All agreements with LIV or the PGL's actual or potential broadcasters, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 33:**

All documents and communications related to LIV or the PGL's actual or potential broadcasters, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the sponsor's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 34:**

All agreements with LIV or the PGL's actual or potential vendors, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 35:**

All documents and communications related to LIV or the PGL's actual or potential vendors, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the vendor's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 36:**

All agreements between LIV or the PGL and any actual or potential tournament host, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 37:**

All documents and communications related to LIV or the PGL's actual or potential tournament hosts, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the tournament host's reasons for hosting or not hosting a LIV or PGL event.

1909578

**REQUEST FOR PRODUCTION NO. 38:**

All agreements between LIV or the PGL and the Major tournaments, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 39:**

All documents and communications related to LIV or the PGL's relationship to the Major tournaments, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia, the OWGR, OWGR rankings, or LIV or PGL golfer's ability to participate in the Major tournaments.

**REQUEST FOR PRODUCTION NO. 40:**

All communications related to the solicitation of golfers to join LIV Golf, including but not limited to communications with agents of professional golfers.

**REQUEST FOR PRODUCTION NO. 41:**

All communications with any actual, potential, or past plaintiff in this litigation related to this litigation.

**REQUEST FOR PRODUCTION NO. 42:**

All communications with any third party related to this litigation.

**REQUEST FOR PRODUCTION NO. 43:**

All documents related to any payments of, or contributions towards, legal fees related to this litigation.

**REQUEST FOR PRODUCTION NO. 44:**

All documents related to any joint-defense agreement or common-interest agreement in this litigation.

**REQUEST FOR PRODUCTION NO. 45:**

All documents related to any cooperation, settlement, or indemnification agreement in this litigation.

**REQUEST FOR PRODUCTION NO. 46:**

All documents related to any conflicts waiver in this litigation.

**REQUEST FOR PRODUCTION NO. 47:**

All documents related to any allegations concerning you or Saudi PIF in the complaint in this litigation.

**REQUEST FOR PRODUCTION NO. 48:**

All documents related to any actual or potential benefit to you, Golf Saudi, Saudi PIF, the Kingdom of Saudi Arabia, or the Saudi Arabian monarchy of hosting golf events or associating with professional golf.

**REQUEST FOR PRODUCTION NO. 49:**

All documents related to any actual or potential benefit to you, Golf Saudi, Saudi PIF, the Kingdom of Saudi Arabia, or the Saudi Arabian monarchy of associating with LIV.

**REQUEST FOR PRODUCTION NO. 50:**

All communications with the Kingdom of Saudi Arabia concerning the current or projected financial plans and expectations for LIV.

**REQUEST FOR PRODUCTION NO. 51:**

All documents related to complaints, criticism, or negative opinions about you, Golf Saudi, Saudi PIF, LIV, the Kingdom of Saudi Arabia, professional golfers participating in LIV events, or the Saudi Arabian monarchy.

**REQUEST FOR PRODUCTION NO. 52:**

All documents and communications related to reservations or concerns about doing business with you, Golf Saudi, Saudi PIF, LIV, the PGL or any of Saudi PIF's other portfolio companies due to the Kingdom of Saudi Arabia's human rights records, its civil rights record, the murder of Jamal Khashoggi, or the September 11, 2001, terrorist attack on the World Trade Center.

**REQUEST FOR PRODUCTION NO. 53:**

Documents sufficient to show all investors and investments in LIV, including but not limited to investments by Saudi PIF and Performance54 Group Ltd.

**REQUEST FOR PRODUCTION NO. 54:**

Documents sufficient to show projected or future investments in LIV, including but not limited to projected or future investments by you, Saudi PIF, and Performance54 Group Ltd.

**REQUEST FOR PRODUCTION NO. 55:**

Documents sufficient to show Saudi PIF's organizational structure and personnel, including of each of its units, departments, divisions, parents, subsidiaries or other entities associated with you.

**REQUEST FOR PRODUCTION NO. 56:**

Documents sufficient to identify Saudi PIF's current leadership.

**REQUEST FOR PRODUCTION NO. 57:**

Documents sufficient to show all stockholders, owners, and investors in Saudi PIF.

**REQUEST FOR PRODUCTION NO. 58:**

All Saudi PIF board minutes, board presentations, board meeting agendas, and other board or leadership materials related to Golf Saudi, the PGL, LIV, the PGA TOUR, or this litigation.

**REQUEST FOR PRODUCTION NO. 59:**

All documents and communications related to LIV's business or strategic plans.

**REQUEST FOR PRODUCTION NO. 60:**

All documents and communications related to LIV's sales and marketing strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 61:**

All documents and communications related to LIV's actual or projected market share in the Alleged Relevant Markets.

**REQUEST FOR PRODUCTION NO. 62:**

All documents and communications related to LIV's media and broadcast strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 63:**

Documents sufficient to show, at a line-item level, the PGL's quarterly and annual revenues (including all sources of revenue), costs (including research and development costs, product development costs, investment costs, employee costs, material costs, manufacturing costs, sales and marketing costs) and profits (including gross profits, net profits and operating profits).

**REQUEST FOR PRODUCTION NO. 64:**

Documents sufficient to show the PGL's projected quarterly and annual revenues, costs, and profits.

**REQUEST FOR PRODUCTION NO. 65:**

All documents and communications related to the PGL's business or strategic plans.

**REQUEST FOR PRODUCTION NO. 66:**

All documents and communications related to the PGL's sales and marketing strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 67:**

All documents and communications related to the PGL's actual or projected market share in the Alleged Relevant Markets.

**REQUEST FOR PRODUCTION NO. 68:**

All documents and communications related to the PGL's media and broadcast strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 69:**

All communications between the PGL and professional golfers, their agents, or anyone acting on their behalf, related to the PGA TOUR, Golf Saudi, Saudi PIF, you, the PGL, the DP World Tour, the Asian Tour, or any other actual or potential professional golf league or tour.

**REQUEST FOR PRODUCTION NO. 70:**

All actual or proposed agreements between the PGL and professional golfers related to playing in the PGL, including but not limited to all drafts of agreements.

15

**REQUEST FOR PRODUCTION NO. 71:**

All communications between the PGL and any golf professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour, related to the PGA TOUR, Golf Saudi, you, the PGL, partnering, or co-sponsoring or co-sanctioning events.

**REQUEST FOR PRODUCTION NO. 72:**

All documents related to meetings between the PGL and any professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 73:**

All documents related to the PGL partnering with, or co-sponsoring or co-sanctioning events with, any professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour.

**REQUEST FOR PRODUCTION NO. 74:**

All communications between the PGL and the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 75:**

All documents and communications related to Saudi PIF's review, analysis, or assessment of LIV's or PGL's financial projections, business or strategic plans, sales and marketing plans, or media plans.

**REQUEST FOR PRODUCTION NO. 76:**

All documents related to Saudi PIF's decision to no longer invest in the PGL.

**REQUEST FOR PRODUCTION NO. 77:**

All documents related to Greg Norman's role at LIV, including, but not limited to, his performance as the Chief Executive Officer and Commissioner of LIV.

**REQUEST FOR PRODUCTION NO. 78:**

All communications with Greg Norman, including, but not limited to, prior to and during his employment with LIV.

**REQUEST FOR PRODUCTION NO. 79:**

Documents sufficient to show your roles with the Saudi PIF and LIV.

# EXHIBIT 7

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California ▾

| | |
|---|---|
| Phil Mickelson, et al. | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.   5:22-cv-04486-BLF |
| PGA Tour, Inc. | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:            Public Investment Fund of the Kingdom of Saudi Arabia

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:  See Attachment A.

| Place: Skadden, Arps, Slate, Meagher & Flom LLP<br>One Manhattan West<br>New York, NY 10001 | Date and Time:<br>          12/06/2022 9:00 am |
|---|---|

         The deposition will be recorded by this method:     Stenographic, audio, video, real-time reporting

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
         See Attachment B.  Please produce any responsive documents by October 3, 2022.

         The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    09/22/2022

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   PGA Tour, Inc.
_____ , who issues or requests this subpoena, are:

Brook Dooley, Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111, bdooley@keker.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 5:22-cv-04486-BLF

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

1909755

**ATTACHMENT A**

**DEFINITIONS**

1.      The terms "You" or "Your" refer to the Public Investment Fund of the Kingdom of Saudi Arabia and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

2.      The term "LIV" refers to LIV Golf Holdings Ltd, LIV Golf Incorporated, LIV Golf Investments Ltd, LIV Golf Ltd, and includes without limitation all predecessors (including the Premier Golf League or "PGL"), predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers (including Greg Norman), agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

3.      The term "this litigation" refers to the following action: *Mickelson et al. v. PGA Tour, Inc.*, No. 5:22-cv-04486-BLF, pending currently in the United States District Court for the Northern District of California.

4.      The term "complaint" refers to the operative complaint by Plaintiffs in this litigation.

5.      The term "Golf Saudi" refers to Golf Saudi and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents (including the Saudi Golf Federation), subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

6.      The term "PGA TOUR" refers to PGA TOUR, Inc. and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

1

1909755

7.      The term "DP World Tour" refers to the PGA European Tour, now known as DP World Tour, and the European Tour Group, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

8.      The term "PGA TOUR Regulations" refers to any and all versions ever in effect of the PGA TOUR Player Handbook & Tournament Regulations.

9.      The term "sponsor" or "sponsorship" refers to any endorsement, name and likeness arrangement, or other promotional activity by a third party of you, including any endorsement covered by the PGA TOUR Regulations "Player Endorsement Policy."

10.      The term "Asian Tour" refers to the Asian Tour and Asian Tour Limited, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

11.      The term "professional golfer" refers to any golfers receiving compensation for their golf performance or appearances, including any current or former member of the PGA TOUR, LIV, DP World Tour, or Asian tour.

12.      The term "Major tournament" refers to the Masters, the U.S. Open, The Open (or The British Open), and the PGA Championship, and any sponsoring or managing entity thereof, as referred to in ¶ 30 of the Amended Complaint.

13.      The term "Competition Agency" refers to any Federal or State agency or person charged with enforcing or empowered to enforce competition-related statutes or policies, including but not limited to the Federal Trade Commission and the Department of Justice.

14.      The term "Official World Golf Ranking" refers to the Private Limited Company Official World Golf Ranking (OWGR) and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers,

2

agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

15.     The term "Alleged Relevant Markets" refers to the national and global market for the services of professional golfers for elite golf events as alleged in ¶ 263 of the Amended Complaint in this litigation and the national and global market for the promotion of elite professional golf events as alleged in ¶ 263 of the Amended Complaint.

16.     The term "agreement" refers to any oral or written contract, arrangement or understanding, whether formal or informal, implicit or explicit, between two or more persons or entities, together with all drafts thereof, and modifications and amendments thereto.

17.     The term "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.  Unless otherwise stated, any request for production of Documents shall include all Communications.

18.     The term "Person" is defined as any natural person or any legal entity, including without limitation any business or governmental entity or association.

19.     The term "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any method, written or verbal.

20.     The term "Third Party" means any Person that is not you or PGA TOUR, Inc.

21.     The terms "All," "Any," and "Each" shall each be construed as encompassing any and all.

22.     The terms "related to," "relating to," or "concerning" mean referring to, reflecting, describing, evidencing or constituting.

23.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

24.     All pronouns shall be construed to refer to the masculine, feminine, or neuter gender, in singular or plural, as in each case makes the request more inclusive.

25.     The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1.     Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, you are directed to designate one or more of your officers, directors, managing agents, or other persons who consent to testify on your behalf and who have knowledge of and are adequately prepared to testify concerning the topics enumerated below.

2.     Your responses to these requests shall be in accordance with Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of California, and the Court's orders in this action.

## DEPOSITION TOPICS

**DEPOSITION TOPIC NO. 1:**

Your organizational structure, leadership, investors, and other sources of funding.

**DEPOSITION TOPIC NO. 2:**

Your relationship to LIV, including, but not limited to, your investment in and management of LIV.

**DEPOSITION TOPIC NO. 3:**

LIV's business or strategic plans, sales and marketing plans, past or future market share, and media strategies.

**DEPOSITION TOPIC NO. 4:**

LIV's actual and projected financial performance, including revenue, costs, and profits.

**DEPOSITION TOPIC NO. 5:**

Your relationship to the PGL, including, but not limited to, your investment in and management of LIV.

**DEPOSITION TOPIC NO. 6:**

The PGL's business or strategic plans, sales and marketing plans, past or future market share, and media strategies.

**DEPOSITION TOPIC NO. 7:**

The PGL's actual and projected financial performance, including revenue, costs, and profits.

**DEPOSITION TOPIC NO. 8:**

Any internal analysis you did of LIV or the PGL, including any internal communications about the business or strategy of LIV or the PGL.

**DEPOSITION TOPIC NO. 9:**

Communications and agreements between you and any professional golfer.

**DEPOSITION TOPIC NO. 10:**

Communications and agreements between you and any professional golf league or tour.

**DEPOSITION TOPIC NO. 11:**

Communications and agreements between you and any actual or potential sponsor, advertiser, media partner, vendor, or tournament host of LIV or the PGL.

**DEPOSITION TOPIC NO. 12:**

Communications and agreements between you and any Major tournament.

**DEPOSITION TOPIC NO. 13:**

Communications and agreements between you and the OWGR.

**DEPOSITION TOPIC NO. 14:**

Communications and agreements related to this litigation.

**DEPOSITION TOPIC NO. 15:**

Allegations related to you in the complaint in this litigation.

**DEPOSITION TOPIC NO. 16:**

Actual or potential costs and benefits to the Kingdom of Saudi Arabia of hosting golf events and associating with professional golf.

1909755

**DEPOSITION TOPIC NO. 17:**

Reservations communicated by any person or entity about doing business with you, LIV, or any of your other portfolio companies due to Saudi Arabia's human rights or civil rights record, the murder of Jamal Khashoggi, or the September 11, 2001, terrorist attack on the World Trade Center.

**DEPOSITION TOPIC NO. 18:**

Your preservation of, search for, and collection of documents responsive to this subpoena.

**DEPOSITION TOPIC NO. 19:**

The documents produced by you in this litigation, including, but not limited to, the authenticity of those documents.

1909755

# ATTACHMENT B

## ATTACHMENT B
## DEFINITIONS

1.       The terms "You" or "Your" refer to the Public Investment Fund of the Kingdom of Saudi Arabia and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

2.       The term "LIV" refers to LIV Golf Holdings Ltd, LIV Golf Incorporated, LIV Golf Investments Ltd, LIV Golf Ltd, and includes without limitation all predecessors (including the Premier Golf League or "PGL"), predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers (including Greg Norman), agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

3.       The term "this litigation" refers to the following action: *Mickelson et al. v. PGA Tour, Inc.*, No. 5:22-cv-04486-BLF, pending currently in the United States District Court for the Northern District of California.

4.       The term "complaint" refers to the operative complaint by Plaintiffs in this litigation.

5.       The term "Golf Saudi" refers to Golf Saudi and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents (including the Saudi Golf Federation), subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

6.       The term "PGA TOUR" refers to PGA TOUR, Inc. and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

1

7.      The term "DP World Tour" refers to the PGA European Tour, now known as DP World Tour, and the European Tour Group, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

8.      The term "PGA TOUR Regulations" refers to any and all versions ever in effect of the PGA TOUR Player Handbook & Tournament Regulations.

9.      The term "sponsor" or "sponsorship" refers to any endorsement, name and likeness arrangement, or other promotional activity by a third party of you, including any endorsement covered by the PGA TOUR Regulations "Player Endorsement Policy."

10.     The term "Asian Tour" refers to the Asian Tour and Asian Tour Limited, and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

11.     The term "professional golfer" refers to any golfers receiving compensation for their golf performance or appearances, including any current or former member of the PGA TOUR, LIV, DP World Tour, or Asian tour.

12.     The term "Major tournament" refers to the Masters, the U.S. Open, The Open (or The British Open), and the PGA Championship, and any sponsoring or managing entity thereof, as referred to in ¶ 30 of the Amended Complaint.

13.     The term "Competition Agency" refers to any Federal or State agency or person charged with enforcing or empowered to enforce competition-related statutes or policies, including but not limited to the Federal Trade Commission and the Department of Justice.

14.     The term "Official World Golf Ranking" refers to the Private Limited Company Official World Golf Ranking (OWGR) and includes without limitation all predecessors, predecessors-in-interest, affiliates, parents, subsidiaries, and all past or present directors, officers,

2

agents, representatives, employees, consultants, attorneys, entities acting in joint venture, licensing agreements, or partnership relationship of each and others acting on behalf of each.

15.     The term "Alleged Relevant Markets" refers to the national and global market for the services of professional golfers for elite golf events as alleged in ¶ 263 of the Amended Complaint in this litigation and the national and global market for the promotion of elite professional golf events as alleged in ¶ 263 of the Amended Complaint.

16.     The term "agreement" refers to any oral or written contract, arrangement or understanding, whether formal or informal, implicit or explicit, between two or more persons or entities, together with all drafts thereof, and modifications and amendments thereto.

17.     The term "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.  Unless otherwise stated, any request for production of Documents shall include all Communications.

18.     The term "Person" is defined as any natural person or any legal entity, including without limitation any business or governmental entity or association.

19.     The term "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any method, written or verbal.

20.     The term "Third Party" means any Person that is not you or PGA TOUR, Inc.

21.     The terms "All," "Any," and "Each" shall each be construed as encompassing any and all.

22.     The terms "related to," "relating to," or "concerning" mean referring to, reflecting, describing, evidencing or constituting.

23.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

24.     All pronouns shall be construed to refer to the masculine, feminine, or neuter gender, in singular or plural, as in each case makes the request more inclusive.

25.     The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1.     These requests for production shall be deemed to be requests for all documents, whether prepared by You or by any other party or any other person, which are in Your custody, possession or control; or that You own in whole or in part; or that You have a right by contract, statute or otherwise to use, access, inspect, examine or copy on any terms; or that You have, as a practical matter, the ability to use, access, inspect, examine or copy on any terms.

2.     Documents produced in response to these requests are to be produced as they are kept in the usual course of business or organized and labeled to correspond with the categories in this request for production.

3.     Documents should be produced on a rolling basis as soon as they have been located and processed for production.  Documents should be produced in digitized form, either imaged in single-page TIFF format or, for documents whose native format prohibits or renders impractical their printing on standard-size paper (e.g., audio, video, spreadsheets, database materials, source code, executable code, or oversized documents such as maps), produced in their native format.  Each TIFF document should be accompanied by corresponding Concordance load files (for both documents and images), including corresponding searchable text files and indicators where the document begins and ends.  The documents produced should be stamped with sequential Bates numbering and the image filename should correspond to its Bates number.

4.     Subject to any future agreement on ESI productions, which order shall control in the event of any conflict, You should also provide the following metadata with each document:

- Production beginning
- Production end
- Attachment beginning

4

- Attachment end

- Author

- Confidentiality designation

- Custodian

- Creation date (attachments and loose files)

- Creation time (attachments and loose files)

- Document type

- Document title

- Email attachments

- Email attachment count

- Email date sent

- Email time sent

- Email date received

- Email time received

- E-mail to

- E-mail cc

- E-mail bcc

- E-mail subject

- E-mail message ID

- Extension

- File location (*e.g.*, directory, structure, or pathname)

- Filename

- Last modified date (attachments and loose files)

- Last modified time (attachments and loose files)

- Master date (email date sent or loose file date modified)

- Master time (email time sent or loose file time modified)

- MD5HASH

5

- Production date
- Pages
- Text (extracted or OCR for all files)

5.      Each document requested herein should be produced in its entirety without redaction or excision (except as qualified by Instruction 6 below) regardless of whether You consider the entire document to be relevant or responsive to these requests.  If any documents cannot be produced in full, then You should produce it to the extent possible, specifying the reasons for Your inability to produce the remainder and stating what information, knowledge or belief You have concerning the portion that You cannot produce.

6.      If You believe that any individual request in these requests for production calls for documents subject to a claim of privilege or that are not subject to discovery, produce so much as is not objected to, state the part of each request to which You raise an objection, and set forth the basis of Your claim of privilege, including a statement identifying the nature of the information withheld.  Furthermore, for all responsive documents You do not produce, You shall provide a privilege log stating: (a) the type of document (e.g. brief, email, memo, handwritten note, letter, excel spreadsheet, etc.); (b) the title of the document; (c) the name and title of each author; (d) the name and title of each addressee; (e) all persons to whom the document or its contents were disclosed in whole or part; (f) the date of the document; (g) the subject matter of the document; (h) the number of pages; (i) an identification of any attachments or appendices; and (j) a statement of the basis on which privilege or other protection is claimed.

7.      If any requested document has been lost or destroyed, state the type of document, its subject matter, author and date and the circumstances in which it was lost or destroyed.

8.      The responsive timeframe for these requests is January 1, 2019 to the present, unless otherwise specified in the request.

9.      You are reminded that You are under a continuing obligation to amend any and all responses to requests for production and supplement any production for inspection and copying to the extent required by Rule 26(e) of the Federal Rules of Civil Procedure.

6

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All communications with LIV.

**REQUEST FOR PRODUCTION NO. 2:**

All agreements with LIV.

**REQUEST FOR PRODUCTION NO. 3:**

All documents and communications related to LIV.

**REQUEST FOR PRODUCTION NO. 4:**

All documents related to the formation of LIV.

**REQUEST FOR PRODUCTION NO. 5:**

All communications with the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 6:**

All documents and communications related to the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 7:**

All communications with professional golfers, their agents, or anyone acting on their behalf, related to the PGA TOUR, Golf Saudi, the PGL, LIV, the DP World Tour, the Asian Tour, any other actual or potential professional golf league, or this litigation.

**REQUEST FOR PRODUCTION NO. 8:**

All agreements with professional golfers, including but not limited to all drafts of agreements.

**REQUEST FOR PRODUCTION NO. 9:**

All documents and communications related to negotiations between you and any professional golfer.

**REQUEST FOR PRODUCTION NO. 10:**

All agreements with any current or former PGA TOUR employee, including but not limited to all drafts of agreements.

7

1908406

**REQUEST FOR PRODUCTION NO. 11:**

All documents and communications related to negotiations between you and any current or former PGA TOUR employee, including but not limited to offer letters.

**REQUEST FOR PRODUCTION NO. 12:**

All documents related to the DP World Tour's relationship to the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 13:**

All communications between you and any professional golf tour, including the DP World TOUR and the Asian Tour, related to the PGA TOUR, Golf Saudi, the PGL, LIV, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 14:**

All documents and communications related to meetings between you and any professional golf tour, including the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and communications related to your partnering with, co-sponsoring or co-sanctioning events with, or establishing a professional golf league with, any other golf tour, including the DP World Tour and the Asian Tour.

**REQUEST FOR PRODUCTION NO. 16:**

All communications between LIV and any professional golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA, related to the PGA TOUR, Golf Saudi, you, the PGL, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 17:**

All documents and communications related to meetings between LIV and any professional golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA, including agendas, presentations, and minutes of such meetings.

1908406

**REQUEST FOR PRODUCTION NO. 18:**

All documents and communications related to LIV's partnering with, co-sponsoring or co-sanctioning events with, or establishing a professional golf league with, any other golf tour, including the DP World Tour, the Asian Tour, the Ladies European Tour, and the LPGA.

**REQUEST FOR PRODUCTION NO. 19:**

All communications between Golf Saudi and any professional golf tour, including the DP World Tour and the Asian Tour, related to the PGA TOUR, you, the PGL, LIV, partnering, co-sponsoring or co-sanctioning events, or establishing a professional golf league.

**REQUEST FOR PRODUCTION NO. 20:**

All documents and communications related to meetings between Golf Saudi and any professional golf tour, including the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 21:**

All documents and communications related to Golf Saudi partnering with, co-sponsoring or co-sanctioning events with, or establishing a professional golf league with, any other golf tour, including the DP World Tour and the Asian Tour.

**REQUEST FOR PRODUCTION NO. 22:**

All communications between Golf Saudi, you, the PGL, or LIV, on the one hand, and the Official World Golf Ranking, on the other hand.

**REQUEST FOR PRODUCTION NO. 23:**

All documents and communications related to the Official World Golf Ranking.

**REQUEST FOR PRODUCTION NO. 24:**

All documents and communications related to money or other benefits you have provided to professional golfers.

**REQUEST FOR PRODUCTION NO. 25:**

All documents and communications related to money or other benefits you expect or project to provide to professional golfers in the future.

9

**REQUEST FOR PRODUCTION NO. 26:**

All documents related to LIV's rules and regulations, including all versions and drafts.

**REQUEST FOR PRODUCTION NO. 27:**

All documents related to the enforcement of LIV's rules and regulations, including actual or potential discipline resulting from violations thereof.

**REQUEST FOR PRODUCTION NO. 28:**

All agreements with actual or potential sponsors of LIV or the PGL, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 29:**

All documents and communications related to LIV or the PGL's actual or potential sponsors, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the sponsor's reasons for agreeing or not agreeing to sponsor LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 30:**

All agreements with LIV or the PGL's actual or potential advertisers, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 31:**

All documents and communications related to LIV or the PGL's actual or potential advertisers, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the advertiser's reasons for agreeing or not agreeing to advertise with you.

**REQUEST FOR PRODUCTION NO. 32:**

All agreements between LIV or the PGL and any media corporation, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 33:**

All documents and communications related to LIV or the PGL's relationship with media corporations, including but not limited to communications between LIV or the PGL and any

1908406

media corporation concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the media corporation's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 34:**

All agreements with LIV or the PGL's actual or potential broadcasters, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 35:**

All documents and communications related to LIV or the PGL's actual or potential broadcasters, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the sponsor's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 36:**

All agreements with LIV or the PGL's actual or potential vendors, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 37:**

All documents and communications related to LIV or the PGL's actual or potential vendors, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the vendor's reasons for contracting or not contracting with LIV or the PGL.

**REQUEST FOR PRODUCTION NO. 38:**

All agreements between LIV or the PGL and any actual or potential tournament host, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 39:**

All documents and communications related to LIV or the PGL's actual or potential tournament hosts, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia or the tournament host's reasons for hosting or not hosting a LIV or PGL event.

1908406

**REQUEST FOR PRODUCTION NO. 40:**

All agreements between LIV or the PGL and the Major tournaments, including but not limited to all documents and communications related to negotiations thereof.

**REQUEST FOR PRODUCTION NO. 41:**

All documents and communications related to LIV or the PGL's relationship to the Major tournaments, including but not limited to communications concerning the PGA TOUR, any PGA TOUR member, this litigation, the Kingdom of Saudi Arabia, the OWGR, OWGR rankings, or LIV or PGL golfer's ability to participate in the Major tournaments.

**REQUEST FOR PRODUCTION NO. 42:**

All documents and communications related to your review, analysis, or assessment of LIV or PGL's financial projections and business, sales and marketing, and media plans.

**REQUEST FOR PRODUCTION NO. 43:**

All communications related to the solicitation of golfers to join LIV Golf, including but not limited to communications with agents of professional golfers.

**REQUEST FOR PRODUCTION NO. 44:**

All communications with any actual, potential, or past plaintiff in this litigation related to this litigation.

**REQUEST FOR PRODUCTION NO. 45:**

All communications with any other third party related to this litigation.

**REQUEST FOR PRODUCTION NO. 46:**

All documents related to any payments of, or contributions towards, legal fees related to this litigation.

**REQUEST FOR PRODUCTION NO. 47:**

All documents related to any joint-defense agreement or common-interest agreement in this litigation.

**REQUEST FOR PRODUCTION NO. 48:**

All documents related to any cooperation, settlement, or indemnification agreement in this litigation.

**REQUEST FOR PRODUCTION NO. 49:**

All documents related to any conflicts waiver in this litigation.

**REQUEST FOR PRODUCTION NO. 50:**

All documents related to any allegations concerning you in the complaint in this litigation.

**REQUEST FOR PRODUCTION NO. 51:**

All documents related to any actual or potential benefit to you, the Kingdom of Saudi Arabia, or the Saudi Arabian monarchy of hosting golf events or associating with professional golf.

**REQUEST FOR PRODUCTION NO. 52:**

All documents related to any actual or potential benefit to you, the Kingdom of Saudi Arabia, or the Saudi Arabian monarchy of associating with LIV.

**REQUEST FOR PRODUCTION NO. 53:**

All communications with the Kingdom of Saudi Arabia concerning the current or projected financial plans and expectations for LIV.

**REQUEST FOR PRODUCTION NO. 54:**

All documents related to complaints, criticism, or negative opinions about LIV, you, the Kingdom of Saudi Arabia, professional golfers participating in LIV events, or the Saudi Arabian monarchy.

**REQUEST FOR PRODUCTION NO. 55:**

All documents and communications related to reservations or concerns about doing business with you, LIV or any of your other portfolio companies due to the Kingdom of Saudi Arabia's human rights records, its civil rights record, the murder of Jamal Khashoggi, or the September 11, 2001, terrorist attack on the World Trade Center.

13

**REQUEST FOR PRODUCTION NO. 56:**

Documents sufficient to show all investors and investments in LIV, including but not limited to investments by you and Performance54 Group Ltd.

**REQUEST FOR PRODUCTION NO. 57:**

Documents sufficient to show projected or future investments in LIV, including but not limited to projected or future investments by you and Performance54 Group Ltd.

**REQUEST FOR PRODUCTION NO. 58:**

Documents sufficient to show your organizational structure and personnel, including of each of your units, departments, divisions, parents, subsidiaries or other entities associated with you.

**REQUEST FOR PRODUCTION NO. 59:**

Documents sufficient to identify your current leadership.

**REQUEST FOR PRODUCTION NO. 60:**

Documents sufficient to show all stockholders, owners, and investors in you.

**REQUEST FOR PRODUCTION NO. 61:**

All board minutes, board presentations, board meeting agendas, and other board or leadership materials related to Golf Saudi, the PGL, LIV, the PGA TOUR, or this litigation.

**REQUEST FOR PRODUCTION NO. 62:**

All agreements with third parties, including but not limited to consultants and banks, related to the development of a professional golf league or tour.

**REQUEST FOR PRODUCTION NO. 63:**

All communications with third parties, including but not limited to consultants and banks, related to the development of a professional golf league or tour.

**REQUEST FOR PRODUCTION NO. 64:**

All documents and communications related to LIV's business or strategic plans.

**REQUEST FOR PRODUCTION NO. 65:**

All documents and communications related to LIV's sales and marketing strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 66:**

All documents and communications related to LIV's actual or projected market share in the Alleged Relevant Markets.

**REQUEST FOR PRODUCTION NO. 67:**

All documents and communications related to LIV's media and broadcast strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 68:**

Documents sufficient to show, at a line-item level, the PGL's quarterly and annual revenues (including all sources of revenue), costs (including research and development costs, product development costs, investment costs, employee costs, material costs, manufacturing costs, sales and marketing costs) and profits (including gross profits, net profits and operating profits).

**REQUEST FOR PRODUCTION NO. 69:**

Documents sufficient to show the PGL's projected quarterly and annual revenues, costs, and profits.

**REQUEST FOR PRODUCTION NO. 70:**

All documents and communications related to the PGL's business or strategic plans.

**REQUEST FOR PRODUCTION NO. 71:**

All documents and communications related to the PGL's sales and marketing strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 72:**

All documents and communications related to the PGL's actual or projected market share in the Alleged Relevant Markets.

**REQUEST FOR PRODUCTION NO. 73:**

All documents and communications related to the PGL's media and broadcast strategies, plans or projections.

**REQUEST FOR PRODUCTION NO. 74:**

All communications between the PGL and professional golfers, their agents, or anyone acting on their behalf, related to the PGA TOUR, Golf Saudi, you, the PGL, the DP World Tour, the Asian Tour, or any other actual or potential professional golf league or tour.

**REQUEST FOR PRODUCTION NO. 75:**

All actual or proposed agreements between the PGL and professional golfers related to playing in the PGL, including but not limited to all drafts of agreements.

**REQUEST FOR PRODUCTION NO. 76:**

All communications between the PGL and any golf professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour, related to the PGA TOUR, Golf Saudi, you, the PGL, partnering, or co-sponsoring or co-sanctioning events.

**REQUEST FOR PRODUCTION NO. 77:**

All documents related to meetings between the PGL and any professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour, including agendas, presentations, and minutes of such meetings.

**REQUEST FOR PRODUCTION NO. 78:**

All documents related to the PGL partnering with, or co-sponsoring or co-sanctioning events with, any professional golf league or tour, including the PGA TOUR, the DP World Tour and the Asian Tour.

**REQUEST FOR PRODUCTION NO. 79:**

All communications between the PGL and the PGA TOUR.

**REQUEST FOR PRODUCTION NO. 80:**

All documents related to your decision to no longer invest in the PGL.

**REQUEST FOR PRODUCTION NO. 81:**

All documents related to Greg Norman's role at LIV, including, but not limited to, his performance as the Chief Executive Officer and Commissioner of LIV.

1908406

**REQUEST FOR PRODUCTION NO. 82:**

All communications with Greg Norman or his agents, including, but not limited to, prior to and during his employment with LIV.

# EXHIBIT 8



About PIF     PIF Investments     The Program     PIF Impact     Newsroom     Investors

Ar

≡

Our History

Since its founding, PIF has evolved and grown from a financial support fund for strategic projects to one of the world's largest sovereign wealth funds.

Who We Are Our History Our Leadership Governance & Investment Decisions Dummy Link

Who We Are

Our History

Our Leadership

Governance
& Investment Decisions

Established in 1971, under Royal Decree No. (M/24), the Fund has been a national economic tributary that has contributed to the establishment of major vital companies locally.

## Our Journey

Established in 1971 under Royal Decree No. M/24, the Fund initially helped establish companies of foundational importance to the Saudi economy, including many "national champions."

PIF was "reborn" in March 2015, when the Kingdom's Council of Ministers issued Resolution 270, which placed the Fund under the direction of the newly formed Council of Economic and Development Affairs (CEDA), with the Crown Prince, HRH Mohammed bin Salman bin Abdulaziz as chairman. This major step gave PIF greater autonomy and better-defined national strategic responsibilities.

This change enabled Saudi Arabia's economy to progress at an accelerated pace, and positioned PIF to be a key driver for Vision 2030, achieving positive, sustainable economic and social change.

# 2015

PIF to report to the Council
Economic and Development Af
(CEDA)

2021

# 1971

PIF establishment as part of Ministry
of Finance

1971

صندوق الاستثمارات العامة
**Public Investment Fund**

All rights reserved to Public Investment Fund © 2017 - 2022

# EXHIBIT 9

Saudi Vision 2030

An ambitious vision for an ambitious nation.

Overview

Vision 2030

VISION
2030
KINGDOM OF SAUDI ARABIA

10/17/22, 5:34 PM

Overview – Vision 2030



# Vision 2030 Overview





Leadership Message

Under the leadership of the Custodian of the Two Holy Mosques, Vision 2030 was launched, a roadmap drawn up by His Royal Highness the Crown Prince, to harness the strengths God bestowed upon us – our strategic position, investment power and place at the center of Arab and Islamic worlds. The full attention of the Kingdom, and our Leadership, is on harnessing our potential to achieve our ambitions.

Since the launch of the vision, we have built a foundation, during which unprecedented reforms were made in the public sector's operating model, the economy and society as a whole. This laid the foundations of success for the future. We faced

https://www.vision2030.gov.sa/v2030/overview/

many challenges and gained a myriad of experiences, which boosted our confidence in achieving our future goals. We worked on improving the effectiveness and response of the government, unlocked opportunities for growth and investment, opened Saudi to the world, built and launched platforms for future growth, and increased citizens' quality of life. These achievements belong to the sons and daughters of this great nation.

## Vision 2030 Draws on The Nation's Intrinsic Strengths

01  Saudi Arabia is the land of the Two Holy Mosques which positions the Kingdom at the heart of the Arab and Islamic worlds

02  Saudi Arabia is using its investment power to create a more diverse and sustainable economy

03  The Kingdom is using its strategic location to build its role as an integral driver of international trade and to connect three continents: Africa, Asia and Europe



A Thriving Ec

An Ambitous

As we continue this transformation, we reaffirm our commitment towards achieving our goals by 2030. We will continue to enable citizens and businesses to unleash their fullest potential, and we will work on diversifying the economy, supporting local content and develop innovative opportunities for the future. This will be through creating an attractive environment for local and foreign investments, in addition to the Public Investment Fund developing and unlocking new sectors.

What has been achieved, and what we seek to achieve, are the fruits of the continuous hard work by Saudi citizens, partnerships with the private and third sectors, which work in harmony to elevate the country's position in the developing world.

What has been achieved, and what we seek to achieve, are the fruits of the continuous hard work by Saudi citizens, partnerships with the private and third sectors, which work in harmony to elevate the country's position in the developing world.

# The Vision Themes



## A Vibrant Society



A vibrant society is vital to achieving the Vision and establishing a strong foundation for economic prosperity.

## A Thriving Economy

A thriving economy provides opportunities for all by building an education system aligned with market needs to give the youth the skills for the jobs of the future, and creating economic opportunities for the entrepreneur, the small enterprise as well as the large corporation.

## An Ambitious Natio




An ambitious nation applies o efficiency and responsibility at levels in order to deliver the Visi including building an effective transparent, accountable, enabl and high-performing governme

Overview - Vision 2030

## Additional files

### Saudi Vision 2030 Document

File Size : 3.6 mb

File Type : PDF

→

EN

10/17/22, 5:34 PM

Overview – Vision 2030

VISION 2030

ABOUT THE KINGDOM

MEDIA CENTER

CONTACT

© All rights reserved to Saudi Vision 2030 - Kingdom of Saudi Arabia 2022

# EXHIBIT 10

 **ESPN.com:** Golf

[Print without images] 

**Friday, October 29, 2021**

# Golf legend Greg Norman set to run competing tour that hopes to begin play in 2022

By Bob Harig
ESPN

Golf icon Greg Norman will put his successful business enterprise aside to become the commissioner of a long-rumored and long-discussed golf league that hopes to begin play in 2022, and he is seeking to sign players to lucrative guaranteed deals with big-money purses.

Norman, 66, announced his association with LIV Golf Investments, backed by the Public Investment Fund (PIF), which is the sovereign wealth fund of Saudi Arabia. Norman will be chief operating officer of the enterprise, as well as commissioner of the new league.

As part of the announcement, Norman said Liv Golf Investments, which will be investing in various golf ventures, has committed a nine-figure sum to help the Asian Tour stage an additional 10 events over the next 10 years.

"This is the biggest decision of my life," Norman said in an interview.

Norman will continue to be based in South Florida to run the new venture while keeping a hand in his golf-course design business.

"What do I do with the Greg Norman Company? It has 12 divisions. I can't do both. I can't put both feet in both office buildings and give 100 percent effort," he said. "So I decided to step away from Greg Norman Company. I'm handing the reins over for the first time in my life to other individuals to run my company.

"That was a big, big decision because that's how much I believe in this. That's how much I believe in the people who have been behind this to get it to a point where we are now taking it and to a point where we will be live and have the first ball in the air in the [spring] of next year."

Norman, a 20-time winner on the PGA Tour who captured two major titles and won 88 times, would not disclose the name or other details or whether any players have signed on to the new league. He would not specify the length of his contract but said he is on board for a "four- to seven-year commitment." In 1993-94, when Norman was in the prime of his playing career, which saw him ranked No. 1 in the world for 331 weeks, he put forth an idea for a World Golf Tour that would see the top players come together in a series of big-money, small-field events. Tim Finchem, commissioner of the PGA Tour at the time, successfully fought the creation of the rival tour, which Norman maintained then and now could have worked had players been allowed to compete on both circuits.

That will remain an issue going forward with the launch of a new league, various iterations of which have been discussed and floated for several years. This venture is not part of a previously disclosed Premier Golf League, which is based in London and has laid out a plan for 18 tournaments and 48-player fields to begin in 2023.

The Liv Golf Investments foray into the Asian Tour is the first step in unveiling what is planned. It suggests some sort of arrangement with the new league as a pathway for players to join it. When the European Tour entered into a strategic alliance with the PGA Tour, it ended its relationship with the Asian Tour that saw a certain number of players earn exemptions while also co-sanctioning several events.

Case 5:22-cv-04486-BLF Document 148-2 Filed 11/09/22 Page 87 of 87

The investment in the Asian Tour will see a commitment of at least $200 million in prize money over a 10-year period to help fund a series of 10 annual marquee events. The series of tournaments will be added to the Asian Tour schedule in 2022.

In turn, the new league likely would be sanctioned by the Asian Tour, which means players could earn World Ranking points, a big issue as news of rival tours surfaced over the past two years. The World Rankings are one of the avenues for qualification for the major championships.

Norman noted the "untapped potential" in the Asia region and suggested the relationship with the Asian Tour is just the start of Liv Golf Investments in various golf endeavors. The Asian Tour's commissioner, Cho Minn Thant, hailed it as a significant milestone, especially in light of losing the association with the European Tour. "This will secure unprecedented new playing opportunities," he said.

The Public Investment Fund is a sovereign wealth fund considered one of the largest in the world, with assets of more than $500 billion. It invests funds on behalf of the government of Saudi Arabia and has been the subject of controversy due to the country's poor human rights record.

"I am pleased that the investor base is 100 percent commercially driven by the opportunity to improve golf for all involved," Norman said. "I am happy to partner with this group of investors to bring the significant resources to bear that are necessary for the fundamental changes required for the greater good of the sport."

The announcement follows a recent one of a 10-year partnership between the Asian Tour and Golf Saudi, which runs the Saudi International, an event formerly part of the European Tour. When the tournament lost its European sanctioning, the PGA Tour said it would not grant releases for its players to play in the tournament.

The event's association with the sanctioned Asian Tour has left the situation unclear. Dustin Johnson, the defending champion, is among several players who have sought releases to play in the tournament in February.

The tournament will become the flagship event of the Asian Tour, although it will not be one of the 10 new events that is part of the series that will take place throughout 2022 and beyond.