# EXHIBIT 38





**LABOR AND AGENTS**

# GSE Worldwide, Wasserman hold big stake in LIV Golf fields

**BY JOSH CARPENTER**

9.1.2022

LIV Golf tees off with its fourth event near Boston tomorrow, and a pair of agencies have a massive stable of players competing for the Saudi-backed tour. A review of all player-agency relationships by SBJ shows that GSE Worldwide and Wasserman both had the biggest influence on players who joined LIV. Of the 48-player field at The International this week, 11 are repped by GSE Worldwide or its subsidiary brand, Impact Point. GSE reps some of LIV's biggest names, including Bryson DeChambeau, Joaquin Niemann and Sergio Garcia, among others. GSE/Impact Point also reps Justin Harding, who has competed in previous LIV events but is not playing this week. Coming in a close second this week is Wasserman, which reps seven golfers in the field, including LIV's highest-ranked player to date in World No. 2 Cam Smith, who is repped by Bud Martin.

British agency CM Management reps five players in LIV, including U.K. players Laurie Canter, Lee Westwood, Ian Poulter and Sam Horsfield, as well as Henrik Stenson. This marks LIV's fourth different field in as many events. The series plans to have a set 48-player field for each event next season.



| PLAYER | AGENCY | PLAYER | AGENCY |
|---|---|---|---|
| Abraham Ancer | GSE Worldwide | Kevin Na | Prosport Management |
| Adrian Otaegui | Rocket Yard Sports | Laurie Canter | CM Management |
| Anirban Lahiri | KHI Management | Lee Westwood | CM Management |
| Bernd Wiesberger | Wasserman | Louis Oosthuizen | GSE Worldwide -- Impact Point |
| Branden Grace | GSE Worldwide -- Impact Point | Martin Kaymer | Sportyard |
| Brooks Koepka | Hambric Sports | Marc Leishman | Wasserman |
| Bryson DeChambeau | GSE Worldwide | Matt Jones | Players Group Management |
| Cameron Smith | Wasserman | Matthew Wolff | Wasserman |
| Cameron Tringale | Wasserman | Paul Casey | GSE Worldwide -- Impact Point |
| Carlos Ortiz | GSE Worldwide -- Impact Point | Pat Perez | No agent |
| Charl Schwartzel | GSE Worldwide -- Impact Point | Patrick Reed | Justine Reed |
| Charles Howell III | 4Sports & Entertainment | Peter Uihlein | 4Sports & Entertainment |
| Chase Koepka | 4Sports & Entertainment | Phachara Khongwatmai | WSM Sports |
| Dustin Johnson | Hambric Sports | Phil Mickelson | Sportfive |
| Eugenio Chacarra | GSE Worldwide -- Impact Point | Richard Bland | International Sports Management |
| Graeme McDowell | Angela Jones Consultancy | Sadom Kaewkanjana | SMG Sport |
| Harold Varner III | Lyon Sports Group | Sam Horsfield | CM Management |
| Henrik Stenson | CM Management | Scott Vincent | NeveRest Management |
| Hudson Swafford | Wasserman | Sergio Garcia | GSE Worldwide -- Impact Point |
| Ian Poulter | CM Management | Shaun Norris | Rocket Yard Sports |
| James Piot | Radegen Sports | Sihwan Kim | Prosport Management |
| Jason Kokrak | GSE Worldwide | Talor Gooch | No agent |
| Jediah Morgan | Wasserman | Turk Pettit | Empire Sports Management |
| Joaquin Niemann | GSE Worldwide -- Impact Point | Wade Ormsby | International Sports Management |

Download the
LIV Golf Player Agents

*Eric Prisbell contributed to this report.*

;

© 2022 Leaders Group. All rights reserved. The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Leaders Group.

1 All Access article remaining   |   **SUBSCRIBE TODAY** ▶

# EXHIBIT 39

FANNATION    SI SWIMSUIT    THE SPUN    ATHLON SPORTS    SI SPORTSBOOK    SI TICKETS    SI SHOP      SUBSCRIBE

**Golf**  |  Home    News    Leaderboard    Travel    Instruction    Gear    Betting    Lifestyle    Shop ⬏



ADVERTISEMENT

# Greg Norman Letter to Players States PGA Tour's Threat of Lifetime Bans is Not Enforceable

As part of the letter to agents and players, Norman attached a two-page document titled, 'PGA Tour Cannot Ban Players Who Join LIV Golf.'

ALEX MICELI • UPDATED: FEB 25, 2022 9:36 PM EST · ORIGINAL: FEB 23, 2022

Greg Norman quietly fired a salvo against the PGA Tour on Friday, which has just come to light on Wednesday.

Norman, the CEO of LIV Golf Investments, sent a letter to players and agents disputing the ability of the PGA Tour to, in his words, impose a "lifetime ban" on players if they decide to play on another Tour. The statement argues that players have the freedom by law to choose how they make a living and that the PGA Tour's threats are impermissible under competition and other laws.

"We will not stay silent in the face of unjust and punitive threats that seek to prevent your clients from pursuing their rightful career opportunities and LIV Golf's right to compete," Norman wrote. "We will not permit the Tour — as the long-standing monopolist over professional golf — to stifle free and fair competition to the detriment of professional golfers and the game itself."

While not a surprise, Norman stated that LIV Golf has retained noted antitrust lawyers to advise them on issues regarding banning players.

And to assist with building a case of anti-competitive behavior, the letter encourages agents and players to ask the PGA Tour to provide them with these threats in writing, along with written opinions of its outside counsel declaring the bans are legal and enforceable.

As part of the letter to agents and players, Norman attached a two-page document, titled, "PGA Tour Cannot Ban Players Who Join LIV Golf." The bullet-pointed document argues why the PGA Tour cannot ban its players and how such actions would be harmful to both the PGA Tour and ultimately its players.

RELATED: Greg Norman Fires Back at PGA Tour With Letter To Commissioner, Accusing Jay Monahan of 'Bullying' And 'Threatening'

PGA Tour commissioner Jay Monahan, in a mandatory player meeting on Tuesday afternoon at the Honda Classic, reiterated the Tour's position that any player that decides to go to the proposed league would be "disbarred" from the PGA Tour, according to a player in attendance.

Monahan told Doug Ferguson of the Associated Press on Wednesday that he informed the players (at the Tuesday meeting) that the Tour is moving on and anyone on the fence needs to make a decision.

He also emphasized anew that players who sign up for a Saudi golf league will lose their PGA Tour membership and should not expect to get it back.

Last week at the Genesis Invitational, world No. 1 Jon Rahm, two-time Saudi International winner Dustin Johnson and Bryson DeChambeau said they were not leaving the PGA Tour for the proposed Saudi league.

In total, nine of the top 12 players in the world have publicly thrown its support behind the PGA Tour, leaving Norman and the Saudi-backed league to look to lesser ranked players.

**More Saudi Golf/Phil Mickelson Coverage:**

- Roundtable: Writers Discuss Off-Record Interviews, Phil's Next Move
- Timeline: Phil Mickelson and the Saudi Golf League, From Beginning to Today
- Callaway to 'Pause' Longtime Relationship with Mickelson
- Video: It's Time for Phil to Hit the Mute Button
- Mickelson Saga is Latest Example of Phil's Ego, Recklessness
- Mickelson Says Interview was Off Record, Apologizes for Word Choice
- Koepka Says Everyone on Tour is Happy – Except Phil
- Monahan Says PGA Tour Focused on Legacy, Not Leverage



# EXHIBIT 40

U.S. Department of Justice

Washington, DC 20530

**Exhibit B to Registration Statement**
**Pursuant to the Foreign Agents Registration Act of 1938, as amended**

INSTRUCTIONS. A registrant must furnish as an Exhibit B copies of each written agreement and the terms and conditions of each oral agreement with his foreign principal, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances by reason of which the registrant is acting as an agent of a foreign principal. Compliance is accomplished by filing an electronic Exhibit B form at https://www.fara.gov.

Privacy Act Statement. The filing of this document is required for the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide the information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the FARA Unit in Washington, DC. Statements are also available online at the FARA Unit's webpage: https://www.fara.gov. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: https://www.fara.gov .

Public Reporting Burden. Public reporting burden for this collection of information is estimated to average .32 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, FARA Unit, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| 1. Name of Registrant | 2. Registration Number |
|---|---|
| Teneo Strategy LLC | 6698 |

3. Name of Foreign Principal
   Public Investment Fund

Check Appropriate Box:

4. ☒ The agreement between the registrant and the above-named foreign principal is a formal written contract. If this box is checked, attach a copy of the contract to this exhibit.

5. ☐ There is no formal written contract between the registrant and the foreign principal. The agreement with the above-named foreign principal has resulted from an exchange of correspondence. If this box is checked, attach a copy of all pertinent correspondence, including a copy of any initial proposal which has been adopted by reference in such correspondence.

6. ☐ The agreement or understanding between the registrant and the foreign principal is the result of neither a formal written contract nor an exchange of correspondence between the parties. If this box is checked, give a complete description below of the terms and conditions of the oral agreement or understanding, its duration, the fees and expenses, if any, to be received.

7. What is the date of the contract or agreement with the foreign principal?   08/03/2022

8. Describe fully the nature and method of performance of the above indicated agreement or understanding.

   The registrant has entered into an agreement with existing foreign principal the Public Investment Fund to extend the term of a consulting project ("Focused Strategy and Structure Diagnostic Project") previously disclosed in the original Exhibit B for the foreign principal and corresponding agreement filed on September 5, 2021. As described in the enclosed agreement, the "Focused Strategy and Structure Diagnostic Project" has been extended until January 20, 2023 and the foreign principal will pay the registrant $2,700,000 (in 12 monthly installments of $225,000). Note that the agreement is dated August 3, 2022 but has an effective date of January 21, 2022.

9.  Describe fully the activities the registrant engages in or proposes to engage in on behalf of the above foreign principal.

    Under the extended agreement, the registrant will continue to provide the foreign principal with the same
    previously-disclosed international communications and stakeholder engagement consulting services with
    respect to the "Focused Strategy and Structure Diagnostic Project" described in the original Exhibit B and
    corresponding agreement filed on September 5, 2021.  In doing so, the registrant will continue to work to
    deliver an international communications and stakeholder engagement plan that will help position the
    foreign principal, "PIF", as a sophisticated global investment organization with a solid track record and
    a targeted investment strategy.

10. Will the activities on behalf of the above foreign principal include political activities as defined in Section 1(o) of the Act[1].

        Yes ☒          No ☐

    If yes, describe all such political activities indicating, among other things, the relations, interests or policies to be influenced
    together with the means to be employed to achieve this purpose. The response must include, but not be limited to, activities
    involving lobbying, promotion, perception management, public relations, economic development, and preparation and
    dissemination of informational materials.

    Under the extended agreement, the registrant will not engage in advocacy before the U.S. government, but
    may continue to engage in the same communications with members of the U.S. media on behalf of the foreign
    principal described in the original Exhibit B for the foreign principal filed on September 5, 2021.

11. Prior to the date of registration[2] for this foreign principal has the registrant engaged in any registrable activities, such as political
    activities, for this foreign principal?

        Yes ☐        No ☐         N/A - This statement is filed to update the registrant's
                                   agreement/contract with the foreign principal.

    If yes, describe in full detail all such activities. The response should include, among other things, the relations, interests, and
    policies sought to be influenced and the means employed to achieve this purpose. If the registrant arranged, sponsored, or
    delivered speeches, lectures, social media, internet postings, or media broadcasts, give details as to dates, places of delivery,
    names of speakers, and subject matter. The response must also include, but not be limited to, activities involving lobbying,
    promotion, perception management, public relations, economic development, and preparation and dissemination of
    informational materials.

    Set forth below a general description of the registrant's activities, including political activities.

    Set forth below in the required detail the registrant's political activities.

    Date            Contact              Method               Purpose

12. During the period beginning 60 days prior to the obligation to register[3] for this foreign principal, has the registrant received from the foreign principal, or from any other source, for or in the interests of the foreign principal, any contributions, income, money, or thing of value either as compensation, or for disbursement, or otherwise?

       Yes ☐     No ☐     N/A – This statement is filed to update the registrant's agreement/contract with the foreign principal.

If yes, set forth below in the required detail an account of such monies or things of value.

| Date Received | From Whom | Purpose | Amount/Thing of Value |
|---|---|---|---|
| | | | |

13. During the period beginning 60 days prior to the obligation to register[4] for this foreign principal, has the registrant disbursed or expended monies in connection with activity on behalf of the foreign principal or transmitted monies to the foreign principal?

       Yes ☐     No ☐     N/A – This statement is filed to update the registrant's agreement/contract with the foreign principal.

If yes, set forth below in the required detail and separately an account of such monies, including monies transmitted, if any.

| Date | Recipient | Purpose | Amount |
|---|---|---|---|
| | | | |

---

1  "Political activity," as defined in Section 1(o) of the Act, means any activity which the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party.

2,3,4  Pursuant to Section 2(a) of the Act, an agent must register within ten days of becoming an agent, and before acting as such.

**EXECUTION**

In accordance with 28 U.S.C. § 1746, and subject to the penalties of 18 U.S.C. § 1001 and 22 U.S.C. § 618, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this statement filed pursuant to the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, that he/she is familiar with the contents thereof, and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

| Date | Printed Name | Signature |
|------|--------------|-----------|
| 08/23/2022 | Lawrence F. Carnevale | /s/Lawrence F. Carnevale |
| | | |
| | | |
| | | |

## EXECUTION

In accordance with 28 U.S.C. § 1746, and subject to the penalties of 18 U.S.C. § 1001 and 22 U.S.C. § 618, the undersigned swears or affirms under penalty of perjury that he/she has read the information set forth in this statement filed pursuant to the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 *et seq.*, that he/she is familiar with the contents thereof, and that such contents are in their entirety true and accurate to the best of his/her knowledge and belief.

| Date | Printed Name | Signature |
|------|-------------|-----------|
| 8/22/22 | LAWRENCE F. CARNEVALE | |
| | | |
| | | |
| | | |

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

**Services Contract**

between

**The Public Investment Fund**

and

**Teneo Strategy LLC**

in connection with Focused Strategy & Structure Diagnostic Project

Dated August 03, 2022

Corresponding to Mhrm 05 1444

عقد خدمات

بين

صندوق الاستثمارات العامة

و

تينيو ستراتيجي المحدودة

فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

بتاريخ ٠٣ اغسطس ٢٠٢٢
الموافق ٥ محرم ١٤٤٤

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096

الرقم المرجعي للعقد : CO-CAD-2022-1096

Received by NSD/FARA Registration Unit   08/23/2022   6:49:25 AM



**Public Investment Fund**

**Services Contract**

صندوق الاستثمارات العامة

عقد خدمات

This contract and all its appendices (herein referred to as (the "**Contract**") is entered by and between:

أبرم هذا العقد بجميع ملاحقه (ويشار إليهم فيما بعد بـ "**العقد**") بين كل من:

1) **The Public Investment Fund**, a government fund established by Royal Decree No. (24/M) and dated 25/6/1391H, and is currently regulated by the Law of the Public Investment Fund issued pursuant to Royal Decree No. M/92 dated 12/8/1440H having its Head Office at Alra'idah Digital City, Building MU04, Al Nakhil District, P.O. Box 6847, Riyadh 11452, Kingdom of Saudi Arabia, (hereinafter referred to as the "**First Party**"), and

١) **صندوق الاستثمارات العامة**، وهو صندوق حكومي تأسس بموجب مرسوم ملكي رقم (٢٤/م) وتاريخ (٢٥/٦/١٣٩١هـ) والصادر في شأنه نظام صندوق الاستثمارات العامة بموجب المرسوم الملكي رقم (م/٩٢) وتاريخ ١٤٤٠/٨/١٢هـ، وعنوان مركزه الرئيسي في مجمع الرائدة المدينة الرقمية، مبنى MU04، حي النخيل، ص.ب. ٦٨٤٧، الرمز البريدي ١١٤٥٢، الرياض، المملكة العربية السعودية، (ويشار إليه فيما بعد بـ "**الطرف الأول**")، و

2) **Teneo Strategy LLC** a limited liability company incorporated pursuant to the laws of the state of Delaware and registered in Delaware under file number 4944124 dated February 23, 2011, having its head office address at 280 Park Avenue, 4th Floor, New York, NY 10017, USA,    (hereinafter referred to as the "**Second Party**").

٢) **تينيو ستراتيجي المحدودة** وهي شركة ذات مسؤولية محدودة مؤسسة وفقاً لأنظمة الولايات المتحدة الأمريكية والمسجلة في ولاية ديلاوير بموجب ملف رقم ٤٩٤٤١٢٤ وتاريخ ٢٠١١/٢/٢٣م وعنوان مركزها الرئيسي في ٢٨٠ بارك أفنيو ص.ب. ١٠٠١٧،نيويورك، الولايات المتحدة الأمريكية، (ويشار إليه فيما بعد بـ "**الطرف الثاني**").

The First Party and Second Party hereinafter referred to as the "**Parties**".

يشار إلى الطرف الأول والطرف الثاني مجتمعين فيما يلي بـ "**الطرفان**" أو "**الطرفين**" حسب ما يقتضيه سياق النص.

**PREAMBLE:**

تمهيد:

A. Whereas the Second Party is specialized in providing strategic consulting and communications advisory services;

أ.  حيث أن الطرف الثاني متخصص في تقديم خدمات الاستشارات الاستراتيجية واستشارات في مجال الاتصالات،

B. Whereas the First Party desires to retain certain services as described in Appendix (1) (**Services**);

ب. وحيث أن الطرف الأول يرغب في الحصول على خدمات معينة حسب التفصيل الوارد في الملحق رقم (١) (**الخدمات**)،

Now therefore the Parties hereto, having due capacity and authority, agree as follows:

فقد اتفق الطرفان وهما بكامل الأهلية المعتبرة شرعاً ونظاماً على ما يلي:

1. **Definitions**

١. التعاريف

Unless the context otherwise requires, the following terms have the following meanings:

يكون للمصطلحات التالية المعاني المبينة أمام كل منها، وذلك ما لم يقتضي سياق النص غير ذلك:

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096

الرقم المرجعي للعقد : CO-CAD-2022-1096

Received by NSD/FARA Registration Unit   08/23/2022   6:49:25 AM

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

| | |
|---|---|
| **"Affiliate"** means, in relation to a body corporate or partnership, any subsidiary or holding entity of such body corporate or partnership, and any subsidiary of any such holding company, in each case from time to time. | "**الشركات التابعة**" فيما يتعلق بأي شخصية اعتبارية أو شراكة، أي شركة تابعة أو مالكة لمثل هذه الشخصية الاعتبارية أو الشراكة، وأي شركة تابعة لهذه الشركة المالكة، في كل حالة على حدة من وقت لآخر. |
| **"Applicable Law"** has the meaning given in Article (24). | "**النظام المطبق**" بحسب المعنى الموضح في المادة (٢٤). |
| **"Business Day"** means the official business days of the First Party. | "**يوم عمل**" يوم عمل بحسب أيام العمل الرسمية للطرف الأول. |
| **"Contract"** means this contract and documents referred to in Article (2). | "**العقد**" هذا العقد والوثائق المشار إليها في المادة (٢). |
| **"Effective Date"** means the starting date for providing the Services as set out in Article (6). | "**تاريخ النفاذ**" تاريخ بداية تقديم الخدمات، حسب ما نصت عليه المادة (٦). |
| **"Fees"** has the meaning given in Article (5). | "**الرسوم**" بحسب المعنى الموضح في المادة (٥). |
| **"Force Majeure"** has the meaning given in Article (17). | "**القوة القاهرة**" بحسب المعنى الموضح في المادة (١٧). |
| **"Services"** has the meaning given in preamble (B). | "**الخدمات**" بحسب المعنى الموضح في الفقرة (ب) من التمهيد. |
| **"Team Members"** has the meaning given in Article (4). | "**فريق العمل**" بحسب المعنى الموضح في المادة (٤). |
| **"The First Party's Intellectual Property Rights"** has the meaning given in Article (13). | "**حقوق الملكية الفكرية للطرف الأول**" بحسب المعنى الموضح في المادة (١٣). |
| **"Services Intellectual Property Rights"** has the meaning given in Article (13). | "**حقوق الملكية الفكرية الخاصة بالخدمات**" بحسب المعنى الموضح في المادة (١٣). |

| | |
|---|---|
| 2.   **Contract Documents** | ٢.   **وثائق العقد** |
| The recitals set forth above and the following documents attached hereto are intended to be, and shall be construed as, an integral part of this Contract: | يشكل التمهيد الوارد أعلاه والوثائق التالية المرفقة بهذا العقد جزء لا يتجزأ من هذا العقد: |
| Appendix No. (1) Services. | الملحق رقم (١) الخدمات. |
| Appendix No. (2) Team Members. | الملحق رقم (٢) فريق العمل. |
| Appendix No. (3) Fees. | الملحق رقم (٣) الرسوم. |
| In case of any contradiction between the terms of this Contract and any of its appendices, the terms of the Contract shall prevail. | وفي حال وجود أي تعارض بين أحكام العقد وأي من ملاحقه فيكون لأحكام هذا العقد الأولية في التطبيق. |

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096   الرقم المرجعي للعقد :

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

| | |
|---|---|
| **3. Services** | ٣. الخدمات |

a. The Second Party shall provide the Services as set out in Appendix No. (1) (**Services**).

أ. يلتزم الطرف الثاني بتقديم الخدمات على النحو المحدد في الملحق رقم (١) (الخدمات).

b. The Second Party represents to the First Party that it has the required professional skills, personnel and technical resources to provide the Services.

ب. يقر الطرف الثاني للطرف الأول أن لديه المهارات المهنية والموارد البشرية والفنية اللازمة لتقديم تلك الخدمات.

c. The Second Party shall ensure full and proper performance of the Services and guarantee their quality, validity and suitability for the intended purpose. In case of any fault or failure in the performance of the Services as compared to the scope of Services, the Second Party shall within ten (10) Business Days from the date of the First Party's notice of such fault or failure, with no additional cost to the First Party, rectify, modify or re-implement the Services. Otherwise, the First Party will have the right to have the Services rectified, modified or re-implemented on the Second Party's account. In this case, the First Party has the right to deduct such amounts from any dues of the Second Party resulting from this Contract or any other contract the Second Party has with the First Party.

ج. يلتزم الطرف الثاني بأداء الخدمات بشكل كامل، مع ضمان جودتها وصلاحيتها وملاءمتها لما أعدت له. وفي حال وجود أي خطأ أو قصور في تقديم الخدمات عما هو وارد في نطاق الخدمات، فسيقوم الطرف الثاني بتصحيح أو تعديل أو إعادة أداء هذه الخدمات خلال مدة أقصاها عشرة (١٠) أيام عمل من تاريخ إشعاره بذلك من قبل الطرف الأول بدون أية مطالبة مالية إضافية. وفي حال عدم التزام الطرف الثاني بتعديل الخطأ أو القصور خلال المدة المشار إليها أعلاه، يحق للطرف الأول تصحيح أو تعديل أو إعادة أداء هذه الخدمات على حساب الطرف الثاني. وفي هذه الحالة، يحق للطرف الأول استقطاع هذه المبالغ من أي مستحقات للطرف الثاني ترتبت بناء على هذا العقد أو أي عقد آخر مع الطرف الأول.

d. The First Party may, at any time, during the period of the Contract, review the Services and its conformity to what is provided by the Second Party in its reports or invoices, and First Party may also conduct such review if necessary at the Second Party's premises after giving the Second Party three (3) Business Days prior written notice. Such review right shall include access to any documents related to the performance of the Services.

د. للطرف الأول في أي وقت أثناء مدة العقد أن يقوم بمراجعة الخدمات ومدى تطابقها مع ما يقدمه الطرف الثاني في تقاريره أو فواتيره، كما أن للطرف الأول الحق في أن يقوم بهذه المراجعة في مكاتب الطرف الثاني متى تطلب الأمر ذلك بعد إعطائه إشعاراً مكتوباً بمهلة مسبقة قدرها ثلاثة (٣) أيام عمل، ويشمل حق المراجعة الاطلاع على جميع الوثائق والمستندات المتصلة بأداء الخدمات.

e. The Second Party shall adhere to all laws, regulations and resolutions issued by the competent authorities, with respect to the performance of the Services. The Second Party shall bear all fees and expenses determined by such authorities, and also any penalties, whatsoever, arising from violation of such laws, regulations and decisions.

هـ. على الطرف الثاني أن يتقيد بجميع الأنظمة واللوائح والقواعد والقرارات الصادرة عن الجهات المختصة فيما يتعلق بتأدية الخدمات، وأن يتحمل جميع الرسوم والمصروفات التي تقررها تلك الجهات، كما أنه يتحمل المسؤولية والغرامات المقررة أياً كان نوعها بسبب مخالفته لتلك الأنظمة واللوائح والقرارات.

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة  وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096 : الرقم المرجعي للعقد

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

**4. Team Members and Due Care**

a. The Second Party undertakes to dedicate a team of its employees having the experience and expertise to deliver the Services to the First Party whose names, titles, qualifications and requirements are described in Appendix No. (2) (**Team Members**).

b. The Second Party shall not, except in case of annual or sick leaves, change any of its Team Members without the prior written consent of First Party. The Second Party has to seek such consent in writing ten (10) Business Days before the date of such required change.

c. In case of resignation or absence of any Team Member for any reason, the Second Party shall notify the First Party of such resignation or absence within three (3) Business Days.

d. The First Party may request the replacement of a Team Member by written notice to the Second Party, and the Second Party shall appoint a substitute acceptable to the First Party within three (3) Business Days from the notice date, without prejudice to the First Party's right to subsequently evaluate the performance of any substitute Team Member and whether to accept or reject such substitute.

e. The Second Party shall perform the Services and carry out its obligations under this Contract with all due care and efficiency in accordance with the applicable professional standards and practices, observe sound management practices, employ appropriate advanced technology.

**5. Fees and Payment**

a. In consideration for the Services provided by the Second Party, the First Party shall pay the fees set out in Appendix No. (3) (**Fees**).

b. Payments due to the Second Party shall be made against invoices delivered to the First Party as outlined in Appendix No. (3) (**Fees**). The First Party shall settle the

٤. فريق العمل والعناية اللازمة

أ. يتعهد الطرف الثاني بتكريس فريق عمل ممن يعملون لديه من ذوي الخبرة والاختصاص لتقديم الخدمات للطرف الأول، حسب الأسماء والمسميات والمؤهلات والمتطلبات الموضحة في الملحق رقم (٢) (**فريق العمل**).

ب. لا يجوز للطرف الثاني ـ فيما عدا حالات الإجازات السنوية والمرضية ـ أن يغيّر أياً من أعضاء فريق العمل إلا بموافقة خطية مسبقة من الطرف الأول، والتي يجب أن يطلبها الطرف الثاني خطياً قبل عشرة (١٠) أيام عمل من تاريخ التغيير المطلوب.

ج. في حال استقالة أو تغيب أي من أعضاء فريق العمل لأي سبب كان، يجب على الطرف الثاني إشعار الطرف الأول خلال ثلاثة (٣) أيام عمل من تاريخ الاستقالة أو التغيب.

د. للطرف الأول أن يطلب تغيير أي من أعضاء فريق العمل بموجب إشعار خطيّ موجه إلى الطرف الثاني. ويجب على الطرف الثاني توفير بديل خلال ثلاثة (٣) أيام عمل من تاريخ إشعاره بذلك، مع عدم الإخلال بحق الطرف الأول في تقييم وقبول أو رفض أي عضو بديل أو جديد.

هـ. يلتزم الطرف الثاني بأداء الخدمات وتنفيذ التزاماته بموجب هذا العقد بالعناية والكفاءة اللازمة ووفقاً للأساليب والممارسات المهنية ذات العلاقة، وبمراعاة الممارسات الإدارية السليمة، وباستخدام التقنيات المتقدمة المناسبة.

٥. الرسوم والدفع

أ. مقابل الخدمات التي يقدمها الطرف الثاني، يقوم الطرف الأول بدفع الرسوم الموضحة في الملحق رقم (٣) (**الرسوم**).

ب. تدفع المبالغ المستحقة للطرف الثاني بموجب فواتير تقدم إلى الطرف الأول وفق ما هو موضح في الملحق رقم (٣) (**الرسوم**). يقوم الطرف الأول بتسوية

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة  وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096 : الرقم المرجعي للعقد



**Public Investment Fund**

**Services Contract**

صندوق الاستثمارات العامة

عقد خدمات

invoice within thirty (30) Business Days from the First Party's acceptance of the relevant services and supporting documents.

الفواتير خلال ثلاثين (٣٠) يوم عمل من تاريخ قبوله للخدمات ذات العلاقة والمستندات المؤيدة.

c. The Second Party acknowledged that it shall not claim any additional fees or amounts (not included in this Contract) without the prior written approval of the authorized representative of the First Party.

ج. يقر الطرف الثاني بأنه لا يحق له مطالبة الطرف الأول بأي رسوم أو مبالغ إضافية (غير مشمولة في هذا العقد) ما لم يتم الحصول على الموافقة الخطية المسبقة على ذلك من قبل الشخص المفوض للطرف الأول.

**6. Term**

٦. المدة

This Contract shall commence from January 21, 2022 ("Effective Date") and shall expire on January 20, 2023 unless terminated earlier pursuant to Article (7).

يبدأ هذا العقد من تاريخ ٢١ يناير ٢٠٢٢ ("**تاريخ النفاذ**") وينتهي بتاريخ ٢٠ يناير ٢٠٢٣ ما لم يتم إنهاؤه قبل ذلك وفقاً للمادة (٧).

**7. Termination and Withdrawal of Work**

٧. إنهاء العقد وفسخ العمل

a. The First Party may terminate the Contract at any time for cause or without cause pursuant to a seven (7) Business Days prior written notice of termination to the Second Party. In the event of termination, the First Party shall pay the Second Party its Fees which have been incurred and approved by the First Party up until such termination date.

أ. يجوز للطرف الأول إنهاء العقد في أي وقت بسبب أو دون سبب وذلك بموجب إشعار إنهاء خطي للطرف الثاني قبل الإنهاء بثلاثة (٧) أيام عمل. وفي حالة الإنهاء يدفع الطرف الأول الأتعاب التي تكبدها الطرف الثاني ووافق عليها الطرف الأول حتى تاريخ الإنهاء.

b. The First Party has the right to withdraw the work from the Second Party and complete the remaining Services on the Second Party's account in any of the following cases:

ب. للطرف الأول الحق في سحب العمل وأداء باقي الخدمات على حساب الطرف الثاني وذلك في أي من الحالات الآتية:

1. If the Second Party has not performed the Services as per its contractual obligations, the First Party's requirements and instructions, or is delayed in its execution of the Services in manner where it is not expected to complete them in the prescribed time, provided that a five (5) Business Days prior written warning of termination is sent to the Second Party.

١. إذا لم يقم الطرف الثاني بأداء الخدمات حسب بنود العقد أو متطلبات وتعليمات الطرف الأول أو تأخر في أداء الخدمات على نحو لا يتوقع معه إكمالها في الوقت المحدد وفقاً لتقدير الطرف الأول، شريطة أن يسبق ذلك توجيه إنذار مكتوب مدته خمس (٥) أيام عمل للطرف الثاني.

2. If it is proven that the Second Party, either by itself or through others, directly or indirectly, paid any money or provided any benefit or promised to do so, in order to enter into this Contract, this does not abrogate the Second Party from any criminal liability in respect of such actions. Upon the occurrence of such case, the First Party also shall have the right to terminate any other agreements entered into with the Second Party.

٢. إذا ثبت أن الطرف الثاني قد شرع بنفسه أو بوساطة غيره بطريقة مباشرة أو غير مباشرة بدفع شيء من المال أو أي قدم أي منفعة أخرى أو وعد بأي من ذلك في سبيل الحصول على هذا العقد، ولا يلغي ذلك مسؤولية الطرف الثاني الجنائية عن تلك التصرفات. وعند حدوث أي من الحالات المذكورة في هذه الفقرة، يحق للطرف الأول أيضاً إنهاء أي اتفاقية أخرى مبرمة مع الطرف الثاني.

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة  وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096   الرقم المرجعي للعقد :



**Public Investment Fund**

**Services Contract**

صندوق الاستثمارات العامة

عقد خدمات

3. If the Second Party failed to perform any of its obligations under this Contract, abandons it, assigns or sub-contracts wholly or partly without the First Party's prior written consent.

4. If the Second Party is declared bankrupt or insolvent, requests declaration of bankruptcy or insolvency, is put under receivership, dissolved or liquidated.

٣. إذا أخل الطرف الثاني بأي التزام من التزاماته بموجب هذا العقد أو تخلى عنه أو قام بتحويله أو التنازل عنه دون الحصول على موافقة مكتوبة مسبقة من الطرف الأول.

٤. إذا أفلس الطرف الثاني أو طلب إشهار إفلاسه أو ثبت إعساره أو صدر أمر بوضعه تحت الحراسة أو بدأ في إجراءات التصفية.

**8. Tax**

The Second Party shall be liable for such taxes, fees and other impositions as may be levied under Applicable Law, the amount of which is deemed to have been included in the Fees. The Second Party acknowledges that the First Party is required under Applicable Law to deduct from payment of each installment of the Fees an amount equal to the tax percentage applied on this Contract, and pay the deducted amount on behalf of the Second Party to the Zakat, Tax and Custom Authority [ZATCA] For the avoidance of doubt, if the value-added tax ("**VAT**") is required by Applicable Law, the Fees contained in this Contract shall be exclusive of such VAT, which will be added separately in each invoice.

**٨. الضرائب**

يلتزم الطرف الثاني بدفع الضرائب والرسوم والأعباء الأخرى التي يفرضها النظام المطبق والتي يعتبر مبلغها مشمولاً ضمن الرسوم، ويدرك الطرف الثاني إن الطرف الأول ملزم بموجب النظام المطبق بخصم مبلغ يعادل النسبة الضريبية المطبقة على هذا العقد من كل دفعه من الرسوم، ودفع ذلك المبلغ المخصوم نيابة عن الطرف الثاني إلى هيئة الزكاة والضريبة والجمارك في المملكة العربية السعودية. ومنعاً للشك، في حال كانت ضريبة القيمة المضافة ملزمة وفقاً للنظام المطبق، تكون الرسوم الواردة في هذا العقد غير مشمولة بهذه الضريبة والتي ستضاف بشكل منفصل في كل فاتورة.

**9. Conflict of Interest**

Neither the Second Party nor its Team Members nor its Affiliates (or any of its subcontractors) shall engage, either directly or indirectly, in any business or professional activities which conflict or would raise conflict of interest with the activities assigned to them under this Contract.

**٩. تعارض المصالح**

لا يجوز للطرف الثاني أو فريق عمله أو الشركات التابعة له (أو أي ممن يتعاقد معه الطرف الثاني من الباطن) أن يقوموا بشكل مباشر أو غير مباشر بأي أعمال أو أنشطة مهنية تتعارض أو قد ينتج عنها تعارض مصالح مع الأعمال الموكّلة إليهم بمقتضى هذا العقد.

**10. Subcontracting**

a. The Second Party shall not subcontract all or any part of the Services without the First Party's prior written consent. Such written consent shall not exempt the Second Party from its liabilities or obligations under the Contract and the Second Party shall remain liable for all actions, default or negligence of the subcontractor, its

**١٠. التعاقد من الباطن**

أ. لا يجوز للطرف الثاني أن يتعاقد من الباطن لأداء جميع الخدمات أو أي جزء منها دون الحصول على موافقة خطية مسبقة من الطرف الأول، ولا تعفي هذه الموافقة الطرف الثاني من المسؤوليات والالتزامات المترتبة عليه بموجب هذا العقد، ويظل الطرف الثاني مسؤولاً عن كل تصرف أو خطأ أو إهمال

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة  وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركّزة.

Contract Reference Number: CO-CAD-2022-1096    الرقم المرجعي للعقد :

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

| | |
|---|---|
| agents or employees as if they were the actions, default or negligence of the Second Party. | يصدر من جانب أي متعاقد معه من الباطن أو من وكلائه أو من العاملين لديه كما لو كان صادراً عن الطرف الثاني. |
| b. The Second Party shall ensure that its contracts with subcontractors include the obligations in this Contract. | ب. يلتزم الطرف الثاني بأن يضمّن عقود المتعاقدين معه من الباطن نصاً يقضي بسريان الالتزامات الواردة في هذا العقد. |

**11. Liability and Indemnity**

١١. المسؤولية والتعويض

a. The Second Party shall be fully responsible for performing its obligations stated in the Contract within the agreed upon phases, specifications, periods and applicable professional standards..

أ. يكون الطرف الثاني مسؤولاً مسؤولية كاملة عن أداء التزاماته المترتبة بموجب هذا العقد حسب المراحل والمواصفات والمدد الزمنية المتفق عليها، والمعايير المهنية المعمول بها..

b. Without prejudice to First Party's right to terminate the Contract, in the event of a default, negligence or impediment to the progress of work and performance of Services by the Second Party or any of its Team Members which the Second Party could have avoided by taking the necessary precautions, and such default, negligence or impediment causes any kind of damage to, or increase to the expected expenses of, the First Party then the Second Party shall be liable for any resulting material or moral damages or consequences to an amount not exceeding five (5) times of the value of the contract. If the contribution of the Second Party or its Team Members to the default, negligence or impediment was deemed partial, at the discretion of the First Party, then the Second Party liability shall be partial and proportional to its contribution to such default, negligence or impediment.

ب. مع عدم الإخلال بحق الطرف الأول في إنهاء العقد، في حال حدوث أي خطأ أو إهمال أو معوق لسير العمل وأداء الخدمات من قبل الطرف الثاني أو فريق عمله، وكان بإمكان الطرف الثاني تفاديه باتخاذ الاحتياطات اللازمة، وتسبب هذا الخطأ أو الإهمال أو المعوق في حدوث ضرر للطرف الأول بأي شكل من الأشكال، أو بزيادة الأعباء والمصروفات على الطرف الأول عما هو متوقع، يكون الطرف الثاني مسؤولاً عن كل ما يترتب على ذلك من تعويض أو تبعات سواء كانت مادية أو معنوية بما لايتجاوز خمسة (٥) أضعاف قيمة العقد. وفي حال كانت مساهمة الطرف الثاني أو أي من فريق عمله في حدوث الخطأ أو الإهمال أو المعوق مساهمة جزئية وفق تقدير الطرف الأول، يعتبر الطرف الثاني مسؤولاً مسؤولية جزئية ويسأل عن الضرر بمقدار مساهمته في حدوث الخطأ أو الإهمال.

c. In the event that the Second Party becomes in delay for delivering the Service on the agreed upon due date(s), the First Party has the right to impose a delay fine on the Second Party for each day of delay to be calculated on the basis of dividing the total value of the Contract by the total number of days during which the Services must be provided and deduct the amounts corresponding to the delayed days, however such delay fine shall not exceed (10%) of the total value of this Contract. In addition to the delay fine, the First Party shall be freely entitled to exercise all of its remedies and rights provided under this Contract. In this case, the First Party has the right to deduct such fine from any dues of the Second Party resulting from this Contract or

ج. يحق للطرف الأول في حال تأخر الطرف الثاني في تسليم الخدمات حسب المواعيد المتفق عليها فرض غرامة تأخير على الطرف الثاني عن كل يوم تأخير، ويتم احتساب الغرامة عبر تقسيم كامل قيمة العقد على مجموع الأيام التي يجب تسليم الخدمات خلالها، ومن ثم خصم المبالغ المقابلة لأيام التأخير بشرط ألا تتجاوز غرامة التأخير ما يعادل (١٠%) من إجمالي قيمة هذا العقد. وبالإضافة إلى غرامة التأخير، يكون للطرف الأول الحق في الحصول على جميع التعويضات والحقوق المنصوص عليها في هذا العقد. وفي هذه الحالة، يحق للطرف الأول استقطاع هذه الغرامة من أي مستحقات للطرف الثاني ترتبت بناء على هذا العقد أو أي عقد آخر مع الطرف الأول.

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project    عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096    الرقم المرجعي للعقد :



**Public Investment Fund**

**Services Contract**

صندوق الاستثمارات العامة

عقد خدمات

any other contract the Second Party has with the First Party.

d. If the First Party exercises his right mentioned in Section (c) above, the delay fine shall become due without need to serve any notice, file any legal action or prove any damage or losses, provided that the delay is not caused by an action attributed to the First Party.

e. The Second Party acknowledges that upon the occurrence of any delay to executing this Contract caused by it, the First Party shall have the right to suspend any payments whether related to this Contract or any other agreements with the Second Party.

**12. Confidentiality**

a. The Second Party undertakes to treat as secret and confidential, and shall not at any time for any reason disclose or permit to be disclosed to any person or otherwise make use of or permit use of any information obtained under the Contract for any purpose other than the performance of the Services. If, for the purpose of performing the Services, it is required to disclose such information or any part thereof, the Second Party shall obtain the prior written consent from the First Party and acknowledges that it will be fully liable for any breach of the confidentiality, without prejudice to First Party's right of recourse, if it is in the First Party's interest.

b. The provisions of this Article shall be applied to all Team Members of the Second Party, its subcontractors and Affiliates. The Second Party shall, after receiving the First Party's prior written consent to share information with third parties, impose similar obligations on the receiving parties in order to ensure maintaining the confidentiality of information prior to disclosing any information related to the Contract.

c. These obligations will not apply to information which the Second Party as the recipient can demonstrate: (i) is or becomes legally available to the public; (ii) is legally known to, or legally in the position of, the

د. في حالة استخدام الطرف الأول لحقه المشار إليه في الفقرة (ج) أعلاه، تستحق غرامة التأخير دون الحاجة لتقديم أي إشعار أو اتخاذ أي إجراء قانوني أو إثبات على وقوع ضرر أو خسائر، مالم يكن التأخير قد حدث بسبب يعزى للطرف الأول.

هـ. يقر الطرف الثاني أنه في حال حدوث أي تأخير في تنفيذ هذا العقد يكون هو المتسبب به، فيحق للطرف الأول إيقاف أية دفعات متصلة بهذا العقد أو بأي اتفاقيات أخرى مع الطرف الثاني.

**١٢. السرية**

أ. يتعهد الطرف الثاني بمعاملة جميع المعلومات المتصلة بموضوع هذا العقد أو التي حصل عليها نتيجةً لأدائه الخدمات بسرية تامة، ويقر الطرف الثاني بأنه لن يقوم في أي وقت بالإفصاح أو يسمح بالإفصاح عنها لأي شخص أو استخدامها أو السماح باستخدامها لأي غرض كان عدا ما هو مرتبط بأداء الخدمات المتفق عليها. وفي حال الحاجة إلى الإفصاح عن هذه المعلومات أو أي منها بغرض أداء الخدمات، يلتزم الطرف الثاني بالحصول على الموافقة الكتابية المسبقة من الطرف الأول، ويقر الطرف الثاني بأنه سيكون مسؤولاً مسؤولية كاملة عن أي مخالفة لهذه السرية يرتكبها هذا الشخص، وذلك دون الإخلال بحق الطرف الأول بالرجوع على ذلك الشخص متى كان هذا في مصلحته.

ب. تسري أحكام هذه المادة على فريق عمل الطرف الثاني والمتعاقدين معه من الباطن والشركات التابعة له. كما يلتزم الطرف الثاني، بعد حصوله على موافقة كتابية مسبقة من الطرف الأول لمشاركة المعلومات مع أطراف أخرى، بفرض التزامات مثيلة للحفاظ على سرية المعلومات قبل افصاحه لهم بأية معلومات متصلة بموضوع العقد.

ج. لا ينطبق التزام السرية على المعلومات التي يتلقاها الطرف الثاني ويستطيع أن يثبت بـ (أ) أنها متاحة للجمهور حال تلقيها أو أصبحت كذلك فيما

Page **9** of 20

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096   الرقم المرجعي للعقد :

Received by NSD/FARA Registration Unit    08/23/2022  6:49:25 AM



| | |
|---|---|
| **Public Investment Fund** | صندوق الاستثمارات العامة |
| **Services Contract** | عقد خدمات |

Second Party prior to the date hereof, (iii) is legally obtained from a third party who owes no obligation of confidence in respect of it; (iv) is or has been independently developed by the Second Party without use or reference to any confidential information or breach of this Contract.

بعد بطريقة نظامية؛ أو (ب) أنها كانت معروفة للطرف الثاني أو في حوزته بشكل نظامي قبل تلقيها من الطرف الأول؛ أو (ج) أنه حصل عليها بشكل نظامي من طرف ثالث لا يتمتع بأي التزام للسرية مرتبط بها؛ أو (د) أنه تم تطويرها بشكل مستقل من قبل الطرف الثاني دون استخدام أو الإشارة إلى المعلومات السرية ودون الإخلال بهذا العقد.

d. As an exception to the above, the Second Party may disclose confidential information to the extent that is requested pursuant to, or required by, Applicable Law, regulation or order of any court or other governmental, regulatory or supervisory body; provided, however, that prior to any such compelled disclosure, the Second Party shall, to the extent legally permitted, give the First Party reasonable advance written notice to allow the First Party to object to such use or disclosure of confidential information. In all cases the disclosure of the confidential information must be limited only by the requirement of the relevant authorities.

د. وكاستثناء مما ذكر أعلاه، يكون الطرف الثاني مخولاً بالإفصاح عن المعلومات السرية بموجب القانون والأنظمة والتعليمات أو بموجب طلب أي من الهيئات العامة أو الإدارية أو القضائية شريطة أن يقدم للطرف الأول إشعاراً خطياً ومهلة كافية للاعتراض على استعمال أو الإفصاح عن المعلومات السرية. وفي جميع الأحوال يجب أن يكون الإفصاح عن المعلومات السرية محصوراً بالحد المطلوب من قبل الجهة ذات العلاقة.

e. The Second Party undertakes to return all the First Party's documents and any relevant property which may be in its possession or under its control, upon accomplishment of the Services or termination of the Contract. The Second Party may not retain a copy of such documents, except to satisfy any legal, regulatory or requirements and subject to this Section 12.

هـ. يتعهد الطرف الثاني فور انتهاء العقد أو إنهائه، بإعادة جميع المستندات والممتلكات التي حصل عليها من الطرف الأول لأداء عمله. ولا يجوز للطرف الثاني الاحتفاظ بنسخ من هذه المستندات، باستثناء تلبية أي متطلبات قانونية أو تنظيمية وتخضع للبند (١٢).

f. The Second Party shall not refer to the First Party, the Services or the Contract in any announcement, statement, disclosure or proposal before obtaining the prior written consent of the First Party. The Second Party is also prohibited from referring to the First Party for any promotional or advertising purpose before obtaining the prior written consent of the First Party.

و. لا يجوز للطرف الثاني الإشارة في أي إعلان أو بيان أو إفصاح أو عرض إلى الطرف الأول أو العقد أو الخدمات قبل حصوله على موافقة خطية مسبقة من الطرف الأول. كما يحظر على الطرف الثاني الإشارة إلى الطرف الأول لأغراض الترويج أو الدعاية قبل حصوله على موافقة خطية مسبقة من الطرف الأول.

### 13. Intellectual Property Rights

١٣. حقوق الملكية الفكرية

a. The parties foresee that the Second Party or Team Members may make, conceive, develop and/or create Intellectual Property in the course of providing the Services.

أ. يعلم الطرفان أن الطرف الثاني أو أفراد فريق العمل قد يكتشفون أو يطورون أو يخترعون ملكيات فكرية أثناء تقديم الخدمات.

b. In this Article:

ب. في هذه المادة:

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096    الرقم المرجعي للعقد :

Received by NSD/FARA Registration Unit    08/23/2022  6:49:25 AM

Case 5:22-cv-04486-BLF   Document 169-3   Filed 12/02/22   Page 23 of 76

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

1) Intellectual Property Right means an invention, utility model, trade mark, service mark, business name, work which is subject matter of copyright or related rights, industrial design, patent, know-how, trade secret and any other intellectual property right of any nature whatsoever throughout the world (whether registered or unregistered and including all applications and rights to apply for the same) which:

   I. relates to or is useful in connection with the business or service of the First Party ("**The First Party's Intellectual Property Rights**"); or

   II. is invented, developed, created or acquired by the Second Party or the Team Members (whether alone or jointly with any other person) specifically and exclusively for the First Party in the course of providing the Services during the course of this Contract ("**Services Intellectual Property Rights**");

2) **Services IP Materials** means any documents (whether in electronic, paper or other form) constituting or relating to any Services Intellectual Property Right.

c. The Second Party hereby agrees and shall procure that each Team Member agrees that based on the type of subject matter, all available intellectual property rights in any Services Intellectual Property Rights, unless otherwise inalienable, would be exclusively owned by the First Party which arise in the course of performing the Services.

d. The Second Party agrees and shall procure that each Team Member agrees to sign all documents and do all other acts which the First Party requests (at its expense) to enable the First Party to enjoy the full benefits of this Article.

e. The Second Party and Team Members may only use the First Party's Intellectual Property Rights and Services IP Materials to perform their obligations under this Contract, and shall not disclose any of the First Party's Intellectual Property Rights or Services IP

١) يقصد بحق الملكية الفكرية أي اختراع، أو نموذج منفعة، أو علامة تجارية، أو علامة خدمة، أو اسم لعمل تجاري، أو عمل يكون موضوعاً لحقوق النشر أو حقوق مماثلة، أو تصميم صناعي، أو براءة اختراع، أو معرفة عملية، أو سر تجاري، وغيرها من حقوق الملكية الفكرية أياً كانت طبيعتها في العالم (سواء كانت مسجلة أو غير مسجلة، وتشتمل على كافة تطبيقات أو حقوق تطبيقها) والتي:

I. تتعلق بأعمال أو خدمات الطرف الأول أو ذات فائدة مرتبطة بما ("**حقوق الملكية الفكرية للطرف الأول**")؛ أو

II. يقوم الطرف الثاني أو فريق العمل باختراعها، أو تطويرها، أو إنشائها، أو الحصول عليها (بشكل منفرد أو مع أي شخص آخر) بشكل خاص وحصري للطرف الأول في سياق تقديم الخدمات أثناء مدة هذا العقد ("**حقوق الملكية الفكرية الخاصة بالخدمات**")؛

٢) تعني **مواد الملكية الفكرية الخاصة بالخدمات** أي وثائق (سواء كانت إلكترونية أو مطبوعة أو غير ذلك) تشكل أو تتعلق بأي حق للملكية الفكرية الخاصة بالخدمات.

ج. يوافق الطرف الثاني بموجب هذا العقد ويضمن موافقة كل فرد من فريق العمل على أن جميع حقوق الملكية الفكرية المتصلة بحقوق الملكية الفكرية الخاصة بالخدمات والتي نشأت وقت تقديم الخدمات، مملوكة بشكل حصري للطرف الأول، مالم تكن تلك الحقوق غير قابلة للنقل.

د. يوافق الطرف الثاني بموجب هذا العقد ويضمن موافقة كل فرد من فريق العمل على التوقيع على كافة الوثائق والقيام بجميع الأعمال التي يطلبها الطرف الأول (على نفقته) وذلك لضمان تمتعه بجميع الحقوق المنصوص عليها في هذه المادة.

هـ. لا يمكن للطرف الثاني أو فريق العمل استخدام حقوق الملكية الفكرية للطرف الأول أو مواد أو حقوق الملكية الفكرية الخاصة بالخدمات إلا من أجل أداء التزاماتهم بموجب هذا العقد، كما يجب على الطرف الثاني وفريق العمل عدم الإفصاح عن أي من حقوق الملكية الفكرية للطرف الأول أو مواد أو حقوق

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096   الرقم المرجعي للعقد :

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

| | | |
|---|---|---|
| | Materials to any third party without the prior written consent of the First Party. | الملكية الفكرية الخاصة بالخدمات لأي طرف ثالث دون الحصول على موافقة خطية مسبقة من الطرف الأول. |
| f. | The Second Party further agrees that it will not claim ownership rights to the work which is subject matter of copyright, or any derivative, compilation, sequel or series, or related work either created by Second Party or by the First Party. | و. يوافق الطرف الثاني كذلك على أنه لا يحق له المطالبة بملكية الحقوق لأي عمل يكون موضوعاً لحقوق النشر، أو أي جزء مشتق منها، أو مادة مجمعة أو تتمة أو سلسلة أو أي عمل مرتبط به سواء تم إنشائه من قبل الطرف الثاني أو الطرف الأول. |
| g. | The Second Party shall and shall procure that each Team Member shall immediately transfer to the First Party all Services IP Materials in their possession or under their control when this Contract expires or terminates for any reason, or at any time when the First Party requests transfer. No copies or other record of any Services IP Materials may be retained by the Second Party except with the prior written consent of the First Party. | ز. يجب على الطرف الثاني بشكل فوري نقل، وأن يضمن قيام كل فرد من فريق العمل بنقل كافة مواد الملكية الفكرية الخاصة بالخدمات للطرف الأول مما يكون في حوزتهم أو تحت سيطرتهم عند انتهاء فترة العقد أو إنهائه لأي سبب، أو في أي وقت يطلب منه الطرف الأول نقلها. ولا يمكن للطرف الثاني الاحتفاظ بأي نسخ أو سجل لمواد الملكية الفكرية الخاصة بالخدمات إلا بعد الحصول على موافقة خطية مسبقة من الطرف الأول. |

### 14. Second Party's Representations and Undertakings

The Second Party acknowledges and undertakes the following:

١٤. إقرارات وتعهدات الطرف الثاني

يقر ويتعهد الطرف الثاني بما يلي:

| | | |
|---|---|---|
| a. | It has been duly incorporated pursuant to the laws of the State of Delaware, USA, and has submitted a valid copy of the relevant documents to the first party. | أ. أنه مؤسس بشكل قانوني بموجب الأنظمة المعمول بها في ولاية ديلاوير، الولايات المتحدة الأمريكية ، وقد قدم نسخ سارية من المستندات المؤيدة لذلك للطرف الأول. |
| b. | It has the full right, authority and capacity to enter into this Contract and full the obligations thereunder and that the Contract is legal, enforceable and binding in accordance with its terms. | ب. أنه يملك كامل الحق والصلاحية والقدرة على توقيع هذا العقد، وتنفيذ الالتزامات الواردة فيه، ويشكل هذا العقد التزاماً نظامياً وملزماً ونافذاً وفقاً لشروطه. |
| c. | It is in compliance with the Applicable Law and all relevant laws and procedures necessary to maintain all licenses, permits and certificates required to provide the Services pursuant to this Contract, and it has submitted a valid copy of the relevant documents to the first party. | ج. أنه ملتزم بالنظام المطبق وبجميع الأنظمة والإجراءات ذات العلاقة الضرورية للمحافظة على جميع التراخيص والتصاريح والشهادات المطلوبة لتنفيذ الخدمات وفقاً لهذا العقد، وقد قدم نسخ سارية من المستندات المؤيدة لذلك للطرف الأول. |
| d. | Its license has never been suspended or cancelled. | د. أنه لم يسبق أن تم سحب أي من تراخيصه مؤقتاً أو إلغائها. |

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

Contract Reference Number: CO-CAD-2022-1096

عقد خدمات بين صندوق الاستثمارات العامة  وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

الرقم المرجعي للعقد : CO-CAD-2022-1096



**Public Investment Fund**

**Services Contract**

<div dir="rtl">

صندوق الاستثمارات العامة

عقد خدمات

</div>

e. It has never been subject to sanctions, penalties or fines.

f. The Team Members (as well as employees of its approved subcontractor by the First Party) shall continue to be employed by the Second Party's (or it's subcontractor as the case may be) and under its sponsorship (or the sponsorship of its subcontractors) in the case of non-Saudi employees. The Second Party shall be responsible for obtaining all permits, licenses and any other documents that may be required to enable its Team Members to perform the Services in a manner that will not delay, impede or affect First Party's interests.

### 15. Assignment of Contract

The obligations of the Second Party under this Contract are direct obligations and it shall not, without the prior written consent of First Party, assign or transfer any of its rights or obligations thereunder to any other party.

### 16. Waiver of Rights

Failure by a Party to assert its rights under this Contract shall not be deemed a waiver of such rights, nor shall any waiver be implied from any act or omission. No waiver by a Party with respect to any right shall extend to any subsequent breach of the terms hereof unless such waiver explicitly provides otherwise.

### 17. Force Majeure

The failure of a party to fulfill any of its obligations under this Contract shall not be considered to be a breach of, or default under, this Contract insofar as such inability arises from any event that is unpredictable and outside of the reasonable control of a party and which affects such Party's performance of its obligations under this Contract, including, without limitation, fire, floods, accidents, declared and undeclared war and military operations, economic sanctions, regulatory requirements and instructions and administrative and judicial orders in the Kingdom of Saudi Arabia ("**Force Majeure**"), provided that the party affected by such an event has taken all reasonable precautions, due care and reasonable alternative measures in order to carry out the terms and conditions of

<div dir="rtl">

هـ. أنه لم يسبق أن تم فرض أي إجراءات جزائية أو عقوبات أو غرامات عليه.

و. أن يظل فريق العمل (إضافة إلى العاملين لدى المتعاقدين من الباطن المعينين من قبله في حال موافقة الطرف الأول على ذلك) يعملون لديه فقط وتحت إشرافه (أو لدى المتعاقدين من الباطن حسب الحال) وفي حال العاملين الغير سعوديين يظلون تحت كفالته (أو كفالة المتعاقدين من الباطن حسب الحال)، وأن يكون مسؤولاً عن الحصول على جميع الرخص والأذونات والوثائق الأخرى التي تمكن فريق العمل من أداء مهامهم بشكل لا تتعرض معه مصالح الطرف الأول لأي تأخير أو معوق.

**١٥. التنازل عن العقد**

تعتبر التزامات الطرف الثاني بموجب هذا العقد التزامات مباشرة لا يجوز له إحالة العقد أو التنازل عن أي من حقوقه أو التزاماته أو تفويض أي من مسؤولياته لأي طرف آخر دون الحصول على موافقة كتابية مسبقة من الطرف الأول.

**١٦. التنازل عن الحقوق**

إن عدم قيام أي طرف بممارسة حقوقه بموجب هذا العقد لا يعتبر تنازلاً عن تلك الحقوق، كما أن أي تصرف أو إغفال لا يوحي ضمناً بالتنازل عن أية حقوق. لا يسري تنازل أي طرف عن أي حق على أي إخلال لاحق بشروط هذا العقد ما لم ينص ذلك التنازل صراحةً على غير ذلك.

**١٧. القوة القاهرة**

لا يعتبر عدم أداء أحد الطرفين لالتزاماته إخلالاً بهذا العقد إذا كان هذا العجز ناشئاً عن أي حدث غير متوقع وخارج عن الإرادة والسيطرة المعقولة لأي طرف مما يؤثر على أداء التزاماته بموجب هذا العقد، ويشمل – على سبيل المثال لا الحصر – الحريق والفيضان والحوادث والحرب المعلنة وغير المعلنة والعمليات العسكرية والحظر الاقتصادي والمتطلبات والتعليمات النظامية أو أي من الأوامر أو الأحكام الصادرة من جهات إدارية أو قضائية في المملكة العربية السعودية ("**القوة القاهرة**") بشرط أن يكون الطرف المتضرر من القوة القاهرة قد اتخذ جميع الاحتياطات المعقولة والعناية الواجبة والتدابير اللازمة، وذلك بغرض تنفيذ شروط

</div>

Page **13** of 20

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

Contract Reference Number: CO-CAD-2022-1096

<div dir="rtl">
عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

الرقم المرجعي للعقد : CO-CAD-2022-1096
</div>



**Public Investment Fund**

**Services Contract**

صندوق الاستثمارات العامة

عقد خدمات

| | |
|---|---|
| this Contract and has informed the other party as soon as possible about the occurrence of such an event. | وأحكام هذا العقد وقد أبلغ الطرف الآخر في أقرب وقت ممكن عن وقوع مثل هذا الحدث. |

### 18. Modifications

This Contract can only be modified by written agreement between the Parties.

١٨. التعديلات

لا يجوز تعديل هذا العقد إلا باتفاق كتابي بين الطرفين.

### 19. Notice

Any notice, or other communication required under this Contract must be in writing and must be delivered by hand, registered mail or internationally recognized air courier service, or e-mail to the designated person of the relevant Party at the respective address below:

١٩. الإخطارات

يجب أن تكون الإخطارات والمراسلات بموجب هذا العقد مكتوبة، ويجب أن يتم تسليمها مناولة باليد أو بواسطة البريد المسجل أو خدمة بريد جوي معروفة عالميًا أو بواسطة البريد الإلكتروني إلى أي من الأشخاص المعنيين بالنسبة لكل طرف على العناوين التالية:

a.  The First Party:

The attention of: Contracts and Procurement Department

Public Investment Fund

Alra'idah Digital City, Building MU04, Al Nakhil District, P.O. Box 6847, Riyadh 11452, Kingdom of Saudi Arabia

Telephone: +966118138394

E-mail: PPC&MC@pif.gov.sa

b.  The Second Party:

The attention of: Tom O'Connor with a copy to: General Counsel

Teneo Strategy LLC

280 Park Avenue, 4th floor,

New York, NY 10017, USA

Telephone: +1 (212) 886 1600

E-mail: tom.oconnor@teneo.com

Us-counsel@teneo.com

أ.  بالنسبة للطرف الأول:

عناية: إدارة العقود والمشتريات

صندوق الاستثمارات العامة

مجمع الرائدة المدينة الرقمية، مبنى MU04، حي النخيل، ص.ب. ٦٨٤٧، الرمز البريدي ١١٤٥٢، الرياض، المملكة العربية السعودية

الهاتف: ٠٩٦٦١١٨١٣٨٣٩٤

البريد الإلكتروني: PPC&MC@pif.gov.sa

ب.  بالنسبة للطرف الثاني:

عناية: توم كونور

تينيو الاستراتيجية المحدودة

٢٨٠ بارك أفنيو، الدور الرابع

نيويورك ، ١٠٠١٧، الولايات المتحدة الأمريكية

الهاتف: ٢١٢-٨٨٦-١٦٠٠

البريد الإلكتروني: Us-counsel@teneo.com
tom.oconnor@teneo.com

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096

الرقم المرجعي للعقد : CO-CAD-2022-1096

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

| | |
|---|---|
| Any such notice, request or other communication shall be deemed to have been delivered (a) when delivered, if delivered by hand against a confirmation of delivery, (b) three Business Days after it is deposited with the registered mail service provider or internationally recognized air courier service, (c) the day of sending, if by e-mail prior to 3:00 p.m. (Riyadh time) on any Business Day or the next Business Day if sent by e-mail after 3:00 p.m. (Riyadh time) on any Business Day or on any day other than a Business Day. | ويعتبر أي من تلك الإخطارات أو المراسلات قد تم تسليمها (أ) عند التسليم، في حالة التسليم مناولة باليد مقابل إيصال تأكيد استلام، (ب) بعد ثلاثة أيام عمل من تاريخ إيداعها لدى مزود خدمة البريد المسجل أو البريد الجوي والمعروف عالمياً، (ج) في يوم الإرسال، في حال الإرسال بواسطة البريد الإلكتروني قبل الساعة الثالثة مساءً (بتوقيت الرياض) من أي يوم عمل، أو في يوم العمل التالي في حال الإرسال بواسطة البريد الإلكتروني بعد الساعة الثالثة مساءً (بتوقيت الرياض) من أي يوم عمل أو في أي يوم ليس يوم عمل. |

**20. Authorized Representatives**

Any action required or permitted to be taken, and any document required or permitted to be executed, under this Contract by the First Party or the Second Party may be taken or executed by the authorized representatives specified below or any person thereunto authorized in writing by such representatives.

The authorized representatives are:

For the First Party:

Chief Operating Officer, Mr. Bander A. Mogren

For the Second Party:

CFO, North America, Mr. Tom O'Connor

**21. Language**

This Contract (except for the appendices attached thereto) has been executed in the Arabic and English language, which the English language shall be the binding and controlling language for all matters relating to the meaning or interpretation of this Contract. The appendices to the Contract are stated in the English language which shall be the controlling language thereof.

**22. Comprehensiveness of the Contract**

This Contract sets out all the terms, conditions and undertakings agreed between the Parties and supersedes and replaces any prior agreements or understanding relating to the subject matter of the Contract. No agent or representative of any Party shall have the right to make any

٢٠. الممثلون المفوضون

يقوم باتخاذ أي تصرف أو توقيع أي وثيقة مما يكون مطلوباً أو مسموحاً به طبقاً لأحكام هذا العقد نيابة عن الطرف الأول أو الطرف الثاني الممثلون المفوضون المحددون أدناه أو أي شخص يخول في ذلك كتابة من قبل الممثل المفوض.

الممثلون المفوضون هم:

عن الطرف الأول:

رئيس الإدارة العامة للخدمات المشتركة، الأستاذ بندر بن عبد الرحمن بن مقرن

عن الطرف الثاني:

توم كونور, المدير المالي , أمريكا الشمالية

٢١. اللغة

أبرم هذا العقد (باستثناء الملاحق المرفقة به) باللغة العربية واللغة الإنجليزية ، و ستكون اللغة الإنجليزية هي اللغة الملزمة وتكون لها الحجية في كافة الأمور المتعلقة بمعنى العقد أو تفسيره، وحررت ملاحق العقد باللغة الإنجليزية التي ستكون اللغة الملزمة وتكون لها الحجية في كافة الأمور المتعلقة بمعنى تلك الملاحق أو تفسيرها.

٢٢. شمولية العقد

يتضمن هذا العقد جميع الاتفاقات والاشتراطات والتعهدات التي اتفق عليها الطرفان ويحل محل أي اتفاقات أو مفاهمات سابقة تتعلق بموضوع العقد أو الخدمات، وليس لأي وكيل أو ممثل لأي من الطرفين سلطة الإدلاء بأية بيانات

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096   الرقم المرجعي للعقد :

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

statements, undertakings, representations, promises, assurances or arrangements not expressly reflected in this Contract and neither Party shall be liable or responsible for any such statements, undertakings, representations, promises, assurances and arrangements.

أو تعهدات أو وعود أو اتفاقات غير منصوص عليها في هذا العقد، ولا تكون تلك البيانات أو التعهدات أو الوعود أو الاتفاقات ملزمة لأي من الطرفين ولن يكونا مسؤولين عنها.

### 23. Survival Articles

The rights and obligations set forth under Article 12 (Confidentiality) and Article 13 (Intellectual Property Rights) shall survive the expiry or termination of the Contract for whatsoever reason.

٢٣. المواد السارية بعد انقضاء العقد

تبقى أحكام المواد (١٢- السرية) و (١٣- حقوق الملكية الفكرية) سارية ونافذة حتى بعد انقضاء العقد أو إنهائه لأي سبب كان.

### 24. Applicable Law and Settlement of Disputes

The Contract shall be subject to, construed and implemented according to the laws, regulations, instructions, decrees and any other instruments having the force in the Kingdom of Saudi Arabia (the "**Applicable Law**"). In the event of any dispute or controversy arising between the First Party and the Second Party in this respect which cannot be settled amicably, the matter in dispute shall be referred for final settlement to the competent Saudi court in the Kingdom of Saudi Arabia.

٢٤. النظام الواجب التطبيق وتسوية المنازعات

يكون تنفيذ هذا العقد وتفسيره وفقاً للأنظمة واللوائح والتعليمات والقرارات وأي أداة نظامية معمول بها في المملكة العربية السعودية ("**النظام المطبق**")، وكل خلاف قد ينشأ في هذا الشأن ولا يتوصل فيه إلى تسوية ودية بين الطرفين يحال إلى الجهة القضائية المختصة في المملكة العربية السعودية للفصل فيه بشكل نهائي.

### 25. Counterparts

This Contract may be executed in any number of counterparts, each of which shall be deemed, when signed, an original, but all of which shall constitute one and the same instrument.

٢٥. نسخ العقد

يجوز توقيع هذا العقد بأي عدد من النسخ المتطابقة والمستقلة وتعتبر كل منها عند توقيعها نسخة أصلية ولكن جميع النسخ المتطابقة مجتمعة تعتبر وثيقة واحدة.

### 26. Signature

In witness hereof, This Contract shall be executed in one or more counterparts, each of which shall be deemed an original. All counterparts shall be construed together and shall constitute one agreement. Counterpart written signatures may be transmitted by email or other electronic means and shall be deemed for all purposes as being valid and have the same legal effect as if they were original versions.

٢٦. التوقيع

وإثباتاً لما تقدم، حرر هذا العقد من نسخة أصلية واحدة. يجب تفسير جميع النسخ منها معاً وتشكل عقد واحد. يتم إرسال التوقيعات الخطية المقابلة عن طريق البريد الإلكتروني أو غيرها من الوسائل الإلكترونية ، ويجب اعتبارها لجميع الأغراض على أنها صالحة ولها نفس الأثر القانوني كما لو كانت نسخاً أصلية

**Page 16 of 20**
Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project
عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096   الرقم المرجعي للعقد :

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

On behalf of the First Party

Mr. Bander A. Mogren

Chief Operating Officer

نيابةً عن الطرف الأول

الأستاذ / بندر بن عبد الرحمن بن مقرن

رئيس الإدارة العامة للخدمات المشتركة

Signature:_____

التوقيع: _____

On behalf of the Second Party

Mr. Tom O'Connor

Chief Financial Officer, North America

نيابةً عن الطرف الثاني

توم كونور

المدير المالي , أمريكا الشمالية

Signature:_____

التوقيع: _____

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096

الرقم المرجعي للعقد :

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

<u>**Appendix No. (1) Services**</u>

<u>ملحق رقم (١) الخدمات</u>

Teneo will work to deliver an international communications and stakeholder engagement plan that will help position PIF as a sophisticated global investment organization with a solid track record and a targeted investment strategy. This involves demonstrating how PIF is enabling the creation of new sectors and opportunities and driving transformation in Saudi Arabia; while enabling stakeholders to fully appreciate the Fund's current and future contributions to society, and communicating PIF's focus on generating sustainable returns for the benefit of the economic growth and diversification of the economy of Saudi Arabia and its people:

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة  وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096   الرقم المرجعي للعقد :

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

<u>**Appendix No. (2) Team Members**</u>

ملحق رقم (٢) فريق العمل

The Second Party undertakes to dedicate the following Team Members to deliver the Services to the First Party:

| Phase | Name | Title | Geography |
|---|---|---|---|
| [Phase 1] | Stephen Cohen | Senior Managing Director | New York, USA |
| | Maie Ahmed | Senior Managing Director | Dubai, UAE |
| | Tim Burt | Vice Chair | London, UK |
| | Iain Day | Senior Managing Director | London, UK |
| | Melissa Mackreath | Managing Director | New York, USA |
| | James Fearnley-Marr | Managing Director | Dubai, UAE |
| | Jeff Hiseley | Senior Vice President | Dubai, UAE |
| | Rebecca Wiles | Senior Vice President | Riyadh, KSA |
| | Meshari Abokhodair | Vice President | Riyadh, KSA |
| | Emily Johns | Senior Associate | New York, USA |
| | Langston Varnadore | Senior Associate | New York, USA |
| | Frederic Ysewijn | Associate | Dubai, UAE |
| | Alexandra Shamma | Executive | Dubai, UAE |
| | Sarah Jordan | Analyst | New York, USA |
| | Andy Parnis | Managing Director | Dubai, UAE |
| | George Allen | Senior Vice President | Dubai, UAE |
| | Oscar Wang | Managing Director | Shanghai, China |
| | Philippe Blanchard | President, Continental EU | Brussels |
| | Olivier Jay | President, France | France |
| | Lucas Van Praag | Senior Managing Director | New York, USA |
| | Tim Falconer | Managing Director | Dubai, UAE |
| | Matthew Hickley | Managing Director | London, UK |
| | David Ferrabee | Senior Managing Director | London, UK |
| | Sparky Zivin | Senior Managing Director | New York, USA |
| | Kevin Kajiwara | Co-President, Teneo Political Risk | New York, USA |
| | Faten Alqaseer | Managing Director | New York, USA |
| | Padraic Riley | Senior Managing Director | New York, USA |
| | John Greenway | Senior Vice President | Dubai, UAE |
| | Alexandra Coogan | Associate Consultant | London, UK |
| | Ben Clarke | Account Executive | London, UK |
| | Elizabeth Mobed | Consultant | London, UK |

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096   الرقم المرجعي للعقد :

**Public Investment Fund**

**Services Contract**



صندوق الاستثمارات العامة

عقد خدمات

**Appendix No. (3) Fees**

ملحق رقم (٣) الرسوم

| Phase | Deliverable | Estimated Timeline | Capped Fees in USD |
|---|---|---|---|
| The project is contemplated to tackle many tasks at once. And as such we have broken this down in months vs phases | Ongoing throughout the Term | 12 months | US$2,700,000.00, payable monthly in equal installments of US$225,000.00 per month. |

Travel expenses should be capped at 10% of the above total value and it is subject to prior consent of an authorized person of the First Party.

Services Contract between the Public Investment Fund and Teneo Strategy LLC in connection with Focused Strategy & Structure Diagnostic Project

عقد خدمات بين صندوق الاستثمارات العامة  وتينيو ستراتيجي المحدودة فيما يتعلق بتشخيص الاستراتيجية

و البنية المركزة.

Contract Reference Number: CO-CAD-2022-1096

الرقم المرجعي للعقد :

# EXHIBIT 41

# Inside Saudi Arabia's $360 Billion Investment Fund

- 
- 
- 
- 

By
Avi Salzman
Updated September 21, 2020 / Original September 18, 2020

- Order Reprints
- Print Article



Illustration by Jaxon Northon; Reference: Misha Friedman/Getty Images

Text size

Saudi Arabia's $360 billion sovereign-wealth fund, the Public Investment Fund, or PIF, has been aggressively putting its money to work in investments around the world. The governor of the fund, Yasir al-Rumayyan, wants to wean the kingdom off its reliance on oil, which accounts for nearly two-thirds of its revenue.

Al-Rumayyan, 50, was the head of an investment bank in Riyadh. Now, he is also the chairman of Saudi Aramco and a top adviser to Crown Prince Mohammed bin Salman.

Al-Rumayyan recently gave a rare interview to *Barron's*. It has been edited for length and clarity.

***Barron's:* We're doing this over Skype now, but do you come to New York often?**
**Yasir al-Rumayyan:** Actually, we're opening up an office there, and another office in London. I'm a frequent visitor to the U.S.—New York, Miami, San Francisco. Some of our portfolio companies are there, so I do go quite often. The new office is going to be in the General Motors Building [on Fifth Avenue], a whole floor. Hopefully, that office is going to open in either the late fourth quarter or early in the first quarter of 2021. In London, it's going to be in a building that we got from the Saudi government. I was looking at the different designs today, so hopefully we will have it manned by the first quarter of 2021.

READ MORE:

- Futures Fall as Supreme Court Battle Heats Up
- Seeking Stock-Market Bargains? Try Europe and Japan.
- The Tech Boom Is Slowing. A Sector Rotation Is Picking Up Steam.

**They'll be meeting with portfolio companies and assessing new investments there?**
It's going to be sourcing deals, [managing] continuous relationships, and monitoring some of these deals.

**In the first quarter, the fund invested pretty heavily in some U.S. equities, like Marriott International [ticker: MAR] and Walt Disney [DIS], that were out of favor at the time. What was the rationale behind that?**
Two things. Heavily is a relative term. What looks big for some funds might not be as big when it comes to the PIF, because our assets under management are $360 billion-plus today, up from $150 billion back in 2015. So we more than doubled up. As to the second question, why now? Because we thought with a great crisis, you have great opportunities. The year 2020 is one of those years everybody thought was going to be different than the previous decade or so. Since 2009, we've been in one of the longest bull markets in the history of the equity markets.

People were expecting that the market would have to correct. With the pandemic, with the trade war, with the uncertainty, you saw lots of different sectors going down excessively. The pandemic is not going to last forever. It's something that will eventually end, just like any other pandemic in the history of mankind. That's why we started deploying funds into not only the U.S. markets, but also in global markets. We were in Italy, we were in China, we were in France, we were in the U.S., we were everywhere.

These markets were really going down to levels unseen in a long time. And we started buying in. And we went into these investment opportunities in three different ways: opportunistic, strategic, or for rescue financing.

**When you say rescue financing, are you referring to loans to companies that were having troubles?**

Yeah, it could be anything. Rescue financing could be loans, it could be convertibles, it could be primary issues.

**Can you give me a sense of a company where you made a rescue financing investment?**
One I remember is Carnival [CCL]; they issued a convertible. And we were looking at different private companies, too.

**In the second quarter, it looks as if you sold a lot of those positions and bought some exchange-traded funds. Why?**
We went into some of the companies, and we made huge profits, so we thought, this is it for us. Some strategic positions that we thought could add some value back to the Saudi economy, we left them there. So that was the reason we got in and the reason for our exits. But our exit doesn't necessarily mean that we've exited from the market. If we see any other opportunities, definitely we would consider them.

**Generally, $10 billion to $20 billion of your investments end up being revealed in public U.S. filings. How do we understand the rest of your investments? How much do you spend in Saudi Arabia, for instance?**
Historically, we were only in Saudi Arabia. We started in 1971 and invested for developmental purposes only. In 2015, we changed our strategy. The board was changed, even the reporting lines were changed. We did a full diagnostic. What have we been doing in the past decades? We started with benchmarks—what are other long-term investment funds and sovereign-wealth funds doing? And what do we want to do? We looked at the diagnostic, the benchmark, and we saw the gap.

**And what did you decide on?**
We came up with six pools of investments. Two of them are international, and four of them are domestic. The four domestic are Saudi equity, which includes mature investments. There's also sector development, which goes into new sectors that either are underdeveloped or nonexistent. I'll give some examples—waste management. There were no rules. There were no companies in Saudi for waste management. We worked with the government to get the rules and regulations and laws in place. And we created our first company in waste management. Same thing is applicable in entertainment—movie theaters. We came in, we worked with the government, and we didn't leave it exclusively for us. We asked the government to open it up for everyone. Today, I think there are seven or eight different movie theater companies. And they're all doing extremely well, opening up in different towns and cities around the kingdom.

The third area is called giga projects. And the fourth is real estate. The difference between real estate and giga projects is that real estate goes into projects by themselves. The giga projects are more like ecosystems. And what do I mean by ecosystems? It's going into empty plots of land. Nothing is there. It's not close to towns or cities. And we create the whole thing, starting from scratch when it comes to the laws, rules, and regulations, when it comes to the infrastructure that we need to bring in,

when it comes to the massive planning, and when it comes to the optimal capital structure and how to get third-party investors.

There are two international pools. One is the diversified portfolio. It's like your typical international investment fund, where we basically get third-party managers to manage some of our funds and some of our small investments here and there. And then we have a strategic international portfolio, where we have the likes of the SoftBank Vision Fund, the Blackstone Infrastructure Fund, and Uber Technologies [UBER]. Some of our international strategic investments are there, too.

**And if you have over $360 billion invested in the fund, what's the breakdown as far as these different kinds of domestic and international investments?**
Initially, it was 98% in Saudi and less than 2% international. Today, it's about 82% Saudi and about 18% to 20% international. Ideally speaking, the strategic asset allocation that we want to have is 25% international versus 75% domestic.

**Not everyone is open to taking money from a sovereign-wealth fund. How do you deal with that? What's your pitch to companies?**
We don't have much resistance from most of our partners. All partners really appreciate our work with them. We've seen maybe a case or two that was based not on investment decisions, but some other decisions.

**The fund has a big position in Uber, which has been up and down during the pandemic. What are your thoughts about that business right now?**
I'm really not sure if I can comment, since I'm a board member, but as an investor we like the company, we've been there for a long time now—since I think, 2016 or 2017. If you look at the impact of Uber in the kingdom, it has created about 150,000 jobs for Saudis. We like what the investment brought into the world, not only to Saudi Arabia— how they've disrupted positively the service markets and are catering to everyone, while making the cost more affordable for a lot of people. If you put all of this together, I think Uber is one of the great investments that we're in.

**They've talked a lot about transitioning to autonomous vehicles. Do you see that happening in the next decade, the next five years? What do you think the timeline is?**
The autonomous-vehicle initiative has been carried out by a number of different competitors. And unfortunately, those competitors are not talking to one another. They're using different technologies, trying to see what is the prevailing technology. Some people use radar, infrared, laser. So we have to all wait and see what would prevail for the auto makers and for the likes of Uber or the e-commerce players that would like to have a better, more efficient service at the same time with a lower cost. When do I think it's going to come? I mean, in 2016, they were talking about three years. Now we're in 2020, and still it's not materializing. And the problem, I think, is not only the technology, but the regulations. In places like Neom [a high-tech city being built in Saudi Arabia as a giga project], for instance, I think it would work fine because we can cater the infrastructure to autonomous vehicles.

**You also have a large investment in the SoftBank Vision Fund. What's your assessment of its investment process? There have been highs and lows. There has been criticism of its WeWork investment, for instance.**

I'm a board member of the SoftBank Group [9984.Japan], too, not only an investor in the SoftBank Vision Fund. And we have great respect and admiration for Masayoshi Son, who is the chairman and CEO of SoftBank and the force behind the SoftBank Vision Fund. We think that most of the investments that SoftBank has participated in make perfect sense.

Now, some of the plays, as you said, didn't work out as expected, maybe some of them for valuation purposes, maybe some didn't have the right execution capabilities to achieve what was originally asked for. At SoftBank, where they invested in about 85 different companies, definitely you're going to have some really good percentage of these companies as unicorns. And that's what we really are looking at. To have these unicorns make up for some of the losses and the companies that lack either the vision or the execution capabilities.

**Is Masa guiding everything very directly? How are you involved? Is it mostly like, "We trust him"?**

The SoftBank Vision Fund started with an idea. We liked the idea. They have somewhere between 400 to 500 professionals working there. The sourcing might be driven by Masa most of the time. But it's what comes after the sourcing that really counts. And that's why they have professionals who are working with these companies, and to see how they kind of align some of the portfolio companies together. We have representation in the compliance committee, we have an advisory role, and we attend the investment committee, but we cannot vote because we are limited partners. But we have some rights that we typically wouldn't have. We can veto any transaction that we don't like if it goes above $3 billion. If we veto, it's not only us, but the whole fund cannot go into this. We have opt-out rights. Anything we don't like, we can opt out and we don't participate in. And we have many other rights, especially with governance.

**How is the PIF different from other sovereign-wealth funds?**

Other sovereign-wealth funds are focused on one vertical: either domestic development or international investments. We want to have both and get them aligned. Our international investments are aligned with some of our portfolios in Saudi, either in sector development or real estate projects. We're not your typical financial investor. We bring value, not only to the companies that we're invested in, but also to the companies [in Saudi Arabia]. We always like to enhance the performance of our companies, while catering to the development in Saudi.

**As you say, you're fulfilling two missions: investing overseas and helping develop the domestic economy. So you have companies that are racing to win global market share, like Uber. And then you have Saudi Arabian companies looking to create business in the kingdom. Is there some overlap?**

Uber is not the best example, but I can tell you what we've done with Uber. We were supporting them with the government, not only in Saudi Arabia but also with the

governments of the Middle East in some of their acquisitions. And that's what we brought to the table.

But I can tell you about another of our companies in the U.S.—Lucid Motors. I think it's going to be the best electric-vehicle company in the world. They just announced that their charge range is 500-plus miles, which is more than 130 miles more than the second best. We've put close to $1.5 billion into this company. We changed the board, and we helped them put their manufacturing facilities in Arizona. Pre-Covid-19, we were targeting the fourth quarter to have commercial production. Now, it's going to be in the first quarter of 2021.

In the second stage, we are going to open the markets for Lucid in Saudi Arabia, we're going to have their manufacturing facility in Neom, most likely, or maybe some other location, and we can give them some kind of offtake for the domestic purchases from the government, automobile procurement, and they can immediately hit the ground running.

**Where does your expertise on electric vehicles come from?**
That's part of our governance. Our management looks at each one of these companies that are in our portfolio, and they see what skill sets are needed. The PIF staff has grown from 40 people in 2016 to over 900. I think by year end, it is going to be more than 1,000. By 2025, It's going to be more than 2,000, hopefully, with all of the offices and the recruitment that we are doing. We are working with some of the best headhunters around the world, in New York and California and Europe and Asia. And we get the subject-matter experts. So in the Lucid example, we have the head of international investment as a board member, we have Andrew Liveris, formerly from Dow Chemical, as the chairman, and we have an industry specialist. We deal with all of the advisers and consultants that we can put our hands on to help these companies go to the next level. We work with them on the strategy, and we monitor their performance continuously.

**In 2018, Elon Musk said that he was going to take Tesla [TSLA] private, and he said that he had the money from Saudi Arabia. Was there a Tesla investment that you were considering?**
We had an investment in Tesla, and we got out of this investment. We had some talks with Musk, but I really cannot comment on it. This issue is sensitive, especially since Tesla is a listed company.
**Do you expect to invest in more wide-ranging investment funds like SoftBank?**
We did that with Blackstone Group [BX]. We committed $20 billion to the largest infrastructure fund in the world, because we think that the U.S. needs a lot of investments in infrastructure. So we partnered up with Blackstone for 40% of their fund. We like to partner with some really experienced asset managers with good track records. Remember, we have a lot of funds, and we need to deploy these with the right partners. It has to go through diligence and negotiations and discussions and dinners and lunches. If you look at most of the asset managers that we are dealing with, we are

the top one or two investor. We don't like to put in $50 million or $100 million. We like to be the top investor, or one of the top two investors, in that fund. And that's the case right now.

**With Blackstone, are you directly involved in the investments?**
Yeah, we are really close to Blackstone. We discuss everything before they do it because we're a cornerstone investor in the fund. Steve Schwarzman is a good friend of mine, and I have the greatest respect and admiration for his track record and him as a person. As I said, we're not your typical limited partner. When we go into these big-ticket items, we always get different rights, and these rights ensure governance, ensure the investment process, and give us the opportunity to co-invest with them in different projects and investments.

**Does much of the money for the fund come from Aramco proceeds? And at a time when oil prices are low, does that affect the future cash flow for the fund?**
The Aramco initial public offering was one of the capital injections that came into the PIF, but we have many other sources of cash. The first source that we always rely on is the dividends that we have from our portfolio companies that have to be reinvested. Then, we have government injections, and these injections could be through cash or in-kind, and the in-kind participation could be companies, or it could be land. Today, the land bank that we have is second to none, I don't think any other entity in the world has the land that we have.

Neom, for instance, is 26,000 square kilometers [16,000 square miles]. That's the size of a country. On our books, it shows [as being worth] one riyal. One riyal is about 27 to 28 cents. So we're very conservative in that regard. Red Sea [another development project] is 46,000 square kilometers; in our books, that shows as one riyal. We have many other lands in Mecca, which is like one of the highest real estate values in the world. We still have it at a very conservative valuation. So, all of these things, once it gets operational, it's going to have an amazing lift to the valuation of the fund's assets under management. And at the same time, it could be an excellent mechanism for us to finance some of our projects.

**So that would be land you would sell for real estate development?**
I won't say it's only real estate development, it's creating an ecosystem. We call them giga projects. And there's a reason why we call them giga projects, because they're way bigger. It's huge. It's something that you haven't seen in recent history. Once we start monetizing these projects, we'll have a lot of cash inflows.

**BP [BP] just said that it thinks demand for oil has already peaked. It may not recover in terms of demand after the pandemic. Do you agree with that?**
It's all a guesstimate, right? So BP is guesstimating that oil has reached its potential. I don't think that's true. You can hear many other analysts and the way they're projecting how oil demand will be. If you look at the rigs shutting down in the U.S., in the short term, it's because of supply surpassing demand. But in the longer term, most of these companies are not investing in capital expenditures. So, if they're not investing in capex,

that means you would have fewer oil fields and less supply. And if that's the case, demand will shoot up while supply is going down, and then we will have higher prices. That's why we would like to continue our capex programs at Aramco, because we see the need for doing so.

**Given your reliance on oil now, a lot of people are wondering if Aramco can pay the dividend. Would that affect the PIF, too?**
I don't think that's the case, because remember, only 1.5% of the float is to shareholders other than the government. And if you look into the prospectus, there was a very clear formula that, in case the $75 billion dividend policy cannot be met by the company, the pro rata of the 75% would go to the 1.5% and the government would have less dividend yield.

**If someone traveled to Saudi Arabia in 10 years, what might they be surprised by?**
The land of Saudi Arabia is just amazing. It's like a big secret. Everybody thinks Saudi Arabia is all desert. Even us. We always thought that it's all desert. It's not. It has some amazing sites. The people of Saudi Arabia, most of us are really great people. Of course, you have the super sweet and the super wicked, but most of the people are really good people. The population of Saudi is leaning toward the younger generation. Generation Y and newer generations—I think these generations are more global generations.

So, in 10 years time, I think most of the people you'll see in Saudi Arabia, they're more global citizens. You cannot tell them apart from the people that you see in New York or London or Mumbai or anywhere else in the world. So, they're going to be amazingly surprised by the people, by the proposition that the Saudis have to offer to others, like companies, infrastructure, quality of life.

We have an amazing environment and ecosystem. We have the Red Sea; it's about 2,000 kilometers long. We don't want to ruin it. We want to have ecofriendly tourism. And that's part of our offerings and the Red Sea projects and Neom, and many other projects. So, what we would like to do is to get the best out of the world to add on top of it and to start from there, not to recreate the wheel over again. That's what I hope you will see in 10 years, in 2030, in Saudi.

**What do you think Western investors should know about the PIF and Saudi Arabia that maybe people don't understand?**
What we need to do is to showcase our performance, our governance, our methodology, our mission, our strategy to the world, to show them what it is exactly that we've been doing and what our aspirations are. PIF is becoming the main engine of Vision 2030, which is the vision of the nation. We would like to get more people into Saudi to invest with us. Come to Saudi and invest and you will have many facilities, you will have a good partner. That's what we need to get across to the others.

**Thank you for your time**.
**Write to** Avi Salzman at avi.salzman@barrons.com

# EXHIBIT 42



Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400
keker.com

**Brook Dooley**
(415) 773-6639
bdooley@keker.com

November 28, 2022

**VIA FEDEX**

John Quinn
Kevin Y. Teruya
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa Street,10th Floor
Los Angeles, California 90017-2543

Re:     *Mickelson et al. v. PGA Tour, Inc.*--Case No. 5:22-cv-04486
        Witness Fee Checks

Dear John and Kevin:

Pursuant to Federal Rule of Civil Procedure 45(b)(1), please find enclosed checks representing witness fees for Mr. Yasir Othman Al-Rumayyan and the Public Investment Fund of the Kingdom of Saudi Arabia in connection with the subpoenas of which you accepted service on September 22, 2022.

If you believe these witness fees are not accurately calculated, please let me know before close of business on Friday, December 2, 2022.

Very truly yours,

KEKER, VAN NEST & PETERS LLP

B rook Dooley

BXD:ddm

Enclosures
cc:     Elliott Peters, Eric K. Phung (via email only)

1948174

KEKER, VAN NEST & PETERS LLP
SAN FRANCISCO, CA 94111

77071

| DATE: 11/28/2022 | PAYEE: | Public Investment Fund | | CHECK #: 77071 |
|---|---|---|---|---|
| MATTER ID | INV. DATE | INV. # | INV. DESCRIPTION | AMOUNT |
| 4546-001 | 11/28/2022 | 11/28/22 Witness Fee | pgaliv | 1,500.00 |

TOTAL:     $ 1,500.00

---

DOCUMENT INCLUDES VISIBLE FIBERS, CHEMICAL REACTIVE PROPERTIES AND FEATURES A FOIL HOLOGRAM

77071

**KEKER, VAN NEST & PETERS LLP**
633 BATTERY STREET
SAN FRANCISCO, CA 94111
415-391-5400

**citibank**
CITIBANK F.S.B.
THE CITIBANK PRIVATE BANK
One Sansome Street, 23rd Floor
San Francisco, CA  94104
91-7118/3211

NUMBER

**11/28/2022**         **$ *** 1,500.00**
DATE                        AMOUNT

**** One Thousand, Five Hundred & No/100 Dollars

PAY
TO THE
ORDER
OF

**Public Investment Fund**

Two authorized signatures required for amount $500,000.00 & over
VOID IF NOT CASHED IN 90 DAYS

  

⑈"077071⑈"   ⑆321171184⑆:   200012599⑈"

**KEKER, VAN NEST & PETERS LLP**
SAN FRANCISCO, CA 94111

77069

**DATE: 11/28/2022    PAYEE:  Yasir Othman Al-Rumayyan**

**CHECK #:  77069**

| MATTER ID | INV. DATE | INV. # | INV. DESCRIPTION | AMOUNT |
|-----------|-----------|--------|------------------|--------|
| 4546-001 | 11/28/2022 | 11/28/22 Witness Fee | pgaliv | 1,500.00 |

**TOTAL:**        **$ 1,500.00**

---

**KEKER, VAN NEST & PETERS LLP**
633 BATTERY STREET
SAN FRANCISCO, CA 94111
415-391-5400

77069

**citibank**
CITIBANK F.S.B.
THE CITIBANK PRIVATE BANK
One Sansome Street, 23rd Floor
San Francisco, CA  94104
91-7118/3211

NUMBER

**11/28/2022**          **$ *** 1,500.00**

DATE                    AMOUNT

**\*\*\*\*  One Thousand, Five Hundred & No/100 Dollars**

PAY
TO THE
ORDER
OF        **Yasir Othman Al-Rumayyan**

Two authorized signatures required for amount $500,000.00 & over
VOID IF NOT CASHED IN 90 DAYS

⑈"077069"⑈  ⑆321171184⑆  200012599"⑈

# EXHIBIT 43

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| PGA EUROPEAN TOUR | § § | |
| Movant, | § § | |
| v. | § § | Case No. 3:22-mc-00016-TJC-LLL |
| LIV GOLF, INC. | § § | |
| Respondent. | § § | |
| | § | |

## LIV GOLF'S OPPOSITION TO PGA EUROPEAN TOUR'S MOTION TO QUASH RULE 45 SUBPOENA

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 3

I.     The ET negotiated and entered into an anticompetitive  agreement with
       the PGAT in this District, which is aimed at destroying competition in
       Florida, the U.S., and globally. ..................................................................... 3

II.    In connection with its alliance with the PGAT, the ET has regularly
       transacted business in this District ................................................................ 5

III.   The ET regularly conducts business throughout the U.S. .............................. 8

ARGUMENT ............................................................................................................. 9

I.     The Subpoena satisfies Rule 45(c)'s 100-mile requirement. ....................... 10

       A.     The Subpoena satisfies Rule 45(c) because the ET regularly
              transacts business in person in Northern Florida. ............................. 10

       B.     Virtual compliance moots the Rule 45(c) issue. ................................ 13

II.    The Court has personal jurisdiction over the ET ......................................... 15

       A.     The ET has sufficient contacts with Florida and the U.S. ................. 15

       B.     Exercising personal jurisdiction does not offend traditional
              notions of fair play and substantial justice. ...................................... 17

III.   International comity does not mandate using the Hague Convention. ......... 18

CONCLUSION ........................................................................................................ 20

_Toc120564664

# TABLE OF AUTHORITIES

Page(s)

Cases

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
   2022 WL 504451 (N.D. Fla. Feb. 18, 2022) ...................................................... 14

*In re: 3M Combat Arms Earplug Prod. Liab. Litig.*,
   2021 WL 2605957 (N.D. Fla. May 28, 2021) .................................................... 13

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   278 F.R.D. 51 (E.D.N.Y. 2010) ........................................................................ 20

*In re Auto. Refinishing Paint*,
   229 F.R.D. 482 (E.D. Pa. 2005) ................................................................... 15, 16

*In re Auto. Refinishing Paint Antitrust Litig.*,
   358 F.3d 288 (3d Cir. 2004) .............................................................................. 19

*Brookman v. Joseph*,
   522 F. Supp. 3d 8 (S.D.N.Y. 2021) ................................................................... 14

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ..................................................................................... 16, 17

*Cable/Home Comm. Corp. v. Network Prods., Inc.*,
   902 F.2d 829 (11th Cir. 1990) .......................................................................... 17

*Empagran v. F. Hoffman LaRoche*,
   542 U.S. 155 (2004) .......................................................................................... 20

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*,
   752 So. 2d 582 (Fla. 2000) ............................................................................... 17

*Exhibit Icons, LLC v. XP Co., LLC*,
   609 F. Supp. 2d 1282 (S.D. Fla. 2009) ............................................................. 17

*Gucci America Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014) .............................................................................. 15

*Halliburton Energy Servs v. M-I, LLC*,
   2006 WL 2663948 (S.D. Tex. Sep. 15, 2006) .................................................. 12

*Int'l Seaway Trading Corp. v. Target Corp.*,
    2021 WL 672990 (D. Minn. Feb. 22, 2021) ...................................................... 13

*Managed Care Advisory Group, LLC v. CIGNA Healthcare, Inc.*,
    939 F.3d 1145 (11th Cir. 2019) ........................................................................ 14

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
    473 U.S. 614 (1985) ......................................................................................... 20

*In re MTS Bank*,
    2018 WL 1718685 (S.D. Fla. Mar. 16, 2018) ................................................... 12

*In re Newbrook Shipping Corp.*,
    498 F.Supp.3d 807 (D. Md. 2020), *vacated on other grounds*,
    31 F.4th 889 (4th Cir. 2022) ............................................................................ 13

*In re Photochromic Lens Antitrust Litig.*,
    2012 WL 12904331 (S.D. Fla. May 2, 2012) ........................................18, 19, 20

*Ping-Kuo Lin v. Horan Cap. Mgmt., LLC*,
    2014 WL 3974585 (S.D.N.Y. Aug. 13, 2014) ................................................... 14

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
    119 F.3d 935 (11th Cir. 1997) .......................................................................... 15

*S.E.C. v. Carrillo*,
    115 F.3d 1540 (11th Cir. 1997) .................................................................. 15, 18

*S.E.C. v. Marin*,
    982 F.3d 1341 (11th Cir. 2020) ........................................................................ 18

*S.E.C. v. Prime Time Group, Inc.*,
    2010 WL 780198 (S.D. Fla. Mar. 2010) ........................................................... 17

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of
    Iowa*,
    482 U.S. 522 (1987) .................................................................................... 18, 19

*Sullivan v. PJ United, Inc.*,
    2017 WL 11675693 (N.D. Ala. Dec. 15, 2017) ................................................. 12

*U.S. v. $110,000 in U.S. Currency*,
    2021 WL 2376019 (N.D. Ill. Jun. 10, 2021) ..................................................... 13

*Walsh v. Tara Constr., Inc.*,
    2022 WL 1913340 (D. Mass. June 3, 2022) ...................................................... 13

*Wesolek v. Wesolek*,
    2021 WL 3572221 (M.D. Fla. Jan. 20, 2021) ................................................... 10

Statutes

9 U.S.C. § 7 ............................................................................................................ 14

Rules

Fed. R. Civ. Proc. 45(b)(2) .................................................................................... 15

Fed. R. Civ. Proc. 45(c)(1)(A) .............................................................................. 10

Fed. R. Civ. Proc. 45(c)(2)(A) .............................................................................. 10

## INTRODUCTION

The European Tour's ("ET") Motion to Quash is based on artfully worded half-truths, omissions of critical facts, and a misleading picture of the ET's extensive contacts with this District and its central role in the conspiracy at issue in the underlying litigation brought by Respondent LIV Golf, Inc. ("LIV"). The ET's top executives traveled to this District to negotiate in-person an unlawful conspiratorial agreement with the PGA Tour ("PGAT," which is headquartered in this District) to work together to destroy competition from LIV—specifically by conspiring to suspend LIV players from the ET and PGAT, by stymieing the flow of players into LIV from other tours around the world, by denying Official World Golf Ranking points to LIV players, by denying LIV players access to the Majors, and by attempting to preclude LIV's access to vendors, sponsors, and broadcasters. This conspiracy to thwart competition injured competition in Florida, the U.S., and globally. In furtherance of that unlawful agreement, ET executives have regularly visited this District to conduct business and have regularly directed electronic communications to and from this District. Indeed, they have publicly announced a plan to continue those conspiratorial meetings *in this District* in less than two weeks' time. Brass Decl. Ex. 31. And pursuant to that unlawful agreement, the ET added to its board the PGAT Commissioner, Jay Monahan, who resides in this District and has conducted business here on behalf of the ET.

Furthermore, pursuant to the unlawful agreement negotiated in this District, the ET has purposefully availed itself of the laws of the U.S. by jointly sanctioning and promoting two tournaments held every year in the U.S. These two tournaments are

1

on top of the ET's extensive other business activities throughout the U.S. For example, the 2022 schedule for the DP World Tour (the ET's flagship tour) boasts six American flags denoting tournaments in the U.S. that qualify for points on the tour—more than any other country on its schedule. Brass Decl. Ex. 1. In addition to these tournaments in this season alone, the ET sponsors the biannual Ryder Cup, which has rotated venues between the U.S. and Europe on a regular basis for nearly a century (last held in Wisconsin in 2021), and is one of the ET's primary sources of revenue.

Through the Ryder Cup and otherwise, the ET does big business in the U.S. And it has directly and regularly conducted business in this District, including negotiating and acting in furtherance of an anticompetitive agreement that is at the heart of the underlying lawsuit. The ET is flat wrong in arguing that it should not be required to provide discovery relating to that unlawful agreement in response to a properly served Rule 45 subpoena.[1] The ET even has the audacity to argue that "the interests of the United States are not implicated by noncompliance with LIV's request." Mot. at 24. The ET could hardly be more misguided. The U.S. has an obvious interest in the enforcement of its laws, particularly a law as important to protection of fair competition as the Sherman Act. It is not asking too much to require a foreign-based commercial enterprise operating in the U.S. to comply with a Rule 45 subpoena when (1) it has come to this country (and District) to repeatedly negotiate and carry out an un-

---

[1] While the ET takes a swipe at the facts relating to service of the subpoena (Mot. at 4), it does not and cannot argue that service upon a director of the ET was improper.

lawful agreement to destroy competition, (2) the counter-party to that unlawful agreement is headquartered in this District, (3) the markets in which competition is harmed pursuant to this unlawful agreement cover Florida and the U.S., (4) it has engaged in acts in furtherance of the conspiracy in this District, (5) pursuant to that unlawful agreement it has expanded the business it does in the U.S., and (6) it conducts extensive other business on a regular basis in the U.S.

Discovery in the underlying litigation is moving forward quickly, with discovery scheduled to close on March 3, 2023. LIV respectfully requests that the Court reject the ET's Motion to Quash and order it to comply with LIV's subpoena.

## BACKGROUND

I. The ET negotiated and entered into an anticompetitive agreement with the PGAT in this District, which is aimed at destroying competition in Florida, the U.S., and globally.

LIV is a recent entrant into the professional golf marketplace, challenging the dominant position of the PGAT, the longstanding monopolist in the market. LIV has alleged in the underlying lawsuit that the PGAT, which is headquartered in Ponte Vedra, Florida, has engaged in an array of anticompetitive conduct aimed at foreclosing LIV from entering and surviving as a rival professional golf tour.

One of the central allegations in the underlying action is that the PGAT entered into an anticompetitive agreement with the ET to lock arms in thwarting LIV's entry. *See* Brass Decl. Ex. 32 (Am. Compl.) ¶ 11.C. Evidence shows that the primary purpose of the ET-PGAT agreement was to thwart competition from LIV, by preventing the ET from working with LIV to facilitate its entry. *See* Brass Decl. Ex. 2 (memo from

3

PGAT Commissioner Jay Monahan explaining the PGAT's desire to work more closely with the ET for the purpose of "removing the European Tour as a potential partner of" competing leagues); *see also, e.g., id.* Ex. 3; Ex. 4; Ex. 28.

Pursuant to that unlawful agreement, the PGAT agreed to invest tens of millions of dollars in the ET, co-sanction tournaments with the ET in the U.S., and provide a pathway for ET golfers to play in the U.S.—all acts through which the ET has purposefully availed itself of the benefit of doing business in the U.S. *See* Brass Decl. Ex. 5; Ex. 6. In return, the ET agreed not to partner with LIV, and instead join the PGAT in taking various actions to foreclose competition from LIV, such as agreeing to ban any players who participate in LIV tournaments. *Id.* Ex. 7; Ex. 29; Ex. 30. Those banned players include Florida resident (and plaintiff in the underlying action) Peter Uihlein. LIV's complaint alleges that the ET-PGAT agreement violates Section 1 and 2 of the Sherman Act by harming competition in the U.S. (including Florida) and globally. *See* Brass Decl. Ex. 32 (Am. Compl.) ¶¶ 36, 341-53.

The ET's top executive, CEO Keith Pelley, traveled to PGAT headquarters in this District to negotiate that anticompetitive agreement at the heart of the underlying litigation. *See* Brass Decl. Ex. 8; Waters Decl. ¶ 13. As Mr. Pelley remarked, "Everything changed after November 2020. It was a mind-set shift for both of our organizations …. We went from competitors to partners." Brass Decl. Ex. 9.

The ET's declarant avers that "[n]one of European Tour's business" takes place in Florida (Waters Decl. ¶ 8), and the ET argues that it "does not transact business within 100 miles of the place of compliance" (Mot. at 10). The ET must be applying

an awfully narrow definition of "transacting business" to make such statements. Negotiating an agreement in-person in this District, with a counter-party based in this District, which secured tens of millions of dollars in funding for the ET as well as an ongoing business relationship in the multi-billion dollar professional golf marketplace, along with a mutual agreement to protect the ET's and PGAT's businesses from competition, surely satisfies any reasonable definition of "transacting business."

Furthermore, given that Mr. Pelley negotiated this agreement in-person in Florida, it lacks credibility for the ET to assert "none of the requested information or documents originated in" the U.S. Mot. at 24. It is inconceivable that Mr. Pelley conducted these enterprise-defining negotiations without communicating to his colleagues at the ET. These communications are in the exclusive control of the ET (contrary to its assertion that it has no unique documents), they are highly relevant to this litigation, and the ET should not be permitted to hide them from discovery.

## II. In connection with its alliance with the PGAT, the ET has regularly transacted business in this District.

In furtherance of its conspiratorial agreement with the PGAT, the ET's executives have regularly engaged in business conduct within this District. For example, Mr. Pelley, the ET's CEO, visited this District in March 2021 for a series of meetings with PGAT Commissioner Monahan, *including attending an ET Board meeting in-person in this District*. The meeting was memorialized in a photo, in which Mr. Pelley (right) and Mr. Monahan (left) stood together in the PGAT's office in Ponte Vedra, Florida and virtually joined an ET Board meeting (Brass Decl. Ex. 10):



In addition, the record reflects numerous other meetings in which ET executives traveled to this District to meet with the PGAT (and others) in furtherance of the conspiracy. *E.g.*, Brass Decl. Ex. 11 (Guy Kinnings, ET's Deputy CEO, at PGAT offices in Mar. 2020); Ex. 12 (Messrs. Pelley and Kinnings meeting with PGAT executives at the Players Championship in Ponte Vedra in Mar. 2022); *see also id.* Ex. 13 (Mr. Pelley at World Golf Hall of Fame Induction in Ponte Vedra in Mar. 2022). Brazenly, <u>Mr. Pelley is scheduled to return to this District in a mere two weeks' time</u> for another conspiratorial meeting with the PGAT (and others) targeting LIV. *Id*. Ex. 31.

The ET tries to brush aside these business transactions and meetings by its executives in this District with the vague representation that its executives have taken "only" 18 business trips to Florida within the past five years. Mot. at 6; *see also* Waters Decl. ¶ 10. That raw number is anything but minimal, particularly when one considers that the ET is attempting to reduce the per-year average by including the travel-restricted period in the COVID pandemic as well as roughly three years before the ET-PGAT alliance. Moreover, the ET is intentionally silent as to the *business purpose* of these trips, apparently in an effort to conceal its knowledge that some portion of these business trips (likely most of them) are directly related to the formation and execution

of the anticompetitive conspiracy alleged in the underlying litigation.

In addition to the numerous trips by UK-based ET executives to Florida and this District to conduct business, the ET regularly conducts business within this District through the activities of Mr. Monahan, who is based in Ponte Vedra and has had a seat on the ET's Board since the ET-PGAT alliance was formed. Waters Decl. ¶ 14. Contrary to the misleading impression the ET seeks to leave, Mr. Monahan's role on behalf of the ET is anything but passive. Since becoming a member of the ET's Board, Mr. Monahan has engaged in a variety of business actions from within this District on behalf of the ET. For example, in March 2021, Mr. Monahan pressured a broadcaster on behalf of the ET to resolve its disputes with the ET. *See* Brass Decl. Ex. 14. Similarly, in 2022, when the ET triumphantly announced that it had entered into agreements with two smaller golf tours to join in working collectively against LIV, Mr. Pelley made clear that these ET agreements were facilitated by Mr. Monahan in support of their unlawful conspiracy. *See id*. Ex. 15. These documented actions by Mr. Monahan on behalf of the ET call into question the assertion that "Mr. Monahan has no authority to unilaterally transact business on behalf of the European Tour in Florida or anywhere else." Mot. at 7. The ET appears to put excessive weight on the word "unilaterally"—as though actions by a director of the ET on behalf of the ET taken within this District shouldn't count for Rule 45(c) or jurisdictional purposes if taken at the request of another ET executive. There is no basis for such a position.

In addition to these actions taken by individuals physically within this District on behalf of the ET, the ET's executives have directed a wide range of actions at this

District, including through electronic communications to counter-parties within this District. For example, in furtherance of the conspiracy to target LIV's players for punishment to deter further player departures to the new tour, the ET coordinated with the PGA of America—the ET's partner in planning the biannual Ryder Cup—to ban LIV players from the Ryder Cup. *See* Brass Decl. Ex. 16. At the time of these discussions, the PGA of America (a different entity than the PGAT, but part of the same conspiracy) was based in Palm Beach Gardens, Florida, Brass Decl. Ex. 17, and thus those conspiratorial communications by the ET were directed at Florida.

III.    The ET regularly conducts business throughout the U.S.

The ET does not argue for any alternative district in which it claims LIV should have served its Rule 45 subpoena. Instead, the ET appears to argue that it cannot be subject to discovery *anywhere* in the U.S. In light of the ET's extensive and regular business contacts with the U.S., that position cannot prevail.

The ET's most prominent event is the Ryder Cup, which it co-administers with the PGA of America. Since 1927, Ryder Cup has been a biannual competition between American and European golfers, held alternatively between the U.S. and Europe, most recently in Wisconsin in 2021. The ET's Deputy CEO, Guy Kinnings, has acted as Ryder Cup Director since 2018. *See* Brass Decl. Ex. 18. And Mr. Pelley, the ET's CEO, is a prominent fixture at Ryder Cup Events. *Id.* Ex. 19.

In addition to the Ryder Cup, there are a number of events each year in the U.S. that are part of the regular schedule of the ET's flagship tour, the DP World Tour. Two of these U.S.-based events are co-sanctioned with the PGAT, the Barracuda and

8

Barbasol Championships.  Waters Decl. ¶ 15.  The DP World Tour's 2022 schedule also includes four other events taking place in the U.S. for which the DP World Tour awards points (all of which are primarily sponsored by other entities but are nonetheless part of its schedule).  Brass Decl. Ex. 1.  In total, the DP World Tour schedule includes more events in the U.S. than in any other country.  Mr. Pelley also serves on the board of the World Golf Foundation, an organization based in St Augustine, Florida (*id.* Ex. 20)—which sponsors the American Golf Industry Coalition—a lobbying entity targeting U.S. legislators and regulators (*id.* Ex. 21).

Mr. Pelley also conducts ET business around the U.S, from Augusta, GA (Brass Decl. Ex. 22), to Kohler, WI (Ex. 23), to Chaska, MN (Ex. 24).  He is not alone—other ET executives routinely conduct business in Florida and around the country. *E.g., id.* Ex. 25 (Mr. Kinnings in Charlotte, NC, Sept. 23, 2022); Ex. 26 (Mr. Waters, ET's COO, at the Ryder Cup, WI, Sept. 23, 2021); Ex. 27 (David Probyn, ET's Director of Competitions and Membership, in Austin, TX, March 16, 2016); *see also id.* Ex. 7 (ET team virtually joining meeting in PGAT's Florida offices).

Moreover, limited discovery already obtained in the underlying action evidences that the ET electronically communicates with the Florida-based PGAT on a near-daily basis, and has done so for years.  *See* Brass Decl ¶ 2.

## ARGUMENT

The European Tour makes three arguments for quashing the subpoena: (1) the subpoena purportedly does not comply with Rule 45(c)'s 100-mile travel limitation; (2) the Court lacks personal jurisdiction; and (3) international comity mandates going

through the Hague Convention.  The European Tour is wrong on all counts.

I.    The Subpoena satisfies Rule 45(c)'s 100-mile requirement.

The ET complains that the subpoena "seeks to haul" it into this District (Mot. at 1).  Nonsense.  The ET and its executives have come to this District willingly and repeatedly, including to enter into an anticompetitive agreement through which they secured tens of millions of dollars in funding for the ET, additional tour opportunities in the U.S., and an agreement with the PGAT to limit competition in this District and throughout the U.S.  They have returned to this District repeatedly to carry out that anticompetitive agreement, and they will be back to meet about LIV before this motion is decided.  And the ET has a director who resides in this District, who has furthered its interests by pressuring other businesses worldwide from his place of business here.

There is no hardship to the ET in asking it to comply with a subpoena in this District.  Rule 45(c)'s 100-mile requirement is readily satisfied here because the ET regularly transacts business in person within 100 miles of Jacksonville.  Indeed, the ET can comply with the subpoena without traveling at all.

A.    The Subpoena satisfies Rule 45(c) because the ET regularly transacts business in person in Northern Florida.

A witness may be compelled to appear for deposition or produce documents within 100 miles of where it "regularly transacts business in person."  Fed. R. Civ. Proc. 45(c)(1)(A), (2)(A).  The party seeking to quash a subpoena bears the burden of establishing that the 100-mile requirement is not met.  *See Wesolek v. Wesolek*, 2021 WL

3572221, *2 (M.D. Fla. Jan. 20, 2021). The ET has not met that burden.[2]

The ET argues it "does not transact business within 100 miles of the place of compliance." Mot. at 10. But that argument cannot withstand scrutiny in the face of evidence showing its top executives came to this District to negotiate the anticompetitive agreement with the PGAT. Obviously, that agreement—which brought tens of millions of dollars to the ET and structured a global alliance to control the multi-billion dollar professional golf business—meets any meaningful definition of "transacting business." *See* Brass Decl. Ex. 5. Furthermore, the ET's repeated contacts within this District in furtherance of that unlawful agreement (as well as its other business dealings) satisfy any reasonable definition of regularly "transacting business."

The ET offers no meaningful argument to carry its burden of showing that it would face any unreasonable burden in complying with LIV's subpoena. The ET concedes that its executives made 11-18 separate trips to Florida over the last five years (which included the period of COVID travel restrictions and multiple years before the anti-competitive agreement). Mot. at 10-11; Walters Decl. ¶ 10. And while its declaration conceals the identity, purpose, and timing of those visits, available evidence fills in some of those gaps, showing that when the ET's executives came to Florida they came for significant periods of time to conduct significant business. *E.g.*, Brass Decl. Ex. 10 (CEO Keith Pelley attended an ET board meeting virtually from Florida in 2021 because he was in Ponte Vedra for a "series of meetings"); *see also, e.g., id*. Ex. 11;

---

[2] The ET's argument that it doesn't "reside" in Florida is irrelevant. Mot. at 9-10. At issue is whether the ET "regularly transacts business in person." Section II.A.1. of its motion can be ignored.

Ex. 12; Ex. 31. The ET's declarant creates no doubt that its top executives have come to this District repeatedly to carry out the anticompetitive agreement that was negotiated here and aimed at destroying competition in Florida and throughout the U.S. And then there is the problem of PGAT Commissioner Jay Monahan, a resident of this district who is an ET board member that has conducted significant business for the ET from his offices in Ponte Vedra. Additionally, as explained above, the ET also transacts business with and serves on the board of other golfing organizations in Northern Florida, including the World Golf Foundation in St. Augustine, which oversees the American Golf Industry Coalition—an American lobbying entity.

On the other hand, there is no evidence suggesting any hardship for the ET to respond to a subpoena in this District, and no real question that the ET regularly transacts business in person for purposes of Rule 45(c). *See, e.g., Sullivan v. PJ United, Inc.*, 2017 WL 11675693, *4 (N.D. Ala. Dec. 15, 2017) (quarterly business visits sufficient); *Halliburton Energy Servs v. M-I, LLC*, 2006 WL 2663948, *2 (S.D. Tex. Sep. 15, 2006) (four 10-day visits per year sufficient); *In re MTS Bank*, 2018 WL 1718685, *5 & n.6 (S.D. Fla. Mar. 16, 2018) ("repeated business transactions provide credible evidence that a subpoena does not violate … Rule 45"). Moreover, the ET does not point to any other district more convenient for subpoena compliance, leaving the untenable implication that this entity that is subject to personal jurisdiction—including for entering an unlawful agreement to harm competition across the U.S. *while in Florida*—is somehow beyond the subpoena power in any court in this country. The ET and its executives found their way to this District—repeatedly—to negotiate, enter, and carry

out an unlawful conspiracy to restrain trade and violate the Sherman Act. They plan to return. They can very well comply with LIV's subpoena in this District.

### B. Virtual compliance moots the Rule 45(c) issue.

The Subpoena also satisfies Rule 45(c) because it gives the ET the option to comply virtually. *See U.S. v. $110,000 in U.S. Currency*, 2021 WL 2376019, *3 (N.D. Ill. Jun. 10, 2021) (ordering virtual compliance from witness located beyond 100 miles because witness did not have to travel to attend virtual deposition; rejecting caselaw cited by ET); *see also, e.g.*, *In re: 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 2605957, at *4 (N.D. Fla. May 28, 2021) (subpoenas permitting "remote testimony within 100 miles of their residences … do not violate the geographic limitations of Rule 45(c) and will not be quashed on that basis"); *Int'l Seaway Trading Corp. v. Target Corp.*, 2021 WL 672990, *5 (D. Minn. Feb. 22, 2021) ("Virtual attendance … is consistent with the plain language of Rule 45(c)(1)(A) because … [the witness] can comply with the deposition from his home or anywhere else he chooses …"); *In re Newbrook Shipping Corp.*, 498 F.Supp.3d 807, 815 (D. Md. 2020), *vacated on other grounds*, 31 F.4th 889 (4th Cir. 2022) ("Given the … notice [] provide[s] for a remote deposition … [it] no longer requires GMS … to travel more than 100 miles (or at all) to comply.").[3]

---

[3] These holdings are further buttressed in the Rule 43 context, where courts have consistently held that compelling virtual trial testimony from more than 100 miles from the courtroom is consistent with compelling virtual depositions under Rule 45. *E.g.*, *Walsh v. Tara Constr., Inc.*, 2022 WL 1913340, *2 (D. Mass. June 3, 2022) ("the prevailing position among district courts both within and outside this circuit" is to permit a subpoena for "remote testimony from any place … where she regularly conducts business"); *id.* ("Although the Court may not command Mr. McGee's physical presence at trial because he does not … conduct business … within 100 miles of the site of the trial, [Rule] 45(c)(1)[']s subpoena power may reach Mr. McGee … [to] command[] his presence by videoconference.").

Here, given the many electronic communications the ET directs at this District, there is plainly no burden for the ET to comply with the subpoena virtually.[4]

The cases cited by the ET (Mot. at 13-15) do not compel a contrary result. *Managed Care Advisory Group, LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145 (11th Cir. 2019), had nothing to do with Rule 45; it involved an arbitrator's powers under a different statute with different operative language (9 U.S.C. § 7), *id.* at 1152, and Rule 45(c) is not even mentioned in the court's analysis. *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2022 WL 504451 (N.D. Fla. Feb. 18, 2022), also does not support the ET's position; instead, ***it directly supports LIV's position***, as it holds that Rule 43 (testimony at trial) should be treated like Rule 45 (compelling deposition testimony), and compels virtual testimony. *Id.* at *2, *6. The ET also relies on two S.D.N.Y. decisions that are contrary to the weight of authority and read into the Federal Rules requirements not found in the text by focusing on the location of the proceeding, not the burden on the witness. *See Broumand v. Joseph*, 522 F. Supp. 3d 8, 23-24 (S.D.N.Y. 2021); *Ping-Kuo Lin v. Horan Cap. Mgmt., LLC*, 2014 WL 3974585, *1 (S.D.N.Y. Aug. 13, 2014).

By giving the ET an option to comply virtually, the subpoena does not require any travel—let alone more than 100 miles of travel—and the ET has done nothing to carry its burden to justify quashing LIV's subpoena under Rule 45(c).

---

[4] ET's separate argument about document production (at 15-16) adds nothing. Rule 45(c) uses the same operative text for depositions and document production. And given that the ET send emails to Florida on a near-daily basis, transmitting information electronically would not pose an undue burden.

II.     The Court has personal jurisdiction over the ET.

Personal jurisdiction comports with due process when: (A) the party challeng-ing jurisdiction has minimum contacts with the applicable forum; and (B) exercising jurisdiction will not offend traditional notions of fair play and substantial justice. *S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997).  Both are satisfied here.

A.     The ET has sufficient contacts with Florida and the U.S.

The ET gets it wrong from the start by presuming that the applicable forum is Florida.  Mot. at 17-21.  Instead, "where, as here, the court's personal jurisdiction is invoked based on a federal statute authorizing nationwide … service of process," the "applicable forum for minimum contacts purposes is the United States." *Carrillo*, 115 F.3d at 1543-44; *see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 946 n.21 (11th Cir. 1997) (when minimum contacts analysis is with the U.S., "contacts with the forum state are not constitutionally required").  In any event, the ET has ample contacts with both Florida and the U.S.

Plaintiffs bring claims under the Sherman Act, 15 U.S.C. §§ 1, 2.  And Rule 45, which governs non-party subpoenas, permits service of process "at any place within the United States."  Fed. R. Civ. Proc. 45(b)(2).  Personal jurisdiction thus turns on whether the ET has "the requisite minimum contacts with the United States, rather than with the particular forum state." *Carrillo*, 115 F.3d at 1543 (quotation omitted).[5]

---

[5] *See also In re Auto. Refinishing Paint*, 229 F.R.D. 482, 490 (E.D. Pa. 2005) (for a subpoena served on a non-party in an antitrust action, the relevant forum for minimum contacts is the U.S.); *Gucci America Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014) (in light of Rule 45(b)(2)'s national service provision, personal jurisdiction depends on contacts with the U.S. as a whole).

The ET has had abundant and purposeful contact with the U.S. for decades, including contacts specific to the underlying litigation that easily provide a basis for jurisdiction. It administers, promotes, and sends its members to numerous professional golf tournaments throughout the U.S., including the flagship Ryder Cup, and it is on the board of U.S.-based organizations. Additionally, senior ET executives regularly travel to and around the U.S. to conduct ET business. *E.g.*, *In re Auto. Refinishing Paint*, 229 F.R.D. at 492 ("Regular business trips or personal visits to the forum by an entity's employees or agents can also establish the necessary minimum contacts for the exercise of specific jurisdiction."). Given these substantial contacts, through which the ET generates millions of dollars (including the tens of millions of dollars it received from the PGAT as part of the unlawful conspiracy), it strains credulity to say that the ET has not "purposefully directed [its] activities at residents of the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

Moreover, the ET's contacts with the U.S. and Florida are specific to the claims asserted in this case. As detailed above, the ET's top executives traveled to Florida to enter into a conspiracy with the Florida-based PGAT to harm competition in the U.S. Through that conspiracy, ostensible competitors became lockstep partners and unlawfully conspired to restrain trade in the U.S. In addition to millions of dollars, the ET's payoff from that conspiracy included an agreement to co-sanction two tournaments each year in the U.S. All of these significant contacts closely relate to the antitrust claims in the underlying action and the discovery sought in the subpoena. These activities alone establish a "substantial connection" with Florida and the U.S. sufficient

to exercise personal jurisdiction. *See Burger King*, 471 U.S. at 475 n.18 ("[E]ven a single act can support jurisdiction.").

Furthermore, it is undisputed that those contacts are not the ET's only business dealings in Florida. *See* Background, *supra*. ET executives have made frequent trips to Florida, and it has targeted electronic communications to Florida on a near-daily basis through communications with the PGAT in furtherance of the conspiracy.[6]

Finally, the ET's discussion of Florida's long-arm statute (Mot. at 17-20) is inapposite. When, as here, "a federal statute … provides for nationwide service of process," the Court "need not address whether Florida's long arm statute applies." *S.E.C. v. Prime Time Group, Inc.,* 2010 WL 780198, *2-3 (S.D. Fla. Mar. 2010). But even if Florida's long arm-statute applied, it provides no refuge because of the ample evidence the ET has unlawfully conspired to restrain trade in Florida and the U.S., bringing it within that statute. *See Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 585 (Fla. 2000) (non-resident corporation subject to Florida's long-arm statute when it conspired to fix prices "throughout the United States, including Florida").

B. **Exercising personal jurisdiction does not offend traditional notions of fair play and substantial justice.**

If there are sufficient minimum contacts, a party seeking to escape jurisdiction

---

[6] It is well-established that communications with a forum state are sufficient to establish personal jurisdiction. *Burger King*, 471 U.S. 462 at 476 (because "a substantial amount of business is transacted solely by mail and wire communication … we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction"); *Cable/Home Comm. Corp. v. Network Prods., Inc.*, 902 F.2d 829, 858 (11th Cir. 1990) (similar); *Exhibit Icons, LLC v. XP Co., LLC*, 609 F. Supp. 2d 1282, 1293–94 (S.D. Fla. 2009) (electronic communications, including 188 phone calls, sufficient to establish personal jurisdiction).

must present "a compelling case" that exercising jurisdiction "would be so unreason-able that the party's liberty interests have actually been infringed." *S.E.C. v. Marin*, 982 F.3d 1341, 1350 (11th Cir. 2020) (citation omitted). Only in "rare" and "highly unusual cases" will litigating in a forum with sufficient minimum contacts offend tra-ditional notions of fair play and substantial justice. *Id.* (citation omitted).

Here, the ET has come nowhere close to making "a compelling case" to resist jurisdiction. As the Eleventh Circuit has recognized, "modern methods of transporta-tion and communication" have significantly lessened the burden on foreign nationals to litigate in U.S. courts. *Carrillo*, 115 F.3d at 1547. The ET, for its part, routinely relies on such methods to conduct its business in Florida and across the U.S. More-over, "contesting a subpoena does not present the same burden as defending a full-scale trial proceeding." *Marin*, 982 F.3d at 1351. And complying with the subpoena here would be less burdensome still. All it need do is designate a representative to attend a virtual deposition and arrange for the electronic delivery of responsive information.

III.   International comity does not mandate using the Hague Convention.

International comity provides no basis to quash the subpoena. Contrary to the ET's suggestion, "[t]he Hague Convention does not provide the exclusive or even pre-ferred method for obtaining discovery from foreign individuals." *In re Photochromic Lens Antitrust Litig.*, 2012 WL 12904331, *3 (S.D. Fla. May 2, 2012) (citing *Société Na-tionale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 539–40, 544 (1987)). Rather, the Supreme Court has squarely held that the Hague Convention "is a permissive supplement, not a pre-emptive replacement, for other

means of obtaining evidence located abroad." *Aérospatiale*, 482. U.S. at 536. The Federal Rules remain "'the normal method[]' for discovery, "unless the 'optional' or 'supplemental' Convention procedures prove to be conducive to discovery under some circumstances." *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 300 (3d Cir. 2004) (quoting *Aérospatiale*, 482 U.S. at 536).

"The proponent of using the Hague Convention procedures bears the burden of demonstrating the ***necessity*** for using those procedures." *In re Photochromic*, 2012 WL 12904331, at *3 (emphasis added). The ET has not met that burden here.

*First*, the information sought is central to LIV's antitrust claims. LIV alleges that the ET unlawfully conspired with the PGAT to destroy competition, including by punishing any players who participate in LIV events, and the evidence shows it took an active role exerting that alliance's influence throughout the golf "ecosystem." The information in the ET's possession is extremely important to the case, including evidence of ET's internal views toward negotiations with the PGAT, evidence showing what the ET's actions would have been absent the unlawful agreement, and evidence of the ET's actions in furtherance of the unlawful conspiracy, including pressure imposed on other actors in the golf "ecosystem." If the ET were to succeed in evading discovery, there would be no alternative source for much of this evidence.

*Second*, the subpoena contains targeted document requests and deposition topics. Those requests are reasonably specific given the scope of the claims, and the ET makes no serious argument to the contrary. *Third*, the ET is likely in possession of unique information that originated in the U.S. and will not be produced by the PGAT,

including communications between the ET and others within the golf "ecosystem," including other tours, golfers, sponsors, vendors, and others. In addition, highly relevant evidence relating to the ET's internal analysis of the conspiratorial agreement, its effects, and the parties' negotiations will exist only in the ET's files.

*Fourth*, the Hague Convention is an inadequate substitute. Plaintiffs initiated Hague Convention proceedings after the ET indicated it would move to quash this subpoena, recognizing that those procedures are slow and cumbersome. And given that fact discovery closes in early March, "the Hague Convention procedures [may] not be a particularly effective discovery device as discovery under the Hague Convention could take six months to a year." *In re Photochromic*, 2012 WL 12904331, at *3.

*Finally*, the ET's suggestion that the U.S. has no interest in enforcing its laws is outrageous. The U.S. has every interest in enforcing it antitrust laws against a foreign company conspiring to restrict competition in its markets. *E.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 54 (E.D.N.Y. 2010) (comity did not require resorting to Hague Convention, as antitrust laws "essential to the country's interests in a competitive economy") (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 634–35 (1985)); *F. Hoffman LaRoche v. Empagran*, 542 U.S. 155, 165 (2004) ("appl[ying] our antitrust laws to foreign anticompetitive conduct is … consistent with … comity, [where it] … redress[es] *domestic* antitrust injury").

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to quash.

DATED:  November 29, 2022       Respectfully submitted,

                                              By:   */s/ Rachel S. Brass*

                                            GIBSON, DUNN & CRUTCHER LLP

                                            RACHEL S. BRASS
          *Admitted Pro Hac Vice*
          rbrass@gibsondunn.com
         555 Mission Street, Suite 3000
         San Francisco, California 94105-0921
         Telephone:  415.393.8200
         Facsimile:  415.393.8306

         JOSHUA LIPTON (Lead Counsel)
          *Admitted Pro Hac Vice*
          jlipton@gibsondunn.com
         1050 Connecticut Avenue, N.W.
         Washington, DC 20036-5306
         Telephone:  202.955.8500

         JASON STERNBERG
          Fla. Bar No. 72887
          jasonsternberg@quinnemanuel.com
         Quinn Emanuel Urquhart & Sullivan LLP
         2601 South Bayshore Drive, Suite 1550
         Miami, Florida 33133
         Telephone: 786.850.3607

         *Counsel for Respondent LIV Golf, Inc.*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 29, 2022, a true and correct copy of
the foregoing document was electronically transmitted to all counsel of record via the
CM/ECF system and by email to:

*PGA European Tour*

| | |
|---|---|
| William P. Keane | Email: wkeane@fbm.com |
| Daniel A. Contreras | dcontreras@fbm.com |
| Janice W. Reicher | jreicher@fbm.com |
| FARELLA BRAUN + MARTEL LLP | |
| 235 Montgomery Street, 17th FL | |
| San Francisco, California 94104 | |
| Tel: (415) 954-4400 | |
| | |
| R. Eric Bilik | ebilik@mcguirewoods.com |
| Kimberly T. Mydock | kmydock@mcguirewoods.com |
| MCGUIREWOODS LLP | |
| 50 N. Laura Street, Suite 3300 | |
| Jacksonville, Florida 32202 | |
| Tel: (904) 798-3200 | |
| Fax: (904) 798-3207 | |

*PGA Tour*

| | |
|---|---|
| John W. Keker | Email: jwk@kvn.com |
| Brook Dooley | bdooley@keker.com |
| Nicholas S. Goldberg | ngoldberg@keker.com |
| Thomas E. Gorman | tgorman@keker.com |
| Sophie A. Hood | shood@keker.com |
| Leo L. Lam | llam@keker.com |
| Robert A. Lauridsen | alauridsen@keker.com |
| Eric H. MacMichael | emacmichael@keker.com |
| Nicholas D. Marais | nmarais@keker.com |
| Elliot R. Peters | epeters@keker.com |
| David J. Silbert | dsilbert@keker.com |
| Kathleen Corey | kcorey@keker.com |
| Keker, Van Nest & Peters LLP | |
| 633 Battery Street | |
| San Francisco, CA 94111-1809 | |

22

Anthony J. Dreyer                                   anthony.dreyer@skadden.com
Karen H. Lent                                       karen.lent@skadden.com
Matthew M. Martino                                  matthew.martino@skadden.com
Skadden, Arps, Slate, Meagher & Flom
LLP
One Manhattan West
New York, NY 10001

Patrick J. Fitzgerald                               patrick.fitzgerald@skadden.com
Skadden, Arps, Slate, Meagher & Flom
LLP
155 N. Wacker Drive, Suite 2700
Chicago, IL 60606

                                    _/s/ Jason Sternberg_____
                                        Jason Sternberg

# EXHIBIT 44

## EXHIBIT FILED UNDER SEAL