Pages 1 - 47

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan van Keulen, Judge

PHIL MICKELSON, *et al.*,      )
                               )
          Plaintiffs,          )
                               )
     vs.                       )      **Case No. 5:22-CV-04486**
                               )
PGA TOUR, INC.,                )
                               )
          Defendant.           )
_____)

San Jose, California
Friday, October 14, 2022

**<u>TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS</u>**

(APPEARANCES ON FOLLOWING PAGE)

TRANSCRIPTION SERVICE BY:      Dipti Patel, CET-997
                               Liberty Transcripts
                               7306 Danwood Drive
                               Austin, Texas 78759
                               (847) 848-4907

**APPEARANCES VIA ZOOM VIDEOCONFERENCE:**

For the Plaintiffs:

                                    QUINN EMANNUAL URQUHART & SULLIVAN
                                        LLP
                                    865 South Figueroa Street
                                    10th Floor
                                    Los Angeles, California 90017
                            **BY: DOMINIC SURPRENANT, ATTORNEY AT LAW**

                                    GIBSON DUNN & CRUTCHER
                                    555 Mission Street, Suite 3000
                                    San Francisco, California 94105
                            **BY: RACHEL S. BRASS, ATTORNEY AT LAW**
                                    **LAUREN DANSEY, ATTORNEY AT LAW**

For the Defendant:

                                    SKADDEN, ARPS, SLATE, MEAGHER &
                                    FLOM LLP
                                    One Manhattan West
                                    New York, New York 10001
                            **BY: ANTHONY DREYER, ATTORNEY AT LAW**

                                    KEKER, VAN NEST, & PETERS LLP
                                    633 Battery Street
                                    San Francisco, California 94111
                            **BY: NICHOLAS GREEN, ATTORNEY AT LAW**

1    **Friday - October 14, 2022**                                   **10:00 A.M.**

2                         **P R O C E E D I N G S**

3                             ---O0O---

4        **THE CLERK:**  Calling Case 22-CV-4486, Mickelson *et al.* versus

5    PGA Tour, Inc.

6        Counsel please identify yourselves for the record beginning

7    with the plaintiff.

8        **MR. SURPRENANT:**  Thank you.

9        Good morning, Your Honor.  Dominic Surprenant, Quinn

10   Emanuel, for the plaintiffs.

11       **THE COURT:**  Mr. Surprenant, good morning.

12       **MR. SURPRENANT:**  Good morning.

13       **MS. BRASS:**  Good morning, Your Honor.  Rachel Brass, Gibson

14   Dunn & Crutcher, for the plaintiffs.

15       **THE COURT:**  Ms. Brass, hello.

16       **MS. DANSEY:**  Good morning Your Honor.  Lauren Dansey from

17   Gibson Dunn & Crutcher for the plaintiffs.

18       **THE COURT:**  Ms. Dansey, welcome.

19       **MR. DREYER:**  I think we're on to defendants, Your Honor, for

20   the PGA Tour, Anthony Dreyer with the firm of Skadden, Arps,

21   Slate, Meagher & Flom.  Good morning.

22       **THE COURT:**  Mr. Dreyer, good morning.

23       **MR. GREEN:**  Good morning, Your Honor.  Nicholas Green,

24   Keker, Van Nest, & Peters, also on behalf of the Tour.

4

1          **THE COURT:**  Mr. Green, hello.

2          All right.  We're on today for LIV's motion to compel

3     responses to Interrogatory Number 1.  And I appreciate everyone

4     making themselves available as far flung as you may be or not but

5     for this hearing on relatively short notice.

6          My usual practice is for the first discovery dispute in a

7     matter is to have the parties come in person because I want to be

8     sure that you understand my ground rules for discovery disputes,

9     and I like to have everyone face-to-face to do that.  Because I

10    set this on short notice, given the timeline in this case, I did

11    set it for a proceeding by Zoom.  But you should expect that

12    should there be a need for further proceedings, they may well be

13    in person.

14         And to that end, if we are unable to successfully resolve

15    issues or at least if I'm not satisfied that I have given

16    sufficient guidance or that you have heard sufficiently my

17    guidance on how to resolve this issue, I will have folks back in

18    on Monday afternoon.  And that will be in my courtroom.

19         And in part, I do that any time that I think the parties

20    will benefit perhaps from some direction from the Court and, more

21    importantly, from meeting in person down the hall and checking in

22    with me periodically.  It may not come to that, but that's my

23    plan (audio interference) see you next week.

24         So with that in mind, let's turn to the issue at hand.  And

25    here's how I want to proceed.  Again, because this is our first

1    proceeding, I'm going to start first with your initial

2    disclosures and any disclosures or productions and discovery

3    that's been held to date.  I just want to get a sense of the

4    landscape as to what has already gone on.

5         I'll hear briefly from each side on that.  I don't need

6    details.  I just want to know -- I'll ask some questions, and I'm

7    sure you'll respond to those.

8         Then we'll move to a discussion with regards to the relevant

9    time frame for discovery in this case.  Then we'll turn to your

10   ESI stipulation.  Again, I want to know status where you are and

11   what next needs to be done.  The ESI stipulation from my

12   perspective, at least at this point, dovetails very much into

13   Interrogatory Number 1 and how we'll manage the responses to

14   that.

15        All right.  So (audio interference) plaintiff first which is

16   what have you done in terms of initial disclosure, how many

17   people have you identified, what have you done in terms of

18   document production.  And I'll hear from both sides, but I want

19   to just get each side's perspective initially.

20        And who (audio interference) for the plaintiffs?

21        MR. SURPRENANT:  (Audio interference) Ms. Dansey on the

22   issues, Your Honor.

23        **THE COURT:**  Thank you.

24        Ms. Brass or Ms. Dansey, initial disclosure status?

25        **MS. DANSEY:**  Your Honor, we have served our initial

1    disclosures and I believe we've identified 14 or more individuals

2    in groups within those initial disclosures that we believe are

3    relevant.

4        We have already made our initial production of documents on

5    October 3rd.  That initial production was made prior to the

6    protective order being entered, but we did produce approximately

7    1,000 and I believe around 5,000 pages.  And we have an

8    additional production that is going to be going out I believe

9    today or tomorrow of another 5,000 documents and approximately

10   18,000 pages.

11       **THE COURT:**  Okay.  All right.

12       Thank you, Ms. Dansey.

13       And from the Tour from PGA, how many persons identified?

14       **MR. DREYER:**  I'll defer to my co-counsel.  I believe it's

15   approximately the same number.  And I apologize, I don't have it

16   in front of me.  But that's the ballpark.

17       **THE COURT:**  Okay.  A little bit of a pop quiz.  I appreciate

18   that.

19       **MR. DREYER:**  I understand.

20       **THE COURT:**  Who can answer that?

21       **MR. GREEN:**  Yes, Your Honor.  I'm just looking at our

22   initial disclosures now.  with respect to members of the Tour

23   itself, I believe that Mr. Dreyer is correct.  There are

24   additional folks who are included on our initial disclosures as

25   folks who may have relevant information.  That's a more --

1       **THE COURT:**  Okay.  Let me be sure I'm understanding.

2       Mr. Green, when you say members of the Tour, how many are

3  you talking about because you seem to be referring to a number,

4  roughly?

5       **MR. GREEN:**  Well, let me just clarify, Your Honor.  There's

6  sort of two -- there's two categories that may be at issue.

7  There's the category of folks who work for the Tour as in the

8  administration, and then there are Tour members --

9       **THE COURT:**  Understood.

10       **MR. GREEN:**  -- golfers.

11       **THE COURT:**  Understood.

12       **MR. GREEN:**  So with respect to Tour administration, I'm just

13  counting here, I see one, two, there, four, five on that list and

14  then several other Tour players.  We can get you the specific

15  number.  It's broken up a little bit, Your Honor, so I would just

16  have to go through and count.

17       **THE COURT:**  Okay.  All right.

18       **MR. DREYER:**  And then --

19       **MR. GREEN:**  And the Tour --

20       **MR. DREYER:**  Oh, forgive me, Nicholas.

21       **THE COURT:**  No, go ahead.  Anything further from plaintiffs,

22  Mr. Dreyer?

23       **MR. DREYER:**  In terms of the document production, we

24  produced approximately 25,000 pages of documents and anticipate

25  producing approximately 7,500 more pages today.

1      **THE COURT:**  Okay.  And when was that initial production?

2      **MR. DREYER:**  I believe it was on or about October 3rd.

3      **THE COURT:**  Okay.  And describe for me generally -- again, I

4   appreciate we're in pop-quiz area here, but describe for me

5   generally the categories of documents that the Tour has produced

6   or is about to produce as part of its initial disclosures?

7      **MR. DREYER:**  It includes email searches from custodians that

8   we had initially offered.  There are obviously more that we've

9   since agreed to.  Tour documents, bylaws, handbooks, board

10  minutes, financial statements.  So it cuts across most of the

11  categories in the RFP requests that we've agreed to already.

12  We're still working through that process.

13     **THE COURT:**  Okay.

14     **MR. DREYER:**  Today's production will be more of the same in

15  terms of categories.

16     **THE COURT:**  Okay.

17     All right.  That's helpful.  It sounds like an okay start

18  and that perhaps there's some additional work to do on both

19  sides.  And we'll get to that.  We'll drill down on that a little

20  bit I think when we get to the ESI stipulation and obviously as

21  we work through the components of the interrogatory.

22     Let's step aside for a moment and talk about the relevant

23  time frame for production or for discovery responses.  That

24  reminds me.  Mr. Dreyer, you just referred to an RFP.  So what

25  formal discovery in addition to Interrogatory 1, if any, has been

1    served to date and first by LIV, what's been served?

2        **MS. BRASS:**  Your Honor, the parties have each served RFPs

3    and interrogatories as well as a number of third-party subpoenas

4    --

5        **THE COURT:**  Okay.

6        **MS. BRASS:**  -- on an agreed time frame, meeting and

7    conferring I would say almost daily on all of those.

8        **THE COURT:**  Oh, I'm sure.

9        **MS. BRASS:**  For hours at a time.

10       **THE COURT:**  Good, good.

11       **MS. BRASS:**  And also, everyone is meeting and conferring

12   with the third-party subpoena recipients, as well.

13       **THE COURT:**  Okay.  And RFPs, if you can, Ms. Brass,

14   generally, how many were served by plaintiff?

15       **MS. BRASS:**  Ms. Dansey will have that offhand.

16       **MS. DANSEY:**  Yep, 72.

17       **MS. BRASS:**  Thank you.

18       **THE COURT:**  Okay.  Thank you.

19       And let me hear from the Tour.  What discovery have you

20   served so far?

21       **MR. DREYER:**  Nicholas, do you want to take the lead?

22       **MR. GREEN:**  Yeah, sure.  Happy to.

23       Your Honor, we've served both interrogatory -- I would say

24   generally Ms. Brass' characterization of the status of discovery

1    is accurate with respect to both parties.  We have served RFPs

2    both on LIV and also on the remaining player plaintiffs.

3         We had originally served RFPs on players who were plaintiffs

4    but then voluntarily withdrew their claims or voluntarily

5    dismissed those claims right around the time that their responses

6    to their requests were due.  And so those were converted by

7    agreement of the parties to subpoenas which those voluntarily

8    dismissed plaintiffs have agreed to produce their documents on

9    the same schedule as the remaining player plaintiffs.

10        **THE COURT:**  Okay.

11        **MR. GREEN:**  With respect to the number of RFPs, Your Honor,

12   I'm just looking at an illustrative set.  I don't know that they

13   are completely --

14        **THE COURT:**  That's fine.

15        **MR. GREEN:**  -- identical with respect to each party, but,

16   for example, the set served on Mr. DeChambeau, who is one of the

17   remaining named player plaintiffs, contains just -- it's just

18   loading here, Your Honor, I apologize.

19        **THE COURT:**  That's fine.

20        **MR. GREEN:**  Contains 79 requests, Your Honor.

21        **THE COURT:**  Okay.  All right.  And would that be about the

22   same number that's been served on LIV or Live?

23        **MR. GREEN:**  I believe that's correct, and I'm just looking

24   to see if I can give you a precise number, Your Honor.  I have it

25   here in front of me.  Just give me one moment.

1      There are 88 requests to LIV, Your Honor.

2      **THE COURT:**  Okay.  Thank you.

3      **MR. GREEN:**  There's one other issue that the parties are

4  still working through, Your Honor, which relates to player agents

5  and whether they're going to be deemed to be in control of

6  documents.  We're still meeting and conferring about that, so I

7  don't think it's time to --

8      **THE COURT:**  Yeah, I'm not looking for other disputes at this

9  point.  I'm confident I know from experience as do each of you

10  that this is a process.  And I am pleased to hear that it does

11  sound like sleeves are rolled up and you're working through it

12  from initial disclosures to formal requests.  And I'm pleased to

13  hear about the meet and confer efforts.

14      And I will just remind you all of my standing order on civil

15  discovery where I do set parameters around meet and confer before

16  a dispute comes to me.  And it's not just letter writing or

17  emails in today's form, but you need to be meeting in person or

18  by video.  But you can't just be sending positions back and

19  forth.  But it does sound like the folks are working, and I

20  appreciate that.  And I will continue to push on that if

21  necessary.

22      All right.  Let's return to relevant time period.  I have

23  been through the complaint, and it's not clear to me.  I saw in

24  the interrogatory response that PGA was or the Tour was offering

25  the 2021-2022 time period.  Have the parties reached an

1   agreement?  Aside from Interrogatory 1, are you working on a

2   fixed time frame or is that still an issue in dispute?

3       And let me hear from plaintiffs first.

4       **MS. DANSEY:**  Your Honor, we don't have a full agreement as

5   of yet on the specific time frame.  In general, I believe the

6   parties are operating with going back to 2019 --

7       **THE COURT:**  Okay.

8       **MS. DANSEY:**  -- with a few discrete issues where plaintiffs

9   are seeking to go back further.

10      **THE COURT:**  Okay.  All right.

11      And, Mr. Dreyer or Mr. Green, does that comport with your

12  understanding, as well, a general agreement from 2019 and perhaps

13  some disputes around other specific issues that go further back?

14      **MR. DREYER:**  It does.  I think we may be looking at

15  September 1st, 2019, but generally speaking, I think Counsel has

16  it correct.

17      **THE COURT:**  Okay.  Well, I'm going to take this as an

18  excellent sign because my notes say set the relevant time frame

19  for essentially September-October, wherever you want to draw that

20  line in 2019.  And I think that is supported by the allegations

21  in the complaint, so good.

22      All right.  Let's turn to ESI status, your ESI stipulation.

23  And I want to go there because as I say I think that this plays

24  into the interrogatory response.  So let's again take it step by

25  step.

1   I did receive following my request the Tour's organizational

2   charts that had been produced in this action, produced to LIV.

3   And I asked for designation of custodians, and as I count, it

4   looks like there are eight custodians that have been agreed upon

5   based on the org charts and that there are five in dispute.  I

6   don't know what that means.

7       **MS. BRASS:**  Your Honor, I --

8       **THE COURT:**  And it may be moved past that.  So Ms. Brass is

9   anxious to update me.

10      **MS. BRASS:**  Yeah, we have resolved that dispute last night.

11  And so we are agreed, you know, doing searches at this point on

12  those 14, you know, subject to identifying through productions,

13  other people who clearly are relevant.

14      **THE COURT:**  All right.

15      **MS. BRASS:**  Mutual (indiscernible).

16      **THE COURT:**  And is that 14 not -- 14, I had 8 and 5 but what

17  do I know?

18      **MS. DANSEY:**  That's correct.

19      **MR. DREYER:**  It's 14, Your Honor.

20      **THE COURT:**  Okay.

21      **MS. DANSEY:**  It's 14 retired individuals plus on the org

22  chart.

23      **THE COURT:**  Okay.  Got it.  I'll just make a note so I don't

24  -- custodians, that's good.

25      Okay.  And I'm sorry, Ms. Dansey, I think you just answered

1     this question.  Are those 14, do they appear on the org chart?

2          **MS. DANSEY:**  It's 13 on the org chart.  There's one

3     individual that's retired and so it does not appear on the org

4     chart.  But it's (indiscernible) custodian.

5          **THE COURT:**  Got it, okay.

6          And it sounds like the parties have discussed adjusting that

7     perhaps, if necessary, going forward.  And your ESI stipulation

8     does provide for that, so I will let you continue to operate

9     under that.

10         Tell me where you are with regards to search terms.  Has a

11    set been agreed on?  Is there no agreement?  Are you working

12    through it in a process?

13         Ms. Dansey, I'll start with you.

14         **MS. DANSEY:**  We are agreed on the search terms.  I think the

15    parties agreed to the final set at least of the preliminary

16    search terms this morning.

17         **THE COURT:**  Okay.  Excellent.

18         **MR. DREYER:**  Your Honor, forgive me for not being able to

19    clarify.  That is correct with the exception of one RFP that we'd

20    initially objected to.  Plaintiff provided some search terms, and

21    we're running those search terms.  So that's an open issue.  But

22    in terms of the majority, the overwhelming majority of the RFPs,

23    Counsel is absolutely correct, we have agreed.

24         **THE COURT:**  Okay.  Good, I'm glad to hear that.

25         All right.  Well, you have an excellent working framework.

1   I think both sides appreciate the timeline you're operating

2   under, which I understand is something that both parties with

3   Judge Freeman and her schedule felt that this was the best way to

4   go forward.

5         So given that now you have custodians and search terms, I'll

6   be interested to hear how that relates to Interrogatory 1 because

7   I will say as drafted, at least as it came to me, it struck me as

8   really an RFP.  Now I appreciate it is an interrogatory.  But

9   whenever the ask is for specific identification and specific

10  communications, especially at the level of detail that's

11  requested as drafted, that looks to me like an RFP because when

12  you receive the chart with all that identification, I assume then

13  that that turns into a "now give us all of those documents."

14        And I of course have no way of telling how much of this has

15  already been covered by the productions to date or the custodians

16  and search terms that have now been agreed to.  I do appreciate

17  -- I read and I hear LIV's point of, well, we have to throw the

18  net far and wide.  We need to be all inclusive because we need --

19  we're trying to capture the universe of communications as that

20  relates to the antitrust claims.

21        And I mean that is just -- you don't have time for it to be

22  that broad.  This interrogatory will need to be narrowed and more

23  focused, and I think -- and it will still be very beneficial.

24        Similarly, the Tour's response is to narrow.  And, you know,

25  it's frankly just too fine.  Again, maybe some of those positions

1   have been better informed since the dispute came to me since you

2   have now agreed on custodians and search terms.  A lot of this

3   may be covered.

4       But both sides are going to have to compromise on this.

5   Both sides are going to have to let go of what was presented to

6   me as very entrenched positions.  You know, all on one side and

7   just a little bit on the other side, that's not going to happen.

8   There's going to have to be compromise.

9       And it sounds like you've been able to do that in a number

10  of contexts.  So let's see if we can address it here.

11      Now I've broken this out into its key components, the first

12  being who's making the communications being currently set forth

13  as each individual; the subject matter of those communications

14  being a defined term of new Tour; the target of those

15  communications being a long series of categories, that is who the

16  communications were with; and then some of the nuts and bolts as

17  to how those are produced or identified and so forth.

18      So for plaintiffs, that's what I'm looking at in that there

19  needs to be some adjustment on those components, again, on both

20  sides.  And maybe you address it and have a path forward, maybe

21  not.

22      So, Mr. Surprenant, I think you have the ball on this one.

23      **MR. SURPRENANT:**  Thank you, Your Honor.

24      The original interrogatory I think Your Honor has fairly

25  described.  Our proposed order and as set forth in the proposed

1   order in Exhibit A, I think has been narrowed and narrowed

2   significantly a ways.

3       We've asked for 83 individuals who are on the org chart and

4   other individuals who likely have information about these

5   communications.  The communications at issue are really critical.

6   That's why we only filed one, Your Honor, because these

7   communications will let us more efficiently take phase two in

8   terms of third parties that we'll serve Rule 45 subpoenas,

9   depositions, custodians.  And that's why we filed one.  And we

10  think we have narrowed it significantly.

11      And we have also narrowed it in terms of who the

12  communications were with.  Specifically, we've narrowed it to

13  broadcasters, sponsors, vendors, the European Tour, the DP World

14  Tour, also known as the European Tour, other tours, the Majors,

15  and the AWGR, the world --

16      **THE COURT:**  I don't see that as very narrowing, as much

17  narrowing, Mr. Surprenant.  But --

18      **MR. SURPRENANT:**  Okay.  I'm sorry, Your Honor.

19      **THE COURT:**  No, no.  I'm just saying.  I'm foreshadowing for

20  you, but it is -- you're explaining to me where you've been.  I

21  have been through the proposed orders.  I did see that.

22      **MR. SURPRENANT:**  Okay.  Thank you, Your Honor.

23      One thing is that we did have, we have been through or going

24  through the discovery that Mr. Dreyer described.  And one of the

25  things that is indicated is that these communications at least to

1  a degree, and it may be a significant degree, are centrally

2  controlled.

3      In other words, the PGA Tour knows at least in part who are

4  making these communications.  And so I think that that is

5  relevant and should inform the nature of the discovery that is

6  imposed on -- that to which they respond.

7      If Your Honor is indicating, as I believe Your Honor just

8  did, that the 83-plus likely is casting the net too broadly, A, I

9  respectfully disagree but, B, I clearly hear you.  And so we will

10 confer internally and with our client and we will -- and discuss

11 with Mr. Dreyer and Mr. Green and our colleagues.  But we do not

12 think -- I mean this is a critical issue to the litigation, and

13 we can't be left at the mercy of a circumscribed number of

14 custodians who are asked about these communications.

15    **THE COURT:**  So that's what I'm trying to work through, Mr.

16 Surprenant, is you have your ESI agreement with custodians and

17 search terms.  Now you have this interrogatory, which -- and your

18 ESI agreement is generally formulated, you know, with the RFPs in

19 mind, which it sounds like you all have done.

20     Now you have the interrogatory which the only way I am aware

21 that any party could respond to this interrogatory would be to do

22 a search for documents.  But as I understand it, plaintiffs' ask

23 is, well, this should be outside of the parameters of the ESI

24 stipulation, this should be not fixed to custodians or search

25 terms or, you know, maybe not those search terms.  I don't know

1   what your search terms are.

2       This needs to be something much broader.  And that's -- it

3   still needs to be a search for electronically stored information.

4   Doesn't it?

5       **MR. SURPRENANT:**  Not necessarily, Your Honor.  Let me

6   address.  There's two points.

7       One, we are asking for the identity of people with relevant

8   information, and we believe this information is highly relevant.

9   And Rule 33 --

10      **THE COURT:**  So I understand that, and that's absolutely a

11  fair question.  The Tour has an obligation under Rule 26, under

12  the rules of initial disclosure, and in your ESI stipulation to

13  identify those people.  And that's why I was asking at the outset

14  in the disclosures how many people are being identified because

15  is it -- it doesn't sound like it was everybody on the org chart.

16      This is to the Tour.  You have an obligation.  If there are

17  people in the organization who were empowered to speak to either

18  other Tours or vendors, broadcasters, et cetera, or to your own

19  Tour members about other Tours, and we have to figure out what

20  that list is but just for a moment, let's -- you know, about

21  competitive or potential competitive Tours, those people need to

22  be identified.  That list -- those names should already have been

23  disclosed.

24      And that's what -- you know, okay, now we're digging down to

25  it and getting to it in the interrogatory, but that information,

1  there's an affirmative obligation for those names to have been

2  provided.

3      **MR. DREYER:**  Completely understood, Your Honor.

4      **THE COURT:**  So has that -- I'm coming back, Mr. Surprenant,

5  not to worry.

6      Has that been done, Mr. Dreyer, or is it in progress?

7  Because it sounds like it needs to be a larger list than what was

8  on the initial disclosure.

9      **MR. SURPRENANT:**  It's been done in part, and I think it's a

10  progress in part, Your Honor, because these communications given

11  the nature of our business are in the form of emails, text

12  messages.  And to your point earlier, and there were three

13  problems we had with this request.  One was the burden which

14  you've addressed even as narrowed.  The other is the questionable

15  probative value of what people can really recall over a four-year

16  period.

17      But more importantly was the fact that there are other tried

18  and true far less burdensome means to get at these

19  communications, specifically as you said, the RFP process.  There

20  is an RFP that asks us to search for and we have agreed to search

21  for effectively every communication by our custodians that

22  relates to LIV Golf, Greg Norman, New Golf Tours, the laundry

23  list, the who that you mentioned earlier, Your Honor.

24      That process is in place.  We've agreed to search terms to

25  get at that information.  We've started producing the

1    information.  And certainly as individuals emerge from that

2    process, as we said in our interrogatory response, we will update

3    our interrogatory response and our disclosures as you posit, Your

4    Honor.

5        **THE COURT:**  I hear that, Mr. -- (clears throat) excuse me,

6    Mr. Dreyer, and that's a good start.  But what concerns me is

7    that the number of individuals with relevant information

8    identified in your initial disclosure seems quite small.

9        And now maybe that's everybody who could have had these

10   communications.  But as does the number of custodians is

11   similarly quite circumscribed.

12       **MR. DREYER:**  Well, let me address that.

13       **THE COURT:**  Now, so --

14       **MR. DREYER:**  Oh, forgive me, Your Honor.

15       **THE COURT:**  -- let me -- so, first, we have to be -- I want

16   absolute certainty and if it can't be today, it will be in the

17   sworn declaration by Monday, but I want absolute certainty that

18   the persons with -- who would have been discussing competitive or

19   potentially competitive tours in the relevant time frame have

20   been identified.  That's step one.

21       And it may be -- well, I don't know.  It may be a broader

22   list than is currently on the initial disclosure and ESI

23   custodian list.  It may not.  But there is an affirmative and

24   good-faith obligation.  It's on the producing party.  The burden

25   is on the producing party to provide that list.

1    So if it is reasonably something fewer than the 83, 83 looks

2    like they -- I mean they all have very impressive titles.  It's,

3    you know, highest to intermediate levels.  It doesn't seem to go

4    down too long.  I don't think necessarily -- certainly,

5    interviewing if not searching for 83 people is burdensome, at

6    least to determine to fulfill your obligations to the Court who

7    would be having these discussions in the relevant time period.

8    **MR. DREYER:**  Understood, Your Honor.

9    And I hear you loud and clear.  You know, I would think it's

10   already Friday afternoon.  We would certainly ask for Wednesday,

11   but we'll represent to do that.

12   The other point I did want to make in terms of the

13   custodians and the 14 we've identified --

14   **THE COURT:**  Yeah, please.

15   **MR. DREYER:**  Because I think it's important to know who

16   we're searching.  That's really important.  In most cases, in

17   cases like this, parties usually fight to keep discovery away

18   from Larry & Peck's officers.  The Tour has not done that.  To

19   the contrary, we've agreed to search for and produce documents

20   from those at the highest levels of the Tour, the Commissioner

21   Jay Monahan whose --

22   **THE COURT:**  Which sounds like is required given the nature

23   of the communications.

24   **MR. DREYER:**  But the chief operating officer, the chief

25   media officer, the chief tournament and competitions officer.  So

1   I just want the Court to understand we are taking our obligation

2   seriously.  We are searching those custodians.  We are producing

3   the communications on a rolling basis, and we will provide the

4   information the Court requested by mid-week next week.

5       **THE COURT:**  Okay.  We will circle back to the issue of

6   deadline.  And don't let me sign off without doing that.

7       Okay.  So that is where we are in individuals.

8       Mr. Surprenant, not -- you know, maybe it's the 83.  It's

9   probably something less.  But we're going to get -- the Court is

10  going to have an assurance in the form of a declaration signed

11  under oath identifying the persons.  And I appreciate it is a

12  process and things may be produced and there may be names to add

13  later.

14      But there's going to be a confirmation to the Court that

15  there has been a reasonable investigation and identification of

16  persons, individuals who would have been discussing competitive

17  or potentially competitive tours in the relevant time period.

18      **MR. SURPRENANT:**  Thank you, Your Honor.  That's very

19  helpful.  If I could make, with Your Honor's permission, a few

20  points.

21      **THE COURT:**  Of course.

22      **MR. SURPRENANT:**  Mr. Dreyer said that they have in part

23  identified the individuals.  I'm not aware we've received any

24  answer to interrogatories or any identification.  We've received

25  documents and the cases we cited hold very clearly that when you

24

1    produce documents in lieu of answering an interrogatory, you have

2    to state what is the document and where is it.

3         So as far as I know, we haven't gotten any of this

4    information from --

5         **THE COURT:**  Well, let me just -- first, you're going to get

6    that information.  You may have gotten it in the form of I

7    understood Mr. Dreyer to be referring to initial disclosures and

8    agreed upon custodians which is not an interrogatory response,

9    granted.  But we're going to get the list and confirmation of

10   that list.  So that will be the identification of individuals.

11   And that will be coming next week and the specific date and time

12   --

13        **MR. SURPRENANT:**  Thank you, Your Honor.  I appreciate it.

14        **THE COURT:**  So --

15        **MR. SURPRENANT:**  I appreciate that.

16        **THE COURT:**  Yeah.  So that is coming.  That is coming.

17        **MR. SURPRENANT:**  With Your Honor's insistence, thank you.

18   There is a point that --

19        **THE COURT:**  Okay.  Let me just finish.

20        And I appreciate that you have structured this in the form

21   of an interrogatory, but we are not going to make work.  Nobody

22   has time for make work.  And if defendants choose to produce

23   documents in response, and we still have to work our way through

24   the other components, of course, the Code allows them to do that

25   and we're going to proceed with that production.

1          We're not going to necessarily have a detailed chart if it

2     is many thousands of documents.  That is both sides can review

3     those.  And we're going to talk about search terms and, you know,

4     targets, et cetera.  And then both sides can roll up their

5     sleeves and get to work on those.

6          **MR. SURPRENANT:**  Thank you, Your Honor.

7          The other point that I think is really critical and why this

8     cannot be answered completely, I think it can't be answered --

9          **THE COURT:**  Okay.

10         **MR. SURPRENANT:**  -- in a significant way with documents --

11         **THE COURT:**  Okay.

12         **MR. SURPRENANT:**  -- is because we know a lot of the threats

13    and a lot of the communications are verbal.  That is key.

14    Commissioner Monahan travels to these tournaments.  He talks to

15    the commissioner of the other leagues.

16         The threats that we've heard about to vendors, the threats

17    to advertisers and broadcasters, they are typically not in emails

18    according to our understanding. There's verbal threats.  If you

19    -- if any golfer in the Japan Tour plays for (indiscernible),

20    we're going to kick out the entire -- no Japanese -- no golfer

21    can enter the PGA Tour.

22         So these threats, as Your Honor might imagine, you know,

23    threats and conspiracies are often even in the age of emails not

24    committed to text or emails.  And so the -- so while I'm sure

25    there are documents that embody these communications and are

1    important, there are probably at least a significant if not

2    equally portion of the communications that are verbal and that's

3    why we asked in the interrogatory because it's the only way to

4    get at that information.

5        **THE COURT:**  All right.  So, Mr. Dreyer, the identification

6    of individuals, we'll include those who communicated in any form

7    as has been discussed and is addressed in the interrogatory.

8    That certainly would also includes verbal communications.

9        **MR. DREYER:**  Of course, Your Honor.

10       **THE COURT:**  And for verbal communications for those

11   individuals that get a, well, yeah, I was talking to people, I

12   talk to people every day, that's my job and, yeah, we were

13   discussing startups and how that might impact, et cetera.  And I

14   appreciate the Tour has a different view of those conversations

15   than do the plaintiffs.

16       But to the extent that those can be identified, you know, I

17   was at these conferences and I had those discussions, I had these

18   meetings in this time frame and I had those discussions.  So for

19   the folks for whom you get a response, an affirmative response as

20   to verbal communications, there needs to be some effort to

21   identify those.

22       Verbal communications are hard.  It always is because it's

23   memory and because there aren't documents.  But the inquiry needs

24   to be made.

25       **MR. DREYER:**  Your Honor, this is the concern that we've

1    expressed because we're talking about a four-year period.  And

2    we're asking folks to remember conversations.  Honestly, I have

3    trouble remembering conversations from four weeks ago.  Maybe I

4    should see somebody about that.  But the concern is that, you

5    know, there are less burdensome means available to LIV to get at

6    this information.

7         Respectfully, that's what depositions are for.  They're

8    going to depose the Commissioner in this case.  There's no doubt

9    about that.  They're going to depose, you know, a substantial

10   number of the custodians, maybe all of the custodians.  We'll

11   see.  And they have the ability to ask those questions of these

12   individuals under oath.

13        The concern we have is we're being forced in a very

14   compressed discovery time period to sit down with these folks to

15   ask them to job their memory when we have produced documents, we

16   will continue to produce documents.  If the communications exist

17   or are reflected in the documents, LIV is of course free to

18   follow up with those with depositions.  They're free to follow up

19   with third parties.  It sounds like Counsel already has a pretty

20   good idea in mind of who he thinks he needs to follow up with.

21        So to put us to this burden of having to conduct extensive

22   witness interviews is the type of burden that court like the

23   Sanofi (phonetic) court and others we've cited have said goes a

24   bridge too far, particularly when there are other less burdensome

25   means for the other side to get at this information.

1      **THE COURT:**  Well, I think what we really need to understand

2  is how many people and what is the scope that we're talking

3  about, okay.  So let's finish our discussion through the

4  components of the interrogatories.

5      Mr. Surprenant, I hear you on verbal communications.  I also

6  hear the what's the most efficient means to get to those.  And

7  there is some logic to having the witness under oath, but let's

8  see how some of these other parameters shake out.  All right?

9      **MR. SURPRENANT:**  I'd to respond --

10     **THE COURT:**  So let's move from individuals.  Let's move from

11  individuals and go to the subject matter.  All right.  The

12  subject matter of these conversations that are the target of this

13  interrogatory, I see that it looked like in the compromise that

14  the Tour had offered as subject matters had offered really three

15  highlighting LIV, PGL, the Premier Golf League, and the Saudi

16  Golf League.  And I think those are very apparent from the

17  complaint.

18     And I'm sure that there should be others, but the

19  definition, the interrogatory definition of new tours frankly is

20  too broad.  Again, needs to be more focused and -- but the PGA

21  list is too narrow and the new tour list is too broad.

22     **MR. SURPRENANT:**  Okay, Your Honor.

23     **THE COURT:**  So you need to figure out what that would

24  encompass.  And I think you need to meet and confer on that.

25     **MR. SURPRENANT:**  Fair point, Your Honor.

1    **THE COURT:**  Okay.  Understood.

2    Mr. Dreyer, understood?

3

4    **MR. DREYER:**  Yes, Your Honor.

5    **THE COURT:**  Okay.  Broader than the PGA's offer in

6    compromise, more narrow than the definition of new tour in the

7    interrogatories.

8    Okay.

9    **MR. DREYER:**  Your Honor, can I just get one point of

10   clarification in terms of the who?

11   **THE COURT:**  Yes.

12   **MR. DREYER:**  Are we talking about the folks -- because the

13   interrogatory refers to individuals who were speaking on behalf

14   of the Tour.  I mean I assume, but I just want to be sure so that

15   we don't have a meet and confer dispute.  We're focusing on those

16   who have the authority to bind the Tour and speak on the Tour's

17   behalf.

18   **THE COURT:**  Those who speak on the Tour's behalf.

19   **MR. DREYER:**  Thank you, Your Honor.

20   **THE COURT:**  The Tour is the defendant and counter-claimant.

21   So that's where we'll start.

22   Okay.  We've talked about the individuals.  We've talked

23   about -- let me just make a note here so I don't lose my place.

24   (Pause)

25   **THE COURT:**  The subject matter, parties understand to meet

1    and confer understanding the parameters that I have expressed

2    here today.

3        All right.  That brings us to the next component which is

4    who these communications are with or directed to.

5        There's a number of categories here.  There are a couple of

6    specific tours identified, some of the golf bodies identified.

7    There's the general category of broadcasters, vendors, and

8    service providers.  And some of these are referred to in the

9    complaint.  Some of these categories are captioned in the

10   complaint; some are not.

11       That's always my starting point for where to start

12   parameters.  And, Mr. Surprenant, you may have been trying to

13   inform me earlier in our discussion this morning that you've made

14   progress with regards to these categories but as you started to

15   identify those, I was a little bit dubious.  So let me hear from

16   you first, please.

17       **MR. SURPRENANT:**  Well, I apologize for Your Honor's dubiety.

18   (Indiscernible), dubiety.  It's the state --

19       (Laughter)

20       **THE COURT:**  No, that's mine.  That's all mine.

21       **MR. SURPRENANT:**  It's the state of being dubious.

22       Your Honor, we think -- they first objected because we said

23   these specific entities and anyone else you talked to about LIV.

24   And we dropped that.  Okay, we dropped that.  The broadcasters,

25   each one of these, Your Honor, are critical.

1    The broadcasters, we understand they've threatened

2    broadcasters.  Sponsors, we understand -- so a sponsor is someone

3    who sponsors a golfer, right.

4    **THE COURT:**  I know.  I --

5    **MR. SURPRENANT:**  Before --

6    **THE COURT:**  -- do watch professional sports.

7    **MR. SURPRENANT:**  Before this case, Your Honor, I knew next

8    to nothing about golf other than I liked miniature golf.

9    Vendors, I mean the European Tour, the other golf tours,

10   there's only a handful and we can identify them.  I'm sure --

11   **THE COURT:**  Well, that list -- again, the list in the

12   interrogatory is much longer than any names that appear in the

13   complaint.

14   **MR. SURPRENANT:**  Okay.  We'll do better.

15   **THE COURT:**  Let me just say I think obviously LIV, PGL, and

16   Saudi as the Tour offered, the European Tour because that's also

17   referenced in the complaint.  And I appreciate there may be some

18   common, you know, it goes by this name or that name.  But, you

19   know, again, you need to be somewhat specific.

20   The list in the interrogatory is a little, you know, or

21   anything --

22   **MR. SURPRENANT:**  Well, we'll (indiscernible) that, Your

23   Honor.

24   The Majors are critical.

25   **THE COURT:**  Let me finish, Mr. Surprenant.

1    I understand, and I can appreciate that a couple of the

2    golf, the bodies that oversee professional golf, I'm thinking of

3    the rulemaking association, is probably that belongs.  Those can

4    be identified.  And I am looking at this list in terms of how are

5    search terms formulated, okay.

6    And, again, I don't know how this list relates to the search

7    terms in your ESI agreement, but there has to be a way to

8    identify these communications in a meaningful way so that the

9    Tour can run its searches and respond and find responsive

10   communications.  So that's what I'm trying to get to.

11   So I think -- again, I don't know -- I think you have to

12   meet and confer on how you manage broadcasters and sponsors and

13   particularly vendors.  Now maybe there's only a couple of

14   broadcasters in this time period who really impact the

15   professional game.  You know, The Golf Channel and NBC come to

16   mind, but what do I know.

17   I'm sure there are some sponsors, some sponsors in

18   particular that may already be on your third-party list.  I don't

19   know.  But, again, it would seem that there can be some fine-

20   tuning on these, understanding that, yeah, then you may get

21   documents or you may have information that informs further

22   searches.

23   Mr. Surprenant?

24   **MR. SURPRENANT:**  Yeah.  Two things, Your Honor.

25   One is we've been talking about categories.  And some of my

1    colleagues who are I believe in the audience but not on the

2    screen may have some constructive ideas how we could identify a

3    limited or more limited set, okay.

4           But one thing I'm not sure if we're on this topic yet, but

5    let's say that a person authorized to speak for the Tour called

6    up a broadcaster or a sponsor and discussed LIV Golf.

7           **THE COURT:**  Right.

8           **MR. SURPRENANT:**  The circumstances of this case, that is

9    almost -- that's all you need to know that that is a relevant

10   conversation because they weren't talking about, oh, LIV Golf is

11   (indiscernible).

12          **THE COURT:**  Oh, I understand, Mr. Surprenant, and I think

13   where you're going is the complaint from the Tour about, well,

14   what were these conversations about.

15          **MR. SURPRENANT:**  Yes, Your Honor.

16          **THE COURT:**  And I'm not -- I don't think we have to get

17   there because I don't disagree that if you're having a discussion

18   about a new tour as it's going to be limited but a competitive or

19   a potentially competitive tour in the time period and it's coming

20   from someone authorized to speak on behalf of PGA with any of

21   these bodies, I agree.

22          I think at least at this stage that is sufficient.  Now you

23   may start to get hits and you may see documents that for whatever

24   reason LIV or PGL or the Saudi League are showing up in that --

25   you know, who knows -- lend absolutely nothing to the case and

1    you all can -- you can be like, look, you can say but not lunch

2    appointment or but not, I don't know, I can't even imagine.

3        **MR. DREYER:**  And, Your Honor, if I may, I think in terms of

4    the documents and the ESI, we were there.  I think the challenge

5    is more in forcing folks to recall conversations dating back four

6    years.  So I don't know if we --

7        **THE COURT:**  I know.  You're very concerned about verbal

8    communications, and I have -- that's an open -- I hear you.  I

9    heard your argument.

10       **MR. DREYER:**  But in terms of documents, I think we have an

11   agreement to get at this issue in light of RFP and others like it

12   to get at the types of conversations that Counsel is suggesting

13   happened.

14       **THE COURT:**  Do you think that there is already a more

15   narrowly formed list under these categories of broadcasters,

16   vendors, sponsors?

17       **MR. DREYER:**  I think for purposes of the document search,

18   yes.

19       **THE COURT:**  Okay.

20       Then it sounds like you all can meet and confer and agree on

21   targets, that is who are these communications with.  Tour, you

22   need to be searching for texts, emails, documents that address --

23   that are on these subject matters and the subject matter so far,

24   as I say, it's LIV, it's PGL, it's Saudi.  And you all are going

25   to meet and confer to complete that.

1    As I've already said a number of times, it won't be as

2    narrow as PGA's list but it won't be as broad as New Tour.  And

3    then who are those conversations with.  That list needs to be

4    sharpened.

5    Mr. Surprenant, is that clear?  Do you understand?

6    **MR. SURPRENANT:**  I do, Your Honor.  If I didn't, I'm sure my

7    colleagues would correct me.  But I understand.

8    **THE COURT:**  And Mr. Dreyer?

9    **MR. DREYER:**  Yes, Your Honor.

10   **THE COURT:**  Do you understand?

11   **MR. DREYER:**  I do.

12   **THE COURT:**  All right.

13   Okay.  Then, I think we're making good progress.  The

14   subcategory Q in the interrogatory for basically anybody else not

15   excluded by this question, I will strike that in a heartbeat.  If

16   you come back to me and that is a hangup, because that is just --

17   we're not going there.  Don't do that.

18   **MR. SURPRENANT:**  Understood, Your Honor.

19   **THE COURT:**  Okay.  So then that gets us back to the, okay,

20   identify individuals, we're going to do that.  That's going to

21   come next week.  You all are going to meet and confer.  There's

22   going to be further parameters around production, and those

23   productions will be run and produced in a rolling fashion

24   expeditiously.  I know you all have those deadlines in mind.

25   And then that brings us to the issue, it brings us back to

the issue of verbal communications if I'm understanding that
correctly.  Before I hone back in on that, are we clear on
everything else so far?

Mr. Surprenant?

**MR. SURPRENANT:**  I think Your Honor has offered very helpful
clarification.  Thank you.

**THE COURT:**  Mr. Dreyer?

**MR. DREYER:**  Yes, Your Honor.

**THE COURT:**  Okay.  So verbal communications, kind of it
depends in part -- you know, the burden issue depends in part as
to, well, how long is that list going to be in next week's
declaration, of persons who are having these conversations.

I think the other -- who they're directed to and what
they're about, those lists I think you're going to come to
agreement on.

Mr. Surprenant, why isn't, okay, if we know -- well, how
about this, if the individuals -- if there's an indication if
they had individual -- excuse me, had verbal communications and
it might be everybody on the list, it might -- maybe only some
people actually went around speaking this, everybody else did
their business by email, I don't know -- or by text.

Doesn't that help you out, Mr. Surprenant, if you get a list
of, okay, here are the individuals who are making the
representations that you care about in terms of your suit and of
those, these are, in addition to any documents that are produced

1    in the response to the interrogatory, these individuals also had

2    verbal communications?

3        **MR. SURPRENANT:**  So long as we know with whom.  In other

4    words, it's not very helpful to say Commissioner Monahan had

5    communications with the European Tour.  We need to know, where

6    it's reasonable, you know, who are the individuals who had

7    communications with and, if possible, and it can be

8    approximately, you know, I had a communication with so-and-so

9    about LIV at this event but we know when that event happened or

10   we can find that out.

11       **THE COURT:**  To Mr. Dreyer's point --

12       **MR. SURPRENANT:**  So I think it's --

13       **THE COURT:**  Excuse me.  To Mr. Dreyer's point, well, then

14   that takes you out of the efficient zone of search terms and

15   pulling documents into interviewing all these people to inquire

16   about verbal communications.

17       **MR. SURPRENANT:**  I think with some individuals, the

18   interview is not only reasonable, I think it's appropriate and

19   required.

20       But our proposal was to email individuals and say do you

21   recall having communications with these entities about LIV or

22   about the Premier Golf League.  And so I think some individuals,

23   interviews would be appropriate.  I think others, emails would be

24   appropriate.

25       But burden has to be weighed against probity.  And we think

1    verbal threats and verbal agreements, verbal threats directed at

2    --

3         **THE COURT:**  I understand.  I understand.  I did read the

4    complaint.  I get it.  But can't you get that in deposition?

5    Won't you get that--

6         **MR. SURPRENANT:**  We may not know who to ask.  I mean we

7    don't know --

8         **THE COURT:**  Aren't you going to ask everybody if they had

9    verbal communications?

10        **MR. SURPRENANT:**  No, we don't know who to notice a

11   deposition if we don't know who made this communication.

12   Somebody threatened the Japanese golfers.  We don't know who that

13   is.  We can't ask him at a deposition until we find out who he

14   is.  And if Commissioner Monahan or somebody else doesn't know,

15   we will never get that information.

16        **THE COURT:**  Okay.  All right.

17        **MR. SURPRENANT:**  So it's not only, you know, is we don't

18   want to do depositions.  Of course, we want to do depositions.

19   But we need to know who we need to depose and, in some instances,

20   Your Honor, that is going to be the names of people who are not

21   on emails that we do not know about who are making coordinated,

22   you know, communications, verbal communications.

23        **THE COURT:**  Okay.  All right.  Here's what --

24        **MS. BRASS:**  Your Honor, just one minor additional point

25   there.

39

1      **THE COURT:**  Yes, ma'am.

2      **MS. BRASS:**  Another part of why the "to whom" is so

3   important, you know, even if you say, well, I'm not going to ask

4   them to enumerate every single conversation, that's what depos

5   are for, but just to take two examples.

6          You know, if it is someone with the European Tour in Europe

7   or someone with the, you know, Japan Tour in Japan, if we have to

8   wait to depose someone in December after substantial discovery is

9   made or January, we will never complete the international

10  discovery that is required on the case schedule that's allotted.

11         And, you know, it is another reason why, you know, we think

12  that for oral conversations, the "with whom have I spoken" is

13  appropriate for these verbal communications in addition.

14     **THE COURT:**  I understand.  I understand.

15     **MS. BRASS:**  Thank you.

16     **THE COURT:**  Okay.  Here's --

17     **MR. DREYER:**  Your Honor, can I (audio interference)?

18     **THE COURT:**  Here's how we're going to proceed.  I think I

19  got your point, Mr. Dreyer, which is (audio interference)

20  regarding list of subjects still subject to meet and confer.  It

21  will be at least LIV, PGL, Saudi, but the list will be larger

22  than that in terms of subject matter but not as large as the

23  definition of a tour.

24         So a declaration will have those individuals who we're

25  discussing those subject matters with a list also for the parties

40

1    yet to complete through their meet and confer effort, that being

2    conversations with -- categories that are going to be more deftly

3    defined.  And you have both assured me that you can get there.

4        So you need to have those meet and confer on the open

5    subject matters.  You need to be working on the list of

6    individuals, Tour, and I think you can do that in tandem.  I

7    don't think you have to wait until these lists are shut down.

8        I know your sleeves are rolled up and you're going to have

9    your meet and confers on the subject and the receivers of these

10   communications.  But you can already be making sure that you have

11   a thorough and complete list of those who are empowered to

12   communicate on behalf of the Tour.

13       You're also going to indicate on that list who had verbal

14   communications.  You can do it with an asterisk or a colored

15   font, but who on that list had verbal communications, again, on

16   the given subjects matters with the given targets.

17       That's going to inform next steps, which is if it's

18   everybody on the list, how do we deal with that, if it's, you

19   know, only a handful of people who are actually making these

20   representations or having these communications verbally, then

21   that's going to be perhaps a clearer path on how to deal with it.

22       But at a minium, individuals who were having verbal

23   communications will need to be identified.  Okay?  That's where

24   we're going to start.  And, again, the parties have already

25   demonstrated to the Court that you get it, you get the time frame

41

1    and your sleeves are rolled up and you're working diligently.

2         So I want you to keep up that effort.  And if you cannot

3    close on this, you're going to be back in front of me in person.

4    So when is that going to be?  I appreciate the nature of the list

5    has expanded somewhat.  And, Mr. Dreyer, you had asked for mid-

6    week.  I definitely need to see you next week.  I'm in trial the

7    following week, and I do want to keep this moving.

8         So if you are unable to resolve the remaining issues around

9    Interrogatory Number 1 pursuant to the Court's guidance, we've

10   been here today, then you will -- the only other time I can see

11   you is on the 20th at 3 p.m.  On the 20th, Thursday, the 20th at

12   3 p.m.

13        **MR. SURPRENANT:**  Okay.

14        **THE COURT:**  And that will be in person in my courtroom, and

15   we'll make use of the conference room down the hall because you

16   will have worked it out before you leave.  The Court is closed

17   up, locked up, right as a drum at 5:00.  Don't make me leave you

18   there overnight.

19        **MR. DREYER:**  Your Honor, if I could just address on point on

20   timing because we had talked about mid-week.

21        **THE COURT:**  Yes.  So the declaration needs to be provided to

22   the other side by noon on Wednesday, by noon on Wednesday.  Okay.

23        **MR. DREYER:**  So, Your Honor, the challenge, and obviously,

24   we understand the timing, is there's a chicken-and-egg problem.

25   We need to resolve the two lists that inform --

1        **THE COURT:**  Yes.

2        **MR. DREYER:**  -- the answers to the declaration.

3        **THE COURT:**  Yes.  Yes.  Yes, you do.  And you're going to

4    have to do that in the coming days.  And nobody likes to hear

5    that on a Friday, but this is the case schedule we have.

6        So you're going to get those lists hammered out, and that is

7    not going to be a sticking point, either of those subcategories,

8    because you have heard my guidance.  And if it is, then you can

9    come see me on Monday.  But I expect that part to be done.

10       And then the list of individuals responsive to Interrogatory

11   Number 1 as we have narrowed it and focused it here today will be

12   provided by the 19th at noon to the plaintiff.  That will give

13   the plaintiff an opportunity at least to look through it, and you

14   all will embark immediately on your discussion around, okay, so

15   how do we handle with however many verbal communicators, how are

16   we going to handle that and can we work that out.

17       **MR. DREYER:**  And, Your Honor, just so I'm clear, the

18   Wednesday declaration would be the names of the individuals who

19   were authorized and power to speak with the Tour on behalf of

20   players to be named later regarding topics to be named later,

21   which we'll address by then.

22       **THE COURT:**  Well, they're speaking on behalf of the Tour.

23   They're speaking on behalf of the Tour --

24       **MR. DREYER:**  Right.

25       **THE COURT:**  -- on the list of subjects that you all are

1    working on.  But you have a pretty good idea.  I mean you know at

2    least --

3        **MR. DREYER:**  Right.

4        **THE COURT:**  -- you have a few components of that.

5        And you are having these communications with a list to be --

6        **MR. DREYER:**  Right.

7        **THE COURT:**  -- more -- to be clarified.  But, again, you

8    know who some of the players on that list are, players being a

9    general term, not a term of art.

10       **MR. DREYER:**  Of course.

11       But at that point, it's just the names who fit the criteria

12   and then we'll deal with what comes next at that point, correct?

13       **THE COURT:**  Correct.  But the declaration needs to indicate

14   who on that list was having verbal communications, okay.

15       **MR. DREYER:**  Understood.

16       **THE COURT:**  Okay.

17       **MR. SURPRENANT:**  Your Honor, can I ask a question of

18   clarification and depending on the clarification, a request?

19       **THE COURT:**  A follow-up question and a follow-up.  Okay, go

20   ahead.

21       **MR. SURPRENANT:**  Thank you, Your Honor.

22       Will that declaration -- we would request, if it's not

23   already in part of Your Honor's contemplation, that to the extent

24   it is reasonably available that there's an indication with whom

25   the speaker spoke.  Because we, frankly, think we were entitled

44

1    to that information on September 27th, and we've already lost

2    some really valuable time.

3        So we would request, if it's not already part of Your

4    Honor's contemplation, that to the extent it's reasonably

5    available, the declaration identifies the speaker and as it were

6    the listener, who they spoke with.

7        **THE COURT:**  Okay.

8        **MR. DREYER:**  Your -- go ahead, Your Honor.

9        **THE COURT:**  We're going to -- we're not going to go there

10   yet, Mr. Surprenant, because we need to see how big this list is.

11       **MR. SURPRENANT:**  Okay.

12       **THE COURT:**  Okay?

13       **MR. SURPRENANT:**  Okay.

14       **THE COURT:**  How detailed.  I do appreciate the scope of the

15   information that plaintiffs are seeking.  It has to be meaningful

16   information, and I don't want to throw the net too wide that

17   we're not getting a meaningful response.

18       **MR. SURPRENANT:**  Fair enough, Your Honor.

19       **THE COURT:**  At this time.  At this time.  Okay?

20       **MR. SURPRENANT:**  And I would suggest, Your Honor, that we

21   meet and confer if it's convenient for PGA Tour counsel tomorrow.

22   I think we need to confer internally on both sides before we can

23   have a productive conversation.  But in light of the time frame,

24   I think we should talk tomorrow.

25       **THE COURT:**  I am confident that given how the parties have

1   worked and met and conferred thus far, which I'm just going to

2   take a wild stab, has already involved some weekends, that you'll

3   be able to work out that timing.

4       **MR. SURPRENANT:**  Thank you, Your Honor.

5       **THE COURT:**  All right.

6       **MR. SURPRENANT:**  Thank you.

7       **THE COURT:**  Okay.  All right.  I think you understand how to

8   go forward from here.  I will issue just a short order, but it

9   will largely reflect or refer back to what we discussed here

10  today.  Okay?

11      Anything further?  I think you're all very clear on how to

12  proceed.

13      From the plaintiff, Mr. Surprenant?

14      **MR. SURPRENANT:**  No.  Thank you, Your Honor.  Your Honor's

15  efforts have been very helpful.  Thank you.

16      **THE COURT:**  Mr. Dreyer, anything further for defendant

17  today?

18      **MR. DREYER:**  Nothing further, Your Honor.  Thank you.

19      **THE COURT:**  All right.  Thank you all very much.  Let me

20  know if you need to come see me.

21      Otherwise, I would like a -- I'll tell you what, I do want

22  the declaration -- the list of names, I've referred to it as

23  being in the form of a declaration because I want everyone to

24  have the necessary assurances that this has been a diligent

25  effort.  So let's -- I'll take that, I want you to go ahead and

46

1   file that and then that way I'll have it, as well, and it can be
2   filed under seal if you think that that is warranted.
3       But that will help me to understand where this is headed and
4   then, obviously, you'll let me know if you need to come see me.
5   And I will -- I'll hold some time for you on Thursday afternoon.
6       **MR. DREYER:**  Your Honor, would a verified interrogatory
7   response also be acceptable?  I'm just trying to think as a
8   practical matter.
9       **THE COURT:**  Yes, that would serve the same purpose, as long
10  as a verification accompanies it.
11      **MR. DREYER:**  Sure.  Understood.
12      **THE COURT:**  All right?  All right.
13      All right, then?  Thank you all very much again for making
14  yourselves available on relatively short notice.  And keep up the
15  hard work and the meet and confer efforts.  And I'll see you next
16  week, if necessary.
17      **MR. DREYER:**  Thank you, Your Honor.
18      **MR. SURPRENANT:**  Thank you, Your Honor.
19      **THE COURT:**  That concludes this matter, and we are
20  adjourned.  Thank you.
21          (Proceedings adjourned at 11:13 p.m.)
22                      ---OOO---
23
24
25

47

1                    **C E R T I F I C A T E**

2        I, DIPTI PATEL, court-approved transcriber, certify that the

3   foregoing is a correct transcript from the official electronic

4   sound recording of the proceedings in the above-entitled matter.

5

6

7   _____

8   DIPTI PATEL, CET-997

9   LIBERTY TRANSCRIPTS                    Date: October 19, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25