1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3     Before The Honorable Susan van Keulen, Magistrate Judge

4

5   JONES, et al.,                )  No. C 22-04486-BLF
                                  )
6          Plaintiffs,            )
                                  )
7   vs.                           )
                                  )
8   PGA TOUR, INC.,               )
                                  )
9          Defendant.             )
    _____)

10

11                              San Jose, California
                                Friday, January 20, 2023
12

13   <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
             RECORDING 2:00 - 2:40 = 40 MINUTES</u>
14

15  <u>APPEARANCES</u>:

16  For Plaintiffs:
                              Gibson Dunn
17                            2001 Ross Avenue, Suite 2100
                              Dallas, Texas 75201
18                    BY:  SCOTT HVIDT, ESQ.

19                            Gibson Dunn
                              555 Mission Street, Suite 3000
20                            San Francisco, California
                               94104
21                    BY:  LAUREN DANSEY, ESQ.

22                            Gibson Dunn
                              1050 Connecticut Avenue, NW
23                            Washington, DC 20036
                      BY:  JOSHUA LIPTON, ESQ.

24

25            (APPEARANCES CONTINUED ON NEXT PAGE)

2

APPEARANCES:   (Cont'd.)

For Defendant:

                     Keker, Van Nest & Peters, LLP
                     633 Battery Street
                     San Francisco, California
                      94111
            BY:   NICHOLAS GOLDBERG, ESQ.

                     Skadden, Arps, Slate, Meagher
                      Flom, LLP
                     One Manhattan West
                     New York, New York 10001
            BY:   ANTHONY DREYER, ESQ.

Transcribed by:         Echo Reporting, Inc.
                     Contracted Court Reporter/
                     Transcriber
                     echoreporting@yahoo.com

3

1  <u>Friday, January 20, 2023</u>                                    <u>2:00 p.m.</u>

2                      P-R-O-C-E-E-D-I-N-G-S

3                           --oOo--

4          THE CLERK:  Calling case 22-CV-4486, Jones, et

5  al., versus PGA Tour, Inc.

6      Counsel, please identify yourselves for the record,

7  beginning with Plaintiff.

8          MR. HVIDT (via Zoom):  This is Scott Hvidt of

9  Gibson, Dunn, Crutcher for the Plaintiffs, with my

10 colleagues, Josh Lipton and Lauren Dansey.

11         THE COURT:  Good afternoon, Mr. Hvidt.

12         MR. DREYER (via Zoom):  Good afternoon, your

13 Honor.  Anthony Dreyer for the PGA Tour, with the firm of

14 Skadden Arps.  Joining me, from the Keker, Van Nest and

15 Peter (sic) -- Peters firm, is my colleague, Nicholas

16 Goldberg.

17         THE COURT:  Excellent.  Good afternoon, Mr.

18 Dreyer.

19     All right.  We're on today for Plaintiffs' motion to

20 compel additional custodial searches.  I took this

21 opportunity to go back through my discovery orders to

22 refresh my recollection as to the earlier rulings, with

23 regards to full or partial custodians and document

24 productions.

25     So, I went back and looked at those.  I have a handful

4

1  of questions, first really just for background, and the

2  first of those are for PGA, and I do refer to you as "PGA",

3  as opposed to "the Tour," only because on some of our

4  discovery issues, there's "the Tour" and there are other

5  tours, and I just find it easier to make that distinction.

6      So, my first question, I want to be sure I understand,

7  Mr. Dreyer.  There are 14 full custodians and then in the

8  paper, PGA says that they've done 24 other targeted

9  searches.  There's the 14 full custodians, plus 24 targeted

10  searches, and I just want to know how we get to 24.  By my

11  count, there were 13 authorized speakers identified in

12  response to interrogatory number one, and then I know in a

13  subsequent order, there were five additional player

14  representatives that there were going to be some searches

15  from.  So, I've got 13 -- I've 18.  I don't get to 24.  And

16  maybe you're counting different buckets altogether.

17          MR. DREYER:  Yes, your Honor.  My math may be

18  faulty.  We'll confirm that.  I thought it was 19 plus the

19  additional five to get us to 24.

20          THE COURT:  That's right, but what -- who are the

21  -- how do you get the 19?

22          MR. DREYER:  I believe the 19 were from the

23  initial interrogatory response.

24          THE COURT:  Okay.  So it's possible that the

25  initial 13 at some point were supplemented to 19.

5

1          MR. DREYER:  I believe that's the case, your
2   Honor.

3          THE COURT:  Okay.  All right.

4          MR. DREYER:  In addition, we've also -- the board
5   members, the five independent board directors, have been
6   subpoenaed and are in the process of producing documents, as
7   well as the former commissioner.

8          THE COURT:  Okay.  Well, the board members have
9   been treated separately from the -- from PGA and I just
10  wanted to be sure I understood how we got to the 24; does
11  that comport with Plaintiffs' understanding, as well, Mr.
12  Hvidt?

13         MR. HVIDT:  Ms. Dansey, is that the numbers that
14  we have?  I think that number sounds correct to us on their
15  total.

16         MS. DANSEY:  Yes, it does.

17         THE COURT:  Okay.  All right.  That's helpful.
18  Thank you.

19      And, Mr. Dreyer, both Mr. Dennis and Mr. Hardy are in
20  that group of 19, that is the 19 targeted searches; is that
21  right?

22         MR. DREYER:  That is correct, your Honor.

23         THE COURT:  Okay.  And Ms. Keller isn't in any of
24  the searches?

25         MR. DREYER:  Correct.

6

1          THE COURT:  Okay.  Got it.  All right.

2      Now, with regards to the full custodians, the 14 full

3  custodians, I assume that -- well, and I've heard from the

4  parties that those searches were done -- there was a set of

5  search terms that were developed and those may have, at some

6  time, come across my desk, that is, the search terms; do you

7  know how many search terms there were, roughly or

8  specifically?

9          MR. DREYER:  I believe there were dozens.  I don't

10  think we wound up submitting any.  We were able to work

11  those out.  And we can certainly submit --

12          THE COURT:  No, no.

13          MR. DREYER:  But I believe, and Counsel is here to

14  correct me, it's well in the dozens and they are rather

15  lengthy.  Some of them had to be broken up into --

16          THE COURT:  I remember.  I know it was going to be

17  somewhat complex and I'm just -- I was -- just wanted to

18  understand, generally, the scope.  You're right, they may

19  not have ever come to me.  I know I did have some

20  supplemental materials supplemented -- or excuse me -- sent

21  to me, just frankly, really for my information.

22      So, Mr. Hvidt?

23          MR. HVIDT:  I was going to confirm Mr. Dreyer's

24  point that we have not submitted the search terms for either

25  parties for the full custodians.  I believe that there may

7

1  have been search terms for the targeted individuals for the

2  interrogatory that was in dispute, and that may be what your

3  Honor is recalling.

4           THE COURT:  Oh, okay.  That's probably true.

5  Thank you.

6      Then, did it work this way, again, with regards to the

7  full custodians, that by -- you took that list of 14, you

8  ran this dozen -- these dozens of search terms against those

9  -- or in those -- folks -- for those folks, and that --

10 obviously, that generated documents and that fulfilled the

11 obligation, in terms of responding to the RFPs?  Did you

12 have any --

13          MR. DREYER:  Yes, they were -- forgive me for

14 speaking over your Honor.

15          THE COURT:  No, no.

16          MR. DREYER:  They were (Zoom glitch) for

17 responsiveness to the RFPs.  If they were responsive and

18 unprivileged, they were produced.

19          THE COURT:  Okay.

20          MR. DREYER:  If they were privileged (Zoom

21 glitch).

22          THE COURT:  Okay.  And that's the mechanism that

23 was used to identify responsive -- responsive documents, as

24 to the 14 custodians?

25          MR. DREYER:  That's correct, your Honor.

8

1          THE COURT:  For the searches.  Okay.  And, I just

2  -- I'm asking that, because I think in the paper, the Tour

3  pointed to 100 RFPs, and I just assumed that those 100 RFPs

4  were managed through this search term against the full

5  custodian process.

6          MR. DREYER:  Yes.  And then when the documents

7  were yielded from those search terms, they were cross

8  referenced against the 100 RFPs for responsiveness.

9          THE COURT:  Understood.  Understood.  Okay.  All

10 right.  That's generally how it works, I just wanted to be

11 sure that there wasn't some other mechanism at place here.

12 Okay.

13     And, was there an agreement -- I see in a couple of

14 these -- in regards to a couple of these custodians at issue

15 before me today, Plaintiffs' specifically requests a search

16 of devices of phones, particularly, and I don't know what

17 the parties agreed to, if anything.  I know I ordered a

18 device search for the -- when I -- when I addressed the

19 search between the player agents and players, but I don't

20 know if those were included in these searches, in the

21 general custodian searches, or not; Mr. Dreyer?

22          MR. DREYER:  They were, your Honor.

23          THE COURT:  They were?

24          MR. DREYER:  The electronic devices were included

25 for custodians, the full custodians.

9

1        THE COURT:  All right.  And what about for the

2  additional 24 of them, were targeted searches?

3        MR. DREYER:  Those were principally email and

4  document searches.  I think both sides have partial

5  custodians for whom the searches were only done against,

6  principally their emails, and then hard copy files, if they

7  had them.

8        THE COURT:  Okay.  All right.  And, Mr. Hvidt,

9  does that comport with Plaintiffs' understanding, as well?

10        MR. HVIDT:  That does comport with the Plaintiffs'

11  understanding.

12        THE COURT:  Okay.  All right.  Okay.  Then that is

13  helpful.  Let me just make a note here.  Okay.  All right

14  then.

15     Let me then turn to, Mr. Hvidt, if you've got the mic

16  for Plaintiffs.  It's your motion.  I did -- obviously, I

17  read through the papers, as I said, I've been through my

18  previous orders, so why don't we just take them, briefly,

19  one at a time.  Tell me your -- your strongest points as to

20  why, this time in the proceedings, there should be custodial

21  searches.  Let's start with Mr. Dennis.  And I understand he

22  is the president of the PGA Tour.

23        MR. HVIDT:  Absolutely, your Honor.  So, for Mr.

24  Dennis, we -- players had no idea the extent of his

25  involvement in the tours, in any competitive conduct, when

1 negotiations of custodians were held in October and

2 September, but once discovery was produced, it became clear

3 that he was on everything and touches everything.  He was

4 involved in communicating the Tour's position on LIV Golf to

5 players and responsible for executing the Tour's conspiracy

6 to tie up global tours with exclusivity deals to keep them

7 from partnering with LIV Golf, and to choke all

8 LIV Golf's access to players.

9     He was involved in carrying out the Tour's monopolistic

10 goals in changing the OWGR ranking system to benefit the

11 Tour, to the detriment of others, and to keep out new tours,

12 and was involved in the coordination between the European

13 Tour and the PGA Tour, regarding their collective release

14 policy against LIV Golf.

15     And critically, we saw evidence that he was deputized

16 by the PGA Tour commissioner to figure out how the Tour

17 could get Augusta to respond to LIV Golf to help the Tour.

18 And by the Tour's interrogatory responses, it was clear that

19 he communicated a lot with players, but the Tour's targeted

20 production for Mr. Dennis didn't reveal many communications

21 with players, and that's, from our experience, because

22 golfers often communicate by phone.  They don't have a job

23 like me where they're sitting behind their desk and their

24 email all of the time, and they communicate by their phone

25 and we don't have his phone, including the collection,

11

1 because he's just a targeted custodian, or use only, where

2 search terms are only applied to his emails.

3          THE COURT:  Okay.  So, can you tell me what the --

4 the volume of the production that you've received from --

5 with regards to Mr. Dennis, in response to interrogatory one

6 in the ensuing production?

7          MR. HVIDT:  When the statement was submitted, I

8 believe it was in the -- around 100, but I -- he appears on

9 many documents.

10          THE COURT:  Uh-huh.

11          MR. HVIDT:  But from his custodial file, it was a

12 low number.

13          THE COURT:  Okay.

14          MR. HVIDT:  And many of them were with other PGA

15 Tour individuals.

16          THE COURT:  Uh-huh.

17          MR. HVIDT:  There were a handful where he was

18 communicating with a player, or player agent, about whether

19 -- about a policy aspect of the PGA Tour's position,

20 relating to LIV Golf or related events.

21          THE COURT:  And your basis for the argument that

22 the communications between Mr. Dennis and players would be

23 -- or may likely be by phone, is based -- or by text, I

24 guess -- is based on what?

25          MR. HVIDT:  It's based on our experience with how

12

1  the players communicate and have communicated with the Tour,

2  and based on our experience of seeing the -- his

3  communications in the -- by phone with other PGA Tour

4  individuals.

5          THE COURT:  All right.  Okay.  Mr. Dreyer, with

6  regards to Mr. Dennis?  He has a fairly -- obviously a high-

7  profile position.  I appreciate he was identified initially

8  in response to interrogatory one.  There obviously has been

9  a targeted production.  Other than burden -- not other than

10 -- obviously, I see the argument on burden, but let me hear

11 from the Tour as to why he -- it would not be appropriate,

12 or proportional, to include him as a full custodian.

13         MR. DREYER:  Sure.  I mean, I feel like we're

14 treading over old ground, in a sense that -- and let me

15 start, I guess, where Mr. Hvidt started, what this case is

16 about.

17     At core, this case is about a claim that the Tour

18 threatened and coerced golfer's agents, broadcasters,

19 governing bodies, other tours and the like, not to do

20 business with LIV, all of which we dispute.

21     For Mr. Dennis, and Mr. Hardy for that matter, we

22 identified which of those entities they were authorized to

23 interact with, regarding LIV, and at the Court's direction

24 ran targeted searches for any communications they may have

25 had with those identities about LIV.  For Mr. Dennis, that

13

1 was certain golfers, agents, sponsors, golfing bodies and

2 golf associations.  At the time, they were asked to be

3 treated as full custodians and the Court made clear that was

4 not appropriate, and that the appropriate approach was

5 targeted searches, and that's how both parties have

6 approached partial custodians.  And quite frankly, and

7 respectfully, we don't think there's any basis to revisit

8 that ruling.

9      At most, what LIV points to is the fact that these two

10 employees, Mr. Hardy and Mr. Dennis, had communications with

11 LIV about golfers, about -- with golf tours, golfers and the

12 like, related to LIV.  But that's been known for months.

13 That's something we told LIV back in October.  We searched

14 for and produced communications with those entities.  It's

15 clear, from what Mr. Hvidt even represented, that those

16 communications that we produced do include communications

17 with golfers.

18      And so, at this point and at this late stage, to start

19 treating specific partial custodians differently, when we've

20 been down this road before and we've had many many motions,

21 as your Honor referenced, on this issue of partial

22 custodians and communications, we just don't think it's

23 appropriate to revisit the Court's prior ruling.

24           THE COURT:  All right.  Thank you.

25      Okay.  Let's move to Mr. Hardy, Senior Vice President,

1  International; Mr. Hvidt?

2          MR. HVIDT:  Absolutely.  Your Honor, players

3  believe that all three witnesses here are crucial, but

4  believe that the addition of Mr. Hardy as a full custodian

5  is needed more than any other.  He was a key point of

6  contact with the European Tour and the Tour's communication

7  with the European Tour are essentially relevant because the

8  coordination between the PGA Tour and the European Tour is

9  central to the allegations in this case.  His

10 communications, in fact, prove that Plaintiffs' allegations

11 are true, but we don't have the full scope of those

12 communications.

13     As the Senior Vice President, International, he was in

14 day-to-day communications with the European Tour.  Many of

15 the communications we have from him include the PGA Tour's

16 Chief Media Officer, Rick Anderson, but Rick Anderson, by

17 the nature of his title, holds many other hats other than

18 communicating with the European Tour, and it was Mr. Hardy

19 who was doing the day-to-day communication with the European

20 Tour, and in particular, on Whatsapp, with European Tour

21 representatives, including Guy Kennings.

22     As one PGA Tour document produced shows, Mr. Hardy told

23 his PGA Tour colleagues that the European Tour keeps asking

24 him if the PGA Tour is going to punish players for playing

25 in LIV Golf events, but because those communications went to

15

1  Mr. Hardy, we don't have them.  We don't have the full

2  extent of them produced in this case.

3       We know that he was a conduit for information shared

4  between the Tour and the European Tour, and the sharing of

5  confidential competitively sensitive information is a

6  hallmark of his conduct and we should have access to it.

7       For Mr. Hardy, I wanted to go back to the disclosure of

8  custodians here, and the time line.  The parties were

9  negotiating custodians in September and October.  In

10 September, counsel for the Tour represented that the Tour

11 didn't have a neat tour org chart, but they'll put one

12 together and send it to us.

13            THE COURT:  Uh-huh.

14            MR. HVIDT:  Later that week, we received a org

15 chart with 25 individuals and did not include Christian

16 Hardy and it did not include Allison Keller, the Chief

17 Administrative Officer of the Tour and the Senior Vice

18 President, International.  We went to the Tour's website and

19 found that a couple of individuals were not on there.  Mr.

20 Hardy was not on the Tour's website at that time, and we

21 would raise questions about the Tour's disclosure.

22      On September 23rd, the Tour disclosed only five PGA

23 Tour individuals in its initial disclosures, and then only

24 offered additionally five PGA Tour representatives as

25 custodians.  We request -- upon asking the Tour if the 25 is

16

1 a full org chart, they sent an additional list of

2 approximately 60 individuals.  So a total of 83 individuals

3 were included in the org charts we had when we were

4 negotiating custodians.  We requested nine more custodians,

5 looking at those org charts, and got to the 14 that we

6 originally had.

7      On October 3rd, among the 5,000 documents the Tour

8 produced on that day, the Tour included an org chart of over

9 1,000 individuals.  We didn't know that org chart existed

10 when it was produced, and we asked on October 13th in

11 written letter, if the Tour had a complete org chart, more

12 than the 83 individuals.  We agreed on October 13th to the

13 original 14 individuals, and then on the 18th the Tour

14 directed us, by BATES number, to the 1,000 individual org

15 chart.

16      And, your Honor, Mr. Dreyer said that we were informed

17 about Mr. Dennis and Mr. Hardy in October in interrogatory

18 response one, but we didn't get the Tour's response to

19 interrogatory number one until this Court compelled them to

20 respond to it, and that didn't happen until November.

21      And so, we have been diligent in our review and trying

22 to get to the right custodians who are relevant to

23 determining the facts in this case, and we -- would we have

24 known Mr. Hardy -- if we would have known of his role at the

25 outset, he would have been an additional custodian, given

17

1   the role and given the role of International tours and the

2   Tour's conduct here that has harmed LIV Golf.  And we have

3   to the Court and come to the Tour, asking for his addition

4   as a custodian, promptly upon learning of it.

5          THE COURT:  Thank you, Mr. Hvidt.

6          MR. DREYER:  Your Honor, let me clarify the

7   record.  First of all, the org chart with the 80-odd

8   employees, including Ms. Keller and Mr. Dennis and Mr.

9   Hardy, was produced on October 3rd.  Mr. Hardy -- excuse me

10  -- Mr. Dennis and Ms. Keller are also on the Tour's website

11  and have been well before this litigation started, among the

12  executive team.

13     In terms of the interrogatory response, I'm looking at

14  the October 20th interrogatory response and Mr. Hardy is

15  listed as having authority to speak on behalf of the Tour,

16  with respect to the European Tour, Asian Tour, Japan Tour,

17  Sunshine Tour, Discovery and ING.  Mr. Dennis was listed as

18  having authority to speak with golfing bodies, the European

19  Tour, RBC Rocket Mortgage, et cetera.  So it was October,

20  not November.

21     I would also add, and I should have mentioned this

22  earlier, because this relates both to Mr. Hardy and Mr.

23  Dennis, when we did the targeted searches, we also agreed

24  with Plaintiffs on what those search terms would be.  And,

25  in fact, for Mr. Hardy there were five separate searches

1 that were run against his emails, for Mr. Dennis there were

2 six separate searches run against his emails.  Again, in

3 agreement with Plaintiffs in this case.

4           THE COURT:  Mr. Dreyer, let me just be sure I

5 understand, because I'm -- as I say, I ordered you to go off

6 and do these searches and I didn't -- you know, I don't

7 always get the what comes after, which is not a bad thing,

8 but -- so for each -- I know we ended up with a list of

9 persons authorized to speak, and who -- you know, we had the

10 categories of who they were speaking with, and then later I

11 know you had to identify that more precisely, as to the

12 specific organizations and individuals; so where in that

13 process did the targeted searches take place?  I'm looking

14 for a time frame.

15           MR. DREYER:  I -- your Honor, we -- I can

16 certainly supply you the more specific date, but my

17 recollection is sometime in the late October, early November

18 period.  I don't want to misrepresent this and I will submit

19 this to chambers, but I believe by the substantial

20 completion date in mid-November those searches had been run.

21           THE COURT:  Okay.  And then the Tour's production.

22 I know there was a substantial completion date and documents

23 have continued to be produced, as they've been identified.

24 I have in mind that there was a substantial production, or

25 not insubstantial production, by the Tour in December.  And

1 maybe that came from one of our other disputes and maybe I'm

2 just mis-remembering, but with regards to these searches,

3 what -- what production, roughly, what time frame of

4 production would they have been included in?

5         MR. DREYER:  Again, my understanding, and I'm

6 happy to confirm this, because I don't want to misstate this

7 in any way, is that these two -- Mr. Dennis and Mr. Hardy's

8 documents that were yielded in response to the targeted

9 searches, were produced prior to the November 18th

10 substantial completion deadline.

11         THE COURT:  Okay.  All right.

12     Mr. Hvidt, do you have any reason -- any basis to agree

13 or disagree with that?  I know it's very hard, there's been

14 a lot of productions and it's hard to know exactly perhaps

15 what came when.

16         MR. HVIDT:  Your Honor, there have been a lot of

17 productions.  I do believe that the targeted production from

18 these two may have came on November 18th or right around the

19 (Zoom glitch) completion deadline.

20         THE COURT:  Uh-huh.

21         MR. HVIDT:  And I can speak to the production that

22 came out a month later, if your Honor --

23         THE COURT:  Briefly, yes, just so I have it in

24 mind.

25         MR. HVIDT:  So, after we reviewed the substantial

20

1 production of documents, we identified that there was a gap

2 in the Tour's production.  Except for one custodian, there

3 were no documents produced from the custodians after June --

4 mid-June -- and up through August, and we asked the Tour

5 about that and they promptly said that they would produce

6 the documents after that.  That's what came through into

7 December, and some of the documents cited were located in

8 those productions, as that was a critical time period in the

9 case, in the development of the facts --

10          THE COURT:  Oh, okay.

11          MR. HVIDT:  -- (indiscernible) lawsuit.

12          THE COURT:  Okay.  And I believe I understood Mr.

13 Dreyer to say that as to Mr. Dennis there were five or six

14 terms that were used for the targeted production, and

15 similarly, a similar number for Mr. Hardy; is that your

16 understanding, Mr. Hvidt?

17          MR. HVIDT:  That's my understanding that it's

18 approximately that number of search terms for them, based on

19 the entities or recipients listed in the response to the

20 interrogatory.

21          THE COURT:  Okay.  All right.  That's very

22 helpful.

23    Was there anything further with regards to Mr. Hardy,

24 Mr. Dreyer?  I didn't want to cut you off, but I think you

25 had given me everything.

1          MR. DREYER:  Yes, your Honor.  And, again, many of

2     the same arguments, with respect to Mr. Dennis apply to Mr.

3     Hardy.  So, in the interest of time, nothing further.

4          THE COURT:  Sure.  Thank you.  Okay.

5       All right.  Then let's move to then, Ms. Keller, the

6     Chief Administrative Officer; Mr. Hvidt?

7          MR. HVIDT:  Yes, thank you, your Honor.

8       So, Allison Keller is the Chief Administrative Officer

9     of the PGA Tour and it's -- based on our review -- it seems

10    as if she's administering the Tour's anti-competitive

11    conduct.

12      We know that the Tour has hired consultants and

13    advisors to carry out (indiscernible) anti-competitive

14    conduct, and she managed those relationships.  The who, what

15    and how those communications are center of this case, and

16    for example, Ms. Keller was responsible for administering

17    the relationship between the Tour and an organization called

18    "Clout", who contacted golfer sponsors on the Tour's behalf

19    to get them to dissuade the golfers from playing in LIV

20    Golf.  Clout had advised the Tour to destroy the player's

21    reputation and basically hold them accountable for the acts

22    that they did not commit, simply because they desired to

23    play for another golf promoter.

24          THE COURT:  But that's not a communication from

25    Ms. Keller, that's the third-party communication, right?

22

1        MR. HVIDT:  Yes, your Honor.  That right there is

2  a third-party communication to the Tour that I was citing.

3        THE COURT:  Uh-huh.

4        MR. HVIDT:  Where we think the Tour will likely

5  claim that Clout's actions are not the Tour's, absent

6  production of the file of the custodian who was

7  administering that relationship, we are not going to see the

8  Tour's communications authorizing the -- that agencies

9  conduct to do as the Tour was asking it to do.

10      And so, the needs of (indiscernible) files to see if

11 the -- it was the Tour, who was telling them to do certain

12 acts or approving them taking certain acts, it's critical to

13 responding to an argument we think that the Tour might be

14 levying in response to conduct we learned about third-party

15 contracted firm by the Tour.

16      And also, Ms. Keller is responsible for managing the

17 Tour's main divisions and departments and communicating with

18 the Tour's Board of Directors.  And the Tour's

19 (indiscernible) campaign seems to be emanating from all the

20 different divisions of the tour, and her communications to

21 up and down with those other divisions that we haven't seen,

22 are critical, particularly because we have important

23 communications where it shows that she directed the reports

24 not to communicate certain acts that the Tour was taking in

25 response to LIV Golf in writing, but keep it verbal only.

1       We think that her communications are critical to

2  understanding the full extent of the Tour's conduct, and we

3  feel that the fact that she wasn't disclosed to us and is

4  not included on the Tour's interrogatory response, despite

5  communications showing that she, in deed, had communications

6  with some of the targets to the interrogatory, shows that we

7  really need to see her documents and believe that she's a

8  critical witness in this case.

9            THE COURT:  All right.  Thank you.

10      Mr. Dreyer?

11           MR. DREYER:  Sure, your Honor.  As an initial

12  matter, we certainly dispute LIV's characterization of the

13  documents, but in terms of the discovery issue, let me start

14  where Mr. Hvidt ended, which is the categories they have

15  identified and that we had spent so much time on the

16  interrogatories.

17      Ms. Keller is not somebody who was authorized by the

18  Tour to communicate about LIV with golfers, with agents,

19  with sponsors, with golfing bodies, with broadcasters, with

20  golf associations or any of the entities we've identified in

21  the rogs.  Her primary role is to oversee human resources,

22  the Tour's diversity equity and inclusion efforts, the

23  Tour's IT group, the information and technology group, the

24  Tour's -- to oversee the Tour's physical headquarters and

25  their corporate offices, to serve as assistant corporate

24

1  secretary, and she also supervises, as part of her duties,

2  Laura Neal, who is the head of communications, who is a

3  custodian.

4      We have treated as a full custodian Ms. Neal, whose

5  full title is Executive Vice President of Media Content and

6  Communications, who's responsible for overseeing external

7  communications of the type Mr. Hvidt believes occurred.

8  We've also produced from Ms. Keller's direct reports,

9  Commissioner Monahan and Chief Operating Officer Ron Price.

10      In addition, we've produced a significant number of

11  communications involving Ms. Keller that relate to LIV.  By

12  our count, more than 4500 such communications involving Ms.

13  Keller.

14      In addition, as part of the board production that has

15  started and will be completed in the next couple of weeks,

16  there are -- there's a production of documents,

17  communications between the board and PGA Tour employees,

18  officers, related to LIV.  So to the extent they're

19  concerned about communications that may have been had with

20  the board, that has been covered by the board's subpoenas.

21      We just don't think that there's been an adequate

22  showing that Ms. Keller should be made a full custodian, in

23  light of all of the other avenues that have been made

24  available to the Plaintiffs and where we are.  Again, she's

25  somebody who was identified as early as October and her role

1 is not a mystery, it's been on the website well before this

2 litigation.

3          THE COURT:  All right.  I saw in the papers the

4 Tour had -- had offered a target search, with regards to Ms.

5 Keller.  What, if anything, did the Tour offer?  Did you get

6 specific or what does the Tour offering there?

7          MR. DREYER:  We didn't get specific, I think to

8 the extent there's a focus on communications that she had

9 with the board about LIV, you know, we could certainly

10 explore the perimeters of those, subject to a targeted

11 search.  I think, you know, given her role as an assistant

12 corporate secretary, that would certainly be within our

13 purview.

14          THE COURT:  What about with regards to Clout,

15 which was specifically referenced in the papers?

16          MR. DREYER:  I think subject -- again, the devil

17 is in the details -- but subject to the search terms, in

18 making sure that we're not getting lots and lots of

19 unnecessary hits, that would certainly be something we would

20 discuss with the Plaintiffs in good faith and hopefully

21 reach a resolution, as we have with, I think, all of the

22 other search terms.

23          THE COURT:  Okay.  In the search process -- back

24 to a general question, Mr. Dreyer -- in the searches for --

25 of custodians, was there a process in place of if a term ran

26

1  and you had very high hit counts, vis a vis, that custodian

2  and for some adjustment or modification?  Did that process

3  take place?

4              MR. DREYER:  It did, your Honor.

5              THE COURT:  Okay.  All right.

6       Mr. Hvidt, it's your motion.  Any -- well, let me --

7  before I get -- before I get to you, because you'll get the

8  last word, anything further, Mr. Dreyer, as to the

9  productions in general?

10             MR. DREYER:  No, I just want to make clear, in

11 responding to your last question, in terms of the back and

12 forth, I believe that took place both for the custodial

13 searches and the partial custodial searches.  There was a

14 back and forth and a collaborative dialogue on those.

15             THE COURT:  Okay.  That's good to hear.  Thank

16 you.

17      Mr. Hvidt, it's Plaintiffs' motion, final comments?

18             MR. HVIDT:  Final comments are just that we really

19 appreciate your Honor's time and we really believe that

20 these three individuals would have been included as

21 custodians at the outset if we had known of their roles and

22 understood their involvement.  And we are bringing this to

23 your Honor, not as matters to add custodians for the sake of

24 adding custodians, but because it's targeted requests for

25 the specific communications from these critical witnesses.

1          THE COURT:  All right.  Okay, thank you.

2      All right.  I am mindful, as I said at the outset, of

3  my previous orders and of the efforts on both sides to

4  develop a workable framework for identifying parties within

5  the -- within PGA to be searched, and the scope of those

6  searches, that led us to this process of having some full

7  custodians and some targeted search custodians in response

8  to interrogatory one.  So here's how -- here's how we will

9  proceed, with regards to these three.

10     For Mr. Hardy, the Senior Vice President,

11  International.  He is a -- it seems to the Court that he is

12  a likely candidate for a full custodial search and it's not

13  unreasonable to include him, particularly in light of some

14  of the documents that have been produced that indicate his

15  involvement in discussions with other tours that are

16  relevant to the claims in this case.  By virtue of that, I

17  find that it is proportional to the needs of the case to

18  expand -- to add Mr. Hardy as a full custodian.

19     With regards to Mr. Dennis, the President of PGA,

20  although by virtue of his title, it would seem logical that

21  he would be a full custodian, I am mindful of the structure

22  of the searches pursuant to interrogatory one, and the areas

23  he identified in the searches that were run, but I do have

24  some concern with regards to the sufficiency of identifying

25  all of his communications within those categories as

1  outlined by interrogatory one.  So I think that the -- what

2  we will do with regards to Mr. Dennis, is expand the search

3  as it was designed, or done in response to interrogatory

4  one, to include his phone or devices, to be sure that we're

5  getting all of the relevant communications.

6       With regards to Ms. Keller, the Chief Administrative

7  Officer, I am mindful that though she reports to up the

8  chain, as well as direct reports to her, were custodians and

9  documents were produced, the argument in the -- in the

10 papers is -- struck me as still quite speculative as to what

11 she may or may not have, with regards to a full custodian

12 production.  But there are clearly some communications, and

13 I believe she is an appropriate candidate for a targeted

14 search, as -- at a minimum, with regards to the third

15 parties, as identified in the papers, such as -- such as

16 with Clout.  That is -- so I want the parties to meet and

17 confer over the targeted search terms.  The example of Clout

18 is not -- I'm not limiting the scope of the searches, as to

19 her, but she certainly appears to have some -- there may be

20 some missing communications there.  So a targeted search on

21 targeted terms, with regards to Ms. Keller.  I also think

22 that the evidence presented does support, although she'll be

23 a targeted custodian, that her phone be included in that

24 search, as well.

25      All right.  So Mr. Hardy is added as a full custodian.

1  Mr. Dennis, his phone communications will be added to the

2  targeted search already conducted.  Ms. Keller will be added

3  as a targeted search custodian.  The specific terms, the

4  parties are to meet and confer promptly and decide what that

5  is to be.

6      I also expect that, with regards to Mr. Hardy and the

7  full custodial search, that the parties will continue their

8  collaborative process, in terms of search terms and hits, so

9  that -- so that that can be addressed as it comes up.

10     Productions made pursuant to this order are to be made

11 as the documents are available on a rolling basis and to be

12 completed by February 15 -- February 15.  The Court is

13 mindful of the discovery close on written discovery and

14 productions coming up in the first part of March.

15     All right.  Any questions?  I will issue a short

16 written order, summarizing my rulings here today; are there

17 any further questions?  Mr. Hvidt?

18         MR. HVIDT:  No questions, your Honor.  Thank you

19 for your time.

20         THE COURT:  Mr. Dreyer?

21         MR. DREYER:  No questions, your Honor.  Thank you

22 for your time and attention.

23         THE COURT:  All right.  Thank you all very much.

24 I appreciate your papers and the preparation -- oh, and I do

25 want to call to your attention, I have updated my standing

30

1  order on -- on the joint discovery submissions.  It really

2  just changes the formatting, so please be mindful of that,

3  in the event you have any other -- any further submissions

4  to the Court.

5       All right.  Thank you all very much, have a good

6  afternoon.  And we are adjourned.

7       (Proceedings concluded at 2:40 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

31

1                     CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4    transcript, to the best of my ability, of the above pages of

5    the official electronic sound recording provided to me by

6    the U.S. District Court, Northern District of California, of

7    the proceedings taken on the date and time previously stated

8    in the above matter.

9        I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties to the action

11   in which this hearing was taken; and, further, that I am not

12   financially nor otherwise interested in the outcome of the

13   action.

14

15

16

17            Echo Reporting, Inc., Transcriber

18                Tuesday, January 24, 2023

19

20

21

22

23

24

25

*Echo Reporting, Inc.*