# EXHIBIT A

**JOINT CHART REGARDING LIV GOLF, INC. AND PGA TOUR, INC.'S JOINT STATEMENT REGARDING SEALING PORTIONS OF ORDER AT DKT. NO. 265.**

| Document | Proposed Text to be Sealed | LIV's Basis for Requesting Sealing | The TOUR's Position | Court's Use |
|---|---|---|---|---|
| Dkt. 265 Order re PGA TOUR's Motion to Compel Subpoena Compliance from PIF and Mr. Al-Rumayyan and PIF and Mr. Al-Rumayyan's Motion to Quash Subpoenas ("Order") | Lines 13:20-14:11, 23:11-18, 36:28-37:2, 37:28, and 38:1 | Contains confidential material about LIV's formation and plans at launch, which would cause competitive harm if disclosed, including by inviting speculation about LIV's business plan in the United States and deviation from its current strategy and disclosing LIV's anticipated approach to competitors (including the Tour), which could be exploited by those entities for competitive gain (e.g., in public relations).<br><br>The information is not limited to the name of the project but includes details about plans for LIV and its competition in the United States. | The TOUR opposes sealing. The citations from the Project Wedge presentation describe LIV's strategy at an extremely high level and in ways that were already largely disclosed in LIV's own complaint or have otherwise been widely reported upon. For example, that "Project Wedge" is an internal name for LIV was already disclosed in public FARA disclosures and there is no feasible sensitivity around LIV's former names. Further, Mr. Al-Rumayyan and PIF's involvement in creating LIV and LIV's goal of disrupting professional golf and recruiting existing golfers with increased incentives have been widely reported, described in LIV's complaint, discussed by LIV personnel in the press, and discussed in other public portions of the Court's Order. Moreover, that LIV was created to further PIF's own Vision 2030 objectives says nothing about LIV's internal strategy; neither does LIV's characterization of the TOUR in that presentation. | |

| | | | | |
|---|---|---|---|---|
| Dkt. 265 Order | Lines 13:27-14:1 and 14:14-16 | Contains confidential material about LIV financials, including specific percentage ownership, investment, and risk allocation not publicly known, which would cause competitive harm if disclosed, including from prejudice to obtaining outside funding, entering a franchise model, and negotiating better deal terms.<br><br>The cited article says nothing about the issue beyond the fact that PIF funds LIV (at an unspecified percentage). | The TOUR opposes sealing. The material identified reflects high-level information about PIF's funding and near-total ownership of LIV. The disclosure of this material will not cause competitive harm to LIV because the information has already been widely reported, including by LIV's CEO Greg Norman. *See Greg Norman: PIF funding, not running, LIV Golf*, Sports Business Journal, Jan. 23, 2022, https://www.sportsbusinessjournal.com/Daily/Issues/2023/01/23/Leagues-and-Governing-Bodies/greg-norman-talks-liv-golf-fox-news.aspx. Moreover, LIV does not explain why its (widely known) source of funding would discourage investors or prevent the franchising of its teams. Nor does LIV specify what "deal terms" would need to be negotiated, and why they would be affected by the unsealing of widely-reported information about LIV's source of funding and ownership. | |
| Dkt. 265 Order | Lines 15:3-9, 16:3-17, and 27:5 | Contains confidential material about LIV's internal decision making processes, which would cause competitive harm if disclosed, including harm from competitors exploiting the information (e.g., by seeking to influence | The TOUR opposes sealing. The material identified at 15:3-9 characterizes the cited communications at an extremely high level and does not reveal any internal decision making processes. Additionally, it has been publicly reported that PIF engaged strategic advisors in the United States, including McKinsey, to provide strategic advice regarding LIV. *See* Alan Blinder and Sarah Hurtes, *Confidential* | |

|  |  | LIV's investors) and harm to LIV's negotiations by suggesting that LIV lacks authority to negotiate certain terms.

These issues are implicated regardless of the substance of the decisions; they concern the process of decision making itself, including topics in which LIV investors are involved.

The citations to the transcript relate to the legal impact of PIF authorizing certain decisions, not evidence that this ever happened (which is strongly disputed). | *Records Show a Saudi Golf Tour Built on Far-Fetched Assumptions*, N.Y. Times, Dec. 11, 2022, https://www.nytimes.com/2022/12/11/sports/golf/liv-saudi-pga.html. Similarly, the material identified at 27:5 is identical to attorney argument that LIV and PIF's attorneys have made publicly. *See* Jan. 13, 2023 Hr'g Tr. at 62:17-21, 63:3-6. The material identified at 16:3-17 describes the cited communications in slightly more detail, but primarily describes Mr. Al-Rumayyan's involvement in LIV's decision-making processes, not the decisions themselves. Competitors will gain no exploitable advantage by knowing that Mr. Al-Rumayyan weighed in on certain details about LIV's operations without knowing what his opinions were or even the specifics of the decisions presented to him. For example, the fact that LIV held a "brainstorming session" on various operational and budgetary issues is standard corporate practice and not a tightly held corporate secret. |  |
| Dkt. 265 Order | Lines 15:11-16:2 and 36:21-24 | Contains confidential material about LIV's negotiations with players, agents, and sponsors, which would cause competitive harm if disclosed, including by exposing the | The TOUR does not oppose sealing. |  |

| | | | | |
|---|---|---|---|---|
| | | negotiation partners to unwanted attention, prejudicing LIV's ability to obtain future business, and hindering its ability to negotiate confidentially, while revealing LIV's internal processes for decision making regarding negotiations, which could be exploited by future negotiation partners and competitors to prejudice LIV. | | |
| Dkt. 265 Order | Lines 25:20-25; 26:1-7, 26:9-11, and 26:17-21 | Contains highly confidential material about a Shareholder Agreement that sets out LIV's relationship with investors, which would cause competitive harm if disclosed, including by prejudicing LIV's ability to obtain outside funding, deterring or affecting terms demanded by outside funders, and deterring or affecting terms demanded by outside | The TOUR opposes sealing. Each of these cites is to the Shareholders' Agreement setting out the corporate arrangement between Performance54 and PIF to establish LIV. The details of that agreement cited in the Order are limited to the Reserved Matters schedule and certain definitions. None of these details are competitively sensitive and LIV provides no reason for why the unsealing of which matters must be approved by PIF, as set out in the Reserved Matters schedule, would deter outside investors or disrupt further business partnerships. Indeed, any outside investor would be provided with this information before providing additional funding. Moreover, LIV itself is | |

| | | business partners in negotiations.

The Tour has no basis to speculate about what outside partners will do when LIV has provided concrete evidence of harm. Loffhagen Decl. ¶ 6. LIV has an interest in confidentiality because it will suffer harm from disclosure as a party the Tour claims is subject to the agreement. | not a party to the Shareholders' Agreement, so it has failed to establish that LIV has an interest in its confidentiality. | |
|---|---|---|---|---|