1  KEKER, VAN NEST & PETERS LLP
   ELLIOT R. PETERS - # 158708
2  epeters@keker.com
   DAVID SILBERT - # 173128
3  dsilbert@keker.com
   R. ADAM LAURIDSEN - # 243780
4  alauridsen@keker.com
   NICHOLAS S. GOLDBERG - # 273614
5  ngoldberg@keker.com
   SOPHIE HOOD - # 295881
6  shood@keker.com
   633 Battery Street
7  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
8  Facsimile:    415 397 7188

   SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
   ANTHONY J. DREYER - (*pro hac vice*)
   anthony.dreyer@skadden.com
   KAREN M. LENT - (*pro hac vice*)
   karen.lent@skadden.com
   MATTHEW M. MARTINO - (*pro hac vice*)
   matthew.martino@skadden.com
   One Manhattan West
   New York, NY 10001
   Telephone:    212 735 3000
   Facsimile:    212 735 2000

   SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
   PATRICK FITZGERALD - (*pro hac vice*)
   patrick.fitzgerald@skadden.com
   155 North Wacker Drive
   Chicago, Il 60606
   Telephone:    312 407 0700
   Facsimile:    312 407 0411

12  Attorneys for Defendant PGA TOUR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MATT JONES; BRYSON DECHAMBEAU; PETER UIHLEIN; and LIV GOLF, INC., | Case No. 5:22-cv-04486-BLF |
| Plaintiffs, | **DEFENDANT PGA TOUR, INC.'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT & AMENDED COUNTERCLAIM** |
| v. | |
| PGA TOUR, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | Judge:    Hon. Beth Labson Freeman |
| | Date Filed:  August 3, 2022 |
| PGA TOUR, INC., | Trial Date:    January 8, 2024 |
| Counterclaimant, | |
| v. | **PUBLIC REDACTED VERSION** |
| LIV GOLF, INC., THE PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA, AND YASIR OTHMAN AL-RUMAYYAN, | |
| Counterdefendants. | |

**ANSWER TO AMENDED COMPLAINT**

Defendant PGA TOUR, INC. ("the TOUR"), by and through its counsel of record, answers Plaintiffs MATT JONES, BRYSON DECHAMBEAU, PETER UIHLEIN (the "Player Plaintiffs"), and LIV GOLF INC.'s ("LIV") (collectively, "Plaintiffs") Amended Complaint as follows:

LIV, a new golf league paid for by Saudi Arabia's sovereign wealth fund, seeks to wield the antitrust laws as a cudgel instead of engaging in an honest effort to compete in the market for professional golf, while at the same time free riding on the TOUR's decades-long investment in tournament promotion for the various tours it operates, and in particular the PGA TOUR. Both LIV and the Player Plaintiffs knew that participating in LIV events while they remained members of the PGA TOUR, without a release from the TOUR's Commissioner, would breach the Player Plaintiffs' contractual obligations and would result in their suspensions.

The PGA TOUR's Player Handbook & Tournament Regulations (the "Regulations") contribute to the success of scheduled TOUR events, help the TOUR fulfill its own contractual obligations (including its obligation to sponsors and media partners to ensure representative fields), and provide substantial benefits to tournament sponsors, title sponsors, broadcasters, local host organizers, and ultimately, the players. The Regulations make the TOUR's media rights more valuable to sponsors and content distributors, leading to higher sponsorship and broadcast revenues, which in turn are distributed to members in the form of prize money and additional benefits.

Through this lawsuit, LIV asks the Court to invalidate these wholly legitimate provisions with the stroke of a pen *after* inducing the remaining Player Plaintiffs to violate those same regulations with hundreds of millions of dollars in Saudi money. The Player Plaintiffs that have remained in the case—eight of the original eleven players have withdrawn their names from this lawsuit already—want only to enrich themselves in complete disregard of the promises they made to the TOUR and its members when they joined the TOUR.

But there is no actual injury to Plaintiffs here, and no violation of the law. LIV, by its own admission, has succeeded in attracting numerous elite professional golfers to participate in its new

league. LIV has held numerous events with full fields and has announced a full season for 2023. Both LIV and the Player Plaintiffs baked the financial cost of their suspensions into LIV's exorbitant signing bonuses, making the Player Plaintiffs whole. Moreover, while LIV and the Player Plaintiffs challenge the TOUR's media rights and conflicting events polices as anticompetitive, LIV imposes similar—indeed far more restrictive—conditions on its players, and the Player Plaintiffs have agreed to them.

This case is not about unfair competition—if anyone is competing unfairly, it is LIV, not the TOUR. Instead, it is a cynical effort to avoid competition and to freeride off of the TOUR's investment in the development of professional golf. Plaintiffs' allegations are baseless and entirely without legal merit. The TOUR responds herein to each allegation, and at the same time, files a counterclaim against LIV for tortious interference with the TOUR's contracts with its members.

1.      The TOUR admits that it was created in the 1960s in part by the world's best golfers at the time. The TOUR states that it is organized as a tax-exempt organization under Internal Revenue Code Section 501(c)(6). The TOUR otherwise denies the allegations in Paragraph 1 of the Amended Complaint.[1]

2.      The TOUR admits that PGA TOUR members are independent contractors. The TOUR further admits that it is organized as a tax-exempt organization under Internal Revenue Code Section 501(c)(6). The TOUR otherwise denies the allegations in Paragraph 2 of the Amended Complaint.

3.      To the extent Paragraph 3 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that it has suspended some players in accordance with the Regulations' disciplinary provisions—including the remaining Player Plaintiffs—for their violations of the Regulations regarding conflicting events, media and

---

[1] The TOUR denies each and every allegation of Plaintiffs' Amended Complaint—including the headings, footnotes, and captions—not specifically admitted or to which the TOUR has not otherwise responded in this Answer.

marketing rights, and player conduct. The TOUR otherwise denies the allegations in Paragraph 3 of the Amended Complaint.

4.      To the extent Paragraph 4 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR is without sufficient information to admit or deny Plaintiffs' allegation that LIV canceled its 2022 business plan to launch a full league, and on that basis denies it. The TOUR admits that LIV launched its "Invitational Series" in 2022. The Tour further admits that it has suspended some players in accordance with the Regulations' disciplinary provisions for their violations of the regulations regarding conflicting events, media and marketing rights, and player conduct. The TOUR otherwise denies the allegations in Paragraph 4 of the Amended Complaint.

5.      The TOUR admits that it has amended its Regulations from time to time. The TOUR otherwise denies the allegations in Paragraph 5 of the Amended Complaint.

6.      To the extent Paragraph 6 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that it has suspended some players in accordance with the Regulations' disciplinary provisions—including the remaining Player Plaintiffs—for their violations of the Regulations regarding conflicting events, media and marketing rights, and player conduct. The TOUR otherwise denies the allegations in Paragraph 6 of the Amended Complaint.

7.      The TOUR admits that many of the best golfers in the world are PGA TOUR members. The TOUR further admits that PGA TOUR members agree each season to adhere to the Regulations, and that pursuant to the Regulations PGA TOUR members generally may not participate in any other golf tournament on a date when a PGA TOUR tournament is scheduled, absent permission from the TOUR. The TOUR further admits that, in certain circumstances, players may seek and receive releases to play in non-TOUR tournaments (and participate in non-TOUR media programs) that are held on the same dates as PGA TOUR events. The TOUR further admits that each player is generally eligible for up to three conflicting event releases per season, assuming he participates in fifteen PGA TOUR tournaments that season, and one additional release for each additional five PGA TOUR tournaments in which he participates. The

TOUR further admits that a release can be denied if the Commissioner determines that it would cause the TOUR to be in violation of a contractual commitment to a tournament sponsor, or would otherwise significantly and unreasonably harm the TOUR and its sponsors. The TOUR further admits that the Regulations preclude conflicting events releases for events held in North America. The TOUR further admits that the TOUR has granted releases for players when the releases do not violate one of these provisions or the TOUR's obligations to its members. The TOUR further admits that the Commissioner did not grant releases to players seeking to play in conflicting LIV events and noted LIV's intention to launch a series of events in North America as one reason for the denial of a release. The TOUR otherwise denies the allegations in Paragraph 7 of the Amended Complaint.

8.     The TOUR admits that the Regulations also contain provisions related to member media rights, to which all PGA TOUR members agree on a season-to-season basis. The TOUR further admits that the quoted words appear in the Regulations, but otherwise denies the second sentence of Paragraph 8. The TOUR further admits that a portion of the media rights regulations provides that "[n]o PGA TOUR member shall participate in any live or recorded golf program without the prior written consent of the Commissioner, except that this requirement shall not apply to PGA TOUR cosponsored, coordinated or approved tournaments, wholly instructional programs or personal appearances on interview or guest shows." The TOUR further admits that the media rights regulations provide that "'[g]olf program' for purposes of [the media rights] section means any golf contest, exhibition or play that is shown anywhere in the world[.]" The TOUR otherwise denies the allegations in Paragraph 8 of the Amended Complaint.

9.     The TOUR admits that PGA TOUR members are independent contractors. The TOUR otherwise denies the allegations in Paragraph 9 of the Amended Complaint.

10.     The TOUR admits that certain of the block quoted words in Paragraph 10 appear in a January 24, 2020 memorandum from Commissioner Monahan to the PGA TOUR Policy Board, but denies the misleading alterations to the text of the memorandum. The TOUR otherwise denies the allegations in Paragraph 10 of the Amended Complaint.

1      11.      To the extent Paragraph 11 sets forth a conclusion of law, no response is required.

2  To the extent a response is required, the TOUR denies the allegations in the introductory portion

3  of Paragraph 11 of the Amended Complaint.

4          a.      The TOUR admits that it has suspended some players in accordance with

5  the Regulations' disciplinary provisions—including the Player Plaintiffs—for their violations of

6  the Regulations regarding conflicting events, media and marketing rights, and player conduct.

7  The TOUR otherwise denies the allegations in Paragraph 11.a of the Amended Complaint.

8          b.      The TOUR admits that it has amended its Regulations from time to time.

9  The TOUR otherwise denies the allegations in Paragraph 11.b of the Amended Complaint.

10          c.      The TOUR is without sufficient information to admit or deny the accuracy

11  of the quotations in Paragraph 11.c, and on that basis denies them. The TOUR otherwise denies

12  the allegations in Paragraph 11.c of the Amended Complaint.

13          d.      The TOUR denies the allegations in Paragraph 11.d of the Amended

14  Complaint.

15          e.      The TOUR denies the allegations in Paragraph 11.e of the Amended

16  Complaint.

17          f.      The TOUR admits that it administers a program called PGA TOUR

18  University designed to identify the best college golfers in the United States and provide them with

19  playing opportunities, including on the Korn Ferry Tour. The TOUR further admits that college

20  players must meet the eligibility requirements in the PGA TOUR University rules and

21  regulations. The TOUR otherwise denies the allegations in Paragraph 11.f of the Amended

22  Complaint.

23          g.      The TOUR is without sufficient information to admit or deny whether or

24  why sponsors have cut ties with players who have joined LIV. The TOUR otherwise denies the

25  allegations in Paragraph 11.g of the Amended Complaint.

26      12.      To the extent Paragraph 12 sets forth a conclusion of law, no response is required.

27  To the extent a response is required, the TOUR denies the allegations in Paragraph 12 of the

28  Amended Complaint.

2093587

13.     The TOUR admits that PGA TOUR members are independent contractors. The TOUR further admits that Commissioner Monahan, consistent with the Regulations, imposed discipline on players for breaching their membership agreements with the TOUR, including imposing certain suspensions in accordance with the Regulations' disciplinary provisions for violations of the Regulations regarding conflicting events, media and marketing rights, and player conduct. The TOUR further admits that Talor Gooch, Hudson Swafford, and Matt Jones earned sufficient points to finish the 2021-2022 TOUR season in the top 125 of the 2021-2022 FedExCup Points list and, but for their suspensions for violations of the Regulations, they would have qualified for the first tournament of the 2022 FedExCup Playoffs. The TOUR otherwise denies the allegations in Paragraph 13 of the Amended Complaint.

14.     The TOUR admits that Player Plaintiffs have already been fully compensated by LIV for all suspensions the TOUR might impose and all of the other consequences that may flow from their decision to violate the Regulations. The TOUR otherwise denies the allegations in Paragraph 14 of the Amended Complaint.

15.     To the extent Paragraph 15 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that LIV has launched its business. The TOUR otherwise denies the allegations in Paragraph 15 of the Amended Complaint and denies that Plaintiffs are entitled to any relief.

16.     Paragraph 16 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 16 sets forth a conclusion of law, no response is required.

17.     Paragraph 17 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 17 sets forth a conclusion of law, no response is required.

18.     Paragraph 18 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 18 sets forth a conclusion of law, no response is required. member of the PGA TOUR; has been suspended by the TOUR; attended the University of Georgia; that he joined the Nationwide Tour in 2012; won.

1
2
3
4
5
6
7
8
9
10
11
12

19.     To the extent Paragraph 19 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that Mr. Jones: is currently forty-two years old; was a member of the PGA TOUR; has been suspended by the PGA TOUR; attended Arizona State University; was a first-team All-American golfer; joined the Nationwide Tour in 2004; joined the PGA TOUR in 2008; won the 2014 Shell Houston Open; won the Emirates Australian Open in both 2015 and 2019 on the PGA Tour of Australasia; won the Honda Classic in 2021; played in over 350 PGA TOUR events; played in 20 events during the 2021-2022 PGA TOUR season; was within the top 50 of the FedExCup standings at the time of his suspension from the TOUR; and would have qualified to play in the first tournament of the 2022 FedExCup Playoffs if he had not been suspended for violations of the Regulations. The TOUR is without sufficient information to admit or deny Plaintiffs' remaining allegations in Paragraph 19 of the Amended Complaint, and on that basis denies them.

13
14
15
16
17
18
19
20
21
22
23
24
25
26

20.     To the extent Paragraph 20 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that Mr. DeChambeau: was twenty-eight years old at the time the Amended Complaint was filed; was a member of the PGA TOUR; has been suspended by the TOUR; attended Southern Methodist University; won the 2015 NCAA individual and U.S. Amateur titles; made his PGA TOUR debut in the 2015 FedEx St. Jude Classic as an amateur; finished second in the 2015 UNIQLO Masters as a professional; finished tied for fourth in the 2016 RBC Heritage on the PGA TOUR; won the 2016 Korn Ferry DAP Championship; won the 2017 John Deere Classic; won the 2018 Memorial Tournament, Northern Trust, and Dell Technologies Championships; played for the United States in the 2018 Ryder Cup; won the 2019 Shriners Hospitals for Children Open and the Omega Dubai Desert Classic on the European Tour (now the DP World Tour); won the 2020 Rocket Mortgage Classic and the U.S. Open; won the 2021 Arnold Palmer Invitational; and played for the United States in the 2021 Ryder Cup. The TOUR is without sufficient information to admit or deny Plaintiffs' remaining allegations in Paragraph 20 of the Amended Complaint, and on that basis denies them.

27
28

21.     Paragraph 21 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 21 sets forth a conclusion of law, no response is required.

22.     To the extent Paragraph 22 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that Mr. Uihlein: was thirty-two years old at the time the Amended Complaint was filed; was a member of the Korn Ferry Tour and PGA TOUR; has been suspended by the TOUR; attended Oklahoma State University; won the 2017 Nationwide Children's Hospital Championship in 2017 on the Web.com Tour (now the Korn Ferry Tour); won the MGM Resorts Championship in 2021 on the Korn Ferry Tour; won the 2013 Madeira Islands Open on the European Tour (now the DP World Tour); represented the United States in the 2009 and 2011 Walker Cups as an amateur; won the 2010 Eisenhower Trophy; won the 2010 United States Amateur Championship; and ranked within the top 50 of the Korn Ferry Tour's regular season points list at the time of his suspension. The TOUR is without sufficient information to admit or deny Plaintiffs' remaining allegations in Paragraph 22 of the Amended Complaint, and on that basis denies them.

23.     To the extent Paragraph 23 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that LIV is the sponsor of the LIV Golf Invitational Series, which will host the majority of its 2022 tournaments in the United States. The TOUR is without sufficient information to admit or deny Plaintiffs' remaining allegations in Paragraph 23 of the Amended Complaint, and on that basis denies them.

24.     To the extent Paragraph 24 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits the allegations in Paragraph 24 of the Amended Complaint.

25.     To the extent Paragraph 25 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits for purposes of this action only that the Court has subject matter jurisdiction. The TOUR otherwise denies the allegations in Paragraph 25 of the Amended Complaint.

2093587

26.     To the extent Paragraph 26 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits for purposes of this action only that the Court may exercise personal jurisdiction over the TOUR. The TOUR further admits that it manages or operates TPC Harding Park within the Northern District of California. The TOUR further admits that, in 2022, it cosponsored the Fortinet Championship, the American Express, the Farmers Insurance Open, the AT&T Pebble Beach Pro-Am, the Genesis Invitational, and the Barracuda Championship in California, and that California hosted more PGA TOUR events than any other state in 2022. The TOUR otherwise denies the allegations in Paragraph 26 of the Amended Complaint.

27.     To the extent Paragraph 27 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR, for purposes of this action only, does not contest that this Court may exercise personal jurisdiction over the TOUR. The TOUR otherwise denies the remaining allegations in Paragraph 27 of the Amended Complaint.

28.     To the extent Paragraph 28 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR does not contest, for purposes of this action only, that venue is proper in this District.

29.     The TOUR is without sufficient information to admit or deny the allegations in Paragraph 29 of the Amended Complaint, and on that basis denies them.

30.     The TOUR admits that it cosponsors a series of tournaments each year and that there are four "major" tournaments each golf season: the Masters, the U.S. Open, the Open Championship, and the PGA Championship. The TOUR further admits that the Ryder Cup and the Presidents Cup take place on a bi-annual basis and that the Olympics take place every four years. The TOUR further admits that PGA TOUR members may compete in other tournaments outside North America that conflict with TOUR cosponsored events if they obtain a conflicting event release and/or a media rights release from the Commissioner under the Regulations. The TOUR otherwise denies the allegations in Paragraph 30 of the Amended Complaint.

31.     The TOUR admits that many of the world's top golfers seek to compete on the PGA TOUR. The TOUR further admits that the TOUR's investments in building its platform

have allowed the TOUR to offer some of the largest purses in professional golf. The TOUR admits that purses are generally larger on the PGA TOUR than on the DP World Tour, the Asian Tour, and the Korn Ferry Tour, but denies Plaintiffs' allegations regarding purse sizes to the extent that they assert PGA TOUR purses are always larger than those on other tours. The TOUR admits that one way members can qualify for competition in the major tournaments is through success in PGA TOUR events. The TOUR otherwise denies the allegations in Paragraph 31 of the Amended Complaint.

32.     The TOUR admits that, historically, it has not held additional cosponsored events the weeks that the majors hosted in North America—the Masters, U.S. Open, and PGA Championship—are played. The TOUR further admits that it has cosponsored an event during the week of the major hosted outside of North America, the Open Championship. The TOUR further admits that one way, among many, that members can qualify for competition in some of the major tournaments is through success in PGA TOUR events. The TOUR is without sufficient information to admit or deny Plaintiffs' allegation that LIV schedules its series and will schedule its league around the Majors, and on that basis denies it. The TOUR otherwise denies the allegations in Paragraph 32 of the Amended Complaint.

33.     The TOUR admits that the DP World Tour (formerly known as the European Tour) is another men's professional golf players' membership organization. The TOUR further admits that Seve Ballesteros, Nick Faldo, and Bernhard Langer played numerous events throughout their careers on the European Tour. The TOUR is without sufficient information to admit or deny the accuracy of the quotations in Paragraph 33 or Plaintiffs' allegation that when DP World Tour members qualify for PGA TOUR membership, they almost invariably elect to immediately become PGA TOUR members, and on that basis denies them. The TOUR otherwise denies the allegations in Paragraph 33 of the Amended Complaint.

34.     The TOUR is without sufficient information to admit or deny the accuracy of the quotation or the allegations in Paragraph 34 of the Amended Complaint, and on that basis denies them.

PGA TOUR, INC.'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT & AMENDED COUNTERCLAIM
Case No. 5:22-cv-04486-BLF

2093587

35.     The TOUR admits that the quoted language in Paragraph 35 appears in Commissioner Monahan's January 2020 memorandum. The TOUR otherwise denies the allegations in Paragraph 35 of the Amended Complaint.

36.     To the extent Paragraph 36 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that it purchased a minority stake in European Tour Productions in 2020. The TOUR otherwise denies the allegations in Paragraph 36 of the Amended Complaint.

37.     The TOUR admits that it organizes and manages the PGA TOUR Champions, the Korn Ferry Tour, and the developmental tours PGA TOUR Latinoamerica and PGA TOUR Canada. The TOUR further admits that the PGA TOUR Latinoamerica holds events in Latin America and that PGA TOUR Canada holds events in Canada. The TOUR further admits that it describes the Korn Ferry Tour as the path to the PGA TOUR. The TOUR further admits that the Asian Tour hosts events principally in Asia, that the Japan Tour hosts events in Japan, that the Sunshine Tour hosts events in South Africa, and that the KPGA Korean Tour holds events in South Korea. The TOUR otherwise denies the allegations in Paragraph 37 of the Amended Complaint.

38.     The TOUR denies the allegations in Paragraph 38 of the Amended Complaint.

39.     The TOUR denies the allegations in Paragraph 39 of the Amended Complaint.

40.     The TOUR admits that one way PGA TOUR members may gain spots in some of the majors, the Ryder and Presidents Cup teams, and the Olympics is through success in PGA TOUR events. The TOUR further admits that holding a ranking within the top 50 of the Official World Golf Rankings is one means through which players may qualify for some major tournaments. The TOUR further admits that the number of World Golf Ranking points earned in any particular tournament is, in part, determined by the Total Field Rating as determined by the Official World Golf Rankings. The TOUR further admits that Olympic Golf Rankings—which are used to determine eligibility for the Olympic golf field—are currently derived from World Golf Rankings. The TOUR is without sufficient information to admit or deny the accuracy of the

2093587

1    quotation in Paragraph 40, and on that basis denies it. The TOUR otherwise denies the allegations

2    in Paragraph 40 of the Amended Complaint.

3        41.    To the extent Paragraph 41 sets for a conclusion of law, no response is required.

4    To the extent a response is required, the TOUR admits Jay Monahan, Keith Pelley, Keith Waters,

5    Seth Waugh, Mike Whan, Will Jones, Martin Slumbers, and Peter Dawson are members of the

6    Official World Golf Rankings' Governing Board. The TOUR otherwise denies the allegations in

7    Paragraph 41 of the Amended Complaint.

8        42.    The TOUR admits its Articles of Incorporation, which were included in the

9    TOUR's application to the Internal Revenue Service for tax-exempt status under Section

10   501(c)(6), state that one of the TOUR's purposes is to promote the common interests of

11   professional tournament golfers. The TOUR otherwise denies the allegations in Paragraph 42 of

12   the Amended Complaint.

13       43.    The TOUR admits that the professional golfers who have earned the right to

14   compete on the PGA TOUR are among the most skilled and popular professional golfers in the

15   United States and the world, and that they include some of the biggest names in sports and

16   popular culture in the United States and the world. The TOUR denies that Phil Mickelson, Bryson

17   DeChambeau, Brooks Koepka, Henrik Stenson, Cameron Smith, Dustin Johnson, Louis

18   Oosthuizen, Sergio Garcia, or Bubba Watson are currently members of the PGA TOUR. The

19   TOUR otherwise denies the allegations in Paragraph 43 of the Amended Complaint.

20       44.    The TOUR admits that PGA TOUR members are independent contractors. The

21   TOUR further admits that there are no teams to cover expenses for players on the TOUR. The

22   TOUR otherwise denies the allegations in Paragraph 44 of the Amended Complaint.

23       45.    The TOUR admits that Jay Monahan is the Commissioner of the PGA TOUR and

24   assumed that role on January 1, 2017. The TOUR further admits that Commissioner Monahan sits

25   on the Board of the DP World Tour (formerly known as the European Tour), the Governing

26   Board of the Official World Golf Rankings, and the Board of Directors and Executive Committee

27   of the International Golf Federation. The TOUR otherwise denies the allegations in Paragraph 45

28   of the Amended Complaint.

46.     The TOUR admits that the quoted language appears in Commissioner Monahan's January 2020 Memorandum to the TOUR Policy Board. The TOUR otherwise denies the allegations in Paragraph 46 of the Amended Complaint.

47.     The TOUR admits that the quality of play on the PGA TOUR continues to flourish. The TOUR otherwise denies the allegations in Paragraph 47 of the Amended Complaint.

48.     The TOUR admits that its revenue has increased between 2011 and 2019. The TOUR otherwise denies the allegations in Paragraph 48 of the Amended Complaint.

49.     The TOUR admits that Brooks Koepka earned $9.68 million in official money during the 2018-2019 PGA TOUR season and that he was first on the PGA TOUR's official money list for that season. The TOUR is otherwise without sufficient information to admit or deny the allegations in Paragraph 49 of the Amended Complaint, and on that basis denies them.

50.     The TOUR admits that it is organized as a tax-exempt organization under Internal Revenue Code Section 501(c)(6). The TOUR further admits that it does not provide players with direct reimbursement for travel. The TOUR otherwise denies the allegations in Paragraph 50 of the Amended Complaint.

51.     The TOUR admits that it does not provide players with direct reimbursement for travel to and lodging at PGA TOUR events, or for coaches, therapists, trainers, or caddies. The TOUR otherwise denies the allegations in Paragraph 51 of the Amended Complaint.

52.     The TOUR is without sufficient information to admit or deny the accuracy of the quotation or the allegations in Paragraph 52 of the Amended Complaint, and on that basis denies them.

53.     The TOUR is without sufficient information to admit or deny the accuracy of the quotation in Paragraph 53, and on that basis denies it. The TOUR otherwise denies the allegations in Paragraph 53 of the Amended Complaint.

54.     The TOUR is without sufficient information to admit or deny the accuracy of the quotation in Paragraph 54, and on that basis denies it. The TOUR otherwise denies the allegations in Paragraph 54 of the Amended Complaint.

55.     The TOUR denies the allegations in Paragraph 55 of the Amended Complaint.

56.     The TOUR admits that the Regulations govern, in large part, membership on the TOUR. The TOUR otherwise denies the allegations in Paragraph 56 of the Amended Complaint.

57.     The TOUR admits that Section V.B.1.a of the Regulations relates to player media rights. The TOUR otherwise denies the allegations in Paragraph 57 of the Amended Complaint.

58.     The TOUR admits that the quoted words appear in the Regulations. To the extent the remaining allegations in Paragraph 58 constitute a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the remaining allegations in Paragraph 58 of the Amended Complaint.

59.     The TOUR admits that PGA TOUR members are independent contractors. The TOUR further admits that other provisions of the Regulations also relate to player media rights. The TOUR otherwise denies the allegations in Paragraph 59 of the Amended Complaint.

60.     The TOUR admits that PGA TOUR members are independent contractors. The TOUR otherwise denies the allegations in Paragraph 60 of the Amended Complaint.

61.     The TOUR is without sufficient information to admit or deny Plaintiffs' allegation that LIV has not reached a broadcast agreement for its tournaments in the United States, and on that basis denies it. The TOUR otherwise denies the allegations in Paragraph 61 of the Amended Complaint.

62.     The TOUR admits that it amended the Regulations in November 2019, and that the quoted language reflects the amendment. Except for the omissions and alterations, the TOUR further admits that quoted language appears in Commissioner Monahan's January 2020 memorandum. The TOUR otherwise denies the allegations in Paragraph 62 of the Amended Complaint.

63.     The TOUR is without sufficient information to admit or deny the accuracy of the quotation or the allegations in Paragraph 63 of the Amended Complaint, and on that basis denies them.

64.     The TOUR admits that some players requested releases to play in the LIV Golf London Invitational. The TOUR further admits that it denied those players' requests and in accordance with the Regulations' disciplinary provisions for violations of the Regulations

regarding conflicting events, media and marketing rights, and player conduct, suspended those who violated the Regulations by still playing in the event. The TOUR otherwise denies the allegations in Paragraph 64 of the Amended Complaint.

65.     The TOUR denies that it did not require PGA TOUR members to obtain releases to participate in the JP McManus in July 2022. The TOUR admits that in accordance with the Regulations' disciplinary provisions for violations of the Regulations regarding conflicting events, media and marketing rights, and player conduct, it imposed discipline on players who violated the Regulations through their participation in the LIV Golf Portland Invitational. The TOUR otherwise denies the allegations in Paragraph 65 of the Amended Complaint.

66.     The TOUR denies the allegations in Paragraph 66 of the Amended Complaint.

67.     The TOUR admits that Sections V.A.2-3 of the Regulations provide that "no PGA TOUR member shall participate in any other golf tournament or event on a date when a PGA TOUR . . . cosponsored tournament . . . is scheduled," that members may participate in a conflicting event "for which a member obtains an advance written release for his participation from the Commissioner," and that "[e]ach Regular Member of PGA TOUR ordinarily shall be eligible for three releases per season based on participation in 15 PGA TOUR cosponsored or approved tournaments and, in addition, shall be eligible for one release for every five cosponsored or approved tournaments . . . in which he participates above 15 tournaments." The TOUR otherwise denies the allegations in Paragraph 67 of the Amended Complaint.

68.     The TOUR admits that the Regulations prohibit PGA TOUR members from participating in golf tournaments on a date when a PGA TOUR cosponsored event is scheduled and for which the PGA TOUR member is eligible, unless the member has obtained a release from the Commissioner. The TOUR further admits that the decision to grant releases is in the discretion of the Commissioner. The TOUR further admits that the Regulations do not permit releases for conflicting events in North America. The TOUR otherwise denies the allegations in Paragraph 68 of the Amended Complaint.

69.     The TOUR admits that the Regulations do not permit releases for conflicting events in North America. The TOUR further admits that the decision to grant releases is in the

2093587

discretion of the Commissioner. The TOUR further admits that it has historically granted releases for international events on tours that are part of a series of events based outside North America. The TOUR further admits that it did not grant releases to any player to participate in the LIV Golf London Invitational. The TOUR further admits that the quoted language appears in the TOUR's letters denying the requested releases. The TOUR further admits that the Commissioner shall make decisions on release requests not later than 30 days in advance of the tournament for which the release is requested. The TOUR otherwise denies the allegations in Paragraph 69 of the Amended Complaint.

70.     The TOUR admits the allegations in Paragraph 70 of the Amended Complaint.

71.     The TOUR admits that it has informed players that it will enforce the Regulations. The TOUR further admits that, in accordance with the Regulations' disciplinary provisions for violations of the Regulations regarding conflicting events, media and marketing rights, and player conduct, it suspended Player Plaintiffs who participated in the LIV Golf London Invitational. The TOUR further admits that it notified other PGA TOUR members of Plaintiffs' suspensions. The TOUR otherwise denies the allegations in Paragraph 71 of the Amended Complaint.

72.     The TOUR admits that Korn Ferry Tour Members must abide by the Korn Ferry Tour Player Handbook and Regulations. The TOUR otherwise denies the allegations in Paragraph 72 of the Amended Complaint.

73.     The TOUR admits that non-members who played in LIV events during the 2021-2022 PGA TOUR season were ineligible for participation in tournaments on any tour operated by the TOUR including PGA TOUR tournaments also sanctioned by another governing body or league. The TOUR otherwise denies the allegations in Paragraph 73 of the Amended Complaint.

74.     The TOUR admits that Greg Norman was involved in the launch of the World Golf Tour in 1994. The TOUR is without sufficient information to admit or deny Plaintiffs' allegations that it informed players by letter nearly three decades ago that it would not grant conflicting events releases for World Golf Tour events held within the United States, and that it would only grant other releases for events taking place on Monday, Tuesday, or Wednesday, and

1   on that basis denies them. The TOUR otherwise denies the allegations in Paragraph 74 of the

2   Amended Complaint.

3          75.    The TOUR admits that the Player Plaintiffs requested releases to participate in

4   LIV events and that the TOUR denied their requests. The TOUR further admits that, in

5   accordance with the Regulations' disciplinary provisions for violations of the Regulations

6   regarding conflicting events, media and marketing rights, and player conduct, it imposed

7   discipline on the Player Plaintiffs for violating the Regulations. The TOUR otherwise denies the

8   allegations in Paragraph 75 of the Amended Complaint.

9          76.    The TOUR admits that the Player Plaintiffs requested releases to participate in a

10  LIV Golf event in London. The TOUR otherwise denies the allegations in Paragraph 76 of the

11  Amended Complaint.

12         77.    The TOUR denies that it orchestrated an anticompetitive response to the Premier

13  Golf League ("PGL"). The TOUR is otherwise without sufficient information to admit or deny

14  the accuracy of the allegations in Paragraph 77 of the Amended Complaint, and on that basis

15  denies them.

16         78.    The TOUR is without sufficient information to admit or deny the accuracy of the

17  allegations in Paragraph 78 of the Amended Complaint, and on that basis denies them.

18         79.    The TOUR is without sufficient information to admit or deny the accuracy the

19  allegations in Paragraph 79 of the Amended Complaint, and on that basis denies them.

20         80.    The TOUR denies the allegations in Paragraph 80 of the Amended Complaint.

21         81.    The TOUR admits that the quoted words appear in Commissioner Monahan's

22  January 2020 memorandum. The TOUR otherwise denies the allegations in Paragraph 81 of the

23  Amended Complaint.

24         82.    Except for the alterations, the TOUR admits that the quoted words appear in

25  Commissioner Monahan's January 2020 memorandum. The TOUR otherwise denies the

26  allegations in Paragraph 82 of the Amended Complaint.

27

28

83.     The TOUR admits that the quoted words appear in Commissioner Monahan's January 2020 memorandum. The TOUR otherwise denies the allegations in Paragraph 83 of the Amended Complaint.

84.     Except for the alterations, the TOUR admits that the quoted words appear in Commissioner Monahan's January 2020 memorandum. The TOUR otherwise denies the allegations in Paragraph 84 of the Amended Complaint.

85.     The TOUR admits that Commissioner Monahan's January 2020 memorandum refers to "two proposed changes to our Regulations[.]" The TOUR otherwise denies the allegations in Paragraph 85 of the Amended Complaint.

86.     Except for the alterations, the TOUR admits that the quoted words appear in Commissioner Monahan's January 2020 memorandum. The TOUR otherwise denies the allegations in Paragraph 86 of the Amended Complaint.

87.     Except for the alterations, the TOUR admits that the quoted words appear in Commissioner Monahan's January 2020 memorandum. The TOUR otherwise denies the allegations in Paragraph 87 of the Amended Complaint.

88.     Except for the alterations, the TOUR admits that the quoted words appear in Commissioner Monahan's January 2020 memorandum. The TOUR otherwise denies the allegations in Paragraph 88 of the Amended Complaint.

89.     The TOUR is without sufficient information to admit or deny the accuracy of the quoted language in Paragraph 89, and on that basis denies it. The TOUR otherwise denies the allegations in Paragraph 89 of the Amended Complaint.

90.     The TOUR admits that PGA TOUR members are independent contractors. The TOUR otherwise denies the allegations in Paragraph 90 of the Amended Complaint.

91.     The TOUR is without sufficient information to admit or deny the accuracy of the quoted language in Paragraph 91, and on that basis denies it. The TOUR otherwise denies the allegations in Paragraph 91 of the Amended Complaint.

2093587

92.     The TOUR is without sufficient information to admit or deny the accuracy of the quotation in Paragraph 92, and on that basis denies it. The TOUR otherwise denies the allegations in Paragraph 92 of the Amended Complaint.

93.     The TOUR admits that Commissioner Monahan's January 2020 memo states that "[w]e have continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of Private Equity Golf." The TOUR otherwise denies the allegations in Paragraph 93 of the Amended Complaint.

94.     The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 94 of the Amended Complaint, and on that basis denies them.

95.     The TOUR admits that OWGR rankings are one means of qualifying for the Majors. The TOUR otherwise denies the allegations in Paragraph 95 of the Amended Complaint.

96.     The TOUR admits that Commissioner Monahan sits on the board of the OWGR. The TOUR is without sufficient information to admit or deny Plaintiffs' allegation that the PGL sought to partner with the European Tour as part of its plan to enter and obtain a sponsor for its OWGR application, and on that basis denies it. The TOUR otherwise denies the allegations in Paragraph 96 of the Amended Complaint.

97.     The TOUR denies the allegations in Paragraph 97 of the Amended Complaint.

98.     To the extent Paragraph 98 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that it entered into a strategic alliance with the European Tour in November 2020. The TOUR further admits that Commissioner Monahan was granted a seat on the European Tour's Board of Directors and that the TOUR made further investments in the European Tour Productions. The TOUR otherwise denies the allegations in Paragraph 98 of the Amended Complaint.

99.     The TOUR is without sufficient information to admit or deny the accuracy of the allegation in Paragraph 99 that the PGL was left with no real prospect of viability, and on that basis denies it. The TOUR otherwise denies the allegations in Paragraph 99 of the Amended Complaint.

100.    The TOUR denies the allegations in Paragraph 100 of the Amended Complaint.

2093587

101. The TOUR denies the allegations in Paragraph 101 of the Amended Complaint.

102. The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 102 of the Amended Complaint, and on that basis denies them.

103. The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 103 of the Amended Complaint, and on that basis denies them.

104. The TOUR admits that a typical TOUR cosponsored tournament includes a cut. The TOUR otherwise denies the allegations in Paragraph 104 of the Amended Complaint.

105. The TOUR denies the allegations in Paragraph 105 of the Amended Complaint.

106. The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 106 of the Amended Complaint, and on that basis denies them.

107. To the extent Paragraph 107 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR is without sufficient information to admit or deny Plaintiffs' allegation that LIV partnered with the Asian Tour, and on that basis denies it. The TOUR is otherwise without sufficient information to admit or deny the accuracy of the allegations in Paragraph 107 of the Amended Complaint, and on that basis denies them.

108. The TOUR is without sufficient information to admit or deny the accuracy of the allegations regarding the relationships LIV sought to cultivate, and on that basis denies them. The TOUR otherwise denies the allegations in Paragraph 108 of the Amended Complaint.

109. The TOUR denies the allegations in Paragraph 109 of the Amended Complaint.

110. The TOUR admits that purse sizes have grown in recent years. The TOUR otherwise denies the allegations in Paragraph 110 of the Amended Complaint.

111. To the extent Paragraph 111 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that the quoted words appear in Commissioner Monahan's January 2020 memorandum. The TOUR otherwise denies the allegations in Paragraph 111 of the Amended Complaint.

112. The TOUR admits that the Player Impact Program ("PIP") went into effect in 2021. The TOUR further admits that PIP is a bonus program designed to recognize those players that have the most impact on the TOUR's business success. The TOUR further admits that the

initial PIP pool totaled $40 million in 2021. The TOUR otherwise denies the allegations in Paragraph 112 of the Amended Complaint.

113.     The TOUR admits that player compensation has increased substantially. The TOUR otherwise denies the allegations in Paragraph 113 of the Amended Complaint.

114.     The TOUR admits the allegations in Paragraph 114 of the Amended Complaint.

115.     The TOUR denies that the publication of increased purse sizes occurred in December 2021. The TOUR otherwise admits the allegations in Paragraph 115 of the Amended Complaint.

116.     The TOUR denies the allegations in Paragraph 116 of the Amended Complaint.

117.     The TOUR denies the allegations in Paragraph 117 of the Amended Complaint.

118.     The TOUR denies the allegations in Paragraph 118 of the Amended Complaint.

119.     The TOUR denies the allegations in Paragraph 119 of the Amended Complaint.

120.     The TOUR is without sufficient information to admit or deny the accuracy of the quotations in Paragraph 120 of the Amended Complaint, and on that basis denies it.

121.     The TOUR is without sufficient information to admit or deny the accuracy of the quotations in Paragraph 121 of the Amended Complaint, and on that basis denies it.

122.     The TOUR admits that it announced purse increases on June 21, 2022. The TOUR further admits that it informed players a portion of the increased purses would be paid from the TOUR's reserves. The TOUR further admits that it announced the 2022-2023 season on August 1, 2022, that the total prize money from official events exceeds $400 million, and that the total bonus money for the season would be $145 million. The TOUR otherwise denies the allegations in Paragraph 122 of the Amended Complaint.

123.     The TOUR denies the allegations in Paragraph 123 of the Amended Complaint.

124.     The TOUR admits that Commissioner Monahan spoke to players prior to the Wells Fargo Championship in Charlotte, North Carolina on May 4, 2021. The TOUR otherwise denies the allegations in Paragraph 124 of the Amended Complaint.

125.     The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 125 of the Amended Complaint, and on that basis denies them.

1    126.    The TOUR is without sufficient information to admit or deny the accuracy of the

2    quotations in Paragraph 126, and on that basis denies it. The TOUR otherwise denies the

3    remaining allegations in Paragraph 126 of the Amended Complaint.

4        127.    The TOUR denies the allegations in Paragraph 127 of the Amended Complaint.

5        128.    The TOUR denies the allegations in Paragraph 128 of the Amended Complaint.

6        129.    The TOUR denies the allegations in Paragraph 129 of the Amended Complaint.

7        130.    The TOUR denies the allegations in Paragraph 130 of the Amended Complaint.

8        131.    The TOUR admits that the DP World Tour co-sanctioned the Saudi International

9    with Golf Saudi between 2019 and 2021. The TOUR is without sufficient information to admit or

10   deny the accuracy of the quotation in Paragraph 131, and on that basis denies it. The TOUR

11   otherwise denies the allegations in Paragraph 131 of the Amended Complaint.

12       132.    The TOUR denies the allegations in Paragraph 132 of the Amended Complaint.

13       133.    The TOUR denies the allegations in Paragraph 133 of the Amended Complaint.

14       134.    The TOUR is without sufficient information to admit or deny the accuracy of the

15   quotation in Paragraph 134, and on that basis denies it. The TOUR otherwise denies the

16   allegations in Paragraph 134 of the Amended Complaint.

17       135.    The TOUR is without sufficient information to admit or deny the accuracy of the

18   quotation in Paragraph 135, and on that basis denies it. The TOUR otherwise denies the

19   allegations in Paragraph 135 of the Amended Complaint.

20       136.    TOUR is without sufficient information to admit or deny the accuracy of the

21   quotation in Paragraph 136, and on that basis denies it. The TOUR otherwise denies the

22   allegations in Paragraph 136 of the Amended Complaint.

23       137.    TOUR is without sufficient information to admit or deny the accuracy of the

24   quotations or allegations in Paragraph 137 of the Amended Complaint, and on that basis denies

25   them.

26       138.    TOUR is without sufficient information to admit or deny the accuracy of the

27   quotations or allegations in Paragraph 138 of the Amended Complaint, and on that basis denies

28   them.

2093587

139.    The TOUR admits that it stated it would not grant conflicting events releases for the 2022 Saudi International. The TOUR otherwise denies the allegations in Paragraph 139 of the Amended Complaint.

140.    The TOUR is without sufficient information to admit or deny the accuracy of the quotations in Paragraph 140 of the Amended Complaint, and on that basis denies it.

141.    The TOUR admits that approximately twenty-eight players requested conflicting event releases for the 2022 Saudi International. The TOUR further admits that it granted conditional conflicting events releases, to the extent permitted by the Regulations. The TOUR further admits that it conditioned the releases that were granted as follows: those players who had played in the AT&T Pebble Beach Pro-Am (the conflicting TOUR event) at least once in the preceding five years were required to commit to play the event at least once in 2023 or 2024, and those who had not played in the Pro-Am in the past five years were required to commit to play the event twice between 2023 and 2025. The TOUR otherwise denies the allegations in Paragraph 141 of the Amended Complaint.

142.    The TOUR is without sufficient information to admit or deny the accuracy of the quotations or allegations in Paragraph 142 of the Amended Complaint, and on that basis denies them.

143.    The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 143 of the Amended Complaint, and on that basis denies them.

144.    The TOUR is without sufficient information to admit or deny the accuracy of the quotations or allegations in Paragraph 144 of the Amended Complaint, and on that basis denies them.

145.    The TOUR denies the allegations in Paragraph 145 of the Amended Complaint.

146.    The TOUR admits that it announced an agreement with the DP World Tour on June 28, 2022. The TOUR further admits that it announced it was increasing its existing stake in European Tour Productions to 40%. The TOUR further admits that it announced that the top ten players in the end of season DP World Tour Rankings would earn PGA TOUR cards for the

2093587

following season. The TOUR otherwise denies the allegations in Paragraph 146 of the Amended Complaint.

147.    The TOUR denies that the DP World Tour issued sanctions at the TOUR's behest. The TOUR is otherwise without sufficient information to admit or deny the accuracy of the quotations or allegations in Paragraph 144 of the Amended Complaint, and on that basis denies them.

148.    The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 148 of the Amended Complaint, and on that basis denies them.

149.    The TOUR is without sufficient information to admit or deny the accuracy of the quotations or allegations in Paragraph 149 of the Amended Complaint, and on that basis denies them.

150.    The TOUR admits that non-members who played in LIV events during the 2021-2022 PGA TOUR season were ineligible for participation in tournaments on any tour operated by the TOUR including PGA TOUR tournaments also sanctioned by another governing body or league. The TOUR otherwise denies the allegations in Paragraph 150 of the Amended Complaint.

151.    The TOUR denies the allegations in Paragraph 151 of the Amended Complaint.

152.    The TOUR is without sufficient information to admit or deny the accuracy of Plaintiffs' allegations that participating in and winning the Majors and the Ryder Cup are the ultimate goal of most top professional golfers and that one of the goals of playing on a tour each year is to secure qualification to the Majors and the Ryder Cup, and on that basis denies them. The TOUR otherwise denies the allegations in Paragraph 152 of the Amended Complaint.

153.    The TOUR admits that the quoted words appear in Commissioner Monahan's January 2020 memorandum. The TOUR otherwise denies the allegations in Paragraph 153 of the Amended Complaint.

154.    The TOUR is without sufficient information to admit or deny the accuracy of the quotation in Paragraph 154, and on that basis denies it. The TOUR otherwise denies the allegations in Paragraph 154 of the Amended Complaint.

2093587

155.     The TOUR admits that the PGA of America is a separate entity from the PGA TOUR, and that the PGA of America organizes the PGA Championship and co-organizes the Ryder Cup along with the European Tour. The TOUR further admits that the PGA of America has a representative, President Jim Richerson, on the PGA TOUR Policy Board. The TOUR is without sufficient information to admit or deny the accuracy of the quotations or remaining allegations in Paragraph 155 of the Amended Complaint, and on that basis denies them.

156.     The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 156 of the Amended Complaint, and on that basis denies them.

157.     The TOUR is without sufficient information to admit or deny the accuracy of the quotations or allegations in Paragraph 157 of the Amended Complaint, and on that basis denies them.

158.     The TOUR is without sufficient information to admit or deny the accuracy of the quotations or allegations in Paragraph 158 of the Amended Complaint, and on that basis denies them.

159.     The TOUR admits that the R&A is the promoter of the Open Championship. The TOUR is otherwise without sufficient information to admit or deny the accuracy of the allegations in Paragraph 159 of the Amended Complaint, and on that basis denies them.

160.     The TOUR admits that Augusta National is the promoter of the Masters Tournament. The TOUR denies that it has pressured August National to do its bidding. The TOUR is without sufficient information to admit or deny the accuracy of the remaining allegations in Paragraph 160 of the Amended Complaint, and on that basis denies them.

161.     The TOUR denies the allegations in Paragraph 161 of the Amended Complaint.

162.     The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 162 of the Amended Complaint, and on that basis denies them.

163.     The TOUR denies the allegations in Paragraph 163 of the Amended Complaint.

164.     The TOUR denies the allegations in Paragraph 164 of the Amended Complaint.

2093587

165.    The TOUR is without sufficient information to admit or deny the accuracy of the quotation in Paragraph 165, and on that basis denies it. The TOUR otherwise denies the remaining allegations in Paragraph 165 of the Amended Complaint.

166.    The TOUR admits that Commissioner Monahan spoke with players prior to the Honda Classic in February 2022 and that he told players that the TOUR would enforce its Regulations. The TOUR otherwise denies the allegations in Paragraph 166 of the Amended Complaint.

167.    The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 167 of the Amended Complaint, and on that basis denies them.

168.    The TOUR denies the allegations in Paragraph 168 of the Amended Complaint.

169.    The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 169 of the Amended Complaint, and on that basis denies them.

170.    The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 170 of the Amended Complaint, and on that basis denies them.

171.    The TOUR denies the allegations in Paragraph 171 of the Amended Complaint.

172.    The TOUR is without sufficient information to admit or deny the accuracy of the allegations in Paragraph 172 of the Amended Complaint, and on that basis denies them.

173.    The TOUR is without sufficient information to admit or deny Plaintiffs' allegation that the Player Plaintiffs and many other players (at least 170 golfers) filed entry applications for LIV Golf Invitational Series' first event, and on that basis denies it. The TOUR admits that the Player Plaintiffs and other PGA TOUR members requested conflicting events releases and media rights releases for the LIV Golf Invitational in London. The TOUR otherwise denies the allegations in Paragraph 173 of the Amended Complaint.

174.    The TOUR admits that it denied all requests for conflicting event and media releases for the LIV Golf Invitational in London. The TOUR further admits that the quoted language appears in the letters the TOUR sent denying the releases. The TOUR further admits that, in certain circumstances, it has granted releases for conflicting events scheduled to take

2093587

place outside North America on tours based outside North America. The TOUR otherwise denies the allegations in Paragraph 174 of the Amended Complaint.

175.   The TOUR denies the allegations in Paragraph 175 of the Amended Complaint.

176.   The TOUR admits that it administers a program called PGA TOUR University designed to identify the best college golfers in the United States and provide them with playing opportunities, including on the Korn Ferry Tour. The TOUR further admits that college players must meet the eligibility requirements in the PGA TOUR University rules and regulations. The TOUR otherwise denies the allegations in Paragraph 176 of the Amended Complaint.

177.   The TOUR denies that the DP World Tour acted in concert with the TOUR to deny releases for the LIV Golf Invitational in London. The TOUR is otherwise without sufficient information to admit or deny the accuracy of the allegations in Paragraph 177 of the Amended Complaint, and on that basis denies them.

178.   The TOUR is without sufficient information to admit or deny Plaintiffs' allegations with respect to LIV's compensation to players. The TOUR otherwise denies the allegations in Paragraph 178 of the Amended Complaint.

179.   To the extent Paragraph 179 sets forth a conclusion of law, no response is required. To extent a response is required, the TOUR admits that LIV announced the field for its London Invitational on May 31, 2022. The TOUR is without sufficient information to admit or deny Plaintiffs' allegations that players were very interested in its product or that the London Invitational lacked the quality of field LIV set out to have, and on that basis denies them. The TOUR otherwise denies the allegations in Paragraph 179 of the Amended Complaint.

180.   The TOUR is without sufficient information to admit or deny the accuracy of the quotations in Paragraph 180 of the Amended Complaint, and on that basis denies it.

181.   The TOUR is without sufficient information to admit or deny the accuracy of the quotations and allegations in Paragraph 181 of the Amended Complaint, and on that basis denies them.

182.   The TOUR denies the allegations in Paragraph 182 of the Amended Complaint.

183.   The TOUR denies the allegations in Paragraph 183 of the Amended Complaint.

2093587

184.     The TOUR admits that quoted language appears in letters sent to TOUR players identified as part of the field for the LIV Golf London Invitational. The TOUR is without sufficient information to admit or deny Plaintiffs' allegation that the DP World Tour sent similar notices to its members who were included in the LIV Golf Invitational Series field. The TOUR otherwise denies the allegations in Paragraph 184 of the Amended Complaint.

185.     The TOUR denies the allegations in Paragraph 185 of the Amended Complaint.

186.     The TOUR admits that TOUR representatives communicated with Mr. Ogletree and explained why his requested release was denied. The TOUR admits that the quotation in Paragraph 186 of the Amended Complaint appeared in those communications. The TOUR otherwise denies the allegations in Paragraph 186 of the Amended Complaint.

187.     The TOUR denies the allegations in Paragraph 187 of the Amended Complaint.

188.     To the extent Paragraph 188 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that it granted Mr. Ogletree a release to compete in an Asian Tour event. The TOUR otherwise denies the allegations in Paragraph 188 of the Amended Complaint.

189.     The TOUR admits that a TOUR representative communicated with Mr. Gooch regarding his participation in LIV events. The TOUR further admits that, except for the alterations, the quotation in Paragraph 189 appeared in those communications. The TOUR otherwise denies the allegations in Paragraph 189 of the Amended Complaint.

190.     The TOUR admits that it sent letters on June 3, 2022 to TOUR members who indicated they intended to participate in the LIV Golf London Invitational. The TOUR further admits that the quoted language appears in the June 3, 2022 letters. The TOUR further admits that Article VII, Section C of the Regulations relates to conduct unbecoming a professional. The TOUR otherwise denies the allegations in Paragraph 190 of the Amended Complaint.

191.     The TOUR denies the allegations in Paragraph 191 of the Amended Complaint.

192.     The TOUR admits that PGA TOUR members are independent contractors. The TOUR further admits that Kevin Na resigned his membership on June 3, 2022. The TOUR further

2093587

admits that, except for the alterations, the quotation in Paragraph 192 appears in Mr. Na's letter. The TOUR otherwise denies the allegations in Paragraph 192 of the Amended Complaint.

193.     The TOUR admits that several players who participated in the LIV Golf London Invitational resigned from the TOUR. The TOUR otherwise denies the allegations in Paragraph 193 of the Amended Complaint.

194.     The TOUR admits that the quoted language appears in a letter sent by the TOUR's Vice President of Competition Administration, Kristen Burgess. The TOUR otherwise denies the allegations in Paragraph 194 of the Amended Complaint.

195.     The TOUR admits that it sent letters to TOUR members who elected to play in the LIV Golf London Invitational on June 9, 2022, and that the letters informed the recipients of their immediate suspension. The TOUR denies the remaining allegations in Paragraph 195 of the Amended Complaint.

196.     The TOUR admits that Commissioner Monahan sent a letter to TOUR members on June 9, 2022 identifying suspended players. The TOUR further admits that, except for the alterations and quotations, the quoted words appear in the Commissioner's June 9, 2022 letter. The TOUR otherwise denies the remaining allegations in Paragraph 196 of the Amended Complaint.

197.     The TOUR admits that on June 9, 2022, the PGA TOUR Vice President of Competition Administration, Kristen Burgess, sent letters to all former PGA TOUR Members who participated in the LIV Golf London Invitational Series but had resigned from the PGA TOUR. The TOUR further admits that the quoted words appear in the letter. The TOUR otherwise denies the allegations in Paragraph 197 of the Amended Complaint.

198.     The TOUR denies the allegations in Paragraph 198 of the Amended Complaint.

199.     The TOUR is without sufficient information to admit or deny the accuracy of the quotations and allegations in Paragraph 199, and on that basis denies them. The TOUR otherwise denies the allegations in Paragraph 199 of the Amended Complaint.

200.     The TOUR admits the allegations in Paragraph 200 of the Amended Complaint.

2093587

201.    To the extent Paragraph 201 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that its Regulations set out the appeals process. The TOUR further admits that the quoted language appears in the Regulations. The TOUR otherwise denies the remaining allegations in Paragraph 201 of the Amended Complaint.

202.    The TOUR admits it received letters from suspended members. The TOUR otherwise denies the allegations in Paragraph 202 of the Amended Complaint.

203.    The TOUR admits that the quoted words appear in the Regulations at Section VI.E. The TOUR further admits that the Player Plaintiffs are currently suspended. The TOUR otherwise denies the allegation in Paragraph 203 of the Amended Complaint.

204.    The TOUR denies the allegations in Paragraph 204 of the Amended Complaint.

205.    The TOUR is without sufficient information to admit or deny the accuracy of the quotation in Paragraph 205, and on that basis denies it. The TOUR admits that Rory McIlroy is a PGA TOUR Board member. The TOUR further admits that Rory McIlroy is a member of the PGA TOUR and the DP World Tour. The TOUR otherwise denies the allegations in Paragraph 205 of the Amended Complaint.

206.    To the extent Paragraph 206 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that the Player Plaintiffs have appealed the penalties imposed for their violations of the Regulations. The TOUR otherwise denies the allegations in Paragraph 206 of the Amended Complaint.

207.    The TOUR admits that it sent a letter to the Player Plaintiffs regarding their violations of the Regulations and the resulting consequences. The TOUR otherwise denies the allegations in Paragraph 207 of the Amended Complaint.

208.    The TOUR admits that it informed PGA TOUR members on July 25, 2022 of the FedExCup Playoffs and Eligibility Point List that would determine eligibility for the FedExCup playoffs. The TOUR otherwise denies the allegations in Paragraph 208 of the Amended Complaint.

2093587

209.   The TOUR admits that some of the Player Plaintiffs' appeals were transferred to the Appeals Committee on July 27, 2022. The TOUR further admits that it confirmed that the Player Plaintiffs' suspensions under VII.C. of the Regulations remained in effect. The TOUR otherwise denies the allegations in Paragraph 209 of the Amended Complaint.

210.   The TOUR admits that Andrew Levinson sent some Player Plaintiffs a letter to the effect that the Tour would no longer send them Notice of Disciplinary Inquiry letters for "ongoing violations." The TOUR otherwise denies the allegations in Paragraph 210 of the Amended Complaint.

211.   The TOUR admits that it sent a letter to Mr. Gooch on August 2, 2022 informing him that his "eligibility to participate in PGA TOUR events has been suspended based on serious violations of the Regulations by your playing in and contributing your media rights to LIV Golf events, contrary to the terms you expressly agreed to as a condition of PGA TOUR membership," and that his "continuing participation in and promotion of LIV Golf is inflicting ongoing harm to the reputation and financial best interest of the TOUR," that his "suspension under Article VII, Section C remains in effect and, under Article VII, Section E, your July 13 appeal does not effectuate a stay of your suspension from tournaments in which your violations continue to occur," and that "[a]ccordingly, you remain ineligible for competition in the FedExCup Playoffs or otherwise." The TOUR otherwise denies the allegations in Paragraph 211 of the Amended Complaint.

212.   The TOUR denies the allegations in Paragraph 212 of the Amended Complaint.

213.   The TOUR denies the allegations in Paragraph 213 of the Amended Complaint.

214.   Paragraph 214 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. To the extent a response is required, the TOUR denies that it engaged in any anticompetitive conduct. The TOUR otherwise admits the allegations in Paragraph 214 of the Amended Complaint.

215.   Paragraph 215 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 215 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 215 of the Amended Complaint.

216.     Paragraph 216 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 216 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 216 of the Amended Complaint.

217.     Paragraph 217 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, To the extent Paragraph 217 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 217 of the Amended Complaint.

218.     Paragraph 218 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 218 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that, in accordance with the Regulations' disciplinary provisions for violations of TOUR Regulations regarding conflicting events, media and marketing rights, and player conduct, it suspended Talor Gooch. The TOUR otherwise denies the allegations in Paragraph 218 of the Amended Complaint.

219.     Paragraph 219 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 219 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 219 of the Amended Complaint.

220.     Paragraph 220 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 220 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 220 of the Amended Complaint.

221.     Paragraph 221 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 221 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 221 of the Amended Complaint.

2093587

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

222.    Paragraph 222 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 222 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that, in accordance with the Regulations' disciplinary provisions for violations of TOUR Regulations regarding conflicting events, media and marketing rights, and player conduct, it suspended Hudson Swafford. The TOUR otherwise denies the allegations in Paragraph 222 of the Amended Complaint.

223.    Paragraph 223 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 223 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 223 of the Amended Complaint.

224.    Paragraph 224 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 224 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 224 of the Amended Complaint.

225.    Paragraph 224 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 225 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 225 of the Amended Complaint.

226.    To the extent Paragraph 226 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that, in accordance with the Regulations' disciplinary provisions for violations of TOUR Regulations regarding conflicting events, media and marketing rights, and player conduct, it suspended Matt Jones. The TOUR otherwise denies the allegations in Paragraph 226 of the Amended Complaint.

227.    To the extent Paragraph 227 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 227 of the Amended Complaint.

PGA TOUR, INC.'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT & AMENDED COUNTERCLAIM
Case No. 5:22-cv-04486-BLF
2093587

228.    To the extent Paragraph 228 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 228 of the Amended Complaint.

229.    To the extent Paragraph 229 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 229 of the Amended Complaint.

230.    To the extent Paragraph 230 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that, in accordance with the Regulations' disciplinary provisions for violations of TOUR Regulations regarding conflicting events, media and marketing rights, and player conduct, it suspended Bryson DeChambeau. The TOUR otherwise denies the allegations in Paragraph 230 of the Amended Complaint.

231.    To the extent Paragraph 231 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 231 of the Amended Complaint.

232.    To the extent Paragraph 232 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 232 of the Amended Complaint.

233.    To the extent Paragraph 233 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 233 of the Amended Complaint.

234.    Paragraph 234 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 234 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that, in accordance with the Regulations' disciplinary provisions for violations of TOUR Regulations regarding conflicting events, media and marketing rights, and player conduct, it suspended Ian Poulter. The TOUR otherwise denies the allegations in Paragraph 234 of the Amended Complaint.

235.     Paragraph 235 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 235 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 235 of the Amended Complaint.

236.     Paragraph 236 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, To the extent Paragraph 236 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 236 of the Amended Complaint.

237.     Paragraph 237 sets forth allegations related to an individual who is no longer a plaintiff in this action, and no response is required. Further, to the extent Paragraph 237 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 237 of the Amended Complaint.

238.     To the extent Paragraph 238 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that, in accordance with the Regulations' disciplinary provisions for violations of TOUR Regulations regarding conflicting events, media and marketing rights, and player conduct, it suspended Peter Uihlein. The TOUR otherwise denies the allegations in Paragraph 238 of the Amended Complaint.

239.     To the extent Paragraph 239 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 239 of the Amended Complaint.

240.     To the extent Paragraph 240 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 240 of the Amended Complaint.

241.     To the extent Paragraph 241 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 241 of the Amended Complaint.

242.     The TOUR denies the allegations in Paragraph 242 of the Amended Complaint.

2093587

243.    The TOUR denies that it told Arena Americas that it would cease doing business with Arena Americas if it worked with LIV Golf. The TOUR is otherwise without sufficient information to admit or deny the remaining allegations in Paragraph 243 of the Amended Complaint, and on that basis denies them.

244.    The TOUR denies that it has a "blacklist" for any vendor that works with LIV Golf. The TOUR is without sufficient information to admit or deny the remaining allegations in Paragraph 244 of the Amended Complaint, and on that basis denies them.

245.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 245 of the Amended Complaint, and on that basis denies them.

246.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 246 of the Amended Complaint, and on that basis denies them.

247.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 247 of the Amended Complaint, and on that basis denies them.

248.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 248 of the Amended Complaint, and on that basis denies them.

249.    The TOUR denies that Commissioner Monahan has impressed upon Ari Emmanuel and Mark Shapiro that the Endeavor Company cannot work with LIV. The TOUR is otherwise without sufficient information to admit or deny the remaining allegations in Paragraph 243 of the Amended Complaint, and on that basis denies them.

250.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 250 of the Amended Complaint, and on that basis denies them.

251.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 251 of the Amended Complaint, and on that basis denies them.

252.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 252 of the Amended Complaint, and on that basis denies them.

253.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 253 of the Amended Complaint, and on that basis denies them.

2093587

254.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 254 of the Amended Complaint, and on that basis denies them.

255.    The TOUR denies that it applied pressure to Ticketmaster. The TOUR is otherwise without sufficient information to admit or deny the remaining allegations in Paragraph 255 of the Amended Complaint, and on that basis denies them.

256.    The TOUR denies that it asked Pro Secrets not to work with LIV. The TOUR is otherwise without sufficient information to admit or deny the remaining allegations in Paragraph 256 of the Amended Complaint, and on that basis denies them.

257.    The TOUR denies that it threatened Cueto. The TOUR is otherwise without sufficient information to admit or deny the remaining allegations in Paragraph 257 of the Amended Complaint, and on that basis denies them.

258.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 258 of the Amended Complaint, and on that basis denies them.

259.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 259 of the Amended Complaint, and on that basis denies them.

260.    The TOUR denies that it threatened golf courses with adverse consequences if they hosted LIV events. The TOUR is otherwise without sufficient information to admit or deny the remaining allegations in Paragraph 260 of the Amended Complaint, and on that basis denies them.

261.    The TOUR denies the allegations in Paragraph 261 of the Amended Complaint.

262.    The TOUR denies the allegations in Paragraph 262 of the Amended Complaint.

263.    To the extent Paragraph 263 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 263 of the Amended Complaint.

264.    To the extent Paragraph 264 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 264 of the Amended Complaint.

2093587

265.    To the extent Paragraph 265 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 265 of the Amended Complaint.

266.    To the extent Paragraph 266 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 266 of the Amended Complaint.

267.    To the extent Paragraph 267 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 267 of the Amended Complaint.

268.    The TOUR denies the allegations in Paragraph 268 of the Amended Complaint.

269.    To the extent Paragraph 269 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 269 of the Amended Complaint.

270.    To the extent Paragraph 270 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 270 of the Amended Complaint.

271.    To the extent Paragraph 271 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 271 of the Amended Complaint.

272.    To the extent Paragraph 272 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 272 of the Amended Complaint.

273.    To the extent Paragraph 273 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that success in PGA TOUR events may lead to opportunities to compete in the Majors. The TOUR otherwise denies the allegations in Paragraph 273 of the Amended Complaint.

274.   To the extent Paragraph 274 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 274 of the Amended Complaint.

275.   The TOUR admits that it describes PGA TOUR viewers as the "most valuable audience in sports." The TOUR further admits that it describes PGA TOUR viewers as "affluent, educated, and influential." To the extent the remaining allegations in Paragraph 275 set forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the remaining allegations in Paragraph 275 of the Amended Complaint.

276.   To the extent Paragraph 276 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 276 of the Amended Complaint.

277.   The TOUR is without sufficient information to admit or deny Plaintiffs' allegations that (1) a substantial proportion of golf fans have a particular affinity for the sport, which is often tied to their participation; (2) that as players of the sport themselves, golf fans have a particular connection with golf broadcasts, which cannot readily be replicated by broadcasts of other sports or entertainment events; and (3) that golf enthusiasts are a particular target of many advertisers on elite golf events, who seek to sell particular products and services (such as golf apparel and equipment) to golf enthusiasts, and on that basis denies them. To the extent the remaining allegations in Paragraph 277 set forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the remaining allegations in Paragraph 277 of the Amended Complaint.

278.   The TOUR admits that events organized by the TOUR occur mostly in the United States, and the fans who attend those events in person are mostly in the United States. The TOUR further admits that TOUR events and their live network broadcasts are scheduled to provide convenient time slots for fans in the United States. The TOUR further admits that LIV has announced plans to organize a tour with events taking place in the United States and that the TOUR has denied releases to members seeking to participate in conflicting events. The TOUR otherwise denies the allegations in Paragraph 278 of the Amended Complaint.

1    279.    To the extent Paragraph 279 sets forth a conclusion of law, no response is
2 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 279
3 of the Amended Complaint.

4    280.    To the extent Paragraph 280 sets forth a conclusion of law, no response is
5 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 280
6 of the Amended Complaint.

7    281.    The TOUR denies the allegations in Paragraph 281 of the Amended Complaint.

8    282.    The TOUR denies the allegations in Paragraph 282 of the Amended Complaint.

9    283.    The TOUR denies the allegations in Paragraph 283 of the Amended Complaint.

10    284.    The TOUR denies the allegations in Paragraph 284 of the Amended Complaint.

11    285.    The TOUR denies the allegations in Paragraph 285 of the Amended Complaint.

12    286.    To the extent Paragraph 286 sets forth a conclusion of law, no response is
13 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 286
14 of the Amended Complaint.

15    287.    To the extent Paragraph 287 sets forth a conclusion of law, no response is
16 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 287
17 of the Amended Complaint.

18    288.    To the extent Paragraph 288 sets forth a conclusion of law, no response is
19 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 288
20 of the Amended Complaint.

21    289.    The TOUR is without sufficient information to admit or deny the allegations in
22 Paragraph 289 of the Amended Complaint, and on that basis denies them.

23    290.    The TOUR is without sufficient information to admit or deny the allegations in
24 Paragraph 290 of the Amended Complaint, and on that basis denies them.

25    291.    The TOUR denies the allegations in Paragraph 291 of the Amended Complaint.

26    292.    The TOUR denies the allegations in Paragraph 292 of the Amended Complaint.

27

28

2093587

293.    To the extent Paragraph 293 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 293 of the Amended Complaint.

294.    To the extent Paragraph 294 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 294 of the Amended Complaint.

295.    The TOUR is without sufficient information to admit or deny Plaintiffs' allegation that LIV sought to secure commitments from players by March 2022 to establish its League for the summer 2022, and on that basis denies it. The TOUR otherwise denies the remaining allegations in Paragraph 295 of the Amended Complaint.

296.    The TOUR denies the allegations in Paragraph 296 of the Amended Complaint.

297.    The TOUR denies the allegations in Paragraph 297 of the Amended Complaint.

298.    The TOUR denies the allegations in Paragraph 298 of the Amended Complaint.

299.    The TOUR denies the allegations in Paragraph 299 of the Amended Complaint.

300.    The TOUR denies the allegations in Paragraph 300 of the Amended Complaint.

301.    The TOUR admits that fans cannot watch Player Plaintiffs in TOUR events due to their suspensions for violations of the Regulations. The TOUR otherwise denies the remaining allegations in Paragraph 301 of the Amended Complaint.

302.    To the extent Paragraph 302 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 302 of the Amended Complaint.

303.    To the extent Paragraph 303 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 303 of the Amended Complaint.

304.    To the extent Paragraph 304 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 304 of the Amended Complaint.

2093587

305.     To the extent Paragraph 305 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that it is enforcing membership rules that have benign purposes. The TOUR otherwise denies the remaining allegations in Paragraph 305 of the Amended Complaint.

306.     To the extent Paragraph 306 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that it is acting to prevent free-riding. The TOUR otherwise denies the remaining allegations in Paragraph 306 of the Amended Complaint.

307.     To the extent Paragraph 307 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that the website "PGA TOUR Fan Shop" is operated by Fanatics. The TOUR is without sufficient information to admit or deny Plaintiffs' allegation that it does business with dozens of sponsors who do billions of dollars of business each year in Saudi Arabia, and on that basis denies it. The TOUR otherwise denies the remaining allegations in Paragraph 307 of the Amended Complaint.

308.     The TOUR denies the allegations in Paragraph 308 of the Amended Complaint.

309.     To the extent Paragraph 309 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 309 of the Amended Complaint.

310.     The TOUR repeats, alleges, and incorporates by reference as if fully set forth herein each and every response to Paragraphs 1-309 above.

311.     To the extent Paragraph 311 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 311 of the Amended Complaint.

312.     To the extent Paragraph 312 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 312 of the Amended Complaint.

2093587

313.   To the extent Paragraph 313 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 313 of the Amended Complaint.

314.   To the extent Paragraph 314 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 314 of the Amended Complaint.

315.   To the extent Paragraph 315 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 315 of the Amended Complaint.

316.   To the extent Paragraph 316 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 316 of the Amended Complaint.

317.   To the extent Paragraph 317 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 317 of the Amended Complaint.

318.   The TOUR repeats, alleges, and incorporates by reference as if fully set forth herein each and every response to Paragraphs 1-317 above.

319.   To the extent Paragraph 319 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 319 of the Amended Complaint.

320.   To the extent Paragraph 320 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 320 of the Amended Complaint.

321.   To the extent Paragraph 321 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 321 of the Amended Complaint.

2093587

322.     To the extent Paragraph 322 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 322 of the Amended Complaint.

323.     To the extent Paragraph 323 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 323 of the Amended Complaint.

324.     To the extent Paragraph 324 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 324 of the Amended Complaint.

325.     To the extent Paragraph 325 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 325 of the Amended Complaint.

326.     The TOUR repeats, alleges, and incorporates by reference as if fully set forth herein each and every response to Paragraphs 1-325 above.

327.     To the extent Paragraph 327 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 327 of the Amended Complaint.

328.     To the extent Paragraph 328 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 328 of the Amended Complaint.

329.     To the extent Paragraph 329 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 329 of the Amended Complaint.

330.     To the extent Paragraph 330 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 330 of the Amended Complaint.

2093587

1      331.    To the extent Paragraph 331 sets forth a conclusion of law, no response is

2 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 331

3 of the Amended Complaint.

4      332.    To the extent Paragraph 332 sets forth a conclusion of law, no response is

5 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 332

6 of the Amended Complaint.

7      333.    To the extent Paragraph 333 sets forth a conclusion of law, no response is

8 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 333

9 of the Amended Complaint.

10      334.    To the extent Paragraph 334 sets forth a conclusion of law, no response is

11 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 334

12 of the Amended Complaint.

13      335.    To the extent Paragraph 335 sets forth a conclusion of law, no response is

14 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 335

15 of the Amended Complaint.

16      336.    To the extent Paragraph 336 sets forth a conclusion of law, no response is

17 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 336

18 of the Amended Complaint.

19      337.    To the extent Paragraph 337 sets forth a conclusion of law, no response is

20 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 337

21 of the Amended Complaint.

22      338.    To the extent Paragraph 338 sets forth a conclusion of law, no response is

23 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 338

24 of the Amended Complaint.

25      339.    To the extent Paragraph 339 sets forth a conclusion of law, no response is

26 required. To the extent a response is required, the TOUR denies the allegations in Paragraph 339

27 of the Amended Complaint.

28

2093587

340.     To the extent Paragraph 340 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 340 of the Amended Complaint.

341.     The TOUR repeats, alleges, and incorporates by reference as if fully set forth herein each and every response to Paragraphs 1-340 above.

342.     To the extent Paragraph 342 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 342 of the Amended Complaint.

343.     To the extent Paragraph 343 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 343 of the Amended Complaint.

344.     To the extent Paragraph 344 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 344 of the Amended Complaint.

345.     To the extent Paragraph 345 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 345 of the Amended Complaint.

346.     To the extent Paragraph 346 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 346 of the Amended Complaint.

347.     To the extent Paragraph 347 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 347 of the Amended Complaint.

348.     To the extent Paragraph 348 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 348 of the Amended Complaint.

2093587

349. To the extent Paragraph 349 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 349 of the Amended Complaint.

350. To the extent Paragraph 350 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 350 of the Amended Complaint.

351. To the extent Paragraph 351 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 351 of the Amended Complaint.

352. To the extent Paragraph 352 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 352 of the Amended Complaint.

353. To the extent Paragraph 353 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 353 of the Amended Complaint.

354. The TOUR repeats, alleges, and incorporates by reference as if fully set forth herein each and every response to Paragraphs 1-353 above.

355. To the extent Paragraph 355 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 355 of the Amended Complaint.

356. The TOUR admits that it cosponsored six tournaments in the State of California during the 2021-2022 season and that a subsidiary entity owns and operates one golf course in the State of California. The TOUR otherwise denies the allegations in Paragraph 356 of the Amended Complaint.

357. To the extent Paragraph 357 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 357 of the Amended Complaint.

358. To the extent Paragraph 358 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 358 of the Amended Complaint.

359. To the extent Paragraph 359 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 359 of the Amended Complaint.

360. To the extent Paragraph 360 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 360 of the Amended Complaint.

361. To the extent Paragraph 361 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 361 of the Amended Complaint.

362. To the extent Paragraph 362 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 362 of the Amended Complaint.

363. To the extent Paragraph 363 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 363 of the Amended Complaint.

364. To the extent Paragraph 364 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 364 of the Amended Complaint.

365. To the extent Paragraph 365 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 365 of the Amended Complaint.

366. The TOUR repeats, alleges, and incorporates by reference as if fully set forth herein each and every response to Paragraphs 1-365 above.

367. To the extent Paragraph 367 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR admits that the TOUR and Player

Plaintiffs entered contracts. The TOUR otherwise denies the allegations in Paragraph 367 of the Amended Complaint.

368.    To the extent Paragraph 368 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 368 of the Amended Complaint.

369.    To the extent Paragraph 369 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 369 of the Amended Complaint.

370.    To the extent Paragraph 370 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 370 of the Amended Complaint.

371.    The TOUR repeats, alleges, and incorporates by reference as if fully set forth herein each and every response to Paragraphs 1-370 above.

372.    To the extent Paragraph 372 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR is without sufficient information to admit or deny the allegations in Paragraph 372 of the Amended Complaint, and on that basis denies them.

373.    To the extent Paragraph 373 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR is without sufficient information to admit or deny the allegations in Paragraph 373 of the Amended Complaint, and on that basis denies them.

374.    To the extent Paragraph 374 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 374 of the Amended Complaint.

375.    To the extent Paragraph 375 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 375 of the Amended Complaint.

376.    To the extent Paragraph 376 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 376 of the Amended Complaint.

377.    To the extent Paragraph 377 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 377 of the Amended Complaint.

378.    To the extent Paragraph 378 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 378 of the Amended Complaint.

379.    To the extent Paragraph 379 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 379 of the Amended Complaint.

380.    The TOUR repeats, alleges, and incorporates by reference as if fully set forth herein each and every response to Paragraphs 1-379 above.

381.    The TOUR is without sufficient information to admit or deny the allegations in Paragraph 381 of the Amended Complaint, and on that basis denies them.

382.    The TOUR denies the allegations in Paragraph 382 of the Amended Complaint.

383.    To the extent Paragraph 383 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 383 of the Amended Complaint.

384.    To the extent Paragraph 384 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 384 of the Amended Complaint.

385.    To the extent Paragraph 385 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 385 of the Amended Complaint.

386.     To the extent Paragraph 386 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 386 of the Amended Complaint.

387.     To the extent Paragraph 387 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 387 of the Amended Complaint.

388.     To the extent Paragraph 388 sets forth a conclusion of law, no response is required. To the extent a response is required, the TOUR denies the allegations in Paragraph 388 of the Amended Complaint.

389.     Plaintiffs' demand for a trial by jury does not state an allegation and does not require a response.

The paragraphs that set forth Plaintiffs' prayer for relief state no allegations and a response is not required. The TOUR denies any allegations contained in Plaintiffs' Prayer for Relief to which a response is required.

## THE TOUR'S DEFENSES

The TOUR asserts the following defenses at law and in equity. The TOUR further reserves all additional defenses under Federal Rule of Civil Procedure 8(c) and any other defense that may now exist or that may in the future be available based on further discovery or factual investigation in this action. The TOUR denies that Plaintiffs are entitled to any relief whatsoever. By setting forth the defenses asserted below, the TOUR does not concede that it bears the burden of proof on any of the issues raised in these defenses. Furthermore, all such defenses are pled in the alternative, and do not constitute an admission of liability or an admission that Plaintiffs are entitled to any relief whatsoever.

### First Defense

The Amended Complaint and each and every cause of action are barred for failure to state a claim upon which relief may be granted.

### Second Defense

Plaintiffs' claims are barred, in whole or in part, because they lack antitrust standing to

pursue them, lack a cognizable antitrust injury, and are not proper or efficient enforcers of the antitrust laws.

### Third Defense

Plaintiffs' claims are barred, in whole or in part, because they have not suffered an injury to their business or property due to any of the TOUR's actions alleged in the Amended Complaint.

### Fourth Defense

Plaintiffs' claims are barred, in whole or in part, because the TOUR's actions alleged in the Amended Complaint were lawful, justified, and procompetitive.

### Fifth Defense

Plaintiffs' claims are barred, in whole or in part, because the TOUR does not possess monopoly power, does not have the specific intent to obtain monopoly power, has not engaged in the willful acquisition or maintenance of monopoly power by engaging in anticompetitive conduct, and has no probability of achieving monopoly power in the relevant market.

### Sixth Defense

Plaintiffs' claims are barred, in whole or in part, because they have failed to properly define the product and geographic markets.

### Seventh Defense

Plaintiffs' claims are barred, in whole or in part, because the TOUR has not formed an agreement with a direct competitor to refuse to deal with Plaintiffs.

### Eighth Defense

Plaintiffs' claims are barred, in whole or in part, because none of the TOUR's actions alleged in the Amended Complaint have caused harm to competition within a relevant market.

### Ninth Defense

Player Plaintiffs' claims are barred, in whole or in part, because they failed to perform under the terms of their contracts.

2093587

1

### Tenth Defense

Player Plaintiffs' claims are barred, in whole or in part, because the TOUR substantially performed all the material terms of its contracts with Player Plaintiffs.

### Eleventh Defense

LIV's claims are barred, in whole or in part, because the TOUR lacked knowledge of LIV's contractual relationships with LIV players.

### Twelfth Defense

LIV's claims are barred, in whole or in part, because the TOUR lacked knowledge of an economic relationship between LIV and third-parties that probably would have resulted in an economic benefit to LIV, or that the TOUR's actions alleged in the Amended Complaint were certain or substantially certain to disrupt any economic relationship between LIV and third-parties.

### Thirteenth Defense

Plaintiffs' claims for equitable and injunctive relief are barred by the doctrine of unclean hands.

### Fourteenth Defense

Plaintiffs' claims for equitable and injunctive relief are barred by the doctrine of laches.

### Fifteenth Defense

Plaintiffs' claims for equitable and injunctive relief are barred because the balance of the equities does not favor granting the requested relief.

### Sixteenth Defense

Plaintiffs' claims for equitable and injunctive relief are barred because the requested relief is not in the public interest.

### Seventeenth Defense

Plaintiffs' claims are barred in whole or in part by the statute of limitations applicable to their respective claims.

### Eighteenth Defense

Plaintiffs' claims are barred, in whole or in part, because of the Player Plaintiffs'

1   ratification, agreement, acquiescence, authorization, or consent to the TOUR's alleged conduct,

2   including by agreeing to the Regulations.

3   **PGA TOUR'S AMENDED COUNTERCLAIM**

4       PGA TOUR, Inc. ("PGA TOUR" or "TOUR"), by its undersigned counsel, brings this

5   amended counterclaim against LIV Golf, Inc. ("LIV"), the Public Investment Fund of the

6   Kingdom of Saudi Arabia ("PIF") and its Governor Yasir Al-Rumayyan (together, the "Counter-

7   Defendants"), and alleges as follows:

8   **INTRODUCTION**

9       1.      The TOUR's counterclaim against the Counter-Defendants arises out of their

10  tortious inducement of numerous, repeated breaches of contract by former TOUR members,

11  including: Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian

12  Poulter, and Peter Uihlein (together, "LIV Players"). The Counter-Defendants have executed a

13  campaign to pay the LIV Players astronomical sums of money to induce them to breach their

14  contracts with the TOUR in an effort to use the LIV Players and the game of golf to sportswash

15  the recent history of Saudi atrocities and to further PIF's Vision 2030 initiatives.

16      2.      Simultaneously, the Counter-Defendants have encouraged and funded the pursuit

17  by the LIV Players of meritless antitrust claims against the TOUR to challenge the lawfulness of

18  the TOUR's contracts with its members. Indeed, to encourage that lawsuit, LIV and, on

19  information and belief, PIF and Mr. Al-Rumayyan, have falsely communicated to the LIV Players

20  and to other players that their agreements with the TOUR are unenforceable and thus LIV Players

21  may breach them. In the same breath, however, LIV has entered into its own agreements with the

22  LIV Players which impose contractual restrictions on the LIV Players more onerous in scope and

23  duration than any of the TOUR regulations they challenge. These restrictions, many of which

24  required LIV Players to breach their contracts with the TOUR, include, but are not limited to, (i)

25  multi-year commitments, (ii) a mandate that LIV Players play in every single LIV event,

26  including all those played in the same week as a TOUR event, (iii) numerous full-day appearance

27  obligations each year, (iv) requirements to wear LIV-branded apparel at non-LIV events, (v)

28  providing LIV with significant control over LIV Players' social media activity and their ability to

55

1    speak with the media, and (vi) a broad and exclusive media rights assignment to LIV. Moreover,

2    at least some LIV contracts, such as that signed by Talor Gooch, require LIV members to "assist

3    [LIV] in seeking to persuade players to enter into multiyear player participation agreements with

4    [LIV]."[2]

5            3.       LIV has entered into these agreements and included these terms at the explicit

6    direction of PIF—which provides the final authority on all player agreements, in addition to the

7    entirety of their funding—and Mr. Al-Rumayyan, who serves as LIV's de facto CEO. PIF and

8    Mr. Al-Rumayyan exercise near absolute authority over LIV, which is a creature entirely of their

9    own making and which was set up to serve their interests. PIF established LIV; PIF funds LIV;

10   PIF decides which golfers LIV may recruit and how much to pay them; PIF approves LIV's

11   media deals, sponsorships, branding, and even logos. LIV cannot spend any meaningful amount

12   of money without PIF's authorization. While LIV has named Greg Norman as its nominal CEO, it

13   is Mr. Al-Rumayyan who functions as LIV's chief executive, receiving regular reports from

14   Norman, approving LIV's budget, making key strategic decisions, participating in player

15   recruitment in the United States, and micro-managing LIV's day-to-day operations both while in

16   the United States and from abroad. And even once contracts are signed and debts accrued, PIF

17   holds the purse strings: none of LIV's partners or golfers gets paid until PIF and Mr. Al-

18   Rumayyan agree to distribute the money.

19

20

21   _____

22   [2] Andrew Beaton, *LIV Golf's Player Contracts Include Restrictions to Go With the Big Money*,

23   Wall Street Journal (Aug. 17, 2022), https://www.wsj.com/articles/liv-golf-pga-tour-contract-

24   11660744567. Indeed, once LIV induced players like Phil Mickelson and Bryson DeChambeau to

25   breach their contracts with the TOUR, they started recruiting members on their own. *See* Abdul

26   Bari Khan, *Report Makes an Amazing Revelation about LIV Team Captains Brooks Koepka and*

27   *Bryson DeChambeau*, Essentially Sports (July 27, 2022), https://www.essentiallysports.com/golf-

28   news-report-makes-an-amazing-revelation-about-liv-team-captains-brooks-koepka-and-bryson-

     dechambeau/.

PGA TOUR, INC.'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT & AMENDED COUNTERCLAIM
Case No. 5:22-cv-04486-BLF

2093587

4.      Working in close cooperation, LIV, PIF, and Mr. Al-Rumayyan have tortiously interfered with the TOUR's contracts with full knowledge of the terms of those agreements and with intent to induce LIV Players to breach their contracts with the TOUR. LIV Players have responded to Counter-Defendants' inducements exactly as Counter-Defendants hoped—by repeatedly breaching their contracts with the TOUR.

5.      Indeed, a key component of Counter-Defendants' strategy has been to intentionally induce TOUR members to breach their TOUR agreements and play in LIV events while seeking to maintain their TOUR memberships and play in marquee TOUR events like The Players Championship and the FedExCup Playoffs, so LIV—and by extension, PIF—can free ride off the TOUR and its platform. LIV's 2022 schedule noticeably and purposefully took a break during the weeks of the TOUR's FedExCup Playoffs, which LIV has described as the "Super Bowl" of golf. LIV has continued this pattern in its 2023 schedule, pausing events for all but two days of the 20-day FedExCup Playoffs.

6.      Aware of golfers' concerns about the legal implications of breaching their TOUR contracts, PIF and Mr. Al-Rumayyan authorized LIV to indemnify all LIV Players. Under the indemnification agreements, LIV committed to funding all legal expenses for LIV Players related to their breach of TOUR Regulations—including this litigation. When the TOUR did not sue the LIV Players, the Counter-Defendants encouraged and funded the LIV Players' lawsuit against the TOUR; when that lawsuit failed to yield the desired results of forcing the TOUR to permit LIV Players to participate in its events, PIF and Mr. Al-Rumayyan authorized LIV itself to join the suit. Because PIF is the sole source of funding for any money paid under the indemnification agreements—or indeed, any money paid through LIV at all—and because the indemnity agreement gives PIF ███████████████████████████████████ ██████ it is the sole Counter-Defendant with a financial interest in the outcome of this litigation.

2093587

1     7.     The Counter-Defendants have falsely informed LIV Players that they may openly

2     breach their contractual obligations to the TOUR, for their benefit and to the detriment of all

3     TOUR members. The Counter-Defendants' interference with the TOUR's contracts is unlawful.

4                                            **PARTIES**

5     8.     Defendant LIV is a professional golf tour created, financed and overseen by PIF.

6     LIV is organized under the laws of the state of Delaware and has identified as its principal place

7     of business New York City, New York. LIV's headquarters and primary offices are in West Palm

8     Beach, Florida.

9     9.     Defendant PIF is the sovereign wealth fund of the Kingdom of Saudi Arabia,

10    which holds more than $679 billion in assets globally, including over $40 billion invested with at

11    least 50 companies publicly traded in the United States. PIF is organized under Saudi Arabia's

12    Public Investment Fund law, which characterizes it as having "a public legal personality as well

13    as financial and administrative independence." It is a separate legal entity from the Kingdom of

14    Saudi Arabia. PIF has offices in New York from which it manages its U.S.-based investments.

15    PIF owns 93% of LIV's parent company LIV Golf Investments, Ltd. ("LGI"), which owns 100%

16    of the holding company LIV Golf Holdings, Ltd. ("LGH"), which in turn owns 100% of LIV.

17    LGI and LGH are incorporated under the laws of Jersey. To date, PIF has committed at least $2

18    billion in funding to LIV.

19    10.    Defendant Mr. Al-Rumayyan is the Governor of PIF, Chairman of the board of

20    directors of both LGI and LGH, and Chairman of the board of directors of the LIV Invitational

21    Series. Mr. Al-Rumayyan is a citizen of the Kingdom of Saudi Arabia.

22    11.    Plaintiff TOUR is a Maryland non-profit corporation, with its principal place of

23    business in Ponte Vedra Beach, Florida. The TOUR operates as a membership organization, the

24    sole members of which are the professional golfers themselves.

25                              **JURISDICTION AND VENUE**

26    12.    Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the

27    TOUR's counterclaim against Counter-Defendants for state-law tortious interference with

28    contract. LIV's action against the TOUR arises under Sections 1 and 2 of the Sherman Antitrust

2093587

Act, 15 U.S.C. §§ 1, 2. This Court has subject matter jurisdiction over those federal claims under 28 U.S.C. § 1331, § 1337. The TOUR's state-law tortious interference counterclaim arises out of facts that are directly related to LIV's claims such that they form part of the same case or controversy within this Court's original jurisdiction.

13.     This Court has personal jurisdiction over LIV and Mr. Al-Rumayyan under California's long-arm statute, Cal. Code Civ. Proc. § 410.10, because LIV initiated this litigation in this District with Mr. Al-Rumayyan's explicit consent and because they have minimum contacts with California.

14.     This Court has personal jurisdiction over PIF under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330(b), 1605(a). For example, this Court has personal jurisdiction over PIF under 28 U.S.C. § 1605(a)(1)—the "waiver exception" to presumptive immunity under FSIA—because PIF explicitly consented to LIV initiating this litigation in this District, pays the legal fees for all Plaintiffs' attorneys in this litigation, and otherwise exercises control over the ongoing conduct of this litigation. This Court also has jurisdiction under 28 U.S.C. § 1605(a)(2) (the "commercial activity exception") because the TOUR's claims are based on PIF's commercial activity within and directly affecting the United States. For example, PIF's acts of unlawful intervention were undertaken primarily in the United States or were directed at people in the United States. PIF created and funded LIV, a golf league primarily based in the United States, and tortiously interfered with the TOUR's U.S.-based contracts with golfers, many of whom are U.S. citizens or residents and whose TOUR contracts are performed primarily in the United States. The contracts that PIF negotiated with LIV Players in the course of PIF's tortious interference with TOUR contracts similarly require performance primarily in the United States, are paid in the United States, and bind golfers who are residents or citizens of the United States.

15.     Venue is proper as to LIV and Mr. Al-Rumayyan in the Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c) because LIV has appeared in this action and filed claims against the TOUR in this District, because Mr. Al-Rumayyan consented to the filing of this action, and because he is not a United States resident. Venue is proper as to PIF in the Northern District of California under 28 U.S.C. 1391(f)(1) and (3) because PIF consented to

2093587

LIV's initiation of litigation in this District and because PIF does business in this District including through investment in local companies such as Uber Technologies, Inc.

<strong><u>GENERAL ALLEGATIONS</u></strong>

**I.      The TOUR's History and Business Model**

16.      The TOUR was founded in 1968 as a membership organization by a group of professional golfers. The TOUR was designed for the collective benefit of its members—all of whom are professional golfers—to secure prize money by soliciting corporate sponsorships and securing television exposure for golf tournaments through the aggregation of all players' rights.

17.      The TOUR's founding members wanted the freedom, among other things, to plan their own travel and playing schedules, to practice as and when they saw fit, and otherwise to operate their respective "golf businesses" independently while, at the same time, associating as a "membership" in order to negotiate efficiently and effectively with sponsors, tournament organizers, media partners, and others to increase the value of their collective rights.

18.      This ability to bundle player rights was then, and is now, dependent upon members assigning their media rights exclusively to the TOUR. In turn, the TOUR is able to provide prospective sponsors/media outlets with the assurances necessary to ensure that the rights "sold" to sponsors/partners are exclusive. That exclusivity influences the fees received by the TOUR on behalf of its members and, in turn, the prize money and other benefits that go to TOUR players.

19.      The TOUR remains a membership organization to this day and is organized under Internal Revenue Code Section 501(c)(6). The TOUR has taken a leading role in charitable initiatives and efforts to develop, promote and expand the game of golf and increase the diversity of participants. As a membership organization, the TOUR takes on certain responsibilities towards its membership. In return, and to receive the benefits of membership, when golfers voluntarily agree to join the TOUR as members, they also must agree to certain obligations.

20.      The obligations and conditions of membership to which each PGA TOUR member agrees are set forth in the PGA TOUR's Player Handbook & Tournament Regulations (the "Regulations"). The Regulations are issued annually and set forth the TOUR's operations,

2093587

policies, and procedures. Each year, PGA TOUR members renew their agreements with the TOUR by agreeing to be bound by the Regulations as updated at the beginning of each season.

21.     The PGA TOUR season includes a regular season of more than forty golf tournaments operated by the TOUR along with the four independently-operated Majors,[3] culminating in the FedEx Cup Playoffs. Forty-eight official tournaments were scheduled for the 2021-2022 season—forty-five regular season events and three FedEx Cup playoff events. TOUR-operated tournaments are played primarily in North America and principally in the United States.

## II.     PIF and Mr. Al-Rumayyan's Creation and Control of LIV

22.     Founded in 1971, PIF is the sovereign wealth fund of the Kingdom of Saudi Arabia. It controls more than $670 billion in assets. In 2015, PIF was "reborn" with a mandate to further Saudi Arabia's "Vision 2030"—an effort to diversify Saudi Arabia's economy, alleviate its dependence on oil and better integrate itself with the international economy.

23.     In furtherance of PIF's Vision 2030 objectives, it has invested extensively in the United States. As of June 2022, PIF had invested over $40 billion in more than 50 companies publicly traded in the United States and opened offices in New York city to oversee those investments. Part of PIF's Vision 2030 strategy is investment in sports franchises—especially those popular among the investment class, including a Formula One team and an English Premier League soccer club.  PIF also sponsored and funded the Premier Golf League ("PGL"), which folded shortly after its creation in 2019.

24.     In 2021, PIF and its Governor Mr. Al-Rumayyan founded and financed LIV for the purpose of creating and scheduling a series of mostly United States-based golf events to further Saudi Arabia's Vision 2030 objectives and burnish its global reputation . Unlike the TOUR and the other golf entities around the world that depend upon media fees and sponsorship for their revenues, LIV relies solely on financial backing from PIF, which has committed at least

_____

[3] The four "Majors" are the Masters, the PGA Championship, the US Open, and the Open Championship. The Majors are operated by independent organizations and not the TOUR, but they are approved events that are part of the TOUR's official schedule.

$2 billion in funding to LIV. PIF's ownership of LIV is structured through a series of shell companies: PIF owns at least 93% of LGI, which owns 100% of the holding company LGH, which in turn owns 100% of LIV. Although the United Kingdom sports marketing company Performance54 Group Ltd. ("Performance54") holds a small minority stake in LGI, PIF is the sole source of capital for LGI, LGH, and LIV itself.

25.    In October 2021, PIF and Performance54 entered into a subscription and shareholders agreement (the "Shareholders' Agreement"), which set out the core terms of their business arrangement in creating the new golf tour now known as LIV. Under the Shareholders' Agreement, PIF retains extraordinary day-to-day control over LIV's activities. LIV cannot ██ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ without PIF's explicit consent and approval. LIV cannot even ████████████████ without PIF's say-so. And it is typically Mr. Al-Rumayyan who is personally involved in these day-to-day decisions on PIF's behalf, and who exercises day-to-day control over LIV.

26.    Around the same time, PIF and Performance54 entered into a services agreement, pursuant to which Performance54 was to advise on and perform staffing, recruitment, media strategy, and event planning for LIV's first seasons in addition to other services central to the organization's early development. Pursuant to a June 2022 novation, PIF's rights under that services agreement were later assigned to LIV. PIF also retained other consultants, lobbyists, and media advisors to create and shape LIV's public image and craft a strategy for breaking into U.S. golf. In short, PIF not only provides consent and approval for LIV's ongoing activities, but actually stood in LIV's shoes—and indeed, continues to stand in LIV's shoes—in entering into the agreements and performing the work necessary to develop the organization. PIF continues to closely supervise LIV's operations through a dedicated set of personnel assigned to monitor LIV's launch in addition to routine meetings at which LIV executives report to Mr. Al-Rumayyan and PIF on various business milestones, including especially player recruitment. In the course of its control and oversight of LIV, PIF has sent hundreds of emails into the United States, including

1    at least 400 emails exchanged between PIF executives and U.S.-based LIV employees and 250

2    emails exchanged between PIF and its U.S. consultants.

3          27.    PIF's close control of LIV is not merely contemplated by the Shareholders'

4    Agreement; it is carried out in practice primarily through Mr. Al-Rumayyan, who serves as

5    chairman of LGI, LGH, and the LIV Golf Invitational Series. Mr. Al-Rumayyan is a Harvard

6    educated banker and reported golf enthusiast who has served as PIF's Governor since 2019. In

7    addition to his duties with PIF, Mr. Al-Rumayyan is chairman of the board of Saudi Arabia's

8    state-owned oil company Aramco as well as Golf Saudi, a PIF-backed entity aimed at developing

9    golf in Saudi Arabia. Mr. Al-Rumayyan also holds board seats on companies in which PIF has

10   invested, including Uber. He routinely travels to the United States to manage PIF's United States

11   investments, including at least nine trips totaling at least 34 days to New York alone since 2021.

12         28.    Despite these wide ranging responsibilities, Mr. Al-Rumayyan has taken an

13   especially keen interest in LIV, which was created and launched under his "instruction." He

14   appears frequently and visibly at LIV events, including tournaments in New Jersey, Illinois, and

15   Florida, and promoted LIV at the 2022 Super Bowl. When appearing at LIV events, Mr. Al-

16   Rumayyan golfs in the Pro-ams alongside LIV Players and other public figures, presents trophies

17   with LIV's CEO, socializes with LIV Players—including Plaintiffs in this lawsuit—and generally

18   appears to relish his role as the public face of PIF's involvement with LIV. Indeed, Mr. Al-

19   Rumayyan contributed to LIV's reputation for showering unprecedented sums of money on

20   golfers when he announced that any golfer who shot a perfect score of 54 would be awarded $54

21

22

23

24

25

26

27

28

2093587

million. In the image below, Mr. Al-Rumayyan (outlined in yellow) poses with Norman (outlined in red) and LIV Players at a welcome event for a LIV tournament near Chicago.



29.     Mr. Al-Rumayyan's involvement with LIV goes beyond his public facing role. He is understood by LIV's leadership to be its de facto CEO, with LIV's nominal CEO, Greg Norman, relegated to be a mere "figurehead." LIV's Managing Director, Majed Al-Sorour, refers to Mr. Al-Rumayyan as "the boss" [4] and LIV's former COO, Atul Khosla, is reported to have resigned his position following a confrontation with Mr. Al-Rumayyan.[5] LIV's management meets weekly with Mr. Al-Rumayyan to brief him on "week-to-week progress and priorities" and

---

[4] Zach Helfand, *Will the Saudis and Donald Trump Save Golf—or Wreck it?*, The New Yorker (Oct. 24, 2022), https://www.newyorker.com/magazine/2022/10/24/will-the-saudis-and-donald-trump-save-golf-or-wreck-it.

[5] James Corrigan, *LIV Golf leading executive in shock mystery exit*, The Telegraph (Dec. 17, 2022), https://www.telegraph.co.uk/golf/2022/12/17/liv-golf-chief-executive-quits-heated-exchange-head-saudi-sovereign/

maintains an extensive document entitled "His Excellency Action Tracker" with status updates for these weekly reports. Mr. Al-Rumayyan has been personally involved in decision-making on minutiae ranging from LIV's scoring mechanism, hotel and airfare costs for players and their caddies, promotional launch video and logo, and LIV's tournament calendar and structure, the "on-site activities (e.g. concerts)" at LIV events and "[t]echnology around the event, including broadcasting and … data analytics."

30.    Norman seeks Mr. Al-Rumayyan's approval before taking any meaningful action on behalf of LIV. Mr. Al-Rumayyan must approve Norman's public statements, including those relating to LIV's future plans and golfer participation and recruitment. When a decision regarding LIV's launch date needed to be made, Norman presented options to Mr. Al-Rumayyan and said he was "looking forward to [Mr. Al-Rumayyan's] direction." Norman also directly and immediately reports all sensitive developments to Mr. Al-Rumayyan, including player recruitment, the terms of negotiations with players, competition with the TOUR, the filing of this lawsuit and, in one instance, unspecified "sensitive and critical" information that was known by only four other people.

31.    Despite Norman's regular reports to PIF and Mr. Al-Rumayyan—and his insistence ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████

32.    Mr. Al-Rumayyan closely controls LIV's golfer recruitment and contract negotiation. He personally approves which golfers LIV is permitted to recruit and how much LIV is permitted to pay them. In one instance he insisted that ████████████████████████████
██████████████████████████████████████████████████████████████

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Norman reports to Mr. Al-Rumayyan with details

2 about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4      33.     Mr. Al-Rumayyan also directly engages with golfers and their agents for purposes

5 of recruitment and contract negotiation. He ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮

11      34.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Wasserman's agency has since become one of

13 "the biggest influence[s] on players who joined LIV." Wasserman represents seven of the forty-

14 eight players in LIV's September event, most of whom were TOUR members at the time Mr. Al-

15 Rumayyan recruited Wasserman, including former Player Plaintiff Hudson Swafford.

16      35.     In addition to golfer recruitment, Mr. Al-Rumayyan is intimately involved in

17 negotiating business agreements on LIV's behalf with potential sponsors, advertisers, and

18 broadcasters in the United States. This has included meeting with ▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮ leadership on behalf of LIV.  When summarizing LIV's negotiations with

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮

26 **III.**    **LIV's PIF-Funded Business Model**

27      36.     LIV's funding through PIF grants it access to nearly unlimited resources from the

28 Saudi government and allows it to operate without consideration of profitability. To date, PIF has

committed at least $2 billion of funding to LIV, which, spurred by competition with the TOUR and other golf tours worldwide, LIV is using to pay nine-figure advances to some PGA TOUR members, provide free and/or significantly reduced tournament tickets to spectators, and fully fund all its operational costs, including hundreds of millions of dollars in tournament purses. With the backing of PIF, LIV has the luxury of operating at a loss for as long as it needs to accomplish its goals.

37.     The limitless nature of LIV's funding is illustrated by the guaranteed contracts LIV has entered into with golfers. LIV has reportedly contracted to pay well-known golfers between $100-200 million to join LIV, with other golfers receiving large upfront payments as well. These payments are not conditioned on the quality of a golfer's performance in LIV's events, and every player is guaranteed at least an additional $120,000 in prize money per LIV event. LIV CEO Greg Norman claimed that LIV offered Tiger Woods between $700-$800 million to join the LIV Tour, a sum that would have nearly equaled the entirety of the TOUR's net revenue in 2021.

38.     PIF and Mr. Al-Rumayyan have final authority in deciding every one of these contracts—each of which is funded entirely through PIF. And even beyond the $2 billion that PIF has committed to fund LIV's operations and player contracts, LIV can access other sources of funding through the PIF-backed entity Golf Saudi, also led by Mr. Al-Rumayyan, to provide additional perks to its players off its official balance sheet.

39.     While LIV's publicly claimed goal is to "grow the game of golf," unlike all of the other major golf tours in the world, it has no system (nor plans for a system) to develop golfers to reach elite status. Instead, its actual objective is to further the commercial interests of the Saudi Arabian government and PIF.

40.     LIV's inaugural season included eight events, five of which will have been held in the United States. By its second season in 2023, LIV plans to expand to fourteen events (eight of

1  which will be held in the United States).[6] LIV events are invitationals, meaning that only those

2  golfers with whom LIV has contracted or whom it has invited to compete may participate.

3        41.    All LIV Players were recruited by LIV, PIF, and Mr. Al-Rumayyan and were PGA

4  TOUR members during the 2021-2022 season. LIV claims its players are "independent

5  contractors" or "free agents," but LIV's own business plan and player agreements demonstrate

6  this is a fiction. Golfers who join LIV must sign long-term exclusive contracts—each of which is

7  specifically approved by PIF and Mr. Al-Rumayyan—that require them to participate in *all* LIV

8  events and prohibit them from playing in *any* TOUR events occurring in the same week as any

9  LIV event (or any conflicting event whatsoever).[7] LIV's statements regarding golfer freedom are

10  a thinly veiled public relations ploy concocted to disparage the TOUR and deflect criticism from

11  LIV's own restrictive business model.

12        42.    Indeed, LIV Players' contracts with LIV are rife with severe restrictions. For

13  example, the TOUR is aware that at least certain LIV Player contracts contain the following

14  requirements:

15      •  Players must play in *every* LIV event "as a fundamental condition of [their]

16        Agreement." LIV projects this will involve 10-14 events (along with qualification

17        events) in the 2023 and 2024 season (and not including any of the four Major

18        championships). ***However***, LIV retains "sole discretion" to schedule these events,

19        and LIV is not restricted in the number, location or dates it schedules those events.

20  _____

21  [6] *See* SE Golf Staff, *2023 LIV Golf Full Schedule*, Sports Illustrated (Jan. 11, 2023),

22  https://www.si.com/golf/news/2023-liv-golf-league-schedule.

23  [7] LIV has already prohibited players from playing in other golf tournaments. For example,

24  Graeme McDowell was prohibited from playing in the Irish Open—his native country's open

25  championship—even though he has played in that tournament for a majority of the past twenty

26  years. *See* Bob Harig, *While Admitting a "Tainted" Legacy, Graeme McDowell Takes Issue with*

27  *LIV Backlash*, Sports Illustrated (July 5, 2022), https://www.si.com/golf/news/while-admitting-a-

28  tainted-legacy-graeme-mcdowell-takes-issue-with-liv-backlash.

LIV already has used its discretion to increase the obligations of players who signed with LIV in May. Those contracts indicate players should expect to participate in 10 events in 2023, but by late June, LIV was publicly stating it would hold 14 events in 2023.

- For the duration of their multi-year contracts with LIV, players must grant LIV "an exclusive, perpetual, royalty-free, worldwide, transferable, fully paid-up irrevocable right and license (with the right to grant sublicenses) to exhibit, exploit, copy, reproduce and otherwise use the Player Identification" in connection with any promotional activities, team apparel, and all content created, recorded or otherwise generated by or on behalf of LIV, LIV Team, or any League Rights Holder (League Rights are defined to include, among other things, any content, advertising and film rights).

- Players must wear LIV Team Apparel in LIV events, other non-LIV tournaments, and other events in which they must participate (effectively granting LIV sponsorship rights that could otherwise be used by the player).

- Players agree they will not enter into any "Conflicting Contract," defined in a manner that would preclude LIV Players from renewing their membership agreements with the TOUR.

- Players are required to use their social media platforms to promote LIV.

- Players are obligated to make numerous required appearances including multiple sponsorship activations, receptions, meet and greets, and appearances at each team's "draft event."

- Players must lend their likenesses to content creation, including photoshoots/video content, participate in a mini-series/documentary series and agree to their inclusion in LIV marketing materials.

- Players are prohibited from providing exclusive interviews or commentaries or entering into any agreements involving exclusive interviews with or appearances

1    in or on any media or social media in relation to any league activities without

2    obtaining LIV or Team operator approval.

3    • Players are required to participate in and assist LIV with meetings, negotiations

4    and/or other activities with corporate sponsors or other business partners, including

5    team promotional activities and league activities (i.e., activities organized by or on

6    behalf of LIV in relation to the league and/or any event including ancillary

7    tournament or promotional activities).

8    • At LIV's request, players must introduce LIV representatives to the player's

9    existing or prior sponsors to facilitate sponsorship discussions for LIV and other

10    LIV Players.

11    • Players must not make any statement or commit any act (or fail to act), nor make,

12    post, publish or communicate to any Person or in any public forum any false,

13    defamatory, libelous, or slanderous remarks, comments or statements which could

14    reasonably be expected to, or actually do, adversely affect (i) the Player's ability to

15    participate in connection with any Tournament or Event, or (ii) the reputation or

16    public image of any relevant person. Relevant person is defined in such a way to

17    specifically cover shareholders of LIV—i.e., the Saudi government.

18    43.    These membership conditions are far more restrictive than the TOUR's own

19  Regulations on player participation in PGA TOUR events, which LIV Players disingenuously

20  have alleged violate the antitrust laws. They also make it impossible for LIV Players to meet their

21  contractual obligations to the TOUR. For example, LIV Players have admitted that they could not

22  realistically participate in their required LIV events (8 in 2022 and 14 in 2023) and the minimum

23  number of PGA TOUR events (15) needed to maintain membership on the PGA TOUR. At least

24  some of the LIV agreements also directly prohibit players from agreeing to the Regulations.

25  These restrictive terms were included under the direction and approval of PIF and Mr. Al-

26  Rumayyan.

27    44.    Counter-Defendants explicitly anticipated not only that their membership

28  conditions would cause LIV Players to breach their TOUR contracts, but also that such breach

would result in litigation. Under PIF and Mr. Al-Rumayyan's direction, LIV entered into

indemnification agreements with LIV Players that were custom tailored to LIV Players'

inevitable breach of their TOUR contracts. Under those agreements, ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████  As with all other LIV contracts, the indemnification agreements are funded entirely by

PIF.

## IV.    The TOUR's Contract with TOUR Members, Including LIV Players

45.    LIV Players admit they had a contractual, business relationship with the TOUR

until the end of the 2021-22 season that required them to comply with the Regulations. Dkt. 83

¶¶ 16-22, 367. The Regulations and any amendment to them are approved not only by a majority

of the TOUR's Policy Board, but generally by at least three of the player directors who sit on the

Policy Board.

46.    As consideration and in exchange for fulfilling these obligations, LIV Players (and

other PGA TOUR members) gained the right to participate in and earn from PGA TOUR events,

taking advantage of the TOUR's reputation, media and sponsorship platform and pool of prize

money. They also receive other reputational and membership benefits (e.g., healthcare and

retirement plans). Dkt. No. 50-5 (Levinson Decl.) ¶ 5.

47.    If PGA TOUR members refuse to live up to the terms of their agreements, and

instead treat their own promises as optional, the entire mutually beneficial arrangement amongst

PGA TOUR members is harmed. The TOUR continues to depend on all members to honor their

contractual membership commitments and has no legal obligation to hold in good standing and/or

provide playing opportunities to any member who willfully violates those terms. Golfers have no

right to claim for themselves whichever of the privileges of PGA TOUR membership they choose

while at the same time rejecting any obligations that they deem inconvenient.

48.    Among the most critical obligations in the Regulations are the requirements that

PGA TOUR members: (i) grant their exclusive media rights to the TOUR; (ii) avoid participating

1    in events that conflict with PGA TOUR events absent a waiver from the TOUR; and (iii) refrain

2    from conduct unbecoming of PGA TOUR members, including by commenting or behaving in a

3    way that will reflect unfavorably on the TOUR or harm the TOUR.

4         **A.**     <u>**Media Rights and Conflicting Events Obligations**</u>

5         49.     Article V of the Regulations sets forth PGA TOUR members' contractual

6    requirements regarding the exclusive grant of their media rights to the TOUR. At the beginning of

7    every season, all PGA TOUR members grant the TOUR the exclusive right to use their media

8    rights in any golf program. (Regulations at Art. V.B.1.a.). Moreover, Article V provides that

9    "[n]o PGA TOUR member shall participate in any live or recorded golf program without the prior

10   written approval of the Commissioner, except that this requirement shall not apply to PGA TOUR

11   cosponsored, coordinated or approved tournaments, wholly instructional programs or personal

12   appearances on interviews or guest shows."

13        50.     Under the TOUR's media rights Regulations, each PGA TOUR member agrees to

14   consolidate his individual media rights with his fellow members' respective rights and

15   contractually assigns such rights to the TOUR on an exclusive basis so that the TOUR can license

16   the pooled rights to media outlets, thereby creating a new product—the pooled media rights—that

17   would not otherwise exist. This new product allows the TOUR to sell the aggregated rights to

18   media outlets in the same manner as other professional sports leagues.

19        51.     As with all obligations under the Regulations, the grant of media rights covers

20   only a single PGA TOUR season. This season-long exclusive grant of media rights by PGA

21   TOUR members is an essential contractual provision because the TOUR must rely on that grant

22   of rights to license those rights to media partners and sponsors.

23        52.     Article V of the Regulations also sets forth PGA TOUR members' contractual

24   requirements regarding conflicting events. These rules contribute to the success of scheduled

25   PGA TOUR tournaments. Consistent with these contractual obligations, the TOUR has long-

26   standing player rules that limit participation in conflicting events.

27        53.     Article V.A.2 of the Regulations provides that PGA TOUR members generally

28   may not participate in any other golf tournament on a date when a PGA TOUR tournament is

1    scheduled. In certain circumstances, players may seek and receive releases to play in non-TOUR

2    tournaments that are held outside of North America on the same dates as TOUR tournaments.

3        54.    Taken together, the media rights grant and conflicting events rules make the

4    TOUR's product more valuable to sponsors, local host organizers, and content distributors,

5    leading to higher sponsorship and broadcast revenues for the TOUR, which in turn are distributed

6    to members in the form of higher purses, bonuses, pensions and other ancillary membership

7    benefits. They also help preserve the TOUR's reputation, including from being tarnished by LIV.

8        **B.    Prohibition on Conduct Unbecoming**

9        55.    Article VI of the Regulations prohibits certain forms of conduct unbecoming

10   professional golfers who are members of the PGA TOUR. Players agree that "Players

11   participating in PGA TOUR cosponsored, approved or coordinated tournaments . . . at all times

12   shall conduct themselves in a manner becoming professional golfers that will not reflect

13   unfavorably on PGA TOUR, its members, officers or representatives, tournaments or sponsors."

14   (Regulations at Art. VI.) They also agree "to refrain from making comments that unreasonably

15   attack or disparage others, including, but not limited to, tournaments, sponsors, fellow

16   members/players and/or PGA TOUR . . . . [P]ublic comments that a member knows, or should

17   reasonably know, will harm the reputation or financial best interest of PGA TOUR, a fellow

18   member/player, a tournament sponsor or a charity are expressly covered by this section."

19   Regulations at Art. VI.E. Violations of this section constitute conduct unbecoming a professional.

20   *Id.*

21   **V.    LIV Players Have Materially Breached Their Contracts with the TOUR**

22       56.    Several PGA TOUR members, including LIV Players Talor Gooch, Matt Jones,

23   Ian Poulter, and Peter Uihlein, requested and were denied media rights and conflicting events

24   releases to participate in LIV's inaugural London tournament, which was scheduled to be held on

25   the same weekend as the TOUR's RBC Canadian Open. Other LIV Players didn't even bother

26   requesting releases despite the obligations to obtain them set forth in the Regulations to which

27   they agreed. By that time, it was clear that Counter-Defendants planned an eight-tournament

28   schedule for 2022—to be held principally in North America—with a far more substantial

schedule in North America in 2023 and beyond. As LIV Players knew, their LIV contracts guaranteed LIV de facto exclusivity for multiple years, and compelled LIV Players to continually violate their existing agreements and any future agreements with the TOUR because, by agreeing to these LIV contract terms, LIV Players were promising to repeatedly breach the TOUR's conflicting events and media rights provisions in Article V.A.2 and V.B.1 of the Regulations—and to recruit other PGA TOUR members to do the same.

57.    Similarly, several additional players, including LIV Player Bryson DeChambeau, elected to play in LIV's next two events held in Portland, Oregon, and/or Bedminster, New Jersey, both of which were held on the same days as PGA TOUR events, without conflicting events and media rights releases. Those players also breached their contracts with the TOUR in the same fashion and were sent disciplinary notices by the TOUR.

58.    Further, numerous LIV Players breached Article VI of the Regulations that prohibits PGA TOUR members from engaging in conduct unbecoming, which, as detailed above, is defined to include conduct that will harm the financial interest of the TOUR. For example, in connection with the LIV event, Jones and Swafford participated in a series of interviews that promoted the LIV series. In addition, Poulter promoted the LIV event through the posting of multiple social media posts. Mickelson and DeChambeau also promoted the LIV event and actively recruited other TOUR members to join LIV and breach their agreements with the TOUR. These LIV Players' active promotion of LIV and other conduct that they knew or should have reasonably known was not in the best financial or reputational interests of the TOUR, violated Article VI, and was in furtherance of contractual obligations to LIV intended to specifically induce others to breach their agreements with the TOUR. Based on these blatant violations of the Regulations, the TOUR notified LIV Players that they were in breach of their obligations.

59.    LIV Players responded to the disciplinary notices from the TOUR with nearly identical messages authored by attorneys acting on LIV's behalf (the "Responses"). None of the Responses denied that LIV Players were violating the Regulations. Instead, again prompted by LIV, LIV Players (wrongly) asserted the TOUR's rules violated the antitrust laws. Indeed, the

Responses, if anything, reaffirmed LIV Players' commitments to continue violating the Regulations by continuing to play in conflicting events and granting their media rights to LIV.

60.     Several TOUR members elected to resign their PGA TOUR memberships and participate exclusively on the LIV tour. However, despite signing lucrative contracts with LIV, numerous other PGA TOUR members, including LIV Players Mickelson, Gooch, Swafford, Jones, Poulter, and Uihlein, did not resign their PGA TOUR memberships and instead knowingly and blatantly breached their obligations to the TOUR and their fellow members.

## VI.   <u>Counter-Defendants' Engineering of LIV Players' Breach of the TOUR's Regulations</u>

61.     Counter-Defendants have conducted a coordinated campaign of ongoing interference with contracts between the TOUR and its members in the hope that they can convince a court to alter the TOUR's membership structure to benefit itself at expense of the TOUR and for the benefit of Counter-Defendants.

62.     Counter-Defendants have made their strategy clear: fully aware the Regulations do not permit members to remain on the PGA TOUR while participating in all events on the LIV tour as required by LIV, Counter-Defendants denigrate the TOUR, encourage players to breach their contracts with the TOUR on the baseless promise that they can help those golfers force their way into PGA TOUR events, and then use LIV Players as a vehicle to challenge the Regulations, directing and funding a campaign to undermine the TOUR's membership structure. From the outset, Counter-Defendants have intentionally and systematically engineered each step of LIV Players' breach, and have provided support and reassurance in an effort to encourage more breaches in the future.

63.     Counter-Defendants recruited LIV Players and entered into contracts with them with full knowledge that doing so would interfere with their contractual obligations to the TOUR and place players in continuing violation of the Regulations, including the provisions on media rights, conflicting events, and conduct unbecoming a PGA TOUR member. Counter-Defendants have openly sought to damage the TOUR's business relationships with its members by inducing them to breach their contractual requirements, even going so far as to pay members' legal fees to make breaching their contracts with TOUR more enticing.

75

64.     At PIF and Mr. Al-Rumayyan's direction, LIV issued a communication—the contents of which were "greenlit" by Mr. Al-Rumayyan—to all PGA TOUR members through their agents demonstrating clear knowledge of the Regulations. LIV expressed understanding that the Regulations "authorize the commissioner to impose punishments on golfers who engage in 'conduct unbecoming a professional golfer,'" including discipline and suspension.

65.     LIV, PIF, and Mr. Al-Rumayyan also knew that golfers would violate their TOUR contracts if they played in LIV events that conflicted with TOUR tournaments. For example, in text messages between Norman and Mr. Al-Rumayyan, Norman described an "internal and publicly stated mandate of not going up against [PGA TOUR] Heritage tournaments while working in partnership with existing tours/governing bodies." That same text message acknowledges that launching LIV while one of those "heritage" tournaments was ongoing might cause players to distance themselves from LIV and cause the news cycle to be "negatively directed at [LIV] for impacting the players in the midst of a tournament."

66.     Aware of these provisions, Counter-Defendants falsely described the TOUR's adherence to its own Regulations as unenforceable anticompetitive behavior and/or falsely insisted that the TOUR had violated its own rules. Counter-Defendants proceeded to encourage PGA TOUR members to join LIV based on the promise that the TOUR either would not and/or could not enforce its contractual rights to suspend golfers, including LIV Players who openly decided to breach their contracts with the TOUR. LIV's public disinformation campaign against the TOUR was initiated at Mr. Al-Rumayyan's specific direction. The TOUR understands that these types of representations were made informally in conversations between TOUR members and representatives from LIV, including Greg Norman, Mr. Al-Rumayyan, and other TOUR members who had already planned to join LIV, like Phil Mickelson. Indeed, Mr. Al-Rumayyan played a direct and central role in recruiting players in reliance on these misrepresentations, personally reaching out to golfers in the midst of their LIV negotiations to provide assurances regarding his, PIF, and LIV's commitment to backing any legal fight with the TOUR. The LIV Players have sued the TOUR based upon their suspensions for violation of the Regulations, in part based upon these false assertions by Counter-Defendants.

2093587

67.     In text messages between Sergio Garcia and LIV CEO Greg Norman, Norman wrongly told Garcia: "They cannot ban you for one day let alone life. It is a shallow threat. Ask them to put in writing to you or any player. I bet they don't. Happy for anyone to speak with our legal team to better understand they have no chance of enforcing." Dkt. 2-3 at 128–132. Norman's reassurances to Garcia and potentially other members of the TOUR were intended to mislead players who were concerned about the consequences of breaching their agreements with the TOUR and to encourage them to breach those agreements.

68.     For instance, Talor Gooch, Hudson Swafford and Matthew Jones elected to remain in the LIV London Invitational Series event despite the TOUR's denial because they claimed they "did not believe the [TOUR] had a lawful right to prevent [them] from playing in the event and because it was important [they] stand up for the lawful rights of professional golfers to achieve their market value as independent contractors." Dkt. 2-9 (Declaration of Hudson Swafford) ¶ 21; Dkt. 2-10 (Declaration of Matt Jones) ¶ 21; Dkt. 2-11 (Declaration of Talor Gooch) ¶ 21. This "belief" is based on misrepresentations made by LIV and Norman.

69.     At LIV events, including the LIV London Invitational Series, Mr. Al-Rumayyan has been documented golfing and socializing with former TOUR members who were induced to breach their TOUR contracts. On information and belief, Mr. Al-Rumayyan used these and other opportunities to make misrepresentations about the TOUR and their contracts similar to those documented in Norman's communications.

70.     Counter-Defendants' actions make clear that they knew that the TOUR's behavior was neither anticompetitive nor in violation of the Regulations. Indeed, despite asserting that the TOUR's Regulations infringe on the supposed rights of independent contractors and violate the antitrust laws, LIV has signed golfers to multi-year contracts containing obligations that are ***far more restrictive than anything in the Regulations***, including a prohibition on participation in conflicting events that, unlike the TOUR's conflicting event rules, does not allow for any request for release. Yet Counter-Defendants told players that the TOUR's behavior was anticompetitive and in violation of the Regulations in a calculated effort to convince LIV Players it would benefit them to breach their agreements with the TOUR, move forward with LIV, and give LIV—and by

extension, PIF—the opportunity to free ride off the TOUR's investments by encouraging the LIV Players to play in PGA TOUR events despite their clear violation of the Regulations.

71.     In anticipation that some PGA TOUR members would hesitate to openly breach their contracts with the TOUR while at the same time insisting upon all the benefits of PGA TOUR membership, on May 11, 2022, Greg Norman promised that LIV, with PIF's money, would offer financial protections to any player who could nevertheless be induced to violate the Regulations: "All the players I've told: we've got your back. We'll defend, we'll reimburse and we'll represent–simple as that." In effect, Counter-Defendants have agreed not only to induce, but also to fund from PIF's nearly limitless financial backing, any LIV Player's ongoing breach of the TOUR Regulations. LIV also specifically provided what it described as "greater payments and extensive indemnification" and "hundreds of millions of dollars . . . to compensate [LIV Players] for the risks they incur in punishments to facilitate these breaches." Dkt. No. 2-12 ¶¶ 23-24.

72.     These "hundreds of millions of dollars" in indemnification and compensation fees come directly and entirely from PIF, and their payment is contingent on PIF's explicit approval. Mr. Al-Rumayyan in particular has personally directed the negotiation of LIV Players' compensation packages, authorizing LIV executives to proceed with the execution of certain players' contracts, approving additional funding to increase players' compensation and, in other cases, imposing a strict limit on players' compensation based on their perceived value to LIV and, by extension, PIF.

73.     The TOUR remains committed to fostering legitimate competition in professional golf, which Counter-Defendants' inducement scheme is not. Counter-Defendants' orchestrated efforts to induce TOUR members to breach their contracts and prevent them from entering into any future contract with the TOUR are part of a deliberate effort to harm the TOUR.

74.     Counter-Defendants have encouraged LIV Players to breach their contracts by providing them with assurances that because they are "independent contractors," they have the right to blatantly and repeatedly breach their contractual relationship with the TOUR. Indeed, Counter-Defendants' true purpose appears to be to induce LIV Players to breach their agreements with the TOUR and then participate in PGA TOUR events in order to free ride off of the TOUR's

platforms, while simultaneously committing LIV Players to multi-year exclusive, contracts with far more restrictive provisions.

75.    Once Counter-Defendants successfully induced players to breach their contracts with the TOUR, those players, in turn, became integral to further Counter-Defendants' recruitment efforts. Indeed, certain LIV Player contracts appear to require LIV members to "assist [LIV] in seeking to persuade [TOUR members] to enter into multiyear player participation agreements with [LIV]."[8]

76.    Through their tortious interference with the TOUR's agreements and membership structure, Counter-Defendants have damaged the TOUR and forced the TOUR to spend considerable resources defending its structure and reputation, including by forcing the TOUR to defend itself from LIV Players' claims based on false representations.

77.    Counter-Defendants' tortious interference has sought to harm the TOUR by jeopardizing the TOUR's reputation and trying to insert instability and uncertainty into the TOUR's existing and planned future business relationships with PGA TOUR members.

78.    Ultimately, Counter-Defendants have sought not only to induce PGA TOUR members, including LIV Players, to breach their contracts and interfere with the TOUR's business relationships with its members, but also to force the TOUR to change its Regulations to suit LIV and PIF's business purposes at the expense of the TOUR. Those business purposes include free riding on the TOUR's player development investments by skimming off the top and pilfering elite players developed under the TOUR's system, while continuing to demand a right to take advantage of the TOUR's platform for LIV Players. Counter-Defendants seek to allow LIV and its members to exploit the TOUR's reputation, goodwill, and platform to benefit them at the TOUR's expense.

---

[8] Andrew Beaton, *LIV Golf's Player Contracts Include Restrictions to Go With the Big Money*, Wall Street Journal (Aug. 17, 2022), https://www.wsj.com/articles/liv-golf-pga-tour-contract-11660744567

1
2

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACT

3
4

79.     The TOUR reasserts the allegations set forth in the foregoing Paragraphs above as though set forth herein.

5
6
7
8

80.     A contractual relationship existed between the TOUR and each LIV Player—Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, and Peter Uihlein—through the contracts between the TOUR and each LIV Player that is embodied in the Regulations.

9
10
11
12

81.     Counter-Defendants had full knowledge of the contracts between the TOUR and each LIV Player, including the specific terms of LIV Players' contracts and the impact their conduct would have on the business and contractual relationships between the TOUR and each of the LIV Players.

13
14

82.     Counter-Defendants paid significant sums of upfront cash and made false representations to the LIV Players to induce their breach of the agreements with the TOUR.

15
16
17

83.     Counter-Defendants have intentionally, willfully, and unjustifiably interfered with, and have knowingly facilitated a conspiracy to interfere with, the contractual and business relationship between the TOUR and each LIV Player.

18
19
20
21

84.     By requiring LIV Players to recruit TOUR members on Counter-Defendants' behalf, Counter-Defendants have intentionally, willfully, and unjustifiably interfered with, and has knowingly facilitated a conspiracy to interfere with, the current business relationship between the TOUR and other TOUR members.

22
23
24
25
26

85.     Among other things, Counter-Defendants interfered with these relationships by engaging in a campaign to direct and fund LIV Players' legal action against the TOUR. Through this campaign, Counter-Defendants have directed LIV Players to try to force the TOUR to amend its contractual provisions in order to harm the TOUR and to exploit each LIV Player's contract to claim for LIV's own benefit the TOUR's platform and reputation.

27
28

86.     Counter-Defendants' intentional interference was committed through improper means, well beyond the bounds of legitimate competition, to LIV's direct benefit and to the

detriment of the TOUR. As a result, Counter-Defendants are intentionally interfering with the TOUR's business relationships through improper means and in violation of the law.

87.     Counter-Defendants engaged in the acts of interference set forth herein with a conscious desire to prevent the contracts from continuing. Counter-Defendants also knew or should have known their conduct would interfere with the contract between the TOUR and each of the LIV Players, and indeed, Counter-Defendants structured their contracts to ensure each of the LIV Players would necessarily be in breach of his contract with the TOUR.

88.     Counter-Defendants' acts have caused damage to the TOUR including, but not limited to, forcing the TOUR to spend its resources through this lawsuit and otherwise on discipline of the LIV Players, forcing the TOUR to defend its reputation, and in such other manners in an amount to be determined at trial. Counter-Defendants' acts will continue to harm the TOUR in an amount to be determined at trial.

## COUNT II
## INDUCING BREACH OF CONTRACT

89.     The TOUR reasserts the allegations set forth in the foregoing Paragraphs above as though set forth herein.

90.     A contractual relationship existed between the TOUR and each LIV Player—Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, and Peter Uihlein—through the contracts between the TOUR and each LIV Player that is embodied in the Regulations.

91.     Counter-Defendants had full knowledge of the contracts between the TOUR and each LIV Player, including the specific terms of LIV Players' contracts and the impact their conduct would have on the contractual relationships between the TOUR and each of the LIV Players.

92.     Counter-Defendants paid significant sums of upfront cash and made false representations to the LIV Players to induce their breach of the agreements with the TOUR.

93.     Counter-Defendants have also intentionally, willfully, and unjustifiably induced the breach of, and have knowingly facilitated a conspiracy to induce the breach of, the contractual

relationship between the TOUR and each LIV Player, and have furthermore recruited other PGA TOUR members to induce such breaches.

94.     Counter-Defendants induced actual breaches of the TOUR's contracts with each LIV Player. Counter-Defendants induced the LIV Players to breach Article V of the Regulations governing media rights and conflicting event obligations and Article VI of the Regulations governing conduct unbecoming of a professional.

95.     Counter-Defendants' acts have caused damage to the TOUR including, but not limited to, forcing the TOUR to spend its resources through this lawsuit and otherwise on discipline of the LIV Players, forcing the TOUR to defend its reputation, and in such other manners in an amount to be determined at trial. Counter-Defendants' acts will continue to harm the TOUR in an amount to be determined at trial.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs hereby request that the Honorable Court award the following relief:

a.      Awarding the TOUR damages suffered as a result of Counter-Defendants' tortious interference with the TOUR's contracts with LIV Players including any lost profits, damages to reputational and brand harm, costs, punitive damages, reasonable attorneys' fees and pre-suit costs.

b.      Granting such further and additional relief this Court deems just and proper.

\\
\\
\\
\\
\\
\\
\\
\\

1

## JURY DEMAND

2      The TOUR demands a trial by jury on all issues so triable.

3

4   Dated: February 23, 2023                          KEKER, VAN NEST & PETERS LLP

5
                                          By:   /s/ *Elliot R. Peters*
6                                               ELLIOT R. PETERS
                                                DAVID SILBERT
7                                               R. ADAM LAURIDSEN
                                                NICHOLAS S. GOLDBERG
8                                               SOPHIE HOOD

9                                               Attorneys for Defendant
                                                PGA TOUR, INC.
10

11                                              SKADDEN, ARPS, SLATE, MEAGHER
                                                & FLOM LLP
12
                                                ANTHONY J. DREYER
13                                              PATRICK FITZGERALD
                                                KAREN M. LENT
14                                              MATTHEW M. MARTINO

15                                              Attorneys for Defendant
                                                PGA TOUR, INC.
16

17

18

19

20

21

22

23

24

25

26

27

28

PGA TOUR, INC.'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT & AMENDED COUNTERCLAIM
Case No. 5:22-cv-04486-BLF
2093587