**WHITE & CASE** LLP
Carolyn Lamm (*pro hac vice*)
Hansel Pham (*pro hac vice*)
Nicolle Kownacki (*pro hac vice*)
701 Thirteenth Street, NW
Washington, District of Columbia 20005
Telephone:  (202) 626-3600
Facsimile: (202) 639-9355
clamm@whitecase.com
hpham@whitecase.com
nkownacki@whitecase.com

Jack E. Pace III (*pro hac vice*)
Kimberly A. Havlin (*pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
jpace@whitecase.com
kim.havlin@whitecase.com

Heather M. Burke (SBN 284100)
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA  94306-2109
Telephone: (650) 213-0300
Facsimile: (650) 213-8158
hburke@whitecase.com

QUINN EMANUEL URQUHART &
SULLIVAN LLP
JOHN B. QUINN, SBN 90378
johnquinn@quinnemanuel.com
DOMINIC SURPRENANT, SBN 165861
dominicsurprenant@quinnemanuel.com
KEVIN TERUYA, SBN 235916
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

JOHN BASH (*pro hac vice*)
johnbash@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
300 West 6th Street, Suite 2010
Austin, TX 78701-3901
Telephone: (737) 667 6100

ROBERT P. FELDMAN, SBN 69602
bobfeldman@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone:  650.801.5000
Facsimile:   650.801.5100

*Attorneys for Non-Parties The Public Investment Fund of the
Kingdom of Saudi Arabia and His Excellency Yasir O. Al-Rumayyan.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| MATT JONES, BRYSON DECHAMBEAU, PETER UIHLEIN, and LIV GOLF INC., <br><br> Plaintiffs, <br><br> v. <br><br> PGA TOUR, INC., <br><br> Defendant and Counter-Plaintiff, <br><br> v. <br><br> LIV GOLF INC., <br><br> Counter-Defendant. | CASE NO. 5:22-cv-04486-BLF <br><br> **DECLARATION OF MR. FAHAD NASSER ALARFAJ CONCERNING SAUDI LAW UNDER FEDERAL RULE OF CIVIL PROCEDURE 44.1** <br><br> Judge:        Hon. Beth Labson Freeman <br><br> Date Filed:   August 3, 2022 <br><br> Trial Date:   January 8, 2024 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION .................................................................................................2

II.   THE PIF'S GOVERNMENTAL STATUS AND STATUTORY MANDATE ..................3

    A.    The PIF's Leadership and Governance Structure............................................3

    B.    The PIF's Responsibilities to Implement the KSA's Reform Policies............5

III.  APPLICABLE LAW CONCERNING CONFIDENTIALITY OBLIGATIONS
    AND RELEVANT PENALTIES .........................................................................7

    A.    Specific Confidentiality Obligations and Penalties Applicable to
    the PIF and the PIF Governor ............................................................7

    B.    Additional Observations on the KSA's Rules of Confidentiality ............10

IV.   CONCLUSION....................................................................................................13

DECLARATION OF MR. FAHAD NASSER ALARFAJ
CASE NO. 5:22-cv-04486-BLF

I, FAHAD NASSER ALARFAJ, declare as follows:

I.     **INTRODUCTION**

1.     I am a lawyer licensed to practice law in the Kingdom of Saudi Arabia (the "KSA"). I have been asked by Counsel for the Public Investment Fund of the KSA (the "PIF") and its Governor, His Excellency Yasir bin Othman Al-Rumayyan (the "PIF Governor"), to provide this Declaration to address certain issues concerning Saudi law and the KSA's legal system.  In particular, I have been asked to describe the confidentiality obligations applicable to information in the possession of the PIF and the PIF Governor under the KSA's laws, as well as the KSA's interest in the confidentiality of such information.  Counsel has also asked me to address the penalties imposed upon those who violate such confidentiality obligations.

2.     My qualifications are further detailed in my biography, which is attached to this report as **Annex A**, and may be summarized as follows.  I am a citizen of the KSA.  I received a B.A. in Islamic Law (Sharia) from Al Imam Mohammed bin Saud University in 1998, an LL.M. in International Law from The American University Washington College of Law in 2000, and a J.D. from Valparaiso University School of Law (Indiana) in 2002.   In 2005, I was admitted to the Massachusetts Bar.

3.     Since 2014, I have been a Partner at Abdulaziz H. Al Fahad & Partners Lawyers Company ("Al Fahad & Partners"), which is a leading legal services provider in Riyadh.  Al Fahad & Partners represents clients in litigation or arbitration (both domestic and international), and also advises on capital-market matters, joint ventures, and other categories of commercial and corporate transactions.  Our clients include entities within the KSA's Government, including a number of ministries, departments and entities, as well as private companies and international law firms.  I have worked for Al Fahad & Partners (formerly the Law Office of Abdulaziz H. Al Fahad) since 2005.

4.     From 2002 to 2005, I worked as in-house counsel at the Saudi Arabian Oil Company ("Saudi Aramco") advising both Saudi Aramco and the KSA's Ministry of Energy (formerly the Ministry of Petroleum and Mineral Resources).  During this time, I served on the Special Committee of the KSA's Ministry of Petroleum and Mineral Resources, which negotiated Saudi Arabia's accession to the WTO in 2005.  I also attended meetings with the heads of State of various EU

Member States, as well as senior officials of EU Member States and the United States.  In a number of instances during the past 20 years, I have advised the KSA's lawmakers and policymakers in relation to the drafting of laws and implementing regulations, including the KSA's Environmental Law, the KSA's Railways Law, and the KSA's Minerals Investment Laws.

5.      I am fluent in Arabic and English.  Should I be required to provide oral testimony or sit for a deposition, I am capable of providing such testimony in English.  All Saudi legal authorities and other exhibits cited herein are listed in **Annex B**.

6.      This Declaration is organized as follows.  In **Part II**, I discuss the interrelationship between the PIF's activities and the public interest, including the PIF's statutory mandate to implement the KSA's highest-priority economic reforms.  This background is necessary because, as further detailed in **Part III**, many of the KSA's laws define the scope of confidentiality obligations—and the corresponding penalties—specifically in relation to either (1) the nature of the connection between the information in question and the public interest or (2) the governmental functions exercised by the institutions and officials that possess the information.

II.    THE PIF'S GOVERNMENTAL STATUS AND STATUTORY MANDATE

    A.    THE PIF'S LEADERSHIP AND GOVERNANCE STRUCTURE

7.      The PIF falls within the definition of a "Government Entity" in accordance with several different Saudi laws.  *E.g.*, Government Tenders & Procurement Law ("GTPL") (July 16, 2019G) (Ex. 27) Arts. 1, 10.  Moreover, the KSA's interests in the PIF's activities are reflected in the PIF's leadership structure, which comprises the highest-ranking public officials in the KSA's Government, as detailed below.

8.      First, the Chairman of the PIF Board is the sitting "Prime Minister" of the KSA—*i.e.*, His Royal Highness, Prince Mohammed bin Salman, the Crown Prince.  PIF Annual Report 2021 (Ex. 9) at PDF p. 2.  This English-language term, "Prime Minister," is often used to describe the public official who "chairs" or "presides" over the Council of Ministers in the KSA's English translations of official documents, although a more precise translation of the original Arabic term is arguably "President of the Council of Ministers."  *Compare* Basic Law of Governance (Mar. 1, 1992G) (Ex. 6) (using the term "Prime Minister"), *with* Law of the Council of Ministers (Aug. 21,

1993G) (Ex. 4) (using the term "President of the Council of Ministers").  The office of Prime Minister is generally held by the King himself, in accordance with Article 56 of the Basic Law of Governance (Mar. 1, 1992G) (Ex. 6), which is functionally the equivalent of the KSA's national constitution. Since September 2022, however, the Crown Prince has held the office of Prime Minister and thus has presided over the Council of Ministers, "as an exception" set forth under Royal Order No. A/61 (Sept. 27, 2022G) (Ex. 5).

9.      The Council of Ministers is the KSA's highest-ranking executive and legislative body, which is subordinate only to the King.  Basic Law of Governance (Mar. 1, 1992G) (Ex. 6) Art. 44. In addition to presiding over the Council of Ministers as a whole, the Prime Minister also serves as the Chairman of both of the two "sub-cabinets" established within the Council of Ministers.  *See* Royal Order No. A/139 (Dec. 27, 2018G) (Ex. 30); Royal Order No. A/140 (Dec. 27, 2018G) (Ex. 31).  These two "sub-cabinets" include the Council of Political and Security Affairs (the "CPSA") and the Council of Economic and Development Affairs (the "CEDA").  Pursuant to the Public Investment Fund Law, the PIF "shall report" directly to the CEDA.  Public Investment Fund Law (the "PIF Law") (Apr. 17, 2019G) (Ex. 8) Art. 2.

10.      Second, *every single member* of the PIF Board is also among the highest-ranking public officials within the KSA's Government.  *All nine* members of the PIF's Board were appointed to their positions by Royal Order, and *all nine* also hold the official rank of "Minister" within the KSA's legal system. *See* PIF Annual Report 2021 (Ex. 9) at 71-75; PIF Law (Apr. 17, 2019G) (Ex. 8) Arts. 5, 10; Royal Order No. A/493 (Mar. 6, 2020G) (Ex. 32).  At least *seven of the nine* members of the PIF's Board are also simultaneously current members of the CEDA.  *See* PIF Annual Report 2021 (Ex. 9) at 71-75; Royal Order No. A/140 (Dec. 27, 2018G) (Ex. 31).  At least *six of the nine* are also simultaneously current members of the Council of Ministers, and another is a *former member* of the Council of Ministers, who now serves as an Advisor to the KSA's Royal Court.  *See* PIF Annual Report 2021 (Ex. 9) at 71-75; Royal Order A/62 (Sept. 27, 2022G) (Ex. 29).

11.      Accordingly, the PIF's leadership is composed entirely of the KSA's highest-ranking public officials.  Each one is a current member, a former member, or otherwise closely affiliated with the Council of Ministers, the CEDA, or both.

12.     Third, the PIF is subject to several administrative frameworks that specifically apply to "Government Entities."  For example, disputes involving the PIF are adjudicated by the KSA's Board of Grievances, which is the KSA's "administrative" court with exclusive jurisdiction to hear "administrative cases" involving claims against governmental entities within the KSA's legal system. Law of the Board of Grievances (Oct. 1, 2007G) (Ex. 17) Arts. 1, 13; *see, e.g.*, Case No. 7718/1/Q (2012G), Appellate Court Judgment No. 173/4 (2014G).  Furthermore, absent the issuance of any exemption by the Council of Ministers, the PIF would be required to adhere to the provisions of the GTPL.  As an entity with an independent public legal personality, the PIF falls under the GTPL's definition of "Government Entity."  GTPL (July 16, 2019G) (Ex. 27) Arts. 1, 10.  The PIF is also subject to the definition of "Government Entity" set forth in the "Principles Regarding Government Entities' Contracting with Companies Without Legal Presence in Saudi Arabia and Related Parties" (Dec. 27, 2022G) (Ex. 20) Art. 1.

13.     The PIF's leadership and governance structure, therefore, demonstrate that the PIF is classified as a "Government Entity" under several Saudi laws, and that the PIF's activities necessarily implicate the KSA's governmental interest.

B.     THE PIF'S RESPONSIBILITIES TO IMPLEMENT THE KSA'S REFORM POLICIES

14.     The PIF also plays a central role in implementing the KSA's Vision 2030 in accordance with its statutory mandate to serve the "public interest" and "the interest of future generations" by promoting the KSA's "economic development" and "diversifying" the KSA's "sources of income."  PIF Law (Apr. 17, 2019G) (Ex. 8) Art. 3.

15.     It is therefore particularly important to identify the goals that the KSA's Government intends for Vision 2030 to achieve.  Fundamentally, Vision 2030 is a national economic reform program established by the KSA's Government to protect the public interest by transitioning the KSA's economy to a more sustainable future through promotion of "non-oil GDP growth" on an unprecedented scale.  Public Investment Fund Program ("PIF Program") 2021-2025 (Ex. 1) at 8.  As described by the Crown Prince (now the Prime Minister), the program's principal goal has always been to end the short-sighted "oil addiction" that characterized the KSA's economy for generations. *Saudi Prince Unveils Sweeping Plans to End 'Addiction' to Oil*, Reuters (Apr. 25, 2016G) (Ex. 21).

16.     It is well known that the KSA's Government has tasked the PIF with a crucial leadership role in the implementation of Vision 2030.  *See, e.g.*, Full Text of Saudi Arabia's Vision 2030 ("Vision 2030 Full Text"), *Al Arabiya News*, Saudi Gazette (Apr. 26, 2016G) (Ex. 3) § 3.1.4 (explaining that Vision 2030 will "further improve the efficiency and effectiveness of the Public Investment Fund, so that its proceeds can become a new and sustainable [non-oil] revenue stream");  PIF Program 2021-2025 (Ex. 1) at 4 (quoting the Crown Prince: "PIF is evolving into a primary driver of Saudi economic growth.  We have doubled its scope and we will continue with steady steps towards realizing its Vision 2030 objectives.").

17.     This understanding has been repeatedly confirmed by the World Bank, IMF, and United Nations.  *E.g.*, World Bank, Saudi Arabia Economic Outlook (Apr. 2022G) (Ex. 26) ("The government's long-term strategy to diversify the economy and reduce dependence on oil is well-articulated in Vision 2030.  The Public Investment Fund (PIF) is envisioned to play a central developmental role in this transformation plan by investing SAR 150 billion (US$ 40 billion) annually into the domestic economy."); IMF, *Saudi Arabia to Grow at Fastest Pace in a Decade* (Aug. 17, 2022G) (Ex. 24) at PDF p. 2 (noting the PIF's role in implementing Vision 2030's "sweeping" economic reforms); *see also* World Bank, The World Bank in Saudi Arabia – Overview (Apr. 12, 2022G) (Ex. 23) at PDF p. 1 (observing the KSA's "major economic and social transformation [as] outlined in its Vision 2030," including the "diversification away from oil"); United Nations, *UNIDO and Saudi Arabia to Enhance Cooperation to Support the Kingdom's Vision 2030* (Jan. 9, 2023G) (Ex. 25) at PDF p. 2 (noting that the KSA has strengthened cooperation with the United Nations "to contribute to Saudi Arabia's Vision 2030 aiming to diversify the Kingdom's economy").

18.     One of the principal goals of Vision 2030 is stated explicitly as working to "give Saudi citizens greater economic security."  Vision 2030 Full Text (Ex. 3) § 3.1.4.  Specifically, the PIF's role in this unprecedented reform is to act as an "economic catalyst" at "the heart of Saudi Arabia's rapid transformation."  PIF Program 2021-2025 (Ex. 1) at 10.  In 2015, the Council of Ministers therefore withdrew the PIF from the portfolio of a single ministry (the Ministry of Finance) and elevated the PIF to a central position directly under the relevant sub-cabinet (the CEDA).  Resolution No. 270 (Mar. 23, 2015G) (Ex. 22).  As a result, the PIF's leadership was now only a single step

removed from the Council of Ministers itself (and, indeed, thereafter had substantial overlap with the membership of the Council of Ministers, as explained above).  Now "[w]ith its mandate broadened," the PIF was "tasked with a vital and specific strategic role within Vision 2030 to lead the charge in building a national economic transformation for positive, sustainable change in Saudi Arabia."  PIF Program 2021-2025 (Ex. 1) at 11.

19.     In this respect, the PIF's mandate was to stimulate "new pillars of [the] economy" in coordination with the KSA's parallel implementation of pertinent regulatory measures.  Vision 2030 Full Text (Ex. 3) § 2.2.2.   The PIF was thus directed to build "deep connections with top-tier international investors and partners" and expand "its investments to North America, Asia, Latin America, and Africa," while simultaneously "attracting the best talents" to the KSA's domestic market.  PIF Program 2021-2025 (Ex. 1) at 30, 70, 101.  Indeed, the KSA's policy documentation makes numerous references to such "strategic partnerships."  *E.g.*, *id.* at 19-33.  The KSA therefore has frequently expressed its direct interest in the PIF's activities based on the interrelationships between Vision 2030, the PIF's activities, and the KSA's economic reforms.  The consequences for the PIF's confidentiality obligations—and the corresponding penalties—are discussed below.

III.   APPLICABLE LAW CONCERNING CONFIDENTIALITY OBLIGATIONS AND RELEVANT PENALTIES

A.   SPECIFIC CONFIDENTIALITY OBLIGATIONS AND PENALTIES APPLICABLE TO THE PIF AND THE PIF GOVERNOR

20.     In this section, I will address the individual legal enactments that establish confidentiality obligations on the PIF and the PIF Governor, as well as upon other categories of PIF executives and employees ("PIF Officials").   Generally speaking, many of the KSA's legal enactments define the scope of confidentiality obligations—and the corresponding penalties—in relation to either (1) the nature of the connection between the information in question and the public interest or (2) the governmental functions exercised by the institutions and officials that possess the information.   This same analysis applies to the PIF in accordance with the KSA's relevant legal enactments, as detailed below.

21.     First, as explained in **Part II-A**, nearly every member of the PIF Board is also either a member of or otherwise closely affiliated with the KSA's Council of Ministers.  The PIF Board's members are thus generally subject to a confidentiality obligation under the Law of the Council of Ministers, Article 16 of which provides that "[d]eliberations of the Council shall be confidential." Law of the Council of Ministers (Aug. 21, 1993G) (Ex. 4) Art. 16.  These PIF Officials therefore cannot disclose information that may reflect the contents of those sensitive deliberations, including information that may overlap with deliberations of the Council of Ministers concerning Vision 2030.  Any unauthorized disclosures would constitute unlawful "violations" of the Law of the Council of Ministers.  Law of the Council of Ministers (Aug. 21, 1993G) (Ex. 4) Art. 17.  Such violations are punishable by "imprisonment of 3 to 10 years" under the Law of Trials of Ministers in the event that such violation "result[s] in the loss of the financial rights of the State."  Law of Trials of Ministers (Mar. 9, 1961G) (Ex. 7) Art. 5.

22.     Second, all PIF Officials—irrespective of rank—are subject to a confidentiality obligation under the PIF's organic law.  This Law provides that the PIF's "[b]oard members" and "employees shall not disclose any confidential information . . . they become privy to in the course of carrying out their duties . . . ."  PIF Law (Apr. 17, 2019G) (Ex. 8) Art. 17.

23.     Third, PIF Officials are likewise subject to a confidentiality obligation under the Code of Conduct, Rules, and Ethics of Public Employment (Sept. 26, 2016G) (Ex. 10).  Specifically, the Code of Conduct prohibits any "Public Official" from "[d]isclosing confidential information and documents that are important, confidential, or private and have been obtained or viewed by the Public Official due to his position unless expressly permitted under the provisions of the laws."  *Id.*, Art. 13. The Code of Conduct further provides that any "[v]iolation[s]" of these obligations "will make the Public Official subject to disciplinary and criminal procedures and penalties in accordance with the applicable laws."  *Id.*, Art. 6.

24.     Fourth, PIF Officials are likewise subject to the general obligations set forth under the Law on the Civil Service, which provides that all "employees" of any public institution, including those holding the rank of Minister, are expressly "prohibited" from "disclosing secrets he is privy to due to his employment . . . ."  Civil Service Law (June 26, 1977G) (Ex. 11) Art. 12.

25.     Fifth, the regulations concerning the National Data Management Office define "protected information" as any information that "if disclosed, may harm the [KSA's] national security, policies, or rights."   Freedom of Information Interim Regulations of the National Data Governance Office (Ex. 12) §§ 7.1(1), 7.1(5).  These regulations further provide that such "protected information" may not be obtained through requests submitted under the KSA's Freedom of Information Policy.  *Id.* § 7.1.  The regulations concerning the National Center for Documents and Archives provide essentially similar definitions and procedures for the category of "very confidential information."  *See* High Order No. 595/M (Aug. 10, 2000G) (Ex. 13) Art. 4(B) ("Those are documents and archives the disclosure of which harms public . . . interest.  Those documents include documents related to administrative secrets . . . .").

26.     Sixth, all of the above rules and regulations may be enforced through the KSA's Penal Law on Dissemination and Disclosure of Classified Information and Documents (the "Penal Law").  Specifically, the Penal Law incorporates the definitions "issued by the National Center for Documents and Archives."  Penal Law (Apr. 12, 2011G) (Ex. 2) Art. 1(c).  The Penal Law also provides general definitions for the categories of "classified documents" and "classified information" as contemplating all categories of media and all categories of information possessed by public employees, the disclosure of which would "prejudice" the KSA's "interests, policies, or rights."  *Id.*, Arts. 1(a), 1(b).  The Penal Law further provides that "classified information or documents" shall not be "disseminate[d] or disclose[d]," "taken outside the premises of government entities," or "circulated by any means . . . outside such entities."  *Id.*, Arts. 2, 4.

27.     Finally, the Penal Law imposes specific penalties—including the payment of fines and terms of imprisonment—for "[d]isseminating or disclosing classified information or documents" and "[f]ailing to maintain confidentiality of classified information or documents," as well as for "participating" or "knowingly . . . assist[ing]" in the commission of such activities.  *Id.*, Arts. 5, 6.  Specifically, all such activities may be "punished by imprisonment for a period not exceeding 20 years or a fine not exceeding one million riyals, or by both penalties."  *Id.*

B.    Additional Observations on the KSA's Rules of Confidentiality

28.    Finally, I will make four general observations about the KSA's legal system, as necessary to properly interpret the KSA's legal enactments and evaluate the KSA's governmental interests.  First, the KSA's legislative and regulatory approach to confidentiality has been consistent for decades.  The confidentiality obligations surveyed above in **Part III-A** were enacted in 1977G, 1993G, 2000G, 2016G, and 2019G.  The applicable penalties were established in 1961G and 2011G. The KSA's legal enactments concerning this subject-matter have therefore significantly predated the current litigation by many years.  Collectively, these legal enactments express the KSA's substantial governmental interest in preserving the confidentiality of information relating to the activities of the PIF and other public institutions in furtherance of the KSA's "interests, policies, or rights."  Penal Law (Apr. 12, 2011G) (Ex. 2) Arts. 1(a), 1(b).

29.    Second, each of the confidentiality obligations described above reflect essentially the same policy concerns, although in different contexts.  Confidentiality is necessary to ensure frank advice and deliberation in the decisional processes of any public institution working to serve the public interest.  Confidentiality is also necessary to protect the reputational interests and strategic interests of the public institutions, as well as their officials, advisors, employees, and external partners. These fundamental values are deeply ingrained in the KSA legal system and are reflected in multiple provisions of the KSA's specific legislation on confidentiality.  All of these interests are directly relevant to the PIF, in light of the PIF's responsibility for sensitive and crucial issues of economic policy.  Unauthorized disclosure would impair and undermine the quality of the PIF's deliberative and decisional process.  In light of the PIF's central role in driving Vision 2030 and catalyzing the reform of the KSA's economy, the PIF's confidentiality must be maintained and improper disclosures are necessarily unacceptable.

30.    Third, it should be noted that the confidentiality obligations described above do not contain any exceptions for instances where the possessor of confidential information is (hypothetically) ordered to give testimony or served with legal process.  Indeed, it is worth emphasizing both (1) that these legal enactments lack any <u>explicit</u> exceptions concerning testimony and legal process, and (2) that attempting to read any <u>implicit</u> exceptions into these texts is precluded

as a matter of statutory construction.  *E.g.*, M. Alzuhaili, *The Maxims of Islamic Jurisprudence and their Applications in the Four Schools of Jurisprudence*, Vol. 1 (2006) (Ex. 14) 499-500 (explaining that "there can be no *ijtihad*," *i.e.*, drawing of inferences indirectly, "in the presence of clear text").

31.     Fundamentally, the absence of any such (explicit or implicit) exceptions to confidentiality for testimony or legal process results from the essential values at the core of the KSA's legal system, which prioritizes a public institution's reputational interests, privacy interests, and strategic interests in serving the public good (including through deliberative and decisional processes).  These same values are concretely illustrated in the KSA's Law of Evidence, which also favors institutional confidentiality over compulsory disclosure.  Law of Evidence (Dec. 30, 2021G) (Ex. 15).  Specifically, the Law of Evidence prohibits any testimony or disclosure of confidential information by current or former public officials and employees assigned to public service "unless the relevant agency permits [the information's] use in testimony upon the request of the court or the request of the litigant."  *Id.*, Art. 71(3) (emphasis added).  The KSA's Law of Evidence thus empowers the public institution—and not the public official, the litigants, or the court itself—to decide whether information will be shared.  The KSA's Law of Evidence also does not impose any penalty where a public official refuses to answer questions posed during legal proceedings.  Accordingly, the type of compulsory disclosures and taking of testimony ("depositions") at issue in this case would be prohibited within the KSA's legal system.

32.     Fourth, although the numerous laws and regulations described above contain broad confidentiality provisions and considerable penalties, there are very few published accounts describing the practice of enforcement.  It is critical, however, to be cautious in drawing any inferences from the scarcity of such public accounts in the KSA legal system.  In the KSA's broader historical context, the scarcity of public records does **not** mean that the relevant authorities are failing to enforce specific legal provisions—particularly when subject-matter pertaining to confidentiality is at issue, given that such issues are *per se* sensitive.

33.     Among other factors contributing to the absence of judicial records and other official records, the KSA has never recognized any doctrine of legal precedent, such that the availability of judicial practice has traditionally been assigned less value than in other legal systems.  Accordingly,

the KSA's courts have traditionally closed official proceedings and sealed records in accordance with their discretion under provisions such as Article 154 of the KSA's Criminal Procedure Code, or other similar provisions. *See, e.g.*, Law of Criminal Procedure (Nov. 25, 2013G) (Ex. 16) Art. 154 (authorizing closure of records for "observance of public morality" or maintenance of public order). This situation began to change only in 2002, when the Council of Ministers directed the Ministry of Justice and Board of Grievances to pursue transparency reforms. *See, e.g.*, Council of Ministers Resolution No. 162 (Aug. 25, 2002G) (Ex. 28) (instructing relevant institutions to "publish selected final judgments issued from the courts, after such judgments are categorized and anonymized").

34.    As a result, approximately 100 volumes of the KSA's judicial practice have now been published in redacted or summary form during the past twenty years. As a practicing lawyer and an expert on the Saudi legal system, I have become very familiar with this relatively limited corpus of publicly available court records and published accounts of judicial practice. I can thus confirm that this corpus contains virtually no published "cases" describing enforcement of confidentiality obligations. In a society that values confidentiality and reputational interests as much as the KSA, however, it would be incorrect to conclude that the absence of published accounts means that confidentiality obligations are not being enforced.

35.    To the contrary, I am aware of a series of official "Circulars," some of which are publicly available, in which the KSA's Ministry of Justice specifically describes the practice of imposing penalties upon public officials who have violated the confidentiality obligations described above in **Part III-A**.

36.    For example, in 2016G, the KSA's Ministry of Justice issued Circular No. 13/T/6548, which describes the KSA's practices of (1) "preserving confidential documents and letters," (2) "preventing the leaking of such documents," and (3) ensuring that the "ramifications" of unauthorized disclosure include "legal penalties" under the Penal Law. Circular No. 13/T/6548 (Nov. 16, 2016G) (Ex. 18). Specifically, this Circular summarizes the practice of certain public officials, including "employees in the Ministry, affiliated entities, courts, and public notary offices" of engaging in unauthorized disclosures ("leaking"). *Id.* This Circular then emphasizes that such disclosure qualifies as a "violation of the rules and regulations," which necessarily "exposes the actor to the penalties

provided for in the Penal Law on Dissemination and Disclosure of Classified Information and Documents." *Id.* This Circular further notes that such penalties include "imprisonment for a duration not more than 20 years and/or a fine not exceeding SAR1 million," which is roughly US$ 265,000 using either today's exchange rate or the 2016G exchange rate. *See id.*

37.     Similarly, in 2018G, the KSA's Ministry of Justice issued Circular No. 13/T/7531, which requires "every government agency" to "educate its employees and affiliates on the importance of preserving the confidentiality of information and documents." Circular No. 13/T/7531 (Oct. 3, 2018G) (Ex. 19). This Circular states further that "the Penal Law . . . must be applied," including to ensure compliance with "the Code of Employment, Conduct, and Ethics of Public Office which prohibits the disclosure of confidential information, documents and archives." *Id.* (quoting a non-public document, High Order No. 2811 (Sept. 25, 2018G)). This Circular then refers to another non-public document designated as "Report No. 49," apparently issued by the CPSA on September 13, 2018G. *Id.* Together with the CEDA, as detailed above, the CPSA is one of the two "sub-cabinets" of the Council of Ministers, and is also chaired by the Prime Minister (the Crown Prince). The CPSA's Report No. 49 evidently addressed "leaks of some official documents" and the CPSA's decision to impose "strict and aggravated penalties, according to the law" upon "whoever violates those rules and regulations." *Id.* (quoting High Order No. 2811 (Sept. 25, 2018G)).

38.     It is therefore evident—as confirmed by these two public Circulars—that the demonstrated practice of the KSA's Government is to enforce public officials' confidentiality obligations in accordance with the applicable penalties under the Penal Law.

IV.   <u>CONCLUSION</u>

39.     As the above analysis reflects, the KSA's Government—like any government—expresses its views concerning the public "interest" and, indeed, establishes protections for such interests by enacting laws, decrees, and regulations. With respect to confidentiality, the KSA has enacted numerous laws that contain confidentiality obligations and corresponding penalties. Moreover, even though enforcement practice is frequently difficult to identify within the KSA's legal system, at least two publicly available Circulars issued by the KSA's Ministry of Justice in 2016G

and 2018G demonstrate that violations of confidentiality obligations are subject to enforceable penalties.

40.     As regards the present case, the PIF's activities are central to the KSA's most significant national reform program, which is intended to safeguard a sustainable future ("economic security") for the KSA and its people by establishing strategic partnerships to stimulate "non-oil revenue."  Vision 2030 Full Text (Ex. 3) § 3.1.4.  The significance of this public interest is further confirmed by the PIF's leadership structure, which shows that the KSA has delegated implementation of Vision 2030 to the KSA's highest-ranking public officials.  I respectfully note, therefore, that the "Narrowed Document Requests" described in this Court's Order of February 9, 2023 (ECF 265) at least *prima facie* seek information covered by the confidentiality obligations described above in **Part III-A**.

41.     I am not a fact witness and, accordingly, I will not express any views concerning the factual meaning of these "Narrowed Document Requests" in the context of the present case. Nevertheless, these requests appear to seek the PIF's internal documents and information, including materials relating to the "strategic partnerships" established by the PIF in furtherance of Vision 2030. For example, the subpoenas explicitly request the PIF's "documents and communications" regarding "business or strategic plans," as well as "financial projections, business, sales and marketing, and media plans."  *See* Narrowed Document Requests to PIF §§ 8-9.  The disclosure of such internal information would evidently be prohibited and subject to "strict and aggravated penalties, according to the law" applicable in the KSA.  *See* Circular No. 13/T/7531 (Oct. 3, 2018G) (Ex. 19) (quoting High Order No. 2811 (Sept. 25, 2018G)).

42.     As an expert on Saudi law and the KSA's legal system, therefore, I conclude that compliance with the "Narrowed Document Requests" would necessarily violate Saudi law and entail penalties.

*     *     *

1 I declare under penalty of perjury under the laws of the United States of America that the foregoing

2 is true and correct and that this Declaration was executed on the 28th day of February, 2023 at

3 New York, New York.

4

5

6

7 _____

8         Fahad Nasser Alarfaj

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MR. FAHAD NASSER ALARFAJ
CASE NO. 5:22-cv-04486-BLF-SVK

# ANNEX A

# FAHAD N. ALARFAJ

## EDUCATION

**DOCTOR OF JURISPRUDENCE**                                                                              **2002**
   **Valparaiso University Law School**                                    Valparaiso, Indiana

**MASTERS OF INTERNATIONAL LAW,** *LLM*                                               **2000**
   **American University Washington College of Law**            Washington DC

**BACHELOR OF Islamic Law**, *Shari'a*                                                     **1998**
   **Al Imam Mohammed Bin Saud Islamic University**       Riyadh, Saudi Arabia

## SELECTED EXPERIENCE

**ABDULAZIZ H. AL FAHAD & PARTNERS**
RIYADH, Saudi Arabia                                                                              2005 - Present
   *Partner:* Dispute Resolution (litigation and arbitration), Corporate and M&A, Banking and Finance, and Capital Markets (Debt and Equity). Actively involved in advising Saudi and foreign clients on a wide range of Saudi Arabian corporate, Sharia, and commercial law issues; litigating and arbitrating cases in Saudi Arabia; acting as expert witness before tribunals in the United States and the United Kingdom; engaged in general corporate and commercial transactions.

**SAUDI ARABIAN OIL COMPANY**
Riyadh/Dhahran, Saudi Arabia                                                                2002 - 2005
   *Legal Counsel:* Acted as legal advisor for both the Ministry of Petroleum and Mineral Resources and Saudi Aramco, represented the Ministry in legal disputes before the Board of Grievances, prepared and negotiated several contracts, participated in drafting new laws and regulations in Saudi Arabia including environmental regulations and real estate regulations, represented the Ministry in meetings with various government authorities and private entities and conducted research relating to government and private matters. In addition to the forgoing, preparing documents and participating in discussions and negotiations with representatives of the European Trade Commission and the office of the United States Trade Representative in connection with Saudi Arabia's accession to the WTO.

**DONOVAN HATEM LLP**
Boston, Massachusetts                                                                              Fall 2002
   *Law Clerk:* Assisted on drafting documents relating to legal disputes, conducted several researches dealing with a variety of legal issues, including intellectual property and preparing documents and agreements governed by Massachusetts law.

## SELECTED POSITIONS

   *Board Member* – Saudi Company for Aircrafts Refurbishing & Maintenance         2016 - Present

## BAR ADMISSIONS

**SAUDI ARABIA**                **MASSACHUSETTS**

## LITIGATION AND ARBITRATION

### Litigation

- Over the last two decades, I have acted on several major and minor cases before all types of courts, at every level of the judicial system, including appeals to the Supreme Judicial Council (now the Supreme Court).

- I have appeared as an advocate before the general courts, the Board of Grievances' administrative and commercial panels, as well as other dispute resolution bodies.

- I have represented clients on many occasions before most of the Saudi Arabian administrative committees and tribunals such as those formed for the resolution of banking disputes, customs disputes, insurance disputes and for resolving claims in respect of negotiable instruments.

- I have extensive experience in handling matters before the Committee for Resolving Securities Disputes.

- Between 2002-2005 I have represented both the Ministry of Petroleum and Mineral Resources in legal disputes before the Board of Grievances and Saudi Aramco in a legal dispute before the General Court.

- For the past fifteen years, I have represented companies in relation to contracting and real estate development disputes, represented leading publications and media outlets such as MBC group before the publishing disputes tribunal, represented various individuals and corporate entities before the Committee for Resolving Securities Disputes and represented several companies before the Board of Grievances and the Commercial Courts in connection with corporate disputes.

- I have been part of the litigation team at Abdulaziz H. Al Fahad & Partners handling claims against the Saudi Government, high profile government officials and businessmen in relation to claims raised outside Saudi Arabia, arbitration in London between Saudi and US companies in relation to contractual disputes,  high-profile shareholder battles involving major mercantile houses in the Kingdom and other disputes, all of which have been supervised by our Managing Partner, Dr. Abdulaziz Al Fahad.

### Arbitration

- I have been involved in domestic and international arbitration proceedings some of which were governed by Saudi law and some of which were conducted under other international arbitration rules.

- I have acted both in disputes before Saudi panels and also for Saudi companies in disputes before overseas panels.

- While claims before Saudi courts and tribunals must be conducted in Arabic, I am also able to provide reports and legal opinions in English.

### Expert Witness

- I have been retained as an expert witness in relation to disputes involving the Saudi Government before the UNCTAD and private Saudi entities before arbitration panels.

- I have also prepared expert opinions and affidavits submitted to US courts.

- Furthermore, I have been retained as an expert witness in relation to disputes involving Saudi officials.

- Moreover, I am assisting Dr. Al Fahad in relation to his role as expert witness in connection with disputes involving both private and public entities.

# ANNEX B

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

*LIV Golf Inc. v. PGA Tour, Inc.*
No. 5:22-cv-04486-BLF-SVK

―――――――――――――――

**DECLARATION OF MR. FAHAD NASSER ALARFAJ
CONCERNING SAUDI LAW UNDER
FEDERAL RULE OF CIVIL PROCEDURE 44.1**

―――――――――――――――

EXHIBITS

February 28, 2023

| No. | Exhibit | Language Designation |
|---|---|---|
| 1. | Public Investment Fund Program 2021-2025 | ENG |
| 2. | Penal Law on Dissemination and Disclosure of Classified Information and Documents, promulgated by Royal Decree No. M/35 dated 08/05/1432H (corresponding to Apr. 12, 2011G) | ENG-AR |
| 3. | Full Text of Saudi Arabia's Vision 2030, *Al Arabiya News*, Saudi Gazette, Riyadh, (Apr. 26, 2016G) | ENG |
| 4. | Law of the Council of Ministers, promulgated by Royal Order No. A/13 dated 03/031414H (corresponding to Aug. 21, 1993G) | ENG-AR |
| 5. | Royal Order No. A/61 dated 01/03/1444H (corresponding to Sept. 27, 2022G) (Excerpts) | ENG-AR |
| 6. | Basic Law of Governance, promulgated by Royal Order No. A/90 dated 27/08/1412H (corresponding to Mar. 1, 1992G) | ENG-AR |
| 7. | Law of Trials of Ministers, promulgated by Royal Decree No. 88 dated 22/09/1380H (corresponding to Mar. 9, 1961G) (Excerpts) | ENG-AR |
| 8. | Public Investment Fund Law, promulgated by Royal Decree No. M/92 dated 12/08/1440H (corresponding to Apr. 17, 2019G) | ENG-AR |
| 9. | PIF Annual Report 2021 | ENG |

| No. | Exhibit | Language Designation |
|---|---|---|
| 10. | Code of Conduct Rules and the Ethics of Public Employment, promulgated by Council of Ministers Resolution No. 555 dated 25/12/1437H (corresponding to Sept. 26, 2016G) (Excerpts) | ENG-AR |
| 11. | Civil Service Law, promulgated by Royal Decree No. M/49 dated 10/07/1397H (corresponding to June 26, 1977G) (Excerpts) | ENG-AR |
| 12. | Freedom of Information Interim Regulations of the National Data Governance Office | ENG-AR |
| 13. | High Order No. 595/M dated 10/05/1421H (corresponding to Aug. 10, 2000G) (Excerpts) | ENG-AR |
| 14. | M. Alzuhaili, The Maxims of Islamic Jurisprudence and their Applications in the Four Schools of Jurisprudence Vol. 1 (2006) (Excerpts) | ENG-AR |
| 15. | Law of Evidence, promulgated by Royal Decree No. M/43 dated 26/05/1443H (corresponding to Dec. 30, 2021G) | ENG-AR |
| 16. | Law of Criminal Procedure, promulgated by Royal Decree No. M/2 dated 22/01/1435H (corresponding to Nov. 25, 2013G) (Excerpts) | ENG-AR |
| 17. | Law of the Board of Grievances, promulgated by Royal Decree No. M/78 dated 19/09/1428H (corresponding to Oct. 1, 2007G) | ENG-AR |
| 18. | Kingdom of Saudi Arabia, Ministry of Justice, Circular No. 13/T/6548 dated 16/02/1438H (corresponding to Nov. 16, 2016G) | ENG-AR |
| 19. | Kingdom of Saudi Arabia, Ministry of Justice, Circular No. 13/T/7531 dated 23/01/1440H (corresponding to Oct. 3, 2018G) | ENG-AR |
| 20. | Principles Regarding Government Entities' Contracting with Companies Lacking Legal Presence in Saudi Arabia and Related Parties, promulgated by Council of Ministers Resolution No. 377 dated 03/06/1444H (corresponding to Dec. 27, 2022G) (Excerpts) | ENG-AR |
| 21. | Samia Nakhoul *et al.*, *Saudi Prince Unveils Sweeping Plans to End 'Addiction' to Oil*, Reuters (Apr. 25, 2016G) | ENG |
| 22. | Council of Ministers Resolution No. 270 dated 3/6/1436H (corresponding to Mar. 23, 2015G) (Excerpts) | ENG-AR |
| 23. | World Bank, The World Bank in Saudi Arabia – Overview (Apr. 12, 2022G) | ENG |
| 24. | IMF, *Saudi Arabia to Grow at Fastest Pace in a Decade* (Aug. 17, 2022G) | ENG |
| 25. | United Nations, *UNIDO and Saudi Arabia to Enhance Cooperation to Support the Kingdom's Vision 2030* (Jan. 9, 2023G) | ENG |
| 26. | World Bank, Saudi Arabia Economic Outlook (Apr. 2022G) | ENG |
| 27. | Government Tenders and Procurement Law, promulgated by Royal Decree No. M/128 dated 13/11/1440H (corresponding to July 16, 2019G) (Excerpts) | ENG-AR |

| No. | Exhibit | Language Designation |
|-----|---------|----------------------|
| 28. | Council of Ministers Resolution No. 162 dated 17/06/1423H (corresponding to Aug. 25, 2022G) (Excerpts) | ENG-AR |
| 29. | Royal Order No. A/62 dated 01/03/1444H (Excerpts) (corresponding to Nov. 25, 2022G) | ENG-AR |
| 30. | Royal Order No. A/139 dated 20/04/1440H (Excerpts) (corresponding to Dec. 27, 2018G) | ENG-AR |
| 31. | Royal Order No. A/140 dated 20/04/1440H (Excerpts) (corresponding to Dec. 27, 2018G) | ENG-AR |
| 32. | Royal Order No. A/493 dated 11/07/1441H (Excerpts) (corresponding to Mar. 6, 2020G) | ENG-AR |