QUINN EMANUEL URQUHART &
 SULLIVAN LLP
JOHN B. QUINN, SBN 90378
 johnquinn@quinnemanuel.com
DOMINIC SURPRENANT, SBN 165861
 dominicsurprenant@quinnemmanuel.com
KEVIN TERUYA, SBN 235916
 kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
 bobfeldman@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone:  650.801.5000
Facsimile:   650.801.5100

RACHEL S. BRASS, SBN 219301
 rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

SCOTT K. HVIDT, *pro hace vice*
 shvidt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Telephone: 214.698.3100

*Attorneys for Plaintiffs LIV Golf, Inc.,*
 *Matt Jones, Bryson DeChambeau, and Peter*
 *Uihlein*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| MATT JONES, BRYSON DECHAMBEAU, PETER UIHLEIN, and LIV GOLF INC., <br><br> Plaintiffs, <br><br> v. <br><br> PGA TOUR, INC., <br><br> Defendant and Counter-Plaintiff, <br><br> v. <br><br> LIV GOLF INC., <br><br> Counter-Defendant. | CASE NO. 5:22-cv-04486-BLF <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION TO BIFURCATE** <br><br> Judge:          Hon. Beth Labson Freeman <br><br> Date Filed:   August 3, 2022 <br><br> Trial Date:    January 8, 2024 |

1   **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2        PLEASE TAKE NOTICE THAT on a date and time to be determined, or as soon as the

3   matter may be heard, before the Honorable Beth Labson Freeman of the United States District Court,

4   Northern District of California at Courtroom 3 – 5th Floor, 280 South 1st Street, San Jose,

5   California, Plaintiff and Counterclaim-Defendant LIV Golf, Inc. ("LIV") and Plaintiffs Matt Jones,

6   Bryson Dechambeau, and Peter Uihlein (together, "Player Plaintiffs") will and do move this Court

7   to bifurcate the PGA Tour, Inc.'s counterclaims (tortious interference with contract and inducing

8   breach of contract) from Plaintiffs' antitrust claims (should the Court grant this motion, Plaintiffs

9   will stipulate that its two inference claims, Counts VII and VIII, can also be bifurcated).  The motion

10  is based upon the notice of motion, supporting memorandum of points and authorities, and such

11  evidence as may be requested or permitted by the Court.

12

13  DATED:  March 16, 2023                Respectfully submitted,

14                                        By:   /s/ *Dominic Surprenant*

15                                              JOHN B. QUINN, SBN 90378
                                                  johnquinn@quinnemanuel.com

16                                              DOMINIC SURPRENANT, SBN 165861
                                                  dominicsurprenant@quinnemmanuel.com

17                                              KEVIN TERUYA, SBN 235916
                                                  kevinteruya@quinnemanuel.com

18                                              QUINN EMANUEL URQUHART &
                                                SULLIVAN LLP

19                                              865 South Figueroa Street, 10th Floor

20                                              Los Angeles, California 90017
                                                Telephone: 213.443.3000

21

22                                              ROBERT P. FELDMAN, SBN 69602
                                                  bobfeldman@quinnemanuel.com

23                                              QUINN EMANUEL URQUHART &
                                                SULLIVAN LLP

24                                              555 Twin Dolphin Dr., 5th Floor

25                                              Redwood Shores, California 94065
                                                Telephone:  650.801.5000

26                                              Facsimile:    650.801.5100

27

28

LIV GOLF, INC.'S NOTICE OF MOTION AND MOTION TO BIFURCATE,
CASE NO. 5:22-CV-04486-BLF

RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
LAUREN D. DANSEY, SBN 311886
  ldansey@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone:    415.393.8200
Facsimile:    415.393.8306

SCOTT K. HVIDT, *pro hac vice*
  shvidt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Telephone: 214.698.3100

JOSHUA LIPTON, *pro hac vice*
  jlipton@gibsondunn.com
KRISTEN C. LIMARZI, *pro hac vice*
  klimarzi@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone:    202.955.8500

*Attorneys for Plaintiffs LIV Golf, Inc.,
Matt Jones, Bryson DeChambeau, and Peter
Uihlein*

1

## PRELIMINARY STATEMENT

2       Plaintiffs respectfully request that the Court exercise its discretion to bifurcate the

3  counterclaims pleaded by PGA Tour, Inc. ("the Tour") from Plaintiffs' antitrust claims.  If the Court

4  does so, Plaintiffs will stipulate its interference claims against the Tour may be bifurcated as well.

5       Plaintiffs seek relief from the Tour's efforts to maintain its monopoly in the markets for

6  promotion of men's elite professional golf and for the services of such golfers.  Those efforts are

7  causing ongoing injuries on Plaintiffs—injuries that have grown more severe in recent months as

8  the Tour has escalated its anticompetitive conduct in an attempt to drive Plaintiff LIV Golf Inc.

9  ("LIV") from the market before Plaintiffs' claims can be tried.

10       This Court has set a trial date for January 2024.  The Tour now seeks to extend the trial date

11  for *years* based on a peripheral issue that has at most marginal relevance to Plaintiffs' antitrust

12  claims.  The Tour seeks discovery from the Public Investment Fund of the Kingdom of Saudi Arabia

13  ("PIF")—an instrumentality of the Saudi government—and His Excellency Yasir Al-Rumayyan

14  ("HE"), the Governor of PIF, and has recently filed amended counterclaims naming those parties as

15  Defendants (though it has already received nearly 13,000 PIF and HE documents from LIV's and

16  P54's productions).  The Tour's litigation strategy raises serious questions of sovereign immunity,

17  and it is likely that PIF and HE would immediately appeal any adverse ruling from this Court to the

18  Ninth Circuit—leading to years of appellate litigation.  In the interim, the Tour will be able to

19  continue to exploit its leverage against elite golfers and others in the "ecosystem" it controls to try

20  to drive LIV from the market.  Should it succeed in doing so before trial, Plaintiffs will be deprived

21  of any opportunity to prove their claims in court—frustrating the basic purposes of the antitrust laws

22  and leaving golfers and their fans worse off.

23       This Court can bifurcate the Plaintiffs' antitrust claims from the Tour's counterclaims to

24  avoid that inequitable result.  PIF and HE contend they are immune from discovery on Plaintiffs'

25  claims.  But even if not, under principles of antitrust law, it is extraordinarily unlikely that the

26  discovery the Tour seeks from PIF and HE is relevant to Plaintiffs' antitrust claims; at most, the

27  discovery may produce evidence relevant to the Tour's counterclaims for tortious interference.  If

28  the counterclaims are bifurcated, Plaintiffs' antitrust claims could proceed to trial in January 2024,

1   as currently scheduled.  Once the immunity issue is resolved, the counterclaims could be separately

2   tried—assuming the interference claims are not resolved by the antitrust trial and the Tour actually

3   pursues claims that appear to have negligible value beyond their potential to delay this case.

4          The lopsided balance of the equities between the parties favors bifurcating the Tour's

5   counterclaims from Plaintiffs' antitrust claims, as does the public interest in preserving the

6   innovation that LIV has brought to the game of golf—as even the Tour's leading players recognize.

7   On the compelling facts of this case, involving a new competitor's urgent need for antitrust relief

8   and a sovereign investor's good-faith invocation of immunity, bifurcation is appropriate.

**BACKGROUND**

9

10      **A.      Procedural History**

11       Plaintiffs have pleaded claims against the Tour under Sections 1 and 2 of the Sherman

12  Antitrust Act, 15 U.S.C. §§ 1 and 2, and state law.  Amended Compl. ¶¶ 310-388.  The gravamen

13  of the complaint is that the Tour has adopted policies and practices designed to illegally maintain

14  its monopoly in the markets for the promotion of elite professional golf and for the services of elite

15  professional golfers.  The Tour originally pleaded a single counterclaim of tortious interference with

16  contract against LIV, alleging that by recruiting golfers to join LIV and encouraging those golfers

17  to challenge the Tour's regulations, LIV had interfered with their contracts with the Tour.

18      In September 2022, the Tour issued subpoenas to PIF and HE.  PIF and HE objected on

19  various grounds, including sovereign immunity.  Judge van Keulen rejected the immunity argument,

20  and PIF and HE appealed her order to this Court.  Judge van Keulen's sole basis for rejecting the

21  immunity argument was that under the third prong of the commercial-activity exception to the

22  Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605(a)(2), the Tour's *counterclaim* is based

23  upon conduct that the court attributed (incorrectly) to PIF and HE that had a direct effect in the U.S.;

24  she did not hold that Plaintiffs' antitrust claims also satisfy that standard.  Dkt. No. 265 at 24:9-10.

25  Because sovereign-immunity waivers are adjudicated on a claim-by-claim basis, *Broidy Capital*

26  *Mgmt. v. Qatar*, 982 F.3d 582, 590 n.2 (9th Cir. 2020); *see also Chamber of Commerce of U.S. v.*

27  *Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996), under Judge van Keulen's ruling, PIF and HE retain

28  their presumptive immunity for any discovery sought only in connection with Plaintiffs' claims.

2

1    While the immunity issue was pending before Judge Van Keulen, the Tour sought leave to

2  amend its counterclaim to add PIF and HE as counterclaim-defendants.  Plaintiffs opposed that

3  motion, explaining that the counterclaim as pleaded was legally insufficient because the Tour's

4  contracts with players are at-will, and a tortious interference claim premised on inducing a party to

5  breach an at-will contract requires "independently wrongful conduct," which the Tour had not

6  alleged.  Dkt. No. 257 at 4:21 to 6:23.  In response, the Tour stated for the first time that it does not

7  allege that LIV persuaded Tour players to *leave* the Tour, but rather that it persuaded players to

8  *remain* with the Tour—its direct competitor—while violating Tour rules.  Dkt. No. 271 at 1:9-14 &

9  3:15-26.  In so arguing, the Tour failed to identify a single document from the Plaintiffs' substantial

10  production that supports that counterintuitive theory.  And as so framed, the claim appears to have

11  little or no actual value:  The Tour has not indicated what damages it could have incurred from LIV

12  supposedly encouraging players to *stay* with the Tour, and that theory could at most apply to a

13  handful of players for less than a single season.  Dkt. 289 ¶ 1 (identifying seven "LIV Players").

14    At a case management conference on February 24, 2023, the Tour's counsel argued that the

15  trial date should be postponed if PIF and HE exercise their right to appeal an adverse immunity

16  ruling.  *See* Hvidt Decl., Ex. A, 2/24/23 Tr. at 7:8-12, 9:19-10:5.  The Tour maintained that the

17  discovery it seeks from PIF and HE is not only relevant to the counterclaim, but also to its defense

18  of the antitrust claims.  *Id*. at 7:22-24.  In response, the Court observed that the antitrust claims

19  principally address the conduct of the *Tour*, not Plaintiffs.  *Id*. at 14:4-15.  Counsel for the Tour,

20  however, asserted that discovery from PIF and HE on the antitrust claims is "integral" and "very

21  important" to its defenses to the claims.  *Id.* at 7:22-24, 9:5.  When the Court asked why, counsel

22  asserted (without explanation) that it was relevant to market definition, competition between LIV

23  and the Tour, the Tour's contractual provisions, and damages.  *Id.* at 10:23 to 12:9.

24    **B.    The Tour's Escalating Anticompetitive Conduct**

25    In the months since this case was filed, the Tour has escalated its anticompetitive conduct

26  against LIV and players who have signed with LIV.  With the Tour pushing to postpone the trial by

27  years, it appears to believe that it can force LIV from the market before LIV can try its claims.

28    ***Sponsorship Ban***:  In September 2022, the Tour issued a Player Handbook for the 2022–23

1  season.  *See id.*, Ex. B (attaching excerpts).  The handbook not only imposes new restrictions on

2  players but also now prohibits sponsors, which are critical sources of revenue for tour promoters,

3  from doing business with the Tour if they also do business with LIV or any of LIV's teams.  *Id.* at

4  79.   The sponsorship ban thus effectively prevents many sponsors from working with LIV or its

5  players, depriving LIV and Player Plaintiffs alike of a critical source of revenue and deterring

6  additional players interested in joining LIV from doing so.

7         ***New Rules Targeting Players:***  Pursuant to the 2022-23 regulations, the 20 most popular

8  golfers are required to participate in 20 Tour events per season, up from 15 (*id.* § IV.B.1).  That

9  makes it more difficult for a golfer to satisfy the minimum event requirements for both the Tour and

10  LIV.  Tour members now may not speak favorably about LIV.  *Id.* § VI.E.  All players (even if not

11  members of the Tour) will now be banned from competing on the Tour or any of its development

12  tours for a minimum of two seasons if they participate in a single LIV event.  *Id.* § VI.D.

13         ***Threats Against Players***:  On March 7, 2023, the Tour Commissioner again announced that

14  it would ban golfers who play for LIV for life.  When asked if LIV players could return to the Tour,

15  he replied, "our position, to answer your question directly, has not changed."  Hvidt Decl., Ex. C.

16         ***Group Boycott***:  Over the last six months, the Tour reached new agreements with the Japan

17  Golf Tour and the Korean PGA that prevent those tours from partnering with LIV.  *Id.*, Exs. D-F.

18  Those agreements represent an expansion of the Tour's preexisting conspiracy with the European

19  Tour to foreclose competition by locking up other global tours:  In 2021 and 2022, they reached

20  agreements with the Sunshine Tour (South Africa), PGA Tour of Australasia, and Chinese Golf

21  Association that barred those Tours from partnering with LIV.  The Tour admits that it is working

22  in concert with the European Tour to use these new alliance agreements as " ██████████████ "

23  of its " ████████ " defense against LIV to " ███████████████████████████

24  ████████████████ "  *Id.* Ex. G.  The Tour's objectives with these alliance agreements—in its own

25  words—are to " ████████████████████████████████████████████████████ " " ████

26  ████ " to the Tour, and " ██████████████████████████████████████████ " LIV " ██

27  ██████████████████████████ "  *Id.*

28         ***OWGR Manipulation***:  The Tour and European Tour directly and through their alliances

1   control three of the Official World Golf Ranking ("OWGR")'s eight Directors.  *Id.*, Ex. H.  The

2   Tour has used its influence on the OWGR to deny the award of critical OWGR points to LIV golfers.

3   *Id.*, Ex. I.  (The Tour even calculated when LIV golfers would fall out of the rankings due to the

4   delay.  *Id.*, Exs. J-L.)  Because of this delay, LIV golfers fell down the OWGR and lost the

5   opportunity to play in the Majors and other premier tournaments.  *Id.*, Ex. M.  The lack of world

6   ranking points has severely harmed LIV golfers and is one of the biggest hurdles to golfers joining

7   LIV.  Not only is the OWGR an avenue to qualify for Majors, but the OWGR crowns the best golfers

8   in the world, bringing them sponsorship opportunities and the achievement of life-long goals.

9        ***The Tour's Surreptitious Anti-LIV PR Campaign***:  The Tour used Clout Public Affairs, a

10  public relations firm, to wage a campaign of player intimidation and LIV exclusion.  Clout's advice,

11  acted upon by the Tour, was to "████████████████████████" again, "████████████████████"

12  of LIV golfers, and send "████████████████████████████████████

13  ████████."  *Id.*, Ex. N.  Clout then threatened sponsors of golfers by pointing to "██████" that

14  Clout contrived.  *Id.*, Ex. O.  The Tour paid Clout over a $1 million—which Clout funneled through

15  a 501(c)(4) entity its sister-companies (Axiom and HenryAlan) created (9/11 Justice, Inc.)—for the

16  production of and to air anti-LIV commercials.  *Id.*, Ex. P.  Clout ran an intense, sophisticated

17  campaign to target localities of LIV's U.S. tournaments, placing op-eds with local media and anti-

18  LIV ads on social media, coordinating and running 9/11 group protests, and coordinating anti-LIV

19  stories with local media, organizations, and politicians, thereby inundating localities with anti-LIV

20  sentiment.  *Id.*, Exs. O(b), Q.  And the Tour required Clout to keep from the Tour the receipts for

21  these acts so that its actions would be "████████████████" to the Tour.  *Id.*, Ex. R.  All of this was

22  an effort to blow up LIV on the launching pad and to blame any competitive disadvantage on anti-

23  Saudi sentiment that the Tour secretly fomented rather than the Tour's own anticompetitive conduct.

24  *See, e.g.*, Dkt. 50 at 17:2-13.  The Tour and Clout even sought to convince at least one federal elected

25  official to influence the Department of Justice's investigation of the Tour.  *Id.*, Ex. S.

26                   **LEGAL STANDARD**

27      Federal Rule of Civil Procedure 42(b) allows a court to order separate trials of claims or

28  issues "for convenience, to avoid prejudice, or to expedite and economize."  *Facebook, Inc. v.*

1   *OnlineNIC Inc.*, 2022 WL 1016670, at *3 (N.D. Cal. Apr. 5, 2022).  Bifurcation under Rule 42(b)

2   is "committed to the sound discretion of the district court." *Arnold v. United Artists Theatre Cir.,*

3   *Inc.*, 158 F.R.D. 439, 458 (N.D. Cal. 1994).

4   **ARGUMENT**

5       This Court should bifurcate the Tour's counterclaims from Plaintiffs' antitrust claims,

6   allowing the latter to proceed to trial in January 2024 as scheduled, while the immunity questions

7   presented by the Tour's subpoenas and counterclaims are resolved by appellate courts (if needed).

8   The likelihood that PIF and HE possess evidence relevant to Plaintiffs' antitrust claims is small at

9   best; a substantial delay in the trial poses an existential threat to LIV and the livelihood of Player

10  Plaintiffs and could enable the Tour to circumvent antitrust scrutiny through attrition; and a

11  resolution of Plaintiffs' claims would likely moot or otherwise resolve the counterclaims, which

12  appear to have no value apart from their role as an excuse to force a postponement of the trial.

13      **A.      The Discovery Sought From PIF And HE Is Not Relevant To Plaintiffs' Claims**

14      The discovery that the Tour seeks against PIF and HE has little-to-no discernible relevance

15  to Plaintiffs' antitrust claims.  Those claims focus on the Tour's anticompetitive conduct.  The

16  communications, actions, or knowledge of an investor in LIV—even assuming *arguendo* that PIF

17  and HE have a closer relationship to LIV than typical for an investor in a start-up—hardly bears on

18  that question, if at all.  Although the Tour vaguely identified four areas of potential relevance at the

19  February 24 case management conference, its assertions lack any grounding in antitrust law.

20      For example, the Tour claimed that the discovery would be "relevant to the definition of a

21  market." Ex. A at 10:24-25.  That makes no sense.  Under blackletter law, "[t]he outer boundaries

22  of a product market are determined by the reasonable interchangeability of use or the cross elasticity

23  of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370

24  U.S. 294, 325 (1962).  That is typically determined through expert testimony.  *See, e.g., Morgan,*

25  *Strand, Wheeler Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (principals were not

26  "experts qualified to opine on [the] highly technical economic question" of defining the relevant

27  product market); *Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 108 F. Supp .2d 549, 576 n. 16 (W.D.

28  Va. 2000) (expert testimony necessary for market definition).  PIF and HE are not experts in the

6

1   relevant economic markets, their lay views have no more relevance than the views of any other non-

2   expert, and would be less informed than the views of actual participants in the market, like LIV.

3        The Tour also claimed that discovery from PIF and HE is "relevant to the existence of

4   competition between LIV Golf and the PGA Tour." Ex. A at 10:25-11:11.  Again, the claim does

5   not make sense.  "[D]efining the product market involves the identification of the field of

6   competition: the group or groups of sellers or producers who have actual or potential ability to

7   deprive each other of significant levels of business." *Morgan, Strand, Wheeler Biggs v. Radiology,*

8   *Ltd.*, 924 F.2d 1484, 1489 (9th Cir. 1991).  PIF is an investor, and HE its Governor; they are not

9   sellers or producers in the relevant field.  It is not plausible that either PIF or HE would possess

10  evidence about whether the Tour has suppressed competition through its policies and practices.

11       The Tour presumably intended to refer to its contention that PIF is willing to spend unlimited

12  amounts of money to support LIV and that LIV therefore cannot suffer antitrust injury, leaving the

13  Tour free to violate the antitrust laws with impunity.  ECF No. 50 at 2:12-16, 6:2-8.  The Tour has

14  never cited a precedent to support that strange theory, and it is clearly wrong:  When an incumbent

15  with substantial market power imposes supracompetitive costs on competitors through

16  anticompetitive conduct, that alone qualifies as a harm to competition under federal antitrust law.

17  *See Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 320-21 & n. 22 (D.D.C. 2011).  In any

18  event, the assertion that a sovereign wealth fund charged with investing its nation's patrimony would

19  waste money on a losing venture *in perpetuity* is deeply implausible, and the evidence already

20  produced shows that the Tour itself does not believe it:  The Tour's own financial advisers have told

21  the Tour that PIF is a rational investor seeking a positive return on its investment in LIV, Hvidt

22  Decl.*,* Ex. T, and in private the Tour had made clear that it believes its financial advisors, not its

23  counsel's made-for-litigation arguments, *id.*, Ex. U.

24        The Tour's other assertions about the relevance of the discovery to Plaintiffs' antitrust

25  claims are even more strained.  It insists that HE's knowledge about LIV's contracts with players is

26  relevant to whether the Tour's contracts, which assertedly contain similar provisions, violate the

27  antitrust laws.  Ex. A at 11:5-25.  But HE is not an antitrust expert, and his views about particular

28  contract provisions do not bear on whether those provisions are anticompetitive.  In any event, LIV

1   and the Tour are not similarly situated; a company with monopoly power may not engage in the

2   same kind of exclusive conduct as a new market entrant.  *Cal. Computer Prod. v. Int'l Business*

3   *Machines*, 613 F.2d 727, 737 n.11 (9th Cir. 1979) ("[C]onduct reasonable for other firms is not

4   necessarily reasonable for the monopolist.").  Although the Tour claimed that HE was involved in

5   "approving the [LIV] contracts," Ex. A at 11:12-18, the Tour has not cited any document out of the

6   more than 230,000 that LIV and P54 have produced—including almost 13,000 PIF and HE

7   documents—that supports that assertion.  Hvidt Decl. ¶¶ 3-7.  At most, HE was involved in

8   approving a handful of monetary *offers*.  In contrast, any number of LIV employees directly involved

9   in negotiations—and who present no sovereign immunity concerns—would have percipient-witness

10  testimony to offer on that topic if the Tour were truly interested.

11          The Tour finally claims that PIF and HE possess information relevant to the damages that

12  Plaintiffs have incurred (and are continuing to incur) as the result of the Tour's anticompetitive

13  conduct.  Ex. A at 12:2-4.  The Tour refers again to "PIF's willingness and ability to continue to

14  supply money."  *Id*.  But the Tour has identified no case in which an antitrust victim's damages were

15  reduced to account for funding from an investor, and such an approach has no basis in antitrust law

16  or the law of remedies.  *See, e.g.,* 15 U.S.C. § 15 (the antitrust plaintiff may recover "threefold the

17  damages *by him* sustained") (emphasis added).  And of course there is no "pass through" defense to

18  antitrust damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) and its progeny.

19          Judge van Keulen's order also provides no basis for waiting for final resolution of the

20  immunity questions by the Ninth Circuit (if needed).  The Order held that the immunity of PIF and

21  HE was overcome only with respect to the Tour's counterclaim for tortious interference.  Dkt. No.

22  265 at 24:9-10.  The Tour has not objected to this holding.  If this Court affirms it, PIF and HE

23  would retain immunity with respect to discovery sought in connection with the Tour's defenses to

24  Plaintiffs' antitrust claims.  The Tour's discovery requests therefore cannot be pursued further

25  against PIF and HE with respect to the antitrust claims, and provide no basis to delay the trial of the

26  Plaintiffs' antitrust claims.

27          **B.      The Balance of Equities, The Public Interest, And Judicial Economy Tilt
                Decidedly In Favor Of Bifurcation**

28

1    Given that the discovery that the Tour seeks against PIF and HE has little or no chance of

2  producing evidence relevant to the Tour's defenses to Plaintiffs' antitrust claims, the relevant factors

3  all strongly favor bifurcation to allow the Plaintiffs' antitrust claims to be tried as soon as possible.

4    *First*, competitive injuries from the Tour's antitrust violations are ongoing.   The Tour has

5  escalated its anticompetitive conduct since this lawsuit was filed.  It continues to threaten LIV's

6  business partners, has adopted new restrictions on sponsors, and has entered new agreements to

7  further its group boycott.  *See supra* pp. 3-5.  If the Tour acted with this level of impunity during

8  ongoing litigation, there is every reason to believe the Tour would pull out all the stops to drive LIV

9  out of the market if this action were stayed.  LIV cannot continue to spend many millions of dollars

10  to attract golfers who reasonably fear that their careers are in jeopardy the moment they sign with

11  LIV because of the Tour's lifetime bans and related anticompetitive restraints.  A postponement of

12  the trial for two years would pose an existential threat to LIV.

13    The harm inflicted on the Player Plaintiffs would also be unfair and unjustified.  A years-

14  long delay in trial could leave Plaintiffs Matt Jones and Peter Uihlein without an option to compete

15  at an elite level in 2024 and beyond, because they have not qualified for the LIV Tour based on

16  performance and the Tour has banned them, as have all other tours in the golf "ecosystem"

17  controlled by the Tour (with the exception of the Asian Tour).

18    *Second*, should the Tour succeed in expelling LIV from the market before its antitrust claims

19  can be tried, the broader public interest will suffer.  Even critics of LIV now acknowledge the

20  enormous benefits that LIV has single-handedly brought to elite golf through its innovative model.

21  A recent *Golf Digest* article quoted Tour golfers as admitting that LIV's entry has "a massive impact

22  on the sport."  Hvidt Decl., Ex. V.  The world's number 3 ranked player, Rory McIlroy—an

23  outspoken critic of players who joined LIV—was quoted as saying "the emergence of a competitor

24  to the PGA Tour[ ] has benefited everyone that plays elite professional golf," has "definitely had a

25  massive impact on the game," and "has caused a ton of innovation at the PGA Tour."  *Id*.  The article

26  also quoted Jon Rahm, the world's top-ranked golfer, as saying that "we should be thankful LIV

27  Golf happened. . . .  otherwise we wouldn't have seen any of this."  *Id*.  From changing player pay

28  and benefits, to altering the format of events to include more modern forms of play, to expanding to

new venues, to appealing to new demographics, competition from LIV benefits players and fans alike.  If the Tour's anticompetitive conduct forces LIV to abandon the market, another serious challenger to the Tour's entrenched monopoly may not emerge for decades—depriving the sport and its devoted fans of the innovation that comes from vigorous market competition.

*Third*, allowing the Tour to use negligible counterclaims to evade a trial on substantial antitrust claims by a new entrant would frustrate the purposes of both the antitrust laws and the FSIA.  Any monopolist could replicate the Tour's litigation strategy when confronted with a start-up challenger funded in part by a foreign sovereign: Seek third-party discovery from the sovereign investor, setting off protracted litigation over immunity, and use the delay to squelch the competitor before it can argue its antitrust claims to a jury.  Congress could not have intended to chill foreign investment in the U.S. by putting foreign sovereign investors to the choice of abandoning good-faith claims of sovereign immunity or seeing its investment fail while it waits years for a trial date.

*Fourth*, the Tour will suffer no prejudice from bifurcation.  The Tour's puzzling new theory of liability—that LIV actually encouraged players to *remain* with the Tour—involves only a handful of players over less than a season.  It is unlikely that whatever damages (if any) flowed from the alleged conduct could exceed seven figures, a rounding error in the Tour's annual $1.6 billion revenues (for 2021).  And the Tour has effectively admitted that it will suffer no harm from delay in resolving its claims, given that it seeks to postpone the entire case indefinitely.

*Finally*, bifurcation will serve judicial efficiency and economy.  Should Plaintiffs prevail on their antitrust claims in early 2024, the Tour's counterclaims would fail because a party cannot tortiously interfere with (or induce the breach of) an unlawful contract.  *Mariscotti v. Merco Group at Akoya*, 917 So. 2d 890, 892 (Fla. 3rd DCA 2006) (if a contract is unenforceable, then an element of a tortious interference claim is absent) (citing *Sullivan v. Econ. Research Props.*, 455 So. 2d 630, 631 (Fla. 5th DCA 1984) (where there is no valid contract, no claim for tortious interference lies)).  That in turn could obviate the need for resolution of immunity issues raised in any appeal by PIF and HE.  If the Tour prevails at trial, it may well conclude that the counterclaims—which appear to have little or no value—are no longer worth pursuing.  Bifurcation thus holds the prospect of avoiding the counterclaims altogether and reducing litigation over immunity.

1                                        **C**ONCLUSION

2         For the foregoing reasons, Plaintiffs respectfully request that their motion to bifurcate the

3 Tour's amended counterclaims from Plaintiffs' antitrust claims be granted in all respects.

4

5 DATED:  March 16, 2023              Respectfully submitted,

6

7                                     By:        */s/ Dominic Surprenant*
                                    JOHN B. QUINN, SBN 90378

8                                       johnquinn@quinnemanuel.com
                                    DOMINIC SURPRENANT, SBN 165861

9                                       dominicsurprenant@quinnemmanuel.com
                                    KEVIN TERUYA, SBN 235916

10                                       kevinteruya@quinnemanuel.com
                                    QUINN EMANUEL URQUHART & SULLIVAN LLP

11                                       865 South Figueroa Street, 10th Floor

12                                       Los Angeles, California 90017
                                    Telephone: 213.443.3000

13

14                                       ROBERT P. FELDMAN, SBN 69602
                                    bobfeldman@quinnemanuel.com

15                                       QUINN EMANUEL URQUHART & SULLIVAN LLP
                                    555 Twin Dolphin Dr., 5th Floor

16                                       Redwood Shores, California 94065
                                    Telephone:  650.801.5000

17                                       Facsimile:   650.801.5100

18

19                                       RACHEL S. BRASS, SBN 219301
                                    rbrass@gibsondunn.com

20                                       LAUREN D. DANSEY, SBN 311886
                                    ldansey@gibsondunn.com

21                                       GIBSON, DUNN & CRUTCHER LLP
                                    555 Mission Street, Suite 3000

22                                       San Francisco, California 94105-0921
                                    Telephone: 415.393.8200
                                    Facsimile:   415.393.8306

23

24                                       SCOTT K. HVIDT, *pro hac vice*
                                    shvidt@gibsondunn.com

25                                       GIBSON, DUNN & CRUTCHER LLP
                                    2001 Ross Avenue, Suite 2100

26                                       Dallas, Texas 75201-2911
                                    Telephone: 214.698.3100

27                                       JOSHUA LIPTON, *pro hac vice*
                                    jlipton@gibsondunn.com

28

LIV GOLF, INC.'S NOTICE OF MOTION AND MOTION TO BIFURCATE,
CASE NO. 5:22-CV-04486-BLF

KRISTEN C. LIMARZI, *pro hac vice*
   klimarzi@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone:    202.955.8500
*Attorneys for Plaintiffs LIV Golf, Inc.,*
*Matt Jones, Bryson DeChambeau, and Peter Uihlein*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1**

Pursuant to Civil Local Rule 5-1(h)(3) of the Northern District of California, I attest that concurrence in the filing of the document has been obtained from each of the other signatories to this document.

Executed on March 16, 2023.

*/s/ Dominic Surprenant*
Dominic Surprenant

LIV GOLF, INC.'S NOTICE OF MOTION AND MOTION TO BIFURCATE,
CASE NO. 5:22-CV-04486-BLF