# EXHIBIT A

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                        SAN JOSE DIVISION


 4
      JONES, ET AL,                   )   CV-22-4486-BLF
 5                                     )
                       PLAINTIFF,      )   SAN JOSE, CALIFORNIA
 6                                     )
                 VS.                   )   FEBRUARY 24, 2023
 7                                     )
      PGA TOUR, INC.,                  )   PAGES 1-51
 8                                     )
                       DEFENDANT.      )
 9                                     )
      _____ )
10
                       TRANSCRIPT OF PROCEEDINGS
11           BEFORE THE HONORABLE BETH LABSON FREEMAN
                    UNITED STATES DISTRICT JUDGE
12

13                     A P P E A R A N C E S

14

15       FOR THE PLAINTIFF:     BY:  JOHN B. QUINN
                                QUINN EMANUEL URQUHART &
16                              SULLIVAN, LLP
                                865 S. FIGUEROA ST, FL 10
17                              LOS ANGELES, CA 90017

18

19       FOR THE DEFENDANT:     BY:  ELLIOT PETERS
         PGA                         NICHOLAS GOLDBERG
20                              KEKER, VAN NEST & PETERS LLP
                                633 BATTERY STREET
21                              SAN FRANCISCO, CA 94111

22          APPEARANCES CONTINUED ON THE NEXT PAGE

23    OFFICIAL COURT REPORTER:      SUMMER FISHER, CSR, CRR
                                    CERTIFICATE NUMBER 13185
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
```

2

```
1        APPEARANCES CONTINUED:

2      FOR THE PLAINTIFF:      BY:  JOSHUA LIPTON
                               GIBSON DUNN
3                              1050 CONNECTICUT AVE. N.W.
                               WASHINGTON, DC 20036
4

5      FOR THE DEFENDANT:      BY:  CAROLYN B. LAMM
       PIF, AL-RUMAYYAN        WHITE AND CASE LLP
6                              701 THIRTEENTH STREET, NW
                               WASHINGTON, DC 20005
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              SAN JOSE, CALIFORNIA              FEBRUARY 24, 2023

 2                       P R O C E E D I N G S

 3         (COURT CONVENED AT 10:00 A.M.)

 4              THE COURT:  GOOD MORNING, EVERYONE.  THANK YOU FOR

 5    JOINING ON ZOOM.

 6              THE CLERK:  CALLING CASE 22-4486.  JONES, ET AL

 7    VERSUS PGA TOUR, INC.

 8         COUNSEL, IF YOU WOULD PLEASE STATE YOUR APPEARANCES, AND

 9    IF WE COULD BEGIN WITH PLAINTIFF AND THEN MOVE TO DEFENDANT.

10              MR. QUINN:  GOOD MORNING, YOUR HONOR.

11         MY NAME IS JOHN QUINN OF QUINN EMANUEL.  I'M APPEARING FOR

12    MATT JONES, BRYSON DECHAMBEAU AND PETER UIHLEIN, PLAINTIFFS IN

13    THIS MATTER.

14              MR. LIPTON:  GOOD MORNING, YOUR HONOR.

15         I'M JOSHUA LIPTON WITH GIBSON, DUNN & CRUTCHER, CO-COUNSEL

16    TO MR. QUINN, AND APPEARING ON BEHALF OF THE SAME PLAINTIFFS.

17              THE COURT:  GOOD MORNING.

18         IS THAT ALL FOR THE PLAINTIFFS, MR. QUINN, IS THAT YOUR

19    SIDE THAT'S APPEARING?

20              MR. QUINN:  YES, YOUR HONOR.

21              THE COURT:  GOOD.  ALL RIGHT.

22         MR. PETERS.

23              MR. PETERS:  GOOD MORNING, YOUR HONOR.

24         ELLIOT PETERS OF KEKER, VAN NEST & PETERS, APPEARING ALONG

25    WITH MY COLLEAGUE, NICK GOLDBERG, ON BEHALF OF THE PGA TOUR.
```

```
1              THE COURT:  GOOD MORNING.

2         AND I HAVE ONE OTHER COUNSEL WHO I'M LOOKING AT.  I DON'T

3    KNOW YOUR NAME.  I DON'T KNOW, I'M SORRY.

4              MS. LAMM:  YES.  GOOD MORNING, YOUR HONOR.

5         IT'S CAROLYN LAMM WITH WHITE AND CASE, AND I'M APPEARING

6    FOR PIF, AND HIS EXCELLENCY, MR. RUMAYYAN, WHO ARE SUBPOENA

7    PARTIES, NOT PARTIES YET, BUT SUBPOENAED.

8              THE COURT:  OKAY.  GOOD.  THANK YOU.

9         ALL RIGHT.  YOU HAVE ALL ASKED FOR CASE MANAGEMENT, SO I

10   WILL CERTAINLY LET YOU START THE AGENDA.

11        A LOT HAS HAPPENED IN THE CASE SINCE YOU MADE THAT

12   REQUEST, AND SO I HAVE BEEN READING ALL THE THINGS THAT HAVE

13   BEEN FILED SINCE THEN, BUT I KNOW SOME OF THE THINGS YOU WROTE

14   WERE IN ANTICIPATION OF JUDGE VAN KEULEN'S ORDER, AND NOW YOU

15   HAVE IT, AND NOW YOU ALSO HAVE MY ORDER GRANTING LEAVE TO FILE

16   AN AMENDED COUNTERCLAIM, WHICH I SEE, MR. PETERS, YOU FILED, I

17   THINK LAST NIGHT.

18             MR. PETERS:  CORRECT, YOUR HONOR.

19             THE COURT:  OKAY.  SO IT'S ONLY FILED, IT'S NOT

20   SERVED.  THERE'S BEEN NO ACCEPTANCE OF JURISDICTION UNDER THE

21   COUNTERCLAIM, SO IT DOESN'T ACTUALLY CHANGE ANYTHING, EXCEPT

22   THAT THAT'S GOTTEN STARTED, BUT I CERTAINLY DON'T PERCEIVE THE

23   PUBLIC INVESTMENT FUND OR MR. AL-RUMAYYAN TO BE PARTIES IN ANY

24   SENSE AT THIS POINT.

25             SO MS. LAMM, TO THE EXTENT THAT'S YOUR -- I KNOW THAT
```

```
 1        WOULD BE YOUR POSITION, AND I THINK WE WOULD BE IN AGREEMENT

 2        TODAY ON THAT ISSUE.

 3             ALL RIGHT.

 4                  MR. PETERS:  YOUR HONOR --

 5                  THE COURT:  YES.

 6                  MR. PETERS:  IF I MAY.  I THINK IT HAS BEEN SERVED

 7        UNDER THE ECF SYSTEM.  MS. LAMM AND HER FIRM FILED NOTICES OF

 8        APPEARANCES ON BEHALF OF THOSE PARTIES, ACKNOWLEDGING THAT IT

 9        WOULD BE PROPER TO SERVE THEM.

10        IT'S NOW BEEN FILED ON THE ECF SYSTEM, I THINK THAT IS

11        SERVICE.  I'M NOT SURE THAT'S RELEVANT TO THE CASE MANAGEMENT

12        ISSUES, BUT I THINK THEY ARE PARTIES AND THEY HAVE BEEN SERVED.

13                  THE COURT:  WELL, I'M NOT AWARE THAT THEY HAVE AGREED

14        TO ACCEPT SERVICE OF A PLEADING BY ECF.  I LEAVE THAT TO YOU.

15        I'M NOT GOING TO RULE ON THAT TODAY.

16        AND MS. LAMM, TO THE EXTENT THAT THAT WAS NOT YOUR

17        INTENTION, YOU AND MR. PETERS WILL HAVE THAT DISCUSSION

18        OFFLINE, I THINK.

19                  MS. LAMM:  THANK YOU, YOUR HONOR.

20        THAT IS ABSOLUTELY NOT MY VIEW.  I HAVE NO AUTHORITY TO

21        ACCEPT SERVICE, AND HE KNOWS THAT.

22                  THE COURT:  ALL RIGHT.  AS I SAID, YOU TWO WILL TALK

23        ABOUT THAT OFFLINE.  I DON'T NEED TO BE PART OF THAT

24        DISCUSSION.

25             ALL RIGHT.  SO MR. PETERS, I THINK YOU ARE THE ONE WHO
```

1    ACTUALLY ASKED FOR THIS, OSTENSIBLY WAY BACK, AT LEAST A WEEK

2    AGO WHEN YOU FILED THIS, YOUR CONCERN WAS CONTINUING THE TRIAL

3    DATE.

4         I'VE READ THE LENGTHY SUBMISSION, THANK YOU BOTH FOR

5    LAYING OUT YOUR POSITIONS.  IS THAT THE FIRST ISSUE YOU WANT TO

6    DEAL WITH, OR IS THERE ANOTHER ORDER OF ISSUES THAT WE SHOULD

7    ADDRESS?

8         MR. PETERS:  NO, THAT'S THE ISSUE, YOUR HONOR.

9         I THINK OUR CONCERNS HAVE ONLY BECOME MORE ACUTE IN THE

10   LAST WEEK, NOW THAT WE HAVE BEEN GIVEN LEAVE TO AMEND TO ADD

11   PIF AND MR. AL-RUMAYYAN AS PARTIES, NOW THAT MAGISTRATE

12   JUDGE VAN KEULEN IN, WHAT WE VIEW, IS A CAREFULLY REASONED

13   58-PAGE OPINION, HAS REJECTED THEIR SOVEREIGN IMMUNITY

14   ARGUMENTS AND FOUND THAT THE COURT HAS JURISDICTION OVER BOTH

15   OF THEM.

16        AND WE GO BACK TO LAST AUGUST WHEN THIS SCHEDULE WAS SET,

17   I'M NOT TELLING THE COURT ANYTHING IT DOESN'T KNOW, BUT THE

18   SCHEDULE WAS SET BASED ON VERY CLEAR REPRESENTATIONS MADE TO

19   THIS COURT, BY MR. WALTERS OF THE GIBSON, DUNN & CRUTCHER FIRM,

20   WHO SAID UNEQUIVOCALLY THAT PIF AND THE SAUDI OWNERS OF LIV

21   GOLF WOULD COOPERATE FULLY, THEY WOULD MOVE HEAVEN AND EARTH,

22   IT WOULD ALL GO SWIMMINGLY.

23        THAT TURNED OUT TO NOT TO HAVE BEEN TRUE AT ALL.  IN FACT,

24   THEY HAVE ERECTED EVERY SINGLE BARRIER THEY COULD THINK OF TO

25   NOT ONLY TO PROVIDING DISCOVERY, BUT I'M SURE WE ARE GOING TO

1    SEE IT IN CONNECTION NOW WITH THE AMENDED COUNTERCLAIM.  AND IT

2    WOULD PROBABLY BE HELPFUL TO KNOW WHAT THEY PLAN TO DO, BUT

3    WHAT I ASSUME THEY PLAN TO DO, BECAUSE THEY HAVE SAID SO, IS

4    APPEAL MAGISTRATE JUDGE VAN KEULEN'S RULE TO YOUR HONOR, FILE A

5    MOTION TO DISMISS OUR AMENDED COUNTERCLAIM, OR PERHAPS EVEN

6    CONTEST SERVICE OF THAT NOW.  I'M CATCHING WIND OF THAT FOR THE

7    FIRST TIME THIS MORNING.

8         BUT THERE COULD BE AN APPEAL FROM YOUR HONOR'S RULING IF,

9    FOR EXAMPLE, YOU WERE TO DENY A MOTION TO DISMISS THE AMENDED

10   COUNTERCLAIM, AND I ASSUME THEY WILL MOVE TO DISMISS IT BASED

11   ON THE SAME GROUNDS THAT MAGISTRATE VAN KEULEN HAS REJECTED,

12   THEN THEY MIGHT APPEAL THAT TO THE NINTH CIRCUIT.

13        IN OTHER WORDS, IT COULD NOW TAKE US A VERY LONG TIME, NOT

14   ONLY TO MAKE THEM PARTIES AND FORCE THEM TO COMPLY WITH THEIR

15   DISCOVERY OBLIGATIONS AS PARTIES, WHICH THEY HAVE ALREADY

16   INDICATED TO US THEY HAVE NO INTENTION OF DOING UNTIL THE

17   MOTION TO DISMISS HAS BEEN RESOLVED, EVEN IF THEY WEREN'T

18   PARTIES, IT'S APPARENTLY GOING TO TAKE US A LONG TIME TO GET

19   THEM TO COOPERATE AND PROVIDE US WITH DISCOVERY, FOR REASONS

20   EXPLAINED FROM THE BEGINNING OF THE CASE AND REITERATED IN OUR

21   CASE MANAGEMENT CONFERENCE STATEMENT.

22        THE DISCOVERY WE SEEK FROM THEM IS INTEGRAL, BOTH TO THE

23   DEFENSE OF THE ANTITRUST CLAIMS, AND TO THE PROSECUTION OF OUR

24   COUNTERCLAIMS AGAINST LIV, PIF AND MR. AL-RUMAYYAN.  AND SO

25   THEIR FAILURE TO COMPLY WITH THEIR OBLIGATIONS AND THEIR

1    INTENTION TO CONTINUE TO LITIGATE THEM, AND I DON'T CRITICIZE

2    THEM FOR PURSUING THEIR RIGHTS TO LITIGATE WHATEVER THEY ARE

3    ENTITLED TO LITIGATE, BUT IT'S SIMPLY NOT FAIR TO US TO PROCEED

4    IN A CASE WHERE THEY ARE NOT GOING TO PROVIDE CRITICAL

5    DISCOVERY.  AND IT'S NOT REALLY FAIR TO THE COURT, FOR THIS

6    COURT TO HAVE SET AN EXPEDITED SCHEDULE AT THEIR REQUEST, BASED

7    ON REPRESENTATIONS WHICH TURN OUT NOT TO BE TRUE.

8         THE CASE HAS CHANGED SINCE THE BEGINNING, IT'S PRIMARILY A

9    CASE BETWEEN PIF AND ITS SHELL CORPORATION, REALLY, LIV GOLF,

10   AND THE PGA TOUR.  YES, THERE'S GOLFERS INVOLVED, BUT IT'S

11   REALLY A STRUGGLE BETWEEN THESE TWO COMPETING GOLF LEAGUES, OR

12   TOURS, OR HOWEVER YOU WANT TO DESCRIBE THEM.

13        THE EXIGENCIES THAT WERE IDENTIFIED IN THE BEGINNING,

14   REALLY HAVE DIMINISHED CONSIDERABLY, IN TERMS OF GOLFERS.

15   THERE'S A LOT OF HYPERBOLE BY THE PLAINTIFFS, SAYING THESE

16   GOLFERS CAN'T MAKE A LIVING.

17        AS THE COURT WELL KNOWS, THESE GOLFERS, THE THREE OF THEM

18   THAT REMAIN OF THE ELEVEN, HAVE BEEN PAID A KINGS RANDOM TO

19   PLAY FOR LIV.  THEY ARE NOT STARVING, THEY ARE NOT FACING ANY

20   KIND OF HARM, LET ALONE IRREPARABLE HARM, AS THIS COURT ALREADY

21   RULED IN CONNECTION WITH SOME OF THE OTHER GOLFERS.

22        AND SO THE PRACTICAL REALITIES OF THIS CASE, I THINK ARE

23   VERY, VERY DIFFERENT THAN WHAT THE COURT ENCOUNTERED WHEN THE

24   ORIGINAL SCHEDULE WAS SET.

25        WE, ON BEHALF OF THE PGA TOUR, HAVE BEEN WORKING VERY,

1    VERY HARD TO COMPLY WITH THIS COURT'S SCHEDULE.  I DON'T NEED

2    TO GO INTO THAT CHAPTER AND VERSE, BUT I COULD.  MAGISTRATE

3    JUDGE VAN KEULEN HAS TO RESOLVE CERTAIN ISSUES, BUT WE HAVE

4    BEEN PRESSING AHEAD, BUT WE CAN'T GO AHEAD, WE CAN'T ACCELERATE

5    THE SCHEDULE FOR THIS VERY IMPORTANT DISCOVERY FROM PIF AND

6    MR. AL-RUMAYYAN, WHILE THEY CONTINUE TO ERECT ALL OF THESE

7    LEGAL BARRIERS.

8         AND SOMETHING HAS GOT TO GIVE.  AND I HAVE IN FRONT OF ME,

9    THE TRANSCRIPT FROM WHEN WE WERE BEFORE YOU LAST TIME, AND

10   OBVIOUSLY ALL OF US LAWYERS LISTEN CAREFULLY TO WHAT YOU SAY,

11   AND DESCRIBING ALMOST THIS EXACT SCENARIO, YOUR HONOR SAID,

12   "THIS WHOLE CASE WILL COME TO A SCREECHING HALT IF THIS ISN'T

13   WORKED OUT."  AND WHAT THE COURT WAS REFERRING TO WAS GETTING

14   WORKED OUT, THIS NEED FOR US TO GET ACCESS TO THIS DISCOVERY.

15        WELL, IT HASN'T BEEN WORKED OUT.  WE HAVE LITIGATED IT.

16   SO FAR, OUR POSITION HAS BEEN VINDICATED BY JUDGE VAN KEULEN,

17   AND TO SOME LIMITED EXTENT, BY YOUR HONOR IN ALLOWING US LEAVE

18   TO AMEND THE COUNTERCLAIM.

19        AND I JUST THINK WE ARE AT THAT POINT NOW, OR WE WILL

20   INEVITABLY BE AT THAT POINT VERY SOON, AND SO WE ARE ASKING FOR

21   YOUR HONOR'S ASSISTANCE IN SETTING A -- IN VACATING THE TRIAL

22   DATE AND SETTING NEW DEADLINES.

23        IT'S SIMPLY INCONCEIVABLE THAT THE DOCUMENT DISCOVERY

24   CUTOFF CAN BE COMPLIED WITH AT THE END OF NEXT MONTH, AT THE

25   END OF MARCH, EVEN AS CONTINUED BY THE COURT.  THE DEPOSITIONS

1       CAN'T BE DONE BY THE END OF MAY, BECAUSE PIF AND

2       MR. AL-RUMAYYAN AREN'T GOING TO COOPERATE, AND I DON'T THINK

3       IT'S REALISTIC TO -- I MEAN, IT COULD TAKE QUITE A WHILE BEFORE

4       THOSE ISSUES ARE RESOLVED, AND THEY HAVE CHOSEN TO LITIGATE

5       THEM AND REFUSED TO COMPLY WITH DISCOVERY.

6            SO I THINK THE SCHEDULE -- THEY HAVE THE CHOICE, THEY CAN

7       COMPLY.  IF THEY DON'T WANT TO, THEN THE SCHEDULE HAS GOT TO

8       GIVE.

9            THAT'S OUR VIEW, YOUR HONOR, AND I WOULD BE HAPPY TO

10      ANSWER ANY QUESTIONS.

11              THE COURT:  YES.

12           MR. QUINN'S AND MR. GOLDBERG'S OPPOSITION TO THIS REQUEST,

13      THEY ARGUE THAT THIS DISCOVERY IS ONLY RELEVANT TO YOUR

14      COUNTERCLAIM AND NOT TO THEIR ANTITRUST CASE.  AND THEY SUGGEST

15      THAT NO CONTINUANCE IS NECESSARY OR THAT THERE COULD BE

16      BIFURCATION.

17           I WILL PUT THE BIFURCATION TO THE SIDE FOR RIGHT NOW, BUT

18      FOR YOU TO TELL ME IT'S INTERTWINED IS FINE, BUT THAT DOESN'T

19      PERSUADE ME THAT IT IS.

20           SO WHAT CAN YOU TELL ME ABOUT THIS DISCOVERY THAT IS

21      INTERTWINED WITH THE ANTITRUST CLAIMS THAT ARE BEING PROSECUTED

22      AGAINST YOUR CLIENT?

23              MR. PETERS:  OF COURSE.

24           THE DISCOVERY FROM PIF AND MR. AL-RUMAYYAN IS RELEVANT TO

25      THE DEFINITION OF A MARKET, IT'S RELEVANT TO THE EXISTENCE OF

```
 1    COMPETITION BETWEEN LIV GOLF AND THE PGA TOUR.  THEY CONTEND

 2    THAT WE ARE A MONOPOLY.  WE CONTEND THAT THEIR CONDUCT AND

 3    ACTIVITIES, WHICH THEY KNOW ABOUT MORE THAN WE DO, WILL

 4    ESTABLISH THAT THERE'S ROBUST COMPETITION IN THE WORLD OF GOLF.

 5         THEIR CONTRACTS, AS YOUR HONOR WELL KNOWS, CONTAIN MANY OF

 6    THE EXACT SAME PROVISIONS THAT THEY CLAIM VIOLATE THE --

 7         THE COURT:  SO "THEIR CONTRACTS" MEANING LIV'S

 8    CONTRACTS, BECAUSE PIF AND MR. AL-RUMAYYAN ARE NOT SIGNATORIES

 9    TO ANY CONTRACT I'M AWARE OF, EXCEPT MAYBE AGREEMENTS --

10    SHAREHOLDER AGREEMENTS BETWEEN LIV AND PIF AND MR. AL-RUMAYYAN;

11    ISN'T THAT CORRECT?

12         MR. PETERS:  YOU ARE ABSOLUTELY RIGHT, YOUR HONOR,

13    BUT EACH OF THOSE CONTRACTS IDENTIFIES THE LAWYERS WHO WERE

14    REPRESENTING PIF, THE GIBSON DUNN FIRM, AS THE PEOPLE WHO

15    DRAFTED THE CONTRACTS.  AND MR. AL-RUMAYYAN, FROM THE DOCUMENTS

16    WE'VE SEEN, AND THEY ARE LIMITED DOCUMENTS WE'VE SEEN, WAS

17    INVOLVED IN THE NEGOTIATIONS, HE WAS INVOLVED IN APPROVING THE

18    CONTRACTS, HE WAS INVOLVED IN FUNDING THE CONTRACTS.

19         THE COURT:  ALL RIGHT.

20         MR. PETERS:  AND SO HIS TESTIMONY ABOUT THOSE

21    CONTRACTURAL PROVISIONS, WHICH GO TO THE HEART OF THE ANTITRUST

22    CLAIMS AND WHY THEY ARE NECESSARY IN THE PIF CONTRACTS, IS

23    GOING TO BE RELEVANT TESTIMONY, HIGHLY RELEVANT ON THE ISSUE OF

24    WHETHER OR NOT THOSE PROVISIONS ARE PRO-COMPETITIVE, AS WE

25    CONTEND, OR ANTI-COMPETITIVE, AS HAS BEEN ALLEGED IN THE
```

1    COMPLAINT.

2         DAMAGES ISSUES ARE ALSO CRITICAL, AND PIF'S WILLINGNESS

3    AND ABILITY TO CONTINUE TO SUPPLY MONEY, WHETHER THEY HAVE BEEN

4    HARMED, IS RELEVANT UNDER THE ANTITRUST LAWS.

5         AND THEN OF COURSE OUR CLAIMS DO INVOLVE THE SAME SET OF

6    OPERATIVE -- SET OF NUCLEUS OF OPERATIVE FACTS, YOUR HONOR,

7    BECAUSE THEY ALSO CENTER ON THE PIF'S/LIV RECRUITMENT OF

8    GOLFERS, NEGOTIATION WITH GOLFERS, OFFER OF MONEY TO GOLFERS,

9    AND THAT'S WHAT THE COUNTERCLAIMS FOCUS ON.

10        AND THE LIV AND PIF COUNTERCLAIMS ARE CLOSELY RELATED

11   BECAUSE THEY INVOLVE THE SAME CONDUCT, AND THAT CONDUCT IS ALSO

12   INTEGRAL TO ASSESSMENT OF THE ISSUES OF MONOPOLY, THE MARKETS,

13   COMPOSITION, DAMAGES, ALL OF WHICH ARE INVOLVED IN THE

14   ANTITRUST CASE.

15        WE THINK THAT THE VENN DIAGRAM IS KIND OF A BULLS-EYE FOR

16   BOTH OF THEM, AND THAT THESE TOPICS ARE CRITICAL.  AND YOU

17   KNOW, LIV, A LOT OF THEIR EXECUTIVES WHO REPORT TO

18   MR. AL-RUMAYYAN, THEY COMMUNICATE WITH HIM WEEKLY, THEY

19   MAINTAIN KIND OF A DASHBOARD OF ISSUES THAT HE'S RESPONSIBLE

20   FOR, THAT'S A DOCUMENT THAT WE SHOWED TO MAGISTRATE

21   JUDGE VAN KEULEN, AND THAT SHE REFERRED TO IN HER OPINION, AND

22   THEN A LOT OF THOSE PEOPLE HAVE LEFT LIV.  SO MR. AL-RUMAYYAN

23   REALLY IS, I THINK, THE PERSON MOST KNOWLEDGEABLE ABOUT LIV AND

24   PIF.

25        AND SO THE IDEA THAT WE CAN GO AHEAD AND DO THAT CASE

```
1     WITHOUT ACCESS TO THEIR DOCUMENTS, THEIR COMMUNICATIONS AND

2     THEIR TESTIMONY, I DON'T THINK IS FAIR TO THE PGA TOUR,

3     YOUR HONOR.

4          THE COURT:  WELL, IT SOUNDS TO ME AS THOUGH YOUR

5     ARGUMENT REALLY IS SEPARATE FROM YOUR COUNTERCLAIM.  I'M ONLY

6     INTERESTED IN THE RELATIONSHIP TO THE CASE IN CHIEF FILED BY

7     THE PLAINTIFFS HERE.  THAT'S WHAT I'M LISTENING FOR.

8          I DO NOTE THAT, SINCE I WENT BACK AND READ THE AMENDED

9     PLEADING, THAT LIV HAS ITS OWN INTENTIONAL INTERFERENCE CLAIMS

10    AGAINST PGA TOUR.  SO IT SEEMS TO ME THAT I AM CERTAINLY NOT

11    BIFURCATING THE CASE THEY FILED.

12         AND SO IT MAY BE THAT THERE IS OVERLAP THAT IF -- UNLESS

13    THEY WANT TO DISMISS THOSE CLAIMS, WHICH THEY ARE ALWAYS

14    WELCOME TO DO, BUT THAT THAT'S A CONCERN FOR YOU TO BE ABLE TO

15    DEFEND AGAINST THE CLAIMS THAT YOU HAVE INTERFERED, THAT YOU

16    MAY NEED DISCOVERY AGAINST PIF AND MR. AL-RUMAYYAN, BUT I WILL

17    LET MR. QUINN ADDRESS THAT.

18         MR. PETERS:  I THINK THAT'S A GOOD POINT, YOUR HONOR,

19    BECAUSE ALL OF THE INTERFERENCE IN THE INDUCING BREACH OF

20    CONTRACT CLAIMS RELATE TO THE COMPETITION FOR THESE GOLFERS,

21    THE OFFERS, THE DISCUSSIONS THAT WERE MADE, OR HAD WITH THEM IN

22    2022 WHEN SOME OF THEM DECIDED TO JUMP FROM THE PGA TOUR TO

23    LIV, THAT'S REALLY WHAT THIS CASE FOCUSES ON.

24         AND THE EVIDENCE REALLY DOES -- THE ANTITRUST CLAIMS DO

25    REQUIRE THE SAME EVIDENCE, THE DEFENSE OF THEM DO, BECAUSE THE
```

1   REASONABLENESS OF WHAT THE PGA TOUR DID, AND OF OUR

2   CONTRACTURAL PROVISIONS, IS REFLECTED IN THE AGREEMENTS THAT

3   PIF AND LIV MADE WITH THE GOLFERS TOO.

4        THE COURT:  WELL, OF COURSE I DON'T WANT TO LOSE

5   SIGHT OF THE FACT THAT IT IS -- PLAINTIFFS ARE TRYING TO

6   ESTABLISH THAT PGA TOUR VIOLATED THE ANTITRUST LAWS, AND YOU

7   ARE ESSENTIALLY TRYING TO PUT THEM ON TRIAL FOR THEIR CONDUCT.

8        AND THAT'S -- AND YOU CAN DO THAT THROUGH -- MAYBE YOU

9   HAVE SOME DEFENSES, MAYBE YOU HAVE SOME COUNTERCLAIMS WHERE YOU

10   ARE PUTTING THEM ON TRIAL, BUT YOU HAVEN'T ACCUSED THEM OF

11   ANTITRUST VIOLATIONS, AND WE ARE NOT HAVING A TRIAL ON WHETHER

12   THEY VIOLATED THE ANTITRUST LAWS.  THEY DON'T HAVE MARKET

13   SHARE, THAT WOULDN'T GET OUT OF THE GATE, BUT I -- I WANT TO BE

14   SURE THAT WE DON'T LET ALL OF THIS BLEED INTO A FOREVER

15   LITIGATION.

16        MR. PETERS:  UNDERSTOOD, YOUR HONOR.

17        BUT CERTAINLY THEIR CONDUCT IS -- EXCUSE ME -- THEIR

18   CONDUCT AND THEIR CONTRACTURAL PROVISIONS ARE RELEVANT TO THE

19   REASONABLENESS AND THE PRO-COMPETITIVE NATURE OF OUR CONTRACTS.

20        THEIR NEGOTIATIONS WITH THE GOLFERS ARE RELEVANT TO THE

21   PRESENCE OF COMPETITION AND THE ABSENCE OF MONOPOLY POWER.

22   THOSE ARE BULLS-EYE TOPICS IN THE ANTITRUST CASE THAT THEY'VE

23   BROUGHT, AND WE WANT THAT EVIDENCE TO DEFEND AGAINST THEIR CASE

24   AS WELL AS TO PURSUE OUR COUNTERCLAIMS.

25        BUT WE VIEW THIS EVIDENCE AS INTEGRAL TO OUR DEFENSE OF

1    THE ANTITRUST CLAIMS, WHICH IS WHY, YOUR HONOR, BACK IN AUGUST,

2    WHEN WE WERE DISCUSSING THIS SCHEDULE, I SAID TO YOUR HONOR

3    ABOUT THE SCHEDULE, MY CONCERN IS GETTING ACCESS TO THIS

4    EVIDENCE FROM SAUDI ARABIA.  AND COUNSEL FOR THE PLAINTIFFS

5    DIDN'T SAY OH, THAT'S IRRELEVANT, WHAT ARE YOU TALKING ABOUT?

6    THEY SAID, WE WILL MOVE HEAVEN AND EARTH, WE WILL COOPERATE,

7    BECAUSE THEY RECOGNIZED THE RELEVANCE OF IT.

8        WE MAY HEAR A DIFFERENT TUNE TODAY, BUT THAT WAS THEIR

9    POSITION AT THAT TIME, AND THEY AGREED WITH US THAT THE

10   EVIDENCE WAS DISCOVERABLE AND NECESSARY AND THEY WERE GOING TO

11   MOVE HEAVEN AND EARTH TO GET IT FOR US.  INSTEAD, THEY MOVED

12   HEAVEN AND EARTH TO PREVENT US FROM GETTING IT.

13            THE COURT:  ALL RIGHT.

14        MR. QUINN, I THINK YOU KNOW THAT I HAVE WANTED TO GET YOUR

15   CLIENT'S CASE BEFORE A JURY AS QUICKLY AS POSSIBLE FROM THE

16   TIME IT WAS FIRST FILED.  AND IT'S OF COURSE MY GOAL STILL, BUT

17   OF COURSE THE DEFENDANTS HAVE RIGHTS, AND I HAVE TO BE CAREFUL

18   THAT THEY ARE ALLOWED TO PRESENT THEIR CASE AS WELL.

19        IT SEEMS TO ME THAT REGARDLESS OF WHETHER MR. AL-RUMAYYAN

20   IS A PARTY OR NOT, HE IS AN INTEGRAL PARTICIPANT IN LIV'S

21   CONDUCT.

22        AND SO FOCUSING ON THE ANTITRUST CASE ITSELF, WHICH IS

23   REALLY -- AND YOUR OTHER CLAIMS, JUST YOUR DIRECT CASE, I

24   WELCOME YOUR COMMENTS ON THE NECESSITY OF A TRIAL CONTINUANCE.

25            MR. QUINN:  YES.  THANK YOU VERY MUCH, YOUR HONOR.

1          AND I DO APPRECIATE THE OPPORTUNITY TO ADDRESS THE

2    ANTITRUST CLAIMS, AS WELL AS THE COUNTERCLAIMS, AND THE

3    POTENTIAL ROLE OF THE PIF AND MR. AL-RUMAYYAN WITH RESPECT TO

4    THOSE CLAIMS.

5          I MEAN, JUST TO JUMP TO THE BOTTOM LINE, FROM OUR

6    PERSPECTIVE, YOUR HONOR, THIS IS ALL ABOUT DELAY, CANDIDLY.

7    IT'S ABOUT DELAY, IT'S THE THIRD TIME.  YOU KNOW, IT'S -- I

8    LISTENED CAREFULLY TO MR. PETERS, YOU ASKED HIM THE QUESTION

9    ABOUT THE RELEVANCE TO THE ANTITRUST CLAIM, I LISTENED

10   CAREFULLY TO WHAT HE SAID, AND HE SAID, WELL, DISCOVERY OF THE

11   PIF AND MR. AL-RUMAYYAN IS RELEVANT TO THE DEFINITION OF A

12   MARKET, TO THE EXISTENCE OF COMPETITION, AND TO DAMAGES, AS TO

13   WHETHER THERE CAN BE ANY DAMAGES IF THERE'S A SOVEREIGN WEALTH

14   FUND THAT'S BEHIND THIS THAT'S PREPARED TO, PRESUMABLY, WAS THE

15   ARGUMENT, HE DIDN'T SPELL THIS OUT, TO FUND THIS INDEFINITELY.

16         I MEAN, WITH ALL RESPECT, THERE IS -- WHAT PIF HAS TO SAY

17   OR WHAT MR. AL-RUMAYYAN HAS TO SAY HAS NOTHING TO DO WITH THE

18   DEFINITION OF THE MARKET THAT WE ARE TALKING ABOUT HERE.  THE

19   MARKET FOR ELITE GOLF, WHERE I THINK BY A TRADITIONAL ANTITRUST

20   DEFINITION, THERE REALLY CAN'T BE ANY DISPUTE THAT THE PGA TOUR

21   IS ESSENTIALLY A MONOPOLIST.

22         PIF, ITSELF, IS NOT A COMPETITOR.  PIF AND MR. AL-RUMAYYAN

23   ARE NOT PARTICIPANTS IN THAT MARKET.  PIF -- THE PIF IS AN

24   INVESTOR IN A NEW ENTERPRISE THAT SOUGHT TO BE A NEW ENTRANT IN

25   THE MARKET WHERE THE TOUR IS A MONOPOLIST.

1    THIS CASE IS ABOUT THE ACTIONS THAT THE TOUR HAS TAKEN IN

2    RESPONSE TO THAT EFFORT FOR A NEW ENTRANT, LIV, NOT PIF, BUT

3    LIV, TO ENTER THAT MARKET.

4    AND BY THE WAY, JUST AS AN ASIDE, THERE'S BEEN A LOT OF

5    TALK, KIND OF FAST AND LOOSE, WITHOUT CITATION TO EVIDENCE,

6    INCLUDING IN THE BRIEFING LEADING UP TO THIS HEARING, ABOUT HOW

7    LIV IS A MERE SHELL INSTRUMENTALITY, ET CETERA, OF THE PIF.

8    YOU JUST HEARD SOME OF THAT FROM MR. PETERS.

9    THE RELATIONSHIP BETWEEN LIV GOLF AND THE PIF WAS

10   EXTENSIVELY BRIEFED FAIRLY WELL BEFORE THE MAGISTRATE.  THEY

11   NEVER CLAIMED, NEVER ATTEMPTED TO MAKE OUT ANY CASE FOR ALTER

12   EGO, THAT CORPORATE FORMALITIES HAD NOT BEEN OBSERVED.

13   I MEAN, THIS IS RHETORIC THAT WE HAVE HEARD FOR THE FIRST

14   TIME IN THE BRIEFING ON THIS MOTION.  THE STATE OF THE EVIDENCE

15   IS IT'S A -- LIV GOLF IS A SEPARATE ENTITY, THE LARGEST

16   INVESTOR AND THE LARGEST SHAREHOLDER, BENEFICIAL OWNER, IS

17   ULTIMATELY PIF.  THERE ARE MULTIPLE LAYERS OF CORPORATIONS THAT

18   STAND BETWEEN THE PLAINTIFF AND THE PIF, BUT IT JUST WOULDN'T

19   BE ACCURATE TO SAY, ESSENTIALLY, THEY ARE ONE AND THE SAME AND

20   THEY ARE A SHELL AND INSTRUMENTALITY.

21   SIMILARLY, WE HEARD SOME FAST AND LOOSE LANGUAGE ABOUT

22   DAILY COMMUNICATION BETWEEN LIV GOLF AND MR. AL-RUMAYYAN.  I

23   DEFY MR. PETERS TO FIND EVIDENCE OF THAT.  IF WE ACTUALLY LOOK

24   IN THE RECORD, THE RELATIONSHIP HERE IS THAT -- IS WHAT YOU

25   WOULD EXPECT OF A REPRESENTATIVE OF AN ULTIMATE INVESTOR IN A

1    NEW STARTUP.  WE WITH ALL HAVE EXPERIENCE WITH THAT.

2         INVESTORS IN STARTUP ENTERPRISES DO STAY INVOLVED, THEY DO

3    SOMETIMES, AS TO CERTAIN SUBJECTS, THEIR CONSENT IS REQUIRED

4    BEFORE CERTAIN ACTIONS ARE TAKEN.  THERE'S NOTHING MAGICAL OR

5    UNUSUAL ABOUT THAT OR SUGGESTS THAT WE SHOULD IGNORE THE

6    SEPARATENESS OR THE DIFFERENCE BETWEEN PIF --

7              THE COURT:  BUT MR. QUINN, I ACTUALLY THINK THE REAL

8     ISSUE IS, IS IT REASONABLE THAT MR. AL-RUMAYYAN HAS EVIDENCE

9     THAT IS CRITICAL TO THE DEVELOPMENT OF THE CASE.

10        I JUST DON'T -- BASED ON EVERYTHING I'VE READ, REGARDLESS

11   OF WHETHER THEY ARE SEPARATE LEGAL ENTITIES, I WILL GRANT YOU

12   THAT FOR THE TIME BEING, BECAUSE YOU ARE RIGHT, THERE'S BEEN NO

13   PROOF OF IT OTHERWISE, JUST AN ASSERTION.  HE IS IN UP TO HIS

14   EYEBALLS IN EVERYTHING THAT LIV HAS DONE.  AND SO HE

15   POTENTIALLY HAS RELEVANT EVIDENCE THAT MAY BE -- LEAD TO

16   ADMISSIBLE EVIDENCE AT TRIAL.  IT'S A PRETTY LOW STANDARD.

17        NOW, MR. PETERS HAS OTHER PROBLEMS BECAUSE HE'S NOT --

18   WHETHER HE CAN BE COMPELLED TO GIVE TESTIMONY IN THE

19   UNITED STATES, THAT'S A SEPARATE ISSUE.

20        AND I SAW THE OBJECTION THAT MR. PETERS FILED YESTERDAY TO

21   JUDGE VAN KEULEN'S ORDER, WE ARE NOT DEALING WITH THAT NOW.

22   BUT MR. AL-RUMAYYAN IS NOT GOING TO BE EXTRACTED FROM THE CASE.

23   HE MIGHT BE PROTECTED FROM COMING TO THE U.S. TO GIVE

24   TESTIMONY.  THAT'S A DIFFERENT ISSUE THAT MS. LAMM WILL DEAL

25   WITH, BUT HE'S NOT -- I JUST SAY, HE'S INTEGRALLY INVOLVED, AND

1    I THINK IT'S LUDICROUS TO SUGGEST OTHERWISE.

2              MR. QUINN:  YOUR HONOR, I HOPE I'M NOT GOING TO

3    SUGGEST SOMETHING LUDICROUS.

4              THE COURT:  I HOPE NOT TOO.

5              MR. QUINN:  BUT I THINK GIVING THE DEFENSE HERE THEIR

6    BEST CASE, THEY WOULD HAVE US BELIEVE THAT THERE'S A TORTIOUS

7    INTERFERENCE CASE.  THEY WOULD HAVE US BELIEVE THAT THE PIF AND

8    MR. AL-RUMAYYAN TORTIOUSLY INTERFERED WITH EXISTING CONTRACTS

9    WITH PLAYERS AND GAVE THEM LOTS OF MONEY AND LURED THEM AWAY,

10   AND THAT THAT WAS TORTIOUS INTERFERENCE.

11             IF ANY OF US HAVE THAT IMPRESSION, THAT THAT IS THEIR

12   CASE, WE WOULD BE FLAT WRONG, BECAUSE THEY COMPLETELY, IN THEIR

13   REPLY BRIEF ON THE MOTION FOR LEAVE TO AMEND, DISCLAIMED THAT

14   CASE.

15             THE PROBLEM WITH THAT CASE, IF YOU OFFER MONEY TO LEAVE,

16   THESE ARE AT-WILL CONTRACT PLAYERS, AND YOU KNOW, THAT'S A FREE

17   MARKET, THEY COULD LEAVE.  AND THERE WOULD BE NO TORTIOUS

18   INTERFERENCE CLAIM, EITHER UNDER CALIFORNIA OR FLORIDA LAW, WE

19   POINTED OUT IN THE OPPOSITION, UNLESS THEY COULD SHOW

20   INDEPENDENTLY WRONGFUL CONDUCT.

21             SO IN THE REPLY, THEY HAD TO RESHAPE THEIR TORTIOUS

22   INTERFERENCE CLAIM.  AND YOUR HONOR, THIS IS WHAT THE TORTIOUS

23   INTERFERENCE CLAIM NOW COMES DOWN TO, IT COMES DOWN TO NOT

24   ENCOURAGING PEOPLE TO LEAVE, BUT ENCOURAGING THEM TO STAY, TO

25   STAY WITH THE TOUR AND PLAY WITH LIV ON ALTERNATE WEEKENDS.

```
1     THAT'S IT.  THAT'S WHAT WE ARE TALKING ABOUT.  THE ALLEGED

2     TORTIOUS INTERFERENCE -- THIS IS THEIR CLAIM NOW, IS THAT YOU

3     TOLD PEOPLE THEY COULD STAY, THAT IT WOULD BE LEGAL, WE WILL

4     INDEMNIFY YOU, AND THEN YOUR PGA TOUR OFF-WEEKENDS, YOU CAN

5     PLAY ON LIV GOLF.  IT'S THAT NARROW.

6         WE ARE TALKING ABOUT A UNIVERSE.  NOW, THIS IS NOT JUST

7     THE TAIL WAGGING THE DOG, YOUR HONOR, THIS IS THE FLEA ON THE

8     TAIL OF THE DOG WAGGING THE DOG.  WE ARE TALKING ABOUT A

9     UNIVERSE OF SEVEN PLAYERS WHO STAYED AND PLAYED AND SUSTAINED

10    DISCIPLINE FROM THE TOUR.

11        NOW THAT'S WHAT WE ARE TALKING ABOUT.  THAT'S THE UNIVERSE

12    OF THIS CLAIM THAT THEY ARE NOW TRYING TO HOLD UP TO STOP

13    DISCOVERY, WHICH BY THE WAY, AND I WOULD LIKE TO TALK ABOUT IT,

14    HOW FAR WE HAVE COME AND HOW READY WE ARE, AND WE ARE READY TO

15    START COMPLETE DISCOVERY BY MARCH 30TH.  THERE ARE SOME ODDS

16    AND ENDS, THERE ALWAYS ARE IN EVERY CASE, BUT WE HAVE ALL

17    WORKED WITH THAT, WE'VE GOTTEN HELP FROM TIME TO TIME FROM THE

18    MAGISTRATE.

19        BUT THEY ARE TALKING ABOUT HOLDING UP A CASE NOW, FOR THIS

20    NARROW CLAIM WHICH THEY HAVE ADDED WHICH INVOLVES A HANDFUL OF

21    PLAYERS, JUST ONE SEASON, ONLY THE 2021 SEASON.  I CAN'T

22    IMAGINE WHAT THE DAMAGES ARE THERE, YOUR HONOR, FOR INDUCING

23    PEOPLE TO STAY WITH THE TOUR AND THEN WORK ON -- YOU KNOW, GO

24    PLAY GOLF, WORK, FOR THESE GENTLEMAN ON THEIR OFF WEEKENDS.

25        AND BY THE WAY, THE IDEA THAT WE WOULD TELL PEOPLE, BY THE
```

1    WAY, WE THINK THESE ARE YOUR LEGAL RIGHTS AND YOU CAN STAND UP

2    FOR THEM.  WHEN THAT'S BRIEFED, I SUSPECT THE POSITION IS GOING

3    TO BE, THAT'S PROTECTED FIRST AMENDMENT CONDUCT.

4         SO, YOU KNOW, GIVING THEM -- THERE IS NO REASON TO HOLD UP

5    THIS CASE WHERE WE HAVE NOW -- THE PARTIES HAVE PRODUCED

6    HUNDREDS OF THOUSANDS OF DOCUMENTS, THIRD PARTIES HAVE PRODUCED

7    DOCUMENTS.

8         YES, THERE ARE SOME LOOSE ENDS, THEY POINT OUT IN THEIR

9    PAPERS, THE PLAYER AGENTS HAVE SAID THEY ARE GOING TO PRODUCE

10   THE DOCUMENTS, THEY WILL DO IT BY THE DEADLINES.  SOME OF THE

11   PLAYERS SAID THEY WILL PRODUCE THE DOCUMENTS.

12        THIS IS NO DIFFERENT THAN ANY OTHER CASE.  WE WROTE THEM,

13   YOUR HONOR.  WE WROTE THEM TWO WEEKS AGO AND SAID, WE ARE

14   WINDING UP DOCUMENT PRODUCTION HERE, IT'S TIME FOR US TO START

15   SCHEDULING DEPOSITIONS, HERE'S OUR LIST OF YOUR WITNESSES, YOUR

16   EMPLOYEES, PEOPLE AFFILIATED WITH YOU WHO WE WOULD LIKE TO

17   DEPOSE, COULD YOU PLEASE LET US KNOW THEIR AVAILABILITY.

18        THE RESPONSE WE GOT, AND THIS RESPONSE IS ALL IN A

19   MICROCOSM, THEIR POSITION, WE CANNOT SCHEDULE A SINGLE

20   DEPOSITION UNLESS MR. AL-RUMAYYAN AGREES TO SIT FOR DEPOSITION

21   BY A DATE SPECIFIED.

22             THE COURT:  SO MR. QUINN, I GUESS I'M LOOKING AT THIS

23    A LITTLE DIFFERENTLY.  I'M LOOKING AT A REQUEST FOR A TRIAL

24    CONTINUANCE, IN LIGHT OF JUDGE VAN KEULEN'S ORDER ON A

25    THIRD-PARTY SUBPOENA UNDER THE PLEADINGS BEFORE I GRANTED LEAVE

1    TO AMEND.

2         I MAY NEVER LET THE AMENDED CROSS-COMPLAINT OUT THE GATE,

3    THAT HAS YET TO COME BEFORE ME.  WHAT I EVALUATED IN ALLOWING

4    IT TO BE FILED IS A VERY LOW THRESHOLD LEVEL, AND I HAVE --

5    THIS FAR IN ADVANCE OF TRIAL, YOU KNOW IT WAS VIRTUALLY

6    ORDAINED THAT I HAD TO LET THEM DO THAT.  TO FIND IT WAS FUTILE

7    WOULD BE SURPRISING, I THINK, TO MOST.  BUT IT DOESN'T MEAN

8    THAT I HAVE AGREED THAT THAT CLAIM CAN GO FORWARD.

9         BUT HERE WE HAVE, THERE NOW IS AN ORDER THAT THE THIRD

10   PARTIES PRODUCE DOCUMENTS AND SIT FOR DEPOSITION.  AND THAT NOW

11   PUTS -- IT REALLY PUTS THE BALL IN THE PLAINTIFF'S COURT AS TO

12   WHEN AND HOW THAT WILL BE COMPLIED WITH.  AND EVERYONE RESPECTS

13   YOUR CLIENT'S RIGHT TO CONTEST THAT OR THE THIRD PARTIES TO

14   CONTEST THAT.  TO THE EXTENT THAT TAKES TIME, AND THAT IS

15   ORDERED DISCOVERY IN THE PRIMARY CASE, WE CAN'T GO FORWARD.  WE

16   JUST CAN'T GO FORWARD.

17         MR. QUINN:  YOUR HONOR, FIRST OFF, IT IS A THIRD

18   PARTY.  THE AMENDED COMPLAINT CHANGED -- AS TO THE ANTITRUST

19   CLAIM, THEY ARE A THIRD PARTY.  IT'S NOT UNUSUAL FOR PARTIES TO

20   BE ADDED IN THE MIDDLE OF DISCOVERY.

21         THE COURT:  SURE.

22         MR. QUINN:  WE CAN GO FORWARD WITH DISCOVERY AND WE

23   CAN HAVE AN UNDERSTANDING THAT IF IT TURNS OUT THERE'S SOME

24   EVIDENCE THAT CHANGES THINGS OR THERE'S CAUSE TO REOPEN

25   DEPOSITION, WE ARE PERFECTLY WILLING TO --

1          THE COURT:  I GUESS WHAT I'M SAYING IS THAT IT

2    APPEARS TO ME THAT BETWEEN YOUR CLIENTS AND MS. LAMM'S CLIENTS,

3    THERE IS AN ENORMOUS WALL OF OPPOSITION TO THE DISCOVERY THAT

4    JUDGE VAN KEULEN ORDERED AND THE DEPOSITION THAT SHE ORDERED,

5    AND THAT YOU APPEAR TO BE WILLING TO -- FIRST, YOU ARE GOING TO

6    OBJECT TO THAT TO ME, I DO NOT EVEN HAVE BRIEFING ON IT, IT WAS

7    DUE YESTERDAY.  YOU ASKED FOR A CONTINUANCE, I GRANTED IT UNTIL

8    EARLY NEXT WEEK, JUST SO THAT WE COULD TALK ABOUT THIS TODAY.

9          MR. PETERS HAS ALREADY FILED HIS OPPOSITION, IT'S A VERY

10   NARROW ISSUE.  BUT IF YOUR CLIENT STANDS IN THE WAY OR THE

11   THIRD PARTY STANDS IN THE WAY OF THE ALREADY ORDERED DISCOVERY,

12   I DON'T KNOW HOW THE TRIAL DATE GOES FORWARD.

13         AND YOU WANT TO KEEP THE PRESSURE ON THE DEFENDANTS TO

14   SAY, LET'S SEE HOW IT PLAYS OUT.  WELL, THE THIRD PARTIES,

15   BECAUSE IT'S A DISPOSITIVE ORDER AS TO THEM AS THIRD PARTIES,

16   CAN APPEAL TO THE NINTH CIRCUIT.  ARE WE GOING TO TAKE TWO

17   YEARS?  THERE WOULD BE NO TRIAL DATE.  THAT'S A CHOICE.  THAT'S

18   A STRATEGIC DECISION THAT YOU ALL HAVE TO MAKE.

19         THERE ARE IMPORTANT SOVEREIGNTY ISSUES AND PERSONAL

20   JURISDICTION ISSUES THAT JUDGE VAN KEULEN ADDRESSED.  AND I

21   HAVEN'T YET DETERMINED, BECAUSE I DON'T HAVE BRIEFING ON IT,

22   WHETHER OR NOT SHE WAS CORRECT.  I'VE READ HER ORDER, LIKE WE

23   ALL HAVE.  IT'S VERY THOROUGH.  THAT DOESN'T SAY IT'S RIGHT OR

24   WRONG, BUT IT LAYS THE GROUND WORK, FRANKLY, FOR THE AMENDED

25   COUNTERCLAIM AS WELL, BECAUSE SHE HAS ALREADY ADDRESSED

```
1      PERSONAL JURISDICTION.
2           BUT AS LONG AS PLAINTIFFS PUT UP THE WALL, I DON'T KNOW
3      HOW YOU EXPECT THE DEFENDANTS TO JUST SAY, OKAY, I GUESS WE
4      HAVE TO GO TO TRIAL WITH A THREE-LEGGED STOOL INSTEAD OF WITH
5      THE DISCOVERY WE NEED.
6           MR. QUINN:  WELL, YOUR HONOR, IN THE SCHEDULE THAT
7      YOUR HONOR SET, NONE OF US BUILT IN TIME OR ANTICIPATED, MAYBE
8      WE SHOULD HAVE, TIME FOR THESE APPEALS.
9           THE COURT:  THAT'S RIGHT.
10          MR. QUINN:  AND IF THERE IS A BRIEF CONTINUANCE, SOME
11     ENLARGEMENT OF TIME IS APPROPRIATE, WE CAN UNDERSTAND THAT.
12          THE COURT:  SO LET ME TELL YOU ABOUT A BRIEF
13     CONTINUANCE, MR. QUINN.
14          MR. QUINN:  YES, YOUR HONOR.
15          THE COURT:  IF THIS WERE MY ONLY CASE, I WOULD BE
16     MORE THAN GLAD, BUT YOU DO UNDERSTAND THAT I HAVE 400 OTHER
17     CASES, AND EACH OF THE LITIGANTS IN THE OTHER 399 CASES
18     BELIEVES THEIR CASE IS AT LEAST AS IMPORTANT AS YOU BELIEVE
19     THIS CASE IS.
20          MR. QUINN:  RIGHT, YOUR HONOR.
21          THE COURT:  AND I WAS JUST SETTING CASES YESTERDAY
22     FOR TRIAL IN AUGUST OF 2025.  AND SO I DON'T KNOW HOW MANY
23     TIMES YOU EXPECT ME TO GIVE PRIORITY TO THIS CASE.  I'VE
24     ALREADY DONE IT TWICE.  THE INITIAL TRIAL SETTING AND THE
25     CONTINUED TRIAL SETTING IS ON THE BACKS OF OTHER LITIGANTS WHO
```

1    HAVE BEEN WAITING IN LINE AHEAD OF YOU.

2          MR. QUINN:  UNDERSTOOD, YOUR HONOR.

3       BUT MR. PETERS TRIVIALIZES IT.  BUT I REPRESENT THREE

4    INDIVIDUALS WHOSE ABILITY -- WE CAN SAY, WELL, THEY GOT BIG

5    CHECKS.  BUT IF YOU'RE A PROFESSIONAL ATHLETE, THE TIME THAT

6    YOU HAVE TO EXERCISE YOUR PROFESSION AND MAKE AN INCOME, MAKE A

7    LIVING, IS A VERY BRIEF -- IT'S A BRIEF PERIOD OF TIME.  AND WE

8    ARE LOOKING AT PEOPLE BECAUSE THEY HAVE BEEN BLACK-BALLED, WHO

9    POTENTIALLY WILL NOT BE ABLE TO PRACTICE THEIR PROFESSIONS

10   AFTER 2024.  THIS IS NOT IMAGINARY, WE HAVE PEOPLE --

11          THE COURT:  OH, I UNDERSTAND.

12          MR. QUINN:  ALL RIGHT.  SO --

13          THE COURT:  I MEAN, MR. WALTERS ADDRESSED THIS

14   THOROUGHLY AT THE MOTION FOR TEMPORARY RETRAINING ORDER.  I

15   DIDN'T AGREE.

16          MR. QUINN:  AND IT'S GOTTEN WORSE.  THE TOUR HAS

17   ACTUALLY DOUBLED DOWN, AND NOW IN RECENT RULES AND NEWLY

18   ADOPTED RULES, HAVE BANNED NOT ONLY MEMBERS, BUT NON-MEMBERS OF

19   THE TOUR WHO PLAY FOR LIV.  SO THEY HAVE ACTUALLY GOTTEN MORE

20   AGGRESSIVE.

21       LOOK, THIS IS A REALITY FOR THESE INDIVIDUALS.  FOR THIS

22   BUSINESS, THE ASSUMPTION REALLY SHOULDN'T BE THAT, YOU KNOW,

23   LIV GOLF WILL BE AROUND BECAUSE IT'S GOT A BACKER WITH DEEP

24   POCKETS THAT THEY CAN FUND ANYTHING, THEY CAN PUT UP WITH THIS.

25   THE REALITY IS THIS BUSINESS ONLY WORKS IF THEY CAN RECRUIT

```
 1    ELITE GOLFERS.
 2              THE COURT:  SURE.
 3              MR. QUINN:  ALL THE EVIDENCE IS, YOUR HONOR, THAT THE
 4    PIF IS A RATIONAL, DISCIPLINED INVESTOR THAT INVESTS FOR A
 5    RETURN.
 6         THE OTHER SIDE KNOWS THIS.  THEIR OWN CONSULTANT, WE HAVE
 7    SEEN THIS IN DOCUMENTS THAT HAVE BEEN PRODUCED, THEIR OWN
 8    CONSULTANT TOLD THE TOUR EXACTLY THAT, THAT THE PIF WON'T BE IN
 9    THIS FOR A LONG RUN IF THEY ARE NOT GOING TO SEE AN OPPORTUNITY
10    FOR RETURN HERE.  A STARTUP ONLY HAS A CERTAIN WINDOW OF
11    OPPORTUNITY.
12         SO, YOU KNOW, YOUR HONOR, THERE IS STILL A NEED FOR SOME
13    URGENCY HERE.  WE'VE GOT NINTH CIRCUIT PRECEDENT ON THAT, THAT
14    WHEN IT COMES TO A SITUATION LIKE THIS, WHERE PEOPLE'S JOBS ARE
15    POTENTIALLY ON THE LINE, AN INJUNCTION IS SOUGHT, THAT PUTTING
16    A CASE ON ICE IS REALLY NOT WHAT OUGHT TO BE DONE.
17         AND WHAT WE ARE ASKING --
18              THE COURT:  SO IT JUST DEPENDS ON THE REASON IT'S
19    BEING PUT ON ICE.
20              MR. QUINN:  YEAH.  BUT, YOUR HONOR --
21              THE COURT:  AND THE QUESTION IS OF NOT PRODUCING
22    DOCUMENTS THAT JUDGE VAN KEULEN HAS ORDERED TO BE PRODUCED.
23    AND THAT'S --
24              MR. QUINN:  I'M SORRY, YOUR HONOR, THAT'S A THIRD
25    PARTY.
```

```
 1            THE COURT:  THEY ARE A THIRD PARTY, THAT'S RIGHT.

 2     MS. LAMM IS A THIRD PARTY.

 3            MR. QUINN:  THEY ARE NOT THESE GOLFERS.  IT'S NOT

 4      THESE GOLFERS.

 5         SO THEY ARE A FAR AND AWAY MAJORITY INVESTOR, THEY ARE NOT

 6      THE ONLY INVESTOR IN LIV GOLF, BUT WE ARE NOT RESPONSIBLE FOR

 7      THE PIF'S DECISIONMAKING IN THAT REGARD.

 8         SO WE HAVE THESE URGENCIES, THEY ARE REAL, WE ARE READY TO

 9      START DEPOSITIONS, AND THEY SHOULDN'T BE ABLE TO SAY, TIMEOUT,

10      WE NEED PIF DOCUMENTS AND WE NEED TO EXAMINE MR. AL-RUMAYYAN

11      BECAUSE OF THIS -- FIRST OFF, THIS COUNTERCLAIM, WHICH AS I'VE

12      DESCRIBED IT IS SO RIDICULOUSLY NARROW.

13         AND ON THE ANTITRUST CASE, WHERE ALL THEY CAN SAY IN

14      RESPONSE IS, IT'S RELEVANT TO THE DEFINITION OF A MARKET, IT'S

15      RELEVANT TO THE EXISTENCE OF COMPETITION, IT'S RELEVANT TO

16      DAMAGES, I SUBMIT, YOUR HONOR, THAT TELLS YOU ALL YOU NEED TO

17      KNOW ABOUT THE DISCOVERY FROM PIF AND MR. AL-RUMAYYAN, RELEVANT

18      TO THE ANTITRUST CASE.

19         THEY WANT THIS CASE TO COME TO A HALT FOR NOTHING, REALLY.

20      THERE'S NOTHING THAT THAT TESTIMONY HAS TO CONTRIBUTE TO THOSE

21      ISSUES.

22         SO --

23            THE COURT:  ALL RIGHT.

24            MR. LIPTON:  YOUR HONOR, THIS IS JOSH LIPTON,

25      MR. QUINN'S CO-COUNSEL.
```

```
1          MAY I BE HEARD ON A BRIEF ISSUE?

2              THE COURT:  I THINK MR. QUINN HAS DONE AN EXCELLENT

3      JOB.  DO YOU THINK HE NEEDS SOME HELP HERE, MR. LIPTON?  I

4      DON'T THINK SO.

5              MR. LIPTON:  I WANTED TO POINT OUT A COUPLE OF FACTS

6      TO CLEAR UP THE MISPERCEPTION IN THE RECORD, IF THAT'S ALRIGHT,

7      YOUR HONOR.

8          THE ISSUE WAS RAISED, YOUR HONOR, THAT THE PLAINTIFFS HAVE

9      BLOCKED THE DISCOVERY FROM PIF AND MR. AL-RUMAYYAN.  I WANTED

10     TO CORRECT THAT, BECAUSE IT'S NOT TRUE.

11         AS MR. QUINN STATED, THE PLAYER PLAINTIFFS, MATT JONES,

12     FOR EXAMPLE, HE HAS NO POWER TO BLOCK ANY DISCOVERY FROM PIF OR

13     MR. AL-RUMAYYAN.  LIV, ITSELF, HAS NOT BLOCKED ANY DISCOVERY

14     FROM PIF AND AL-RUMAYYAN.

15         AND THE TELLING POINT THERE IS LIV HAS PRODUCED MORE THAN

16     7,000 DOCUMENTS, MORE THAN 7,000 E-MAILS THAT WERE TO OR FROM A

17     PIF PERSON, FROM ITS FILE.

18         SO IF THERE'S A PIF DOCUMENT IN LIV'S FILES THAT'S

19     RESPONSIVE TO THE DOCUMENT REQUEST, IT HAS BEEN PRODUCED.  SO

20     THERE ARE THOUSANDS OF DOCUMENTS ALREADY FROM PIF IN THE

21     PRODUCTION.

22         IF THERE WAS ANY COMMUNICATION FROM MR. AL-RUMAYYAN TO ANY

23     OF THE GOLFERS, OR THEIR AGENTS, OR ANYONE AT LIV RELATED TO

24     THE CASE, IT'S GOING TO BE IN THEIR FILES.  THOSE HAVE ALL BEEN

25     SEARCHED FOR AND PRODUCED.
```

1        SO WHEN WE ARE TALKING ABOUT DISCOVERY FROM PIF THAT THEY

2    DON'T HAVE, IT'S NOT THE DOCUMENTS THAT HAVE COME TO LIV, TO

3    THE PLAYERS, TO THE PLAYERS' AGENTS OR ANYONE ELSE WHO IS

4    SUBJECT TO DISCOVERY, AND IT'S A VERY LARGE UNIVERSE IN THIS

5    CASE, YOUR HONOR, WE ARE ONLY TALKING ABOUT DOCUMENTS THAT

6    MIGHT BE IN PIF'S POSSESSION THAT HAVE NOT COME INTO POSSESSION

7    WITH ONE OF THE MANY CUSTODIANS.

8        THE COURT:  I REALLY THINK THE DEPOSITION IS PROBABLY

9     KEY AS WELL THOUGH, MR. LIPTON.  ALL RIGHT.

10        MR. LIPTON:  THANK YOU.

11        THE COURT:  YES.

12     MR. PETERS, I'M NOT ACTUALLY PERSUADED THAT WE NEED A

13    TRIAL CONTINUANCE AT THIS POINT.  I MAY NOT AGREE WITH

14    MR. QUINN THAT JUDGE VAN KEULEN WAS INCORRECT AND THEN THERE

15    WILL BE A MOST EXPEDITED DISCOVERY SCHEDULE IMPOSED ON THE

16    THIRD PARTIES, AS WITHIN DAYS OF A CONCLUSION.

17        THE FINAL CONCLUSION MAY NOT BE UP TO ME, I CERTAINLY

18    UNDERSTAND THAT, BUT I AM INCLINED TO RETAIN THE TRIAL DATE AND

19    REQUIRE THAT YOU COMPLETE ALL THE DISCOVERY, SEPARATE FROM

20    THESE THREE PARTIES, UNDER THE CURRENT SCHEDULE.

21        AND IN THE EVENT THAT THE DISCOVERY STILL NEEDED FROM PIF

22    AND MR. AL-RUMAYYAN IS STILL OUTSTANDING AT THE END OF MARCH OR

23    THE MIDDLE OF APRIL, I DON'T KNOW WHAT A REASONABLE TIME FRAME

24    IS, THEN WE CAN READDRESS THE TRIAL SCHEDULE.

25        AS FAR AS I'M CONCERNED, YOUR SUMMARY JUDGEMENT MOTION

1    ISN'T SET UNTIL AUGUST AND TRIAL IS NOT UNTIL NEXT JANUARY.  SO

2    THERE'S STILL A LOT OF TIME FOR THIS DISCOVERY TO TAKE PLACE.

3         AND I'M GOING TO PUT SOME LIMITATIONS ON THIS MOTION TO

4    DISMISS, IF THERE'S GOING TO BE ONE FROM THE PARTIES, BECAUSE

5    I'M NOT GOING TO HAVE HUNDREDS OF PAGES OF BRIEFING ON ALL OF

6    THIS, BECAUSE THEN I WILL CONTINUE THE TRIAL DATE, AND I WILL

7    CONTINUE IT BY YEARS BECAUSE I CAN'T KEEP UP WITH THE PAGES, SO

8    I WILL JUST LIMIT THAT.

9         BUT RIGHT NOW, I'M CONCERNED THAT THE MORE PEDESTRIAN

10   DISCOVERY THAT NEEDS TO TAKE PLACE HAS NOT BEEN CONCLUDED AND

11   HAS NOT BEEN BROUGHT TO JUDGE VAN KEULEN TO COMPEL.  THAT'S A

12   CONCERN TO ME.

13        IF THE PARTIES COULD TELL ME THAT EVERYTHING ELSE WAS

14   WRAPPED UP AND ALONG ON ITS SCHEDULE AND THIS WAS THE ONLY

15   OUTSTANDING CONCERN, THAT MIGHT BE DIFFERENT.  BUT THAT'S NOT

16   THE CASE.

17        AND SO IT'S NOT PERSUASIVE TO ME THAT YOU ARE WAITING FOR

18   THE TESTIMONY OF AL-RUMAYYAN BEFORE YOU CAN CONCLUDE THE OTHER

19   TESTIMONY.  AND DOCUMENT REQUESTS, AS MS. LAMM SUGGESTS EARLY

20   ON, YOU CAN ALWAYS COME BACK AND ASK TO REOPEN A DEPOSITION.

21   AND YOU CAN ASK THAT ONE DAY AND I CAN ORDER IT THE NEXT DAY.

22   IT'S SIMPLE, IT DOESN'T EVEN TAKE BRIEFING.

23        I JUST -- EACH OF YOU COULD SPEAK FOR THREE MINUTES ON A

24   TOPIC LIKE THAT AND WE CAN MAKE IT HAPPEN OR DENY IT AND MOVE

25   IT FORWARD.

1          SO AT THIS POINT, I THINK THAT THE PARTIES NEED TO REALLY

2     FOCUS ON GETTING -- WRAPPING UP THE DISCOVERY THAT IS SEPARATE

3     FROM THESE THIRD PARTIES.  WE WILL LITIGATE THE AMENDED

4     COUNTERCLAIM, IF THAT GETS BOLLOXED UP IN DELAY, I DO HAVE

5     REMEDIES TO BIFURCATE THAT, IT'S NOT WHAT I WANT TO DO.  AND IT

6     MAY BE THAT BECAUSE LIV HAS ITS OWN TORTIOUS INTERFERENCE

7     CLAIMS, THAT THEN THEY BECOME TOO INTERTWINED AND MR. QUINN HAS

8     TO MAKE THE DECISION OF WHETHER HE WANTS TO DISMISS, I THINK

9     IT'S CLAIM 7 AND 8 FROM THE AMENDED COMPLAINT.

10          THOSE ARE CHOICES THAT CAN BE MADE.  I DON'T NEED TO MAKE

11     THOSE DECISIONS TODAY.  AND THAT'S NEVER GOING TO -- AND YOU

12     KNOW, I JUST -- I DOUBT THOSE ARE GOING TO BE THE HOT SUBJECT

13     OF A MOTION FOR SUMMARY JUDGEMENT, BECAUSE THEY ARE SO

14     FACTUALLY INTERTWINED WITH EVERYTHING ELSE.

15          SO THAT'S HOW I'M SEEING IT, MR. PETERS.  I THINK THAT

16     IT'S PREMATURE TO GRANT A CONTINUANCE, AND ONCE I GIVE UP THIS

17     TRIAL DATE, I'M NOT SURE WHEN I'M GOING TO BE ABLE TO RESET IT.

18          MR. PETERS:  I HEAR YOU, YOUR HONOR.

19          MAY I RESPOND TO WHAT THE COURT JUST SAID, AND TO A COUPLE

20     OTHER THINGS THAT MR. QUINN JUST SAID?

21          THE COURT:  SURE.

22          MR. PETERS:  THE CHARACTERIZATION OF THE RELEVANCE OF

23     PIF AND MR. AL-RUMAYYAN TO THE ANTITRUST CLAIMS, INCLUDES

24     NEGOTIATIONS WITH PLAYERS, IT INCLUDES NEGOTIATIONS WITH

25     BROADCASTERS, WHICH MR. AL-RUMAYYAN WAS INVOLVED IN.  IT

1    INCLUDES NEGOTIATIONS WITH SPONSORS, IT INCLUDES NEGOTIATIONS

2    WITH VENDORS, IT RELATES TO THEIR CLAIM THAT THERE WAS A

3    BOYCOTT ARRANGED AGAINST THEM.  IT'S BROADLY RELEVANT TO THE

4    ANTITRUST ISSUES, IN ADDITION TO THE NEGOTIATION WITH THE

5    PLAYERS.  SO --

6              THE COURT:  MR. PETERS, THOSE ARE ALL IMPORTANT

7    ISSUES, BUT NORMALLY THAT'S DISCOVERY TAKEN AGAINST THE

8    DEFENDANT, NOT AGAINST THE PLAINTIFF.

9              MR. PETERS:  YES.  BUT WHETHER OR NOT THERE WAS SOME

10   KIND OF ANTICOMPETITIVE EFFECT, WHETHER THERE WAS SOME KIND OF

11   BOYCOTT, MR. AL-RUMAYYAN'S TESTIMONY IN HIS DOCUMENTS ABOUT HIS

12   UNFETTERED ACTIVITIES IN THOSE AREAS, IS GOING TO BE RELEVANT

13   TO ALL OF THOSE ISSUES.

14       IT'S NECESSARY FOR US TO PROVE OUR DEFENSE AND COME

15   FORWARD WITH EVIDENCE ABOUT HOW FREELY THEY WERE ABLE TO

16   COMPETE.  YOUR HONOR RECALLS, WHEN I ARGUED BEFORE YOU IN

17   AUGUST, A BIG POINT OF OUR ARGUMENT WAS YOU WANT TO SEE

18   COMPETITION.  THERE'S COMPETITION HERE.

19       I REMEMBER SHOWING YOU A SLIDE, WHICH IT APPEARED IT

20   INTERESTED YOU, WHERE I SAID HALF OF THE TOP TEN PLAYERS NOW

21   PLAY FOR THEM.  THIS IS ROBUST COMPETITION.  SO WE WANT TO

22   DEMONSTRATE THAT.

23       AND YES, THERE IS OTHER DISCOVERY THAT CAN TAKE PLACE, BUT

24   IT MAKES IT MORE DIFFICULT FOR US IF THE MOST CRITICAL

25   WITNESSES AND REPOSITORIES OF DOCUMENTS ON THE PLAINTIFF'S SIDE

1      ARE A STONE WALL, A BIG WALL PLACED UP AGAINST -- IN FRONT OF

2      US WHILE WE ARE PROVIDING DOCUMENTS AND DISCOVERY, AS WE

3      SHOULD, PROPERLY.  THEY SAID THEY WOULD DO THIS, AND THEY

4      HAVEN'T.

5           AND I REALLY -- YOU KNOW, MR. QUINN TO TELL YOU HE

6      REPRESENTS THESE THREE GOLFERS, HE REPRESENTS PIF AND

7      MR. AL-RUMAYYAN.  HE'S THE PERSON WHO ATTEMPTED SERVICE OF THE

8      SUBPOENA.  HIS PARTNER ARGUED IN FRONT OF JUDGE VAN KEULEN.

9      QUINN EMANUEL REPRESENTS THEM.

10          NOW HE SAYS IT'S SO UNFAIR TO THESE INDIVIDUALS IF THERE'S

11     ANY DELAY IN THE TRIAL.  WELL, HE HAS THE SOLUTION TO THE

12     PROBLEM.  HE CAN TALK TO HIS CLIENTS AND SAY, WHY DON'T YOU

13     AGREE TO PRODUCE THE DISCOVERY AND AGREE TO SIT FOR DEPOSITIONS

14     AND AGREE TO COMPLY WITH JUDGE VAN KEULEN'S ORDER SO THAT THIS

15     CASE CAN MOVE FORWARD.

16          WHY SHOULD THEIR CHOICES BE IMPOSED -- VISIT AN UNFAIRNESS

17     ON THE PGA TOUR IN THIS DISPARITY OF ACCESS TO INFORMATION

18     WHILE WE GO FORWARD WITH DISCOVERY?

19          THEY HAVE THE SOLUTION TO THE PROBLEM, IF THEY WANT TO DO

20     IT.  BUT FOR THEM TO BOTH WITHHOLD OUR ACCESS TO CRITICAL

21     DISCOVERY AND THEN PLOW AHEAD WITH THE DISCOVERY THEY WANT TO

22     DO, CREATES A KIND OF IMBALANCE THAT I REALLY BELIEVE THE COURT

23     WAS NOT CONTEMPLATING WHEN THEY PROMISED THAT THEY WOULD

24     COOPERATE WITH THIS DISCOVERY AND THIS SCHEDULE WAS SET.

25          THE COURT:  ALL RIGHT.

1          WELL, TELL ME WHEN IS YOUR FACT DISCOVERY CUTOFF DATE?

2               MR. PETERS:  END OF MAY, THE DOCUMENT COMPLETION DATE

3     IS THE END OF MARCH.

4               THE COURT:  MARCH.

5               MR. PETERS:  SO WE HAVE 30 DAYS -- IT'S INCONCEIVABLE

6     THAT THE DOCUMENTS CAN BE -- THEY ARE GOING TO BE LITIGATING

7     AND APPEALING TO THE NINTH CIRCUIT.  I MEAN, YOUR HONOR, I

8     THINK IT WOULD BE HELPFUL TO KNOW, AND MAYBE MR. QUINN COULD

9     TELL US --

10              THE COURT:  I GUESS WHAT I'M REALLY -- WHERE I'M

11    REALLY GOING TO GO ON THIS IS THAT I THINK IT'S PREMATURE TO

12    CONTINUE THE TRIAL UNTIL WE REACH THE MARCH 30TH DATE.  I'M

13    GOING TO WANT TO SEE THAT ALL THE DISCOVERY, OTHER THAN THE

14    THIRD PARTY DISCOVERY, HAS BEEN CONCLUDED.

15         I DON'T WANT TO HEAR ANY MORE, MR. PETERS, THAT I NEED TO

16    WAIT UNTIL I GET THE OTHER EVIDENCE.  I WILL LET YOU REOPEN

17    THOSE DEPOSITIONS, IF YOU LATER GET EVIDENCE THAT REQUIRES YOU

18    TO GO BACK IN.  AND THOSE WITNESSES WILL BE COMPELLED TO ATTEND

19    A FURTHER DEPOSITION IF IT'S BASED UPON THE DELAY IN PRODUCING

20    THE PIF DOCUMENTS.

21         BUT I AM CONCERNED THAT EVERYONE IS DRAGGING THEIR FEET ON

22    ALL OF THE DISCOVERY.  IT GOES TO BOTH SIDES, I'M NOT POINTING

23    TO PGA TOUR ON THAT SPECIFICALLY.

24         I WANT TO SEE WHAT THE NATURE OF THE OBJECTIONS ARE TO

25    JUDGE VAN KEULEN'S ORDER.  MR. QUINN SUGGESTS IN HIS INITIAL

1    FILING ASKING FOR EXTRA PAGES, THAT THERE ARE SOME DE NOVO

2    CONSIDERATIONS I HAVE TO MAKE.  THAT MAY BE TRUE, BUT I CAN CUT

3    AND PASTE HER ORDER IF I AGREE WITH IT.  I DON'T HAVE TO -- I

4    CAN FIND IT WELL REASONED AND INDICATE THAT I'VE MADE AN

5    INDEPENDENT DETERMINATION.  I DON'T HAVE TO WRITE MY OWN

6    50-PAGE ORDER ON IT, AND I'M NOT GOING TO DELAY YOU.

7         SHE HAS DONE THE BACK-BREAKING WORK OF WORKING THROUGH

8    THIS, AND I WILL PERFORM BY OBLIGATION.  BUT HERS WAS NOT A

9    TRIAL RUN, IT IS THE PRIMARY ORDER, AND I AM THERE TO DETERMINE

10   WHETHER IT WAS CORRECT OR INCORRECT, AND THE ELEMENTS I HAVE TO

11   CONSIDER DE NOVO, I MOST CERTAINLY WILL.

12        BUT I'M GOING TO MOVE THAT ALONG AND I'M GOING TO SET A

13   NEW CASE MANAGEMENT CONFERENCE FOR EARLY APRIL SO THAT WE CAN

14   SEE WHERE WE ARE.  AND I WOULD LIKE TO MOVE ON TO THE ISSUE OF

15   SCHEDULING OF THE BRIEFING.

16        MR. QUINN, I HAVE LIMITED YOU TO 15 PAGES FOR YOUR

17   OBJECTIONS, AND THEY ARE -- AT THIS POINT, THEY ARE DUE ON

18   TUESDAY OF NEXT WEEK.  ARE YOU PREPARED FILE THE OBJECTIONS BY

19   TUESDAY?

20             MR. QUINN:  YOUR HONOR, PERHAPS AT THIS POINT IT IS

21    TRUE THAT THE CASE HAS TAKEN SOME TURNS, AND SO NOW THE PIF AND

22   MR. AL-RUMAYYAN HAVE SEPARATE COUNSEL, AND THAT'S WHY --

23             THE COURT:  HAVE YOU WITHDRAWN AS THEIR COUNSEL?

24             MR. QUINN:  WE ARE STILL OF RECORD.

25             THE COURT:  SO YOU ARE STILL THEIR COUNSEL.  THEY

```
 1        HAVE ADDITIONAL COUNSEL?

 2               MR. QUINN:  YES, WHO ONLY REPRESENT THEM.  SO WE ARE

 3        STILL COUNSEL.

 4               THE COURT:  OKAY.  AND I WELCOME THE EXTRA, BUT IF

 5        YOU'RE COUNSEL, THEN YOU ARE COUNSEL.  YOU CAN WITHDRAW AND

 6        THEY CAN BE SEPARATELY REPRESENTED, BUT IT SOUNDS LIKE YOU

 7        HAVEN'T DONE THAT YET.

 8               MS. LAMM:  JUDGE, IF I MIGHT JUST SAY, OUR APPEAL IS

 9        READY TO FILE.  WE CAN FILE IT TODAY OR TOMORROW.

10               THE COURT:  OKAY.

11               MS. LAMM:  WE ALSO WILL ACCOMPANY THAT WITH A MOTION

12        FOR STAY UNTIL YOU DECIDE THE ISSUES.  AND YOU CAN -- WE WILL

13        HAVE THAT IMMEDIATELY AS WELL.  SO YOU CAN TAKE THIS UP.

14               THE COURT:  ALL RIGHT.

15          AND MS. LAMM, I RECEIVED A LETTER FROM A LAW FIRM

16        REPRESENTING THE KINGDOM OF SAUDI ARABIA, AND SUGGESTING THAT

17        THEY MIGHT WANT TO FILE AN AMICUS BRIEF.

18          I GAVE 15 PAGES FOR THE OBJECTION.  IF YOU WANT TO WORK

19        THEIR COMMENTS INTO YOUR 15 PAGES, THAT'S FINE.  THEY CAN FILE

20        SEPARATELY, BUT IT'S A TOTAL OF 15 PAGES.  AND I DON'T KNOW

21        WHAT THEIR INTENTION WAS OTHERWISE.

22               MS. LAMM:  YOUR HONOR, I THINK THEY ARE -- I KNOW

23        THEY ARE SEPARATE FROM US.

24               THE COURT:  I KNOW THEY ARE SEPARATE FROM YOU.  I'M

25        JUST SAYING IT'S 15 PAGES, THAT'S ALL I'M SAYING.  I DO THIS
```

1    ALL THE TIME, THERE IS A PAGE LIMIT, AND YOU CAN SHARE IT WITH

2    THEM, OR WORK IT OUT, OR GIVE THEM THE WHOLE 15 PAGES, I DON'T

3    ACTUALLY CARE.  I'M NOT ENLARGING THE PAGES.

4         MS. LAMM:  I DON'T KNOW THAT THEY WILL BE READY

5    BECAUSE OURS IS ONLY BETWEEN --

6         THE COURT:  THE BRIEFING -- THEY HAVE TO COMPLY WITH

7    THE BRIEFING.  THEY CAN FILE A MOTION TO FILE AN AMICUS BRIEF.

8    YOU CAN LET THEM KNOW.  AND I RECEIVED THIS LETTER FROM --

9         MS. LAMM:  YES, I KNOW.  RIGHT.  FROM

10   MICHAEL KELLOGG.

11        THE COURT:  RIGHT.  LET HIM KNOW, IF HE WANTS TO FILE

12   A REQUEST FOR AMICUS FILING, IF YOU LEAVE SOME PAGES, I'M

13   TELLING YOU NOW, AND MAYBE HE'S ON THE LINE, OR YOU CAN CALL

14   HIM THIS AFTERNOON, 15 PAGES TOTAL.  IF YOU WANT TO GIVE UP

15   SOME PAGES, YOU CAN GIVE IT TO HIM, OTHERWISE I WILL JUST BE

16   DENYING HIS MOTION.

17        HE CAN GIVE YOU A TWO-PAGE DECLARATION IF HE WANTS TO

18   SUBMIT IT, THAT MAY BE HELPFUL.  IT LOOKS LIKE THE KINGDOM

19   READ, OR YOU ALL READ JUDGE VAN KEULEN'S ORDER AND SAID, OOPS,

20   WE FORGOT TO GET THE KINGDOM TO SUBMIT THEIR CONCERNS TO HER,

21   BECAUSE SHE COMMENTED THAT THEY HAD NOT.

22        I MEAN, TO ME, THAT'S ALL THAT THAT LETTER TELLS ME, THAT

23   THEY WERE BEHIND THE GAME HERE AND THEY ARE TRYING TO MAKE UP

24   FOR IT.  THEIR TIME TO APPEAR WAS BEFORE HER, AND I DON'T

25   GENERALLY ACCEPT ADDITIONAL EVIDENCE ON AN APPEAL AND

1   OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER.

2       SO I'M NOT INCLINED TO EVEN ACCEPT IT, BUT I CERTAINLY

3   WANT TO SEE THEIR GROUNDS FOR ASKING ME TO DO SO.

4       MS. LAMM:  I WILL SUGGEST THAT THEY ADDRESS IT IN A

5   MOTION, YOUR HONOR, BUT THE KINGDOM WAS NOT INVOLVED EARLIER,

6   AND THEIR --

7       THE COURT:  ARE YOU TELLING ME PIF DOESN'T

8   COMMUNICATE WITH THE KINGDOM?  I THOUGHT THEY WERE PART OF THE

9   SOVEREIGNTY.

10      MS. LAMM:  THEY ARE PART OF THE SOVEREIGNTY.  I AM

11  TELLING YOU, YOUR HONOR, I HAVE NOT LOOKED INTO HOW THE

12  COMMUNICATIONS GO AND I AM NOT MAKING RANDOM REPRESENTATIONS TO

13  THE COURT.

14      THE COURT:  I UNDERSTAND.

15      I'M NOT IN A POSITION TO ACCEPT ADDITIONAL EVIDENCE.  AND

16  AN AMICUS BRIEF GENERALLY TELLS ME THEY WANT TO MAKE THE SAME

17  ARGUMENTS YOU COULD MAKE, OR THAT THEY WANT TO MAKE ARGUMENTS

18  THAT THEY SHOULD HAVE MADE TO JUDGE VAN KEULEN, IN WHICH CASE,

19  SOMETIMES IF IT'S IMPORTANT, I WOULD CONSIDER REMANDING IT TO

20  THE MAGISTRATE JUDGE.  I'M NOT INCLINED TO DO THAT HERE.

21      WHO IS -- THIS FEEDS INTO, I JUST WANT TO COMMENT, THIS

22  FEEDS INTO MR. PETERS COMMENTS ABOUT WHO IS CAUSING THE DELAY.

23  YOU CAN'T HAVE IT BOTH WAYS.

24      SO YOUR CLIENTS AREN'T TECHNICALLY PARTIES YET BECAUSE

25  THERE DOESN'T APPEAR TO BE SERVICE, THEY ARE THIRD PARTIES.

1      AND YOU KNOW, THE KINGDOM, I DON'T KNOW WHAT THEY WANT TO

2   DO, THE LETTER WAS INTERESTING.  I READ THE LETTER AFTER I READ

3   JUDGE VAN KEULEN'S ORDER, AND SO I RECALLED THAT SHE MADE THE

4   COMMENT THAT, HELLO KINGDOM, I HAVEN'T HEARD FROM YOU.  AND

5   THEN ALL OF THE SUDDEN WE GET A LETTER, BECAUSE THEY READ THE

6   ORDER AS WELL, SAYING OOPS, WE FORGOT TO TELL YOU THIS REALLY

7   MATTERS TO US.

8      SO IT'S FALLING A LITTLE BIT ON DEAF EARS, MS. LAMM, I

9   MUST SAY.

10      SO YOUR PAPERS WILL BE FILED BY TUESDAY, THE OBJECTION.

11      MS. LAMM:  YES.

12      THE COURT:  AND LIV HAS NO REASON TO FILE ANYTHING

13   THEN.  AND MR. QUINN, YOU ARE NOT FILING SOMETHING SEPARATE.

14      SO MR. PETERS, YOU WILL HAVE THE SAME 15 PAGES.  WHEN WILL

15   YOU FILE YOUR -- I WILL LET THIS BE BRIEFED -- WHEN WILL YOU

16   FILE YOUR OPPOSITION?

17      MR. PETERS:  IF THEY ARE ALL FILING ON TUESDAY, CAN

18   WE HAVE UNTIL A WEEK FROM THE FOLLOWING FRIDAY, SO WE WOULD

19   HAVE TEN DAYS TO RESPOND?

20      THE COURT:  I THINK THAT'S REASONABLE.

21      MS. LAMM:  YOUR HONOR --

22      THE COURT:  MS. LAMM, IN CASE YOU HAVEN'T HAD THE

23   OPPORTUNITY TO READ MY STANDING ORDERS, PLEASE REVIEW YOUR

24   PAPERS BEFORE YOU FILE THEM, I THINK I'VE ALREADY SAID NO

25   FOOTNOTES, SO PLEASE MAKE SURE THERE ARE NONE.

1           MS. LAMM:  ALL RIGHT.

2           YOUR HONOR, ONE OTHER COMMENT THOUGH.  I SEE YESTERDAY, IN

3     FACT, MR. PETERS FILED A MOTION ABOUT THE AL-RUMAYYAN

4     DEPOSITION, AND I DO WANT TO RESPOND TO THAT.

5           THE COURT:  OF COURSE.  THAT'S SEPARATE.  THAT WILL

6     BE SEPARATE.  HE FILED A SEVEN-PAGE FILING, AND YOU MAY HAVE

7     THE SAME SEVEN PAGES.

8           MR. PETERS:  SO YOUR HONOR, STICKING WITH THE

9     CALENDAR, I THINK THEY ARE FILING ON TUESDAY THE 28TH, IF WE

10    COULD RESPOND ON FRIDAY THE 10TH.

11          MS. LAMM:  AND WE WOULD WANT AN EQUAL AMOUNT OF TIME

12    TO --

13          THE COURT:  ALL OPPOSITIONS WILL BE DUE MARCH 10TH.

14          MS. LAMM:  ALL RIGHT.

15          THE COURT:  AND THERE ARE NO REPLIES.

16    I NORMALLY DON'T HAVE HEARINGS ON THESE.

17    NO INCORPORATION BY REFERENCE TO ALL THE OTHER PAPERS IS

18    ALLOWED, PLEASE UNDERSTAND THAT.  SO YOU MAY HAVE BRIEFED THIS

19    OVER 30 PAGES TO JUDGE VAN KEULEN, AND IF YOU HAVE A SENTENCE

20    THAT SAYS IT'S INCORPORATED BY REFERENCE, YOU CAN BE ASSURED I

21    WILL NOT READ IT AND YOUR ARGUMENT WILL FAIL.

22    IF THERE ARE DOCUMENTS YOU ARE RELYING ON, YOU MUST

23    DELIVER THEM TO ME IN HARD COPY.  I DO READ THEM, THEY'RE NOT

24    WASTED.  I KNOW THEY MAY BE STREWN THROUGHOUT THE DOCKET, BUT

25    WE ARE AT DOCKET ENTRY 288 RIGHT NOW, I'M NOT GOING TO SPEND MY

1      TIME READING THE DOCKET.  SO PLEASE SEND ME NEW COPIES OF

2      EVERYTHING, TABBED AND DELIVERED TO MY CHAMBERS.

3          I THINK THAT TAKES CARE OF THE BRIEFING ON THE OBJECTIONS.

4          THE OTHER ISSUE THAT I HAD ON MY LIST WAS WHERE WE WERE ON

5      SERVING THE AMENDED ANSWER.  AND MS. LAMM, I THINK, HAS

6      ANSWERED THAT, IS THAT IN HER VIEW, THERE HAS NEVER BEEN

7      CONSENT TO ACCEPT SERVICE THROUGH COUNSEL.

8          AND SO MR. PETERS, I'M GOING TO HAVE TO LEAVE THAT IN YOUR

9      HANDS AS TO HOW YOU EFFECTUATE SERVICE.  RULE FOUR DOES NOT

10     CONTROL SERVICE ON FOREIGN PARTIES, SO THERE ISN'T EVEN A

11     90-DAY RULE THERE.  AND I DON'T BELIEVE SAUDI ARABIA IS PART OF

12     THE HAGUE CONVENTION, MAYBE THEY ARE, I'M NOT FAMILIAR, SO I --

13     THOSE ARE COMPLICATED THINGS THAT LUCKILY JUDGES DON'T HAVE TO

14     WORRY ABOUT SO MUCH.

15          MS. LAMM:  WELL, YOUR HONOR, I MIGHT SAY, IN OUR

16     VIEW, MR. PETERS SHOULD READ THE FOREIGN SOVEREIGN IMMUNITIES

17     ACT, 28 USC 1608(B)(3), HE WILL FIND A WAY, BUT WHAT WE CAN'T

18     DO IS E-MAIL COUNSEL, PUBLIC VERSIONS THAT ARE REDETECTED, IT

19     HAS NO EFFECT.

20          MR. PETERS:  WELL, THANK YOU FOR EDUCATING ME,

21     MS. LAMM, I REALLY DO APPRECIATE IT.  WE WILL CERTAINLY LOOK AT

22     THE STATUTE.  BUT COUNSEL DID FILE NOTICES OF APPEARANCE IN

23     THIS COURT WHICH EXPRESSLY STATED THAT ANY SERVICE OF ANY

24     PAPERS FILED WITH THE COURT ON THEM WOULD BE EFFECTUATED

25     THROUGH FILING THEM WITH THE COURT AND E-FILING.  THEY DIDN'T

1    CARVE OUT SOMETHING FOR THE SERVICE OF THE SUBSEQUENT

2    COMPLAINT.  AND SO I WILL LOOK AT THE FOREIGN SOVEREIGN

3    IMMUNITIES ACT AGAIN, BUT I BELIEVE THAT THEY ALREADY

4    CONSENTED, EXPLICITLY, TO ACCEPTING SERVICE THROUGH COUNSEL.

5          THE COURT:  SO MR. PETERS, THIS WILL COME UP, THAT IF

6    YOU BELIEVE YOU'VE ADEQUATELY SERVED PIF AND MR. AL-RUMAYYAN,

7    THEN YOU WILL COUNT THE DAYS UNTIL THEIR ANSWER IS DUE AND YOU

8    WILL FILE A REQUEST FOR DEFAULT, AND THE CLERK WILL EITHER

9    GRANT YOUR DEFAULT OR NOT.

10        THIS IS NOT A MATTER THAT'S GOING TO COME TO ME.  I MEAN,

11   THAT'S JUST THE WAY IT WORKS.  AND YOU KNOW, I'M NOT WADING

12   INTO THIS THICKET RIGHT NOW.

13         MR. PETERS:  UNDERSTOOD.

14         THE COURT:  AND MS. LAMM I DON'T THINK YOU WISH IT

15   ANY OTHER WAY AT THIS POINT, DO YOU?

16         MS. LAMM:  I THINK WHAT HE SHOULD DO IS SERVE

17   APPROPRIATELY AND WE WILL MAKE THE APPROPRIATE MOTIONS.  AND HE

18   KNOWS FULL WELL, HE'S A VERY BRIGHT GUY.

19         THE COURT:  OKAY.  ALL RIGHT.

20        SO IT DOESN'T -- I'M NOT ANTICIPATING THAT LIV WILL BE

21   FILING A MOTION TO DISMISS OR THE PLAYERS ON THE AMENDED

22   COUNTERCLAIM, IT DOESN'T AFFECT THEM.

23         MR. QUINN:  THAT'S CORRECT, YOUR HONOR.

24         THE COURT:  OKAY.  THAT'S GOOD.

25         ALL RIGHT.  SO I AM, TO A CERTAIN EXTENT, IGNORING THE

1    FACT OF THE AMENDED PLEADING BY PGA TOUR.  I'M FOCUSING ON THE

2    ORDER OF JUDGE VAN KEULEN, BECAUSE IT COVERS THE DISCOVERY,

3    DIFFERENT FACTORS MIGHT BE AT ISSUE ON THE WHERE AND WHEN AND

4    SCOPE OF DISCOVERY OR WHETHER IT'S EVEN ALLOWED, BUT DID SHE

5    GIVE A DATE BY WHICH THE DOCUMENTS NEEDED TO BE PRODUCED UNDER

6    HER ORDER.

7              MR. PETERS:  SHE INSTRUCTED US, YOUR HONOR, TO

8    RESERVE SUBPOENAS, TO RESERVE THE SUBPOENAS.

9              THE COURT:  OH, YEAH --

10             MR. PETERS:  WHICH WE HAVE DONE WITH THE WITNESS

11   FEES.  AND I CAN'T RECALL WHAT THE SPECIFIC DATE IS, MAYBE

12   MR. GOLDBERG COULD HELP ME, BUT THERE'S A COMPLIANCE DATE ON

13   THOSE SUBPOENAS.

14       I UNDERSTOOD MS. LAMM TO SAY THAT SHE'S GOING TO FILE,

15   WITH HER OBJECTION, A MOTION FOR A STAY.  AND AS I UNDERSTOOD

16   IT, MAYBE I'M WRONG, THAT'S ASKING YOUR HONOR TO STAY THEIR

17   COMPLIANCE WITH THOSE SUBPOENAS, BECAUSE I THINK THE COMPLIANCE

18   DATE IS GOING TO COME UP PRIOR TO THE TIME THAT THIS IS FULLY

19   BRIEFED.

20             MS. LAMM:  THAT IS CORRECT.  WELL, FULLY BRIEFED AND

21   DECIDED.

22             THE COURT:  WELL, YOU KNOW, JUDGE VAN KEULEN WORKED

23   ON IS THIS FOR QUITE A WHILE.  WHEN I READ HER ORDER, I

24   REALIZED WHAT AN ENORMOUS JOB IT WAS.  SHE LEARNED ABOUT THE

25   FOREIGN SOVEREIGN IMMUNITIES ACT, AND NOW I'M GOING TO HAVE TO

```
1      LEARN ABOUT IT MYSELF.  AS YOU CAN IMAGINE, I DIDN'T SHADOW HER

2      WORK WHILE SHE WAS DOING THAT.

3           AND IT IS -- WHAT I NEED TO DETERMINE -- I HAVE TO

4      DETERMINE THE ISSUES YOU ARE GOING TO PRESENT TO ME, THEN I

5      HAVE TO DETERMINE HOW -- WHAT SCOPE OF AN ORDER YOU ARE

6      ENTITLED TO.

7           AND IN LIGHT OF HER LENGTHY ORDER, I'M HOPING THAT I

8      CAN -- THE WRITING IS OFTEN WHAT BOGS US DOWN, NOT THE

9      DECIDING, SO I WILL HAVE TO TAKE A LOOK AT THAT.

10          ALL RIGHT.  WE HAVE A SCHEDULE.  I WILL HAVE THIS ISSUE

11     FULLY BRIEFED BY MARCH 10TH.  I DON'T ANTICIPATE A HEARING ON

12     IT.  YOU WILL SEND ME COURTESY COPIES OF EVERYTHING, AND YOU

13     UNDERSTAND THE FORMATTING.

14          THAT ACTUALLY COVERED MY ISSUES.  MR. PETERS, DID YOU HAVE

15     ANYTHING ELSE YOU WANTED TO ADDRESS THIS MORNING?

16          MR. PETERS:  YOUR HONOR, YOU DID MENTION SETTING A

17     FURTHER CMC FOR EARLY APRIL, AND I DON'T KNOW IF THAT'S

18     SOMETHING THE COURT WANTS TO DO NOW.

19          THE COURT:  I THINK WE SHOULD GET IT ON CALENDAR

20     BECAUSE I WANT TO SEE WHERE WE ARE WITH MY RULING ON THE

21     OBJECTIONS AND YOUR COMPLETION OF SERVICE OF THE AMENDED

22     ANSWER.

23          I KNOW THE POSITIONS OF THE PARTIES NOW, IT WILL MATURE IN

24     THE NEXT 30 DAYS.  SO THAT -- I THINK IT'S JUST BETTER FOR US

25     TO HAVE A SCHEDULED DATE.
```

1          LET ME JUST LOOK AT MY CALENDAR.  I WOULD -- TIFFANY, DO

2     WE HAVE TRIAL ON APRIL 7TH?

3          THE CLERK:  APRIL 7TH.  NO, YOUR HONOR -- OH, I'M

4     SORRY.  JUST A MOMENT.  WE ARE SCHEDULED FOR JURY SELECTION IN

5     THE WANG CASE ON APRIL 7TH.

6          THE COURT:  OKAY.  MAYBE THE AFTERNOON THEN OF

7     APRIL 6TH.  IF YOU COULD LOOK AT YOUR CALENDARS FOR APRIL 6TH

8     AT 1:30.  I THINK YOU ARE ALL PACIFIC TIME, AREN'T YOU?  I'M

9     LOOKING AT FACES HERE, I THINK YOU ARE ALL IN CALIFORNIA,

10    AREN'T YOU?

11         MS. LAMM:  NO, NO.  I AM EAST COAST.

12         THE COURT:  OH, YOU ARE.  I'M SORRY, MS. LAMM.

13         MS. LAMM:  IT DOESN'T MATTER.

14         THE COURT:  IT'S STILL GENERALLY WITHIN THE BUSINESS

15    DAY IF I SET IT AT 1:30.

16         MS. LAMM:  THAT IS CORRECT.  I'M HAPPY TO DO IT.

17         THE COURT:  ALL RIGHT.

18       SO LET'S SET A FURTHER CASE MANAGEMENT CONFERENCE FOR

19    APRIL 6TH.  THE ISSUE THAT I WANT TO ADDRESS IS THE STATUS OF

20    DISCOVERY, BECAUSE THE DOCUMENT PRODUCTION DEADLINE WILL HAVE

21    PASSED.

22       I EXPECT THAT YOU WILL HAVE COMPLETED ALL OF THE DOCUMENT

23    DISCOVERY, SEPARATE FROM THE THIRD PARTIES.  MAYBE THERE WILL

24    BE SOME PENDING MOTIONS TO COMPEL.  OBVIOUSLY YOU HAVE -- I'M

25    SURE YOU HAVE THE NORMAL 14 DAYS AFTER THE CLOSE OF DISCOVERY

```
1     TO FILE THOSE.  YOU WILL BE ABLE TO GIVE ME AN UPDATE ON THAT.

2     I WILL WANT TO KNOW WHAT YOUR DEPOSITION SCHEDULE LOOKS LIKE, I

3     WILL EXPECT THAT YOU HAVE A DEPOSITION SCHEDULE BY THEN AND

4     THAT YOU WILL BE MOVING FORWARD ON -- TO MEET THE SUMMARY

5     JUDGEMENT DEADLINE.

6          I WANT TO JUST HIGHLIGHT THAT IF YOU ARE LOOKING AT

7     CROSS-MOTIONS FOR SUMMARY JUDGEMENT, AND WE CAN DISCUSS THIS IN

8     APRIL, I ONLY ALLOW FOUR BRIEFS AND CROSS-MOTIONS, BECAUSE THE

9     ISSUES OVERLAP.  I JUST DON'T NEED SIX BRIEFS TO TELL ME THE

10    SAME THING SIX DIFFERENT TIMES.  I THINK YOU ALL KNOW THE

11    FORMATTING ON CROSS MOTIONS, SO I WILL LEAVE IT AT THAT.

12         THE CLERK:  YOUR HONOR, I'M SORRY TO INTERRUPT.  I DO

13    HAVE FINAL PRETRIAL CONFERENCE ON APRIL 6TH FOR THE WANG V.

14    EHANG CASE.

15         THE COURT:  THEN -- I THOUGHT YOU SAID I HAD WANG

16    JURY SELECTION ON THE 7TH?

17         THE CLERK:  THAT IS FOR --

18         THE COURT:  THE DIFFERENT WANG CASE.

19         THE CLERK:  THE DIFFERENT WANG CASE, YES.  THAT IS

20    FOR WANG V. FORENSIC PROFESSIONAL GROUP.

21         THE COURT:  SO THAT'S NOT A JURY CASE.

22         THE CLERK:  OH, HAS THAT BEEN CHANGED TO A PRETRIAL?

23    THEN WE WOULDN'T HAVE JURY SELECTION ON THE 7TH, IF IT'S A

24    BENCH TRIAL.

25         THE COURT:  ALL RIGHT.
```

1       I GUESS -- SO I DO NOTE THAT APRIL 7TH IS GOOD FRIDAY.

2    I'M GLAD TO DO THIS -- I WOULD DO IT IN THE MORNING.  I WILL

3    HAVE TO CHECK MY CALENDAR AGAIN.  BUT WOULD THE 7TH AT 9:00 BE

4    AVAILABLE?

5        MR. PETERS:  YOUR HONOR, FOR ME, THAT'S MUCH MORE

6    DIFFICULT THAN THE 6TH.  I WILL DO IT IF YOUR HONOR SETS IT,

7    NEEDLESS TO SAY.

8        THE COURT:  I'M NOT AVAILABLE ON THE 6TH, I HAVE

9    SOMETHING ELSE SET.  THAT'S MY PROBLEM.  I JUST DON'T WANT TO

10    LET MORE TIME GO BY.

11    WE COULD DO IT ON THE 31ST, I SUPPOSE.  TIFFANY, HOW DOES

12    THAT LOOK?

13        MR. PETERS:  WOULD IT BE THE AFTERNOON OF THE 7TH,

14    YOUR HONOR?

15        THE COURT:  I'M SORRY, MR. PETERS, WHAT WAS THAT?

16        MR. PETERS:  THE AFTERNOON OF THE 7TH?

17        THE COURT:  WELL, I'M SENSITIVE TO THE FACT THAT

18    THAT'S EASTER WEEKEND, AND I DON'T KNOW WHETHER PEOPLE HAVE

19    FAMILY PLANS.

20        THE CLERK:  MARCH 31ST IS AVAILABLE, YOUR HONOR.

21        MR. QUINN:  YOUR HONOR, I HAVE A CONFLICT -- I HAVE A

22    PROBLEM ON MARCH 31ST.

23        THE COURT:  OKAY.

24        MR. QUINN:  I CAN DO THE 6TH OR THE 7TH OR ANY DAY

25    THAT WEEK.

```
 1            THE COURT:  MR. PETERS, WHEN DOES YOUR CONFLICT ON
 2    THE 7TH CONCLUDE?
 3            MR. PETERS:  AT 1:00 P.M.
 4            THE COURT:  OH, WELL THAT'S GETTING AWFULLY LATE FOR
 5    EAST COAST APPEARANCE BY MS. LAMM.
 6            MS. LAMM:  DID HE SAY 1:00?
 7            MR. PETERS:  1:00 PACIFIC.
 8            MS. LAMM:  YEAH, THAT'S FINE.
 9            THE COURT:  ALL RIGHT.  SO WE ARE BACK ON APRIL 7TH
10    AT 1:00 P.M. PACIFIC TIME.
11        OKAY.  I WILL HAVE TO LOOK AT MY CALENDAR.  WHEN I'M ON
12    ZOOM, I DON'T HAVE TWO SCREENS, SORRY.  I WANT TO LOOK AND SEE
13    WHAT THOSE CASES ARE.  I DON'T WANT TO LEAVE THAT ON TIFFANY'S
14    SHOULDERS.
15        SO IF THERE'S ANY CHANGE, I WILL BE IN TOUCH WITH YOU,
16    OTHERWISE I WILL PUT OUT AN ORDER FOR FURTHER CASE MANAGEMENT
17    ON APRIL 7TH.
18        AND WE WILL EXPECT A BRIEF STATEMENT, JOINT STATEMENT FROM
19    THE PARTIES ON THE STATE OF DISCOVERY.  IT WAS A PLEASURE TO
20    READ 28 PAGES OF YOUR JOINT STATEMENT THIS TIME, BUT LET'S KEEP
21    IT AT 15 PAGES NEXT TIME.  I JUST DON'T NEED THAT MUCH.  AND
22    YOU CAN FILE THAT ONE WEEK IN ADVANCE, BY THE 31ST.
23        ALL RIGHT.  I WILL WAIT TO RECEIVE YOUR BRIEFING ON -- ON
24    JUDGE VAN KEULEN'S ORDER, AND THEN I WILL PROCEED TO WORK ON
25    THAT.
```

```
1            MR. QUINN?

2                  MR. QUINN:  YOUR HONOR, MAY I CORRECT ONE THING?

3                  THE COURT:  SURE.

4                  MR. QUINN:  YOU ASKED ME WHETHER LIV WOULD BE FILING

5       A MOTION TO DISMISS ON THE AMENDED COUNTERCLAIM.  I SAID

6       DEFINITIVELY NO, AND I GOT A POKE THAT SOMEBODY WAS STILL

7       LOOKING AT THAT.  THE ANSWER IS PROBABLY.

8                  THE COURT:  THAT'S FINE.  THAT'S FINE.  AND THAT'S

9       FINE, AND THANK YOU FOR THAT.

10          OF COURSE I'M NOT RESTRICTING YOU.  IF A MOTION TO DISMISS

11      IS FILED, ALL PARTIES WILL SHARE THE 25 PAGES.  THAT'S WHAT I

12      WANT YOU TO KNOW.  YOU CAN FILE SEPARATE BRIEFS, I'M NOT

13      SUGGESTING OTHERWISE, BUT 25 PAGES TOTAL, OKAY.

14          AND I MEAN, YOU KNOW, I KNOW THERE ARE PERSONAL

15      JURISDICTION ISSUES, LIV MAY DECIDE THAT IT CAN JUST SIMPLY

16      JOIN THE ARGUMENTS ON THE ADEQUACY, THE 12(B)(6) ISSUES, THE

17      ADEQUACY OF THE PLEADING, BUT I'M JUST -- I DON'T NEED IT SAID

18      TWICE.

19          OKAY.  THANK YOU FOR THAT.  I THINK WE ARE -- BUT SERVICE

20      HAS TO TAKE PLACE FIRST ON THAT AMENDED -- WELL, NOT FOR YOU, I

21      GUESS, MR. QUINN.  LIV HAS BEEN SERVED, SO I DON'T KNOW WHERE

22      WE ARE ON THE BRIEFING ON A MOTION TO DISMISS.  PLEASE WORK

23      THAT OUT.  COORDINATE IT.  I DON'T NEED THIS TO BE ASKEW.

24                 MR. QUINN:  VERY WELL, YOUR HONOR.

25                 THE COURT:  THANK YOU VERY MUCH.
```

1           ALL RIGHT.  THANK YOU ALL.  WE HAVE A LOT OF ISSUES

2      BROILING, I THINK WE ALL WANT THIS CASE TO MOVE TO TRIAL AS

3      QUICKLY AS POSSIBLE, BUT IT'S GOT TO BE DONE IN THE RIGHT WAY.

4               MR. QUINN:  THANK YOU, YOUR HONOR.

5               MR. PETERS:  THANK YOU.

6               MS. LAMM:  THANK YOU.

7               THE COURT:

8          (THE PROCEEDINGS WERE CONCLUDED AT 11:11 A.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    **<u>CERTIFICATE OF REPORTER</u>**

5

6

7

8            I, THE UNDERSIGNED OFFICIAL COURT

9   REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
    CERTIFICATE NUMBER 13185          DATED: 2/27/23

# EXHIBIT B



# PGA TOUR

## PLAYER HANDBOOK &
## TOURNAMENT REGULATIONS

# 2022–2023

# 2022−2023 PLAYER HANDBOOK & TOURNAMENT REGULATIONS

PGA TOUR
1 PGA TOUR Boulevard
Ponte Vedra Beach, FL 32082
Telephone: 904-285-3700

Revised DECEMBER 2022



Dear PGA TOUR members,

Welcome to the PGA TOUR. This directory was compiled to assist you in your preparation for a season on the PGA TOUR.

The Player Handbook includes a 2022-2023 tournament schedule and covers such topics as special event eligibility and special awards.

The Tournament Regulations are the guide to specific rules pertaining to PGA TOUR play. We have incorporated changes made to the Tournament Regulations since last season into this season's book. In addition, the index provides quick reference. These Regulations are the final authority on the operations and policies of the PGA TOUR. I encourage every member to become familiar with these rules.

Best wishes for a successful 2022-2023 season!

Jay Monahan
Commissioner
PGA TOUR

# SIGNIFICANT CHANGES FOR THE 2022-2023 SEASON

**SCHEDULE CHANGES:**

- Beginning with the 2022-2023 season, the Policy Board approved significant changes to the PGA TOUR schedule in future years. The approved changes include:

  - A return to a calendar-year schedule, with the FedExCup contested from January to August, culminating with the FedExCup Playoffs and followed by the fall events, which will determine the top-125 and finalize eligibility for the next FedExCup Season.

    - The top-125 will be based on accumulated FedExCup points from the regular season and the fall events.
    - The first full year of this new system will be in the 2024 calendar year.

  - In order to transition to this schedule, the 2022-23 season will begin with the fall events in 2022 and continue through the FedExCup Playoffs played in August 2023 with eligibility determined after the fall events of 2023.

  - Revised qualification for the FedExCup Playoffs in 2023 and beyond of top 70 players at the FedEx St. Jude Championship, top 50 players at the BMW Championship and top 30 players at the TOUR Championship.

  - 12 events will be elevated within the 2022-2023 season with an average purse of $20 million. Top Players will be subject to the new Mandatory Participation Requirement which means they are making a commitment to participate in these events (if eligible), plus three additional FedExCup events of their choosing, THE PLAYERS, Masters, PGA Championship, US Open and The Open Championship. The 12 "elevated events" are Sentry Tournament of Champions, WM Phoenix Open, The Genesis Invitational, Arnold Palmer Invitational presented by Mastercard, WGC-Dell Match Play, RBC Heritage, Wells Fargo Championship, the Memorial Tournament presented by Workday, Travelers Championship, FedEx St Jude Championship, BMW Championship, and TOUR Championship.

  - For 2023, the top 20 players eligible for the bonus distribution on the previous year's Player Impact Program (Note: 2021-2022 includes the top 20 players under the old criteria and the top 20 players under the new criteria) will be subject to the Mandatory Participation Requirement.  The top players criteria for 2024 and beyond will be determined at a later date.

  - Korn Ferry Tour cards will be awarded at the end of the season, which is projected to end in early October. Korn Ferry Tour players who earn their card will begin play on the PGA TOUR in January of the following year.

- The current Korn Ferry Tour Finals system will go away. Instead, "Korn Ferry Tour Finals" will be in reference to the final four events of the Korn Ferry Tour season, which will have increased purses – minimum of $1.5M per event as well as increased points – 600 vs. 500 for a normal event.

- The Korn Ferry Tour will award 30 cards at the end of the 2023 regular season for the 2024 FedExCup season. This is up from 25 currently.

- Starting with the 2024 FEC season, the top performers from the DP World Tour Ranking List will now receive 10 PGA TOUR cards (e.g. the top 10 DP World Tour players [not otherwise exempt in top 125 FedExCup Points list category or above] from their 2023 season gain eligibility for the PGA TOUR in 2024).

- With the return to calendar year season and the elimination of the current KFT Finals system, 5 cards and ties will be reintroduced at the Qualifying Tournament held at the end of the year. The Qualifying Tournament will also continue to award eligibility for the Korn Ferry Tour.

**BONUS PROGRAMS:**

- Beginning in 2023, the Policy Board approved the Earnings Assurance Program, where all fully exempt members (Korn Ferry Tour category and above) are guaranteed a $500,000 league minimum. At the end of the season, the program will fund any gap between actual comprehensive earnings and the $500,000 minimum for each fully exempt member who participates in at least 15 events. Rookies and other players earning their way back onto the PGA TOUR will have the option to receive an upfront payment.

- Non-exempt members (126-150 category and below) will have access to a new Travel Stipend Program, which provides $5,000 for every missed cut to assist with travel costs and other tournament-related expenses.

- The Earnings Assurance Program and Travel Stipend Program will replace the Play15 Program.

**ADDITIONAL CHANGES:**

- Starting in 2021-22, qualifying for the season-ending TOUR Championship will provide a two-season PGA TOUR exemption. This is not in addition to a winner's exemption but would impact a player who doesn't have any additional status in the second year following his qualification for the TOUR Championship.

- The Top 30 players from the Final FedExCup Playoffs and Eligibility Points List will be exempt into the Sentry Tournament of Champions the following season, beginning with this year's Sentry Tournament of Champions.

- The Sentry Tournament of Champions will award 550 FedExCup points to the winner, aligning with the Genesis Invitational, Arnold Palmer Invitational presented by Mastercard, the Memorial Tournament presented by Workday and the WGC-Dell Match Play.

- Life Members will no longer have a requirement of 15 seasons of membership. Once a player reaches 20 wins, he will immediately be eligible for Life Membership.

- The number of Player Directors on the PGA TOUR Policy Board is increasing from four to five. The Player Directors will appoint a fifth Player Director to serve a one-year term beginning January 1, 2023. Thereafter, the current Player Directors would appoint a fifth Player Director for the standard three-year term beginning January 1, 2024. This system will ensure that no more than two Player Directors would be rolling off the Policy Board at one time.

- The Korn Ferry Tour Exemption for Former Fully Exempt PGA TOUR Member was modified to allow for a Veteran Member who loses fully exempt status but retains status in the 126-150 category to utilize this exemption in the season immediately after failing to retain 126-150 status; provided that in the seasons he was in the 126-150 category he participated in less than five (5) events on the Korn Ferry Tour.

**ELIGIBILITY ADJUSTMENTS FROM THE 2021-2022 SEASON:**

- The Policy Board approved the creation of the FedExCup Playoffs and Eligibility Points List. The list will be created by taking the FedExCup Points List and removing those players who are under suspension for participation in an unauthorized event. This list will not take the place of the Official FedExCup Points List but will be displayed in addition for purposes of tournament eligibility including the FedExCup Playoffs and Priority Rankings for the 2022-2023 season.

- To determine eligibility for the 2022-2023 season, the FedExCup Playoffs and Eligibility Points List will continue to update through the conclusion of the Korn Ferry Tour Championship (Sunday, September 4, 2022) with eligibility lists being set on Monday, September 5, 2022, and leading up to the commitment deadline of Friday, September 9, 2022, for the Fortinet Championship. While the FedExCup Playoffs and Eligibility Points List will continue to update through the conclusion of the Korn Ferry Tour Finals, the FedExCup season will end, and bonus payments will be awarded through the TOUR Championship.

- For the Korn Ferry Tour Finals, all players who become eligible for the PGA TOUR via Top 125 from the FedExCup Playoffs and Eligibility Points List or Top 125 Non-Members will be removed from the Korn Ferry Tour Finals Points List and the list reprocessed with the 50 cards awarded being reallocated based on the new ranking. The Korn Ferry Tour Finals Points List will continue to be amended, if necessary, until 5:00 p.m. Eastern Time on Friday preceding the first tournament of the 2022-2023 season.

# PLAYER ENDORSEMENT POLICY

All sponsorships, endorsements, name and likeness arrangements and promotional activities (collectively, "sponsorships") of members, whether during or outside PGA TOUR competitions, are subject to this policy. When playing in PGA TOUR co-sponsored, sanctioned or approved events, nonmember contestants are subject to this policy as well. Generally, all sponsorships must be tasteful and in accordance with standards of decorum expected of professional golfers. Sponsorships that may reflect adversely upon the image and reputation and/or financial interest of the PGA TOUR, cast the PGA TOUR in an unfavorable light, insult or offend the community or any group within the community or be viewed as hateful, abusive, obscene or divisive, as reasonably determined by the PGA TOUR, are prohibited. Additionally, a player may not display on the player's apparel, headwear, golf bag or golf equipment a display of a political message or endorsement of a political candidate. Further, the following addresses categories of special concern:

*Season-Long Points Competition Sponsor FedEx.* In recognition of the unique standing of FedEx as the sole sponsor of a season-long points competition on the PGA TOUR, so long as FedEx is the season-long sponsor of the PGA TOUR, no sponsorships are allowed by FedEx competitors United Parcel Services ("UPS") or DHL Express ("DHL") that involve displaying the name, logo or any product likeness of either company on a player's apparel, headwear, golf bag or golf equipment. Such provision shall apply during PGA TOUR co-sponsored, sponsored and sanctioned events to members only. Players with existing sponsorship agreements as of January 1, 2017 with either UPS or DHL will be allowed to continue or extend such relationship but may not expand upon the contractual branding or endorsement obligations in such relationships.

*Competing Tours.* In order to protect the financial interest of the membership as a whole, and so not as to allow others to freeride on the PGA TOUR's platform, no player may display on his person, bag, hat or otherwise the marks or indicia of an entity or brand that operates, sanctions, sponsors, funds and/or co-sanctions unauthorized tournaments or teams participating in unauthorized tournaments without prior written permisson of the PGA TOUR.

*Tobacco / Marijuana*. No sponsorships of any sort are permitted by companies selling tobacco products (including, starting March 1, 2019, cigars and tobacco smoked in pipes), smokeless tobacco products (including e-cigarettes and vaping products) and marijuana products (recreational and medicinal). However, a player may make appearances for any such company as long as the appearances are private and not promoted or covered publicly. Players with existing sponsorships by companies selling cigars and tobacco smoked in pipes as of March 1, 2019 will be allowed to continue or extend such sponsorships after such date but may not expand such sponsorships after such date.

*Alcohol.* A player may have a sponsorship by a beer, wine, distilled spirit or other alcohol company, subject to the following terms and conditions:

- Any ads and other promotions (using a player's name or likeness) for any alcohol company must include a social responsibility message and cannot include a direct call to action (e.g. "Call 1-800-555-5555 or visit us at www.xyz.com" or "Drink XYZ Distilled Spirit").

- A player may not display more than one name, brand, logo or other mark or identifier of any alcohol company on the player's apparel, headwear, golf bag and golf equipment in the aggregate at any time.

- No visual representation of any alcohol product (e.g., liquor bottle, etc.) may appear on a player's headwear, apparel, golf bag or golf equipment.

*Gambling.* A player may have sponsorships by casinos, sports betting, daily fantasy and other legal gambling companies, subject to the following terms and conditions:

- All sponsorships by gambling companies require the prior approval of the PGA TOUR. All sponsorships must be submitted to the PGA TOUR Competitions department in advance for review and approval.

- The gambling company must be in compliance with all applicable gambling laws.

- A player may display on the player's apparel, headwear, golf bag or golf equipment any name, brand, logo or other identifier of a gambling company.

- No visual representation of any gambling-related product (e.g., cards or dice) may appear on a player's headwear, apparel, golf bag or golf equipment.

- A player may not display on the player's apparel, headwear, golf bag or golf equipment more than one gambling-related identifier in the aggregate at any time.

- A player may appear and otherwise be used in ads and other promotions for sports betting and daily fantasy generally, but not ads and promotions that promote betting on a specific player or making a specific bet. For example, a player could appear in an ad that says, "Download the DraftKings app and bet on PGA TOUR golf," but not, "Bet on me this week." Further, each ad or promotion requires the prior approval of the PGA TOUR and must be submitted to the PGA TOUR Competitions department in advance for review and approval. Each ad or promotion must include a responsible gambling or social responsibility message (e.g., "Please remember to bet responsibly").

- A player may not enter into any sponsorship or other agreement that provides compensation to the player based on any sports betting activity (e.g., a player may not receive a revenue share based on the "handle" or revenues from sports betting).

*Logo / Mark Size, Location and Quantity.* All names, brands, logos and other marks and identifiers ("marks") on a player's apparel, headwear, golf bag and golf equipment must be in good taste as to content, size, location and quantity, as reasonably determined by the PGA TOUR. Further, all marks must satisfy the following specific terms and conditions:

- A mark (other than a mark on a golf bag) may not exceed three by five inches (3"x5").

- Marks on upper torso apparel (including shirts, sweaters, outerwear and upper torso underwear, but excluding, for clarity, belts and headwear) may appear only at the following seven locations: right and left breast, right and left sleeve, right and left collar, and the yoke of the

back (i.e., just below the collar). Only one mark may appear at each such location (i.e., seven logos total are permitted for upper torso apparel).

- Marks on belts may appear only on the buckle or front buckle area. Only one mark may appear on a belt.

- Marks on lower torso apparel (including pants and outerwear, but excluding, for clarity, belts and footwear) may appear only at the following locations: the right or left back pocket area (but not both back pocket areas) and below the right or left knee (but not below both knees). Only one mark may appear at each such location (i.e., two logos total are permitted for lower torso apparel).

- The location of marks is otherwise not restricted, but all marks must satisfy the good taste requirement set forth above.

*Golf Outings.* Golf outings for all companies are subject to the conflicting events terms set forth in Section A-2 of Article V.Guidelines for Payments to Players

Any payments, other than official prize money and prize money paid for official tournament pro ams, made

*by:*     a host organization, title or presenting sponsor, or any person or entity acting on their behalf (collectively, "Tournament Sponsors")

*to:*     a player eligible to participate in the applicable tournament

*for:*    any event or activity conducted from Monday of tournament week through the day following the conclusion of the competition (the "Tournament Period"), or in general proximity to the Tournament Period

must be approved in writing by PGA TOUR no less than 45 days in advance of the applicable event.

TOUR will not approve payments it deems to (i) be designed to solicit a player's appearance in the tournament or (ii) give the appearance or perception that it is designed to solicit a player's appearance in the tournament.

Tournament Sponsors will be required to inform TOUR of all such player arrangements and all specifics of such arrangements, including player compensation, and will provide TOUR a copy of all applicable contracts.

Players not following these guidelines or accepting (directly or through an agent) payments from a Tournament Sponsor not in accordance with these guidelines, will be subject to disciplinary action, which could include a minimum fine equal to the amount of compensation received and suspension from tournament play.

These guidelines are issued as an interpretation of the Tournament Regulations relating to appearance fees and, as such, all Tournament Sponsors will be required to adhere to the guidelines as they would Tournament Regulations in accordance with their Tournament Agreement and/or Title Sponsor Agreement.

1.   **Mandatory Participation Requirement**

The top 20 players eligible for the bonus distribution on the previous year's Player Impact Program (Note: 2021-2022 includes the top 20 players under the old criteria and the top 20 players under the new criteria) are required to participate in the following elevated purse events, if eligible: Sentry Tournament of Champions, WM Phoenix Open, The Genesis Invitational, Arnold Palmer Invitational presented by Mastercard, WGC-Dell Match Play, RBC Heritage, Wells Fargo Championship, the Memorial Tournament presented by Workday, Travelers Championship, the three FedExCup Playoff events, THE PLAYERS Championship, Masters Tournament, PGA Championship, US Open and Open Championship, and not less than three official money, non-elevated purse events of their choosing during the season, including official money events played after the TOUR Championship. (Note: a player may count participation in not more than one official event played after the TOUR Championship towards this requirement).

Any player subject to this regulation who fails to meet the obligations set forth herein shall be ineligible for the amount due to such player from the Player Impact Program.

Notwithstanding the above, the Commissioner, upon application by a member subject to this regulation and for a serious medical condition or other extraordinary circumstances that the Commissioner, at his discretion, determines to be a valid reason for not meeting this requirement, may excuse a player from the regulation and/or from participating in an elevated purse event. Further, the Commissioner, at this discretion, may excuse a player from one elevated purse event for a reason not related to a serious medical condition or other extraordinary circumstance.

2.   **One New Event Played Per Season Requirement**

During the current PGA TOUR season, any Regular Member of the PGA TOUR (as defined in Article IX, Section A.1.a. through e.) is required to play in at least one tournament he has not played in previously during any of the preceding four (4) seasons.

Tournaments eligible to fulfill such Regular Member's obligation under this regulation shall include all official money, co-sponsored and approved tournaments but shall not include The Masters Tournament, U.S. Open Championship, The Open Championship, PGA Championship, THE PLAYERS Championship, World Golf Championships, the FedExCup Playoff Events, Presidents Cup, Ryder Cup, Olympic Games, and any first-year official money event.

Any Regular Member of the PGA TOUR (as defined in Article IX, Section A.1.a. through d.) who meets any of the following criteria shall be exempt from the provisions of this Regulation in the current season:

    a.   Played in 25 or more official money, co-sponsored or approved tournaments in the previous or current season.

    b.   Life Members (as defined in Article IX, Section A.4.)

    c.   Veteran Members (as defined in Article IX, Section A.8.) who are age 45 or older at any point during the current season

    d.   Dual Members of both the PGA TOUR and PGA TOUR Champions

# V.  CONFLICTING EVENTS; MEDIA AND MARKETING RIGHTS

## A.  CONFLICTING EVENTS

### 1.  Obligations of PGA TOUR

On a date on which any golf tournament or event cosponsored by PGA TOUR is being played, PGA TOUR will not cosponsor or approve any other similar golf tournament or event without the advance written consent of the tournament of the first scheduled PGA TOUR tournament or event, which consent shall not be unreasonably withheld. "Similar golf tournament or event" means a tournament or event of the same type (i.e., PGA TOUR/Regular TOUR tournament or event). For example, PGA TOUR shall not be prohibited under this section from holding a PGA TOUR Champions, Korn Ferry Tour, PGA TOUR Latinoamérica, PGA TOUR Canada, or PGA TOUR China tournament on the same dates as a PGA TOUR (regular tour) tournament or event.

### 2.  Obligations of PGA TOUR Members

To contribute to the success of a PGA TOUR tournament or event and to permit PGA TOUR to fulfill its contractual obligations concerning representative fields, no PGA TOUR member shall participate in any other golf tournament or event on a date when a PGA TOUR (Regular TOUR) cosponsored tournament or event for which such member is exempt is scheduled, except for the following tournaments or events:

a.   A tournament or event for which a member obtains an advance written release for his participation from the Commissioner (See "Guidelines for Conflicting Event Release" set forth below);

**NOTE:** No conflicting event releases will be approved for tournaments held in North America.

b.   A tournament or event cosponsored or approved by and held in the territory of the PGA section with which the PGA TOUR member is affiliated or where he is then employed, provided that he is eligible for such sectional tournament under the constitution of the PGA;

c.   The PGA National Professional Championship, and PGA winter tournaments for professionals;

d.   Golf tournaments on the "home circuit" of a foreign player who is a PGA TOUR member.

**NOTE:** "Home circuit" is defined as the recognized professional golf tournament circuit which plays all or some portion of its schedule in the country of which the player is a citizen. Such foreign PGA TOUR member shall be eligible for this "home circuit" exception to provisions of these Regulations with regard to conflicting tournaments provided he has played, or committed to play, in a minimum of 15 PGA TOUR cosponsored or approved tournaments (as defined in paragraph C of Article I) in the season, or in the case of

a Regular Member or Life Member (as defined in Section A.1 and 4 of this Article IX) who is age 45 or more and has made 150 cuts or more in tournaments awarding official prize money in his career, in a minimum of 12 PGA TOUR cosponsored or approved tournaments in the season. (See Section D-2 of Article IX, Membership Reinstatement Provisions.) In addition, a player who has played regularly on a recognized professional golf tournament circuit (i.e., meets membership requirements) for the past five seasons regardless of citizenship may designate this circuit as his "home circuit," provided he plays in a minimum of 20 PGA TOUR cosponsored or approved tournaments in the season, or in the case of a Regular Member or Life Member (as defined in Section A.1 and 4 of this Article IX) who is age 45 or more and has made 150 cuts or more in tournaments awarding official prize money in his career, in a minimum of 15 PGA TOUR cosponsored or approved tournaments in the season.

For purposes of the Tournament Regulations, the following professional golf tournament circuits, and the geographical area covered by each, are recognized as "home circuits":

| Home Circuit | Geographical Region |
| --- | --- |
| PGA European Tour | Countries within the continent of Europe plus Morocco, Tunisia and the Middle East |
| PGA Tour of Southern Africa | Countries within the continent of Africa |
| Japan Golf Tour | Japan |
| PGA Tour of Australasia | Australia, New Zealand, Singapore, Indonesia, Malaysia, Thailand, Philippines, Myanma, Vietnam, Guam, China, Hong Kong, Taiwan, India and Pakistan |
| Korean PGA | Korea |
| Asian Tour | Singapore, Indonesia, Malaysia, Thailand, Philippines, Myanma, Vietnam, Guam, Taiwan, India, and Pakistan |

Any events sanctioned or cosanctioned by any of the above professional golf tours which are not within the geographical area listed for such professional golf tour shall not be considered events within the "home circuit" of a foreign player claiming such professional golf tour as his "home circuit."

Furthermore, the Commissioner, in the exercise of his discretion, may recognize additional "home circuits" and determine their geographical area.

e.   Masters Tournament, U.S. Open, The Open Championship or PGA Championship;

f.   Ryder Cup, Presidents Cup or Olympic Games;

g.   World Cup, provided that the dates have been approved in advance by PGA TOUR;

h.   PGA TOUR Champions cosponsored or approved tournaments; and

i.   Korn Ferry Tour tournaments, but only for those PGA TOUR members who gain eligibility to Korn Ferry Tour tournaments as a result of being Life Members of PGA TOUR (Section A-4 of Article IX), Past Champion Members of PGA TOUR (Section A-5 of Article IX), Special Temporary Members of PGA TOUR (Section A-6 of Article IX), Team Tournament Winners (Section A-7 of Article IX), Veteran Members of PGA TOUR (Section A-8 of Article IX), or any other member of PGA TOUR who is an alternate for a PGA TOUR (Regular TOUR) cosponsored tournament but who elects to play in a Korn Ferry Tour tournament opposite such PGA TOUR (Regular TOUR) cosponsored tournament.

In addition, in any week when a PGA TOUR, PGA TOUR Champions, Korn Ferry Tour, PGA TOUR Latinoamérica, PGA TOUR Canada, or PGA TOUR China cosponsored tournament is scheduled, no PGA TOUR member shall participate in any golf activity (including public exhibitions, clinics and pro-ams) in the same geographic area as such PGA TOUR, PGA TOUR Champions, Korn Ferry Tour, PGA TOUR Latinoamérica, PGA TOUR Canada, or PGA TOUR China tournament without the prior approval of the Commissioner. Nothing in the foregoing shall preclude PGA TOUR members from playing in "outings" during the week of a cosponsored tournament. As used herein, an "outing" refers to an event in which a player or players are invited by a company to entertain its customers, without any broadcast or other electronic portrayal of play and without public gallery.

**3.  Guidelines for Conflicting Event Release**

a.   Each Regular Member of PGA TOUR ordinarily shall be eligible for three releases per season based on participation in 15 PGA TOUR cosponsored or approved tournaments and, in addition, shall be eligible for one release for every five cosponsored or approved tournaments (as defined in paragraph C of Article I) in which he participates above 15 tournaments.

b.   Notwithstanding the above, the Commissioner may deny any particular release request if he determines that such a release would cause PGA TOUR to be in violation of a contractual commitment to a tournament sponsor, or would otherwise significantly and unreasonably harm PGA TOUR and such sponsors. Also, the Commissioner shall be entitled, but not obligated, to grant additional releases when he determines that to do so would not unreasonably harm PGA TOUR or the sponsor involved.

c.   In making the factual determinations contemplated in the preceding paragraph, the Commissioner shall consider, but shall not be limited to, the following factors:

(1)  The overall makeup of the field from which the member seeks to be released;

(2)  The member's standing on the current and previous season's FedExCup Points List;

(3)  The number of tournaments that the member has played in, or committed to play in, for the current season;

(4)  The member's record of participation in the tournament from which he seeks to be released.

    d.   The Commissioner will consider conditional releases under the following circumstances:

        (1)  If the member has not played in the tournament for which he seeks to be released for an extended period of time, such release may be conditional upon his participation in the tournament the following season.

        (2)  After five releases have been granted for the same tournament, subsequent releases may be conditional upon the member playing in the tournament the next season.

        (3)  If a member has committed to the tournament and is subsequently granted a release, such a member may be required to play in the tournament the following season.

        All requests for conflicting event releases and/or television releases must be submitted no less than 45 days in advance of the first official round of competition of the tournaments for which such releases are requested. The Commissioner normally shall make decisions on release requests not later than 30 days in advance.

**NOTE:** No conflicting event releases will be approved for events held in North America.

## B.   MEDIA AND MARKETING RIGHTS

### 1.   Media Rights

    a.   The television, digital, radio, motion picture and all other media rights of all players participating in PGA TOUR cosponsored and coordinated tournaments, pro-ams or any other golf event conducted in conjunction with PGA TOUR cosponsored and coordinated tournaments (e.g., clinics, long-drive contests), or any portion thereof, are hereby granted and assigned to PGA TOUR. Based upon this grant and assignment, all such rights shall be the property of and expressly reserved by and to PGA TOUR, and any use thereof without the express written consent of PGA TOUR shall be forbidden.

    b.   No PGA TOUR member shall participate in any live or recorded golf program without the prior written approval of the Commissioner, except that this requirement shall not apply to PGA TOUR cosponsored, coordinated or approved tournaments, wholly instructional programs* or personal appearances on interview or guest shows. "Golf program" for purposes of this section means any golf contest, exhibition or play that is shown anywhere in the world in any form of media now known or hereinafter developed. The Commissioner's approval of any member(s) participating in any golf program covered by this rule may be subject, without limitation, to the sponsor, promoter, television producer and/or other parties involved in the golf program entering into a sanctioning or other agreement with PGA TOUR, including an acknowledgement of PGA TOUR's media rights and the payment of rights fees to the PGA TOUR, therefore, and to such other conditions as are designated by the Commissioner.

        *While wholly instructional programs have been exempted from the scope of this rule by the PGA TOUR Policy Board, any PGA TOUR member participating in such a program is nonetheless required to obtain an agreement from the producer of the program or other appropriate party that the program will not be shown or distributed at the same time as any scheduled live coverage of a PGA TOUR cosponsored, approved or coordinated

tournament. The "on demand" distribution of a wholly instructional program will not violate this rule as long as the program is not debuted during live coverage.

**2. Marketing Rights**

a. Aside from the assignment of individual television and similar rights provided for herein, nothing in these Regulations or in marketing programs adopted by PGA TOUR shall be deemed to restrict any member's individual marketing rights (e.g., promotions, endorsements, licensing, etc.).

b. In addition, no person shall make any commercial use of the name, likeness or identity of any member of PGA TOUR without the advance written approval of such member.

c. Similarly, no individual PGA TOUR member, tournament sponsor or other person or entity is authorized to make any commercial use of the PGA TOUR name, marks or logo without the advance written approval of PGA TOUR.

# VI. CONDUCT OF PLAYERS

Players participating in PGA TOUR cosponsored, approved or coordinated tournaments shall observe these Regulations and the applicable rules of play while engaged in tournament play, and at all times shall conduct themselves in a manner becoming professional golfers that will not reflect unfavorably on PGA TOUR, its members, officers or representatives, tournaments or sponsors.

To this end, players shall use their best efforts to play golf of the caliber and with the skill befitting professionals, and to show respect for the game of golf. Any player who violates any of the foregoing or any of the provisions of this Article VI and/or the Fair Way Manual or Tournament Courtesy Vehicle Agreement may be subject to a fine, suspension from play in PGA TOUR cosponsored and coordinated tournaments, permanent disbarment from such play or any appropriate combination thereof.

## A.  ANTI-DOPING PROGRAM

All players shall comply with the PGA TOUR Anti-Doping Program, as amended from time to time.

## B.  NO GUARANTEE FOR APPEARANCE

Neither players nor other individuals acting on such players' behalf shall solicit or accept any compensation, gratuity or other thing of value offered for the purpose of guaranteeing their appearance in any PGA TOUR cosponsored, approved or coordinated tournament, including any pro-am played in connection therewith, except as may be specifically authorized by the PGA TOUR Policy Board prior to the tournament.

Conversely, neither players nor other individuals acting on such players' behalf shall offer anything of value to a PGA TOUR cosponsored, approved or coordinated event in return for an invitation to the tournament as described in Section A-1a(12) of Article III (i.e., a sponsor exemption.)

Neither a player nor other individuals acting on player's behalf shall promise or guarantee such player's appearance in any PGA TOUR cosponsored, approved or coordinated event conditioned upon the grant of a sponsor's exemption to a different player.

## C.  INTEGRITY PROGRAM

All players shall comply with PGA TOUR Integrity Program as amended from time to time, which prohibits betting on professional golf and other betting-related activities, among other things.

## D.  FINANCIAL INTEREST BY A PLAYER IN ANOTHER PLAYER; GAMBLING; DOPING

In order to ensure the competitive integrity of PGA TOUR tournaments, a player participating in a PGA TOUR tournament shall not have any financial interest, either direct or indirect, in the performance or winnings of another player in any golf event cosponsored, coordinated, approved or otherwise sanctioned by the PGA TOUR or any other professional golf tour, including, without

140

limitation, an unauthorized tournament, whether through purse-splitting, prize money "insurance," financial assistance, bets, team membership, team/league ownership or otherwise without prior written permission of the PGA TOUR. Any member who violates the provisions of this paragraph shall be subject to immediate suspension under Article VII. Section. C. Such member shall also be subject to Major Penalty under Article VII. Section E.2 of suspension from tournament play for a minimum period of two complete seasons. Any non-member who violates the provisions of this paragraph shall be ineligible for PGA TOUR tournament play for a minimum period of two complete seasons. Notwithstanding the foregoing, the Commissioner in their discretion may determine that there are aggravating or mitigating circumstances that warrants a lesser or greater penalty, as applicable.

Further, a player shall not do any of the following:

1.   Gamble or play cards on the premises where a PGA TOUR cosponsored or coordinated tournament is being played.

2.   Associate or having dealings with persons whose activities have involved trafficking or administration of substances or methods prohibited by the PGA TOUR Anti-Doping Program, or other forms of doping.

## E.  PUBLIC COMMENTS, PUBLIC ATTACKS

The favorable public reputation of PGA TOUR, its players and its tournaments are valuable assets and create tangible benefits for all PGA TOUR members. Accordingly, it is an obligation of membership to refrain from making comments that unreasonably attack or disparage others, including, but not limited to tournaments, sponsors, fellow members/players and/or PGA TOUR. Speech that could be reasonably viewed as hateful, abusive, obscene and/or divisive is expressly prohibited. Responsible expressions of legitimate disagreement with PGA TOUR policies are not prohibited. However, public comments that a member knows, or should reasonably know, will harm the reputation or financial best interest of PGA TOUR, a fellow member/player, a tournament sponsor or a charity are expressly covered by this section. Any violation of this section shall be considered conduct unbecoming a professional. For the avoidance of doubt, promotion of an unauthorized tournament (or series of unauthorized tournaments) by a member shall be deemed to be a violation of this section.

## F.  WORTHLESS CHECKS

If any player issues a worthless (dishonored) check in payment of entry fees or otherwise in connection with a PGA TOUR cosponsored, approved or coordinated tournament, he shall be fined and disciplined as follows:

| | |
|---|---|
| **First Offense**: | $200 fine. |
| **Second Offense:** | $200 fine and loss of check-cashing privileges for six months. |
| **Third Offense:** | $500 fine and loss of check-cashing privileges for one season. |

Repeated instances of the issuance of worthless checks by a member shall be grounds for suspension or permanent disbarment from tournament play, as may be determined by the PGA TOUR Policy Board.

# EXHIBIT C

ASAP Sports Transcripts - THE PLAYERS CHAMPIONSHIP - Jay Monahan



about ASAP Sports     FastScripts archive     recent interviews     products

Our
Clients:
     

**Browse by Sport**

- Auto Racing
- Baseball
- Basketball
- Boxing
- CoSIDA
- Cricket
- Equestrian
- Extreme
- Football
- Golf
- Hockey
- Lacrosse
- Soccer
- Swimming
- Tennis
- Track & Field
- Volleyball
- Wrestling

**Find us on**  

 Subscribe to RSS

 Click to go to
Asaptext.com

# THE PLAYERS CHAMPIONSHIP

## March 7, 2023

### Jay Monahan

*Ponte Vedra Beach, Florida, USA*

**TPC Sawgrass**
**Press Conference**

LAURA NEAL: Good morning, everybody. We would love to welcome PGA TOUR Commissioner into the interview room to help us kick off the 2023 PLAYERS Championship. As we all know the drill, we'll give Jay the mic for some opening remarks and then open it up to questions. Jay?

JAY MONAHAN: Thank you, Laura. It's awesome to be with all of you here today as we kick off the 2023 PLAYERS Championship. I want to welcome all of you to Ponte Vedra and this our 49th playing.

It's hard to believe that we are just shy of the event's 50th anniversary. It is remarkable, absolutely remarkable to reflect on the tournament's history and continued growth over the last 10 years, including a world-class field that is consistently amongst the strongest in golf.

The 2023 PLAYERS marks the 10-year anniversary of Tiger Woods' second PLAYERS win. Since then, there's been a new champion each year, which speaks to the strength not only of the field but also of the venue and THE PLAYERS Stadium Course at TPC Sawgrass.

As always, I would like to thank our proud partners, Morgan Stanley, Optum and Grant Thornton. With their support of our flagship event THE PLAYERS has generated over $100 million for charity across Northeast Florida through the years, a shining example of the positive impact PGA TOUR tournaments have each and every week.

For our fans, the 22 hours presented on NBC and Golf Channel will have limited commercial interruptions. At PGA TOUR Live on ESPN+, we'll produce more than 150 hours of live coverage throughout the week over four streams.

I'd also like to recognize Executive Director Jared Rice, director of golf course maintenance operations Jeff Plotts, alongside Gary Young, Stephen Cox and Jason Larson from the Rules Committee, for their perpetual dedication to making this one of golf's premier championships. The Stadium Course is in pristine condition and as always will be one of the stars of the show this week.

With the Rules Committee in mind, I would like to take a moment to remember the great John Paramor, longtime DP World Tour chief referee. He was a giant in the game and worked closely with our team at many PLAYERS Championships. Our thoughts are with his family and the broader golf family that called him their own.



View our
e-Brochure

We are coming into THE PLAYERS with a tremendous amount of momentum both on and off the course. Before I get into some of the specific examples, I just want to say how proud I am of everyone of our members and corporate partners who have been so loyal to this organization. I've just come out of a player meeting, and it's inspiring to see the continued level of commitment, communication, passion and investment they're all making in this organization and the level of competition they are exhibiting while doing so.

I'm going to say this: It's a great time to be a PGA TOUR fan and a PGA TOUR player. Competitively we have seen a supercharged first two months of the year. It's clear that the PGA TOUR stars have been inspired by the opportunity to compete head-to-head more regularly on some of golf's biggest stages. Jon Rahm enjoyed a historic stretch with three wins in four starts, including a Genesis Invitational victory where he hoisted the winner's trophy handed to him by none other than Tiger Woods. Scottie Scheffler defended his title at the WM Phoenix Open on Super Bowl Sunday in front of the largest crowds we'll see all year. Max Homa further solidified his position among the world's best with a win at the Farmers Insurance Open. And last week, Kurt Kitayama won his first ever PGA TOUR event against a stacked leaderboard at the Arnold Palmer Invitational presented by MasterCard.

Over the last month, we have seen the top position in the Official World Golf Ranking ranking change hands on consecutive weeks from Rory to Scottie to Jon, who now sits at the top.

During that same stretch, we've also witnessed the fabric of the TOUR shine through as the ultimate meritocracy. At the Honda Classic, we had 34-year old rookie Eric Cole, whose long and winding path to the PGA TOUR included 54 mini-tour victories. He forced a playoff with Chris Kirk, whose own journey overcoming adversity has been well-documented. It made for great storytelling and amazing theater, and it plays right into our 2024 competitive framework that I'll touch on in a bit.

A point of emphasis for our organization has been delivering the PGA TOUR to fans where they are and making our sport more welcoming through innovation and strategic partnerships. "Full Swing" debuted to Netflix's 230 million subscribers the week of the Genesis Invitational and has been consistently in the Netflix top 10 worldwide.

As a result of such strong performance out of the gate, Netflix announced earlier this morning that they are officially green-lighting season two of "Full Swing." Our streaming partner, ESPN+, brings its 25 million subscriber base to golf, and 60 percent of those subscribers are between the ages of 18 and 44. PGA TOUR Live bookends perfectly with our linear partnerships with NBC, Golf Channel and CBS. Together our collaboration has resulted in mic'd-up players, more golf shots, more technology, new camera angles, new cameras, and some familiar voices in new roles.

We've relaunched both the PGA TOUR app and website this year, and we've averaged 88 million video views each week across our social platforms. Those numbers were nearly doubled at the WM Phoenix Open and Genesis Invitational earlier this year.

In the last three months we've broken ground on both the DraftKings sports book at TPC Scottsdale and the TGL facility in South Florida at Palm Beach State College.

We recently announced a new mixed team event, the Grant Thornton Invitational, for our Challenge Season as our part of our strategic partnership with the LPGA.

Our strategic alliance with the DP World Tour continues to strengthen. We're looking forward it to again co-sanctioning the Genesis Scottish Open along with crossover opportunities at the Barracuda Championship and Barbasol Championship. Our two organizations are working closely on commercial opportunities, and perhaps most exciting this year, the top 10 finishers in the DP World Tour's Race to Dubai will earn PGA TOUR cards for 2024.

Speaking of 2024, I want to spend some time framing our 2024-and-beyond approach, which we unveiled to our membership last week after much thought and discussion and ultimately unanimous approval from our board. I know you'll have questions on the details, but at the heart of the changes announced is our effort to present the best possible PGA TOUR to our fans and provide maximum benefits for every PGA TOUR member across the board. We've looked at all possible competitive models, and it was evident and perhaps obvious that whatever we do differently, we must showcase our top performers competing against one another more often.

This is what fans want and this is what fans have been asking for. Here's a data point: Consider the last five years on the PGA TOUR. What percentage of the top 10, top 20, top 30 players in the world compete

on average against one another at a major championship? The answer: More than 95 percent. What about those same top players competing together at the remaining PGA TOUR events? Answer: Less than 40 percent. Let me repeat that. Less than 40 percent.

We know that designated events can resonate both with core and casual fans, evidenced by the metrics of the WM Phoenix Open and the Genesis Invitational last month. But designated events can't stand on their own. You need strong, compelling full-field events to provide consistency and keep the PGA TOUR top of mind week-in and week-out with storylines and breakout stars.

Now, the analogy that I've been playing around with, one great chapter does not make a great book. A few great chapters cannot stand alone. It is the whole story, the ebbs and the flows, the transitions, the connectivity between each. That's what makes a book great, and that's what you need to do to deliver a bestseller.

That's what we're attempting to do with our new competitive model. I'm confident our fans, partners and players will get what they're looking for, the most competitive compelling consequential TOUR in the world.

Our 2024 schedule will look significantly different, with a consistent cadence of designated and full-field events. Within this framework, those players who qualify for these designated events will be able to better complement their schedules through full-field events, as they return to favorite venues, support their home markets, and solidify positions at the start of the season as well as in advance of the FedExCup Playoffs.

Every single member aspiring to qualify for the designated events has the opportunity to do so throughout the season. I referenced the Chris Kirk and Eric Cole storylines from the Honda Classic earlier. Those two players are perfect examples as to how compelling the PGA TOUR can be with this new connectivity between tournaments.

Will this model be perfect right out of the gate? Perhaps not. But as we've done throughout our history and using the FedExCup as a prime example, we will listen, we will learn and we will adapt each year with the changing needs of our players, partners and fans.

Growth and momentum have been threads throughout my comments today. Both of these themes are not possible without change, which can be uncomfortable, especially when we're all exceptionally proud of what the PGA TOUR has built and stood for over the past 55 years. But thanks to the cooperation, support and input of the player directors, members of the Player Advisory Council, and the membership at large, we're ready for the change to come and what it will mean for our fans and partners along the way.

With all that said, there's one thing I can assure you that will not change. Our commitment to giving our fans reasons to invest their time, their energy in the PGA TOUR and the dynamic consequential competition that will always be our calling card. Thank you, and I'm happy to take your questions.

LAURA NEAL: Okay. We'll take some questions. If you raise your hand we'll bring a mic your way.

**Q. You mentioned that this week's event is going to be broadcast with limited commercial interruptions. I'm wondering what, if any, changes have you discussed with TOUR leadership about the commercial load during PGA TOUR broadcasts.**

JAY MONAHAN: Coming into this season, we spent a significant amount of time with our broadcast partners, CBS, NBC, with Golf Channel in particular, looking at and assessing our broadcasts over the course of last season. One of the things that we have attempted to do together coming into this year was to show more live golf shots.

I'm pleased to say, as we transitioned from last year into this year, we're showing -- we have more than nine minutes more of live golf shots that you're seeing during our broadcast, and that's something that we are going to continue to lean into. We recognize that our fans want to see as many live golf shots as possible. I think when you look at the double box and keeping the play front and center on Saturday and Sunday, that has been a really nice enhancement. The way CBS and NBC have used their commercial breaks has been really strong heading into this year.

But, I mean, we're running a business. We're fortunate to have the great corporate support that we have, and we're doing the best we can to balance that with making certain that we're showing as many live golf shots as possible. Also, I just think that with the way fans are consuming the PGA TOUR today, watching

live golf is front and center but also looking at our apps and live video and the way that we're taking our fans to that journey, we're going to continue to invest in that.

But I understand the basis of your question, and I think as we look into the rest of the season and into 2024, particularly with these designated events, that's a trend that we will continue to lean into with the partners that we have. The response that we get at THE PLAYERS Championship with limited commercial interruption, thanks to the great proud partners we have, as you can imagine, is very well-received.

**Q. Two things. We think of now the designated events as being 20 million, 25 this week. What are the chances that those go up next year, part one. Secondly, I realize you talk about a cadence and a full book, et cetera. But it's still kind of two tours in a way or a two-tiered system of the elite events and the regular events. How can you, or how confident are you that you can convince sponsors to pony up for a field that will not have a majority of the top players? And if you're confident, why are you confident?**

JAY MONAHAN: So on the first question, I think when you look at purses and prize money for this season, and as we transition into next year, when we announce the full schedule, that's the point in time we will announce purse levels going into 2024. At this point, I think the expectation should be that they remain at the levels that they're at in 2024.

Then I think it's important to, when you look at -- when I look at your question or listen to your question, I think it's really important to note that what has gotten us to this point was a lot of discussion with our players and with our partners. We're fortunate in that we made changes into this year where we see the impact of moving to designated events at larger field sizes. So when you look to the future, being able to balance our entire schedule between designated and full-field events is absolutely critical.

By keeping these field sizes at 70 to 80 players, that allows us to make the field sizes at all of our full-field events as strong if not stronger going forward. All of our modeling suggests that. Candidly, we have seen some challenges with player fields early in the season. We've had a 20 percent decline in exempt members that are participating in some events. That's something that we recognized was going to happen as we came in this year when we made the changes last summer.

We feel that ultimately by having field sizes the way that we are going to have them next year, that puts the entire body of work, the book that I was talking about, in the strongest possible position because those tournaments are going to have a number of players that are playing in these designated events that we'll be playing.

If you look at the overall cadence, the fact that there are stretches between designated events, the fact that we don't have isolated events, which is a big issue for us this year, the fact that we will not have designated events between late June and the end of the year so players are playing their way into the playoffs and competing for positioning, not only in the playoffs but for the following year, I think all of that together leads me to believe that the incredible corporate partners that we've had -- I look back over, I look at the pandemic and the challenges we've had and the changes we've made to our schedule and the way that they not only stood by but leaned into returning the PGA TOUR and returning golf, to really over the last year, year and a half, we as partner need to make certain we're doing everything we possibly can in the context of this change to make certain that the yield, the value continues to grow.

So when you look at the overall portfolio, the overall presentation of the PGA TOUR and what we stand for, I feel confident that we'll be in a really good place as it relates to 2024 because when you deliver what the fans want, ultimately that's what your corporate partners want. When you have top players competing together more often, as we've said we're going to do, those same storylines are going to come through and the connectivity over the course of the season I think is something that right now we don't fully understand, but when we get into it I think it's going to be extremely compelling and is going to help all of our events grow and succeed.

**Q. I think everyone can appreciate why this restructuring benefits the PGA TOUR. You say the strategic alliance is only getting stronger. How can these changes specifically possibly benefit the DP World Tour?**

JAY MONAHAN: Well I think when you look at, you know, both organizations -- Keith Pelley has been here, he and his team, the last three or four days. We're spending a lot of time looking at the DP World Tour schedule and opportunities that we have going forward. I'm not going to comment on those today, but when you look at what has happened over the last couple of years, when you look at this year, you know, the DP World Tour is playing for $141 million in prize funds, which we are underpinning. We have made a $100 million investment in European Tour Productions.

We as a team are rolling up our sleeves and working with Keith and his team every single day on that important part of the DP World Tour's business.

I think what we've done from a co-sanctioning standpoint at Genesis, the two crossover opportunities we have with Barbasol, Barracuda, if you look at their -- if you look at the portfolio of sponsors and you look at those that share a relationship with the PGA TOUR and DP World Tour, our sponsors are interested in partnering with the DP World Tour.

You've seen some of that. I think you'll continue to see more of it. Ultimately as we go forward, you'll hear about the benefit of more opportunities because we are -- again, I'm on that board; that's a commitment this organization has made to the DP World Tour and to its members, and it's very important to me that we continue to deliver on that. I think the early signs are that we're on a really good path.

**Q. Has there has it been complicated to navigate the fact that the defending champion, Cam Smith, has gone to LIV Golf but also lives in the area?**

JAY MONAHAN: Listen, Cam Smith had a great performance in 2022. He was a deserved champion. I think as I look to this week and I look at the field that we have here and the strength from top to bottom, I think when we leave here on Sunday night we're going to crown another deserving champion.

To answer your question directly, yes, it's awkward. But you know, ultimately that's a decision he made, and we've got an unbelievable field here this week and a history and tradition that one of these 144 is going to go seek to get.

**Q. When the new designated events structure dropped last week, predictably there were a lot of people who said, limited fields, no cuts, looks very similar to what LIV Golf is doing. Understanding you explained why you did the limited fields to protect the other events, what was the decision process with not having a cut in eight of the TOUR's marquee events next year?**

JAY MONAHAN: So to your question, I would ask you, do you think we really look the same? And, you know, the players that are competing in our events in this new format next year will have earned the right to compete in them and they will have earned it through top-50 position in the FedExCup this year as well as their performance in the fall and ultimately in these swings.

So that's what this organization has always stood for. When I think about, when I think about your question, you know the PGA TOUR has always had limited-field, no-cut 72-hole stroke play events. In fact, Jack Nicklaus won 17 times in that format. Arnold Palmer won 23. Tiger Woods won 26. To me, those wins, those, the format did not diminish those accomplishments as we sit here today.

I think as we look out to 2024, 2025, 2026, the same will hold true.

I think when you get to the question about what got you to that point, and you're right, there was and there still is a lot of discussion and debate on whether or not there should be no cuts. But for us to be able to have our stars assured to play for four days is a really important element to this model going forward. We think that's what fans want, particularly given the players have earned their right and their ability to play in those events. So that's first and foremost.

And I think that when you look at the competitive integrity of the competitions, with the strength of these fields, I think it further warrants that you have the players, not only from a media standpoint but from an on-site standpoint, and one of the real takeaways for me is if you think about a field size of 70 to 80 players, and if you think about a higher reward for a top-10 finish, which is what we're talking about in the FedExCup going forward and in these events, FedExCup points, any player that is near the bottom of the cut line in what is already a reduced field has the chance to come back and finish inside the top 10. In fact, I think you'll probably see over the next couple years a player in that spot come back with a chance to win. For us I think that that's very compelling for our fans, and I also think it's very compelling competitively for our players.

**Q. Is there a timeframe on when you'll have this schedule completed?**

JAY MONAHAN: I gave you guys a timeframe last year at the TOUR Championship. I'm not doing that again. I think the timeframe is, if you look at when we traditionally announce our schedule, which is would be mid to late summer, that's when we'll likely announce our schedule for 2024.

We also -- but I will say that we have not announced our fall schedule, and I would expect you all to have that in the coming weeks.

**Q. Which leads to the other question, which is, are you at liberty to discuss at all what the fall will look like and what the players who will play in those events, are they playing for just prize money? Is there a point system for that?**

JAY MONAHAN: Well, the fall, as we go forward, as we come into this fall and in future falls, I think it's really -- I think it's important to note that by the time you get to Memphis, the time you get to Wyndham, you're playing to be in the top 70. We get to Memphis, and you're playing in the BMW, which is top 50. Those top-50 players are guaranteed position in the designated events the following year.

Positions 51 to 70 and positions 51 through the rest of the membership are competing for two things: You'll have 10 spots that will be eligible for the first couple of designated events, so it's important that you perform and compete in the fall. You're going to continue to carry forward the benefits of being a winner on the PGA TOUR, including the impact of that on designated events. And, I mean, ultimately you're competing for the ultimate prize, which is continuing to be a member of this TOUR.

So the fall is going to have real consequence and real drama and a lot at stake. I couldn't be more excited about it. More importantly, as we've talked to our partners, who candidly had some concerns when we announced the changes last year about the future of the fall, they're feeling a lot stronger about what this schedule impact will be in a positive way for them going forward.

**Q. I'm wondering if you all have sort of done the math because obviously FedExCup points and finishes are even more critical now to try and get in that top 50, of what kind of advantage players in these designated events will have in terms of maintaining that top-50 status or being higher in the FedExCup.**

JAY MONAHAN: You're right, we've run a dizzying number of models. To answer your question, the models that we have -- the model right now would suggest that roughly a little north of 60 percent of the players in the top 50 will retain their position. So more than a third will not.

That was an important element to the changes that we're making. We wanted to make certain that there was real consequence and there's real promotion, there's real relegation. I think that accomplishes that.

I think it's also helpful to know that when you look at the top 125 and our current system, the turnover rate there is 25 percent. So the turnover rate within the top 50 is greater than what it's been in the top 125 in the past, which fully supports the fact that players have the opportunity, based on their performance, to play their way into these designated events. Players have the ability based on their performance to play their way out of these designated events, and because we're taking the season-long points list, the top 10 there, the top 5 between swings, you're matching up the hottest players at the time with the top performers from the prior year, that's what creates that variability and the retention rates.

But we're going to continue to look at that. It's something that we talked to our players about this morning, and I think there were a lot of rumors about what that would be. But to me, this is as pro competitive a result as you can find.

**Q. We know some players this morning, they said that the recent announcement about the changes in policies were much needed. They said that LIV Golf was one of the reasons why the PGA sort of rethinking its policies. Why did it take until the arrival of an upstart and new rival like LIV Golf to arrive on the scene for the PGA to really rewrite its playbook, as you said, or rethink its product?**

JAY MONAHAN: Well I think it's important to step back and look at what's happened over the last several years. You heard me say this a few times, that we're running a business. If you go back to the period of 2017, 2018, we as an organization recognized that it was important for us to end our FedExCup Playoffs prior to the start of college football and the NFL.

In order to do that, we had to reduce our FedExCup playoff events from four to three, which we did. Okay.

Then for our TOUR Championship, at the time we were competing for two trophies. We recognized that to put more focus on season-long performance we needed to have a singular champion and a single trophy at the TOUR Championship. So we worked with our membership, and we came forward with a single scoring format which is now in operation today, and we have produced four great champions since that point in time.

So we have that, plus we also administered a regular -- brought forward a regular season bonus pool for the first time that, again, rewards season-long performance. Then we get into the early stages of the pandemic. The PGA TOUR responds; we respond on June 11, come back at a point probably sooner than a

lot of people were comfortable coming back with, but we were very confident in it, and during that period of time we continued to look at the ways that we could continue to evolve and improve the PGA TOUR.

I think that the commitment that we made at that time to Netflix, some of the real innovation that we've had around concepts like TGL, all that starts to manifest itself at that point in time.

We come to last year. We go to our board and say, how do we continue to make the PGA TOUR stronger and even more competitive. What we did at that point in time is we reduced our FedExCup playoff sizes from 125/70, down to 30, to 70/50/30, which we thought was a really important result for us.

At that time we announced increased purses in our events, the events that we're yielding this year. It's really important to note that back in that timeframe we were also in the midst of extending our domestic media rights deals, and those didn't take affect until the beginning of 2022. In running a business, you can only spend the money you generate. For us, that was a big moment for the PGA TOUR, and when you think about how the resources have been allocated, that comes from the great loyal membership that we have on the PGA TOUR, their incredible talents, their commitment to the model, to the meritocracy of the PGA TOUR and the game, to the corporate partners that we have that support all of our tournaments, to the communities where we make such a huge impact, to our fans who want to see more of our -- all these things really come as a result of the business having these changes that we could reinvest in our product.

So to me, the credit goes to all of our players out here and also goes to our fans. We've listened to our fans and we've responded and we're returning to our fans what they have told us that they wanted. So that's really how we got to the amount of change that we've had over the last five or six years.

**Q. There's been a lot of talk recently amongst players about whether there would be any path back to the PGA TOUR for people who left for LIV. I'm wondering what the organization's current position, and is there any room to evolve should that scenario arise where a player comes back and says, I would like to explore the opportunity to come back and play on the PGA TOUR? What would that look like?**

JAY MONAHAN: Yeah, for some reason I've been hearing that a lot lately, and I'm not certain where that's coming from. I mean, players that have, the players that are playing on that TOUR are contractually obligated to play on that TOUR. So any hypotheticals at this point really aren't relevant, and I think you know me well enough to know I'm not a big fan of hypotheticals. But our position, to answer your question directly, has not changed.

**Q. I know you've been a little busy with the big picture, but this event, as you noted at the top of this press conference, not only is being played for the 50th time next year but it's a 50th anniversary. It's a little quirk because you guys didn't get through 2020. Do you anticipate that week, any preliminary thoughts about how that week is going to be special in any way?**

JAY MONAHAN: How it's going to be what? Sorry?

**Q. The week of next year's PLAYERS.**

JAY MONAHAN: I expect to be in front of you guys at Tuesday at 11:00 o'clock next year talking about the 50th anniversary.

But to your point, look, I think it's going to be an awesome year, moment in time, to reflect on the rich history and tradition of this championship, of our champions, of the uniqueness of this golf course and our TOUR and the game, the advancements that we've made through THE PLAYERS Championship for our TOUR and the game.

I think when we come back here next year, we're going to have an incredible field, and we'll be celebrating this year's champion, and we'll be telling the story of what makes this event so special and why we're so proud of it, and most importantly, hopefully our players will have the opportunity to do that.

**Q. Rory's been on some run here not just as a player but as a spokesman, too. Three years ago I'm sure you remember he was really the first person to say it's going to get worse before it gets better, talking about the pandemic. I'm wondering, of course Arnold Palmer has his tournament, Jack's got one, Tiger has got one. Do you envision the day when Rory will have a tournament in a similar kind of capacity?**

JAY MONAHAN: I envision a lot of things. I mean, that would be -- I mean I don't want to get ahead of that because I don't want to put Rory in that spot. But I think that the thing I will say is that his leadership, coupled with his extraordinary play, his leadership in the game and his extraordinary play, all

the trend lines are when you look at Jack, when you look at Arnold, when you look at Tiger, that's an opportunity that would be in his future.

But we're a long way from that. I think he would be the first to tell you he wants to win this week and he wants to win more championships. But I also, you know, when you look back over the last 12 to 18 months, Rory sat in a board meeting for seven hours last Tuesday night and finished one shot off the lead last week. I mean, it's extraordinary. He was in the room this morning for an hour and a half, and he was here with you all today.

The thing that's been so impressive about what he's done and having seen where we were coming out of Delaware last year to where we are now, his leadership has manifested itself in a way where he has a very good grasp on and balance on the full picture and on the entire membership, and where we were last summer to where we are now is largely a reflection on the amount of time and energy he's put into understanding that.

He's not alone. I mean, he -- and I'm not going to start listing other players, but I think you've talked to a lot of them. You've talked with some of them today; you'll talk to them tomorrow; you've heard their voices along the way. He would be the first to tell you that what's happened here is that is exactly what they said would happen, which is they were going to come together and they were going to help identify the best path forward for the PGA TOUR. I believe that's what they have done.

I'm proud to partner with them, proud to partner with Rory and all the players, and our entire membership, make no mistake about it, it was as important to -- it's very important to me, but it was certainly important to Rory, certainly important to our player directors that every member of the PGA TOUR benefit from the changes that we're making. That's something that we feel we're going to accomplish going forward.

That was a long answer, sorry.

**Q. A couple things real quick. Since most of the events on the PGA TOUR going forward will be non-elevated – you've said that a majority of those events are – if a sponsor or a tournament wanted to up its purse to a level that may be beyond an elevated event, would you be in support of that?**

JAY MONAHAN: That's a conversation I would be happy to have with our sponsors. It's not a conversation we're having right now, but as we get into this, I think there are a lot of different ways these conversations will go, and that may be one of the considerations.

**Q. And then secondly, there's been a lot of reporting about the World Golf Championships and the Match Play in less than a month and that it's going to be gone. Are the WGCs, have they run their course in your mind?**

JAY MONAHAN: Well, you know, first as it relates to the Dell Match Play, the WGC-Dell Match Play, I do want to thank Austin Country Club and Dell. They have been tremendous partners to the PGA TOUR.

I think as we go forward, we're going to continue to -- to your question have they run their course, right now the only remaining WGC we have on our -- you know, that we're currently contracted to would be the WGC HSBC Champions. We've not played there in three years, and it's difficult to foresee when we would play. So part of the decision we're making as it relates to the WGC-Dell Match Play is a result of that.

I think that running their course, I would never say anything has run its course. But I think right now you see the direction the PGA TOUR's heading in. It is with these designated events; it's with the concentration of the best players on the PGA TOUR competing in them, and I don't really, I really don't expect that to change as we go forward.

**Q. We hear a lot from leaders in the sport like yourself about growing the game and what's best for the game. I just wonder if there's any part of you that believes it is best for the game that there is this divide, you know, with the two tours here and obviously the guys having made their choice to go to LIV and I just have a follow after that.**

JAY MONAHAN: I think, to me, "grow the game," I don't fully understand that expression. It's what's your impact on the game; what's your positive impact on the game. So for us, focusing on the things that we control, obviously being able to generate over $200 million for charity through our tournaments every single year, getting fully behind First Tee and teaching young people life skills through the game of golf, and then all the efforts that we have around Make Golf Your Thing, those are our priorities.

There's no question that there's been more attention to not only the men's professional game but to our sport over the last year, year and a half. As it relates to growing the game, the expression you're using, I'll leave that for you guys to answer. We're growing the PGA TOUR. We're growing the PGA TOUR in the ways that I've outlined, and that's the result of, again, the great members we have and the great support we have from our corporate partners and our media partners.

Q. I was going to go more -- I wasn't using the growing the game. We obviously hear that a lot, but --

JAY MONAHAN: Neither was I.

Q. -- more for the sport, what's best for the sport in general. But do you see there's anything down the line? Obviously not anything immediate, but do you see anything on down the line, and would you like to see a merging of these two ideas, concepts or however you want to put it for the betterment so you have your defending champion here for example this year and you have some of these other top players in the world who aren't who you guys have obviously banned from the TOUR?

JAY MONAHAN: What I want to see is us continue to grow with our membership, and to me getting into hypothetical situations given where we currently are is not a worthwhile effort. That's not a possibility.

So what I want to see is, we are who we are. We're the most pro competitive legacy-driven TOUR in men's professional golf. We're about to get stronger. We're about to create more opportunities for our players, and we're about to inspire future and younger generations to continue to play the game and be inspired to get here.

So that's how, that coupled with what I mentioned earlier, that's how we contribute to the game that we're a part of and that we're a party to. I think any other hypotheticals are just not worth talking about.

Q. Another TV question. Given the stacked field and the exciting finish at the API on Sunday, do you foresee the possibility wherefore the sake of the fans and viewership that that last hour of television, specifically in designated events, might be commercial free and restricting the sponsor messaging during that time?

JAY MONAHAN: It sounds like that's what you would like to see. Yeah, listen, we're -- I don't want to get ahead of myself, because we're having conversations with our tournament organizations and title sponsors, but we will not have delivered if we don't make changes that benefit not just our players but also our fans.

We have great partners: NBC, Golf Channel, CBS, ESPN+, Discovery International as well as our 48 international partners. We have partners that think the same way. So now we're at the point where, how do you make that happen. And we'll report back when we get further, when we get closer to the '24 season.

Q. The sport resolutions panel met a month ago, and we haven't heard a decision, and it looks as though it could be some time. I know this is hypothetical, and I'm sure you'll be able to answer that, but what would happen if they were to rule in favor of LIV? How would that affect the special relationship that exists between the PGA TOUR and the European Tour?

JAY MONAHAN: That is --

Q. I'm sorry, I know this is hypothetical, but what would the reaction be? What is your feeling about why there's a delay? Do you think it's ominous, or do you think it's encouraging?

JAY MONAHAN: I can't speak to, you know, what's happening with the resolution panel. Our commitment is to Keith Pelley and the DP World Tour and every member out there.

So as it relates to what, how this is all going to play out and what we should be feeling about it, I'm going to leave that for you guys to understand, and I'm not going to comment on it.

Q. Dovetailing off the World Golf Championships question, are the designated events just the new look World Golf Championships?

JAY MONAHAN: Well I think if you go back, this is the 25th anniversary of the World Golf Championships. If you go back and you look at them and look at how they have evolved, and you look at field composition, I think depending upon which of the four events that you choose, you had field sizes anywhere in the high 40s up into the low 70's, and anywhere between 20 percent and 35 percent of those

players were not PGA TOUR members. So you look at who is actually in those fields from the PGA TOUR, and they're very different from what we're presenting here with designated events going forward.

Also I think as we're talking about today with these designated events, the criteria is very well understood. It will be consistent. That was not the case with the World Golf Championships in the past, and there are ways over the course of the year to play yourself in or to play yourself out of these events, which I think is an important characteristic that doesn't necessarily like in real time the hottest player exists the way it is in this model going forward.

So the World Golf Championships for 25 years have been a real, been a strong portfolio. We've had great events and great champions. But the business evolves and it adapts. That's not a knock on the World Golf Championships; that's more about where we are and how we think the TOUR can get stronger in the years ahead.

**Q. And then as far as your conversations with those events that are not premier league events, so to speak, what are the concerns that they have, in that getting some of those top 20, top 30 players, they're obviously looking at the designated events. How are they going to best market their tournaments?**

JAY MONAHAN: Well I think for, you know, as we are here in 2023, there were a couple of concerns that we heard from our tournaments. One, you don't want to be in isolated weeks sandwiched between designated events. There was a concern because we were thinking about it, that you may have a number significantly larger than 16 and the impact that that could have on field quality. So now that we've made the decisions that we've made, and we're having conversations with our tournament organizations and our sponsors, I think tournaments themselves realize that they're in a position to compete for fields, which is what tournaments have always done. I've run tournaments.

Now I think when you think about starting the season, and whether you're a player that's qualified to play in designated events or not, you're going to have to get off to a fast start. You're going to see players try and get themselves well positioned at the start of the year, adjust their schedules. I think the fact that certain players have historically played certain events, we maintain that flexibility, which has always been so important, there aren't rules from which to play and then when you get to the back end of the year where everything's at stake going from late June to the Wyndham Championship, you've got six or seven events there that are not going to have designated events, and our players are going to be really running hard to the end of the season to finish out the year and get themselves hopefully into the TOUR Championship top 50 or in the FedExCup Playoffs themselves, and if not, preparing for the fall and retaining their card.

**Q. I think you've said this publicly yourself, but if not members of your staff have, that there's more than eight tournaments that would like to be these designated events. How do you decide who these eight events are, and why are you opposed to the idea of rotating them?**

JAY MONAHAN: In terms of how you decide, it comes back to the cadence of the schedule. When you see the cadence of the schedule and where you're going to put these events relative to whether it's the PLAYERS, the major championships, you know, how this all flows, we've given a lot of thought to that. We feel like we have the right cadence, and in doing that, you kind of self-identify the tournaments that would be eligible or would be likely candidates to do so.

I never say never. So as it relates to rotation, I think we'll listen to our tournaments, we'll listen to our fans and as this develops that there's -- if there's a need to or we think we can get stronger by virtue of doing that, it's something we'll do. But right now as we look to 2024, that's not something we're planning on doing.

**Q. Do you think that fans like no-cut events?**

JAY MONAHAN: I think fans like seeing the best players competing together more often and being there on the weekend. And I think in a -- listen, 75 percent of our events don't have cuts. I would say to our fans that this is just a different form or flavor of a cut. Because as I was alluding to earlier, if you're coming into the Wyndham Championship and trying to get into the top 70 in the FedExCup, you are putting yourself in a position to get to BMW, and once we finish in Memphis, 20 of those players are going home and are not eligible for these designated events. To me that's a cut, okay.

Then we move our way through the TOUR Championship and ultimately we crown our FedExCup champ. You get to the fall, you're going to have seven or eight events. The top 10 performers from that fall period are going to qualify, so there's a cut because there's players that aren't going to qualify.

Then you get into the first three swing events, and the top-5 performers from those events are going to make their way into the designated events. So there are cuts along the way.

As I said earlier, what we're considering here is to have players, having 70- to 78-player field sizes, recognizing the depth of that field and depth of any field in the PGA, but those players can come back and put themselves in a top-10 position.

Given the way that we are, given the emphasis that we're placing as it relates to FedExCup points, the way prize money will be allocated, the importance of that concentration of players in the Official World Golf Ranking, there's going to be an awful lot to play for Thursday, Friday Saturday and Sunday.

I think the tradeoff and having a quarter of your events be that way, particularly given that that's something that we've done in the past with up to eight events in 2019 versus 11 this year. So I really feel that fans, as we get into this, and you actually see the results of it and some of these storylines develop, I think fans will appreciate what we've done here. But they will be the judge, and we've given a lot of thought to making certain we put ourselves in that position.

**Q. Rory was in here earlier, and he was asked about the difference between the final product, what's going to be the schedule next year versus what was kind of recommended at the Delaware meeting, and he kind of pointed out some pretty dramatic differences. Seems to me there was more designated events and smaller fields. How delicate was that balance between what we ended up with and what they wanted to see?**

JAY MONAHAN: It was delicate. I mean, it was delicate. When I go back to that point in time -- and I was referring to this earlier when I was talking about Rory, and it applies to all the players that were in that meeting.

I mean, coming out of it, you were looking at, if your retention rate is in the low 60 percentile, if it was close to 80 percent and the field sizes were a lot smaller, how does that look to the broader PGA TOUR membership? How does that look to fans? Is it the most pro-competitive model that we can put forward?

To everybody's credit in that room, once we saw, once we knew what the interest was, there was an openness to make certain that we could adapt it in a way that served the broader membership, served our partners and actually benefited everyone.

So it has been -- there have been a lot of conversations. There have been a lot of bad ideas that we came up with along the way. But candidly, I think the level of discussion has been really helpful and got us to the point that we're at today. But I would -- that's where we were last summer. That's the spot we were in.

**Q. You covered this earlier with the Match Play, and obviously you've got a lot of priorities here, a lot of things you've been talking about. But is the idea of a Match Play format not in the immediate future, or could that just become a -- is there a chance that could just be a regular non-designated event somewhere at some point?**

JAY MONAHAN: Yes. Yeah, I just think, I think for right now, for next season's schedule it didn't work. But Match Play has been a staple out here. It's been a staple on the DP World Tour. I think that there's -- that will certainly be a consideration as we go forward.

**Q. These designated events are designed to obviously have the best players playing at the best events. But I think something that has left to LIV are the Brooks Koepkas, the Patrick Reeds, the Bryson DeChambeaus. These guys were kind of pivoting to wrestling the heels, and they sort of generated a lot of storylines outside of you're going to have some of the best players playing at THE PLAYERS Championship. Do you think having the top 30 players at these isolated events is going to generate more of these, not to say venom, but more of a rivalry storyline, because as we have seen in "Full Swing" and covering the sport, a lot of these guys are friends. I'm wondering if you've kind of thought about that.**

JAY MONAHAN: We think about everything, and I think you've seen early on in this season with these designated events and the strength of field and the names at the top of these leaderboards that there is, they want nothing more than to beat each other. They want to do that every single week. There's tremendous respect amongst each other for the talents that are there, but that drive is as ever present as it has ever been on the PGA TOUR. I think that will continue, not just in designated events but every full-field event.

Winning out here is extremely difficult to do every single week. That's why you see the emotion and the energy and passion every single Sunday night when we crown a champion. I think that the rivalries on this TOUR are strong and will continue to be stronger, particularly as we shine more light on our stars and all of our players.

The reality is you can't look at this in a short timeframe because the stars of the future are the stars you don't even know exist yet. This platform is going to produce them and identify them and bring them forward to compete in full-field events and to compete across the entire FedExCup schedule on the PGA TOUR.

**Q. You mentioned in your opening statement maybe this isn't perfect and you'll go back and re-examine that. I wonder if you can kind of expand on that and how realistically malleable some of these things are, and then what's that balance of change versus creating some continuity so fans know what's happening every year over year, especially a casual fan.**

JAY MONAHAN: Yeah, you know, I don't want to overstate. We'll listen, we'll learn and adapt, but we're firm on what we're doing in 2024.

So you listen to your fans, we do that through our fan council; we'll continue to listen to our players, that manifests itself through our Player Advisory Council, more conversations we're having with our players in the coming weeks at tournaments, more discussions that we're going to have with our sponsors, our title sponsors, marketing partners and ultimately media partners. But we'll learn, just like we've learned this year. We'll learn along the way, and we'll apply that learning where we think it's going to be to the betterment of this organization and all of our members.

But I just think that's a huge part of probably what a lot of people don't see, but what I'm really proud of with our team, which is there are no sacred cows, we're just trying to get to the best possible outcome, and that is to continue to grow this TOUR and its preeminence.

**Q. If you go back to 2007 to the FedExCup, the points to the winner have always been equitable across the board regardless of the prize money, a little bump for WGC's, 600, I think, for the majors. Does this new system require you to provide greater points to the designated events in order to achieve whatever you're after for the turnover rate? I'm not sure if you guys have announced what that's going to be. If you wanted to do it now, that would be great. It's up to you.**

JAY MONAHAN: We haven't. But I think that, again, going back to the question on learnings, one of the things that we learned coming out of the TOUR Championship was that players want to compete against each other more often. But players don't necessarily want to be told where they need to compete. So as we looked at our 2024 schedule, we said, okay, given the investments that we're going to seek to make in purses, given the investments that we're going to make in the FedExCup, the regular season bonus program, that we need to make certain that the points recognize that when you've got the top 70 to 78 players, either from the composition of the prior year and the current year, that you want to do everything you can to incentivize those players in that model to play those events.

So we're trying to strike the balance, that balance in the way that we're thinking about FedExCup points in the designated events. We feel like we've done that statistically through our model.

**Q. It's been awhile since we heard from you. I think it was the TOUR Championship since we last got to ask you questions. Curious how you weigh your decision versus like the players driving the message on some of these changes versus yourself kind of coming out front. Obviously they're the ones driving a lot of the discussion, they're having meetings in Delaware. How do you sort of decide whether you should step up and say stuff versus do stuff behind the scenes to move things forward?**

JAY MONAHAN: That's a phenomenal question. You know, to me, the key -- you hear me use this expression: We adapt and we evolve. So I go back to -- I've always prided myself on being open to any, to our membership and all the conversations we need that lead to us improve.

When you get to last summer, I was grateful that Tiger and Rory and that group of players got together because I was a part of the process. I understood what they were seeking to accomplish; the lines of communication were very open and transparent. In my role it's my job to synthesize that and ultimately come back to our board of five player directors and five independent directors and alongside my team make a recommendation that's in the best interests of the TOUR.

So having conversations with those players, having conversations with our Player Advisory Council, with our board, with the membership week-in and week-out, which is what our player relations team does, that's how we communicate. Admittedly it was a challenging environment, but I was all in and leaning all in to that process and making certain that one, we had the ability to impact it in the way that we did, which is to the betterment of all the members of the PGA TOUR. But, so, yeah, that's -- that gives me energy being a part of that. Like I love every second of it and I'm thankful for it.

The alternative is no communication and you don't understand where your top players are and you don't understand where your membership is. And we do.

**Q. I had the same question as him, so just to continue that line of thinking, how different is that for Tiger and Rory and these top players to really be getting on the same page and getting in a room and thinking more as a team? How different is that than the few years before that?**

JAY MONAHAN: Well, it's different. But those players have always had a strong voice and strong opinions. I think that they have always felt that that voice and that opinion could be heard.

But I think if you look at that two, three, four years ago, it was probably as individuals, not as a larger collective. That's what was different.

To me, if you go back to the origins of this organization in 1968, and when Jack, Gary and Arnold broke away from the PGA of America, in many respects when I look back at this point in time, that's what I look at, which is they came together for the betterment of men's professional golf, touring professional golf, and this point in time those players, and it's broader than the group that was in Delaware, they came together to help participate in shaping the PGA TOUR in a positive way for everybody else. So it was definitely different.

LAURA NEAL: Jay, thank you so much for your time. Thank you, guys.

JAY MONAHAN: Thank you.

**FastScripts Transcript by ASAP Sports**



**About ASAP Sports** • **FastScripts Archive** • **Recent Interviews** • **Captioning** • **Upcoming Events** • **Contact Us**
FastScripts | Events Covered | Our Clients | Other Services | ASAP in the News | Site Map | Job Opportunities | Links

**ASAP Sports, Inc.** | T: 1.212 385 0297

www.asapsports.com/show_interview.php?id=184317                                                                                    13/13

# EXHIBIT D

# Exclusive: PGA Tour Threatens to Ban Japan Golf Tour Players Who Compete in LIV Golf Events

Four Japanese players had played in LIV events but are not in the field for this week's tournament. If they don't play again in LIV, they may play in 2023 PGA Tour-run tournaments.

**BOB HARIG** SEP 1, 2022 10:11 PM EDT

The PGA Tour has told the organizers of the Japan Golf Tour that any of its members who participated in LIV Golf Series events this year or LIV Golf Tour events during the 2022-23 season will be barred from competing in PGA Tour-run tournaments, including the Zozo Championship and the Korn Ferry Tour Qualifying Tournament.

The move helps explain why all four of the Japanese players who competed in the last LIV Golf Invitational Series event in New Jersey are not in this week's field outside of Boston.

Yuki Inamori, Ryosuke Kinoshita, Jinichiro Kozuma and Hideto Tanihara had played at Trump Bedminster in July and formed an all-Japanese team.

*Sports Illustrated* obtained a copy of the letter the Japan Golf Tour sent to its members this week. In the letter, the JGTO quotes correspondence with the PGA Tour which explains the decision.

Any players who participated in LIV Golf events to this point "remain ineligible for all events across all PGA Tour sanctioned tours through the end of the calendar year, including the Zozo Championship,'' according to the letter.

Here is the letter:

The PGA Tour's position was announced when LIV Golf launched in June. In a letter sent by commissioner Jay Monahan, those who participated in the first event were deemed "no longer eligible to participate in PGA Tour tournament play, including the Presidents Cup." Monahan further stated, "The same fate holds true for any other players who participate in future Saudi Golf League events in violation of our regulations." Monahan later added, "To be clear, these players will not be permitted to

play in PGA Tour tournaments as a non-member via a sponsor exemption or any other eligibility category.''

Inamori, ranked 90th in the world, Kinoshita, ranked 119th and Kozuma, ranked 134th, all competed in the Zozo Championship last year. The tournament is an official event on the PGA Tour schedule, played outside of Tokyo and co-sanctioned by the Japan Golf Tour (JGTO), which designates 10 of its members to compete in the event.

Japan's Hideki Matsuyama won the Zozo Championship last year and is expected to defend his title in October. The 2021 Masters champion, who also won the Sony Open earlier this year, has long been the subject of speculation concerning LIV Golf. He told the Associated Press at the Tour Championship that he would not be joining LIV Golf.

It is unclear if his decision was in any part based on the PGA Tour's stance regarding Japanese players, which according to the JGTO, was first brought to its attention on Aug. 22. The JGTO, in its letter to the members, said it sought clarification on those who had already competed in LIV events and what it meant for the rest of this year. None of the four players who have competed so far would be allowed to try and qualify for the Korn Ferry Tour, for example.

"If a JGTO member does not participate in any further unauthorized events during the 2022-2023 PGA Tour season, they would be eligible to participate in the 2023 Sony Open and the 2023 Zozo Championship,'' the letter said. "However, if they participate in any further unauthorized events, they will not be eligible for any events sanctioned by PGA TOUR through the end of 2023 including the 2023 Zozo Championship.''

None of the four Japanese players has any sort of PGA Tour membership. They've all mostly competed on the Japan Golf Tour as well as the Asian Tour.

"We would have loved to have had these players join LIV, but we respect their decision given the unfortunate, anti-competitive threats imposed on them by the PGA Tour," LIV Golf said in a statement. "The lengths the Tour is going to to stop players from joining LIV is quite amazing."

Inamori, Kinoshita and Kozuma played in and missed the cut at the PGA Championship this year. Kozuma also missed the cut at the U.S. Open. Inamori won the Japan Players Championship in June while Kozuma won the Token Homemate Cup 2022.

Four other players who competed at Bedminster are not in this week's field: South Africa's Hennie Du Plessis and Justin Harding, Australia's Travis Smyth and Spain's David Puig. The LIV Golf Invitational Series has used various criteria for qualification along with invites to fill its fields and all of those players were competing on a per-event basis.

LIV Golf last week joined an antitrust lawsuit brought against the PGA Tour originally by 11 players but is now seven. The lawsuit claimed the PGA Tour has used monopoly power to try and thwart

competition and has unfairly suspended players.

Those who have competed in LIV Golf events have been indefinitely suspended. Three of the players in the lawsuit—Talor Gooch, Hudson Swafford and Matt Jones—sought a temporary restraining order to compete in the FedEx Cup playoffs. It was denied on the eve of the first playoff event.

In July, the Wall Street Journal reported that the PGA Tour is under investigation by the United States Department of Justice for potential anticompetitive behavior in response to the threat from the LIV Golf Invitational Series.

# EXHIBIT E

# PGA Tour and DP World Tour announce alliance with Japan Golf Tour

**By Joel Beall** December 05, 2022



Chung Sung-Jun

The PGA Tour and DP World Tour announced a new partnership on Monday with the Japan Golf Tour Organization.

According to a joint press release, the top three players on the JGTO Order of Merit will earn membership onto the DP World Tour for the ensuing year, beginning with the 2022-23 season. Additionally the JGTO will work with both circuits on business development areas, highlighted by a

commitment to the ISPS HANDA Championship, which is set to make its debut on the DP World Tour schedule this coming April at PGM Ishioka GC in Omitama, Japan.

Founded in 1973, the JGTO boasts the third-largest purses in professional golf. Kazuki Higa, ranked No. 73 in the OWGR, is the tour's reigning money winner.

"Japan has a long, storied history of producing world-class golf talent that deserves the opportunity to compete on the game's highest stage, and today's announcement is recognition of that," said PGA Tour commissioner Jay Monahan. "Over the past 30 years, 25 players have claimed at least one victory on both the PGA Tour and Japan Golf Tour, including current Japan Golf Tour chairman Isao Aoki, who in 1983 became the first Japanese-born player to win on the PGA Tour when he holed out for eagle on the 72nd hole to win the Sony Open in Hawaii. His legacy continues today with eight-time JGTO winner Hideki Matsuyama and will now endure for years to come under this new pathway."

Added Aoki: "We are proud of the rich tradition the Japan men's golf tour has established over the last 40 years, and this development is the next step in the journey of our organization."

The news comes months after the PGA Tour and DP World Tour strengthened their strategic alliance in the threat posed by the emergence of LIV Golf. As part of the alliance, the leading 10 players on DP World Tour's Race To Dubai Rankings, in addition to those already exempt, will earn PGA Tour cards beginning with the 2024 season.

# EXHIBIT F

# DP World Tour, PGA TOUR announce expansion of relationship with Korea Professional Golfers' Association

**4 Min ReadLatest**

## $2 million Korea Championship to debut in April as part of DP World Tour, PGA TOUR support of Korean golf; KPGA Genesis Point Winner Youngsoo Kim to earn DPWT membership

| A | Change Text Size |  |
|---|---|---|

**Written by Staff**
**@PGATOUR**

The DP World Tour and PGA TOUR jointly announced today an expansion to the relationship with the Korea Professional

Golfers' Association (KPGA) that will see the KPGA's Genesis Point Award Winner earn membership onto the DP World Tour for the ensuing season, beginning with the current 2023 campaign, and the launch of a brand new $2 million tournament in Korea.

A raft of benefits will also see the top finishers on the Genesis Point list earning entry into various stages of the DP World Tour Qualifying School, which takes place later in 2023. The three Tours intend to further discuss expansion of additional pathway commitments for 2024 and beyond.

Youngsoo Kim has secured this exemption for the 2023 DP World Tour season after finishing the 2022 campaign as the Genesis Point Award Winner, having claimed his first career KPGA victory in October at the Genesis Championship before winning again at the season-ending LG Signature Players Championship. As announced previously, as a result of winning the Genesis Championship in October, he will also gain entry into July's Genesis Scottish Open, the Rolex Series event which is co-sanctioned by the DP World Tour and PGA TOUR.

As part of its commitment to supporting professional golf in Korea, the DP World Tour will also mark its return to the country for the first time in 10 years next April for the

inaugural Korea Championship. The tournament, which will be co-sanctioned by the DP World Tour and KPGA, will be played at Jack Nicklaus Golf Club Korea in Incheon with a $2 million prize fund on offer. Additional information regarding the Korea Championship will follow in due course.

Today's announcement further enhances the playing opportunities for international players to compete at the highest levels of men's professional golf. As part of this system, the leading 10 players on DP World Tour's Race To Dubai Rankings [in addition to those already exempt] will earn cards on the PGA TOUR, beginning with the 2024 season – an aspect of the partnership between the PGA TOUR and DP World Tour announced in June.

In addition to the exemptions confirmed today, the KPGA will also work alongside the DP World Tour and PGA TOUR on other key business areas, including strategic development and commercial growth, as

Keith Pelley, Chief Executive Officer of the DP World Tour, said, "The KPGA has a strong history of producing exceptional talent and we are delighted to confirm these formal pathways, giving players clearly defined routes to showcase their skills on the DP World Tour and PGA TOUR.

"Combined with our tournament in Korea next April, we look forward to working closely with the KPGA and the PGA TOUR to inspire, and to enable, future generations of Korean players to reach the very top of the men's professional game."

Jay Monahan, Commissioner of the PGA TOUR, said:

"Sungjae Im, K.H. Lee, Si Woo Kim and Joo-hyung 'Tom' Kim are all becoming household names in the United States thanks in large part to the contributions they made this past September for the International Team at the 2022 Presidents Cup. What each of those young stars has in common is that they all honed their craft at the KPGA, which continues a proud tradition of producing world-class talent each and every year. We look forward to seeing the next set of young stars from this proud golf country make their way onto the DP World Tour and perhaps subsequently onto the PGA TOUR in future seasons."

Ja-Cheol (J.C.) Koo, Chairman of the Korea Professional Golfers' Association, said, "It has been our honour to see Korean Tour winners go on to have similar success at the top echelon of the men's professional game. We are certain that today's announcement will help further grow the sport

in Korea, and we are grateful to be officially welcomed into the meritocracy that the men's professional game provides."

Korean stars who have previously been victorious on both the DP World Tour and PGA TOUR include K.J. Choi, Y.E. Yang and Seung-Yul Noh. Choi jointly holds the record for most PGA TOUR victories by an Asian golfer with eight, including the 2011 PLAYERS Championship.

Choi said: "I'm delighted the KPGA, DP World Tour and PGA TOUR have expanded their relationship which will only benefit Korean golfers. Our young players will have added motivation to excel in the game as there is now a clear career pathway for them to compete on the KPGA, and subsequently play against the best players in the world on the DP World Tour and PGA TOUR. This announcement is a wonderful development for Korean golf."

# EXHIBIT G

## PUBLIC VERSION
## DOCUMENT LODGED
## UNDER SEALED

# EXHIBIT H



The concept of the Ranking originated in the early 1980s by Mark H McCormack and Tony Greer. The SONY RANKING, owned and managed by IMG, launched on Sunday, April 6th, 1986. After McCormack's death in 2003, a new Private Limited Company by guarantee was formed: Official World Golf Ranking (OWGR).

## MISSION

The mission of the OWGR is to administer and publish, on a weekly basis, a transparent, credible, and accurate Ranking based on the relative performances of players participating in male Eligible Golf Tours worldwide.

The OWGR is governed by seven board of directors, supported by a Technical Committee composed of representatives from the Governing Bodies, Major Championships and leading tours from within men's professional golf.

### GOVERNING BOARD

Chairman - Peter Dawson CBE

Augusta National Golf Club - Will Jones, Executive Director

PGA European Tour - Keith Pelley, Chief Executive

PGA of America - Seth Waugh, Chief Executive Officer

PGA Tour - Jay Monahan, Commissioner

The R&A - Martin Slumbers, Chief Executive

USGA - Mike Whan, Chief Executive Officer

International Federation of PGA Tours - Keith Waters

### TECHNICAL COMMITTEE

Chairman - Ian Barker



European Tour - Keith Waters, Chief Operating Officer & Director of International Policy

Japan Golf Tour - Amigo Urayama, General Manager

PGA of America - Kerry Haigh, Chief Championships Officer

PGA Tour of Australasia - Nick Dastey, Tournament Director

PGA Tour - Billy Schroder, Vice President, International Relations

Sunshine Tour - Thomas Abt, Chief Operating Officer

The R&A - Professor Steve Otto, R&A Executive Director – CTO

USGA - Jeff Hall, Managing Director Rules & Open Championships

# *ELIGIBLE* TOURS

















ISPS HANDA







## FOUNDER MEMBERS











Terms & Conditions

Privacy Policy

Player Privacy Policy

Cookie Policy

## CONTACT US

Contact Form






# EXHIBIT I

# PGA Tour, DP World Tour Bosses Step Away From Deciding LIV Golf's World Ranking Fate

Jay Monahan and Keith Pelley recused themselves from reviewing the Saudi-backed tour's application, leaving it to representatives of the four majors.

**BOB HARIG** JAN 24, 2023 11:04 AM EST

Jay Monahan and Keith Pelley have recused themselves from reviewing LIV Golf's application for Official World Golf Ranking points.

Monahan, the commissioner of the PGA Tour, and Pelley, the CEO of the DP World Tour, are two of the seven members of the OWGR board of directors that ultimately decides the fate of tours seeking accreditation.

Keith Waters, who heads up the International Federation of PGA Tours and is the DP World Tour's chief operating officer, has also recused himself from the application.

Pelley disclosed this decision to reporters covering the Hero Dubai Desert Classic, which begins Thursday in the United Arab Emirates. The PGA Tour confirmed that Monahan has removed himself from the process.

"I have not looked at the LIV application," Pelley said during a session with reporters in Dubai. "So I can't give an opinion on an application I have not seen. It is in the hands of the technical committee. On the advice of legal counsel, myself and Jay recused ourselves from the separate committee. Representatives of the four majors will now determine the LIV application. We are not involved and we have no influence on what transpires as far as LIV goes."

With three members of the board out of the decision, that means it would be decided by the four representatives from the major championships. For Augusta National and the Masters, that is executive director Will Jones. The other representatives are Seth Waugh, CEO of the PGA of America; Mike Whan, CEO of the United States Golf Association; and Martin Slumbers, CEO of the R&A.

Peter Dawson, the former head of the R&A, is chairman of the OWGR governing board.

The technical committee is made up of 12 members representing all four majors and various tours around the world, including the Asian Tour and CEO Cho Minn Thant. The Asian Tour has a financial arrangement through LIV Golf via funding for the International Series, an elevated group of tournaments part of the Asian Tour schedule—and which offers a spot into the LIV Golf League.

Greg Norman, the CEO and commissioner of LIV Golf, has maintained that Monahan and Pelley's association with the OWGR is a conflict of interest given their opposition to the LIV Golf League.

LIV Golf first submitted its application in July. It later submitted another application by partnering with the MENA Tour, a developmental tour that is already afforded points. It is still hoping that a decision will be reached on whether it will be awarded points for its events prior to the first event, Feb. 24-26, at Mayakoba in Mexico.

# EXHIBIT J

## PUBLIC VERSION
## DOCUMENT LODGED
## UNDER SEALED

# EXHIBIT K

## PUBLIC VERSION
## DOCUMENT LODGED
## UNDER SEALED

# EXHIBIT L

# A final look at how far LIV golfers fell in the OWGR in 2022 is eye-opening

By Ryan Herrington December 26, 2022



Chris Trotman/LIV Golf

Guaranteed dollars versus a guaranteed drop in the Official World Golf Ranking. That was the trade-off those who made the jump to LIV Golf in its inaugural season faced as part of the decision-making process. With LIV events applying for, but not yet offering, OWGR points, competitors would sacrifice their spots in the World Ranking to play on the lucrative, but controversial, Saudi-backed circuit.

Much has been written about this trend, with headlines throughout the fall noting how high-profile players such as Dustin Johnson, Sergio Garcia, Brooks Koepka, Phil Mickelson and others have fallen to their lowest points in years (and even decades).

Yet with the release of the final OWGR ranking of the year on Monday, it felt appropriate to explore just how big an impact this all had on LIV golfers in 2022. So we pulled out 54 golfers who played in three or more LIV events, identifying their spot in the OWGR the week before making their first LIV start and comparing it to their OWGR spot in the final 2022 ranking.

Interestingly, there were seven players who saw their place in the OWGR stay the same or improve. The most notable being Harold Varner III, who went from 46th before making his LIV debut in Boston to 45th. This, despite not playing a single OWGR-counting event during that time. Call it a quirk in the OWGR formula.

| NAME | OWGR joining LIV | Final OWGR 2022 | Improvement | Money earned in LIV events |
|---|---|---|---|---|
| James Piot | 1751 | 1515 | 236 | $ 1,936,000 |
| Chase Koepka | 1562 | 1437 | 125 | $ 4,328,964 |
| Adrian Otaegui | 165 | 73 | 92 | $ 1,294,500 |
| Sadom Kaewkanjana | 118 | 101 | 17 | $ 1,412,286 |
| Travis Smyth | 395 | 393 | 2 | $ 846,000 |
| Harold Varner III | 46 | 45 | 1 | $ 1,457,500 |
| Scott Vincent | 91 | 91 | 0 | $ 1,498,700 |

Others among the seven did play OWGR-sanctioned events outside LIV starts that offered OWGR points (of course, not in any PGA Tour events, in which they were prohibited from competing). And since most had fairly low rankings to start with (James Piot had just turned pro before his LIV debut), the chance to improve was uniquely possible for this group.

MORE FROM GOLF DIGEST

YEAR IN REVIEW

2022 Newsmakers of the Year: Our countdown of the top 25 players, events and moments of the year

The rest saw their rankings tumble, as predicted. Here's a look at the numbers. We also included how much money each of the players earned in competing in LIV events, figuring it was an interesting look at that initial trade-off question. The money listed is only what was earned in official LIV events, not with the reported guaranteed dollars many received just for signing to play in the circuit. So while Dustin Johnson dropped 26 spots in the OWGR, he made $35.6 million on the course as LIV's leading money winner. So was the trade off worth it? Only he can answer that.

| NAME | OWGR joining LIV | Final OWGR 2022 | Decline | Money earned in LIV events |
|---|---|---|---|---|
| Cameron Smith | 2 | 3 | 1 | $ 7,378,500 |
| Anirban Lahiri | 92 | 94 | 2 | $ 4,226,000 |
| Joaquin Niemann | 19 | 22 | 3 | $ 4,524,286 |
| Talor Gooch | 35 | 40 | 5 | $ 10,374,500 |
| Abraham Ancer | 22 | 32 | 10 | $ 4,445,500 |
| Jason Kokrak | 36 | 47 | 11 | $ 3,959,500 |
| Cameron Tringale | 55 | 66 | 11 | $ 1,091,200 |
| Kevin Na | 34 | 49 | 15 | $ 1,914,286 |
| Marc Leishman | 62 | 84 | 22 | $ 2,968,000 |
| Richard Bland | 67 | 90 | 23 | $ 3,545,833 |
| Hudson Swafford | 95 | 119 | 24 | $ 1,241,000 |
| Henrik Stenson | 173 | 197 | 24 | $ 5,566,000 |
| Dustin Johnson | 15 | 41 | 26 | $ 35,637,767 |
| Pat Perez | 185 | 211 | 26 | $ 8,023,500 |
| Paul Casey | 31 | 58 | 27 | $ 4,543,367 |

| NAME | OWGR joining LIV | Final OWGR 2022 | Decline | Money earned in LIV events |
|---|---|---|---|---|
| Louis Oosthuizen | 21 | 50 | 29 | $ 5,395,167 |
| Bernd Wiesberger | 94 | 123 | 29 | $ 1,843,500 |
| Graeme McDowell | 374 | 403 | 29 | $ 2,373,381 |
| Brooks Koepka | 19 | 52 | 33 | $ 8,276,100 |
| Patrick Reed | 39 | 72 | 33 | $ 12,210,714 |
| Sam Horsfield | 74 | 111 | 37 | $ 3,534,000 |
| Phachara Khongwatmai | 136 | 173 | 37 | $ 1,858,333 |
| Bryson DeChambeau | 28 | 67 | 39 | $ 3,511,750 |
| Hideto Tanihara | 180 | 219 | 39 | $ 752,600 |
| Charl Schwartzel | 126 | 166 | 40 | $ 8,135,000 |
| Matt Jones | 69 | 110 | 41 | $ 3,404,700 |
| Laurie Canter | 119 | 160 | 41 | $ 2,906,950 |
| Hennie Du Plessis | 133 | 179 | 46 | $ 4,530,000 |
| Sihwan Kim | 144 | 191 | 47 | $ 2,382,000 |
| Peter Uihlein | 327 | 377 | 50 | $ 12,814,786 |

# EXHIBIT M

# How Does The Official World Golf Ranking Work?

The Official World Golf Ranking is a technical subject, so we try to make sense of it a little better for you here.

     Newsletter



(Image credit: Getty Images)

BY RYAN DABBS
LAST UPDATED SEPTEMBER 13, 2022

**The Official World Golf Ranking is a technical subject, so we try to make sense of it a little better for you here.**

**How Does The Official World Golf Ranking Work?**

The Official World Golf Ranking (OWGR) is a system for rating the performance level of professional golfers, with players accumulating points over a two year rolling period to determine their ranking in the OWGR.

Sponsored Links

## Child Refugees and Migrants Need Help Now
UNICEF USA

DONATE TODAY

To put it simply, a golfer's World Ranking is obtained by dividing their points total by the number of events they have played, which gives an average from which players are ranked by.

RECOMMENDED VIDEOS FOR YOU... 

PLAY SOUND



This video will resume in 21 seconds

However, there are more technical details involved, especially when considering that the system will change in August 2022.

In order to place additional emphasis on recent performances, points awarded for each tournament are maintained for a 13-week period.

Ranking points are then reduced in equal decrements for the remaining 91 weeks of the two year ranking period, and each player is then ranked according to their average points per tournament by dividing their total number of points by the number of tournaments they have played in.

In order to qualify for ranking, a player must have played a minimum of 40 tournaments over the two year ranking period, while there's a maximum of 52 tournaments too - the most recent events will therefore only count in this instance.

Currently, players need to play on one of the leading professional Eligible Golf Tours, of which there are 23, to receive World Ranking Points.

Major Championships, World Golf Championships, Olympic Golf Competition, and the World Cup of Golf are also all eligible for World Ranking Points - team events aren't, however.

These technicalities will all stay the same in August 2022 when the format of the OWGR changes.

Currently, there is a strength of field metric that is used to determine ranking points to differentiate between the 23 recognised tours.

Ultimately, players playing on the European Tour or PGA Tour are more likely to rank higher on the OWGR, because there are simply more points available.

The strength of field is determined by adding together the world rating and the home rating.

The world rating relates to the number of top-200 world ranked players are competing in the event, who are all given different points depending on their ranking - the World No. 1 is allocated 45 points, the No. 2 is allocated 37, the No. 3 is allocated 32, down to those ranked between 101 and 200 who are allocated a rating value of 1 each.

The home rating is based on the number of top-30 ranked players from the previous year on that specific tour are competing in the event - the home tour No. 1 is allocated 8, down to those from 16 to 30 who are allocated a rating value of 1 each.

A strength of field rating is then produced by adding together the world and home rating, which converts into an event ranking using a table that determines the number of points available for players at an event.

For example, a strength of field value of 10 converts to an event ranking of 8, a strength of field value of

100 converts to an event ranking of 24, while a strength of field value of 500 converts to an event ranking of 62.

Major Championships have a fixed event ranking of 100 points, and the top eight tours have flagship events that are guaranteed more ranking points.

New rankings are produced each week, though a player's recent upheaval in form still might not propel them up the rankings, because the previous two years are taken into account.

However, from August 2022 the ranking system will implement more modern statistical techniques to calculate the modified system.

Each player in the OWGR system will have a Strokes Gained (SG) world rating based on their scores in stroke-play events, which is adjusted for the relative difficulty of each round they play.

A player's SG world rating dictates the number of performance points a player brings into a tournament, with the sum of all golfers' points determining the event's field rating - replacing the strength of field metric currently used.

Minimum points on offer at flagship events will no longer exist too, though The Players Championship winner still receives 80 points.

Fields will therefore be evaluated by the skill level of every player involved, rather than just the world's top-200, with all players making the cut in an event now receiving ranking points.

## OFFICIAL WORLD GOLF RANKING RECORDS

The Official World Golf Ranking started in 1986, with Bernard Langer earning the title as the World Number One for the first time.

In 35 years of the ranking, only 24 players have ever made the top spot.

Tiger Woods has spent the most consecutive weeks (281), and the most total weeks (683), as the World Number One.

Tiger Woods became the youngest player to become the World No. 1 in 1997, when just 21 years and 167 days old.

Woods has spent 906 weeks in the top-ten of the Official World Golf Ranking, while Ernie Els spent 788 weeks, and Phil Mickelson 775.

Phil Mickelson has spent 270 weeks at No. 2 without ever rising to the top ranked player in the world - next man on the list Jim Furyk spent 39 weeks in second for comparison.

Tom Lehman has spent the lowest amount of time at the top, with just one week in April 1997.

Three golfers have spent an entire year at World No. 1: Nick Faldo in 1993, Greg Norman in 1996, and Tiger Woods in 2000, 2001, 2002, 2003, 2006, 2007, 2008, and 2009.

Luke Donald and Lee Westwood are the only two players to become World No. 1 who haven't won a Major in their career.

Vijay Singh is the oldest player to have held World No. 1 status, when he was 42 years and 93 days old.

Singh was 46 years and 140 days old when he was last in the top-ten of the OWGR, making him the oldest player to be there.

Sergio Garcia was just 20 years and 7 days old when he became the youngest ever player to enter the top-ten in 2000.

---

**Ryan Dabbs**
Writer



Ryan has worked as a junior staff writer for Golf Monthly since 2021.

---

# EXHIBIT N

## PUBLIC VERSION
## DOCUMENT LODGED
## UNDER SEALED

# EXHIBIT O

## PUBLIC VERSION
## DOCUMENT LODGED
## UNDER SEALED

# EXHIBIT P

## PUBLIC VERSION
## DOCUMENT LODGED
## UNDER SEALED

# EXHIBIT Q

## PUBLIC VERSION
## DOCUMENT LODGED

## UNDER SEALED

# EXHIBIT R

## PUBLIC VERSION
## DOCUMENT LODGED
## UNDER SEALED

# EXHIBIT S

## PUBLIC VERSION
## DOCUMENT LODGED
## UNDER SEALED

# EXHIBIT T

## PUBLIC VERSION
## DOCUMENT LODGED
## UNDER SEALED

# EXHIBIT U

## PUBLIC VERSION
## DOCUMENT LODGED

## UNDER SEALED

# EXHIBIT V



Richard Heathcote

# Players 2023: Even Rory McIlroy admits LIV Golf has been great for PGA Tour players

**By Evin Priest**

PONTE VEDRA BEACH — Even if Rory McIlroy has been the most vocal critic of LIV Golf since its emergence last year, he is giving the rival league credit where it's due.

The radical changes made to the PGA Tour in the past 12 months—spearheaded by creating a series of "designated" events that next year <u>will have reduced fields and no cut</u>—have been

strongly influenced by the Saudi Arabia-funded LIV circuit.

"A lot of it," McIlroy said of the changes, speaking to reporters Tuesday at this week's Players Championship, the PGA Tour's flagship tournament. "I'm not going to sit here and lie; I think the emergence of LIV, or the emergence of a competitor to the PGA Tour, has benefited everyone that plays elite professional golf. LIV coming along, it's definitely had a massive impact on the game, but I think everyone who's a professional golfer is going to benefit from it going forward."

LIV Golf, which has a 48-player roster and is led by Greg Norman, kicked off its rival circuit last summer with 54-hole events featuring no cuts and $25 million purses—$5 million of it for a team component. With large, guaranteed-money contracts, a lighter schedule than the PGA Tour, and those increase purses, LIV poached a host of PGA and DP World tour stars including the reigning Players Championship and Open Championship winner, Cam Smith, as well as fellow major winners Dustin Johnson, Brooks Koepka, Patrick Reed, Phil Mickelson and others.

The PGA Tour reacted by unveiling a series of 12 events outside the four majors and the Players which had their prize purses boosted to $20 million. That matches the individual component of LIV's tournaments, of which there were eight in its inaugural season and 14 this year. Next year, on the PGA Tour, there will be eight $20 million tournaments with reduced fields of between 70 and 80 players and no 36-hole cut.

The changes were revealed last Wednesday at the Arnold Palmer Invitational at Bay Hill. Many, including LIV itself, thought the changes had a strong resemblance to LIV's format. LIV Golf was quick to rib the tour on social media.

"Imitation is the greatest form of flattery. Congratulations PGA Tour. Welcome to the future," LIV tweeted from its official Twitter account.

McIlroy has previously said he "hates what [LIV] is doing to the game" in causing a divide, which has been felt strongly among the European contingent who traverse the PGA and DP World Tours. That's because several Ryder Cup stalwarts such as Sergio Garcia and Ian Poulter have defected to LIV. He has also had a running public feud with LIV chief executive Norman. But four-time major winner McIlroy said there was perhaps a degree of complacency on the PGA Tour before LIV emerged.

"I think when you've been the biggest golf league in the biggest market in the world for the last 60 years, there's not a lot of incentive to innovate," McIlroy, the 2019 Players champion, said. "This [LIV] has caused a ton of innovation at the PGA Tour, and what was quite, I would say, an antiquated system is being revamped to try to mirror where we're at in the world in the 21st century with the media landscape. The PGA Tour isn't just competing with LIV Golf or other sports, it's competing with Instagram and TikTok and everything else that's trying to take eyeballs away from the PGA Tour as a product. "

McIlroy isn't the first to say it. World No. 1 Jon Rahm said in November that "we [PGA Tour pros] should be thankful LIV Golf happened." Reiterating those comments Tuesday at TPC Sawgrass, Rahm was even more direct.

"Oh, it's LIV Golf," Rahm said when asked what had caused the PGA Tour officials to reassess its product. "I mean, without a doubt. Without LIV Golf, this wouldn't have happened. So to an extent, like I've said before, we should be thankful this threat has made the PGA Tour want to change things.

"I think I said it last week [at Bay Hill], as well; I wish it didn't come to the PGA Tour being under fire from somebody else to make those changes and make things better for the players, but I guess it is what we needed," he said. "So, yeah, it is because of LIV Golf, otherwise we wouldn't have seen any of this."