KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS - # 158708
epeters@keker.com
DAVID SILBERT - # 173128
dsilbert@keker.com
R. ADAM LAURIDSEN - # 243780
alauridsen@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
SOPHIE HOOD - # 295881
shood@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
ANTHONY J. DREYER - (*pro hac vice*)
anthony.dreyer@skadden.com
KAREN M. LENT - (*pro hac vice*)
karen.lent@skadden.com
MATTHEW M. MARTINO - (*pro hac vice*)
matthew.martino@skadden.com
One Manhattan West
New York, NY 10001
Telephone:     212 735 3000
Facsimile:     212 735 2000

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
PATRICK FITZGERALD - (*pro hac vice*)
patrick.fitzgerald@skadden.com
155 North Wacker Drive
Chicago, Il 60606
Telephone:     312 407 0700
Facsimile:     312 407 0411

Attorneys for Defendant and Counter-Claimant
PGA TOUR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MATT JONES; BRYSON DECHAMBEAU; PETER UIHLEIN; and LIV GOLF, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PGA TOUR, INC., <br><br> Defendant. <br><br> PGA TOUR, INC., <br><br> Counter-claimant, <br><br> v. <br><br> LIV GOLF, INC., THE PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA, AND YASIR OTHMAN AL-RUMAYYAN, <br><br> Counter-defendants. | Case No. 5:22-CV-04486-BLF (SVK) <br><br> **DEFENDANT AND COUNTER-CLAIMANT PGA TOUR, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO BIFURCATE** <br><br> Courtroom:   3 <br> Judge:         Hon. Beth Labson Freeman <br><br> Date Filed:   August 3, 2022 <br><br> Trial Date:    January 8, 2024 <br><br><br> **PUBLIC REDACTED VERSION** |

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................................1

II. BACKGROUND .....................................................................................................................1

III. ARGUMENT ...........................................................................................................................3

    A. PIF and Al-Rumayyan are central to Plaintiffs' antitrust claims and the TOUR's defenses ...................................................................................................3

        1. PIF and Al-Rumayyan's recruitment of broadcasters and sponsors. ...........3

        2. PIF and Al-Rumayyan's recruitment of golfers. .........................................4

        3. PIF's funding of LIV and its viability as a powerful competitor. ................5

        4. Plaintiffs' arguments ignore the record. .......................................................6

    B. Plaintiffs' proposal is inefficient, burdensome, and prejudicial to the TOUR ........6

    C. Plaintiffs' justification for bifurcation is speculative and misleading. ....................8

    D. Bifurcation would be fundamentally unfair to the TOUR ....................................10

IV. CONCLUSION ......................................................................................................................10

## I. INTRODUCTION

Plaintiffs' Motion to Bifurcate reveals just how desperate the Public Investment Fund of the Kingdom of Saudi Arabia ("PIF") and its Governor Yasir Othman Al-Rumayyan are to avoid providing critical discovery in this lawsuit that they conceived of, authorized, and control. The Motion recycles the same arguments PIF and Mr. Al-Rumayyan made—and Magistrate Judge van Keulen rejected—minimizing their central role in the critical events giving rise to Plaintiffs' antitrust claims and the TOUR's tortious interference counterclaims. Now, Plaintiffs lean on those same counter-factual arguments to request an extreme bifurcation order that would severely prejudice the TOUR's defense of Plaintiffs' antitrust claims and require the Court to bifurcate not only the TOUR's tortious interference claims, but *Plaintiffs' own affirmative claims*. The Court should reject Plaintiffs' gambit. PIF and Mr. Al-Rumayyan are core witnesses to LIV's antitrust allegations, and the TOUR cannot be required to defend itself on an incomplete record that entirely omits their evidence. Nor should PIF and Mr. Al-Rumayyan be permitted to stonewall necessary, highly relevant discovery by manipulating the Court's procedures all while contending that they are beyond the Court's reach. If they were actually interested in keeping the original trial date, all they had to do was produce documents and give testimony as the Court has ordered. That they are more interested in shielding themselves from discovery than facilitating progress to trial only confirms that Plaintiffs' motion is baseless. The Court should deny it.

## II. BACKGROUND

The TOUR has extensively briefed the extent of PIF and Mr. Al-Rumayyan's central role in creating and controlling LIV—as well as this lawsuit—before Judge van Keulen. Dkts. 148, 169, 225. Judge van Keulen found that PIF and Mr. Al-Rumayyan were "not merely 'relevant'" but "*essential*" to LIV's "founding, funding, oversight, and operation," overruled their sovereign immunity objections, and ordered them to produce discovery. Dkt. 265. PIF and Mr. Al-Rumayyan moved for relief from that Order, Dkt. 306, but did not meaningfully challenge its factual findings, Dkt. 322.

In support of her conclusion that PIF and Mr. Al-Rumayyan are "essential" to all claims in this case, Judge van Keulen linked PIF's financial support of LIV to LIV's antitrust allegations,

1

noting that "PIF's argument that the claims in this case have nothing to do with it relies on an overly narrow reading *of Plaintiffs' claims*." Dkt. 265 at 21 (emphasis added). Her order also concluded that PIF and Mr. Al-Rumayyan oversee and are directly involved in LIV's day-to-day operations, including negotiations with golfers, broadcaster and sponsors. She cited evidence that PIF and Mr. Al-Rumayyan had ███████████████████████████████████ ████████████████████████ before LIV even existed and were ██████████ ███████████████████████████████████ *Id.* at 14-15. In response to PIF and Mr. Al-Rumayyan's attempts to minimize their central role with LIV, Judge van Keulen concluded that their "carefully-worded and conclusory denials do not overcome the evidence…concerning PIF's own commercial activities" in founding, funding, and operating LIV. *Id.* at 16.

PIF did not just found LIV. Until very recently, PIF *was* LIV. It was PIF, not LIV, that ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████. MacMichael Decl. Ex. 1. ████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████. *Id.* Ex. 2. Moreover, PIF was contemplating this antitrust litigation as part of its strategy to compete with and potentially displace the TOUR since long before LIV existed as an entity. ████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████ *Id.* Ex. 3. Consistent with the Shareholders' Agreement requirement █████████████████████████████████████ PIF and Mr. Al-Rumayyan continue to control Plaintiffs' strategy in this case. Their control is unsurprising, as PIF has a greater financial stake in this litigation than any Plaintiff—indeed, █ ███████████████████████████████████████████████████ *Id.* Ex. 32.

Now, while PIF and Mr. Al-Rumayyan's motion for relief from Judge van Keulen's order remains pending, Plaintiffs have filed a motion to bifurcate their antitrust claims from both parties' contractual interference claims. Dkt. 332 ("Mot."). Plaintiffs request that the Court allow its antitrust claims "to proceed to trial in January 2024 as scheduled" while PIF and Al-Rumayyan

continue to stonewall the ordered discovery. Mot. at 6. In other words, Plaintiffs request that the Court force the TOUR to trial on Plaintiffs' antitrust claims on an incomplete record and without allowing the same jury to hear the evidence from PIF and Mr. Al-Rumayyan that the TOUR needs to defend against Plaintiffs' antitrust claims and help prove the TOUR's counterclaims. Because such bifurcation would be highly prejudicial to the TOUR and a waste of the parties', witnesses' and Court's resources, the Court should deny the motion.

### III.    ARGUMENT

As the party requesting bifurcation, Plaintiffs have the burden to prove that bifurcation "will promote judicial economy and avoid inconvenience or prejudice to the parties." *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D. Cal. 1992); *see also* Fed. R. Civ. P. 42. Bifurcation "is the exception rather than the rule of normal trial procedure." *Clark v. I.R.S.*, 772 F.Supp.2d 1265 (D. Haw. 2009). Plaintiffs have failed to carry their burden.

    **A.    PIF and Al-Rumayyan are central to Plaintiffs' antitrust claims and the TOUR's defenses.**

Plaintiffs' motion hinges on the false claim that PIF and Mr. Al-Rumayyan are not relevant to their antitrust claims. But Plaintiffs themselves recognized their centrality when they told the Court (falsely) that they would facilitate discovery from PIF and Mr. Al-Rumayyan long before the TOUR's counterclaims were even filed, *see* Ex. 33 at 14:16, and again when they agreed to produce documents related to PIF and Mr. Al-Rumayyan without objection, *id.* Ex. 4. Documents and testimony from PIF and Mr. Al-Rumayyan are directly relevant to the extent of competition between LIV and the TOUR, the TOUR's alleged market power, the alleged anticompetitive conduct, Plaintiffs' supposed antitrust injury, and Plaintiffs' claimed damages.

    **1.    PIF and Al-Rumayyan's recruitment of broadcasters and sponsors.**

Plaintiffs allege that the TOUR's regulations "compromised LIV Golf's ability to secure a television broadcast contract," Dkt. 83 ("FAC"), ¶ 61, and that the TOUR orchestrated a boycott of LIV among broadcasters and potential advertisers or sponsors. *id.* ¶¶ 93-100, 131-163, 242-262. Mr. Al-Rumayyan led LIV's negotiations with broadcasters, including by ████ ████████████████████████████████████ MacMichael Decl. Ex. 5. Mr.

Al-Rumayyan and other PIF employees also directly communicated with potential sponsors on LIV's behalf. *Id.* Exs. 6, 7. And these are only the communications that the TOUR knows about from LIV's documents produced to-date. The TOUR, and potentially LIV itself, has no insight into PIF and Mr. Al-Rumayyan's efforts to recruit broadcasters and sponsors that predate LIV's existence as an entity or that didn't include LIV personnel. Discovery into PIF's negotiations with potential broadcast partners, sponsors, and advertisers is necessary to understand the actual reasons these businesses gave for declining to do business with LIV, including whether they expressed any concerns regarding the quality of LIV's product or the source of its funding. This evidence is relevant not only to LIV's alleged injuries and anticompetitive effects, but also to the competitiveness of LIV's product in the media marketplace and any potential antitrust damages.

### 2.   PIF and Al-Rumayyan's recruitment of golfers.

Plaintiffs also allege that "LIV Golf sought to secure commitments from players by March 2022 to establish its League for the summer 2022" but the TOUR's purportedly anticompetitive conduct caused golfers not to sign up and that LIV ultimately attracted "weaker" golfers. *Id.* at ¶¶ 288, 295. For those golfers who LIV did sign up, Plaintiffs allege that the LIV was forced to pay supra-competitive wages due to the TOUR's regulations. *Id.* ¶¶ 12, 14, 15, 171, 332. PIF and Mr. Al-Rumayyan's documents are testimony are directly relevant to all of these allegations.

PIF and Mr. Al-Rumayyan set the strategic goals for LIV, including player recruitment goals. They were also directly involved in player negotiations, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See* Dkt. 265 at 15-16; MacMichael Decl. Exs. 8-9. Their documents and testimony are thus central to establishing what PIF's player recruitment goals actually were, whether they were realistic for a new tour, and whether it is true that LIV failed to meet them. Discovery from PIF and Mr. Al-Rumayyan is also central to establishing the actual reasons given by golfers and their agents for declining to sign with LIV. Indeed, LIV's own documents state that certain golfers backed away from LIV not due to any pressure from the TOUR but as a result of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. MacMichael Decl. Exs. 10-11. PIF and Mr. Al-Rumayyan's recruitment of golfers

is relevant to the existence of competition in the world of golf, including between LIV and the TOUR, and demonstrates that the TOUR lacks monopsony power over elite golf.

Further, PIF and Mr. Al-Rumayyan ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ before LIV even existed. *Id.* Exs. 8, 9. As the TOUR has explained, those agreements contain provisions that are nearly identical to the provisions in the TOUR's contract that LIV contends are anticompetitive, and others even more restrictive than any provision in the TOUR's contract. *Id.* Ex. 20 at 83:19-20. ("[T]hese contracts lock up these players in ways that the PGA TOUR never imagined. They are so restrictive.") Documents and testimony from PIF and Mr. Al-Rumayyan regarding their reasons for including those provisions in LIV's player agreements are directly relevant to the TOUR's procompetitive justifications for near identical terms. The TOUR cannot be forced to go to trial on a partial record that permits PIF and Mr. Al-Rumayyan to obscure their central role in drafting, negotiating, and approving the golfer contracts at the heart of all parties' disputes.

### 3. PIF's funding of LIV and its viability as a powerful competitor.

Plaintiffs allege that LIV has "suffered and will continue to suffer severe financial injuries" due to the TOUR's conduct, including that LIV was forced "to concentrate funds towards increasing upfront payments…scale down its entry plans and offer fewer tournaments in 2022." FAC at ¶ 288-290. The TOUR cannot defend against these allegations without understanding what PIF and Mr. Al-Rumayyan's strategic and financial goals for LIV actually were, including whether they had non-financial objectives, such as generating positive publicity for PIF and the Kingdom of Saudi Arabia. Documents have already indicated that promoting PIF and the Kingdom of Saudi Arabia were central to LIV's conception. MacMichael Decl. Exs. 8, 13. The interaction between PIF's non-financial and financial objectives for LIV are directly relevant to PIF's claims of antitrust injury and anticompetitive effects. If PIF was motivated to launch LIV and recruit players by more than just financial profits—but by the expectation that its association with professional golf and certain golfers may garner goodwill for the Kingdom of Saudi Arabia—then its willingness to pay higher amounts cannot be attributed to the TOUR and cannot constitute antitrust injury.

In addition to PIF and Mr. Al-Rumayyan's *expectations* for a financial or non-financial return on their LIV investment, the TOUR is entitled to discovery into how PIF and Mr. Al-Rumayyan have since evaluated that return. For example, LIV alleges that its "ongoing cash outlays significant impact [its] long-term viability…threaten[ing] [its] competitive viability." FAC ¶ 290. This calls for discovery into LIV's finances, which is directly dependent on whether PIF is willing to continue funding LIV based on its performance to-date. PIF's underlying motivations in funding LIV and its willingness to tolerate losses speak directly to whether LIV is likely to remain viable in the market, negating Plaintiffs' allegations of competitive harm.

Relatedly, reporting indicates that LIV has suffered from large "unnecessary and unaccounted for" expenditures, causing PIF to take a firmer hand in its daily operations. MacMichael Dec. Ex. 21. And LIV's own documents show that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ MacMichael Decl. Ex. 15. Thus, PIF's evidence is directly relevant to whether LIV's alleged losses are attributable to its own mismanagement—not the TOUR's conduct—and LIV's official ledgers do not tell the full story of LIV's resources and budget.

### 4. Plaintiffs' arguments ignore the record.

Contrary to Plaintiffs' assertions, Judge van Keulen's order was not limited to the TOUR's counterclaims. Rather, her order specifically noted that "PIF's argument that the claims in this case have nothing to do with it relies on an overly narrow reading of ***Plaintiffs' claims***." Dkt. 265 at 21. She went on to quote extensively from Plaintiffs' First Amended Complaint to link PIF's "essential role in the founding, financing, oversight, and operation of PIF" to Plaintiffs' antitrust allegations. *Id.* She also held that "the ***claims and counterclaim*** in this case 'arise out of or relate to' the contacts between PIF, Mr. Al-Rumayyan, and the United States." Dkt. 265 at 39 (emphasis added). And, as this Court observed, Mr. Al-Rumayyan is "up to his eyeballs in everything that LIV has done." MacMichael Decl. Ex. 22 at 18:13-14. In short, Judge van Keulen's order only confirms the relevance of PIF and Mr. Al-Rumayyan to the antitrust claims.

### B.  Plaintiffs' proposal is inefficient, burdensome, and prejudicial to the TOUR.

Bifurcating the parties' contractual interference claims from Plaintiffs' antitrust claims is

directly contrary to Rule 42's guidance that bifurcation promote "convenience" and "avoid prejudice." Fed. R. Civ. P. 42(b). Bifurcation is inappropriate where, as here, a separate trial of one issue "would involve extensive proof and substantially the same facts or witnesses as the other issues in the case[.]" *Bates v. State Farm Mut. Auto. Ins. Co.*, 2015 WL 11777838, at *1 (W.D. Wash. May 18, 2015). Here, the TOUR's counterclaims focus on LIV's recruitment of former TOUR golfers. ACC ¶ 61-78. LIV's allegations that it paid more to recruit golfers due to the TOUR's alleged anticompetitive conduct focus on the same facts. FAC ¶¶ 14, 171, 287-288.

LIV has offered to stipulate to the bifurcation of *its own* contractual interference claim, notwithstanding the Court's admonition that it was "certainly ***not*** bifurcating the case [LIV] filed," MacMichael Decl. Ex. 22 at 13:10-11 (emphasis added). But bifurcating LIV's claims would only compound the inefficiencies because LIV's tortious interference claims also arise from the same facts as its antitrust claims. LIV alleges that the TOUR interfered with LIV's contracts with golfers and business relationships that LIV was "on the verge of entering" with professional golfers, vendors, sponsors, and broadcasters. FAC ¶ 381. That is the same anticompetitive harm that LIV also alleges resulted from the TOUR's purported anticompetitive conduct. Accordingly, holding an initial trial on LIV's antitrust claims and a second, subsequent trial on LIV and the TOUR's interference claims will require the same set of witnesses to appear twice for trial, double the amount of time the Court must reserve for trial, and otherwise result in extensive duplication of effort by the Court, counsel, parties, and witnesses.

The bifurcation that Plaintiffs request is also highly prejudicial to the TOUR in light of the overlapping subject matter between the antitrust and interference claims. "[I]f two issues are so interwoven that they 'cannot be submitted to the jury independently ... without confusion and uncertainty which would amount to a denial of a fair trial," then bifurcation is "not appropriate." *Equal Emp. Opportunity Comm'n v. Creative Networks, LLC*, 2010 WL 11519280, at *1 (D. Ariz. Apr. 14, 2010). The bifurcated antitrust trial that Plaintiffs seek would tell only half of the story of LIV, PIF, and Mr. Al-Rumayyan's efforts to create a breakaway golf tour. To the extent PIF and Mr. Al-Rumayyan's involvement were told at all, it would be through one-sided evidence they have cherry picked to be presented through LIV. And Plaintiffs' argument that the antitrust

trial could dispose of the TOUR's counterclaims is false and only underscores the extent to which the parties' claims are intertwined: the contract provisions that the TOUR alleges LIV interfered with are the same ones Plaintiffs contend are anticompetitive. Plaintiffs should not be permitted to force a trial on the competitive effects of those contract provisions without the TOUR being permitted to introduce evidence of how LIV interfered with those provisions. Because these claims are "so interwoven that they cannot be submitted to the jury independently," *Creative Networks, LLC*, 2010 WL 11519280, they cannot be fairly bifurcated. *Id.*

### C. Plaintiffs' justification for bifurcation is speculative and misleading.

The alleged "escalated" conduct Plaintiffs list in an attempt to justify the extraordinary relief they seek, Mot. at 9, is neither recent nor anticompetitive. First, Plaintiffs wildly mischaracterize a standard TOUR regulation preventing its members from displaying a brand that "operates, sanctions, sponsors, funds, and/or co-sanctions" competing tournaments. Hvidt. Decl. Ex. B at 79. Far from a "sponsorship ban," Mot. at 3-4, this is a commonsense restriction to avoid "free-riding"—a widely accepted procompetitive justification, *see Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990).

Next, Plaintiffs misread supposed "new rules targeting players" that are not even facially restrictive. Contrary to Plaintiffs' suggestion, TOUR members are not "required to participate in 20 Tour events per season." Mot. at 4. Rather, the cited regulation relates to *eligibility for a bonus* under the TOUR's Player Impact Program. Hvidt. Decl. Ex. B at 3, 79. In any event, this regulation is far less restrictive than LIV's requirement that *all* golfers participate in *all* LIV events. MacMichael Decl. Exs. 17-19. And there is no rule that TOUR golfers "may not speak favorably about LIV." Only the "*promotion* of unauthorized tournaments" is prohibited—another standard provision aimed at freeriding. Hvidt. Decl. Ex. B. at 139. *See Indep. Ent. Grp., Inc. v. Nat'l Basketball Ass'n*, 853 F. Supp. 333, 340 (C.D. Cal. 1994). The restriction on LIV golfers joining the TOUR or participating in TOUR-run events is not a new policy at all. And the restriction reasonably protects the TOUR's reputation, prevents free-riding, and stops players from gaming the system to circumvent the TOUR's regulations.

Plaintiffs also cite the TOUR's non-exclusive alliances with various golf tours as

ostensible evidence of a group boycott. Mot. at 4. But LIV has entered agreements with the Asian and MENA Tours and has actively sought partnerships with other golf tours across the globe. Plaintiffs also recycle stale allegations regarding the TOUR's strategic alliance with the European Tour, relying on a years-old document discussing the 2021-2022 golf season that described no coordinated effort against LIV. Hvidt. Decl. Ex. G. Plaintiffs' complaints about the OWGR are equally misleading: the OWGR Directors from the TOUR and European Tour *recused themselves from reviewing LIV's application*—a fact Plaintiffs strategically omit despite citing a news article reporting exactly that. Hvidt. Decl. Ex. I. Moreover, since at least May 2022, ███ ████████████████████████████████████████████████████████████. MacMichael Decl. Exs. 12, 14. Plaintiffs accuse the TOUR of engaging in a "surreptitious anti-LIV PR campaign," Mot. at 5, but the TOUR's engagement of a PR firm, which ended over six months ago, is neither ongoing nor anticompetitive. And Plaintiffs do not mention their own PR efforts against the TOUR, or that their counsel spent months ████████████████████████████████ ████████████████████████████████████████. *Id.* Ex. 16.

      Plaintiffs' claim that LIV may fail before its antitrust claims can be tried is particularly hypocritical, considering that PIF and Mr. Al-Rumayyan are shielding LIV's true financial standing from discovery. Setting aside that hypocrisy, none of the harms that Plaintiffs alleged in their complaint have materialized. LIV alleged that the TOUR has prevented it from attracting broadcasters, but recently signed a multi-year broadcast deal with a U.S. network. *Id.* Ex. 23. LIV alleged that the TOUR has prevented it from attracting sponsors, but recently announced a 2023 season sponsor and describes other sponsors as "lined up." *Id.* Ex. 24. LIV alleged that the TOUR has prevented it from signing players, but recently signed four former TOUR golfers plus a Ryder Cup winner from the European Tour in advance of its 2023 season and claims it has more interested golfers than spots available. *Id.* Ex. 25. LIV alleged that the TOUR's conduct forced it to scale back its 2022 season, but recently announced a 2023 season with nearly double the number of tournaments. *Id.* Exs. 25, 26. LIV alleged that the TOUR's conduct would prevent its golfers from playing in the four majors, but as of February 2023 all four majors have announced that LIV players are eligible. *Id.* Ex. 27. Indeed, LIV's own CEO has recently affirmed that it is

"going to be around for a long period of time, *because of [PIF's] investment*." *Id.* Ex. 28.

Finally, Plaintiffs' concern that a delay in trial will deprive the Player Plaintiffs of "an option to compete at an elite level in 2024 and beyond," Mot. at 9, is disingenuous and misleading. Uihlein has an option in his contract ███████████████, DeChambeau is already ████████████████, and LIV could easily provide playing opportunities to Jones on LIV, the Asian Tour and MENA tours that LIV and PIF control. Plaintiffs disingenuously argue that if LIV doesn't want these players in its leagues in 2024, the TOUR should be forced to include them. Moreover, these players received financial windfalls by signing with LIV. Uihlein has reportedly earned over $16 million in his first 10 events with LIV—more than *four times* what he earned over his *career* on the TOUR. *Id.* Exs. 18, 29. And Jones described his $4 million LIV contract as "[p]urely a business decision." *Id.* Exs. 19, 30. Player Plaintiff Bryson DeChambeau, whose LIV contract guaranteed a fee well in excess of ████████, declared that this lawsuit is "not about the money; it's about the principle." *Id.* Exs. 17, 31. The players' calculated business decisions provide no grounds to upend standard procedure and force this case to trial without necessary discovery. In any event, any inconvenience to LIV or its players is a problem PIF and Mr. Al-Rumayyan can solve by producing the discovery as ordered.

**D. Bifurcation would be fundamentally unfair to the TOUR.**

Plaintiffs' motion to bifurcate is an unabashed attempt to avoid the consequences of PIF and Mr. Al-Rumayyan's commercial activity in the United States. PIF has the largest financial stake in the outcome of this litigation and, under Mr. Al-Rumayyan's leadership, planned for it long before LIV even existed. *Id.* Exs. 3, 9. Now, after invoking the United States legal system to protect their financial interests and compete against the TOUR, LIV's owners refuse to participate in discovery and seek to force the TOUR to trial on a skewed and incomplete record that carves out their integral role. Plaintiffs' proposal is fundamentally unfair, and the Court should reject it.

**IV. CONCLUSION**

The Court should deny Plaintiffs' Motion to Bifurcate.

| | |
|---|---|
| Dated: March 30, 2023 | KEKER, VAN NEST & PETERS LLP |
| | By: */s/ Elliot R. Peters* |
| | ELLIOT R. PETERS |
| | DAVID SILBERT |
| | R. ADAM LAURIDSEN |
| | NICHOLAS S. GOLDBERG |
| | SOPHIE HOOD |
| | |
| | Attorneys for Defendant and Counter-Claimant |
| | PGA TOUR, INC. |
| | |
| | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
| | |
| | ANTHONY J. DREYER |
| | PATRICK FITZGERALD |
| | KAREN M. LENT |
| | MATTHEW M. MARTINO |
| | |
| | Attorneys for Defendant and Counter-Claimant |
| | PGA TOUR, INC. |