# EXHIBIT 1
# TO SECOND ALARFAJ
# EXPERT OPINION



Qur'an | **Sunnah** | Prayer Times | Audio

### SUNNAH.COM

Search ...   🔍   Search Tips

Home • Riyad as-Salihin • The Book of the Prohibited actions • كتاب الأمور المنهي عنها • Hadith 1779

17   The Book of the Prohibited actions

كتاب الأمور المنهي عنها

(355)  Chapter: Prohibition of Malpractices in Commerce

(355) - باب تحريم بيع الحاضر للبادي وتلقي الركبان والبيع على بيع أخيه والخطبة على خطبته إلا أن يأذن أو يرد

Ibn 'Umar (May Allah be pleased with them) said:

The Messenger of Allah (ﷺ) said, "A person should not enter into a transaction when his (Muslim) brother has already negotiated, nor should he make a proposal of marriage when that of his brother is pending, except with the permission of the latter."

[Al-Bukhari and Muslim]

وعن ابن عمر رضي الله عنهما، أن رسول الله صلى الله عليه وسلم قال: "لا يبع بعضكم على بيع بعض، ولا يخطب على خطبة أخيه إلا أن يأذن له" ((متفق عليه، وهذا لفظ مسلم))

**Reference**        : Riyad as-Salihin 1779
In-book reference : Book 17, Hadith 269

Report Error | Share | Copy ▼

‹ 1778                                                                                        1780 ›

# EXHIBIT 2
# TO SECOND ALARFAJ
# EXPERT OPINION

**An extract from the text of a lecture by Sheikh Mohammed Bin Mohammed Al Shanqiti explaining Sharh Zad Al Mustaqnie' (Excerpts)**

And the majority of scholars have said: The second sale is valid because the essential elements and conditions of the sale are fulfilled, but the person committing it sins by selling it over the sale of his Muslim brother

And this is known as the question: Does admonition imply the invalidity of the admonished act? The correct view, as we have mentioned before, is that if the admonition is not based on the essence of the admonished act itself, then it does not imply invalidity. This is considered a form of "Infikak al-jihah" [where the act is valid and sinful at the same time]. Therefore, we say: the sale is valid because it was for value, from a genuine owner, with the consent of both parties, the subject was ascertained, and the conditions for a valid sale were fulfilled. Thus, the sale is valid and must be completed, as Allah says: "O you who have believed, fulfill [all] contracts" (Quran, Surah Al-Ma'idah 1). But because the person committed a wrong against his Muslim brother and treated him unjustly by interfering, he is sinful in this act. Based on this, the second transaction is not invalid, and this is the correct view.

وقال جمهور العلماء: البيع الثاني صحيح، ولكنه يأثم ببيعه على بيع أخيه المسلم؛ لأن أركان البيع وشروطه تامة، وهذا ما يسمى بمسألة: هل النهي يقتضي فساد المنهي عنه؟ والصحيح -كما ذكرنا غير مرة-: أن النهي إذا لم يرجع إلى ذات المنهي عنه فلا يقتضي الفساد، وأن هذا يعتبر من باب انفكاك الجهة، فنقول: البيع صحيح؛ لأنه اشترى بالقيمة من مالك حقيقي برضا الطرفين في شيء معلوم وتوفرت شروط صحة البيع، فالبيع صحيح ومأمور بإتمامه؛ لقوله تعالى: ﴿يَا أَيُّهَا الَّذِينَ آمَنُوا أَوْفُوا بِالْعُقُودِ﴾ [المائدة:١]، لكن كونه أساء إلى أخيه المسلم وظلمه بالدخول عليه فهو آثم بهذا الفعل، وعلى هذا لا يحكم بفساد الصفقة الثانية، وهذا هو الصحيح.

# EXHIBIT 3
# TO SECOND ALARFAJ
# EXPERT OPINION

# CPS Int'l v. Dresser Indus.

Court of Appeals of Texas, Eighth District, El Paso

May 4, 1995, Decided

No. 08-93-00250-CV

## Reporter

911 S.W.2d 18 *; 1995 Tex. App. LEXIS 971 **

CPS INTERNATIONAL, INC., and CREOLE PRODUCTION SERVICES, INC., Appellants, v. DRESSER INDUSTRIES, INC., DRESSER A.G. (VADUZ), DRESSER RAND ARABIAN MACHINERY, LTD, f/d/b/a DRESSER AL-RUSHAID MACHINERY COMPANY, LTD., ABDULLAH RUSHAID AL-RUSHAID, AL-RUSHAID TRADING CORPORATION, AL-RUSHAID GENERAL TRADING CORPORATION, and AL-RUSHAID INVESTMENT COMPANY, Appellees.

**Subsequent History:** **[**1] As Corrected June 19, 1995.

Writ denied by, 02/01/1996

Rehearing of writ of error overruled, 02/29/1996

**Prior History:** Appeal from the 334th Judicial District Court of Harris County, Texas. (TC# 88-46399).

**Counsel:** For Appellants: Hon. Rufus Wallingford, Hon. Lee Haag, Hon. Jeff Cody, Hon. William J. Boyce, Fulbright & Jaworski, L.L.P., Houston, TX.

For Appellees: Hon. Robert M. Hardy, Jr., Hughes & Luce, L.L.P., Houston, TX. Hon. Parker C. Folse, III, Susman Godfrey, Houston, TX.

**Judges:** Before Panel No. 3, Barajas, C.J., Larsen and McCollum, JJ. (McCollum J., not participating)

**Opinion by:** RICHARD BARAJAS

## Opinion

### [*19] OPINION

This is an appeal from a summary judgment dismissing Appellants' claims for breach of contract, breach of fiduciary duty, misappropriation of trade secrets, tortious interference with contractual relations, and civil conspiracy. The trial court found Saudi Arabian law controlling and dismissed the case after concluding that Saudi Arabian law did not recognize Appellants' causes of action. We affirm in part and reverse in part. We further remand Appellants' claims for breach of contract to the trial court for a new trial.

## I. SUMMARY OF THE EVIDENCE

Critical to our decision is the complex set of relationships that existed between the parties at various times and each

party's [**2] conduct with regard to those relationships. We therefore set out these relationships and chronicle the parties' conduct in some detail.

## [*20] A. The Parties

Appellants are a Delaware corporation (Creole) with its headquarters and principal place of business in Houston, Texas, and its wholly owned subsidiary, a Panamanian corporation. Appellants provide project management, maintenance, repair, installation, overhaul, design, and other services in connection with compressors, pumps, turbines, engines, and related equipment used in the energy and refining industry. Creole has no offices outside the United States. Although Creole provides (from its Houston headquarters) to CPS all physical facilities, employees, resources, and capabilities to enable CPS to provide services, CPS is not registered to conduct business in Texas or any other state of the United States, nor does it have any offices in the United States. The record shows, in accordance with a judicial decision in a previous federal anti-trust lawsuit, that Creole was formed by CPS to operate outside the United States, while Creole performs essentially the same work in the United States.

Appellee Abdullah Rushaid Al-Rushaid [**3] is a Saudi Arabian citizen and businessman. Appellees Al-Rushaid Trading Corporation (ARTC), Al-Rushaid General Trading Corporation (ARGTC), and Al-Rushaid Investment Company (ARIC) are Saudi Arabian business entities

and the business interests of Abdullah Rushaid Al-Rushaid. [1] Appellants sued the Al-Rushaid Appellees for breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and conspiracy.

Appellee Dresser Industries, Inc., is a Delaware corporation with its headquarters and principal place of business in Houston, Texas. Appellee Dresser A.G. (Vaduz) is a Liechtenstein corporation and a wholly owned subsidiary of Appellee Dresser Industries. We shall refer to these entities collectively as the Dresser Appellees. Appellants sued the Dresser Appellees for tortious [**4] interference with contractual relations and conspiracy.

In 1978, CPS and Abdullah Rushaid Al-Rushaid formed a Saudi Arabian company called Creole Al-Rushaid, Ltd. (CARL), whose purpose was to conduct business in Saudi Arabia. This business relationship was embodied in a writing called the Contract of Kriol El Rashid Company, Ltd. (the Kriol contract). Three other contracts accompanied the Kriol contract: (1) a Working Agreement, which provides for a 70-30 ownership division between CPS and ARGTC; (2) a Technical Assistance Agreement, which provides for the supply of staff, technical, and other resources to CARL; and (3) a Loan Agreement, under which CPS agreed to loan two million Saudi Riyals to CARL, apparently to satisfy initial capitalization requirements of Saudi

---

[1] Although Al-Rushaid is never unambiguous, be states in one pleading that he "does business as" ARTC and ARIC. We shall refer to Al-Rushaid and his affiliated business interests collectively as the Al-Rushaid Appellees.

Arabian law.

In 1981, Dresser A.G. (Vaduz) and ARIC formed Dresser Al-Rushaid Machinery Company, Ltd. (DARMCO), a Saudi Arabian company whose purpose was to conduct business in Saudi Arabia. Appellants sued DARMCO for tortious interference with contractual relations and conspiracy.

## B. The Conduct

CARL was formed to satisfy the requirements for qualifying to do business in Saudi Arabia. Appellants' CEO, Richard [**5] Flowers, understood that CARL would be formed under Saudi Arabian law and would have to abide by the law of Saudi Arabia. Flowers several times traveled to Saudi Arabia to meet with Al-Rushaid for the purpose of setting up a Saudi Arabian company in accordance with Saudi Arabian law. On one of these visits, Flowers met with Al-Rushaid's lawyer, Ahmed Audhali. Audhali explained to Flowers that Saudi Arabian law required disputes to be brought in a Saudi Arabian forum. He further explained that a CPS representative would have to sign before a Saudi Arabian notary a Memorandum of Association, which sets out the foregoing requirements and operates as the company's charter after publication in the Saudi Arabian Official Gazette.

CARL's articles of association provide that it will operate under the laws of Saudi Arabia, that disputes will be submitted to arbitration [*21] in Saudi Arabia and, if arbitration fails, they will be resolved in Saudi Arabia. CARL was intended to operate exclusively in Saudi Arabia and never conducted operations outside Saudi Arabia. Appellants claim that the Al-Rushaid Appellees' violated contractual and other duties they owed to Appellants by their involvement with [**6] the Dresser Appellees and that the Dresser Appellees conspired to and did interfere with Appellants' relations with the Al-Rushaid Appellees.

## C. The Litigation

In 1983, both CPS and Al-Rushaid stated they wished to dissolve CARL. Dissolution under Saudi Arabian law, however, proved cumbersome and difficult, and Appellants accuse Al-Rushaid of deliberately slowing the process.

In 1985, CPS brought a federal anti-trust action against Dresser Industries and the Al-Rushaid defendants, claiming a conspiracy to drive CPS out of the Saudi Arabian market. This suit was dismissed the following year for lack of a sufficient impact on United States commerce. Before dismissal, Appellants collectively filed a separate suit in the same court against all present Appellees. This second federal suit was dismissed in 1988, the court finding that "if there are any anticompetitive effects, surely they are in Saudi Arabia, where CARL was eliminated as a competitor." In finding only a tenuous relationship between the United States and the subject matter of the suit, the court reasoned that it concerned merely the "decline of a Saudi joint venture [that] indirectly affected the parent

company [**7] [Creole] whose foreign subsidiary [CPS] participated in the venture."

In 1985, CPS also brought suit in a Saudi Arabian court against Al-Rushaid for breach of contract, breach of fiduciary duty, misappropriation of confidential information, and conspiracy. The cause was heard by a three-judge panel of the court, which deemed the claims not actionable under Saudi law, but went on to seek alternative methods to resolve the dispute. Both sides agreed before the court to settle the suit, Al-Rushaid agreeing to cooperate in CARL's dissolution and CPS agreeing to drop the then pending federal anti-trust suit. This agreement is contained in a letter from CPS to Al-Rushaid, which letter was notarized by a Texas notary, the Texas Secretary of State, and verified by United States Secretary of State George P. Schultz.

## II. DISCUSSION

Appellants attack the judgment of the trial court in three points of error that challenge the dismissal of Appellants' claims against the (1) Dresser Appellees, (2) DARMCO, and the (3) Al-Rushaid Appellees. Because our disposition of Appellants' contract claims differs from our resolution of their tort claims, we necessarily segregate our discussion [**8] of them. We treat Appellants' breach of contract claims in our contract analysis, and address Appellants' remaining claims in our tort analysis.

## A. Standard of Review

We begin with the traditional standards employed to review a summary judgment. The standard of review on appeal is whether the successful movant at the trial level carried its burden of showing that there is no genuine issue of material fact and that a judgment should be granted as a matter of law. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex. 1991); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548 (Tex. 1985); *Hernandez v. Kasco Ventures Inc.,* 832 S.W.2d 629, 631 (Tex.App.--El Paso 1992, no writ). Thus, the question on appeal is not whether the summary judgment proof raises fact issues as to required elements of the movant's cause or claim, but whether the summary judgment proof establishes, as a matter of law, that there is no genuine issue of material fact as to one or more elements of the movant's cause or claim. *Gibbs v. General Motors,* 450 S.W.2d 827, 828 (Tex. 1970). In resolving the issue of whether the movant has carried this burden, all evidence favorable to the non-movant [**9] must be taken as true and all reasonable inferences, including any doubts, must be resolved in the non-movant's favor. *Nixon,* 690 S.W.2d at 548-49; *Stoker v. Furr's, Inc.,* 813 S.W.2d 719, 721 (Tex.App.--El Paso 1991, writ denied). When, as here, the defendants are the movants and [*22] they submit summary evidence disproving at least one essential element of each of plaintiff's causes of action, then summary judgment should be granted. *Perez,* 819 S.W.2d at 471; *Bradley v. Quality Service Tank Lines,* 659 S.W.2d 33, 34 (Tex. 1983); *Hernandez,* 832 S.W.2d at 633.

911 S.W.2d 18, *22; 1995 Tex. App. LEXIS 971, **9

Our research has yielded no case addressing the propriety of using summary judgment standards to review a conflict of laws issue. Appellants urge us to employ the foregoing standards to review the two primary issues presented by the instant case: (1) whether Saudi Arabian law applies to Appellants' claims and, if Saudi law applies to any claims, (2) the outcome of those claims under Saudi law. Although they might be awkwardly applied to the instant case, we think the traditional summary judgment standards either are inapplicable or require some modification because of the nature of the issues presented to the trial **[\*\*10]** court for decision.

Our inclination to use traditional summary judgment standards is greatest with respect to the second primary issue because the task of determining foreign law intuitively strikes us as a factual inquiry into the content or text of foreign rules of law. Texas Rules of Evidence 203 informs us, however, that the determination of the content of foreign law is a question of law for the court [2]. Thus, although one might label the parties' dispute over the second primary issue a disagreement over the "fact" of what Saudi Arabian law says, Rule 203 makes clear that the determination of the content of Saudi law is a question of law. Accordingly, the better inquiry is not whether there existed a fact question regarding the content of Saudi law, but whether the trial court reached a proper legal conclusion about its content. Any fact question presented by evidence of the content of Saudi law was for the trial court to resolve because Rule 203 commits to the trial court the exclusive responsibility to discern foreign law.

**[\*\*11]** On the parties' motion, the trial court in the case at hand conducted a separate hearing to determine foreign law wherein the court heard expert testimony, the substance of which reappeared in affidavit form in later summary judgment motions. We find the application of traditional summary judgment standards inappropriate because a reversal for a mere factual conflict would result in the remand of the case to the trial court, which would simply repeat the procedures it used to determine foreign law without regard to any identified factual conflict. Whether presented before summary judgment, simultaneously with it, or during trial, the issue is one for the trial court to resolve. We see no virtue in employing a standard of review that increases the potential for forcing the trial court to conduct duplicative procedures because of a factual controversy when it is the same trial court that will eventually be called upon to resolve that controversy.

Similarly, the Texas Supreme Court has deemed the determination of which state's law will apply to a case to be a question of law. *See Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex. 1984)("The question of which state's law will **[\*\*12]**

---

[2] The rule reads in pertinent part:

The court, in determining the law of a foreign nation, may consider any material or source, whether or not submitted by a party or admissible under the rules of evidence, including but not limited to affidavits, testimony, briefs, and treatises…. **The court, and not a jury, shall determine the laws of foreign countries. The court's determination shall be subject to review as a ruling on a question of law.**

(emphasis added).

apply is one of law.") For the same reasons, then, we also think summary judgment standards inappropriate for use in reviewing the trial court's determination that Saudi Arabian law applied to this litigation.

Although we are committed to the foregoing analysis, we apply it only to review the judgment of the trial court with respect to the first primary issue, the applicability of Saudi Arabian law, because we are equally committed to the jurisprudential canon that appellate courts, especially intermediate appellate courts, should fashion new law in disposing of a case only when the facts of the case do not present grounds for decision based on already established principles. We therefore use traditional summary judgment **[*23]** principles to review the trial court's judgment with respect to the second primary issue, the outcome of Appellants' claims under Saudi Arabian law, because we find that the summary judgment evidence bearing on this issue is not in conflict. Accordingly, we review the trial court's determination of the first issue as a question of law and review its determination of the second issue as a conventional summary judgment [3].

### **[**13] B. Contract Claims**

The Texas Supreme Court has addressed what effect should be given to contractual

choice of law provisions with respect to claims sounding in contract.

We begin with what Chief Justice Marshall referred to as a principle of "universal law … that, in every forum, a contract is governed by the law with a view to which it was made." *Wayman v. Southard,* 23 U.S. 1, 6 L. Ed. 253 (1825). This principle derives from the most basic policy of contract law, which is the protection of the justified expectations of the parties. *See* E. SCOLES & P. HAY, CONFLICT OF LAWS 632 (1984) ["SCOLES"]; Reese, *Choice of Law in Torts and Contracts and Directions for the Future,* 16 COLUM.J. TRANSNAT'L L. 1, 21 (1977). The parties' understanding of their respective contractual rights and obligations depends in part upon the certainty with which they may predict how the law will interpret and enforce their agreement. *Id.*

When parties to a contract reside or expect to perform their respective obligations in multiple jurisdictions, they may be uncertain as to what jurisdiction's law will govern construction and enforcement of the contract. To avoid **[**14]** this uncertainty, they may express in their agreement their own choice that the law of a specified jurisdiction apply to their agreement. Judicial respect for their choice advances the policy of protecting their expectations. This conflict of laws concept has come to be referred to as party autonomy. *See* R. WEINTRAUB, COMMENTARY ON THE CONFLICT

---

[3] We recognize that summary judgment is most appropriate when the only disputed issues are questions of law, and we do not imply otherwise. We mean only that a question of law is less sensitive to extant factual controversies because it is the trial court that must resolve them, while summary judgment with respect to issues not exclusively committed to the trial court is precluded by any genuine issue of material fact.

OF LAWS 269-271 (1971) ["WEINTRAUB"]. However, the parties' freedom to choose what jurisdiction's law will apply to their agreement cannot be unlimited. They cannot require that their contract be governed by the law of a jurisdiction which has no relation whatever to them or their agreement. And they cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply. So limited, party autonomy furthers the basic policy of contract law. With roots deep in two centuries of American jurisprudence, limited party autonomy has grown to be the modern rule in contracts conflict of laws. *See* SCOLES, *supra* at 632-652; WEINTRAUB, *supra* at 269-275; RESTATEMENT (SECOND) OF CONFLICT OF LAWS ["THE RESTATEMENT"] § 187 (1971).

The party autonomy rule has been recognized in this state. The Legislature **[\*\*15]** has provided in the Uniform Commercial Code:

> When a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties.

TEX.BUS. & COM.CODE ANN. § 1.105(a)(Vernon Supp. 1989). In a different context, one court of appeals has elaborated further:

> An express agreement of the parties that the contract is to be governed by the laws of a particular state will be given effect if the contract bears a reasonable relation to the chosen state and no countervailing public policy of the forum demands otherwise.

*First Commerce Realty Investors v. K-F Land Co.,* 617 S.W.2d 806, 808-09 (Tex.Civ.App.--Houston [14th Dist.] 1981, writ ref'd n.r.e.)(citing, *inter alia,* the RESTATEMENT § 187). We believe the rule is best formulated in section 187 of the RESTATEMENT **[\*24]** and will therefore look to its provisions in our analysis of this case.

Section 187 states: Law of the State Chosen by the Parties

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if **[\*\*16]** the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of Sec. 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

*DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 677-78 (Tex. 1990), *cert. denied,* 498 U.S. 1048, 112 L. Ed. 2d 775, 111 S. Ct. 755 [**17]** (1991). The initial issue before us with respect to the Al-Rushaid Appellees--whether and the manner in which the Al-Rushaid Appellees could compete with CARL--is one "which the parties could have resolved by an explicit provision in their agreement". *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 comments c and d (1971). We therefore apply Section 187(1).

The contracts evincing the parties' choice of law conflict with each other. Four separate documents contain provisions that may operate as choice of law provisions. The first is the Kriol contract [4], the original of which is in Arabic [5] and was signed by a

---

[4] DARMCO and the Al-Rushaid Appellees refer to this document as CARL's Articles of Association. Although this is not self-evident, the document's appearance supports such a characterization.

[5] Perhaps obviously, we work from certified English translations of the Arabic documents.

CPS representative and Al-Rushaid in his personal capacity. It begins "IN THE NAME OF GOD THE MERCIFUL," and recites that:

On this day 9/11/1398 Hegriya (which corresponds to 11/10/1978 A.D.)

. . .

. . . .

The… parties …. have agreed to establish a limited liability company in accordance with the Act of the Minister of Industry Number 26 dated 17 Moharrem 1399 and in accordance with the Saudi Arabian Companies Act promulgated under Royal Decree No. M/6 dated 22/4/1385 Hegriya and the Foreign Capital Investment Code promulgated under Royal Decree No .35 dated [**18]** 22/4/1383 Hegriya and the provisions set forth in these articles. . . .

. . . .

ARTICLE        SEVENTEEN        - ARBITRATION AND SETTLEMENT OF DISPUTES

. . . .

If arbitration fails to settle the dispute the ease will be taken to the committee of seting the [sic] commercial disputes at Dammam (Hayat Hasam El Menasaat El Tegariya). . . .

ARTICLE TWENTY - GENERAL RULES

1) The company shall abide by all the rules and regulations existing in force in the Kingdom of Saudi Arabia.

2) All provisions not stated in this contract will be governed by the code of the Companies Act.

The second relevant choice of law provision appears in CARL's bylaws, which were signed by a CPS representative and Al-Rushaid [*25] in his capacity as a representative of ARGTC, and reads in pertinent part:

In the Name of God
the Merciful, the Compassionate
. . . .

ARTICLE                TWENTY-FOUR: DISPUTES

If any difference or dispute shall arise between the Parties as to the interpretation of [the bylaws] or any matter or thing arising therefrom or in connection therewith, then, upon either Parties [sic] giving notice of difference or dispute to the other, the same shall be referred [**19] to arbitration. . . [the venue for which] shall be the Committee for Settlement of Commercial Disputes, Dhahran, Saudi Arabia.

The third relevant choice of law provision appears in the Working Agreement. CPS and Creole were both parties to this document and were represented by the same person; ARGTC and CARL were both parties to the document and both represented by Al-Rushaid. It reads in pertinent part:

4. Each director of CARL will meet [the] responsibilities imposed [on him] by the laws of Saudi Arabia. Creole agrees to manage the joint venture company in accordance with Saudi Arabian laws. . . .

. . . .

7. Any controversy or claim among the parties to this Agreement arising out of

or relating to this Agreement shall be settled in accordance with the provision in the Bylaws of CARL for the settlement of disputes.

[**20] DARMCO and the Al-Rushaid Appellees rely on the foregoing provisions and claim they redundantly evince an agreement to subject to Saudi law all disputes arising from CARL's activities. Specifically, they argue that CARL's Articles of Association control the parties' relationship and preempt all other agreements because the Articles can be altered only by application to the Saudi Arabian Ministry of Trade. Appellants respond that mere agreements to "abide by" Saudi law are not binding choice of law clauses. In support of their argument, Appellants point to what they characterize as the only genuine choice of law provision in any of the contracts. It appears in the Technical Assistance Agreement, to which CPS and CARL were parties, with Al-Rushaid signing on CARL's behalf, and reads in pertinent part:

4.6 Applicable Law Any controversy, dispute or question arising out of, or in connection with, or in relation to this Agreement or its interpretation, performance, or nonperformance or any breach thereof shall be determined in accordance with the Laws of the United States of America.

Significantly, the foregoing clause is located in a section of the document that might [**21] properly be titled "Miscellaneous & Prudent" and appears between a force majeure clause and clauses

concerning complete integration, assignability, and the extent to which the contract binds the parties successors.

Appellants' are correct in their assertions that no other clause in the relevant documents is as explicit or as broad as the foregoing. They are also correct in their assertion that no other provision even purports to preempt it. Indeed, we find persuasive Appellants' argument that it is the only traditional choice of law provision in any of the contracts, which argument is supported by the clause's location among other standardized contractual clauses such as force majeure and complete integration clauses, an attribute lacking in the provisions referring to Saudi Arabian law.

We find the argument equally persuasive even without reference to quantitative notions of the clauses usually or even prudently incorporated into a contract or of the conventional phrasing of a particular type of clause. We here find it useful to evaluate each clause's suitability for service as a model choice of law provision. We conceive of this issue as the extent to which each approximates the **[**22]** phrasing of a normatively optimal choice of law clause or, alternatively, as a question of which clause would most likely result were the parties to draft a provision with the clear intention of producing the choice of law clause least vulnerable to attack. We find, for reasons we set out below, that both formulations point to the clause in the Technical Assistance Agreement that identifies United States law as controlling.

**[*26]** In reaching our conclusions, we find profitable a comparison of the language of each clause and an examination of its scope as evinced by its language, the document in which it appears, and the relationship between that document and the other documents. We begin with those clauses most easily dismissed as facially insufficient as choice of law clauses.

We think it unlikely that either Article 2 of the Kriol contract or Paragraph 4 of the Working Agreement were conceived and drafted as choice of law clauses. They speak more to the status of CARL than to the law applicable to all disputes involving it. They are essentially agreements not to operate an illegal enterprise. A promise to *abide* by Saudi law and *manage* CARL in accordance therewith is little more **[**23]** than a promise to refrain from criminal conduct. It addresses only the concern that a citizen of the United States would attempt to operate a business in a foreign locale without regard to the law of the locality. These clauses fail altogether to implicate what law will apply to disputes between the parties. Similarly, the pledge to meet one's legal responsibilities is not even a pledge not to be a criminal, but merely a pledge not to shirk a contractual undertaking. This, too, is unrelated to the parties' choice of law.

The remaining clauses, Article 24 of CARL's bylaws, Article 17 of the Kriol contract, and Paragraph 7 of the Working Agreement (collectively, the arbitration clauses) are slightly more difficult to overcome. These clauses at least address disputes or controversies among the parties. The broadest language in the arbitration clauses is Article 24's reference to "any

matter or thing arising therefrom or in connection therewith…." One might seize on the nature and scope of the document in which this clause appears or on its ambiguous relationship to the other documents to argue the clause concerns only disputes arising from or connected with the bylaws. We think this **[**24]** restriction too facile, for it simply replaces the ambiguity regarding those disputes to which the clause applies with an ambiguity regarding those agreements to which the clause applies. Although the latter ambiguity is clearly the lesser evil, we find the clause inconclusive. This does not, however, end our textual analysis.

Although the content of the arbitration clauses is inconclusive, much can be gleaned from what is lacking in them, especially when compared with the relative breadth of Paragraph 4.6 of the Technical Assistance Agreement. None of the arbitration clauses expressly applies to issues of interpretation, performance, nonperformance, or breach of the contract, which issues we think the gravamen of contractual disputes. Although Article 24 attempts to broaden its scope by invoking any matter connected with the bylaws, we find this generic attempt at universal relevance far less meaningful than Paragraph 4.6's methodical and deliberate expression of application to specific issues.

We end our textual analysis with an examination of the significance of the arbitration clauses' common theme: arbitration. Interestingly, no party cites a failure to submit this dispute to **[**25]** arbitration, and we cannot discern from the record whether arbitration was explored by the parties. This ambiguity notwithstanding, the arbitration clauses clearly contemplate arbitration as a prerequisite to litigation. Whether or not these clauses can colorably be characterized as choice of law clauses, they can certainly be deemed arbitration clauses. We here think it useful to return to our second formulation of the reasons we find the arbitration clauses inadequate, that being a question of the clause most likely to result from an overt, deliberate attempt to draft the clearest, least vulnerable choice of law clause. Given the arbitration clauses' common theme, we are then forced to question why the parties would bury a choice of law clause deep within an arbitration clause. We find an answer not in poor lawyering but in the intended purpose of the clauses. The arbitration clauses are precisely that, arbitration clauses. They are qualitatively different from the choice of law provision in the Technical Assistance Agreement. Although perhaps not the definitive choice of law clause, when compared to the arbitration clauses, Paragraph 4.6 occupies an extreme position on a spectrum **[**26]** that represents the range of clarity and quality **[*27]** resulting from an effort to draft a model choice of law provision. One simply does not clutter an intended choice of law clause with sundry arbitration procedures [6]. We conclude that Paragraph 4.6 of the Technical Assistance

---

[6] That one of the arbitration clauses provides a procedure for dispute resolution in the event arbitration fails does not alter our conclusion. First, one would expect to find such a provision in an arbitration clause, not in a choice of law clause. Second, we find this contention neutralized by the clauses' unexplained direction to what is apparently the same Saudi Arabian entity both for arbitration and for resolution in the event arbitration fails.

911 S.W.2d 18, *27; 1995 Tex. App. LEXIS 971, **26

Agreement, which provides that United States law will apply, is the only choice of law provision in any of the relevant contracts.

Having found the operative choice of law clause among the contracts, we now determine its scope. The signatories to the Technical Assistance Agreement are two: [**27] Appellant CPS and CARL. Al-Rushaid signed the contract in his representative capacity as CARL's president. Al-Rushaid at once concedes that he signed the document and claims without elaboration that the record lacks evidence to establish that he actually knew of its existence. We find his argument transparent and therefore hold him accountable for knowledge of the contract's content and legal effect. The question remains whether the contract and its election for United States law encompass Al-Rushaid's various business interests involved in CARL and him personally.

At stake in the determination of the scope of the choice of law clause is the identity of those contract claims that will be governed by Texas law [7]. This turns initially on those causes of action that are contractual [8], and secondarily on which contractual causes of action are subject to the choice of law clause. If construed in its narrowest sense, the choice of law clause in the Technical

Assistance Agreement binds only CPS and CARL, the immediate parties to it. At its broadest, it binds both Appellants and the Al-Rushaid Appellees. In resolving this issue we find helpful an examination of the relationships among the [**28] relevant documents and the nature of each. We conceive of this issue as a question of whether the documents are more properly characterized as a primary contract with several subsidiary contracts, what we term the hierarchical model, or as several contracts of initial organization that were executed in sequence out of logical necessity, what we term the sequential model. For the reasons set out below, we favor the latter characterization.

The five documents [9] at issue serially (1) create a joint venture, (2) establish its bylaws, (3) identify ownership interests, [**29] (4) make provision for its initial capitalization, and (5) make provision for its staffing and other resource requirements. All functions are characteristic of the launching of a new enterprise. We think it conventional and nearly necessary to undertake an international business venture involving many parties by setting out in writing the nature of and rules for operating the venture, clarifying who will own it, and making clear how it will be funded and staffed. All are done at the outset of the business because all collectively provide the framework for its operation. Although each function is distinct, all are interrelated; although each function is performed in a separate writing, all are only facets of a

---

[7] No patty suggests that the choice of law clause's reference to United States law should implicate the law of any other American State.

[8] Because Appellants bring contract claims against only the Al-Rushaid Appellees, the following discussion does not directly apply to DARMCO and the Dresser Appellees or to the tort claims against the Al-Rushaid Appellees. It applies only to Appellants' claims against the Al-Rushaid Appellees for breach of contract.

[9] The Kriol contract, CARL's bylaws, the Working Agreement, the Loan Agreement, and the Technical Assistance Agreement.

single transaction and collectively comprise the very business into which the parties entered. The participants' ownership interests, for example, do not render unnecessary provision for the company's funding. They do, however, create expectations for individual contributions to the enterprise and are consequently wisely clarified before cash antes are sought. Similarly, although staff and technical resources might be secured [*28] without regard to the business' funding, they are prudently [**30] sought with an eye to the financial resources necessary to obtain them. A third example is the loan agreement's purpose to meet the initial capitalization requirements of Saudi Arabian law. This requirement could have been satisfied in the same instrument that created CARL. The parties chose, however, to use a separate writing. Indeed, the parties used five instruments to accomplish what might have been awkwardly done in a single omnibus agreement. That they did so does not segregate each contract from the others or from the larger transactional undertaking to launch an international joint venture. The parties simply elected to place the various agreements necessary to operate a new multi-participant business in separate, more digestible writings. Their unremarkable choice can no more confine the scope of each contract than a dispute with the Saudi government over CARL's capitalization could be limited to the loan agreement, leaving unscathed CARL's existence as evinced by the Kriol contract.

[**31] The Al-Rushaid Appellees do not expressly challenge the foregoing analysis as it applies to any of them, In the single brief filed on behalf of all Al-Rushaid Appellees, they implicitly challenge only the applicability of the choice of law clause with respect to Al-Rushaid personally, arguing that he was not a party to the Technical Assistance Agreement. We have already resolved this issue against Al-Rushaid because of his failure to even allege that he represented the other Al-Rushaid Appellees in any kind of restricted capacity. Although in their brief they make little of this issue generally, the Al-Rushaid Appellees alternatively might be thought to attempt to characterize four of the contracts as subsidiary agreements of the Kriol contract. We find this characterization inappropriate. As we have discussed above, these contracts collectively comprise a single transaction. The Kriol contract is not so different in purpose or scope from the other contracts as to be subject to examination without reference to them. Neither is it more important than the others. While it might exhibit a temporal primacy over the other agreements, this is a necessary byproduct of the parties' decision [**32] to memorialize their agreement in separate writings and does nothing to establish a hierarchical relationship among the contracts. To the contrary, the temporal arrangement of the agreements supports a sequential model of the larger transaction. Before a company is funded, its owners should be known. Before ownership is established, it must be created. The five agreements embody only different, albeit perceptibly distinct, steps in the creation and organization of a sophisticated new business. The separate contracts reflect

only the structure of the joint venture and its operational beginning. The creation and organization of the joint venture itself comprise a single legally significant event. Thus, we are presented with a single transactional event from which Appellants' contract claims arise. We therefore find the contract binding on all litigants that were parties to the five documents we have discussed [10]. Accordingly, we enforce the parties' choice to subject their disputes to United States law, and, consistent with Section 187(1) of the RESTATEMENT, find Appellants' contract claims governed by United States law. Appellants' third point of error is sustained with respect to **[**33]** the contract claims they assert against the Al-Rushaid Appellees.

## C. Tort Claims

Appellants brought several tort claims against Appellees. Appellants asserted claims for tortious interference against DARMCO and the Dresser Appellees, civil conspiracy claims against those parties and the Al-Rushaid Appellees, and misappropriation of trade secrets and breach of fiduciary duty claims against the Al-Rushaid Appellees. The Texas Supreme Court has identified the choice of law principles applicable to tort claims, stating that

It is the holding of this court that in the future all conflicts cases sounding in tort

[*29] will be governed by the "most significant relationship" test as enunciated in Sections [**34] 6 [11] [**35] and 145 [12] of the RESTATEMENT (SECOND) OF CONFLICTS [OF LAWS]. This

---

[11] the Section 6 sets out general principles by which the more specific rules are to be applied, and states in full:

Choice-of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

[12] Section 145 lists factual matters to be considered when applying the principles of Section 6 to a tort case, and states in full:

The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

---

[10] We find all Al-Rushaid Appellees encompassed by the choice of law clause because of Al-Rushaid's failure to even attempt to clarify his relationships with his business interests. Appellants allege each is Al-Rushaid's alter ego, and he directs us to no record evidence that controverts this allegation.

methodology offers a rational yet flexible approach to conflicts problems. It offers the courts some guidelines without being too vague or too restrictive. It represents a collection of the best thinking on this subject….

*Gutierrez v. Collins,* 583 S.W.2d 312, 318 (Tex. 1979)(footnotes added). We therefore apply Section 145 to the facts of the instant case. Before we begin our Section 145 analysis, however, we turn to Section 156 of the RESTATEMENT for guidance as to the relative importance of the four factors identified in Section 145. Section 156 reads:

Tortious Character of Conduct

(1) The law selected by application of the rule of§ 145 determines whether the actor's conduct was tortious.

(2) **The applicable law will usually be the local law of the state where the injury occurred.**

RESTATEMENT § 156 (emphasis added). Thus, the RESTATEMENT reveals an emphasis on the situs of the injury, at least with respect to the application of Section 145. Accordingly, it is to this factor that we first turn.

The injury occurred in Saudi Arabia. Appellants themselves appear to recognize this when they allege that the Dresser **[**36]** Appellees acted to "wrest[] field servicing business in Saudi Arabia" away from CARL and Appellants and that the Dresser Appellees and Al-Rushaid "have attempted to keep [Appellants] from doing any further business in Saudi Arabia." Although Appellants now argue they were harmed financially in Texas, that financial harm is a mere measurement of and was produced by Appellants' inability to operate in Saudi Arabia. The record lacks any evidence that any party acted to hinder Appellants' ability to operate outside of Saudi Arabia or that Appellants' competitiveness in the United States suffered. Indeed, the trial judge in the previous federal anti-trust litigation correctly found that any anticompetitive effects were felt in Saudi Arabia. Section 145's first element favors Saudi Arabia.

The second element we consider under Section 145 is the situs of the injury-producing conduct. The parties here engage in a discourse largely duplicative of their argument about the situs of the injury. Not surprisingly, we reach the same conclusion and again find Appellants' pleadings revealing. Appellants allege that the Dresser Appellees "spread false and malicious statements to [Appellants] **[**37]** and CARL's customers" and that "Dresser used its dominant market power to … entice Al-Rushaid into **[*30]** agreeing not to do any further business with [Appellants]." Appellants now argue for the application of Texas law because the conduct they allege to be tortious was directed from Texas. First, we find this argument to be inapplicable to the Al-Rushaid Appellees, a Saudi Arabian citizen and his affiliated Saudi Arabian business interests. Appellants do not allege that the Al-Rushaid Appellees engaged in any relevant conduct **outside** of Saudi Arabia. Second, that tortious conduct may have been directed from Texas does not alter the reality that the conduct was directed to and carried out in Saudi Arabia,

and it was the carrying out of the conduct that was the source of its harmful nature. Section 145's second element favors Saudi Arabia.

The third Section 145 element we consider is the parties' domiciles and residences. The present litigation involves nine litigants domiciled in four countries and as many continents, with residences in Saudi Arabia, Liechtenstein, Houston, Dallas, and New York. Of nine litigants, none is a Texas corporation and only two have offices in Texas. **[\*\*38]** Significantly, although Appellant Creole and Appellee Dresser Industries are headquartered in Texas, neither was a direct signatory to any of the documents creating and controlling CARL or DARMCO. The signatories to CARL's seminal agreement were Appellant CPS, a Panamanian Corporation with no Texas office, and Al-Rushaid; the participants in DARMCO were Appellant Dresser A.G. (Vaduz) and an Al-Rushaid entity. Appellants here offer only the weak argument that Creole was involved in the transactions because it provided various resources to CPS. Creole, however, was not a party to CARL. CPS was. It is undisputed that CPS is a Panamanian corporation with no offices in Texas. The trial judge had a firm grasp on this issue.

> It strikes me as if you have an offshore corporation and CPS was created for the purpose of having the benefits of an offshore corporation to carry out business without reference to the laws of the United States. . . . And if you live by a foreign corporation, you die by a foreign corporation. . . . You had this

offshore business for a particular reason to achieve the benefits of having an offshore corporation and also carry out some liability that comes along **[\*\*39]** with this kind of way of doing business. You have to accept the risk of those liabilities along with accepting the benefits that you get from that kind of business.

> So, it strikes me that we have here a Panamanian corporation entering into a deal with a Saudi national under the laws of Saudi Arabia to carry the business that Saudi Arabia -- and I don't see any way that I can rule but that Saudi Arabian law applies.

Because five of the nine litigants are Saudi Arabian, Section 145's third element favors Saudi Arabia slightly.

The foregoing analysis of the first three of Section 145's four elements does much to foretell the outcome of the analysis of the fourth element. Indeed, we think it rare that the injury, the conduct producing it, and the parties' domiciles would point to the same foreign state, yet the relationship would somehow be centered in Texas. Although we do not trivialize Section 145's fourth element, we find it potentially duplicative of an analysis of the first three, which finding is supported by the recognition, present in the language of Section l45(2)(d) itself, that analysis of an extant relationship will only be intermittently possible. We nonetheless **[\*\*40]** find two relationships worthy of discussion.

The first is the relationship between Appellants and the Dresser Appellees, which we think most properly characterized

as a competitive one. These parties competed in the Saudi Arabian market to provide energy equipment maintenance and repair services. We find Saudi Arabia to be the center of gravity of this competitive relationship. *Cf. DeSantis,* 793 S.W.2d at 680-81 (finding that Florida has no interest in restraints on competition in Texas). The second relevant relationship existed between Appellants and the Al-Rushaid Appellees. While we could chronicle Appellants contacts with each of the Al-Rushaid entities, we think these relationships more efficiently examined by focusing on the contacts between Appellants and Al-Rushaid, in part because Al-Rushaid's testimony does not clearly define his relationships **[*31]** with his business interests and because he was obviously the driving force behind all of them. Appellant CPS and Al-Rushaid were joint venturers in an enterprise that was designed to and actually did operate exclusively in Saudi Arabia. Thus, their relationship was centered in Saudi Arabia. *Cf. Maxus Exploration Co. v. Moran* **[**41]** *Bros., Inc,* 817 S.W.2d 50 (Tex. 1991)(applying Kansas, not Texas, law to a contract for drilling services to be performed in Kansas notwithstanding that contract was negotiated in and contracting parties were headquartered in Texas). Section 145's fourth element favors Saudi Arabia.

Mindful that a proper Section 145 analysis is much more than a bean-counting exercise, we find that both the quantity and quality of the contacts among the parties and Saudi Arabia mandate the application of Saudi Arabian law to all tort claims asserted by Appellants because the parties and the subject matter of this litigation have a more significant relationship to Saudi Arabia than to Texas. Accordingly, we overrule Appellants' points of error to the extent they challenge the applicability of Saudi Arabian law to Appellants' tort claims. Having found Saudi law applicable, it remains to determine the outcome of these claims under Saudi law.

The trial court found that Saudi law did not recognize Appellants' tort claims. Appellants claim that extensive expert testimony conflicted over the extent to which Saudi law provided causes of action similar to Anglo-American tort claims. We find any factual conflict **[**42]** in the expert testimony insufficient to preclude summary judgment.

The parties agree that Saudi Arabia generally provides remedies for wrongs. They further agree that Saudi law employs different nomenclature than Texas law for certain causes of action in what is known to Texas law as tort. They agree that Saudi Arabian law offers no cause of action termed tortious interference with contractual relations, civil conspiracy, or breach of fiduciary duty. Appellants claim, however, that conduct that is actionable in Texas as one or more of the foregoing torts is actionable in Saudi Arabia, though it may be known by another name. They rely heavily on the agreed upon notion that Saudi law provides redress for wrongs. This, however, begs the question, for it fails to delineate what is wrong or to identify the form of relief available for any given wrong. Appellants claim the evidence at

least presents a fact question sufficient to preclude summary judgment. A careful review of the evidence leads us to conclude otherwise.

## 1. Tortious Interference

The expert testimony produced by the parties is in greatest agreement with regard to whether Saudi Arabian law recognizes claims for tortious interference. [**43] The following is the strongest testimony provided by Appellants' expert, William Van Orden Gnichtel [13]:

> Q. Would Saudi law allow a claim to redress a wrong against a party for interfering with a contract that Plaintiff might have had?
> A. Yes.
> Q. … Is it your testimony that type of cause of action would exist but the label tort may not be known in Saudi Arabia?
> A Yes, I would set aside or disregard the nomenclature and get to the essence, and the essence is basically that if one does a wrong to another he will be required to compensate the wronged party.

Although Gnichtel's first response might preclude summary judgment if considered alone, his second response is fatal. It is death by qualification. It reveals that Gnichtel relied on a general principle without regard to the specific conduct at issue in the instant case and without regard to the particular cause of action known to

---

[13] As a preliminary matter, Appellees challenge the admissibility of Gnichtel's testimony, claiming it is hearsay because Gnichtel conceded that many of his opinions and much of his knowledge of Saudi law resulted from conversations with a colleague who, unlike Gnichtel, is a licensed Saudi Arabian lawyer. We find it unnecessary to resolve this allegation because of our conclusions about the results of Appellants' tort claims under Saudi law.

Texas law as tortious interference with contractual relations.

[**44] The Dresser Appellees' expert, Joseph Saba, was more precise about the content of Saudi law and carefully exposed the modesty [*32] of Gnichtel's statements. In an affidavit available to the trial court for summary judgment, Saba stated:

> The American concept of tortious interference with contracts is not among the acts giving rise to a cause of action in Saudi Arabia. The nonexistence of such a cause of action is consistent, inter alia, with the Hanbali School's emphasis on individual free will and responsibility. If a person does not perform his contractual obligations or does not enter into a contract or breaches his duties to another, such conduct is his own responsibility, not that of anyone else. Even if another person persuades, requests or otherwise influences such conduct, that other person is not liable in a civil action for monetary payments to the plaintiff, in the absence of a direct contractual obligation running from that other person to the plaintiff.

Saba went on to address a specific statement from Gnichtel's affidavit, in which Gnichtel foreshadowed his live testimony we quoted above, saying, "The Shari'a [Islamic scripture] recognizes civil liability [**45] for wrongful acts resulting in damages. This is an overriding principle of the Shari'a. It is not dependent on specific contractual arrangements or specific regulations promulgated by the government." Saba responded:

This passage is literally correct, so long as it is read to involve concepts of Saudi Arabian law rather than more general American usages. Thus, there is liability for "wrongful acts," but only for those acts that are recognized as wrongful under Saudi Arabia's application of the Shari'a or under the Regulations [of the Kingdom of Saudi Arabia]. The Saudi scope of liability of one private party to another does not encompass all acts which American law might consider to be wrongful…. Finally, while the existence of liability is not necessarily dependent upon "specific contractual arrangements or specific regulations," the conduct in question still must lie within an appropriate category of actionable conduct under Saudi Arabia's strict construction of the Shari'a. As stated above, based upon my review of the pleadings in this case, the claims against Dresser in this suit do not fit within such a category. There is no nexus under Saudi law between Dresser and **[**46]** the plaintiffs giving the plaintiffs the cause of action they assert.

Thus, Saba exposed the hollowness of Gnichtel's conclusions by defining the terms Gnichtel used and then applying the definitions to Gnichtel's statements to reveal their precise content. He made clear the inadequacy of Gnichtel's reliance on a general principle of justice by showing the principle to itself be dependent on Saudi law's definition of terms used to articulate the principle. Further, he specifically examined the viability of Appellants' particular causes of action for tortious interference and expressed his opinion that they were not viable. Significantly, Appellants did not respond to Saba's deconstruction of Gnichtel's statements and in their brief offer no argument to overcome his conclusions. Indeed, on cross-examination Gnichtel conceded that Saudi law would not recognize a claim for contractual interference against a non-contracting third party and acknowledged that his statements stopped short of saying that Dresser could be liable to Appellants for interfering with Appellants' contracts with Al-Rushaid. Absent even argument that Saba's testimony is inaccurate, the trial court was justified **[**47]** in finding there existed no genuine issue of material fact and in applying Saudi Arabian law to Appellants' claims against the Dresser Appellees for tortious interference with contractual relations, which application resulted in their dismissal. Accordingly, we overrule Appellants' first and second points of error to the extent they challenge the outcome of Appellants' tortious interference claims under Saudi Arabian law.

2. Breach of Fiduciary Duty

Appellants brought claims for breach of fiduciary duty against the Al-Rushaid Appellees. The parties agree that Saudi Arabian law recognizes the concept of fiduciary duty and provides a cause of action for the breach thereof Appellants claim that the trial court erred by granting summary judgment in favor of the Al-Rushaid Appellees based on the Al-Rushaid Appellees' contention that Saudi law allows lawsuits among parties to a business enterprise over matters arising from the

 **[*33]** company's activities only during the existence of the company. The Al-Rushaid Appellees offered testimony to this effect, their expert specifically stating that all claims not settled prior to dissolution are waived. Appellants in their brief do not challenge that **[**48]** Saudi law requires claims to be asserted prior to dissolution. Neither do they claim they asserted their breach of fiduciary duty claims in this lawsuit before CARL was dissolved or that these claims do not involve CARL. Appellants address only the Al-Rushaid Appellees secondary argument that Appellants' breach of fiduciary duty claims are barred by res judicata and estoppel. Absent argument that Saudi law allows parties to a business enterprise to bring against each other claims involving the business after its dissolution, and absent competent evidence to establish that Saudi law follows a different rule, the trial court was justified in dismissing Appellants' claims for breach of fiduciary duty. Accordingly, we overrule Appellants' third point of error to the extent it challenges the outcome of Appellants' breach of fiduciary duty claims under Saudi Arabian law.

### 3. Misappropriation of Trade Secrets

Appellants brought claims for misappropriation of trade secrets against the Al-Rushaid Appellees. Appellants' brief mystifyingly omits any argument that the trial court erred in dismissing these claims. We presume Appellants rely on their general contention, which we addressed in our **[**49]** discussion of Appellants' tortious interference claims, that Saudi Arabian law provides redress for wrongs. If

our presumption is correct, we do not disturb the trial court's judgment on this issue for the reasons we cited in our discussion of Appellants' tortious interference claims. If our presumption is incorrect, we do not disturb the trial court's judgment because of Appellants' failure to brief this aspect of their point of error directed to the Al-Rushaid Appellees, which failure offends Texas Rules of Appellate Procedure 74(f). We therefore overrule Appellants' third point of error to the extent it challenges the outcome of Appellants' claim for misappropriation of trade secrets under Saudi Arabian law.

### 4. Conspiracy

Appellants brought civil conspiracy claims against all Appellees. Aside from a reference to Appellees' contentions that Saudi law does not recognize claims for civil conspiracy, Appellants offer no argument on this issue and do not even allege that such claims are viable under Saudi law. They make no attempt to challenge expert Saba's opinion that:

> The law of Saudi Arabia does not provide a private party with a cause of action or other remedy against a third **[**50]** party for conspiring to perform an act, whether that act is itself a compensable wrong or not. Depending upon the nature of the act, the person who commits the act may or may not be liable to his victim. In any event, however, another person is not liable for conspiring with the actor.

Given that Appellants direct us to no record evidence to controvert the notion that Saudi

law provides no cause of action for conspiracy independent of the underlying conduct and, alternatively, our conclusion that Appellants' other tort claims are not viable under Saudi Arabian law, the trial court was justified in dismissing Appellants' claims for civil conspiracy. Accordingly, we overrule all of Appellants' points of error to the extent they challenge the outcome of Appellants' civil conspiracy claims under Saudi Arabian law.

D. Public Policy

Appellants alternatively urge that none of their claims should be governed by Saudi Arabian law because their claims involve rights the vindication of which implicates the fundamental public policy of Texas. Appellants rely on Sections 6(2)(b) and 6(2)(c) of the RESTATEMENT and on *DeSantis,* 793 S.W.2d 670, in which case the Texas Supreme Court found [**51] that enforcement of a noncompetition agreement that constituted an unreasonable restraint on work performed in Texas implicated the fundamental public policy of the State. *DeSantis* involved a contract claim governed by Section 187(2) of the RESTATEMENT, which is particularly deferential to the public policy of a state with a materially greater interest than the state [*34] selected by the parties in the determination of the issue. That *DeSantis* involved a contract claim renders it irrelevant to Appellants' tort claims. Moreover, we resolved Appellants' contract claims under Section 187(1) of the RESTATEMENT, which does not expressly consider the public policy of the chosen state. Thus, we found Appellants' contract

claims controlled by Texas law because the parties' contractually agreed to subject disputes to United States law, not because the public policy of the State of Texas favored the application of its law.

Sections 6(2)(b) and 6(2)(c) of the RESTATEMENT do not alter our conclusion that Appellants' tort claims are governed by Saudi Arabian law. These sections direct courts to consider the policies of the forum. Whether or not Texas has an important policy interest in policing [**52] the conduct of subsidiaries of businesses with Texas offices that occurs outside Texas and has no effect on its territory, this is only one of several factors listed in Section 6. Further, Section 145 of the RESTATEMENT directs us to consider Section 6 factors in light of the specific contacts listed in Section 145. Appellants labor under a heavy burden when they allege error in a failure to consider two of seven factors, which seven factors are to be applied in light of four other factors, which in turn are subject to varying applications depending on their relative importance to a particular issue. In a discussion of the fundamental state policy exception to the general rule of Section 187(2), which we emphasize is irrelevant, the Texas Supreme Court indicated the exception's narrow scope.

Comment g to section 187 does suggest that application of the law of another state is not contrary to the fundamental policy of the forum merely because it leads to a different result than would obtain under the forum's law. We agree that the result in one ease cannot

determine whether the issue is a matter of fundamental state policy for purposes of resolving a conflict of laws. **Moreover, [\*\*53] the fact that the law of another state is materially different from the law of this state does not itself establish that application of the other state's law would offend the fundamental policy of Texas.** In analyzing whether fundamental policy is offended under section 187(2)(b), the focus is on whether the law in question is a part of state policy so fundamental that the courts of the state will refuse to enforce an agreement contrary to that law, despite the parties' original intentions, and even though the agreement would be enforceable in another state connected with the transaction.

*DeSantis,* 793 S.W.2d at 680 (emphasis added). We think this indication of the narrowness of the fundamental policy exception in Section 187(2) applicable to tort claims examined under Section 145 to the extent Section 145 directs courts to consider the policies of the forum and other interested states as directed by Section 6. We therefore approach Sections 6(2)(b) and 6(2)(c) with the presumption that they will rarely be dispositive.

There is no evidence to suggest the trial court failed to consider or attributed too little weight to the public policy of Texas. We have examined the **[\*\*54]** relationships among the parties, Texas, Saudi Arabia, and the subject matter of this litigation pursuant to the RESTATEMENT and concluded that the parties and this litigation have the most

significant relationship to Saudi Arabia. Interestingly, the Texas Supreme Court's adherence to the RESTATEMENT leads us to further conclude that the RESTATEMENT'S most significant relationship test itself is woven into the fabric of Texas policy. Thus, even if Texas had a significant policy interest in giving extraterritorial effect to its own laws, it would be countered by Texas' interest in having the tort claims in this litigation governed by the state with the most significant relationship to the claims and parties. We therefore overrule all of Appellants' points of error to the extent they challenge the trial court's judgment based on the fundamental policy of the State of Texas.

## III. <u>CONCLUSION</u>

Having overruled Appellants' first and second points of error with respect to all claims, having overruled Appellants' third point of error with respect to tort claims, and having sustained Appellants' first point of error with **[\*35]** respect to contract claims asserted against the Al-Rushaid Appellees, **[\*\*55]** we affirm the judgment of the trial court dismissing all of Appellants' claims against DARMCO and the Dresser Appellees and their tort claims against the Al-Rushaid Appellees, and reverse the judgment of the trial court dismissing the contract claims against the Al-Rushaid Appellees. We hold Appellants' contract claims against the Al-Rushaid Appellees governed by [14] Texas law and

───────────────

[14] In what they denominate a conditional cross-point of error, the Al-

911 S.W.2d 18, *35; 1995 Tex. App. LEXIS 971, **55

remand the case for trial of these claims

 [**56]  May 4, 1995

/s/ RICHARD BARAJAS,

Chief Justice

Before Panel No. 3

Barajas, C.J., Larsen and McCollum, JJ.

(McCollum, J., not participating)

---

End of Document

---

Rushaid Appellees purport to challenge the trial court's alleged implicit overruling of their Plea In Abatement, which they filed simultaneously with their Motion For Summary Judgment, and urged as an alternative ground for disposition of the case. Their Plea In Abatement sought abatement based on comity and forum non conveniens. That the trial court never ruled on the plea is fatal to their claim that it was implicitly overruled when the trial court granted their Motion For Summary Judgment. The Al-Rushaid Appellees cite no authority to support their apparent contention that comity and forum non conveniens are necessarily prerequisite issues to a conflict of laws issue. Because the trial court has not ruled on the Al-Rushaid Appellees' Plea In Abatement, there exists no order or judgment from which they can appeal. We therefore do not address the issue, and our opinion does not prevent the Al-Rushaid Appellees from urging their plea on remand.