# DOCUMENT 1
# PUBLIC VERSION

UNITED STATES
DISTRICT COURT
Northern District of
California

# FAX TRANSMISSION

| **TO:** | |
|---|---|
| **FAX NUMBER:** | 94153977188 |
| **PHONE:** | |
| **RE:** | 5:22-cv-04486-BLF Jones et al v. |

**FROM:** Justine        Fanthorpe

**NO. OF PAGES:**   (INCLUDING COVER):  63

**DATE:** 2023-02-09

**TIME:** 16:40:14

**SUBJECT:**    **5:22-cv-04486-BLF Jones et al v. PGA Tour, Inc.**

**DETAILS:**



**Justine Fanthorpe**
CRD to Magistrate Judge Susan van Keulen
280 South First Street, Room 2112
United States District Court
Northern District of California
https://cand.uscourts.gov
Justine_Fanthorpe@cand.uscourts.gov
Office: 408-535-5375

2023/02/09 16:40:14    2  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 3 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 1 of 58

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT JONES, et al., | Case No.  22-cv-04486-BLF   (SVK) |
| Plaintiffs, | **UNDER SEAL** |
| v. | **ORDER ON (1) MOTION OF PGA TOUR, INC. TO COMPEL COMPLIANCE WITH SUBPOENAS TO THIRD PARTIES PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S MOTION; (2) MOTION OF THIRD PARTIES PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S MOTION TO QUASH SUPOENAS; AND (3) ADMINISTRATIVE MOTIONS FOR LEAVE TO SUPPLEMENT MOTION TO COMPEL AND MOTION TO QUASH** |
| PGA TOUR, INC., | |
| Defendant and Counter-Plaintiff, | |
| v. | |
| LIV GOLF INC., | |
| Counter-Defendant. | |

Docket Nos. 148, 166, 209, 211

## I.    INTRODUCTION

Plaintiffs, who are several professional golfers and LIV Golf Inc. ("LIV"), are suing Defendant PGA Tour, Inc. ("PGA") over PGA's conduct related to the player-Plaintiffs' involvement with LIV, a recently-established golf league that competes with PGA.  Dkt. 83 (First Amended Complaint).  Plaintiffs allege that PGA committed antitrust violations, breached contracts, and engaged in tortious conduct.  *Id.*  PGA has counterclaimed against LIV for tortious interference with PGA's contracts with the player-Plaintiffs.  Dkt. 108 (Answer and Counterclaim).

The present motions relate to subpoenas issued by PGA to non-parties Public Investment Fund of the Kingdom of Saudi Arabia ("PIF") and Yasir Othman Al-Rumayyan ("Mr. Al-Rumayyan").  The subpoenas called for PIF and Mr. Al-Rumayyan to produce documents and appear for depositions at the office of PGA's counsel in New York City.  Dkt. 148-2 at Ex. 6 (subpoena to Mr. Al-Rumayyan) and Ex. 7 (subpoena to PIF).  PIF and Mr. Al-Rumayyan served

2023/02/09 16:40:14    3   /63

Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 4 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 2 of 58

United States District Court
Northern District of California

1  responses and objections to the subpoenas. Dkt. 148-5 at Ex. 36 (Mr. Al-Rumayyan's responses

2  and objections) and Ex. 37 (PIF's responses and objections).

3      PGA moves to compel compliance with the subpoenas (Dkt. 148), and PIF and Mr. Al-

4  Rumayyan move to quash the subpoenas on various grounds (Dkt. 166). The Court held a hearing

5  on the motions on January 13, 2023. As explained below, the Court **DENIES** the motion of PIF to

6  quash the subpoena directed to PIF on the grounds of sovereign immunity because it finds that

7  PIF's conduct falls within the commercial activity exception to the Foreign Sovereign Immunity

8  Act, 28 U.S.C. § 1602 *et seq.* ("FSIA"). The Court **DENIES** the motion of Mr. Al-Rumayyan to

9  quash the subpoena directed to him on the grounds of common law immunity because his conduct

10 falls within an exception for commercial activity. The Court further **DENIES** the motion of PIF

11 and Mr. Al-Rumayyan to quash the subpoenas on the grounds of lack of personal jurisdiction

12 because it concludes it has personal jurisdiction over these witnesses. The motion of PIF and Mr.

13 Al-Rumayyan to quash the subpoenas on the grounds that PGA failed to tender the witness fees

14 required under Federal Rule Civil Procedure 45(b)(1) at the time of service is **DENIED** with

15 respect to the requests for production of documents in the subpoenas and **GRANTED** with respect

16 to the demand for deposition testimony in the subpoenas, **WITHOUT PREJUDICE** to PGA's

17 right to re-serve PIF and Mr. Al-Rumayyan pursuant to the relevant parties' Service Agreement

18 with subpoenas for deposition testimony that are accompanied by the requisite witness fees. The

19 place of compliance for the deposition subpoenas is **MODIFIED** in that the re-served deposition

20 subpoenas may specify the New York City location identified in the original subpoenas, but PIF

21 and Mr. Al-Rumayyan may request that the depositions take place at a place of PGA's choosing in

22 Riyadh, Saudi Arabia by so notifying PGA within **five (5) days of re-service** of the subpoenas.

23 PIF and Mr. Al-Rumayyan may produce the documents requested by the subpoenas at either the

24 specified New York City location or a place of PGA's choosing in Riyadh, Saudi Arabia. The

25 categories of documents in the subpoenas are **MODIFIED** as set forth in **Exhibit A** to protect

26 nonparties PIF and Mr. Al-Rumayyan from undue burden, as required under Rule 45(d)(1). The

27 Court's rulings on the motion to quash filed by PIF and Mr. Al-Rumayyan also address the

28 arguments made in PGA's motion to compel.

2

Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 3 of 58

## II.    BACKGROUND

### A.    Relevant case background

On August 3, 2022, eleven professional golfers filed the initial complaint in this case against PGA. Dkt. 1. LIV was not a party to the original complaint. *Id.* Along with the complaint, several of the original player-Plaintiffs filed a motion for temporary restraining order. Dkt. 2. Following a hearing, District Judge Beth Labson Freeman denied the motion for temporary restraining order without prejudice to filing a motion for preliminary injunction. Dkt. 63.

Plaintiffs subsequently filed a First Amended Complaint against PGA. Dkt. 83 ("FAC"). LIV was added as a Plaintiff, and several of the original player-Plaintiffs were not named in the FAC. *Id.* The FAC includes causes of action for antitrust violations, breach of PGA's contracts with the player-Plaintiffs, and tortious interference with LIV's contractual relationships and prospective business relationships. *Id.*

PGA filed an answer and counterclaim. Dkt. 108. The counterclaim alleges that LIV interfered with PGA's contracts with certain LIV players. *Id.*

PGA recently filed a motion for leave to amend the counterclaim to add PIF and Mr. Al-Rumayyan as counter defendants. Dkt. 238. That motion is currently pending before Judge Freeman and is not a factor considered by this Court in reaching its conclusions.

### B.    PIF, Mr. Al-Rumayyan, and LIV

The following discussion regarding PIF, Mr. Al-Rumayyan, and LIV is based on the limited record presently before the Court, including the pleadings and the declarations and evidence filed in connection with the present subpoena-related motions. Additional discovery or other proceedings may bring to light different or additional facts regarding these parties.

#### 1.    PIF

PIF is the sovereign wealth fund of the Kingdom of Saudi Arabia, established in 1971 by Royal Decree. Dkt. 166-4 ¶ 2. It was formed "for the purpose of serving the public interest; promoting economic development in the Kingdom and diversifying its sources of income; and maintaining the interest of future generations. *Id.* ¶ 12. PIF plays a role in Saudi Arabia's "Vision

United States District Court
Northern District of California

2023/02/09 16:40:14    5  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 6 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 4 of 58

United States District Court
Northern District of California

2030," which includes "using its investment power to create a more diverse and sustainable economy." Dkt. 148-2 at Ex. 9, PDF pp. 81.

PIF is its own legal entity. *Id.* ¶ 3. It is headquartered and has its principal place of business in Riyadh, Saudi Arabia. *Id.* ¶ 18. In 2022, a PIF subsidiary, USSA International LLC, opened an office in New York City. *Id.* ¶¶ 18-19. PIF itself has no real estate or employees in the United States. *Id.* ¶¶ 19-20.

PIF is regulated by a special legal framework, the Public Investment Fund Law. *Id.* ¶ 2. PIF is governed by a Board of Directors comprised of government Ministers and an advisor at the Royal Court, including the Governor, Mr. Al-Rumayyan. *Id.* ¶¶ 4-6. Day-to-day management of PIF is overseen by the Executive Management, which reviews PIF's operations and evaluates investment proposals before submitting them to the Board of Directors for decision. *Id.* ¶ 4.

PIF's assets total approximately $676 billion. Dkt. 148-4 at 112. In 2021, approximately $40 billion of those assets were held in investments in public companies in the United States, including Uber, Meta, Microsoft, Alphabet, Zoom, Starbucks, Paypal, Costco, the Home Depot, Amazon, and Walmart. *Id.* at 122.

According to the allegations of LIV and the player-Plaintiffs in the FAC, "in late 2019 and into 2020, a number of individuals and entities, some of whom later became involved with LIV Golf, attempted to launch a competing tour known as the Premier Golf League ('PGL')." Dkt. 83 ¶ 77. LIV admits that PIF was involved in the PGL venture (*id.* ¶ 78) but PIF denies that it invested in PGL (Dkt. 166-4 ¶ 117). Plaintiffs allege that PGA took certain actions that "ensur[ed] that the competitive threat from the PGL was thwarted before it could launch." Dkt. 83 ¶ 88.

### 2.    Mr. Al-Rumayyan

Mr. Al-Rumayyan is Governor of PIF and holds the rank of Minister in the Kingdom of Saudi Arabia. Dkt. 166-5 ¶¶ 1-2. He is a citizen of Saudi Arabia and resides in Riyadh. *Id.* ¶ 3. Mr. Al-Rumayyan is referred to in many of the documents produced in this case by the honorific "His Excellency" or "HE." *See, e.g., id.*

### 3.    LIV

Plaintiff LIV Golf Inc. ("LIV") was formed in 2021. Dkt. 83 ¶ 101. LIV is a Delaware

1    corporation with its principal place of business in New York City.  *Id.* ¶ 23.  According to the

2    Certification of Interest Entities or Persons filed by LIV in this action, LIV is wholly owned by

3    LIV Golf Holdings Ltd., a private limited company incorporated under the laws of Jersey (a

4    United Kingdom dependency).  Dkt. 85; Dkt. 166-4 ¶¶ 13-14.  LIV Golf Holdings Ltd. is, in turn,

5    wholly owned by LIV Golf Investments Ltd., another private limited company incorporated under

6    the laws of Jersey.  *Id.*  PIF is the majority owner of LIV Golf Investments Ltd.  *Id.*

7      As LIV describes itself in the FAC,  it is "the sponsor of the LIV Golf Invitational Series,

8    an eight-event series of golf tournaments, a majority of which have been or will be set in the

9    United States, from June to October 2022" and also is "the sponsor of a planned season-long golf

10   tour, the League" that it was "forced to delay in 2022" in favor of the "scaled-down" LIV Golf

11   Invitational Series, allegedly due to conduct of PGA.  Dkt. 83 ¶¶ 23, 169.  LIV states that "[t]he

12   LIV Golf League format was designed as a fan-friendly alternative to the PGA Tour."  *Id.* ¶ 103.

13   LIV claims that "[b]y introducing an innovative format highlighting weekly head-to-head

14   competition among the top players in the game, LIV Golf League's format would have created a

15   more desirable product offering than the PGA Tour format."  *Id.* ¶ 102.

16      According to PGA, LIV has recruited 20 American golfers to join the LIV tour.  *See*

17   Dkt. 148-5 at Ex. 31.  Five of the eight LIV events held in 2022 took place in the United States,

18   and nine of the 14 LIV events scheduled for 2023 will take place in the United States.  Dkt. 83

19   ¶ 169; Dkt. 148-5 at Exs. 32-33.

20      **C.**    **PGA's Subpoenas to PIF and Mr. Al-Rumayyan**

21      The role of PIF and Mr. Al-Rumayyan in LIV and the events at issue became known early

22   in this case.  At a status conference held by Judge Freeman on August 18, 2022, PGA's counsel

23   stated that "LIV is owned by the Saudi Public Investment Fund, and will [sic] want to take

24   discovery, I would assume, from key decision makers of the [] owners of LIV."  Dkt. 76 at 9.

25   PGA's counsel noted, however, that "Saudi Arabia is not a signatory to the Hague Treaty, so it's

26   not clear to me exactly how we are going to do that."  *Id.*  An attorney from the law firm of Gibson

27   Dunn, which at the time represented the player-Plaintiffs but which later began also representing

28   LIV, stated:

2023/02/09 16:40:14    7  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 8 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 6 of 58

United States District Court
Northern District of California

> To the extent there's appropriate discovery of the Public Investment Fund, we will find a way to cooperate with that. We would never insist that they do any sort of formal service, so we will figure out a way to do that. All of that will come together swimmingly."

*Id.* at 14.

PGA later negotiated an agreement with attorneys at the law firm of Quinn Emanuel, which is counsel for LIV as well as PIF and Mr. Al-Rumayyan, regarding service of subpoenas on PIF and Mr. Al-Rumayyan. Dkt. 148-2 at Ex. 5 (the "Service Agreement"); *see also* Dkt. 148-1 ¶ 7. The Service Agreement provides, in relevant part:

> In this instance only, His Excellency agrees to treat the PGA Tour's sending to Quinn Emanuel Urquhart & Sullivan LLP the subpoena attached hereto as Exhibit A as if the PGA Tour had personally delivered a copy of it to His Excellency in the United States.

> In this instance only, PIF agrees to treat the PGA Tour's sending to Quinn Emanuel Urquhart & Sullivan LLP the subpoena attached hereto as Exhibit B as if the PGA Tour had personally delivered a copy of it to a PIF officer or managing agent in the United States.

> The PGA Tour agrees that in doing so His Excellency and PIF waive no objections or rights whatsoever to the subpoenas attached hereto as Exhibits A and B, and reserve all rights and privileges with respect thereto.

Dkt. 148-2 at Ex. 5.

PGA subsequently served subpoenas on PIF and Mr. Al-Rumayyan in accordance with the Service Agreement, calling for them to testify at depositions in New York City and produce documents at the depositions. Dkt. 148-2 at Exs. 6 and 7. PIF and Mr. Al-Rumayyan served responses and objections to the subpoenas. Dkt. 148-5 at Exs. 36 and Ex. 37. The relevant parties met and conferred concerning their disputes about the subpoenas, to no avail. *See, e.g.,* Dkt. 148-1 ¶ 2; Dkt. 166-1 ¶¶ 3-8 and Exs. 1 and 2.

**D.      Motions Regarding the PIF and Al-Rumayyan Subpoenas**

On or about October 21, 2022, PGA filed motions to compel PIF and Mr. Al-Rumayyan to comply with the subpoenas. *See* Dkt. 166-1 ¶ 9. The motions to compel were filed in the United States District Court for the Southern District of New York, which is the district court for the place where compliance with the subpoenas was set to occur. *Id.; see also* Fed. R. Civ. P. 45(d).

2023/02/09 16:40:14  8  /63
Case 5:22-cv-04486-BLF  Document 499-1  Filed 09/07/23  Page 9 of 64
Case 5:22-cv-04486-BLF  Document 265 *SEALED*  Filed 02/09/23  Page 7 of 58

By stipulation of PGA, PIF, and Al-Rumayyan, the New York district court transferred PGA's motions to compel as well as the motions to quash that PIF and Mr. Al-Rumayyan expected to file to this Court. Dkt. 142-5; *see also* Fed. R. Civ. P. 45(f).

This Court ordered combined briefing on the motion to compel and motion to quash the subpoenas. Dkt. 144, 152. As ordered by the Court, PGA re-filed the motion to compel (Dkt. 148), PIF and Mr. Al-Rumayyan filed a combined motion to quash and opposition to the motion to compel (Dkt. 166), PGA filed a combined opposition to the motion to quash and reply on the motion to compel (Dkt. 169), and PIF and Mr. Al-Rumayyan filed a reply on the motion to quash (Dkt. 173). Four days before the January 13, 2023 hearing on the motions, each side filed administrative motions to file supplemental materials in connection with the motions. Dkt. 209-210 (PGA's administrative motion); Dkt. 211 (PIF and Mr. Al-Rumayyan's administrative motion).

On January 13, 2023, this Court held a hearing on the motion to compel, motion to quash, and administrative motions to file supplemental materials. *See* Dkt. 221 (1/13/23 Hrg. Tr.).

### III. ISSUING COURT AND GOVERNING LAW

As a preliminary matter, these subpoena-related disputes are properly before this Court. In accordance with to Federal Rule of Civil Procedure 45, the subpoenas directed to PIF and Mr. Al-Rumayyan were prepared by PGA's counsel and issued from this Court, where the underlying action is pending. Fed. R. Civ. P. 45(a)(2), (3). In accordance with Rule 45(d)(2)(B)(i), PGA originally filed a motion to compel compliance with the subpoenas in the Southern District of New York, which is the court for the district where compliance was required. The Southern District of New York transferred PGA's motion to compel and PIF and Mr. Al-Rumayyan's expected motion to quash to this District, as the court that issued the subpoenas, pursuant to an agreement between PGA, PIF, and Mr. Al-Rumayyan and Federal Rule of Civil Procedure 45(f). *See* Dkt. 142-5.

In considering the motions related to the subpoenas—which were issued to foreign witnesses and called for compliance in the Southern District of New York—the Court must decide whether the present motions should be decided under Second Circuit law, Ninth Circuit law, or other authority. The parties to the motions did not address this issue in this briefing, and both

2023/02/09 16:40:14    9   /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 10 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 8 of 58

United States District Court
Northern District of California

1    sides cite both Second Circuit and Ninth Circuit law, among other authorities.  In response to a

2    question by the Court at the hearing, counsel for PGA stated that it is unclear which law governs,

3    counsel for PIF and Mr. Al-Rumayyan stated that Ninth Circuit law applies, and both sides

4    indicated that the law of these two circuits does not differ on the relevant issue and therefore the

5    choice of law is not determinative.  Dkt. 221 (1/13/23 Hrg. Tr.) at 6-7, 7-8.

6    **IV.    ADMINISTRATIVE MOTIONS TO SUPPLEMENT RECORD**

7            After briefing on the motion to compel and motion to quash was complete, each side filed

8    an administrative motion to supplement the record.  PGA moved to file a Subscription and

9    Shareholders' Agreement produced by LIV that relates to PIF's investment in LIV (Dkt. 208-1 -

10   the "Subscription Agreement"), along with a supplemental memorandum in support of its motion

11   to compel and its opposition to the motion to quash (Dkt. 208-2).  Dkt. 209, 210.  PIF and Mr. Al-

12   Rumayyan moved to supplement the record with additional information regarding Saudi law.  Dkt.

13   211.  By agreement of the parties, each side addressed the other side's motion to supplement in

14   their own submissions and waived further briefing on the motions to supplement.  *See* Dkt. 209-1

15   ¶ 6; Dkt. 211-1 ¶ 5.

16           The Court addressed the administrative motions to supplement the record at the January

17   13, 2023 hearing.  The Court granted PGA's motion to supplement the record, on the grounds that

18   the Subscription Agreement was produced by LIV to PGA after the close of briefing on the

19   present motions and relates directly to the issues raised by the motions.  Dkt. 221 (1/13/23 Hrg.

20   Tr.) at 11-15.[1]  After the hearing and in accordance with the discussion at the hearing, PGA filed

21   its supplemental brief and the Subscription Agreement (Dkt. 225) and PIF and Mr. Al-Rumayyan

22   filed a response to PGA's supplemental filing (Dkt. 230).

23           The Court denied the motion of PIF and Mr. Al-Rumayyan to supplement the record on the

24

25   ─────────────────────
     [1]PIF and Mr. Al-Rumayyan argue that they did not delay production of the Subscription
26   Agreement and that production was "timely" because a LIV witness referenced the agreement in
     his November 22, 2022 declaration, PGA requested the document on November 28, 2022, and
27   LIV produced the document after privilege review.  Dkt. 230 at 11; Dkt. 230-1 ¶¶ 4-13.
     Nevertheless, PGA and Mr. Al-Rumayyan confirm that the document was not produced to PGA
28   until December 21, 2022.  Dkt. 230-1 ¶ 8.  This was several weeks after briefing on the present
     motion to compel and motion to quash was completed.

2023/02/09 16:40:14    10 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 11 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 9 of 58

1  grounds that they had failed to show good cause for not filing the additional material regarding

2  Saudi law earlier.   Dkt. 221 at 11-15.  As the Court explained, the subpoenas to PIF and Mr. Al-

3  Rumayyan were served on September 22, 2022, and PGA filed its motion to compel compliance

4  with the subpoenas in the Southern District of New York on October 2022.  *Id.* at 12.  PIF and Mr.

5  Al-Rumayyan filed their motion to quash the subpoenas in this Court on November 22, 2022,

6  which includes an argument that enforcement of the subpoenas would require them to violate

7  Saudi law.  Dkt. 165-3 at 16.  PIF and Mr. Al-Rumayyan therefore had ample time to develop

8  their arguments on this issue and to marshal the relevant supporting evidence.  Accordingly, PIF

9  and Mr. Al-Rumayyan have failed to demonstrate good cause for waiting until just days before the

10  hearing to seek introduce additional evidence on Saudi law.

11       Accordingly, as stated and for the reasons discussed at the hearing, PGA's administrative

12  motion to supplement the record at Dkt. 209-210 is **GRANTED**, and PIF and Mr. Al-Rumayyan's

13  administrative motion to supplement the record at Dkt. 211 is **DENIED.**

## V.     MOTION TO COMPEL AND MOTION TO QUASH SUBPOENAS TO PIF AND MR. AL-RUMAYYAN

### A.     Legal Standards

#### 1.     Motion to Compel

18       "At any time, on notice to the commanded person, the [party serving a Rule 45 subpoena]

19  may move the court for the district where compliance is required for an order compelling

20  production or inspection."  Fed. R. Civ. P. 45(d)(2)(B)(i).  As discussed above, under certain

21  circumstances the motion may be transferred to the court that issued the subpoena.  Fed. R. Civ. P.

22  45(f).  On a motion to compel compliance with discovery requests, the Local Rules in this District

23  require a party to "detail the basis for the party's contention that it is entitled to the requested

24  discovery and show how the proportionality and other requirements of Fed. R. Civ. P. 26(b)(2) are

25  satisfied."  N.D. Cal. Civ. L.R. 37-2.  An order compelling compliance with a subpoena "must

26  protect a person who is neither a party nor a party's officer from significant expense resulting from

27  compliance."  Fed. R. Civ. P. 45(d)(2)(B)(ii).  The court has discretion to determine whether to

28  grant a motion to compel.  *See Garrett v. City & Cnty. of San Francisco*, 818 F.2d 1515, 1519 (9th

United States District Court
Northern District of California

2023/02/09 16:40:14    11 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 12 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 10 of 58

1  Cir. 1987). At bottom, the court is vested with broad discretion to manage discovery. *Hunt v.*

2  *Cnty. of Orange*, 672 F.3d 606, 616 (9th Cir. 2012).

3  **2. Motion to Quash**

4  "On a motion to quash a subpoena, the moving party has the burden of persuasion . . . but

5  the party issuing the subpoena must demonstrate that the discovery sought is relevant." *Chevron*

6  *Corp. v. Donziger*, No. 12-MC-80237, 2013 WL 4536808, at *4 (N.D. Cal. Aug. 22, 2013)

7  (internal citation omitted); *see also Optimize Tech. Solutions, LLC v. Staples, Inc.*, No. 14-MC-

8  80095, 2014 WL 1477651, at *2 (N.D. Cal. Apr. 14, 2014) ("The party issuing the subpoena must

9  demonstrate that the information sought is relevant and material to the allegations and claims at

10  issue in the proceedings.").

11  **B. Sovereign Immunity – PIF**

12  PIF argues that under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.*

13  ("FSIA"), it is immune from enforcement of the subpoena issued by PGA. Dkt. 165-3 at 7-11.

14  FSIA provides that "a foreign state shall be immune from the jurisdiction of courts of the United

15  States and of the States," subject to several enumerated exceptions. 28 U.S.C. § 1604. FSIA

16  "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine*

17  *Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). "Under the Act, a foreign

18  state is presumptively immune from the jurisdiction of United States courts; unless a specified

19  exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign

20  state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

21  Once the party seeking sovereign immunity establishes a *prima facie* case that it is a

22  foreign sovereign within the meaning of FSIA, the burden shifts to the party opposing immunity to

23  make an initial showing that an enumerated exception to sovereign immunity applies. *Anglo-*

24  *Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 175 (2d Cir. 2010). "Determining

25  whether that burden is met involves a review of the allegations in the complaint and any

26  undisputed facts, and resolution by the district court of any disputed issues of fact." *Id.* "The

27  district court may look to evidence outside the pleadings and may hold an evidentiary hearing, if

28  one is warranted, in determining facts relevant to jurisdiction." *Id.*; *see also Figueroa v. Ministry*

10

2023/02/09 16:40:14    12  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 13 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 11 of 58

1  *for Foreign Affairs of Sweden*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016).  At the motion to

2  dismiss stage, when considering a motion to dismiss for lack of subject matter jurisdiction on the

3  basis of sovereign immunity, 'the Court generally must accept the material factual allegations in

4  the complaint as true, but does not draw all reasonable inferences in the plaintiff's favor.'"  *Pablo*

5  *Star Ltd. v. Welsh Gov't*, 378 F. Supp. 3d 300, 306 (S.D.N.Y. 2019) ("*Pablo Star I*"), *aff'd*, 961

6  F.3d 555 (2d Cir. 2020) ("*Pablo Star II*") (quoting *Figueroa*, 222 F. Supp. 3d at 307).

7  Once a party makes the "initial showing" that a FSIA exception applies, "the party

8  claiming immunity bears the burden of proving by a preponderance of evidence that the exception

9  does not apply."  *Pablo Star I*, 378 F. Supp. 3d at 306*; see also Embassy of the Arab Republic of*

10  *Egypt v. Lasheen*, 603 F.3d 1166, 1170 (9th Cir. 2010) (internal quotation marks and citation

11  omitted).  The party seeking sovereign immunity bears the ultimate burden of persuasion.  *Anglo-*

12  *Iberia*, 600 F.3d at 175; *see also Pablo Star II*, 961 F.3d at 560.

13  As used in FSIA, a "foreign state" includes a political subdivision, agency, or

14  instrumentality of a foreign state.  28 U.S.C. § 1603(a).  FSIA does not apply to claims against

15  individual state officials.  *Samantar v. Yousuf*, 560 U.S. 305, 325 (2010).  The parties to the

16  present motions agree that PIF, the sovereign wealth fund of the Kingdom of Saudi Arabia, is a

17  "foreign state" within the meaning of FSIA and that Mr. Al-Rumayyan, as an individual state

18  official, does not qualify as a "foreign state" under FSIA.  *See* Dkt. 147-3 at 13-17 and n.7; Dkt.

19  165-3 at 8-9 and 11-12.  Therefore, at issue is whether PIF falls into an exception to FSIA

20  immunity.  PGA argues that two of the enumerated exceptions to FSIA immunity apply in this

21  case:  the commercial activity exception and the waiver exception.  Dkt. 147-3 at 13-17.

### 1.    Commercial Activity Exception

23  FSIA's commercial activity exception abrogates sovereign immunity in cases in which the

24  action is based:  (1) "upon a commercial activity carried on in the United States by the foreign

25  state"; (2) "upon an act performed in the United States in connection with a commercial activity of

26  the foreign state elsewhere"; or (3) "upon an act outside the territory of the United States in

27  connection with a commercial activity of the foreign state elsewhere and that act causes a direct

28  effect in the United States."  28 U.S.C. § 1605(a)(2).  Here, PGA relies on the first and third

United States District Court
Northern District of California

2023/02/09 16:40:14    13    /63
Case 5:22-cv-04486-BLF    Document 499-1    Filed 09/07/23    Page 14 of 64
Case 5:22-cv-04486-BLF    Document 265 *SEALED*    Filed 02/09/23    Page 12 of 58

1   clauses.  *See* Dkt. 147-3 at 14-16, Dkt. 168-39 at 7-10; Dkt. 223-1 (PGA Hrg. Slides) at Slide 25.

2       After reviewing the allegations of the FAC and the counterclaim, as well as the evidence

3   and testimony in the record on the current motions, the Court finds that PGA has made an initial

4   showing that the commercial activity exception applies.  As discussed more fully below, PIF's

5   conduct in founding, funding, overseeing, and operating a professional golf league, LIV, is

6   commercial activity.  In light of PGA's initial showing, the burden shifts to PIF to prove, by a

7   preponderance of the evidence, that the exception does not apply.  *See Lasheen*, 603 F.3d at 1170.

8                   a.      **Commercial activity of PIF**

9       FSIA defines "commercial activity" as "either a regular course of commercial conduct or a

10  particular commercial transaction or act."  28 U.S.C. § 1603(d).  This definition "leaves the critical

11  term 'commercial' largely undefined."  *Pablo Star II*, 961 F.3d at 560 (quoting *Republic of*

12  *Argentina v. Weltover, Inc.*, 514 U.S. 607, 612 (1992)).  However, FSIA provides that "[t]he

13  commercial nature of an activity shall be determined by reference to the nature of the course of

14  conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C.

15  § 1603(d).  The "purpose" of the activity is "the *reason* why the foreign state engages in the

16  activity" and the "nature" of the activity is "the *outward form* of the conduct that the foreign state

17  performs or agrees to perform."  *Pablo Star II*, 961 F.3d at 561 (quoting *Nelson*, 507 U.S. at 361)

18  (emphasis in original).  A foreign instrumentality's conduct is commercial when it "acts, not as

19  regulator of a market, but in the manner of a private player within it."  *Weltover*, 504 U.S. at 614.

20  For example, "a foreign government's issuance of regulations limiting foreign currency exchange

21  is a sovereign activity, because such authoritative control of commerce cannot be exercised by a

22  private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity,

23  because private companies can similarly use sales contracts to acquire goods."  *Id.* at 614-15

24  (holding that Argentina's issuance of debt instruments was commercial in nature, despite

25  Argentina's argument that it issued the instruments to fulfill its obligations under a foreign

26  exchange program designed to address a domestic credit crisis).  In another example of this

27  distinction between sovereign conduct and commercial activity, where the Welsh government used

28  a company's copyrighted photographs of Welsh poet Dylan Thomas in a tourism campaign, the

United States District Court
Northern District of California

2023/02/09 16:40:14    14  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 15 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 13 of 58

1    court held that the conduct was commercial given its nature (publication of what were essentially

2    advertising materials) despite the fact that its purposes ("enhancing the image of the country and

3    the prosperity of its citizens") were "legitimate purposes for a sovereign to pursue." *Pablo Star II*,

4    961 F.3d at 562.

5    The Court must first decide what conduct it will consider in determining whether the

6    commercial activity exception applies.  PIF argues that PGA "cannot rely on LIV's alleged acts."

7    Dkt. 165-3 at 9.  PIF states that the requirement that commercial conduct be "carried on in the

8    United States by the foreign state itself" (clause 1 of section 1605(a)(2)) or be performed outside

9    the United States but cause a direct effect in the United States (clause 3) "have long been

10   interpreted to relate only to the conduct of the foreign state—*i.e.*, it is the foreign state that has to

11   have engaged in the activity that took place in the United States, or that has to have engaged in

12   acts elsewhere that have an effect inside the United States." *Id.* at 9-10 (quoting *Wye Oak Tech.,*

13   *Inc. v. Rep. of Iraq*, 24 F.4th 686, 700-01 (D.C. Cir. 2022)).  PIF goes on to assert that the conduct

14   of LIV, as a separate legal entity, cannot be attributed to PIF under section 1605(a)(2).  Dkt. 165-3

15   at 10.  PIF also characterizes its activities as consistent with those of a "typical" investor and

16   argues that the claims in this case have "nothing to do with PIF."  Dkt. 166-3 at 6; Dkt. 172-2 a5 3.

17   What PIF's argument misses is that PGA's invocation of FSIA's commercial activity

18   exception does not rest on LIV's activities in isolation from PIF or on the mere fact that PIF

19   invested in LIV.  Instead, PGA alleges and has presented evidence of ***PIF's own conduct*** in:

United States District Court
Northern District of California

13

2023/02/09 16:40:14  15 /63
Case 5:22-cv-04486-BLF  Document 499-1  Filed 09/07/23  Page 16 of 64
Case 5:22-cv-04486-BLF  Document 265 *SEALED*  Filed 02/09/23  Page 14 of 58

*see also* Dkt. 83 ¶ 103

("The LIV Golf League format was designed as a fan-friendly alternative to the PGA Tour.")

PIF's media and sponsorship strategy for LIV also targeted the United States market.  Dkt. 147-8.

***Funding LIV***:  PIF funded 100% of the start-up costs of LIV and owns 80 percent or more of LIV.  Dkt. 168-1 at Ex. 1 PDF p. 4; Dkt. 168-2; *see also* Dkt. 165-3 at 21 n.8 (statement by PIF that "[i]t is undisputed that PIF is the primary investor of LIV").  According to the FAC filed by LIV and the player-Plaintiffs, PGA has "monopsony power in the market for the services of professional golfers for elite golf events and its monopoly power in the market for the promotion of elite professional golf events."  Dkt. 83 ¶ 280.  Plaintiffs allege that "[t]o enter these markets, a competing elite golf promoter needs to raise at least hundreds of millions of dollars in capital" and take other steps.  *Id.*  Even LIV's "scaled-down" inaugural season of the eight-event LIV Golf Invitational Series in 2022 offered "more than $250 million in prize purses."  *Id* ¶ 169.  Although Plaintiffs claim that PGA's alleged anticompetitive conduct has caused them financial injuries (*see, e.g., id.* ¶¶ 171, 288, 290), LIV has had the resources, at least in the 2022 season, "to concentrate funds towards increasing upfront payments," "to make initial cash outlays to launch its product," and to withstand "higher costs and lost revenue" (*id.* ¶¶ 289, 298, 293).  In May 2022, LIV also announced that its plans for an expanded event schedule in 2023-2025 was backed by a $2 billion investment.  Dkt. 148-6 at Ex. 46.

2023/02/09 16:40:14    16  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 17 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 15 of 58

1    It follows from LIV's own allegations in the FAC that PIF's multi-billion dollar funding is

2    an existential imperative that enabled LIV to enter and compete in the relevant markets.

3    ***Overseeing LIV's operations:***

4

5

6

7

8

9

10    ***Directly involving itself in LIV's operations:***  PGA has also provided evidence that PIF

11    was directly involved in LIV's operations.  For example, it appears that

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    Mr. Al-Rumayyan was involved in LIV's discussions with possible sponsors and

United States District Court
Northern District of California

15

2023/02/09 16:40:14   17 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 18 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 16 of 58



PIF seeks to characterize its conduct with respect to LIV in a way to avoid a conclusion that PIF has engaged in commercial activity.  For example, PIF argues that "PIF does not **control** LIV's day-to-day operations," LIV's decision to file this lawsuit was "not **directed** by PIF," and "PIF's **Board** does not approve LIV's budget or budget changes." Dkt. 165-3 at 5 (emphasis added).  Mr. Al-Rumayyan's declaration on behalf of PIF also states that "[a]lthough PIF provides high level oversight for LIV Golf, Inc. through LIV Golf Investments Ltd., it does not exercise day-to-day control over its decisions or operations." Dkt. 166-4 ¶ 14.  These carefully-worded and conclusory denials do not overcome the evidence summarized above concerning PIF's own commercial activities.

The Court notes that PIF's conduct with respect to LIV is arguably consistent with the aim of PIF "to generate returns by investing its funds …. for the purpose of serving public interest;

United States District Court
Northern District of California

2023/02/09 16:40:14    18 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 19 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 17 of 58

promoting economic development in the Kingdom and diversifying its sources of income; and maintaining the interest of future generations." *See* Dkt. 166-4 at Ex. A. However, PIF does <u>not</u> argue that its conduct with respect to LIV is governmental, rather than commercial, in nature. And rightly so. As discussed above, whether conduct is sovereign or commercial depends on its nature or outward form, not its purpose. *Pablo Star II*, 961 F.3d at 561. "[I]n determining whether the commercial exception applies, courts do not ask whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives but whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a party engages in trade and traffic or commerce." *Everard Findlay Consulting, LLC v. Republic of Suriname*, 831 Fed. App'x 599, 600 (2d Cir. 2020) (citing *Pablo Star II*, 961 F.3d at 561) (internal quotation marks omitted); *see also Weltover,* 504 U.S. at 614.

It is plain that PIF is not a mere investor in LIV; it is the moving force behind the founding, funding, oversight, and operation of LIV. PIF's actions are indisputably the type of actions by which a private party engages in trade and traffic or commerce. Accordingly, the Court concludes that PIF has engaged in commercial activity within the meaning of section 1605(a)(2).

### b.  Clause 1:  Action based upon a commercial activity carried on in the United States by a foreign state

As discussed above, clause 1 of section 1605(a)(2) is an exception from FSIA immunity that applies where "the action is based [i] upon a commercial activity carried on in the United States by the foreign state." Section 1605(a)(2). Having concluded that PIF engaged in commercial activity, the Court must now determine whether that activity was "carried on in the United States by the foreign state" and whether this action is "based upon" that activity, as required to satisfy clause 1.[2]

### i.    Location of PIF's commercial activity

As used in clause 1, a "commercial activity carried on in the United States by a foreign

---

[2] As reasoned herein, the Court finds that limited discovery would be appropriate and necessary to find an exception under Clause 1. The Court finds that Clause 3 is satisfied without the need for further discovery. *See* section V.B.1.c., *infra*.

2023/02/09 16:40:14 19 /63
Case 5:22-cv-04486-BLF Document 499-1 Filed 09/07/23 Page 20 of 64
Case 5:22-cv-04486-BLF Document 265 *SEALED* Filed 02/09/23 Page 18 of 58

state," is defined as "commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e). "Exactly what constitutes 'substantial contact' for purposes of the FSIA is poorly defined" but "it is clear that Congress intended a tighter nexus than the 'minimum contacts' standard for due process." *Pablo Star II*, 961 F.3d at 565 (quoting *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1019 (2d Cir. 1991)); *see also Sachs v. Republic of Austria*, 737 F.3d 584, 598 (9th Cir. 2013) (en banc), *rev'd on other grounds by OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015) ("It is generally agreed that ['substantial contact'] sets a higher standard for contact than the minimum contacts standard for due process").

A foreign government's commercial activity may have "substantial contact with the United States" even though some relevant activity took place abroad. For example, in *Pablo Star II*, the Second Circuit affirmed a district court decision finding that the commercial activity exception in clause 1 of section 1605(a)(2) applied to the Welsh government's distribution of tourism materials in New York, even though the government's tourism strategy was formulated in Wales, all electronic storage and distribution of the tourism materials occurred from computers and servers located in the United Kingdom, and all of its offices in the United States were located in U.K. embassies and consulates. 961 F.3d at 565-66. The court explained that "[t]he point here is not whether the Welsh Government maintained an office in New York, or whether that office was located in a consulate or a commercial office building." *Id.* at 566. Instead, the Welsh Government's commercial activity had substantial contact with the United States because the tourist materials were displayed and distributed in the United States and some were printed here. *Id.* Indeed, some of the material "could have been useful only if distributed for use in New York." *Id.*

In *Lasheen*, the Ninth Circuit held that the commercial activity exception in clause 1 of section 1605(a)(2) applied to the Egyptian government where the government's education bureau had entered into a benefit services management agreement with a U.S.-based insurance company, Loomis, to provide administrative services for a health care benefits plan provided by the Egyptian embassy. *Lasheen*, 603 F.3d at 1169. Under the agreement, the Egyptian education bureau agreed to indemnify Loomis for claims brought against Loomis to recover benefits under the plan. *Id.*

2023/02/09 16:40:14   20   /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 21 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 19 of 58

There was evidence that all fees, premiums, and claim funds came directly from Egypt, the plan was funded entirely by the Egyptian government, and no documents related to the provisions and/or administration of the plan were ever approved or signed without the permission of the Egyptian government. *Id.* at 1171. The court rejected an argument by the Egyptian government that the commercial activity exception did not apply to the government, even if did apply to the Egyptian embassy and education bureau, holding that this evidence "supports a determination that Egypt was involved in both the provision and administration of the Plan" and "rebut[s]" an argument that Loomis could point to no specific conduct of Egypt within the United States forming an element of its claims. *Id.* The court noted that the fact that Loomis and the Egyptian education bureau were located in the United States "leads us to conclude that Egypt's commercial activities had substantial contact with the United States." *Id.* (quotation marks omitted). The court also found that Loomis's claims against all three Egyptian defendants arose out of the defendants' direct involvement with commercial activity within the United States. *Id.*

Similarly, in *Everard Findlay Consulting*, the Second Circuit found that the commercial activity of the Republic of Suriname, which had engaged a company based in the United States to develop a strategic branding campaign for Suriname, had substantial contact with the United States where Suriname chose to deal with an American company, key contractual negotiations allegedly occurred in New York, many aspects of the contract were performed in New York, and the contract targeted the United States travel market. 831 Fed. App'x at 601.

As discussed above, PIF has engaged in commercial activity in the founding, funding, oversight, and operation of LIV, and that activity targeted the United States market. PIF nevertheless argues that "any relevant activity occurred outside the U.S." Dkt. 165-3 at 9. PIF states that although "PIF employees have attended meetings related to LIV Golf, Inc. in the United States to observe and show support," it has not "purposefully undertaken or consummated [any transaction] related to LIV Golf, Inc. in the United States." Dkt. 166-4 ¶ 15; *see also* Dkt. 165-3 at 14 (arguing, in connection with minimum contacts analysis for personal jurisdiction, that "[a]ny financing or oversight by PIF takes place *abroad*" (emphasis in original)). This raises the question of exactly **where** PIF's commercial activity took place. Limited discovery would be necessary to

2023/02/09 16:40:14    21  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 22 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 20 of 58

1    determine this issue.  At the hearing, PIF's counsel argued that although courts have sometimes

2    ordered discovery to determine the availability of sovereign immunity under FSIA, this case is

3    distinguishable because PGA has already received approximately 100,000 documents from LIV.

4    According to PIF's counsel, if there was evidence of PIF's commercial activities with respect to

5    LIV, it would be cited in the documents produced by LIV.  However, because, as discussed above,

6    PIF itself has engaged in commercial activities, the Court concludes that targeted discovery from

7    PIF regarding its own activities would be necessary and appropriate.

ii.    **Nexus between this action and PIF's commercial activity carried on in the United States**

To determine whether the commercial activity exception set forth in clause 1 of section

1605(a)(2) applies, the Supreme Court has explained that evaluating whether an action is "based

upon" a commercial activity carried on in the United States by a foreign state "first requires a

court to identify the particular conduct on which the [plaintiff's] action is based." *OBB

Personenverkehr*, 577 U.S. at 33 (internal quotation marks and citations omitted).  The court must

identify that particular conduct by looking to the "basis or foundation" for a claim; those elements

that, if proven, would entitle a plaintiff to relief; and the "gravamen of the complaint." *Id.* at 33-

34 (internal quotation marks and citations omitted); *see also Lasheen*, 603 F.3d at 1170-71.  The

mere fact that certain conduct would establish a single element of the claim is insufficient to

demonstrate that the claim is "based upon" that conduct for purposes of section 1605(a)(2). *OBB

Personenverkehr*, 577 U.S. at 34.  Nor is it sufficient under the first clause of section 1605(a)(2)

that the foreign entity's activities "led to the conduct that eventually injured" the plaintiff. *Nelson*,

507 U.S. at 358.  "The only reasonable reading of the ["based upon" language in clause 1] calls for

something more than a mere connection with, or relation to, commercial activity." *Id.* at 357–58.

However, to identify whether an action is "based upon" a foreign state's commercial activity in the

United States, the court is not required to undertake an "exhaustive claim-by-claim, element-by-

element analysis" of each cause of action. *OBB Personenverkehr*, 577 U.S. at 34.  Instead, the

court looks to "the overall question where a lawsuit's foundation is geographically based."

*Atlantica Holdings v. Sov. Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 108 (2d Cir. 2016).

United States District Court
Northern District of California

1    PGA argues that PIF's conduct is the basis, within the meaning of clause 1 of section

2    1605(a)(2), of both PGA's counterclaim for tortious interference with contract and LIV's claim

3    that PGA has illegally prevented it from entering the relevant markets.  Dkt. 168-39 at 8-9.

4    Turning first to PGA's counterclaim, PGA alleges a single cause of action against LIV for tortious

5    interference with contract.  Dkt. 108.[3]  The basis for PGA's counterclaim is that LIV allegedly

6    interfered with PGA's contractual relationships with the Plaintiffs who now play for LIV.  *See id.*

7    ¶¶ 55-64.  In the counterclaim, PGA cites PIF's financing and oversight of LIV, including its

8    commitment to LIV of at least $2 billion to date.  *Id.* ¶¶ 6, 16.  PGA alleges that "LIV's funding

9    through PIF grants it access to nearly unlimited resources from the Saudi government and allows it

10   to operate without consideration of profitability" and that LIV has used PIF's funding "to pay

11   nine-figure advances to some PGA TOUR members, provide free and/or significantly reduced

12   tournament tickets to spectators, and fully fund all its operational costs, including hundreds of

13   millions of dollars in tournament purses."  *Id.* ¶ 17.  According to PGA, "[w]ith the backing of

14   PIF, LIV has the luxury of operating at a loss for as long as it needs to accomplish its goals."  *Id.*

15   PGA explains how LIV has allegedly used its "limitless" funding to pay golfers to join LIV.  *Id.*

16   ¶ 18.  PGA also alleges that LIV's "actual objective is to further the interests of the Saudi Arabian

17   government and PIF."  *Id.* ¶ 19.  These allegations establish that PIF's conduct, particularly its

18   financial backing of LIV, is essential to PGA's theory that LIV interfered with PGA's contracts

19   with golfers.

20        Turning next to the allegations of the First Amended Complaint, PIF's argument that the

21   claims in this case have nothing to do with it relies on an overly narrow reading of Plaintiffs'

22   claims.  The FAC is replete with allegations that LIV was designed and intended to compete with

23   PGA.  *See, e.g.,* Dkt. 83 ¶ 319 ("The only viable competitor to the PGA Tour's dominant market

24   position in [the market for the promotion of elite professional golf events in the United States (or,

25   alternatively, in the world)] is LIV Golf"); *id.* ¶ 335 (asserting that if not enjoined, PGA's conduct

26

27   ─────────────────
     [3] As noted above, after these subpoena-related motions were briefed and argued, PGA filed a
     motion to amend its counterclaim to add PIF and Mr. Al-Rumayyan as parties.  Dkt. 238.  That
28   motion is pending.  This order analyzes the "based upon" requirement of clause 1 in section
     1605(a)(2) in the context of the operative FAC (Dkt. 83) and the existing counterclaim (Dkt. 108).

2023/02/09 16:40:14    23 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 24 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 22 of 58

"will forever destroy the competitive viability of the only potential challenger to the Tour's monopoly and monopsony power"); *id.* ¶ 361 (LIV Golf is "the only viable alternative in the relevant market" for the services of professional golfers). And again, as discussed above, PIF played an essential role in the founding, financing, oversight, and operation of LIV.

A review of the counterclaim and FAC establish that PIF's conduct is not merely "relevant" to the Parties' claims, as PIF suggests. Dkt. 172-2 at 2-3. However, to thoroughly analyze whether this action is "based upon a commercial activity carried on in the United States" by PIF, as required under clause 1 of section 1605(a)(2), it first would be necessary to pinpoint which of PIF's relevant commercial activity was "carried on in the United States" as opposed to elsewhere. As discussed above, targeted discovery would be necessary to resolve that issue.

In sum, PIF itself has engaged in commercial activity. Targeted discovery would be needed to determine which of that activity took place in the United States. Once those facts are established, the Court would be in the position to evaluate whether this action is "based upon" that activity in the United States within the meaning of clause 1 of section 1605(a)(2). However, it is not necessary to proceed with such discovery at this time because as discussed below, the existing record establishes that the commercial activity exception in clause 3 of section 1605(a)(2) applies.

        **c.**    **Clause 3: Action based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States**

Clause 3 of section 1605(a)(2) sets forth an exception to FSIA immunity where an action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. PGA argues that "even if PIF's management of LIV mostly occurs abroad, such activity nevertheless constitutes commercial activity that 'causes a direct effect in the United States'" within the meaning of clause 3. Dkt. 147-3 at 16. PIF counters by arguing that LIV's alleged interference is not a "direct effect" of PIF's activities and that "[t]his action is no more 'based upon' PIF's foreign conduct than its U.S. conduct." Dkt. 165-3 at 10; Dkt. 172-2 at 3.

To satisfy the requirement that the commercial activity outside the United States caused a

1   direct effect inside the United States, it is not necessary that the effect be substantial or

2   foreseeable, although it must be more than trivial, remote, or attenuated. *Weltover*, 504 U.S. at

3   618. "[A]n effect is direct if it follows as an immediate consequence of the defendant's …

4   activity." *Id.* (internal quotation marks and citation omitted). A consequence is "immediate" if no

5   intervening act breaks "the chain of causation leading from the asserted wrongful act to its impact

6   in the United States." *Intercontinental Indus. Corp. v. Luo*, No. LA CV10-04174 JAK (Ex), 2016

7   WL 11757610, at *11 (C.D. Cal. Sep. 27, 2016) (quoting *Lyon v. Agusta S.P.A.*, 252 F.3d 1078,

8   1083 (9th Cir. 2001)).

9        To the extent PIF's commercial activity in connection with the formation, funding,

10   oversight, and operation of LIV took place in Saudi Arabia or elsewhere outside the United States,

11   it nevertheless caused a direct effect inside the United States. As discussed above,

12

13

14

15

16

17

18

19   According to PGA's counterclaim, LIV operated just as PIF planned, using its access to "early

20   unlimited resources from the Saudi government" to pay large advances to players and offer large

21   tournament purses and induce a number of PGA players to sign long-term, exclusive contracts

22   with LIV "make it impossible for LIV Players to meet their contractual obligations to" PGA. Dkt.

23   108 ¶¶ 16-23. As a result, PGA claims it has suffered damage and been forced "to spend

24   considerable resources defending its structure and reputation." *Id.* ¶ 69. Accordingly, the

25   requirement in clause 3 that PIF's commercial acts outside the United States cause a direct effect

26   in the United States is satisfied.

27        Clause 3 also requires that the action be based upon acts performed outside the United

28   States in connection with a commercial activity elsewhere. Section 1605(a)(2). This language

United States District Court
Northern District of California

2023/02/09 16:40:14    25  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 26 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 24 of 58

1  differs from clause 1 of section 1605(a)(2) which, as discussed above, requires that the action be

2  "based upon a commercial activity carried on in the United States by the foreign state."

3  "Distinctions among descriptions juxtaposed against each other are naturally understood to be

4  significant … and Congress manifestly understood there to be a difference between a suit 'based

5  upon' commercial activity and one 'based upon' acts performed 'in connection with' such

6  activity." *Nelson*, 507 U.S. at 357–58.  The Supreme Court in *Nelson* indicated that the "based

7  upon" language in clause 1 "calls for something more than" clause 3's requirement of "a mere

8  connection with, or relation to, commercial activity."  *Id.* at 357–58.  For the reasons already

9  discussed, PGA's counterclaim against LIV is based upon commercial acts of PIF involving the

10  founding, funding, oversight, and operation of LIV within the meaning of clause 3.

### d.    Conclusion on commercial activity exception to FSIA

12      The Court concludes that PIF falls within the commercial activity exception in clause 3 of

13  section 1605(a)(2) and therefore is  not immune from enforcement of the subpoena served by PGA

14  on PIF.  In light of this conclusion, it is unnecessary for the Court to order the additional

15  jurisdictional discovery that would be necessary to determine if PIF also falls within the exception

16  in clause 1 of that statute.

### 2.    Waiver Exception

18      PGA argues that the waiver exception to FSIA immunity also applies to PIF.  Dkt. 147-3 at

19  16-17.  An exception to FSIA immunity exists where the foreign instrumentality has waived its

20  immunity either explicitly or by implication.  28 U.S.C § 1605(a)(1).  PGA does not argue that PIF

21  explicitly waived sovereign immunity, but instead relies on the FSIA exception for implicit

22  waiver.  Dkt. 147-3 at 16-17.

23      "The FSIA's waiver exception is narrowly construed.... With respect to implicit waivers,

24  the courts have found such waivers in cases where a foreign state has agreed to arbitration in

25  another country or where a foreign state has agreed that the law of a particular country should

26  govern a contract.  An implicit waiver would also include a situation where a foreign state has

27  filed a responsive pleading in an action without raising the defense of sovereign immunity." *In re*

28  *Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2018 WL 659084, at *6 (N.D. Cal.

United States District Court
Northern District of California

2023/02/09 16:40:14    26  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 27 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 25 of 58

United States District Court
Northern District of California

1    Feb. 1, 2018) (citations omitted). The Ninth Circuit has also recognized implicit waiver where a

2    written agreement entered into by the foreign sovereign contemplates adjudication of a dispute in

3    the United States courts. *See Barapind v. Gov't of Republic of India*, 844 F.3d 824, 829 (9th Cir.

4    2016).

5       At the time it filed the motion to compel compliance with the subpoenas to PIF and Mr.

6    Al-Rumayyan, PGA's waiver argument was premised on "information and belief" that PIF

7    authorized or agreed to the filing of this lawsuit against PGA in this District. Dkt. 147-3 at 16-17;

8    Dkt. 168-39 at 10-11. In support of this assertion, PGA noted that PIF is represented by the same

9    law firm as LIV and the player-Plaintiffs. Dkt. 147-3 at 16. PGA also contended that PIF controls

10    LIV's budget. Dkt. 148-3 at 16-17; Dkt. 147-12. Dkt. 169-39 at 10; Dkt. 168-18. PGA argues

11    that LIV's budget "would have to account for the legal fees necessary to fund this litigation." Dkt.

12    147-3 at 17.

13       In accordance with the Court's order permitting PGA to supplement its briefing on the

14    subpoena motions, PGA submitted a supplemental memorandum together with a copy of the

15    Subscription and Shareholders' Agreement, which PGA contends governs the relationship

16    between PIF and LIV and bears on the issue of waiver. Dkt. 208-1 (the "Subscription

17    Agreement"), 208-2. PGA argues that the Subscription Agreement "is crystal clear that PIF's

18    consent is *required* for 'the initiation and the subsequent conduct of any [] litigation." Dkt. 208-2

19    at 2 (citing Dkt. 208-1 at 47) (emphasis in original). In support of this argument, PGA cites

20

21

22

23

24

25

26

---

27    [4] PIF does not contest PGA's assertions that the Subscription Agreement "governs the relationship

28    between PIF and LIV" (Dkt. 208-2 at 1) and that the provisions of the Reserved Matters schedule
to the Subscription Agreement apply to LIV (Dkt. 208-2 at 3). *See* Dkt. 229-3.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8    The Court finds that PGA has made an initial showing that the waiver exception applies by

9

10

11    Dkt. 208-1 at Schedule 5, p. 44.  In light of PGA's

12    initial showing, the burden shifts to PIF to prove, by a preponderance of the evidence, that the

13    exception does not apply.  *See Lasheen*, 603 F.3d at 1170.

14    PIF argues that its purported approval of LIV's finances and retention of the same lawyers

15    does not amount to an implicit waiver of sovereign immunity, which is construed narrowly.  Dkt.

16    165-3 at 10-11.  PIF also accuses PGA of "misreading" the Subscription Agreement.  Dkt. 229-3

17

18

19

20

21

22    *Id.* (emphasis in original).

23    It appears from the parties' arguments that they agree that the relevant issue in relation to

24    the waiver exception to sovereign immunity under FSIA is whether PIF authorized the filing of

25    this lawsuit.  Because, as discussed above, the Court found that PGA made an initial showing that

26    the waiver exception applies, the burden is on PIF to show that it did not waive its sovereign

27    immunity.  The parties' disagreement about the proper interpretation of the Subscription

28    Agreement, which focuses on whether the requisite approval by PIF directors of the initiation and

2023/02/09 16:40:14    28    /63
Case 5:22-cv-04486-BLF    Document 499-1    Filed 09/07/23    Page 29 of 64
Case 5:22-cv-04486-BLF    Document 265 *SEALED*    Filed 02/09/23    Page 27 of 58

1    subsequent conduct of litigation can be regarded as the approval of PIF itself, somewhat misses

2    the key point:  did PIF actually authorize the initiation of this lawsuit?  PIF surely knows the

3    answer to that question, but the evidence it has provided does not provide a clear answer.  PIF

4    submitted the declaration of Tim Taylor, the Chief Financial Officer of LIV, in which Mr. Taylor

5    states that "LIV decided to enter this lawsuit.  PIF did not direct the decision." Dkt. 165-2 ¶ 2.

6    This statement does not address whether PIF approved or authorized the filing of the lawsuit.

7    Notably, Mr. Al-Rumayyan, Governor of PIF, does not address whether PIF authorized the filing

8    of the lawsuit in either of the declarations filed in connection with PIF's motion to quash.

9    Dkt. 166-4, 166-5.

10            The existing record is therefore inconclusive as to PIF's involvement (if any) in the

11    decision to file this lawsuit.  Although the Court might be justified in finding that PIF had failed to

12    carry its burden of showing that the waiver exception does not apply, it recognizes that the

13    evidence presented by PGA, while sufficient to make an initial showing that the waiver exception

14    applies, is not direct evidence of PIF's approval of this lawsuit.  Accordingly, the better course

15    would be to allow the parties to conduct discovery for the limited purpose of establishing the facts

16    necessary to a determination of whether the waiver exception applies.  *See First City, Texas–*

17    *Houston N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir.1998).

18            However, given the Court's conclusion that the commercial activity exception to FSIA

19    applies, it is not necessary to order discovery at this time for the purpose of determining whether

20    the waiver exception also applies.  *See generally Lasheen*, 603 F.3d at 1171-72 (finding that

21    because commercial activity exception applies "we need not address whether the waiver exception

22    also applies to these claims").

23            **C.    Common Law Immunity – Mr. Al-Rumayyan**

24            Mr. Al-Rumayyan argues that common law immunity precludes jurisdiction over him in

25    this matter. Dkt. 165-3 at 11-12.  "Common-law foreign sovereign immunity extends to

26    individual foreign officials for 'acts performed in their official capacity if the effect of exercising

27    jurisdiction would be to enforce a rule of law against the state.'"  *Dogan v. Barak*, 932 F.3d 888,

28    893-94 (9th Cir. 2019) (quoting Restatement (Second) of Foreign Relations Law § 66(f) (1965)).

United States District Court
Northern District of California

2023/02/09 16:40:14    29  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 30 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 28 of 58

United States District Court
Northern District of California

1   Common law immunity extends not only to a suit against a foreign official, but also to protect

2   such an official from the burdens of litigation.  *See Wultz v. Bank of China Ltd.*, 32 F. Supp. 3d

3   486, 496 (S.D.N.Y. 2014) (quashing subpoena served on former national security officer); *Giraldo*

4   *v. Drummond Co., Inc.*, 808 F. Supp. 2d 247, 249 (D.D.C. 2011), *aff'd*, 493 Fed. App'x 106 (D.C.

5   Cir. 2012) (former government official immune from testifying about "information he received

6   and acts he took in his official capacity").

7                        **1.       Common law immunity framework**

8           Case law on the issue of common law immunity refers to a "two-step procedure" under

9   which the diplomatic representative of the sovereign may request a "suggestion of immunity"

10  from the State Department before the district court considers the immunity issue.  *See, e.g.,*

11  *Samantar,* 560 U.S. at 311; *see also Wultz v. Bank of China Ltd.,* 32 F. Supp. 3d 486, 492–93

12  (S.D.N.Y. 2014).  This procedure reflects the fact that "foreign official immunity ultimately

13  belongs to the sovereign rather than the official."  *Wultz*, 32 F. Supp. 3d at 497 (citation omitted).

14  At the hearing, the Court noted that none of the briefs on the present motions discussed the first

15  step of seeking a suggestion of immunity from the State Department.  Dkt. 221 (1/13/23 Hrg. Tr.)

16  at 33.  From the discussion at the hearing, it appears that Mr. Al-Rumayyan did not seek a

17  suggestion of immunity from the State Department before he filed the present motion to quash.

18  *See id.* at 63-64.  PGA suggested at the hearing that his failure to make a request to the State

19  Department may constitute a waiver.  *Id.* at 33-34.  However, it appears that where, as here, the

20  foreign official does not request or receive a suggestion of immunity from the State Department,

21  the proper course is for the court to decide whether the requisites for common law immunity

22  exists.  *See Samantar*, 560 U.S. at 311-12.

23          At the second step of determining foreign official immunity, courts distinguish between

24  status-based immunity (which is reserved for diplomats and heads of state and attaches regardless

25  of the substance of the claim) and conduct-based immunity (which is afforded to any public

26  minister, official, or agent of the state with respect to acts performed in his official capacity if the

27  effect of exercising jurisdiction would be to enforce a rule of law against the state." *WhatsApp*

28  *Inc. v. NSA Group Techs. Ltd.*, 472 F. Supp. 3d 649, 664 (N.D. Cal. 2020) (citations omitted),

28

*aff'd*, 17 F.4th 930 (9th Cir. 2021).  Mr. Al-Rumayyan relies on conduct-based immunity.

Dkt. 165-3 at 11.

### 2.    Conduct-based immunity

Section 66(f) of the Restatement (Second) of Foreign Relations (1965) provides a three-part test under which conduct-based immunity applies where (1) the actor is a public minister, official, or agent of the foreign state; (2) the acts in question were performed in his official capacity; and (3) the exercise of jurisdiction would not serve to enforce a rule of law against the foreign state.  In *Samantar*, the Supreme Court "express[ed] no view on whether Restatement § 66 correctly sets out the scope of the common law immunity applicable to current or former foreign officials." 560 U.S. at 321 n.15.  A district court in the Southern District of New York recently remarked that it found no cases from the Second Circuit applying the section 66(f) factors.  *See United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229, at *6 (S.D.N.Y. Mar. 17, 2022).  However, a number of courts in the Ninth Circuit have utilized the section 66(f) test.  *See, e.g., Dogan*, 932 F.3d at 893-94; *Rosasen v. Kingdom of Norway*, No. 221CV05811JHWSP, 2022 WL 409679, at *6 (C.D. Cal. Feb. 10, 2022); *WhatsApp*, 472 F. Supp. 3d at 664.

It is undisputed that Mr. Al-Rumayyan satisfies the first requirement by virtue of his position with PIF, the Saudi wealth fund.  Mr. Rumayyan argues that the second factor is satisfied because PGA's subpoena seeks documents and testimony regarding acts he performed in his official capacity–specifically, information concerning his role as Governor of PIF.  Dkt. 165-3 at 11.  He also notes that the subpoena to him seeks the same documents as the subpoena to PIF and many requests concern PIF on their face.  Dkt. 172-2 at 4.  PGA counters that "Mr. Al-Rumayyan ***sits on the board of LIV's parent company*** ... , and is the ***'Chairman of the Board and the CEO and Commissioner' for the LIV Invitational Series.***"  Dkt. 168-39 at 16 (citing Dkt 148-5 at Ex. 37 and Dkt. 89-2) (emphasis in original).  The present record is unclear as to exactly what roles Mr. Al-Rumayyan holds with LIV and related entities, with Mr. Al-Rumayyan stating that he, "as PIF's representative, acts as Chairman" of LIV Golf Investments, which is "a separate legal entity from plaintiff in this lawsuit, but disputes that he is "CEO & Commissioner".  Dkt. 172-2.  However, the documents and deposition topics contained in the subpoena to Mr. Al-Rumayyan

United States District Court
Northern District of California

29

United States District Court
Northern District of California

1  demonstrate that most if not all of the information sought stems from his official capacity with

2  PIF.  The Court therefore assumes for purposes of the present motions that the subpoena from

3  PGA seeks documents and testimony from Mr. Al-Rumayyan acting in his official capacity.

4      Mr. Al-Rumayyan also claims that he meets the third requirement to be eligible for

5  conduct-based immunity because compelling him to produce documents or attend a deposition

6  "would enforce a rule of law against a foreign state because the documents are official documents

7  of Saudi entities or the Kingdom itself" and because PIF would be responsible for all costs and

8  activities associated with any document production or deposition, which is an apparent reference

9  to Restatement § 66(f).  Dkt. 165-3 at 12 (citing Dkt. 166-5 ¶ 2 and *Rosasen*, 2022 WL 409679, at

10  *6).  Analysis of this factor often considers whether a judgment against an individual foreign

11  official who is a defendant in an action would be enforceable against the foreign state's treasury or

12  would require the state to take specific action, which is not the situation here.  *See, e.g., WhatsApp*,

13  472 F. Supp. 3d at 665.  As to Mr. Al-Rumayyan's argument that PIF would incur costs associated

14  with Mr. Al-Rumayyan's compliance with the subpoena, these are "collateral effects" that are "too

15  attenuated to be equated with the direct fiscal impacts on the foreign state that are contemplated

16  by" section 66(f) of the Restatement.  *Lewis v. Mutond*, 918 F.3d 142, 147 (D.C. Cir. 2019)

17  (finding third requirement of section 66(f) not met despite argument that the action against a

18  foreign official would take him away from his official duties").  However, issuance of a subpoena

19  to a third-party foreign official has been found to "have the effect of enforcing a rule of law

20  against the state" where the information sought "relate[d] solely to 'political acts' that implicate

21  Israel's diplomatic relations with other nations" and the testimony could be used "in order for this

22  Court to pass judgment on the propriety of Israel's actions."  *Moriah v. Bank of China Ltd.*, 107 F.

23  Supp. 3d 272, 280 (S.D.N.Y. 2015).  Moreover, an individual official of Israel who received a

24  third party subpoena was also held to be entitled to conduct-based immunity even though the

25  subpoena "would not call into question" the actions of Israel or the official because "official

26  immunity operates not only as [a] shield from accusation or claims of wrongdoing" but "also

27  offers broad protection from a domestic court's jurisdiction."  *Wultz v. Bank of China Ltd.*, 32 F.

28  Supp. 3d at 496.  Because enforcement of the subpoena served on Mr. Al-Rumayyan would

2023/02/09 16:40:14    32  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 33 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 31 of 58

1  require him to provide documents and information regarding PIF, the Court finds that it would

2  "enforce the rule of law against a foreign state."

3      Accordingly, Mr. Al-Rumayyan satisfies the three requirements for conduct-based

4  immunity set forth in Restatement § 66(f). However, that does not end the Court's analysis of

5  whether Mr. Al-Rumayyan is entitled to immunity because it must also consider whether a

6  commercial activity exception applies to his conduct.

7          **3.      Commercial activity exception to common law immunity**

8      PGA argues that Mr. Rumayyan's conduct falls within a commercial activity exception to

9  common law immunity (Dkt. 168-39 at 15-16), whereas Mr. Al-Rumayyan argues that no such

10  exception exists (Dkt. 165-3 at 12 n.5; Dkt. 172-2 at 4-5). Evaluating this question requires a brief

11  discussion of the history of sovereign immunity.

12      "Foreign sovereign immunity is, and always has been, 'a matter of grace and comity on the

13  part of the United States, and not a restriction imposed by the Constitution.'" *Rep. of Argentina v.*

14  *NML Cap., Ltd.*, 573 U.S. 134, 140 (2014) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461

15  U.S. 480, 486 (1983)). Historically, "foreign sovereigns enjoyed absolute immunity in the U.S.

16  courts," and the judicial branch generally "deferred to the decisions of the political branches—in

17  particular those of the Executive Branch—on whether to take jurisdiction over actions against

18  foreign sovereigns and their instrumentalities." *Verlinden*, 461 U.S. at 486. In 1952, however, the

19  State Department announced its adoption of a "restrictive" theory of foreign sovereign immunity.

20  *Id.* at 486-87; *see also* Letter from Jack B. Tate, Acting Legal Advisor, Dep't of State, to Acting

21  Attorney General Philip B. Perlman (May 19, 1952). "Under this theory, 'immunity is confined to

22  suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a

23  foreign state's strictly commercial acts.'" *Samantar*, 560 U.S. at 312 (quoting *Verlinden*, 461 U.S.

24  at 487). After a period of "disarray," "Congress responded to the inconsistent application of

25  sovereign immunity by enacting the FSIA in 1976." *Samantar*, 560 U.S. at 313. "After the

26  enactment of FSIA, the Act—and not the pre-existing common law—indisputably governs the

27  determination of whether a foreign state is entitled to sovereign immunity." *Id.* However, as

28  discussed in section V.B. above, FSIA only applies to foreign states and instrumentalities, not

2023/02/09 16:40:14 33 /63
Case 5:22-cv-04486-BLF Document 499-1 Filed 09/07/23 Page 34 of 64
Case 5:22-cv-04486-BLF Document 265 *SEALED* Filed 02/09/23 Page 32 of 58

1   individual foreign officials. *Id.* at 325-26.

2          That brings us to the question raised by the present motions: whether there is a

3   commercial activity exception to the common law immunity available to individual foreign

4   officials. Courts in both the Second and Ninth Circuits have recently held that such an exception

5   exists. *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 350–51 (2d Cir. 2021), cert.

6   granted, 214 L. Ed. 2d 12, 143 S. Ct. 82 (2022) ("[A]ny foreign sovereign immunity at common

7   law also had an exception for a foreign state's commercial activity, just like FSIA's commercial

8   activity exception"); *United States v. Pangang Grp. Co., Ltd.*, No. 11-CR-00573-JSW-7-10, 2022

9   WL 580790, at *13 (N.D. Cal. Feb. 25, 2022) (holding that "[b]ecause the Court has determined

10  that the charged conduct is commercial in nature, it concludes the [foreign] Defendants are not

11  entitled to immunity under the common law," citing *Turkiye Halk Bankasi*). These cases both

12  involve criminal charges brought against foreign defendants and may be distinguishable from the

13  context in which the question of common law immunity has arisen in this case for additional

14  reasons. Moreover, the Supreme Court has granted certiorari in *Turkiye Halk Bankasi* on the

15  question of "[w]hether U.S. district courts may exercise subject-matter jurisdiction over criminal

16  prosecutions against foreign sovereigns and their instrumentalities under 18 U.S.C. § 3231 and in

17  light of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1441(d), 1602-1611." *Turkiye*

18  *Halk Bankasi,* 143 S. Ct. 82 (U.S. Oct. 3, 2022 ) (No. 21-1450). However, Mr. Al-Rumayyan fails

19  to address these and other authorities on this point, instead focusing on distinguishing the cases

20  cited by PGA and faulting PGA for "not citing to a single case applying a commercial activity

21  exception to common law sovereign immunity." Dkt. 165-3 at 12 n.5. Based on the current state

22  of the case law and the record in this case, the Court follows courts in the Second and Ninth

23  Circuits that have found that a commercial activity exception to common law immunity exists.

24  This conclusion is consistent with the fact that under the common law "restrictive" approach to

25  sovereign immunity that was announced in the 1952 Tate Letter, "immunity is confined to suits

26  involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign

27  state's strictly commercial acts." *Verlinden*, 461 U.S. at 487.

28          Mr. Al-Rumayyan argues that even if there is a commercial activity exception to common

United States District Court
Northern District of California

2023/02/09 16:40:14    34  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 35 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 33 of 58

1   law immunity, it does not apply to him for the same reasons PIF argues the FSIA exception for

2   commercial activity does not apply to it.  However, as discussed above, the Court has concluded

3   that PIF falls within the commercial activity exception to FSIA immunity.  Given Mr. Al-

4   Rumayyan's direct involvement in the relevant commercial activity of PIF, he falls within the

5   commercial activity exception to common law immunity.

6          Accordingly, the Court concludes that Mr. Al-Rumayyan is not entitled to common law

7   immunity from enforcement of the subpoena served by PGA.

8          **D.      Personal Jurisdiction**

9          PIF and Mr. Al-Rumayyan argue that the Court lacks personal jurisdiction over them.

10   Dkt. 165-3 at 12-16.  As a preliminary matter, the parties to these motions disagree about whether

11   the Court is required to analyze whether it has personal jurisdiction over PIF in light of the Court's

12   conclusion that the commercial activity exception to FSIA applies.  PGA argues that "[o]nce

13   jurisdiction is established under a FSIA exception, personal jurisdiction is 'automatic,' and no

14   further due process or minimum contacts analysis is required."  Dkt. 168-39 at 7 (citing *Samantar*,

15   560 U.S. at 325 n.20 and 28 U.S.C. § 1330).  PIF, on the other hand, argues that the Court is

16   required to evaluate whether it has personal jurisdiction over it as a non-party even if a FSIA

17   exception applies.  Dkt. 172-2 at 5.  According to PIF, both statutory and constitutional

18   requirements must be satisfied to exercise jurisdiction, and the authorities cited by PGA concern

19   only statutory jurisdiction.  *Id.* (citing *Pebble Beach v. Caddy*, 453 F.3d 1151, 1154-55 (9th Cir.

20   2006); *Shapiro*, 930 F.2d at 1020).  Because this issue is not fully developed in the briefs and

21   because, for the reasons discussed below, the Court finds that it has personal jurisdiction over PIF

22   in any event, the Court need not and does not reach a conclusion on the preliminary question of

23   whether an analysis of personal jurisdiction is required where a FSIA exception applies.

24          Turning to the requirements for the exercise of personal jurisdiction, California's long arm

25   statute allows the exercise of personal jurisdiction to the "full extent permissible under the U.S.

26   Constitution."  *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); Cal. Code Civ. P. § 410.10.[5]

27

28   [5] PIF and Mr. Al-Rumayyan assert that "'[t]he New York long-arm statute is 'largely identical'" to
    the California long-arm statute. Dkt. 165-3 at 13 n.6.  As discussed above, at the hearing, counsel

United States District Court
Northern District of California

1   Thus the party over whom jurisdiction is sought must have certain "minimum contacts" with the

2   forum state, "such that the maintenance of the suit does not offend traditional notions of fair play

3   and substantial justice." *Ranza v. Nike, Inc.*, 793 F. 3d 1059, 1068 (9th Cir. 2015) (quoting *Int'l*

4   *Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation

5   omitted)).

6       A federal district court may exercise either general or specific personal jurisdiction.

7   *Daimler AG*, 571 U.S. at 127-28.  General jurisdiction exists when the entity or individual has

8   contacts that "are so continuous and systematic as to render [them] essentially at home in the

9   forum State." *Id.* at 139 (internal quotation marks and citation omitted).  In contrast, specific

10  jurisdiction exists when the entity or individual has more limited contacts with the forum state, but

11  the plaintiff's claims arise out of or relate to those contacts.  *Id.* at 128.  Here, PGA does not argue

12  that the Court has general jurisdiction over PIF or Mr. Al-Rumayyan, and the parties focus instead

13  on specific jurisdiction.

14      The Ninth Circuit has established a three-prong test for whether a court can exercise

15  specific personal jurisdiction:  "(1) The non-resident [entity or individual] must purposefully

16  direct his activities or consummate some transaction with the forum or resident thereof; or perform

17  some act by which he purposefully avails himself of the privilege of conducting activities in the

18  forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which

19  arises out of or relates to [those] forum-related activities; and (3) the exercise of jurisdiction must

20  comport with fair play and substantial justice, *i.e.* it must be reasonable." *LNS Enter. LLC v.*

21  *Continental Motors, Inc.*, 22 F.4th 852, 859 (9th Cir. 2022).  "The [party asserting jurisdiction]

22  bears the burden on the first two prongs," and "the burden then shifts to the [other party] to present

23  a compelling case that the exercise of jurisdiction would be unreasonable." *Schwarzenegger v.*

24  *Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

25      The parties to the present motions agree that in this antitrust case, where federal statute

26  authorizes nationwide service of process, the relevant forum for the minimum contacts analysis is

27

28  for PIF and Mr. Al-Rumayyan took the position that Ninth Circuit law governs, and counsel for
    both sides agreed that the choice between Ninth Circuit and Second Circuit law is not dispositive.

United States District Court
Northern District of California

2023/02/09 16:40:14 36 /63
Case 5:22-cv-04486-BLF Document 499-1 Filed 09/07/23 Page 37 of 64
Case 5:22-cv-04486-BLF Document 265 *SEALED* Filed 02/09/23 Page 35 of 58

the United States as a whole, as opposed to New York, California, or any other local forum. Dkt. 147-3 at 19; Dkt. 221 (1/13/23 Hrg. Tr.) at 40, 79; *see also Shields v. Federation Internationale de Natation*, 419 F. Supp. 3d 1188, 1202 (N.D. Cal. 2019). Accordingly, the Court now looks at whether PIF and Mr. Rumayyan have sufficient minimum contacts with the United States to support an exercise of specific personal jurisdiction.

### 1. Purposeful direction

"The purposeful availment requirement ensures that a nonresident defendant will not be haled into court based upon 'random, fortuitous or attenuated contacts with the forum state." *Panavision Intern., L.P. v. Toeppen,* 141 F.3d 1316, 1320 (9th Cir.1998) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). In the Ninth Circuit, courts in tort cases "typically inquire whether a defendant purposefully directs his activities at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,* 433 F.3d 1199, 1206 (9th Cir.2006) (citing *Calder v. Jones,* 465 U.S. 783, 789 (1984)); *see also Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1111 (9th Cir. 2002). Under *Calder,* "the 'effects' test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food,* 303 F.3d at 1111.

This case involves (1) claims for antitrust violations, tortious interference, and breach of contract brought by LIV and several golfers against PGA, and (2) a counterclaim for intentional interference with contract brought by PGA against LIV. Dkt. 83, 102. As discussed in section V.B.1. above, the discovery sought from PIF and Mr. Al-Rumayyan relates to both the claims and counterclaim in this case. Due to the nature of the claims, the *Calder* "effects" test applies to determine whether PIF and Mr. Al-Rumayyan purposefully directed their conduct at the United States. *See Yahoo!*, 433 F.3d at 1206 (purposeful direction test typically applies in tort cases); *Shields,* 419 F. Supp. 3d at 1203 ("The parties do not dispute that courts in this circuit apply the 'purposeful direction' test to antitrust actions").

#### a. PIF

2023/02/09 16:40:14    37  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 38 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 36 of 58

PGA has met its burden of demonstrating that by engaging in the conduct discussed more fully in section V.B.1.a. above, PIF purposefully directed its conduct at the relevant forum, the United States by launching, financing, overseeing, and helping to operate a professional golf tour that has contracted for the services of golfers who live in the United States and that holds tournaments in the United States with the knowledge that it would "disrupt" the leading competing tour based in the United States. *See Shields,* 419 F. Supp. 3d at 1207 (finding that plaintiffs in antitrust class action had made a prima facie showing that international governing body for swimming "purposefully directed its anticompetitive conduct at the United States by knowingly interfering with USA Swimming and [International Swimming League, Ltd.'s] plans to host a competition in the United States").

PIF's arguments to the contrary are not persuasive. PIF argues that PGA cannot rely on LIV's contacts to establish personal jurisdiction over them but must instead: (1) show PIF's sufficient, direct contacts with the forum; (2) use the alter ego theory; or (3) under certain circumstances, use an agency theory. Dkt. 165-3 at 13-14; *see also Walden v. Fiore,* 571 U.S. 277, 284 (2014) (relationship between the defendant and the forum state must arise out of contacts that the "defendant himself" created). The Court's finding that PIF purposefully directed its activities to the United States does not rest on PIF's status as a "mere invest[or] in a U.S. company" *i.e.,* LIV, or otherwise rely on LIV's separate contacts with the United States. *See* Dkt. 165-3 at 13. Instead, PIF itself engaged in extensive activities with the necessary nexus to the United States in founding, funding, overseeing, and operating LIV. PIF acknowledges its

*(see, e.g.,* Dkt. 168-16, 168-17, 168-20, 168-38). As also discussed above, PIF was the driving force in establishing LIV in the United States. *See, e.g.,* Dkt. 168-1. Moreover, relevant activities of PIF outside the United States were aimed at the United States and are alleged to have caused harm that PIF knew was likely to be suffered in the United States. *See, e.g.,* Dkt. 168-1 at PDF p. 26

████████████████████████████████████████████████████

PIF's other arguments are variations on the same theme and fail for the same reasons. PIF argues that any financing or oversight by PIF takes place abroad, and therefore such conduct does not constitute contacts with the United States, even though it relates to a plaintiff (LIV) that resides here. Dkt. 165-3 at 14; Dkt. 166-4 ¶¶ 14-15. But as explained above, PIF's own contacts with the United States support the exercise of personal jurisdiction over PIF; it is not necessary to impute LIV's contacts to PIF. PIF also argues that its creation, funding, and oversight of LIV are "contacts with 'persons who reside [in the forum],' not the forum itself." Dkt. 165-3 at 14. In support of this argument, PIF quotes *Walden v. Fiore*, in which the Supreme Court held that the defendant's search of Nevada residents in a Georgia airport did not give rise to personal jurisdiction over the defendant in Nevada because the jurisdictional analysis required the court to inquire about whether the defendant's actions connected him to the forum, not merely to residents of the forum. *Walden*, 571 U.S. 277, 289 (2014). The Supreme Court emphasized that "[i]t is the defendant"—*i.e.*, the party over whom personal jurisdiction is sought—"not the plaintiff or third parties, who must create contacts with the forum State." *Id.* at 283. In *Way.com, Inc. v. Singh*, another Court in this District reconciled *Walden* with *Calder*. No. 3:18-cv-04819-WHO, 2018 WL 6704464, at *7-8 (N.D. Cal. Dec. 20, 2018). As explained in *Way.com*, in *Calder* held there was specific jurisdiction in California over an out-of-state reporter and editor because the effects of their actions in Florida were felt in California, where the subject of the allegedly libelous story lived and worked. *Id.* at *8 (citing *Calder*, 465 U.S. at 788-89). "By contrast with *Calder*, where the forum state was the focal point of the defendants' activities, in *Walden* the defendant 'never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada.'" *Way.com*, 2018 WL 6704464, at *8. Here, personal jurisdiction is not based on PIF's contacts with a forum resident (LIV) outside the forum (the United States). It is instead based on PIF's own activities. The United States was the focal point of PIF's activities because it sought to engage many golfers based in the United States, hold tournaments in the United States, and ████ the competing PGA Tour, which is based in the United States and which PIF described

2023/02/09 16:40:14   39  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 40 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 38 of 58

1  ████████████████████████████████████████████████████ Dkt. 168-

2  1 at PDF p. 6, 7.

3       Accordingly, PIF purposefully directed its activities at the United States.  It "knew and

4  intended that the consequence of [its conduct] would be felt [in the United States]." *Shields*, 419

5  F. Supp. 3d at 1209 (quoting *In re Western States Wholesale Natural Gas Antitrust Litig.*, 715

6  F.3d 716, 744 (9th Cir. 2013)).

7                **b.**    **Mr. Al-Rumayyan**

8       The fact that PIF satisfies the purposeful direction test does not mean that Mr. Al-

9  Rumayyan automatically satisfies the test.  Ordinarily, each relevant party's "contacts" with the

10  forum state must be assessed individually.  *In re Boon Global Ltd.*, 923 F3d 643, 652 (9th Cir.

11  2019).  The mere fact that a corporation is subject to local jurisdiction does not necessarily mean

12  its nonresident officers, directors, agents and employees can be sued locally as well.  *Calder*, 465

13  U.S. at 790.  Mr. Al-Rumayyan states in his declaration that he "did not conduct LIV Golf

14  business" during his "number of" visits to New York and that he has not "purposefully undertaken

15  or consummated any transaction related to LIV Golf or the Premier Golf League in the United

16  States, including in New York or California." Dkt. 166-5 ¶¶ 5-6.  These conclusory statements are

17  called into question by his attempt to characterize a LIV Golf tournament in New Jersey that he

18  attended in July 2022 as a "social event" and his apparent distinction between undertaking a

19  transaction related to LIV and attending the Super Bowl in Los Angeles in February 2022 to

20  "show support to LIV Golf and to talk to other attendees about LIV Golf's vision." Dkt. 166-5 at

21  ¶ 5.  In any event, Mr. Al-Rumayyan was personally involved in and himself carried out many of

22  PIF's activities in connection with the establishment, funding, oversight, and operation of LIV,

23  including these and other activities in the United States.  *See* section V.B.1.a., *supra*.  "[F]or

24  claims sounding in tort, a corporate officer can be subject to jurisdiction based on his own

25  sufficient individual contacts with the forum." *Youlin Wang v. Kahn*, No. 20-cv-08033-LHK,

26  2022 U.S. Dist. LEXIS 1536, at *42 (N.D. Cal. Jan. 4. 2022) (quoting *Ziegler v. Indian River*

27  *Cnty.*, 64 F.3d 470, 475 (9th Cir. 1995)).  Here, Mr. Al-Rumayyan has such sufficient contacts

28  with the United States forum.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

**c.      Conclusion on PIF and Mr. Al-Rumayyan's purposeful direction**

2      For the reasons discussed, by their own direct contacts, PIF and Mr. Al-Rumayyan

3 purposefully directed their activities at the United States. Their conduct in the United States was

4 deliberate and recurring, not "random, isolated, or fortuitous. *See Keeton v. Hustler Magazine,*

5 *Inc.*, 465 U.S. 770, 774 (1984). Because the witnesses' own contacts with the United States are

6 sufficient, it is not necessary to reach the question of whether LIV's conduct in the United States

7 can be imputed to PIF (or Mr. Al-Rumayyan) on an alter ego or agency theory.

8      **2.      Relation of claim to witnesses' activities in the United States**

9      PGA must next show that the claims in this case "arise out of or relate" to the forum-

10 related conduct of PIF and Mr. Al-Rumayyan. *See Daimler*, 571 U.S. at 127; *Schwarzenegger*,

11 374 F.3d at 802.[6] "The first half of that standard asks about causation; but the back half, after the

12 'or,' contemplates that some relationships will support jurisdiction without a causal showing."

13 *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, -- U.S. --, 141 S. Ct. 1017, 1026 (2021).

14 Thus a "strict causal relationship between the defendant's in-state activity and the litigation" is not

15 required, although "the phrase 'relate to' incorporates real limits, as it must to adequately protect

16 defendants foreign to a forum." *Id.*  The first two prongs of the test for specific personal

17 jurisdiction have a "unique relationship to one another" in which "[a] strong showing on one axis

18 will permit a lesser showing on the other." *LNS Enterprises*, 22 F. 4th at 859.

19      For similar reasons as those discussed in section V.B.1. above, the Court concludes that the

20 claims and counterclaim in this case "arise out of or relate to" the contacts between PIF, Mr. Al-

21 Rumayyan, and the United States.

22      **3.      Whether exercise of jurisdiction is unreasonable**

23      Because PGA has met its burden as to the first two prongs of the test for specific

24 jurisdiction, to avoid this Court's exercise of personal jurisdiction PIF and Mr. Al-Rumayyan must

25 "present a compelling case" that such exercise of jurisdiction would be unreasonable. *See*

26

27 ─────────────────

[6] In the subpoena context, the Second Circuit has endorsed a focus on "the connection between the nonparty's contacts with the forum and the discovery order at issue." *Gucci Am., Inc. v. Li*, 768 F.3d 122, 141 (2d Cir. 2014).

28

39

2023/02/09 16:40:14    41  /63
Case 5:22-cv-04486-BLF  Document 499-1  Filed 09/07/23  Page 42 of 64
Case 5:22-cv-04486-BLF  Document 265 *SEALED*  Filed 02/09/23  Page 40 of 58

United States District Court
Northern District of California

1  *Schwarzenegger*, 374 F.3d at 802; *Dole Food*, 303 F.3d at 1117 (noting that both domestic and

2  foreign defendants face a "heavy burden" once a plaintiff satisfies the first two prongs of specific

3  jurisdiction and must prove "a compelling case of unreasonableness to defeat jurisdiction").

4      In determining whether the exercise of personal jurisdiction is unreasonable, courts

5  consider several factors:  (1) the extent of the defendants' purposeful interjection into the forum

6  state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict

7  with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the

8  dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the

9  forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an

10  alternative forum. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122,

11  1132 (9th Cir. 2003).  No single factor is dispositive, courts must instead "balance all seven." *Id.*

12  "When the entity that may be subject to personal jurisdiction is a foreign one, courts consider the

13  *international* judicial system's interest in efficiency and the shared interests of the *nations* in

14  advancing substantive policies." *Asahi Metal Indus. Co. v. Super. Court of Cal., Solano County*,

15  480 U.S. 102, 115 (1987) (emphasis in original).

16      PIF and Mr. Al-Rumayyan do not directly address these factors other than to argue that

17  international comity concerns, distinct from those related to their sovereign immunity argument,

18  render the Court's exercise of personal jurisdiction over them unreasonable.  Dkt. 165-3 at 15-16.

19  Specifically, PIF and Mr. Al-Rumayyan assert that exercising jurisdiction over them would

20  unfairly subject them to jurisdiction based on typical "investor" activities like financing and

21  supervision and would violate principles of "fair play and substantial justice." *Id.* at 16.  They

22  also contend that enforcing the subpoenas here would force them to violate PIF's governing law

23  and general Saudi law against disclosure of confidential information.  *Id.*  With the briefing on the

24  motion to compel and motion to quash, PIF and Mr. Al-Rumayyan presented evidence of a

25  provision in the PIF governing law that prohibits disclosure of confidential information as well as

26  their understanding that other Saudi law prohibits disclosing official documents subject to

27  discipline, fines, and imprisonment.  Dkt. 166-4 ¶¶ 8-11 and Ex. A.  As discussed above, the Court

28  denied PIF and Mr. Al-Rumayyan's motion to supplement the record with additional evidence of

Saudi law as untimely by several months.

2023/02/09 16:40:14    42 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 43 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 41 of 58

PGA contends that it would be unfair to allow PIF and Mr. Al-Rumayyan to engage in the relevant activities in the United States while shielding themselves behind international comity arguments. Dkt. 168-39 at 14-15. PGA also argues that PIF and Mr. Al-Rumayyan have not shown that compliance with the subpoenas would violate Saudi laws and that, in any event, concerns about foreign secrecy laws can be overridden where the information sought is vital to the litigation and cannot be obtained elsewhere. *Id.* (citing *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475, 1477 (9th Cir. 1992)).

The Court accepts, for purposes of the present motions, the contention in PIF and Mr. Al-Rumayyan's main briefs on the subpoena-related motions that PIF's governing law and Saudi law prohibit disclosure of the information sought by the subpoenas. The Court also recognizes that "[l]itigation against an alien defendant creates a higher jurisdictional barrier than litigation against a citizen from a sister state because important sovereignty concerns exist." *Shields*, 419 F. Supp. 3d at 1211-12 (quoting *Harris Rutsky*, 328 F.3d at 1133). However, these concerns are not dispositive. *Shields,* 419 F. Supp. 3d at 1212 (citing *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1333 (9th Cir. 1984)). "[A] foreign-law prohibition will not always excuse compliance with a discovery order." *Richmark Corp.*, 959 F.2d at 1474. The interest of Saudi Arabia and PIF in secrecy "must be balanced against the interests of the United States and [the party seeking discovery] in obtaining the information." *Id.* The Supreme Court and the Ninth Circuit have endorsed the balancing test contained in the Restatement (Third) of Foreign Relations Law § 442(1)(c), under which factors relevant in deciding whether or not foreign statutes excuse noncompliance with discovery orders include:

> the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Id.* at 1475; *Societe Nationale Industrielle Aerospatiale v. United States District Court,* 482 U.S. 522, 544 n. 29 (1987). This list of factors is not exhaustive, and other factors that courts have considered include "the extent and the nature of the hardship that inconsistent enforcement would

2023/02/09 16:40:14    43 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 44 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 42 of 58

1    impose upon the person, ... [and] the extent to which enforcement by action of either state can

2    reasonably be expected to achieve compliance with the rule prescribed by that state." *Richmark*,

3    959 F.2d at 1475 (internal quotation marks and citations omitted).

4         As addressed more fully in section V.E.3. below, the document and deposition topics in the

5    subpoenas served on PIF and Mr. Al-Rumayyan are in some respects overly broad and

6    duplicative, and the Court will modify the subpoenas accordingly.  As modified, the information

7    sought is directly relevant and not available elsewhere and, as such, the factors that consider the

8    importance of the information requested and the specificity of the request weigh in favor of

9    enforcing the modified subpoenas.  *See Richmark*, 959 F.2d at 1475 (citation omitted).  The fact

10   that most or all of the information sought is located in a foreign country weighs against disclosure.

11   *Id.*  As for whether there are alternative means for obtaining the information sought, the Ninth

12   Circuit requires the alternative means to be "substantially equivalent" to the requested discovery.

13   *Id.* at 1475-76.  PIF and Mr. Al-Rumayyan argue that the subpoenas seek information that is also

14   available from LIV.  However, LIV does not have access to all of the same information and

15   documents as PIF and Mr. Rumayyan.  Indeed, as examined above, given PIF's and Mr. Al-

16   Rumayyan's direct involvement LIV's operations, PIF and Mr. Al-Rumayyan may have custody

17   and control of documents regarding LIV's operations that LIV does not.  The Court is modifying

18   the subpoenas to address overbreadth and burden, and PIF and Mr. Al-Rumayyan have not

19   suggested any alternative sources for this modified scope of information, which is unique to them.

20   *See id.* at 1476.

21        The factor requiring the Court to balance the national interests of each nation is "the most

22   important factor."  *Id.*  In assessing the strength of the interests of Saudi Arabia, the Court can

23   consider "expressions of interest by the foreign state," "the significance of disclosure in the

24   regulation ... of the activity in question," and "indications of the foreign state's concern for

25   confidentiality prior to the controversy."  *Id.* (quoting Restatement (Third) of Foreign Relations

26   Law § 442 comment c).  Here, although PIF and Mr. Al-Rumayyan have submitted some general

27   information about PIF governing law and other Saudi laws against the disclosure of confidential

28   information, they have not presented evidence that Saudi Arabia has expressed an interest in the

United States District Court
Northern District of California

2023/02/09 16:40:14    44  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 45 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 43 of 58

United States District Court
Northern District of California

1    outcome of the current disputes or, more importantly, in the secrecy of the specific information

2    sought in the subpoenas prior to the litigation in question.  *See id.*  They have not shown that the

3    Saudi government has an interest in maintaining the confidentiality of information sought, which

4    concerns the commercial activities of PIF and Mr. Al-Rumayyan in connection with a professional

5    golf tour and which PIF itself attempts to portray as "typical 'investor' activities." Dkt. 165-3 at

6    16.  The information sought by the subpoenas has not been shown to involve matters of national

7    security or other information the disclosure of which would adversely affect Saudi Arabia,

8    especially in light of the protective order in place in this case.  On the other side of the scale, the

9    United States has an interest in "vindicating the rights of American [parties]." *Richmark*, 959 F.2d

10   at 1477.  The United States also has an interest in ensuring that its courts are able to adjudicate

11   controversies involving American citizens where, as here, there has been no showing that the

12   production of relevant information in the hands of a third party would in any way harm the

13   interests of Saudi Arabia.

14        "The effect that a discovery order is likely to have on the foreign [entity from which

15   discovery is sought] is another factor to be considered," and if the foreign entity is likely to face

16   criminal prosecution in a foreign country for complying with the United States court order, that

17   fact constitutes a "weighty excuse" for nonproduction.  *Id.* (quoting *Societe Internationale,* 357

18   U.S. at 211).   PIF and Mr. Al-Rumayyan claim that they could face consequences, including

19   possible criminal prosecution, if they produce the requested information, although (unlike the

20   situation in *Richmark*) they have not provided evidence that the Saudi government has actually

21   ordered them to withhold the information or that they in fact are "between the Scylla of contempt

22   sanctions and the Charybdis of possible criminal prosecution." *Richmark*, 959 F.2d at 1477.

23        "If a discovery order is likely to be unenforceable, and therefore have no practical effect,

24   that factor counsels against requiring compliance with the order" and is a factor against

25   compelling discovery.  *Id.* at 1478.  When the Court asked counsel for PIF and Mr. Al-Rumayyan

26   at the hearing if they would comply with an order from the Court that they provide jurisdictional

27   discovery, counsel did not state that they would not so comply, and said he would have to discuss

28   with his clients. Dkt. 221 (1/13/23 Hrg. Tr.) at 57.  Counsel for PIF and Mr. Al-Rumayyan also

2023/02/09 16:40:14    45  /63
Case 5:22-cv-04486-BLF  Document 499-1  Filed 09/07/23  Page 46 of 64
Case 5:22-cv-04486-BLF  Document 265 *SEALED*  Filed 02/09/23  Page 44 of 58

expressed that his clients "deeply respect the U.S. courts and the U.S. court system." *Id.* In any event, "a clear statement that foreign [entities and individuals] which avail themselves of business opportunities in the United States must abide by United States laws might have a substantial effect on how [such entities, individuals, and others] do business in the United States in the future." *Richmark*, 959 F.2d at 1478. The Court finds this possible effect to be particularly salient in this case, where PIF and Mr. Al-Rumayyan have repeatedly highlighted the fact that PIF invests extensively in many United States companies. *See* Dkt. 165-3 at 4.

The record before the Court reflects PIF's intent "to benefit from the United States market" by launching a professional golf league that would engage U.S.-based players, play numerous tournaments in the United States, and compete with the U.S.-based PGA Tour. As such "the sovereign considerations weigh less heavily." *Shields*, 419 F. Supp. 3d 1188 (quoting *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1200 (9th Cir. 1988)). PIF and Mr. Al-Rumayyan have not established that international comity concerns should prevent the Court from ordering them to comply with PGA's subpoenas.

For the reasons discussed, the Court concludes that PGA has shown that PIF and Mr. Al-Rumayyan purposefully directed their activities at the United States and that the claims in this case and the subpoenas that are the subject of the present motions arise from or are related to these contacts. PIF and Mr. Al-Rumayyan, the parties objecting to jurisdiction, have not carried their burden of making a "compelling case" that the exercise of personal jurisdiction over them would be unreasonable. *See Bank Brussels Lambert*, 305 F.3d at 129. Accordingly, the Court concludes that it has personal jurisdiction over PIF and Mr. Al-Rumayyan.

### 4.    Tag Jurisdiction

PGA argues that even if PIF and Mr. Al-Rumayyan do not have sufficient minimum contacts, the Court has personal jurisdiction over them under tag jurisdiction. Dkt. 147-3 at 21-22. "'Tag jurisdiction' refers to a court's exercise of personal jurisdiction over an individual who is served, and thus 'tagged,' while physically present in the forum." *Sokolow v. Palestine Liberation Organization*, --- F.Supp.3d ---- 2022 WL 2159351 (S.D.N.Y. June 15, 2022); *see also Ridgway v. Phillips*, 383 F. Supp. 3d 938, 945 (N.D. Cal. 2019) ("the Ninth Circuit continues to recognize 'tag

United States District Court
Northern District of California

2023/02/09 16:40:14    46  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 47 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 45 of 58

1    jurisdiction,' the jurisdictional theory that 'personal service upon a physically present defendant

2    suffice[s] to confer jurisdiction, without regard to whether the defendant was only briefly in the

3    State or whether the cause of action was related to his activities there'" (quoting *Martinez v. Aero*

4    *Caribbean*, 764 F.3d 1062, 1067 (9th Cir. 2014)).   Tag jurisdiction is available not only with

5    regard to service of a summons and complaint, but also with regard to service of a subpoena under

6    Rule 45.   *In re Application for Order Quashing Deposition Subpoenas, dated July 16, 2002*, No.

7    M8-85, 2002 WL 1870084, at *2 (S.D.N.Y. Aug. 14, 2002).   "Given that an individual may be

8    subjected to liability by the exercise of so-called 'tag' jurisdiction far from home without the Due

9    Process Clause being violated, there is no reason why service of a subpoena under Rule 45(b)(2),

10   'which is simply a discovery mechanism and does not subject a person to liability, requires

11   more.'"   *Id.* (citing *In re Edelman*, 295 F.3d 171, 179 (2d Cir. 2002) and *First Am. Corp. v. Price*

12   *Waterhouse LLP*, 154 F.3d 16, 20 (2d Cir. 1998) (*"Price Waterhouse I"*).

13       PGA's tag jurisdiction argument rests on the Service Agreement, in which PIF and Mr. Al-

14   Rumayyan agreed that their counsel would treat sending the subpoena to their counsel "as if the

15   PGA Tour had personally delivered a copy of it to [the witness] in the United States."  Dkt. 148-2

16   at Ex. 5; *see also* Dkt. 147-3 at 22.   The Court rejects PGA's tag jurisdiction argument, for several

17   reasons.  First, tag jurisdiction exists only over natural persons, not corporations, even where a

18   corporate officer is served in the forum state.  *Martinez v. Aero Caribbean,* 764 F.3d 1062 (9th

19   Cir. 2014); *Ridgway,* 383 F. Supp. 3d at 945.  Although PIF is not a corporation, PGA has not

20   demonstrated that tag jurisdiction is permissible over an entity such as PIF.  Second, and more

21   fundamentally, the Court finds that the language in the Service Agreement agreeing to accept

22   service of the subpoenas "as if" they were personally delivered to the witnesses in the United

23   States is too attenuated a basis for the exercise of tag jurisdiction, which is premised on physical

24   presence.

25       Accordingly, tag jurisdiction does not apply.  However, as discussed above, the Court

26   concludes it has personal jurisdiction over PIF and Mr. Al-Rumayyan under a minimum contacts

27   analysis.

28

United States District Court
Northern District of California

2023/02/09 16:40:14   47 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 48 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 46 of 58

### E. Subpoena Formalities and Scope

In addition to their immunity and jurisdictional arguments, PIF and Mr. Al-Rumayyan argue that the subpoenas should be quashed because: (1) PGA failed to tender the witness fees required under Rule 45(b)(1) at the time the subpoenas were served; (2) the subpoenas violate the 100-mile limit of Rule 45(c); and (3) PGA violated its obligation under Rule 45(d)(1) to avoid imposing undue burden and expense on these non-party witnesses. Dkt. 165-3 at 17-24.

#### 1. Witness fees

PIF and Mr. Al-Rumayyan argue that the deposition subpoenas should be quashed because PGA did not tender witness fees at the time of service. Dkt. 165-3 at 17-18; *see also* Dkt. 166-1 ¶ 4. PGA does not contend that it tendered witness fees at the time it served the subpoenas on counsel for PIF and Mr. Al-Rumayyan. Instead, PGA argues that it had "no obligation to tender witness fees because counsel for PIF and Mr. Al-Rumayyan had already agreed to accept service of the subpoenas." Dkt. 168-39 at 17. PGA notes that once PIF and Mr. Al-Rumayyan objected to the subpoenas on the grounds of failure to pay witness fees, PGA tendered the fees. *Id.*; Dkt. 169-3 at Ex. 42.

Service of a Rule 45 subpoena requires personal delivery "and, if the subpoena requires that person's attendance, tendering the fees for 1 day's attendance and the mileage as allowed by law." Fed. R. Civ. P. 45(b)(1). Failure to simultaneously tender witness fees invalidates service of the subpoena. *CF & I Steel Corp. v. Mitsui & Co.* (USA), 713 F2d 494, 496 (9th Cir. 1983) (finding tender of fees 34 days after service of deposition subpoena and one week after notice of deficiency could not cure defect). Accordingly, courts in this District have quashed subpoenas calling for deposition testimony where the subpoenaing party failed to tender witness fees at the time of service. *See, e.g., Kwong Mei Lan Mirana v. Battery TaiShing Corp.*, No. C 08-80142 MISC. JF (RS), 2009 WL 290459, at *1 (N.D. Cal. Feb. 5, 2009); *S.F. Bay Area Rapid Transit Dist. v. Spencer*, No. C 04-04632 SI, 2006 WL 2734284, at *1 (N.D. Cal. Sept. 25, 2006); *see also Fujikura v. Finisar*, No. 15-mc-80110-HRL (JSC), 2015 WL 5782351, at *5 (N.D. Cal. Oct. 5, 2015) (collecting cases). "Failure to tender fees invalidates the service *with respect to the testimony*" and "does not invalidate the request for production of documents." *Mirana*, 2009 WL

United States District Court
Northern District of California

1    290459, at *2 (citing *First City, Texas-Houston, N.A. v. Rafidain Bank*, 197 F.R.D. 250, 266 n.6

2    (S.D.N.Y. 2000), *aff'd*, 281 F.3d 48 (2d Cir. 2002)) (emphasis added).  Moreover, in most if not

3    all instances in which a deposition subpoena has been quashed for failure to pay witness fees, the

4    order has been without prejudice to re-service of the subpoena accompanied by the requisite

5    witness fees. *See, e.g., Spencer,* 2006 WL 2734284, at *1.

6             The subpoenas served on PIF and Mr. Al-Rumayyan require them to both produce

7    documents and appear for deposition.  As discussed above, the requirement for payment of

8    witness fees in Rule 45(b)(1) applies only to subpoenas requiring the witness's attendance.

9    Therefore, to the extent PIF and Mr. Al-Rumayyan seek to quash the document production

10   portions of the subpoenas due to nonpayment of witness fees, that request is **DENIED**.  As to the

11   portions of the subpoenas calling for PIF and Mr. Al-Rumayyan to appear for depositions, PGA

12   has presented no authority for its argument than an agreement to accept service of subpoenas

13   waives the requirement for payment of witness fees.  Moreover, the Service Agreement in this

14   case was silent on the issue of payment of fees, and it contains a statement that PIF and Mr. Al-

15   Rumayyan "reserve all rights and privileges with respect" to the subpoenas.  Dkt. 148-2.

16   Accordingly, PGA's failure to simultaneously tender witness fees invalidates service of the

17   original subpoenas to the extent they require PIF and Mr. Al-Rumayyan to testify at deposition

18   and the deposition portions of the subpoenas are therefore **QUASHED.**  This order is **WITHOUT**

19   **PREJUDICE** to PGA's ability to re-serve PIF and Mr. Al-Rumayyan with deposition subpoenas.

20   PGA's re-service of the deposition subpoenas must be accompanied by the requisite witness fees.

21   The Court finds the Service Agreement, which provides for service of subpoenas on counsel for

22   PIF and Mr. Al-Rumayyan "[i]n this instance only" (Dkt. 148-2 at Ex. 5), remains in effect for re-

23   service of the subpoenas to PIF and Mr. Al-Rumayyan because that re-service concerns the same

24   "instance" covered by the Service Agreement.  The deposition topics in the re-served subpoena to

25   PIF must conform to the Court's modifications to the requests for production in the subpoena to

26   PIF, as discussed below in section V.E.3. and Exhibit A.

27             **2.       100-mile rule**

28             For subpoenas that command a nonparty witness to appear for deposition, the place set for

United States District Court
Northern District of California

47

2023/02/09 16:40:14 49 /63
Case 5:22-cv-04486-BLF Document 499-1 Filed 09/07/23 Page 50 of 64
Case 5:22-cv-04486-BLF Document 265 *SEALED* Filed 02/09/23 Page 48 of 58

1   deposition must be within 100 miles of where "the person resides, is employed, or regularly

2   transacts business in person." Fed. R. Civ. P. 45(c)(1)(A). Similarly, the place set for a nonparty

3   to produce documents pursuant to a Rule 45 subpoena must be "within 100 miles of where the

4   person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P.

5   45(c)(2)(A). Under Rule 45(d)(3), the court <u>must</u> quash or modify a deposition subpoena if it

6   "requires a person to comply beyond the geographical limits specified in Rule 45(c)." Fed. R.

7   Civ. P. 45(d)(3)(A)(ii); *see also AngioScore, Inc. v. TriReme Med., Inc.*, No. 12 CV 3393, 2014

8   WL 67068733, at *1 n.1 (N.D. Cal. Nov. 24, 2014).

9          The subpoenas at issue called for Mr. Al-Rumayyan and PIF to appear for depositions and

10  bring documents to those depositions. Dkt. 148-2 at Ex. 6 (subpoena to Mr. Al-Rumayyan) and

11  Ex. 7 (subpoena to PIF). The location for the depositions was identified Skadden, Arps, Slate,

12  Meagher & Flom LLP, One Manhattan West, New York, NY 10001 (the "NYC location"). *Id.*

13  Although Mr. Al-Rumayyan and PIF agreed to accept service of the subpoenas on their counsel

14  "as if the PGA Tour had personally delivered a copy" of the subpoenas (Dkt. 148-2 at Ex. 5), there

15  is no evidence before the Court that the parties met and conferred about the deposition location

16  before PGA issued the subpoenas. At the hearing on the present motions, PGA's counsel stated

17  that PGA picked the NYC location based on the convenience of the witnesses. Dkt. 221 (1/13/23

18  Hrg. Tr.) at 45.

19         Mr. Al-Rumayyan and PIF argue that the subpoenas must be quashed under Rule

20  45(d)(3)(A)(ii) because the NYC location is more than 100 miles from where they reside, are

21  employed, or regularly transact business in person. Dkt. 165-3 at 17. PGA does not contend that

22  PIF or Mr. Al-Rumayyan reside or are employed within 100 miles of the NYC location. *See*

23  Dkt. 147-3 at 24; Dkt. 168-39 at 17. Instead, PGA argues that the place set for compliance is

24  proper based on the deponents' business activities within 100 miles of the NYC location. *Id.*

### a.      Subpoena to Mr. Al-Rumayyan

26         The Court first considers whether Mr. Al-Rumayyan regularly transacts business in person

27  within 100 miles of the NYC location. PGA points to the following evidence in support of its

28  argument that the NYC location satisfies the 100-mile rule as to Mr. Al-Rumayyan:

United States District Court
Northern District of California

48

2023/02/09 16:40:14    50 /63
Case 5:22-cv-04486-BLF  Document 499-1  Filed 09/07/23  Page 51 of 64
Case 5:22-cv-04486-BLF  Document 265 *SEALED*  Filed 02/09/23  Page 49 of 58

- Mr. Al-Rumayyan attended various events in New York as discussed above, and also spoke at a summit hosted by a "PIF-run organization" in New York City in September 2022, appeared at the U.S. Chamber of Commerce in September 2022, appeared at a New York dinner hosted in his honor in November 2022, and invited LIV CEO Greg Norman to attend an ARAMCO event in New York City in October 2021  (*see generally* section V.B.1.a., *supra; see also* Dkt. 147-3 at 8-9, 24; Dkt. 147-11; Dkt. 148-4 at Exs. 28-30; Dkt. 148-5 at Exs. 34-35;

- Mr. Al-Rumayyan spent multiple days in 2022 conducting LIV-related business at LIV Golf Invitational in Bedminster, NJ, less than 50 miles from Manhattan (Dkt. 147-3 at 24);

- Mr. Al-Rumayyan admits taking 9 trips to or within 100 miles of New York City since January 1, 2021, for a total of 34 days. (Dkt. 168-39 at 17 (citing Dkt. 166-5 ¶ 6));

- Mr. Al-Rumayyan is quoted in a September 2020 news article that he comes to New York "often." (Dkt. 168-39 at 17 (citing Dkt. 169-3 at Ex. 41)); and

- Mr. Al-Rumayyan may have taken even more trips in previous years, before pandemic travel restrictions and opening of "PIF's New York City office" (Dkt. 168-39 at 17).

Mr. Al-Rumayyan argues that the evidence offered by PGA does not demonstrate that he regularly transacts business in person within 100 miles of the NYC location. Dkt. 165-3 at 17.  He states that he is a citizen of Saudi Arabia who resides in Riyadh, Saudi Arabia. Dkt. 166-5 ¶ 3. He contends that attendance at "one-off events" is not enough because it is irregular by definition. Dkt. 165-3 at 17; *see also* Dkt. 172-2 at 10.  Mr. Al-Rumayyan also characterizes some of his trips as having "attended social events, such as the LIV Golf tournament that was held in July 2022 in New Jersey," thereby apparently taking the position that such events do not constitute "transacting business." Dkt. 166-5 ¶ 6.  In addition, Mr. Al-Rumayyan explains that his cited comments that he comes to the United States "quite often" actually stated in full:  "I'm a frequent visitor to the U.S.-New York, Miami, San Francisco.  Some of our portfolio companies are there, so I do go quite often." Dkt. 172-2 at 10 (citing Dkt. 169-3 at Ex. 41).  Mr. Al-Rumayyan points out that this statement "contains no specifics of [his] frequency of visits to *New York*, the only venue that matters." *Id.* (emphasis in original).

2023/02/09 16:40:14    51 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 52 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 50 of 58

1    As a preliminary matter, the Court notes that the inquiry into whether an individual

2    "regularly transacts business in person" within the meaning of Rule 45(c) is different than the

3    minimum contacts analysis for personal jurisdiction.  *See Regents of the Univ. of Cal. v. Kohne*,

4    166 F.R.D. 463, 464 (S.D. Cal. 1996).  An individual may have sufficient minimum contacts to

5    give rise to personal jurisdiction, but those contacts may not reach the level of "regularly

6    transacting business" within 100 miles of the place set for compliance with a subpoena.  For

7    example, as discussed above, in this case the Court can take into account the contacts of Mr. Al-

8    Rumayyan and PIF with the United States as a whole in determining whether it has personal

9    jurisdiction; however, that does not mean that they regularly transact business in person within

10   100 miles of the NYC location.  Therefore, the Court must necessarily evaluate

11   Mr. Al Rumayyan's activities in the context of the 100-mile rule under Rule 45(c) even though it

12   has already concluded that it has personal jurisdiction over Mr. Al-Rumayyan.

13   "Although Rule 45 does not state with what regularity a person must transact business in a

14   certain location to amount to a place where one regularly transacts business, infrequent visits do

15   not qualify as regular transaction of business within the meaning of Rule 45(c)(1)(A)."  9 Moore's

16   Federal Practice - Civil § 45.51 (2022).  "Courts examine the frequency and duration of a person's

17   business trips over a given period of time to determine whether the visits are sufficient to qualify

18   as regularly transacting business." *Dietz v. Spangenberg*, 2014 U.S. Dist. LEXIS 17046, *12-13

19   (D. Minn. 2014).

20   Courts have found that the "regularly transacts business in person" requirement was

21   satisfied where, for example:  the nonparty employee who was served with a subpoena traveled to

22   the relevant area for business four times per year, staying approximately ten days per trip, over a

23   ten-year period (*Halliburton Energy Servs., Inc. v. M-I, LLC,* No. H06MC00053, 2006 WL

24   2663948, at *2 (S.D. Tex. Sept. 15, 2006)); and employees of the nonparty company that was

25   served with a subpoena traveled to the relevant area for quarterly visits and inspections of forty-six

26   franchises—assumed to require one hour for each of the forty-six stores four times a year, yielding

27   approximately twenty-three eight-hour business days of time spent by company representatives

28   within 100 miles of the place set for compliance per year (*Sullivan v. PJ United, Inc.*, No. 7:13-cv-

2023/02/09 16:40:14    52   /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 53 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 51 of 58

United States District Court
Northern District of California

1  01275-LSC), 2017 U.S. Dist. LEXIS 233280, *12 (N.D. Ala. Dec. 15, 2017)).  By contrast, the

2  following activities have been held not to constitute "regularly transact[ing] business in person"

3  within the meaning of Rule 45:  traveling to an area within the 100-mile radius for fourteen to

4  eighteen days in two years (*M'Baye v. N.J. Sports Prod.*, 246 F.R.D. 205 (S.D.N.Y. 2007));

5  traveling to the relevant area four times in five years (*Nissan Fire & Marine Ins. Co., Ltd. v.

6  Fortress Re, Inc.*, No. M8-85, 2002 U.S. Dist. LEXIS 14928, 2002 WL 1780084, at *3 (S.D.N.Y.

7  Aug. 14, 2002)); traveling to the relevant area ten times in seven years (*Regents of the Univ. of

8  Cal. v. Kohne*, 166 F.R.D. 463, 465 (S.D. Cal. 1996)); twice-yearly visits to the relevant area

9  (*Bostian v. Suhor Indus., Inc.*, No. 07-151, 2007 WL 3005177, at *1 (N.D. Okla. 2007)); traveling

10  to the relevant area three times to transact business during the past year, where the individual

11  stayed for less than 24 hours on two of the trips (*Dietz v. Spangenberg*, 2014 U.S. Dist. LEXIS

12  17046, *12-13 (D. Minn. 2014)); two sets of quarterly board meetings in the relevant area, totaling

13  eight meetings per year (*Jones v. Wyman*, 2022 U.S. Dist. LEXIS 202889, *11 (D. Maine 2022));

14  and three trips to the deposition location in the course of one year for a matter which is unrelated

15  to the deponent's primary business (*RFP, LLC v. Republica Bolivariana de Venezuela*, No. 2:04-

16  cv-793, 2015 WL 13034991, at *2 (S.D. Ohio June 30, 2015)).

17       The cases discussed above demonstrate that the question of whether a subpoena recipient

18  "regularly transacts business in person" within 100 miles of the place of compliance is highly fact-

19  specific and does not lend itself to a bright-line rule.  In a declaration dated November 10, 2022,

20  Mr. Al-Rumayyan admits that "[o]ver the past two years, [he] visited New York a number of

21  times" and that he "made nine trips to or within 100-miles of New York City since January 1,

22  2021, for a total of thirty-four days." Dkt. 166-5 ¶ 6. It is unclear from Mr. Al-Rumayyan's

23  declaration whether these nine trips encompass all of the events identified by PGA in its motion to

24  compel. *See* Dkt. 147-3 at 8-9. Mr. Al-Rumayyan also provides no evidence of his visits to New

25  York prior to 2021. As reflected in the discussion above, some of the cases that analyze whether

26  the recipient of a subpoena "regularly transacts business in person" within 100 miles of a

27  particular occasion look at a longer time period than two years. *See, e.g., Halliburton*, 2006 WL

28  2663948, at *2 (discussing visits over a 10-year period). In addition, the references in Mr. Al-

Rumayyan's declaration and briefs to his visits to other parts of the United States also suggest the possibility that there might be other locations in the United States that satisfy the 100-mile rule even if the NYC location does not. *See, e.g.,* Dkt. 166-5 ¶ 5 (discussing his attendance at the Super Bowl in Los Angeles in February 2022, which he "attended to show support to LIV Golf and to talk to other attendees about LIV Golf's vision"); Dkt. 172-2 at 10 (referring to quote in news article that Mr. Al-Rumayyan visits New York, Miami, and San Francisco).

The Court notes that under the plain language of Rule 45(c), the 100-mile rule also applies to document subpoenas. Fed. R. Civ. P. 45(c)(2)(A) (stating that subpoena may command production of documents or electronically stored information "at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person"); *see also Europlay Capital Advisors, LLC v. Does*, 323 F.R.D. 628, 629 (C.D. Cal. 2018). Some courts have relaxed the 100-mile rule where subpoenas call for only the production of documents and do not require a witness to appear for depositions because of the practical reality that documents can be copied and shipped to a more distant location. *See, e.g., Elsom v. Global Life and Accident Ins. Co.*, No. 6:17-CV-00408-JR, 2018 WL 4092020, at *2 (D. Or. Jan. 16, 2018). Here, however, the subpoenas at issue call for Mr. Al-Rumayyan and PIF to both produce documents and appear for deposition, and the Court concludes that the 100-mile rule applies to both the deposition and document production aspects of those subpoenas.

### b.    Subpoena to PIF

The Court next addresses whether PGA's subpoena to PIF complies with the 100-mile rule in Rule 45(c). PGA points to the following evidence in support of its argument that the NYC location satisfies the 100-mile rule for the subpoena to PIF:

- PIF regularly "transacts business on New York City's stock exchanges, having invested more than $40 billion in 50 companies publicly traded in the United States." (Dkt. 168-39 at 17);

- The opening of "PIF's New York office" in February 2022 (Dkt. 147-3 at 8; Dkt. Dkt. 148-4 at Ex. 24); and

- PIF's engagement of several firms based in New York to consult on the development of LIV's business model and perform public relations work for LIV

52

United States District Court
Northern District of California

(Dkt. 168-24 to 168-32).

PIF argues that the evidence offered by PGA does not demonstrate that PIF regularly transacts business in person within 100 miles of the NYC location. Dkt. 165-3 at 17; Dkt. 172-2 at 10. PIF states that it is headquartered and has its principal place of business in Riyadh, Saudi Arabia. Dkt. 166-4 ¶ 18. According to PIF, the New York Office cited by PGA belongs to a PIF subsidiary, USSA International LLC, which is a "distinct separate legal entity" from PIF. Dkt. 166-4 ¶ 19; Dkt. 165-3 at 4; Dkt. 172-2 at 10. Moreover, PIF contends that its stock exchange activity does not qualify because Rule 45 requires that witness regularly conduct business in person. Dkt. 172-2 at 10.

Because Rule 45(c) requires that business be transacted "in person," "[b]usiness transacted via telephone, email, and fax does not meet the requirement of regular transaction of business in a location." 9 Moore's Federal Practice - Civil § 45.51 (2022). It follows that the stock exchange activity cited by PGA does not satisfy the "in person" requirement of Rule 45(c). The evidence regarding the New York office of PIF's subsidiary is inconclusive, with PIF submitting a declaration stating that the office belongs to a subsidiary that is a separate, independent legal entity (Dkt. 166-4 ¶¶ 19), and PGA presenting evidence that PIF has conducted business from that office (Dkt. 148-6 at Ex. 41).

However, the more pertinent issue regarding whether the subpoena to PIF satisfies the 100-mile rule requires the Court to evaluate the location of the individual who will testify and/or produce documents on PIF's behalf in response to the subpoena. The subpoena to PIF, issued pursuant to Rule 45, was directed to the entity pursuant to Rule 30(b)(6). *See* Dkt. 148-2 at Ex. 7, Exhibit A. Under Rule 30(b)(6), a subpoena may be directed to an organization such as a corporation or governmental entity, and "the named organization must designate one or more officers, directors, or managing agents, or designate other person who consent to testify on its behalf" about information known or reasonably available to the organization concerning the deposition topics described in the subpoena. Fed. R. Civ. P. 30(b)(6). By its terms, Rule 30(b)(6) applies to any organization that is subject to a deposition subpoena, including nonparties. "The plain language of Rule 45(c) indicates that the court cannot compel a witness to testify at a

2023/02/09 16:40:14    55 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 56 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 54 of 58

1    deposition (as an individual or corporate representative) when the individual must travel more than

2    100 miles from a place of residence, employment, or regular business … regardless of where the

3    corporate entity itself resides." *Tele Draulic, Inc. v. Hetronic Int'l, Inc.*, Misc. No. 16-108-SR,

4    2016 WL 3606775, at *2 (D. Del. June 30, 2016) (citing *Hermitage Global Partners LP v.*

5    *Prevezon Holdings Ltd.*, No. 13-6326, 2015 WL 728463, at *4 (S.D.N.Y. Feb. 19, 2015) (internal

6    quotation marks omitted)); *see also* Fed. R. Civ. P. 45(d)(3)(A)(ii) (requiring court to quash or

7    modify a subpoena that "requires a person to comply beyond the geographic limits specified in

8    Rule 45(c)"). "Rule 45's goal is to prevent inconvenience to the flesh-and-blood human beings

9    who are asked to testify, not the legal entity for whom those human beings work." *Price*

10   *Waterhouse LLP v. First Am. Corp.*, 182 F.R.D. 56, 62 (S.D.N.Y. 1998) ("*Price Waterhouse II*").

11   This principle is illustrated by *Price Waterhouse LLP II*, in which a district court in the Southern

12   District of New York concluded that although it had personal jurisdiction over a nonparty

13   company based in the United Kingdom, a subpoena issued pursuant to Rules 45 and 30(b)(6)

14   calling for the company's corporate designee to sit for deposition in New York violated the 100-

15   mile rule of Rule 45 because there was no employee with knowledge within those territorial limits.

16   *Id.* at 64.

17         Accordingly, the Court looks at whether PIF employs any individual who could serve as a

18   deponent in this matter and who satisfies the 100-mile rule. *See Estate of Klieman v. Palestinian*

19   *Authority*, 293 F.R.D. 235, 239 (D.D.C. 2013). Mr. Al-Rumayyan is the only PIF-affiliated

20   individual discussed in the present motions and, as discussed above, the record is unclear whether

21   he regularly transacts business within 100 miles of the NYC location. Moreover, PIF is not

22   required, in response to the Rule 30(b)(6) subpoena, to create a witness or witnesses within the

23   geographic limitations of Rule 45(c) with knowledge on the identified deposition topics. *Klieman*,

24   293 F.R.D. at 239 (quashing subpoena to BBC's news bureau in Washington, D.C. seeking

25   testimony and documents regarding program broadcast by United Kingdom-based BBC where no

26   knowledgeable witness satisfied 100-mile rule, rejecting argument that BBC was "required to

27   *create* a witness or witnesses … with responsive knowledge" who satisfied the geographic

28   requirements). "[A]llowing a subpoena served pursuant to Rule 30(b)(6) to evade the

United States District Court
Northern District of California

2023/02/09 16:40:14   56  /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 57 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 55 of 58

1    proscriptions of Rule 45(c) would render Rule 45 surplusage and subject nonparties to the same

2    level of burdensome discovery that can be imposed upon a party …" *Price Waterhouse*, 182

3    F.R.D. at 63.

4                                    **c.      Conclusion on 100-mile rule**

5          Mr. Al-Rumayyan and PIF, who seek to quash the subpoenas for failure to comply with the

6    100-mile rule, carry the burden on the issue. *See Donziger*, 2013 WL 4536808, at *4. As

7    discussed above, the evidence offered by these witnesses is inconclusive on the issue of whether

8    either of them regularly transact business in person within 100 miles of the NYC location, within

9    the meaning of Rule 45.

10         Rule 45(d) provides that a court <u>must</u> quash or modify subpoena that does not comply with

11   the geographic limits in Rule 45(c). Fed. R. Civ. P. 45(d)(3)(A)(ii) (emphasis added). Under the

12   circumstances of this case, the Court concludes that it is most appropriate to exercise its discretion

13   to modify rather than quash the subpoenas on the issue of the place of compliance.

14         As for the deposition subpoenas, which as discussed above in section V.E.1. PGA may re-

15   serve along with payment of requisite witness fees, in consideration of the case schedule, the fact

16   that Mr. Al-Rumayyan (who is expected to be the Rule 30(b)(6) witness for PIF as well as an

17   individual witness) repeatedly travels to the New York City area, and the fact that PIF and Mr. Al-

18   Rumayyan have counsel in New York City, the re-served deposition subpoenas may specify the

19   same NYC location as the original subpoenas for the deposition location. However, in light of the

20   arguments of PIF and Mr. Al-Rumayyan regarding the 100-mile rule, they may request within **five**

21   **(5) days of re-service of the subpoenas** that PGA instead designate a deposition location in

22   Riyadh, Saudi Arabia, in which case the depositions will proceed at that location. *See generally*

23   *Asea, Inc. v. So. Pac. Transp. Co.*, 669 F.2d 1242, 1248 (9th Cir. 1981) (holding it was not abuse

24   of district court's discretion to direct that nonparty witness be deposed in Sweden, where witness

25   resided, to protect witness from burden of traveling overseas). Except for this option of the

26   witnesses to select among locations for the depositions, and assuming the re-served deposition

27   subpoenas conform to this Order, the re-served deposition subpoenas are not subject to further

28   objection by PIF and Mr. Al-Rumayyan.

                                                    55

United States District Court
Northern District of California

2023/02/09 16:40:14   57 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 58 of 64
Case 5:22-cv-04486-BLF   Document 265 *SEALED*   Filed 02/09/23   Page 56 of 58

As for the portion of the subpoenas that require PIF and Mr. Al-Rumayyan to produce documents, the Court exercises its discretion to modify the place of compliance to permit production at either the NYC location or at a location in Riyadh of PGA's choosing.

### 3. Undue burden

A party serving a Rule 45 subpoena "must take reasonable steps to avoid imposing undue burden or expense on a party subject to the subpoena. Fed. R. Civ. P. 45(d)(1). The court "<u>must</u> quash or modify a subpoena that [] subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv) (emphasis added). The court "<u>may</u>, on motion, quash or modify a subpoena if it requires [] disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B)(i) (emphasis added).

To determine whether a subpoena should be enforced, the Court is guided by Rule 45, which protects a subpoenaed party from 'undue burden,' and Rule 26, which provides that the Court must limit discovery if 'the discovery sought ... can be obtained from some other source that is more convenient, less burdensome, or less expensive' or if 'the burden or expense of the proposed discovery outweighs its likely benefit.'" *Intermarine, LLC v. Spliethoff Bevrachtingskantoor, B.V.*, 123 F. Supp. 3d 1215, 1217 (N.D. Cal. 2015) (citing Fed. R. Civ. P. 45(d)(1) and Fed. R. Civ. P. 26(b)(2)(C)(i)); *see* also Fed. R. Civ. P. 45 advisory committee note to 1970 Amendment ("the scope of discovery through a subpoena is the same as that applicable to Rule 34 and the other discovery rules"). Courts can also consider Rule 26(b)(1), which provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Planned Parenthood Federation of Amer., Inc. v. Center for Medical Progress*, No. 16-cv-00236-WHO (DMR), 2019 WL 1236054, at *2 (N.D. Cal. Mar. 18, 2019).

PIF and Mr. Al-Rumayyan do not dispute that they have information that is relevant to this action, but they argue that the subpoenas are overly broad because "(1) the requests and topics

1   require an unduly burdensome effort to identify what they seek; (2) the requests and topics seek

2   irrelevant documents and information; (3) the requests and topics seek documents and information

3   that can be more conveniently obtained from Plaintiffs or other non-parties to which the

4   information relates; and (4) PGA cannot meet its burden to show that its need for certain

5   documents and information outweighs the potential privacy and economic harms resulting from

6   divulgence." Dkt. 165-3 at 18.

7        As noted above and at the January 13, 2023 hearing, the subpoenas as served on PIF and

8   Mr. Al-Rumayyan both suffer from overbreadth both in scope and number of requests. In

9   particular, the subpoena directed to PIF contains 82 requests for production; the subpoena directed

10  to Mr. Al-Rumayyan has 79 requests. Dkt. 148-2 at Exs. 6 and 7. Following the January 13

11  hearing the Court gave the parties to these subpoena-related motions an opportunity to meet and

12  confer to resolve the pending issues prior to this Court issuing an order. Dkt. 217. During that

13  process, PGA offered to substantially narrow the number of the requests for production, to 20 for

14  PIF and 13 for Mr. Al-Rumayyan. Dkt. 228 at Ex. B. The Court is aware, of course, that PGA's

15  offer of reduction was in the context of a larger proposed compromise which was not reached.

16  Nevertheless, the offer serves to distill PGA's requests down to its most essential demands, and

17  the Court now evaluates the remaining requests from that vantage point.

18       After reviewing the subpoenas and the objections of PIF and Mr. Al-Rumayyan, the Court

19  concludes the subpoenas can be appropriately modified to protect PIF and Mr. Al-Rumayyan,

20  while preserving PGA's interest in seeking information from those witnesses. Accordingly, the

21  Court exercises its discretion to modify, rather than quash, the portions of the subpoenas that

22  request documents. The Court finds that the number of requests, by itself, is no longer

23  objectionable. Certain of the requests, however, continue to suffer from vagueness and

24  overbreadth which renders them unduly burdensome, particularly in light of PIF's and Mr. Al-

25  Rumayyan's current status as third parties. Accordingly, the Court **MODIFIES** the requests as set

26  forth in **Exhibit A** to this Order. All other objections not specifically addressed herein are

27  **OVERRULED**. This ruling is without prejudice to PGA's ability to seek further discovery from

28  PIF and Mr. Al-Rumayyan if they are added as counter defendants.

United States District Court
Northern District of California

2023/02/09 16:40:14 59 /63
Case 5:22-cv-04486-BLF Document 499-1 Filed 09/07/23 Page 60 of 64
Case 5:22-cv-04486-BLF Document 265 *SEALED* Filed 02/09/23 Page 58 of 58

## VI. CONCLUSION

For the foregoing reasons, the Court **DENIES** the motion of PIF to quash the subpoena directed to PIF on the grounds of sovereign immunity because it finds that PIF's conduct falls within the commercial activity exception to the Foreign Sovereign Immunity Act, 28 U.S.C. § 1602 *et seq.* ("FSIA"). The Court **DENIES** the motion of Mr. Al-Rumayyan to quash the subpoena directed to him on the grounds of common law immunity because his conduct falls within an exception for commercial activity. The Court further **DENIES** the motion of PIF and Mr. Al-Rumayyan to quash the subpoenas on the grounds of lack of personal jurisdiction because it concludes it has personal jurisdiction over these witnesses. The motion of PIF and Mr. Al-Rumayyan to quash the subpoenas on the grounds that PGA failed to tender the witness fees required under Federal Rule Civil Procedure 45(b)(1) at the time of service is **DENIED** with respect to the requests for production of documents in the subpoenas and **GRANTED** with respect to the demand for deposition testimony in the subpoenas, **WITHOUT PREJUDICE** to PGA's right to re-serve PIF and Mr. Al-Rumayyan pursuant to the relevant parties' Service Agreement with subpoenas for deposition testimony that are accompanied by the requisite witness fees. The place of compliance in the re-served depositions subpoenas may be identified as the NYC location identified in the original subpoenas, but PIF and Mr. Al-Rumayyan may request that the depositions take place at a place of PGA's choosing in Riyadh, Saudi Arabia by so notifying PGA within **five (5) days of re-service** of the deposition subpoenas. The categories of documents in the subpoenas are **MODIFIED** as set forth in **Exhibit A** to protect nonparties PIF and Mr. Al-Rumayyan from undue burden, as required under Rule 45(d)(1). The Court's rulings on the motion to quash filed by PIF and Mr. Al-Rumayyan also address the arguments made in PGA's motion to compel.

**SO ORDERED.**

Dated: February 9, 2023

_Susan van Keulen_

SUSAN VAN KEULEN
United States Magistrate Judge

58

2023/02/09 16:40:14 60 /63
Case 5:22-cv-04486-BLF Document 499-1 Filed 09/07/23 Page 61 of 64
Case 5:22-cv-04486-BLF Document 265-1 *SEALED* Filed 02/09/23 Page 1 of 4

**EXHIBIT A to** *ORDER ON (1) MOTION OF PGA TOUR, INC. TO COMPEL COMPLIANCE WITH SUBPOENAS TO THIRD PARTIES PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S MOTION; (2) MOTION OF THIRD PARTIES PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S MOTION TO QUASH SUPOENAS; AND (3) ADMINISTRATIVE MOTIONS FOR LEAVE TO SUPPLEMENT MOTION TO COMPEL AND MOTION TO QUASH*

*Jones v. PGA Tour, Inc.*, **N.D. Cal. Case No. 22-cv-04486-BLF (SVK)**

### Narrowed Document Requests to PIF

1. Documents and communications related to the creation of LIV.~~ and the allegations made by LIV in this litigation.~~ (RFP 3)

2. ~~Documents and communications related to competition with the PGA TOUR or the TOUR's policies.~~ (RFP 6)

3. Communications related to the solicitation of golfers to join LIV, including negotiations with golfers or their agents. (RFP 43)

4. ~~Communications with any actual, potential, or past plaintiff in this litigation related to this litigation.~~ (RFP 44)

5. ~~Communications with professional golfers or their agents related to the PGA TOUR, Golf Saudi, the PGL, LIV, the DP World Tour, the Asian Tour, or this litigation.~~ (RFP 7)

6. Communications related to the solicitation of any current or former PGA TOUR employee. (RFP **11**)

7. Documents and communications related to money or other benefits you have provided to any past or current PGA TOUR member. (RFP 24)

8. Documents and communications related to LIV's business or strategic plans. (RFP 70).

9. Documents and communications related to LIV's financial projections and business, sales and marketing, and media plans. (RFP 42)

10. ~~Documents and communications related to any actual or potential benefit to you, the Kingdom of Saudi Arabia, or the Saudi Arabian monarchy of hosting golf events or associating with professional golf.~~ (RFP 51)

11. Documents and communications related to your ownership interest in LIV as well as your control over LIV's activities. (RFP 60)

12. Board minutes, board presentations, board meeting agendas, and other board or leadership materials related to LIV, the PGA TOUR, or this litigation. (RFP 61)

**EXHIBIT A to** *ORDER ON (1) MOTION OF PGA TOUR, INC. TO COMPEL COMPLIANCE WITH SUBPOENAS TO THIRD PARTIES PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S MOTION; (2) MOTION OF THIRD PARTIES PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S MOTION TO QUASH SUPOENAS; AND (3) ADMINISTRATIVE MOTIONS FOR LEAVE TO SUPPLEMENT MOTION TO COMPEL AND MOTION TO QUASH*

***Jones v. PGA Tour, Inc.*, N.D. Cal. Case No. 22-cv-04486-BLF (SVK)**

13. ~~Communications and agreements with third parties, including consultants and banks, related to LIV or the development of a professional golf league or tour.~~ (RFP's 62 &63).

14. Documents and communications related to LIV's actual or potential sponsors. (RFP 29)

15. Documents and communications related to LIV's actual or potential advertisers. (RFP 31)

16. Documents and communications related to LIV's actual or potential broadcasters. (RFP 35)

17. Documents and communications related to LIV's actual or potential vendors, tournament hosts, and relationship with the Major tournaments. (RFPs 37, 39, & 41).

18. Documents and communications related to LIV's actual or potential agreements, including co-sponsoring or co-sanctioning agreements, with any other golf tour. (RFP 15 and 18)

19. ~~Documents and communications related to complaints, criticism, or negative opinions about LIV, you, the Kingdom of Saudi Arabia, professional golfers pa1ticipating in LIV events, or the Saudi Arabian monarchy.~~ (RFP 54)

20. Documents and communications related to any payments of legal fees related to this litigation, or any cooperation, settlement, or indemnification agreements. (RFPs 46 &48)

2023/02/09 16:40:14    62 /63
Case 5:22-cv-04486-BLF   Document 499-1   Filed 09/07/23   Page 63 of 64
Case 5:22-cv-04486-BLF   Document 265-1 *SEALED*   Filed 02/09/23   Page 3 of 4

**EXHIBIT A to** *ORDER ON (1) MOTION OF PGA TOUR, INC. TO COMPEL COMPLIANCE WITH SUBPOENAS TO THIRD PARTIES PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S MOTION; (2) MOTION OF THIRD PARTIES PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S MOTION TO QUASH SUPOENAS; AND (3) ADMINISTRATIVE MOTIONS FOR LEAVE TO SUPPLEMENT MOTION TO COMPEL AND MOTION TO QUASH*

*Jones v. PGA Tour, Inc.*, N.D. Cal. Case No. 22-cv-04486-BLF (SVK)

<u>**Narrowed Document Requests to Mr. Al-Rumayyan**</u>

1. Documents and communications related to the creation of LIV. ~~and the allegations made by LIV in this litigation.~~ (RFP 3)

2. ~~Documents and communications related to competition with the PGA TOUR or the TOUR's policies.~~ (RFP 5)

3. Communications related to the solicitation of golfers to join LIV, including negotiations with golfers or their agents. (RFP 40)

4. ~~Communications with any actual, potential, or past plaintiff in this litigation related to this litigation.~~ (RFP 41)

5. ~~Communications with professional golfers or their agents related to the PGA TOUR, Golf Saudi, the PGL, LIV, the DP World Tour, the Asian Tour, or this litigation.~~ (RFP 6)

6. Communications related to the solicitation of any current or former PGA TOUR employee. (RFP 10)

7. Documents and communications related to LIV's business or strategic plans. (RFP 59).

8. ~~Documents and communications related to any actual or potential benefit to you, the Kingdom of Saudi Arabia, or the Saudi Arabian monarchy of hosting golf events or associating with professional golf.~~ (RFP 48)

9. Documents and communications related to LIV's actual or potential sponsors. (RFP 27)

10. Documents and communications related to LIV's actual or potential advertisers. (RFP 29)

11. Documents and communications related to LIV's actual or potential broadcasters. (RFP 33)

12. Documents and communications related to LIV's actual or potential vendors, tournament hosts, and relationship with the Major tournaments. (RFPs 35, 37, & 39).

**EXHIBIT A to** *ORDER ON (1) MOTION OF PGA TOUR, INC. TO COMPEL COMPLIANCE WITH SUBPOENAS TO THIRD PARTIES PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S MOTION; (2) MOTION OF THIRD PARTIES PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S MOTION TO QUASH SUPOENAS; AND (3) ADMINISTRATIVE MOTIONS FOR LEAVE TO SUPPLEMENT MOTION TO COMPEL AND MOTION TO QUASH*

*Jones v. PGA Tour, Inc.*, **N.D. Cal. Case No. 22-cv-04486-BLF (SVK)**

13. Documents and communications related to LIV's actual or potential agreements, including co-sponsoring or co-sanctioning agreements, with any other golf tour. (RFP 12 and 16)

14. ~~Documents and communications related to complaints, criticism, or negative opinions about LIV, you, the Kingdom of Saudi Arabia, professional golfers participating in LIV events, or the Saudi Arabian monarchy.~~ (RFP 51)

15. Documents and communications related to any payments of legal fees related to this litigation, or any cooperation, settlement, or indemnification agreements. (RFPs 43 &45)

16. Documents sufficient to show your roles with the Saudi PIF and LIV. (RFP 79).