# EXHIBIT 37
# PUBLIC VERSION

KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS - # 158708
epeters@keker.com
DAVID SILBERT - # 173128
dsilbert@keker.com
R. ADAM LAURIDSEN - # 243780
alauridsen@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
SOPHIE HOOD - # 295881
shood@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:      415 397 7188

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
ANTHONY J. DREYER - (*pro hac vice*)
anthony.dreyer@skadden.com
KAREN M. LENT - (*pro hac vice*)
karen.lent@skadden.com
MATTHEW M. MARTINO - (*pro hac vice*)
matthew.martino@skadden.com
One Manhattan West
New York, NY 10001
Telephone:     212 735 3000
Facsimile:      212 735 2000

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
PATRICK FITZGERALD - (*pro hac vice*)
patrick.fitzgerald@skadden.com
155 North Wacker Drive
Chicago, Il 60606
Telephone:     312 407 0700
Facsimile:      312 407 0411

Attorneys for Defendant PGA TOUR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT JONES; BRYSON DECHAMBEAU; PETER UIHLEIN; and LIV GOLF, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PGA TOUR, INC., <br><br> Defendant. | Case No. 5:22-cv-04486-BLF <br><br> **PGA TOUR, INC.'S REPLY IN SUPPORT OF MOTION TO COMPEL PUBLIC INVESTMENT FUND OF THE KINGDOM OF SAUDI ARABIA AND YASIR OTHMAN AL-RUMAYYAN'S COMPLIANCE WITH DOCUMENT AND DEPOSITION SUBPOENAS AND OPPOSITION TO MOTION TO QUASH** <br><br> Date: <br> Time: <br> Courtroom: 5, 5th Floor <br><br> Judge:      Hon. Beth Labson Freeman <br><br> Date Filed:  August 3, 2022 |

**FILED UNDER SEAL**

| | |
|---|---|
| PGA TOUR, INC., | Trial Date:  January 8, 2024 |
| Counterclaimant, | |
| v. | |
| LIV GOLF, INC., | |
| Counterdefendant. | |

1

## <u>TABLE OF CONTENTS</u>

2
<u>Page</u>

3  I.     INTRODUCTION ...................................................................................................1

4  II.    FACTS ...................................................................................................................3

5         A.    PIF and Al-Rumayyan manage LIV's day-to-day business operations....................3

6         B.    PIF and Al-Rumayyan negotiated business transactions in the U.S.......................4

7         C.    PIF and Al-Rumayyan have extensive contacts with the U.S. ...............................5

8  III.   PERSONAL JURISDICTION...............................................................................7

9         A.    The Court has jurisdiction over PIF under FSIA. ...................................................7

10              1.    The commercial activity exception applies to PIF....................................7

11              2.    The waiver exception applies to PIF........................................................10

12        B.    PIF and Al-Rumayyan have minimum contacts with the U.S. .............................11

13              1.    PIF and Al-Rumayyan's U.S. contacts "relate to" this litigation. ............11

14              2.    PIF and Al-Rumayyan are agents of LIV. ................................................13

15              3.    The exercise of personal jurisdiction is reasonable. ................................14

16        C.    PIF and Al-Rumayyan are subject to tag jurisdiction............................................15

17        D.    Al-Rumayyan is not protected by common law immunity.....................................15

18  IV.   SERVICE WAS PROPER ....................................................................................17

19        A.    The TOUR has tendered witness fees.....................................................................17

20        B.    PIF and Al-Rumayyan regularly transact business in New York City. .................17

21  V.    THE TOUR'S SUBPOENAS SEEK RELEVANT DISCOVERY .....................17

22        A.    The subpoenas seek relevant discovery in PIF and Al-Rumayyan's
                exclusive control. ..................................................................................................17
23
          B.    PIF and Al-Rumayyan would not be burdened by the discovery sought. ..............19
24
          C.    PIF and Al-Rumayyan never offered to produce documents voluntarily...............20
25
    VI.   CONCLUSION.....................................................................................................20
26

27

28

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
    425 U.S. 682 (1976)........................................................................................15, 16

*Andros Compania Maritima, S.A. v. Intertanker Ltd.*,
    718 F. Supp. 1215 (S.D.N.Y. 1989)...............................................................10

*Broidy Cap. Mgmt., LLC v. State of Qatar*,
    982 F.3d 582 (9th Cir. 2020) ...........................................................................8

*Burnham v. Sup. Ct. of Cal., Cnty. of Marin*,
    495 U.S. 604 (1990)......................................................................................15

*Cancino v. McAleehan*,
    2020 WL 1332485 (S.D. Cal. March 20, 2020)...........................................19

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    2018 WL 659084 (N.D. Cal. Feb. 1, 2018) ...................................................9

*Doe v. Unocal Corp.*,
    248 F.3d 915 (9th Cir. 2001) .........................................................................13

*Dogan v. Barak*,
    932 F.3d 888 (9th Cir. 2019) .........................................................................16

*Embassy of the Arab Republic of Egypt v. Lasheen*,
    603 F.3d 1166 (9th Cir. 2010) ...................................................................7, 8

*Everard Findlay Consulting, LLC v. Republic of Surin.*,
    831 F. App'x 599 (2d Cir. 2020) ....................................................................7

*First Am. Corp. v. Price Waterhouse LLP*,
    154 F.3d 16 (2d Cir. 1998)............................................................................15

*Flatlow v. Islamic Rep. of Iran*,
    308 F.3d 1065 (9th Cir. 2002) ........................................................................8

*Funk v. Belneftekhim*,
    861 F.3d 354 (2d Cir. 2017)..........................................................................11

*Giraldo v. Drummond Co., Inc.*,
    808 F. Supp. 2d 247 (D.D.C. 2011) .............................................................16

*Halliburton Energy Servs., Inc. v. M-I, LLC*,
    2006 WL 2663948 (S.D. Tex. Sept. 15, 2006) ............................................17

*In re Hydroxycut Mktg. & Sales Pract. Litig.*,
   810 F.Supp.2d 1100 (S.D. Cal. 2011)..................................................................13

*LNS Enter. LLC v. Cont'l Motors, Inc.*,
   22 F.4th 852 (9th Cir. 2022) ..............................................................................11

*OBB Personenverkehr AG v. Sachs*,
   577 U.S. 27 (2015)................................................................................................8

*Pablo Star Ltd. v. Welsh Gov't*,
   961 F.3d 555 (2d Cir. 2020).............................................................................7, 9

*In re Packaged Seafood Prod. Antitrust Litig.*,
   277 F. Supp. 3d 1167 (S.D. Cal. 2017)..............................................................13

*Republic of Phil. v. Marcos*,
   806 F.2d 344 (2d Cir. 1986)...............................................................................15

*Richmark Corp. v. Timber Falling Consultants*,
   959 F.2d 1468 ...............................................................................................14, 15

*Rosasen v. Kingdom of Nor.*,
   2022 WL 409679 (C.D. Cal. Feb. 10, 2022).......................................................16

*Samantar v. Yousuf*,
   560 U.S. 305 (2010)..............................................................................................7

*Smith v. Soc. People's Libyan Arab Jamahiriya*,
   101 F.3d 239 (2d Cir. 1996)...............................................................................10

*Sullivan v. PJ United, Inc.*,
   2017 WL 11675693 (N.D. Ala. Dec. 15, 2017)...................................................17

*In re Terrorist Attacks on Sept. 11, 2001*,
   122 F. Supp. 3d 181 (S.D.N.Y. 2015).................................................................16

*Verlinden B.V. v. Cent. Bank of Nigeria*,
   461 U.S. 480 (1983)............................................................................................16

*Walden v. Fiore*,
   571 U.S. 277 (2014)............................................................................................12

*Wultz v. Bank of China Ltd.*,
   298 F.R.D. 91 (S.D.N.Y. 2014) ..........................................................................17

*Wultz v. Bank of China Ltd.*,
   32 F. Supp. 3d 486 (S.D.N.Y. 2014)...................................................................16

*Wye Oak Tech., Inc. v. Republic of Iraq*,
   24 F.4th 686 (D.C. Cir. 2022).............................................................................16

iii

1

**Federal Statutes**

2

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et. seq................................................. *passim*

3

**Rules**

4

Fed. R. Civ. P. 45....................................................................................................................2, 17

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PGA TOUR'S REPLY IN SUPPORT OF MOTION TO COMPEL AND OPPOSITION TO MOTION TO QUASH
Case No. 5:22-cv-04486-BLF
1948137

## I.    INTRODUCTION

The Public Investment Fund and Mr. Al Rumayyan's Opposition and Motion to Quash is filled with misdirection, mischaracterization of controlling law, and misrepresentations.

PIF and Mr. Al-Rumayyan begin by arguing that since they purportedly offered to voluntarily produce unidentified documents of their own choosing, the TOUR's subpoenas and its Motion are unnecessary. First, PIF's suggestion is false. If PIF wanted to cooperate with discovery by producing documents voluntarily, as its counsel told Judge Freeman it would, it would have done so. But it has not produced—or offered to produce—a single page of discovery, much less offered to testify. Instead, PIF made false representations to this Court about cooperating with discovery, agreed to accept service of subpoenas it knew it would argue were unenforceable, and then made every argument it could conjure—regardless of how frivolous--to avoid compliance. Second, even if true, the argument that PIF offered to voluntarily produce some self-identified set of documents is beside the point. No litigant is required to accept its adversary's offer to "voluntarily" produce cherry-picked documents (and hide other documents that support the litigant's position) in lieu of being compelled by law to do so.

PIF and Mr. Al-Rumayyan's jurisdictional and comity arguments also fail. Their extensive commercial activity in, and contacts with, the United States give rise to jurisdiction under the Foreign Sovereign Immunities Act (FSIA) and provide more than sufficient contacts to satisfy any due process concerns. The voluminous evidence submitted in support of the TOUR's Motion and this Opposition and Reply establishes that PIF is no mere passive investor in LIV. PIF owns nearly 95% of LIV and has invested $2 billion thus far to establish and fund LIV's operations. Mr. Al-Rumayyan functions as LIV's chief executive, meeting regularly with LIV's nominal CEO Greg Norman, approving LIV's budget, making key strategic decisions, participating in player recruitment in the United States, and micro-managing LIV's day-to-day operations. PIF and Mr. Al-Rumayyan are central figures. They are the wizards behind the curtain: they call the shots, they approve the expenditures, and they supply the money.

PIF and Mr. Al-Rumayyan's conduct is also inextricably intertwined with LIV's and the Player Plaintiffs' claims and the TOUR's counterclaims and defenses. This case is about LIV's

use of billions of dollars—bankrolled by PIF—to establish a new golf league, pay players staggering sums to breach their TOUR contracts, indemnify them for the damages caused by their breaches, and fund this litigation using PIF's lawyers. PIF's gambit to mastermind this lawsuit but then stonewall discovery should be rejected.

PIF and Mr. Al-Rumayyan's remaining arguments fare no better. Their claim that tag jurisdiction does not apply because they were not "served while physically present" in the United States, is the high-water mark of dishonesty. In accepting service, PIF and Mr. Al-Rumayyan agreed to treat the subpoenas as "***personally delivered***" to them "***in the United States***." They cannot avoid tag jurisdiction by ignoring the plain terms of this agreement. The TOUR complied with Rule 45 by setting compliance in New York City, where PIF admits that it has an office, where Mr. Al-Rumayyan admits that he travels regularly, and where PIF regularly transacts business, including investing in more than 50 publicly traded companies. And the quibble about witness fees—an odd objection for a sovereign wealth fund with nearly $650 billion in assets that agreed to accept service of the subpoenas—is moot because the TOUR has tendered fees.

Finally, PIF and Mr. Al-Rumayyan all but concede the relevance of the TOUR's requests, as they must. At its core, LIV's claim is that its effort to develop a competing golf tour and break into the market has been blocked by the TOUR. PIF and Mr. Al-Rumayyan created, funded, and own LIV, and they manage LIV at a strategic and day-to-day operational level. Moreover, PIF and Mr. Al-Rumayyan have funded, approved and actively assisted LIV in inducing TOUR members to breach their contracts. And, having availed themselves of the U.S. market and funded this litigation, PIF and Mr. Al-Rumayyan should not be heard to complain about the relatively slight cost or burden of complying with the TOUR's subpoenas.

Stripped of its distractions and half-truths, the Opposition and Motion to Quash are a transparent effort to prevent the TOUR from obtaining relevant discovery. After promising the Court that PIF would cooperate by providing this discovery, it has now backtracked and engaged in every form of foot-dragging and straw-grasping imaginable to delay the process. It is long past time for PIF and Mr. Al-Rumayyan to comply with their discovery obligations. The TOUR respectfully requests that its Motion to Compel be granted and PIF's Motion to Quash be denied.

## II.     FACTS

### A.     PIF and Al-Rumayyan manage LIV's day-to-day business operations.

LIV was created and launched "[u]nder the instruction of H.E. The Governor of PIF." Declaration of Sophie Hood ("Hood Decl."), Ex. 1 at 3.[1]  PIF owns 93% of LIV, and it is "assuming all financial risks [of launching LIV] (due to its 100% funding of the project)." *Id.*, Exs. 2; 1 at 24. Nonetheless, PIF and Mr. Al-Rumayyan attempt to portray themselves as garden-variety passive investors. The record shows otherwise. In fact, documents produced since the TOUR filed its Motion confirm that they serve as ultimate decisionmakers directing LIV's high-level business strategy ***and*** hands-on supervisors running its daily business operations.

Mr. Al-Rumayyan has final authority over major decisions, such as "███████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████ in breach of their agreements with the TOUR. *See id.*, Exs. 3–4; *see also id.*, Ex. 5 (█████████████████████████████████████████ Mr. Al-Rumayyan also requires meetings ██████████████ with LIV and PIF leadership to discuss LIV's ████████████████████████████████████████████████████████████████████ ██████████████. *Id.*, Ex. 6. Mr. Al-Rumayyan's close supervision of LIV is consistent with PIF's internal description of Mr. Norman as a █████████████ for LIV, *id.*, Ex. 1 at 12, and it is no surprise that LIV's regulations identify Mr. Al-Rumayyan as "Chairman of the Board and the CEO & Commissioner," *see* Dkt. 89-2 at 11

PIF and Mr. Al-Rumayyan also supervise LIV's day-to-day operations and manage its executives. Mr. Al-Rumayyan participates in a ████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████ *Id.* Ex. 7. This is in addition to the ████████████ ████████████████████████████████████████████████████████ *Id.* Mr. Al-Rumayyan and PIF thus run LIV through their direct supervision of its executives.

---

[1] Page citations to Hood Declaration exhibits reference the exhibit's internal pagination.

PIF and Mr. Al-Rumayyan have micro-managed the minutiae of LIV's operations from the very beginning. Mr. Al-Rumayyan provided input into LIV's ███████████████████ ████████████████████████████████████████, and L███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *Id.*, Exs. 8–11. Indeed, █████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████. *Id.* Ex. 44 at 9-12. ███████████ ████████████████████████████████████████ *Id.*, Ex. 12. In short, PIF's and Mr. Al-Rumayyan's daily involvement and influence bears on everything from LIV's global strategy to the tiniest detail—such as the way it ████████████████████████

**B.      PIF and Al-Rumayyan negotiated business transactions in the U.S.**

PIF and Mr. Al-Rumayyan brokered business deals for LIV with players and their agents and ████████████████████████████████████████████████" *See, e.g.*, Hood Decl., Ex. 1 at 3. Mr. Al-Rumayyan met personally with █████ representatives from as early as █████████████. *Id.*, Ex. 14. For example, Mr. Al-Rumayyan coordinated with LIV leadership to recruit ███████████████████ and the golfers █████████ represents. *See id.*, Exs. 13 (██████████████████████████████████████████ 15 (█████████████████ 16 ████████ ████████████████████████████ Mr. Al-Rumayyan specifically used "█ █████████████████████████████████████████████████████ ████████████████████ *Id.*, Ex. 17. Wasserman's agency has since become one of "the biggest influence[s] on players who joined LIV," representing seven of the forty-eight players in LIV's September event, most of whom were TOUR members at the time █████████████ ███████████████, including former Player Plaintiff Hudson Swafford. *See id.*, Ex. 38.

PIF and Mr. Al-Rumayyan have also directly recruited players in the United States and decided on the terms of their contracts with LIV. For example, on ████████████, Mr. Al-Rumayyan ██████████ Mr. Al-Sorour to ████████████████████████████████

4

1   [REDACTED] *Id.*, Ex. 18 (emphasis added). These

2   negotiations and signings induced TOUR members to breach their contracts with the TOUR.

3   Following this episode, Plaintiffs allege that TOUR Commissioner Jay Monahan addressed a

4   meeting of TOUR players at the Honda Classic in Florida on February 22, 2022. Dkt. 83 ¶ 166. In

5   response, Mr. Al-Rumayyan "green li[t]" an open letter by LIV designed to induce additional

6   TOUR members to breach their contracts. *See* Hood Decl., Exs. 4; 39. In following months, Mr.

7   Al-Rumayyan continued recruiting and negotiating with players on LIV's behalf. He instructed

8   Mr. Norman [REDACTED]

9   [REDACTED] *Id.*, Ex. 19 And in June 2022, Mr. Al-Rumayyan [REDACTED]

10  [REDACTED]

11  [REDACTED]

12  [REDACTED]

13  [REDACTED] *Id.*, Ex. 20 (emphasis added).

14      Mr. Al-Rumayyan is also intimately involved in negotiating business agreements on

15  LIV's behalf with sponsors, advertisers, and broadcasters. This has included meeting with

16  [REDACTED] *Id.*,

17  Exs. 21, 22. Just five weeks ago, more than a month after the subpoenas were served on PIF and

18  Mr. Al-Rumayyan, [REDACTED]

19  [REDACTED]

20  [REDACTED]

21  [REDACTED]" *Id.*, Ex. 23.

22      **C.    PIF and Al-Rumayyan have extensive contacts with the U.S.**

23      PIF executives such as Mr. Al-Rumayyan have also regularly visited the United States

24  where they have conducted PIF business. Mr. Al-Rumayyan alone has traveled to the United

25  States "a number of times"—including nine times to New York and once to California—over the

26  last 2 years, and he admits that he has promoted LIV during his visits. Dkt. 166-5, ¶ 4-5. Also

27  regularly directs electronic communications to the United States. LIV has produced more than

28  400 emails sent directly between executives at PIF and LIV employees in the United States. Hood

1   Decl. ¶ 42. LIV has likewise produced more than 250 direct email communications between PIF

2   and its U.S. consultants. *Id.*

3          PIF has engaged at least three such U.S. consultants to perform work relating to LIV and

4   the issues in this litigation. PIF hired ████████████████████████████████████████

5   ██████████████████████████████████████ *See* Hood Decl., Exs. 24-25. PIF hired

6   Teneo Strategy, LLC ("Teneo")—headquartered in New York City and registered under the

7   Foreign Agency Registration Act—to "demonstrat[e] how PIF is enabling the creation of new

8   sectors and opportunities and driving transformation" as a part of "Project Wedge." *Id.*, Ex. 40 at

9   8. While Teneo's contract makes no mention of LIV, "Project Wedge" is PIF's internal

10  designation for its plan to disrupt professional golf and compete with the TOUR via LIV. ████

11  ████████████████████████████████████████ *See id.*, Ex. 26 at

12  ████████████████████████████████████████████

13  ██████████████████████████████ For example, Teneo works with PIF and LIV leadership

14  to ██████████████████████████████████████████████

15  ██████████████████████████████████ *Id.*, Exs. 5; 27–29.

16  PIF and Mr. Al-Rumayyan also retained ██████████████████████████████████

17  ████████████ including producing ████████████████████████████████

18  ██████████████████████ *See id.*, Exs. 30–32 (emphasis added).

19         Finally, contrary to his self-serving declarations, Mr. Al-Rumayyan previously admitted

20  that PIF's New York office is used to source deals, manage ongoing relationships with U.S.

21  portfolio companies, and monitor new deals in the United States. *See* Hood Decl., Ex. 41.

22  Unsurprisingly, PIF and Mr. Al-Rumayyan have ██████████████████████████████

23  ██████████████████████████. For example, PIF and Mr. Al-

24  Rumayyan are making efforts to ██████████████████████████████████████

25  ████████████████████████████████████████████████

26  ██████████████████████████████. *Id.*, Exs. 33–35.

27

28

III.     PERSONAL JURISDICTION

    A.     **The Court has jurisdiction over PIF under FSIA.**

        Once jurisdiction is established under a FSIA exception, personal jurisdiction is "automatic," and no further due process or minimum contacts analysis is required, *Samantar v. Yousuf,* 560 U.S. 305, 325 n.20 (2010) (citing 28 U.S.C. § 1330), which PIF does not meaningfully contest. Nor does PIF contest its burden of proving that FSIA exceptions do not apply, in light of the TOUR's evidence that they do. *See* Dkt. 147-3 ("Mot.") at 14. Accordingly, because PIF has failed to carry its burden of rebutting the TOUR's abundant evidence establishing that both the commercial activity and waiver exceptions apply—indeed, it has presented virtually no evidence at all—the Court's jurisdiction is automatic under FSIA.

        1.     **The commercial activity exception applies to PIF.**

        PIF likewise does not dispute that its creation and control of LIV are quintessential "commercial activities" under § 1605(a)(2). PIF does not contest that these commercial activities had "substantial contact with the United States." 28 U.S.C. § 1603(e). And PIF does not address the cases the TOUR cited in its motion, including *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 565 (2d Cir. 2020), where a foreign state's distribution of promotional materials in the United States subjected it to jurisdiction under the commercial activities exception, *Everard Findlay Consulting, LLC v. Republic of Surin.*, 831 F. App'x 599, 601 (2d Cir. 2020), where a foreign state's "negotiating, entering, and allegedly breaching" an agreement with a firm in the United States fell under the commercial activities exception, and *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1171 (9th Cir. 2010), where a foreign state's funding of an insurance plan in the United States fell under the exception.

        Instead, PIF argues that this lawsuit is not "based upon" its commercial activity. Dkt. 165-3 ("Opp.") at 9-10. Specifically, PIF argues that the commercial activity exception does not apply because its "conduct is not the basis of the lawsuit or counterclaim." *Id.* This argument fails as a matter of law and fact. Indeed, PIF mischaracterizes the scope of the commercial activity exception and ignores the mountain of evidence tying its conduct—both in and affecting the United States—to the claims, defenses and counterclaims in this case.

1    First, to the extent that PIF is suggesting that a foreign sovereign can only be subject to

2 jurisdiction under the commercial activity exception when the sovereign is the named defendant,

3 that is not the law. Section 1605(a)(2) requires that the relevant action—here, LIV's lawsuit and

4 the TOUR's defenses and counterclaims thereto—be "based upon" one of the three enumerated

5 categories of foreign conduct, and the case law requires "a nexus between the plaintiff's asserted

6 cause of action and the foreign state's commercial activity," *Lasheen*, 603 F.3d at 1170. But no

7 case holds that, because PIF is not the named the defendant, it can sidestep the exception to

8 sovereign immunity for commercial activity. And such a rule would make no sense: it would

9 permit a foreign agency to be sued based on its domestic commercial activity, but not compelled

10 to produce evidence when that same activity gives rise to a lawsuit between other parties.

11    None of the cases cited by PIF supports its cramped view of § 1605(a)(2), and none

12 involves the domestic commercial activity present here. *OBB Personenverkehr AG v. Sachs*, 577

13 U.S. 27, 31 (2015), involved a tort claim arising from a railway accident in Austria, where the

14 sole U.S.-based activity was the purchase of a Eurail pass. *Broidy Cap. Mgmt., LLC v. State of*

15 *Qatar*, 982 F.3d 582, 594 (9th Cir. 2020), did not involve any commercial activity; the court ruled

16 that Qatar was immune from suit because its alleged "clandestine surveillance and espionage"

17 was an exercise of sovereign power and not a commercial activity. And *Flatlow v. Islamic Rep. of*

18 *Iran*, 308 F.3d 1065 (9th Cir. 2002) did not even apply or interpret FSIA.

19    *Second*, as a matter of fact, PIF is simply wrong that its conduct "is not the basis of the

20 lawsuit or counterclaims." Opp. at 9. To start with the TOUR's counterclaims, the "core of [its]

21 suit" is that TOUR members were illegally induced to breach their contracts to play for LIV, *OBB*

22 *Personenverkehr*, 577 U.S. at 35, and it is now abundantly clear that ████████████████████

23 ████████████████████████████████████████████████████████████████████████████████. *See*

24 *supra* at Section II.B. PIF ████████████████████████████████████████████████████████

25 ████████████. Hood Decl., Ex. 1 at 3. ████████████████████████████████████████████

26 ████████████████████████████████████████████████. *Id.* Exs. 19, 36. ████████████████

27 ████████████████████████████████████████████████████████████████████████

28 ████████████████████████. *Id.* Ex. 18. Mr. Al-Rumayyan personally

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Exs. 20, 38. And PIF has supplied LIV with

2    essentially its entire capital, so of course its "funding … caused LIV to … induce golfers to

3    breach [their] contracts." Opp. at 10. Most of this conduct inducing TOUR golfers to breach their

4    contracts occurred in or was directed to the United States. Thus, just as the Welsh government

5    was not immune from a copyright suit where it "played an active role in the United States in the

6    development and distribution" of "materials that included plaintiffs' photographs," *Pablo Star*,

7    961 F.3d at 565, so too has PIF played an active role in the United States in the tortious

8    interference with the TOUR's contracts and thus cannot avoid this Court's jurisdiction.

9    Similarly, PIF's conduct is at the heart of LIV's claim that the TOUR has illegally

10   prevented it from entering the relevant markets. As shown above, every element of LIV's attempt

11   to enter the market is managed by PIF, and PIF's active role in the "funding and oversight" of

12   LIV, Opp. at 10, is directly related to the TOUR's antitrust defenses. For example, as explained in

13   the TOUR's Motion, PIF's conduct is relevant to show that LIV and its backers lack a real profit

14   motive and that PIF's abundant funding serves as a market-distorting force, not a pro-competitive

15   one. *See* Mot. at 11-13. Thus, PIF's glib assertion that the claims brought by its subsidiary LIV

16   "[have] nothing to do with PIF," Opp. at 9, could not be further from the truth, and PIF cannot

17   carry its burden to show that its commercial activities "carried on in the United States" are

18   shielded by FSIA. 28 U.S.C. § 1605(a)(2) (first clause).

19   Finally, PIF's commercial activities "outside the territory of the United States" also

20   subject it to this Court's jurisdiction because they were "in connection with a commercial activity

21   of [LIV] elsewhere" and they caused "a direct effect in the United States." 28 U.S.C. § 1605(a)(2)

22   (third clause). As the TOUR has explained, the claims, defenses and counterclaims are all tied to

23   PIF's actions, whether undertaken in New York, Riyadh, or the Bailiwick of Jersey, and those

24   actions have had a direct effect in the United States. Mot. at 15-16. For example, it was an

25   "immediate consequence of" PIF's authorization and funding of LIV player contracts, *In re*

26   *Cathode Ray Tube (CRT) Antitrust Litig.*, 2018 WL 659084, at *5 (N.D. Cal. Feb. 1, 2018), that

27   numerous TOUR players were induced to breach their TOUR contracts and were consequently

28   suspended from the TOUR—actions at the heart of this case.

1    In short, the record is so replete with evidence of PIF's involvement in the actions

2 underlying this lawsuit—whether carried out in the United States or directly affecting the United

3 States—that PIF is not entitled to immunity under the first or third clause of § 1065(a)(2).

4                        **2.    The waiver exception applies to PIF.**

5    The waiver exception applies wherever a foreign instrumentality "has waived its

6 immunity either explicitly ***or by implication***." 28 U.S.C. § 1605(a)(1) (emphasis added).

7 Canonical examples of implied waiver include "cases where a foreign state has agreed to

8 arbitration in another country" and "where a foreign state has agreed that the law of a particular

9 country should govern a contract." *Smith v. Soc. People's Libyan Arab Jamahiriya*, 101 F.3d 239,

10 243 (2d Cir. 1996) (quoting H.R. Rep. No. 94–1487, at 18 (1976)). In fact, "seeking affirmative

11 relief from the Court is the paradigm of" a waiver of a personal jurisdiction defense. *Andros*

12 *Compania Maritima, S.A. v. Intertanker Ltd.*, 718 F. Supp. 1215, 1217 (S.D.N.Y. 1989). These

13 examples demonstrate that a "subjective or objectively reasonable intent" to waive is not required

14 to find waiver. *Id.* Rather, courts must "hold a foreign state to an implied waiver of sovereign

15 immunity by the state's ***actions in relation to the conduct of litigation***." *Id.* (emphasis added).

16    The TOUR has presented abundant evidence that PIF and Mr. Al-Rumayyan "agreed to"

17 litigate in the United States. *Smith*, 101 F.3d at 243. ██████████████████████████

18 ██████████████████████ which is affected by this lawsuit, are documented at great length.

19 *See supra*, Section II.A, B; *see also* Dkt. 147-9. To rebut this evidence, PIF has offered nothing

20 more than artfully worded and self-serving statements contradicted by the evidence. For example,

21 LIV's CFO Tim Taylor writes that "PIF's ***Board*** does not approve LIV's budget or budget

22 changes," Taylor Decl. at ¶ 2, Dkt. 166-6 (emphasis added), but the TOUR's assertions that PIF

23 controls LIV are not limited to PIF's "board." In fact, LIV's documents show unambiguously that

24 ████████████████████████ Hood Decl. Ex. 18 (██████████████████████████████

25 ████████████████████████). Moreover, Mr. Taylor's assertion that "LIV

26 decided to enter this lawsuit. PIF did not direct the decision," Taylor Decl. at ¶ 2, is beside the

27 point. PIF could well have "agreed to" the filing of this lawsuit without "direct[ing]" it.

28

At minimum, the TOUR has presented "a colorable factual dispute" under FSIA's waiver exception, which is sufficient to order jurisdictional discovery into whether PIF agreed to U.S. litigation. *Funk v. Belneftekhim*, 861 F.3d 354, 367 (2d Cir. 2017). This is particularly true where PIF has put its own decision making about this lawsuit in contention. *See* Taylor Decl. ¶ 2.

## B.   PIF and Al-Rumayyan have minimum contacts with the U.S.

PIF and Mr. Al-Rumayyan concede that the "minimum contacts" test for specific personal jurisdiction is satisfied when an individual or entity (1) "purposefully direct[s] his activities or consummate[s] some transaction with the forum *or resident thereof*; or perform[s] some act by which he purposefully avails himself of the privilege of conducting activities in the forum," (2) the claim "arises out of or *relates to* [the] forum-related activities," and (3) the exercise of jurisdiction is reasonable. *LNS Enter. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022) (emphasis added). PIF and Mr. Al-Rumayyan also concede that the entire United States is the relevant forum for assessing minimum contacts in this antitrust case. Opp. at 13.

As explained above, jurisdiction over PIF is "automatic" under FSIA, but as set out here, such jurisdiction also comports with the due process and minimum contacts analysis. Both PIF and Mr. Al-Rumayyan have purposefully directed activities—through their direct contacts and under an agency theory—and engaged in transactions with "resident[s]" of the United States that "relate[]" to the litigation. And the exercise of jurisdiction here is reasonable because the need for discovery outweighs PIF and Mr. Al-Rumayyan's overstated concerns about comity.

### 1.   PIF and Al-Rumayyan's U.S. contacts "relate to" this litigation.

PIF's and Mr. Al-Rumayyan's abundant contacts with the United States relate directly to the claims in this case. *First*, their purposeful contacts and transactions relate to the TOUR's counterclaims that LIV induced TOUR members to breach their contracts with the TOUR and to LIV's claim that the TOUR's alleged monopsony "has depressed professional golfer wages." *See* Dkt. 83 ¶ 293; Dkt. 108. PIF and Mr. Al-Rumayyan have repeatedly and personally negotiated with ███████████████████ in the United States. *See, e.g.*, Hood Decl., Exs. 1 at 3 (explaining that PIF ████████████████████████████████████████████ 20 (message from Mr. Al-Rumayyan to ████████████████████

1   [REDACTED]

2   [REDACTED]; 14 (Mr. Al-

3   Rumayyan meeting personally with players' lawyers). Mr. Al-Rumayyan's [REDACTED]

4   [REDACTED] sparked LIV's (false) allegations in this

5   litigation that Commissioner Monahan threatened TOUR members in the United States who

6   signed with LIV. *See* Hood Decl., Exs. 18; 39; 4; Dkt. 83 ¶ 166. And Mr. Al-Rumayyan

7   specifically used [REDACTED]

8   [REDACTED] to recruit [REDACTED]

9   [REDACTED] to contract with LIV. *See id*., Exs. 17; 38.

10   *Second*, PIF purposefully engaged U.S. entities to perform business-modeling, public-

11   relations and lobbying work directly related to the issues in this case. [REDACTED] helped develop

12   LIV's strategy for breaking into the market for elite professional golf events. *See* Hood Decl.,

13   Exs. 25 & 24. PIF contracted with the New York firm Teneo to influence the American public to

14   "fully appreciate PIF's current and future contributions to society" and to "[REDACTED]

15   [REDACTED] including by [REDACTED]

16   [REDACTED] in the United States. *See* Hood Decl., Exs. 40 at 8; 5; 26 at 4; 27–30. PIF's Teneo

17   contacts are particularly relevant to PIF's attempt at "sportswashing," which is central to the

18   TOUR's defenses that the prices paid to LIV players are untethered to competitive pricing and

19   that Saudi Arabia's reputation—not anticompetitive conduct—is the reason why sponsors,

20   broadcasters and others have distanced themselves from LIV. *See* Hood Decl., Ex. 1 at 4 (internal

21   PIF document explaining that the "investment [in LIV] fits with PIF's strategic goal of being . . .

22   a leader in creating positive and innovative change within the sports industry, a point of focus for

23   the Kingdom's Vision 2030"); Dkt. 108 at 54; Dkt. 50 at 5–7, 16.

24   These facts distinguish this case from *Walden v. Fiore*, cited by PIF and Mr. Al-

25   Rumayyan. 571 U.S. 277 (2014). They do not just have "random, fortuitous, or attenuated

26   contacts" with residents of the United States. *Id.* at 286 (cleaned up). Instead, they "purposefully

27   reached out" by "entering … contractual relationship[s]" with numerous U.S. parties "that

28   envisioned continuing and wide-reaching contacts" in the United States. *Id*. at 285 (cleaned up).

*Third*, PIF and Mr. Al-Rumayyan have negotiated on behalf of LIV with U.S. sponsors, broadcasters, and advertisers, which is relevant to LIV's claim that the TOUR prevented LIV "from contracting with agencies, vendors, sponsors, advertisers and players needed to offer an elite professional golf entertainment product." *See* Dkt. 83 ¶¶ 314, 322, 333. Mr. Al-Rumayyan has been personally involved in these negotiations. *See, e.g.*, Hood Decl., Exs. 21–23. And PIF has leveraged its tens of billions of dollars of investments in U.S. companies—managed through its New York office—███████████████. *See id.*, Exs. 33–35. Because Mr. Al-Rumayyan and PIF have communicated directly with these U.S. parties—without LIV—their contacts have created unique evidence relevant to LIV's allegations.

*Finally*, PIF and Mr. Al-Rumayyan have sent hundreds of emails into the United States, *Id.*. ¶ 42, and, according to LIV, "[i]t is well-established that communications with a forum state are sufficient to establish personal jurisdiction," *Id*. Ex. 43 at 17 n.6.

## 2.    PIF and Al-Rumayyan are agents of LIV.

The Court also has personal jurisdiction over PIF and Mr. Al-Rumayyan through their relationship with LIV—a Delaware corporation based in New York City—under an agency theory because PIF has exerted "parental control of [LIV's] internal affairs or daily operations." *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001). To determine whether an agency relationship exists, courts consider whether a parent negotiated on the subsidiary's behalf with businesses and was "involved in advertising-, marketing-, and business-based decisions." *See In re Hydroxycut Mktg. & Sales Pract. Litig.*, 810 F.Supp.2d 1100, 1119–21 (S.D. Cal. 2011).

The agency test is easily satisfied here for PIF and Mr. Al-Rumayyan. Mr. Al-Rumayyan has acted as the "supervisor of [LIV's] CEO and approved day-to-day matters related to [LIV's] business, including the . . . employment terms of [LIV players], the contract terms with [LIV's] suppliers [agents, sponsors, broadcasters]" and ██████████████████████████ ███████. *In re Packaged Seafood Prod. Antitrust Litig.*, 277 F. Supp. 3d 1167, 1190 (S.D. Cal. 2017); *see, e.g.*, Hood Decl., Exs. 1 at 12 (████████████████████████ 7 (██ ██████████████; 3 (██████████████████████████████████████ ████████████ 4 (████████████████████████████████); 6 (██

1   ██████████████████████████████████████████); 12 (████████████████

2   █████████████████████); 5 (████████████████████); 44 ("███████████████████).

3        Indeed, Mr. Al-Rumayyan has directed everything from LIV's ████████

4   ██████████████████████████████████████████████████████████████████

5   Hood Decl., Exs. 36; 19; 8; 10; 11. The Court can thus exercise personal jurisdiction over PIF and

6   Mr. Al-Rumayyan through their agency relationship with LIV.

7             **3.**       **The exercise of personal jurisdiction is reasonable**.

8        PIF and Mr. Al-Rumayyan concerns about comity are dramatically overstated. PIF and

9   Mr. Al-Rumayyan argue that it would be unfair to subject them to personal jurisdiction "based on

10   typical 'investor' activities." Opp. at 16. In fact, the opposite is true. It would be unfair to allow

11   PIF and Mr. Al-Rumayyan to manage LIV's day-to-day affairs, recruit TOUR members for LIV

12   and induce them to breach their contracts with the TOUR, negotiate with sponsors and

13   broadcasters on LIV's behalf, and work with LIV and its lawyers to orchestrate this litigation, but

14   then hide critical evidence from the TOUR behind the veil of international comity. Having made

15   the business determination to effectuate "Project Wedge" by directing their commercial activities

16   to the United States knowing full well that such activity would result in litigation, PIF and Mr.

17   Al-Rumayyan cannot now invoke comity as a shield from discovery.

18        Moreover, the Court's interest in enforcing the subpoenas outweighs any concerns about

19   the Saudi laws cited by PIF and Mr. Al-Rumayyan because the "information [the TOUR seeks] is

20   vital to the litigation and cannot be obtained elsewhere." *See Richmark Corp. v. Timber Falling*

21   *Consultants*, 959 F.2d 1468, 1475, 1477 (enforcing the discovery order despite foreign secrecy

22   laws because the United States has a "vital" interest in "vindicating the rights of" the U.S.

23   parties). As a threshold matter, PIF and Mr. Al-Rumayyan have failed to demonstrate that

24   providing discovery in this case would actually violate ***any*** of the Saudi laws they cite. *See* Dkt.

25   166-4 ¶ 11 (Mr. Al-Rumayyan's statement that "producing documents or providing testimony in

26   response to the Subpoena ***could*** violate the laws discussed.") (emphasis added). Even if they had

27   made such a showing, "the balance [still] tips significantly" in favor of enforcing the subpoenas

28   because PIF "undertook an obligation to comply with the lawful orders of United States courts"

1   when it "availed itself of business opportunities in this country." *Richmark Corp.*, 959 F.2d at

2   1478–79. Just like in *Richmark*, PIF and Mr. Al-Rumayyan have "routinely disclosed" the

3   information that the TOUR is seeking to outside consultants and others, yet neither the Kingdom

4   of Saudi Arabia nor PIF had "express[ed] interest in the confidentiality of this information prior

5   to the litigation in question." *See id.* at 1476. Finally, the fact that PIF and Mr. Al-Rumayyan

6   claim to have represented "time and again that they were willing to voluntarily provide

7   appropriate discovery," *see* Opp. at 1, demonstrates that complying with the subpoenas does not,

8   in fact, present any legitimate comity concern or breach Saudi law.

9            **C.      PIF and Al-Rumayyan are subject to tag jurisdiction.**

10           PIF and Mr. Al-Rumayyan contend that tag jurisdiction does not apply because they were

11   not served "while physically present" in the United States. Opp. at 16. But each agreed to treat the

12   service of the subpoenas as if a copy had been "personally delivered" to them "in the United

13   States." Dooley Decl., Ex. 5 (Dkt 142-2 at 18). In other words—they agreed to be treated as

14   "nonresidents who are physically present in the" United States. *Burnham v. Sup. Ct. of Cal., Cnty.

15   of Marin*, 495 U.S. 604, 610 (1990). This is all that tag jurisdiction requires. Indeed, tag

16   jurisdiction over non-natural persons such as PIF is not only a permitted means of establishing

17   personal jurisdiction but a "venerable one." *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d

18   16, 20 (2d Cir. 1998) (holding that organization "should have known" that sending one of its

19   members to a New York "was risking exposure to personal jurisdiction in New York.").

20           **D.      Al-Rumayyan is not protected by common law immunity.**

21           Common law foreign official immunity contains the same commercial activity exception

22   as § 1605(a)(2) of FSIA. "When a state enters the marketplace seeking customers it divests itself

23   of its Quasi sovereignty Pro tanto." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S.

24   682, 696 (1976) (cleaned up) (denying immunity under the common law commercial activity

25   exception); *see also Republic of Phil. v. Marcos*, 806 F.2d 344, 359 (2d Cir. 1986) (same). Mr.

26   Al-Rumayyan's argument to the contrary mischaracterizes the case law and relevant history. His

27   own authority explains that the "1952 letter," Opp. at 12, n.5, is a U.S. policy document adopting

28   the "restrictive" theory of common law sovereign immunity—pursuant to which immunity does

15

not extend to commercial acts—later codified in § 1605(a)(2). *Wye Oak Tech., Inc. v. Republic of Iraq,* 24 F.4th 686, 691 (D.C. Cir. 2022); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487 (1983). Thus, for the very same reasons that PIF's commercial activities preclude sovereign immunity under FSIA, so too do Mr. Al-Rumayyan's commercial activities preclude the application of common law immunity.

Mr. Al-Rumayyan's assertions that the subpoenas seek information related to his "official capacity," Opp. at 11, are self-serving, unsupported by even a declaration cite, and in direct contradiction to the record in this case. Mr. Al-Rumayyan ***sits on the board of LIV's parent company***, Hood Decl. Ex. 37, and is the ***"Chairman of the Board and the CEO & Commissioner" for the LIV Invitational Series***, Dkt. 89-2 at 11. By his own admission, actions taken with respect to LIV are in his capacity as a board member. Mr. Al-Rumayyan declares that PIF employees "represent PIF on the Board and Board Committees of LIV Golf Investments Ltd. and LIV Golf Holdings Ltd." where they are "responsible for managing and monitoring investment in LIV Golf Investments Ltd." Dkt. 166-4; *see also* Hood Decl. Ex.1 at 12 (▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The management of a golf series and U.S. portfolio company by a parent company board member is not an official act of the Kingdom of Saudi Arabia. *Alfred Dunhill of London, Inc*., 425 U.S. at 697–98 ("we are in no sense compelled to recognize as an act of state the purely commercial conduct of foreign governments").

Mr. Al-Rumayyan cites no case in which a foreign official was found immune when engaging in such commercial activity. Rather, the cases on which he relies involve unmistakable and quintessential acts of state. *Dogan v. Barak*, 932 F.3d 888 (9th Cir. 2019) (foreign official's work in overseas military operation); *In re Terrorist Attacks on Sept. 11*, *2001*, 122 F. Supp. 3d 181, 189 (S.D.N.Y. 2015) (Saudi charity official's alleged funding of Al Qaida); *Wultz v. Bank of China Ltd*., 32 F. Supp. 3d 486, 490 (S.D.N.Y. 2014) (national security official's anti-terrorism investigation); *Giraldo v. Drummond Co., Inc*., 808 F. Supp. 2d 247, 249 (D.D.C. 2011) (former head of state's involvement with paramilitary group); *Rosasen v. Kingdom of Nor.*, 2022 WL 409679, at *1 (C.D. Cal. Feb. 10, 2022) (foreign child services officials' relocation of children).

## IV.  SERVICE WAS PROPER

### A.  The TOUR has tendered witness fees.

Although the TOUR had no obligation to tender witness fees because counsel for PIF and Mr. Al-Rumayyan had already agreed to accept service of the subpoenas, the TOUR has since tendered reasonable fees in accordance with Rule 45(b)(1) to provide for the deposition appearances of Mr. Al-Rumayyan and a PIF representative. *See* Hood Decl., Ex. 42.

### B.  PIF and Al-Rumayyan regularly transact business in New York City.

It is beyond legitimate dispute that PIF and Mr. Al-Rumayyan "regularly transact[] business in person" within 100 miles of New York City, Fed. R. Civ. P. 45(c), given PIF's New York office and Mr. Al-Rumayyan's frequent trips to New York City on PIF business. Indeed, the PIF offices alone establish compliance with Rule 45(c). *Wultz v. Bank of China Ltd.*, 298 F.R.D. 91, 98–99 (S.D.N.Y. 2014) (denying a motion to quash because the foreign non-party witness had a branch office in New York). Further, Mr. Al-Rumayyan has admitted taking "nine trips to or within 100-miles of New York City since January 1, 2021, for a total of thirty-four days." Dkt. 166-5 ¶ 6. And he likely took these trips with even greater frequency in prior years—before the pandemic's travel restrictions and the opening of PIF's New York City office. Indeed, when asked in September 2020 whether he "come[s] to New York often," he responded, "our portfolio companies are [in New York and the United States], so I do go *quite often*." Hood Decl., Ex. 41 (emphasis added). These frequent visits far exceed the Rule 45(c) standard. *See Sullivan v. PJ United, Inc.*, 2017 WL 11675693, at *4 (N.D. Ala. Dec. 15, 2017) (twenty-three business days in a year); *Halliburton Energy Servs., Inc. v. M-I, LLC*, 2006 WL 2663948, at *2 (S.D. Tex. Sept. 15, 2006) (four ten-day visits per year "clearly" met the requirement). Moreover, PIF regularly transacts business on New York City's stock exchanges, having invested more than $40 billion in 50 companies publicly traded in the United States. *See* Mot. at 8.

## V.  THE TOUR'S SUBPOENAS SEEK RELEVANT DISCOVERY

### A.  The subpoenas seek relevant discovery in PIF and Al-Rumayyan's control.

PIF and Mr. Al-Rumayyan do not seriously dispute the relevance of the TOUR's requests. This is unsurprising as LIV—represented by the same counsel—conceded the relevance of

1  discovery from PIF and Mr. Al-Rumayyan by assuring the Court that it would facilitate such

2  discovery, Dooley Decl. Ex. 4 (Dkt. 148-2 at 11), and by agreeing to produce its own documents

3  related to PIF and Mr. Al-Rumayyan without objection, Dooley Decl. Ex. 49 (Dkt. 148-6 at 69).

4         Indeed, PIF and Mr. Al-Rumayyan fail to engage with the TOUR's arguments regarding

5  relevance. The TOUR explained that PIF and Mr. Al-Rumayyan's reasons for backing LIV and

6  the venture's financial projections are relevant to whether LIV's golfer contracts reflect

7  competitive pricing. *Id*. at 11. The TOUR further explained that PIF's communications with golf

8  tours, broadcasters, advertisers, sponsors, and vendors are relevant to LIV's claim that the TOUR

9  conspired to keep LIV out of the "golf ecosystem," and how PIF's communications with

10  professional golfers are relevant to the TOUR's tortious interference counterclaims. *Id*. at 12. PIF

11  and Mr. Al-Rumayyan do not even attempt to deny the relevance of these or the other categories

12  the TOUR set forth. Instead, they lump together the TOUR's requests and claim they are

13  irrelevant because they focus on "the internal workings of PIF." Opp. at 21-22. This hand waving

14  does not refute, the relevance of the TOUR's requests.

15         The same is true of PIF and Mr. Al-Rumayyan's arguments that discovery related to

16  criticism of PIF, LIV, or the Kingdom of Saudi Arabia is not relevant because the TOUR's fear of

17  reputational harm "is premised solely on the Tour's knowledge." *Id*. at 22. Such information is

18  directly relevant, as it substantiates the pro-competitive justification behind the TOUR's

19  enforcement of its regulations. Finally, PIF and Mr. Al-Rumayyan's claim that discovery

20  regarding Golf Saudi is irrelevant because PIF "has no relationship with… Golf Saudi" is simply

21  false. *Id*. Documents produced by LIV show that PIF was working with Golf Saudi to develop a

22  new golf league before launching LIV. *See, e.g.*, Hood Decl. Ex.1 at 3 ("████████████████

23  ████████████████████████████████████████████████████████████████

24  ████████████████████████████████████").

25         PIF and Mr. Al-Rumayyan also claim that the discovery sought can be obtained from

26  other sources, such as LIV itself. Not so. The information the TOUR seeks is exclusively in the

27  possession of PIF or Mr. Al-Rumayyan. Mot. at 11-13. For example, the TOUR is entitled to

28  discovery of PIF and Mr. Al-Rumayyan's communications with professional golfers, other golf

tours, broadcasters, sponsors, vendors and advertisers. This information is in PIF's, not LIV's, control. Likewise, documents produced thus far confirm PIF's involvement with the Premier Golf League ("PGL"), as do allegations in the Complaint. *See, e.g.,* Hood Decl. Ex. 1 at 3; Compl. ¶ 78 ("PGL was a venture involving … the Public Investment Fund of Saudi Arabia."). Evidence regarding PIF's involvement with the PGL and the true reason for the PGL's collapse, is within PIF's control, and the TOUR is entitled to that evidence.

**B.      PIF and Al-Rumayyan would not be burdened by the TOUR's discovery.**

PIF and Mr. Al-Rumayyan's alleged burdens do not warrant quashing the subpoena. "Just because complying with a discovery request will involve expense or may be time consuming, does not make it unduly burdensome." *See Cancino v. McAleehan*, 2020 WL 1332485 at *6 (S.D. Cal. Mar. 20, 2020). Even taking PIF and Mr. Al-Rumayyan at their word regarding the cost of compliance, it strains credulity that a document collection costing "tens of thousands of dollars" would pose an extraordinary financial burden to a sovereign wealth fund with $646 billion in assets that has already put more than $2 billion into LIV. Opp. at 18. Further, their claim that they are unprepared for discovery is belied by their assertion that they offered to engage in voluntary disclosures. Indeed, PIF and Mr. Al-Rumayyan have been aware that the TOUR intended to seek discovery since August, when counsel they share with LIV told the Court that such discovery would go "swimmingly." Their burden argument is hollow.

So too are PIF and Mr. Al-Rumayyan's complaints that the TOUR's requests are overbroad and call for "confidential and competitively sensitive information." Their breadth objection is plainly make-weight. Their real position, as reflected in the TOUR's discussions with their counsel and in their brief, is that they are not required to produce *anything* or testify on *any topic*. If PIF or Mr. Al-Rumayyan was truly concerned about the breadth of the TOUR's subpoenas, they would have offered to produce a narrower range of documents and testify on a narrower set of topics, which they never did. Moreover, the TOUR's requests are reasonable given PIF and Mr. Al-Rumayyan's central role in this litigation. Their confidentiality objection, to the extent there is anything to it, is easily addressed by the Protective Order in the case

## C.      PIF and Al-Rumayyan never offered to produce documents voluntarily.

Finally, PIF and Mr. Al-Rumayyan's suggestion that the Court should deny the TOUR's Motion because they gestured in the direction of voluntary disclosure is baseless. PIF and Mr. Al-Rumayyan never actually offered to produce any document or testify on any topic voluntarily despite the opportunity to do so during the parties' meet-and-confer call and in the parties' correspondence, *see, e.g.*, Teruya Decl., Ex. 2 (Dkt. 166-3). Nor does their brief provide a single example of a document, much less a category of documents, they are willing to produce. Their "offer[s] to engage in voluntary disclosure" are meaningless; they offered nothing.

Regardless, the "voluntary disclosure" contemplated by PIF and Mr. Al-Rumayyan is unacceptable. Without a way to compel them to produce documents or testify, PIF and Mr. Al-Rumayyan would be free to pick and choose which documents to produce and on which topics to testify (if they agreed to testify at all). The TOUR's requests would not be a means to obtain relevant evidence, but rather an opportunity for PIF and Mr. Al-Rumayyan to bolster LIV's case and hiding evidence helpful to the TOUR by cherry picking documents and information they deemed favorable. It is thus no surprise that PIF and Mr. Al-Rumayyan do not cite a single case holding that a party must accept voluntary disclosures in lieu of an enforceable subpoena.

## VI.      CONCLUSION

For the foregoing reasons, the Court should grant the TOUR's Motion to Compel and deny PIF and Mr. Al-Rumayyan's Motion to Quash.


Dated:  December 2, 2022                          KEKER, VAN NEST & PETERS LLP


                                          By:    /s/ *Elliot R. Peters*
                                                 ELLIOT R. PETERS
                                                 DAVID SILBERT
                                                 R. ADAM LAURIDSEN
                                                 NICHOLAS S. GOLDBERG
                                                 SOPHIE HOOD

                                                 Attorneys for Defendant
                                                 PGA TOUR, INC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

ANTHONY J. DREYER
PATRICK FITZGERALD
KAREN M. LENT
MATTHEW M. MARTINO

Attorneys for Defendant
PGA TOUR, INC.